# ORIGINAL

THOMAS L. SANSONETTI
Assistant Attorney General
Environment & Natural Resources Division
ROBERT MULLANEY
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, CA 94105
Tel: (415) 744-6483
Fax: (415) 744-6476

LEONARDO M. RAPADAS
United States Attorney
MIKEL SCHWAB
Assistant United States Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez
Hagåtña, Guam 96910
Tel: (671) 472-7332
Fax: (671) 472-7215

Attorneys for United States of America

FILED
DISTRICT COURT OF GUAM

FEB 02 2004

MARY L. M. MORAN
CLERK OF COURT

48

## IN THE UNITED STATES DISTRICT COURT

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CIVIL CASE NO. 02-00022 |
| ) | |
| Plaintiff, ) | |
| ) | MEMORANDUM IN SUPPORT OF |
| vs. ) | MOTION TO ENTER CONSENT |
| ) | DECREE |
| ) | |
| GOVERNMENT OF GUAM, ) | Date: February 11, 2004 |
| ) | Time: 9:00 a.m. |
| Defendant. ) | |
| ───────────────────────────── ) | |

I.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 2 -

     A.   Clean Water Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 2 -

     B.   The Ordot Dump . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -

     C.   EPA's Administrative Actions Involving the Ordot Dump . . . . . . . . . . . . . . - 4 -

          1.   EPA's CERCLA Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

          2.   EPA's Clean Water Act Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

II.  THE COMPLAINT AND CONSENT DECREE . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -

     A.   Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -

     B.   Consent Decree . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 6 -

III. STANDARD OF REVIEW FOR ENTRY OF A PROPOSED
     CONSENT DECREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -

IV.  THE CONSENT DECREE IS FAIR, REASONABLE, AND
     CONSISTENT WITH THE PURPOSES OF THE CLEAN WATER ACT . . . . . . . . - 8 -

     A.   The Consent Decree is Procedurally and Substantively Fair . . . . . . . . . . . . . - 8 -

     B.   The Consent Decree is Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 9 -

     C.   The Consent Decree is in the Public Interest and Consistent with
          the Purpose of the Clean Water Act . . . . . . . . . . . . . . . . . . . . . . . . . . . - 10 -

V.   THE COMMENTS ABOUT THE PROPOSED CONSENT DECREE DO NOT
     PROVIDE A BASIS FOR REJECTING THE SETTLEMENT   . . . . . . . . . . . . . - 11 -

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 16 -

## TABLE OF AUTHORITIES

### FEDERAL CASES

Ahern v. Central Pacific Freight Lines, 846 F.2d 47, 48 (9th Cir. 1988) . . . . . . . . . . . . . . . - 7 -

Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983) . . . . . . . . . . . - 8 -

Officers for Justice v. Civil Serv. Comm'n , 688 F.2d 615, 630 (9th Cir. 1982) . . . . . . . . . . - 8 -

SEC v. Randolph, 736 F.2d 525, 528 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -

Sierra Club v. Coca-Cola Corp., 673 F. Supp. 1555, 1556 (M.D. Fla. 1987) . . . . . . . . . . . . - 10 -

Sierra Club, Inc. v. Electronic Controls Design, Inc., 909 F.2d 1350, 1355 (9th Cir. 1990) . . - 7 -

United States v. Akzo Coatings of Am. Inc., 949 F.2d 1409, 1436 (6th Cir. 1991) . . . . . . . . - 7 -

United States v. BP Exploration & Oil Co., 167 F. Supp. 2d 1045, 1051 (N.D. Ind. 2001) . . - 8 -

United States v. Bechtel Corp., 648 F.2d 660, 666 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . - 7 -

United States v. Cannons Eng'g Corp., 899 F.2d 79, 84, 86 (1st Cir. 1990) . . . . . . . . . . . - 7 -, -8-

United States v. Microsoft Corp., 56 F.3d 1448, 1460 (D.C. Cir. 1995) . . . . . . . . . . . . . . . - 10 -

United States v. Montrose Chemical Corp. of California, 50 F.3d 741, 746 (9th Cir. 1995) . . - 7 -

United States v. State of Oregon, 913 F.2d 576, 580 (9th Cir. 1990) . . . . . . . . . . . . . . . - 7 -, - 8 -

1    <u>United States v. Telluride Co.</u>, 849 F. Supp. 1400, 1402 (D. Colo. 1994) . . . . . . . . . . - 9 -, - 10 -

3                              <u>FEDERAL STATUTES</u>

4    33 U.S.C. § 1251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 2 -

6    33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -

8    33 U.S.C. § 1319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 2 -, -3-

10    33 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -

12                            <u>GUAM STATUTES</u>

13    10 G.C.A. § 51101(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

14                          <u>FEDERAL REGULATIONS</u>

15    40 C.F.R. §§ 19.2, 19.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 3 -

17    68 Fed. Reg. 70,533 (Dec. 18, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 2 -

- iv -

1    On August 7, 2002, the United States filed a Complaint in this case under Section 309 of

2    the Clean Water Act (the "Act" or "CWA"), 33 U.S.C. § 1319, alleging that the Government of

3    Guam ("GovGuam") violated the Act by: (1) discharging pollutants from the Ordot Dump to

4    waters of the United States without a National Pollutant Discharge Elimination System

5    ("NPDES") permit; and (2) violating the terms of an Order from the U.S. Environmental

6    Protection Agency ("EPA"), requiring GovGuam to eliminate the unpermitted discharges. The

7    United States sought both injunctive relief and civil penalties to address the violations of the Act.

8        The United States lodged a proposed Consent Decree, which had been fully signed by the

9    parties, with the Court on December 3, 2003. After lodging the Consent Decree, the United

10   States published notice of the Consent Decree in the Federal Register and requested public

11   comment on the proposed Decree for a period of thirty days. See 68 Fed. Reg. 70,533 (Dec. 18,

12   2003).[1]/ During the 30-day public comment period, the United States received a comment letter

13   from the law firm of Calvo and Clark, LLP, counsel to Guam Resource Recovery Partners, and a

14   comment letter from a citizens' group called "Concerned Citizens to Close Ordot," expressing

15   objections to the proposed Decree.[2]/

16       The United States has carefully considered these comment letters. After this review, the

17   United States has concluded that none of the comments raised issues that would cause the United

18   States to withdraw its consent to the Consent Decree. The United States continues to regard the

19   Consent Decree as fair, reasonable, and consistent with the purposes of the Clean Water Act.

20   Therefore, the United States respectfully moves this Court to approve, sign, and enter the

21   Consent Decree that was lodged with the Court on December 3, 2003.

22   **I.    BACKGROUND**

23       A.    Clean Water Act

24       The objective of the Clean Water Act is to restore and maintain the chemical, physical,

25   and biological integrity of the Nation's waters. 33 U.S.C. § 1251(a). In order to achieve this

26   _____

27   [1]/    A copy of the Federal Register notice is included as Exhibit 1 to this Memorandum.

28   [2]/    The comment letters are included as Exhibit 2 to this Memorandum.

- 1 -

objective, CWA Section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants into waters of the United States by any persons except as authorized by, and in compliance with, specific sections of the Act. Pursuant to CWA Section 402, 33 U.S.C. § 1342, EPA may issue an NPDES permit to authorize discharges of pollutants into waters of the United States. Such discharges are subject to the conditions and limitations set forth in the NPDES permit.

EPA has broad authority under CWA Section 309(a), 33 U.S.C. § 1319(a), to issue compliance orders to persons whenever EPA finds that a person has violated Section 301 of the Act. In addition, Section 309(b) authorizes EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, against any person who violates CWA Section 301 and for any violation for which EPA is authorized to issue a compliance order. Pursuant to CWA Section 309(d), 33 U.S.C. § 1319(d), any person who violates CWA Section 301 or an order issued by EPA under Section 309(a) is subject to civil penalties not to exceed $25,000 per day for each violation that occurred on or before January 30, 1997. The maximum civil penalty has been increased to $27,500 per day per violation for violations after January 30, 1997. 40 C.F.R. §§ 19.2, 19.4.

B.   The Ordot Dump

GovGuam owns and operates the Ordot Dump, which is located on high ground north of the Lonfit River.[3]/ Because the Dump is unlined on its bottom and uncapped at its top, it acts like a sponge, retaining rain water and releasing it after it has percolated through the landfill and absorbed contaminants. As a direct result of these conditions, the Ordot Dump has discharged, and continues to discharge, leachate into the Lonfit River along the surface of the ground via two streams.

In addition, there have been a series of major fires at the Ordot Dump in 1998, 2000, 2002, and 2003. Smoke from Dump fires has caused the temporary evacuation of residents in the nearby village of Ordot. Odors and vectors (rats, flies, and mosquitoes) have also been serious

---

[3]/   The Lonfit River merges with the Sigua River to form the Pago River and then drains into Pago Bay and the Pacific Ocean.

1   and constant problems. Both the residents of Guam and individual agencies of GovGuam have

2   expressed their frustration and lack of ability to get the Ordot Dump closed and a new sanitary

3   landfill opened.

4         The Ordot Dump serves Guam's civilian population of about 115,000 and currently

5   receives about 255 tons of municipal solid waste per day. It is the only municipal landfill on the

6   Island of Guam and is already filled beyond capacity. The Guam Legislature has attempted to

7   address the landfill issue, including setting deadlines for closure of the Ordot Dump. However,

8   GovGuam has not been able to come up with a political consensus or the funding required for

9   closure. Thus, the Dump remains open, leachate discharges continue, and the Dump remains a

10  public nuisance.

11        C.    EPA's Administrative Actions Involving the Ordot Dump

12              1.    EPA's CERCLA Investigation

13        On June 1, 1982, EPA Region 9 approved a "formal investigation" of the Ordot Dump

14  under the Comprehensive Environmental Response, Compensation, and Liability Act

15  ("CERCLA"). The Ordot Dump was included on the original National Priorities List. In a 1988

16  Record of Decision, EPA decided to take no further action under CERCLA to address the Dump.

17  EPA concluded that "applying standard operation practices to control landfill leachate to

18  receiving waters" and "improved leachate control measures consisting of capping and surface

19  water control" could be implemented through enforcement of EPA's 1986 Order under the

20  CWA. (See Section C.2. below.)

21              2.    EPA's Clean Water Act Actions

22        EPA issued administrative Orders under the CWA against GovGuam in both 1986 and

23  1990. The 1986 EPA Order required GovGuam to submit a detailed compliance plan by May 1,

24  1986, assess landfill operations by June 15, 1986, assess past discharges by May 1, 1986, and

25  cease the discharges by May 1, 1987.

26        Despite the administrative Order, GovGuam continued to discharge and violated other

27  provisions of the 1986 Order. EPA filed an administrative complaint against GovGuam in 1989

28  for the discharge of untreated leachate from the Dump and settled the case in May 1990.

- 3 -

1  GovGuam paid a civil penalty of $15,000 and performed a $40,000 Supplemental Environmental
2  Project ("SEP").[4/]

3      EPA issued another administrative Order pursuant to the CWA in July 1990, requiring
4  GovGuam to cover the Ordot Dump to prevent discharges by June 30, 1992, and to submit plans
5  for capping and for the continued operations for the remaining life of the landfill. The 1990
6  Order did not explicitly require closure. In February 1991, EPA approved an extension of the
7  cover deadline to August 15, 1992. That deadline was missed and the capping was never done.

8      In April 1997, EPA amended the 1990 Order to require, by July 9, 1997, a schedule for
9  the design of a cover system to eliminate the untreated leachate discharges. GovGuam submitted
10 a proposed schedule. In September 1997, EPA rejected the schedule because it lacked funding
11 commitments to make the plan credible. GovGuam has continued to fail to comply with the
12 amended 1990 Order.

13 **II.    THE COMPLAINT AND CONSENT DECREE**

14      A.    Complaint

15      On August 7, 2002, the United States filed a Complaint against GovGuam under the Act.
16 The Complaint alleged that: (1) GovGuam does not have a permit from EPA authorizing the
17 discharge of any pollutant from the Ordot Dump to waters of the United States; (2) from at least
18 1988 to the present, GovGuam has routinely discharged untreated leachate from the Ordot Dump
19 into the Lonfit River and two of its tributaries; (3) leachate is a pollutant under the Act; (4) the
20 Lonfit River and its tributaries are waters of the United States; and (5) the Ordot Dump and the
21 earthen channels, gullies, trenches, and ditches that carry leachate to the Lonfit River's tributaries
22 are point sources under the Act. The United States also alleged that, in response to EPA's
23 administrative Order, GovGuam failed to submit a compliance schedule that contained an
24 unconditional source of funding and failed to construct a closure system at the Ordot Dump. The

25 _____

26 [4/]    EPA's policy defines a Supplemental Environmental Project ("SEP") as an environmentally
    beneficial project that a defendant undertakes in settlement of an enforcement action. In order to
27 qualify under EPA's policy, the project must be one that the defendant is not otherwise legally
    obligated to perform. The costs incurred by the defendant in performing the SEP may be considered
28 by EPA as one factor in determining an appropriate penalty amount.

- 4 -

1   United States sought civil penalties and injunctive relief for violations of the Act.

2   B.   Consent Decree

3       The United States had negotiated with GovGuam for over a year before filing the
4   Complaint in this case. After the Complaint was filed, the parties participated in a number of
5   Court-supervised negotiations beginning in November 2002, and were able to reach agreement
6   on the terms of the Consent Decree that the United States lodged with the Court on December 3,
7   2003.

8       The Consent Decree sets out a schedule for the closure of the Ordot Dump and the
9   opening of a new sanitary landfill. Pursuant to the Decree, Guam Department of Public Works
10  ("Guam DPW") is required to submit a closure plan that includes a site investigation, a baseline
11  survey, and the design of a landfill cover system and a perimeter surface water diversion system.
12  Guam DPW is also required to submit a permit application to Guam EPA to comply with
13  requirements for the disposal of municipal solid waste at Ordot Dump for the interim period until
14  the Dump is closed. Guam DPW will also need to obtain the Army Corps of Engineers' approval
15  of a Wetland Mitigation Plan for the closure. After its closure plan is approved, Guam DPW is
16  required to award a construction contract for closure, complete closure, begin implementing a
17  post-closure plan, and certify that it no longer accepts municipal waste at Ordot Dump.

18      The Ordot Dump is presently the sole municipal landfill on Guam. Thus, in addition to
19  requiring the closure of the Ordot Dump, the Consent Decree also directs Guam DPW to
20  construct and operate a new sanitary landfill. The Decree requires Guam DPW to complete an
21  Environmental Impact Statement regarding at least 3 alternative sites for the new landfill, choose
22  a site, and submit design and construction plans to EPA. Thereafter, Guam DPW must submit a
23  permit application and obtain a permit from Guam EPA, submit a permit application and obtain a
24  Wetland Development Permit from the Army Corps of Engineers, award a construction contract,
25  and construct and operate a new sanitary landfill.

26      The Consent Decree requires GovGuam to spend $1 million for a SEP to develop and
27  implement a comprehensive waste diversion strategy for household hazardous waste on Guam.
28  Currently, Guam has no system in place to regulate the disposal of household hazardous waste.

- 5 -

1 Pursuant to the Consent Decree, GovGuam will: (1) develop a service for residents to properly

2 dispose of such wastes; (2) produce a guide and public education program to inform the public

3 about the type of wastes, alternative products, and disposal options; and (3) construct and operate

4 a hazardous waste holding facility to allow recycling, reuse, or disposal of hazardous wastes at an

5 EPA-approved facility. Finally, the Consent Decree requires GovGuam to pay a civil penalty of

6 $200,000 in a series of installments.

7 **III. STANDARD OF REVIEW FOR ENTRY OF A PROPOSED CONSENT DECREE**

8 Approval of a proposed consent decree is committed to the informed discretion of the

9 district court. United States v. State of Oregon, 913 F.2d 576, 580 (9th Cir. 1990). The court's

10 discretion should be exercised in favor of the strong policy favoring voluntary settlement of

11 litigation. Ahern v. Central Pacific Freight Lines, 846 F.2d 47, 48 (9th Cir. 1988); accord SEC v.

12 Randolph, 736 F.2d 525, 528 (9th Cir. 1984) ("[t]he use of consent decrees encourages informal

13 resolution of disputes, thereby lessening the risks and costs of litigation"). Judicial deference to

14 negotiated settlements is particularly appropriate when a government agency charged with

15 protecting the public interest 'has pulled the laboring oar in constructing the proposed

16 settlement.'" United States v. Montrose Chemical Corp. of California, 50 F.3d 741, 746 (9th Cir.

17 1995); see also United States v. Akzo Coatings of Am. Inc., 949 F.2d 1409, 1436 (6th Cir. 1991)

18 (judicial deference to a government settlement is "particularly strong where a consent decree has

19 been negotiated by the Department of Justice on behalf of a federal administrative agency like

20 EPA which enjoys substantial expertise in the environmental field"). Accordingly, "a district

21 court reviewing a proposed consent decree 'must refrain from second-guessing the Executive

22 Branch.'" Montrose Chemical Corp., 50 F.3d at 746 (quoting United States v. Cannons Eng'g

23 Corp., 899 F.2d 79, 84 (1st Cir. 1990)); see also United States v. Bechtel Corp., 648 F.2d 660,

24 666 (9th Cir. 1981) (the balancing of interests "must be left, in the first instance, to the discretion

25 of the Attorney General").

26 The trial court should enter the consent decree if it is fair, reasonable, and consistent with

27 the purposes that the statute is intended to serve. Montrose Chemical Corp., 50 F.3d at 747; see

28 Sierra Club, Inc. v. Electronic Controls Design, Inc., 909 F.2d 1350, 1355 (9th Cir. 1990) (in a

- 6 -

1  CWA case, Ninth Circuit concluded that the court may enter the consent decree as long as the

2  decree comes within the general scope of the case made by the pleadings, furthers the statute's

3  objectives, and does not violate the statute). In undertaking its review, a court is not required to

4  make the same in-depth analysis of a proposed settlement that it would be required to make in

5  order to enter a judgment on the merits after trial: "[t]he trial court in approving a settlement

6  need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the

7  claims or controversy, but need only determine that the settlement is fair, adequate, reasonable

8  and appropriate under the particular facts and that there has been valid consent by the concerned

9  parties." Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983); accord

10  United States v. State of Oregon, 913 F.2d at 582.

11       A court does not have the authority to modify the decree. Instead, it must either accept or

12  reject the decree as submitted. See Officers for Justice v. Civil Serv. Comm'n , 688 F.2d 615,

13  630 (9th Cir. 1982). The relevant standard is "not whether the settlement is one which the court

14  itself might have fashioned, or considers as ideal, but whether the proposed decree is fair,

15  reasonable, and faithful to the objectives of the governing statute." Cannons, 899 F.2d at 84.

16       In sum, the Court's role in reviewing this Consent Decree is limited. Broad deference

17  should be afforded to EPA's expertise in determining an appropriate settlement and to the

18  voluntary agreement of the parties in proposing the settlement. If the Consent Decree is fair,

19  reasonable, and consistent with applicable law, it ought to be approved. Since this Consent

20  Decree meets the standards for entry, the United States requests the Court to approve and enter it.

21  **IV.   THE CONSENT DECREE IS FAIR, REASONABLE, AND CONSISTENT WITH
        THE PURPOSES OF THE CLEAN WATER ACT**

22

23       A.   The Consent Decree is Procedurally and Substantively Fair

24       Courts evaluate both the procedural and substantive fairness of settlements. Cannons,

25  899 F.2d at 86. Procedural fairness concerns the negotiation process; courts assess whether the

26  process was open and at arm's length. United States v. BP Exploration & Oil Co., 167 F. Supp.

27  2d 1045, 1051 (N.D. Ind. 2001). A consent decree's substantive fairness "incorporates 'concepts

28  of corrective justice and accountability: a party should bear the cost of harm for which it is

- 7 -

1  legally responsible.'" <u>United States v. Telluride Co.</u>, 849 F. Supp. 1400, 1402 (D. Colo. 1994).

2      In this instance, the United States negotiated with GovGuam representatives for over one
3  year before the Complaint was filed. The parties also participated in Court-supervised
4  negotiations since November 2002. Both parties were represented by counsel and engineers and
5  closely negotiated the terms of the settlement that was presented to the Court in December 2003.
6  It is undisputed that this Consent Decree is the product of arm's length negotiations.

7      In addition, the Consent Decree is substantively fair. In its administrative actions before
8  the Complaint was filed in this case, EPA sought to require GovGuam to cap the Ordot Dump
9  and to stop leachate discharges from the Dump. Under the Consent Decree, GovGuam bears the
10  cost of harm for which it is responsible. Not only does the Decree require the cessation of
11  leachate discharges from Ordot Dump, it also mandates that GovGuam close the Dump
12  permanently and construct a new sanitary landfill. Moreover, GovGuam will pay $1 million for
13  an SEP to develop and implement a comprehensive waste diversion strategy for household
14  hazardous waste on Guam, which will prevent some hazardous waste from ever being disposed
15  in a landfill and will protect the Nation's waters from hazardous waste discharges. The Consent
16  Decree is therefore fair to Guam residents, who have the right to expect that they and the Island's
17  fragile environment will be adequately protected, because it provides an environmentally sound
18  approach to Guam's landfill problem. Furthermore, steps toward compliance will begin
19  immediately and will not be delayed by additional litigation.

20      B.      The Consent Decree is Reasonable

21      In discerning whether a consent decree is reasonable, a court may consider whether the
22  decree is technically adequate, fully compensates the public for the alleged violations, and takes
23  into consideration the risks of litigation. <u>Telluride Co.</u>, 849 F. Supp. at 1403. Applying that
24  standard here, the Court should find that this Decree represents a reasonable settlement of the
25  CWA violations. As discussed above, the Decree is technically adequate because it contains
26  specific, tailored relief that addresses the violations alleged in the United States' Complaint.
27  Moreover, it obtains this compliance without requiring the parties to spend scarce resources to
28  litigate the case and without the attendant delay of such litigation. The Decree requires payment

- 8 -

1  of a civil penalty that is appropriate under the circumstances because it provides a deterrent effect
2  while taking into account GovGuam's current fiscal straits. The Decree also provides for an SEP
3  that will improve Guam's management of solid waste and prevent future harm to waters of the
4  United States. If the United States had litigated this case to judgment, this SEP would not have
5  been obtained as injunctive relief because it is, by definition, a project that is not required by law.

6      C.    The Consent Decree is in the Public Interest and Consistent with the Purpose of
             the Clean Water Act

7          The role of the Court in reviewing an environmental settlement is to determine "whether
8  the decree comports with the goals of Congress." Sierra Club v. Coca-Cola Corp., 673 F. Supp.
9  1555, 1556 (M.D. Fla. 1987). Thus, this Court should determine whether the Consent Decree "is
10 in the public interest and upholds the objectives of the Clean Water Act, the primary of which is
11 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"
12 Telluride Co., 849 F. Supp. at 1402-03. In making this determination, "[t]he court should also
13 bear in mind the flexibility of the public interest inquiry: the court's function is not to determine
14 whether the resulting array of rights and liabilities 'is the one that will best serve society,' but
15 only to confirm that the resulting settlement is 'within the reaches of the public interest.'" United
16 States v. Microsoft Corp., 56 F.3d 1448, 1460 (D.C. Cir. 1995) (citations omitted).
17         As described above, the settlement achieves, without further litigation delays or costs,
18 environmental benefits by requiring GovGuam to comply with a schedule for the closure of the
19 Ordot Dump and the opening of a new sanitary landfill. In the closure plan, GovGuam will
20 design a landfill cover system and a perimeter surface water diversion system to stop the
21 discharge of leachate from the Dump. The construction and operation of a new sanitary landfill
22 will end Guam's dependence on the Ordot Dump, thereby eliminating a long-standing nuisance
23 and bringing GovGuam into compliance with the CWA. GovGuam's development of a new
24 household hazardous waste diversion plan through implementation of the SEP will also protect
25 against the future discharge of hazardous wastes to the Nation's waters. Thus, this Consent
26 Decree furthers the statutory goals of the Clean Water Act and serves the public interest.
27
28

-9-

**V.    THE COMMENTS ABOUT THE PROPOSED CONSENT DECREE DO NOT PROVIDE A BASIS FOR REJECTING THE SETTLEMENT**

As noted above, the United States published notice of the proposed Consent Decree for public comment and received a comment letter from Calvo and Clark, LLP, on behalf of Guam Resource Recovery Partners ("GRRP"). According to GRRP, GovGuam and GRRP executed a Solid Waste Construction and Services Agreement (the "SWCS Agreement") in 1996 that was intended to finance the generation of electricity from waste. GRRP notes that the validity of the SWCS Agreement is currently being challenged in a case that is pending in Guam's Supreme Court. GRRP's letter contained four comments that are summarized below.

The United States also received a comment letter from a citizens' group called "Concerned Citizens to Close Ordot" ("CCCO"), enclosing a petition that CCCO had previously presented to the Court in 2003.[5]/ CCCO's comment letter and petition contain four comments that are summarized below.

Comment 1:    Expansion of the Ordot Dump

GRRP - Expansion of the Ordot Dump should not be permitted because it will complicate existing environmental problems in the area, violate Guam law, and breach the SWCS Agreement, which granted GRRP the option to design, construct, and operate a new landfill.

CCCO - The Ordot Dump is a public health hazard, has been operating in an unsafe and illegal manner, and should be closed as soon as possible. CCCO opposes any expansion of the Ordot Dump and the acquisition of any private property in Ordot for the purposes of operating a solid waste facility. Ordot has been designated as a Superfund site and needs to be cleaned up without any further pollution pressures placed on it.

The Consent Decree is designed to remedy GovGuam's continuous violation of the federal Clean Water Act. For many years, GovGuam has acknowledged that the Ordot Dump has been filled beyond its capacity. For example, Guam's former Governor sent a letter to the Legislature in February 1998 about Bill No. 495 in which he noted that the Ordot Dump was overflowing and that Guam had considered closing Ordot beginning in 1982. Similarly, the Guam Legislature has made specific findings relating to the Ordot Dump:

---

[5]/     The United States has included a copy of one page of the petition in Exhibit 2 to this Memorandum. As the Court is aware, the petition was signed by over 3,600 Guam residents.

1    (1) *the Ordot Landfill is a threat to the health and safety of the residents of Guam*, and

2    specifically for the residents of Ordot-Chalan Pago, Yona and the villages down river and

3    downwind; . . .

4    (4) the Ordot Landfill reached its capacity in the 1990's, and the *closure of the dump is*

5    *necessary in order to eliminate this existing serious environmental hazard.*

6 10 G.C.A. § 51101(a) (emphasis added).

7    Despite repeated acknowledgments by Guam's government of this serious problem and

8 several legislative acts attempting to address it, the Ordot Dump continues to discharge leachate

9 into the Lonfit River. In addition, conditions at the Dump periodically cause catastrophic fires,

10 necessitating the evacuation of nearby residents. This Consent Decree finally serves to break the

11 legislative logjam that prevented GovGuam from addressing this serious public health and

12 environmental hazard.

13    Pursuant to Paragraph 9 a. of the Consent Decree, Guam DPW is required to submit a list

14 of at least three potential landfill sites to EPA and Guam EPA within 30 days after entry of the

15 Decree. Contrary to GRRP's assumption, the Decree does not mandate that Guam DPW include

16 an expansion of Ordot as one of its choices on that list. Paragraph 7 a. of the Decree serves only

17 to clarify that Guam DPW may consider the option of constructing and operating new cells at a

18 location adjacent to Ordot Dump when it evaluates potential landfill sites for the new Municipal

19 Solid Waste Landfill ("MSWLF"). Thus, the decision whether to include an Ordot option on its

20 list of potential sites rests with Guam DPW under the Decree.

21    If Guam DPW does choose to include an Ordot option on its list, the Consent Decree

22 requires DPW to complete an Environmental Impact Statement ("EIS") that includes a detailed

23 analysis and comparison of the landfill sites on the list. ¶ 9 a. The EIS process will allow for

24 public participation so that citizens can express their concerns about each site. In that EIS

25 process, Guam DPW will be able to evaluate the advantages and disadvantages of each site.

26 After completing the EIS, Guam DPW will identify its preferred alternative for a new landfill

27 site. ¶ 9 a.

28    At this point, it is premature to conclude that an Ordot option is either feasible or

1   infeasible for the following reasons. First, Guam DPW has not yet identified Ordot expansion as

2   an option under Paragraph 9 a. Second, even if an Ordot option is identified, it may not be

3   DPW's preferred alternative after the EIS process is completed. Third, EPA has the prerogative

4   to dispute DPW's preferred alternative pursuant to Paragraph 9 b. If EPA and GovGuam cannot

5   agree on a location for the new landfill site, the matter will be submitted to the Court for

6   resolution. ¶ 9 b. Fourth, Paragraph 8 of the Consent Decree requires GovGuam to design and

7   implement a closure plan for the existing Ordot Dump that will eliminate the source of the

8   discharge of leachate to the Lonfit River. This approach to the problem is consistent with EPA's

9   conclusion in its 1988 Record of Decision when EPA decided to take no further action under

10  CERCLA to address the Ordot Dump. Finally, if any new MSWLF is slated for the vicinity of

11  Ordot, it will be sited, constructed, and operated in accordance with all applicable federal and

12  local laws pursuant to the requirements of the Consent Decree. Therefore, a new MSWLF

13  should not complicate existing environmental problems in the area.

14          The United States also believes that any perceived conflict with Guam law can be

15  managed by Guam DPW. For example, if Guam DPW identifies an Ordot option as the

16  preferred alternative for a new landfill at the conclusion of the EIS process, DPW can request the

17  Guam Legislature to authorize its decision in new legislation.

18          Similarly, it is premature to state there will be any conflict with the SWCS Agreement. It

19  is conceivable that the legal challenge to the validity of the SWCS Agreement will be decided by

20  the Guam Supreme Court by the time Guam DPW needs to state its preferred alternative for a

21  landfill site for the new MSWLF. The Court may determine that the SWCS Agreement is

22  invalid. In addition, GovGuam may interpret the SWCS Agreement differently than GRRP.

23  Even if the SWCS Agreement is determined to be valid, GRRP's interpretation of its substantive

24  provisions is not necessarily controlling.

25          Comment 2:    Construction Contract

26  GRRP: The Consent Decree's provision requiring GovGuam to award a construction contract
    for the new MSWLF violates the SWCS Agreement because GovGuam has already exercised an
27  option under the Agreement and designated GRRP to construct a new landfill.

28          The Consent Decree does require GovGuam to construct a new MSWLF. However, as

- 12 -

1  long as GovGuam follows the requirements of the Consent Decree in making its siting decision

2  regarding a new MSWLF, GovGuam could decide to construct the new MSWLF at the location

3  chosen by GRRP. Moreover, as stated previously, the validity of the SWCS Agreement is

4  currently before the Guam Supreme Court and will likely be decided long before DPW is

5  required to award a construction contract under the Consent Decree, which occurs 32 months

6  after entry. In addition, GovGuam may interpret the SWCS Agreement differently than GRRP.

7  Finally, if the Guam courts determine that the SWCS Agreement is valid and if GRRP were to

8  prevail in its interpretation of the Agreement, GRRP would have a remedy at law. That would

9  not affect the validity of this Consent Decree.

10        Comment 3:    Location of Potential Landfill Sites

11  GRRP: The Consent Decree's requirement that Guam DPW identify three potential landfill sites
    allows GovGuam to identify potential sites outside of those designated by the Guam Legislature,
12  which chose Guatali and Malaa. Consideration of sites other than Guatali and Malaa would
    violate Guam law and the SWCS Agreement.

13
    CCCO: Allowing GovGuam to locate a new solid waste management facility adjacent to the
14  existing Ordot Dump conflicts with previous Guam legislation prohibiting such an option.
    Citizens will be required to bring litigation against GovGuam for ignoring Guam law.
15

16        The Decree establishes an EIS procedure in Paragraph 9 that requires GovGuam to

17  complete a detailed analysis and comparison of at least three alternative sites for a new MSWLF.

18  An analysis of alternative sites in an EIS process will not necessarily result in any conflict with

19  the Guam Legislature's preferred alternatives. First, Guam DPW could conclude, after

20  completing the EIS, that Guatali or Malaa is its preferred alternative. Alternatively, Guam DPW

21  could decide, after considering its options in the EIS process, that a new site is preferable and ask

22  the Guam Legislature to ratify its decision in new legislation.

23        Regarding the perceived conflict with the SWCS Agreement, the United States has

24  addressed that concern in its response to comment 2.

25

26

27

28

- 13 -

1    Comment 4: Methods of Solid Waste Disposal

2    GRRP: The Consent Decree contemplates that the primary method of municipal solid waste
     disposal on Guam shall be a landfill. The SWCS Agreement contemplates that incineration shall
3    be the primary method. GRRP objects to the Consent Decree to the extent that it impacts the
     SWCS Agreement by calling for an alternate primary method of solid waste disposal other than
4    incineration.

5    CCCO: The Consent Decree assumes that construction of landfill constitutes compliance with
     the Court's Order and eliminates any alternative method of solid waste management such as
6    incineration. GovGuam has previously adopted an incinerator-based approach to the problem.
     GovGuam is attempting to use this Consent Decree to abandon previously approved methods of
7    solid waste management. GovGuam does not have the authority to negotiate the compliance
     provisions of this Decree because it conflicts with previous governmental acts by GovGuam.

8

9         Contrary to assertions by GRRP and CCCO, the Consent Decree does not establish any

10   primary method of municipal solid waste disposal for Guam. As long as it complies with

11   applicable federal and local laws, GovGuam is free to decide whether it will rely on incineration

12   as the primary method of municipal solid waste disposal on Guam. The Consent Decree does

13   require that GovGuam close the Ordot Dump and design, construct, and operate a new MSWLF.

14   While incineration may be used to reduce the total volume of municipal solid waste, it cannot

15   eliminate solid waste entirely. Therefore, even if GovGuam were to decide to construct a waste-

16   to-energy facility, the Territory of Guam would still require a new MSWLF for disposal of ash

17   and material that cannot be incinerated.

18        Comment 5: Financial Plan

19   CCCO: The Consent Decree is unenforceable because GovGuam does not have the money to
     comply with its provisions. Paragraph 10 of the Consent Decree requires only that GovGuam
20   exercise its best efforts to fund the compliance terms and does not guarantee that the terms of the
     Decree will ever be brought to fruit. It is ironic that GovGuam is proposing to pay stipulated
21   penalties if it has not secured funding for compliance with the Decree.

22        Within 120 days after entry of the Consent Decree, Paragraph 10 requires GovGuam to

23   submit to EPA a financial plan for funding the closure of Ordot Dump and the opening of a new

24   sanitary landfill. The financial plan will include both the sources of funds and a schedule to

25   secure funds for both capital costs and operating expenses.

26        The parties acknowledge in Paragraph 10 that GovGuam does not currently have the total

27   amount of funding necessary to complete these projects. However, the projects will take more

28   than three years to complete and can be funded over time. Moreover, the Guam Legislature has

                                           - 14 -

1   already provided some funding through the Solid Waste Operations Fund, which is specifically

2   designed to finance the closure of Ordot and the opening of a new sanitary landfill, and the U.S.

3   Department of the Interior has provided some additional funding. In addition, collection of

4   tipping fees is an expected source of revenue for these projects. GovGuam presently has

5   sufficient funds to begin the planning process required by the Consent Decree. To the extent that

6   the Solid Waste Operations Fund is insufficient to complete the projects, GovGuam committed

7   to use its best efforts to secure the necessary funding for these projects.

8        The stipulated penalties provisions in Paragraph 12 of the Consent Decree provide the

9   United States with an important enforcement tool to ensure that GovGuam follows through on its

10  commitments. The threat of such fines will also serve to motivate GovGuam to focus on

11  compliance with the terms of the Decree, which should prevent any undue delays in the

12  compliance schedule.

13       In sum, the parties negotiated the terms of the compliance schedule embodied in the

14  Consent Decree over a period of many months. GovGuam is committed now to a reasonable and

15  enforceable compliance schedule to address and resolve the long-standing issue of municipal

16  solid waste disposal for Guam.

17  **VI.    CONCLUSION**

18       The Consent Decree now before the Court was reached after the parties' careful and

19  informed assessment of the merits of the case, the costs, risks, and delays that litigation would

20  entail, and the value of an early settlement, including the significant environmental benefits that

21  will accrue from GovGuam commencing many of the comprehensive injunctive measures

22  contained in the proposed Decree immediately. As explained above, the proposed settlement is

23  fair, reasonable, and consistent with the purpose of the Clean Water Act. Because the public

24  comments submitted on the proposed Decree do not provide a basis for the United States to

25  withhold its consent to the settlement, the United States requests this Court to approve and enter

26

27

28

- 15 -

the proposed Consent Decree.

Respectfully submitted,

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

Dated: __2/2/04__                    _____

MIKEL SCHWAB
Assistant U.S. Attorney

OF COUNSEL:

JULIA JACKSON
Assistant Regional Counsel
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, California 94105

- 16 -

Citation                 Found Document        Rank 2 of 2           Database
68 FR 70533-01                                                       FR
2003 WL 22963978 (F.R.)
(Cite as: 68 FR 70533)

## NOTICES

## DEPARTMENT OF JUSTICE

## Notice of Lodging of Consent Decree Under the Clean Water Act

### Thursday, December 18, 2003

*70533 Under 28 CFR 50.7, notice is hereby given that on December 3, 2003, a proposed consent decree in United States v. Government of Guam, Civil Case No. 02-00022, was lodged with the United States District Court for the District of Guam.

In this action, the United States sought injunctive relief and civil penalties under section 309 of the Clean Water Act ("CWA") against the Government of Guam for: (1) Discharges of leachate from the Ordot Landfill without a permit in violation of CWA section 301; and (2) violation of the U.S. Environmental Protection Agency's administrative order to cease the discharges. The consent decree requires the Government of Guam to: (1) Close the Ordot Landfill, conduct environmental studies, and develop, design, construct, and operate a new sanitary landfill; (2) as a supplemental environmental project, develop and implement a comprehensive waste diversion strategy for household hazardous waste on Guam; and (3) pay a civil penalty of $200,000.

The Department of Justice will receive for a period of thirty (30) days from the date of this publication comments relating to the consent decree. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, P.O. Box 7611, U.S. Department of Justice, Washington, DC 20044-7611, and should refer to United States v. Government of Guam, D.J. Ref. #90-5-1-1-06658.

The consent decree may be examined at the Office of the United States Attorney, Suite 500, Sirena Plaza, 108 Hernan Cortez, Hagatna, Guam, and at U.S. EPA Region 9, Office of Regional Counsel, 75 Hawthrone Street, San Francisco, California. During the public comment period, the consent decree may also be examined on the following Department of Justice Web site: http:// www.usdoj.gov/enrd/open.html. A copy of the consent decree may also be obtained by mail from the Consent Decree Library, P.O. Box 7611, U.S. Department of Justice, Washington, DC 20044-7611 or by faxing or e-mailing a request to Tonia Fleetwood (tonia.fleetwood@usdoj.gov), fax no. (202) 514-0097, phone confirmation number (202) 514-1547. In requesting a copy from the Consent Decree Library, please enclose a check in the amount of $20.00 (25 cents per page reproduction cost) payable to the U.S. Treasury.

Ellen M. Mahan,

Assistant Chief, Environmental Enforcement Section, Environment and Natural Resources Division.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

GOVERNMENT EXHIBIT
1

# CALVO AND CLARK, LLP

ATTORNEYS AT LAW
655 SOUTH MARINE DRIVE, SUITE 202
TAMUNING, GUAM 96913
TEL: (671) 646-9355 • FAX: (671) 646-9403
e-mail: caclaw@calvoandclark.com

EDUARDO A. CALVO*
ARTHUR B. CLARK
RODNEY J. JACOB
MICHAEL A. PANGELINAN

JANALYNN M. CRUZ
DANIEL M. BENJAMIN*
RAYMOND L. SOUZA, JR.*
JENNIFER A. CALVO*

January 15, 2004

Assistant Attorney General
Environmental and Natural Resources Division
Post Office Box 7611
U.S. Department of Justice
Washington, DC 20044-7611

RE:    **United States v. Government of Guam, D.J. Ref. 90-5-1-1-06658**

Dear Assistant Attorney General:

      This office is legal counsel for Guam Resource Recovery Partners ("GRRP"). On behalf of GRRP, we wish to submit the following comments to the Consent Decree in the action entitled *United States of America v. Government of Guam*, U.S. District Court of Guam Civil Case No. 02-00022 (the "Ordot Dump Action"), for the U.S. Government's consideration.

      In 1996, the Government of Guam and GRRP executed the Solid Waste Construction and Services Agreement (the "Agreement"). The Agreement has as its general purpose the generation of electricity from waste using a privately financed, constructed and operated facility and the purchase of the power produced by the facility by the Government of Guam. In 2000, a local senator filed a complaint seeking declaratory and injunctive relief against the Government of Guam in order to have the Agreement declared invalid and to enjoin the Government from proceeding with the Agreement. See *Pangelinan v. Gutierrez*, Superior Court of Guam Special Proceedings Case No. 212-00. GRRP intervened in that action.

      In 2001, the Superior Court of Guam issued a Decision and Order declaring the Agreement valid and finding unconstitutional and inorganic local laws that impaired the Agreement. The judgment of the Superior Court was appealed and the matter is still pending before the Guam Supreme Court after the issuance of an opinion and the granting of a motion to reconsider that opinion. Since the matter is still pending before the Guam Supreme Court the applicable judicial enactment is the decision of the Superior Court of Guam upholding the validity of the Agreement.

90-5-1-1-06658

DEPARTMENT OF JUSTICE

LANDS DIVISION
ENFORCEMENT SECTION

**SAIPAN OFFICE:** PMB 951 Box 10001, Saipan, MP 96950
**TELEPHONE** (670) 323-2045 • **FACSIMILE** (670) 323-2776 • e-mail: caclawrep@calvoandclark.com

*NOT LICENSED IN CNMI

B040115.50-0001.LTR (Comments to Consent Decree).wpd

**GOVERNMENT EXHIBIT**
2

Assistant Attorney General
January 15, 2004
Page 2

GRRP offers the following comments:

1.      Paragraph 7.a. provides that "the new Municipal Solid Waste Landfill or
"MSWLF" shall include the option of constructing and operating new cells at a location adjacent to
the Ordot Dump location."

Comment - Expansion of the Ordot Dump site will only lead to a complication of the
existing environmental degradation downstream and adjacent to the dump. For instance, according
to the U.S. EPA, leachate of questionable composition has been observed openly entering the Lonfit
River from the dump. The Water and Energy Research Institute (University of Guam) characterizes
this leachate as containing certain toxic and harmful substances, which are probably now in situ in
the river sediment. Until the source of these substances is identified and specifically isolated and
monitored, the whole area can be considered as an environmental hazard and area source for these
pollutants. If the MSWLF is located adjacent to or close to the dump, isolation of any additional
source will be difficult to accomplish. The Ordot site is listed as a Superfund site, so any work at
Ordot should be isolated to the closing of the dump and remediation of the existing violations.

Additionally, constructing the MSWLF at a location adjacent to the Ordot Dump
violates existing Guam Law. Guam Public Laws 23-95 (1996) and 24-06 (1997) and the Integrated
Solid Waste Management Plan for the Island of Guam provide that the primary site for the MSWLF
shall be *Guatali* and the secondary site shall be *Malaa*. Expansion of the Ordot Dump, as
contemplated by the Consent Decree, contravenes the express provisions of Guam Public Law 23-95
and 24-06. It is highly likely that if the Ordot Dump is expanded, residents of Ordot-Chalan Pago
will protest and bring suit to enforce the provisions of Public Laws 23-95 and 24-06 and prohibit
such expansion.

Finally, expansion of the Ordot Dump is a breach of the Agreement. The Agreement
grants the Government of Guam the option to cause GRRP to design, construct, and operate a new
landfill. The Government of Guam exercised its option in February 1997. In anticipation of
satisfying its obligations under the option, GRRP identified a landfill site and is in fact leasing a site
from the Chamorro Land Trust Commission for the development and operation of the new landfill.
The leased site is Parcel B of the area commonly known as *Guatali* and this site meets all U.S. EPA
and Guam EPA requirements for landfill siting, construction and operation. Should the Government
of Guam proceed with expansion of the Ordot Dump, GRRP will seek an injunction from the court
and enforcement of the option exercised by the Government of Guam.

2.      Paragraph 9.5 provides: "Within 975 days (approximately 32 months), DPW
shall award a construction contract for the new MSWLF in accordance with applicable procurement
rules and policies of the Government of Guam and provide a notice to proceed to the selected
contractor and submit evidence of such award and notice to U.S. EPA."

B040115.50-0001.LTR (Comments to Consent Decree).wpd

Assistant Attorney General
January 15, 2004
Page 3

      Comment - Pursuant to the option exercised by the Government of Guam under section 5.09 of the Agreement, the Government of Guam has designated GRRP as the entity responsible for the design, construction and operation of a new landfill. Putting out the design, construction and operation of the MSWLF for bid is a direct violation of the option exercised by the Government of Guam under the Agreement. GRRP intends on fully protecting its rights under the option and the Agreement and will institute legal action to ensure that its rights are adequately protected.

      3.    Paragraph 9.a. provides that "Within 30 days, DPW shall submit a list of at least three potential landfill sites to U.S. EPA and GEPA."

      Comment - This broad language allows the Government of Guam to identify potential landfill sites outside of those mandated by the Guam Legislature. The sites to be considered under the Consent Decree should be specifically identified as either Parcel A of *Guatali* (designated by Guam P.L. 23-95 and 24-06), Parcel B of *Guatali* (designated by GRRP under the Agreement) or *Malaa* (designated by Guam P.L. 23-95 and 24-06). Consideration of sites other than *Guatali* and *Malaa* would be a violation of local law and a breach of the Agreement.

      4.    As a general matter the Consent Decree contemplates that the primary method of municipal solid waste disposal on Guam shall be landfilling. This is in direct contravention of the Agreement, which contemplates that incineration should be the primary method of solid waste disposal on Guam. Accordingly, GRRP objects to the Consent Decree to the extent that it impacts the Agreement by calling for an alternate primary method of solid waste disposal other than incineration.

      In conclusion, the Agreement is a valid contract between the Government of Guam and GRRP. It appears that the Consent Decree fails to take into consideration the Government of Guam's obligations under the Agreement and the impact the Agreement might have on the Government of Guam's ability to comply with the consent Decree. Inversely, the Consent Decree also fails to consider the impact the Government of Guam's compliance with the Consent Decree might have on the Agreement. To the extent that the Government of Guam's compliance with the Consent Decree works as a material breach of the Agreement, the Government of Guam risks being in default under the Agreement thereby subjecting itself to damages.

      Sincerely,

      CALVO AND CLARK, LLP

      Janalynn M. Cruz

ABC:rp

B940115.50-0001.LTR(Comments to Consent Decree).wpd

January 15, 2004

Assistant Attorney General
Environmental and Natural Resources Division
Post Office Box 7611
U.S. Department of Justice
Washington, DC 20044-7611

RE: **United States v. Government of Guam, D.J. Ref. 90-5-1-1-06658**

To Whom It May Concern:

As concerned citizens of Guam we are transmitting the enclosed comments on the proposed consent decree in the issue of the United States of America vs. the Government of Guam , Civil Case No. 02-00022.

The enclosure outlines our concerns that the decree and appurtenant conditions do not take into account the fact that the Government of Guam has previously adopted methods of solid waste management, and has previously excluded the existing Ordot Dump location from consideration for expansion of trash disposal facilities on Guam.

We are enclosing for your reference, copies of signature sheets previously presented at the District Court of Guam in 2003, voicing citizens' opinions that the Ordot Dump should be closed and no adjacent or nearby expansion considered.

Ordot has been designated a Superfund site. It needs to be closed and cleaned up with no further pollution pressures placed on it.

Sincerely,

Concerned Citizens to Close Ordot

Attachments: Comments to Consent Decree
Signature Sheets

90-5-1-1-06658

**GOVERNMENT EXHIBIT**
3

## COMMENTS ON THE PROPOSED CONSENT DECREE
## IN CIVIL CASE NO. 02-00022
### *UNITED STATES OF AMERICA V. GOVERNMENT OF GUAM*

**THE UNDERSIGNED** are citizens and residents of the Territory of Guam, and are

persons directly affected by the current and future waste management policies of the

Government of Guam. THE UNDERSIGNED submit their comments on the proposed

Consent Decree in the above identified suit as follows:

### I. SUMMARY OF COMMENTS

The proposed Consent Decree has assumptions built into it that actually constitute

a fraud on the United States District Court that will be asked to enter this Consent

Decree.

By assuming that a landfill constitutes compliance with a U.S. court order, this

proposed Consent Decree eliminates any alternative methods of solid waste management.

In fact, the Government of Guam has previously explored and adopted methods of solid

waste management different from simple landfill solutions and has entered into contracts,

including legislative approvals, for an incinerator based approach to the problem.  It

appears that GovGuam is attempting to use this proposed Consent Decree to abandon

previous approved methods of solid waste management.

The proposed Consent Decree explicitly allows consideration of the existing

Ordot location for a new landfill.  Again, previous legislation by the Guam legislature has

excluded the Ordot area from consideration for new solid waste management facilities.

GovGuam is attempting to use the Consent Decree process and the power of the Court to

avoid binding legislation that limits GovGuam's powers in this area.

The proposed Consent Decree is essentially unenforceable. GovGuam does not have the money to comply with the proposed Consent Decree (see Consent Decree, Par. 10). The proposed Consent Decree only requires "best efforts" on the part of GovGuam to comply with the provisions of this proposed Consent Decree. This is a subjective and essentially unenforceable standard of compliance. It is foreseeable that this "best efforts" standard will require re-litigation of each step of compliance with the Consent Decree, with inevitable delays.

## II. PRE-EXISTING OBLIGATIONS OF GOVGUAM

The proposed Consent Decree, if entered by the Court, will implicitly adopt two underlying factual assumptions. First, the proposed Decree assumes that GovGuam has no previous governmental restrictions and obligations that limit or define its choices in solid waste management. Second, the proposed Decree assumes in advance that a simple landfill solution is the proper solution to Guam's solid waste management problems.

GovGuam does have prior governmental commitments and obligations concerning solid waste management that are directly inconsistent with the proposed compliance provisions of the proposed Consent Decree. There has been previous legislation, contracts, financing arrangements. There have been prior feasibility studies, site studies, and decisions made from those prior studies. There has been previous legislation involving these prior obligations and restrictions. GovGuam does not have the authority to negotiate the compliance provisions of the proposed Consent Decree. They conflict with previous governmental acts by GovGuam.

The direct interest of the undersigned persons is that these prior legislative and contractual obligations and restrictions on GovGuam direct placement of new solid waste management facilities at sites other than the Ordot vicinity.

If the proposed Consent Decree is entered, it would constitute the blessings of the United States District Court on GovGuam's disregard of its prior governmental actions and obligations pertaining to future solid waste management on Guam.

### III. LOCATION OF NEW LANDFILL IN ORDOT

The proposed Consent Decree, Paragraph 7(a), would allow GovGuam to locate new solid waste management facilities adjacent to the existing Ordot Dump. However, previous Guam legislation prohibits such an option. By placing the signature of the United States District Judge on this Consent Decree, the Court would be authorizing GovGuam's violation of its own governmental acts and limitations.

The citizens who live in the vicinity of the existing Ordot Dump have deferred private litigation pending the negotiation of this Consent Decree. Extensive and expensive litigation under applicable provisions of the United States Constitution and the Guam Organic Act could be avoided if GovGuam would recognize its pre-existing obligations and limiting legislation in proposing compliance terms for the Consent Decree. If, on the other hand, GovGuam persists in ignoring its prior governmental acts, then the same Court that is being asked to enter this Consent Decree will soon be asked to apply constitutional standards to the states actions of GovGuam.

## III.  UNENFORCEABLE FUNDING PROVISIONS

Paragraph 10 of the proposed Consent Decree acknowledges that GovGuam does not have the funds to pay for the compliance provisions of the Decree.  GovGuam is then obligated to exercise "best efforts" to fund the compliance terms of the Decree.

"Best efforts" is a fluid and subjective measure of GovGuam's compliance efforts.  This offers the citizens of Guam no guarantee of any kind that, in fact, the terms of the Decree will ever be brought to fruit.  It does, however, guarantee multiple hearings before the Court over whether or not GovGuam is complying with this amorphous standard of "best efforts."  It is virtually guaranteed that there will be delay upon delay in an already lengthy compliance project while the Court must determine whether GovGuam is doing what it must do to fund this solid waste management project.

The irony of this provision of the proposed Consent Decree is the proposed penalties for non-compliance.  Paragraph 12, etc., of the Decree provides for economic civil penalties for non-compliance.  GovGuam is proposing to pay economic penalties in response to the accusation that it has not secured funding for compliance with the Decree.  This does appear to the average person to make a mockery of the funding provisions of the proposed Consent Decree.

## PUBLIC PETITION

Attached is a public petition showing the support for solving the Ordot Dump problem in a rational and effective way.  The undersigned ask that the spirit and letter of this petition be considered in this comment process.

## CONCLUSION

The undersigned feel very strongly that this proposed Consent Decree only papers over a long-standing problem on Guam. Foreseeably, it resolves nothing. Foreseeably, the terms of this Consent Decree would only offer the authority of the United States District Court to support extensive, and ultimately fruitless, delay.

**COMMENTS AS SIGNED BELOW**

| NAME PRINTED | SIGNATURE |
|---|---|
| ANGELO N. GOMBAR | Naylo N. Gombar |
| Lourdes AG Mesa | Lourdes AG Mesa |
| Barbara Salus | Salow Salas |
| DIANA BELL | Djama Bell |
| GEORGE R. BELL | G R Bell |
| LEONA Tamay | George Tamay |
| Rossana D. San Miguel | Ros D. Miguel |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

MICROMALL

# Committee for the
# Closure of the Ordot Dump

We, the people, are opposed to any expansion of the Ordot Dump, or the acquisition
of private property in Ordot for the purposes of operating a Solid Waste Facility.

The Ordot Dump is a public health hazard, and has been operating in an
unsafe and illegal manner, and should be closed as soon as possible.

| | Print Name | Signature | Address | Phone # (optional) | Village of Residence |
|---|---|---|---|---|---|
| 1 | Jana G. Salas | | PO Box 20066 GMF 96921 | 734-8795 | Barrigada |
| 2 | Eric domgen | | P.O. Box 27531 GMF | 477-7514 | TOTO |
| 3 | Bruce Dinsman | | 147 Cadena De Amor Mangilao GU 96913 | 652-7731 | Mangilao |
| 4 | Sharon Dinsman | Sharon P Dinsman | 147 CADENA DE AMOR | 652-7731 | Mangilao |
| 5 | Paula Segel | | POB 350 Hagat | | Dededo |
| 6 | Pam Spach | Pamela Spach | Box 2389, GMF | | Maite |
| 7 | WANDA KRAFT | Wanda T. Kraft | P.O. Box 25145 GMF 96921 | 477-1531 | CHALAN PAGO |
| 8 | Jesse Sola | Jesse Sola | P.O.BOX 22231 GMF 96921 | 477-1403 | TOTO |
| 9 | Janet Green | | 556 San Miguel St. Talofofo | 789-2930 | Talofofo |
| 10 | Wendy Legaspi | Wendy Legaspi | 179 Cunao St Dededo, GU 96929 | | Dededo |
| 11 | RECHLYN | Rechlyn | TAMUNING | 646-9217 | |
| 12 | Janice Lorenzo | J Lorenzo | Maite | 720-1980 | Maite |
| 13 | Florentina Viloria | FM Viloria | Maite | 720-1980 | Maite |
| 14 | Kathrine Kakigi | K.K. | Dededo | 6530140 | Dededo |
| 15 | JULIE B. GARCIA | | YIGO | 653-2077 | YIGO |
| 16 | M Sablala | | Dededo | | |
| 17 | Shellaman Dizon | | A Mangilao | | Mangilao |
| 18 | Gaylene Cruz | | P.O. Bx 5128 | | Barr. |
| 19 | William T. Cruz | | Mong. 96903 | | Mangilao |
| 20 | Morton G Mueol | | YIGO | 653-3216 | |
| 21 | Johanna Delgado | | Agana HS. | - | Agana HS. |

Please return to Ordot Mayor's Office or call 477-9606 -Mark

TOTAL P.13