# ORIGINAL

1  SUE ELLEN WOOLDRIDGE
   Assistant Attorney General
2  Environment & Natural Resources Division
   ROBERT D. MULLANEY
3  Environmental Enforcement Section
   United States Department of Justice
4  301 Howard Street, Suite 1050
   San Francisco, California 94105
5  Tel: (415) 744-6483
   Fax: (415) 744-6476
6
   LEONARDO M. RAPADAS
7  United States Attorney
   MIKEL W. SCHWAB
8  Assistant United States Attorney
   Suite 500, Sirena Plaza
9  108 Hernan Cortez
   Hagåtña, Guam 96910
10 Tel: (671) 472-7332
   Fax: (671) 472-7215
11
   Attorneys for United States of America
12

**FILED**

DISTRICT COURT OF GUAM

DEC 15 2006

MARY L.M. MORAN
CLERK OF COURT

13                  IN THE UNITED STATES DISTRICT COURT
14                              FOR THE
15                        TERRITORY OF GUAM
16

17

18  UNITED STATES OF AMERICA,          )   CIVIL CASE NO. 02-00022
                                       )
19                      Plaintiff,     )
                                       )   UNITED STATES' SUPPLEMENTAL
20          vs.                        )   INFORMATION: AUDIT REPORT
                                       )   AND RECOMMENDATIONS
21                                     )
    GOVERNMENT OF GUAM,                )
22                                     )
                        Defendant.     )
23  _____ )

24

25        The United States hereby supplements its earlier filings in this case with the

26  attached Report entitled, "Focused Audit Report and Recommendations, August 18,

27  2006." The report was prepared at the Guam Public Utilities Commission's direction to

28

1  examine the capabilities of DPW and the Department of Administration.   It is submitted
2  to more fully inform the Court.
3        SO SUBMITTED this 15th day of December, 2006.

5                              LEONARDO M. RAPADAS
                              United States Attorney
6                              Districts of Guam and NMI

7                        BY:  _Mikel W Schwab_____
8                              MIKEL W. SCHWAB
                              Assistant U.S. Attorney

BEFORE THE GUAM PUBLIC UTILITIES COMMISSON
Focused Audit Report and Recommendations
August 18, 2006

**EXECUTIVE SUMMARY.**

Under the Federal Consent Decree[1], defendant Government of Guam (GovGuam) is required to: a) close the existing landfill; b) open and operate a new landfill; and c) undertake other solid waste remedial actions. GovGuam is currently in material violation of Consent Decree deadlines.

GovGuam intends to finance the initial sum of approximately $100 million dollars as part of the cost of Consent Decree compliance with revenue bonds. These bonds would be repaid, in substantial part, by rate revenue from Department of Public Works (DPW) Solid Waste Management (SWM) customers.

GovGuam financial advisors forecast that existing SWM rates will need to be increased by upto 400% in the next 36 months to produce the revenues necessary to support the revenue bonds. These substantial increases assume that SWM operations in the future attain a level of efficiency that is the norm in the industry and which currently does not exist. In the absence of making these efficiency and operational improvements the rates required to support the anticipated bonds would be even higher than those currently projected and service levels would continue to be unacceptable.

This audit report has been prepared at the Guam Public Utilities Commission's [PUC] direction[2] to examine whether DPW is capable of efficiently billing and collecting the increased rate revenue, which will be required to fund GovGuam's obligations under the proposed revenue bonds.

This audit report finds that:

|     |     |
| --- | --- |
| a. | DPW's current billing and collection system is unable to competently handle even current rate revenue levels much less the increased burden necessary to support the revenue bonds. |
| b. | Substantial remedial action, including operational changes, legislation, regulatory action and rulemaking must immediately occur to enable DPW to bill and collect the revenue necessary to fund revenue bond requirements. |
| c. | If this remedial action does not occur, DPW will not be able to bill and collect the rate revenues necessary to fund revenue bond obligations and this burden would fall, in part, on the General Fund. Regulatory principles could obstruct the PUC: i] from awarding rate increases to compensate for DPW billing and collection mismanagement; and ii] from increasing SWM residential customer rates unless the quality of residential service is dramatically improved. |

This audit report will now examine each of the above findings and will propose a broad outline of immediate remedial action, which will be necessary to empower DPW to bill and collect the rate revenues necessary to meet the requirements of the proposed revenue bonds. A summary of the recommendations contained in our report together with the recommended implementation time lines are as follows:

---

[1] USA v. Government of Guam, Guam District Court Civil Case 02-22, Consent Decree dated February 11, 2004.
[2] PUC Resolution dated April 20, 2006.

## Summary – Audit Recommendations

| Recommendation | Action Date |
|---|---|
| **Legislation:** | |
| Establish SWM as public corporation under CCU governance. | ASAP |
| Consolidate administration of SWM finances. | ASAP |
| Privatize third residential collection district. | ASAP |
| Convert commercial tipping fee to hauler business expense or bring haulers under PUC regulation and Public Auditor audit authority. | ASAP |
| **Procurements:** [Action date is for PUC approval of procurement documents.] | |
| Outsource SWM billing and collection system with conversion to prepaid decal system | 1/07 |
| Privatize two of three residential collection districts. [Privatize 3 rd district if authorized.] | 1/07 |
| Retain accounting consultant to address accounts receivable, establish accounting system and issuance of reliable financial reports | 11/06 |
| **Regulatory Action:** [Preparation of documents for regulatory consideration would be collaborative effort between GCG and Compliance Team]. | |
| Approve recommended procurement documentation. | 1/07 |
| FY07 rate proceeding, including establishment of residential rate and variable residential rate | 1/07 |
| Review and approve revised residential service rules. | 1/07 |
| Establish customer hauler service rules [in event haulers are placed under PUC regulatory authority]. | 1/07 |
| Public Auditor financial audit of commercial haulers. | 4/07 |
| Phase II GCG audit of SWM $10 million accounts receivable | 1/07 |
| **Operational Action:** Repair landfill scales. | 11/06 |
| Institute rules for transfer site revenues. | 11/06 |
| Establish three residential collection districts. | 11/06 |
| Enforcement of revised residential service rules. | 2/07 |
| GEPA enforcement of illegal dumping laws. | ASAP |

## TABLE OF CONTENTS

I.   SUMMARY OF CONCLUSIONS AND RECOMMENDATIONS ................................ 1

II.  FINDINGS AND RECOMMENDATIONS ................................................................. 10

    1.   Residential Collection and Revenue Problems .................................... 10

    2.   Operational and Administrative Function Problems. ........................ 14

    3.   Commercial Collection and Revenue Problems. ................................. 16

    4.   Billing and Collection Problems ......................................................... 17

III.   Attachment A: ALJ Memo and PUC Order Docket 05-09

    Attachment B:  Press Reports Regarding Service

    Attachment C:  Executive Order 2006-12

    Attachment D:  Legal Memorandum on Just and Reasonable Rates

    Attachment E:  Current SWM Service Rules

    Attachment F:  Inventory and Discussion of Proposed Legislative Changes

1 **I. SUMMARY OF CONCLUSIONS AND RECOMMENDATIONS**

2    1. It is essential that whatever entity is created or designated to handle SWM's

3 responsibilities discharge SWM operations in a prudent and efficient manner

4 including billing and collecting for its services in a businesslike manner.  The

5 financial hurdles facing SWM are daunting.  Recent projections for future residential

6 fees and tipping fees show increases of up to 400% in a period of 3 years as follows:[3]

|  | FY 2006 | FY2009 |
|---|---|---|
| Residential Fee (Month) | $8.00 | $22.22 |
| Tipping Fee (Ton) | $20.00 | $95.00 |

10    These projections assume that there will exist accurate billing and a collection rate of

11 95% for the residential fee.  As will be detailed in this report, current practices for

12 billing and collection are in disarray and must be corrected.  Time is of the essence

13 and the solutions must be put in place immediately.  Failure to do so could threaten

14 the proposed bond financing that is required to fund critical compliance projects.

15    Concurrent with the improvement of billing and collection practices, there also needs

16 to be significant improvements in operational practices and the poor current level of

17 services in order to collect in the face of the rate increases. Current collection rates

18 for residential service are extremely low. GCG believes a significant cause of the low

19 collection rate[4] for residential SWM customers is resistance to paying amounts owed

20 due to poor and sporadic service.

21    To solve these important issues it is our primary recommendation that SWM be

22 transferred to a public corporation under the oversight of the Consolidated

23 Commission on Utilities ("CCU"). With this recommendation all functions will be

24 consolidated in one corporation, there will be an experienced Chief Financial Officer,

---

[3] From the most recent draft estimate contained in the draft Engineer's Report, which is being prepared by HDR Inc. to support the proposed revenue bonds.

[4] See paragraphs 5 and 6 below

1        experience with billing and collection systems and potential assistance available from

2        the sister utilities – GPA and GWA plus experience in dealing with the Guam

3        Environmental Protection Agency.

4

5        2. The PUC has indicated that it has a dual role in regulating DPW's rates: a) the

6        obligation to provide adequate revenues to enable DPW to meet its financial

7        obligations; and b) the obligation to assure that DPW's customers pay *just and*

8        *reasonable* rates for reliable service. P.L. 28-56 directs the PUC to audit SWM's

9        existing operations and by implication to issue such orders as may be necessary to

10      require SWM to provide competent service at a reasonable cost.

11

12      3. GCG's audit review and recent press reports[5] establish that the current quality of

13      residential service is unacceptable. Given the principle of just and reasonable rates

14      for reliable service, an unacceptable level of service invites the possibility of

15      disallowed or deferred rate increases by the PUC. Given that significantly higher

16      rates will be required[6] to support the anticipated bond offering, such a potential

17      disallowance or deferral would be a major problem to providing the required

18      financial resources to provide for adequate debt service. The resolution of the

19      unacceptable level of service problem must be given the highest priority.

20

21      4. DPW has failed to comply with the mandate of P.L. 26-99 that DPW establish

22      and privatize 2 of 3 residential collection districts by October 2002. As of the date

23      of this audit report, DPW has not even defined the three collection districts. DPW has

24      recently reported that privatization would occur by the end of 2007. This timeframe

---

[5] See Attachment B

[6] Conclusion reached in the rate proceeding concluded on October 27, 2005, Docket 05-09.

| | |
|---|---|
| 1 | is, in GCG's judgment, unacceptable. DPW's chronic failure to regularly collect |
| 2 | residential waste raises public health concerns and will frustrate efforts to increase |
| 3 | revenues from residential service. Every effort must be made to have this effort fast |
| 4 | tracked. This is best approached by a combined collaborative effort between the |
| 5 | PUC, DPW and the Consent Decree Compliance Team ("Compliance Team").[7] All |
| 6 | options, including accelerating the procurement process by requesting an emergency |
| 7 | declaration from the Governor, should be considered. It is essential in GCG's |
| 8 | opinion that this privatization be concluded as early in 2007 as is reasonably possible. |
| 9 | We further recommend that all 3 residential districts be subject to privatization. |
| 10 | Privatization of residential collection would have the potential to quickly resolve the |
| 11 | unacceptable level of service issue. The failure to resolve this problem could |
| 12 | potentially lead to: |
| 13 | a. Continued poor collection rates from residential customers as a result of |
| 14 | poor service and a backlash to substantial higher rates; |
| 15 | b. The PUC disallowing or deferring rate increases as a result of the PUC |
| 16 | action based on the principle of *just and reasonable* rates. Simply stated, |
| 17 | this is the *quid pro quo* of decent service for a fair rate.[8] |
| 18 | |
| 19 | 5. DPW collection rates from its residential customers are abysmal. Data collected |
| 20 | since the last rate proceeding showed that recent collection rates for residential |
| 21 | customers had averaged approximately 37%. DPW management stated during |
| 22 | GCG's audit that the collection rate has been improved from the data available in the |
| 23 | rate proceeding. The data we received does not support this contention. To fix this |
| 24 | problem the billing and collection systems together with the customer service |

---

[7] Under Executive Order 2006-12 [1] the Consent Decree Compliance Team has the responsibility to propose solutions and proposed legislation. See Attachment C.
[8] See Attachment D legal memorandum.

3

1                 systems need to be completely overhauled. GCG recommends that CCU be

2                 authorized and directed to oversee SMW billing and collection functions if SWM is

3                 transferred into a public corporation and that the billing and collection function be

4                 outsourced regardless of whether SWM is transferred into a public corporation or

5                 becomes another entity.

6

7                 6. During our audit SWM was in the process of evaluating a prepaid "sticker"

8                 system for residential pickup. The implementation of this system was deferred or

9                 abandoned. We recommend that such a system be developed and implemented after

10                 appropriate input from stakeholders and approval from the PUC. The benefits of

11                 such a system are significant in the current environment. It eliminates, on a

12                 prospective basis, concerns about accounts receivable and about back billing

13                 problems. It accomplishes our recommendation of prepayment for services to assist

14                 with a severe cash flow problem. It eliminates concerns about establishing a reliable

15                 customer list and assures that the drivers collect only customer trash. We

16                 recommend that this system be implemented by the end of 2006, by which time we

17                 have recommended that privatization of residential collection be implemented or in

18                 the context of the next rate proceeding anticipated to be heard in January 2007.

19

20                 7. Data from DOA regarding SWM collections from the largest commercial

21                 customers[9] shows that *none or very little* of the October 25, 2005 interim rate

22                 increase (effective November 1, 2005) was received by DPW through March 31,

23                 2006. The explanation offered for this situation is that the commercial haulers have

24                 not received payment from their commercial customers and only make payment after

25                 they receive payment. This situation cannot be permitted to continue if there is to be

---

[9] See Table 1 in the report.

4

1    any confidence in the financial integrity of SWM's billing and collection system. To
2    solve these SWM billing and collection problems:

3    a.    GCG endorses the PUC's April 20, 2006 finding that the best solution is
4          to transform DPW into a public corporation under the CCU's governance
5          under whose guidance normal business practices would be implemented.
6          The reasons for this recommendation are clear. Such a transformation
7          would unify all financial matters under a single CFO at the CCU,
8          establish a strong governing body and make support, experience and
9          resources available from GPA and GWA. In GCG's opinion, it is
10         unlikely that any other viable alternative could be implemented in a
11         timely fashion in these critical circumstances. Implementation of this
12         recommendation would *require immediate interaction* with the
13         Legislature and the Governor. If this solution is not adopted by policy
14         makers, then the less desirable second solution would be to implement
15         other remedial actions contained in our report.

16   b.    In addition to the change of structure recommended, it is essential the
17         current practice of dividing the revenue cycle functions between DOA,
18         the Treasurer of Guam and DPW for certain aspects of cash
19         management, accounting, customer interface and customer service cease.
20         All revenue cycle operations should be consolidated under a single
21         entity. The current practice leads to very poor financial and cash control
22         and customer service. Putting DPW's SWM division under the CCU
23         would solve this problem. In the absence of the CCU solution, we
24         recommend that PUC require DPW under PUC oversight to evaluate all
25         options to update its billing and collection and customer service systems,
26         including contracting with the CCU for the implementation of an

5

| 1 | | improved system, or outsourcing this task to a private entity and then |
| 2 | | order the option it determines is the best. We recommend that evaluation |
| 3 | | of the best option begin immediately, coupled with a requirement that an |
| 4 | | improved billing and collection system be implemented no later than |
| 5 | | April 1, 2007 |
| 6 | c. | The current problems in the billing and collection practices as well as |
| 7 | | inefficient accounting procedures jeopardize the proposed bond issue. |
| 8 | | The solution ultimately adopted to address these deficiencies should |
| 9 | | include an understandable and reasonable list of milestones and a |
| 10 | | timeline for correcting these deficiencies in accounting, billing and |
| 11 | | collection In order to moderate the expected large rate increases that will |
| 12 | | be required to fund the proposed bond issue[10], it is essential that PUC |
| 13 | | establish an overall collection rate standard of at least 90% on all |
| 14 | | accounts for the fiscal year 2007. The previously mentioned Engineer's |
| 15 | | Report projects that there will be substantial rate increases in each of the |
| 16 | | next three years. In evaluating the rate increases we recommend that the |
| 17 | | PUC set appropriate collection standards that will be taken into account |
| 18 | | in setting the revenue requirement.[11] The absence of such a standard |
| 19 | | would potentially require higher rates to offset any cash shortfalls (if |
| 20 | | permitted by the PUC). To achieve this goal of a 90% overall collection |
| 21 | | rate for FY 2007, GCG recommends that as many of SWM accounting |
| 22 | | billing and collection functions be privatized, even if SWM is put under |
| 23 | | CCU's governance. Timeframes are tight and CCU resources, while |
| 24 | | available, are already burdened with complying with GWA's Stipulated |

---

[10] PUC Audit Report ¶1.a
[11] The Engineer's Report assumes that the residential collection rate will rise to 95% by FY 2008.

6

1    Order[12] while GPA personnel are dealing with the expanded

2    infrastructure requirements facing Guam as a result of expected increase

3    in the number of military personnel over the next three years.

4

5    8.  During the audit, GCG found that the escrow account ordered by the PUC to hold

6    revenues received by DPW from the rate increase authorized by PUC's October 27,

7    2005 Order contained only $9,000 six months after an annual rate increase of

8    approximately $1.3 million dollars was approved.

9        a.  This unacceptable situation is illustrative of the consequences of a

10           dysfunctional, fragmented billing and collection system. We have

11           recommended consolidation of the functions under the CCU and

12           recommend privatization of the function whether or not these functions

13           are placed under the oversight of the CCU;

14       b.  Current legislation requires the commercial haulers serve as collection

15           agents for tipping fees and have no duty to take enforcement action to

16           pursue collection and remit to DPW payments only after tipping fees are

17           collected from their customers. Our audit indicated that there existed

18           business accounts that were approximately 6 months in arrears in

19           collecting and depositing fees. The current situation needs to be

20           corrected immediately. GCG concludes that corrections will require a

21           legislative solution that would:

22           i.   Amend current law to make the tipping fees a cost of business

23                for the commercial haulers, which they should recoup from their

24                customers. Consideration should be given to exempting the

---

[12] Guam Waterworks Authority, like the Government of Guam, is subject to a Federal order, which
mandates that its improvement of water and wastewater service to meet Federal standards, at a cost in
excess of $200 million dollars.

7

| 1 | | tipping fee portion of the haulers' revenues from the Guam gross |
| 2 | | receipts tax (GRT). This would maintain the status quo. No GRT |
| 3 | | is currently paid on tipping fees, since these are government |
| 4 | | revenue. If implemented, this recommendation would shift the |
| 5 | | risk of nonpayment from the government to the commercial |
| 6 | | haulers, who would in the ordinary course of business terminate |
| 7 | | service to any customer who fails to pay the fee. |
| 8 | ii. | Impose sanctions on haulers who fail to make timely payments |
| 9 | | (consideration should be given to the suspension of a hauler's |
| 10 | | GEPA Solid Waste Collection Permit, cancellation of a hauler's |
| 11 | | business license, and imposition of penalties and interest). |
| 12 | iii. | Given the extraordinarily high level of accounts receivable from |
| 13 | | commercial haulers [see Table 2 below], a large portion of which |
| 14 | | GCG is informed represents tipping fees which have not been |
| 15 | | remitted to the haulers, GCG recommends that proposed |
| 16 | | legislation authorize an immediate audit of all commercial |
| 17 | | haulers' tipping fee collection records. We recommend that the |
| 18 | | Public Auditor be tasked with the audit and make the findings |
| 19 | | available to the PUC. We recommend that legislation empower |
| 20 | | the PUC to take appropriate action to enforce findings that the |
| 21 | | PUC concludes should be implemented. The scope of the audit |
| 22 | | should include: |
| 23 | | • Are commercial haulers billing the tipping fee to their |
| 24 | | customers? |
| 25 | | • Are they collecting it? |

8

1         • Are they providing services to customers who have paid
2            the commercial hauler's fees but not the tipping fee?
3         • Are they timely depositing with DOA all monies
4            collected consistent with P.L. 25-93, which prescribes
5            that payments shall be remitted within 20 days into the
6            month following receipt of payment from a customer?
7         • Are there any underlying reasons for businesses failing
8            to pay the tipping fee or haulers failing to remit the same
9            to DOA?

9

1 II.  **FINDINGS AND RECOMMENDATIONS**

2   1.  **Residential Collection and Revenue Problems**

3   Approximately 42% of SWM recorded revenues come from the collection fee[13] of $10

4   per month for weekly pickup of waste from residential customers.  Guam residents have three

5   legal choices for the disposal of residential waste, i.e. pay SWM to pickup the waste at curbside,

6   contract the same services from a private hauler or "self-haul" the waste to the Ordot facility or

7   one of the three Transfer Stations operated by SWM.  As mentioned before, recent collection

8   information indicates that there is only an approximate 37% collection rate for residential

9   customers. This could mean that only approximately 37% of those DPW regards as customers

10  are paying for their pickup. One method of expanding revenues could come from expanding

11  SWM's customers who pay their bills.  It is critical that the collection rate increase to at least

12  90% in FY 2007 if rate increases are to be kept from being even higher than the high levels

13  already projected.  SWM residential service is poor and sporadic,[14] causing customers to either

14  not pay their bills or use private contractors rather than SWM.[15]  The collection function for two

15  out of three districts was already supposed to have been privatized by law by October 2002 but

16  this has not taken place.  This issue is discussed later in this section.

17  GCG has found that many residential customers do not comply with SWM's rules for

18  collections, which are attached to this report.[16] For example, residential customers are required to

19  keep their waste in lightweight waterproof containers with handles (or lifting features).  These

20  containers should have a capacity of between 5 and 35 gallons and be placed four feet from the

21  curb.  GCG observed that many customers overload their containers, resulting in an overflow of

22  waste onto the ground.  GCG also observed waste being placed in plastic bags and cardboard

23  boxes at curbside rather than in the required containers.  In all instances that GCG observed,

---

[13] At times this collection fee is incorrectly referred to as a "Tipping" Fee,
[14] See Attachment B for recent articles in the press regarding the poor quality of service and collection.
[15] It is likely that DPW does not have an accurate count of current customers.
[16] See Attachment E

10

1  SWM's drivers picked up the garbage despite obvious violation of SWM rules. It is clear that
2  these violations are causing additional and unnecessary effort by the drivers as well as creating an
3  unsightly and unhealthy situation. GCG recommends that enforcement of the current rules be one
4  of SWM's highest short-term priorities. This would improve sanitation and provide customers
5  with the perception of receiving reasonable service. Implementation should occur as soon as
6  possible but in any event no later than the end of 2006. **[Finding and Recommendation #1]**

7          There is no current restriction on the number of containers placed at curbside by
8  residential customers. As part of the transition to mandated volume-based residential rates[17] this
9  policy needs to be changed. During the course of GCG's audit, it was observed that the number
10 of containers per customer ranged from as few as one to as many as eight! We recommend that
11 SWM establish a maximum number of containers that will be unloaded by the SWM drivers at
12 the interim residential rate (currently $10 per month). Once PUC approval is given, SWM should
13 begin to charge an additional rate for containers in excess of that maximum.

14         It is widely anticipated that a further rate case will be needed to support the anticipated
15 bond issue. We believe that it is realistic to estimate that this case will be heard by the PUC in
16 the January 2007 timeframe. SWM has a very large workload in front of it currently, assisting
17 with the bond process as well as keeping track of the Consent Decree compliance. We therefore
18 recommend that GCG assist SWM in the preparation of the next rate filing and that GCG should
19 also be directed to propose revisions to the service rules to accomplish the legislative mandate for
20 volume-based residential rates.[18] **[Finding and Recommendation #2]**

21         During our audit we were informed that DPW personnel had developed preliminary plans
22 for the handling of containers in excess of the base. Containers in excess of a base number could
23 be identified by a "one time use" receipt or sticker that would be purchased in advance and
24 attached to the container. SWM drivers would remove and discard the sticker in the course of

---

[17] 10 GCA § 51118 (e)
[18] GCG was advised that SWM will seek additional revenues from the PUC in a filing anticipated in late 2006.

11

1  each weekly collection. These "one time use" receipts or stickers would have been available for

2  purchase not only at SWM customer service locations, but also be made widely available for

3  purchase through local vendors and the mail. This concept has been temporarily deferred by

4  SWM. We recommend that in the forthcoming rate proceeding, discussed above, GCG be

5  authorized to consider the concept of stickers. While this concept needs further study there are

6  many attractive features including eliminating, on a prospective basis, concerns about accounts

7  receivable and about back billing problems. It accomplishes prepayment for service and it

8  eliminates concerns about establishing a reliable customer list and assuring that the drivers collect

9  only customer trash. **[Finding and Recommendation #3]**

10  GCG's on-site investigation revealed that SWM does not have accurate lists for the

11  residential customers on each of its 35 collection routes, making it impossible to identify or

12  calculate the overall total number of SWM residential customers. SWM's drivers use their

13  "judgment" as to whether residential waste left at the curbside has been set out for collection by a

14  current SWM customer. GCG observed no instance where a SWM driver failed to collect waste

15  that was set out at curbside. It should, therefore, be a top priority of SWM to prepare a complete

16  and accurate database of residential customers, to update this list on a regular basis and to ensure

17  that the list of SWM residential customers is sorted by route number and distributed to SWM's

18  drivers before they begin their routes each day. The determination as to whether a household is a

19  current SWM customer should not be left to SWM's drivers. Without such a list it is possible

20  that trash would be collected from non-customers or customers that are delinquent in their

21  payments, essentially providing the service free to these households,[19]     **[Finding and**

22  **Recommendation #4]**

23  As previously discussed, SWM needs to update its rules and regulations concerning

24  residential collection services. While an informational hand-out[20] is provided to customers

---

[19] Many of these problems would be eliminated by the "sticker" system discussed above.
[20] See Attachment E

1    requesting new or continued service, it is not clear that all other residential customers are aware

2    of these service rules. The current hand-out, with input from SWM drivers, should be expanded

3    to list situations in which SWM will not provide services and widely publicized.    In

4    Recommendation #2 above we recommended that GCG be instructed to prepare a revised

5    collection policy and present the policy to the PUC for review and approval during the anticipated

6    rate filing hearing in January 2007. **[Finding and Recommendation #5]**

7            Within the preparation of the revised service rules referred to above, GCG and SWM

8    should investigate whether the current rules and regulations for residential pick up services (as

9    described in a hand-out to new customers) are consistent with current laws[21] and that no new

10   legislation or amending legislation has been adopted that would invalidate any of these current

11   rules and regulations. We recommend that SWM and GCG be tasked with this legal review and

12   should be submitted to the PUC for approval during the rate hearing in January 2007. **[Finding**

13   **and Recommendation #6]**

14           GCG inquired how SWM's drivers knew whether households with containers set out in

15   front of them at curbside were not only SWM customers, but also customers who are not in

16   arrears to SWM. The simple answer is they do not. Regarding delinquent customers, SWM had

17   implemented a policy during the second quarter of calendar 2006 that if a customer is identified

18   as a delinquent, his containers are marked with an "X" and the SWM drivers are instructed not to

19   service this customer. Once the customer satisfies his indebtedness to SWM, the containers are

20   then marked with the circle surrounding the "X." SWM determined there may be legal issues

21   with this program, since at the current time the containers are not property of SWM and

22   terminated the program. This problem would be addressed by our Recommendation #4 where

23   accurate customer lists would be developed. These lists should be made current no later than the

---

[21] The handout references PL17-87; 23-64, 24-272, 24-313, 25-93 and its amendments.

13

1   end of 2006, the date by which we recommend that privatization of all residential collection

2   occur.[22] **[Finding and Recommendation #7]**

3          SWM has not segregated collection routes into roughly equal Northern, Central and

4   Southern districts for future privatization as required by PL26-99. SWM is already about four

5   years past the deadline required for the privatization of collection for two thirds of the residential

6   customers (October 2002). This requires that this program be provided the highest priority by

7   SWM. We noted that SWM customer service had on its own initiative begun to segregate

8   customer files into three territories, but it is not clear whether upper management and/or the

9   Consent Decree team is aware of this process. SWM is currently reviewing its data with the intent

10  of complying with the mandate in PL26-99. This should not be an overly complex exercise and

11  SWM must move toward compliance with the greatest urgency – we recommend no later than the

12  end of 2006. Furthermore, we recommend that the PUC should seek an amendment to PL26-99

13  that would provide that <u>all</u> of the residential collections be privatized. **[Finding and**

14  **Recommendation #8]**

15  **2.       Operational and Administrative Function Problems.**

16           **Truck Maintenance.**

17          GCG inspected DPW's maintenance department and interviewed its chief mechanic.

18  GCG observed that while SWM has sixteen packer trucks, only seven packers were operational at

19  the time of GCG's inspection. Of the remaining nine packer trucks, two had been cannibalized

20  for parts and the remaining packer trucks were in various states of disrepair, ranging from repairs

21  as simple as tire replacement to repairs as major as installing a new transmission. Some of these

22  packer trucks have been non-operational for many months while many of the ones that are in

23  operation are fifteen years old (most were purchased in 1992 and 1993 Recent press reports[23]

24  indicate that recently, since our audit, as few as one or two trucks have been working resulting in

---

[22] This would also be another relevant issue to consider in the analysis of implementing the "sticker" system.
[23] See Attachment B

1  frequent missed pick up days, a level of very poor service and customer frustration. Our

2  recommendation that all residential routes should be privatized for collection would eliminate this

3  issue. [Finding and Recommendation #9]

4        **Transfer Station Operations**

5        SWM is responsible for operating three transfer stations. These transfer stations are open

6  five days per week (Thursday through Monday 9-5 except for Holidays and Sundays when open

7  7-3:30). During GCG's inspection, operations at the Agat transfer station were observed. That

8  operation consisted of three employees, two trash containers ("roll offs") and a guard house.

9  Only one transaction occurred during GCG's on-site inspection. The SWM employee responsible

10  for collection of the self-haul fee is issued a book of blank invoices that are sequentially

11  numbered. Upon entry into the transfer station, a customer pays the self-haul fee and receives

12  one of the three triplicate invoices listing the customer's license plate number and the total

13  charged. The transfer station is a cash only operation. There is no scale or any device for cubic

14  yard measurement on premise. The one customer GCG observed arrived with a partially full

15  pickup truck and was charged the $5 self-haul rate. This rate covers anything over 3 cubic yards.

16        GCG was informed by the SWM employee who collected the self-haul fee that a SWM

17  runner is supposed to arrive at the transfer station toward the end of each day to pick up the

18  receipts and cash. Cash and one copy of the receipt are delivered to DOA, while the second copy

19  of the receipt is delivered to SWM. If the SWM runner fails to appear at the end of the day, a

20  SWM employee takes the cash home. This is bad policy and should cease in order to provide

21  security for the cash as well as appropriate internal control. [Finding and Recommendation

22  #10] The utilization rate of transfer stations and appropriate self-haul rate should be carefully

23  investigated in future proceedings, since a rate that is below the monthly curbside pickup rate

24  might encourage the public to bring the waste to the transfer station and from illegally disposing

25  of waste. Currently, in the face of no or irregular residential waste collection, many residences

26  are faced with the dilemma of health hazards associated with storing waste on premises, self-

15

1   hauling or illegal dumping. This issue will be important when the significant rate increases that
2   are imminent are implemented and customers will be strained to afford service.

3           SWM employees reported that waste is frequently left at the gates of the transfer stations
4   as well as the Ordot facility. This situation is not only unsightly, but attracts vermin. The waste
5   left at the gate is swept up by SWM employees at the start of each day and deposited into
6   available receptacles. This "illegal" dumping of waste represents additional revenues that should
7   have been collected by SWM, but were not. This situation provides free service to the individual
8   or individuals responsible. Bond holders are adverse to free service and the bond indenture
9   usually prohibits free service. Enforcement of existing laws related to illegal dumping of waste
10  needs to be undertaken. SWM should seek police assistance in monitoring the transfer stations
11  during off hours. SWM and GEPA should establish a joint strategy to eliminate this situation,
12  including the possibility of installing surveillance cameras. **[Finding and Recommendation**
13  **#11]**

14

15  3.      **Commercial Collection and Revenue Problems.**

16          Approximately 57% of SWM revenue comes from services rendered to commercial
17  haulers at the Ordot facility. The tipping fees, which the customers of these haulers are required
18  to pay is determined by the whether the waste is un-compacted or compacted. This is determined
19  by weight. The scale at the Ordot facility is currently broken which makes it difficult, if not
20  impossible for SWM to correctly determine the tipping fee, which is due for each truck. The
21  amount of revenue which has been lost from this problem is difficult to calculate. However, what
22  is clear is that it must be immediately corrected. The current rates for per cubic yard are $5 un-
23  compacted and $20 compacted. Because of this significant differential it is important that SWM
24  have procedures in place to ensure that the correct fee is being charged for waste deposited. We
25  were approached with allegations that SWM was in certain cases charging an uncompacted fee
26  for compacted trash. We are not able to verify the allegations. SWM should be required to

16

1    immediately repair or replace the scale until such time as the new landfill facility is functional

2    and provide adequate controls to ensure that the commercial haulers are properly billed. **[Finding**

3    **and Recommendation #12]**

4

5    **4.      Billing and Collection Problems**

6          GCG's focus in this audit was a review of the billing and collection functions of both

7    SWM and DOA.    SWM has had the responsibility to bill for residential services for

8    approximately one year now and DOA bills for commercials services.  Historically, SWM has

9    been woefully unable to collect revenues from the residential segment of customers as indicated

10   by the following table:

11                                  **Table 1**

12                    **Four Year Average Collection Ratios**

|                           |       |
| ------------------------- | ----- |
| Commercial Haulers        | 92%   |
| Other Commercial Haulers  | 65%   |
| Residential Customers     | 26%   |
| Transfer Stations         | 100%  |
| Total Collection          | 68%   |

13

14         At the current time, SWM prepares all billings to the residential customers receiving

15   SWM collection services.  There are significant problems with these billings: customer lists are

16   incomplete and collection rates are very low and the paid up status of customers are also

17   incomplete and inaccurate. There was a massive six-month billing (containing retroactive

18   periods) that was prepared by SWM customer service and mailed out in early April 2006.  A total

19   of nearly 23,000 invoices were prepared.  In many cases customers do not agree with the invoices

20   prepared. Customers that dispute their bills must come in to the SWM customer service office

21   with their complaints. In the instance where the customer claims that he is no longer a customer,

22   he must submit proof that his service was terminated by showing customer service disconnection

17

1  notices from GPA or GWA. Moreover, GCG is aware that in one instance it took a new customer

2  nearly two hours to become a customer.

3  We were informed that there is no written policy has been created by SWM to handle

4  complaints of this nature  SWM has only five customer service positions authorized and two of

5  these were vacant at the time of GCG's inspection.  A specific problem identified with the latest

6  residential billing is that there is a legal prohibition against back-billing for more than four

7  months of services (see PL26-17). This public law was passed in the aftermath of Supertyphoon

8  Pongsonga. Collection of tipping fees had previously been suspended immediately after the super

9  typhoon struck Guam, and the intent of PL26-17 was to limit the economic hardship that was felt

10  by Guam residents once collection of tipping fees resumed.  This law needs to be reviewed and

11  amending legislation may need to be introduced to ensure that restrictions for time periods that

12  may be back-billed will be determined based on sound management decisions as this could

13  impact the financial condition of SWM and its ability to support debt service. A sound Collection

14  Policy should be developed.  This should be done in conjunction with the development of service

15  rules that we have recommended and should be either approved through the Administrative

16  Adjudication Act (AAA) process or be approved by petitioning the PUC and heard in the same

17  time frame as the January 2007 rate hearing. SWM should bill no less than quarterly and should

18  do so immediately. Any legal impediment for this recommendation should be removed. **[Finding**

19  **and Recommendation #13]**

20  GCG was informed by SWM management that a policy regarding promissory notes (or

21  payment plans) was evolving.  Currently, the decisions for such plans are made on an ad hoc

22  basis by SWM customer service personnel.  Though the concept of a promissory note permitting

23  a customer to make monthly payments against arrears may be desirable, a formal policy needs to

24  be created by SWM management and approved by the PUC so that SWM customer service is not

25  placed in the position of making policy decisions of a potentially arbitrary nature.  There should

26  be a written summary of this policy posted at all customer service locations that is also made

18

1    available to SWM customers through the mail or "on-line." Such a collection policy should

2    include specific timing from when an invoice is deemed late, interest or penalty charges for late

3    payments, fines for return of customer check for "insufficient funds" and written criteria for

4    promissory notes. Implementing such a policy would be a significant effort and before this effort

5    is made we recommend that its implementation be deferred to a later phase in the process. We

6    make this recommendation because current collection rates are so low and service currently and

7    historically has not been acceptable making the possibility of customer disputes multiply. We

8    recommend that GCG be tasked with this evaluation and that this recommendation should also be

9    made in the January 2007 time frame. Any legal impediment to in creating a collection policy

10   should be removed. **[Finding and Recommendation #14]**

11          The current situation of billing and collection for SWM residential service is abysmal.

12   While there has been considerable effort by SWM customer service employees to rectify this

13   matter, the situation will need significant time and effort to fully address all of the systemic

14   problems that have lead to a wholly unacceptable 26% SWM residential collection average over

15   the past four years. Except for the GovGuam accounts, GPA and GWA currently have collection

16   rates between 95 and 100% of billings. Based on information received from DOA, the most

17   recent estimate of accounts receivables is approximately $11 million broken down as follows:

18                                            **Table 2**

| Month Ending | Large Commercial | Other* Commercial | Residential |
|---|---|---|---|
| June 30, 2006 | 3,197,945 | 239,948 | 7,593,970 |
| Annual Revenue | 3,670,647 | 80,263 | 2,730,435 |
| Days Outstanding | 318 | 1,091 | 1,015 |

19

20          It is of course highly questionable whether the amounts in the table are collectible. For

21   residential customers the amounts of prior billings are questionable and the amounts subject to

                                              19

1  collection are limited to a specific period of time if they are the result of back billing. For large

2  commercial customers the amounts may be more collectible. We recommend that the

3  investigation into the collection of receivables be put into a second phase under the oversight of

4  the ALJ. We have previously recommended that the Public Auditor undertake an audit of the

5  commercial haulers' billing and collection of their customers and amounts collected and remitted

6  from their customers to SWM. The amounts receivable from large commercial SWM customers

7  is approximately 10.5 months. These amounts can clearly be reduced.

8         Our recommendations to privatize the billing and collection functions, even if SWM is

9  made a public corporation and transferred under the oversight of the CCU we believe will

10  transform the billing and collection issues and reduce the high level of receivables. We

11  recommend that GCG be tasked with establishing a realistic level of receivables and to make

12  recommendations to bring the level down to reasonable levels and to provide a report to the PUC

13  in the January 2007 time frame. [**Finding and Recommendation #15**]

14         Currently, SWM bills and collects in arrears for residential services. Assuming that

15  SWM bills on a quarterly basis, this results in a lag between the date services are rendered and the

16  date payment is due of at least 120-150 days from the first month of service even when payment

17  is made within thirty days of the bill being issued. This is not a desirable effect considering the

18  need for sufficient cash flow for both routine operations and the cost of preparing SWM to be in a

19  financial situation that would improve investor confidence in the upcoming bond issuance. GPA

20  and GWA bill in arrears, but on a monthly basis. Late payment policies are also in place at both

21  GPA and GWA including interest payments and promissory notes. As a result, the average lag

22  between the time that services are rendered and the time that its customers' payments are due is

23  forty-five days or less.

24         As mentioned previously SWM had under consideration during the period of our audit a

25  proposed SWM Decal program that would be used to identify customers (including lifeline

26  customers) and to purge SWM's aging database of incorrect information. Although SWM has

1    deferred the "Decal" program pending the resolution of other matters SWM deems to be higher

2    priorities, one of the benefits of such a program is that it would result in a prepayment plan, i.e.

3    customers would pay prospectively for service. While the specific program has been deferred,

4    the concept of prepayment for services would be useful and would certainly help SWM both in

5    cash flow and in customer service. An appropriate prospective billing program for no more than

6    three months should be considered even if the decal program is not implemented. This change in

7    billing protocol would require PUC approval and should be submitted for approval in the January

8    2007 timeframe or earlier.

9          As noted, we have recommended the full privatization of the residential collection

10   function and we have also recommended the privatization of the billing and collection function.

11   We recommend that after the January 2007 set of hearings the concept of setting up independent

12   franchise areas where all aspects of trash collection, billing and collection would be undertaken

13   by a single entity and be subject to the oversight of the PUC be examined. **[Finding and**

14   **Recommendation #16]**

15         A lifeline rate as required by GCA 10 §51118h (1) does not exist at this time. P.L. 28-56

16   law requires that the PUC set rates that are "consistent with and meeting the low income

17   eligibility criteria, requirement policies or procedures established by the Guam Housing and

18   Urban Renewal Authority (GHURA) applicable to their Low Income Public Housing Program."

19   The PUC must approve both the rate for lifeline customers and the non-lifeline rate that combined

20   would develop sufficient revenues to cover SWM's operational costs and debt service

21   requirements.

22         PUC has determined that a lifeline rate should be established in the next rate case

23   (assumed to be heard in January 2007). PUC should task GCG with recommending a lifeline rate

24   and the criteria for determination of eligibility consistent with the GHURA's "low income"

25   eligibility criteria. Announcement of the proposed rate and eligibility requirements should be

26   published when SWM files its next rate case. We have previously indicated in our previous rate

21

1   case testimony that the current "low income" criteria has the potential to qualify too many

2   customers, making the lifeline program either too costly or the discount too small. We

3   recommend that consideration be given to using more targeted criteria for the population in

4   economic need. If income qualifications other than the GHURA "low income" eligibility criteria

5   are used, the Guam Legislature must first change the applicable law. GCG is awaiting additional

6   information from GEDA regarding the success of the new "swipe program"[24] to determine if it

7   can be used by SWM to more easily identify customers eligible for the lifeline rate. If SWM ties

8   eligibility for the lifeline rate to participation in that program, assuming that the number of

9   participants is not too large, SWM may be able to more easily enroll customers eligible for the

10  lifeline rate and reduce the administrative burden of the program. The specific discounted rate as

11  well as the eligibility criteria should be presented to the PUC in the upcoming rate case  **[Finding**

12  **and Recommendation #17]**

13          After receiving a copy of an invoice for services for the commercial haulers at the Ordot

14  landfill, DOA (who is currently responsible for billing these customers) prepares and submits

15  bills to individual haulers which are due within sixty days. It is the responsibility of the

16  commercial hauler to collect the invoiced tipping fees from their customers and pay SWM in 60

17  days. we believe that the 60 day time frame set for payment is too long from time of receipt of

18  the bill and should be reduced to 30 days. We note here however, that a lot of progress need to be

19  made on this issue as our previous table showed that for commercial haulers the accounts

20  receivables are currently approximately 318 days.  This recommendation should also be read in

21  conjunction with our finding and Recommendation #20 to make the commercial customer the

22  customer of the hauler and to make the tipping fee the responsibility of the hauler. **[Finding and**

23  **Recommendation #18]**

---

[24] The SWIPE program uses a credit type card in lieu of food stamps where the client "swipes" the card at the counter.

1    During GCG's meeting with DOA, it was discovered that there are occasions (apparently
2    not infrequent) where invoices from Ordot are delivered to DOA with invoices that are either out
3    of sequence or in no sequential order at all. This belies what GCG was told by SWM customer
4    service, who claimed that specific invoices were assigned to each SWM employee and that each
5    such employee was required to account for all of the numbered invoices in the sequence so
6    issued. DOA stated that it had upon occasion held invoices until SWM answered DOA inquiries
7    about the reasons for missing numbered invoices. Until such time as the Ordot facility is closed or
8    until such time as billing and collection are turned over to outside contractors, SWM employees
9    that issue receipts for commercial haulers (or at the transfer stations for self-haul) should be
10   required to sign for all blank numbered receipts and thereafter be required to account for all
11   numbered receipts issued to each such employee. [**Finding and Recommendation #19**]

12   Currently commercial haulers are merely agents for SWM in the collection of tipping
13   fees from their customers. Therefore, commercial hauler take the position that PL25-93 requires
14   that only those tipping fees actually collected from a commercial hauler's customers are required
15   to be forward to SMW. This places the collection burden on SWM and not on the commercial
16   haulers. In defense of this position, the commercial haulers cite the portion of PL25-93 that
17   provides:

18       Tipping fees for business or government generators that have their solid waste
19       collected by commercial collectors shall be collected by commercial collectors,
20       on behalf of the government of Guam. Commercial collectors shall remit the
21       tipping fees paid by their customers in the prior month to the government by the
22       twentieth (20th) day of the following month. The tipping fees collected by
23       commercial collectors, upon remittance to the government of Guam, shall be
24       considered as revenue for the government and *not* as income for commercial
25       collectors. *If* a commercial collector does *not* remit the tipping fees actually
26       collected from generators, as provided in this Section, then the commercial
27       collectors shall be liable for full payment to the government of all tipping fees
28       that are collected from generators, but *not* remitted to the government.
29

30   We recommend that this situation be changed so that the business or government
31   customers become customers of the commercial haulers and that the commercial hauler be

23

1     responsible for the collection of all fees from their customers and remittance to SWM. The

2     current situation results in a situation where SWM has no means of knowing what is owed by the

3     ultimate business or government customer and not being able to collect. While the

4     recommendations of this report are being evaluated and alternative implemented, we recommend

5     that the haulers be required to notify SWM monthly of customers that are delinquent in payments.

6     SWM should pursue collection efforts with these customers and the haulers should be put on

7     notice that any delivery that contains a delinquent customer's trash will not be accepted. Our

8     audit obtained information from DOA that indicated that collections from commercial haulers

9     lagged over 5 months while the accounts receivables show a 318 day balance. Under the

10     recommended scenario where commercial haulers would be responsible for all payments, the

11     billings to them should be made monthly and payments due in 30 days. When this

12     recommendation is adopted, appropriate service rules should be developed and approved by the

13     PUC, including penalties for delinquent payments. GCG also recommends that if the tipping fee

14     expense is shifted from the hauler's customer to the hauler, that it be exempt from gross receipts

15     tax to maintain the current status quo. . **[Finding and Recommendation #20]**

16     There does not appear to be a strong policy forcing full and timely payments from

17     commercial haulers. Information obtained from SWM indicates that there is a payment lag by

18     some of these haulers of as much as one year after the time service is rendered. This was also

19     confirmed by DOA in its communications regarding collections of the interim rate increases

20     effective November 2005. Service rules should be established by SWM and approved by the

21     PUC that would force full and timely payments from the commercial haulers, including denying

22     access to the SWM's solid waste disposal facility for non-payment of undisputed bills and for

23     payment for disputed bills after all appropriate remedies are exhausted. All commercial haulers

24     should be notified of this policy at least thirty days in advance of the implementation of this

25     policy. This policy should inform the commercial hauler of its ability to dispute bills and the

26     methods for the resolution of those disputes. Payment on all bills should be due, other than

24

1  disputed amounts, within thirty days. Any commercial hauler failing to pay its bills timely should

2  be denied access to the Ordot facility until such time as payments are brought current. **[Finding**

3  **and Recommendation #21]**

4      As mentioned in GCG's September 2005 report filed in the prior rate proceeding[25] many

5  of the requirements of the legislation transferring rate making authority to the PUC, including

6  cost-based and variable rates, could not be implemented without more detailed financial reports.

7  Internal financial reports are not routinely generated and are only provided by DOA at the request

8  of SWM. This lack of an ongoing flow of financial information from DOA to SWM management

9  prevents simple reports, such as accounts receivable aging or budget versus actual expenditures,

10  from being received and reviewed by the appropriate individuals at SWM on a timely basis. This

11  situation cannot continue, as fragmented financial information is viewed as a negative by the

12  investment community. GCG was advised that there is an accounting consultant at SWM who is

13  capable of creating these reports using the DOA accounting software and that a regularized

14  reporting process is in the process of being reviewed and implemented. This should be completed

15  by January 2007. This recommendation should be read with our primary recommendation to

16  make SWM a public corporation and put it under the CCU. **[Finding and Recommendation**

17  **#22]**

18      The PUC required that all additional revenues derived from the November 1, 2005

19  interim rate increase be deposited into a reserve fund for future use in payment of costs associated

20  with the management audit, regulatory review and debt service requirements. Establishing this

21  fund was a condition of PUC approval of the interim rate increases. During GCG's on-site

22  review, it was discovered that while the separate account into which DOA (SWM) was ordered

23  by the PUC to deposit the additional revenues has been established, the account is grossly under-

24  funded. The total amount in the fund as of May 2006 was less than $9,000, even though DOA

25  stated in its response to GCG that the amount should be $47,000. Recent correspondence from

---

[25] This report is available on the PUC web site.

1  SWM and DOA indicates that they now believe that the proper amount that should be in the
2  account as of June 30, 2006 should be approximately $580,000. Ensuring that the portion of
3  collected funds that is derived from the increase in rates is actually deposited into this reserve
4  account would improve SWM's ability to provide the necessary funding for its upcoming rate
5  case and implementation activities from this audit. The proper funding of this account should be
6  viewed as a priority item, because establishing permanent rates and implementing the
7  recommendations of this audit will be viewed as a positive development in SWM operations by
8  potential bond investors. We believe that the amount that should be in the fund as of June 30,
9  2006 should be approximately $465,000. This should be funded in 60 days and then be
10  maintained at the appropriate level. **[Finding and Recommendation #23]**

11      In several meetings attended by GCG, it became obvious that all of the parties (SWM,
12  DPW, EPA, GEPA, legislators, bond counsel, PUC, etc) are in agreement that some
13  independence from DOA and DPW would be beneficial to SWM. We believe that such
14  independence is a necessity and have recommended that we support the PUC's position that
15  SWM be a public corporation under the CCU. It is difficult to see how there could be any
16  support for the current situation to continue. This would cause consternation from bondholders
17  and put the contemplated financing in jeopardy. The CCU would bring seasoned management as
18  a resource, a Chief Financial Officer, and an organizational structure that has experience in
19  managing utility operations and making operational improvements using both in house and
20  outside resources as appropriate. These management skills will be extremely valuable in
21  reorganizing SWM and providing its customers with good service as well as to manage the
22  required operations at the landfill and bring SWM into compliance with the Guam EPA.
23  **[Finding and Recommendation #24]**

24      Again, GCG thanks the all SWM and other GovGuam employees and management for
25  their assistance provided to GCG during the course of its investigation, without which GCG

26

1    would not have been able to prepare this report. GCG looks forward to a long-term relationship

2    with SWM in whatever form it will ultimately take. This concludes GCG's report.

ATTACHMENT A

ALJ MEMORANDUM & PUC RATE ORDER

DOCKET 05-09

OCTOBER 27, 2005

*Memorandum*

| To: | Commissioners |
| From: | ALJ Boertzel |
| Date: | April 20, 2006 |

**RE:** **Docket 05-9 [Department of Public Works [DPW] – Revenue Bonds]**

### Overview

Under a schedule driven by the Federal Consent Decree, the government of Guam and its financial consultants are working under a May 2006 deadline to secure $90 million dollars in revenue bond financing to fund the capital requirements for the Ordot landfill closure, the construction of the new landfill and associated costs.

As the repayment of these bonds will be funded through DPW rates, financial consultants emphasize the importance of a strong PUC commitment to approve such rates increases [estimated at 400% over current rates within the next 26 months] to enable DPW to meet its bond obligations.

PUC customarily issues two orders in support of utility bond financing: a] an order drafted by bond counsel, which provides formal approval of the transaction terms and conditions and a regulatory commitment to provide adequate rates to fund bond commitments; and b] an order which approves and establishes regulatory oversight over the use of bond proceeds.

### Challenges

The fact that DPW is a line agency of the Executive Branch creates significant regulatory challenges, which PUC does not encounter in regulating GPA and GWA, which are autonomous public corporations. These challenges have come into sharp focus during this April regulatory session as a result of consultations with DPW's financial advisor and management. DPW does not have the power to contract and its revenues are held under the Department of Administration's [DOA] custody. These challenges are reflected in the following facts:

1. On December 20, 2005 PUC gave its regulatory approval for DPW to employ a procurement advisor to craft the documentation for the privatization of the Ordot closure, the construction and operation of the new landfill and for the privatization of residential trash collection. The contract, which also requires the Attorney General's approval, has sat in

1

the AG's office since early February. As a result, DPW has no resources to move forward with procurements mandated by the Consent Decree and is incurring fines as a result.

2.  On October 27, 2005, PUC awarded DPW a 25% rate increase, effective for services rendered after November 1, 2005. DPW has still not implemented this increase for its residential customers. The rate order is enclosed as *Attachment A*.

3.  The October rate order was premised on DPW's assurance that it would improve its collection rate to 95% for commercial customers and 70% for residential customers. DPW has failed to meet this assurance – its current collection rate is at 30%. As a result, there will be a substantial FY06 revenue shortfall.

4.  The October rate order mandated that all revenue created by the rate increase shall be deposited into a restricted DOA account, which could not be withdrawn without PUC approval. Georgetown estimates that the current balance in the restricted account *[even excluding the residential rate increase]* should be in the range of $400,000. DOA has reported that it currently has only $47,000 on deposit in the restricted account. The government's financial advisor recommends that the bond covenants mandate that a "locked box" be created under the Trustee's custody for all rate revenues. PUC should strongly support this recommendation, with the condition that the Trustee observe PUC orders, which restrict the use of funds and establish reporting requirements. *Attachment B* is a presentation by the advisor *[Municipal Services Group]* regarding the challenges of marketing the DPW revenue bonds.

5.  As PUC's rate authority is derived from statute, it is essential that the legislation, which approves this financing include a covenant from the Legislative and Executive branches that they will not take any action, which would impair PUC's independent rate making authority. Similar covenants have been provided in GPA and GWA bond financing legislation.

6.  DPW is not in compliance with Guam law, which mandated that 2 of 3 residential collection districts be privatized by October 2002. No residential collection has yet been privatized. As a result, residential customers receive poor service and are unlikely to favorably receive the reality of a 400% rate increase over the next 26 months unless service is dramatically improved. In its December 20, 2005 Order *[Attachment C]*, PUC directed DPW to prioritize the privatization of residential trash

2

3

collection. As discussed in paragraph 1 above, this effort has been obstructed by DPW's inability to employ a procurement advisor.

### *Recommendations*

PUC has a dual responsibility in regulating DPW's rates: a] the obligation to provide adequate rate revenues to enable DPW to meet its financial obligations; and b] the obligation to assure that DPW's customers pay *just and reasonable* rates for reliable, quality service. Unless the above challenges are resolved, these dual responsibilities will likely put PUC on the proverbial *horns of a dilemma* I offer the following recommendations to address this dilemma:

1. PUC should make it clear that it will not make bond rate commitments unless DPW is empowered to employ a procurement advisor, which must occur before residential service can be improved through privatization.

2. Bond counsel, who will be crafting the legislation, which authorizes the bond financing, should be requested to include a covenant to protect PUC's independent rate making authority.

3. PUC should support a *"locked box"* bond covenant.

4. PUC should immediately initiate a focused audit by Georgetown of DPW's billing and collection practices and DOA restricted account management, which would be ready for regulatory review and implementation at the next regulatory session.

5. PUC should support the recommendation made in Guam Environmental Protection Agency's *2006 Integrated Solid Waste Management Plan* that solid waste management be transferred to a public corporation under the oversight of the Consolidated Commission on Utilities.

I recommend that PUC adopt these recommendations by resolution, which authorizes me, in consultation with Chairman Brooks, to implement them.

4

BEFORE THE GUAM PUBLIC UTILITIES COMMISSION



DEPARTMENT OF PUBLIC WORKS
ESTABLISHMENT OF TIPPING AND
USER FEES PURSUANT TO P.L. 28-56          DOCKET 05-09

## RATE ORDER

Public Law 28-56 directs the Guam Public Utilities Commission *[PUC]* to
establish commercial, government and residential tipping and user fees to fund
the activities of the Department of Public Works' *[DPW]* Division of Solid Waste
Management *[DSWM]* in discharging its statutory duties and those imposed by
Federal District Court of Guam Consent Decree *[Consent Decree]* in Civil Case No.
02-22.

On September 20, 2005 Georgetown Consulting Group *[GCG - PUC's regulatory
consultant]* issued a Report, which recommends the following *interim* service fee
increases:

| Service Fee | Current | Proposed [Interim] |
|---|---|---|
| Residential pick-up | $8 per month | $10 per month |
| Tipping fee [compacted] | $16/cubic yd. | $20/cy |
| Tipping fee [uncompacted] | $4/cy | $5/cy |
| Self drop [under 3 cy] | $2/pickup | $2.50/pickup |
| Self drop [over 3 cy] | $4/cy | $5/cy |

On October 17, 2005, GCG and DPW entered into a stipulation, which
recommends that:

1. PUC adopt the above proposed fees as a first step toward volume and
   cost based rates.

2. The GCG report should be found to satisfy the requirement in 10 GCA
   51118[e] that fees be based on an actuarial cost of service analysis.

3. The additional revenues created by the proposed fee increases, which
   are estimated to be $1.3 million in FY06 *[net of uncollectible allowance]*,
   should be restricted and spent only pursuant to PUC order.

4. PUC should await the management audit required under 10 GCA
   51118[e] before establishing a variable residential tipping fee.

1

5. A targeted residential lifeline tipping fee should be established with other permanent fees during the April 2006 regulatory session

6. DPW should provide PUC with quarterly reports, commencing with quarter beginning October 2005, on DSWM's revenues and expenses, including income statements and balance sheets. Reports should be filed within 21 days after the close of each quarter *[the first report due January 21, 2006]*.

7. PUC should conduct a quarterly review of DPW's compliance with this rate order and of the adequacy of the proposed interim rates.

8. PUC should immediately undertake the focused management audit of DSWM operations as required by 10 GCA 51118[e].

9. Any DPW procurement or obligation relating to DSWM in excess of $50,000 should require PUC's prior review and approval. The contract review protocol, which PUC established to regulate the procurements of Guam Power Authority and Guam Waterworks Authority should be adopted as the review protocol for these procurements and obligations.

PUC conducted a public workshop at 6:00 p.m. on October 17, 2005 to receive a briefing on the GCG report and the Stipulation. In addition, PUC conducted public rate hearings at 6:00 p.m. October 25, 2005 in Hagatna, at 5:00 p.m. October 26, 2005 in Agat and at 6:30 p.m. October 26, 2005 in Dededo on the proposed interim fee increases.

After due consideration of the record in this docket, including public comments regarding the proposed interim fee increases, for good cause shown and on motion duly made, seconded and carried by the affirmative vote of the undersigned commissioners, the Guam Public Utilities Commission HEREBY FINDS AND ORDERS THAT:

1. DPW, including DSWM, is subject to PUC jurisdiction pursuant to 10 GCA 51118[e].

2. The stipulated recommendations from GCG and DPW, as discussed above, should be and are hereby adopted. DPW is ordered to comply with the recommendations, subject to instructions from PUC's administrative law judge *[ALJ]*.

2

3. The proposed interim fee increases are hereby approved for services rendered on and after November 1, 2005. PUC recognizes that this is but the first of a series of rate increases, which will be necessary to support the $93 million borrowing required to enable DPW to comply with the Consent Decree. The GCG Report satisfies the requirement in 10 GCA 51118[e] that fees shall be based on an actuarial cost of service analysis.

4. Under separate order, ALJ will be authorized to oversee the focused management audit of DSWM's existing operations.

5. The contract review protocol, in form attached hereto, shall govern the regulatory review of DSWM procurements and obligations.

6. ALJ is hereby authorized and directed to oversee regulatory proceedings, which will lead to PUC's consideration of a variable residential rate, including a lifeline component, and of the implementation of permanent fees.

7. PUC emphasizes that the revenue created by the interim fee increases shall be restricted funds and shall not be spent without prior PUC authorization.

Dated this 27th day of October 2005.

Terrence M. Brooks

Edward C. Crisostomo

Joseph M. McDonald

Rowena E. Perez

3

ATTACHMENT B

PRESS REPORTS REGARDING SERVICE

8

**by Marissa Borja, KUAM News**
**Thursday, May 25, 2006**

Back on Guam as part of a routine biannual visit, the United States Environmental Protection Agency made it clear today that Guam continues to face a number of serious challenges - those that will only become more difficult to address the longer it takes to tackle them. And moreover, these issues will become magnified a hundredfold with the impending relocation of U.S. Marines from Japan.

The Department of Public Works was hit hard today with comments by the USEPA on its inability to meet several key deadlines affecting the closure of Ordot Dump and the opening of the new landfill. USEPA Guam program manager Ben Machol described these milestones as being in jeopardy, telling KUAM News, "If you can't award a contract to close Ordot, clearly you're not going to be able to close Ordot, so we're just seeing what's coming down the line and those final milestones the ones that triggered the lawsuit just don't look like they're going to happen on time...it's looking less realistic that they're going to meet the major milestones that triggered the lawsuit."

In addition to assessing fines to DPW for the closure of Ordot, the USEPA also fined the agency for its failure to complete a wetland mitigation plan. (The latter however is said to have been squared away as of today.) But this still doesn't bring DPW out of the red; Machol says he has yet to see any concrete evidence indicating that there is a larger plan dealing with such issues as transfer stations, recycling, **revenue collections.**

Noting that these are smaller pieces of a bigger picture, the federal government maintains that everything is set up like dominoes - so if you miss the first pieces, you're going to miss those last ones, too.

While DPW doesn't dispute what the feds had to say, they would however like to be acknowledged for the work they have done. Director Larry Perez defended, "It's not like DPW is sitting around doing nothing - we spend millions of dollars and hundreds of hours working on all these consent decree requirements. Now, you have to keep in mind that this is a violation that's been for the last fifteen years and now it's all due yesterday." He furthermore explained the impediments they face are not limited to his agency, but are actually attributed to the government as a whole.

"It should be penalties against the Government of Guam because we don't control the Attorney General's Office because they can actually make or break this project, but to assess it against DPW when there's things that are beyond our control is somewhat unreasonable," Perez continued.

But evidently it all boils down to money, as Perez believes that he'd be able to come into full compliance with the consent decree if given $93 million. In the meantime, Attorney General Doug Moylan disputes that the failure to meet deadlines of wetland mitigation penalties and the closure of the Ordot Dump lie within his office.

9

by <u>Mindy Fothergill</u>, KUAM News
Thursday, June 29, 2006

Accused of gassing up on the government's dime and accepting bribes from a local sanitation company, Department of Public Works employee Patrick Santos was charged in two separate indictments today. Attorney General Douglas Moylan told KUAM News, "The grand jury found two charges of theft, a crime against the community charge with a special allegation and official misconduct against Mr. Santos. For the Ordot Landfill bribery case, the grand jury returned true bills for solicitation of a bribe and official misconduct."

Santos is accused of taking five gallons of gas every two weeks for his personal vehicle from December 2002 through June 2003. **The DPW staffer is also accused of received $750 in bribe money to allow Maria Santos from Lagu Sanitation to dump for free at the Ordot Landfill.**

An arrest warrant was issued for Santos and bail was set at $5,000.


**Broken equipment stalls trash pickup services**
**by Clynt Ridgell, KUAM News**
**Tuesday, May 16, 2006**

If you've been wondering why your trash hasn't been picked up lately, it's because the Department of Public Works' Division of Solid Waste Management has been having problems with equipment breaking down. If you live in any of the following areas and your trash wasn't picked up last week, according to DPW, collection will resume on their scheduled pickup days:

- Latte Heights
- Latte Plantation
- Ordot village
- Famha, Ordot
- Afame, Sinajana
- Canada, Barrigada
- Toto Gardens
- Toto Gardens
- Yona village
- Bordallo Subdivision, Santa Rita
- Santa Rita village

If you have any questions, you are urged to call DPW's Customer Service Center at 646-3111/3109/3147.

10

Mindy Fothergill, KUAM News
Thursday, June 29, 2006

Accused of gassing up on the government's dime and accepting bribes from a local sanitation company, Department of Public Works employee Patrick Santos was charged in two separate indictments today. Attorney General Douglas Moylan told KUAM News, "The grand jury found two charges of theft, a crime against the community charge with a special allegation and official misconduct against Mr. Santos. For the Ordot Landfill bribery case, the grand jury returned true bills for solicitation of a bribe and official misconduct."

Santos is accused of taking five gallons of gas every two weeks for his personal vehicle from December 2002 through June 2003. The DPW staffer is also accused of received $750 in bribe money to allow Maria Santos from Lagu Sanitation to dump for free at the Ordot Landfill.

An arrest warrant was issued for Santos and bail was set at $5,000.

## DPW expectedly will handoff trash duties to private firm
by Mindy Fothergill, KUAM News
Tuesday, July 18, 2006

With some residents waiting four weeks for their trash to be picked up, it's just a matter of time before the Department of Public Works starts outsourcing its trash pickup services. While nine packer trucks make up DPW's solid waste collection fleet, agency director Larry Perez confirms only two of the packer trucks are in operation. Perez admits some villages haven't had trash services in a month, while others are behind only a week.

With the constant break down of the packer trucks, the director says the agency will begin outsourcing its services. Perez could not say how much the privatization will cost, but the contracts will be month-to-month temporarily until trash collection is permanently outsourced.

In the meantime, DPW expects five additional packer trucks to be repaired before the end of the week.

Case 1:02-cv-00022    Document 62-2    Filed 12/15/2006    Page 11 of 21

**Expect full privatization of trash services by 2008**
**by Mindy Fothergill, KUAM News**
**Monday, July 24, 2006**

The Department of Public Works is playing catch-up to get residential waste collection back on track. With only one packer truck working two weeks ago, the agency now has four packer trucks in operation and three more are expected to be up by Friday. DPW director Larry Perez says because of the constant problems, the agency will outsource a portion of the trash pickup services in the next month or two.

DPW will need a private company to augment five trucks and operators to assist the agency's trash services. Residential waste collection is slated to be fully privatized before the end of next year.

**DPW promises trash services back online by Friday**
**by Marissa Borja, KUAM News**
**Wednesday, August 09, 2006**

After three weeks of poor service, Department of Public Works director Larry Perez says all trash will be picked up and his agency will be back on track. Perez claiming they've managed to make repairs to at least nine trash trucks, adding, "We're able to pick up all the trash every trash including those that are in bags that are not in receptacles authorized receptacles and we're going to pick up all the trash to get all those backlogs that we had for the last three to four weeks; we're going to get it all caught up no later than this Friday."

As we reported DPW plans to outsource a portion of the trash pickup services in the next month or two. Residential waste collection is slated to be fully privatized before the end of next year.

12

ATTACHMENT C

EXECUTIVE ORDER 2006-12



HAI 12
Janet

EXECUTIVE ORDER NO. 2006-_12_

RELATIVE TO ESTABLISHING THE ORDOT CONSENT DECREE
COMPLIANCE TEAM WITHIN THE OFFICE OF THE GOVERNOR
AND TO ESTABLISH PRIORITY PROCUREMENT AND INTRA-
AGENCY COOPERATION FOR THE ORDOT CONSENT DECREE

WHEREAS, the Organic Act of Guam provides that *I Maga'lāhen Guåhan* Governor of Guam, is tasked with the responsibility of overseeing the health and safety of the people of Guam; and

WHEREAS, the old Ordot dump poses a continuing threat to public and environmental health, and must be closed pursuant to a Consent Decree entered into by the Government of Guam, the United States Environmental Protection Agency, and the United States Department of Justice (U.S District Court Territory of Guam Civil Case No 02-00022); and

WHEREAS, this order reaffirms Executive Order 2004-02 and the Government of Guam's commitment to the Consent Decree, which requires the closure and post-closure of the Ordot Dump as well as the construction and operation of a new, sanitary municipal solid waste landfill; and

WHEREAS, the process of closing the old dump and opening a new landfill requires resources beyond the immediate capabilities of the Department of Public Works, and will require substantial and continuing involvement by a number of other Government of Guam agencies; and

WHEREAS, further delays in the closure of the Ordot dump and the opening of a new landfill will violate Consent Decree timelines, and may result in substantial penalties imposed on the Government of Guam

NOW, THEREFORE, I, FELIX P. CAMACHO, *I Maga' Lāhen Guåhan* Governor of Guam, by virtue of the authority vested in me by the Organic Act of Guam, as amended, do order:

1   Ordot Consent Decree Compliance Team.   The Ordot Consent Decree Compliance Team is hereby established and shall consist of at least one representative from the following agencies, to be designated by the Governor:

    a   Department of Public Works
    b   Guam Environmental Protection Agency
    c   Bureau of Budget and Management Research
    d   Department of Administration

The Governor also shall request representatives from the Guam Economic Development and Commerce Authority and the Office of the Attorney General

The compliance team shall be chaired by the Governor's designee and the representative from the Office of the Attorney General

14

Case 1:02-cv-00022     Document 62-2     Filed 12/15/2006     Page 14 of 21



The Governor may appoint additional representatives to the compliance team at his discretion. The purpose of the team shall be to:

1. Create a plan to meet the remaining timelines and requirements established by the Consent Decree.
2. Identify actions that will require legislative changes or approval and prepare legislative proposals for the Governor's consideration.
3. Implement the plan.

The Governor, or his designee, shall appoint members of the compliance team within one day of this signing of this order.

2. **Authority.** All government departments, agencies, instrumentalities and other public entities shall coordinate with the Compliance Team to comply with the mandates of the Consent Decree. All Government of Guam departments and agencies shall provide the necessary support and assistance to the compliance team for the purposes of complying with the mandates of the Consent Decree.

All existing contracts and accounts associated with the Consent Decree shall be supervised by the Compliance Team. Procurement, contractual and certifying authority shall be delegated by the Department of Public Works director to a member of the Compliance Team.

3. **Disputes.** Any disputes arising from this Executive Order shall be resolved by the Governor or his designee. The Governor or designee's determination of the dispute shall be final. The Governor's designee shall have authority to recommend appropriate disciplinary action against anyone who fails to make best efforts to comply with this Executive Order.

SIGNED AND PROMULGATED at Hagåtña, Guam this ____ day of May, 2006.

FELIX P. CAMACHO
I Maga' låhen Guåhan
Governor of Guam

Case 1:02-cv-00022     Document 62-2     Filed 12/15/2006     Page 15 of 21

ATTACHMENT D

LEGAL MEMORANDUM ON JUST AND REASONABLE RATES

## MEMORANDUM

| | |
|---|---|
| **TO:** | Georgetown Consulting Group |
| **FROM:** | John N. Ingram |
| **DATE:** | August 17, 2006 |
| **RE:** | Guam Public Utilities Commission - Ratemaking Considerations for the Management Audit of the Guam Department of Public Works |

In furtherance of your report to the Guam Public Utilities Commission ("Commission") concerning the management audit of the Guam Department of Public Works ("DPW"), this memorandum addresses the Commission's obligation or authority to disallow rate increases, in whole or in part, for DPW due to poor or inadequate service and management inefficiency. In this regard, it is our understanding that the management audit has indicated an unacceptable level of service by DPW, and you have observed that, in the absence of legislative changes, the Commission may be required to disallow or defer rate increases for DPW on the principal of just and reasonable rates. As discussed herein, this issue implicates at least two separate ratemaking principles accepted in other jurisdictions: (1) a state commission may disallow costs in establishing just and reasonable rates if such costs have been imprudently incurred; and (2) a state commission may consider the quality of service and management efficiency in establishing just and reasonable rates and a reasonable rate of return for the utility.

### Imprudent Costs

The Supreme Court of the United States long ago recognized that (a) under the standard of "just and reasonable" rates "it is the result reached not the method employed which is controlling", (b) a commission's ratemaking function "involves the making of 'pragmatic adjustments'" and (c) the fixing of "just and reasonable" rates "involves a balancing of the investor and consumer interests."[26]

In undertaking such balancing, courts and state commissions have often recognized that imprudent or wasteful expenses by a utility may not be passed on to such utility's customers through ratemaking.[27] In applying this principle, it is a generally accepted principle in many states that the state commission may review the utility's costs to determine whether such costs have been prudently incurred, and, if the state commission ultimately

---

[26] _Federal Power Commission v. Hope Natural Gas Co._, 320 U.S. 591, 602-603 (1944) (evaluating the authority of the Federal Power Commission under the federal Natural Gas Act).

[27] See, e.g., _West Ohio Gas Co. v. Public Utilities Commission of Ohio_, 294 U.S. 63, 68 (1935) ("A public utility will not be permitted to include negligent or wasteful losses among its operating charges"); _Gulf States Utilities Company v. Public Utility Commission of Texas_, 841 S.W.2d 459, 466 (Tex. App. 1992) ("A rate cannot be deemed just and reasonable unless the utility was prudent in incurring the operating expenses it seeks to pass through to its customers").

determines that any costs were imprudently incurred, such costs may be excluded from the utility's rate calculation.[28]

Ultimately, the Commission's authority or obligation to disallow imprudently incurred costs in ratemaking will depend on the Commission's statutory authority. The law giving the Commission jurisdiction and authority to establish rates for DPW (Public Law 28-56) does not expressly provide that DPW's rates must be "just and reasonable" and does not otherwise expressly provide that costs must be prudently incurred to be included in DPW's rates.[29] However, such legislation does provide that in performing its ratemaking obligations with respect to DPW under such law, the Commission "shall have the full authority and powers conferred upon it by its enabling legislation, 12 GCA 1200 et sec., including the audit power conferred upon it by Public Laws 25-05:12 and 26-78:2."[30]

In this regard, 12 GCA 12105(a) provides that all rates charged by any "public utility" must be "just and reasonable."[31] The term "just and reasonable" is specifically defined in the Commission's enabling legislation as "that rate, charge or assessment cost which enables the public utility to repay its debts, finance its obligations, finance its capital improvement needs and cover all of its operating expenses."[32] Georgetown has previously recommended that this definition of "just and reasonable" should be construed to include only prudent costs and expenses, and we understand that the Commission has previously accepted Georgetown's recommendation and determined that it has the authority to disallow imprudent and unreasonable expenses.[33] Further, the Commission's enabling legislation provides that any "rate change shall be considered by the Commission using standards and financial criteria consistent with generally accepted ratemaking practices of public utilities."[34]

---

[28] See, e.g., Popowsky v. Pennsylvania Public Utility Commission, 674 A.2d 1149, 1154 (Pa. Comm. 1996) ("Only prudently incurred expenses are includable in rate case expense claims"); Gulf States Utilities Company, 841 S.W.2d at 478 ("to the extent that the capacity charges were imprudently incurred, they were properly disallowed"); Niagara Mohawk Power Corporation v. Public Service Commission of the State of New York, 507 N.E.2d 287 (N.Y. App. 1987); Connecticut Light and Power Company v. Connecticut Department of Public Utility Control, 148 P.U.R.4th 364 (Conn. Superior Ct. 1993); In re United Cities Gas Company, 140 P.U.R.4th 382 (Kansas State Corp. Comm. January 11, 1993).

[29] We note that Public Law 28-56 is drafted in a manner that addresses an immediate need by providing that the Commission shall establish fees for DPW that will replace those previously created by law or adopted by DPW. The legislation also provides the Commission with authority to undertake the instant management audit. However, the legislation does not expressly provide that the Commission should continue to have ratemaking authority over DPW for future rate increases or that DPW should be treated as a "public utility" within the meaning of the Commission's enabling legislation. To the extent the Commission is intended to have such authority, we believe legislative action to clarify such intent may be beneficial.

[30] Public Law 28-56:1.

[31] As discussed in footnote 4 of this memorandum, DPW is not included in the definition of "public utility." However, Public Law 28-56 could be construed to mean, by referencing the Commission's enabling legislation, that the Commission must establish "just and reasonable" rates for DPW. Again, we believe legislative action to clarify such intent may be beneficial.

[32] 12 G.C.A. § 12017.

[33] See Guam Power Authority Levelized Energy Adjustment Clause (LEAC), Docket 94-04, Order (March 14, 2002).

[34] 12 G.C.A. § 12004.

18

In addition, Public Law 28-56 itself provides that the Commission has the authority to undertake a management audit of DPW and, by virtue of referencing the Commission's power under Public Law 25-05, the authority to issue orders necessary to insure DPW's compliance with the audit findings, as approved by the Commission.

In light of the foregoing, existing authority, both in Guam and by reference to generally accepted ratemaking principles, supports the proposition that the Commission may disallow, or indeed may be compelled to disallow, costs in establishing just and reasonable rates for DPW if such costs have been imprudently incurred. This may possibly include costs incurred by DPW to correct conditions that resulted from imprudent management by DPW.[35]

## Quality of Service and Management Efficiency

Apart from evaluating DPW's costs to determine whether such costs have been prudently incurred, the Commission may also have authority to consider DPW's quality of service and management efficiency in establishing just and reasonable rates and a fair rate of return. The primary distinction between this regulatory principle and the principle discussed above is that the principle of prudence considers which costs have been prudently incurred by the utility and may be included in ratemaking, whereas the regulatory principle of quality service and management efficiency discussed below considers whether the utility's rate of return or the rate assessed is itself just and reasonable. In this regard, this principle may be implemented by establishing a lower rate or rate of return within a "range of reasonableness" for inadequate service.

Utility ratemaking has been historically evaluated by the constitutional and statutory principles that a utility is entitled to receive a reasonable rate of return[36] or that a state commission must allow a utility sufficient rates "to operate successfully, maintain its financial integrity, attract capital, and compensate its investors for the risk assumed."[37] In this regard, some courts and state commissions have previously determined that a state commission may not deny or reduce an increase in rates due to poor service, at least where such denial or reduction is structured as a penalty after a finding by the commission that the requested increase was itself just and reasonable pursuant to the foregoing principles.[38]

Notwithstanding the foregoing, and as discussed above regarding prudent costs, existing authority also indicates that a state commission must consider both the interests of the utility and the interests of the consumer in setting rates.[39] In this regard, recent authority exists in other jurisdictions to support the proposition that a state commission may consider a utility's quality of service and management efficiency in establishing just and reasonable

---

[35] See, e.g., In re United Cities Gas Company, 140 P.U.R.4th 382 (Kansas State Corp. Comm. January 11, 1993) (finding that utility's costs to correct improperly performed work should not be included in rates).

[36] See National Utilities, Inc. v. Pennsylvania Public Utility Commission, 709 A.2d 972, 976 (Pa. Comm. 1998).

[37] State v. Mountain States Te. & Tel. Co., 224 P.2d 155, 170 (N.M. 1950).

[38] See, e.g., General Telephone Company of the Southwest v. Corporation Commission, 652 P.2d 1200 (N.M. 1982); Florida Tel. Corp. v. Carter, 70 So.2d 508 (Fla. 1954).

[39] See, e.g., Federal Power Commission v. Hope Natural Gas, 320 U.S. at 603; In re Citizens Utilities Company, 769 A.2d 19 (Vt. 2000); U.S. West Communications, Inc. v. Washington Utilities and Transportation Commission, 949 P.2d 1337, 1361 (Wash. 1997).

19

rates for such utility.[40]   This may include consideration of the utility's deficiencies as to accounting and billing.[41]   Some authority even supports the proposition that a state commission may deny a rate increase for poor or inadequate service or management inefficiency despite the fact that such denial will result in operating losses.[42]

To some degree, the distinction may lie in considering quality of service in determining what are just and reasonable rates in lieu of penalizing the utility for quality of service after determining what rates are otherwise just and reasonable.[43]   At a more general level, however, recent authority recognizes a range of "reasonableness" for utility rates and recognizes that poor service quality or management inefficiency may result in a permitted return at the lower end of such range of reasonableness.[44]

The Commission's authority or obligation to consider quality of service and management efficiency may ultimately depend upon the Commission's statutory authority and DPW's statutory obligations.   For example, some states, such as Pennsylvania, specifically provide by statute that a state commission may consider quality of service in evaluating any request for increased rates.[45]   Alternatively, some other jurisdictions have recognized the authority of state commissions to consider quality of service in ratemaking as part of a *quid pro quo* based on statutory obligations of the utility to provide adequate and proper service.[46]   As one court has observed with respect to such statutory obligations:

> the public is entitled to prompt, expeditious and efficient
> service.  Quid pro quo, the company is entitled to rates which
> are fair, just, reasonable and sufficient to allow it to render
> such services.[47]

Public Law 28-56 does not specifically authorize the Commission to consider DPW's quality of service and management efficiency in establishing rates and does not specifically obligate DPW to provide adequate service.[48]   Rather, as discussed above, Public Law 28-56 provides that in performing its duties under such law, the Commission has the full authority

---

[40] See, e.g., Citizens Utilities Company, 769 A.2d 19; National Utilities, 709 A.2d at 979; U.S. West Communications, 949 P.2d at 1361; In the Matter of the Petition of Valley Road Sewerage Company for Approval of an Increase in its Rates for Sewer Service, 285 N.J. Super. 202, 666 A.2d 992 (1995); In re Aloha Utilities, Inc., 217 P.U.R.4th 1 (Fla. P.S.C. April 30, 2002).
[41] See, e.g., In re CenterPoint Energy Arkla, 245 P.U.R.4th 384 (Ark. P.S.C. April 19, 2005).
[42] See, e.g., Valley Road Sewerage Company, 666 A.2d at 996.
[43] See U.S. West Communications, 949 P.2d at 1359.
[44] See U.S. West Communications, 949 P.2d at 1361; In re Aloha Utilities, Inc., 217 P.U.R.4th 1.
[45] See, e.g., National Utilities, 709 A.2d at 974 (citing Section 526(a) of the Pennsylvania Public Utility Code).
[46] See, e.g., Citizens Utilities Company, 769 A.2d 19; Valley Road Sewerage Company, 666 A.2d at 995; In re Aloha Utilities, Inc., 217 P.U.R.4th 1.
[47] U.S. West Communications, 949 P.2d at 1361.
[48] We note that certain obligations may be imposed upon DPW under 10 G.C.A. Chapter 55 or other provisions of Guam law, including an obligation to implement the Solid Waste Management Plan approved by the Guam legislature.  See 10 G.C.A. § 51101(14).  However, we have not observed any specific obligation of DPW to provide adequate service as part of our brief review of 10 G.C.A. Chapter 55.  To the extent any such obligation of DPW exists in current legislation or in legislation subsequently enacted by the Guam legislature, additional analysis may be necessary or appropriate to consider whether DPW's entitlement to just and reasonable rates may be considered a quid pro quo for such obligation.

and powers conferred upon it by its enabling legislation (12 GCA 12000 et seq.). However, such enabling legislation likewise fails to specifically authorize the Commission to consider quality of service in setting rates and fails to specifically obligate DPW to provide adequate service.

In light of the foregoing, it is unclear whether the Commission has the authority under existing Guam law to reduce or disallow rate increases for DPW (apart from a review of prudently incurred costs) on the basis of poor or inadequate service or management inefficiency.

ATTACHMENT E

CURRENT SWM SERVICE RULES

22

CHAPTER 2
SOLID WASTE MANAGEMENT

Article 1
Solid Waste Collection, Disposal, Processing and Recycling

§2100. Provisions.
§2101. Purpose.
§2102. Duty to Assure Removal of Solid Wastes.
§2103. Definitions.
§2104. Storage of Solid Wastes.
§2105. Collection of Solid Wastes.
§2106. Transportation of Solid Wastes.
§2107. Disposal of Solid Wastes.
§2108. Additional Prohibited Acts.
§2109. Contract for Collection and Disposal Service.
§2110. Enforcement and Penalties.
§2111. Rate Deviations; Disputes.
§2112. Development.
§2113. General Requirements.
§2114. Guidelines for All Development Projects.
§2115. Additional Guidelines for Single Tenant Development Projects.
§2116. Additional Guidelines for Multiple Tenant Development Projects.
§2117. Location.

§2100. Provision. Any provision of the adopted rules and regulations of this Act on "Solid Waste Collection, Disposal, Processing and recycling" in conflict with Public Law Number 24-272, the provision of Public Law Number 24-272 shall prevail.

§2101. Purpose. The purpose of these rules and regulations ('Regulation') is to protect public health, safety and welfare by reducing or eliminating health hazards, fire hazards, offensive odors and unsightly litter attributable to accumulations of solid wastes, and provide for maximum recovery of useable materials of solid waste within the limits of economic feasibility.

The government of Guam must divert twenty five percent (25%) of all solid waste by January 1, 2001, through source reduction, recycling and composting activities. Diverting twenty five percent (25%) of all solid waste requires the collective participation of the residential,

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 1

Case 1:02-cv-00022    Document 62-3    Filed 12/15/2006    Page 2 of 25

commercial, industrial and public sectors. The government shall continuously seek community participation and technology to further reduce solid waste.

The lack of adequate areas for collecting and loading recyclable materials that are compatible with surrounding land uses is a significant impediment to diverting solid waste and constitutes an urgent need for the government of Guam to address access to solid waste for source reduction, recycling and composting activities. This Regulation has been developed to meet that need.

§2102. Duty to Assure Removal of Solid Waste. Every occupant who produces solid wastes has the duty to provide for the storage and removal of all such wastes produced on the occupied premises. Occupant shall segregate the same into solid wastes and into recyclables. When the solid waste is so segregated, the two (2) may be disposed of separately as hereinafter established.

§2103. Definitions. The words and phrases used throughout this Regulation are derived from §51102 of Chapter 51, Part 2, Division 2 of Title 10 of the Guam Code Annotated plus the following definitions:

(a) Collection Service means the collection of solid wastes at the point of storage on the premises of a single family residential property receiving service.
(b) Bulky Rubbish means non-rotting solid wastes from dwelling units, institutional, commercial, industrial or agricultural establishments which are either too large or too heavy to be safely and conveniently loaded in solid waste transportation vehicles by solid waste collectors.
(c) Department means the Department of Public Works, ('DPW') government of Guam.
(d) Director means the Director of Public Works or his delegate serving as director of the solid waste management program on Guam.
(e) Disposable Solid Waste Container means disposable plastic or paper sacks with a capacity of five (5) to thirty-five (35) gallons specifically designed for storage wastes.
2

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 2

Case 1:02-cv-00022    Document 62-3    Filed 12/15/2006    Page 3 of 25

(f) Division means the Division of Solid Waste Management of the Department of Public Works, government of Guam.

(g) Dwelling Unit means one (1) or more rooms, and a single kitchen in a dwelling, designed as a unit for occupancy by one (1) family for living and sleeping purposes.

(h) Family means one (1) person living alone, two (2) or more persons related by blood, marriage or legal adoption, or a group not in excess of five (5) unrelated persons living together as a single housekeeping unit; and in addition thereto domestic employees.

(i) Grading, Demolition and Construction Wastes means waste materials from the grading of land or the construction, remodeling or destruction of structures.

(j) Government means the government of Guam.

(k) Multiple Dwelling means a building, or portion thereof, used and/or designed as a residence for two (2) of more families living independently of each other in dwelling units and doing their own cooking in said building.

(l) Occupant means any person whom, alone or jointly or severally with others, shall be in actual possession of any dwelling unit, or of any other improved real property, either as owner or as a tenant.

(m) Single Family Residence means a detached building designed for and/or occupied exclusively by one (1) family.

(n) Solid Wastes means unwanted or discarded waste materials in a solid or semi-solid state, other than those specifically intended for recycling. Such material includes, but is not limited to, garbage, wood, glass, paper, plastics, ashes, street refuse, rubbish, dead animals, animal and agricultural wastes, except manure, discarded furnishings and appliances, industrial wastes, and grading, demolition and construction wastes.

(o) Solid Waste Management means management of the entire solid waste system of storage, collection, transportation, processing and disposal.

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 3

(p) Special Solid Waste or Special Collection or Special Fees means solid waste that requires special handling and separate fees (for example tires, construction debris, batteries, air conditioners,

cars, etc.) as designated by the Director of DPW and in compliance with all local, state, and Federal laws and regulations and established pursuant to Article 3, Chapter 9 of Title 10 of the Guam Code Annotated, Administrative Adjudication Law, Rule Making Procedures.

§2104. Storage of Solid Wastes. (a) Contents Required. The occupant of every dwelling unit and of every institutional, commercial, industrial or agricultural establishment producing solid waste within the corporate limits of Guam shall provide on the premises, without expense to the government, a sufficient number of adequate containers for the storage of all solid wastes, except bulky rubbish, grading, demolition and construction wastes, which would ordinarily accumulate at each such dwelling unit or establishment between the scheduled collections. Such containers shall be maintained at all times in good repair, and both containers and the area used for storage of containers at each dwelling or establishment shall be maintained at all times in a clean, neat and sanitary condition.

(b) Single Family Residential Containers. Single family residential solid wastes shall be stored on the premises in containers of not more than thirty-five (35) gallons, and not less than five (5) gallons in nominal capacity. Containers shall be leak-proof, waterproof and fitted with a fly-tight lid, and shall be covered at all times except when depositing waste therein or removing the contents thereof. The containers shall have handles, bails or other suitable lifting devices or features. Containers shall be of a type originally manufactured for dwelling unit solid wastes, with tapered sides for easy emptying. They shall be of lightweight and sturdy construction. The weight of any individual container and contents when such container is filled to within four (4) inches of the top shall not exceed sixty (60) pounds. Rubber, fiberglass or plastic containers, which do not become brittle in hot/cold weather, may be used. Disposable solid waste containers may also be used by a dwelling unit for storage of solid wastes; provided such containers are leak-proof, waterproof, tightly covered, and less than ten (10) pounds.

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 4

(c) Other Containers. Multi-family residential, institutional, commercial, industrial or agricultural solid wastes shall be stored in bulk containers of the type designed to be handled mechanically by refuse collection vehicles, as approved by the Director, taking into consideration the quantity of wastes generated at each establishment and the frequency and method of collection, but containers shall at least meet the standards as indicated in this Regulation. All containers shall be waterproof, leak-proof and shall be covered, except when depositing waste therein or removing the contents thereof. Containers shall be stored on private property, unless the owner shall have been granted written permission by the Director to use public property for such purposes. Cleaning of bulk containers shall be the responsibility of the private property owner, unless otherwise stipulated in a written contract for other persons to be responsible for the cleaning of bulk containers.

(d) Yard Wastes. Tree limbs, brush, and other yard wastes which cannot be placed in storage containers shall be securely tied in bundles not longer than forty-eight inches (48") in length and eighteen inches (18") in diameter. The weight of each individual bundle shall not exceed thirty (30) pounds.

(e) Bulky Rubbish. Bulky rubbish shall be confined to the property upon which it originates in such a manner so as not to permit it to create any health or safety hazard. No such items of bulky rubbish shall be stored in front of any dwelling, business or establishment so as to be unsightly.

(f) Grading, Demolition and Construction Wastes. Grading, demolition and construction wastes shall be confined to the property on which grading, demolition or construction is taking place, and shall be removed by the owner or his agents immediately after such grading, demolition or construction is completed.

(g) Recyclables. Material intended by the occupant to be recycled, shall be stored prior to recycling in such containers, or in such a manner so as to prevent it from creating any health or safety hazard, or from littering public or private property, including the property of the occupant. No material stored pursuant to this Section shall be stored in front of any dwelling, business or establishment so as to be unsightly.

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 5

Case 1:02-cv-00022    Document 62-3    Filed 12/15/2006    Page 6 of 25

The Director and the Administrator of the Guam Environmental Protection Agency shall submit comprehensive rules and regulations for the disposition of recyclable materials for the collection, separation,

storage, recycling process and other needs for a comprehensive recycling municipal solid waste system to reduce the waste stream.

(h) Unauthorized Containers. Solid waste containers or bundles which are not in accordance with this Regulation shall be collected together with their contents, and disposed of after reasonable notice has been left on the container during a prior collection visit. Containers or bundles exceeding size or weight limitations, or containers filled in such a manner that contents are not easy to empty, shall not be collected and notice shall be left on each such container or bundle advising the owner of applicable provisions of this Regulation.

§2105. Collection of Solid Wastes. (a) Response. The government of Guam shall provide for the collection of solid wastes from individual dwelling units or single family residences; provided, however, that DPW may contract for collection services with a person, business or corporation, or a combination thereof, for such as deemed to be in the best interests of the Island.

(b) Collection and Transport Assignments . The government, its employees or solid waste collection contractors shall have, the exclusive right to collect or transport solid wastes for individual dwelling units or

single family residences not covered by agreements through homeowner associations or other group agents for the collection of waste by a licensed, waste hauler. Solid waste collection for multi-family residential or multiple dwelling units, commercial, industrial or agricultural activities shall be based on a free enterprise or privatized system as regulated and permitted by the Guam Environmental Protection Agency. However, nothing in this Section shall operate so as to prevent, or cause any unnecessary hardship to, the occupant or entity of any premises producing solid wastes, from recycling or transporting to the extent allowed said solid wastes. Further, nothing contained in this Section shall be construed so as to prevent any community-based recycling center from receiving solid waste segregated for recycling at its place of business, or at centrally

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 6

located collection points as approved by the government of Guam, or from thereafter transporting such waste.

(c) Right to Transport Own Wastes . Any person may transport solid wastes generated on his own premises to an authorized processing or disposal site, providing the requirements of this Regulation are met.

(d) Collection Intervals. All single-family residential solid wastes, other than bulky rubbish and recyclables, shall be collected at least once weekly. Multi-family residential, institutional, commercial or agricultural solid wastes shall be collected by privately contracted and duly permitted solid waste collectors or transporter at least once weekly, and may be collected at such lesser intervals as may be relaxed by the Director, or requested by the establishment upon a determination that such lesser intervals will not harm the public health or safety.

(e) Point of Collection – Single Family . Single family residential solid wastes in containers or bundles authorized by this Regulation shall be placed at the curb or alley for collection as specified by the Director, taking into consideration the quantity of wastes generated at each establishment and the frequency and method of collection. Solid wastes storage sites shall be easily accessible to collection personnel and equipment.

(f) Time Limit on Containers Placement on Curb. Containers or bundles shall be placed at the curb for collection not earlier than twelve (12) hours prior to the collection date, and shall be removed no later than twelve (12) hours following the collection date.

(g) Grading, Demolition and Construction Wastes. Removal of grading, demolition and construction wastes from the property upon which grading, demolition or construction is taking place shall be the responsibility of the owner, and shall not be the responsibility of the government or authorized solid waste collection contractors under this Regulation. The government or authorized solid waste collection contractors may offer a removal service for such wastes and may charge a fee therefor.

(i) Responsibilities at Point of Collection. Authorized solid waste collectors shall be responsible for the collection of solid wastes from the point of collection to the transportation vehicle; provided, the

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 7

Case 1:02-cv-00022     Document 62-3     Filed 12/15/2006     Page 8 of 25

solid wastes were stored in compliance with this Regulation. Any spillage or displaced solid waste occurring prior to the arrival of the solid waste collectors at the point of collection shall be the responsibility of the owner. Any spillage or displaced litter caused as a result of the duties of the solid waste collectors shall be collected and placed in the transportation vehicle by the solid waste collectors. Any solid waste collected shall, upon being loaded into transportation equipment, become the property of the collection agency. Solid waste collectors shall not be required to reach into solid waste containers to remove contents. Authorized containers emptied by solid waste collectors shall be returned to the point of collection.

(j) Collection Fees. All tipping/user fees to be charged by the DPW for solid waste collection, disposal, recycling and processing services established by Public Law Numbers 24-139 and 24-272 and other special fees shall be billable every first (1 st) of the month for the previous month service. All fees shall be paid within sixty (60) days from the date of billing.

(k) Special Collections. The Director may require special collections as he deems appropriate under the circumstances in accordance with Guam's procurement law or through a standard schedule of fees established in accordance with Article 3 of Chapter 9 of Title 5 of the Guam Code Annotated, Administrative Adjudication Law, Rule Making Procedures.

(l) Bulk Containers. Solid waste collection contractors shall make available sufficient numbers of bulk containers and meet all requirements for such containers under this Regulation and may charge a rental.

§2106. Transportation of Solid Wastes. (a) Vehicle Standards. All solid waste collection transportation vehicles used by DPW authorized solid waste collection contractors, shall be maintained in a safe, clean and sanitary condition, and shall be so constructed, maintained and operated as to prevent spillage of solid wastes, leakage of liquids or emission of offensive odors therefrom.

(b) Transportation of Own Wastes. Any person transporting solid wastes under the provision of this Regulation shall do so in a

8

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 8

Case 1:02-cv-00022    Document 62-3    Filed 12/15/2006    Page 9 of 25

manner as to prevent spillage of solid wastes, leakage of liquids or emission of offensive odors therefrom.

(c) Grading, Demolition and Construction Wastes . Any person transporting materials resulting from grading, demolition or construction activities shall do so in vehicles so constructed and maintained that none of the materials being transported shall spill onto the public roads and streets.

§2107. Disposal of Solid Wastes. (a) Disposal at Authorized Sites Only. Solid wastes shall be deposited at a processing facility or disposal area approved by DPW and complying with all relevant requirements of local, state, and Federal laws and regulations.

(b) Hazardous Wastes. The Director may direct certain solid wastes deemed as hazardous wastes which will require special handling, and shall be disposed of only in a manner acceptable to the Director and in compliance with Guam and Federal laws and regulations.

(c) Unlawful Disposal. It shall be unlawful for any person to throw or deposit any solid wastes, or to cause the same to be thrown or deposited, in or upon any street, alley, gutter, park, body of water or other public property, or to throw or deposit the same in or upon any private lot, yard or body of water.

§2108. Additional Prohibited Acts. (a) Use of Other Than Own Container. It shall be unlawful for any person to deposit solid wastes in any solid waste container other than his own without the written consent of the owner of such container or with the intent of avoiding payment of the service fees for solid waste collection.

(b) Failure to Pay Fees. It shall be unlawful for any person to fail to pay the service fees when a person is receiving such service. The government or any contractor collecting solid wastes under this Regulation may enforce compliance with any provision of this Regulation against such person or business. DPW may, in addition to whatever other rights and remedies it may have, seek enforcement of this Regulation under applicable laws of Guam.

(c) Interference. It shall be unlawful for any person to interfere in any manner with solid waste collection equipment or solid waste collectors in the lawful performance of their duties as such, whether

9

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 9

Case 1:02-cv-00022    Document 62-3    Filed 12/15/2006    Page 10 of 25

such equipment or collectors are those of the government or those of an authorized solid waste collection contractor.

(d) Burning. Only application to and approval of the Guam Fire Department prior to said burning may permit burning of solid wastes.

(e) Scavenging. It shall be unlawful for any person to molest, remove, handle or otherwise disturb the container or containers, contents thereof, or other materials which have been placed out for servicing by the collectors; provided, this Paragraph does not apply to the occupant of the residence, dwelling or business establishment from which the container and/or contents or materials are removed.

§2109. Contracts for Collection and Disposal Service. (a)

Contracts Authorized. Contracts may be entered into by the government of Guam for the collection and disposal of solid wastes in accordance with the provisions of this Regulation. Such contracts shall be for a period not to exceed five (5) years, and shall be awarded in accordance with the Guam Procurement Law. The contracting of services shall be made only to meet service requirements which cannot be met by the

Department. The full privatization of services shall occur only after a privatization plan has been approved by I Liheslaturan Guahan.

(b) Exclusive Right. Contracts for the collection and disposal of solid wastes shall grant the contractor the exclusive right to perform such services as are specified in the contract. However, nothing in this Section or Chapter shall be construed so as to take away from any occupant the right to recycle solid wastes produced on his premises provided no health or safety violation results therefrom.

(c) Liability Insurance. No contract for solid waste collection and disposal service shall be entered into by DPW until and unless the prospective contractor shall procure and maintain for the duration of the contract Workers Compensation insurance, and insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of the work hereunder by the contractor, his agents, representatives, employees or subcontractors. The cost of such insurance shall be included in the Contractor's bid. The coverage, minimum limits of insurance, deductibles, and self-insured retention, as well as all other insurance provisions, shall be in form and in an amount satisfactory to the government. Under no

10

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 10

Case 1:02-cv-00022    Document 62-3    Filed 12/15/2006    Page 11 of 25

circumstances shall the government be liable as a result of a contractor's activities.

§2110. Enforcement and Penalties . (a) Inspection. In order to ensure compliance with this Regulation, the Director, as well as duly assigned personnel from GEPA, the Department of Public Health and Social Services and the Guam Fire Department are authorized to inspect any and all phases of solid waste management within the oversight of the government. No inspection shall be made in any dwelling unit unless authorized by the occupant or in accordance with due process of law. In all cases where such inspections reveal violation of the provisions of this Regulation, the Director, or appropriate agency, shall issue notice for each such violation stating therein the violation or violations found, the applicable laws and regulations, and the time period within which corrective action shall be taken.

(b) Penalties. Any person violating the provisions of this Regulation shall be liable and may be fined not less than Ten Dollars ($10.00) nor more than Fifty Dollars ($50.00) for each offense; and a separate offense shall be deemed committed on each day during or on which a violation occurs or continues. The fact that solid wastes remains on any occupant's premises in a continuity is a violation of this Regulation and shall be "prima facie" evidence that the occupant or the property owner of such premises is responsible for the violation hereof.

(c) Request for a Hearing. Any person cited for violating the provisions of this Regulation shall be served by DPW with an administrative citation delineating the specific violation, and be notified of the right to request a hearing under the Administrative Adjudication Law, Article 2 of Chapter 9 of Title 5 of the Guam Code Annotated.

§2111. Rate Deviations; Disputes. (a) Deviations. The accumulation of solid wastes in certain instances may be so far above the normal or average that the rates relaxed by this Regulation may not be sufficient to fairly compensate the collector for collecting the same, or the accumulation of solid wastes in certain instances may be so far below the normal average that the rates fixed by this Regulation may not be fair and just to the occupant obligated to pay for the removal of such wastes. If either the collector or the occupant believes such to be the fact, he may make written application to the Director for relief, and

11

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 11

it shall be the duty of the Director to make an investigation and, if necessary, will recommend a rate.

(b) Deviations: Filing. All cases of deviations from the rates fixed by this Regulation shall be filed in writing with the Director.

(c) Disputes. The Director shall decide disputes over charges made by collectors, or as to the character performed, and his decision shall be final.

§2112. Development. Development Project . (a) Development Project. Means any of the following:

(1) A project for which a building permit is required for a commercial, industrial or institutional building, marina, or residential building having five (5) or more living units, where solid waste is collected and loaded and any residential project where solid waste is collected and loaded in a location serving five (5) or more units. (2) Any new public facility where solid waste is collected and loaded, and any improvements for areas of a public facility used for collecting and loading solid waste.

(3) The definition of development project only includes subdivisions or tracts of single-family detached homes if within such subdivisions or tracts there is an area where solid waste is collected and loaded in a location which serves five (5) or more living units. In such instances, recycling areas as specified in this Regulation are only required to serve the needs of the living units, which utilize the solid waste collection and loading area.

(b) Improvement. An improvement adds to the value of a facility, prolongs its useful life, or adapts it to new uses. Improvements should be distinguished from repairs. Repairs keep facilities in good operating conditions, do not materially add to the value of the facility, and do not substantially extend the life of the facility.

(c) Floor Area of a Marina. The floor area of a marina shall be defined as the space dedicated to the docking or mooring of marine vessels.

(d) Public Facility. The definition of public facility includes, but is not limited to, buildings, structures, marinas and outdoor recreation areas owned by a local agency.

12

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 12

(e) Recycling Area (Areas for Recycling). Space allocated for collecting and loading of recyclable materials. Such areas shall have the ability to accommodate receptacles for recyclable materials. Recycling

areas shall be accessible and convenient for those who deposit as well as those who collect and load any recyclable materials placed therein.

§2113. General Requirements. (a) Any new development project for which an application for a building permit is submitted on or after the approval date of this Regulation, shall include adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste.

(b) Any improvements for areas of a public facility used for collecting and loading-solid waste shall include adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste.

(c) Any existing development project for which an application for a building permit is submitted on or after the approval date of this Regulation for a single alteration which is subsequently performed that adds thirty percent (30%) or more to the existing floor area of the development project shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste.

(d) Any existing development project for which an application for a building permit is submitted on or after the approval date of this Regulation for multiple alterations which are subsequently performed within a twelve (12) month period which collectively adds thirty percent (30%) or more to the existing floor area of the development project shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste.

(e) Any existing development project for which multiple applications for building permits are submitted within a twelve (12) month period beginning on or after the approval date of this Regulation for multiple alterations which are subsequently performed that collectively adds thirty percent (30%) or more to the existing floor area of the development project shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste.

13

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 13

(f) Any existing development project occupied by multiple tenants, one (1) of which submits on or after the approval date of this Regulation, an application for a building permit for a single alteration which is subsequently performed that adds thirty percent (30%) or more to the existing floor area of that portion of the development project which said tenant leases shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste. Such recycling areas shall, at a minimum be sufficient in capacity, number and distribution to service that portion of the development project which said tenant leases.

(g) Any existing development project occupied by multiple tenants, one (1) of which submits on or after the approval date of this Regulation an application for a building permit for multiple alterations which are subsequently performed within a twelve (12) month period which collectively adds thirty percent (30%) or more to the existing floor area of that portion of the development project which said tenant leases, shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste. Such recycling areas shall, at a minimum, be sufficient in capacity, number and distribution to serve that portion of the development project which said tenant leases.

(h) Any existing development project occupied by multiple tenants, one (1) of which submits within a twelve (12) month period beginning on or after the approval date of this Regulation multiple applications for building permits for multiple alterations which are subsequently performed that collectively adds thirty percent (30%) or more to the existing floor area of that portion of the development project which said tenant leases shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste. Such recycling areas shall, at a minimum, be sufficient in capacity, number, and distribution to serve that portion of the development project which said tenant leases.

(i) Any costs associated with adding recycling space to existing development projects shall be the responsibility of the party or parties who are responsible for financing the alterations.

14

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 14

§2114. Guidelines for All Development Projects. (a) Where local standards exist, recycling areas should be designed to be architecturally compatible with nearby structures and with the existing topography and vegetation, in accordance with such standards.

(b) The design and construction of recycling areas shall not prevent security of any recyclable materials placed therein.

(c) The design, construction and location of recycling areas shall not be in conflict with any applicable Federal, state or local laws relating to fire, building, access, transportation, circulation or safety.

(d) Recycling areas or the bins or containers placed therein must provide protection against adverse environmental conditions, such as rain, which might render the collected materials unmarketable.

(e) Driveways and/or travel aisles shall, at a minimum, conform to local building code requirements for garbage collection access and clearance. In the absence of such building-code requirements, driveways and/or travel aisles shall provide unobstructed access for collection vehicles and personnel.

(f) A sign clearly identifying all recycling and solid waste collection and loading areas, and the materials accepted therein, shall be posted adjacent to all points of direct access to the recycling areas.

(g) Developments and transportation corridors adjacent to recycling areas shall be adequately protected for any adverse impacts, such as noise, odor, vectors or glare through measures, including, but not limited to, maintaining adequate separation, fencing and landscaping.

§2115. Additional Guidelines for Single Tenant Development Projects. (a) Areas for recycling shall be adequate in capacity, number and distribution to serve the development project.

(b) Dimensions of the recycling area shall accommodate receptacles sufficient to meet the recycling needs of the development project.

(c) An adequate number of bins or containers to allow for the collection and loading of recyclable materials generated by the development project should be located within the recycling area.

§2116. Additional Guidelines for Multiple Tenant Development Projects.

(a) Recycling areas shall, at a minimum be sufficient in

15

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 15

Case 1:02-cv-00022    Document 62-3    Filed 12/15/2006    Page 16 of 25

capacity, number and distribution to serve that portion of the development project leased by the tenant(s) who submitted an application orapplications resulting in the need to provide recycling area(s) pursuant to §111 'Development' of this Regulation.

(b) Dimensions of recycling areas shall accommodate receptacles sufficient to meet the recycling needs of that portion of the developmentproject leased by the tenant(s) who submitted an application or applications resulting in the need to provide recycling area(s) pursuant to §111'Development' of this Regulation.

(c) An adequate number of bins or containers to allow for the collection and loading of recyclable materials generated by that portion of the development project leased by the tenant(s) who submitted an application or applications resulting in the need to provide recycling area pursuant to §111 of this Regulation should be located within the recycling area.

§2117. Location. (a) Recycling areas shall not be located in any area required to be constructed or maintained.as unencumbered, according to any applicable Federal, state or local laws relating to fire, access, building, transportation, circulation or safety.

(b) Any and all recycling area(s) shall be located so they are at least as convenient for those persons who deposit, collect and load the recyclable materials placed therein as the locations where solid waste is collected and loaded. Whenever feasible, areas for collecting and loading recyclable materials shall be adjacent to the solid waste collection areas.

16

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 16

Case 1:02-cv-00022    Document 62-3    Filed 12/15/2006    Page 17 of 25



# TIPPING FEE CUSTOMERS
## Solid Waste Management



1. Customer's are required to keep their solid waste in lightweight waterproof, lead-proof containers with handle or other lifting features, between 5 and 35 gallons in size, and not weighing more that 60 pounds when filled.

2. Customer's are to put out their containers up to 12 hours prior to the collection date and take them in within 12 hours after the connection date.

3. YARD Waste must be tied in bundles not longer than 48 inches, 18 inches in diameter, and weight no more than 30 pounds. (This is for the safety and ability of those doing the collection to perform the works).

4. Separating out recyclable materials from solid waste and placing these items in separate containers. There must be enough space around the building for the containers to be pickup

5. No DEAD Animals, Pig Foods & Metal (i.e. Toaster, Iron, Wire Hanger, Computer, Computer monitor Chairs, Table etc )

6. No HAZAROUS WASTES such as Batteries, Air conditioners, Tires (i e. etc )

7. NO Demolition and Construction Wastes.

8. No Water in containers.

9. Place your trash containers at the curb or 4 feet from the edge of the road way   Trash collection site shall be easily accessible for removable by the Solid Waste collectors.

10. It is unlawful for any person to dispose solid waste in any street, gutter, parks, body of water or other public or private property.

11. It is unlawful for any person to dispose of solid waste in any trash container other than his own without the written consent of the owner of the container or with the intent of avoiding payment of service fees for solid waste collection



## Pursuant to   Chapter 51 Relative to Solid Waste . Management & Litter Control & Public Laws 17-87, 23-64, 24-272, 24-313, 25-93 and it amendments.

### Acting Director Lawrence P. Perez
Tamuning, Guam 96911

Telephone  646-3109/3111/3147
Fax 647-4352



## Funded by Solid Waste Management Fund

39

**ATTACHMENT F**

**INVENTORY AND DISCUSSION OF**

**PROPOSED LEGISLATIVE CHANGES**

The following is a list of legislation that will be required if the recommendations contained in GCG's August 18, 2006 Focused Audit Report are adopted:

- **Creation of an autonomous agency for solid waste management**

  Proposal: remove the Solid Waste Management Division (SWM") from the auspices of the Department of Public Works ("DPW") and make SWM an autonomous agency under the auspices of the Consolidated Commission on Utilities ("CCU").

  Rationale: remove numerous obstacles currently faced by SWM in obtaining bond financing. Also address the issues created by the Guam Supreme Court holdings in 2000 Guam 11 and 2004 Guam 16 that invalidated those provisions of Chapter 51-Title 10 of the Guam Code Annotated ("GCA") that were enacted by PL24-139 and PL24-272.

- **Privatization of all residential collections**

  Proposal: increase the number of districts to be privatized from two to three. Legislation should clarify whether the PUC will regulate private hauler rates for residential customers.

  Rationale: SWM has been unable to provide reliable service since interim rate increase approved on October 25, 2005.

- **Authorization to outsource SWM billings and collections**

  Proposal: grant SWM the right to privatize its billing and collection services.

  Purpose: SWM presently unable to produce reliable billings on a timely basis; collection rate remains below 40% of residential customers receiving service.

- **Clarification of commercial haulers' responsibility for collection of tipping fees**

  Proposal: make commercial haulers customers of SWM instead of individual businesses.

  Rationale: making commercial haulers primarily liable for payment of tipping fees and granting them the right to recoup tipping fees from their customers more efficient that having SWM separately bill businesses for tipping fees. SWM unable to determine if a business who failed to pay its tipping fee is still being serviced by a commercial hauler; charging commercial haulers directly provides incentive to immediately terminate service to any business customer that fails to pay any portion of the commercial hauler's bill.

- **Modification of lifeline eligibility standard**

  Proposal: Change "GHURA low income eligibility criteria" to "appropriate income eligibility criteria as determined by the PUC."

  Rationale: The GHURA low income eligibility criteria is the most liberal of its three eligibility standards. A family of four with household income of up to $50,400 in 2005 would have qualified for the lifeline rate. Granting PUC the discretion to set eligibility requirements that would extend lifeline rates only to households who would not otherwise be able to afford services would prevent unnecessary erosion of SWM's rate base.

- **Clarification of enforcement powers**

  Proposal: specify under what circumstances SWM may deny a commercial hauler access to the landfill. Legislation should also consider granting GEPA the right to summarily suspend a commercial hauler's license in the event the commercial hauler is denied entrance to the landfill for any reason (non-payment, non-conforming equipment, or failure to comply with landfill rules).

  Rationale: will provide incentive for commercial haulers to pay bills timely, as delinquent haulers will be unable to collect solid waste until all arrears paid.

42

The following is a brief discussion of the considerations for legislation that will be required if the recommendations contained in GCG's Focused Audit Report are adopted:

- **Creation of an autonomous agency for solid waste management**

  Removing the Solid Waste Management Division (SWM") from the auspices of the Department of Public Works ("DPW") and making SWM an autonomous agency under the auspices of the Consolidated Commission on Utilities ("CCU") will remove numerous obstacles currently faced by SWM in obtaining bond financing. The enabling legislation for the Guam Waterworks Authority is the closest model for this, as it resulted in the conversion of an entire line agency into an autonomous entity.

  The legislation creating this new autonomous agency should also address the issues created by the Guam Supreme Court holdings in 2000 Guam 11 and 2004 Guam 16 that invalidated those provisions of Chapter 51-Title 10 of the Guam Code Annotated ("GCA") that were enacted by PL24-139 and PL24-272. If the recommendation to make SWM an autonomous agency under the CCU is not adopted, then separate legislation will be needed to deal with this issue.

- **Privatization of all residential collections**

  This legislation can be accomplished by amending PL26-99:2 to increase the number of districts to be privatized from two to three. This proposed legislation should specify whether the PUC will regulate private hauler rates for residential customers.

  Those haulers who are awarded contracts should be required to provide SWM with a list of initial customers and thereafter report on at least a monthly basis all new customers as well as all existing customer whose services have been terminated. This will enable SWM to determine which households are not receiving collection services and take appropriate action to ensure that these households are all using the transfer stations to dispose of their solid waste.

  PL26-99:3 provides that "[n]othing herein shall be construed as authorizing the termination of any employee of the government of Guam." If this requirement is retained, then the feasibility of reassigning DPW employees and

43

packer fleet currently handling SWM residential collections to staffing the transfer stations and collecting solid waste from the various government of Guam agencies and public housing (as opposed to having these customers serviced by public haulers) needs to be explored. Having SWM service public housing units will greatly reduce the number of households that will need to be provided with a lifeline rate in order to afford residential collection services.

- **Authorization to outsource SWM billings and collections**

The proposed legislation should grant SWM the right to privatize its billing and collection services. If adopted, the cost of these services should be included in SWM's budget so that the same may be factored into the rates set by the PUC.

- **Clarification of commercial haulers' responsibility for collection of tipping fees**

The efficiency of SWM operations would be enhanced if the commercial haulers themselves were customers of SWM instead of individual businesses. The commercial haulers would be required to pay tipping fees on all solid waste brought to the landfill based on weight regardless of who generated the solid waste.

The legislation should specify the extent to which commercial haulers may pass this cost on to their customers. A possible model is the visible GRT law that permits businesses to segregate GRT from bills for services rendered and recoup the same from their customers.

Making commercial haulers primarily liable for payment of tipping fees and granting them the right to recoup tipping fees from their customers would be more efficient that having SWM separately bill businesses for tipping fees, as SWM would be unable to determine if a business who failed to pay its tipping fee is still being serviced by a commercial hauler. If the tipping fees were instead charged to commercial haulers coupled with a right to recoup the same from their business customers, then commercial haulers would have the incentive to immediately terminate service to any business customer that fails to pay any potion of the commercial hauler's bill.

The legislation should require a commercial hauler to notify SWM if service is terminated to any its business customers. SWM should then coordinate with the DPH&SS

44

Division of Public Health to determine if the sanitary permit for such business should be suspended until such time as alternative solid waste collection services are arranged.

- **Authorization for commercial haulers to collect tipping fees**

  This is a less-preferable alternative to making the commercial haulers direct customers of SWM, as SWM will instead have to make the commercial haulers collection agents for SWM much the same way as a retailer is responsible for collection of sales tax and remitting the same over to the state. This would require comprehensive legislation imposing a myriad of duties on commercial haulers similar to those borne by retailers in states that have imposed a sales tax.

- **Authorization for SWM to audit commercial haulers**

  This will be a necessary component of making the commercial haulers collection agents for SWM. The statute should be modeled after a state's power to conduct a sales tax audit. The power to audit commercial haulers' records is essential in order to ensure that a commercial hauler is not providing service to a business customer who has paid commercial hauler's fees but not the tipping fees. If this situation is discovered, then a commercial hauler should be subject to similar penalties to those imposed on a retailer who neglects to collect sales tax on a taxable transaction.

- **Clarification of enforcement powers**

  As part of the legislation clarifying the responsibility for payment of business tipping fees, the legislation should specify under what circumstances SWM may deny a commercial hauler access to the landfill. The legislation may include a grace period and may also include a separate dollar limitations (for example, allowing a 30 day grace period for payment of delinquent accounts, which grace period is reduced to 15 days if the account is $10,000 or more delinquent).

  In addition, the legislation should consider granting GEPA the right to summarily suspend a commercial hauler's license in the event the commercial hauler is denied entrance to the landfill for any reason (non-payment, non-conforming equipment, or failure to comply with landfill rules).

45

- **Restrictions on back-billing**

    Adoption of GCG's recommendations for improving billing and collection practices should largely eliminate the possibility of SWM failing to bill for services for over four (4) months. If these recommendations are not adopted, then the 4 month limitation on back billing imposed by PL26-17:4 may need to be re-examined.

46