
ORIGINAL

MATTHEW J. MCKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division
ROBERT D. MULLANEY
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6483
Fax: (415) 744-6476

LEONARDO M. RAPADAS
United States Attorney
MIKEL SCHWAB
Assistant United States Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez
Hagåtña, Guam 96910
Tel: (671) 472-7332
Fax: (671) 472-7215

Attorneys for United States of America

FILED
DISTRICT COURT OF GUAM
JAN 31 2007
MARY L.M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>GOVERNMENT OF GUAM, )<br><br>Defendant. ) | CIVIL CASE NO. 02-00022<br><br>UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE CONSENT DECREE<br><br>Date: March 8, 2007<br>Time: 9:00 a.m. |

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    The Ordot Dump . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    EPA's Administrative Actions Involving the Ordot Dump . . . . . . . . . . . . . . . . . 2

      C.    Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      D.    Consent Decree . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      E.    GovGuam's Violations of the Consent Decree . . . . . . . . . . . . . . . . . . . . . . . 4

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    Without Court Intervention, GovGuam Is Incapable of Closing the Ordot Dump
            and Opening a New Landfill in a Timely Manner. . . . . . . . . . . . . . . . . . . 5

      B.    This Court Has the Authority to Enforce the Compliance Deadlines Set
            by the Consent Decree. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.    This Court Has Wide Discretion to Fashion a Remedy to Ensure GovGuam's
            Expeditious Compliance with the Consent Decree's Deadlines. . . . . . . . . . . . . . 9

            1.    GovGuam Lacks the Managerial Competence to Comply with the
                  Consent Decree. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            2.    Institutional Inertia Hinders GovGuam's Compliance Efforts. . . . . . . . . 11

            3.    GovGuam Has Failed to Raise the Financial Resources to Comply
                  with the Consent Decree. . . . . . . . . . . . . . . . . . . . . . . . . . 13

      D.    This Court Should Require GovGuam to Meet a Series of Interim Milestones
            Necessary to Ensure Prompt Compliance with the Consent Decree. . . . . . . . . 16

      E.    The United States Reserves its Right to Request the Appointment of a Receiver
            if GovGuam Fails to Meet Interim Deadlines Set by this Court . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Badgley v. Santacroce, 800 F.2d 33(2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Delaware Valley Citizens' Council for Clean Air v. Pennsylvania, 533 F. Supp. 869 (E.D. Pa. 1982), aff'd 678 F.2d 470 (3d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Gary W. v. Louisiana, 1990 WL 17537 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Gates v. Shinn, 98 F.3d 463 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Gilmore v. State of California, 220 F.3d 987 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Hook v. State of Ariz. Dept. of Corrections, 972 F.2d 1012 (9th Cir. 1992) . . . . . . . . . . . . . 7, 8

Local Number 93, Intl. Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501 (1986) . . . . . . . 7

McComb v. Jacksonville Paper Co., 336 U.S. 187 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Morgan v. McDonough, 540 F.2d 527 (1st Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Puget Sound Gillnetters Ass'n v. U.S. Dist Ct., 573 F.2d 1123 (9th Cir. 1978), vacated and remanded, 443 U.S. 658, aff'd on remand, 605 F.2d 492 (9th Cir. 1979) . . . . . . . . . . . . . . . . . 10

Stone v. City and County of San Francisco, 968 F.2d 850 (9th Cir. 1992) . . . . . . . . . . . . . . . . . 8

Town of Greenwich v. Dep't of Transportation, 10 ELR 20178 (D. Conn. Nov. 7, 1979 & Jan. 21,1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20

Case 1:02-cv-00022    Document 69    Filed 01/31/2007    Page 3 of 24

<u>United States v. Alisal Water Corp.</u>, 326 F. Supp.2d 1010 (N.D. Cal. 2002) . . . . . . . . . . . 10, 20

<u>United States v. Alisal Water Corporation</u>, 431 F.3d 643 (9th Cir. 2005) . . . . . . . . . . . . . . . . 9

<u>United States v. Am. Tobacco Co.</u>, 221 U.S. 106 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>United States v. Armour & Co.</u>, 402 U.S. 673 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>United States v. City of Detroit</u>, 476 F. Supp. 512 (E.D. Mich. 1979) . . . . . . . . . . . . . . . . . . . . 16

<u>United States v. ITT Continental Baking Co.</u>, 420 U.S. 223 (1975) . . . . . . . . . . . . . . . . . . . . . 7

<u>United States v. Wheeling-Pittsburgh Steel Corp.</u>, 818 F.2d 1077 (3d Cir. 1987) . . . . . . . . . . . 7

<u>Vuitton et Fils S.A. v. Carousel Handbags</u>, 592 F.2d 126 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . 9

**<u>FEDERAL STATUTES</u>**

33 U.S.C. § 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9

33 U.S.C. § 1319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9

**<u>GUAM STATUTES</u>**

10 GCA § 51101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

10 GCA § 51118 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

12 GCA § 12017 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

# I.    INTRODUCTION

After more than a decade of U.S. Environmental Protection Agency's ("EPA") administrative efforts to stop the Government of Guam's ("GovGuam") illegal discharges from the Ordot Dump, the United States filed a Complaint in this case on August 7, 2002. Pursuant to Section 309 of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1319, the United States alleged that the Government of Guam ("GovGuam") violated the Act by: (1) discharging pollutants from the Ordot Dump to waters of the United States without a permit in violation of 33 U.S.C. § 1311; and (2) violating the terms of EPA's Order, requiring GovGuam to eliminate the unpermitted discharges. The United States sought both injunctive relief and civil penalties to address the violations of the Act.

This Court supervised negotiations between the parties for over one year. In December 2003, the United States and GovGuam reached an agreement on the terms of a Consent Decree. Both parties agreed that the Consent Decree should address not only the closure of the Ordot Dump, but also the opening of a new landfill. Technical staff at Guam Environmental Protection Agency ("Guam EPA") and the Guam Department of Public Works ("DPW") worked collaboratively with EPA to create realistic deadlines in the Decree to achieve both of these goals. The Court entered the Consent Decree on February 11, 2004.

Three years later, GovGuam has failed to comply with critical deadlines established by the Consent Decree. GovGuam has not only failed to award a contract for the closure of the Ordot Dump, it has also failed to award a contract to construct the new landfill. Based on these violations, it is readily apparent that GovGuam will not only fail to operate a new landfill by September 22, 2007, it will also fail to close the Ordot Dump and cease its illegal discharges by October 22, 2007, as required by the Consent Decree.

For the past twenty years, GovGuam has been in continuous violation of the Act. The time to close the Ordot Dump and open a new landfill is long overdue. Accordingly, the United States, on behalf of EPA, submits this memorandum in support of its motion to enforce the Consent Decree. As a remedy for GovGuam's violations of the Decree, we request the Court to issue an Order requiring GovGuam to meet a series of interim deadlines. This Order will require

-1-

1    GovGuam to focus on the tasks necessary to implement the requirements of the Consent Decree.

2    **II.    BACKGROUND**

3        A.    <u>The Ordot Dump</u>

4        GovGuam owns and operates the Ordot Dump, which is located in the Village of Ordot.

5    Complaint ¶1; Answer ¶ 1. Because the Dump is unlined on its bottom and uncapped at its top,

6    it acts like a sponge, retaining rain water and releasing it after it has percolated through the Dump

7    and absorbed contaminants. Lee Decl., ¶ 3. As a direct result of these conditions, the Ordot

8    Dump has discharged, and continues to discharge, leachate into the Lonfit River. <u>Id</u>.[1]/

9        The Ordot Dump serves Guam's civilian population of about 150,000 and currently

10    receives approximately 300 tons of municipal solid waste per day. Lee Decl., ¶ 2. It is the only

11    municipal landfill on the Island of Guam and is already filled beyond capacity. <u>Id</u>. As the Guam

12    Legislature stated in 1995: "(1) the Ordot Landfill is a threat to the health and safety of the

13    residents of Guam .... (4) the Ordot Landfill reached its capacity in the 1990's, and the closure

14    of the dump is necessary in order to eliminate this existing serious environmental hazard." 10

15    GCA § 51101 (Legislative Findings); U.S. Submission of Authorities (hereafter "Subm."), Att. 3.

16        B.    <u>EPA's Administrative Actions Involving the Ordot Dump</u>

17        EPA issued an administrative Order under the CWA to DPW on March 26, 1986,

18    directing DPW to cease the discharges of leachate from the Ordot Dump by May 1, 1987. Lee

19    Decl., ¶ 4; Subm., Att. 6. DPW failed to comply with that 1986 Order and the Ordot Dump

20    continued to discharge leachate into the Lonfit River. <u>Id</u>.

21        EPA issued another administrative Order pursuant to the CWA in July 1990, requiring

22    DPW to cover the Ordot Dump to prevent discharges by June 30, 1992. Lee Decl., ¶ 5; Subm.,

23    Att. 7. EPA approved an extension of the cover deadline to August 15, 1992. <u>Id</u>. That deadline

24    was missed and the capping was never done. <u>Id</u>. DPW continued to violate the 1990 Order by

25    discharging leachate from the Ordot Dump. <u>Id</u>.

26

27

28

---

[1]/    The Lonfit River merges with the Sigua River to form the Pago River and then drains into Pago Bay and the Pacific Ocean. Answer ¶ 9.

In April 1997, EPA amended the 1990 Order to require DPW to submit, by July 9, 1997, a schedule for the design of a cover system to eliminate the untreated leachate discharges. Lee Decl., ¶ 6; Subm., Att. 8. DPW submitted a proposed schedule. Lee Decl., ¶ 6. In September 1997, EPA rejected the schedule because it lacked funding commitments to make the plan credible. Id. DPW has continued to fail to comply with the amended 1990 Order. Id.

C.    Complaint

On August 7, 2002, the United States filed a Complaint against GovGuam under the Act. The Complaint alleged that: (1) GovGuam does not have a permit from EPA authorizing the discharge of any pollutant from the Ordot Dump to waters of the United States; (2) from at least 1988 to the present, GovGuam has routinely discharged untreated leachate from the Ordot Dump into the Lonfit River and two of its tributaries; (3) leachate is a pollutant under the Act; (4) the Lonfit River and its tributaries are waters of the United States; and (5) the Ordot Dump and the earthen channels, gullies, trenches, and ditches that carry leachate to the Lonfit River's tributaries are point sources under the Act. In sum, the United States sought civil penalties and injunctive relief under the Act for GovGuam's illegal discharges from the Ordot Dump.

D.    Consent Decree

The United States had negotiated with GovGuam for over a year before filing the Complaint in this case. Machol Decl., ¶ 2. After the Complaint was filed, the parties participated in a number of Court-supervised negotiations beginning in November 2002, and were able to reach agreement on the terms of the Consent Decree lodged with the Court on December 3, 2003.

The Consent Decree established a schedule for the closure of the Ordot Dump. Pursuant to the Decree, DPW was required to submit a draft closure plan that included a site investigation, a baseline survey, and the design of a landfill cover system and a perimeter surface water diversion system. ¶ 8.a.i. After its closure plan was approved, Guam DPW was required to award a construction contract for closure of the Ordot Dump by April 24, 2006. ¶ 8.g. By October 22, 2007, Guam DPW must complete closure, certify that it no longer accepts municipal waste at Ordot Dump, cease all discharges to the waters of the United States, and begin

-3-

1    implementing a post-closure plan. ¶¶ 8.h., 8.i.

2      The Ordot Dump is presently the sole municipal landfill on Guam. Thus, in addition to

3 requiring the closure of the Ordot Dump, the Consent Decree also directed Guam DPW to

4 construct and operate a new sanitary landfill. The Decree required Guam DPW to complete an

5 Environmental Impact Statement regarding at least 3 alternative sites for the new landfill and

6 choose a site. ¶ 9.a. DPW was then required to submit design and construction plans to EPA.

7 ¶¶ 9.c, 9.d, and 9.f. By no later than October 13, 2006, DPW was required to award a

8 construction contract for the new landfill. ¶ 9.h. The Consent Decree mandates that DPW begin

9 to operate the new sanitary landfill by September 22, 2007. ¶ 9.i.

10      E.    GovGuam's Violations of the Consent Decree

11      GovGuam has not met the Decree's compliance deadlines to date. On May 5, 2006, EPA

12 assessed stipulated penalties against GovGuam in the amount of $51,500 for failure to submit a

13 draft wetlands mitigation plan required under Paragraph 8.c.iii. of the Decree, and in the amount

14 of $7,000 for failure to award a construction contract for the Ordot Dump closure by April 21,

15 2006, as required by Paragraph 8.g. Machol Decl., ¶ 5. The wetlands plan was finally submitted

16 on July 9, 2006, but GovGuam has yet to award the construction contract for the closure of the

17 Ordot Dump. Id; Wolfram Decl., ¶ 3. The accrued stipulated penalty for this missed deadline is

18 $493,000 (as of January 31, 2007), and is accruing at $2,000 per day. Wolfram Decl., ¶ 3.

19      On January 5, 2005, EPA assessed stipulated penalties against GovGuam in the amount

20 of $7,250 for its failure to identify a preferred site for the new landfill, in violation of Paragraph

21 9.a. Machol Decl., ¶ 4. EPA also assessed stipulated penalties against GovGuam in the amount

22 of $7,500 on February 13 and March 7, 2006, for failure to submit the 90% Draft Final Plan for

23 the new landfill pursuant to Paragraph 9.d. Id. In addition, GovGuam has failed to submit the

24 final plan for the new landfill, which was due on June 5, 2006. Decree ¶ 9.f, Wolfram Decl., ¶ 4.

25 Pursuant to Paragraph 12.a.i., the stipulated penalty for this violation is $201,500 (as of January

26 31, 2007), and is accruing at a rate of $1,000 per day. Id. Finally, GovGuam has not awarded the

27 construction contract for the new landfill, which was due on October 13, 2006. Decree ¶ 9.h,

28 Wolfram Decl., ¶ 5. Pursuant to Paragraph 12.a.ii., the stipulated penalty for this violation is

-4-

1    $145,000 (as of January 31, 2007), and is accruing at a rate of $2,000 per day.  Id.

2    **III.    ARGUMENT**

3          A.    Without Court Intervention, GovGuam Is Incapable of Closing the Ordot Dump
             and Opening a New Landfill in a Timely Manner.

4

5          Looking ahead to the Consent Decree's upcoming critical deadlines in 2007, the Guam

6    Public Utilities Commission ("PUC")  determined that GovGuam needs $90 million in bond

7    financing in order to pay for closing Ordot Dump and opening a new landfill.  Subm., Att. 9 at 1.

8    According to the PUC's Administrative Law Judge, GovGuam should have obtained these funds

9    by May 2006 to comply with the Decree's 2007 deadlines.  Subm., Att. 16 at Att.  However, both

10   DPW's quality of service to its customers and its financial management must be "dramatically

11   improved" before GovGuam could successfully apply for any revenue bond financing.  Subm.,

12   Att. 12.

13         Specifically, in April 2006, pursuant to 10 GCA § 51118(e), the PUC requested the

14   Georgetown Consulting Group ("GCG") to prepare a "Focused Management Audit" of DPW's

15   Solid Waste Management ("SWM") division.  Subm., Att. 12, Executive Summary; Subm., Att.

16   4.  GCG's audit report noted that GovGuam intended to finance its compliance with the Consent

17   Decree through the issuance of revenue bonds.  Subm., Att. 12, Executive Summary.  These

18   bonds would be repaid, in substantial part, by DPW's rate revenue, requiring a 400 percent

19   increase in DPW's existing rates in the next three years.  Id.  GCG concluded, however, that

20   DPW's current billing and collection system "is unable to competently handle even current rate

21   revenue levels, much less the increased burden necessary to support the revenue bonds."  Id.

22   Given that Guam law provides that all rates charged by any public utility must be "just and

23   reasonable" as defined in 12 GCA §12017 (Subm., Att. 5), GCG stated that Guam law could

24   prevent the PUC:  "i] from awarding rate increases to compensate for DPW billing and collection

25   mismanagement; and ii] from increasing [DPW's] SWM residential customer rates unless the

26   quality of residential service is dramatically improved."  Subm., Att. 12, Executive Summary.

27         As GCG indicated, obtaining $90 million in revenue bond financing would require a two-

28   step process:  (1) DPW would need to obtain the PUC's approval of any financing plan to

-5-

comply with the Consent Decree; and (2) the Legislature would need to enact legislation to authorize the financing. Subm., Att. 13 at 2. Yet, to date, DPW has not petitioned the PUC to review and approve any financing for Consent Decree compliance. Id. In fact, DPW requested that the PUC's rate increase hearing, originally set for January 24, 2007, be postponed until April 2007.[2]/ Subm., Att. 19. Nor has the Guam Legislature introduced the legislation required to issue the bonds.[3]/ Subm., Att. 20. Regarding such legislative action, GCG concluded: "There is a compelling need for the legislative and executive branches to join in a unified effort to promptly secure this financing." Subm., Att. 13 at 2-3.

GovGuam's failure to even award contracts to close the Ordot Dump and open the new landfill strongly signals that GovGuam's present system for meeting critical dates on these Consent Decree projects is simply not working. In response to the Court's questions at the December 2006 status conference, GovGuam's counsel estimated that it would take a minimum of 20 to 21 months to close the Ordot Dump even if GovGuam were able to enter into a contract *today*. Subm., Att. 15 at 12-13. GovGuam candidly admitted that "it has become impossible for DPW to meet these and other Consent Decree deadlines because it currently lacks the funds for these large construction projects." GovGuam's Stat. Conf. Resp. at 2 (hereafter "GovGuam's Resp."). Given DPW's poor residential service and billing and collection mismanagement, bond financing is currently unlikely. Moreover, the Guam Legislature has not appropriated any funds for Consent Decree construction projects in this fiscal year. GovGuam's Resp. at 9. Unless this Court takes immediate action, GovGuam's dilatory pattern will continue, even further delaying GovGuam's compliance with the Decree's requirements to operate a new landfill, close the Ordot Dump, and cease its illegal discharges.

---

[2]/ GCG noted the apparent paradox of DPW's Director asking for a delay in the January 2007 PUC rate proceeding at the same time that he was stating that DPW does not have adequate resources to safely operate the Ordot Dump. Subm., Att. 20 at 3.

[3]/ In a July 13, 2006 letter to EPA, Guam's attorney stated that bond legislation should be introduced by July 18, 2006. Subm., Att. 17 at 2.

1    B.    This Court Has the Authority to Enforce the Compliance Deadlines Set by the
      Consent Decree.

2

3         A consent decree is both a contract and a judicial order.  Local Number 93, Intl. Ass'n of

4    Firefighters v. City of Cleveland, 478 U.S. 501, 519 (1986); Gilmore v. State of California, 220

5    F.3d 987, 1000-1 (9th Cir. 2000).  For purposes of enforcement, a consent decree is construed as

6    a contract.  Hook v. State of Ariz. Dept. of Corrections, 972 F.2d 1012, 1014 (9th Cir. 1992).

7    Thus, this Court may enforce a decree against one of the parties at the request of another pursuant

8    to ordinary contract principles.  United States v. ITT Continental Baking Co., 420 U.S. 223, 238

9    (1975); see Hook, 972 F.2d at 1014 (intended third party beneficiaries of consent decree have

10   standing to enforce the decree).  As the Third Circuit, in enforcing an environmental consent

11   decree, stated:

12        Although a consent decree is a judicial act, it has many of the attributes of a contract
          voluntarily undertaken, . . . and a party to a consent decree, having made a "free,
13        calculated and deliberate choice to submit to an agreed upon decree rather than seek a
          more favorable litigated judgment," bears a burden which "is perhaps even more
14        formidable than had [it] litigated and lost."

15   United States v. Wheeling-Pittsburgh Steel Corp., 818 F.2d 1077, 1088 (3d Cir. 1987) (citations

16   omitted).  As a contract, "the scope of the consent decree must be discerned within its four

17   corners, and not by reference to what might satisfy the purposes of one of the parties to it . . .

18   [T]he instrument must be construed as it is written."  United States v. Armour & Co., 402 U.S.

19   673, 682 (1971); accord, Gates v. Shinn, 98 F.3d 463, 468 (9th Cir. 1996).

20        In this case, the Decree's "WHEREAS" clauses state that the operation of the Ordot

21   Dump is subject to the provisions of the Clean Water Act.  Decree at p. 2.  The parties also

22   provided that:  (1) the United States had alleged that discharges from the Ordot Dump constituted

23   discharges of pollutant without a permit; and (2) Guam law provided a financing source from

24   tipping and user fees for the closure of the Ordot Dump and the construction and operation of a

25   new landfill.  Id. at pp. 2-3.  The Consent Decree contained specific compliance measures in

26   Section IV, in which the parties provided:  "The Government of Guam shall correct all

27   compliance problems that form the basis for the Complaint filed in this action by undertaking the

28   actions below within the specified times."  ¶ 7 at p. 4.  The specified actions in Section IV of the

-7-

Decree include both the "Closure of Ordot Dump and Cessation of Discharge of Pollutant from Ordot Dump into Waters of the United States" in Paragraph 8 and the "Construction and Operation of New Municipal Solid Waste Landfill" in Paragraph 9. Therefore, the scope of this Consent Decree, as discerned within its four corners, encompassed both the timely closure of the Ordot Dump and the timely operation of a new landfill.

This Court retains jurisdiction to enforce its judgments, including consent decrees. Hook, 972 F.2d at 1014; McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949) (court has inherent power to enforce a decree). As the Ninth Circuit recognized: "'The strong policy encouraging settlement of cases requires that the terms of a consent judgment . . . be respected as fully as a judgment entered after trial.'" Stone v. City and County of San Francisco, 968 F.2d 850, 861 n. 20 (9th Cir. 1992), quoting and following Badgley v. Santacroce, 800 F.2d 33, 38 (2d Cir. 1986). In addition, the Consent Decree specifically contemplated this role for the Court in this case, providing: "Until termination of the Consent Decree, the Court shall retain jurisdiction to handle any disputes that arise under this Consent Decree." Decree, ¶ 59.

In this case, the parties conducted an arm's length negotiation over the course of many months. During those negotiations, this Court served to mediate several disputes that had separated the parties. Significantly, GovGuam joined the United States' motion to enter the consent decree, stating: "The Consent Decree is fair, reasonable, consistent with the purposes of the Clean Water Act, and serves the public interest." GovGuam's Joinder in Mot. to Enter. The Court then entered the Consent Decree as a final judgment. Fed. R. Civ. P. 54, 58; Decree, ¶ 62.

The Consent Decree represents the culmination of years of federal efforts to compel GovGuam to bring the Ordot Dump into compliance with the CWA. EPA brought its first administrative enforcement action against Guam in March 1986, more than twenty years ago. After more than a decade of EPA's administrative efforts, the United States finally filed a Complaint in this action to enforce the Act. Through careful negotiations, the parties ultimately reached an agreement in this Consent Decree that fully served the public interest. The United States entered this agreement based on its belief that the Decree would finally break the legislative logjam that had prevented GovGuam from addressing the serious public health and

-8-

environmental hazards posed by the Ordot Dump. U.S. Mem., Mot. to Enter Consent Decree at 11. By entering into the Decree, the United States avoided the costs, uncertainties, and delays that litigation could have entailed in exchange for the significant environmental benefits that would accrue from GovGuam commencing the comprehensive injunctive measures contained in the Decree *immediately* upon entry of the Decree. Id. at 15. After both parties have engaged in lengthy negotiations, reached the agreement embodied in the Decree, and jointly moved to enter the Decree, one party to the Decree, GovGuam, cannot now selectively choose which provisions of the Consent Decree it will ignore. It is undisputed that GovGuam has failed to meet critical Consent Decree deadlines relating to its central obligations to properly close the Ordot Dump and to construct a new sanitary landfill, and is currently in violation of the Consent Decree. Accordingly, the United States requests the Court to construe the Consent Decree as it is written and to enter an Order fully enforcing its requirements.

C. This Court Has Wide Discretion to Fashion a Remedy to Ensure GovGuam's Expeditious Compliance with the Consent Decree's Deadlines.

Section 309(b) of the Clean Water Act provides EPA with authority to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation of CWA section 1311, and the Complaint in this action is based on that authority. 33 U.S.C. § 1319(b). Section 309(b) also provides the district court with jurisdiction to "restrain such violation and to require compliance." Id. Pursuant to this broad grant of authority, this Court can fashion an appropriate remedy for a violation of the Act. As the Ninth Circuit stated in United States v. Alisal Water Corporation, 431 F.3d 643, 654 (9th Cir. 2005), "the court will not generally infer restrictions on inherent judicial authority from congressional silence." In upholding the District Court's divestiture order in Alisal under the Safe Drinking Water Act, the Ninth Circuit held: "There is no limiting language, so the statute incorporates the full panoply of the court's equitable powers." Id.

A district judge, "sitting in equity, is vested with wide discretion in fashioning a remedy" for violations of a decree. Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir. 1979); see also Delaware Valley Citizens' Council for Clean Air v. Pennsylvania, 533 F. Supp.

-9-

869, 880-82 (E.D. Pa. 1982), aff'd, 678 F.2d 470 (3d Cir. 1982). In this case, GovGuam violated EPA's administrative Orders for over ten years before the Complaint was filed. Moreover, GovGuam has failed to comply with this Court's Order in the Consent Decree despite EPA's imposition of $73,250 in stipulated penalties. GovGuam's recalcitrance has not been deterred despite the accrual of an additional $839,500 in stipulated penalties for GovGuam's current violations of the Decree. Under these circumstances, "when the usual remedies are inadequate, a court of equity is justified, particularly in aid of an outstanding injunction, in turning to less common ones . . . to get the job done." Morgan v. McDonough, 540 F.2d 527, 533 (1st Cir. 1976) (court appointed a receiver); see also Puget Sound Gillnetters Ass'n v. U.S. Dist Ct., 573 F.2d 1123, 1129 (9th Cir. 1978) (affirming District Court's direct management of State's fishing industry to protect tribal fishing rights under treaty), vacated and remanded, 443 U.S. 658, aff'd on remand, 605 F.2d 492 (9th Cir. 1979). As demonstrated below, GovGuam's managerial incompetence, institutional inertia, and lack of financial resources provide compelling reasons for the Court to intervene in this case to fashion an appropriate remedy for GovGuam's violations. Cf. United States v. Alisal Water Corp., 326 F. Supp.2d 1010, 1023-26 (N.D. Cal. 2002).

> 1.    GovGuam Lacks the Managerial Competence to Comply with the Consent Decree.

GCG's "Focused Management Audit" portrayed DPW as incapable of operating solid waste management on Guam. Subm., Att. 12. For example, GCG found: (1) DPW's current quality of residential service is unacceptable with frequent missed pickup days (pp. 2, 14-15); (2) only 7 of 16 packer trucks used to haul garbage were operational and some trucks had been out of operation for months (p. 14); (3) DPW does not have accurate lists of its customers and its drivers do not know which households are customers (pp. 12-13); (4) DPW does not enforce its rules for collection of residential waste (pp. 10-11); (5) there is no scale to measure incoming waste at the transfer stations (p. 15); (6) garbage is illegally dumped at the gates of the transfer stations and at the Ordot Dump (p. 16); and (7) DPW failed to comply with Guam law requiring the privatization of 2 of 3 residential collection districts by 2002 (pp. 2, 14). Based on these findings, the Guam PUC concluded that "DPW does not have adequate resources *[management,*

-10-

*staff, financial, legal, engineering and systems]* to implement the audit recommendations in a timely manner." Subm., Att. 9 at 1 (bracketed material and italics in original). The PUC recommended that DPW's solid waste management "be reconstituted as a public corporation under the governance of the Consolidated Commission on Utilities." Id.

When the Consent Decree was entered in February 2004, the parties contemplated a series of incremental steps over three and one-half years culminating in the closure of the Ordot Dump in October 2007. Thus, for example, the Decree required GovGuam to submit a Draft Final Closure Plan for the Ordot Dump by May 6, 2005, more than one and one-half years ago, to allow for the proper and timely closure of this Dump. As recent correspondence confirms, however, GovGuam now seeks to revise the closure design. Subm., Att. 18. This vacillation is emblematic of GovGuam's inability to manage the projects required by the Consent Decree in a timely manner. A revision of the Closure Plan at this point would inevitably result in yet further delays in closing the Dump (Wolfram Decl., ¶ 6), and highlights the urgent need for judicial supervision and control. See Town of Greenwich, 10 ELR 20178, 20181 (D. Conn. Nov. 7, 1979 & Jan. 21, 1980) (court supervision, control, and management needed when defendant failed to meet critical construction dates despite the specific schedule in consent judgment).[4]

    2.    Institutional Inertia Hinders GovGuam's Compliance Efforts.

In the United States' request for a status conference dated November 6, 2006, we listed several problems with GovGuam's daily operation of the Ordot Dump, including: (1) its failure to have a certified landfill manager on duty; (2) the absence of a tracking system, including a functioning scale, to measure incoming waste at the Dump; and (3) its failure to consistently apply a daily cover of dirt over the trash due to the lack of functioning heavy duty equipment. U.S. Stat. Conf. Req. at 8-9. GovGuam's response served to directly highlight the bureaucratic problems that have hampered its compliance efforts under the Decree. GovGuam explained that while it had the funds to address these issues, it had encountered other impediments: "Because DPW is a line agency within GovGuam, the delivery and placement of daily cover is hampered

---

[4]    A copy of this case is available at Subm., Att. 1.

by the governmental bureaucracy - it is dependent upon actions outside the control of the Solid Waste Division." GovGuam's Resp. at 9. GovGuam pointed to several factors leading to its violations of the Decree and its failure to properly manage its solid waste operations, including: (1) the Guam Legislature did not appropriate any funds in this fiscal year for Consent Decree construction projects (p. 9); (2) the lack of operating equipment is due to procurement issues delayed by the Guam Department of Administration's ("DOA") cumbersome process (Id.); (3) the lack of competent, qualified employees is again due to DOA's lengthy hiring process and inadequate salary scales (p. 10); and (4) access to the site of the new landfill is blocked by unresolved disputes between the current landowners (p. 11).

GovGuam's focus on the bureaucratic obstacles hindering DPW's response not only fails to address DPW's mismanagement of solid waste operations detailed in GCG's audit report, it also ignores one crucial fact - GovGuam is the defendant in this case. This explanation directly identifies the Government of Guam's bureaucratic morass as the obstacle in this case. GovGuam's Legislature failed to appropriate funds, GovGuam's DOA failed to process procurement and hiring requests, and GovGuam's Attorney General failed to pursue access to the landfill site through a condemnation action. GovGuam's institutional inertia is exemplified by the fact that DPW failed to submit any information to the PUC on bond financing to date. Subm., Att. 13 at 2. Furthermore, while PUC has offered to propose specific legislation to address DPW's fundamental problems, the Legislature has not responded. Id. at p. 3.

Most significantly, GovGuam's complete inability to comply with the Consent Decree persists despite Governor Camacho's creation of an inter-agency "Ordot Compliance Team" on May 12, 2006, and his Executive Order on May 17, 2006, which declared that the Ordot Dump is an emergency. Subm., Att. 10, 11. This Executive Order was intended to release funds to help GovGuam comply with the Decree requirements. Notwithstanding these efforts by Guam's Governor, however, institutional inertia prevails and the Decree's deadlines are not being met.

3. GovGuam Has Failed to Raise the Financial Resources to Comply with the Consent Decree.

When the Consent Decree was entered in February 2004, the parties specifically acknowledged that "the total amount of funding needed to complete the projects required under this Consent Decree is not currently available." Decree, ¶ 10. The Decree required GovGuam to submit a financial plan within 120 days after the entry of the Decree to identify "the funding source or sources and a schedule to secure funds for the capital and operating costs necessary" to pay for these compliance measures. Id. While the parties agreed that the Solid Waste Operations Fund would be used to fund Decree projects, it was not regarded as the exclusive source of funding. Id. Accordingly, GovGuam was required to "use its best efforts to obtain sufficient funding to fully implement the projects required by this Consent Decree." Id. Thus, the parties not only expressly addressed the financing issues within the four corners of the Consent Decree, they also agreed that GovGuam would prepare a financial plan to set forth the funding mechanisms for the compliance measures.

GovGuam submitted its financial plan to EPA in June 2004 and revised it in response to EPA's comments in October 2004. Machol Decl., ¶ 3. The plan stated that costs associated with the closure of Ordot and the opening of a new landfill would be approximately $100 million. Because GovGuam had $3.2 million in available funding, it expected to raise approximately $100 million in private activity bonds. Subm., Att. 14 at 24. The plan concluded:

> [T]he preferred alternative for financing the sanitary landfill and costs associated with the closure of the Ordot dump would be the private activity bond. Assuming qualification of the bond issue and approval by the Guam Legislature, it would be anticipated that the bond issue can be accomplished within 90 to 120 days.

Id. at 11. A detailed time line for accomplishing these tasks was attached to the plan.

GovGuam should have obtained bond funding by May 2006 in order to meet the Consent Decree's 2007 deadlines. Subm., Att. 16 at Att. However, GovGuam has not even begun the PUC review and approval process for bond financing. Subm., Att. 13 at 2. In a recent letter to the PUC, DPW stated that GovGuam now intends to solicit private interest in financing the construction and operation of these projects required by the Consent Decree. Subm., Att. 19.

-13-

GovGuam repeated this position to the Court at the status conference, explaining: "some legislators appear to prefer private financing . . . *even though GEDCA's advisor recommends a revenue bond as more economical to GovGuam and the ratepayers.*" GovGuam's Resp. at 8-9 (italics added).

Similar to GovGuam's mismanagement of the draft closure plan for Ordot discussed above, this latest change in position again illustrates GovGuam's inability to manage the projects required by the Consent Decree in a timely manner. As GCG, the PUC's consultant, aptly observed: "GovGuam's two year effort to obtain special activity bond financing has been marred by indecision and a lack of urgency and leadership to address operational and organizational problems . . . ." Subm., Att. 13 at p. 2. Even though DPW must obtain PUC approval of the funding for Consent Decree obligations, whether private or bond financing, DPW has not submitted any petition to date to the PUC. Id. Moreover, although legislation is required to authorize the financing, this is also conspicuous by its absence. Id. In fact, DPW's financial advisor and potential bond underwriter are not aware of any alternative to bond financing that is under consideration. Id. at 4. GCG concluded that GovGuam's potential change in course entails "a considerable risk for delay" and does not meet an adequate cost-benefit threshold. Id. at 5.

GovGuam's failure to obtain a bond or private financing has inevitably resulted in its failure to comply with the Decree. As GovGuam readily acknowledged: "it has become impossible for DPW to meet . . . Consent Decree deadlines because it currently lacks the funds for these large construction projects." GovGuam's Response at 2. Moreover, based on GCG's Focused Audit Report, GovGuam's inability to finance Consent Decree projects will not be corrected at any foreseeable point without major changes. Subm., Att. 12. For example, GCG found: (1) DPW's fee collection rate from its customers for residential service is "abysmal," amounting to an average of 26% over the past four years (pp. 3, 19); (2) customer lists are incomplete and the paid-up status of customers is incomplete and inaccurate (p. 17); (3) none or very little of an October 2005 rate increase was collected from commercial haulers by March 31, 2006 (p. 4); (4) accounts receivable for commercial haulers are currently 318 days in arrears; the

-14-

commercial haulers assert that they do not owe DPW if the haulers' customers do not pay the tipping fee to the haulers (pp. 22-23); (5) it is highly doubtful that the $11 million in DPW's stated accounts receivable is collectible[5] (p. 19); (6) Ordot Dump's scale is broken, making it impossible for DPW to correctly determine the tipping fee that is due (p. 16); (7) as of May 2006, DPW had only $9,000 in a reserve fund that should have had $465,000 in it (pp. 25-26); and (7) GovGuam has a dysfunctional, fragmented billing system with revenue cycle functions divided between DPW and DOA (pp. 5, 7). After reviewing GCG's audit report, the Guam PUC concluded that the basic building blocks needed to support bond financing were not in place: "DPW is not prepared to assume the financial responsibilities, which would be imposed upon it by the proposed $90 million dollar revenue bonds financing, which is necessary to fund the Government of Guam's compliance with the Federal Consent Decree." Subm., Att. 9 at 1.

Faced with this conclusion, GovGuam observed that the PUC is reluctant to raise residential and commercial tipping and user fees until DPW improved its waste collection services and revenue collection. GovGuam's Resp. at 8. According to GovGuam, the PUC has set deadlines for improvement of DPW that conflict with Consent Decree deadlines. Consequently, "limited DPW Consent Decree staff has assumed collateral duties related to improved solid waste collection services and revenue collection." Id. In sum, GovGuam apparently views the PUC as a distraction rather than as a part of the solution. The United States regards GovGuam's position as completely unfounded and agrees with GCG's cogent assessment: The PUC's "recommendation to fix a non-functioning billing and collection system, with which the Government intends to repay over $90 million dollars of debt necessary for Decree compliance, is not a 'distraction' but the only hope there is to provide access to the capital markets to fund the necessary [Decree] projects." Subm., Att. 13 at p. 2 n. 5. As GCG stated, DPW's attempts to improve its operations have been hampered because it is a "fractured organization" without a sense of purpose or a strategic plan. Subm., Att. 20 at 3. Clearly, DPW

[5] Not surprisingly, Guam's DOA has an allowance for bad debt of $9 million for DPW's $11 million in accounts receivable, meaning that DPW could have problems collecting over 80% of its accounts receivable. Subm., Att. 13 at 6.

-15-

faces the same type of crisis in managing its solid waste operations as the City of Detroit did in managing its sewage treatment plant. Cf. Subm., Att. 20 at 3-4 with United States v. City of Detroit, 476 F. Supp. 512, 517-18 (E.D. Mich. 1979) (in appointing a receiver, court noted that the City's "present management is consumed by the demands of crisis operating conditions that command priority over personnel, planning, budgeting, process evaluation, and other administrative functions."). Similarly, DPW's limited management staff is consumed by the demands of crisis operating conditions that preclude any sustained effort to comply with the Consent Decree. Under these circumstances, the Court's intervention is necessary.

> **D.** This Court Should Require GovGuam to Meet a Series of Interim Milestones Necessary to Ensure Prompt Compliance with the Consent Decree.

According to the Guam PUC, GovGuam needs to obtain approximately $90 million in bond financing to comply with the Consent Decree's mandates. To qualify for a bond, the PUC's consultant found that SWM needs to dramatically improve both the quality of service provided to its customers and its billing and collection system.[6] Bureaucratic hurdles also loom large: the Guam Legislature has not acted in response to the PUC's offer to propose specific legislation to address SWM's intractable problems. As a result, serious management problems at DPW, together with GovGuam's failure to finance the construction projects required by the Consent Decree and bureaucratic inertia, have led to an endless cycle of violations.

In light of these violations, the United States could demand stipulated penalties of $839,500 from GovGuam.[7] Unfortunately, even if GovGuam promptly paid these penalties, that payment would not ensure either the proper and timely closure of the Ordot Dump or the opening of a new landfill. For situations such as this, the Consent Decree explicitly states that stipulated

---

[6] In its Focused Management Report on DPW, GCG recommended that privatization of SWM's residential waste collection should be "concluded as early in 2007 as is reasonably possible." Subm., Att. 12 at 3. GCG also recommended that SWM's billing and collection system be "outsourced." Id. at 4.

[7] Although the United States is not currently demanding the payment of these stipulated penalties, we reserve our right to demand them in the future.

penalties are not the United States' exclusive remedy for violations of the Decree. The United States "expressly reserved its rights to seek any other relief it deems appropriate, including . . . contempt, or injunctive relief against the defendant." Decree, ¶ 16. The payment of stipulated penalties has not resulted in a change in GovGuam's performance. Accordingly, the United States requests that the Court issue an Order enforcing the Decree and establishing a series of milestones for GovGuam to meet in order to achieve prompt compliance with the Decree.

By issuing an Order establishing interim compliance milestones, this Court can finally sever the Gordian knot that has prevented any meaningful progress in this case. These milestones will enable GovGuam to improve the quality of SWM's service to residential customers and to establish a reliable billing and collection system for SWM, which the PUC had identified as critical prerequisites for obtaining the bond financing necessary to pay for the work required by the Consent Decree. Therefore, the United States requests that the Court direct GovGuam to complete the following tasks:

1. By April 2, 2007, GovGuam shall provide an Operations Report to the Court and the United States identifying all equipment and supplies necessary to properly operate residential waste collection service, the transfer stations, and the Ordot Dump, including, but not limited to, packer trucks, scales to measure incoming waste at both the transfer stations and the Ordot Dump, heavy equipment needed at the transfer stations and at Ordot Dump to perform required tasks (such as providing daily cover at the Ordot Dump), and a source of material for the daily cover. For all identified equipment and supplies that are currently either out of service or unavailable, GovGuam's Operations Report shall provide a schedule for repairing or replacing the equipment and providing the supplies by May 31, 2007.

2. By April 2, 2007, GovGuam shall issue a request for a proposal to procure the services of a company to handle all billing, collections, and accounting functions for DPW's SWM. GovGuam shall enter into a contract for such services as expeditiously as possible, but no later than July 2, 2007.

3. By April 2, 2007, GovGuam shall collect at least 50% of the accounts receivable owed to SWM. By May 31, 2007, GovGuam shall collect at least 75% of the accounts receivable owed to

-17-

SWM.

4.     By April 2, 2007, GovGuam shall issue a request for a proposal to procure the services of a company to collect residential waste for the Island of Guam.  This residential waste collection service shall be established by no later than July 2, 2007.

5.     By April 2, 2007, GovGuam shall commence a condemnation action to gain access to the site for the new landfill if it has not satisfactorily resolved the disputes between the current landowners by that time.

6.     By April 2, 2007, GovGuam shall submit a Financial Plan to the Court and the United States, identifying the method that it has chosen to finance the expeditious closing of the Ordot Dump and the opening of a new landfill, and stating the amount of revenue it requires to comply with the Consent Decree.

7.     If GovGuam chooses to finance the Consent Decree's projects through the issuance of a municipal bond, GovGuam shall submit an application to the PUC for approval of SWM's rate increases necessary to support the bonds by April 30, 2007.  GovGuam shall request authorization of this financing by the Legislature by May 15, 2007.  The bond shall be issued as soon as practicable thereafter.

8.     If GovGuam chooses private financing of the Consent Decree's tasks, GovGuam shall submit an application to the PUC for approval of this financing by April 30, 2007.  GovGuam shall issue a request for a proposal to solicit interest in this approach by May 10, 2007. GovGuam shall enter into a contract as soon as possible, but no later than July 2, 2007.

9.     By April 30, 2007, SWM shall be reconstituted as a public corporation under the governance of the Consolidated Commission on Utilities.[8]/  GovGuam shall request authorization of this action by the Legislature by April 2, 2007.

10.     Beginning on April 15, 2007, and continuing on the 15th of each month until July 15,

---

[8]/     This requirement implements the central recommendation of the PUC's Order dated September 28, 2006. Subm., ¶ 9 at 1. The PUC concluded that DPW, as a line agency of GovGuam, lacked adequate authority and resources to comply with the covenants and requirements that would be imposed by bond documents for the $90 million in bond financing. Subm., ¶ 16.

-18-

2007, GovGuam shall provide a monthly compliance report to the Court and the United States. Each report shall: (i) document that GovGuam has provided a sufficient daily cover over the trash at the Ordot Dump to comply with Guam law; (ii) identify and explain any failures to comply with the compliance milestone established in Paragraphs 1 through 9; and (iii) include, pursuant to paragraph 3, the amount of revenue collected in the proceeding month, the amount of accounts receivable that have not been collected, a recitation of the percentage of accounts receivable collected, and an explanation about why GovGuam has not collected the unpaid accounts receivable. Each report shall be signed by GovGuam's Attorney General and all representations shall be subject to Fed. R. Civ. P. 11.

As the Court will note, this set of tasks does not directly result in either the closure of the Ordot Dump or the opening of a new landfill, as required by the Consent Decree. At this point, we need to create the basic building blocks that will allow GovGuam to eventually meet its obligations under the Decree. In order to monitor GovGuam's compliance with these interim milestones, the United States requests the Court to schedule a monthly status conference. The Court should direct that high-level GovGuam officials, such as the Attorney General and a representative of the Governor's office, be required to attend these monthly status conferences to ensure that GovGuam regards compliance with the Court's Order as its top priority. Once GovGuam has the financial mechanism in place to fund the Consent Decree's projects, the United States will request the Court to issue an additional Order to establish new compliance dates for construction of the Decree's projects.

E.    The United States Reserves its Right to Request the Appointment of a Receiver if GovGuam Fails to Meet Interim Deadlines Set by this Court.

If GovGuam is unable to comply with these interim milestones, the United States reserves its right to request this Court to appoint a Receiver to assume management of SWM. The appointment of a receiver has historically been considered an inherent power of a federal court sitting in equity. See United States v. Am. Tobacco Co., 221 U.S. 106, 186-87 (1911) (appointment of a receiver is appropriate "for the purpose of preventing a continued violation of the law"). The Federal Rules provide specific authority for the appointment of a receiver to

-19-

ensure compliance with a consent decree: "If a judgment directs a party . . . to perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court and the act when so done has like effect as if done by the party." Fed. R. Civ. P. 70; see Town of Greenwich, 10 ELR at 20181. A receivership is particularly appropriate when, as in this case, public health issues are implicated.[9/] See Alisal Water Corp., 326 F. Supp.2d at 1012. In determining whether to appoint a receiver, courts have particularly focused on two factors: (1) defendant's actual ability to manage their facilities in compliance with the law; and (2) defendant's financial ability to comply with the law. Id. at 1013; see Gary W. v. Louisiana, 1990 WL 17537 at *32 (E.D. La. 1990) (in justifying a receivership, courts have "found a lack of leadership . . . , systemic deficiencies in administrative, organizational, and fiscal structures, institutional inertia, and similar indicia of bureaucratic morass.").[10/] If GovGuam fails to comply with the deadlines set by this Court, the United States reserves the right to request the Court to appoint a receiver to perform the tasks necessary to ensure compliance with the Consent Decree.

Respectfully submitted,

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

Dated: _Jun 31, '07_

_____
MIKEL SCHWAB
Assistant U.S. Attorney

OF COUNSEL:

JULIA JACKSON
Assistant Regional Counsel
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, California 94105

_____

[9/]     See 51 GCA § 51101; Arora Decl., ¶¶ 7, 8; Wolfram Decl., ¶ 2; and Lee Decl., ¶ 3.

[10/]    A copy of this case is available at Subm., Att. 2.

-20-

# ATTACHMENT 1

Legislators also attacked proposed funding reductions for even the most obscure *individual programs*.[19] But no legislator at any time complained that the President had violated the Act by supplying inadequate *information*. No complaint was forthcoming even after the National Wildlife Federation sent to all the appropriations committee members a copy of its letter to President Carter. *See* note 4 and accompanying text *supra*.

The absence of congressional complaints is highly relevant, we think, in light of the Act's purpose. Congress in 1974 was frustrated by President Nixon's impoundment of appropriated funds. *See generally* Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297 (codified at 31 U.S.C. §§ 1301-53). The Renewable Resources Planning Act to some extent reflected these sentiments. *See* 16 U.S.C. § 1606(b) (1976). The Act was designed to help legislators understand when, and to what extent, budget requests were inadequate to fulfill policies approved by Congress.[20] In light of the Act's purpose, one would expect that legislators dissatisfied with the President's submissions would have made their dissatisfaction known. Appellant concedes that not one legislator did so.[21]

Second, appellant also concedes that no witness at the appropriations hearings—not even appellant's own witness—complained that the President's submission was inadequate, or that debate was handicapped by the inadequacy of the presidential statement.[22]

[19] [Representative] DUNCAN. Decreases of $1.6 million are requested to eliminate the noxious farm weed control program. The tanzi ragwort is very poisonous, and we have an epidemic of it in Oregon. I have difficulty in understanding why you are cutting down that program.

Mr. THORNTON [of the Forest Service]. The reason is that in the zero-based budget process it did not get the priority.

*  *  *  *

[Representative] DUNCAN. So what you are telling me is control of the tanzi ragwort in Oregon is going to suffer?

Mr. THORNTON: Yes.

[Representative] DUNCAN. I want to know what you need in this budget to maintain this program at last year's level and what you need in your judgment, to adequately respond to the need for the eradication of noxious weeds in this country.

*Id.* at 711.

[20] "The intent of the legislation is to establish more Congressional control over the management activities and appropriation processes of National Forest System lands." H.R. Rep. No. 1163, 93d Cong., 2d Sess. 1 (1974). *See id.* at 8, 9, 10 & S. Rep. No. 686, 93d Cong., 2d Sess. 23-24, 28 (1974) (the Nixon administration feared the Act would unduly restrict presidential flexibility and discretion).

[21] Brief for Appellant at 14. We do not hold that Congress' uncomplaining appropriation of money in itself affirmed the legitimacy of the President's budget submissions. *See* Tennessee Valley Auth. v. Hill, 437 U.S. 153, 190-91 (1978); Realty Income Trust v. Eckerd, 564 F.2d 447, 458 & n.38 (D.C. Cir. 1977). We do think, however, that the absence of objection by legislators is highly relevant to the decision not to award *discretionary* relief.

[22] Brief for Appellant at 14. The record reveals, also, that appellant failed to complain about the adequacy of the President's submissions in its own newsletter. One issue of the newsletter, entitled *Conservation Report from the National Wildlife Federation*, was published within one month of the issuance of the President's proposed budget. It discussed the proposed Forest Service budget in some detail. The newsletter

Third, we are hesitant to venture to rule on the President's compliance with the Act because this issue may never arise again. As the District Court recognized, passage of time under the Act may produce a greater accommodation of appellant's view of the statutory requirements and the President's response to them. Indeed, this already may have occurred. The President's Statement of Reasons accompanying the proposed 1980 budget is more elaborate than that accompanying the 1979 budget. *Compare* 1980 Statement, *supra* note 5, *with* 1979 Statement, p. 7 *supra*. Moreover, the Assessment, Program, and Statement of Policy all have been newly revised during the pendency of this appeal, or are in the process of being revised. 16 U.S.C. §§ 1601(a), 1602, 1606(a). This controversy never will recur unless future budget statements diverge from the plans envisioned by the updated versions of these documents. That it is wholly speculative that this dispute will arise again militates against awarding discretionary relief.[23]

We think for all these reasons that it would be improvident, on the record before us, to afford mandamus or a declaratory judgment. We therefore ground our affirmance of the District Court's decision on the discretionary power federal courts possess to withhold such relief. Accordingly, we do not assess the adequacy of the President's submissions under the Act.[24]

*It is so ordered.*

## Town of Greenwich v. Department of Transportation

No. B-76-193 (O. Conn. Nov. 7, 1979 & Jan. 21, 1980)

The court grants plaintiff's motion for partial summary judgment in a suit charging defendants with violating an Environmental Protection Agency (EPA) compliance order and appoints an administrator to oversee closure of the antiquated Cos Cob Power Plant by Dec. 31, 1980 in accordance with an amended abatement schedule. The court finds that the Connecticut Department of Transportation has admitted that it is "running" the plant and the commuter railroad line that it powers. There is, moreover, no dispute that defendants are in violation of the EPA order and the applicable air pollution control regulations. Ruling that continued "slippage" in the schedule for completing reelectrification of the railroad and closure of the plant is unacceptable in light of the potential for further air pollution and jeopardy to the continuation of commuter rail service, the court determines that judicial supervision, control, and management of the compliance process are needed. As an exercise of its broad remedial power, the court appoints an administrator vested with the powers necessary to achieve expeditious compliance with the EPA order.

Counsel for Plaintiff
Haynes N. Johnson
Parmelee, Johnson, Bollinger & Bramblett
460 Summer St., Stamford CT 06901
(203) 327-2650

at no point, however, expressed dissatisfaction with the President's submissions under the Act. *See* Plaintiff's Exhibit D at 24-26.

[23] "[S]ound discretion withholds the remedy where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted." A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 331 (1961).

[24] This decision does not prejudice the right of appellant, or any one else, to challenge the adequacy of the President's submissions with respect to future proposed budgets. *See, e.g.*, Baker v. Carr, 369 U.S. 186, 236-37 (1962) (discretionary denial of relief is nonprecedential), *quoting* Cook v. Fortson, 329 U.S. 675, 678 n.8 (1946).

Counsel for Defendants
Bryan E. O'Neill, Ass't Attorney General
State Office Bldg., Rm. 147, Hartford CT 06115
(203) 566-2090

Daly, J.:

## Partial Ruling on Plaintiff's Motion for Partial Summary Judgment

Plaintiffs seek partial summary judgment against the Connecticut Department of Transportation (CDOT) and its Commissioner for

(1) Violation by CDOT of the Order of The Environmental Protection Agency (EPA) of January 7, 1976, as amended, relating to, *inter alia*, steps to be taken by CDOT to permit expeditious closing of the Cos Cob Power Plant.

(2) Violation of the following air pollution regulations of EPA:

(a) §19-508-18(a)(1) relating to opacity of emissions;

(b) §19-508-18(d) relating to emissions of particulate matter;

(c) §19-508-19(a)(2)(i) relating to sulfur content of fuel used.

(3) Violation of the EPA primary ambient air standards for suspended particulate matter, §19-508-24(f) (adopted by EPA 40 Fed. Regis. 3279-80).

(P. motion for summary judgment June 8, 1979 at 1-2.)

There is no dispute that CDOT has failed to comply with the EPA order of January 7, 1976, or that CDOT has violated the EPA air pollution regulations mentioned above. The only issue in dispute is whether CDOT is '' 'running' the commuter railroad line or the Cos Cob electrical plant that is the power source for that commuter railroad line, in any meaningful sense . . . .'' (D. Memo. in opposition to P. motion for summary judgment June 26, 1979 at 1.)

## Standard for Summary Judgment

On a motion for summary judgment pursuant to FED. R. CIV. P. 56 the Second Circuit requires the trier of fact to determine that "the moving party . . . [show] that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." *Robertson v. Seidman & Seidman*, No. 78-7278, slip op. at 4403 (2d Cir. Aug. 29, 1979). In addition "the inferences to be drawn from the underlying facts [must be] in the light most favorable to the [non-movant] . . . [and] [w]hen conflicting inferences can be drawn from the facts, . . . summary judgment is inappropriate." *Id.* at 4407, 4404.

On June 26, 1979 defendant responded to plaintiff's request for admissions pursuant to FED. R. CIV. P. 36 dated June 6, 1979. Defendant specifically admitted to D.3.(b) which states that "[p]rior to issuing said Order, EPA found that the contractual relationship between CDOT [CTA] and ConRail [Penn Central] made it clear that: '. . . both are principals whose actions directly affect the operation of the Cos Cob plant.' (Interim Ex. 2, p. 3)." (D. answers to P. request for admissions June 26, 1979 at 2.) Defendant failed to respond to plaintiff's request to admit D.4.(b) & (c) which state ''(b) that [CDOT] has and has had its own consultant inspect and report on the plant on a regular basis . . . and (c) that [CDOT] meets on a monthly basis with personnel of ConRail and others to make decisions as to details of operation of the railroad, including the power plant.'' (P. request to admit June 6, 1979 at 9.)

FED. R. CIV. P. 36(a) requires each matter for which an admission is requested to be answered by a denial or detailed reasons why the answering party cannot truthfully admit or deny the matter. Failure to respond results in an admission which shall be deemed conclusively established under subsection (b).

Thus, while a party may respond in any one of three ways, (1) file an admission, (2) file a specific denial, or (3) file a statement setting forth why he cannot truthfully admit or deny the requests, nevertheless he must take affirmative action if he wants to avoid the consequences of failing to respond in accordance with the Rule.

20 ALR3d 756, 759 (1968).

The courts have held that the clear import of Rule 36 is that failure to respond to a request to admit results in having the party upon whom the request was made be deemed to have admitted the request as true. *Chess Music, Inc. v. Tadych*, 467 F. Supp. 819, 820 (E.D. Wisconsin 1979); *Comm'rs of Hwys. of Town of Annawan et al. v. U.S.*, 466 F. Supp. 745, 748 n.1 (N.D. Illinois, E.D. 1979). On the basis of defendant's admissions and the arguments of counsel on November 6, 1979 this Court finds that CDOT participated in the operation and financing of the commuter railroad line and the Cos Cob electrical plant in material part so as to be "running" these two facilities. Therefore, there is no genuine issue of material fact to be resolved and the plaintiff is entitled to partial summary judgment as a matter of law.

It is so ORDERED.

## Order Appointing Administrator

On July 8, 1976 and September 21, 1976 plaintiffs' respectively filed lawsuits seeking to restrain the defendants from repeated and continuing violations of the United States Environmental Protection Agency (EPA) regulations, promulgated pursuant to The Clean Air Act, 42 U.S.C. §§7401-7642,[1] and an EPA Order issued on January 7, 1976, as amended July 21, 1976, requiring, *inter alia*, that the Cos Cob power generating facility terminate operations by September 15, 1978, in order to achieve compliance with applicable regulations, and the established interim timetable to ensure compliance.

The plaintiffs in B-76-193 seek the appointment of an Administrator following this Court's granting of plaintiff's motion for summary judgment on November 7, 1979.[2]

The plaintiff in B-76-282 seeks the appointment of an Administrator to effect compliance with the work schedule set forth in Schedule B of the consent judgment filed in its action on May 2, 1979 which amended the September 15, 1978 shut down date to extend the closing of the Cos Cob electric generating plant to December 31, 1980.

## Findings of Fact

The Cos Cob Power Plant is used to supply electricity to operate the commuting railroad to New York. It is antiquated and subject to temporary and possibly permanent failure. The plant is operated under the terms of the New Haven Suburban Passenger Train Service Agreement of October 27, 1970, between the Connecticut Transportation Authority, now succeeded by the Connecticut Department of Transportation (CDOT), and the Penn Central Transportation Company, now succeeded by the Consolidated Rail Corporation (ConRail).

The Cos Cob Power Plant, for more than ten years, has been charged by the Town of Greenwich and its residents with polluting the air in the surrounding area with substantial quantities of particulate matter, fly ash, and sulfur. This pollution, it is claimed, will not entirely cease until the Power Plant is closed.

The United States Environmental Protection Agency (EPA) adopted regulations relating to the air polluting emissions from the Cos Cob Power Plant. See note 1, *supra*. These regulations were held valid in *Blanchette v. U.S. Environmental P.A.*, 551 F.2d 906 [7 ELR 20282] (2d Cir. 1977). Those portions of the regulations dealing with opacity of emissions, emission of particulate matter and emission of sulfur are as follows:

(1) §19-508-18(a)(1) on *opacity* of emissions:

No person shall cause or permit the emission of visible

---

1. The applicable regulations may be found at 40 C.F.R. §§52.377(b), 52.380 (1976), effective June 30, 1975, 40 Fed. Reg. 22279-80 (1975), 42 U.S.C. §§7401-7642 was the result of a complete revision of the Clean Air Act, July 14, 1955, c. 360, 69 Stat. 322, on August 7, 1977. See 91 Stat. 685. The Act was formerly codified at 42 U.S.C. §§1857-1858a.

2. The motion for summary judgment and the requested relief by the plaintiffs in B-76-193 only applies to the Department of Transportation of the State of Connecticut and its Commissioner. The relief sought by the plaintiff in B-76-282 includes the Consolidated Rail Corporation in addition to the Connecticut Department of Transportation and its Commissioner.

air pollutants of a shade or density equal to or darker than that designated as No. 1 on the Ringelmann chart of 20 percent opacity.

(2) §19-508-18(d) on *particulate matter:*

No person shall cause or permit the emission from fuel-burning equipment of particulate matter in excess of 0.20 pounds per million BTU . . . of heat input.

(3) §19-508-19(a)(2)(i) on *sulfur* emissions:

No person shall use or burn fuel which contains sulfur in excess of one-half of one percent (0.5 percent) by weight (Dry Basis).

These regulations form part of the State Implementation Plan for ambient air quality required by The Clean Air Act, 42 U.S.C. §7401, formerly §1857c-5. The history of the Implementation Plan may be found in *Blancherte,* 551 F.2d at 908.

On January 7, 1976 after notice to, *inter alia,* CDOT and a hearing, the Regional Administrator of EPA for Region 1 issued findings and an Order against CDOT and others, jointly and severally, relative to emissions from the Cos Cob Power Plant. The Regional Administrator found that CDOT was operating the Cos Cob Power Plant in violation of those regulations cited above. Said findings and subsequent Order were not appealed by CDOT and remain in full force and effect.[3] CDOT has admitted said violations and acknowledges probable continuing violations until the Cos Cob Plant is shut down.[4]

The EPA Order of January 7, 1976, as amended July 21, 1976, ordered CDOT and ConRail to do, *inter alia,* the following:

(a) Not later than February 1, 1976, CDOT and ConRail shall enter into a force account agreement for Phase I-1, I-2, I-3 and I-4 of the signal conversion work and commence on-site work on signal conversion. (¶ 4.)

(b) Not later than May 1, 1976, CDOT and ConRail shall submit all remaining necessary funding requests for the signal conversion work to the Urban Mass Transit Authority for approval. (¶ 5.)

(c) CDOT and ConRail shall complete work on the signal conversion of the main line from Greenwich through New Haven, including the New Canaan Branch, designated on the Construction Schedule as "j" through "ii," according to the schedule set forth below:

(i) 9% by June 30, 1976

(ii) 27% by December 31, 1976

(iii) 56% by June 30, 1977

(iv) 82% by December 31, 1977

(v) 100% by August 15, 1978 (¶ 6(a).)

(d) Not later than September 15, 1977, CDOT and ConRail shall:

(i) Cut over to 60 hertz traction power on the Woodlawn to New Rochelle segment designated on the Construction Schedule as Major Work Items a. through d., and (ii) cease providing traction power from the Cos Cob Plant to operate this segment of the railroad. (¶ 7(a).)

(e) Not later than January 15, 1978, CDOT and ConRail shall:

(i) Cut over to 60 hertz traction power for the East

Norwalk to New Haven segment designated on the Construction Schedule as Major Work Items t. through hh; (ii) cease providing power for that segment from the Cos Cob Plant; and (iii) operate boiler units 902 and 903 individually only and not at the same time. (¶ 7(b).)

(f) Not later than August 15, 1978, CDOT and ConRail shall:

(i) Cut over to 60 hertz traction power for the East Norwalk to Cos Cob segment designated on the Construction Schedule as Major Work Item m. through s., and (ii) cease providing power for that segment from the Cos Cob Plant. (¶ 7(c), as amended.)

(g) Not later than September 15, 1978, CDOT and ConRail shall cease operation of the Cos Cob Plant. (¶ 7(d), as amended.)

(h) Until all operations at the Cos Cob Plant cease, CDOT and ConRail shall:

(i) Limit visible emissions

(a) from the stack ducted to units 902 and 903 to forty percent (40%) opacity; and

(b) from the stack ducted to unit 904 to twenty percent (20%) opacity, with not greater than forty percent (40%) opacity for not more than five minutes in any sixty minutes. (¶ 8(a).)

Compliance with the EPA Order was not made subject to receipt of federal funding.

The defendants concede that there is no dispute that CDOT has failed to comply with the EPA Order of January 7, 1976, as amended July 21, 1976, or that CDOT has violated the EPA air pollution regulations mentioned above. CDOT has been participating in the operation, decision-making, and financing of the commuter railroad line and the Cos Cob electrical plant in material part so as to be running those two facilities. See note 3, *supra.*

By the terms of the EPA Order defendants were to have taken steps to re-electrify the railroad so that, in thirty-two months (by September 1978), electricity could be purchased elsewhere and the Cos Cob Power Plant closed, permanently abating the air pollution and protecting continuation of the commuter service against possible failure of the plant. Contrary to the EPA Order, defendants did not commence the re-electrification project until April 1978.

In May 1978 defendants supplied this Court with a month-by-month "Work Schedule" which provided that the electrification would be completed by December 1980, twenty-seven months after the date required by the EPA Order. In November 1978 defendants signed a Consent Judgment in B-76-282, incorporating the "Work Schedule" as Exhibit B thereto. The Consent Judgment required compliance with the "Work Schedule" and completion of the conversion project by December 1980. After due publication in the Federal Register, 28 C.F.R. §50.7, the Consent Judgment was entered by this Court on May 2, 1979.

Defendants have failed to meet the scheduled dates required by the "Work Schedule" in each and every month subsequent to the entry of the Consent Judgment and have advised the Court that they will be unable to meet the December 1980 completion date for converting the project and closing the Cos Cob Power Plant. On December 18, 1979 defendants submitted to this Court a "New Haven-Line Revised 60 Hz Power Conversion Schedule" which looks toward July 1981 for completion. This is seven months beyond the completion date agreed to in the consent decree entered on May 2, 1979.

By defendants' own admission, in order to satisfy the July 1981 completion date, work at three substations must be deferred and "Phase I" of the conversion project, which was to be completed six months prior to the final completion of the entire project,[5] will be completed at the same time as the rest of the project.

---

3. This Court found in its ruling of November 7, 1979 that "[t]here [was] no dispute that CDOT [had] violated the EPA air pollution regulations . . . ." The only issue in dispute for purposes of the summary judgment motion was whether CDOT was "running" the commuter railroad line or the Cos Cob electrical plant in any meaningful sense. This Court held that "CDOT participated in the operation and financing of the commuter railroad line and the Cos Cob electrical plant in material part so as to be 'running' [those] two facilities." Town of Greenwich, Connecticut *et al.* v. Department of Transportation of the State of Connecticut *et al.,* Civil No. B-76-193, slip op. at 2, 4 (D. Conn. Nov. 7, 1979).

4. *See* letter from CDOT to EPA (August 15, 1975): "[CDOT] . . . acknowledges that it may continue to be in violation of all three of the above mentioned regulations until such time as the plant is shut down."

5. Early completion of "Phase I" would have permitted purchase of power from elsewhere and allowed early partial shutdown of the power plant.

By not completing the additional work at the three substations the reliability of the system may be affected and possibly cause an additional four months delay.

Out of a total ninety-eight items to be completed over a twenty month period, according to the revised schedule, fifty-four are marked with an asterisk. The defendants define the significance of an asterisk beside an item as meaning it is critical and must be completed on the date specified to avoid further delay in the schedule. In effect, over fifty-five percent of all work to be done to complete the project by July 1981 is critical and delay in any one item could set back the completion date.

The present system for meeting critical dates on the project is not working. It is likely that unless some action is taken the pattern of "slippage" will continue, seriously jeopardizing a foreseeable completion date. Such delay is unacceptable in light of the potential for further air pollution and jeopardy to the continuation of commuter service to New York on the New Haven Division Line.

In view of the continued "slippage" in converting the electrification system, irrespective of the existence of the Consent Judgment requiring conversion on a specific schedule, court supervision, control, and management are needed. The failure of the defendants to comply with existing judgments and orders warrants the relief requested by the plaintiffs. A court appointed Administrator will be selected, not as an indicia of bad faith or incompetency, to secure compliance with the law and the judgment of this Court. The authority of this Court to exercise such broad remedial power is well articulated by Judge Feikens in *United States v. Detroit*, 476 F. Supp. 512 (E.D. Michigan 1979), and cases cited therein.

Upon consideration of the foregoing, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. That George J. Conklin, of North Haven, Connecticut be and he hereby is appointed as Administrator to perform all acts required to be performed by defendants Connecticut Department of Transportation (CDOT) and Consolidated Rail Corporation (ConRail) for the purposes of carrying out the order of the United States Environmental Protection Agency, dated January 7, 1976, directed to permanently closing the Cos Cob Power Plant and the obligations of the defendants under the Consent Judgment entered by this Court on May 2, 1979.

2. The Administrator is responsible solely to this Court and is vested with the power and authority provided under Rule 70 of the Federal Rules of Civil Procedure to perform all acts he deems necessary to achieve expeditious compliance with:

(a) Said EPA Order;

(b) The matters set forth in the "Signal Control and Traction Conversion Schedule," identified as Exhibit B attached to the Consent Judgment of May 2, 1979 in B-76-282 and also made part of the Consent Order of June 20, 1979 against defendant ConRail in B-76-193; and

(c) The matters set forth in the "New Haven Line Revised 60 Hz Power Conversion Schedule" filed by defendants on December 18, 1979; the foregoing hereinafter being referred to as the "Conversion Project."

3. The Administrator shall forthwith procure the services of those persons and/or organizations deemed necessary by him to carry out the conversion project. Said persons or organizations shall be responsible solely to the Administrator. To this end the Administrator may solicit the advice of the parties to this action.

4. The Administrator shall have full power to manage, control, and deal with all items, assets, properties, contracts, and other matters associated with the conversion project and shall have the authority required or necessary for the complete management and control of the conversion project, including but not limited to:

(a) The supervision of all employees of defendants associated with the conversion project, including removal of employees from the conversion project and/or hiring additional employees;

(b) Entering into and performance of existing and future contracts deemed necessary by him for the conversion project. Said contracts shall not be subject to competitive bidding if, in the judgment of the Administrator, such action would prevent delay in the conversion project and fair and reasonable contracts can be entered into;

(c) The hiring of all such special consultants, contractors, engineering firms or counsel which the Administrator deems necessary;

(d) The borrowing of such funds and the pledging of security of defendants as he deems necessary to carry out his duties relating to the conversion project;

(e) Preparing, filing, and processing all applications for Federal funds, or other Federal approvals; and

(f) Acting without approvals or other consents or actions of the Urban Mass Transportation Agency (UMTA) in the event of delay in required actions by UMTA and/or when in the judgment of the Administrator the same might unduly delay or impede prompt and expeditious completion of the conversion project.

5. The Administrator shall initially make a full evaluation of the current status of the conversion project and report his findings to this Court.

6. All costs and expenses of carrying out this Order, including the fees of the Administrator, shall be submitted to this Court for approval and, except for those which may be paid by UMTA, shall be paid by defendants.

7. Defendants, their officers, agents, servants and employees, and all other persons in active concert or participation, are enjoined from failing to immediately comply with this Order and from interfering in any manner, or from failing to cooperate either directly or indirectly, with the Administrator in the performance of his functions and duties.

8. This appointment shall be for the period necessary to complete the conversion project unless:

(a) The Administrator recommends termination of this Order as no longer necessary, or modification thereof, and said termination or modification is accepted by this Court;

(b) The Administrator requests to be relieved and such request is approved by this Court; and

(c) This Order is otherwise modified or terminated by this Court.

9. (a) The Administrator may at any time apply to this Court for instructions and/or modification of this Order;

(b) The Administrator may seek instructions as to whether funds should be expended for a particular purpose, *ex parte*, upon application to this Court;

(c) Any party may, for good cause, at any time apply to this Court for modification or termination of this Order or such other relief as may be appropriate.

10. This Court retains jurisdiction.

It is SO ORDERED.

## South Dakota v. Andrus

No. 79-1178 (8th Cir. Feb. 12, 1980)

Affirming the district court, 9 ELR 20128, the Eighth Circuit Court of Appeals rules that the Department of the Interior need not prepare an environmental impact statement (EIS) prior to the issuance of a mineral patent. The court first points out that as the issuance of a mineral patent is a ministerial act under the Mining Law of 1872, it is doubtful whether it would constitute an "action" by the federal government for purposes of the National Environmental Policy Act (NEPA). Non-discretionary actions such as this have generally been held outside the ambit of the EIS requirement. The court bases its decision, however, on the conclusion that granting a patent is not a "major" federal action under NEPA because it is not a federal determination to enable the applicant to begin mining operations. Locators of mining claims may extract minerals without such a patent if they have met the statutory prerequisites. Finally, the court declines to decide

# ATTACHMENT 2

**Westlaw.**

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Gary W. v. State of La.E.D.La.,1990.Only the
Westlaw citation is currently available.
United States District Court, E.D. Louisiana.
GARY W., et al.,
v.
STATE of LOUISIANA, et al.
**CIV. A. No. 74-2412.**

Feb. 26, 1990.
ROBERT F. COLLINS, District Judge.

*FINDINGS OF FACT AND CONCLUSIONS OF
LAW*

**\*1** This matter came before the Court on the motion
of plaintiffs for supplemental relief, pursuant to 28
U.S.C. § 2002. After the hearing on this matter on
October 19, 1989, the Court makes the following
Findings of Fact and Conclusions of Law.

*FINDINGS OF FACT*

I. *COURSE OF PROCEEDINGS AND PREVIOUS
JUDICIAL ACTION*

A. *Preliminary Proceedings, the Trial and Findings
by the Court*

(1) Plaintiffs initiated this litigation in September of
1974 by filing a Complaint which alleged that
Louisiana officials, through placing certain children
in various Texas institutions, had denied them the
care and treatment which was minimally adequate in
a constitutional sense.

(2) The matter was assigned to then United States
District Judge Alvin Rubin, who certified the matter
as a class action in December of 1975, pursuant to
Rule 23(b)(1) and (b)(2) of the Federal Rules of
Civil Procedure. The class was defined as "all

Louisiana citizens under twenty-one years of age
who are placed or housed in a Texas child-caring
institution at the instigation, on the order, or with
funding, in whole or in any part, of the state
Defendants."

(3) The 684 members of the class had one basic
characteristic in common-the fact that they were
Louisiana children who had been placed in Texas
institutions by Louisiana officials. Otherwise, they
exhibit a wide range of needs and characteristics in
that some were mentally retarded, others were
emotionally disturbed, some had severe physical
disabilities, and still others had no apparent physical
or mental disabilities. *Gary W., et al. v. State of
Louisiana, et al.,* 437 F.Supp. 1209, 1213
(E.D.La.1976) (hereinafter referred to as "Principal
Order").[FN1]

(4) A lengthy trial commenced in March of 1976.
Over 47,000 pages of exhibits were introduced and
3,300 pages of testimonial depositions were entered
into evidence. The trial lasted eleven days.

(5) Judge Rubin's Opinion concluded that
classmembers possessed a constitutional right to
adequate care and treatment which had been
violated by their placement in Texas institutions.
He defined the parameters of that right as
encompassing

"a program of treatment that affords the individual a
reasonable chance to acquire and maintain those life
skills that enable him to cope as effectively as his
own capacities permit with the demands of his own
person and of his environment and to raise the level
of his physical, mental and social efficiency."

Principal Order at 1219. In view of the evidence as
to the abuse, neglect, unnecessary restraint, and
restriction of classmembers in the Texas
institutions, Judge Rubin held that the defendants
had not met this standard of care for the class.
Principal Order at 1216-1233.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

## B. *The Remedy: The Principal Order*

(6) As a result of his findings, Judge Rubin ordered the situation remedied on a classmember-specific basis: the bedrock of his Orders and those subsequent Orders of this Court was that treatment decisions and programs must be made on a case-by-case basis. As Judge Rubin said, "[w]hat is proper must be determined separately for each child based on that child's personal attributes and needs." Principal Order at 1219.

*2 (7) Under the Principal Order, the defendants were obligated to evaluate each classmember, determine his or her needs, and then develop and implement an individualized plan of treatment. Principal Order at 1226. Substantial emphasis was placed upon the important role to be played by disinterested professionals throughout the process. Principal Order at 1223, 1226-1227. This orientation towards the unique needs of each classmember represents the dominant theme of this lengthy litigation and is one that is rooted in the significant diversity of the members of the class. That theme has been reiterated in the many subsequent Orders issued in this case.

(8) Judge Rubin considered and specifically rejected a rigid formulation of the right to adequate care and treatment in terms of the physical location or characteristics of the treating facilities (e.g., community-based or institutional, within or out-of-state, etc.). Principal Order at 1219. As his decision expressly noted, "[o]ne prescription will not suffice for all [classmembers]. What the constitution requires as the state's due to the individual it confines is a program that is proper for that individual." *Id.*

(9) Section 2.1 of the Court Order required that the individual treatment plans be developed in accordance with evaluations conducted by the professional staff of the Department of Psychiatry and Biobehavioral Sciences of the Louisiana State University (LSU) School of Medicine in New Orleans. Principal Order at 1226.[FN2]

(10) To ensure compliance with his Orders, Judge Rubin devised a system of monitoring by the Court,

plaintiffs' counsel, and the parents of the children. State officials were ordered to assign a case worker to each child who would visit the child as required in the treatment plan and then send a written report to the parents. *Id.* at 1231, paragraph 5.4. Each child's treatment plan would be reviewed semi-annually by professionals not affiliated with the treating institutions, and the review would include participation by the child's parents and case worker. *Id.* at 1226-27, paragraph 2.4. Plaintiffs' counsel were entitled to examine the reports of these "status-review" teams, and every six months, the State was required to submit a progress report to the Court and to counsel reflecting the status of implementation. *Id.* at 1227, paragraph 2.5. The superintendent of any institution treating a child was required to report on the child's progress to the parents every six months. *Id.* at 1231, paragraph 5.2.

(11) The Principal Order also provided for the dismissal of classmembers after certain conditions had been met. *Id.* at 1231, paragraph 5.5.

(12) Judge Rubin summarized his philosophy as to the remedy he devised as follows:

"In general, the Court has tried to avoid ordering the parties to comply with an order that would have the infinite detail of a set of engineering specifications. It has attempted to write guidelines that would prevent child abuse and assure good treatment for children without writing an order that would require infinite precautions against spectral perils and without enmeshing treatment personnel in a bureaucracy."

*3 *Id.* at 1223.

(13) In 1976 and 1977, the defendants began to attempt to locate the classmembers in Texas to transfer them back to facilities or homes in Louisiana and to schedule and conduct the LSU evaluations. A former tuberculosis hospital, Greenwell Springs, was used as a residential placement for many of the members of the class. A few new facilities, such as Padua House, owned and operated by Associated Catholic Charities in New Orleans, were opened.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

(14) The Secretary of the Louisiana Department of Health and Human Resources (DHHR) appointed a special assistant, Melvin Meyers, to coordinate *Gary W.* compliance and to reassign all of the children to the various program offices. Almost all of the members of the class fell under the authority of the Office of Mental Health (OMH), the Office of Mental Retardation (OMR), or the Office of Human Development (OHD), although a few were assigned to two other offices, the Office of Family Security (OFS) and the Office of Licensing and Regulations.

(15) From the standpoint of implementation of the individual treatment plans, however, little progress was made in the first few years after the issuance of the Principal Order.

(16) Approximately six months after the *Gary W.* trial ended, Judge Rubin was elevated to the United States Court of Appeals for the Fifth Circuit. The case was rotated among several different district judges of the Eastern District of Louisiana until 1978, when the undersigned was confirmed.

C. *The Supplemental Order and Appointment of a Special Master*

(17) Within weeks of the confirmation of the undersigned, plaintiffs' counsel moved for the appointment of a Special Master and a panel of experts to develop a comprehensive implementation plan. After a review of the slow progress of the LSU evaluations and defendants' inability or unwillingness to implement those evaluations, this Court ordered the appointment of a Special Master, but denied plaintiffs' request for an expert planning team.

(18) Defendants appealed the decision to appoint a Special Master to the U.S. Fifth Circuit Court of Appeals. The Fifth Circuit upheld this Court's decision to appoint a Special Master, citing the facts that hundreds of children had not been evaluated by the LSU team, and, of those evaluated, over fifty percent had not been placed as recommended by the teams. The Fifth Circuit noted that "there is no indication that, left unsupervised, the Department [DHHR] and the LSU team will make better

progress." *See Gary W. v. State of Louisiana,* 601 F.2d 240, 244 (5th Cir.1979).

(19) On September 6, 1978, this Court issued a Supplemental Order, setting forth the powers and responsibilities of the Special Master. The Special Master was to function as an officer of the Court, a fact-finder, a monitor, and a hearing officer. The Special Master would make reports and recommendations to the District Court, and each party would then have the right to object to those recommendations and be afforded a hearing on those objections. The Special Master would serve until the last child was dismissed from the case.

*4 (20) On March 29, 1979, the Court appointed Dr. James Lynn McDuffie as a part-time Special Master.

(21) After a year, counsel for plaintiffs asked that Dr. McDuffie be dismissed for failure to produce a comprehensive monitoring plan. This Court ordered that the Special Master contract with an outside group to monitor the case.

(22) One of those consultants selected was Dr. Sue A. Gant, who arrived in May of 1980 to design an " audit instrument," a device by which to measure objectively DHHR's compliance with the Principal Order. Dr. Gant's audit revealed serious deficiencies in the defendants' efforts at compliance.

(23) In September of 1980, Dr. McDuffie resigned as Special Master, and Dr. Gant was appointed as a full-time Special Master to replace him.

(24) Dr. Gant issued her first Compliance Audit on March 23, 1981. She then issued a formal report to the Court on April 21, 1981. Her report was based on reviews of 498 classmembers. The report showed that the defendants had made no plans to place 426 of the children evaluated by LSU, that more than half of the classmembers were still in institutions, and that the State's records failed to account for 186 of the members of the class. Dr. Gant identified major problems with DHHR's compliance activities and recommended immediate remedial action. Central to the remedial action was the recommendation of a detailed five-year

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

implementation plan aimed at expanding the community services for members of the class in a cost effective manner. Dr. Gant recommended an implementation plan that would identify the bureaucratic roadblocks to compliance and outline specific steps and timelines to remedy the present situation of inadequate placements.

(25) Defendants objected to the Special Master's proposals and submitted their own plan. Defendants' alternate plan of implementation was designed to ensure compliance with the Principal Order by February 1983. Under that plan, children would be placed in the best "available" environment, rather than in the least restrictive alternatives. In other words, defendants' plan would have used existing resources and would not have fostered the development of a comprehensive system of community group homes, supervised apartments, and other less restrictive placements. The DHHR plan did not involve the participation of grass-roots advocacy groups, as the Special Master had recommended, and contemplated little involvement by the Special Master in the process of developing new services for the *Gary W.* classmembers.

(26) Defendants' plan challenged the Special Master's legal authority to involve herself in several areas that DHHR considered to be solely within its discretion.

(27) In its objections, the Department also noted that compliance with the Principal Order was a " complicated business." The class involved 686 children with entirely different needs which changed all the time. They were not confined at a central institution, but were spread around the State. Some were living in the community, and some had not ever been located. While one department, DHHR, was responsible for serving all of the classmembers, any one of five separate agencies within that department might actually be in charge. FN3 An analogy frequently invoked by the defendants during this period of time was that the Department was similar to an ocean-going ship, in that even though the decision had been made to turn around, the change in course would take some time to implement.

*5 (28) Confronted with the Special Master's report and a counter proposal by the defendants, this Court requested that the parties negotiate with each other under the direction of the Special Master. Several hearings were held and agreements were made and signed at these hearings addressing several issues.

(29) The central agreement, however, was the " Memorandum of Agreement," dated September 14, 1981. The Memorandum provided a wholly new procedure for the evaluation of classmembers. The LSU evaluations, many of which were incomplete, and all of which were dated, were discarded. Every child was entitled to be evaluated again in a much more systematic way, to determine what services the defendants were obligated to provide to them within the scope of the Principal Order which had been issued five years previously.

(30) Specifically, the parties agreed that the "2.1 evaluations" FN4 were to be conducted by a " multi-disciplinary" team, comprised of persons selected by DHHR, but trained by the Special Master. Once those evaluations were completed, a final decision would be made by a Special Review Committee (SRC), composed of a member of the 2.1 evaluation team, a professional chosen by the plaintiffs, and a professional mutually agreed-upon by all of the parties. The parties agreed to try to conclude the SRC process in six months, by January 31, 1982, at which point, DHHR would begin the task of delivering the agreed upon services to members of the class. The question of the means by which "compliance" would then be measured was left to a later meeting.

(31) The Memorandum of Agreement committed DHHR to developing an overall plan that would set forth all agency actions necessary to bring DHHR into compliance with the Principal Order. It also bound DHHR to report any incidents of abuse or neglect inflicted upon members of the class to the Special Master within 24 hours. Additionally, defendants agreed to continue to search for Texas children who had been lost in the seven years since the case was first filed. DHHR also agreed to seek interagency agreements with the Department of Corrections, to seek appropriations for compliance activities, and to consider the "least restrictive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

environment" in selecting private service providers.

(32) Before signing the Memorandum of Agreement, defendants sought and obtained approval of then Governor, David C. Treen.

(33) The parties also agreed to add staff for the Special Master, and defendants agreed to submit periodic status reports on implementation of the Court's Order.

(34) An internal management plan for the *Gary W.* case, dated March 15, 1982, was filed by the defendants in connection with their October 26, 1983 Status Report. The plan included specific internal management objectives for ensuring compliance with the Principal Order. The plan also included objectives, rationale, and action steps in a number of areas, including conclusion of the 2.1 and 2.4 evaluation processes and implementation of treatment and service plans for all classmembers.

**\*6** (35) It is important to note that the DHHR internal management plan also addressed the following areas which remain of major concern in the implementation of the Principal Order to this day:

(a) *Training.* "To develop a Departmental training plan to include training in the areas of psycho-pharmacology, case management, individual service plan development, interdisciplinary team process, behavior management techniques and client rights"

(b) *Abuse and Neglect.* "To systematize the reporting procedures utilized in the reporting of abuse, neglect, mistreatment and deaths of classmembers"

(c) *Case Management.* "To develop a Department-wide case management system"

(d) *Quality Assurance.* "To develop a Department-wide program evaluation system"

(e) *Specialized Services.* "To develop the role and scope of responsibility for each program office to ensure a spectrum of services to all Department

clients (regardless of placement)"

(f) *Technical Assistance.* "To develop within individual offices the capacity of provision of technical assistance and monitoring of programs operated directly or through contract"

(g) *Consent and Legal Status.* "To develop a Departmental policy on consent for medical treatment"; "To develop a reference manual regarding legal statuses in Louisiana"

(h) *Standards.* "To promulgate Departmental policy so that all standards set forth in the Principal Order are implemented and enforced for classmembers"

(i) *Review and Update of Plans.* "To conduct 2.4 evaluations on each classmember in residential placement six months following the review of the Special Review Committee and annually thereafter"

(j) *Classmember Tracking.* "To develop an adequate classmember tracking system [to track the classmember's needs and treatment plans]"

(36) By the end of June of 1982, 2.1 evaluations were completed on 277 classmembers and special reviews were being prepared with respect to those classmembers whose medical condition was so precarious that movement to a new facility, less restrictive or not, was risky.

(37) In April of 1982, the Special Master issued a report and recommended remedial actions related to incidents of abuse, neglect, and mistreatment of classmembers, an issue that also remains a major concern to this day. The remedial actions recommended included staff training, human and legal rights committee review, and a system for sanctions for non-compliance.

(38) As a result of negotiations commencing in May of 1982, this Court signed an Order detailing the conduct of the SRC hearings at which the 2.1 recommendations would be reviewed and refined. That Order provided that the three members of each SRC would strive for consensus and established a mechanism for appeal of an SRC decision. By the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

end of 1982, SRC-approved plans were complete for all 290 out-of-home classmembers.

(39) During the same time period, the parties reached an agreement as to members of the class who were no longer in the care and custody of the defendants, individuals for whom the Principal Order had made no provision. Those classmembers were to be visited by a DHHR case worker. If they were in any immediate danger, steps were to be taken to make them safe. If not, the case worker would convene an evaluation conference with the classmember and other interested parties, agree upon a "generic services plan," and submit the plan for approval to a team composed of the case worker's supervisor and a professional selected by the plaintiffs. All services approved by the team would be provided or arranged as a free service by DHHR. A classmember, by signing the appropriate forms, would elect to "waive out" of the class, or forego this whole process.

*7 (40) In February of 1983, Dr. Gant conducted a " debriefing" of the SRC members to get a better understanding of the recommendations they had made for over 200 members of the class. At that meeting, DHHR raised the question of what yardstick would be used to measure compliance with the Principal Order. Until it knew that, the Department argued, it would be difficult to begin implementing the SRC plans. The Special Master solicited proposals from the parties, and, on March 28, 1983, recommended a Quality Assurance Monitoring Document. The question of standards would be visited and re-visited on many occasions over the next several years.

(41) Defendants rejected the Special Master's recommendations and began negotiating, first with the Special Master and then with plaintiffs' counsel, to reach a mutually acceptable definition of " compliance." These negotiations continued, with no agreement reached, through 1983. The only substantive issue on which the parties agreed was that the "compliance clock" would begin once all services and programs were in place for each classmember and that after 18 months of " compliance", each child would be dismissed from

the class.

(42) According to a Status Report submitted by defendants on October 26, 1983, covering the period from March 1981 to October 1983, DHHR hired consultants to prepare a manual on the rights of mentally retarded and mentally ill patients, including new minimum standards for State-licensed facilities. The Department hired a psychopharmacologist to develop a training manual on medications and a consultant on behavior management procedures to train private providers in behavior management techniques. A manual was developed by Gary W. case managers. and a Gary W. "Statewide Planning Council" was established with sub-committees on zoning, legislation, and advocacy. Furthermore, as discussed previously, an internal management plan was submitted in connection with the report.

(43) As of October of 1983, DHHR estimated that only 50 classmembers were in SRC-recommended placements and that only 30 of these had all of the recommended programs and services in place. Plaintiffs noted that 18 of these 50 were living where they were before the SRC process began and that DHHR, therefore, could claim to have created only 32 new "placements" as a result of the seven years of post-judgment litigation.

(44) In November of 1983, the parties reached an agreement, subsequently adopted by the Court, as to the policies and procedures establishing the implementation process for both placements and services. That Order established specific requirements for a planning process to be carried out for any classmember when there was to be any significant change in the classmember's program of services or placement.

*D. Increasing Intervention by the Court*

(45) By December 14, 1983, dissatisfied with the low level of placements of classmembers in their SRC residential facilities, this Court felt the need to mandate a timeline for compliance with its previous Orders. That Order adopted the timetable in DHHR's own report from October of that year, which had projected that by the end of 1984, all 277

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

SRC decisions affecting classmembers in State facilities would be implemented. Under that timeline, if DHHR implemented all placements, full compliance could be achieved and the case finally resolved by mid-1987. Quarterly conferences addressing the issue of progress towards compliance were to begin in April of 1984.

*8 (46) Defendants moved immediately to amend the Order, raising a number of issues, including the question of the constitutionally minimal requirements which must be in place before an individual classmember was eligible for dismissal.

(47) By Order dated March 21, 1984, this Court placed the issue of compliance squarely in the hands of the Special Master. As was pointed out in that Order, "[[O]f great concern to the Court is the glaring contrast between the large amount of state resources invested in this case and the small amount of actual compliance with the Principal Order that has occurred to date." The Order accepted defendants' projected implementation schedule and made it binding. Compliance was defined as *full* implementation of all SRC-indicated services except guardianship, advocacy, and legal services. " Compliance" and hence dismissal of a classmember from the suit, were to be determined on an individual basis by the Special Master. The Special Master would be fully in charge of monitoring implementation of the SRC decisions.
If in any month the State fulfilled less than 80% of its implementation goals, the Special Master was to convene a hearing. In addition, this Court mandated that a minimum of 50% of the placements in State-financed group homes of six or less had to be for members of the plaintiff class.

(48) As of August of 1984, 141 of the 241 classmembers evaluated under the SRC process were living in the community, with at least some of their services in place. In October of 1984, the Special Master issued a document entitled *Report: Systemic Problems that Impede Implementation of the Principal Order; Remedial Actions Recommended.*

(49) The findings of that report were issued three and one-half years after the first Compliance Audit

and identified the problem areas which continue to this day, some five years later (and eight and one-half years after Dr. Gant's first Compliance Audit). These findings are summarized at page 5 as follows:

A number of problems continue to plague the system. The most obvious problem noted is the continued lack of ability to address problems in a comprehensive manner. Instead, crisis intervention by the central program offices and the holding of grass roots level personnel responsible without adequate authority, support and resources prevails. Other areas of concern are as follows:

(a) The lack of professional supervision of basic program delivery, known as case management;

(b) The lack of provision of adequate educational and vocational programs;

(c) The lack of provision of adequate health and therapy programs;

(d) The lack of provision of a comprehensive community service system;

(e) The failure to monitor adequately the quality of services in the community.

(50) On November 2, 1984, this Court issued an Order Governing Procedures for Responding to Special Master's Compliance Findings. That Order set forth the basic outline for compliance determination by the Special Master and the conditions under which the "compliance clock" could be stopped or started by the Special Master.
The Order, in essence, used the *full* compliance standard this Court had adopted in its March, 1984 Order. It was clear that full compliance with the agreed upon standards constituted the yardstick against which defendants' actions would be measured.

*9 (51) During this same period, the Special Master requested the assistance of personnel from Temple University's Developmental Disabilities Center to automate and analyze data collected by the Office of the Special Master. Data was gathered for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

137 individuals who were relocated from institutions to their SRC-recommended settings. Temple University issued a report to the Special Master dated December 15, 1984.

(52) The Temple University report showed that at that time, 56% of the SRC classmembers resided in Region 1 (New Orleans) or Region 2 (Baton Rouge). About 80% of the population was considered severely or profoundly impaired. The average *Gary W.* classmember was profoundly retarded and approximately 24 years old. The Temple University findings essentially mirrored those of the Special Master issued the previous October.

(53) In February of 1985, the Temple University team issued a report on changes in adaptive behavior of 268 classmembers originally monitored in 1981 who had been moved to community settings. The conclusion of the report was that the people who had moved to community placements were, in fact, better off in terms of adaptive behavior and that they were far less dependent than they formerly had been.

(54) In that same moonth, the Special Master issued a report on the status of implementation of Paragraph 5.3 of the Principal Order for classmembers in the community. That report reviewed the actions of the Court and the parties as they related to this segment of the class. The report summarized the process by which CRT classmembers had waived some or all of their rights and identified the services needed by those members in the community, including routine dental and medical services; specialized medical, psychological, and counselling services; and educational and vocational services. It is worth noting that the defendants are still having problems delivering many of these services to classmembers in the community, a situation exacerbated by the fact that almost every member of the class resides in a community placement.

(55) In May of 1985, some 18 months after the Court had mandated a timeline of all SRC placements being implemented by December of 1984, this Court, dissatisfied with defendants' progress, gave even more specific instructions to ensure the placement of classmembers. Defendants were to report to the Court a schedule of placements for the 50 classmembers who had yet to be placed. Defendants were also to address certain barriers to placement, including the inadequate recruitment of providers, as well as actions taken to ensure the adequacy of services to be provided and the provision of specialized training for private providers. Again, over four years later, defendants still have not eliminated these barriers.

(56) In early June of 1985, the Special Master issued a report on a classmember-specific basis for selected individuals for whom she had concerns. The report listed for each classmember the area of concern, an explanation of the concern, a remedy to be implemented, and a timeline for implementation. A similar report was issued subsequently. The purpose of these reports was to give the parties notice of problem areas uncovered by the Office of the Special Master so that the problems could be eliminated before the joint audit process began.[FN5]

*10 (57) By June of 1985, the parties submitted a joint motion and memorandum regarding compliance standards, with the parties representing to the Court that "agreement to these Standards removes the possibility of any further delays due to disagreements about what Standards the Special Master will apply in determining compliance for each class member."

(58) As the first round of joint audits were completed, it became apparent to Cecil N. Colwell, Assistant Secretary of DHHR and head of the Office of Mental Retardation, that certain aspects of the previously approved standards applicable to Adult Day Programs were misunderstood and misinterpreted by employees who were preparing for joint audits. Accordingly, on February 5, 1986, he issued a memorandum to all OMR administrators to address this problem. Among the issues covered by Mr. Colwell's memorandum were those of sheltered and supported employment and a clarification of the definitions for Day Services.

(59) On March 17, 1986, a report was made to the Special Master by Clarence Sundram and Nancy Ray concerning the Abuse and Neglect Reporting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

and Investigation System as it related to classmembers. The report, since designated the " Sundram Report," recommended strongly that the abuse/neglect policy be changed to formulate a uniform state policy concerning the protection from abuse, neglect, and mistreatment of people in state custody, and that legislative action be taken to accomplish these changes. Among the specific recommendations of the Sundram Report were for a follow-up of all recommendations emanating from investigations or the incident review process: "[t]he responsibility for ensuring that such follow-up has in fact occurred should be lodged with the central intake point to assure accountability." Other recommendations were for external oversight of the entire reporting and investigation system, and structural revision of the Department to establish a Division of Abuse and Neglect Reporting within the Department which would report directly to the Secretary. The new division would have a variety of duties and functions, including the responsibility to "make referrals for corrective action to the appropriate program division within DHHR where systemic problems were identified, either as a result of reviewing investigation reports or the minutes of incident review committees [and] to follow-up with the program division to ensure implementation of necessary corrective actions."

(60) The Sundram Report was issued five years after the Special Master noted abuse and neglect as a major problem area and four years after defendants' Plan of Compliance set forth a plan "to systematize the reporting procedures utilized in the reporting of abuse, neglect, mistreatment and deaths of classmembers."

(61) On May 19, 1986, the Special Master issued an analysis of joint audit data on SRC classmembers, listing the rank order of deficiencies (both residential and day program) with a breakdown of the data by case manager, region, and program office. The data also showed the months of compliance credit for CRT classmembers with the same breakdowns. The standards which were missed most often were those related to case management (71% deficiencies), delivery of services (71%), and professional supervision of services (62%). Other problem areas were

medication administration, behavior management, abuse and neglect, and humane physical and psychological environment. The narrative noted the need for technical assistance and local supervision of case managers. It also concluded that behavior management programs were not being implemented properly because of a lack of sufficient staff with appropriate training, rendering the plan "not only ... ineffective, but often times harmful.... Without the safeguard of training those individuals responsible for implementing these sensitive behavioral programs, classmembers are subject to harm." It is important to note that these same problem areas continue to exist over three years later.

**\*11** (62) On May 26, 1986, John O'Brien and Connie Lyle issued a report entitled, *Strengthening the System: Improving Louisiana's Community Residential Services for People with Developmental Disabilities.* The report focused on a number of issues, including the failure to make better use of the time of professionals with whom the State had contracted to provide services, the methods of providing funding as a limitation on the variety and development of services, an under-utilization of the Title XIX funding mechanism, problems with rates to providers, and capacity problems with the current system of providing residential and support services. A major part of the report was devoted specifically to the problems of Region 1 of OMR. Among the findings of the O'Brien report in that regard were the following:

(a) The region "is unmanageably large and complex and OMR resources are physically located in [the former Belle Chasse State School]." The report concluded that the specialists and case managers should be physically relocated to one or more locations close to classmembers and that the region should be divided into more manageable, sub-regional areas "which respect the natural boundaries recognized by the region's people."

(b) Case management resources "are insufficient to meet the obligations placed upon them." The report concluded that the case managers' priorities and responsibilities should be examined and changed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

(c) Existing day providers "are over-committed and have limited capacity to create supported work."

(d) The region has "a limited capacity to develop providers even though new places for people with increasingly complex needs are needed."

(e) Technical assistance which is available in the region "mostly relates to the regulatory process," not to the provision of services.

(f) "[T]he system invests a very large proportion of its resources in large, congregate settings."

(63) On May 21, 1986, this Court directed the Department to submit a plan of action addressing the barriers to implementation of the Court's Orders in Region 1 of the OMR. In July of 1986, defendants submitted such a plan.

(64) The plan submitted by the defendants identified the following barriers "to the effective and efficient operation of the OMR/DD Regional organization and as a consequence, to the service delivery system as a whole":

(a) There was no viable organizational structure at the Regional staff level.

(b) Although broad "job descriptions" existed for Regional staff members, there were no clear and definitive areas of responsibilities assigned to individual staff.

(c) Related to the absence of clearly defined job responsibilities was the absence of accountability for task completion.

(d) Minimum supervision of staff had existed; where supervision existed, the quality of supervision had been less than adequate.

(e) The Community Services staff in Region 1 had not existed as an integrated staff of professionals united by common goals or objectives related to the develop-ment and management of community-based services. The result had contributed to the fragmentation of the delivery system. Critical to the absence of a coordinated team effort had been

the absence of leadership within the Regional staff section.

*12 (f) There was no broad and comprehensive vision and commitment to community services. Reflecting this factor had been the absence of staff knowledge and information related to the variety of issues and disciplines that must be brought to bear in a community based service delivery system.

(g) Region 1 Community Services, in reality, had little identity as a service delivery system. One reason for this occurrence was the close tie Community Services had with Metropolitan Developmental Center and the fact that it was housed on the grounds of that State institution.

(65) The plan for re-organization of Region 1 included a relocation of the staff to the East Bank of the Mississippi River, a structural re-organization with the addition of ten new staff positions, and a re-definition of job functions.

(66) Over three years later, the Regional Staff is still located in a geographically remote area of the Region and little has been done to ameliorate the clearly defined barriers to the delivery of services in the New Orleans area where most classmembers now live.

E. *The Shift from Full Compliance to Substantial Compliance And Independent Monitoring*

(67) On October 23, 1986, this Court amended its Order of November 2, 1984 by changing the standard against which defendants' progress would be measured from *full* compliance to *substantial* compliance. By that point in time, all but nine members of the class had been placed in their residential placements. In deciding to shift from full compliance to substantial compliance, this Court noted its concern that full compliance did not allow the Court and the parties the flexibility to deal with the issues involved in the litigation. The new standard was to be retroactively applied, with the Special Master reviewing all previous recommendations for the award of compliance time. Significantly, however, this Court served notice that it expected services to remain intact even after

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

members of the class were dismissed. Defendants were ordered for the first time to provide semi-annual reports for three years following the discharge of a member of the class, with the reports to detail the quality and quantity of the services actually provided to former classmembers. Any discharged classmember would be reinstated if there is a significant decrease in the quantity or quality of services provided or if a discharged classmember is reinstitutionalized.

(68) On November 5, 1986, after Dr. Sue A. Gant had announced her intention to resign as Special Master effective January 1, 1987, this Court issued a Minute Entry addressing the State's Motion to Vacate the Supplemental Order of September 11, 1978. The Supplemental Order had established the Office of the Special Master. That Minute Entry found that changed circumstances (i.e., the placement of most of the members of the class in their residential facilities) had eliminated the necessity for the extraordinary remedy of the appointment of a Special Master. To avoid disruption of services, however, the Court decided to continue the operation of the office until July 30, 1987.

*13 (69) On November 20, 1986, Dr. Gant issued a formal report and requested remedial actions related to the abuse, neglect and mistreatment of classmembers. The report and requested remedial actions echoed those of the Sundram Report in March of 1986 and Dr. Gant's 1981 Report. It also noted that although defendants had submitted a draft policy, the DHHR proposal omitted "a number of areas critical to the protection of class-members from harm." The Special Master recommended yet another series of remedial actions by the defendants including, "follow-up of all recommendations emanating from investigations or the incident review process. The responsibility for ensuring such follow-up has in fact occurred should be lodged with the central intake point to assure accountability." Dr. Gant also recommended external oversight of the entire reporting and investigation system, as well as the other matters discussed in paragraph 60 above. Again, it is important to note that the evidence presented at the most recent evidentiary hearing shows the same

problems still exist.

(70) In late 1986, the Louisiana State Planning Council on Developmental Disabilities issued, along with OMR, a Three Year State Plan for fiscal years 1987 to 1989. The report detailed a number of problems in the Louisiana system of delivery of services to mentally retarded individuals. Specifically noted for their absence were specialized medical services, especially in neurology, nutrition, orthopedics, and psychiatry; staff training, particularly in seizure management, medication administration, and in identification and referral to generic health agencies; vocational opportunities, particularly in competitive employment, job development, job placement, and follow-up services; case management, with special note made that many case management coordinator positions had been eliminated by OMR; and other gaps and obstacles to the delivery of services. Today, three years after these problems were again identified by OMR, the same problems still persist.

(71) In late December of 1987, the Special Master issued another report, entitled *Changes in Behavior 1981 to 1986, Among People Monitored in Community Based Settings.* The report traced the history of her collection of data on members of the *Gary W.* class from 1981 and noted that classmembers had gained a number of adaptive behavior skills during the period since 1981. The Special Master concluded that classmembers and their families expressed satisfaction with both the living arrangements and work situations of classmembers after they had moved from large institutions into the community.

(72) On January 30, 1987, this Court held a status conference and introduced Dr. Brenda Lyles as the new Special Master. Dr. Lyles formerly had been a career DHHR employee, with particular training in the problems of the mentally ill. She had been directly involved in the *Gary W.* case as a State employee and was very familiar with defendants' compliance problems, including those in Region 1.

*14 (73) By May of 1987, Dr. Lyles issued a preliminary report on audit findings for the period of August, 1986 to March, 1987, using the "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 12

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

substantial compliance" standard. As has been pointed out previously, almost every member of the class had been placed in a residential placement as recommended by the SRC. Dr. Lyles' report, however, found major problems in both residential and day programs. The most frequently cited problem area was that of case management, with approximately 60% of the class having problems in that area. Dr. Lyles concluded that the case management system had completely broken down and that these deficiencies "preclude adequate treatment and substantial compliance" with the Orders of this Court. Abuse and neglect was also cited as a major problem area, as was the life safety area, with 41% of the residential programs and 51% of the day programs showing major problems in regard to life safety. Overall, the report revealed deficiencies that went far beyond mere technicalities. Even using the substantial compliance yardstick, Dr. Lyles concluded that many of the standards with high levels of deficiencies were fundamental to the provision of adequate treatment of classmembers and that the deficiencies in these areas precluded compliance with the Principal Order. It was clear at this point in time that this Court's decision to reduce the level of compliance required from full to substantial compliance would not eliminate the difficulties the defendants had in implementing the Court's Orders.

(74) On June 10, 1987, this Court issued an Order setting up an independent monitoring unit to review defendants' compliance efforts. The Court pointed out that although when it had initially decided to terminate the Office of the Special Master effective July 30, 1987, it was hopeful that DHHR would be able to assume the responsibilities of the Office of Special Master, the Department clearly was unable to do so. The State had shown the Court nothing which indicated that DHHR was capable of assuming those responsibilities. The Court noted particularly its concern about the ability of DHHR to handle "the identification of individual and systemic barriers to the implementation of the *Principal Order*" and the lack of "independent oversight of the State's self-monitoring efforts and abuse and neglect reporting procedures." Over two years later, this Court has the same concerns.

(75) The Court decided to extend the Office of Special Master for one month, to August 31, 1987, and to require a transition from the Special Master to a United States Magistrate with respect to responsibility for determining dismissal eligibility. The Court also ordered that an independent monitoring unit, to be appointed by July 15, 1987 for a term of one year, would be substituted for the Office of Special Master in the monitoring of compliance. The joint audits would proceed in three phases: the first would be joint audits with the monitoring unit and DHHR; the second would be done by DHHR, with sampling by the monitor; and the third phase would involve "exclusive self-monitoring by the State with observation by the independent monitoring unit to assure that the problems identified have been corrected and that the State has developed full capacity to self-monitor. " It bears noting that the initial joint audits for each classmember were not completed until September of this year, some two years later. Many of those audits have not been through the Second Level Review process to this day. Phases two and three have yet to be implemented.

*15 (76) The independent monitoring unit was also to be involved in the preparation of narrative and statistical reports for the Court and the parties " which concern classmembers' progress towards substantial compliance and the State's progress towards developing the capacity to self-monitor." The reports were to be issued semi-annually, and, as the responsibilities of the monitoring group were gradually phased out, "the State will prepare the reports with the assistance of the monitors. Upon termination of the responsibilities of the independent monitoring unit, the State will have full responsibility for the reports." The Court also served notice that it would revisit the issue of whether to reinstate the 1978 Supplemental Order establishing the Office of the Special Master in nine months, based on information provided through the monitoring unit and reports submitted to the Magistrate by the State. That issue had not been formally reviewed by this Court until the instant proceedings were initiated.

(77) On July 10, 1987, this Court appointed the members of the Monitoring Unit. The appointment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 13

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

was to be for a one-year term, beginning on September 1, 1987.

### F. Continued Abuse/Neglect Problems

(78) Abuse and neglect issues which had been addressed in the Sundram Report in March, 1986, and Dr. Gant's report in November, 1986, again moved to the forefront during the remainder of 1987. Before the Office of Special Master was terminated, Dr. Lyles issued a Formal Recommendation on abuse and neglect. The defendants objected to the Recommendation. Plaintiffs' counsel replied to the objection and set the matter for hearing before the Magistrate.

(79) An evidentiary hearing on the Special Master's recommendation was held before Magistrate Ivan L.R. Lemelle on January 29, 1988. The Magistrate made Findings and Recommendations to the Court on March 1, 1988.

(80) The Magistrate's recommendation highlighted major areas of concern with regard to the health, safety and quality of services for specific classmembers. The Magistrate found it "obvious to this Court that the existing [abuse and neglect] policy while acceptable in some areas needs to be improved as is demonstrated by the lack of evaluation of trends by the existing Human Rights Committee as well as the concomitant lack of development of appropriate interventions based on the analysis." The Magistrate noted three specific examples of abuse/neglect but concluded that the three were not isolated instances and that the Court needed to intervene: "[s]omething more than ' deliberate speed' following over a decade of litigation and something more than the existing policy is needed to prevent further harm or discrimination." The Magistrate set deadlines for analysis, corrective action plans, and verification of the corrective action plans, all to be reported to him by March 16, 1988.

(81) Most significantly, for current purposes was the language of the final paragraph of the Magistrate's Opinion:

All parties are on notice that given the present

deadlines and need for providing an adequate, lasting, and complete system for protecting classmembers, the Court may have no alternative other than to extend the life of the monitoring unit beyond the existing September, 1988 contract. Accordingly, it would be appropriate for *all* parties to demonstrate, at this time more so than at any other, a good faith renewed commitment toward alleviating the problems of abuse that have plague classmembers over the course of this action.

*16 (82) The parties and the independent monitors met and reached consensus on an abuse and neglect policy which was issued by the Magistrate as Amended Findings and Recommendations on May 5, 1988.

(83) This Court adopted the Amended Findings and Recommendations on the same day. The Court's Order also stated that as long as the Quality Assurance Monitoring Group (QAMG) existed, it was to perform the functions of the External Oversight Committee described in the Recommendations. Furthermore, the Court provided that "[u]pon termination of the order of July 9, 1987 relating to the Independent Monitoring Unit, ... the Court will select and appoint a unit to undertake these activities. The Court's selection will take into consideration any groups recommended by the parties to serve as the External Oversight Committee."

(84) On June 17, 1988, this Court, "[u]pon review of the correspondence, documents submitted to the Court and all other activities of the Quality Assurance Monitoring Unit in connection with its oversight of the progress of the Defendants in the above captioned case," extended the services of QAMG as independent monitor through September 1, 1989. The Court listed two specific factors which contributed to its decision: (1) the inability to complete adequate program audits of a substantial number of classmembers; and (2) the failure to assign adequate personnel for the *Gary W.* Project Office of DHHR, along with detailed descriptions of the duties and functions of said personnel. Dissatisfied with the lack of progress on the joint audits, the Court also ordered the parties to complete a minimum of 150 detailed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

program audits of *Gary W.* classmembers and "to move with all deliberate speed towards the development of an adequate process for the final resolution of all *Gary W.* matters."

G. *Continued Problems with Region 1 of OMR*

(85) In early August of 1988, QAMG issued a report on substantial compliance credit, summarizing the amount of compliance time awarded to classmembers. QAMG's report revealed substantial deficiencies in terms of the nature and quality of services to classmembers residing in facilities operated by VANCO, a service provider in the New Orleans area. At that time, 13 of the 17 classmembers who had received no months of compliance credit were residents of VANCO facilities. A second report by QAMG summarized the historical and then current deficiencies associated with VANCO programs and documented numerous instances of VANCO's failure to take all steps necessary to ensure that classmembers are protected from harm and serious injuries and that they receive adequate care and treatment consistent with the Principal Order. The parties agreed that the 12 VANCO classmembers should be moved to interim placements, and this Court issued an Order to that effect.

(86) The August 31, 1988 Order required the defendants to submit a report delineating plans for moving classmembers into community residences in accordance with their SRC plans. By letter dated December 19, 1988, Dr. Lyles of QAMG forwarded to Magistrate Lemelle a report addressing major concerns concerning the DHHR plans, particularly focusing on the problems of Region 1 of OMR. QAMG pointed out that the defendants' plan failed to address serious problems in the following areas:

*17 (a) lack of training and professional supervision for case manager;

(b) lack of case managers' involvement in the selection of providers to serve classmembers;

(c) lack of case managers' involvement in the placement process;

(d) lack of planning by the State to assist providers in the development of programs for members of the class and to provide classmember-specific assistance to providers;

(e) lack of individualized treatment plans for transition of classmembers to the new providers;

(f) lack of sufficient information as to new providers;

(g) no report on departmental efforts to encourage and assist current providers in expanding their services;

(h) no evidence of classmember or family involvement in the planning process;

(i) no evidence of the type and scope of training of staff, staffing patterns and the adequacy of support services;

(j) no targeted timelines for professionals who will provide services; no plan or requirement for the level and scope of training of staff in the new settings;

(k) lack of attention to day programs consistent with the SRC-required services upon re-entry into the community; and

(l) lack of use of the vast amount of information on each classmember in the planning and implementation of services upon transition back into the community.

The conclusion of the report is worth noting:

This review with summary of major concerns and recommendations is certainly not exhaustive. The [State] plan needs much more detail, with timelines and goals, objectives and procedures to audit progress. The State has demonstrated in the development of the Audit Plan that it has the technical expertise to put together a document with all the needed aspects of an action plan. We recommend this expertise be applied to the present plan with specific responsibilities assigned, action steps laid out and timelines set.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

(87) This Court elected to lower the standard of compliance and to begin turning back over responsibilities to the defendants from the Office of the Special Master.

(88) In the three years since those decisions were made, the defendants have proven themselves incapable of fulfilling their responsibilities. Clearly defined problem areas have not been resolved. The concerns expressed by this Court in June of 1987 about the defendants' ability to identify and address individual and systemic barriers to the implementation of the Principal order have proved well-founded. The long identified abuse/neglect problems were not addressed by the defendants until they were forced to do so. The problems of classmembers in VANCO in Region 1 of OMR were not addressed by the defendants until after the QAMG Report was issued in August, 1988.

(89) Whenever this Court has expected the defendants to demonstrate their ability, capacity, and willingness to provide classmembers with their constitutional due, it has been met with a dismal record of non-compliance and management by crisis. The evidence now placed before this Court, coupled with the pervasive history of non-compliance, clearly shows the defendants do not have the ability, capacity and willingness to adhere to this Court's orders.

## II. THE PROCESSES FOR DETERMINING COMPLIANCE CREDIT: THE JOINT AUDIT AND SECOND LEVEL REVIEW

*18 (90) As pointed out above, the previous Orders of this Court have established not only the detailed standards against which the defendants' compliance efforts will be measured, but also the specific procedures by which the parties will objectively determine the actual status of each member of the class.

(91) The *Gary W* Audit Manual was finalized in January, 1989. The parties have agreed that the following is an overview of the Joint Audit Process:

The parties have agreed upon a joint audit process.

The purpose of the process is to gather data regarding the services provided to individual classmembers.

The joint audit currently involves the participation of two representatives: one from QAMG and one from the defendants.

In preparation for the on-site visit, the case manager prepares and forwards to the Project Office the following information: (1) SRC/CRT On-Going Services Chart: Completed by Case Manager; (2) Log of Monthly Day and Residential Visits; (3) Classmember Profile Sheet; (4) Classmembers' Current GSP and SSP; (5) Verified/Updated Placement History; and (6) List of names of all staff who currently work with the classmember. The Project Office collects validated abuse/neglect reports for the audit period, most recent licensing report and placement history and SRC/CRT services. The Project Office forwards all of the above listed data to the auditors representing DHHR and QAMG for review prior to the site visit.

On-site, the audit team has the following responsibilities:

(a) Interview case manager and/or qualified professional to obtain information for rating standards, completing Summary of Classmember Plan, and the services bargraph.

(b) Review staff training records at both residential and day program.

(c) Review incident logs at both residential and day programs.

(d) Review pertinent classmember records.

(e) Rate core and appropriate classmember specific standards.

(f) Interview classmember or a person who is familiar with him for completion of the Quality of Life Questionnaire.

(g) Tour both residential and day programs and summarize observations on appropriate forms.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

The auditors record relevant information on the appropriate forms. They conclude the on-site Joint Audit with a survey debriefing session which informs providers of the audit findings both positive and negative, and explain deficiencies that need to be remedied.

Auditors then forward Joint Audit documents to appropriate offices: original to Project Office, copy to QAMG.

92. The parties have also stipulated as to the following description of the Second Level Review process:

Late in 1987, the plaintiffs and defendants agreed upon a process for determining awards of compliance credit on a classmember specific basis. The procedures involved constitute what is known as Second Level Review.

A three-person team reviews audit and related information for each class member who has been audited. A representative from plaintiffs, defendants, and QAMG constitute the team.

*19 The team assesses the defendants' performance with regard to each individual classmember in the following areas: (a) the standards identified in the audit instrument; (b) the provision of mandated CRT/SRC services as reflected by the services paragraph; (c) compliance with other regulatory agency requirements; (d) relevant abuse/neglect information; and (e) the results of the quality of life survey.

As a result of its review, the team makes a determination of the months during the audit period when substantial compliance has occurred with respect to each classmember. While the team members have agreed to certain general guidelines governing compliance determinations, the members do exercise reasonable professional judgment with respect to such determinations. Flexibility in the application of the substantial compliance standard consistently has been exhibited.

In addition to the responsibilities noted above, the review team possesses certain additional authority.

It may: (a) recommend that the defendants undertake certain corrective actions prior to the classmember's dismissal; (b) defer action until additional data or documentation is provided by the defendants; or (c) recommend an award of compliance credit contingent upon completion and verification of certain corrective action.

When the members reach unanimous agreement as to specific months of compliance, the team issues a recommendation for compliance credit. The recommendation is forwarded to the Magistrate for review and approval. If the members are unable to agree upon a compliance recommendation, the matter is referred to the Magistrate for a decision.

### III. THE CURRENT SITUATION: CONTINUED PROBLEMS WITH COMPLIANCE WITH THE ORDERS OF THIS COURT

93. The plaintiffs presented testimony from four witnesses, each of whom agreed the State has continuing and substantial problems which must be addressed before members of the class as a whole can expect to earn compliance time sufficient for their dismissal from the case. Those witnesses were Jerry Vincent, Deputy Assistant Secretary for the Office of Mental Retardation and Developmental Disabilities for the State of Louisiana; Rosemary Estes, Director of the Gary W. Project Office for the State of Louisiana; Linda Jones; and Celia Feinstein, Director of Quality Assurance and Monitoring at Temple University's Developmental Disabilities Center in Philadelphia, Pennsylvania.

94. In addition to abuse and neglect reporting, each of the witnesses for the plaintiffs agreed that the defendants have historically had and continue to have major problems in the following areas:

(a) gathering and analyzing data;

(b) case management;

(c) staff training;

(d) protecting classmembers from harm;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

(e) classmembers at risk of falling out of placement;

(f) specialized services;

(g) Region 1 of the Office of Mental Retardation;

(h) problems with respect to lower functioning classmembers; and

(i) lack of involvement of classmembers and their families.

95. Furthermore, these deficiencies noted by the Joint Audit Process have been confirmed by the Second Level Reviews which have been done to date. Additionally, there are continued problems with defendants' abilities to self-monitor and with the attitudinal deficiencies of defendants. Finally, the classmembers are being harmed by these problems, separate and apart from the abuse and neglect process.

**\*20** 96. As noted above, there is little substantive dispute between the parties as to the accuracy of the raw data from the Joint Audit Process and Second Level Reviews, since the parties participate throughout both processes. There also is little dispute about the methodology used in the QAMG Report, but there is disagreement as to the interpretations of the results of the analyses.

A. *Overall Review of the QAMG Report*

97. At the request of plaintiffs, Ms. Feinstein reviewed the *Joint Audit Report* (January-April 1989) issued by QAMG on August 31, 1989. That report summarized the results of joint audits conducted for 143 classmembers and compliance determinations for 95 classmembers for whom the Second Level Review Team had recommended awards for substantial compliance.

98. The methodology employed by QAMG in compiling this report fully satisfies prevailing professional standards and is consistent with sound statistical practices.

99. Overall, the Court finds that the Report consists of valid and reliable measures designed to assess the existence and quality of services to classmembers. It represents an accurate summary of the status of compliance in this case.

100. The data contained in the QAMG Report indicates that significant areas of non-compliance exist with respect to the provision of services to classmembers. Substantial numbers of these individuals continue to be without necessary therapeutic and supportive services or adequate day programs.

101. These service gaps, in turn, are indicative of the existence of definite systemic barriers to non-compliance. As was explored exhaustively above, all of these barriers have been identified previously in the record, and the parties and the Court have known of them for years.

102. In reviewing the data in the QAMG Report, it is essential to keep in mind the relatively minimal level of substantial compliance presently required of defendants.

103. By agreement of the parties, the number of standards used in auditing classmembers has been substantially reduced. The original number of audit standards stood at 133. While the actual number applied in current audits varies according to the characteristics of the classmember, an SRC classmember will generally be audited on approximately 45 standards and a CRT individual on 20-25.

104. The reduction in the number of standards definitely has lowered the level of compliance expected of the defendants. The parties, by agreement, eliminated more than just duplicative standards; they eliminated ones that were the primary indicators of compliance in their respective areas. The level of substantial compliance now required of the defendants in present audits is distinctly lower than that required in previous audits.

105. A second methodological factor of importance relates to those classmembers for whom audits were conducted. With respect to the first audit group, the defendants selected one-half of the classmembers to be audited. In general, they

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

selected individuals who were likely to be eligible for substantial amounts of compliance credit.

**\*21 B.** *Deficiencies in Gathering And Analyzing Data*

106. Basic problems exist with respect to the information which the defendants gather regarding classmembers and the defendants' capacity to analyze that information.

107. The defendants receive a good deal of information about classmembers from the results of audits and the abuse/neglect reporting system, but in the past, they have not known how to use that information.

108. At this point, the Office of Community Services (OCS), the successor organization to the former Office of Human Development, does not have the computer capacity to aggregate audit and Second Level Review data as to classmembers for whom it provides case management services.

109. Primary responsibility for this function lies with the Project Office, yet to date that office has produced only a minimal number of skeletal summaries on the current audits.

110. Defendants have not issued any formal reports summarizing the results of the data gathered from the joint audits. Nor has the Project Office put out a formal, written analysis of the data generated by Second Level Reviews.

111. In short, defendants have not undertaken a systematic analysis of the data on classmembers currently available to them.

112. Defendants, for example, have not used the data from the audits and Second Level Reviews in a systematic effort to identify problem areas-either in terms of program offices, regions or providers-and develop remedial approaches.

113. The Project Office has not made any specific recommendations to the program offices based on the results of the audits.

114. Nor have the defendants used available data to identify "at risk" classmembers-those who are in danger of being reinstitutionalized. There are no current plans to identify such classmembers.

115. Similarly, defendants have not undertaken trend analyses to identify factors associated with the reinstitutionalization of classmembers. The lack of data analysis in this area is particularly disturbing in view of the relatively high rates of reinstitutionalization-higher than in any other case with which Ms. Feinstein has been involved.

**C.** *Deficiencies in the Provision of Case Management Services*

116. Difficulties continue to persist in the area of case management services. Problems in this area undermine the actual provision and supervision of all other services to classmembers.

117. One-fifth or 20% of the classmembers audited did not have at least one monthly meeting at their residences with their case managers.

118. In view of the minimal requirements of this standard (3.1.3.2) and the critical importance of case management services, such low ratings constitute another area of systemic non-compliance.

119. Case managers presently have inadequate and insufficient training opportunities. Case managers could use more frequent and more intensive training particularly with regard to program planning, the interdisciplinary team process, and information as to disabilities.

**\*22 D.** *Deficiencies in Staff Training*

120. Deficiencies in the training provided to direct care staff continues to be a problem area, particularly with respect to day program providers.

121. In several ratings related to life safety, over one-quarter or 25% of the classmembers were in day programs that earned a rating of one, indicating complete non-compliance.

122. Whenever more than one-quarter or 25% of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

Page 19

the classmembers attained such a score of one, then an unacceptable level of non-compliance exists on a systemic basis. The scores recorded in the area of life safety training for day program providers indicate such a level of systemic non-compliance.

123. Additional problems with respect to staff training extend into the area of medication administration. One-third or 33% of the classmembers resided in programs which received a rating of level one-complete non-compliance-on Standard 5.15.6.

124. This standard is a significant one for a substantial segment of the class. It requires that the provider ensure that staff members who administer medications have been appropriately trained.

E. *Protection from Harm*

125. Similar deficiencies exist with respect to the standards associated with protection from harm. S tandard 2.5 requires providers to maintain an on-site record of seizure activity to be kept with respect to any classmember experiencing seizures within the past three years. One-half of the classmembers rated were in residential programs which attained a level one score of complete non-compliance.

126. Such a deficient rating in an area as basic as this exhibits the risks to which the class is exposed.

127. Standard 5.17 establishes certain minimal requirements, including the use of positive reinforcement, as part of behavior modification programs. A rating of complete non-compliance was recorded for those residential providers who provided services to one-half or 50% of the classmembers audited.

128. Serious programmatic deficiencies pervaded the area of training for classmembers with respect to independent living skills. Eight standards (7.8.1-8.8.8) measured performance in regard to such training. For six of these standards, 25% or more of the classmembers rated received a rating of complete non-compliance. Substantial compliance for one-half or 50% of the classmembers was achieved with respect to only three standards.

129. Similarly problematic scores were reflected by the responses to the Quality of Life Questionnaire, a valid, reliable instrument.

F. *Classmembers at Risk of Falling out of Their Placements*

130. The audit results yielded other areas of significant concern, particularly related to the potential for classmembers to fall out of their placements. According to Standard 6.6, day programs at a minimum must be provided for at least three days and 20 hours a week. Providers for 30% of the classmembers rated on this standard could not attain levels of substantial compliance.

131. While it is possible that auditors rated this standard out of compliance due to the fact that a classmember was in a day program other than the SRC/CRT-approved service, the audit results indicate that this is a real area for concern.

*23 132. Other studies have indicated the importance of providing day programs of adequate frequency and duration at a site away from the individual's residence. Because of the importance of Standard 6.6, defendants should have undertaken an independent examination of the validity of the scores in this area.

133. Day programs of inadequate frequency and duration place additional strain on the residential placement and may well lead to problems with management of the classmember's behavior. As was pointed out above, the compliance audit shows that the area of behavior management is a major deficiency. Inadequate programs not only may lead to harm of classmembers, but without appropriate support services for residential providers, classmembers may be moved to a more restrictive residential setting.

G. *Specialized Services*

134. Serious gaps exist with respect to the provision of essential services, such as professional and mental health counseling, occupational and physical therapy, special education, and certain specialized medical services.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 20

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

135. It is not professionally acceptable for classmembers to be deprived of such services over extended periods of time. The provision of those services was deemed necessary by those professionals who comprised the SRC's and CRT's.

136. Various problems of Region 1 have been addressed throughout the findings. Illustrative of the problems are that Region 1 accounted for the highest number of reported abuse/neglect incidents and assumed the lowest rank of compliance months.

### H. *Non-Compliance with Respect to Lower Functioning Classmembers*

137. The QAMG Report of August 31, 1989 also documented one tendency of significant importance in identifying "at risk" classmembers. Overall, classmembers who were not mentally retarded or only moderately or mildly retarded achieved compliance awards substantially greater than profoundly or severely retarded classmembers.

138. This result indicates that defendants are less able to provide adequate care for more severely impaired classmembers than they are for higher functioning individuals. In other words, the more complex or greater the needs of the classmember, the less likely those needs will be met.

139. This conclusion does not provide an explanation for the relatively poor compliance awards achieved by Region 1 of OMR. That region is not inordinately populated with severely or profoundly retarded classmembers.

### I. *Lack of Involvement of Classmembers and Their Families*

140. Another area of concern relates to the lack of involvement of family members and classmembers in the treatment and habilitation process. The defendants have done little to encourage the participation of such individuals in this area, particularly in contrast to the emphasis on such involvement during the SRC process.

141. Defendants customarily do not involve classmembers and their families in the audit

debriefing process. They are not routinely told of the audit results, nor do defendants notify families of validated incidents of abuse and neglect.

*24 142. Defendants' failure actively to encourage the involvement of classmembers and their families is inconsistent with prevailing professional practices.

### J. *Deficiencies Confirmed by Second Level Reviews*

143. The results of the Second Level Reviews for 95 classmembers confirm the systemic deficiencies identified by the joint audits in the areas noted above. The accuracy of the data generated by these reviews is enhanced by the following factors:

(a) A representative of the defendants participated on the Second Level Review Team and agreed to each of the compliance awards;

(b) In general, the Team deferred action on classmembers where definitional problems, such as that related to day development training, existed;

(c) The Team could correct possible errors or misinterpretations by auditors; and

(d) The Team exercised professional judgment in awarding compliance allowing for an additional application of the substantial compliance approach.

144. Defendants' lack of earned compliance credit, as confirmed by Second Level Review, was stunning. Over an audit period of approximately 24 months, the defendants attained an average of only 8.5 months of awarded compliance. For 28 classmembers (29% of the group reviewed), not a single month of compliance credit was awarded.

145. The results of the Second Level Reviews also indicate substantial differences in the awards earned by the respective program offices. The OCS recorded an average compliance credit of 13.0 months as compared to 5.3 months for the OMR. Forty-two percent of all OMR classmembers reviewed were awarded *no* months of compliance credit.

146. A number of explanations for these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:02-cv-00022     Document 69-3     Filed 01/31/2007     Page 6 of 14

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

performance results exist. OMR, particularly in Region 1, has had real difficulties in terms of staff turnover. The high rate of turnover has contributed to compliance problems.

147. In general, certain bureaucratic barriers, such as the layers of bureaucracy that interfere with the flow of information, impede the ability of defendants to achieve compliance. OMR has another layer of bureaucracy which OCS does not; the organizational and informational structure is just not as tight in the former organization.

148. OCS also has a more centralized approach to case management. Information is less likely to be fragmented in OCS than in OMR. OCS case managers tend to be more knowledgeable about programmatic issues than OMR case managers. The former also are on higher pay range than the latter.

149. Similar discrepancies in terms of compliance awards appeared in regard to the various regions of the program offices. Non-compliance with the requirements of the Court's Orders pervades Region 1 of OMR. Seventeen (77%) of the 22 classmembers residing in that Region received *no* months of compliance credit.

150. In general, OMR Region 1 reflects a pretty dismal compliance picture. Historically, this region has had difficulties. It has not provided the kind of support and information that providers need.

151. As a result, there are significant gaps in some services shown by the data regarding Normal Life, Inc. The situation as to the availability of occupational and physical therapy services in that region is bleak.

**\*25** 152. The data contained in the QAMG Report of August 31, 1989, regarding awards of compliance credit, generally is consistent with that reported by defendants.

153. After Second Level Reviews had been completed with respect to 67 classmembers, defendants briefly summarized those results. The average amount of compliance credit earned over the 24 month audit period was 7.6 months-a figure comparable with the QAMG average of 8.5 months for 95 classmembers.

### K. *Defendants' Current Self-Monitoring Activities*

154. For some time, defendants have been conducting self-monitoring with respect to individuals previously dismissed from the class. These monitoring reports have been submitted to the Court on a semi-annual basis.

155. For each dismissed classmember, the assigned case manager records information regarding the provision of services on a monthly basis on a bar graph. Also included is a brief narrative as to the services provided.

156. Defendants compile these documents on individuals, and then the *Gary W.* Project Office submits them to the Court every six months.

157. Defendants' self-monitoring activities with respect to dismissed classmembers do not satisfy prevailing professional standards in this area.

158. It is not professionally acceptable to delegate primary responsibility for monitoring to the actual service provider. That approach lies at the core of defendants' monitoring of dismissed classmembers, since case managers have responsibility for ensuring the provision of services. The Court finds it unrealistic that a case manager in filling out a monitoring form is going to admit that he or she has not done the required job.

159. Also, OMR and OCS utilize different forms for reporting on the status of classmembers.

### L. *Defendants' Attitudinal Deficiencies*

160. Defendants have not come forward with a professionally acceptable, written plan to address these compliance deficiencies, nor have they developed such a formal plan with respect to possible self-monitoring.

161. Defendants overall have not demonstrated the willingness or capacity to identify and remediate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

systemic barriers to non-compliance.

162. For example, DHH and DSS [FN6] have not taken specific steps to ensure that SRC classmembers remain in their SRC-approved placements, nor is there a special plan to address this area.

163. There has also been a reduction in enthusiasm among defendants for ensuring that classmembers receive all the services for which their plans call. This reduction in enthusiasm applies to both the administrative level as well as the direct service level. There is just not as much effort as there needs to be to obtain services.

164. Defendants' primary response to the QAMG Report and the results of the joint audits and Second Level Reviews has been negative and defensive. The type of proactive attitude and ability necessary to remedy the clearly identified problem areas, even after repeated opportunities to do so, just has not been evident in this case.

*26 165. Defendants' non-compliance has persisted despite a variety of remedial strategies employed by this Court. On at least two occasions, for example, this Court has raised the possibility of holding defendants in contempt and imposing sanctions for failure to adhere to its Orders.

166. Defendants, through their agents and employees, were well aware of the possibility of a contempt holding and sanctions. They took the Court's pronouncements in this area seriously.

167. Even in the face of these threats, defendants have been unable or unwilling to attain conformity with the Court's Orders in this case.

M. *Harm to Classmembers*

168. The collective impact of all these areas of deficiency-the above noted problems with respect to case management services, training for both provider and departmental personnel, data collection and analysis, and so forth-are reflected in the poor results obtained by defendants as a result of the Second Level Reviews. In view of those

results, it is not surprising that such a relatively high rate of reinstitutionalization exists and that some classmembers have been subject to an inordinate number of multiple incidents.

169. The harm suffered by classmembers in this regard is reflected in the relatively high rates of reinstitutionalization and the multiple incidents of abuse and neglect. Clearly distinct segments of the class stand at risk of harm both now and in the future: OMR classmembers residing in Region 1, classmembers with a history of seizures, those taking medications, and those lower functioning classmembers are especially vulnerable. With respect to these groups, the sad reality of the present litigation is that those classmembers with the greatest needs and who are most vulnerable presently are receiving the least acceptable level of care.

IV. *THE CURRENT SITUATION: CONTINUED PROBLEMS WITH ABUSE AND NEGLECT*

170. On April 17, 1989, the Department issued a document entitled, *Six Month Gary W. Summary Report of Immediate Reportable Incidents, July 1, 1988-December 31, 1988.* The report showed the total number of reportable incidents and investigations to have remained level but stated that no significant conclusions could be drawn as to whether there was either an increase or a decrease in the number of validated allegations of abuse and neglect. The report concluded that "[r]eview and analysis of the data in this report and conclusions reached indicates there are systemic issues to be addressed by the DHH Program Offices with the assistant of the Gary W. Project Office. The conclusions reached highlight areas related to incidents and validated allegations that might require further scrutiny." It is significant to note that no specific systemic issues were identified in the report, nor were the areas which required further scrutiny. No action plan was submitted, nor were any specific recommendations made to the Program Offices.

171. The Department's new Abuse/Neglect Plan was implemented on January 17, 1989, with training

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          Page 23

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

being held for many of the service providers. The report also noted that the Gary W. Project Office planned to follow up with providers to ensure their compliance with the requirements of the policy.

**\*27** 172. The evidence presented at the hearing shows the positions of the parties are diametrically opposed to each other on the issue of abuse and neglect. The best examples of those positions are the QAMG Report on Abuse and Neglect and the *Gary W.* Project Office's Report on Abuse and Neglect.

173. The QAMG Report, *Report on Abuse and Neglect Allegations for the Period of January 17, 1989 to May 14, 1989 [Revised]*, concluded as follows:

(a) The problem related to the differentiation among allegations of neglect, injury, and accident has not been resolved.

(b) The policy has apparently been implemented differently among the various regions and various providers. The State must provide appropriate training and ongoing technical assistance to providers to ensure uniformity of implementation, as well as address the high number of incidents in Regions I and II.

(c) The timeliness of investigations has improved.

(d) The Project Office must assure that all investigations include a determination of validity.

(e) Involvement of classmembers in multiple incidents continues to be a problem.

(f) The State must closely examine the facts around multiple incidents to determine whether or not to request a formal Corrective Action Plan. The Corrective Action Plan process should be used to ensure that classmembers are protected from harm.

174. The Project Office's Report, *Six Month Summary Report Gary W. Abuse and Neglect Reporting and Investigations January 17-June 30, 1989,* reached the following conclusions:

(a) In the first six months of the policy, the Departments and providers "have conscientiously moved forward with full implementation of all provisions and requirements of the policies."

(b) There has been an increase in the number of reports of incidents: whether the increase is simply one of improved reporting or is an actual increase cannot be determined at this time.

(c) The Departments have emphasized the goal of protecting classmembers from harm, as well as the significance of meeting timelines in the policy. They have achieved "real success" in ensuring that classmembers are protected from harm.

(d) There has been a marked difference between the number of allegations of abuse which have been found valid and the number of neglect and unusual occurrences which have been found valid. The differences are "sufficient to warrant careful and ongoing review of all factors associated with incident allegations of abuse." The Project Office will "continue to review all investigative reports as they are submitted and assure that all required components of investigative procedures are included."

(e) The level of local oversight committee has increased, but there seems to be a problem with the relative rates in the various regions, with Regions 5 and 7 appearing inordinately low and Regions 1 and 2 to be inordinately high. "It is the Departments' expectation to address these apparent discrepancies through continued technical assistance to agencies in the system and through the policy monitoring plan implemented by the Project Office."

**\*28** (f) "Classmembers most at risk as evidenced by the report of multiple incidents have had the benefit of appropriate correction action through the convening of individual team meetings."

(g) Approximately 81% of all reports came from Regions 1 and 2. This is to be expected due to the larger population of classmembers residing in those regions, as well as the fact that those classmembers are more medically fragile and demonstrate more complex behavioral characteristics than those in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

other regions. Furthermore, the greater number of reports in those regions is directly attributable to several specific classmembers.

175. Areas of systemic non-compliance persist in the area of abuse/neglect reporting.

176. Standard 4.1.1 requires simply that reports of alleged abuse or neglect are made in accordance with state law and the defendants' policies. One-third or 33% of the 120 classmembers rated on this standard were listed at level one, complete non-compliance.

177. The large number of classmembers for whom this standard was ranked as complete non-compliance is particularly disturbing in view of the fundamental nature of this standard.

178. Providers are given extensive latitude in defining the type of incident reported, and hence the actual entity that will investigate that incident is, in effect, chosen by the provider.

179. The Project Office has failed to move proactively to resolve systemic problems related to abuse and neglect. The defendants have not used incoming data to analyze trends and possible causes of incidents of abuse and neglect, nor have any corrective actions ever been required of providers.

180. In short, defendants have not acted aggressively to identify and correct problems in this area. The frequency of multiple instances of abuse or neglect remains unacceptably high.

181. Dr. Vincent, who serves as the head of OMR, testified that he had reviewed the QAMG Report on Joint Audits, and while the defendants did not always agree with the methodology used, he believed the conclusions of the QAMG Report were similar to the conclusions that the State had drawn. He listed his concerns as follows:

(a) training needs to be addressed statewide;

(b) case management issues;

(c) problem definitions need to be clarified;

(d) specialized services need to be developed to ensure they are available to members of the class;

(e) problems with classmembers who are either at risk, have fallen out of their SRC placements, or about to fall out of them;

(f) legal status of classmembers;

(g) abuse and neglect; and

(h) management problems with Region 1.

182. Dr. Vincent further testified that OMR has formulated a written plan for dealing with each of these issues. The "plan" sets forth only the intention of OMR to identify problems, develop a plan for resolving the problems, and then implement the plan. There are no action steps listed, nor anything other than an extremely superficial overview of problem areas.

## V. CONCLUDING FINDINGS

183. In sum, the evidence shows that despite repeated efforts and an array of orders, conferences, and remedies undertaken by this Court over the past fifteen years, the defendants still have not complied and lack the ability to comply with the Principal Order and this Court's remedial Orders. Furthermore, the evidence is clear that individual and systemic barriers have been repeatedly identified by the numerous reports and recommendations filed over the eight years since Dr. Gant's first report in 1981 and that the defendants have not been able to remove those barriers.

**\*29** 184. The time for "all deliberate speed" is long passed. Although defendants have placed members of the class in their residential placements, they are unable to ensure the quality of those placements and the support services necessary to keep the classmembers there and to protect them from harm. Furthermore, defendants have not only shown no capacity to implement corrective plans previously submitted, but also that they either are no longer willing or able to even devise remedial programs to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
(Cite as: Not Reported in F.Supp.)

address the clearly identified barriers to compliance with the Orders of this Court.

185. The Court has already exhausted the avenues ordinarily undertaken by other courts in cases of this kind to implement relief: appointment of a Special Master; appointment of a Monitor; formal and informal conferences with the parties and counsel; warnings as to possible contempt and related sanctions; and an Order requiring the creation of an Executive Management Committee within the defendants' organization. Notwithstanding these efforts, progress in meeting plaintiffs' constitutional rights continues to be elusive. Under these circumstances, stronger relief, specifically tailored to address the causes of non-compliance, is essential.

186. Further delay cannot and will not be tolerated. The issue is not one of overly technical requirements blindly applied. The evidence demonstrates, and the above Findings reflect, the fact that discrete segments of the class stand at risk of clear harm. Significant numbers of classmembers are suffering physical and emotional harm, while others are at immediate risk of suffering such harm due to the failure of the defendants to implement this Court's Orders.

187. To the extent that the above Findings of Fact also constitute Conclusions of Law, they are specifically adopted as both Findings of Fact and Conclusions of Law.

## CONCLUSIONS OF LAW

1. This matter is before the Court pursuant to plaintiffs' Motion for Supplementary Relief under 28 U.S.C. § 2202.

2. The form of relief sought by plaintiffs is a further injunction to ensure implementation of this Court's previous Orders. Such relief will be warranted if: (a) a legal, in this case, constitutional violation is made out; (b) plaintiffs will suffer irreparable harm if the injunction does not issue; and (c) there is a lack of an adequate remedy at law. *Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402 U.S. 1, 16

(1971); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959). Plaintiffs have satisfied these criteria.

3. Certainly, the constitutional right of plaintiffs to be protected from harm was established by the Principal Order issued by this Court and by the decision of the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307 (1982). Indeed, this Court's Principal Order and subsequent Orders have closely followed *Youngberg's* prescription of deference to professional judgment. It is precisely the failure of the defendants to properly implement professional judgments made with respect to individual classmembers and their treatment needs that is the very source of the ongoing constitutional violation.

*30 4. Our findings also lead inexorably to the conclusion that plaintiffs will suffer irreparable injury unless a further injunction issues.

5. Given the history of this case, including the past efforts of this Court to facilitate, cajole, and even coerce compliance, the demonstrated inability of defendants to comply substantially with this Court's previous Orders (despite many opportunities to do so), and the flawed organizational structure and division of responsibilities for this case in DHH and DSS, all as described in the Findings of Fact, this Court concludes that an Order holding the defendants in contempt is not an adequate remedy. In light of the above reasons for defendants' failure to substantially comply with our Orders, such measures "promise only confrontation and delay." *Newman v. State of Alabama*, 466 F.Supp. 628, 635 (M.D.Ala.1979); *Morgan v. McDonough*, 540 F.2d 527, 529-33 (1st Cir.1976), *cert. denied*, 429 U.S. 1042 (1977).

6. While the plaintiffs clearly are entitled to further injunctive relief, the nature and scope of that relief must be carefully considered. It is axiomatic that in exercising their powers, "federal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced." *Hutto v. Finney*, 437 U.S. 678, 690 (1979). The federal courts possess both the authority and power to implement whatever remedies are necessary to correct constitutional

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

violations. *Washington v. Washington State Comm. Passenger Fishing Vessel Assoc.*, 443 U.S. 658, 695-96 (1979) ("The federal court unquestionably has the power to enter the various orders that state official and private parties have chosen to ignore, and even to displace local enforcement of those orders if necessary to remedy the violation of federal law found by the court." *Id.*); *Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977); *Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402 U.S. 1, 15-16 (1971).

7. Indeed, where constitutional rights have been denied over an extensive period of time, the responsibility of this Court is "clear and compelling: to use its broad and flexible equitable powers to implement a remedy that, while sensitive to the burdens that can result from a decree and the practical limitations involved, promises, ' *realistically to work now.*' *Green v. County School Bd.*, 1968, 391 U.S. 430, 439 ..." *United States v. Desoto Parish School Bd.*, 574 F.2d 804, 811 (5th Cir.1978), *cert. denied*, 439 U.S. 982 (1978). *See also Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402 U.S. at 15; *Brown v. Board of Education*, 349 U.S. 294, 300 (1955).

8. As in any equity case, the scope of relief is determined by the nature of the violation. *Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402 U.S. at 16.

9. In dealing with cases involving violations of constitutional rights by state officials, the district courts have employed a variety of measures to ensure implementation of equitable decrees. In complex cases, such as *Gary W.*, these measures have included appointment of a court designated agent to oversee the implementation of court orders. The power of the courts to appoint such agents in cases of this kind "has long been established." *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir.1982), *vacated in part on other grounds*, 688 F.2d 266 (5th Cir.1982), *cert. denied*, 460 U.S. 1042 (1983) (monitor); *Gary W. v. State of Louisiana*, 601 F.2d 240, 244-46 (5th Cir.1979) (special master); *Miller v. Carson*, 563 F.2d 741, 752-54 (5th Cir.1977) (ombudsman).

*31 10. Defendants have been given 13 years to

meet their obligations under the Principal Order and subsequent Orders of this Court. Having failed in " their affirmative obligation under these holdings, judicial authority may be invoked." *Swann*, 402 U.S. at 15.

11. As observed by the Court of Appeals for the Fifth Circuit, "the remedy should begin with what is absolutely necessary. If those measures later prove ineffective, more stringent ones should be considered." *Ruiz v. Estelle*, 679 F.2d at 1145-1146 (5th Cir.1982).

12. Where, as in the present case, state or local officials have failed to meet court orders in significant respects over a period of many years, the courts have given greater authority to court appointed agents or ordered relief which directed certain administrative or executive actions.

13. Thus, in order to remedy the unconstitutional segregation of schools, the federal courts have ordered the transfer of faculty and the hiring of particular school personnel. *See Morgan v. Kerrigan*, 509 F.2d 599 (1st Cir.1975); *Davis v. School District of City of Pontiac*, 487 F.2d 890 (6th Cir.1973). *See also United States v. DeSoto Parish School Board*, 574 F.2d 804 (5th Cir.1978).

14. In *Griffin v. County School Board of Prince George's County*, 377 U.S. 218, 232-34 (1964), the Supreme Court affirmed broad and far reaching powers in the trial court to remedy a situation where public schools were closed and state aid was given to segregated private schools. The Supreme Court held that the trial court had the power to order the public schools to be reopened, to order the county supervisors to levy taxes to support the public schools, to enjoin the county from giving tuition grants or tax credits in support of private schools, and to enjoin the processing of applications for state tuition grants.

15. These are by no means isolated examples of federal judicial intervention in state affairs under circumstances in which state officials have failed to follow constitutional mandates. *See, e.g., Reynolds v. Sims*, 377 U.S. 533 (1964) (approving a court ordered temporary reapportionment plan when

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

legislature failed to devise its own plan); *Bell v. Southwell,* 376 F.2d 659 (5th Cir.1967) (local election characterized by racial discrimination ordered voided and new special election ordered).

16. In other instances, the courts have appointed administrators or receivers and vested them with substantial authority to implement the Court's remedial Orders. *See Morgan v. McDonough,* 540 F.2d 527 (1st Cir.1976) (receivership in school desegregation case); *Reed v. Rhodes,* 500 F.Supp. 363 (N.D.Ohio 1980), *aff'd as to appointment of Administrator of Desegregation, rev'd on other grounds,* 635 F.2d 559 (6th Cir.1980); *Newman v. State of Alabama,* 466 F.Supp. 628 (M.D.Ala.1979) (receivership imposed on state prison system); *Perez v. Boston Housing Authority,* 400 N.E.2d 1231, 379 Mass. 703 (1980) (receivership imposed to achieve restructuring of housing authority); *Turner v. Goolsby,* 255 F.Supp. 724 (S.D.Ga.1966) (receivership in school desegregation context); *Crain v. Bordenkircher,* 376 S.E.2d 140 (W.Va.1988) (holding by the Supreme Court of Appeals of West Virginia that it "has authority to place the [West Virginia] penitentiary in receivership and appoint a receiver for the purpose of constructing a new facility.").

**\*32** 17. "When the usual remedies are inadequate, a court is justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction." *Newman v. State of Alabama,* 466 F.Supp. at 635. Ultimately, the test of whether the appointment of an administrator with authority to carry out court orders is justified is "one of reasonableness under the circumstances." *Morgan v. McDonough,* 540 F.2d at 533.

18. In each of the cases in which courts have appointed administrators to carry out their orders, state or local officials had shown an "inability to comply substantially with court remedial orders." *Reed v. Rhodes,* 500 F.Supp. at 397.

19. In instances of justifying such relief, the courts have typically found a lack of leadership that could be expected to improve conditions within a reasonable period of time, systemic deficiencies in administrative, organizational, and fiscal structures,

institutional inertia, and similar indicia of bureaucratic morass. *See generally, Reed v. Rhodes,* 500 F.Supp. at 397-98.

20. The findings in this case evince a similar pattern of ineffective leadership, an inefficient bureaucratic structure, and a plain inability of the defendants to get the job done in several critical respects.

21. The scope of authority of court appointed administrators will, of course, vary from case to case. As a general proposition, these administrators have been given whatever authority was necessary to ensure implementation of remedial orders.

22. In *Reed v. Rhodes, supra,* the Administrator of Desegregation was given authority to direct all district personnel, including the superintendent of schools and the treasurer, with respect to planning and implementing components of the remedial orders of the Court. The administrator also had responsibility to hire or transfer administrative personnel and the power to review the defendant's actual or proposed desegregation policies, budgets, reports, regulations, directives, and personnel actions and, based on such review, to issue recommendations directly to the Board of Education or instructions to the superintendent of schools. 500 F.Supp. at 403. In *Morgan v. McDonough,* the Receiver had the authority to transfer administrative staff, evaluate the qualifications of faculty, and arrange the transfer or replacement of whomever he saw fit for purposes of desegregation, file a plan with the Court for renovation of the school, and establish certain classes. 540 F.2d at 529.

23. The facts of this case justify the judicial appointment of administrative personnel to carry out certain aspects of this Court's prior Orders. But the relief which this Court will grant, and the authority of the administrators appointed by this Court will be no broader than necessary to remedy the constitutional violation. *Newman v. State of Alabama,* 559 F.2d 283, 288 (5th Cir.1977).

24. The Court concludes that defendants have persistently shown an inability to comply

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)
**(Cite as: Not Reported in F.Supp.)**

substantially with this Court's Orders in the areas of case management and staff training, as well as the other areas set forth in detail above. The Court also concludes that the Office of Mental Retardation for Region 1 of the State has persistently demonstrated an inability to comply substantially with this Court's Orders.

**\*33** 25. An Order will be fashioned to specifically remedy these particular deficiencies. It will be limited in nature to address only those problematic areas identified at the hearing on plaintiffs' motion. In this sense, the remedy ordered, while extensive in terms of authority, will be restricted only to those demonstrated areas of protracted non-compliance.

26. To the extent that these Conclusions of Law also constitute Findings of Fact, they are specifically adopted as both Findings of Fact and Conclusions of Law.

> FN1. The material which appears at 437 F.Supp. 1209 consists of three separate orders. The first, dated July 26, 1976, was, in effect, Findings of Fact and Conclusions of Law on the merits. The second, dated October 28, 1976, was Supplemental Reasons for the July 26 findings. The third, dated December 2, 1976, was a detailed Remedial Order.

> FN2. This type of evaluation, although performed by other professionals as a result of negotiations discussed below, is referred to by the parties and Court as the " 2.1 evaluations."

> FN3. As was mentioned above, the five agencies were OMR, OHD, OMH, the Office of Licensing and Regulations, and the Office of Family Security. *Id.* at 17-18.

> FN4. "2.1" refers to the paragraph of the Principal Order relating to evaluations of members of the class.

> FN5. The joint audit process at that juncture of the case was to be conducted

jointly by the Office of the Special Master and the defendants to determine objectively (i.e., measured against the objective standards of the audit instrument) where defendants stood in relation to each member of the class.

> FN6. The Department of Health and Hospitals (DHH) and the Department of Social Services (DSS) are the successor organizations to the former Department of Health and Human Services.

E.D.La.,1990.
Gary W. v. State of La.
Not Reported in F.Supp., 1990 WL 17537 (E.D.La.)

Briefs and Other Related Documents (Back to top)

• 2:74cv02412 (Docket) (Sep. 03, 1974)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# ATTACHMENT 3

Westlaw.

**10 G.C.A. § 51101**

GUAM CODE ANNOTATED
TITLE 10. HEALTH AND SAFETY.
DIVISION 2. ENVIRONMENTAL HEALTH
PART 2. GUAM ENVIRONMENTAL PROTECTION AGENCY.
CHAPTER 51. SOLID WASTE MANAGEMENT AND LITTER CONTROL
ARTICLE 1. SOLID WASTE MANAGEMENT
### § 51101. Legislative Findings.

(a) The Guam Legislature finds:

(1) the Ordot Landfill is a threat to the health and safety of the residents of Guam, and specifically for the residents of Ordot-Chalan Pago, Yona and the villages down river and downwind;

(2) solid waste collection and disposal on Guam does not adequately eliminate the threat that improperly disposed solid waste poses to the health, safety, and welfare of Guam residents;

(3) under the Government of Guam Property Act, the Ordot Landfill shall be converted to a public park after it is closed in accordance with applicable U.S. E.P.A. and government of Guam regulations. In order to protect the health and welfare of the residents of Chalan Pago-Ordot and the people of Guam, the Agency shall monitor the landfill on an on-going basis for compliance with this Section and take proper measures to mitigate environmental damage;

(4) the Ordot Landfill reached its capacity in the 1990's, and the closure of the dump is necessary in order to eliminate this existing serious environmental hazard. The dump should be converted to a public park;

(5) even with closure of the Ordot Landfill and construction of a new landfill at the same or any other site, landfilling cannot continue as the sole method of waste disposal for Guam due to the shortage of land on Guam, and the general aversion of any community to the location of a landfill within their proximity;

(6) it is in the best interest of the government to privatize through free and fair competition, the solid waste management operations of the Island, from collection to disposal, without jeopardizing the job security for the employees of the Solid Waste Management Division of the Department of Public Works as well as the private businesses currently engaged in solid waste collection, recycling and other solid waste management operations;

(7) it is in the best interest of the government to establish a funding procedure or financial arrangement which will pay for operations and meet the requirements for a totally funded program for solid waste management;

(8) Guam contains approximately 215 square miles of landmass. Over half of that mass is located over the northern Guam Lens, a pure groundwater resource that requires protection. Thus, any landfill more likely should be located in southern Guam, south of a line running approximately from Cabras Island to Pago Bay. With the pristine south already imposed upon by this geological and environmental constraint, and in order to protect the cultural traditional nature of the villages in the south and the unique environments there, a source and waste disposal reduction policy shall be implemented to minimize the requirement for landfilling;

(9) source reduction shall include a conservation and recycling program. It shall also consider the disposal of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

green waste through mulching or composting, or the recovery of resources through recycling of the green waste. Construction or demolition waste and metallic debris shall be addressed alternately, and the alternate plan should include hardfilling or quarrying, recycling or disposal other than at the landfill. Rubber tires, rubber products, and batteries shall be addressed and recycled, recovered or disposed of at alternate sites;

(10) a solid waste management plan for Guam shall address typhoon and other disaster recovery; it is estimated that Super Typhoon Paka produced over 750,000 cubic yards of waste, which should be recycled or disposed of; Guam is in: the typhoon belt; in an active volcanic range; and, an active seismic zone so disasters will happen on a regular basis;

(11) the Guam Legislature further finds that while other communities with alternative sites for landfilling enjoy the option of not paying for source reduction and resource recovery, we must establish a Guam site-specific solid waste management policy, because we have very limited alternative acceptable sites for future disposal requirements;

(12) in 1983, the Guam Environmental Protection Agency ("GEPA") adopted a Solid Waste Management Plan for Guam and also adopted regulations for solid waste collection and disposal;

(13) the government must now establish an updated Solid Waste Management Plan ("WMP" *or* the "Plan"), which shall include the closure and beneficial use of the Ordot Landfill, the privatization of the complete solid waste program, including landfill operations and provisions for job protection for the employees of the Solid Waste Division, source reduction, recycling, composting, resource recovery, waste reduction and regulated landfill disposal in an integrated program for solid waste collection and disposal, and the funding for the Plan. The SWMP shall also address construction debris or demolition waste; metallic debris; tires; waste oil; household hazardous waste; abandoned vehicles and other bulky metallic waste; white goods, such as washers, dryers and refrigerators; and green waste, which may be useful in some form, but unnecessarily contribute to landfill volume;

(14) the Department of Public Works shall implement the updated Solid Waste Management Plan, as approved by the Guam Legislature, regulated by GEPA;

(15) any and all solid waste handling and disposal contemplated by and authorized under this Act shall obtain and operate under any and all permits required by laws, rules and regulations applicable to Guam; and

(16) The government of Guam shall not direct or regulate existing permitted private entities actively engaged in solid waste collection or recycling beyond the scope and extent of Federal statutory and regulatory requirements. The standings of such private businesses permitted to actively engage in solid waste collection shall be given maximum protection and support under this Act to promote their viability and longevity under a free enterprise system.

(b) The purposes of this Chapter are to:

(1) plan for and regulate the storage, collection, transportation, separation, processing and disposal of solid waste to protect the public safety, health and welfare, and to enhance the environment of the people of Guam;

(2) provide the authority and resources, including funding to plan for, establish, finance, operate and maintain efficient, environmentally acceptable solid waste management systems, privatized, but administered by the Department of Public Works and regulated by GEPA;

(3) privatize Guam's Solid Waste Management System ("SWMS") subject to all applicable laws and Public Law Number 24-06;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**10 G.C.A. § 51101**

(4) establish the SWMS to be operated by private ventures, entities or individuals, to promote land conservation by limiting landfilling requirements consistent with the SWMP, and to establish as a limit the reusing, recycling and composting of no less than twenty percent (20%) of the total solid waste generated on Guam from all sources within the time frame established by the Plan and a comprehensive solid waste disposal and resource recovery program that ultimately will minimize Guam's need for additional landfills beyond replacing the Ordot Landfill; quantitative factors to meet such an objective shall be specified and substantiated in the SWMP;

(5) continue authority to regulate solid waste storage practices within the Department of Public Health and Social Services pursuant to Chapter 33 of this Title and, where applicable, establish such authority in the Department of Public Works to insure that such practices do not constitute a danger to human health, safety and welfare;

(6) continue authority in GEPA to review the design of and to issue permits for the operation of solid waste collection, transport, processing and disposal activities;

(7) continue authority in GEPA to undertake a comprehensive investigation of and set minimum standards for the transportation, processing, storage, treatment, and disposal of hazardous waste, and conduct surveys for special disposal facilities for hazardous waste, to protect public health, other living organisms and the environment through an effective and efficient hazardous waste management system;

(8) continue authority in GEPA to establish and implement an enforcement system to prevent the improper disposal of solid waste;

(9) promote the application of a Solid Waste Management System which preserves and enhances the quality of air, water and land resources;

(10) promote and assist in the development of markets for recovered and recycled materials;

(11) support and encourage the rapid and efficient removal, recycling, processing, or disposal of abandoned vehicles and other bulky waste, and to assure that the recovery of resources is facilitated;

(12) authorize the closure and beneficial use of the Ordot Landfill site, and promote, assist and support the construction and operation of a privatized sanitary landfill, resource recovery and other solid waste management facilities;

(13) require consideration and evaluation of treatment of bottom and fly ash generated from resource recovery facilities that any municipal solid waste incinerator company which operates a facility which generates bottom and fly ash or waste ash shall be responsible for the collection and disposal thereof and cost of the collection and disposal thereof; and

(14) authorize GEPA to establish such advisory committees as are necessary to carry out its planning and solid waste management responsibilities; the committees shall include but limited to representatives of GEPA, DPW, the Department of Public Health and Social Services, collectors, operators, applicable Federal agencies, educational/environmental groups and the public at large.

**SOURCE:** Repealed and reenacted by P.L. 24-139:2. Repealed and reenacted by P.L. 24-272:1.

<General Materials (GM) - References, Annotations, or Tables>

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:02-cv-00022     Document 69-4     Filed 01/31/2007     Page 4 of 22

**10 G.C.A. § 51101**

**10 G.C.A. § 51101,** GU ST T. 10, § 51101

Current through P.L. 28-142 (2006)

Copr. © 2006. Government of Guam.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# ATTACHMENT 4

Westlaw.

GUAM CODE ANNOTATED
TITLE 10. HEALTH AND SAFETY.
DIVISION 2. ENVIRONMENTAL HEALTH
PART 2. GUAM ENVIRONMENTAL PROTECTION AGENCY.
CHAPTER 51. SOLID WASTE MANAGEMENT AND LITTER CONTROL
ARTICLE 1. SOLID WASTE MANAGEMENT
### § 51118. Tipping/User Fees and Solid Waste Operations Fund.

(a) Legislative Intent. Tipping and user fees shall provide a financing source for government of Guam costs and expenses directly related to the closure of the Ordot landfill, the development, design, construction, operation and final closure of a new sanitary landfill and the Ordot Landfill, as well as other solid waste management facilities that are contracted or may be established by this Act and in accordance with the plan and annual fiscal year appropriation for the Division of Solid Waste Management of DPW.

(1) Tipping/user fees will vary depending on the nature of collection, privatized contract for residential dwellings or hired commercial collectors for other municipal solid wastes outlets.

(2) For residential or dwelling, the charge is a user fee which includes the collection fee with the disposal tipping fee.

(3) For commercial, including multi-family dwellings and government agencies, the charge is a disposal tipping fee and does not include collection fees independently charged by commercial waste haulers.

(b) Effective Date of Charging Tipping Fees. The commercial and residential tipping fees established in this § 51118 are charged beginning the first day of the month following the adoption of supporting rules and regulations by DPW under the Administrative Adjudication Law.

(c) Business and Governmental Tipping Fees. A tipping fee of Four Dollars ($4.00) per cubic yard, uncompacted, is hereby established for business and government generators. For compacted trash, a tipping fee of Four Dollars ($4.00) per cubic yard multiplied by the compaction ratio of any vehicle or container with compaction equipment, is hereby established for business and government generators. Commercial and government collectors shall provide the Department of Public Works the compaction ratios of all equipment used to haul solid waste to the landfill to insure the accurate assessment of tipping fees for compacted trash. This fee does *not* include collection charges that are independently set by licensed commercial collectors.

(d) Residential Tipping Fees. A residential tipping fee, which includes collection charges, is hereby established for residential generators in the amount of Eight Dollars ($8.00) per dwelling per month.

(e) PUC Rate-making. The Public Utilities Commission of Guam ['PUC'] is hereby authorized to establish and amend commercial, government and residential tipping and user fees [including without limitation a self-drop fee, a variable residential tipping fee and a targeted lifeline rate for residential tipping fee, *collectively referred to as "tipping fees"*], which when established shall replace those previously created by law or by the Department of Public Works ['DPW']. Tipping fees established by PUC shall be based on volume and on an actuarial analysis of costs of service. Rate-making authority, which was previously given to the DPW under this Section, is hereby *revoked.* PUC is empowered to undertake a focused management audit of the existing operations of the DPW Division of Solid Waste Management. In performing its duties under this Section, PUC shall have the full authority

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**10 G.C.A. § 51118**

and powers conferred upon it by its enabling legislation, 12 GCA 12000 *et. sec.,* including the audit power conferred upon it by Public Laws 25-05:12 and 26-78:2.

(f) Solid Waste Operations Fund. All tipping, user and other fees authorized under this Section and collected based on duly established rules and regulations or on a PUC rate order shall be deposited in a special fund designated and hereby established as the Solid Waste Operations Fund. All tipping/user fees in the Fund shall be used *solely* for solid waste management practices and, pursuant to PUC order, for the payment of regulatory costs and expenses as may be incurred by PUC in performing its regulatory duties under Subsection (e).

(g) Notification to Department of Interior. Within thirty (30) days of the enactment of this Act, the Governor shall notify the Department of Interior of the establishment of tipping fees, for the purpose of releasing Federal funds available to resolve environmental issues relative to the Ordot Landfill. Unless otherwise restricted by any conditions, Federal-funding will be allocated between the Ordot Landfill compliance mitigation work and closure.

(h) DPW to Develop Variable Residential Tipping Fees In recognition of the fact that the initial residential tipping fee established by Public Law Number 24- 272 is a flat fee, which discourages trash reduction, penalizes smaller families and subsidizes large residential generators of waste, the Department of Public Works shall develop a plan to institute a sliding scale of residential tipping fees. The sliding scale shall, at a minimum, charge residential generators based on the amount of waste produced and picked up by the department. The plan shall also address the methodology for billing individual residential customers based on the revised variable tipping fee. The plan shall be submitted to *I Liheslaturan Guåhan* within four (4) months of enactment of this Act.

(h) (1) Lifeline Rates for Tipping Fees. Notwithstanding any other provision of law, the Department of Public Works shall, through the development of rules and regulations pursuant to the Administrative Adjudication Law, establish and modify from time to time, Targeted Lifeline Rates for Residential Tipping Fees covering pick-up and delivery of residential trash *only* that are consistent with and meeting the low income eligibility criteria, requirement, policies or procedures established by the Guam Housing and Urban Renewal Authority ('GHURA') applicable to their Low Income Public Housing Program.

(i) Self-Drop Fee Established. Any person or entity that is *not* a business or government generator shall be billed Two Dollars ($2.00) per vehicle load of solid waste delivered to a landfill operated by the Department or its contractor; provided, that the vehicle load capacity is one (1) ton or less. Vehicles in excess of said load capacity shall be billed a rate that is based on an established formula developed by the Department.

(j) Temporary Exemption from Tipping Fees for Municipal Waste Collection. For a period of one (1) year commencing the date of the enactment of this Act, all waste collected by any Mayor or Vice-Mayor in the performance of their official duties, and transported to a landfill operated by the Department or its contractor, shall be exempt from all tipping fees. The Department of Public Works shall monitor and record the amount of solid waste delivered by Mayors and Vice-Mayors under this Section. This information shall be provided on a quarterly basis to the Mayors Council, *I Maga'lahen Guåhan, and I Liheslaturan Guahan* for the purpose of determining an appropriate budget for each municipality following the end of the exemption.

(k) "Good Citizen" Exemption Established. Any individual, registered non-profit organization, or other person who intends to volunteer their resources for the purpose of cleaning up and collecting trash and litter from public places or facilities may be granted a temporary exemption from the fees established herein by securing a written exemption from the Department of Public Works in advance of their planned collection activities. The Department of Public Works shall determine the manner, time limit and procedure by which such an exemption may be granted and honored.

(l) Temporary Exemption of Tipping Fees Following a Force Majeure. Following a force majeure, *I Magalahen Guåhan* shall be authorized to suspend tipping fees for all solid waste collected and transported to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:02-cv-00022     Document 69-4     Filed 01/31/2007     Page 8 of 22

**10 G.C.A. § 51118**

landfill that is operated by the Department or its contractor for a period *not to exceed* sixty (60) days.

(m) Exemption from Tipping Fees for Municipal Waste Collection. All Mayors or Vice-Mayors who collect waste in the performance of their official duties shall be allowed to dump the waste at the Ordot landfill, the Agat transfer station and any other landfill or transfer station operated by the Department of Public Works ("DPW"), or its contractor. The Mayors or Vice-Mayors shall be exempt from all tipping fees when dumping the waste collected in their official capacity.

**SOURCE:** Added by P.L. 24-139:9. Repealed and reenacted by P.L. 24-272:1. Subsection (c) amended by P.L. 25-70:2 & P.L. 25-93:1. Subsection (d) amended by P.L. 25-93:2. Subsection (e) amended by P.L. 25-70:3; repealed and reenacted by P.L. 28-56:1 (June 30, 2005). Subsection (f) amended by P.L. 28-56:2 (June 30, 2005). Subsection (h) added by P.L. 25-93:3. Subsection (i) added by P.L. 25-93:4. Subsection ( j) added by P.L. 25-93:5. Subsection (k) added by P.L. 25-93:6. Subsection (l) added by P.L. 25-93:7. Subsection (m) added by P.L. 26-35:III:23(c) .

<General Materials (GM) - References, Annotations, or Tables>

**10 G.C.A. § 51118**, GU ST T. 10, § 51118

Current through P.L. 28-142 (2006)

Copr. © 2006. Government of Guam.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# ATTACHMENT 5

Westlaw.

**12 G.C.A. § 12017**

GUAM CODE ANNOTATED
TITLE 12. AUTONOMOUS AGENCIES
DIVISION 1. AUTONOMOUS AGENCIES
CHAPTER 12. PUBLIC UTILITIES COMMISSION AND THE GUAM TELECOMMUNICATIONS ACT OF 2004
ARTICLE 1. PUBLIC UTILITIES COMMISSION.
> **§ 12017. Just and Reasonable Defined.**

The term "just and reasonable" as used in this Article is defined as that rate, charge or assessment cost which enables the public utility to repay its debts, finance its obligations, finance its capital improvement needs and cover all its operating expenses. This Section shall have no application to Article 2 of this Chapter.

**SOURCE:** Added by P.L. 17-74. Repealed and reenacted by P.L. 27-110:9.

**12 G.C.A. § 12017,** GU ST T. 12, § 12017

Current through P.L. 28-142 (2006)

Copr. © 2006. Government of Guam.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# ATTACHMENT 6



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION IX
215 Fremont Street
San Francisco, Ca. 94105

**2 6 MAR 1986**

CERTIFIED MAIL NO P007 594 933
RETURN RECEIPT REQUESTED

In Reply Refer to:  IX-FY86-55

Carl J.C. Aguon
Director, Department of Public Works
P.O. Box 2950
Agana, Guam 96910

Dear Mr. Aguon:

Pursuant to Sections 308(a), 309(a)(3), (a)(4) and (a)(5)(A) of the Clean Water Act as amended [33 U.S.C. §1318(a), §1319(a)(3), (a)(4) and (a)(5)(A)] (hereinafter the Act), enclosed are a Finding of Violation and Order for the Ordot Landfill facility in Guam.

The enclosed Finding of Violation relates to the failure of the Guam Department of Public Works (DPW) to comply with Section 301(a) of the Act [33 U.S.C. §1318(a)]. Section 301(a) of the Act prohibits any discharge of pollutants to waters of the United States unless authorized by a National Pollutant Discharge Elimination System (NPDES) permit. The Guam DPW does not possess a NPDES permit authorizing the discharge of untreated leachate from the Ordot Landfill to the Lonfit River.

The enclosed Order requires the Guam DPW to take steps to cease discharging leachate from the Ordot Landfill to the Lonfit River. The Order requires the Guam DPW to assess the entire operation at the Ordot Landfill to ensure that discharges cannot occur under any circumstances. Table I summarizes the actions to be taken by the Guam DPW in chronological order.

Any violation of the terms of the enclosed Order or violations of Section 301(a) of the Act could subject the Guam DPW to a civil action for appropriate relief pursuant to Section 309(b) of the Act [33 U.S.C. §1319(b)] and/or civil penalties not to exceed $10,000 per day of violation under Section 309(d) of the Act [33 U.S.C. §1319(d)]. In addition, Section 309(c)(1) of the Act [33 U.S.C. §1319(c)(1)] provides that willful or

negligent violations shall be punished by a fine of not less than $2,500 or more than $25,000 per day of violation, or imprisonment for not more than one year, or by both.

If you have any questions concerning this matter, please contact Doris Betuel at (415) 974-7433.

Sincerely yours,

Frank M. Covington
Director, Water Management Division

Enclosures

cc: James B. Branch,
    Guam Environmental Protection Agency

Table I.

GUAM DEPARTMENT OF PUBLIC WORKS
ADMINISTRATIVE ORDER IX-FY86-55

| Action | Due Date |
|---|---|
| 1. Take steps to cease discharge | Within ten (10) days upon receipt of FOV/AO |
| 2. Submit assessment report on past discharge | April 15, 1986 |
| 3. Submit compliance plan for corrective measures | May 01, 1986 |
| 4. Submit results of chemical and physical analyses | May 01, 1986 |
| 5. Submit assessment report of current operation and main-tenance procedures | June 15, 1986 |
| 6. Complete all corrective measures in compliance plan | May 01, 1987 |

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 9

In the Matter of      )
             )
Guam Department of Public Works )
Ordot Landfill       )  FINDING OF VIOLATION
Agana, Guam       )
             )
Under Section 308(a), 309(a)(3), )   AND ORDER
(a)(4) and (a)(5)(A) Clean Water )
Act, as amended 33 U.S.C. §1319(a), ) Docket No. IX-FY86-55
§1319(a)(3), (a)(4) and (a)(5)(A) )
             )

Under Sections 308(a), 309(a)(3), (a)(4) and (a)(5)(A) of
the Clean Water Act [33 U.S.C. §1318(a), §1319(a)(3), (a)(4)
and (a)(5)(A)], this Finding of Violation and Order (Docket
No. IX-FY86-55) is issued this date to the Guam Department of
Public Works (Guam DPW) by the Director of the Water Management
Division of EPA Region 9 pursuant to the authority delegated to
him by the Administrator and the Regional Administrator of EPA.

## FINDING OF VIOLATION

On the basis of the following facts, the Director of the
Water Management Division of EPA Region 9 finds Guam DPW in
violation of Section 301(a) of the Clean Water Act (hereinafter
the Act) [33 U.S.C. §1311(a)]. This Finding is made on the
basis of the following facts:

1. Section 301(a) of the Act, prohibits the discharge of any
  pollutant to waters of the United States except as in
  compliance with Section 301, 302, 306, 307, 318, 402 and
  404 of the Act. [33 U.S.C. §1311, 1312, 1316, 1317, 1328,
  1342 and 1344].

2. The Guam DPW has failed to comply with Section 301(a) of the Act in that:

   a. Thirty-five inspections, conducted by the Guam Environmental Protection Agency (GEPA) dating from January 26, 1984 to March 6, 1985, document that leachate from the Ordot Landfill has been entering the Lonfit River. The Lonfit River is a water of the United States.

   b. Guam DPW, owner and operator of the Ordot Landfill has not applied for nor received a National Pollutant Discharge Elimination System Permit, authorizing the discharge of leachate from the landfill to the Lonfit River.

   A copy of the GEPA letter verifying the discharge is attached hereto as Appendix A and made a part of this Finding of Violation and Order.

- 2 -

## ORDER

Taking these Findings into consideration, and considering the potential environmental and human health effects of the violations as well as all good faith efforts to comply, EPA has determined that compliance in accordance with the following requirements is reasonable. Pursuant to Sections 308(a), 309(a)(3), (a)(4) and (a)(5)(A) of the Clean Water Act [33 U.S.C. §1318(a), §1319(a)(3), (a)(4) and (a)(5)(A)]. IT IS HEREBY ORDERED that the Guam DPW comply with the following requirements:

### CESSATION OF DISCHARGE

1.  Immediately upon receipt of this Order, the Guam DPW shall take steps to cease the practice of discharging untreated leachate from the Ordot Landfill to the Lonfit River and submit a written notification within ten (10) days of the steps that have been implemented.

2.  By May 1, 1986, the Guam DPW shall submit a detailed compliance plan that describes the measures to be taken in order to ensure that discharges from the Ordot Landfill, including the discharge of untreated leachate, cannot occur under any condition. This compliance plan shall contain, at least, the following:

    a.  A detailed description of all equipment, construction, safety, and operating procedures to be used to ensure the proper operation and maintenance of the Ordot Landfill so that discharges cannot occur;

- 3 -

b.  A schedule of compliance, not to extend past May 1, 1987, that lists the following dates:

1.  The beginning and ending dates of any construction necessary to ensure that all discharges from the Ordot Landfill cannot occur;

2.  The dates that new operating procedures, identified in response to item 2(a) of this Order, will take effect.

3.  By May 1, 1987, the Guam DPW shall take all measures necessary to ensure that discharges from the Ordot Landfill cannot occur.

## ASSESSMENT OF ORDOT LANDFILL OPERATIONS

4.  By June 15, 1986, the Guam DPW shall submit a complete assessment of the operation and maintenance procedures in place at the Ordot Landfill the EPA and GEPA.  This complete assessment shall include, but not be limited to, the following:

a.  A topographic map of the Ordot Landfill extending at least one mile beyond the property boundaries that illustrates the location of each of the following:

1.  The property boundary of the Ordot Landfill

2.  All surface waters such as rivers, streams, and springs

3.  The watersheds of the major surface waters identified in item 4 a.2. above.

b.  A description of the Ordot Landfill facility depicting all discharge points.  This description shall include:

- 4 -

1. A map of the Ordot Landfill Facility that identifies each discharge point, the drainage boundaries around each discharge point, and the path of the discharges to to the Lonfit River.

2. Descriptions of the facility conditions, operations and processes located immediately adjacent to the discharge points identified in response to item 4.b.1. of this Order:

c. Safety and operational practices which have been implemented in accordance with the Guam Environmental Protection Agency Waste Management Permit for the Ordot Landfill issued on January 29, 1986.

d. Flow characteristics such as rate, and whether intermittent or continuous.

e. Rainfall data for one year preceding the date of this Order.

## ASSESSMENT OF PAST DISCHARGES

5. By April 15, 1986, the Guam DPW shall submit a report to EPA and GEPA assessing the duration and estimated volume of discharge that have occurred since 1980.

6. By May 1, 1986, the Guam DPW shall complete the following chemical and physical analyses of the leachate from each discharge point, identified in 4.b.1. of this Order for the following parameters and submit such results to EPA and GEPA. Analytical testing methods for these parameters shall be in accordance with the most recent editions of Standard Methods for the Examination of Water and Wastewater (APHA,

- 5 -

AWWA, WPCF) and Methods for Chemical Analyses of Water and Wastes (USEPA).

1. Biochemical oxygen demand

2. Suspended solids

3. Chemical oxygen demand

4. Total dissolved solids

5. Copper

6. Zinc

7. Cadmium

8. Lead

9. Iron

10. Nitrate-Nitrogen

11. Orthophosphate

12. pH

## SUBMISSIONS

7. All applications, certifications and reports submitted pursuant to this Order shall be signed by the Director or a principal executive officer of the Guam Department of Public Works and shall include the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, I certify that the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibliity of fine and imprisonment for knowing violations.

- 6 -

8. This Order is not and shall not be interpreted to be an NPDES permit under §402 of the Act [33 U.S.C. §1342], nor shall it in any way relieve the Guam DPW of obligations imposed by the Act or any other Territorial or Federal law.

9. All submissions shall be mailed to the following addresses:

    U.S. ENVIRONMENTAL PROTECTION AGENCY
        215 Fremont Street
        San Francisco, California 94105
        Attn:   Doris Betuel (W-1-1)

    GUAM ENVIRONMENTAL PROTECTION AGENCY
        P.O. Box 2999
        Agana, Guam 96910
        Attn:   James B. Branch

Dated: _3 - 25 - 86_

_for_ Frank M. Covington
Director, Water Management Division

- 7 -

# ATTACHMENT 7

CERTIFIED MAIL NO. P 057 506 663
RETURN RECEIPT REQUESTED

Mr. Benigno M. Palomo
Director
Department of Public Works
Government of Guam
P.O. Box 2950
Agana, Guam  96910

Dear Mr. Palomo:

Enclosed is an Administrative Order issued to the Guam Department of Public Works (DPW), Ordot Landfill, by me under Section 309 of the Clean Water Act (the "Act") for violations of the Act.  Specifically, the Guam Department of Works has allowed the discharge of untreated leachate from the Ordot Landfill to the Lonfit River.  EPA has not issued an National Pollutant Discharge Elimination System (NPDES) permit to allow the Guam DPW to discharge pollutants (leachate) into the Lonfit River, a water of the United States.

This Order, which is effective upon receipt, seeks to remedy the violations by requiring Guam DPW to submit a work plan and compliance schedule for construction of a cover (cap) system, to implement an operation and monitoring plan, and for construction of any additional surface water diversion systems for the Ordot Landfill to ensure the elimination of discharges of untreated leachate to the Lonfit River.

Any violations of the terms of the enclosed Order could subject Guam DPW to a civil action for appropriate relief pursuant to Section 309(b) and/or civil penalties under Section 309(d). In addition, Section 309(c) of the Act provides that negligent violations shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or imprisonment for not more than one year, or both, and willful violations shall be punished by a fine of not less than $5,000 nor more than $50,000 per day of violation, or imprisonment for not more than three years, or both.

| SYMBOL | E-4 | E-4 | E-4 | RC-4 | W-1 |
|---|---|---|---|---|---|
| SURNAME | Fee | Cox | Lovelace | Kerens | |
| DATE | 7/9/90 | 7.11.90 | 7/11/90 | 7/2/90 | 7/2/90 |
| U.S. EPA CONCURRENCES | | | | OFFICIAL FILE COPY | |

If you have any questions regarding this matter, please con-
tact Mike Lee at (415)556-5059 or Su Cox (415)556-5070, Office of
Pacific Island and Native American Programs.

Sincerely,

Harry Seraydarian
Director
Water Management Division

Enclosure

cc: Fred Castro, GEPA

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 9

| | | |
|---|---|---|
| In the matter of | ) | |
| Guam Department of Public Works | ) | |
| Ordot Landfill | ) | Docket No. IX-FY90-28 |
| Agana, Guam | ) | |
| | ) | |
| Proceedings under Sections 308 and | ) | FINDINGS OF VIOLATION |
| 309(a) of the Clean Water Act, | ) | AND |
| as amended, 33 U.S.C. Sections | ) | ORDER FOR COMPLIANCE |
| 1318 and 1319(a). | ) | |

### STATUTORY AUTHORITY

The following Findings are made and Order issued pursuant to
the authority vested in the Administrator of the Environmental
Protection Agency (EPA) by Section 309 of the Clean Water Act
(the "Act"), 33 U.S.C. Section 1319.  The Administrator has
delegated this authority to the Regional Administrator of EPA
Region 9, who in turn has delegated it to the (undersigned)
Director, Water Management Division, Region 9.

### FINDINGS OF VIOLATIONS

1.  Inspectors from the Guam Environmental Protection Agency
(GEPA) on at least 51 inspections from July 11, 1985 to June 29,
1990 observed discharges of pollutants (untreated leachate) from
the Guam Department of Public Works' (Guam DPW) Ordot Landfill,
Ordot, Guam, to the Lonfit River.  A copy of the inspection dates
that untreated leachate was observed discharging to the Lonfit
River by GEPA inspectors has been enclosed (Table 1) and made a
part of these Findings and Order.

1

2. Section 301(a) of the Act, 33 U.S.C. Section 1311(a), provides that except as in compliance with certain specified sections of the Act, including Section 402, "the discharge of any pollutant by any person shall be unlawful." Section 402 of the Act, 33 U.S.C. Section 1342, authorizes EPA to issue National Pollutant Discharge Elimination System (NPDES) permits allowing for the discharge of pollutants into water of the United States. Compliance with Section 301(a) of the Act therefore requires, _inter alia_, compliance with a valid NPDES permit.

3. Section 502(12) of the Act, 33 U.S.C. Section 1326(12), defines "discharge of a pollutant" as "any discharge of any pollutant to navigable waters from any point source."

4. The leachate discharge from the Ordot Landfill, as observed by GEPA inspectors, is within the definition of "pollutant(s)" contained in Section 502(6) of the Act, 33 U.S.C. Section 1326(6).

5. The Lonfit River, which receives the discharge of the leachate, is a navigable water as defined by Section 502(7) of the Act, 33 U.S.C. Section 1326(7), and waters of the United States as defined by regulations, 40 CFR Section 122.2.

6. The conveyance of the leachate via earthen channel(s) are discernable, confined and discrete conveyances, and are "point sources" as defined by Section 502(14) of the Act, 33 U.S.C. Section 1326(14).

2

7.   The Guam DPW is the owner and operator of the facility,
which is subject to regulation under the National Pollutant Dis-
charge Elimination System program, 40 CFR Section 122.2.  EPA has
not issued an NPDES permit to allow Guam DPW to discharge pol-
lutants into the Lonfit River, a water of the United States.

8.   On the basis of the facts specified in paragraphs 1 through
7 above, the Director of the Water Management Division of EPA
Region 9 hereby finds the Guam DPW in violation of Section 301(a)
of the Act, 33 U.S.C. Section 1311(a).

## ORDER FOR COMPLIANCE

Based on the foregoing Findings, and considering the poten-
tial environmental and human health effects of the violations,
EPA has determined that compliance in accordance with the follow-
ing requirements is reasonable.  Pursuant to the authority of
Sections 308 and 309 of the Act, 33 U.S.C. Sections 1318 and
1319, IT IS HEREBY ORDERED that the Guam DPW comply with the fol-
lowing requirements:

1.   By September 15, 1990, the Guam DPW shall submit a detailed
work plan and compliance schedule for the design and construction
of a cover system for the Ordot Landfill that will ensure the
elimination of discharges of untreated leachate to waters of the
United States.  The compliance schedule shall not extend past
June 30, 1992 and shall include, but not be limited to, the fol-
lowing milestones:  commence design, concept design (30%), 60%
design, prefinal design (95%), complete design, commence con-

3

struction, draft operational plan, finalize operational plan,
implement operational plan, draft monitoring plan, finalize
monitoring plan, implement monitoring plan, complete construc-
tion, demonstrate compliance (no discharge). EPA shall review
and approve the compliance schedule or disapprove the schedule
and make any necessary adjustments within thirty (30) days after
receipt of Guam DPW's submittal. Upon approval by EPA, the com-
pliance schedule shall be incorporated into and become an en-
forceable part of this Order.

2.   The Guam DPW shall submit a cover system design plan, in ac-
cordance with the approved compliance schedule, for the Ordot
Landfill that incorporates a multilayer design comprised of a
vegetation/soil top layer, drainage middle layer, a low per-
meability compacted clay lower layer and a gas vent layer (if
sufficient gas quantities exist). The cover system design shall
thoroughly address the covering (capping) of the inactive portion
of the landfill, including covering and stablizing of the
landfill exposed toe area facing toward and adjacent to the Lon-
fit River. The design should also include a detailed topographic
drawing(s) that clearly defines the boundaries of the proposed
inactive area to be covered. EPA shall review and approve the
design plan or disapprove the plan and make any necessary adjust-
ments within forty-five (45) days after receipt of Guam DPW's
submittal.

4

3. Based on the cover system design plan, Guam DPW shall develop, submit and implement an engineered operational plan, in accordance with the approved compliance schedule, that addresses the remaining active areas of the Ordot Landfill. The plan shall establish, for the remaining anticipated lifespan of the landfill, an operational strategy to optimize and structure the landfill operation. The plan shall also include implementation of the Guam's Solid Waste Disposal Rules and Regulations, General Operating Requirements, i.e., cell construction, required slopes, daily cover, etc., for the landfill to be implemented prior to and during the cover system construction and eventual landfill closure. A plan drawing shall also be provided describing the engineered plan strategy of the landfill. EPA shall review and approve the operational plan or disapprove the plan and make any necessary adjustments within thirty (30) days after receipt of Guam DPW's submittal.

4. Based on the cover system design plan, Guam DPW shall submit a design plan for a perimeter diversion system that diverts surface water(s) around the landfill. The plan shall include any diversion structures in addition to the existing diversion swales as necessary. The design plan shall also include sufficient information (photos, maps, drawings, design calculations, etc.) to demonstrate and evaluate that the diversion system adequately addresses all possible surface flows on to the landfill area. EPA

5

shall review and approve the perimeter diversion system or disap-
prove the system and make any necessary adjustments within thirty
(30) days after receipt of Guam DPW's submittal.

5.    The Guam DPW shall develop and submit a monitoring plan in
accordance with the approved compliance schedule, to adequately
determine the effectiveness of the Ordot Landfill cover system
design in eliminating the discharge of leachate to waters of the
United States.  The monitoring plan shall be implemented im-
mediately after the cover system has been completed for the ex-
isting inactive area of the Ordot Landfill.  EPA shall review and
approve the monitoring plan or disappove the plan and make any
necessary adjustments within forty-five (45) days after receipt
of Guam DPW's submittal.  Upon approval by EPA the monitoring
plan shall be incorporated into and become an enforceable re-
quirement of the Order.

The monitoring plan shall include, but not be limited to,
the following:

    -- A map of the Ordot Landfill area that identifies each
       potential discharge point, the drainage boundaries around
       each discharge point, and path of discharge to the
       Lonfit River emanating directly from the landfill or
       immediate area.
    -- The number and location of the monitoring stations.

The Guam DPW monitoring plan shall include at least the fol-
lowing chemical and physical analyses for any discharge point in-
dentified in the monitoring plan for the following constituents.

6

Analytical testing methods for these parameters shall be in ac-cordance with the most recent editions of <u>Standard Methods for the Examination of Water and Wastewater</u> (APHA, AWWA, WPCF) and <u>Methods for Chemical Analysis of Water and Wastes</u> (USEPA).

-- Biochemical oxygen demand
-- Suspended Solids
-- Chemical oxygen demand
-- Total dissolved solids
-- Copper
-- Zinc
-- Cadmium
-- Lead
-- Iron
-- Manganese
-- Nitrate-Nitrogen
-- Orthophosphate
-- pH

Guam DPW shall submit a report on the results of analyses and the effectiveness of the cover system for the landfill.

6. For each activity required by this Order or specified in a plan required by this Order, the Guam DPW shall submit a written report on compliance or noncompliance with each compliance date. The reports shall be mailed within ten days after each required activity. If the required activity is a status report, no addi-tional report is necessary.

7. If noncompliance is reported, notification shall include the following information:

a. A description of the nature and dates of violations;

b. A description of any actions taken or proposed by the Guam DPW to comply with the requirements;

c. A description of any factors which tend to explain or

7

mitigate the noncompliance;

d.  The date by which the Guam DPW will perform the required
    activity.

8.  All reports submitted pursuant to this Order shall be signed
by a principal executive officer of the Guam DPW and shall in-
clude the following statement:

> I certify under penalty of law that this document and
> all attachments are prepared under my direction or su-
> pervision in accordance with a system designed to assure
> that qualified personnel properly gather and evaluate
> the information submitted.  Based on my inquiry of the
> person or persons who manage the system, or those per-
> sons directly responsible for gathering the information,
> I certify that the information submitted is, to the best
> of my knowledge and belief, true, accurate, and com-
> plete.  I am aware that there are significant penalties
> for submitting false information, including the pos-
> sibility of fine and imprisonment for knowing viola-
> tions.

9.  All submissions required by this Order shall be mailed
to the following:

> U. S. Environmental Protection Agency
> 1235 Mission Street
> San Francisco, California  94103
> Attn:  Mike Lee (E-4)

> and

> Fred M. Castro, Administrator
> Guam Environmental Protection Agency
> IT&E Harmon Plaza, Complex Unit D-107
> 130 Rojas Street
> Harmon, Guam  96911

8

10. This Order is not and shall not be interpreted to be an NPDES permit under Section 402 of the Act, 33 U.S.C. Section 1342, nor shall it in any way relieve the Guam DPW from obligations imposed by the Act or any other state or federal law.

11. Issuance of this Administrative Order shall not be deemed an election by EPA to forgo a civil or criminal action to seek penalties, fines or other appropriate relief under the Act.

12. This Order shall become effective upon the date of receipt by the Guam DPW.

13. This Order shall expire ninety (90) days after receipt of notification from EPA that Guam DPW has satisfied all re-quirements of this Order and has demonstrated compliance through the elimination of the discharge of leachate from the Ordot Landfill.


Dated: July 19, 1990

Harry Seraydarian
Director
Water Management Division

9

# TABLE 1

### GUAM ENVIRONMENTAL PROTECTION AGENCY
### ORDOT LANDFILL INSPECTION DATES
### (JULY 11, 1985 THROUGH JUNE 29, 1990)

The following inspection dates reflect the dates that Guam Environmental Protection Agency inspectors observed leachate discharging from the Ordot Landfill to the Lonfit River.

| Inspection Date | Inspection Dates |
|---|---|
| June 29, 1990 | April 20, 1988 |
| May 29, 1990 | April 3, 1988 |
| April 27, 1990 | March 11, 1988 |
| March 29, 1990 | February 16, 1988 |
| February 22, 1990 | January 29, 1988 |
| January 23, 1990 | January 5, 1988 |
| December 28, 1989 | December 10, 1987 |
| November 27, 1989 | November 17, 1987 |
| October 31, 1989 | October 5, 1987 |
| September 28, 1989 | September 21, 1987 |
| August 25, 1989 | September 4, 1987 |
| July 28, 1989 | August 3, 1987 |
| June 30, 1989 | July 15, 1987 |
| April 29, 1989 | June 19, 1987 |
| March 29, 1989 | June 1, 1987 |
| December 11, 1988 | February 12, 1987 |
| November 16, 1988 | January 7, 1987 |
| October 12, 1988 | March 6, 1986 |
| September 15, 1988 | February 18, 1986 |
| September 3, 1988 | February 13, 1986 |
| August 7, 1988 | December 31, 1985 |
| July 18, 1988 | December 20, 1985 |
| June 18, 1988 | November 12, 1985 |
| June 4, 1988 | October 28, 1985 |
| May 21, 1988 | September 30, 1985 |
| | July 11, 1985 |

1

# ATTACHMENT 8



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION IX
75 Hawthorne Street
San Francisco, CA 94105

APR 1 0 1997

Gil Shinohara
Director
Department of Public Works
Government of Guam
P.O. Box 2950
Agana, Guam 96910

Re: USEPA Administrative Order, Ordot Landfill, Guam

Dear Mr. Shinohara:

This letter is to notify the Guam Department of Public Works (DPW) of our administrative action to amend our Clean Water Act (CWA) Administrative Order (Order), Docket No. IX-FY90-28, issued to Guam DPW on July 19, 1990 and amended on February 26, 1991. The purpose of this administrative action is to address Guam DPW's noncompliance with the Order's compliance schedule for the design and construction of a cover system to eliminate the discharge of untreated leachate from the Ordot landfill to the Lonfit River, a water of the United States.

The Order's compliance schedule identified completion dates for various required tasks for the design, construction and demonstration of compliance. The Order's compliance schedule required demonstration of compliance by August 15, 1992. Although Guam DPW has revised and/or completed various design and feasibility studies in an effort to comply with requirements of the Order, conditions at the Ordot Landfill basically remain unchanged. In addition, efforts by Guam EPA, which included attempts to meet on a weekly basis with Guam DPW to resolve those issues identified in the Order, have been unsuccessful. As a result, Guam DPW remains in noncompliance with the Order's established compliance schedule and requirements. No final corrective actions have been accomplished to eliminate the discharge of untreated leachate into the Lonfit River since establishment of the compliance schedule in 1991. The most recent inspection by the Guam Environmental Protection Agency (March, 1997) confirmed that untreated leachate continues to discharge into the Lonfit River.

We have been exceedingly understanding in our enforcement actions and decisions toward Guam DPW with regard to resolving problems associated with the Ordot Landfill. This is including the fact that we realize recent federal Solid Waste Disposal regulations (40 CFR Part 258) have impacted Guam DPW's efforts to meet our Order's requirements. However, our latest attempts involving working around these regulations have not progressed satisfactorily. Our recent efforts to work out a MOU between the Government of Guam and our Agency to expedite the closure of Ordot Landfill and siting of a new landfill for the Territory of Guam over the last two years have basically resulted in minimal movement toward addressing the solid waste crisis for the Territory of Guam.

Therefore, we seek to address this matter by amending the Order by requiring Guam DPW to submit, within ninety (90) days of the date of this letter, a firm compliance schedule for the design and construction of a cover system for the Ordot Landfill that will ensure the elimination of discharges of untreated leachate to waters of the United States. The compliance schedule shall include, but not be limited to, the following: Closure Plan for Ordot Landfill; Draft and final closure designs; Draft and final post-closure monitoring plan; Commence closure; Complete closure; and Implementation of post-closure monitoring plan. Upon approval by EPA, the compliance schedule shall be incorporated into and made a part of the Order, Docket No. IX-FY90-28.

Failure of Guam DPW to comply with the amended Order will subject Guam DPW to further enforcement actions, i.e., referral of the matter to the U.S. Department of Justice. Such a referral may result in, but not be limited to:

- Assessment of civil penalties of up to $25,000 per day for past and present violations of the Clean Water Act and Administrative Order [Section 309(d), Clean Water Act, 33 U.S.C. Section 1319(d)];

- A permanent or temporary injunction, i.e., restrictions or requirements on types/amounts of waste disposed of at the landfill until such time as the corrective actions at the landfill have been completed and leachate discharges have ceased [Section 309(b), Clean Water Act, 33 U.S.C. Section 1319(b)];

- Fines for negligent violations of not less than $2,500 nor more than $25,000 per day of violation, or imprisonment for not more than one year, or both, and for willful violations fines of not less than $5,000 nor more than $50,000 per day of violation, or imprisonment for not more than three years, or both [Section 309(c), Clean Water Act, 33 U.S.C. Section 1139(c)]; and

- A court ordered compliance schedule [Section 309(b), Clean Water Act, 33 U.S.C. Section 1319(b)].

If you have any questions regarding this matter, please contact Mike Lee at (415) 744-1484 or Lily Lee at (415) 744-1592, in the Pacific Insular Area Program at our office.

Sincerely,

Alexis Strauss
Director (Acting)
Water Division

cc: Honorable Carl T.C. Gutierrez, Governor, Guam
Jesus T. Salas, Admin., GEPA
Tony. Quinata, GDPW

# ATTACHMENT
# 9



BEFORE THE GUAM PUBLIC UTILITIES COMMISSION

FOCUSED MANAGEMENT AUDIT
OF DEPARTMENT OF PUBLIC
WORKS' SOLID WASTE MANAGEMENT                    DOCKET 06-2
DIVISION BILLING AND COLLECTION
SYSTEM

## ORDER

In response to its administrative law judge's [ALJ] April 20, 2006 memorandum
[Attachment A], the Guam Public Utilities Commission [PUC] at its April 20, 2006
meeting directed ALJ to oversee a focused management audit by Georgetown
Consulting Group [GCG] of the Department of Public Works' [DPW] solid waste
management's [SWM] billing and collection practices and the Department of
Administration's restricted account management. On August 18, 2006, GCG
filed its audit report [Attachment B] with PUC. On September 21, 2006 GCG
presented its report to PUC at a workshop.

After careful review of the GCG audit report and the record herein, including
comments from DPW, for good cause shown and on motion duly made,
seconded and carried by the undersigned commissioners, the Guam Public
Utilities Commission **HEREBY FINDS AND ORDERS THAT:**

1. The audit report presents compelling and convincing evidence that DPW
   is not prepared to assume the financial responsibilities, which would be
   imposed upon it by the proposed $90 million dollar revenue bonds
   financing, which is necessary to fund the Government of Guam's
   compliance with the Federal Consent Decree[1].

2. DPW does not have adequate resources [management, staff, financial, legal,
   engineering and systems] to implement the audit recommendations in a
   timely manner.

3. Accordingly, it is critical that the legislation recommended in the audit
   report be implemented *concurrently* with any legislative authorization for
   the Government to proceed with the revenue bond financing - *paramount
   of which is the recommendation that SWM be reconstituted as a public
   corporation under the governance of the Consolidated Commission on Utilities.*
   PUC respectfully cautions the Government of Guam, in furtherance of its
   May 2, 2006 letter to Vice Speaker Brown [Attachment C] that without

---

[1] Consent Decree dated February 11, 2004 in *USA v. Government of Guam*, District Court Civil Case
02-22.

1

these legislative reforms, PUC has material concern over DPW's ability to collect, deposit, account for and properly expend the *just and reasonable* rate revenues awarded by PUC in a manner which will enable DPW and the Government of Guam to comply with its proposed bond covenants.

4. PUC stands ready, upon request, to propose specific legislation to implement the audit recommendations.

5. In the interim, PUC is committed to do its part in implementing those audit recommendations, which are within its power to address. Accordingly, the following regulatory activities shall be commenced under ALJ's oversight:

    a. In anticipation of the revenue requirements, which would be imposed on DPW by the revenue bond financing, DPW has requested GCG's assistance in preparing a petition for FY07 rate relief for PUC consideration during the January 2007 regulatory session. ALJ is authorized and directed to oversee the preparation of this petition by GCG in collaboration with DPW. As part of this rate proceeding, GCG shall: i] propose a residential lifeline rate, a variable residential rate and a prepaid decal system for residential service; ii] propose necessary amendments to SWM's service rules; and iii] examine and make recommendations regarding SWM's $10 million dollar accounts receivable.

    b. PUC is encouraged by DPW's acceleration of the timeline for outsourcing the collection of residential waste for the entire island not later than July 2007. On or before October 15, 2006, DPW shall inform PUC of the additional resources, which it will require to successfully meet this deadline. DPW's progress under the timeline will be examined during the January 2007 rate proceeding.

6. PUC stands ready to issue necessary regulatory orders, which will be required to secure revenue bond financing; subject to its strong reservation that without the concurrent legislation recommended above, it is questionable whether DPW and the Government of Guam will be able to meet the requirements of the bond covenants.

7. Except as provided herein, the deadlines for action recommended in the audit report will be suspended pending further consideration during the January 2007 regulatory session.

2

8. A copy of this Order shall be transmitted to the Speaker of the 28th Guam Legislature, to the Governor of Guam, to the Department of Public Works and to the Consolidated Commission on Utilities.

Dated this 28th day of September 2006.

_____
Terrence M. Brooks

_____
Edward C. Crisostomo

_____
Rowena E. Perez

_____
Joseph M. McDonald

_____
Filomena M. Cantoria

_____
Jeffrey C. Johnson

3

# ATTACHMENT 10



EXECUTIVE ORDER NO. 2006- _12_

RELATIVE TO ESTABLISHING THE ORDOT CONSENT DECREE
COMPLIANCE TEAM WITHIN THE OFFICE OF THE GOVERNOR
AND TO ESTABLISH PRIORITY PROCUREMENT AND INTRA-
AGENCY COOPERATION FOR THE ORDOT CONSENT DECREE

WHEREAS, the Organic Act of Guam provides that *I Maga'låhen Guåhan*, Governor of
Guam, is tasked with the responsibility of overseeing the health and safety of the people of
Guam; and

WHEREAS, the old Ordot dump poses a continuing threat to public and environmental
health, and must be closed pursuant to a Consent Decree entered into by the Government of
Guam, the United States Environmental Protection Agency, and the United States Department of
Justice (U.S. District Court Territory of Guam Civil Case No. 02-00022); and

WHEREAS, this order reaffirms Executive Order 2004-02 and the Government of
Guam's commitment to the Consent Decree, which requires the closure and post-closure of the
Ordot Dump as well as the construction and operation of a new, sanitary municipal solid waste
landfill; and

WHEREAS, the process of closing the old dump and opening a new landfill requires
resources beyond the immediate capabilities of the Department of Public Works, and will require
substantial and continuing involvement by a number of other Government of Guam agencies;
and

WHEREAS, further delays in the closure of the Ordot dump and the opening of a new
landfill will violate Consent Decree timelines, and may result in substantial penalties imposed on
the Government of Guam.

NOW, THEREFORE, I, FELIX P. CAMACHO, *I Maga' Låhen Guåhan* , Governor
of Guam, by virtue of the authority vested in me by the Organic Act of Guam, as amended, do
order:

1. **Ordot Consent Decree Compliance Team.**  The Ordot Consent Decree
Compliance Team is hereby established and shall consist of at least one representative
from the following agencies, to be designated by the Governor:

    a. Department of Public Works
    b. Guam Environmental Protection Agency
    c. Bureau of Budget and Management Research
    d. Department of Administration

The Governor also shall request representatives from the Guam Economic Development
and Commerce Authority and the Office of the Attorney General.

The compliance team shall be chaired by the Governor's designee and the representative
from the Office of the Attorney General.



The Governor may appoint additional representatives to the compliance team at his discretion. The purpose of the team shall be to:

1. Create a plan to meet the remaining timelines and requirements established by the Consent Decree.
2. Identify actions that will require legislative changes or approval and prepare legislative proposals for the Governor's consideration.
3. Implement the plan.

The Governor or his designee shall appoint members of the compliance team within one day of this signing of this order.

2. **Authority.**   All government departments, agencies, instrumentalities and other public entities shall coordinate with the Compliance Team to comply with the mandates of the Consent Decree. All Government of Guam departments and agencies shall provide the necessary support and assistance to the compliance team for the purposes of complying with the mandates of the Consent Decree.

All existing contracts and accounts associated with the Consent Decree shall be supervised by the Compliance Team. Procurement, contractual and certifying authority shall be delegated by the Department of Public Works director to a member of the Compliance Team.

3. **Disputes.**   Any disputes arising from this Executive Order shall be resolved by the Governor or his designee. The Governor or designee's determination of the dispute shall be final.   The Governor's designee shall have authority to recommend appropriate disciplinary action against anyone who fails to make best efforts to comply with this Executive Order.

SIGNED AND PROMULGATED at Hagåtña, Guam this ____ day of May, 2006.

FELIX P. CAMACHO
*I Maga' låhen Guåhan*
Governor of Guam

# ATTACHMENT 11



RECEIVED
MAY 17 2006
Guam Environmental
Protection Agency

EXECUTIVE ORDER NO. 2006- 13

RELATIVE TO DECLARING A STATE OF EMERGENCY TO COMPLY
WITH THE CONSENT DECREE ISSUED IN DISTRICT COURT OF
GUAM CIVIL CASE NO. 02-00022, *UNITED STATES OF AMERICA V.
GOVERNMENT OF GUAM*

**WHEREAS**, the Organic Act of Guam provides that *I Maga'låhen Guåhan*, Governor of
Guam, is tasked with the responsibility of overseeing the health and safety of the people of
Guam; and

**WHEREAS**, the Ordot dump poses a continuing threat to public and environmental
health, and must be closed pursuant to a Consent Decree entered into by the Government of
Guam, the United States Environmental Protection Agency, and the United States Department of
Justice (U.S. District Court Territory of Guam Civil Case No. 02-00022); and

**WHEREAS**, the Government of Guam remains committed to the requirements of the
Consent Decree, which requires the design, construction, and operation of a new, sanitary
municipal solid waste landfill at Layon, Inarajan, as well as the Government's best efforts to
finance the closure and post-closure care of the Ordot Dump; and

**WHEREAS**, the Administration is committed to providing the resources available and
necessary to ensure that the Government of Guam completes the mandates of: *Closure of Ordot
Dump and Cessation of Discharge of Pollutants from Ordot Dump into Waters of the United
States; Construction and Operation of New Municipal Solid Waste Landfill ("MSWLF");
Financing Closure of Ordot Dump and Construction and Operation of New Municipal Solid
Waste Landfill; and the Supplemental Environment Project*, imposed by the Consent Decree in
*United States v. Government of Guam* and prevent a threat to public health, the environment and
the potential of significant penalty fines imposed on the Government of Guam; and

**NOW, THEREFORE, I, FELIX P. CAMACHO**, *I Maga' Låhen Guåhan* , Governor
of Guam, by virtue of the authority vested in me by the Organic Act of Guam, as amended, do
order:

1.      **Declaration of State of Emergency.** A state of emergency is hereby declared in
order to assist the Government of Guam to comply with the mandates of the Consent Decree
issued in the *United States of America v. Government of Guam*, and prevent a threat to public
health, the environment and the continued imposition of significant penalty fines.

2.      **Emergency Procurement and Emergency Expenses.** Pursuant to 5
G.C.A.§5215, authorizing emergency procurement upon executive order, and pursuant to 5
G.C.A. §22402, authorizing the Governor to utilize no more than Two Hundred Fifty
Thousand Dollars ($250,000.00) from the General Fund appropriations for the Executive
Branch for expenses resulting from civil defense, public safety or health care emergencies,
the Director of Bureau of Budget and Management Research is authorized to transfer to the
Department of Public Works, Consent Decree Account an amount not to exceed Two
Hundred Fifty Dollars ($250,000.00) from outstanding appropriations within the General
Fund for immediate use by the Ordot Consent Decree Compliance Team for costs to comply
with the mandates of the Consent Decree issued in the *United States v. Government of Guam*.



Priority projects under this declaration include, but are not limited to:

    a.    Ordot Wetland Mitigation Plan, which shall undergo an expedited government review;

    b.    Compliance requirements for the Ordot Dump Continual Use Permit;

    c.    Updates of the Layon appraisals for land acquisition; and

    d.    Technical advisor for Consent Decree implementation.

    3.    **Overtime.** The applicability of ineligibility for the accrual of overtime by exempt employees is hereby waived for government of Guam employees working on Consent Decree matters for the duration of this 30-day emergency, provided that the co-chairs of the Ordot Consent Decree Compliance Team pre-approve such overtime prior to actual accrual. Overtime expenses shall be paid by the Consent Decree accounts with appropriate documentation and approval by the co-chairs.

    4.    **Documentation of Expenses.** The Ordot Consent Decree Compliance Team is hereby instructed to keep appropriate documentation on all emergency expenses for inspection by the Executive and Legislative Branches and by the Public Auditor of Guam.

    5.    **Purpose of Emergency Procurement and Expenditure of Funds.** Emergency procurement may be used for procurement of any services relative to complying with the mandates of the Consent Decree issued in the United States of America v. Government of Guam and continuing for Thirty Days(30) days after the date of this Executive Order as provided in § 5215 of Title 5, Guam Code Annotated.

    **SIGNED AND PROMULGATED** at Hagåtña, Guam this _17_ day of May, 2006.

                                **FELIX P. CAMACHO**
                                *I Maga' Låhen Guåhan*
                                Governor of Guam

# ATTACHMENT 12

BEFORE THE GUAM PUBLIC UTILITIES COMMISSON
Focused Audit Report and Recommendations
August 18, 2006

**EXECUTIVE SUMMARY.**

Under the Federal Consent Decree[1], defendant Government of Guam (GovGuam) is required to: a) close the existing landfill; b) open and operate a new landfill; and c) undertake other solid waste remedial actions. GovGuam is currently in material violation of Consent Decree deadlines.

GovGuam intends to finance the initial sum of approximately $100 million dollars as part of the cost of Consent Decree compliance with revenue bonds. These bonds would be repaid, in substantial part, by rate revenue from Department of Public Works (DPW) Solid Waste Management (SWM) customers.

GovGuam financial advisors forecast that existing SWM rates will need to be increased by upto 400% in the next 36 months to produce the revenues necessary to support the revenue bonds. These substantial increases assume that SWM operations in the future attain a level of efficiency that is the norm in the industry and which currently does not exist. In the absence of making these efficiency and operational improvements the rates required to support the anticipated bonds would be even higher than those currently projected and service levels would continue to be unacceptable.

This audit report has been prepared at the Guam Public Utilities Commission's [PUC] direction[2] to examine whether DPW is capable of efficiently billing and collecting the increased rate revenue, which will be required to fund GovGuam's obligations under the proposed revenue bonds.

This audit report finds that:

a. DPW's current billing and collection system is unable to competently handle even current rate revenue levels much less the increased burden necessary to support the revenue bonds.

b. Substantial remedial action, including operational changes, legislation, regulatory action and rulemaking must immediately occur to enable DPW to bill and collect the revenue necessary to fund revenue bond requirements.

c. If this remedial action does not occur, DPW will not be able to bill and collect the rate revenues necessary to fund revenue bond obligations and this burden would fall, in part, on the General Fund. Regulatory principles could obstruct the PUC: i] from awarding rate increases to compensate for DPW billing and collection mismanagement; and ii] from increasing SWM residential customer rates unless the quality of residential service is dramatically improved.

This audit report will now examine each of the above findings and will propose a broad outline of immediate remedial action, which will be necessary to empower DPW to bill and collect the rate revenues necessary to meet the requirements of the proposed revenue bonds. A summary of the recommendations contained in our report together with the recommended implementation time lines are as follows:

---

[1] USA v. Government of Guam, Guam District Court Civil Case 02-22, Consent Decree dated February 11, 2004.
[2] PUC Resolution dated April 20, 2006.

## Summary – Audit Recommendations

| Recommendation | Action Date |
|---|---|
| **Legislation:** | |
| Establish SWM as public corporation under CCU governance. | ASAP |
| Consolidate administration of SWM finances. | ASAP |
| Privatize third residential collection district. | ASAP |
| Convert commercial tipping fee to hauler business expense or bring haulers under PUC regulation and Public Auditor audit authority. | ASAP |
| **Procurements:** [Action date is for PUC approval of procurement documents.] | |
| Outsource SWM billing and collection system with conversion to prepaid decal system | 1/07 |
| Privatize two of three residential collection districts. [Privatize 3 rd district if authorized.] | 1/07 |
| Retain accounting consultant to address accounts receivable, establish accounting system and issuance of reliable financial reports | 11/06 |
| **Regulatory Action:** [Preparation of documents for regulatory consideration would be collaborative effort between GCG and Compliance Team]. | |
| Approve recommended procurement documentation. | 1/07 |
| FY07 rate proceeding, including establishment of residential rate and variable residential rate | 1/07 |
| Review and approve revised residential service rules. | 1/07 |
| Establish customer hauler service rules [in event haulers are placed under PUC regulatory authority]. | 1/07 |
| Public Auditor financial audit of commercial haulers. | 4/07 |
| Phase II GCG audit of SWM $10 million accounts receivable | 1/07 |
| **Operational Action:** | |
| Repair landfill scales. | 11/06 |
| Institute rules for transfer site revenues. | 11/06 |
| Establish three residential collection districts. | 11/06 |
| Enforcement of revised residential service rules. | 2/07 |
| GEPA enforcement of illegal dumping laws. | ASAP |

# TABLE OF CONTENTS

I.     SUMMARY OF CONCLUSIONS AND RECOMMENDATIONS ................................... 1

II.    FINDINGS AND RECOMMENDATIONS ....................................................................... 10

        1.    Residential Collection and Revenue Problems ..................................................... 10

        2.    Operational and Administrative Function Problems. ....................................... 14

        3.    Commercial Collection and Revenue Problems. .............................................. 16

        4.    Billing and Collection Problems ........................................................................ 17

III.    Attachment A: ALJ Memo and PUC Order Docket 05-09

        Attachment B:  Press Reports Regarding Service

        Attachment C:  Executive Order 2006-12

        Attachment D:  Legal Memorandum on Just and Reasonable Rates

        Attachment E:  Current SWM Service Rules

        Attachment F:  Inventory and Discussion of Proposed Legislative Changes

# I. SUMMARY OF CONCLUSIONS AND RECOMMENDATIONS

1. It is essential that whatever entity is created or designated to handle SWM's responsibilities discharge SWM operations in a prudent and efficient manner including billing and collecting for its services in a businesslike manner. The financial hurdles facing SWM are daunting. Recent projections for future residential fees and tipping fees show increases of up to 400% in a period of 3 years as follows:[3]

|                          | FY 2006  | FY2009   |
|--------------------------|----------|----------|
| Residential Fee (Month)  | $8.00    | $22.22   |
| Tipping Fee (Ton)        | $20.00   | $95.00   |

These projections assume that there will exist accurate billing and a collection rate of 95% for the residential fee. As will be detailed in this report, current practices for billing and collection are in disarray and must be corrected. Time is of the essence and the solutions must be put in place immediately. Failure to do so could threaten the proposed bond financing that is required to fund critical compliance projects.

Concurrent with the improvement of billing and collection practices, there also needs to be significant improvements in operational practices and the poor current level of services in order to collect in the face of the rate increases. Current collection rates for residential service are extremely low. GCG believes a significant cause of the low collection rate[4] for residential SWM customers is resistance to paying amounts owed due to poor and sporadic service.

To solve these important issues it is our primary recommendation that SWM be transferred to a public corporation under the oversight of the Consolidated Commission on Utilities ("CCU"). With this recommendation all functions will be consolidated in one corporation, there will be an experienced Chief Financial Officer,

---

[3] From the most recent draft estimate contained in the draft Engineer's Report, which is being prepared by HDR Inc. to support the proposed revenue bonds.
[4] See paragraphs 5 and 6 below

experience with billing and collection systems and potential assistance available from the sister utilities – GPA and GWA plus experience in dealing with the Guam Environmental Protection Agency.

2. The PUC has indicated that it has a dual role in regulating DPW's rates: a) the obligation to provide adequate revenues to enable DPW to meet its financial obligations; and b) the obligation to assure that DPW's customers pay *just and reasonable* rates for reliable service. P.L. 28-56 directs the PUC to audit SWM's existing operations and by implication to issue such orders as may be necessary to require SWM to provide competent service at a reasonable cost.

3. GCG's audit review and recent press reports[5] establish that the current quality of residential service is unacceptable. Given the principle of just and reasonable rates for reliable service, an unacceptable level of service invites the possibility of disallowed or deferred rate increases by the PUC. Given that significantly higher rates will be required[6] to support the anticipated bond offering, such a potential disallowance or deferral would be a major problem to providing the required financial resources to provide for adequate debt service. The resolution of the unacceptable level of service problem must be given the highest priority.

4. DPW has failed to comply with the mandate of P.L. 26-99 that DPW establish and privatize 2 of 3 residential collection districts by October 2002. As of the date of this audit report, DPW has not even defined the three collection districts. DPW has recently reported that privatization would occur by the end of 2007. This timeframe

---

[5] See Attachment B
[6] Conclusion reached in the rate proceeding concluded on October 27, 2005, Docket 05-09.

2

1    is, in GCG's judgment, unacceptable. DPW's chronic failure to regularly collect

2    residential waste raises public health concerns and will frustrate efforts to increase

3    revenues from residential service. Every effort must be made to have this effort fast

4    tracked. This is best approached by a combined collaborative effort between the

5    PUC, DPW and the Consent Decree Compliance Team ("Compliance Team").[7] All

6    options, including accelerating the procurement process by requesting an emergency

7    declaration from the Governor, should be considered. It is essential in GCG's

8    opinion that this privatization be concluded as early in 2007 as is reasonably possible.

9    We further recommend that all 3 residential districts be subject to privatization.

10   Privatization of residential collection would have the potential to quickly resolve the

11   unacceptable level of service issue. The failure to resolve this problem could

12   potentially lead to:

13          a.  Continued poor collection rates from residential customers as a result of

14              poor service and a backlash to substantial higher rates;

15          b.  The PUC disallowing or deferring rate increases as a result of the PUC

16              action based on the principle of *just and reasonable* rates. Simply stated,

17              this is the *quid pro quo* of decent service for a fair rate.[8]

18

19   5.  DPW collection rates from its residential customers are abysmal. Data collected

20   since the last rate proceeding showed that recent collection rates for residential

21   customers had averaged approximately 37%. DPW management stated during

22   GCG's audit that the collection rate has been improved from the data available in the

23   rate proceeding. The data we received does not support this contention. To fix this

24   problem the billing and collection systems together with the customer service

---

[7] Under Executive Order 2006-12 [1] the Consent Decree Compliance Team has the responsibility to propose solutions and proposed legislation. See Attachment C.
[8] See Attachment D legal memorandum.

3

1   systems need to be completely overhauled. GCG recommends that CCU be

2   authorized and directed to oversee SMW billing and collection functions if SWM is

3   transferred into a public corporation and that the billing and collection function be

4   outsourced regardless of whether SWM is transferred into a public corporation or

5   becomes another entity.

6

7   6. During our audit SWM was in the process of evaluating a prepaid "sticker"

8   system for residential pickup. The implementation of this system was deferred or

9   abandoned. We recommend that such a system be developed and implemented after

10  appropriate input from stakeholders and approval from the PUC. The benefits of

11  such a system are significant in the current environment. It eliminates, on a

12  prospective basis, concerns about accounts receivable and about back billing

13  problems. It accomplishes our recommendation of prepayment for services to assist

14  with a severe cash flow problem. It eliminates concerns about establishing a reliable

15  customer list and assures that the drivers collect only customer trash. We

16  recommend that this system be implemented by the end of 2006, by which time we

17  have recommended that privatization of residential collection be implemented or in

18  the context of the next rate proceeding anticipated to be heard in January 2007.

19

20  7. Data from DOA regarding SWM collections from the largest commercial

21  customers[9] shows that *none or very little* of the October 25, 2005 interim rate

22  increase (effective November 1, 2005) was received by DPW through March 31,

23  2006. The explanation offered for this situation is that the commercial haulers have

24  not received payment from their commercial customers and only make payment after

25  they receive payment. This situation cannot be permitted to continue if there is to be

---

[9] See Table 1 in the report.

4

1      any confidence in the financial integrity of SWM's billing and collection system. To

2      solve these SWM billing and collection problems:

3      a.      GCG endorses the PUC's April 20, 2006 finding that the best solution is

4      to transform DPW into a public corporation under the CCU's governance

5      under whose guidance normal business practices would be implemented.

6      The reasons for this recommendation are clear. Such a transformation

7      would unify all financial matters under a single CFO at the CCU,

8      establish a strong governing body and make support, experience and

9      resources available from GPA and GWA. In GCG's opinion, it is

10      unlikely that any other viable alternative could be implemented in a

11      timely fashion in these critical circumstances. Implementation of this

12      recommendation would *require immediate interaction* with the

13      Legislature and the Governor. If this solution is not adopted by policy

14      makers, then the less desirable second solution would be to implement

15      other remedial actions contained in our report.

16      b.      In addition to the change of structure recommended, it is essential the

17      current practice of dividing the revenue cycle functions between DOA,

18      the Treasurer of Guam and DPW for certain aspects of cash

19      management, accounting, customer interface and customer service cease.

20      All revenue cycle operations should be consolidated under a single

21      entity. The current practice leads to very poor financial and cash control

22      and customer service. Putting DPW's SWM division under the CCU

23      would solve this problem.. In the absence of the CCU solution, we

24      recommend that PUC require DPW under PUC oversight to evaluate all

25      options to update its billing and collection and customer service systems,

26      including contracting with the CCU for the implementation of an

5

1    improved system, or outsourcing this task to a private entity and then

2    order the option it determines is the best. We recommend that evaluation

3    of the best option begin immediately, coupled with a requirement that an

4    improved billing and collection system be implemented no later than

5    April 1, 2007

6    c.    The current problems in the billing and collection practices as well as

7          inefficient accounting procedures jeopardize the proposed bond issue.

8          The solution ultimately adopted to address these deficiencies should

9          include an understandable and reasonable list of milestones and a

10         timeline for correcting these deficiencies in accounting, billing and

11         collection In order to moderate the expected large rate increases that will

12         be required to fund the proposed bond issue[10], it is essential that PUC

13         establish an overall collection rate standard of at least 90% on all

14         accounts for the fiscal year 2007. The previously mentioned Engineer's

15         Report projects that there will be substantial rate increases in each of the

16         next three years. In evaluating the rate increases we recommend that the

17         PUC set appropriate collection standards that will be taken into account

18         in setting the revenue requirement.[11] The absence of such a standard

19         would potentially require higher rates to offset any cash shortfalls (if

20         permitted by the PUC). To achieve this goal of a 90% overall collection

21         rate for FY 2007, GCG recommends that as many of SWM accounting

22         billing and collection functions be privatized, even if SWM is put under

23         CCU's governance.  Timeframes are tight and CCU resources, while

24         available, are already burdened with complying with GWA's Stipulated

---

[10] PUC Audit Report ¶1.a
[11] The Engineer's Report assumes that the residential collection rate will rise to 95% by FY 2008.

6

1   Order[12] while GPA personnel are dealing with the expanded

2   infrastructure requirements facing Guam as a result of expected increase

3   in the number of military personnel over the next three years.

4

5   8.  During the audit, GCG found that the escrow account ordered by the PUC to hold

6   revenues received by DPW from the rate increase authorized by PUC's October 27,

7   2005 Order contained only $9,000 six months after an annual rate increase of

8   approximately $1.3 million dollars was approved.

9       a.   This unacceptable situation is illustrative of the consequences of a

10          dysfunctional, fragmented billing and collection system. We have

11          recommended consolidation of the functions under the CCU and

12          recommend privatization of the function whether or not these functions

13          are placed under the oversight of the CCU;

14      b.   Current legislation requires the commercial haulers serve as collection

15          agents for tipping fees and have no duty to take enforcement action to

16          pursue collection and remit to DPW payments only after tipping fees are

17          collected from their customers. Our audit indicated that there existed

18          business accounts that were approximately 6 months in arrears in

19          collecting and depositing fees. The current situation needs to be

20          corrected immediately. GCG concludes that corrections will require a

21          legislative solution that would:

22          i.    Amend current law to make the tipping fees a cost of business

23               for the commercial haulers, which they should recoup from their

24               customers. Consideration should be given to exempting the

---

[12] Guam Waterworks Authority, like the Government of Guam, is subject to a Federal order, which mandates that its improvement of water and wastewater service to meet Federal standards, at a cost in excess of $200 million dollars.

7

| 1 | | tipping fee portion of the haulers' revenues from the Guam gross |
| 2 | | receipts tax (GRT). This would maintain the status quo. No GRT |
| 3 | | is currently paid on tipping fees, since these are government |
| 4 | | revenue. If implemented, this recommendation would shift the |
| 5 | | risk of nonpayment from the government to the commercial |
| 6 | | haulers, who would in the ordinary course of business terminate |
| 7 | | service to any customer who fails to pay the fee. |
| 8 | ii. | Impose sanctions on haulers who fail to make timely payments |
| 9 | | (consideration should be given to the suspension of a hauler's |
| 10 | | GEPA Solid Waste Collection Permit, cancellation of a hauler's |
| 11 | | business license, and imposition of penalties and interest). |
| 12 | iii. | Given the extraordinarily high level of accounts receivable from |
| 13 | | commercial haulers [see Table 2 below], a large portion of which |
| 14 | | GCG is informed represents tipping fees which have not been |
| 15 | | remitted to the haulers, GCG recommends that proposed |
| 16 | | legislation authorize an immediate audit of all commercial |
| 17 | | haulers' tipping fee collection records. We recommend that the |
| 18 | | Public Auditor be tasked with the audit and make the findings |
| 19 | | available to the PUC. We recommend that legislation empower |
| 20 | | the PUC to take appropriate action to enforce findings that the |
| 21 | | PUC concludes should be implemented. The scope of the audit |
| 22 | | should include: |
| 23 | | • Are commercial haulers billing the tipping fee to their |
| 24 | | customers? |
| 25 | | • Are they collecting it? |

8

1       •    Are they providing services to customers who have paid

2           the commercial hauler's fees but not the tipping fee?

3       •    Are they timely depositing with DOA all monies

4           collected consistent with P.L. 25-93, which prescribes

5           that payments shall be remitted within 20 days into the

6           month following receipt of payment from a customer?

7       •    Are there any underlying reasons for businesses failing

8           to pay the tipping fee or haulers failing to remit the same

9           to DOA?

9

1    II.       **FINDINGS AND RECOMMENDATIONS**

2         **1.**      **Residential Collection and Revenue Problems**

3         Approximately 42% of SWM recorded revenues come from the collection fee[13] of $10

4 per month for weekly pickup of waste from residential customers. Guam residents have three

5 legal choices for the disposal of residential waste, i.e. pay SWM to pickup the waste at curbside,

6 contract the same services from a private hauler or "self-haul" the waste to the Ordot facility or

7 one of the three Transfer Stations operated by SWM. As mentioned before, recent collection

8 information indicates that there is only an approximate 37% collection rate for residential

9 customers. This could mean that only approximately 37% of those DPW regards as customers

10 are paying for their pickup. One method of expanding revenues could come from expanding

11 SWM's customers who pay their bills. It is critical that the collection rate increase to at least

12 90% in FY 2007 if rate increases are to be kept from being even higher than the high levels

13 already projected. SWM residential service is poor and sporadic,[14] causing customers to either

14 not pay their bills or use private contractors rather than SWM.[15] The collection function for two

15 out of three districts was already supposed to have been privatized by law by October 2002 but

16 this has not taken place. This issue is discussed later in this section.

17         GCG has found that many residential customers do not comply with SWM's rules for

18 collections, which are attached to this report.[16] For example, residential customers are required to

19 keep their waste in lightweight waterproof containers with handles (or lifting features). These

20 containers should have a capacity of between 5 and 35 gallons and be placed four feet from the

21 curb. GCG observed that many customers overload their containers, resulting in an overflow of

22 waste onto the ground. GCG also observed waste being placed in plastic bags and cardboard

23 boxes at curbside rather than in the required containers. In all instances that GCG observed,

---

[13] At times this collection fee is incorrectly referred to as a "Tipping" Fee.

[14] See Attachment B for recent articles in the press regarding the poor quality of service and collection.

[15] It is likely that DPW does not have an accurate count of current customers.

[16] See Attachment E

10

1   SWM's drivers picked up the garbage despite obvious violation of SWM rules. It is clear that

2   these violations are causing additional and unnecessary effort by the drivers as well as creating an

3   unsightly and unhealthy situation. GCG recommends that enforcement of the current rules be one

4   of SWM's highest short-term priorities. This would improve sanitation and provide customers

5   with the perception of receiving reasonable service. Implementation should occur as soon as

6   possible but in any event no later than the end of 2006. **[Finding and Recommendation #1]**

7          There is no current restriction on the number of containers placed at curbside by

8   residential customers. As part of the transition to mandated volume-based residential rates[17] this

9   policy needs to be changed. During the course of GCG's audit, it was observed that the number

10  of containers per customer ranged from as few as one to as many as eight! We recommend that

11  SWM establish a maximum number of containers that will be unloaded by the SWM drivers at

12  the interim residential rate (currently $10 per month). Once PUC approval is given, SWM should

13  begin to charge an additional rate for containers in excess of that maximum.

14         It is widely anticipated that a further rate case will be needed to support the anticipated

15  bond issue. We believe that it is realistic to estimate that this case will be heard by the PUC in

16  the January 2007 timeframe. SWM has a very large workload in front of it currently, assisting

17  with the bond process as well as keeping track of the Consent Decree compliance. We therefore

18  recommend that GCG assist SWM in the preparation of the next rate filing and that GCG should

19  also be directed to propose revisions to the service rules to accomplish the legislative mandate for

20  volume-based residential rates.[18]  **[Finding and Recommendation #2]**

21         During our audit we were informed that DPW personnel had developed preliminary plans

22  for the handling of containers in excess of the base. Containers in excess of a base number could

23  be identified by a "one time use" receipt or sticker that would be purchased in advance and

24  attached to the container. SWM drivers would remove and discard the sticker in the course of

---

[17] 10 GCA § 51118 (e)

[18] GCG was advised that SWM will seek additional revenues from the PUC in a filing anticipated in late 2006.

Case 1:02-cv-00022   Document 69-6   Filed 01/31/2007   Page 2 of 18

1   each weekly collection. These "one time use" receipts or stickers would have been available for
2   purchase not only at SWM customer service locations, but also be made widely available for
3   purchase through local vendors and the mail. This concept has been temporarily deferred by
4   SWM. We recommend that in the forthcoming rate proceeding, discussed above, GCG be
5   authorized to consider the concept of stickers. While this concept needs further study there are
6   many attractive features including eliminating, on a prospective basis, concerns about accounts
7   receivable and about back billing problems. It accomplishes prepayment for service and it
8   eliminates concerns about establishing a reliable customer list and assuring that the drivers collect
9   only customer trash. **[Finding and Recommendation #3]**

10  GCG's on-site investigation revealed that SWM does not have accurate lists for the
11  residential customers on each of its 35 collection routes, making it impossible to identify or
12  calculate the overall total number of SWM residential customers. SWM's drivers use their
13  "judgment" as to whether residential waste left at the curbside has been set out for collection by a
14  current SWM customer. GCG observed no instance where a SWM driver failed to collect waste
15  that was set out at curbside. It should, therefore, be a top priority of SWM to prepare a complete
16  and accurate database of residential customers, to update this list on a regular basis and to ensure
17  that the list of SWM residential customers is sorted by route number and distributed to SWM's
18  drivers before they begin their routes each day. The determination as to whether a household is a
19  current SWM customer should not be left to SWM's drivers. Without such a list it is possible
20  that trash would be collected from non-customers or customers that are delinquent in their
21  payments, essentially providing the service free to these households,[19]   **[Finding and**
22  **Recommendation #4]**

23  As previously discussed, SWM needs to update its rules and regulations concerning
24  residential collection services. While an informational hand-out[20] is provided to customers

---

[19] Many of these problems would be eliminated by the "sticker" system discussed above.
[20] See Attachment E

12

1    requesting new or continued service, it is not clear that all other residential customers are aware

2    of these service rules. The current hand-out, with input from SWM drivers, should be expanded

3    to list situations in which SWM will not provide services and widely publicized.    In

4    Recommendation #2 above we recommended that GCG be instructed to prepare a revised

5    collection policy and present the policy to the PUC for review and approval during the anticipated

6    rate filing hearing in January 2007. **[Finding and Recommendation #5]**

7         Within the preparation of the revised service rules referred to above, GCG and SWM

8    should investigate whether the current rules and regulations for residential pick up services (as

9    described in a hand-out to new customers) are consistent with current laws[21] and that no new

10   legislation or amending legislation has been adopted that would invalidate any of these current

11   rules and regulations. We recommend that SWM and GCG be tasked with this legal review and

12   should be submitted to the PUC for approval during the rate hearing in January 2007. **[Finding**

13   **and Recommendation #6]**

14        GCG inquired how SWM's drivers knew whether households with containers set out in

15   front of them at curbside were not only SWM customers, but also customers who are not in

16   arrears to SWM. The simple answer is they do not. Regarding delinquent customers, SWM had

17   implemented a policy during the second quarter of calendar 2006 that if a customer is identified

18   as a delinquent, his containers are marked with an "X" and the SWM drivers are instructed not to

19   service this customer. Once the customer satisfies his indebtedness to SWM, the containers are

20   then marked with the circle surrounding the "X." SWM determined there may be legal issues

21   with this program, since at the current time the containers are not property of SWM and

22   terminated the program. This problem would be addressed by our Recommendation #4 where

23   accurate customer lists would be developed. These lists should be made current no later than the

---

[21] The handout references PL17-87; 23-64, 24-272, 24-313, 25-93 and its amendments.

13

1      end of 2006, the date by which we recommend that privatization of all residential collection

2      occur.[22] **[Finding and Recommendation #7]**

3          SWM has not segregated collection routes into roughly equal Northern, Central and

4      Southern districts for future privatization as required by PL26-99. SWM is already about four

5      years past the deadline required for the privatization of collection for two thirds of the residential

6      customers (October 2002). This requires that this program be provided the highest priority by

7      SWM. We noted that SWM customer service had on its own initiative begun to segregate

8      customer files into three territories, but it is not clear whether upper management and/or the

9      Consent Decree team is aware of this process. SWM is currently reviewing its data with the intent

10      of complying with the mandate in PL26-99. This should not be an overly complex exercise and

11      SWM must move toward compliance with the greatest urgency – we recommend no later than the

12      end of 2006. Furthermore, we recommend that the PUC should seek an amendment to PL26-99

13      that would provide that <u>all</u> of the residential collections be privatized. **[Finding and**

14      **Recommendation #8]**

15      **2.**        **Operational and Administrative Function Problems.**

16          **Truck Maintenance.**

17          GCG inspected DPW's maintenance department and interviewed its chief mechanic.

18      GCG observed that while SWM has sixteen packer trucks, only seven packers were operational at

19      the time of GCG's inspection. Of the remaining nine packer trucks, two had been cannibalized

20      for parts and the remaining packer trucks were in various states of disrepair, ranging from repairs

21      as simple as tire replacement to repairs as major as installing a new transmission. Some of these

22      packer trucks have been non-operational for many months while many of the ones that are in

23      operation are fifteen years old (most were purchased in 1992 and 1993  Recent press reports[23]

24      indicate that recently, since our audit, as few as one or two trucks have been working resulting in

---

[22] This would also be another relevant issue to consider in the analysis of implementing the "sticker" system.
[23] See Attachment B

1  frequent missed pick up days, a level of very poor service and customer frustration. Our

2  recommendation that all residential routes should be privatized for collection would eliminate this

3  issue. **[Finding and Recommendation #9]**

4       **Transfer Station Operations**

5       SWM is responsible for operating three transfer stations. These transfer stations are open

6  five days per week (Thursday through Monday 9-5 except for Holidays and Sundays when open

7  7-3:30). During GCG's inspection, operations at the Agat transfer station were observed. That

8  operation consisted of three employees, two trash containers ("roll offs") and a guard house.

9  Only one transaction occurred during GCG's on-site inspection. The SWM employee responsible

10 for collection of the self-haul fee is issued a book of blank invoices that are sequentially

11 numbered. Upon entry into the transfer station, a customer pays the self-haul fee and receives

12 one of the three triplicate invoices listing the customer's license plate number and the total

13 charged. The transfer station is a cash only operation. There is no scale or any device for cubic

14 yard measurement on premise. The one customer GCG observed arrived with a partially full

15 pickup truck and was charged the $5 self-haul rate. This rate covers anything over 3 cubic yards.

16       GCG was informed by the SWM employee who collected the self-haul fee that a SWM

17 runner is supposed to arrive at the transfer station toward the end of each day to pick up the

18 receipts and cash. Cash and one copy of the receipt are delivered to DOA, while the second copy

19 of the receipt is delivered to SWM. If the SWM runner fails to appear at the end of the day, a

20 SWM employee takes the cash home. This is bad policy and should cease in order to provide

21 security for the cash as well as appropriate internal control. **[Finding and Recommendation**

22 **#10]** The utilization rate of transfer stations and appropriate self-haul rate should be carefully

23 investigated in future proceedings, since a rate that is below the monthly curbside pickup rate

24 might encourage the public to bring the waste to the transfer station and from illegally disposing

25 of waste. Currently, in the face of no or irregular residential waste collection, many residences

26 are faced with the dilemma of health hazards associated with storing waste on premises, self-

15

1    hauling or illegal dumping. This issue will be important when the significant rate increases that

2    are imminent are implemented and customers will be strained to afford service.

3        SWM employees reported that waste is frequently left at the gates of the transfer stations

4    as well the Ordot facility. This situation is not only unsightly, but attracts vermin. The waste

5    left at the gate is swept up by SWM employees at the start of each day and deposited into

6    available receptacles. This "illegal" dumping of waste represents additional revenues that should

7    have been collected by SWM, but were not. This situation provides free service to the individual

8    or individuals responsible. Bond holders are adverse to free service and the bond indenture

9    usually prohibits free service. Enforcement of existing laws related to illegal dumping of waste

10   needs to be undertaken. SWM should seek police assistance in monitoring the transfer stations

11   during off hours. SWM and GEPA should establish a joint strategy to eliminate this situation,

12   including the possibility of installing surveillance cameras. **[Finding and Recommendation**

13   **#11]**

14

15   **3.      Commercial Collection and Revenue Problems.**

16       Approximately 57% of SWM revenue comes from services rendered to commercial

17   haulers at the Ordot facility. The tipping fees, which the customers of these haulers are required

18   to pay is determined by the whether the waste is un-compacted or compacted. This is determined

19   by weight. The scale at the Ordot facility is currently broken which makes it difficult, if not

20   impossible for SWM to correctly determine the tipping fee, which is due for each truck. The

21   amount of revenue which has been lost from this problem is difficult to calculate. However, what

22   is clear is that it must be immediately corrected. The current rates for per cubic yard are $5 un-

23   compacted and $20 compacted. Because of this significant differential it is important that SWM

24   have procedures in place to ensure that the correct fee is being charged for waste deposited. We

25   were approached with allegations that SWM was in certain cases charging an uncompacted fee

26   for compacted trash. We are not able to verify the allegations. SWM should be required to

16

1   immediately repair or replace the scale until such time as the new landfill facility is functional

2   and provide adequate controls to ensure that the commercial haulers are properly billed. **[Finding**

3   **and Recommendation #12]**

4

5   **4.      Billing and Collection Problems**

6         GCG's focus in this audit was a review of the billing and collection functions of both

7   SWM and DOA.    SWM has had the responsibility to bill for residential services for

8   approximately one year now and DOA bills for commercials services.   Historically, SWM has

9   been woefully unable to collect revenues from the residential segment of customers as indicated

10  by the following table:

11                              **Table 1**

12                  **Four Year Average Collection Ratios**

|                          |      |
|--------------------------|------|
| Commercial Haulers       | 92%  |
| Other Commercial Haulers | 65%  |
| Residential Customers    | 26%  |
| Transfer Stations        | 100% |
| Total Collection         | 68%  |

13

14        At the current time, SWM prepares all billings to the residential customers receiving

15  SWM collection services.  There are significant problems with these billings: customer lists are

16  incomplete and collection rates are very low and the paid up status of customers are also

17  incomplete and inaccurate. There was a massive six-month billing (containing retroactive

18  periods) that was prepared by SWM customer service and mailed out in early April 2006.  A total

19  of nearly 23,000 invoices were prepared.  In many cases customers do not agree with the invoices

20  prepared. Customers that dispute their bills must come in to the SWM customer service office

21  with their complaints.  In the instance where the customer claims that he is no longer a customer,

22  he must submit proof that his service was terminated by showing customer service disconnection

17

1    notices from GPA or GWA. Moreover, GCG is aware that in one instance it took a new customer

2    nearly two hours to become a customer.

3        We were informed that there is no written policy has been created by SWM to handle

4    complaints of this nature  SWM has only five customer service positions authorized and two of

5    these were vacant at the time of GCG's inspection.  A specific problem identified with the latest

6    residential billing is that there is a legal prohibition against back-billing for more than four

7    months of services (see PL26-17). This public law was passed in the aftermath of Supertyphoon

8    Pongsonga. Collection of tipping fees had previously been suspended immediately after the super

9    typhoon struck Guam, and the intent of PL26-17 was to limit the economic hardship that was felt

10   by Guam residents once collection of tipping fees resumed.  This law needs to be reviewed and

11   amending legislation may need to be introduced to ensure that restrictions for time periods that

12   may be back-billed will be determined based on sound management decisions as this could

13   impact the financial condition of SWM and its ability to support debt service. A sound Collection

14   Policy should be developed. This should be done in conjunction with the development of service

15   rules that we have recommended and should be either approved through the Administrative

16   Adjudication Act (AAA) process or be approved by petitioning the PUC and heard in the same

17   time frame as the January 2007 rate hearing. SWM should bill no less than quarterly and should

18   do so immediately. Any legal impediment for this recommendation should be removed.  **[Finding**

19   **and Recommendation #13]**

20        GCG was informed by SWM management that a policy regarding promissory notes (or

21   payment plans) was evolving. Currently, the decisions for such plans are made on an ad hoc

22   basis by SWM customer service personnel. Though the concept of a promissory note permitting

23   a customer to make monthly payments against arrears may be desirable, a formal policy needs to

24   be created by SWM management and approved by the PUC so that SWM customer service is not

25   placed in the position of making policy decisions of a potentially arbitrary nature.  There should

26   be a written summary of this policy posted at all customer service locations that is also made

Case 1:02-cv-00022   Document 69-6   Filed 01/31/2007   Page 9 of 18

1    available to SWM customers through the mail or "on-line." Such a collection policy should

2    include specific timing from when an invoice is deemed late, interest or penalty charges for late

3    payments, fines for return of customer check for "insufficient funds" and written criteria for

4    promissory notes. Implementing such a policy would be a significant effort and before this effort

5    is made we recommend that its implementation be deferred to a later phase in the process. We

6    make this recommendation because current collection rates are so low and service currently and

7    historically has not been acceptable making the possibility of customer disputes multiply. We

8    recommend that GCG be tasked with this evaluation and that this recommendation should also be

9    made in the January 2007 time frame. Any legal impediment to in creating a collection policy

10   should be removed. **[Finding and Recommendation #14]**

11        The current situation of billing and collection for SWM residential service is abysmal.

12   While there has been considerable effort by SWM customer service employees to rectify this

13   matter, the situation will need significant time and effort to fully address all of the systemic

14   problems that have lead to a wholly unacceptable 26% SWM residential collection average over

15   the past four years. Except for the GovGuam accounts, GPA and GWA currently have collection

16   rates between 95 and 100% of billings. Based on information received from DOA, the most

17   recent estimate of accounts receivables is approximately $11 million broken down as follows:

18                                               **Table 2**

| Month Ending | Large Commercial | Other* Commercial | Residential |
|---|---|---|---|
| June 30, 2006 | 3,197,945 | 239,948 | 7,593,970 |
| Annual Revenue | 3,670,647 | 80,263 | 2,730,435 |
| Days Outstanding | 318 | 1,091 | 1,015 |

19

20        It is of course highly questionable whether the amounts in the table are collectible. For

21   residential customers the amounts of prior billings are questionable and the amounts subject to

19

1    collection are limited to a specific period of time if they are the result of back billing. For large
2    commercial customers the amounts may be more collectible. We recommend that the
3    investigation into the collection of receivables be put into a second phase under the oversight of
4    the ALJ. We have previously recommended that the Public Auditor undertake an audit of the
5    commercial haulers' billing and collection of their customers and amounts collected and remitted
6    from their customers to SWM. The amounts receivable from large commercial SWM customers
7    is approximately 10.5 months. These amounts can clearly be reduced.

8         Our recommendations to privatize the billing and collection functions, even if SWM is
9    made a public corporation and transferred under the oversight of the CCU we believe will
10   transform the billing and collection issues and reduce the high level of receivables. We
11   recommend that GCG be tasked with establishing a realistic level of receivables and to make
12   recommendations to bring the level down to reasonable levels and to provide a report to the PUC
13   in the January 2007 time frame. **[Finding and Recommendation #15]**

14        Currently, SWM bills and collects in arrears for residential services. Assuming that
15   SWM bills on a quarterly basis, this results in a lag between the date services are rendered and the
16   date payment is due of at least 120-150 days from the first month of service even when payment
17   is made within thirty days of the bill being issued. This is not a desirable effect considering the
18   need for sufficient cash flow for both routine operations and the cost of preparing SWM to be in a
19   financial situation that would improve investor confidence in the upcoming bond issuance. GPA
20   and GWA bill in arrears, but on a monthly basis. Late payment policies are also in place at both
21   GPA and GWA including interest payments and promissory notes. As a result, the average lag
22   between the time that services are rendered and the time that its customers' payments are due is
23   forty-five days or less.

24        As mentioned previously SWM had under consideration during the period of our audit a
25   proposed SWM Decal program that would be used to identify customers (including lifeline
26   customers) and to purge SWM's aging database of incorrect information. Although SWM has

20

1     deferred the "Decal" program pending the resolution of other matters SWM deems to be higher

2     priorities, one of the benefits of such a program is that it would result in a prepayment plan, i.e.

3     customers would pay prospectively for service. While the specific program has been deferred,

4     the concept of prepayment for services would be useful and would certainly help SWM both in

5     cash flow and in customer service. An appropriate prospective billing program for no more than

6     three months should be considered even if the decal program is not implemented. This change in

7     billing protocol would require PUC approval and should be submitted for approval in the January

8     2007 timeframe or earlier.

9        As noted, we have recommended the full privatization of the residential collection

10    function and we have also recommended the privatization of the billing and collection function.

11    We recommend that after the January 2007 set of hearings the concept of setting up independent

12    franchise areas where all aspects of trash collection, billing and collection would be undertaken

13    by a single entity and be subject to the oversight of the PUC be examined. **[Finding and**

14    **Recommendation #16]**

15       A lifeline rate as required by GCA 10 §51118h (1) does not exist at this time. P.L. 28-56

16    law requires that the PUC set rates that are "consistent with and meeting the low income

17    eligibility criteria, requirement policies or procedures established by the Guam Housing and

18    Urban Renewal Authority (GHURA) applicable to their Low Income Public Housing Program."

19    The PUC must approve both the rate for lifeline customers and the non-lifeline rate that combined

20    would develop sufficient revenues to cover SWM's operational costs and debt service

21    requirements.

22       PUC has determined that a lifeline rate should be established in the next rate case

23    (assumed to be heard in January 2007). PUC should task GCG with recommending a lifeline rate

24    and the criteria for determination of eligibility consistent with the GHURA's "low income"

25    eligibility criteria. Announcement of the proposed rate and eligibility requirements should be

26    published when SWM files its next rate case. We have previously indicated in our previous rate

1    case testimony that the current "low income" criteria has the potential to qualify too many
2    customers, making the lifeline program either too costly or the discount too small. We
3    recommend that consideration be given to using more targeted criteria for the population in
4    economic need. If income qualifications other than the GHURA "low income" eligibility criteria
5    are used, the Guam Legislature must first change the applicable law. GCG is awaiting additional
6    information from GEDA regarding the success of the new "swipe program"[24] to determine if it
7    can be used by SWM to more easily identify customers eligible for the lifeline rate. If SWM ties
8    eligibility for the lifeline rate to participation in that program, assuming that the number of
9    participants is not too large, SWM may be able to more easily enroll customers eligible for the
10   lifeline rate and reduce the administrative burden of the program. The specific discounted rate as
11   well as the eligibility criteria should be presented to the PUC in the upcoming rate case **[Finding**
12   **and Recommendation #17]**

13          After receiving a copy of an invoice for services for the commercial haulers at the Ordot
14   landfill, DOA (who is currently responsible for billing these customers) prepares and submits
15   bills to individual haulers which are due within sixty days. It is the responsibility of the
16   commercial hauler to collect the invoiced tipping fees from their customers and pay SWM in 60
17   days. we believe that the 60 day time frame set for payment is too long from time of receipt of
18   the bill and should be reduced to 30 days. We note here however, that a lot of progress need to be
19   made on this issue as our previous table showed that for commercial haulers the accounts
20   receivables are currently approximately 318 days. This recommendation should also be read in
21   conjunction with our finding and Recommendation #20 to make the commercial customer the
22   customer of the hauler and to make the tipping fee the responsibility of the hauler. **[Finding and**
23   **Recommendation #18]**

---

[24] The SWIPE program uses a credit type card in lieu of food stamps where the client "swipes" the card at the counter.

Case 1:02-cv-00022     Document 69-6     Filed 01/31/2007     Page 13 of 18

1    During GCG's meeting with DOA, it was discovered that there are occasions (apparently
2    not infrequent) where invoices from Ordot are delivered to DOA with invoices that are either out
3    of sequence or in no sequential order at all. This belies what GCG was told by SWM customer
4    service, who claimed that specific invoices were assigned to each SWM employee and that each
5    such employee was required to account for all of the numbered invoices in the sequence so
6    issued. DOA stated that it had upon occasion held invoices until SWM answered DOA inquiries
7    about the reasons for missing numbered invoices. Until such time as the Ordot facility is closed or
8    until such time as billing and collection are turned over to outside contractors, SWM employees
9    that issue receipts for commercial haulers (or at the transfer stations for self-haul) should be
10   required to sign for all blank numbered receipts and thereafter be required to account for <u>all</u>
11   numbered receipts issued to each such employee. [**Finding and Recommendation #19**]

12       Currently commercial haulers are merely agents for SWM in the collection of tipping
13   fees from their customers. Therefore, commercial hauler take the position that PL25-93 requires
14   that only those tipping fees actually collected from a commercial hauler's customers are required
15   to be forward to SMW. This places the collection burden on SWM and not on the commercial
16   haulers. In defense of this position, the commercial haulers cite the portion of PL25-93 that
17   provides:

18       Tipping fees for business or government generators that have their solid waste
19       collected by commercial collectors shall be collected by commercial collectors,
20       on behalf of the government of Guam. Commercial collectors shall remit the
21       tipping fees paid by their customers in the prior month to the government by the
22       twentieth (20th) day of the following month. The tipping fees collected by
23       commercial collectors, upon remittance to the government of Guam, shall be
24       considered as revenue for the government and *not* as income for commercial
25       collectors. *If* a commercial collector does *not* remit the tipping fees actually
26       collected from generators, as provided in this Section, then the commercial
27       collectors shall be liable for full payment to the government of all tipping fees
28       that are collected from generators, but *not* remitted to the government.
29

30       We recommend that this situation be changed so that the business or government
31   customers become customers of the commercial haulers and that the commercial hauler be

23

1    responsible for the collection of all fees from their customers and remittance to SWM. The

2    current situation results in a situation where SWM has no means of knowing what is owed by the

3    ultimate business or government customer and not being able to collect. While the

4    recommendations of this report are being evaluated and alternative implemented, we recommend

5    that the haulers be required to notify SWM monthly of customers that are delinquent in payments.

6    SWM should pursue collection efforts with these customers and the haulers should be put on

7    notice that any delivery that contains a delinquent customer's trash will not be accepted. Our

8    audit obtained information from DOA that indicated that collections from commercial haulers

9    lagged over 5 months while the accounts receivables show a 318 day balance. Under the

10    recommended scenario where commercial haulers would be responsible for all payments, the

11    billings to them should be made monthly and payments due in 30 days. When this

12    recommendation is adopted, appropriate service rules should be developed and approved by the

13    PUC, including penalties for delinquent payments. GCG also recommends that if the tipping fee

14    expense is shifted from the hauler's customer to the hauler, that it be exempt from gross receipts

15    tax to maintain the current status quo. . **[Finding and Recommendation #20]**

16           There does not appear to be a strong policy forcing full and timely payments from

17    commercial haulers. Information obtained from SWM indicates that there is a payment lag by

18    some of these haulers of as much as one year after the time service is rendered. This was also

19    confirmed by DOA in its communications regarding collections of the interim rate increases

20    effective November 2005. Service rules should be established by SWM and approved by the

21    PUC that would force full and timely payments from the commercial haulers, including denying

22    access to the SWM's solid waste disposal facility for non-payment of undisputed bills and for

23    payment for disputed bills after all appropriate remedies are exhausted. All commercial haulers

24    should be notified of this policy at least thirty days in advance of the implementation of this

25    policy. This policy should inform the commercial hauler of its ability to dispute bills and the

26    methods for the resolution of those disputes. Payment on all bills should be due, other than

24

1  disputed amounts, within thirty days. Any commercial hauler failing to pay its bills timely should

2  be denied access to the Ordot facility until such time as payments are brought current. **[Finding**

3  **and Recommendation #21]**

4      As mentioned in GCG's September 2005 report filed in the prior rate proceeding[25] many

5  of the requirements of the legislation transferring rate making authority to the PUC, including

6  cost-based and variable rates, could not be implemented without more detailed financial reports.

7  Internal financial reports are not routinely generated and are only provided by DOA at the request

8  of SWM. This lack of an ongoing flow of financial information from DOA to SWM management

9  prevents simple reports, such as accounts receivable aging or budget versus actual expenditures,

10  from being received and reviewed by the appropriate individuals at SWM on a timely basis. This

11  situation cannot continue, as fragmented financial information is viewed as a negative by the

12  investment community. GCG was advised that there is an accounting consultant at SWM who is

13  capable of creating these reports using the DOA accounting software and that a regularized

14  reporting process is in the process of being reviewed and implemented. This should be completed

15  by January 2007. This recommendation should be read with our primary recommendation to

16  make SWM a public corporation and put it under the CCU. **[Finding and Recommendation**

17  **#22]**

18      The PUC required that all additional revenues derived from the November 1, 2005

19  interim rate increase be deposited into a reserve fund for future use in payment of costs associated

20  with the management audit, regulatory review and debt service requirements. Establishing this

21  fund was a condition of PUC approval of the interim rate increases. During GCG's on-site

22  review, it was discovered that while the separate account into which DOA (SWM) was ordered

23  by the PUC to deposit the additional revenues has been established, the account is grossly under-

24  funded. The total amount in the fund as of May 2006 was less than $9,000, even though DOA

25  stated in its response to GCG that the amount should be $47,000. Recent correspondence from

_____

[25] This report is available on the PUC web site.

Case 1:02-cv-00022    Document 69-6    Filed 01/31/2007    Page 16 of 18

1    SWM and DOA indicates that they now believe that the proper amount that should be in the
2    account as of June 30, 2006 should be approximately $580,000. Ensuring that the portion of
3    collected funds that is derived from the increase in rates is actually deposited into this reserve
4    account would improve SWM's ability to provide the necessary funding for its upcoming rate
5    case and implementation activities from this audit. The proper funding of this account should be
6    viewed as a priority item, because establishing permanent rates and implementing the
7    recommendations of this audit will be viewed as a positive development in SWM operations by
8    potential bond investors. We believe that the amount that should be in the fund as of June 30,
9    2006 should be approximately $465,000. This should be funded in 60 days and then be
10   maintained at the appropriate level. **[Finding and Recommendation #23]**

11          In several meetings attended by GCG, it became obvious that all of the parties (SWM,
12   DPW, EPA, GEPA, legislators, bond counsel, PUC, etc) are in agreement that some
13   independence from DOA and DPW would be beneficial to SWM. We believe that such
14   independence is a necessity and have recommended that we support the PUC's position that
15   SWM be a public corporation under the CCU. It is difficult to see how there could be any
16   support for the current situation to continue. This would cause consternation from bondholders
17   and put the contemplated financing in jeopardy. The CCU would bring seasoned management as
18   a resource, a Chief Financial Officer, and an organizational structure that has experience in
19   managing utility operations and making operational improvements using both in house and
20   outside resources as appropriate. These management skills will be extremely valuable in
21   reorganizing SWM and providing its customers with good service as well as to manage the
22   required operations at the landfill and bring SWM into compliance with the Guam EPA.
23   **[Finding and Recommendation #24]**

24          Again, GCG thanks the all SWM and other GovGuam employees and management for
25   their assistance provided to GCG during the course of its investigation, without which GCG

26

1   would not have been able to prepare this report. GCG looks forward to a long-term relationship

2   with SWM in whatever form it will ultimately take. This concludes GCG's report.

ATTACHMENT A

ALJ MEMORANDUM & PUC RATE ORDER

DOCKET 05-09

OCTOBER 27, 2005

*Memorandum*

| To: | Commissioners |
|---|---|
| From: | ALJ Boertzel |
| Date: | April 20, 2006 |

RE:        Docket 05-9 [Department of Public Works [DPW] – Revenue Bonds]

### Overview

Under a schedule driven by the Federal Consent Decree, the government of Guam and its financial consultants are working under a May 2006 deadline to secure $90 million dollars in revenue bond financing to fund the capital requirements for the Ordot landfill closure, the construction of the new landfill and associated costs.

As the repayment of these bonds will be funded through DPW rates, financial consultants emphasize the importance of a strong PUC commitment to approve such rates increases [estimated at 400% over current rates within the next 26 months] to enable DPW to meet its bond obligations.

PUC customarily issues two orders in support of utility bond financing; a] an order drafted by bond counsel, which provides formal approval of the transaction terms and conditions and a regulatory commitment to provide adequate rates to fund bond commitments; and b] an order which approves and establishes regulatory oversight over the use of bond proceeds.

### Challenges

The fact that DPW is a line agency of the Executive Branch creates significant regulatory challenges, which PUC does not encounter in regulating GPA and GWA, which are autonomous public corporations. These challenges have come into sharp focus during this April regulatory session as a result of consultations with DPW's financial advisor and management. DPW does not have the power to contract and its revenues are held under the Department of Administration's [DOA] custody. These challenges are reflected in the following facts:

1. On December 20, 2005 PUC gave its regulatory approval for DPW to employ a procurement advisor to craft the documentation for the privatization of the Ordot closure, the construction and operation of the new landfill and for the privatization of residential trash collection. The contract, which also requires the Attorney General's approval, has sat in

1

the AG's office since early February. As a result, DPW has no resources to move forward with procurements mandated by the Consent Decree and is incurring fines as a result.

2. On October 27, 2005, PUC awarded DPW a 25% rate increase, effective for services rendered after November 1, 2005. DPW has still not implemented this increase for its residential customers. The rate order is enclosed as *Attachment A.*

3. The October rate order was premised on DPW's assurance that it would improve its collection rate to 95% for commercial customers and 70% for residential customers. DPW has failed to meet this assurance – its current collection rate is at 30%. As a result, there will be a substantial FY06 revenue shortfall.

4. The October rate order mandated that all revenue created by the rate increase shall be deposited into a restricted DOA account, which could not be withdrawn without PUC approval. Georgetown estimates that the current balance in the restricted account *[even excluding the residential rate increase]* should be in the range of $400,000. DOA has reported that it currently has only $47,000 on deposit in the restricted account. The government's financial advisor recommends that the bond covenants mandate that a "locked box" be created under the Trustee's custody for all rate revenues. PUC should strongly support this recommendation, with the condition that the Trustee observe PUC orders, which restrict the use of funds and establish reporting requirements. *Attachment B* is a presentation by the advisor *[Municipal Services Group]* regarding the challenges of marketing the DPW revenue bonds.

5. As PUC's rate authority is derived from statute, it is essential that the legislation, which approves this financing include a covenant from the Legislative and Executive branches that they will not take any action, which would impair PUC's independent rate making authority. Similar covenants have been provided in GPA and GWA bond financing legislation.

6. DPW is not in compliance with Guam law, which mandated that 2 of 3 residential collection districts be privatized by October 2002. No residential collection has yet been privatized. As a result, residential customers receive poor service and are unlikely to favorably receive the reality of a 400% rate increase over the next 26 months unless service is dramatically improved. In its December 20, 2005 Order *[Attachment C]*, PUC directed DPW to prioritize the privatization of residential trash

2

3

collection. As discussed in paragraph 1 above, this effort has been obstructed by DPW's inability to employ a procurement advisor.

### Recommendations

PUC has a dual responsibility in regulating DPW's rates: a] the obligation to provide adequate rate revenues to enable DPW to meet its financial obligations; and b] the obligation to assure that DPW's customers pay *just and reasonable* rates for reliable, quality service. Unless the above challenges are resolved, these dual responsibilities will likely put PUC on the proverbial *horns of a dilemma* I offer the following recommendations to address this dilemma:

1. PUC should make it clear that it will not make bond rate commitments unless DPW is empowered to employ a procurement advisor, which must occur before residential service can be improved through privatization.

2. Bond counsel, who will be crafting the legislation, which authorizes the bond financing, should be requested to include a covenant to protect PUC's independent rate making authority.

3. PUC should support a *"locked box"* bond covenant.

4. PUC should immediately initiate a focused audit by Georgetown of DPW's billing and collection practices and DOA restricted account management, which would be ready for regulatory review and implementation at the next regulatory session.

5. PUC should support the recommendation made in Guam Environmental Protection Agency's 2006 *Integrated Solid Waste Management Plan* that solid waste management be transferred to a public corporation under the oversight of the Consolidated Commission on Utilities

I recommend that PUC adopt these recommendations by resolution, which authorizes me, in consultation with Chairman Brooks, to implement them.

4



RECEIVED
OCT 2 7 2005
Public Utilities Commission
of Guam

DEPARTMENT OF PUBLIC WORKS
ESTABLISHMENT OF TIPPING AND
USER FEES PURSUANT TO P.L. 28-56        DOCKET 05-09

## RATE ORDER

Public Law 28-56 directs the Guam Public Utilities Commission [PUC] to
establish commercial, government and residential tipping and user fees to fund
the activities of the Department of Public Works' [DPW] Division of Solid Waste
Management [DSWM] in discharging its statutory duties and those imposed by
Federal District Court of Guam Consent Decree [Consent Decree] in Civil Case No.
02-22.

On September 20, 2005 Georgetown Consulting Group [GCG - PUC's regulatory
consultant] issued a Report, which recommends the following interim service fee
increases:

| Service Fee | Current | Proposed [Interim] |
|---|---|---|
| Residential pick-up | $8 per month | $10 per month |
| Tipping fee [compacted] | $15/cubic yd. | $20/cy |
| Tipping fee [uncompacted] | $4/cy | $5/cy |
| Self drop [under 3 cy] | $2/pickup | $2.50/pickup |
| Self drop [over 3 cy] | $4/cy | $5/cy |

On October 17, 2005, GCG and DPW entered into a stipulation, which
recommends that:

1. PUC adopt the above proposed fees as a first step toward volume and
   cost based rates.

2. The GCG report should be found to satisfy the requirement in 10 GCA
   51118[e] that fees be based on an actuarial cost of service analysis.

3. The additional revenues created by the proposed fee increases, which
   are estimated to be $1.3 million in FY06 [net of uncollectible allowance],
   should be restricted and spent only pursuant to PUC order.

4. PUC should await the management audit required under 10 GCA
   51118[e] before establishing a variable residential tipping fee.

1

5

5. A targeted residential lifeline tipping fee should be established with other permanent fees during the April 2006 regulatory session

6. DPW should provide PUC with quarterly reports, commencing with quarter beginning October 2005, on DSWM's revenues and expenses, including income statements and balance sheets. Reports should be filed within 21 days after the close of each quarter *[the first report due January 21, 2006].*

7. PUC should conduct a quarterly review of DPW's compliance with this rate order and of the adequacy of the proposed interim rates.

8. PUC should immediately undertake the focused management audit of DSWM operations as required by 10 GCA 51118[e].

9. Any DPW procurement or obligation relating to DSWM in excess of $50,000 should require PUC's prior review and approval. The contract review protocol, which PUC established to regulate the procurements of Guam Power Authority and Guam Waterworks Authority should be adopted as the review protocol for these procurements and obligations.

PUC conducted a public workshop at 6:00 p.m. on October 17, 2005 to receive a briefing on the GCG report and the Stipulation. In addition, PUC conducted public rate hearings at 6:00 p.m. October 25, 2005 in Hagatna, at 5:00 p.m. October 26, 2005 in Agat and at 6:30 p.m. October 26, 2005 in Dededo on the proposed interim fee increases.

After due consideration of the record in this docket, including public comments regarding the proposed interim fee increases, for good cause shown and on motion duly made, seconded and carried by the affirmative vote of the undersigned commissioners, the Guam Public Utilities Commission HEREBY FINDS AND ORDERS THAT:

1. DPW, including DSWM, is subject to PUC jurisdiction pursuant to 10 GCA 51118[e].

2. The stipulated recommendations from GCG and DPW, as discussed above, should be and are hereby adopted. DPW is ordered to comply with the recommendations, subject to instructions from PUC's administrative law judge *[ALJ].*

2

3. The proposed interim fee increases are hereby approved for services rendered on and after November 1, 2005. PUC recognizes that this is but the first of a series of rate increases, which will be necessary to support the $93 million borrowing required to enable DPW to comply with the Consent Decree. The GCG Report satisfies the requirement in 10 GCA 51118[e] that fees shall be based on an actuarial cost of service analysis.

4. Under separate order, ALJ will be authorized to oversee the focused management audit of DSWM's existing operations.

5. The contract review protocol, in form attached hereto, shall govern the regulatory review of DSWM procurements and obligations.

6. ALJ is hereby authorized and directed to oversee regulatory proceedings, which will lead to PUC's consideration of a variable residential rate, including a lifeline component, and of the implementation of permanent fees.

7. PUC emphasizes that the revenue created by the interim fee increases shall be restricted funds and shall not be spent without prior PUC authorization.

Dated this 27th day of October 2005.

_____
Terrence M. Brooks

_____
Edward C. Crisostomo

_____
Joseph M. McDonald

_____
Rowena E. Perez

3

Case 1:02-cv-00022    Document 69-7    Filed 01/31/2007    Page 7 of 21

ATTACHMENT B

PRESS REPORTS REGARDING SERVICE

**by Marissa Borja, KUAM News**
**Thursday, May 25, 2006**

Back on Guam as part of a routine biannual visit, the United States Environmental Protection Agency made it clear today that Guam continues to face a number of serious challenges - those that will only become more difficult to address the longer it takes to tackle them. And moreover, these issues will become magnified a hundredfold with the impending relocation of U.S. Marines from Japan.

The Department of Public Works was hit hard today with comments by the USEPA on its inability to meet several key deadlines affecting the closure of Ordot Dump and the opening of the new landfill. USEPA Guam program manager Ben Machol described these milestones as being in jeopardy, telling KUAM News, "If you can't award a contract to close Ordot, clearly you're not going to be able to close Ordot, so we're just seeing what's coming down the line and those final milestones the ones that triggered the lawsuit just don't look like they're going to happen on time...it's looking less realistic that they're going to meet the major milestones that triggered the lawsuit."

In addition to assessing fines to DPW for the closure of Ordot, the USEPA also fined the agency for its failure to complete a wetland mitigation plan. (The latter however is said to have been squared away as of today.) But this still doesn't bring DPW out of the red; Machol says he has yet to see any concrete evidence indicating that there is a larger plan dealing with such issues as transfer stations, recycling, **revenue collections.**

Noting that these are smaller pieces of a bigger picture, the federal government maintains that everything is set up like dominoes - so if you miss the first pieces, you're going to miss those last ones, too.

While DPW doesn't dispute what the feds had to say, they would however like to be acknowledged for the work they have done. Director Larry Perez defended, "It's not like DPW is sitting around doing nothing - we spend millions of dollars and hundreds of hours working on all these consent decree requirements. Now, you have to keep in mind that this is a violation that's been for the last fifteen years and now it's all due yesterday." He furthermore explained the impediments they face are not limited to his agency, but are actually attributed to the government as a whole.

"It should be penalties against the Government of Guam because we don't control the Attorney General's Office because they can actually make or break this project, but to assess it against DPW when there's things that are beyond our control is somewhat unreasonable," Perez continued.

But evidently it all boils down to money, as Perez believes that he'd be able to come into full compliance with the consent decree if given $93 million. In the meantime, Attorney General Doug Moylan disputes that the failure to meet deadlines of wetland mitigation penalties and the closure of the Ordot Dump lie within his office.

9

by **Mindy Fothergill**, KUAM News
Thursday, June 29, 2006

Accused of gassing up on the government's dime and accepting bribes from a local sanitation company, Department of Public Works employee Patrick Santos was charged in two separate indictments today. Attorney General Douglas Moylan told KUAM News, "The grand jury found two charges of theft, a crime against the community charge with a special allegation and official misconduct against Mr. Santos. For the Ordot Landfill bribery case, the grand jury returned true bills for solicitation of a bribe and official misconduct."

Santos is accused of taking five gallons of gas every two weeks for his personal vehicle from December 2002 through June 2003. **The DPW staffer is also accused of received $750 in bribe money to allow Maria Santos from Lagu Sanitation to dump for free at the Ordot Landfill.**

An arrest warrant was issued for Santos and bail was set at $5,000.

**Broken equipment stalls trash pickup services**
by Clynt Ridgell, KUAM News
Tuesday, May 16, 2006

If you've been wondering why your trash hasn't been picked up lately, it's because the Department of Public Works' Division of Solid Waste Management has been having problems with equipment breaking down. If you live in any of the following areas and your trash wasn't picked up last week, according to DPW, collection will resume on their scheduled pickup days:

- Latte Heights
- Latte Plantation
- Ordot village
- Famha, Ordot
- Afame, Sinajana
- Canada, Barrigada
- Toto Gardens
- Toto Gardens
- Yona village
- Bordallo Subdivision, Santa Rita
- Santa Rita village

If you have any questions, you are urged to call DPW's Customer Service Center at 646-3111/3109/3147.

Mindy Fothergill, KUAM News
Thursday, June 29, 2006

Accused of gassing up on the government's dime and accepting bribes from a local sanitation company, Department of Public Works employee Patrick Santos was charged in two separate indictments today. Attorney General Douglas Moylan told KUAM News, "The grand jury found two charges of theft, a crime against the community charge with a special allegation and official misconduct against Mr. Santos. For the Ordot Landfill bribery case, the grand jury returned true bills for solicitation of a bribe and official misconduct."

Santos is accused of taking five gallons of gas every two weeks for his personal vehicle from December 2002 through June 2003. The DPW staffer is also accused of received $750 in bribe money to allow Maria Santos from Lagu Sanitation to dump for free at the Ordot Landfill.

An arrest warrant was issued for Santos and bail was set at $5,000.


## DPW expectedly will handoff trash duties to private firm
by Mindy Fothergill, KUAM News
Tuesday, July 18, 2006

With some residents waiting four weeks for their trash to be picked up, it's just a matter of time before the Department of Public Works starts outsourcing its trash pickup services. While nine packer trucks make up DPW's solid waste collection fleet, agency director Larry Perez confirms only two of the packer trucks are in operation. Perez admits some villages haven't had trash services in a month, while others are behind only a week.

With the constant break down of the packer trucks, the director says the agency will begin outsourcing its services. Perez could not say how much the privatization will cost, but the contracts will be month-to-month temporarily until trash collection is permanently outsourced.

In the meantime, DPW expects five additional packer trucks to be repaired before the end of the week.

11

**Expect full privatization of trash services by 2008**
by Mindy Fothergill, KUAM News
Monday, July 24, 2006

The Department of Public Works is playing catch-up to get residential waste collection back on track. With only one packer truck working two weeks ago, the agency now has four packer trucks in operation and three more are expected to be up by Friday. DPW director Larry Perez says because of the constant problems, the agency will outsource a portion of the trash pickup services in the next month or two.

DPW will need a private company to augment five trucks and operators to assist the agency's trash services. Residential waste collection is slated to be fully privatized before the end of next year.

**DPW promises trash services back online by Friday**
by Marissa Borja, KUAM News
Wednesday, August 09, 2006

After three weeks of poor service, Department of Public Works director Larry Perez says all trash will be picked up and his agency will be back on track. Perez claiming they've managed to make repairs to at least nine trash trucks, adding, "We're able to pick up all the trash every trash including those that are in bags that are not in receptacles authorized receptacles and we're going to pick up all the trash to get all those backlogs that we had for the last three to four weeks; we're going to get it all caught up no later than this Friday."

As we reported DPW plans to outsource a portion of the trash pickup services in the next month or two. Residential waste collection is slated to be fully privatized before the end of next year.

12

ATTACHMENT C

EXECUTIVE ORDER 2006-12



EXECUTIVE ORDER NO. 2006- 12

RELATIVE TO ESTABLISHING THE ORDOT CONSENT DECREE
COMPLIANCE TEAM WITHIN THE OFFICE OF THE GOVERNOR
AND TO ESTABLISH PRIORITY PROCUREMENT AND INTRA-
AGENCY COOPERATION FOR THE ORDOT CONSENT DECREE

WHEREAS, the Organic Act of Guam provides that I Maga' Lāhen Guåhan Governor of
Guam, is tasked with the responsibility of overseeing the health and safety of the people of
Guam; and

WHEREAS, the old Ordot dump poses a continuing threat to public and environmental
health, and must be closed pursuant to a Consent Decree entered into by the Government of
Guam, the United States Environmental Protection Agency, and the United States Department of
Justice (U.S. District Court Territory of Guam Civil Case No. 02-00022); and

WHEREAS, this order reaffirms Executive Order 2004-02 and the Government of
Guam's commitment to the Consent Decree, which requires the closure and post-closure of the
Ordot Dump as well as the construction and operation of a new, sanitary municipal solid waste
landfill; and

WHEREAS, the process of closing the old dump and opening a new landfill requires
resources beyond the immediate capabilities of the Department of Public Works, and will require
substantial and continuing involvement by a number of other Government of Guam agencies;
and

WHEREAS, further delays in the closure of the Ordot dump and the opening of a new
landfill will violate Consent Decree timelines, and may result in substantial penalties imposed on
the Government of Guam

NOW, THEREFORE, I, FELIX P. CAMACHO, I Maga' Lāhen Guåhan Governor
of Guam, by virtue of the authority vested in me by the Organic Act of Guam, as amended, do
order:

1  Ordot Consent Decree Compliance Team.    The  Ordot  Consent  Decree
Compliance Team is hereby established and shall consist of at least one representative
from the following agencies, to be designated by the Governor:

   a  Department of Public Works
   b  Guam Environmental Protection Agency
   c  Bureau of Budget and Management Research
   d  Department of Administration

The Governor also shall request representatives from the Guam Economic Development
and Commerce Authority and the Office of the Attorney General

The compliance team shall be chaired by the Governor's designee and the representative
from the Office of the Attorney General

14



The Governor may appoint additional representatives to the compliance team at his discretion. The purpose of the team shall be to:

1. Create a plan to meet the remaining timelines and requirements established by the Consent Decree.
2. Identify actions that will require legislative changes or approval and prepare legislative proposals for the Governor's consideration.
3. Implement the plan.

The Governor or his designee shall appoint members of the compliance team within one day of this signing of this order.

2. **Authority.** All government departments, agencies, instrumentalities and other public entities shall coordinate with the Compliance Team to comply with the mandates of the Consent Decree. All Government of Guam departments and agencies shall provide the necessary support and assistance to the compliance team for the purposes of complying with the mandates of the Consent Decree.

All existing contracts and accounts associated with the Consent Decree shall be supervised by the Compliance Team. Procurement, contractual and certifying authority shall be delegated by the Department of Public Works director to a member of the Compliance Team.

3. **Disputes.** Any disputes arising from this Executive Order shall be resolved by the Governor or his designee. The Governor or designee's determination of the dispute shall be final. The Governor's designee shall have authority to recommend appropriate disciplinary action against anyone who fails to make best efforts to comply with this Executive Order.

SIGNED AND PROMULGATED at Hagåtña, Guam this _12_ day of May, 2006.

_____
FELIX P. CAMACHO
I Maga' låhen Guåhan
Governor of Guam

15

ATTACHMENT D

LEGAL MEMORANDUM ON JUST AND REASONABLE RATES

16

# McKenna Long & Aldridge LLP
### Attorneys at Law

## MEMORANDUM

| | |
|---|---|
| **To:** | Georgetown Consulting Group |
| **From:** | John N. Ingram |
| **Date:** | August 17, 2006 |
| **Re:** | Guam Public Utilities Commission - Ratemaking Considerations for the Management Audit of the Guam Department of Public Works |

In furtherance of your report to the Guam Public Utilities Commission ("Commission") concerning the management audit of the Guam Department of Public Works ("DPW"), this memorandum addresses the Commission's obligation or authority to disallow rate increases, in whole or in part, for DPW due to poor or inadequate service and management inefficiency. In this regard, it is our understanding that the management audit has indicated an unacceptable level of service by DPW, and you have observed that, in the absence of legislative changes, the Commission may be required to disallow or defer rate increases for DPW on the principal of just and reasonable rates. As discussed herein, this issue implicates at least two separate ratemaking principles accepted in other jurisdictions: (1) a state commission may disallow costs in establishing just and reasonable rates if such costs have been imprudently incurred; and (2) a state commission may consider the quality of service and management efficiency in establishing just and reasonable rates and a reasonable rate of return for the utility.

### Imprudent Costs

The Supreme Court of the United States long ago recognized that (a) under the standard of "just and reasonable" rates "it is the result reached not the method employed which is controlling", (b) a commission's ratemaking function "involves the making of 'pragmatic adjustments'" and (c) the fixing of "just and reasonable" rates "involves a balancing of the investor and consumer interests."[26]

In undertaking such balancing, courts and state commissions have often recognized that imprudent or wasteful expenses by a utility may not be passed on to such utility's customers through ratemaking.[27] In applying this principle, it is a generally accepted principle in many states that the state commission may review the utility's costs to determine whether such costs have been prudently incurred, and, if the state commission ultimately

---

[26] Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602-603 (1944) (evaluating the authority of the Federal Power Commission under the federal Natural Gas Act).

[27] See, e.g., West Ohio Gas Co. v. Public Utilities Commission of Ohio, 294 U.S. 63, 68 (1935) ("A public utility will not be permitted to include negligent or wasteful losses among its operating charges"); Gulf States Utilities Company v. Public Utility Commission of Texas, 841 S.W.2d 459, 466 (Tex. App. 1992) ("A rate cannot be deemed just and reasonable unless the utility was prudent in incurring the operating expenses it seeks to pass through to its customers").

Case 1:02-cv-00022   Document 69-7   Filed 01/31/2007   Page 17 of 21

determines that any costs were imprudently incurred, such costs may be excluded from the utility's rate calculation.[28]

Ultimately, the Commission's authority or obligation to disallow imprudently incurred costs in ratemaking will depend on the Commission's statutory authority. The law giving the Commission jurisdiction and authority to establish rates for DPW (Public Law 28-56) does not expressly provide that DPW's rates must be "just and reasonable" and does not otherwise expressly provide that costs must be prudently incurred to be included in DPW's rates.[29] However, such legislation does provide that in performing its ratemaking obligations with respect to DPW under such law, the Commission "shall have the full authority and powers conferred upon it by its enabling legislation, 12 GCA 1200 et sec., including the audit power conferred upon it by Public Laws 25-05:12 and 26-78:2."[30]

In this regard, 12 GCA 12105(a) provides that all rates charged by any "public utility" must be "just and reasonable."[31] The term "just and reasonable" is specifically defined in the Commission's enabling legislation as "that rate, charge or assessment cost which enables the public utility to repay its debts, finance its obligations, finance its capital improvement needs and cover all of its operating expenses."[32] Georgetown has previously recommended that this definition of "just and reasonable" should be construed to include only prudent costs and expenses, and we understand that the Commission has previously accepted Georgetown's recommendation and determined that it has the authority to disallow imprudent and unreasonable expenses.[33] Further, the Commission's enabling legislation provides that any "rate change shall be considered by the Commission using standards and financial criteria consistent with generally accepted ratemaking practices of public utilities."[34]

---

[28] See, e.g., Popowsky v. Pennsylvania Public Utility Commission, 674 A.2d 1149, 1154 (Pa. Comm. 1996) ("Only prudently incurred expenses are includable in rate case expense claims"); Gulf States Utilities Company, 841 S.W.2d at 478 ("to the extent that the capacity charges were imprudently incurred, they were properly disallowed"); Niagara Mohawk Power Corporation v. Public Service Commission of the State of New York, 507 N.E.2d 287 (N.Y. App. 1987); Connecticut Light and Power Company v. Connecticut Department of Public Utility Control, 148 P.U.R.4th 364 (Conn. Superior Ct. 1993); In re United Cities Gas Company, 140 P.U.R.4th 382 (Kansas State Corp. Comm. January 11, 1993).

[29] We note that Public Law 28-56 is drafted in a manner that addresses an immediate need by providing that the Commission shall establish fees for DPW that will replace those previously created by law or adopted by DPW. The legislation also provides the Commission with authority to undertake the instant management audit. However, the legislation does not expressly provide that the Commission should continue to have ratemaking authority over DPW for future rate increases or that DPW should be treated as a "public utility" within the meaning of the Commission's enabling legislation. To the extent the Commission is intended to have such authority, we believe legislative action to clarify such intent may be beneficial.

[30] Public Law 28-56:1.

[31] As discussed in footnote 4 of this memorandum, DPW is not included in the definition of "public utility." However, Public Law 28-56 could be construed to mean, by referencing the Commission's enabling legislation, that the Commission must establish "just and reasonable" rates for DPW. Again, we believe legislative action to clarify such intent may be beneficial.

[32] 12 G.C.A. § 12017.

[33] See Guam Power Authority Levelized Energy Adjustment Clause (LEAC), Docket 94-04, Order (March 14, 2002).

[34] 12 G.C.A. § 12004.

18

In addition, Public Law 28-56 itself provides that the Commission has the authority to undertake a management audit of DPW and, by virtue of referencing the Commission's power under Public Law 25-05, the authority to issue orders necessary to insure DPW's compliance with the audit findings, as approved by the Commission.

In light of the foregoing, existing authority, both in Guam and by reference to generally accepted ratemaking principles, supports the proposition that the Commission may disallow, or indeed may be compelled to disallow, costs in establishing just and reasonable rates for DPW if such costs have been imprudently incurred. This may possibly include costs incurred by DPW to correct conditions that resulted from imprudent management by DPW.[35]

<u>Quality of Service and Management Efficiency</u>

Apart from evaluating DPW's costs to determine whether such costs have been prudently incurred, the Commission may also have authority to consider DPW's quality of service and management efficiency in establishing just and reasonable rates and a fair rate of return. The primary distinction between this regulatory principle and the principle discussed above is that the principle of prudence considers which costs have been prudently incurred by the utility and may be included in ratemaking, whereas the regulatory principle of quality service and management efficiency discussed below considers whether the utility's rate of return or the rate assessed is itself just and reasonable. In this regard, this principle may be implemented by establishing a lower rate or rate of return within a "range of reasonableness" for inadequate service.

Utility ratemaking has been historically evaluated by the constitutional and statutory principles that a utility is entitled to receive a reasonable rate of return[36] or that a state commission must allow a utility sufficient rates "to operate successfully, maintain its financial integrity, attract capital, and compensate its investors for the risk assumed."[37] In this regard, some courts and state commissions have previously determined that a state commission may not deny or reduce an increase in rates due to poor service, at least where such denial or reduction is structured as a penalty <u>after</u> a finding by the commission that the requested increase was itself just and reasonable pursuant to the foregoing principles.[38]

Notwithstanding the foregoing, and as discussed above regarding prudent costs, existing authority also indicates that a state commission must consider both the interests of the utility and the interests of the consumer in setting rates.[39] In this regard, recent authority exists in other jurisdictions to support the proposition that a state commission may consider a utility's quality of service and management efficiency in establishing just and reasonable

---

[35] See, e.g., In re United Cities Gas Company, 140 P.U.R.4th 382 (Kansas State Corp. Comm. January 11, 1993) (finding that utility's costs to correct improperly performed work should not be included in rates).

[36] See National Utilities, Inc. v. Pennsylvania Public Utility Commission, 709 A.2d 972, 976 (Pa. Comm. 1998).

[37] State v. Mountain States Te. & Tel. Co., 224 P.2d 155, 170 (N.M. 1950).

[38] See, e.g., General Telephone Company of the Southwest v. Corporation Commission, 652 P.2d 1200 (N.M. 1982); Florida Tel. Corp. v. Carter, 70 So.2d 508 (Fla. 1954).

[39] See, e.g., Federal Power Commission v. Hope Natural Gas, 320 U.S. at 603; In re Citizens Utilities Company, 769 A.2d 19 (Vt. 2000); U.S. West Communications, Inc. v. Washington Utilities and Transportation Commission, 949 P.2d 1337, 1361 (Wash. 1997).

Case 1:02-cv-00022    Document 69-7    Filed 01/31/2007    Page 19 of 21

rates for such utility.[40] This may include consideration of the utility's deficiencies as to accounting and billing.[41] Some authority even supports the proposition that a state commission may deny a rate increase for poor or inadequate service or management inefficiency despite the fact that such denial will result in operating losses.[42]

To some degree, the distinction may lie in considering quality of service in determining what are just and reasonable rates in lieu of penalizing the utility for quality of service after determining what rates are otherwise just and reasonable.[43] At a more general level, however, recent authority recognizes a range of "reasonableness" for utility rates and recognizes that poor service quality or management inefficiency may result in a permitted return at the lower end of such range of reasonableness.[44]

The Commission's authority or obligation to consider quality of service and management efficiency may ultimately depend upon the Commission's statutory authority and DPW's statutory obligations. For example, some states, such as Pennsylvania, specifically provide by statute that a state commission may consider quality of service in evaluating any request for increased rates.[45] Alternatively, some other jurisdictions have recognized the authority of state commissions to consider quality of service in ratemaking as part of a *quid pro quo* based on statutory obligations of the utility to provide adequate and proper service.[46] As one court has observed with respect to such statutory obligations:

> the public is entitled to prompt, expeditious and efficient service. Quid pro quo, the company is entitled to rates which are fair, just, reasonable and sufficient to allow it to render such services.[47]

Public Law 28-56 does not specifically authorize the Commission to consider DPW's quality of service and management efficiency in establishing rates and does not specifically obligate DPW to provide adequate service.[48] Rather, as discussed above, Public Law 28-56 provides that in performing its duties under such law, the Commission has the full authority

---

[40] See, e.g., Citizens Utilities Company, 769 A.2d 19; National Utilities, 709 A.2d at 979; U.S. West Communications, 949 P.2d at 1361; In the Matter of the Petition of Valley Road Sewerage Company for Approval of an Increase in its Rates for Sewer Service, 285 N.J. Super. 202, 666 A.2d 992 (1995); In re Aloha Utilities, Inc., 217 P.U.R.4[th] 1 (Fla. P.S.C. April 30, 2002).

[41] See, e.g., In re CenterPoint Energy Arkla, 245 P.U.R.4[th] 384 (Ark. P.S.C. April 19, 2005).

[42] See, e.g., Valley Road Sewerage Company, 666 A.2d at 996.

[43] See U.S. West Communications, 949 P.2d at 1359.

[44] See U.S. West Communications, 949 P.2d at 1361; In re Aloha Utilities, Inc., 217 P.U.R.4[th] 1.

[45] See, e.g., National Utilities, 709 A.2d at 974 (citing Section 526(a) of the Pennsylvania Public Utility Code).

[46] See, e.g., Citizens Utilities Company, 769 A.2d 19; Valley Road Sewerage Company, 666 A.2d at 995; In re Aloha Utilities, Inc., 217 P.U.R.4[th] 1.

[47] U.S. West Communications, 949 P.2d at 1361.

[48] We note that certain obligations may be imposed upon DPW under 10 G.C.A. Chapter 55 or other provisions of Guam law, including an obligation to implement the Solid Waste Management Plan approved by the Guam legislature. See 10 G.C.A. § 51101(14). However, we have not observed any specific obligation of DPW to provide adequate service as part of our brief review of 10 G.C.A. Chapter 55. To the extent any such obligation of DPW exists in current legislation or in legislation subsequently enacted by the Guam legislature, additional analysis may be necessary or appropriate to consider whether DPW's entitlement to just and reasonable rates may be considered a quid pro quo for such obligation.

20

and powers conferred upon it by its enabling legislation (12 GCA 12000 et seq.). However, such enabling legislation likewise fails to specifically authorize the Commission to consider quality of service in setting rates and fails to specifically obligate DPW to provide adequate service.

In light of the foregoing, it is unclear whether the Commission has the authority under existing Guam law to reduce or disallow rate increases for DPW (apart from a review of prudently incurred costs) on the basis of poor or inadequate service or management inefficiency.

21

ATTACHMENT E

CURRENT SWM SERVICE RULES

22

CHAPTER 2
SOLID WASTE MANAGEMENT

Article 1
Solid Waste Collection, Disposal, Processing and Recycling

§2100. Provisions.
§2101. Purpose.
§2102. Duty to Assure Removal of Solid Wastes.
§2103. Definitions.
§2104. Storage of Solid Wastes.
§2105. Collection of Solid Wastes.
§2106. Transportation of Solid Wastes.
§2107. Disposal of Solid Wastes.
§2108. Additional Prohibited Acts.
§2109. Contract for Collection and Disposal Service.
§2110. Enforcement and Penalties.
§2111. Rate Deviations; Disputes.
§2112. Development.
§2113. General Requirements.
§2114. Guidelines for All Development Projects.
§2115. Additional Guidelines for Single Tenant Development Projects.
§2116. Additional Guidelines for Multiple Tenant Development Projects.
§2117. Location.

§2100. Provision. Any provision of the adopted rules and regulations of this Act on "Solid Waste Collection, Disposal, Processing and recycling" in conflict with Public Law Number 24-272, the provision of Public Law Number 24-272 shall prevail.

§2101. Purpose. The purpose of these rules and regulations ('Regulation') is to protect public health, safety and welfare by reducing or eliminating health hazards, fire hazards, offensive odors and unsightly litter attributable to accumulations of solid wastes, and provide for maximum recovery of useable materials of solid waste within the limits of economic feasibility.

The government of Guam must divert twenty five percent (25%) of all solid waste by January 1, 2001, through source reduction, recycling and composting activities. Diverting twenty five percent (25%) of all solid waste requires the collective participation of the residential,

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 1

23

commercial, industrial and public sectors. The government shall continuously seek community participation and technology to further reduce solid waste.

The lack of adequate areas for collecting and loading recyclable materials that are compatible with surrounding land uses is a significant impediment to diverting solid waste and constitutes an urgent need for the government of Guam to address access to solid waste for source reduction, recycling and composting activities. This Regulation has been developed to meet that need.

§2102. Duty to Assure Removal of Solid Waste. Every occupant who produces solid wastes has the duty to provide for the storage and removal of all such wastes produced on the occupied premises. Occupant shall segregate the same into solid wastes and into recyclables. When the solid waste is so segregated, the two (2) may be disposed of separately as hereinafter established.

§2103. Definitions. The words and phrases used throughout this Regulation are derived from §51102 of Chapter 51, Part 2, Division 2 of Title 10 of the Guam Code Annotated plus the following definitions:

(a) Collection Service means the collection of solid wastes at the point of storage on the premises of a single family residential property receiving service.

(b) Bulky Rubbish means non-rotting solid wastes from dwelling units, institutional, commercial, industrial or agricultural establishments which are either too large or too heavy to be safely and conveniently loaded in solid waste transportation vehicles by solid waste collectors.

(c) Department means the Department of Public Works, ('DPW')
government of Guam.

(d) Director means the Director of Public Works or his delegate serving as director of the solid waste management program on Guam.

(e) Disposable Solid Waste Container means disposable plastic or paper sacks with a capacity of five (5) to thirty-five (35) gallons specifically designed for storage wastes.

2

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 2

(f) Division means the Division of Solid Waste Management of the Department of Public Works, government of Guam.

(g) Dwelling Unit means one (1) or more rooms, and a single kitchen in a dwelling, designed as a unit for occupancy by one (1) family for living and sleeping purposes.

(h) Family means one (1) person living alone, two (2) or more persons related by blood, marriage or legal adoption, or a group not in excess of five (5) unrelated persons living together as a single housekeeping unit; and in addition thereto domestic employees.

(i) Grading, Demolition and Construction Wastes means waste materials from the grading of land or the construction, remodeling or destruction of structures.

(j) Government means the government of Guam.

(k) Multiple Dwelling means a building, or portion thereof, used and/or designed as a residence for two (2) of more families living independently of each other in dwelling units and doing their own cooking in said building.

(l) Occupant means any person whom, alone or jointly or severally with others, shall be in actual possession of any dwelling unit, or of any other improved real property, either as owner or as a tenant.

(m) Single Family Residence means a detached building designed for and/or occupied exclusively by one (1) family.

(n) Solid Wastes means unwanted or discarded waste materials in a solid or semi-solid state, other than those specifically intended for recycling. Such material includes, but is not limited to, garbage, wood, glass, paper, plastics, ashes, street refuse, rubbish, dead animals, animal and agricultural wastes, except

manure, discarded furnishings and appliances, industrial wastes, and grading, demolition and construction wastes.

(o) Solid Waste Management means management of the entire solid waste system of storage, collection, transportation, processing and disposal.

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 3

Case 1:02-cv-00022     Document 69-8     Filed 01/31/2007     Page 4 of 25

(p) Special Solid Waste or Special Collection or Special Fees means solid waste that requires special handling and separate fees (for example tires, construction debris, batteries, air conditioners,
cars, etc.) as designated by the Director of DPW and in compliance with all local, state, and Federal laws and regulations and established pursuant to Article 3, Chapter 9 of Title 10 of the Guam Code Annotated, Administrative Adjudication Law, Rule Making Procedures.

§2104. Storage of Solid Wastes. (a) Contents Required. The occupant of every dwelling unit and of every institutional, commercial, industrial or agricultural establishment producing solid waste within the corporate limits of Guam shall provide on the premises, without expense to the government, a sufficient number of adequate containers for the storage of all solid wastes, except bulky rubbish, grading, demolition and construction wastes, which would ordinarily accumulate at each such dwelling unit or establishment between the scheduled collections. Such containers shall be maintained at all times in good repair, and both containers and the area used for storage of containers at each dwelling or establishment shall be maintained at all times in a clean, neat and sanitary condition.

(b) Single Family Residential Containers. Single family residential solid wastes shall be stored on the premises in containers of not more than thirty-five (35) gallons, and not less than five (5) gallons in nominal capacity. Containers shall be leak-proof, waterproof and fitted with a fly-tight lid, and shall be covered at all times except when depositing waste therein or removing the contents thereof. The containers shall have handles, bails or other suitable lifting devices or features. Containers shall be of a type originally manufactured for dwelling unit solid wastes, with tapered sides for easy emptying. They shall be of lightweight and sturdy construction. The weight of any individual container and contents when such container is filled to within four (4) inches of the top shall not exceed sixty (60) pounds. Rubber, fiberglass or plastic containers, which do not become brittle in hot/cold weather, may be used. Disposable solid waste containers may also be used by a dwelling unit for storage of solid wastes; provided such containers are leak-proof, waterproof, tightly covered, and less than ten (10) pounds.

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 4

Case 1:02-cv-00022    Document 69-8    Filed 01/31/2007    Page 5 of 25

(c) Other Containers. Multi-family residential, institutional, commercial, industrial or agricultural solid wastes shall be stored in bulk containers of the type designed to be handled mechanically by refuse collection vehicles, as approved by the Director, taking into consideration the quantity of wastes generated at each establishment and the frequency and method of collection, but containers shall at least meet the standards as indicated in this Regulation. All containers shall be waterproof, leak-proof and shall be covered, except when depositing waste therein or removing the contents thereof. Containers shall be stored on private property, unless the owner shall have been granted written permission by the Director to use public property for such purposes. Cleaning of bulk containers shall be the responsibility of the private property owner, unless otherwise stipulated in a written contract for other persons to be responsible for the cleaning of bulk containers.

(d) Yard Wastes. Tree limbs, brush, and other yard wastes which cannot be placed in storage containers shall be securely tied in bundles not longer than forty-eight inches (48") in length and eighteen inches (18") in diameter. The weight of each individual bundle shall not exceed thirty (30) pounds.

(e) Bulky Rubbish. Bulky rubbish shall be confined to the property upon which it originates in such a manner so as not to permit it to create any health or safety hazard. No such items of bulky rubbish shall be stored in front of any dwelling, business or establishment so as to be unsightly.

(f) Grading, Demolition and Construction Wastes. Grading, demolition and construction wastes shall be confined to the property on which grading, demolition or construction is taking place, and shall be removed by the owner or his agents immediately after such grading, demolition or construction is completed.

(g) Recyclables. Material intended by the occupant to be recycled, shall be stored prior to recycling in such containers, or in such a manner so as to prevent it from creating any health or safety hazard, or from littering public or private property, including the property of the occupant. No material stored pursuant to this Section shall be stored in front of any dwelling, business or establishment so as to be unsightly.

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 5

The Director and the Administrator of the Guam Environmental Protection Agency shall submit comprehensive rules and regulations for the disposition of recyclable materials for the collection, separation,
storage, recycling process and other needs for a comprehensive recycling municipal solid waste system to reduce the waste stream.

(h) Unauthorized Containers. Solid waste containers or bundles which are not in accordance with this Regulation shall be collected together with their contents, and disposed of after reasonable notice has been left on the container during a prior collection visit. Containers or bundles exceeding size or weight limitations, or containers filled in such a manner that contents are not easy to empty, shall not be collected and notice shall be left on each such container or bundle advising the owner of applicable provisions of this Regulation.

§2105. Collection of Solid Wastes. (a) Response. The government of Guam shall provide for the collection of solid wastes from individual dwelling units or single family residences; provided, however, that DPW may contract for collection services with a person, business or corporation, or a combination thereof, for such as deemed to be in the best interests of the Island.

(b) Collection and Transport Assignments . The government, its employees or solid waste collection contractors shall have, the exclusive right to collect or transport solid wastes for individual dwelling units or
single family residences not covered by agreements through homeowner associations or other group agents for the collection of waste by a licensed, waste hauler. Solid waste collection for multi-family residential or multiple dwelling units, commercial, industrial or agricultural activities shall be based on a free enterprise or privatized system as regulated and permitted by the Guam Environmental Protection Agency. However, nothing in this Section shall operate so as to prevent, or cause any unnecessary hardship to, the occupant or entity of any premises producing solid wastes, from recycling or transporting to the extent allowed said solid wastes. Further, nothing contained in this Section shall be construed so as to prevent any community-based recycling center from receiving solid waste segregated for recycling at its place of business, or at centrally

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 6

Case 1:02-cv-00022    Document 69-8    Filed 01/31/2007    Page 7 of 25

located collection points as approved by the government of Guam, or from thereafter transporting such waste.

(c) Right to Transport Own Wastes . Any person may transport solid wastes generated on his own premises to an authorized processing or disposal site, providing the requirements of this Regulation are met.

(d) Collection Intervals. All single-family residential solid wastes, other than bulky rubbish and recyclables, shall be collected at least once weekly. Multi-family residential, institutional, commercial or agricultural solid wastes shall be collected by privately contracted and duly permitted solid waste collectors or transporter at least once weekly, and may be collected at such lesser intervals as may be relaxed by the Director, or requested by the establishment upon a determination that such lesser intervals will not harm the public health or safety.

(e) Point of Collection -- Single Family . Single family residential solid wastes in containers or bundles authorized by this Regulation shall be placed at the curb or alley for collection as specified by the Director, taking into consideration the quantity of wastes generated at each establishment and the frequency and method of collection. Solid wastes storage sites shall be easily accessible to collection personnel and equipment.

(f) Time Limit on Containers Placement on Curb. Containers or bundles shall be placed at the curb for collection not earlier than twelve (12) hours prior to the collection date, and shall be removed no later than twelve (12) hours following the collection date.

(g) Grading, Demolition and Construction Wastes. Removal of grading, demolition and construction wastes from the property upon which grading, demolition or construction is taking place shall be the responsibility of the owner, and shall not be the responsibility of the government or authorized solid waste collection contractors under this Regulation. The government or authorized solid waste collection contractors may offer a removal service for such wastes and may charge a fee therefor.

(i) Responsibilities at Point of Collection. Authorized solid waste collectors shall be responsible for the collection of solid wastes from the point of collection to the transportation vehicle; provided, the

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 7

29

solid wastes were stored in compliance with this Regulation. Any spillage or displaced solid waste occurring prior to the arrival of the solid waste collectors at the point of collection shall be the responsibility of the owner. Any spillage or displaced litter caused as a result of the duties of the solid waste collectors shall be collected and placed in the transportation vehicle by the solid waste collectors. Any solid waste collected shall, upon being loaded into transportation equipment, become the property of the collection agency. Solid waste collectors shall not be required to reach into solid waste containers to remove contents. Authorized containers emptied by solid waste collectors shall be returned to the point of collection.

(j) Collection Fees. All tipping/user fees to be charged by the DPW for solid waste collection, disposal, recycling and processing services established by Public Law Numbers 24-139 and 24-272 and other special fees shall be billable every first (1 st) of the month for the previous month service. All fees shall be paid within sixty (60) days from the date of billing.

(k) Special Collections. The Director may require special collections as he deems appropriate under the circumstances in accordance with Guam's procurement law or through a standard schedule of fees established in accordance with Article 3 of Chapter 9 of Title 5 of the Guam Code Annotated, Administrative Adjudication Law, Rule Making Procedures.

(l) Bulk Containers. Solid waste collection contractors shall make available sufficient numbers of bulk containers and meet all requirements for such containers under this Regulation and may charge a rental.

§2106. Transportation of Solid Wastes. (a) Vehicle Standards. All solid waste collection transportation vehicles used by DPW authorized solid waste collection contractors, shall be maintained in a safe, clean and sanitary condition, and shall be so constructed, maintained and operated as to prevent spillage of solid wastes, leakage of liquids or emission of offensive odors therefrom.

(b) Transportation of Own Wastes. Any person transporting solid wastes under the provision of this Regulation shall do so in a

8

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 8

Case 1:02-cv-00022    Document 69-8    Filed 01/31/2007    Page 9 of 25

manner as to prevent spillage of solid wastes, leakage of liquids or emission of offensive odors therefrom.

(c) Grading, Demolition and Construction Wastes . Any person transporting materials resulting from grading, demolition or construction activities shall do so in vehicles so constructed and maintained that none of the materials being transported shall spill onto the public roads and streets.

§2107. Disposal of Solid Wastes. (a) Disposal at Authorized Sites Only. Solid wastes shall be deposited at a processing facility or disposal area approved by DPW and complying with all relevant requirements of local, state, and Federal laws and regulations.

(b) Hazardous Wastes. The Director may direct certain solid wastes deemed as hazardous wastes which will require special handling, and shall be disposed of only in a manner acceptable to the Director and in compliance with Guam and Federal laws and regulations.

(c) Unlawful Disposal. It shall be unlawful for any person to throw or deposit any solid wastes, or to cause the same to be thrown or deposited, in or upon any street, alley, gutter, park, body of water or other public property, or to throw or deposit the same in or upon any private lot, yard or body of water.

§2108. Additional Prohibited Acts. (a) Use of Other Than Own Container. It shall be unlawful for any person to deposit solid wastes in any solid waste container other than his own without the written consent of the owner of such container or with the intent of avoiding payment of the service fees for solid waste collection.

(b) Failure to Pay Fees. It shall be unlawful for any person to fail to pay the service fees when a person is receiving such service. The government or any contractor collecting solid wastes under this Regulation may enforce compliance with any provision of this Regulation against such person or business. DPW may, in addition to whatever other rights and remedies it may have, seek enforcement of this Regulation under applicable laws of Guam.

(c) Interference. It shall be unlawful for any person to interfere in any manner with solid waste collection equipment or solid waste collectors in the lawful performance of their duties as such, whether

9

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 9

such equipment or collectors are those of the government or those of an authorized solid waste collection contractor.

(d) Burning. Only application to and approval of the Guam Fire Department prior to said burning may permit burning of solid wastes.

(e) Scavenging. It shall be unlawful for any person to molest, remove, handle or otherwise disturb the container or containers, contents thereof, or other materials which have been placed out for servicing by the collectors; provided, this Paragraph does not apply to the occupant of the residence, dwelling or business establishment from which the container and/or contents or materials are removed.

§2109. Contracts for Collection and Disposal Service. (a)

Contracts Authorized. Contracts may be entered into by the government of Guam for the collection and disposal of solid wastes in accordance with the provisions of this Regulation. Such contracts shall be for a period not to exceed five (5) years, and shall be awarded in accordance with the Guam Procurement Law. The contracting of services shall be made only to meet service requirements which cannot be met by the

Department. The full privatization of services shall occur only after a privatization plan has been approved by I Liheslaturan Guahan.

(b) Exclusive Right. Contracts for the collection and disposal of solid wastes shall grant the contractor the exclusive right to perform such services as are specified in the contract. However, nothing in this Section or Chapter shall be construed so as to take away from any occupant the right to recycle solid wastes produced on his premises provided no health or safety violation results therefrom.

(c) Liability Insurance. No contract for solid waste collection and disposal service shall be entered into by DPW until and unless the prospective contractor shall procure and maintain for the duration of the contract Workers Compensation insurance, and insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of the work hereunder by the contractor, his agents, representatives, employees or subcontractors. The cost of such insurance shall be included in the Contractor's bid. The coverage, minimum limits of insurance, deductibles, and self-insured retention, as well as all other insurance provisions, shall be in form and in an amount satisfactory to the government. Under no

10

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 10

circumstances shall the government be liable as a result of a contractor's activities.

§2110. Enforcement and Penalties . (a) Inspection. In order to ensure compliance with this Regulation, the Director, as well as duly assigned personnel from GEPA, the Department of Public Health and Social Services and the Guam Fire Department are authorized to inspect any and all phases of solid waste management within the oversight of the government. No inspection shall be made in any dwelling unit unless authorized by the occupant or in accordance with due process of law. In all cases where such inspections reveal violation of the provisions of this Regulation, the Director, or appropriate agency, shall issue notice for each such violation stating therein the violation or violations found, the applicable laws and regulations, and the time period within which corrective action shall be taken.

(b) Penalties. Any person violating the provisions of this Regulation shall be liable and may be fined not less than Ten Dollars ($10.00) nor more than Fifty Dollars ($50.00) for each offense; and a separate offense shall be deemed committed on each day during or on which a violation occurs or continues. The fact that solid wastes remains on any occupant's premises in a continuity is a violation of this Regulation and shall be "prima facie" evidence that the occupant or the property owner of such premises is responsible for the violation hereof.

(c) Request for a Hearing. Any person cited for violating the provisions of this Regulation shall be served by DPW with an administrative citation delineating the specific violation, and be notified of the right to request a hearing under the Administrative Adjudication Law, Article 2 of Chapter 9 of Title 5 of the Guam Code Annotated.

§2111. Rate Deviations; Disputes. (a) Deviations. The accumulation of solid wastes in certain instances may be so far above the normal or average that the rates relaxed by this Regulation may not be sufficient to fairly compensate the collector for collecting the same, or the accumulation of solid wastes in certain instances may be so far below the normal average that the rates fixed by this Regulation may not be fair and just to the occupant obligated to pay for the removal of such wastes. If either the collector or the occupant believes such to be the fact, he may make written application to the Director for relief, and

11

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 11

Case 1:02-cv-00022    Document 69-8    Filed 01/31/2007    Page 12 of 25

it shall be the duty of the Director to make an investigation and, if necessary, will recommend a rate.

(b) Deviations: Filing. All cases of deviations from the rates fixed by this Regulation shall be filed in writing with the Director.

(c) Disputes. The Director shall decide disputes over charges made by collectors, or as to the character performed, and his decision shall be final.

§2112. Development. Development Project . (a) Development Project. Means any of the following:

(1) A project for which a building permit is required for a commercial, industrial or institutional building, marina, or residential building having five (5) or more living units, where solid waste is collected and loaded and any residential project where solid waste is collected and loaded in a location serving five (5) or more units. (2) Any new public facility where solid waste is collected and loaded, and any improvements for areas of a public facility used for collecting and loading solid waste.

(3) The definition of development project only includes subdivisions or tracts of single-family detached homes if within such subdivisions or tracts there is an area where solid waste is collected and loaded in a location which serves five (5) or more living units. In such instances, recycling areas as specified in this Regulation are only required to serve the needs of the living units, which utilize the solid waste collection and loading area.

(b) Improvement. An improvement adds to the value of a facility, prolongs its useful life, or adapts it to new uses. Improvements should be distinguished from repairs. Repairs keep facilities in good operating conditions, do not materially add to the value of the facility, and do not substantially extend the life of the facility.

(c) Floor Area of a Marina. The floor area of a marina shall be defined as the space dedicated to the docking or mooring of marine vessels.

(d) Public Facility. The definition of public facility includes, but is not limited to, buildings, structures, marinas and outdoor recreation areas owned by a local agency.

12

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 12

(e) Recycling Area (Areas for Recycling). Space allocated for collecting and loading of recyclable materials. Such areas shall have the ability to accommodate receptacles for recyclable materials. Recycling

areas shall be accessible and convenient for those who deposit as well as those who collect and load any recyclable materials placed therein.

§2113. General Requirements. (a) Any new development project for which an application for a building permit is submitted on or after the approval date of this Regulation, shall include adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste.

(b) Any improvements for areas of a public facility used for collecting and loading-solid waste shall include adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste.

(c) Any existing development project for which an application for a building permit is submitted on or after the approval date of this Regulation for a single alteration which is subsequently performed that adds thirty percent (30%) or more to the existing floor area of the development project shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste.

(d) Any existing development project for which an application for a building permit is submitted on or after the approval date of this Regulation for multiple alterations which are subsequently performed within a twelve (12) month period which collectively adds thirty percent (30%) or more to the existing floor area of the development project shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste.

(e) Any existing development project for which multiple applications for building permits are submitted within a twelve (12) month period beginning on or after the approval date of this Regulation for multiple alterations which are subsequently performed that collectively adds thirty percent (30%) or more to the existing floor area of the development project shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste.

13

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 13

(f) Any existing development project occupied by multiple tenants, one (1) of which submits on or after the approval date of this Regulation, an application for a building permit for a single alteration which is subsequently performed that adds thirty percent (30%) or more to the existing floor area of that portion of the development project which said tenant leases shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste. Such recycling areas shall, at a minimum be sufficient in capacity, number and distribution to service that portion of the development project which said tenant leases.

(g) Any existing development project occupied by multiple tenants, one (1) of which submits on or after the approval date of this Regulation an application for a building permit for multiple alterations which are subsequently performed within a twelve (12) month period which collectively adds thirty percent (30%) or more to the existing floor area of that portion of the development project which said tenant leases, shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste. Such recycling areas shall, at a minimum, be sufficient in capacity, number and distribution to serve that portion of the development project which said tenant leases.

(h) Any existing development project occupied by multiple tenants, one (1) of which submits within a twelve (12) month period beginning on or after the approval date of this Regulation multiple applications for building permits for multiple alterations which are subsequently performed that collectively adds thirty percent (30%) or more to the existing floor area of that portion of the development project which said tenant leases shall provide adequate, accessible and convenient areas for collecting and loading recyclable materials and solid waste. Such recycling areas shall, at a minimum, be sufficient in capacity, number, and distribution to serve that portion of the development project which said tenant leases.

(i) Any costs associated with adding recycling space to existing development projects shall be the responsibility of the party or parties who are responsible for financing the alterations.
14

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 14

Case 1:02-cv-00022     Document 69-8     Filed 01/31/2007     Page 15 of 25

§2114. Guidelines for All Development Projects. (a) Where local standards exist, recycling areas should be designed to be architecturally compatible with nearby structures and with the existing topography and vegetation, in accordance with such standards.

(b) The design and construction of recycling areas shall not prevent security of any recyclable materials placed therein.

(c) The design, construction and location of recycling areas shall not be in conflict with any applicable Federal, state or local laws relating to fire, building, access, transportation, circulation or safety.

(d) Recycling areas or the bins or containers placed therein must provide protection against adverse environmental conditions, such as rain, which might render the collected materials unmarketable.

(e) Driveways and/or travel aisles shall, at a minimum, conform to local building code requirements for garbage collection access and clearance. In the absence of such building-code requirements, driveways and/or travel aisles shall provide unobstructed access for collection vehicles and personnel.

(f) A sign clearly identifying all recycling and solid waste collection and loading areas, and the materials accepted therein, shall be posted adjacent to all points of direct access to the recycling areas.

(g) Developments and transportation corridors adjacent to recycling areas shall be adequately protected for any adverse impacts, such as noise, odor, vectors or glare through measures, including, but not limited to, maintaining adequate separation, fencing and landscaping.

§2115. Additional Guidelines for Single Tenant Development Projects. (a) Areas for recycling shall be adequate in capacity, number and distribution to serve the development project.

(b) Dimensions of the recycling area shall accommodate receptacles sufficient to meet the recycling needs of the development project.

(c) An adequate number of bins or containers to allow for the collection and loading of recyclable materials generated by the development project should be located within the recycling area.

§2116. Additional Guidelines for Multiple Tenant Development Projects.

(a) Recycling areas shall, at a minimum be sufficient in

15

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 15

Case 1:02-cv-00022    Document 69-8    Filed 01/31/2007    Page 16 of 25

capacity, number and distribution to serve that portion of the development project leased by the tenant(s) who submitted an application orapplications resulting in the need to provide recycling area(s) pursuant to §111 'Development' of this Regulation.

(b) Dimensions of recycling areas shall accommodate receptacles sufficient to meet the recycling needs of that portion of the developmentproject leased by the tenant(s) who submitted an application or applications resulting in the need to provide recycling area(s) pursuant to §111'Development' of this Regulation.

(c) An adequate number of bins or containers to allow for the collection and loading of recyclable materials generated by that portion of the development project leased by the tenant(s) who submitted an application or applications resulting in the need to provide recycling area pursuant to §111 of this Regulation should be located within the recycling area.

§2117. Location. (a) Recycling areas shall not be located in any area required to be constructed or maintained as unencumbered, according to any applicable Federal, state or local laws relating to fire, access, building, transportation, circulation or safety.

(b) Any and all recycling area(s) shall be located so they are at least as convenient for those persons who deposit, collect and load the recyclable materials placed therein as the locations where solid waste is collected and loaded. Whenever feasible, areas for collecting and loading recyclable materials shall be adjacent to the solid waste collection areas.

16

CH. 2 -SOLID WASTE MANAGEMENT -1998 CODIFICATION -P. 16



# TIPPING FEE CUSTOMERS
## Solid Waste Management



1. Customer's are required to keep their solid waste in lightweight waterproof, lead-proof containers with handle or other lifting features, between 5 and 35 gallons in size, and not weighing more that 60 pounds when filled.

2. Customer's are to put out their containers up to 12 hours prior to the collection date and take them in within 12 hours after the connection date.

3. YARD Waste must be tied in bundles not longer than 48 inches, 18 inches in diameter, and weight no more than 30 pounds. (This is for the safety and ability of those doing the collection to perform the works).

4. Separating out recyclable materials from solid waste and placing these items in separate containers. There must be enough space around the building for the containers to be pickup

5. No DEAD Animals, Pig Foods & Metal (i.e. Toaster, Iron, Wire Hanger, Computer, Computer monitor Chairs, Table etc )

6. No HAZAROUS WASTES such as Batteries, Air conditioners, Tires (i.e. etc )

7. NO Demolition and Construction Wastes.

8. No Water in containers.

9. Place your trash containers at the curb or 4 feet from the edge of the road way  Trash collection site shall be easily accessible for removable by the Solid Waste collectors.

10. It is unlawful for any person to dispose solid waste in any street, gutter, parks, body of water or other public or private property.

11. It is unlawful for any person to dispose of solid waste in any trash container other than his own without the written consent of the owner of the container or with the intent of avoiding payment of service fees for solid waste collection

Pursuant to   Chapter 51 Relative to Solid Waste Management & Litter Control & Public Laws 17-87, 23-64, 24-272, 24-313, 25-93 and it amendments.

Acting Director Lawrence P. Perez
Tamuning, Guam 96911

Telephone 646-3109/3111/3147
Fax 647-4352



Funded by Solid Waste Management Fund





39

**ATTACHMENT F**

**INVENTORY AND DISCUSSION OF**

**PROPOSED LEGISLATIVE CHANGES**

40

The following is a list of legislation that will be required if the recommendations contained in GCG's August 18, 2006 Focused Audit Report are adopted:

- **Creation of an autonomous agency for solid waste management**

  Proposal: remove the Solid Waste Management Division (SWM") from the auspices of the Department of Public Works ("DPW") and make SWM an autonomous agency under the auspices of the Consolidated Commission on Utilities ("CCU").

  Rationale: remove numerous obstacles currently faced by SWM in obtaining bond financing. Also address the issues created by the Guam Supreme Court holdings in 2000 Guam 11 and 2004 Guam 16 that invalidated those provisions of Chapter 51-Title 10 of the Guam Code Annotated ("GCA") that were enacted by PL24-139 and PL24-272.

- **Privatization of all residential collections**

  Proposal: increase the number of districts to be privatized from two to three. Legislation should clarify whether the PUC will regulate private hauler rates for residential customers.

  Rationale: SWM has been unable to provide reliable service since interim rate increase approved on October 25, 2005.

- **Authorization to outsource SWM billings and collections**

  Proposal: grant SWM the right to privatize its billing and collection services.

  Purpose: SWM presently unable to produce reliable billings on a timely basis; collection rate remains below 40% of residential customers receiving service.

41

- **Clarification of commercial haulers' responsibility for collection of tipping fees**

  Proposal: make commercial haulers customers of SWM instead of individual businesses.

  Rationale: making commercial haulers primarily liable for payment of tipping fees and granting them the right to recoup tipping fees from their customers more efficient that having SWM separately bill businesses for tipping fees. SWM unable to determine if a business who failed to pay its tipping fee is still being serviced by a commercial hauler; charging commercial haulers directly provides incentive to immediately terminate service to any business customer that fails to pay any portion of the commercial hauler's bill.

- **Modification of lifeline eligibility standard**

  Proposal: Change "GHURA low income eligibility criteria" to "appropriate income eligibility criteria    as determined by the PUC."

  Rationale: The GHURA low income eligibility criteria is the most liberal of its three eligibility standards. A family of four with household income   of up to $50,400 in 2005 would have qualified for the    lifeline rate.    Granting   PUC   the discretion to    set   eligibility requirements      that would extend      lifeline rates only to households   who   would not  otherwise  be  able  to  afford  services  would  prevent unnecessary erosion of SWM's rate base.

- **Clarification of enforcement powers**

  Proposal: specify under what circumstances SWM may deny a commercial hauler access to the landfill. Legislation should also consider granting GEPA the right to summarily suspend a commercial hauler's license in the event the commercial hauler is denied entrance to the landfill for any reason (non-payment, non-conforming equipment, or failure to comply with landfill rules).

  Rationale: will provide incentive for commercial haulers to pay bills timely, as delinquent haulers will be unable to collect solid waste until all arrears paid.

42

The following is a brief discussion of the considerations for legislation that will be required if the recommendations contained in GCG's Focused Audit Report are adopted:

- **Creation of an autonomous agency for solid waste management**

  Removing the Solid Waste Management Division (SWM") from the auspices of the Department of Public Works ("DPW") and making SWM an autonomous agency under the auspices of the Consolidated Commission on Utilities ("CCU") will remove numerous obstacles currently faced by SWM in obtaining bond financing. The enabling legislation for the Guam Waterworks Authority is the closest model for this, as it resulted in the conversion of an entire line agency into an autonomous entity.

  The legislation creating this new autonomous agency should also address the issues created by the Guam Supreme Court holdings in 2000 Guam 11 and 2004 Guam 16 that invalidated those provisions of Chapter 51-Title 10 of the Guam Code Annotated ("GCA") that were enacted by PL24-139 and PL24-272. If the recommendation to make SWM an autonomous agency under the CCU is not adopted, then separate legislation will be needed to deal with this issue.

- **Privatization of all residential collections**

  This legislation can be accomplished by amending PL26-99:2 to increase the number of districts to be privatized from two to three. This proposed legislation should specify whether the PUC will regulate private hauler rates for residential customers.

  Those haulers who are awarded contracts should be required to provide SWM with a list of initial customers and thereafter report on at least a monthly basis all new customers as well as all existing customer whose services have been terminated. This will enable SWM to determine which households are not receiving collection services and take appropriate action to ensure that these households are all using the transfer stations to dispose of their solid waste.

  PL26-99:3 provides that "[n]othing herein shall be construed as authorizing the termination of any employee of the government of Guam." If this requirement is retained, then the feasibility of reassigning DPW employees and

packer fleet currently handling SWM residential collections
to staffing the transfer stations and collecting solid
waste from the various government of Guam agencies and
public housing (as opposed to having these customers
serviced by public haulers) needs to be explored. Having
SWM service public housing units will greatly reduce the
number of households that will need to be provided with a
lifeline rate in order to afford residential collection
services.

- **Authorization to outsource SWM billings and collections**

  The proposed legislation should grant SWM the right to
  privatize its billing and collection services. If adopted,
  the cost of these services should be included in SWM's
  budget so that the same may be factored into the rates set
  by the PUC.

- **Clarification of commercial haulers' responsibility for
  collection of tipping fees**

  The efficiency of SWM operations would be enhanced if the
  commercial haulers themselves were customers of SWM instead
  of individual businesses. The commercial haulers would be
  required to pay tipping fees on all solid waste brought to
  the landfill based on weight regardless of who generated
  the solid waste.

  The legislation should specify the extent to which
  commercial haulers may pass this cost on to their
  customers. A possible model is the visible GRT law that
  permits businesses to segregate GRT from bills for services
  rendered and recoup the same from their customers.

  Making commercial haulers primarily liable for payment of
  tipping fees and granting them the right to recoup tipping
  fees from their customers would be more efficient that
  having SWM separately bill businesses for tipping fees, as
  SWM would be unable to determine if a business who failed
  to pay its tipping fee is still being serviced by a
  commercial hauler. If the tipping fees were instead
  charged to commercial haulers coupled with a right to
  recoup the same from their business customers, then
  commercial haulers would have the incentive to immediately
  terminate service to any business customer that fails to
  pay any potion of the commercial hauler's bill.

  The legislation should require a commercial hauler to
  notify SWM if service is terminated to any its business
  customers. SWM should then coordinate with the DPH&SS

44

Division of Public Health to determine if the sanitary permit for such business should be suspended until such time as alternative solid waste collection services are arranged.

- **Authorization for commercial haulers to collect tipping fees**

  This is a less-preferable alternative to making the commercial haulers direct customers of SWM, as SWM will instead have to make the commercial haulers collection agents for SWM much the same way as a retailer is responsible for collection of sales tax and remitting the same over to the state. This would require comprehensive legislation imposing a myriad of duties on commercial haulers similar to those borne by retailers in states that have imposed a sales tax.

- **Authorization for SWM to audit commercial haulers**

  This will be a necessary component of making the commercial haulers collection agents for SWM. The statute should be modeled after a state's power to conduct a sales tax audit. The power to audit commercial haulers' records is essential in order to ensure that a commercial hauler is not providing service to a business customer who has paid commercial hauler's fees but not the tipping fees. If this situation is discovered, then a commercial hauler should be subject to similar penalties to those imposed on a retailer who neglects to collect sales tax on a taxable transaction.

- **Clarification of enforcement powers**

  As part of the legislation clarifying the responsibility for payment of business tipping fees, the legislation should specify under what circumstances SWM may deny a commercial hauler access to the landfill. The legislation may include a grace period and may also include a separate dollar limitations (for example, allowing a 30 day grace period for payment of delinquent accounts, which grace period is reduced to 15 days if the account is $10,000 or more delinquent).

  In addition, the legislation should consider granting GEPA the right to summarily suspend a commercial hauler's license in the event the commercial hauler is denied entrance to the landfill for any reason (non-payment, non-conforming equipment, or failure to comply with landfill rules).

- **Restrictions on back-billing**

Adoption of GCG's recommendations for improving billing and collection practices should largely eliminate the possibility of SWM failing to bill for services for over four (4) months. If these recommendations are not adopted, then the 4 month limitation on back billing imposed by PL26-17:4 may need to be re-examined.

46

# ATTACHMENT 13

# G E O R G E T O W N   C O N S U L T I N G   G R O U P,   I N C.
### 716 DANBURY RD.
### RIDGEFIELD, CT. 06877

Jamshed K. Madan
Michael D. Dirmeier

Edward R. Margerison
Jean Dorrell

Telephone (203) 431-0231
Facsimile (203) 438-8420
jkmadan@gmail.com



January 5, 2007

Harry Boertzel, Esq. ALJ
The Guam Public Utilities Commission
Suite 207, GCIC Building
Hagatna, Guam 96932

**Re:** **Docket 06-2 (Focused Management Audit of Department of Public Works' Solid Waste Management Division Billing and Collection System).**

Dear ALJ Boertzel:

This letter is in response to your December 14, 2006 request that Georgetown Consulting Group (GCG) provide the Guam Public Utilities Commission (PUC) with an update on the findings contained in GCG's September 2006 audit report (Audit) of the Department of Public Works' (DPW) solid waste management division (SWM)[1]. This update is based upon GCG's November 2006 on-site visit with SWM.

Both the Audit and this update focus on GovGuam's inability to meet the requirements of the Consent Decree dated February 2, 2004 in Federal District Court Civil Case 02-22. Although the Government of Guam (GovGuam) is the defendant this proceeding, it delegated to SWM and a management team created by Executive Order 2006-12 the duty of complying with the Consent Decree, including the closure of the Ordot dump and the construction and operation of a new landfill[2]. It is estimated that the capital cost of these mandated projects is in the range of $90-100 million dollars. GovGuam's failure to meet Consent Decree compliance timelines caused the Federal government to recently commence an enforcement proceeding before the District Court, which is currently in progress.

Within the context of the Consent Decree, PUC is directed by Guam law[3] to establish just and reasonable rates for residential waste collection and landfill dumping ("tipping fees"), which are

---

[1] PUC's 9/28/06 Order in Docket 06-2 (*Attachment A*) directed its administrative law judge (ALJ) to oversee GCG's preparation of a rate proceeding to address SWM's FY07 revenue requirements. After reviewing SWM's 12/5/06 request that the rate proceeding be postponed, ALJ, in consultation with GCG, cancelled the proceeding by letter dated 12/14/06 (*Attachment B*) and directed GCG to use the information, which it had collected during its November on-site visit, as a basis for this update letter.

[2] In this letter report, reference is often made to GovGuam as it is the government rather than either its line agency Department of Public Works or the operational division thereof Solid Waste Management. GovGuam is the entity that will prepare and sign contracts as it is the defendant in District Court Civil Case No. 02-22.

[3] 10 GCA section 51118.

adequate (with grants and other revenue sources) to fund GovGuam's compliance with the Consent Decree. The Audit found that SWM as currently organized[4] was incapable of billing, collecting and managing the expenditure of SWM rate revenues in keeping with normal business practices that would assure investors in the required capital program associated with compliance with the Consent Decree. This letter enforces this Audit finding. An effective SWM billing and collection system is central to GovGuam's ability to comply with the Consent Decree[5].

## SUMMARY OF UPDATED FINDINGS

As is further discussed in the balance of this letter, GCG respectfully submits the following updated findings to PUC:

1. GCG expresses serious concern that GovGuam is revisiting the October 2004 finding in DPW's Landfill Financial Plan[6] that special activity bonding is the preferred means of financing the $90 million dollar cost of Consent Decree compliance. In its December 5, 2006 letter to you, DPW informed PUC that GovGuam now intends to solicit private interest in financing the construction and operation of the Consent Decree projects. GovGuam's December 15, 2006 Response in the Federal enforcement proceeding states that "some legislators appear to prefer private financing for the Layon Landfill development, even though GEDCA's advisor recommends a revenue bond as more economical to Govguam and the ratepayers. Consequently, DPW is now also pursuing private financing for the Layon Landfill construction."[7] Based upon GCG's observations, GovGuam's two year effort to obtain special activity bond financing has been marred by indecision and a lack of urgency and leadership to address operational and organizational problems, which has frustrated the financial advisors tasked assisting GovGuam in securing it. Under PUC's October 27, 2005 Order in Docket 05-9, GovGuam (*DPW*) must obtain PUC approval of the means (private or bond financing) by which it will obtain the funding necessary for Consent Decree compliance[8]. To date, GovGuam has not petitioned PUC to review and approve any financing for Consent Decree compliance. In addition, legislation must be enacted to authorize this financing. There is a

---

[4] See the Audit for recommendations to address these critical issues.

[5] In GovGuam's December 15, 2006 *Response to the United States' Concerns Raised in its Request for a Status Conference*, District Court of Guam Civil Case No. 02-22 *(Response)* at page 8, it has asserted that PUC's focus on the immediate need to resolve substantial deficiencies in SWM's billing and collection system and on the privatization of residential waste collection is distracting the Government from its ability to meet Consent Decree timelines. GCG respectfully disagrees. The recommendation to fix a non-functioning billing and collection system, with which the Government intends to repay over $90 million dollars of debt necessary for Decree compliance, is not a "distraction" but the only hope there is to provide for access to the capital markets to fund the necessary SO projects.

[6] This document can be reviewed at *guamlandfill.org*. Select public documents from public link menu.

[7] *See* Govguam's Response at pages 8 and 9.

[8] As with the other regulated utilities, PUC adopted a contract review protocol by Order dated 10/27/05, under which GovGuam (DPW?) must obtain PUC approval before undertaking procurement activities, including borrowing, in excess of $50,000. This Order is supported by a Stipulation dated 10/17/05, signed by authorized representatives of the Department of Public Works, the Attorney General of Guam and GCG. The reason for this regulatory review is that rate revenues will be expected to fund such procurements and the repayment of the financing. Accordingly, to protect the interests of ratepayers, PUC must determine that the financing alternative selected by the government is reasonable and prudent.

compelling need for the legislative and executive branches to join in a unified effort to promptly secure this financing.

2. In its May 2, 2006 letter to the 28th Guam Legislature[9], PUC expressed its serious concern whether the Department of Public Works, a GovGuam line agency, had adequate authority and resources to comply with the covenants and requirements of revenue bonds. PUC recommended that legislation be enacted to transform SWM into a public corporation under the oversight of the Consolidated Commission on Utilities. The Audit strongly supported this recommendation, which is also embodied in the Guam Environmental Protection Agency's 2006 Guam Integrated Solid Waste Management Plan. In its September 28, 2006 Order, PUC offered its assistance, upon request, to propose specific legislation, which is necessary to implement key Audit recommendations, including the transformation of SWM into a public corporation[10]. No such request has been received by PUC. It is essential that the legislative and executive branches join in an expedited collaborative effort to implement the Audit recommendations for remedial legislation. This legislation is indispensable to enable GovGuam to meet the financial obligations incident to Consent Decree compliance.

3. GCC recommends that PUC defer any further SWM rate proceedings until findings 1 and 2 above are addressed by the executive and legislative branches. SWM's current rate revenues are derived 41% from residential customers with the remainder coming from the tipping fees paid by commercial haulers and "self haul" customers. As is discussed later in this letter, SWM currently only collects 50% of its residential billings. GCG concludes that it would be manifestly unfair and unreasonable to increase the collection fees for the 50% of residential customers who actually pay for service[11], without first: a) fixing SWM's billing and collection system and b) privatizing island-wide residential collection service. GCG is encouraged by draft procurement documents, not yet filed for PUC review, by which GovGuam would procure services to implement a prepaid decal system to bill and collect for residential collection service and to privatize residential service. SWM should file a petition for PUC review of these procurements at the earliest possible date. The Audit also establishes that flawed legislation, under which commercial haulers serve as government agents for the collection of commercial tipping fees without any duty or authority to enforce collection, must be fixed before it would be reasonable to increase tipping fees. PUC's first SWM rate proceeding (October 2005) was grounded on the premise that rates needed to be gradually increased to prepare for the impact of revenue bonding. GCG submits that, in light of the GovGuam's reconsideration of its decision to pursue revenue bonding, further rate proceedings should await PUC's review and approval of the means of financing, which may have a substantial bearing on the level and timing of future rate increases.

4. PUC should continue to offer its support and cooperation to GovGuam in its efforts to comply with Consent Decree requirements. Subject to the GovGuam's commitment (either voluntarily or under judicial order) to promptly address findings 1 and 2 above, PUC should support

---

[9] *Attachment C.*

[10] *Attachment D* summarizes this proposed remedial legislation.

[11] Even with improved SWM collection rates, the audit estimated that residential rates would increase 220% and tipping would increase 380% to cover anticipated expenses related to a $90 million dollar bond issue and the implementation of required SO projects.

GovGuam's request in ongoing District Court enforcement proceedings that the timelines in the Consent Decree be reasonably amended.

We also observe that in contrast to the GWA Stipulated Order, PUC is not tasked by the DPW Consent Decree with reviewing and approving the Financial Plan, by which GovGuam will meet its duties under the Consent Decree. We recommend that PUC communicate to USEPA its availability to provide this service by PUC order in this proceeding.

This letter will now review in greater detail GCG's findings during its recent visit with SWM.

Detailed findings

1. Financing of Consent Decree compliance.

During our recent visit with SWM, a decision was made to defer filing an application for a rate increase that had tentatively been scheduled for hearing at the January 2007 Regulatory Session. One of the reasons for the requested deferral was that SWM informed us that bond financing of Consent Decree projects is not a certainty and that other options were now being evaluated. Bond financing was the basis of our previous recommendations to increase revenues. Alternative financing measures are being evaluated by SWM and any final decision would have to be reviewed and approved by the PUC for the costs and benefits. Prior to our receiving this information, we were not aware of any other alternatives under consideration. In fact, in the Landfill Financial Plan available on the website (www.guamlandfill.org) prepared by Duenas & Associates and Ernst & Young, LLP in October 2004, the following conclusion is reached:

It would appear that the preferred alternative for financing the sanitary landfill and costs associated with the closure of the Ordot dump would be the private activity bond. Assuming qualification of the bond issue and approval by the Guam Legislature, it would be anticipated that the bond issue can be accomplished within 90 to 120 days. As noted above, successful financing through the private activity bonds is dependent on the Governor of Guam and the Guam Legislature

We contacted SWM financial advisor and potential bond underwriter, UBS and Bank of America (BOA), to investigate whether they were aware of any alternative to bond financing that was under consideration. They indicated to us that they did not have any such information. Based on our analysis and our conversations with UBS and BOA we believe that any alternative to bond financing and project structure would have to show a net benefit over the following benefits that bond financing would offer:

- Benefits arising from the issuance providing tax free interest to investors
- Potential additional charges by the private investor to offset the risks of assuming a privatized structure
- Potential loss of control of operations assuming a privatized structure
- Potential request for a GovGuam guarantee of payment given SWM's poor history of billing and collection

- Potential delay in gearing up for an alternate project structure and means of financing[12]
- Potential consideration of the amount privately financed as being GovGuam debt in any financial evaluation

Given that all of the prior planning studies relied upon bond financing and the most recent advice of SWM financial advisors does not include evaluating private financing and changing fundamentally the structure of the project, we view this potential change of course as having a considerable risk for delay and not meeting an adequate cost-benefit threshold. Since we are unaware of the basis on which this alternative is being considered, we are unable to provide further analysis. SWM should be required to show why this change in course is prudent, upon whose advice it is being considered and whether and upon what basis it has the potential to meet a cost-benefit standard and overcome the concerns listed above.

We caution again that any plan will be subject to the fundamental reality that SWM must get into a position that those customers who are paying for service receive good service and those customers that do not pay for service are cut off from further service until payment is made. Our recommendations to accomplish this are contained in the Audit.

2. Financial update.

In this section we provide an update on various financial issues discussed in the prior Auditor in the prior rate proceeding.

a.    Examination of Accounts Receivable

In our Audit Report to the PUC we highlighted what appeared to be a significant problem regarding collections not only from the residential customers, but from large commercial and other haulers. The following table provides an update of the level of receivables being carried by SWM and shows that this chronic problem remains:

---

[12] A substantial amount of work has already been completed assuming an initial revenue bond issue of $90 − 95 million.

Table 1
Accounts Receivable Gross

| Month Ending | Large Commercial | Other Commercial | Residential | TOTAL |
|---|---|---|---|---|
| September 30, 2005 | 3,255,241 | 222,761 | 6,305,891 | 9,783,893 |
| October 31, 2005 | 3,271,957 | 226,853 | 6,429,969 | 9,928,779 |
| November 30, 2005 | 3,099,224 | 230,819 | 6,605,100 | 9,935,143 |
| December 31, 2005 | 3,141,201 | 233,290 | 6,804,152 | 10,178,643 |
| January 31, 2006 | 3,076,025 | 237,605 | 7,004,435 | 10,318,065 |
| February 28, 2006 | 3,119,295 | 232,262 | 7,208,661 | 10,560,218 |
| March 31, 2006 | 3,177,542 | 234,567 | 7,420,362 | 10,832,471 |
| April 30, 2006 | 3,234,900 | 236,982 | 7,495,591 | 10,967,473 |
| May 31, 2006 | 3,216,904 | 236,527 | 7,454,734 | 10,908,165 |
| June 30, 2006 | 3,197,945 | 239,948 | 7,593,970 | 11,031,863 |
| July 31, 2006 | 3,128,425 | 241,448 | 7,577,267 | 10,947,141 |
| August 31, 2006 | 3,203,980 | 242,597 | 7,530,771 | 10,977,348 |
| September 30, 2006 | 3,287,960 | 260,760 | 7,677,862 | 11,226,582 |

We inquired of the Department of Administration (DOA) whether or not these amounts were collectible, especially from the large commercial and other commercial haulers.[13] DOA provided evidence that, according to its records, there was an allowance for bad debt of nearly $9 million against this amount – i.e. over 80% could have problems being collected. The gross balances equate to almost two year's worth of revenues, making collection of these amounts difficult if not impossible. Current annual revenues are slightly less than $6 million.

In addition to obtaining account information from DOA, we met with the Public Auditor (PA) during our visit. In the last report filed with the Commission, GCG suggested that the PUC and SWM contact the PA to have her review the commercial accounts. We discussed the collection problem with the PA and she agreed to consider use of her time and efforts for follow-up on the commercial accounts, particularly the large commercial accounts. SWM was to meet with her again to discuss the matter further, but we do not know whether or not this meeting has occurred.

---

[13] At the current time, DOA does the bookkeeping for SWM.

DOA indicated that of the $3.3 million of outstanding receivables for large commercial customers, $1.7 million were for receivables in excess of 120 days. With the Ordot landfill facility a necessary component of the private haulers to conduct their business, we do not understand why this receivable was allowed to reach this magnitude. The Ordot facility should have been closed to haulers with large outstanding receivables, or to those customers of the haulers that have not paid their bills, until some arrangement had been made to pay down the large balance.

DOA also provided a detailed schedule of the gross balance of accounts receivable during our on-site review. That schedule shows that within the large balance of AR in excess of 120 days is an amount of $1.3 million due from one provider, Commercial Sanitation Systems. It is our understanding that key employees of this commercial hauler have been indicted for fraud and bribery related to dumping at the Ordot facility. We are unclear as to whether the AG is seeking recovery of this amount from the hauler. SWM management was going to meet with the AG (at the suggestion of the PA), but we do not know at this time whether such meeting has occurred or if management has even made an appointment to meet with the AG.

b.      Results for Fiscal 2006 and Cash Balances

Attached to this testimony is an attachment (**Attachment E**) that contains two exhibits. The first exhibit shows the accrued revenues and the collection of those revenues for the year ending September 2006. As can be seen in the exhibit, the overall collection ratio was 80% of cash to accrued revenues. This is an improvement over the period when the PUC last adjusted rates (November 2005). The current rates were approved by the PUC using an assumption that SWM would collect about 96% of its commercial hauling revenues[14] and 70% of its residential revenues. While the Large Commercial collection ratio was about 96% on an actual basis (the level assumed by the PUC in setting rates), the residential collection ratio was only 50%, which is lower than the assumption used to set the current rates (albeit improved over prior periods) when the collection ratio was approximately 30%. This means that SWM would have less revenue than the PUC assumed in setting rates at a reasonable collection level. Even though the current level of residential collection has shown an improvement, it is still abysmal. No ongoing business could survive with a collection ratio of 50%. The inherent unfairness of requiring half of the customers to support the entire residential population should be obvious. This level of collection could not support bond financing – or any other form of financing.

The following table shows the "net" revenues achieved over the entire fiscal year 2006 and compares that with the net revenues assumed by the PUC when setting rates in November 2005 for FY 2006:

---

[14] Weight Average of Large and Other Commercial Haulers collection ratio.

Table 2
SWM Net Revenue
($000's)

|  | PUC Forecast | SWM Actual |
|---|---|---|
| Commercial Tipping Fees | $ 3,397 | $ 3,610 |
| Allowance For Bad Debt | (170) | (160) |
| Residential Hauling Fees | 2,495 | 2,765 |
| Allowance For Bad Debt | (748) | (1,382) |
| Self Hauling Fees | 733 | 266 |
| Total Revenues | $ 5,706 | $ 5,100 |

The shortfall between the PUC forecasted revenues for Fiscal 2006 and the actual SWM revenues for Fiscal 2006 can only be balanced by either a decrease in actual Fiscal 2006 expenditures or by transferring other funds in the general fund to the SWOF account. In other words, while SWM had budgeted expenses of $5.7 million based on expected revenues, only $5.1 million of expenses could have been funded with actual revenues. We were informed by DOA that during Fiscal 2006 SWM only expended approximately $4.7 million for operational expenses. That implies that SWM "under spent" its 2006 expense budget. We do not understand the reasons for this under spending, especially when the Director constantly indicates that he is short of resources.[15] SWM personnel indicate that there was "no variance" in the actual level of 2006 expenses compared to budget. We have not analyzed this conflict further. At the end of the fiscal year 2006, SWM had approximately $840 thousand of cash recognized on its balance sheet. This represents an increase over the Fiscal Year-end 2005 balance of cash of about $515 thousand or a net increase of $325 thousand on a cash basis.

SWM did comply with the PUC order and establish a bank account into which DOA would deposit and escrow funds, as ordered by the PUC in the last rate proceeding. This reserve or escrow account was set up in the Bank of Guam. We were provided a copy of the bank statement as of September 30, 2006 showing that this account had a balance of $575,657 on deposit. We have appended Exhibit 2 of *Attachment E* to this testimony. That exhibit shows that at the end of September 2006, DPW should have a total $716 thousand in reserve and not the $584 thousand. Therefore, DOA needs to transfer the difference $132 thousand to the account to complete the required deposits through September 2006. There was verbal acceptance of our proposed computation, but we still do not have an official acceptance.

c.     Residential Collection and Hauling

The PUC Order required that SWM accelerate the process that would lead to the privatization of residential collection and hauling for the entire island. This could make a profound difference in the entire residential participation in the billing and collection process. SWM was supposed to submit to the PUC by October 2006 a list of any additional required

---

[15] We also enquired of the director statements regarding to not having the budget to deal with the recent fire at the dump. We understand this statement to mean that the budget did not specifically allocate expenses for such an incident. As indicated later in this section SWM had cash balance to over $800,000 at the end of FY 2006.

resources that it would need to fully privatize this portion of SWM's business by July 2007. No request has been made. We assume that this means that no additional resources are required. We have recently received a nearly completed draft IFB for this project. The IFB will seek bidders for all of its proposed franchises ("Zones 1, 2 & 3). The bidder may select to bid on any one, two or all three Zones. The IFB is still in draft form and needs additional information to complete. The most significant missing piece of information is the estimate of the number of customers by Zone. This is the same informational hang-up that delays the Decal program proposal. SWM should file the IFB with the PUC before the January 2006 session for review and approval (assuming that the bid is completed).

3. Remedial legislation.

In this section we review issues that we believe require legal intervention.

a. Use of the SWOF by the General Fund

Our counsel informs us that a conflict exists between PL28-56 which gave the PUC regulatory authority to adjust rates and that required that the SWOF used for solid waste management operations and regulatory costs and PL28-150 establishing the budget for the General Fund. The concern centers on the failure of PL28-150 to include the SWOF in the list of special funds that are exempted from the Executive branch's "use and restore" powers.. We have included our Counsel's legal opinion regarding this matter in this report (*Attachment D*).

We believe that the failure to exempt the SWOF from use for purposes other than the uses stated in PL28-56 was an inadvertent omission by the Legislature rather than an implicit attempt to repeal PL28-56. Nonetheless, GCG believes that the Commission should approach the Legislature to amend PL28-150 to exempt the SWOF from uses other than SWM operations and regulatory expenses.

b. Other Legal Issues

There are other legal impediments that should also be addressed by the Legislature in an expedited fashion and if possible before the next rate increase is reviewed by the PUC. We have provided a brief summary of legislative changes as part of *Attachment D* as well our legal counsel's opinions regarding the Focused Management Audit Report that we issued in August 2006. In addition to those recommended changes we are informed by counsel that large portions of Chapter 51-Title 10 of the Guam Code Annotated were affected by the invalidation of PL24-272 by the Guam Supreme Court in Pangelinan and Wesley v. Gutierrez, 2004 Guam 16. The result is that Chapter 51 contains several gaps caused by having to delete each provision of Chapter 51 that was enacted into law by PL24-272 and not amended by subsequent legislation. In addition, there are numerous existing statutes that conflict with the plans developed by the Governor's Ordot Consent Decree Compliance Team. These plans include adopting a pre-paid decal program, creating an autonomous Solid Waste Management Authority under the auspices of the Consolidated Commission on Utilities, making commercial collectors responsible for the collection of tipping fees from their customers and floating revenue bonds to finance the tasks that are required pursuant to the Consent Decree in U.S. v. Government of Guam, District Court of Guam Case No. 02-00022. During our recent visit with SWM management, we inquired whether SWM or other members of the Consent Decree Team had created a list of proposed changes to Guam Code Annotated Title 10-Chapter 51 that would essentially make SWM an autonomous agency and permit

unencumbered management decisions regarding operations and cash management. We were informed that the parties had not yet proposed nor even drafted any such "cleansing" legislation.

If you wish to discuss any and all of the above, please do not hesitate to call.

Cordially,

Jamshed K. Madan

Cc:     Larry Perez, Director, DPW
        Jim Baldwin, Esq.

Attachment A
PUC Order Docket 06-02

BEFORE THE GUAM PUBLIC UTILITIES COMMISSION



FOCUSED MANAGEMENT AUDIT
OF DEPARTMENT OF PUBLIC
WORKS' SOLID WASTE MANAGEMENT          DOCKET 06-02
DIVISION

## ORDER

Public Law 28-56 authorizes and directs the Guam Public Utilities Commission
[PUC] to undertake a focus management audit of the existing operations of the
Department of Public Works' [DPW] Division of Solid Waste Management
[DSWM]. The law provides that the audit will be funded by the *Solid Waste
Operations Fund.*

In furtherance of this statutory duty, after review of the protocol used by PUC to
conduct management audits of Guam Power Authority, Guam Telephone
Authority and Guam Memorial Hospital Authority, for good cause shown and
on motion duly made, seconded and carried by the affirmative vote of the
undersigned commissioners, the Guam Public Utilities Commission HEREBY
ORDERS THAT:

1. PUC's administrative law judge [ALJ] is authorized and directed to:

    a. Conduct a competitive selection process for the procurement of a
    firm to perform the audit, using a request for proposal [RFP],
    which is crafted in consultation with the Committee created under
    subsection [b] below;

    b. Organize and oversee the activities of a management audit
    committee [Committee], which shall be comprised of a DPW
    representative, ALJ as chair, and a representative from Georgetown
    Consulting Group; provided, however, that: I] DPW's failure to
    either appoint a Committee member or to attend Committee
    meetings, as scheduled by ALJ, shall not delay the Committee's
    business; and ii] the DPW representative shall be expected to have
    full authority to make recommendations on its behalf; and

    c. After consulting with the Committee, make all decisions on behalf
    of the Committee as required herein and under the RFP, when a
    consensus among the Committee members is not reached.

2. The Committee is authorized and directed to:

1

a. Review the proposals submitted in response to the RFP and establish an unranked list of the three best qualified offerors;

b. Interview the best qualified offers;

c. Rank the three offerors in order of their respective qualifications; and

d. Negotiate a contract with the best qualified offeror, in form as attached hereto, subject to such amendments as it may deem appropriate and necessary during the course of the negotiation, including the determination of the compensation which is deemed to be fair and reasonable, and thereafter to submit the negotiated contract to the PUC chairman for signature.

3. PUC authorizes and directs ALJ to under take the following:

a. In his capacity as Committee chairman, to oversee the audit as the duly authorized PUC representative with delegated authority to take such action as may be reasonably necessary or appropriate in furtherance thereof.

b. To keep PUC fully advised on the audit's progress and to submit the final audit report to PUC for review and approval.

4. DPW is ordered and directed to:

a. Pay for the auditor's fees and expenses from the Solid Waste Operations Fund in accordance with the contract terms and all other fees and expenses, which are incurred by PUC in this docket;

b. Provide the logistical and office support which the auditor may require during the course of the audit; and

c. Fully cooperate with the audit process under ALJ oversight.

Dated this 27th day of October 2005.

_____
Terrence M. Brooks

_____
Joseph M. McDonald

_____
Edward C. Crisostomo

_____
Rowena R. Perez

2

Attachment B
December 14, 2006 Letter From ALJ

# PUBLIC UTILITIES COMMISSION
## OF GUAM

Terrence M. Brooks

Edward C. Crisostomo
Filomena M. Contoria
Joseph M. McDonald
Rowena E. Perez
Jeffrey C. Johnson

Suite 207, GCIC Building
Post Office Box 862
Hagatna, Guam 96932

Telephone: (671) 472-1907
Fax: (671) 472-1917
Email: info@gpscampuc.com

Harry M. Boertzel
Administrative Law Judge

Loures R. Palomo
Administrator

December 14, 2006

<u>VIA ELECTRONIC TRANSMISSION</u>
Lawrence P. Perez, General Manager
Department of Public Works
542 North Marine Drive
Tamuning, Guam 96913

RE:   Docket 07-1 [SWM FY07 Rate Proceeding]

Dear Mr. Perez:

In response to your December 5, 2006 letter:

1.  I am canceling the DPW rate hearing previously scheduled for January 24, 2007. Enclosed is Georgetown's December 12, 2006 letter, which supports your request, with observations and reservations. The issue of when and under what circumstances the rate proceeding should be rescheduled will be reviewed by PUC during the January 2007 regulatory session. The Georgetown rate report, previously deadlined for December 27, 2007, will now focus instead on Mr. Margerison's findings during his recent Guam visit. Georgetown principal, Jim Madan, will present this report to PUC at a multi-purpose regulatory workshop, which will be held at 6:00 p.m. on January 23, 2007.

2.  Your request that PUC approve the omnibus RFP *concept* mentioned in your letter is premature. DPW is required under PUC's October 27, 2005 Docket 05-9 Order *[contract review protocol]* to file with PUC the detailed information described in section 4[b] of the Order, including the full text of the proposed RFP, in support of a petition for PUC review of a proposed procurement. The Order emphasizes that DPW must obtain PUC's approval *before the procurement process begins.* PUC awaits this long overdue filing from DPW so that Georgetown can be authorized to begin its review of the omnibus RFP.

1

3. A SWM regulatory conference has been scheduled for 2:00 p.m. January 18, 2006 at Suite 207 GCIC Building to review the status of DPW's efforts to prepare and submit for regulatory review: a] a petition for approval of financing for Consent Decree projects; and b] a petition for approval of the omnibus RFP discussed in paragraph 2 above.

4. In its September 28, 2006 Order [Docket 06-2] PUC emphasized the importance of privatizing residential collection for the entire island by July 2007. The Order required DPW to inform PUC not later than October 15, 2006 of the additional resources it would require to successfully meet this deadline. PUC has not received any filing from DPW in response to this order.

I look forward to meeting with you on January 18, 2007 to discuss the above matters. Please let me know if there is any regulatory assistance which PUC can provide in the interim.

With best wishes for a merry Christmas and successful New Year,

Harry M. Boertzel /HRP
Harry M. Boertzel

cc:     Jim Madan, Georgetown
        Terrence Brooks, Esq.

Encl:   Georgetown 12/12/06 letter

2

Attachment C
PUC Letter to Legislature

# PUBLIC UTILITIES COMMISSION
## OF GUAM

Terrence M. Brooks

Joseph M. McDonald
Edward C. Crisostomo
Rowena E. Perez

Suite 207, GCIC Building
Post Office Box 862
Hagatna, Guam 96932

Telephone: (671) 472-1907
Fax: (671) 472-1917
Email: info@guampuc.com

Harry M. Boertzel
Administrative Law Judge

Lourdes R. Palomo
Administrator

May 2, 2006

**VIA HAND DELIVERY**
The Honorable Joann Brown
Vice Speaker, 28th Guam Legislature
Chairman, Committee on Utilities and Land
155 Hesler Street
Hagåtña, Guam 96910

Dear Vice Speaker Brown:

During its recently concluded regulatory session, the Guam Public Utilities Commission [PUC] reviewed and approved the five recommendations contained in the enclosed April 20, 2006 report from Administrative Law Judge Boertzel. The report summarizes the challenges, which must be resolved in order to secure the financing necessary to enable the Government of Guam to comply with the Federal Consent Decree.

The purpose of this letter is to share with you PUC's serious concern whether Department of Public Works [DPW], a line agency, has adequate authority and resources to comply with the covenants and requirements, which will be imposed by the bond documents. It should be recalled that it took Guam Waterworks Authority, under the Consolidated Commission on Utilities' [CCU] governance and with a capable management team *[experienced general manager, engineer, chief financial officer and legal counsel]* almost three years to prepare itself for its first bond financing. DPW is being expected, without comparable resources or lead time, to assume the same responsibilities. These realities persuade PUC that the recommendation made in Guam Environmental Protection Agency's 2005 *Guam Integrated Solid Waste Management Plan*, that solid waste management be transferred to a public corporation under CCU's oversight, should be given serious consideration.

PUC stands ready to work with the Guam Legislature as it considers the legislation, which will be necessary to authorize the important revenue bond financing discussed in this letter.

Respectfully,

Terrence Brooks
Chairman

Attachment D
Summary of Required Legislation
And Legal Memoranda

The following statutes and regulations that have identified as being problematic for the reason stated:

1.  10 GCA §51101 (enacted by invalidated statute);
2.  10 GAC §51102 (enacted by invalidated statute);
3.  10 GCA §51103(b) (enacted by invalidated statute);
4.  10 GCA §51103(c) (enacted by invalidated statute);
5.  10 GCA §51118(a) (DPW reference needs to be changed if autonomous agency created);
6.  10 GCA §51118(f) (control of Solid Waste Operating Fund);
7.  10 GCA §51118(h) (DPW reference needs to be changed if autonomous agency created);
8.  10 GCA §51118(h)(1) (GHURA low income housing criteria over-inclusive for use as residential tipping fee lifeline criteria);
9.  10 GCA §51118(l) (Governor's authority to suspend tipping fees after force majeure incompatible with pledge of revenues for revenue bond);
10. 29 GAR §2100 (enacted by invalidated statute);
11. 29 GAR §2101 (target date of January 1, 2001);
12. 29 GAR §2105(j) (billing after services provided with payment due 60 days thereafter);
13. 29 GAR §2105(m) (commercial haulers must be responsible for payment of tipping fees in order to avoid need for PUC oversight); and
14. 29 GAR §2105(n) (commercial haulers currently face no consequences if solid waste collected from customer delinquent in tipping fees is brought to landfill).

# MEMORANDUM

| | |
|---|---|
| **TO:** | **GEORGETOWN CONSULTING GROUP** |
| **FROM:** | **JAMES F. BALDWIN, ESQ.** |
| **SUBJECT:** | **EFFECT OF 2007 BUDGET BILL ON INTEGRITY OF SOLID WASTE OPERATING FUND** |
| **DATE:** | **JANUARY 5, 2007** |

## ISSUE PRESENTED

Whether the government of Guam 2007 budget bill ("PL 28-150") adversely affects the integrity of the Solid Waste Operating Fund ("SWOF") and is in conflict with stated intention in PL 28-56 to limit the use of the SWOF to solid waste management operations and regulatory costs.

## ANALYSIS

Section 1(g)-Chapter IV of PL 28-150 provides two lump sum appropriations to the Department of Public Works ("DPW"), one of which appropriates $5,822,582[16] to the SWOF. Section 5-Chapter IV of this same public law provides:

> **Special Fund Transfer.** *I Maga'lahen Guåhan* is authorized to transfer to the General Fund any cash available from any Special Fund or Revolving Fund to fund the appropriations authorized in this Act, provided that such authority shall *not* extend to Trust Funds; the Historic Preservation Trust Fund; the Tourist Attraction Fund; the Customs, Agriculture and Quarantine Inspection Services Fund; the Healthy Futures Fund; the Wildlife Conservation Fund; Special Funds under the purview of the Guam Environmental Protection Agency; and funds under the purview and administration of *I Liheslaturan Guåhan*, the Judiciary, the Guam Memorial Hospital Authority, the Guam Public School System and those departments

---

[16] The level of the Fiscal 2007 budget for Solid Waste Management

and agencies exempted in this Act from the Governor of Guam's transfer authority.

All cash from Special Funds or Revolving Funds transferred to cover the appropriations authorized by this Act <u>shall be reimbursed to the Special or Revolving Fund from which it was transferred promptly as cash becomes available</u>.

*I Maga'lahen Guåhan* shall submit a report to the Speaker of *I Liheslaturan Guåhan* on the fifth (5th) day of every month on all transfers made pursuant to this Section. Said report shall include detailed information on the amount of such transfers and identify the fund from which the transfers were made and the purposes of the transfers. [emphasis added]

The SWOF is not among the various special funds specifically exempted from the Governor of Guam's transfer authority. As a result, the Governor of Guam may transfer funds from the SWOF and need only restore funds so transferred "as cash becomes available" in his sole discretion.

DPW has announced plans to pursue a revenue bond to fund the solid waste management projects required of the government of Guam pursuant to the Consent Decree in District Court of Guam Case No. 02-00022. Any such bond offering would need to be approved by the Guam Legislature. Since the legislation approving of the bond offering would presumably include authorization to pledge the revenue of the SWOF as the source of funds for repayment of the bond, this subsequent legislation would supersede the Governor of Guam's authority to borrow funds from the SWOF granted in PL28-150 since the funds would already be encumbered. Thus, the integrity of the SWOF would presumably be restored once this pledge of SWOF revenue is authorized by the Guam Legislature and effectuated by issuance of the revenue bond.

The key problem caused by granting the Governor of Guam an unrestricted ability to borrow funds from the SWOF is the effect it will have short-term ability of DPW to convince potential bidders for upcoming solid waste management projects (such as residential trash collection) that there will be sufficient funds available in the SWOF for payment of services rendered. Should DPW abandon or delay its bond borrowing plans, then these problems will extend beyond the short-term horizon because the legislation authorizing the pledge of

revenues that are required to be deposited in the SWOF will not have been enacted.

In simple terms, the Governor of Guam has the ability to remove cash from the SWOF and replace it with an IOU that only need be honored "as cash becomes available." Such an open-ended obligation is likely to cause great uncertainty among potential bidders as to whether the SWOF will have sufficient cash on deposit to pay their invoices should they be awarded contracts. If the potential bidders instead are convinced that the SWOF will soon have on deposit more open-ended IOUs from the Governor of Guam than cash and that vendors will need to wait for payment "as cash becomes available" in the Governor of Guam's sole discretion, these potential bidders are likely to increase their bid prices if they decide to bid at all.

The ability to borrow from the SWOF also undermines the October 27, 2005 PUC regulatory order restricting the use of the additional tipping fees authorized by this order to regulatory expenses and other uses authorized by subsequent PUC order, as these earmarked funds are also subject to the Governor of Guam's transfer authority notwithstanding the October 27, 2006 PUC order. If the Governor has the ability to withdraw funds that the PUC has ordered to be segregated and reserved for specific purposes authorized by PUC order, it makes it difficult for the PUC to enforce its orders concerning these segregated funds because there may not be cash on deposit for these necessary expenditures once they have been authorized by the PUC.

## CONCLUSION

Section 5-Chapter IV of PL 28-150 completely destroys the "lock box" concept for the SWOF that was set forth in Public Law 28-56. The reason is that this section permits the Governor of Guam to borrow funds on deposit in the SWOF, with the only requirement to repay said funds being the vague condition "as cash becomes available" in the Governor of Guam's sole discretion. This unfettered ability to tap into the SWOF for purposes other than solid waste management operations is likely to undermine the confidence of potential bidders in the upcoming Invitation for Bids for residential trash collection services. Section 5-Chapter IV of PL 28-150 would also permit the Governor of Guam to drain off the current balance of the escrow account established by the October 27, 2005 PUC order that was earmarked for the payment

of regulatory and other PUC approved expenses.  These problems
can easily be solved by adding the SWOF to the list of special
funds identified in Section 1(g)-Chapter IV of PL28-150 that
are exempt from the Governor of Guam's transfer authority.

JFB

F\24931-95
G:\WORDDOC\DRAFT\JFB\07 01 05 GCG FOLLOW UP LETTER (WITH
BSJ RED LINE EDITS).DOC
G:\WORDDOC\DRAFT\JFB\07 01 05 GCG FOLLOW UP LETTER (with
BSJ red line edits).doc

ATTACHMENT E
Financial Analysis

Exhibit 1

| | Oct. 2005 | Nov. 2005 | Dec. 2005 | Jan. 2006 | Feb. 2006 | Mar. 2006 | Apr. 2006 | May. 2006 | June 2006. | July 2006. | Aug. 2006. | Sep. 2006. | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| Commercial Billings | 241,820 | 308,069 | 307,260 | 287,564 | 278,315 | 317,952 | 302,655 | 313,645 | 299,435 | 289,650 | 310,570 | 342,955 | 3,609,790 |
| OCH Billings | 8,532 | 8,440 | 7,795 | 8,200 | 4,190 | 5,100 | 5,210 | 5,325 | 7,345 | 5,385 | 6,485 | 8,025 | 80,032 |
| Residential Billings | 187,384 | 231,854 | 232,146 | 234,360 | 234,778 | 235,270 | 233,740 | 234,092 | 234,364 | 234,806 | 235,746 | 236,622 | 2,765,262 |
| Total Billed Revenue | 437,736 | 548,463 | 547,201 | 540,124 | 517,283 | 558,322 | 541,505 | 553,062 | 541,144 | 529,841 | 552,801 | 587,802 | 6,455,084 |
| Self Haul Collections | | | | | | | | | | | | | |
| Ordot Landfill | 9,938 | 13,413 | 11,980 | 12,529 | 11,911 | 12,983 | 12,348 | 17,225 | 12,503 | 14,179 | 14,055 | 16,625 | 159,088 |
| Agat Transfer Station | 1,644 | 1,377 | 1,750 | 2,100 | 1,980 | 1,630 | 1,430 | 1,675 | 1,510 | 2,290 | 1,400 | 1,830 | 20,616 |
| Dededo Transfer Station | 4,108 | 6,123 | 6,140 | 6,995 | 5,270 | 5,230 | 4,828 | 5,740 | 5,640 | 6,270 | 5,895 | 5,935 | 68,174 |
| Malojlo Transfer Station | 1,224 | 1,298 | 1,720 | 1,855 | 1,270 | 1,440 | 1,260 | 1,720 | 1,390 | 1,950 | 1,695 | 1,545 | 18,367 |
| Total Revenues | 454,050 | 570,674 | 558,791 | 563,603 | 537,714 | 579,605 | 561,371 | 579,422 | 562,187 | 554,530 | 575,846 | 613,537 | 6,721,329 |
| Commercial Payments | 225,104 | 480,602 | 356,283 | 382,740 | 235,015 | 269,705 | 245,197 | 274,283 | 332,760 | 264,554 | 138,550 | 286,311 | 3,461,303 |
| OCH Payments | 4,440 | 4,474 | 5,324 | 3,885 | 5,336 | 9,633 | 2,795 | 3,340 | 3,924 | 9,755 | 3,595 | 5,830 | 62,331 |
| Residential Payments | 63,306 | 46,823 | 33,092 | 34,077 | 30,552 | 23,969 | 158,511 | 275,055 | 84,878 | 251,509 | 282,252 | 89,541 | 1,383,564 |
| Transfer Payments | 16,314 | 22,211 | 21,590 | 23,479 | 20,431 | 21,283 | 19,866 | 26,360 | 21,043 | 24,689 | 23,045 | 25,935 | 266,245 |
| Total Collections | 309,164 | 554,310 | 416,289 | 424,181 | 291,334 | 314,589 | 426,369 | 579,037 | 452,605 | 550,507 | 447,442 | 407,616 | 5,173,443 |
| Collection Success | | | | | | | | | | | | | |
| Commercial Haulers | 93.1% | 156.1% | 116.0% | 121.9% | 84.4% | 81.7% | 81.0% | 87.4% | 111.1% | 91.3% | 44.6% | 83.5% | 95.9% |
| Other Commercial Haulers | 52.0% | 53.0% | 68.3% | 47.4% | 127.4% | 188.9% | 53.6% | 62.7% | 53.4% | 181.2% | 55.4% | 72.6% | 77.9% |
| Residential Customers | 33.8% | 20.2% | 14.3% | 14.5% | 13.0% | 10.2% | 67.8% | 117.5% | 40.5% | 107.1% | 119.7% | 37.8% | 50.0% |
| Transfer Stations | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Total Collection | 70.6% | 101.1% | 76.1% | 78.5% | 56.3% | 56.3% | 78.7% | 104.7% | 83.6% | 103.9% | 80.9% | 68.4% | 80.1% |

Exhibit 2

| Customer Classification | Nov. 2005 | Dec. 2005 | Jan. 2006 | Feb. 2006 | Mar. 2006 | Apr. 2006 | May-06 | Jun. 2006 | Jul. 2006 | Aug. 2006 | Sept. 2006 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Payments** | | | | | | | | | | | | |
| CH - Payment | 480,802 | 356,283 | 362,740 | 235,015 | 269,705 | 245,197 | 274,283 | 332,780 | 264,554 | 138,550 | 286,311 | 3,236,199 |
| OC - Payment | 4,474 | 5,324 | 3,885 | 5,336 | 9,633 | 2,795 | 3,340 | 3,924 | 9,755 | 3,595 | 5,830 | 57,881 |
| Residential - Payment | 46,823 | 33,092 | 34,077 | 30,522 | 23,969 | 158,511 | 275,055 | 84,878 | 251,509 | 282,253 | 89,541 | 1,320,230 |
| Total Payments CH/OC/Residential | 532,099 | 394,699 | 400,702 | 270,873 | 293,307 | 406,503 | 552,678 | 421,582 | 525,818 | 424,398 | 381,682 | 4,614,310 |
| **Payments adjusted to "old" rates** | | | | | | | | | | | | |
| Commercial Haulers | 384,642 | 285,026 | 290,192 | 188,012 | 207,764 | 196,158 | 219,426 | 266,208 | 211,643 | 110,840 | 228,049 | 2,588,959 |
| Other Commercial Haulers | 3,679 | 4,259 | 3,108 | 4,269 | 7,706 | 2,236 | 2,672 | 3,139 | 7,804 | 2,876 | 4,664 | 46,312 |
| Residential | 37,458 | 26,474 | 27,262 | 24,418 | 19,175 | 126,809 | 220,044 | 75,902 | 201,207 | 225,802 | 71,633 | 1,056,184 |
| Total Payments CH/OC/OCH/Residential (old Rates) | 425,679 | 315,759 | 320,561 | 216,699 | 234,646 | 325,203 | 442,142 | 345,250 | 420,654 | 339,518 | 305,346 | 3,691,455 / 25% |
| **Uncompl/Cash Transactions** | | | | | | | | | | | | |
| Uncompacted (Ordot - 341661005) | 13,413 | 11,960 | 12,529 | 11,911 | 12,963 | 12,348 | 17,225 | 12,503 | 14,179 | 14,055 | 16,625 | 149,729 |
| **Cash Collection - Transfer Stations:** | | | | | | | | | | | | |
| Agat (341661006) | 1,377 | 1,750 | 2,100 | 1,980 | 1,630 | 1,430 | 1,675 | 1,510 | 2,290 | 1,400 | 1,830 | 18,972 |
| Dededo (341661007) | 6,123 | 6,140 | 6,995 | 5,270 | 5,230 | 5,923 | 5,740 | 5,640 | 6,270 | 5,895 | 5,935 | 65,161 |
| Malojlo (341681008) | 1,298 | 1,720 | 1,855 | 1,270 | 1,440 | 1,260 | 1,720 | 1,390 | 1,950 | 1,665 | 1,545 | 17,143 |
| Total Ordot/Transfer Stations | 22,211 | 21,570 | 23,479 | 20,431 | 21,263 | 20,960 | 26,360 | 21,043 | 24,689 | 23,045 | 25,935 | 251,005 |
| Total Ordot/Transfer Stations (old Rates) | 22,211 | 21,570 | 18,783 | 16,345 | 17,028 | 16,783 | 21,088 | 16,844 | 19,751 | 18,436 | 20,748 | 200,804 / 25% |
| **Percent of Payments with Increase** | | | | | | | | | | | | |
| CH - Payment | 0.0% | 0.0% | 33.3% | 66.7% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |
| OC - Payment | 0.0% | 0.0% | 33.3% | 66.7% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |
| Residential - Payment | 0.0% | 0.0% | 33.3% | 66.7% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |
| Ordot/Transfer Stations | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |
| **PUC Escrow** | | | | | | | | | | | | |
| CH - Payment | 0 | 0 | 24,183 | 31,335 | 51,941 | 49,039 | 54,857 | 66,552 | 52,911 | 27,710 | 57,262 | 415,790 |
| OC - Payment | 0 | 0 | 259 | 711 | 1,927 | 559 | 668 | 785 | 1,951 | 719 | 1,166 | 8,745 |
| Residential - Payment | 0 | 0 | 2,272 | 4,070 | 4,794 | 31,702 | 55,011 | 18,976 | 50,302 | 66,451 | 17,908 | 241,485 |
| Ordot/Transfer Stations | 4,442 | 4,314 | 4,696 | 4,086 | 4,257 | 4,192 | 5,272 | 4,209 | 4,938 | 4,609 | 5,187 | 50,201 |
| Total PUC Escrow (25% increase) | 4,443 | 4,315 | 31,410 | 40,203 | 63,021 | 85,496 | 115,810 | 90,521 | 110,104 | 99,492 | 81,526 | 716,220 |

Total Escrow @ 9/30/06    $ 584,832    *Includes Interest*

# ATTACHMENT 14



FINANCIAL PLAN





Submitted By

Consent Decree Task Force
Department of Public Works
Government of Guam
542 North Marine Drive
Tamuning, Guam 96913

Prepared By:

Dueñas & Associates, Inc.
115 E.T. Calvo Memorial Parkway
Suite 200
Tamuning, Guam 96913

Ernst & Young LLP
Ernst & Young Building
Suite 200, 231 Ypao Road
Tamuning, Guam 96913

## Response to   US EPA Comments to LF Financial Plan 2004JUL07

*1) Are costs of ancillary solid waste facilities incorporated into any of the eleven functional groups represented in the Financial Plan? For example, are collection costs, transfer station construction, material recovery facilities, and hauling costs incorporated? If so, in which functional groups? If not, what are the costs associated with these activities  and how will funds be generated to support them?*

No.  The costs of the ancillary facilities such as collection, transfer stations and material recovery facility are not included in any of the eleven functional groups, as they are not required in the Consent Decree. DPW and GEPA agreed that the transfer stations, material recovery facility elements were not to be included at this time (see minutes of initial project meeting of April 21, 2004). Collection and hauling are provided by either commercial collection and disposal services (for businesses and organized residential communities) or the DPW. The costs for the DPW collection services are included in the current DPW operating costs.  Should DPW continue providing such services, the user fee would continue to provide the needed funds for the service, with appropriate adjustments for actual cost of service established by the PUC actuarial analysis. Should DPW elect to privatize such services and the PUC sets rates in accordance with PL 24-272, the rates would change to reflect a two part charge: 1) cost of collection – set by the PUC based on actuarial analysis of the private service provider's cost of service; and 2) disposal costs based on the PUC approved tipping fee.  The current $8/household per month user fee incorporates both collection and disposal.

In discussions with Guam EPA, it is anticipated that the impending update of Guam's Integrated Solid Waste Management Plan will likely involve legislative approval of upgrading the regional facilities.  There is also a strong possibility that legislative appropriations for these ancillary facilities will be provided.

*2) How much revenue is collected from the $8/month residential service fee versus the volume based fees presented in section 3.1?*

This information was retrieved by DPW in cooperation with the Department of Administration. For FY02 and FY03, revenue collected from the residential tipping fees were 45.5% and 38.2% respectively.  All other fees (volume-based fees presented in Section 3.1) made up the balance of the revenues collected.  A table of this breakdown was added to the text of the plan.

*3) Is the SWMF used for any other expenses (beyond solid waste handling)?  Has DPW or any other entity tapped the fund in the past years to pay for non-solid waste expenses? If so, DPW must allow for this contingency when establishing tipping fees. Provide more information on how the SWMF was utilized in past years, and a better breakdown of the various revenue sources (e.g., residential fees vs. private haulers).*

No.  The SWMF is used only for SW related expenses.  The fund has been used by DPW to pay for emergency contractual services (such as services for dealing with landfill fires), but not for any non-solid waste related items.  Additional breakdown of expenses has been added to the plan.

*4) What is PUC actuarial analysis of tipping and user fees discussed in Executive Summary?*

Actuarial analysis is analysis of the actual cost of service to be used in setting the rates.  Usually requires the presentation of audited financial statements and valid estimates of cost for planned expenses and operations.

**5) The landfill construction cost estimates of $60/ton are significantly higher than other similarly situated island facilities. It would be useful to compare Guam's construction and operations costs estimates with Saipan and other Island facilities.**

Actual construction costs were compared for another RCRA compliant landfill constructed on Guam, and were adjusted downward to account for features which will not be required at the new landfill site. Construction costs for Saipan, although similarly located, must be compared with qualifications for such factors as a significant disparity in labor costs. DPW has received information from the CNMI regarding the construction and operation of their MSWLF facility. Based on this information, construction costs used in the estimates are within about 15% of actual costs in the CNMI. These costs reflect an approximate compaction rate at the CNMI facility and CNMI labor rates.

A comparison of other island facilities would be useful. DPW has requested this information and will incorporate any information received accordingly.

**6) Section 5.6.1 should address expected (and best and worst case scenarios) for recycling rates. That would affect recycling and landfill operations cost estimates.**

Information contained in this section of the report utilized solid waste generation rates with minimal waste diversion, which represents the worst-case scenario. As the materials recovery facility and regional transfer stations (with attendant recycling facilities) were not included, nominal or "best case" recycling rates are not justified under the agreed project basis of analysis. It was agreed during the initial stages of the project that as additional generation and cost data became available, the LF Financial Plan could be revised to reflect this information. It is anticipated that such information would be incorporated into the plan as the new landfill facility design scope is finalized, however, it is not anticipated that an increased recycling rate will affect the near term costs for the landfill construction.

**7) What assumptions are used to convert the annual costs to needed tipping fees? Are the fees based on the current delinquency rates or an improved ability to collect fees in the future? Will there be different rates for commercial or residential customers? Are the administrative costs of managing the solid waste management fund and overseeing procurement included in the proposed tipping fees?**

The numbers presented in the proposed tipping fees are the annual operation and maintenance costs, and the amortized annual cost of service for the identified program elements divided by the projected generation rate in tons. No data on delinquency rates was provided and is therefore not incorporated into the fees presented. The assumption is that the rates will be paid at the landfill on the per ton basis, regardless of whether the waste is residential or commercial. Hauling/collection fees are not included in the tipping fee for private haulers – this is an additional charge, which is not regulated or administered by the DPW. If residential collection is privatized, a similar arrangement will result. The actuarial analysis conducted by the PUC will set the residential user fee. Administrative costs for managing the SWMF and procurement of contracted services are incorporated in the existing DPW budget; additional personnel needed to administer the program have been incorporated into the program costs.

**8) Has DPW met with FEMA or the military to discuss the possibilities of cost sharing portions of the new landfill?**

No. At this time, DPW has not had discussions with FEMA or the military. Such discussions can be conducted once the scope of the new landfill is more clearly defined, with any cost sharing

arrangements worked incorporated into subsequent revisions of the plan. DPW and GEPA will continue their dialogue with FEMA and the military to explore possible contributions to the financing of jointly used facilities.

**9) Please provide the basis for the wetlands mitigation cost estimate of $10,000,000 ($100,000 per acre times 100 acres).**

Conservative estimates of impacted wetlands at both the Ordot site and worst-case of the three prospective landfill sites were used to arrive at the potential mitigation area, applying a ratio of impacted wetlands to created wetlands of 1:2. The estimated area of Ordot wetlands impacted is 15 acres and the estimated area of wetlands impacted for the Sabanan Batea site is 35 acres. Applying the ratio yields a potential area of 100 acres.

**10) Are assumptions about special activity bonds interest rates affected by the expected large increase in the number of AMT taxpayers in the near future? That is, do you expect bond interest rates to rise as fewer taxpayers qualify to deduct private activity bond interest?**

No. The reduced number of taxpayers qualified to deduct private activity bond interest is not anticipated to affect the interest rates as the bonds will not be issued for purchase locally, but rather on an institutional level on the financial market. The Guam Economic Development and Commerce Authority (GEDCA) will be primarily responsible for the issuance of qualified private activity bonds and has the authority to engage financial consultants, bond agents and other professionals to facilitate the purchase of the bonds.

**11) Section 4.2.1 notes that the federal government approved $100 million for solid waste disposal facility bonds. Which entity within the federal government provided this approval? Provide a copy of the approval by the federal agency.**

Guam is allocated a fixed dollar amount of potential Qualified Private Activity Bonds by the Internal Revenue Service each year ($200 Million). The authorized agency within the Government of Guam – GEDCA - must apply to the IRS for this allocation each year and specify the nature of the use of potential bond issuances that qualify for the "tax-exempt" private activity status. The IRS has already approved $100 Million in prior years to be used for solid waste facilities under this QPAB status. DPW has requested documentation from GEDCA relating to this approval. The response received is attached.

**12) How will DPW raise revenue for these projects if the bond financing and/or DBOT contract are not successful? Does Guam have a contingency plan (the development of an import tax)?**

The broad authority granted by the creation of the "tipping and user fees" to fund the Solid Waste Management Fund, and the protection of those funds by the restrictions on their use make the pursuit of bond financing very feasible. The Financial Plan presents several options for financing, including QPABs, General Obligation Bonds and direct appropriations. The latter two remain contingent options, while the former is the preferred financing method.

The stability of a PUC regulated fee based on the actual cost of service and the existing legislative authority for the privatization of solid waste management operations, coupled with a captive market with no disposal alternatives, make the DBOT concept an attractive contract vehicle. However, in the event that these options are not successful, the Government of Guam has the option of pursuing legislated increases in real property taxes or creation of an import tax to fund the annual capital outlay required for the program elements. This information has been

included in the Financial Plan.

**13) Will it be too inefficient (and costly) if the preliminary design is completed by one firm and the full design/construction by another? Is it likely that the second firm will prefer to do a completed redesign? At a minimum, all design assumptions, drawings and electronic data should be provided to the second firm.**

No. The Design-Build-Operate-Transfer contract vehicle is a well established method of achieving fast-track design and construction with the benefit of utilizing private sector financial capabilities in situations where municipalities or other organizations would be hard pressed to obtain financing necessary to quickly complete the project. The development of a preliminary design prior to the issuance of the DBOT contract is typical for this contracting method and is desirable for the following reasons:

1. It allows the owner to establish the development program, project design and construction criteria and constraints, general design plans and specifications in order to adequately convey the intent of the project to the prospective bidders;
2. It affords sufficient information to the bidders to develop accurate and efficient bids;
3. It provides a baseline of design data for the completion of the design.
4. The preliminary design is still general enough to allow for flexibility and the incorporation of innovative design and construction techniques in the completion of the design phase.

Under this contracting method, it is not likely that the DBOT team would "redesign" from the ground up. Those elements of the design subject to change would be changed; those required to meet the design intent and critical to the overall program requirements would be fully developed to complete the design. All preliminary design data, drawings and specifications would be made available to the DBOT team.

**14) What is the timing and hiring of the Consent Decree Staff (Group C)?**

The additional positions for the additional staff necessary to manage the implementation of these program elements are funded under the FY2005 budget. Advertising and hiring were begun soon after the publication of the draft plan. Several positions have been filled as of the beginning of FY 2005.

**15) Due dates must be added to the three tables of Section 6-3.**

Dates were added to the tables.

**16) The status of each of the items discussed in the Financial Plan must be included in the quarterly progress reports.**

The quarterly report will include status updates on these items.

**17) Who will be the DPW lead for the activities discussed in the Financial Plan (e.g., working with GEDCA on bonds, Section 6.2.3)?**

The DPW lead for the implementation of the Financial Plan will be Marc Gagarin, P.E., Chief Engineer.

**18) The Financial Plan must include the certification statement found in paragraph 42 of the Consent Decree.**

The certification has been incorporated into the Financial Plan.

Aturidad Inadilanton      **GUAM**      Ikunumihan Guahan
ECONOMIC DEVELOPMENT
AUTHORITY

**Governor**
Felix P. Camacho

**Lieutenant Governor**
Kaleo S. Moylan

October 25, 2004

Joseph W. Duenas
Director
*Department of Public Works*
542 North Marine Drive
Tamuning, Guam 96913

SUBJECT:    <u>Consent Decree Matters – Qualified Private Activity Bond Allocation</u>

Hafa Adai Director Duenas,

I am responding to your letter received by the Guam Economic Development and Commerce Authority (GEDCA) dated October 15, 2004 as it relates to the carry forward election filed with the Internal Revenue Service (IRS) under the category of Solid Waste Disposal Facility Bond. As per your letter, you would like documentation on this application and the approvals needed for submittal to the U.S. EPA.

Every calendar year the government of Guam is allowed a certain amount of private activity bond financing. For 2003, Guam's private activity bond volume was at $72,546,385.00. If the government does not issue all or part of their volume cap, they may file IRS Form 8328 Carry forward Election of Unused Private Activity Bond Volume Cap to carry forward any unused portion of the volume cap.

The Governor has the discretionary authority to allocate the amount within the purposes allowed; however, the carry forward amounts are only good for three (3) years.

## Background

As per Section 146(f) of the U.S. Internal Revenue Code, the Government of Guam must file IRS Form 8328 to carry forward its allowable amount of private activity bonds under its federally regulated annual volume cap for the year. These filings reserve identified amounts that the government may elect to move forward with projects that utilize tax exempt financing. GEDCA maintains documentation for the carry forward of the permissible unused private activity bond amounts under its volume cap for each consecutive calendar year from 1992 through 2003.

Although the government files annually to declare its intent to float a private activity bond, the act of filing does not provide authority for the issuance of bonds by Guam or any other issuer. The filing simply addresses certain conditions that must be satisfied in order for a "private activity bond" to be a "qualified private activity bond", which is necessary for interest on any such bond to be tax-exempt.

*Guam USA ~ The Ultimate Destination*

The requirement of legislative approval of terms and conditions of any and all bonds issued by Guam's agencies and instrumentalities is an additional, separate and distinct requirement, applicable whether the interest on those bonds is expected to be tax-exempt or not (Section 50103(k) of Title 12, Guam Code Annotated).

### Financial Plan for the Ordot Dump Closure and the New Municipal Solid Waste Landfill

As summarized in your plan, a total amount of $100 million in private activity bonds would be needed to fund this project.    Approximately $70 million would be required by 2005 for costs associated with closure of the existing facility and opening of cell A of the new facility.  An additional $30 million would be issued in 2008 for opening of cell B of the sanitary landfill.

Be advised that the Governor has recently made a commitment to allocate up to $200 million of the volume cap for Guam available in calendar years 2004 and 2005 towards water furnishing facilities and sewage facilities.  The potential for floating a private activity bond for water furnishings and sewage facilities is being considered by Guam Waterworks Authority ("GWA") to address the EPA Consent Order which requires that GWA secure funds for capital, operational and maintenance costs necessary to bring the islands systems into compliance with the Clean Water Act.

To ensure compliance with the Landfill Consent Order, the private activity bonds to be issued in 2005 will come from the current year allocation, an amount available to Guam in addition to the 3 year Carry forward amount reserved for GWA.  Should DPW not be able to issue bonds in 2005, the amount will be reserved and carried forward in the following year.  There should be no issues in funding the remaining $30 million in consequent years.

I hope this detailed information assists you in understanding how this program is managed.  Should you have any questions or need more information, please do not hesitate to bring it to my attention.

Sincerely,

Michael Bamba

Michael Bamba
Acting Administrator

cc:       Governor Felix P. Camacho

**LANDFILL FINANCIAL PLAN**
ORDOT DUMP CLOSURE
NEW MUNICIPAL SOLID WASTE LANDFILL

Prepared for

Solid Waste Division
Department of Public Works
Government of Guam
542 North Marine Drive
Tamuning, Guam 96913

Prepared by

Dueñas & Associates, Inc.
115 E.T. Calvo Memorial Parkway
Suite 200
Tamuning, Guam 96913

Ernst & Young, LLP
Ernst & Young Building
Suite 200, 231 Ypao Road
Tamuning, Guam 96913

October 2004

Table of Contents

Certification ......................................................................................................... v
Executive Summary ............................................................................................ 1
1.0 Introduction................................................................................................... 2
2.0 Scope of Financial Plan .............................................................................. 2
   2.1 Group A1: Closure Plan for the Ordot Dump .......................................... 3
      2.1.1 Draft Closure Plan............................................................................. 3
      2.1.2 Temporary Operational Plan.............................................................. 4
      2.1.3 90%Closure Plan................................................................................ 4
      2.1.4 Draft Final Plan and Schedule .......................................................... 4
      2.1.5 Supplement to Temporary Operational Plan...................................... 4
      2.1.6 Final Closure Plan.............................................................................. 4
      2.1.7 Final Plan and Schedule..................................................................... 4
      2.1.8 90% Wetland Mitigation Plan............................................................ 4
   2.2 Group A2: Construction of Closure of Ordot Dump ................................ 4
   2.3 Group A3: Construction Management Services for Closure of Ordot Dump .......... 5
   2.4 Group B1: EIS and Site Selection for New MSWLF ............................... 5
   2.5 Group B2: Plan for New MSWLF ............................................................ 5
      2.5.1 Draft Plan for the New MSWLF........................................................ 5
      2.5.2 90% Plan for the New MSWLF......................................................... 5
      2.5.3 Permit Application ............................................................................. 5
      2.5.4 90% Wetland Mitigation Plan............................................................ 5
      2.5.5 100% Final Plan for the New MSWLF.............................................. 6
   2.6 Group B3: Construction of New MSWLF................................................. 6
   2.7 Group B4: Construction Management Services for New MSWLF ........... 6
   2.8 Group C: Funding and Training of Consent Decree Staff ........................ 6
   2.9 Group D: Wetland Mitigation ................................................................... 6
   2.10 Group E: Land Acquisition for New MSWLF ........................................ 7
   2.11 Group F: Off-Site Infrastructure for New MSWLF................................ 7
3.0 Summary of Existing Financial Data .......................................................... 7
   3.1 Status of Solid Waste Operating Fund...................................................... 7
   3.2 Income and Revenue Projections............................................................... 8
   3.3 Operating Expenses .................................................................................. 8
4.0 Basis of Financial Analysis.......................................................................... 9
   4.1 General Basis ............................................................................................ 9
   4.2 Financing Alternatives.............................................................................. 9
      4.2.1 Special Activity Bonds ...................................................................... 10
      4.2.2 General Obligation Bonds.................................................................. 11
      4.2.3 Grants................................................................................................. 11
      4.2.4 Appropriations from the General Fund............................................... 14
5.0 Financial Plan............................................................................................... 15
   5.1 Group A1: Closure Plan for the Ordot Dump........................................... 15
      5.1.1 Program Costs.................................................................................... 15
      5.1.2 Preferred Funding Alternative ........................................................... 15
      5.1.3 Financing Strategy ............................................................................. 15
   5.2 Group A2: Construction of Closure of Ordot Dump ................................ 15

5.2.1 Program Costs ........................................................................................... 15
5.2.2 Preferred Funding Alternative ..................................................................... 16
5.2.3 Financing Strategy ...................................................................................... 16
5.3 Group A3: Construction Management Services for Closure of Ordot Dump ........ 16
5.3.1 Program Costs ........................................................................................... 16
5.3.2 Preferred Funding Alternative ..................................................................... 16
5.3.3 Financing Strategy ...................................................................................... 17
5.4 Group B1: EIS and Site Selection for New MSWLF ........................................ 17
5.4.1 Program Costs ........................................................................................... 17
5.4.2 Preferred Funding Alternative ..................................................................... 17
5.4.3 Financing Strategy ...................................................................................... 17
5.5 Group B2: Plan for New MSWLF .................................................................... 17
5.5.1 Program Costs ........................................................................................... 17
5.5.2 Preferred Funding Alternative ..................................................................... 18
5.5.3 Financing Strategy ...................................................................................... 18
5.6 Group B3: Construction of New MSWLF .......................................................... 18
5.6.1 Program Costs ........................................................................................... 18
5.6.2 Preferred Funding Alternative ..................................................................... 18
5.6.3 Financing Strategy ...................................................................................... 19
5.7 Group B4: Construction Management Services for New MSWLF ...................... 19
5.7.1 Program Costs ........................................................................................... 19
5.7.2 Preferred Funding Alternative ..................................................................... 19
5.7.3 Financing Strategy ...................................................................................... 19
5.8 Group C: Training of Engineering Staff ............................................................ 19
5.8.1 Program Costs ........................................................................................... 19
5.8.2 Preferred Funding Alternative ..................................................................... 20
5.8.3 Financing Strategy ...................................................................................... 20
5.9 Group D: Wetland Mitigation ........................................................................... 20
5.9.1 Program Costs ........................................................................................... 20
5.9.2 Preferred Funding Alternative ..................................................................... 21
5.9.3 Financing Strategy ...................................................................................... 21
5.10 Group E: Land Acquisition for New MSWLF .................................................. 21
5.10.1 Program Costs ......................................................................................... 21
5.10.2 Preferred Funding Alternative ................................................................... 21
5.10.3 Financing Strategy .................................................................................... 21
5.11 Group F: Off-Site Infrastructure for New MSWLF .......................................... 22
5.11.1 Program Costs ......................................................................................... 22
5.11.2 Preferred Funding Alternative ................................................................... 23
5.11.3 Financing Strategy .................................................................................... 23
6.0 Total Program Funding .................................................................................... 24
6.1 Program Costs ................................................................................................ 24
6.2 Overall Funding Strategy ................................................................................ 26
6.2.1 Solid Waste Management Fund ................................................................... 27
6.2.2 DBOT .......................................................................................................... 27
6.2.3 Grants, Loans and Bonds ........................................................................... 28

Case 1:02-cv-00022     Document 69-10     Filed 01/31/2007     Page 12 of 27

## TABLES

Table 2-1   -   Program Elements
Table 3-1   -   SWMF Revenue Breakdown
Table 3-2   -   SWMF Expense Breakdown
Table 4-1   -   Grant Opportunities
Table 5-1   -   DPW Solid Waste Engineering Staff Program Costs
Table 5-2   -   Off-Site Infrastructure Costs
Table 6-1   -   Program Costs
Table 6-2   -   Projected Tipping Fees
Table 6-3A   -   Funding Strategy for Solid Waste Management Fund
Table 6-3B   -   Funding Strategy for Design-Build-Operate-Transfer
Table 6-3C   -   Funding Strategy for Grants, Loans and Bonds

## EXHIBITS

Exhibit 1   -   Financial Plan Schedule

## APPENDICES

Appendix A  -  Consent Decree

Appendix B  -  BBMR Solid Waste Management Fund Financial Statements (FY00-FY04)

Appendix C  -  Solid Waste Management Fund Annual Financial Statements (FY99-FY02)

Appendix D  -  Solid Waste Management Fund Appropriations Accounts

Appendix E  -  Department of Interior, Office of Insular Affairs Approval Form

Appendix F  -  DPW Consent Decree Staffing Pattern and Solid Waste Staffing Pattern

Appendix G  -  Detailed Grant Information

## Certification

I certify under penalty of law that I have examined and am familiar with the information submitted in this document and all attachments and that this document and its attachments were prepared either by me personally or under my direct supervision in manner designed to ensure that qualified and knowledgeable personnel properly gathered and presented the information contained therein. I further certify, based on my personal knowledge or on my inquiry of those individuals immediately responsible for obtaining the information, that the information is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing and willful submission of a materially false statement.


By: _____        Date _____

For the Department of Public Works

# Executive Summary

This *Financial Plan* presents the work conducted by the Department of Public Works, Government of Guam, in conjunction with the Guam Environmental Protection Agency, in the development of a viable financial strategy to implement the requirements of the Consent Decree filed for U.S. District Court Civil Case No. 02-00022.

DPW has defined and confirmed, through a series of meetings with the GEPA, the individual elements to be incorporated into a comprehensive financial program for the Consent Decree requirements, as well as the possible funding mechanisms for each element. This program consists of items specifically outlined in the Consent Decree, as well as related items identified by either DPW or GEPA as being necessary to insure compliance with the Consent Decree. The program is detailed in Section 2 of the plan and is divided into eleven functional groups on the basis of specific criteria detailed in the plan. These groups are designated A through F, with groups A and B representing the major items of landfill closure and opening of the new landfill, subdivided in-line with the Consent Decree.

A detailed review of existing public laws and statutory requirements was also conducted to identify possible constraints and authorized alternate funding mechanisms. DPW conducted meetings with the Executive Committee on Government Reorganization and the Guam State Clearinghouse to coordinate possible impacts to and approval of potential federal grant and/or loan opportunities. A thorough review of the existing special fund account of the DPW Solid Waste Management Division was conducted. This information is presented in Section 3. Additional information was obtained through meetings and discussions with the Office of the Governor, Bureau of Budget Management and Research to augment data available for subsequent analysis. Such analysis was conducted to determine historical operating expenditures and revenues, and to develop projections of the same.

In Section 4, DPW evaluated several possible funding mechanisms, including Special Activity Bonds, General Obligation Bonds, Grants/Loans, General Fund appropriations, and the use of existing monies within the solid waste management fund earmarked for closure of the existing Dump and opening of the new MSWLF. Based on this evaluation and financial analysis, DPW recommends a strategy combining the use of existing SWMF monies, aggressive pursuit of grants, Design-Build-Operate-Transfer project execution and issuance of special activity bonds to cover the cost of most of the major program elements. This plan is presented for program elements in Section 5.

An overall strategy for total program funding is described and detailed in Section 6. Total program costs and project tipping fees to cover such costs are also presented. An actuarial analysis of Guam's tipping and user fees by the Public Utilities Commission is mandated by law no sooner than October of 2004. This plan allows for the development of documentation and cost estimates necessary to support an increase in tipping fees and provide cost-of-service rate structure in accordance with the components of the plan.

Case 1:02-cv-00022     Document 69-10     Filed 01/31/2007     Page 15 of 27

# 1.0 Introduction

On February 11, 2004, the U.S. Environmental Protection Agency and the U.S. Department of Justice filed a Consent Decree in the United States District Court of Guam for Civil Case 02-00022 (see Appendix A). The consent decree was the result of negotiations between the U.S. Government and the Department of Public Works of the Government of Guam in relation to on-going violations of various federal environmental regulations, primarily the Clean Water Act, resulting from the operations at the Ordot Dump.

The consent decree provides for the execution of specific actions, along with related deliverables and timelines, necessary to effect the cessation of the operations at the Ordot Dump that have resulted in the violations prompting the lawsuit. It is intended that the completion of these items will contribute to or result in compliance with the applicable regulations. The compliance items generally relate to a) the closure of the existing Ordot Dump – (Paragraph 8 of the Consent Decree), b) the opening of a new permitted municipal solid waste landfill facility – (Paragraph 9 of the Consent Decree), and 3) the financing of these compliance items – (Paragraph 10 of the Consent Decree).

This document represents the financial strategy the Government of Guam should undertake in order to complete the compliance items. It presents the general scope of items which are required to achieve the actions outlined in the consent decree, a summary of the available existing funding mechanisms and financial data, an analysis of alternative funding vehicles, and a recommended plan for obtaining the funding necessary to achieve these items.

# 2.0 Scope of Financial Plan

The Department of Public Works (DPW) and Guam Environmental Protection Agency (GEPA) met on several occasions to define the program necessary to achieve the requirements of the consent decree. The result of this process was a *Technical Memorandum*, which sets the direction for the financing plan and details the following program elements of the solid waste management system. Each program element has been grouped with consideration to the operational and administrative criteria under which the DPW must operate, as well as with consideration to the existing statutory requirements. DPW also conducted discussions with the Guam State Clearinghouse and Executive Committee on Government Reorganization to insure that efforts to fund the upcoming activities of the DPW are coordinated within the organizational framework and federal funding mandates of the administration.

The general scope of the financial plan has been divided into eleven functional groups on the basis of the criteria specified above. These groups are designated A through F, with groups A and B representing the major items of landfill closure and opening of the new landfill, subdivided with references to specific paragraph numbers corresponding to the requirements of the Consent Decree.

**Table 2-1**
**Program Elements**

| Group | Para. No | Item | Description |
|---|---|---|---|
| A1 | 8 | a.l. | Draft Closure Plan |
| | 8 | a.ii | Temporary Operational Plan |
| | 8 | b.l | 90% Closure Plan |
| | 8 | b.ii | Draft Final Plan and Schedule |
| | 8 | b.iii | Supplement to Permit Application |
| | 8 | c.l | Final Closure Plan |
| | 8 | c.ii | Final Plan and Schedule |
| | 8 | c.iii | 90% Wetland Mitigation Plan |
| A2 | 8 | f. & g. | Advertise & Award Closure Contract |
| | 8 | h. | Complete Closure |
| A3 | 8 | n/a | Construction Management Services |
| B1 | 9 | a. | EIS and Site Selection |
| B2 | 9 | c. | Draft Plan for New MSWLF |
| | 9 | d.l | 90% Plan for New MSWLF |
| | 9 | d.ii | Permit Application |
| | 9 | d.iii | 90% Wetland Mitigation Plan |
| | 9 | f.l | 100% Final Plan for New MSWLF |
| B3 | 9 | f.ii & h | Advertise & Award New MSWLF Contract |
| | 9 | l | Complete New MSWLF |
| B4 | 9 | n/a | Construction Management Services |
| C | n/a | n/a | Funding &Training of Consent Decree Staff |
| D | n/a | n/a | Wetland Mitigation Construction |
| E | n/a | n/a | Acquisition of Land for New MSWLF |
| F | n/a | n/a | Off-site Infrastructure for New MSWLF |

## 2.1 Group A1: Closure Plan for the Ordot Dump

The Closure Plan for the Ordot Dump involves the submittal and completion of eight documents as specified in the Consent Decree.

### 2.1.1 Draft Closure Plan

The Draft Closure Plan shall include site investigation, survey and mapping, an environmental baseline survey, and 40% conceptual design of the dump cover system, perimeter surface water diversion system and other measures related to closure in accordance with GEPA regulations (22 G.A.R. § 23601).

### 2.1.2 Temporary Operational Plan

A Temporary Operation Plan shall be submitted to GEPA as an interim measure in accordance with GEPA regulations (22 G.A.R. § 23104) for the disposal of municipal solid waste at the Ordot Dump until the facility is closed and no longer accepts municipal solid waste for disposal.

### 2.1.3 90%Closure Plan

The 90% Closure Plan shall include 100% design of the dump cover system, 100% design of the perimeter surface water diversion system and other measures related to closure in accordance with GEPA regulations (22 G.A.R. § 23601). The plan shall also include 100% post-closure care and monitoring plan, 40% draft specifications and construction management plan.

### 2.1.4 Draft Final Plan and Schedule

The draft final plan and a schedule to implement post-closure care requirements shall be submitted to U.S. EPA and GEPA.

### 2.1.5 Supplement to Temporary Operational Plan

Upon completion of the draft final plan, a supplement to the original Temporary Operational Plan shall be submitted to GEPA. The supplement shall include information about the closure plan in compliance with GEPA regulations (22 G.A.R. § 23104).

### 2.1.6 Final Closure Plan

The final closure shall include 100% design of the dump cover system, 100% design of the perimeter surface water diversion system and other measures related to closure in accordance with GEPA regulations (22 G.A.R. § 23601). The plan shall also include final specifications and a construction management plan.

### 2.1.7 Final Plan and Schedule

The final plan and schedule to implement post-closure care requirements shall be submitted to U.S. EPA and GEPA.

### 2.1.8 90% Wetland Mitigation Plan

The 90% Wetland Mitigation Plan for the closure of the Ordot Dump shall be submitted to U.S. EPA, GEPA and the U.S. Army Corps of Engineers for approval. Issuance of any closure permits is subject to the approval of the mitigation plan and a viable financial plan.

## 2.2 Group A2: Construction of Closure of Ordot Dump

This program element of the financial plan involves the advertisement and award of the construction contract for the Closure of the Ordot Dump, as well as the actual closure of the landfill. The closure activities include implementation of the post-closure care and monitoring plan and submittal to U.S. EPA certifying that the Ordot Dump no longer receives municipal solid waste for disposal. A certification shall also be submitted to U.S. EPA that discharges to waters of the United States from the Ordot Dump have ceased.

## 2.3 Group A3: Construction Management Services for Closure of Ordot Dump

A request for the services of an A&E firm shall be advertised and awarded for construction management of the closure of the Ordot Dump. This firm shall act on behalf of the Government of Guam in ensuring that the contractor selected under Group A2 meets the design and specification requirements of the Final Closure Plan. The construction management services will end upon closure of the Ordot Dump. Post-care and monitoring of the Ordot Dump will be managed by the Consent Decree staff of the DPW Solid Waste Division.

## 2.4 Group B1: EIS and Site Selection for New MSWLF

A request for the services of an A&E firm shall be advertised and awarded for the completion of an Environmental Impact Statement (EIS) of at least three potential landfill sites. The EIS shall include a detailed analysis and comparison of the potential landfill sites for the new municipal solid waste landfill (MSWLF) and identify DPW's preferred alternative for the MSWLF.

## 2.5 Group B2: Plan for New MSWLF

Once the site of the new MSWLF has been determined, plans for the design, construction and operation of the new MSWLF must be completed. This program element involves the submittal and completion of five documents as specified in the Consent Decree.

### 2.5.1 Draft Plan for the New MSWLF

The Draft Plan for the design, construction and operation of the new MSWLF shall include site investigation, survey and mapping, hydrogeological/subsurface investigation, 40% design and specifications and other measures related to the siting, design and operational criteria for a new MSWLF in accordance with GEPA regulations (22 G.A.R. § 23601).

### 2.5.2 90% Plan for the New MSWLF

The 90% Draft Plan for the design, construction and operation of the new MSWLF shall include 100% design for the construction and operation of the new MSWLF and other measures related to the siting, design and operational criteria for a new MSWLF in accordance with GEPA regulations (22 G.A.R. § 23601). The plan shall also include draft specifications and construction management plan.

### 2.5.3 Permit Application

A permit application shall be submitted to GEPA in accordance with GEPA regulations (22 G.A.R. § 23104) to site, construct, and operate a new MSWLF in accordance with applicable local and Federal regulations.

### 2.5.4 90% Wetland Mitigation Plan

The 90% Wetland Mitigation Plan for the closure of the Ordot Dump shall be submitted to U.S. EPA, GEPA and the U.S. Army Corps of Engineers for approval. Additionally, a Wetland Development Permit application shall be submitted to the Guam Land Use

Commission. Issuance of any landfill construction permits is subject to the approval of the 100% final mitigation plan, a viable financial plan, and the Wetland Development Permit application.

### 2.5.5 100% Final Plan for the New MSWLF

The final plan shall include 100% Final Plan for the design, construction and operation of the new MSWLF and other measures related to the siting, design and operational criteria for a new MSWLF in accordance with GEPA regulations (22 G.A.R. § 23601). The plan shall also include final specifications and construction management plan. As the development of the new MSWLF design affects the amount of wetlands which shall be mitigated, and since the mitigation of wetlands for both the closure of the existing Ordot Dump and the construction of the new MSWLF will likely be accomplished through the construction of a single project, this program element will also accomplish the completion of the 100% wetland mitigation plan for both the Ordot closure and the new MSWLF.

## 2.6 Group B3: Construction of New MSWLF

This program element of the financial plan involves the advertisement and award of the construction contract for the new MSWLF, as well as the actual construction of the new MSWLF.

## 2.7 Group B4: Construction Management Services for New MSWLF

A request for the services of an A&E firm shall be advertised and awarded for construction management of the construction of a new MSWLF. This firm shall act on the behalf of the Government of Guam in ensuring that the contractor meets the design and specification requirements of the Final Plan. The construction management services do not include operation of the new MSWLF.

## 2.8 Group C: Funding and Training of Consent Decree Staff

Management of the requirements of the Consent Decree will be the responsibility of the Consent Decree staff of the DPW Solid Waste Division. It is anticipated that three engineers, an administrative secretary and clerk will be responsible for the contract administration and management duties for the closure and post-closure care of the Ordot Dump and the construction and operation of the new MSWLF. Training on an annual basis for the professional staff is anticipated to insure they are adequately equipped to handle their responsibilities and maintain compliance with applicable regulatory requirements.

## 2.9 Group D: Wetland Mitigation

It is anticipated that wetland mitigation will be required for adverse impacts to existing wetlands resulting from closure of the Ordot Dump and the construction of the new MSWLF. The intent is to package the mitigation at a single site. Acquisition of land for the development of the new wetland is not included in this financial plan as it is

anticipated that appropriate land can be identified within the existing government inventory for either construction of exchange.

## 2.10 Group E: Land Acquisition for New MSWLF

It is anticipated that acquisition of private land will be required to construct the new MSWLF.

## 2.11 Group F: Off-Site Infrastructure for New MSWLF

Off-site infrastructure will be required for the new MSWLF. This program element includes the acquisition of land to serve as an access road for the new MSWLF, construction of a new road (including drainage) and infrastructure improvements such as power, water and telephone. If sanitary sewer is not available at new MSWLF site, generated wastes will be treated on-site.

# 3.0 Summary of Existing Financial Data

Currently, the Department of Public Works funds the operations of the Division of Solid Waste Management through a special or "proprietary" fund derived from the collection of tipping and user fees as authorized by Public Laws 24-139 and 24-272. The intent of the Solid Waste Management Fund (SWMF or the "fund") was to provide for the complete cost of solid waste operations. Data for the SWMF is maintained by the Bureau of Budget and Management Resources (BBMR).

Information from both DPW and BBMR was used in the development of this analysis (see Appendix B). Where necessary for the purposes of projecting revenues and expenses that are based on solid waste generation rates, DPW has relied on generation data developed for the preparation of the *Guam Integrated Solid Waste Management Plan* (GEPA, 2000).

The following sections describe the existing funding mechanism as it relates to revenue and expenses associated with the operations.

## 3.1 Status of Solid Waste Operating Fund

DPW reviewed general information on the account for the years 1999 through 2002 (see Appendices C, D and E). BBMR provided additional information subsequent to initial meetings with the DPW for this project. Limited detailed information was made available for operational expenses associated with the fund.

Funding is provided by the following fee structure for tipping fees per cubic yard (cy):
1. $4/cy uncompacted
2. $16/cy compacted (based on a 4:1 compaction ratio)
3. $2/ pickup (for self drops)
4. $4/cy for self drops in excess of 3 cy

The unaudited financial statements of the Solid Waste Management Fund as of April 30, 2004 indicate a cash balance of the fund of $1,145,543.

## 3.2 Income and Revenue Projections

It was noted that revenues for the seven months ended April 30, 2004 totaled $1,693,372 with $2,008,028 in expenditures, yielding a deficit of $324,656. Annualized revenues, based on the seven months, would yield $2,902,923. This would represent a decrease of $2,268,747 from the fiscal year 2003 revenues of $5,171,671. Inquiries are being made with BBMR officials to determine possible reasons for the decrease.[1] Revenue breakdowns for FY 2002 and FY 2003 are presented in Table 3-1 below. Additional information is presented in Appendix B.

**Table 3-1**
**SWMF Revenue Breakdown**

| Revenue Description | FY 02 ($) | % | FY 03 ($) | % |
|---|---|---|---|---|
| Residential | 2,039,473 | 45.5 | 1,973,248 | 38.2 |
| Commercial – Compacted | 1,954,996 | 43.6 | 2,549,784 | 49.3 |
| Ordot – Uncompacted, Self Haul | 428,088 | 9.6 | 592,159 | 11.5 |
| Agat – Uncompacted, Self Haul | 13,564 | 0.3 | 12,416 | 0.2 |
| Dededo – Uncompacted, Self Haul | 34,468 | 0.8 | 34,461 | 0.7 |
| Malojloj – Uncompacted, Self Haul | 9,556 | 0.2 | 9,564 | 0.2 |
| Total | 4,480,145 | | 5,171,632 | |

The Department of Public Works has had difficulties in billing and collecting tipping fees. Based on a projected 1,837,110 cubic yards of uncompacted solid waste for 2005, the projected revenues would be expected to be approximately $7,348,000, as opposed to the FY2003 revenues of $5,171,671.

## 3.3 Operating Expenses

For FY 2003, the unaudited financial statements indicated operating expenses of $4,507,795. Operating expenses for the earlier years (based on audited financial statements) were $3,678,238 (FY2000), $2,190,612 (FY 2001) and $3,378,328 (FY2002). Accordingly, revenues based on the current tipping schedule barely covers operating expenses and, as a result, would be insufficient to provide adequate funds for the $100 million projected to the close the Ordot dump and open a new sanitary landfill.

Expense breakdowns for FY 2002 and FY 2003 are presented in Table 3-2 below. The information contained in this table is based on un-audited financial information from DPW Solid Waste Management Division.[2]

---

[1] Information received from DPW subsequent to the inquiries indicates un-audited total revenue for FY04 of $5,581,141. Additional information is included in Appendix B.
[2] Information received from DPW subsequent to the publication of the Draft Landfill Financial Plan indicates un-audited total expenditures for FY04 of $3,959,855. Additional information is included in Appendix D.

**Table 3-2**
**SWMF Expense Breakdown**

| Expense Description | FY 02 ($) | % | FY 03 ($) | % |
|---|---|---|---|---|
| Regular Salary | 1,861,721 | 53.50 | 2,002,363 | 54.58 |
| Overtime Salary | 73,984 | 2.13 | 45,957 | 1.25 |
| Fringe | 501,938 | 14.43 | 564,685 | 15.39 |
| Travel | 0 | 0 | 5,340 | 0.15 |
| Contract | 790,063 | 22.71 | 671,920 | 18.32 |
| Supplies | 211,002 | 6.06 | 204,072 | 5.56 |
| Equipment | 3,055 | 0.09 | 12,229 | 0.33 |
| Power Utility | 6,484 | 0.19 | 92,848 | 2.53 |
| Water Utility | 2,364 | 0.07 | 1,834 | 0.05 |
| Telephone | 7,132 | 0.20 | 7,743 | 0.21 |
| Capital | 21,808 | 0.63 | 59,463 | 1.62 |
| Totals | | | | |

# 4.0 Basis of Financial Analysis

## 4.1 General Basis

In preparing the financial analysis, various financing alternatives were considered, including:

- Current funding provided to the Solid Waste Management Fund
- Appropriations from the General Fund of the Government of Guam
- Grants
- Revenue Bonds
- General Obligation Bonds
- Special Activity Bonds

Data was provided by the Bureau of Budget Management and Research of the Office of the Governor, Department of Public Works Solid Waste Management and the Guam Economic Development and Commerce Authority.

The following sections provide an analysis of the various financing options identified in the *Technical Memorandum* (D&A-E&Y, 2004) that were considered in the development of the financial plan.

## 4.2 Financing Alternatives

The following is a discussion of the various financing alternatives, including:

- Special Activity Bonds
- General Obligation Bonds
- Grants
- Appropriations from the General Fund of the Government of Guam

## 4.2.1 Special Activity Bonds

Under Code Section 141 of the US Internal Revenue Code, a private activity bond can be used for a variety of activities including solid waste disposal facilities (Section 142 (a) (6)). Under these bonds interest is excluded from income when the bond proceeds (95% or more) is used for activities of state and local government units or the bonds are repaid with revenues of those entities. Accordingly, the interest rate and related debt service is lower than those that are issued by private enterprises.

Although the government files annually to declare its intent to float a private activity bond, the act of filing does not provide authority for the issuance of bonds by Guam or any other issuer. The filing simply sets forth certain conditions, among others, that must be satisfied in order for a "private activity bond" to be a "qualified private activity bond", which is necessary for interest on any such bond to be tax-exempt. It is a federal requirement for the Government of Guam to file IRS Form 8328 on an annual basis in order to preserve qualified private activity bond amounts.

The requirement of legislative approval of the terms and conditions of any and all bonds issued by Guam's agencies and instrumentalities is an additional, separate and distinct requirement, applicable whether the interest on those bonds is expected to be tax-exempt or not (in Section 50103(k) of Title 12, Guam Code Annotated).

The 2001 allocation amount will expire at the end of 2004. With regard to the allocation for 2004, the deadline to file the new carry-forward amount is February 15, 2005. Basically, the Governor of Guam needs to determine for what purposes he wants to carry forward and in what amounts. As the Governor of Guam is a partner in this process, once the required amount is determined, the 2004 allocation can be filed at the beginning of 2005 to the purpose required.

Discussions with the GEDCA officials indicated that the interest rate on such instruments ranged from approximately 5.87% per annum (assuming AAA tax-exempt rating conditions as of October 27, 2003) to 7.39% per annum (assuming B tax-exempt rating conditions). While interest rates have remained unchanged, it is anticipated that the Federal Reserve Bank will raise interest rates by 50 to 75 basis points by December 31, 2004. Accordingly, interest rates could be as high as 6.37% for AAA rated tax-exempt bonds to 7.89% for B rated tax-exempt bonds.

AAA rated tax-exempt bonds would require bond insurance that would approximate average annual debt service for the bonds. In addition a bond reserve account equal to the average annual debt service would be required. For B rated tax-exempt bonds no insurance or bond reserve fund would be required. For bond issue there would be an underwriter's discount equal to 2% of the total proceeds and issuance costs of approximately $1 million. Under the AA rated tax-exempt bond a premium could be expected at approximately 8.2% of the par value of the bonds (due to the high rating). For the B rated tax-exempt bonds the premium or discount would be expected to be immaterial (assuming current market conditions remain unchanged).

Case 1:02-cv-00022    Document 69-10    Filed 01/31/2007    Page 24 of 27

GEDCA officials indicated that there is a total of $100 million approved by the federal government for solid waste disposal facility bonds. This is comprised of $50 million approved for 2001 and an additional $50 million for 2002. However, there is a restriction that the amounts can only be carried forward for 3 years and, accordingly, the $50 million ceiling approved for 2001 will expire in 2004. It was indicated that the Government of Guam would need to apply to reallocate the $50 million of the 2001 ceiling if the bonds are not issued in 2004. Deadline for reapplication is February 15, 2005. Under the Internal Revenue Code, at least 95% of the bond proceeds must be used for the solid waste facility. Such a bond issue would be subject to the approval of the Guam Legislature, Governor and Attorney General.

It would appear that the preferred alternative for financing the sanitary landfill and costs associated with the closure of the Ordot dump would be the private activity bond. Assuming qualification of the bond issue and approval by the Guam Legislature, it would be anticipated that the bond issue can be accomplished within 90 to 120 days. As noted above, successful financing through the private activity bonds is dependent on the Governor of Guam and the Guam Legislature

## 4.2.2 General Obligation Bonds

General obligation bonds are similar to the private activity bonds in that the interest is tax exempt to the bondholder and, accordingly, the interest rate is lower than those of private enterprises. The interest rates would be similar to those of the private activity bonds with similar requirements and costs. As these bonds are secured by the Government of Guam, they are subject to the debt ceiling specified by public law. Currently, the Attorney General of Guam has challenged the ability of the Government of Guam to issue additional general obligation bonds as it is the contention of his office that the Government of Guam has already exceeded the debt limit. This position has been rejected by the Governor of Guam and the Attorney General filed suit against the Governor. Although the Governor prevailed in the initial lawsuits, the case has been appealed to the US Ninth Circuit Court of Appeals (the "Ninth Circuit") in San Francisco, CA. Although a judgment has been anticipated in May 2004, no judgment has been rendered as of the date of this report. As a result, the Attorney General has been unwilling to approve any issues of general obligation bonds.

Even if the Governor were to prevail in the Ninth Circuit, the Attorney General has recourse to the US Supreme Court. In any event the terms and conditions for a general obligation bond for the purpose of the new solid waste facility would be similar to those of the private activity bond and would not have a significant impact on the financing plan.

## 4.2.3 Grants

A research of federal grants and loans in yielded the following as they may apply to each program component.

*CFDA#10.760 Water and Waste Disposal Systems for Rural Communities (USDA-RD)*:
Assistance in the form of project grants, direct loans and guaranteed/insured loans are

provided for the installation, repair, improvement, or expansion of a rural water facility and rural waste disposal facility. Examples of funded projects include construction of additional water distribution lines, the purchase of land for landfill and purchase of trucks and equipment for solid waste disposal. Grants may not be used to pay for operation and maintenance costs or to acquire or refinance an existing system. Range and average of financial assistance for FY2001: Direct Loans $500 to $9,509,000 (average $854, 285); Grants $3,423 to $9,900,000 ($657,339).

*CFDA#11.300 Grants for Public Works and Economic Development Facilities (DOC).* Eligible activities include the acquisition, rehabilitation, design and engineering, or improvement of public land (i.e. Brownfields) or publicly-owned and operated development of facilities.

*CFDA#14.246 Community Development Block Grants / Brownfields Economic Development Initiative (HUD).* Grants provided to enhance the security of loans guaranteed under the Section 108 program or improve the viability of projects financed with Section 108 funds *(additional information needed)*.

*CFDA#15.875 Economic, Social, and Political Development of the Territories and the Freely Associated States (DOI).* Awards grants for capital improvement programs and technical assistance. Examples of funded projects include grants for the construction of basic infrastructure such as road, water systems, power, and sewer.

*CFDA#66.610 Surveys, Studies, Investigations and Special Purpose Grants within the Office of the Administrator (EPA).* Grants awarded to support surveys, studies and investigations, and special purpose assistance associated with air quality, drinking water, water quality, hazardous waste, toxic substance and pesticides. Grants also awarded to prevent, reduce and eliminate pollution and provide support for environmental education training. Range and average of financial assistance: $500 to $1,000,000.

*CFDA#66.802 Superfund State, Political Subdivision, and Indian Tribe Site Specific Cooperative Agreements (Superfund).* Grants may be used to perform site characterization activities such as preliminary assessments, site inspections, remedial investigations and conduct feasibility studies and remedial design activities at potential or confirmed hazardous waste sites; conduct remedial actions at uncontrolled hazardous waste sites listed on the National Priorities List; and oversee cleanups.

*CFDA#66.814 Brownfields Training, Research, and Technical Assistance Grants and Cooperative Agreements (EPA).* Brownfield sites are real properties that have complications with expansion, redevelopment or reuse due to the presence or potential presence of a hazardous substance, pollutant or contaminant. Grants are awarded for training, research and technical assistance to individuals and organizations, to facilitate the inventory of Brownfield properties, site assessments, cleanup of Brownfield sites, community involvement or site preparation. Average grant award is in the amount of $200,000.

Case 1:02-cv-00022    Document 69-10    Filed 01/31/2007    Page 26 of 27

*CFDA#66.815 Brownfield Job Training Cooperative Agreements (EPA).* Brownfield sites are real properties that have complications with expansion, redevelopment or reuse due to the presence or potential presence of a hazardous substance, pollutant or contaminant. The objective of the grant is to provide training to facilitate assessment, remediation, or preparation of Brownfield sites.

*CFDA# 66.818 Brownfield Assessment and Cleanup Cooperative Agreements (EPA).* Brownfield sites are real properties that have complications with expansion, redevelopment or reuse due to the presence or potential presence of a hazardous substance, pollutant or contaminant. Assessment grants may be used to inventory, characterize, assess, and conduct planning and community involvement of Brownfield sites. Cleanup grants may be used to carry cleanup activities at Brownfield sites that are owned by the grant recipient.

The following table presents the program elements by group number, funding recommendations and grant opportunities identified above which may be applicable to the specific element.

**Table 4-1**
**Grant Opportunities**

| Group | Description | Funding Status | Funding Recommendations | Grant I.D. |
|-------|-------------|----------------|-------------------------|------------|
| A1 | Closure Plan for the Ordot Dump | Allocated | Existing SWOF | CFDA#10.762 |
| A2 | Construction of Closure of Ordot Dump | Unfunded | Grants, Loans, Bond | CFDA#14.246 #66.610 #66.818 |
| A3 | Construction Management Services for the Closure of Ordot Dump | Unfunded | Grants, Loans, Bond | None |
| B1 | EIS and Site Selection of New MSWLF | Allocated | Existing SWOF | None |
| B2 | Plan for New MSWLF | Partially Funded | Restructure: 1) Existing SWOF for item c. and 2) Privatize using DBOT | CFDA#11.300 #66.610 |
| B3 | Construction of New MSWLF | Unfunded | Privatize using DBOT | CFDA#11.300 #15.875 |
| B4 | Construction Management Services | Unfunded | Grants, Loans, Bond | None |
| C | Funding and Training of Consent Decree Staff | Unfunded | Grants, Loans, Bond | #15.875 #66.610, #66.802, #66.814 #66.815 |
| D | Wetland Mitigation | Unfunded | Grants, Loans, Bond | None |
| E | Acquisition of Land for New MSWLF | Unfunded | Government Exchange or DBOT | CFDA#10.760 |
| F | Off-Site Infrastructure of New MSWLF | Unfunded | DBOT | CFDA#10.760 #11.300, #15.875 |

## 4.2.4 Appropriations from the General Fund

In the past, the government of Guam has relied on appropriations to provide capital and operating funds for various government agencies, including the Department of Public Works and its Solid Waste Division. However, the funding deficits of the past several fiscal years have limited funds to current operations. While it is reported that tax revenues for the Government of Guam may gradually increase due to improving economic conditions in Guam, it would not be expected there would be sufficient funds appropriated for the closure of the existing Ordot dump and development of a new solid waste disposal facility anticipated by this financial plan.

Case 1:02-cv-00022     Document 69-11     Filed 01/31/2007     Page 1 of 27

# 5.0 Financial Plan

The following sections describe the program costs, the preferred funding mechanism, and outlines the general steps necessary to obtain the funding for each program element. In the sections that follow, the use of the terms 'Preferred Funding Alternative' should not be construed to mean the exclusion of other funding mechanisms. It is the intent of this plan that the Government of Guam will pursue all available funding options for a given program element, with the understanding that the preferred alternative can be augmented with funds obtained through other options, the success or approval of which are not known at this time. It should also be understood that the plan is necessarily based on best available estimates of program costs and conservative approaches to the execution of the program. Therefore, changes to the program costs are expected. The plan is intended to be flexible in its structure and application to allow for modifications as more detailed information on costs and development are obtained.

## 5.1 Group A1: Closure Plan for the Ordot Dump

### 5.1.1 Program Costs

Capital costs for the first seven components of the Closure plan are estimated at $2.5 million, based on the initial fee proposal submitted by the selected A&E firm. Capital costs to complete the 90% Wetland Mitigation Plan is estimated at $318,000. This assumes that closure of Ordot Dump will affect 15 acres of wetland that need to be developed off-site at a ratio of 1:2 or 30 acres. This includes siting of the new wetland, delineation of the wetlands at the Ordot Dump and the new site, topographic surveying and property title research of the new site, wetland mitigation design, and coordination with necessary local and federal government agencies for approval of the mitigation plan.

Total Programming Cost is estimated at $2.818 million [($2.500 + $0.318) million].

### 5.1.2 Preferred Funding Alternative

**Existing SWMF:** Funding for this program element is the use of existing SWMF monies. Final costs for this program element are dependent on the negotiation of contracts for the services, and therefore may change from what has been estimated. It is assumed that the existing funds available will be sufficient for this element.

### 5.1.3 Financing Strategy

No additional steps are required for this funding alternative other than the continued billing and collection of tipping and user fees to augment the SWMF. Budgeting of the programmed amounts for the upcoming fiscal year will include the estimated expenditure amounts and projected revenues to justify the costs of the program element.

## 5.2 Group A2: Construction of Closure of Ordot Dump

### 5.2.1 Program Costs

Capital costs for the closure of the Ordot Dump is estimated at $250,000 per acre and includes post-closure activities. Based on aerial photographs taken in 1994, it is estimated

that the Ordot Dump occupies 35 acres. Due to the additional constraint of final slope geometry associated with the steep slopes at the Ordot Dump, it is estimated that the closure of the Ordot Dump will involve a total of 40 acres.

Total Programming Cost is estimated at $10 million [$250,000/acre x 40 acres].

## 5.2.2 Preferred Funding Alternative

**Grants, Loans or Bonds:** The funding for this alternative includes grants, loans and/or bonds. The financial analysis has identified Private Activity Bond financing as the preferred alternative; however, three potential grant sources have been identified for possible funding.

## 5.2.3 Financing Strategy

As the grant or federal loan possibilities identified cannot be confirmed without completing the application process, bond financing will be pursued as the primary funding source for this program element. DPW will begin the application process for the identified grant opportunities. If grant funds are obtained, they will be used to reduce the amount of bond financing required, in order to minimize the overall program financing cost and the resulting tipping fee.

The ability of the Government of Guam to identify and obtain qualified private activity bonds is dependent on many factors, such as the reliability of financial data, historical performance relating to DPWs ability to meet payment obligations and the projected revenue stream to be used to service the debt. In order to pursue the preferred funding alternative, DPW will immediately begin working with the Guam Economic Development and Commerce Authority (GEDCA) and BBMR to lay the necessary groundwork required to secure the bond.

## *5.3 Group A3: Construction Management Services for Closure of Ordot Dump*

### 5.3.1 Program Costs

Capital costs for construction management services are estimated at $30,000 per month for the life of the construction contract for the closure of the Ordot Dump. The Consent Decree requires that the closure of the landfill be completed 18 months after award of the contract.

Total Programming Cost is estimated at $540,000 [$30,000/month x 18 months].

### 5.3.2 Preferred Funding Alternative

**Grants, Loans or Bonds:** The funding for this alternative includes grants, loans and/or bonds. The financial analysis has identified Private Activity Bond financing as the preferred alternative.

Case 1:02-cv-00022     Document 69-11     Filed 01/31/2007     Page 3 of 27

### 5.3.3 Financing Strategy

Bond financing will be pursued as the primary funding source for this program element. The ability of the Government of Guam to identify and obtain qualified private activity bonds is dependent on many factors, such as the reliability of financial data, historical performance relating to DPW's ability to meet payment obligations and the projected revenue stream to be used to service the debt. In order to pursue the preferred funding alternative, DPW will immediately begin working with the Guam Economic Development and Commerce Authority (GEDCA) and BBMR to lay the necessary groundwork required to secure the bond.

## 5.4 Group B1: EIS and Site Selection for New MSWLF

### 5.4.1 Program Costs

Capital costs for the EIS and Site Selection for the new MSWLF is estimated at $1.1 million, based on the negotiations between DPW and the selected A&E firm.

Total Programming Cost is estimated at $1.1 million.

### 5.4.2 Preferred Funding Alternative

**Existing SWMF:** Funding for this program element is the use of existing SWMF monies. Existing funds available will be sufficient for this element.

### 5.4.3 Financing Strategy

No additional steps are required for this funding alternative other than the continued billing and collection of tipping and user fees to augment the SWMF. Budgeting of the programmed amounts for the upcoming fiscal year will include the estimated expenditure amounts and projected revenues to justify the costs of the program element.

## 5.5 Group B2: Plan for New MSWLF

### 5.5.1 Program Costs

Capital costs for the design of the new MSWLF is assumed to be similar to the cost of the closure plan for Ordot Dump, which is estimated in Section 5.1.1 as $2.5 million. This does not include the preparation of the wetland mitigation plan, which is estimated at $596,000. This assumes that the new landfill site will contain 35 acres of wetland that need to be developed off-site at a ratio of 1:2 or 70 acres. Wetland mitigation plan costs include siting of the new wetland, delineation of the wetlands at the new MSWLF site and the new wetland site, topographic surveying and property title research of the new site, wetland mitigation design, and coordination with necessary local and federal government agencies for approval of the mitigation plan.

Total Programming Cost is estimated at $3.096 million [($2.500 + $0.596) million].

## 5.5.2 Preferred Funding Alternative

**Existing SWMF and DBOT:**  The preferred funding alternative for this program
element involves a restructuring of the execution of the new MSWLF project from the
traditional design (Group B2)-bid-build (Group B3) concept, to a preliminary design
(partial Group B2), then design-build-operate-transfer (Partial Group B2 and Group B3),
or DBOT project structure. The former would require funding of the complete design,
and the latter requires funding only a portion of the total design cost. This DBOT project
vehicle allows a reduced encumbrance of government funds at the outset and use of
private funding for financing, complete design and construction capital improvements,
with fees for the service incorporated into the tipping fees.

The use of the preferred alternative would require approximately 40% of the total
program element cost ( 40% of $3.096M) from existing SWMF monies. The remaining
60% would be financed into the DBOT.

## 5.5.3 Financing Strategy

No additional steps are required for the portion of this program element using the existing
SWMF other than the continued billing and collection of tipping and user fees to augment
the SWMF.  Budgeting of the programmed amounts for the upcoming fiscal year will
include the estimated expenditure amounts for the portion of this program element and
projected revenues to justify the relevant costs.

The portion of the program element requiring the use of the DBOT project vehicle will be
undertaken as outlined in the following section.

## *5.6 Group B3: Construction of New MSWLF*

### 5.6.1 Program Costs

Capital costs to construction the new MSWLF at $60 per ton is based on initial startup
costs for landfill development, equipment, and two landfill cells. Each cell has a capacity
of 500,000 tons and a life of 3 years. Operating and maintenance costs are estimated at
$20 per ton. Using projected waste generated annually from the ISWMP and assuming
that 98% of the waste is landfilled, the average volume of waste landfilled during the first
6 years of operation is approximately 217,000 tons.

Total Programming Cost is estimated at
> $60 million [$60 per ton x 2 cells x 500,00 tons] for capital costs and
> $4.340,000 [$20 per ton x 217,000 tons per year] annual O&M costs.

### 5.6.2 Preferred Funding Alternative

**DBOT:**  As described under Section 5.5.2, the preferred funding alternative for the
construction of the new MSWLF involves a restructuring of the traditional project vehicle
into a DBOT contract vehicle.  Under this alternative, the majority of design and the
construction are financed and conducted by a private enterprise for a fixed fee paid to the
enterprise by the government over the life of the facility.

Case 1:02-cv-00022     Document 69-11     Filed 01/31/2007     Page 5 of 27

### 5.6.3 Financing Strategy

The preferred funding alternative requires the issuance of a request for proposals (RFP) for the DBOT of a new MSWLF upon completion of a preliminary design for the facility. Existing public laws authorize and support the privatization of the MSWLF. The financing of this program element, under the preferred strategy, will be the responsibility of the DBOT offeror. DPW will insure that the DBOT service fee is incorporated into the tipping and user fees, and that adequate and appropriate documentation exists for the development of an actuarial rate case with the Public Utilities Commission.

## 5.7 Group B4: Construction Management Services for New MSWLF

### 5.7.1 Program Costs

Capital costs for construction management services are estimated at $30,000 per month for the life of the construction contract for the new MSWLF. The Consent Decree requires that the new landfill be completed 12 months after award of the contract.

Total Programming Cost is estimated at $360,000 [$30,000/month x 12 months].

### 5.7.2 Preferred Funding Alternative

**Grants, Loans or Bonds:** The funding alternative for this program element includes grants, loans and/or bonds. The financial analysis has identified Private Activity Bond financing as the preferred alternative.

### 5.7.3 Financing Strategy

The ability of the Government of Guam to identify and obtain qualified private activity bonds is dependent on many factors, such as the reliability of financial data, historical performance relating to DPW's ability to meet payment obligations and the projected revenue stream to be used to service the debt. In order to pursue the preferred funding alternative, DPW will immediately begin working with the Guam Economic Development and Commerce Authority (GEDCA) and BBMR to lay the necessary groundwork required to secure the bond.

## 5.8 Group C: Training of Engineering Staff

### 5.8.1 Program Costs

This program element consists of the bolstering of Solid Waste Division staff to allow for the effective management and monitoring of the landfill operations, landfill closure and post-closure requirements. The costs associated with the program element include annual salary and benefits, as well as annual training (see Appendix F).

**Table 5-1**
**DPW Solid Waste Engineering Staff Program Costs**

| Position Description | Annual Salary & Benefits |
|---|---|
| Engineer Supervisor | $ 70,000 |
| Engineer III | $ 60,000 |
| Engineer II | $ 53,000 |
| Administrative Assistant | $ 39,000 |
| Word Processing Secretary II | $ 31,000 |
| | |
| Annual training for three engineers | $ 30,000 |
| | |
| **Annual Personnel & Training Costs** | **$ 283,000** |

Total Programming Cost is estimated at $283,000.

## 5.8.2 Preferred Funding Alternative

**Grants, Loans or Bonds:** The funding alternatives for this program element include grants, loans and/or bonds. The financial analysis has identified Private Activity Bond financing as the preferred alternative; however, five potential grant sources have been identified for possible funding.

## 5.8.3 Financing Strategy

As the grant or federal loan possibilities identified cannot be confirmed without completing the application process, bond financing will be pursued as the primary funding source for this program element. DPW will begin the application process for the identified grant opportunities. If grant funds are obtained, they will be used to reduce the amount of bond financing required, in order to minimize the overall program financing cost and the resulting tipping fee.

The ability of the Government of Guam to identify and obtain qualified private activity bonds is dependent on many factors, such as the reliability of financial data, historical performance relating to DPW's ability to meet payment obligations and the projected revenue stream to be used to service the debt. In order to pursue the preferred funding alternative, DPW will immediately begin working with the Guam Economic Development and Commerce Authority (GEDCA) and BBMR to lay the necessary groundwork required to secure the bond.

## *5.9 Group D: Wetland Mitigation*

### 5.9.1 Program Costs

Capital cost for wetland mitigation from the closure of Ordot Dump and the construction of the new MSWLF is estimated at $100,000 per acre. Assuming worst-case scenarios, 30 acres will have to be developed as wetland from the closure of Ordot Dump and 70 acres will have to be developed as wetland from the construction of the new MSWLF.

Total Programming Cost is estimated at $10 million [$100,000 per acre x (30+10) acres].

## 5.9.2 Preferred Funding Alternative

**Grants, Loans or Bonds:** The funding alternatives for this program element include grants, loans and/or bonds. The financial analysis has identified Private Activity Bond financing as the preferred alternative.

## 5.9.3 Financing Strategy

The ability of the Government of Guam to identify and obtain qualified private activity bonds is dependent on many factors, such as the reliability of financial data, historical performance relating to DPW's ability to meet payment obligations and the projected revenue stream to be used to service the debt. In order to pursue the preferred funding alternative, DPW will immediately begin working with the Guam Economic Development and Commerce Authority (GEDCA) and BBMR to lay the necessary groundwork required to secure the bond.

## *5.10 Group E: Land Acquisition for New MSWLF*

### 5.10.1 Program Costs

Capital cost for the acquisition of raw land in the southern half of Guam is estimated at $40,000 per acre. It is estimated that approximately 150 acres of land will need to be acquired for the new MSWLF, not including off-site improvements.

Total Program Cost is estimated at $6 million [$40,000 per acre x 150 acres].

### 5.10.2 Preferred Funding Alternative

**DBOT:** The preferred funding alternative for acquisition of real property for the MSWLF is through the DBOT contract vehicle. In this scenario, the cost of property can be rolled into the financing package for the design and construction of the facility. There is the possibility that the government can reduce the finance amount for the DBOT by exchanging government property for the required real property. This will have a beneficial overall affect on the total program cost.

### 5.10.3 Financing Strategy

The preferred funding alternative requires the issuance of a request for proposals (RFP) for the DBOT of a new MSWLF upon completion of a preliminary design for the facility. The design will indicate in sufficient detail the real property requirements for site development and future expansion of the facility, to include all cells needed for the projected generation rates and the desired landfill lifespan. To facilitate the valuation of the real property, DPW will undertake an independent appraisal, and such other procedures necessary for the justification of a taking by eminent domain in the event that property exchange is not acceptable.

Case 1:02-cv-00022    Document 69-11    Filed 01/31/2007    Page 8 of 27

## 5.11 Group F: Off-Site Infrastructure for New MSWLF

The aerial map of the three potential sites for the new MSWLF (Lonfit, Sabana Bateo, and Dandan) was reviewed to determine the necessity for off-site infrastructure improvements. Based on the likely location of the landfill within those areas, distance to the nearest access road was estimated. It is assumed that existing access roads will be improved as necessary under the Federal Highways Fund and infrastructure improvements such as power and water were available along the nearest access road with residential and commercial land use.

### 5.11.1 Program Costs

The following table describes the conceptual engineering cost estimates for land acquisition, road and infrastructure improvements. Since siting for the new MSWLF has not yet been determined, this financial plan will use the worst-case scenario for funding this program element.

**Table 5-2**
**Off-Site Infrastructure Costs**

| Location & Item | Description | Unit | Qty | Unit Cost | Total Capital Cost |
|---|---|---|---|---|---|
| LONFIT | | | | | |
| Land | Acquisition of land for 40 foot right of way | AC | 0.6 | $ 40,000 | $ 24,000.00 |
| Road | 36ft Wide, 2-1/2" paved road system with shoulder & drainage | LF | 650 | $ 284 | $184,600.00 |
| Power | 45ft Concrete Poles with Guy Wires and Primary Lines every 180ft | EA | 50 | $ 3,500 | $ 175,000.00 |
| Water | 10" Diameter Ductile Iron, Mechanical Joints | LF | 8950 | $ 42 | $ 375,900.00 |
| | | | | TOTAL | $ 759,500.00 |
| SABANA BATEO | | | | | |
| Road | Available | LF | 0 | $ 284 | $ - |
| Power | 45ft Concrete Poles with Guy Wires and Primary Lines every 180ft | EA | 18 | $ 3,500 | $ 63,000.00 |
| Water | 10" Diameter Ductile Iron, Mechanical Joints | LF | 3200 | $ 42 | $ 134,400.00 |
| | | | | TOTAL | $ 197,400.00 |
| DANDAN | | | | | |
| Land | Acquisition of land for 40 foot right of way | AC | 4.6 | $ 40,000 | $ 184,000.00 |
| Road | 36ft Wide, 2-1/2" paved road system with shoulder & drainage | LF | 5000 | $ 284 | $1,420,000.00 |
| Power | 45ft Concrete Poles with Guy Wires and Primary Lines every 180ft | EA | 28 | $ 3,500 | $ 98,000.00 |
| Water | 10" Diameter Ductile Iron, Mechanical Joints | LF | 5000 | $ 42 | $ 210,000.00 |
| | | | | TOTAL | $ 1,912,000.00 |

Case 1:02-cv-00022     Document 69-11     Filed 01/31/2007     Page 9 of 27

### 5.11.2 Preferred Funding Alternative

**DBOT:** As described under Section 5.5.2, the preferred funding alternative for the construction of the new MSWLF involves a restructuring of the traditional project vehicle into a DBOT contract vehicle. In addition to the design and construction costs, the cost for off-site infrastructure will also be financed and conducted by a private enterprise for a fixed fee paid to the enterprise by the government over the life of the facility.

### 5.11.3 Financing Strategy

The preferred funding alternative requires the issuance of a request for proposals (RFP) for the DBOT of a new MSWLF upon completion of a preliminary design for the facility and any required off-site infrastructure. Existing public laws authorize and support the privatization of the MSWLF.

# 6.0 Total Program Funding

## 6.1 Program Costs

As summarized in the table below, costs associated with the closure of the existing Ordot dump and construction of the new sanitary landfill facility are projected to approximately $100 million. Currently, the Government of Guam has identified total available funding of $3,259,000. Accordingly, it would be expected that $100 million in private activity bonds would be used for funding of this project.

**Table 6-1**
**Program Costs**

| Description | Funding Status | Preferred Funding Alternative | Capital Costs ($1,000) | O & M Costs ($1,000) | Total Costs ($1,000) |
|---|---|---|---|---|---|
| Final Closure Plan, Schedule and 90% Wetland Mitigation Plan | Allocated | SWMF | $3,096 | --- | $3,096 |
| Advertise, Award, Complete Closure & Post Closure | Unfunded | Grants, Loans, Bonds | $10,000 | --- | $10,000 |
| Closure Construction Management Services | Unfunded | Grants, Loans, Bonds | $540 | --- | $540 |
| EIS and Site Selection of New MSWLF | Allocated | SWMF | $1,100 | --- | $1,100 |
| Final Plan for New MSWLF and 90% Wetland Mitigation Plan | Partially Funded | SWMF, DBOT | $2,818 | --- | $2,818 |
| Advertise, Award & Complete New MSWLF | Unfunded | DBOT | $60,000 | $4,000 | $64,000 |
| New MSWLF Construction Management Services | Partially Funded | Grants, Loans, Bonds | $360 | --- | $360 |
| Training of Engineering Staff | Partially Funded | Grants, Loans, Bonds | | $283 | $283 |
| Wetland Mitigation Construction | Unfunded | Grants, Loans, Bonds | $10,000 | --- | $10,000 |
| Acquisition of New Land for MSWLF | Unfunded | DBOT, Gov't Exchange | $6,000 | --- | $6,000 |
| Off-Site Land and Infrastructure | Unfunded | DBOT | $1,912 | --- | $1,912 |
| Total funding required | | | | | $100,109 |
| Available funding | | | | | $3,259 |

Funding of approximately of $70 million would be required by 2007 for costs associated with closure of the existing facility and opening of cell A of the new facility. An additional $30 million would be required by 2010 for opening of cell B of the sanitary landfill. As the Internal Revenue Code requires, the funds from the issuance of a PAB must be used within 2 years of the bond issuance. For purposes of this financial plan, it was assumed that a PAB of $70 million would be issued in 2005 and an additional bond

Case 1:02-cv-00022    Document 69-11    Filed 01/31/2007    Page 11 of 27

of $30 million would be issued in 2008. Interest rates for the 2005 bond issue are based on the October 27, 2003 rates plus 75 basis points. For this analysis the interest rates for the 2008 bond issue are assumed to increase another 100 basis points.

As indicated in the following table, it would be expected that the annual debt service for the bond issue would range from $6.2 million to $6.8 million and the second bond issue would have an annual debt service ranging from $2.9 million to $3.1 million.

It has been estimated that the operating and management costs for the new sanitary landfill would be $20 per ton in 2007 adjusted annually by an average inflation factor of 3.5%. Assuming the Design, Build, Operate and Transfer (DBOT) option is pursued, a profit margin should be included for the private contractor. While this would be subject to negotiation between the Government of Guam and the private contractor, for purposes of this financial plan a 10% profit margin is assumed. Accordingly, the operating and management costs, inclusive of a 10% margin would be expected to equal $22 per ton in 2007.

In the table below, the average annual debt service is added to the costs and profit margin. The final column of the table indicates the proposed tipping fee for each of the years in the 20-year period.

Table 6-2
Projected Tipping Fees

| Year | Tons of Waste Generated | Operation & Maintenance Costs plus Profit | Debt Service | Total Outlay | Tipping Fee (per ton) |
|------|------|------|------|------|------|
| 2007 | 198,511 | $4,280 | $6,162 | $10,442 | $53 |
| 2008 | 206,219 | 4,602 | 6,162 | 10,764 | 49 |
| 2009 | 215,054 | 4,967 | 6,162 | 11,129 | 49 |
| 2010 | 224,149 | 5,358 | 9,020 | 14,378 | 61 |
| 2011 | 235,939 | 5,837 | 9,020 | 14,857 | 59 |
| 2012 | 246,797 | 6,320 | 9,020 | 15,340 | 59 |
| 2013 | 258,009 | 6,838 | 9,020 | 15,858 | 58 |
| 2014 | 269,586 | 7,395 | 9,020 | 16,415 | 57 |
| 2015 | 281,537 | 7,993 | 9,020 | 17,013 | 57 |
| 2016 | 293,868 | 8,635 | 9,020 | 17,655 | 57 |
| 2017 | 306,585 | 9,324 | 9,020 | 18,344 | 56 |
| 2018 | 319,697 | 10,063 | 9,020 | 19,083 | 56 |
| 2019 | 330,628 | 10,771 | 9,020 | 19,791 | 56 |
| 2020 | 344,021 | 11,600 | 9,020 | 20,620 | 57 |
| 2021 | 358,587 | 12,514 | 9,020 | 21,534 | 57 |
| 2022 | 373,617 | 13,495 | 9,020 | 22,515 | 57 |
| 2023 | 389,118 | 14,547 | 9,020 | 23,567 | 57 |
| 2024 | 400,100 | 15,675 | 9,020 | 24,695 | 58 |
| 2025 | 421,570 | 16,883 | 9,020 | 25,903 | 58 |
| 2026 | 438,539 | 18,177 | 9,020 | 27,197 | 59 |

Case 1:02-cv-00022    Document 69-11    Filed 01/31/2007    Page 12 of 27

Based on the above table, the average annual tipping fee would be expected to be $57 per ton of waste generated during the twenty-year period. If an uninsured bond was utilized the average would be slightly higher.

In evaluating the viability of the operation and financing of the sanitary landfill, financial statements were projected for an operator assuming average tipping fees of $57 per ton., as summarized in Table 6-2. Overall, based on the assumption above, the operator would be expected to generate a total of approximately $21 million over the twenty year period. It should be noted that losses would be generated in years 2011 through 2014 due to higher operating and maintenance costs associated with opening of the second cell. Accordingly, it may be expected that a temporary increase to the tipping fees would be required.

## *6.2 Overall Funding Strategy*

Previous sections have detailed the preferred funding alternative and strategy for each program element. The coordinated overall strategy for the entire program consists of

- ❖ The continued management of the Solid Waste Management Fund,
- ❖ Deployment of existing DPW staff, with supporting staff from other offices/agencies, to spearhead grant, loan and bond data development, applications, and coordination
- ❖ The augmentation of the existing fund balance through additional federal assistance, including
  - o Compact-Impact funds,
  - o Federal grants and/or
  - o Loans
- ❖ The development of required documentation, relating to the fund revenues and expenses, to support all activities required for private activity bond financing.
- ❖ The use of design-build-operate-transfer project execution method to avail private financing of the new MSWLF, and assigning a portion of the actual cost-based tipping and user fees to the service fee for such method
- ❖ Employment of the Guam Economic Development and Commerce Authority to secure the issuance of private activity bonds, through such activities as
  - o Financial guidance and assistance
  - o Structuring bond issuances
  - o Preparation and dissemination of financial and investment information
  - o Development of interest among investment bankers
- ❖ Coordination with the Public Utilities Commission on the schedule of actuarial analysis to be used in the setting of tipping fees to cover operations and maintenance as well as debt service for capital improvements

This strategy is presented in the series of tables below, which group all program elements by the appropriate funding mechanism and present detailed tasks necessary to implement each one. The tasks listed in these tables are presented along with timelines and schedule milestones at the end of this plan as **Exhibit 1**.

Case 1:02-cv-00022    Document 69-11    Filed 01/31/2007    Page 13 of 27

In the event that the options presented above are not successful, the Government of Guam has the option of pursuing legislated increases in real property taxes or the creation of an import tax to fund the annual capital outlay required for the program elements.

## 6.2.1 Solid Waste Management Fund

The existing SWMF is intended to be the primary source of funding for the operations of the solid waste division of DPW, including the closure of the Ordot Dump and the construction of the new MSWLF. As the fund was relatively recently established, DPW has not had the benefit of time nor experience to gain efficiency in managing the fund. Further, the activities covered under this financial plan will tap the fund to its limits. Thus, DPW will focus on improving the management performance through enhanced collections and decreased expenses, so as to allow for improved cash flow for operations.

As the fund will serve as the revenue base to which all other funding mechanisms are tied, production of accurate, defensible and auditable records is of paramount importance. DPW will also focus on increasing the fund balance available for expenditures on the program elements by providing reliable documentation of the fund to support the augmentation of funding through various outside sources, such as grants. DPW will also coordinate with GEDCA and the PUC to propose a revised fee structure for the fund, which incorporates debt service and service fees for the necessary capital expenditures to be performed through the other funding mechanisms: DBOT, loans and bonds.

Table 6-3A
**Funding Strategy for Solid Waste Management Fund**

| Funding Alternative | Applicable Program Element | Item | Funding Strategy Task | Due Date | Responsible Party |
|---|---|---|---|---|---|
| SWMF | A1 | 1 | Assess effectiveness of billing and collection system | Oct'04 | DPW |
| | B1 | 2 | Determine viability of outsourcing billing and collection | Oct'04 | DPW |
| | B2 (partial) | 3 | Reduce operational expenses where possible | Jan'05 | DPW |
| | | 4 | Enhance revenue through increased collection | Jan'05 | DPW/DOA |
| | | 5 | Implement regular audits of field receipts | Jan'05 | DPW |
| | | 6 | Develop detailed records of operating expenses | Jan'05 | DPW/DOA |
| | | 7 | Develop detailed records of revenues | On-going | DPW/DOA |
| | | 8 | Coordinate with PUC on requirements for actuarial analysis documentation | Apr'05 | DPW |
| | | 9 | Conduct management audit of solid waste operations | Jan'05 | DPW |

## 6.2.2 DBOT

The use of the DBOT project structure is fairly common for large-scale municipal capital improvement projects throughout the U.S. and the world. It is especially well suited as a public-private partnership for solving 'capacity' problems, such as landfills, bulk treatment facilities and production facilities. The steps necessary to implement this

funding mechanism are not much different from traditional CIP project execution activities, with which DPW is intimately familiar. The critical differences are in the areas of contracting and authorization. DPW, through various existing public laws, is authorized and encouraged to privatize landfill operations. However, existing statutory requirements may contain references to outdated siting requirements and documents, which will require updating or revision. DPW will review and confirm these requirements and work with the appropriate legislative committee to enact revisions which will allow for the timely initiation and completion of this project execution mechanism. This effort will be undertaken in advance of and simultaneously with the development of preliminary design documents for the new MSWLF to insure that once there is sufficient design data, the RFP can be issued and estimates of the required service fee for the DBOT project can be developed for assignment of SWMF revenues. The following table lists the steps anticipated to complete this funding strategy.

**Table 6-3B**
**Funding Strategy for Design-Build-Operate-Transfer**

| Funding Alternative | Applicable Program Element | Item | Task | Due Date | Responsible Party |
|---|---|---|---|---|---|
| | B2 (partial) B3 E F | 1 | Review statutory requirements regarding privatization of landfill to determine applicable items for DBOT RFP | Dec'04 | DPW |
| | | 2 | Identify items in existing legislation requiring updating or revision | Jan'05 | DPW |
| | | 3 | Coordinate with legislative oversight committee chairperson | Mar'05 | DPW / Legislat. |
| | | 4 | Coordinate preliminary design and DBOT scopes of work, including provisions for land acquisition and off-site infrastructure | Apr'05 | DPW |
| | | 5 | Develop draft legislation | May'05 | DPW / Legislat. |
| | | 6 | Issue Solicitation of Interest | Jan'05 | DPW |
| | | 7 | Identify and address private sector concerns | Jul'05 | DPW |
| | | 8 | Develop DBOT Request For Proposal (RFP) | Aug'05 | DPW |
| | | 9 | Finalize legislation | Aug'05 | DPW / Legislat. |

## 6.2.3 Grants, Loans and Bonds

This plan has identified potential sources of grant and loan funding which may be applicable to the various program elements. Obviously, the challenge is in obtaining the funding from these potential sources. In order to do this, DPW will bring the necessary resources to bear on the effort by assigning specific DPW staff to work on grants and loans for these program elements. DPW will also request assistance from the Office of the Governor, through BBMR and Guam State Clearinghouse, to provide staff resources in coordinating and completing grant and loan applications. This "team" will be responsible for tracking all related deadlines and coordinating the development of support

documentation to maximize the chances for obtaining additional funding. See Appendix G for detailed grant information.

The primary and preferred funding method for most of the larger program elements is through the issuance of bonds. DPW will assign staff to coordinate the pursuit of bond financing for the department. DPW will also engage the Guam Economic Development and Commerce Authority to provide technical assistance and financial guidance in this pursuit.

Such joint and cooperative efforts will include development and preparation of financial information for dissemination to interested financial institutions, finalizing funding estimates, modeling/revision of tipping fee structures to include debt service, and seeking relevant government approvals of bond issuance. GEDCA will lead efforts on development of bond prospectuses, solicitation of interest among bond brokers and or investment bankers, retaining bond counsel, and such other consultants or services required to complete the transaction.

In order to insure all requirements relating to obtaining an actual cost of service rate for tipping and service fees are achieved, DPW will coordinate with the PUC to determine those requirements. The assigned DPW staff, with supporting staff as assigned from the Office of the Governor, will develop the required documentation to support the rate case.

DPW will develop a preliminary financial model that supports the proposed fee structure and includes operation and maintenance costs for existing solid waste operations (adequately modified to account for any privatized operations), debt service for needed bond financing (after grant amounts are subtracted), and service fees for DBOT transaction. This model, the proposed fee structure and all supporting documentation developed will form the basis for the rate case to be presented to the PUC for approval and establishment of an actuarial rate for solid waste operations. The table below indicates the steps proposed for this funding mechanism.

Case 1:02-cv-00022    Document 69-11    Filed 01/31/2007    Page 16 of 27

**Table 6-3C**
**Funding Strategy for Grants, Loans and Bonds**

| Funding Alternative | Applicable Program Element | Item | Task | Due Date | Responsible Party |
|---|---|---|---|---|---|
| | A2 | 1 | Identify and assign DPW staff for grants | Dec'04 | DPW |
| | A3 | 2 | Request staff support from Governor's office | Dec'04 | DPW |
| | B4 | 3 | Establish/augment list of grant opportunities | Jan'05 | DPW/GSC |
| | C D | 4 | Contact all federal grant agencies and coordinate applicability and grant/loan application requirements | Apr'05 | DPW/GSC |
| | | 5 | Begin necessary documentation assembly | Apr'05 | DPW |
| | | 6 | Develop grant/loan applications | Apr'05 | DPW |
| | | 7 | Schedule and track grant specific deadlines | Apr'05 | DPW |
| | | 8 | Submit grant/loan applications | Jul'05 | DPW/GSC |
| | | 9 | Coordinate application review and comments | Aug'05 | DPW/GSC |
| | | 10 | Assess and report on grant/loan opportunities and potential funding amounts | Sep'05 | DPW |
| | | 11 | Identify and assign DPW staff for bonds | Dec'04 | DPW |
| | | 12 | Engage GEDCA financial consultant to assist in processing of bond issue | Feb'05 | DPW / GEDCA |
| | | 13 | Coordinate with PUC on schedule for actuarial analysis and rate case requirements | Apr'05 | DPW / PUC |
| | | 14 | Investigate bond insurance requirements and potential options | Mar'05 | DPW |
| | | 15 | Assemble previous financial statements and other documentation | On-Going | DPW/DOA |
| | | 16 | Refine estimated costs for each program element based on detailed engineering estimates | May'05 | DPW |
| | | 17 | Incorporate adjustments for confirmed grant opportunities | Oct'05 | DPW |
| | | 18 | Develop rate case for PUC presentation | Oct'05 | DPW / GEDCA |

APPENDIX A:  Consent Decree

APPENDIX B:  BBMR Solid Waste Management Fund
Financial Statements (FY2000-FY2004)

APPENDIX C:  Solid Waste Management Fund Annual
Financial Statements (FY1999-FY2002)

APPENDIX D:  Solid Waste Management Fund
Appropriations Accounts

- Details personnel (salary, overtime,
fringes), supply, equipment, utilities, and
capital costs

APPENDIX E:  Department of the Interior Office of Insular
Affairs Approval Form

- Reprogram for Ordot Landfill Closure

APPENDIX F:  DPW Consent Decree Staffing Pattern and
Solid Waste Staffing Pattern

APPENDIX G:  Detailed Grants and Loans Information



# ATTACHMENT 15

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

* * *

**FILED**

DISTRICT COURT OF GUAM

JAN 1 8 2007

MARY L.M. MORAN
CLERK OF COURT

UNITED STATES OF AMERICA,          )
                                   )
                  Plaintiffs,      )
                                   )
     vs.                           )    CIVIL CASE
                                   )      NO. 02-00022
GOVERNMENT OF GUAM,                )
                                   )    **US Attorney's Office**
                  Defendant.       )    **Districts of Guam & NMI**
_____)

JAN 19 2007
Time 1050
Receiving name _Emmanuel_
Date keyed in Dbase _1/19/07_
Entered into Dbase by: _je_

TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE JUDGE JOAQUIN V. E. MANIBUSAN, JR.

Magistrate Judge

**STATUS CONFERENCE**

**WEDNESDAY, DECEMBER 20, 2006**

* * *

**APPEARANCES:**


FOR THE PLAINTIFF:

SUE ELLEN WOOLDRIDGE
ASSISTANT ATTORNEY GENERAL
Environmental & Natural Resources Division
BY:  ROBERT D. MULLANEY (appearing telephonically)
     and also JULIA JACKSON & PANJAK ARORA
Environmental Enforcement Section
UNITED STATES DEPARTMENT OF JUSTICE
301 Howard Street, Suite 1050
San Francisco, CA  94105

LEONARDO M. RAPADAS
UNITED STATES ATTORNEY
BY:  MIKEL W. SCHWAB
Assistant United States Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagatna, Guam  96910



FOR THE DEFENDANT:

OFFICE OF THE ATTORNEY GENERAL
BY:  HELEN KENNEDY and ELIZABETH CRUZ
Assistant Attorneys General
Pedro's Plaza Building
287 West O'Brien Drive
Hagatna, Guam 96910


FOR THE GOVERNOR OF GUAM:
BY:  RAYMOND HADDOCK, Esq.

1    HAGATNA, GUAM; WEDNESDAY, DECEMBER 20, 2006; 10:12 A.M.

2                            *  *  *

3         THE CLERK:  Civil case 02-00022, United States

4    of America versus Government of Guam, status

5    conference.

6         Counsel, please state your appearances.

7         MR. SCHWAB:  Your Honor, Mikel Schwab on

8    behalf of the United States.

9         THE COURT:  Good morning.

10        MR. MULLANEY:  Robert Mullaney on behalf of

11   the United States.

12        THE COURT:  Good afternoon.

13        MR. MULLANEY:  Good afternoon.

14        MS. JACKSON:  Julia Jackson on behalf of the

15   United States Environmental Protection Agency.

16        MS. ARORA:  Panjak Arora from US-EPA.

17        THE COURT:  Good afternoon.

18        MS. KENNEDY:  Hafa adai, good morning, and

19   good afternoon, Helen Kennedy on behalf of the

20   Government of Guam, and at counsel table with me is

21   Elizabeth Cruz, and Ray Haddock of the Governor's Legal

22   Counsel.

23        THE COURT:  Good morning.

24        We're here this morning based on a request by

25   the plaintiff to have a status conference.  And the

1 court has reviewed the request filed herein by the
2 plaintiff, and the court has also reviewed the response
3 filed by the government, filed herein on December 15,
4 2006, and the supplemental information filed by the
5 United States government also on December 15.

6 And it is my understanding that the plaintiff,
7 the United States of America, desires to present I
8 guess information to the court at this time.

9 And, well, before we begin, let me say that
10 when I was a little kid, I used to go to Ordot Dump to
11 dump trash. So we're here today I guess to ultimately
12 determine what's going to happen in the next -- in the
13 foreseeable future.

14 So let me hear from Mr. Schwab at this time.

15 MR. SCHWAB: Your Honor, we're here today as
16 a preliminary to solutions that we're going to be
17 presenting to the court, I believe, under Rule 70
18 where there's contempt of court, because of course the
19 court's order has been not followed in this case. And
20 I think what we're going to hear today from the other
21 side is that we need more time or more money. And our
22 reason for filing our supplemental report is so you can
23 see that there are experts and people out there who are
24 saying --

25 THE COURT: I'm not so sure whether there are

1   contempt issues today.

2          MR. SCHWAB:  Not today, Your Honor.  Today

3   we're giving you the status, which is that the court

4   order has not been followed.  We're having a breakdown

5   on following the court order --

6          THE COURT:  Mr. Schwab, can I ask you to go to

7   the podium so that --

8          MR. SCHWAB:  Certainly.

9          THE COURT:  -- so that those participating

10  telephonically are more able to participate and hear.

11         MR. SCHWAB:  Absolutely, Your Honor.

12         Our purpose here today, Your Honor, is a

13  status to let the court know the breakdown in the court

14  order.  And we'll be following this with possible

15  solutions that will explore -- we've given Your Honor

16  the supplemental submission that shows an independent

17  group that has studied the problem and given us some

18  more insight into what is going wrong and why it's

19  going wrong.

20         And with that I'll also turn it over to

21  Mr. Mullaney to address the court.  Mr. Mullaney is

22  from the Environment and Natural Resources Division,

23  and he's a specialist in this field.

24         THE COURT:  All right.

25         MR. SCHWAB:  Thank you.

1          THE COURT:  Mr. Mullaney, are you on the other

2     side?

3          MR. MULLANEY:  Yes, I am, thank you.

4          THE COURT:  All right.  Let me hear from you

5     at this time, sir.

6          MR. MULLANEY:  Okay.  We brought this to the

7     court's attention because we have a very long history

8     of involvement with this site--perhaps not as long as

9     Your Honor's.  But the EPA first issued orders in this

10    case in 1986 and attempted over the next ten years,

11    from '86 actually through '99, to solve this problem

12    with administrative orders, working closely with the

13    Government of Guam.  After more than a decade of trying

14    to do that, they turned the case over to the Department

15    of Justice to file a complaint.

16         We have not -- we did not pursue this right

17    away tooth and hammer with the government; we actually

18    engaged with the court under Judge Unpingco for over a

19    year, and the Judge had frequent status conferences

20    with all of the parties.  He actually engaged the

21    Legislature at one point, we had a very open meeting in

22    the courtroom.  And we know that he put a lot of

23    effort, over a year's time, to bring the parties

24    together and to get the consent decree in place.

25         We had very strong hopes that this would

1  resolve the issue once and for all. And the consent

2  decree took a four-year path to close Ordot and to open

3  a new landfill. It was our hope from the outset that

4  this could be done locally, and that the Government of

5  Guam would take this project on and complete it. And

6  what we've found over the last months now is that the

7  government has not been able to comply at all with the

8  terms of the consent decree, and the option that we

9  have is to impose stipulated penalties, and now as of

10  today that would be over $560,000 in stipulated

11  penalties. But it's not been our intent to simply

12  collect civil penalties from the Government of Guam.

13  We don't believe that that really will get the dump

14  closed. So we are here today to make the court aware

15  of where things are right now, and to explore some

16  options going forward to try and get this closed and

17  to get a new landfill opened.

18  At this point we've somewhat reached the end

19  of our rope. If you can look at the Government of

20  Guam's brief, on page 9 you'll see that in this fiscal

21  year the Legislature on Guam did not appropriate any

22  funds for a consent decree compliance. So we're asking

23  ourselves how is this going to happen.

24  We see from the report of the Georgetown

25  Consulting Group that they, the Government of Guam will

1     need over a hundred million dollars in bond revenue to

2     make this project work. And we know that in order to

3     pay for those bonds, unless the Government of Guam does

4     it out of the general fund, that money has to come from

5     the users. But, we know that those pieces are not in

6     place to make those user funds work.

7           We can see from the Georgetown Report again

8     that the Department of Public Works over the last four

9     years has managed to only collect about 26 percent of

10    the revenue from its residential customers. We also

11    see that they have done an abysmal job at collecting

12    money from the commercial customers, and that there's

13    very long lead times in money that should be coming in.

14          And one of the things that highlights that for

15    us, the PUC in 2005 authorized a rate increase. It

16    should have been a rate increase of 1.3 million

17    dollars. That money was supposed to go into a lockbox,

18    so it could be used to finance the closing of this

19    dump. And what we've found is that as of June 30th,

20    2006, instead of having 465,000 in the lockbox, the

21    account held $9,000.

22          So what we see when we go through the record

23    here is that the agency is not putting together the

24    building blocks for making the project work here.

25    There's not the financial situation that they need,

there's not the financial stability that would allow them to borrow the money that they need to finish these projects.

Our hope was that this was going to be done in a timely manner, and that the project would get completed in 2007. October 2007 was supposed to be the deadline for Ordot closing. And at the outset of this project, that seemed doable; now, it seems impossible. And we don't believe that just simply extending the deadlines will make this happen either, because the building blocks are not in place to get the funding to make this happen.

So our sense is that this has now moved from violations of EPA's orders to the violations of the court's order. And our sense is that no government agency can be above the law, and this is the time to draw the line and essentially say to the Government of Guam: This is a project that needs to be done, this is a project that your governor back in the 1980s said was the most pressing problem on the island, and here we are 20 years later and we do not want to hear another 20 years worth of excuses. So that's why we're here.

And as Mikel said at the outset, our thought is, we need to move forward, we need to find a way to make this happen, and we want to explore that with the

1    Government of Guam and with the court.  But we think

2    this is a problem that can't be ignored anymore.

3         THE COURT:  Thank you, Mr. Mullaney.

4         Mr. Schwab, any other --

5         MR. SCHWAB:  No, Your Honor.

6         THE COURT:  All right.  Ms. Kennedy?

7         MS. KENNEDY:  Yes.  Thank you, Your Honor.

8         On behalf of DPW, I think I've set out in our

9    pleadings that there have been circumstances beyond the

10   direct control of DPW with regard to moving forward on

11   the consent decree projects, and as well as on the

12   financing.  They don't have the money at the moment for

13   the construction contracts.  And --

14        THE COURT:  It's the sense from the defendant

15   that the main party responsible for complying with the

16   court's order is the Department of Public Works?

17   Because the defendant is the Government of Guam.

18        MS. KENNEDY:  Yes, Your Honor, the defendant

19   is the Government of Guam.  However, within the consent

20   decree, DPW is the agency that is tasked to

21   accomplishing the majority of the task in the consent

22   decree.  So, DPW would like to -- for the court to

23   explore a revised schedule that takes into account

24   these building blocks that the United States has

25   pointed out are -- are missing, and which admittedly

1       lag behind in terms of the timing.

2              I did want to say that the latest reports from

3       DPW with regards to collection of the residential

4       tipping fees is upward of 50 percent, which is

5       significant --

6              MR. MULLANEY:  I'm sorry, I didn't understand

7       that?

8              MS. KENNEDY:  The latest reports from DPW with

9       regards to the collection of the residential tipping

10      and user fee is up to 50 percent, and continues to

11      rise.  As well as the lockbox or the reserve account

12      for the tipping fees now has about $350,000 in it.

13             COURT REPORTER:  Ms. Kennedy, please move the

14      microphone a little closer to you.

15             MS. KENNEDY:  Is this better?

16             MR. MULLANEY:  It's fading in and out.

17             MS. KENNEDY:  So, Your Honor, we also believe

18      that the United States didn't point out the accomplish-

19      ments that DPW and the Government of Guam have

20      accomplished with respect to the consent decree, so we

21      put them in our brief.  We've spent over 9.3 million

22      dollars, or have contracted with work for 9.3 million

23      dollars, and most of that is from Department of

24      Interior grants.  About four million of it is from

25      local funds, and about 800,000 is from the tipping and

```
 1    user fee moneys.

 2            So we would like to present to the court a

 3    revised schedule, that's what DPW would like to do.

 4            THE COURT:  So basically, the government is

 5    in agreement with the plaintiff that closing Ordot by

 6    the October 23rd, 2007 deadline is impossible at the

 7    present time?  Is that opinion also shared by the

 8    defendant?

 9            MS. KENNEDY:  Yes, Your Honor, it's impossible

10    within the confines of both having the funding to do

11    the procurement and doing the procurement, and then

12    starting the work and completing the work by that date.

13    The hundred percent design document contemplated that

14    the contract would be let in April of 2006, and even

15    with the contract having -- if it had been let on that

16    date, by the consent decree deadline, the design

17    engineers still anticipated that closure would not even

18    be completed until, I believe, January or February of

19    2008, so it was almost a two-year process of completion

20    of closure.

21            THE COURT:  If you were to enter into a

22    contract today to close the dump, what would be the

23    duration of that contract?

24            MS. KENNEDY:  I believe, Your Honor, based on

25    the schedule that the design contractor did, that if
```

1　the contract was to start today, that that period would

2　be about 20 to 21 months.

3　　　THE COURT: All right. So, if, for example,

4　the Government of Guam were to enter into such a

5　contract a year from now, so we're looking at closure

6　approximately three years from now then?

7　　　MS. KENNEDY: Yes, Your Honor.

8　　　THE COURT: And what is the cost for the

9　contract?

10　　　MS. KENNEDY: Well, that's one of DPW's

11　concerns. Your Honor, the design contractor came up

12　with a design that was estimated to be 22 million

13　dollars. As it turned out, it's my understanding from

14　DPW that the subcontractor had designed a cover system,

15　a final cover system that is somewhat proprietary, and

16　hence, more expensive than cover systems that -- other

17　cover systems that are available on the market. This

18　led to a contract dispute, and DPW didn't ask the

19　contractor to revise the design, the contractor really

20　didn't want to do that, so DPW didn't pay the

21　contractor, contractor then did not provide the final

22　engineer's stamped drawings to DPW, and those are

23　necessary in order to go out for an invitation to bid.

24　　　DPW and the Government of Guam has been in

25　negotiations with the prime contractor to resolve the

1  contract dispute and incorporate some design changes

2  that were -- that went through a two step process.  The

3  first step was, there a value engineering analysis done

4  on the design, and the value engineering identified

5  potential changes that could get better value for the

6  project as well as lower cost.  Guam EPA then reviewed

7  those possibilities and identified the ones that have

8  some viability of meeting the local regulations

9  regarding design and construction and operations of

10  closure, and gave that back to DPW, who has then taken

11  those possibilities back to the contractor in

12  negotiations to do a cost benefit of those potential

13  savings and come up with the best of those, and then

14  from there, do the design changes.  So the potential

15  cost savings in the end could be, instead of 22 million

16  dollars, it could be as low as about 15 million

17  dollars, the construction costs for Ordot closure.

18  THE COURT REPORTER:  We've lost somebody.

19  (Court confers with deputy clerk.)

20  THE COURT:  I'm trying to see if we lost

21  Mr. Mullaney on the other line.

22  MR. SCHWAB:  Mr. Mullaney, do we still have

23  you?

24  (No response.)

25  (Pause while the deputy clerk attempted to

```
 1              reconnect Mr. Mullaney.)

 2        THE COURT:  Any other matters you want to

 3   state to the court today, Ms. Kennedy?

 4        MS. KENNEDY:  No, Your Honor, I mean, I guess

 5   briefly that --

 6        THE COURT:  Well, let me ask some other

 7   questions then.

 8        MS. KENNEDY:  Yes.

 9        THE COURT:  You say that the residential

10   collection is up to 50 percent at this point.  What

11   about for the businesses?  See, the prior report

12   indicated 9 percent collection; has that also

13   increased?

14        MS. KENNEDY:  Your Honor, I do not have the

15   answer to that question.  And as I stand here, if we

16   took a recess, I could consult with my client very

17   briefly and ask her.

18             (The telephone rang.)

19        THE COURT:  All right.

20        THE CLERK:  One moment, please.

21             (Party back on line.)

22        THE COURT:  Do you have any information, if

23   there were a hundred percent collection on residential,

24   how much does that generate the government on a monthly

25   basis?
```

1    MS. KENNEDY: Again, Your Honor, I would be

2    doing estimates here, but --

3    THE COURT: A rough estimate. You can bring

4    someone, your -- do you have staff with you? You can

5    bring them up with you, if you so like.

6    (Pause.)

7    THE COURT: Mr. Mullaney, are you on the other

8    line, sir?

9    MR. MULLANEY: Yes, thank you, Your Honor, I'm

10   back on line.

11   THE COURT: All right.

12   MR. MULLANEY: I did miss something of this.

13   The last thing I heard, there was talk about a value

14   engineering design. My understanding is that Helen's

15   point was that there could be some savings associated

16   with that. But I didn't hear her actually address the

17   point that she made in her brief, that there wasn't any

18   funding whether the amount was 15 or 22 million. I

19   don't know if she addressed that.

20   THE COURT: Well, she said the savings could

21   be as low as 7 million for the government, so that

22   would mean that the construction costs could be 15

23   million dollars.

24   MR. MULLANEY: Yes. But in her brief she said

25   that they didn't have money for either of those

1    amounts, and she didn't address that; right?

2           THE COURT:  I guess not.

3           MR. MULLANEY:  (Chuckling.)  Because that I

4    think is the critical issue here, it's what I was

5    saying about the building block.  My sense is that

6    whether the dollar amount is 15 million or 22 million,

7    it's way more millions than they have, and that's part

8    of the problem right now.

9           THE COURT:  All right.  Do you have the

10   information, Ms. Kennedy?

11          MS. KENNEDY:  Yes, Your Honor.  Currently,

12   DPW at the 50 percent on the residential level is

13   anticipating revenues of about 5.9 million.  It's

14   difficult to --

15          THE COURT:  Is that based on the current rate?

16          MS. KENNEDY:  Well, that's what they're

17   collecting at the moment.  Now, if you estimate out,

18   the estimates are a combination of the residential and

19   the commercial.  And so, based on the calculations that

20   were done in a financial plan, it estimated I believe

21   about 7.8 million annually.

22          Now since that time, the PUC has increased

23   rates, so my guess -- and I can get the court and

24   opposing counsel the numbers later today -- is probably

25   around 8 million annually.

1    THE COURT:  All right.  The PUC, you say, have

2    raised the rates.  Now, have those increased rates been

3    passed on to the consumers or not?

4    MS. KENNEDY:  Yes, Your Honor, the rate

5    increase was from $8.00 per month for residential to

6    $10.00 per month; and I believe it was 25 percent

7    increase on the commercial side, which is charged by

8    cubic yard.  Those funds, as Mr. Mullaney was stating,

9    are supposed to be placed into a reserve account.  And

10   where we are on that matter is that as of today we have

11   $350,000 in that reserve, or he called it a lockbox,

12   but we refer to it as a reserve account.  That's the

13   extra revenue resulting from the increase in the

14   tipping fee.

15   THE COURT:  And I think the government, the

16   government, the United States has stated that in order

17   to meet the deadlines here and the amounts that are

18   necessary to close Ordot, that you still need to

19   increase these fees; is that correct?

20   MS. KENNEDY:  Yes, Your Honor, that is

21   correct.  The financial plan setout set forth with

22   respect to Ordot that there would be a revenue bond for

23   construction cost, and the PUC would approve the bond

24   plus the construction project, and then set a rate that

25   would allow the government to pay the debt service on

1    the bond.

2        THE COURT:  Now the consent decree actually

3    has two basic purposes, the closure of Ordot and the

4    opening of a new landfill.  And it seems that the

5    government, the United States is also saying that in

6    terms of opening the new landfill, that the Government

7    of Guam has also failed in that regard, to meet the

8    deadlines in the consent order.

9        MS. KENNEDY:  Yes, Your Honor.

10       THE COURT:  Now, in terms of -- I gather from

11   reading the materials submitted that the Government of

12   Guam's focus appears to be perhaps opening the new

13   landfill versus closing Ordot; is that fair to say or

14   that's not correct?

15       MS. KENNEDY:  Well, Your Honor, I'm --

16       THE COURT:  Or is it a policy, or does it have

17   some priority as to either of those issues?

18       MS. KENNEDY:  I think that there is a little

19   bit of a misunderstanding.

20       THE COURT:  Okay.

21       MS. KENNEDY:  The Department of Public Works

22   is being pushed, the PUC is pushing it in one direction

23   and the consent decree is pushing it in a somewhat

24   different direction.  And with respect to the landfill,

25   there have been some unforeseen circumstances.

1      THE COURT: Let me ask this. Is the PUC

2   outside the Government of Guam?

3      MS. KENNEDY: No, Your Honor.

4      THE COURT: So you're all part of -- you're

5   all defendants here presumably then?

6      MS. KENNEDY: Well, Your Honor, that's --

7   that's something that perhaps there should be some

8   briefing on.

9      THE COURT: Well, if you say they're not

10  outside the Government of Guam, and the defendant here

11  is the Government of Guam, then they must be part of

12  the defendants here.

13      MS. KENNEDY: Well, I haven't -- I don't know

14  that the PUC has given me, or given the Attorney

15  General's Office, you know, its stand on that position.

16  The PUC is not a signatory to the decree.

17      THE COURT: The Government of Guam is, and if

18  the Government of Guam includes PUC, then obviously

19  it's included?

20      MS. KENNEDY: Well, the PUC is an independent

21  agency.

22      THE COURT: Okay. I'm just asking.

23      MS. KENNEDY: With respect to the landfill,

24  Your Honor, there have been some unforeseen

25  circumstances as well as -- that have affected both

1    the funding and progress towards finishing the design.

2    A couple of those things I mentioned in my brief.

3    For one thing the design moneys were coming from the

4    Department of Interior, a grant, and no one could

5    foresee that in response to some lawsuits against

6    Department of Interior grant funds, which the Interior

7    was not prevailing on, that they would have a new

8    policy and the new policy would be that the National

9    Environmental Policy Act procedures, the NEPA

10   Environmental Impact Statement Procedures would apply

11   to their grant moneys.

12          And this held up -- they withheld all of their

13   grant moneys to the Government of Guam, including the

14   moneys needed for the design for a number of months

15   until they realized, first, that the amount of money

16   that the federal government was putting into the

17   overall project in helping fund the design was very

18   small, so small that it did not rise to the triggering

19   factor of a major federal action significantly

20   affecting the environment which is the legal trigger

21   for an environmental impact statement; and second, that

22   the consent decree required what it refers to within

23   the consent decree an environmental impact statement

24   which mirrors the NEPA process, and that the Government

25   of Guam had already gone through that environmental

1    impact process evaluation, and had concluded that Layon

2    was the best site on Guam.  So that was one of the

3    unforeseeable circumstances that has delayed further

4    design efforts.

5         The other is some access issues.  The parties

6    that own the land at Layon are in litigation with each

7    other; they are tenants in common, there's been a

8    partition action filed, and they are --

9         THE COURT:  How would that -- how would that

10   delay your ability to get access?

11        MS. KENNEDY:  Because access has been denied.

12        THE COURT:  But don't you have condemnation

13   proceedings that you can avail yourself to, to get

14   access, and in that way you don't have to worry about

15   the infighting going over as to who is the owner of a

16   certain parcel.

17        MS. KENNEDY:  Certainly, Your Honor, and that

18   possibility is being explored very seriously, as we

19   speak.

20        THE COURT:  It seems like it shouldn't be

21   explored as a possibility, but rather, as something

22   that should be imminent, in light of the fact that you

23   don't have access.  I mean, it certainly cuts down the

24   delay period if you file a condemnation action.  I

25   mean, if you're going to allow the landowners to settle

1    the dispute as to who owns property, you might never

2    open the landfill.

3         MS. KENNEDY:  Yes, Your Honor.  I guess what

4    I can say is that putting together a land condemnation

5    case is not simply -- the attorney can't simply just

6    sit down and type out the complaint; there needs to be

7    a preliminary title report, they need to know the

8    actual square footage, you have to have an appraisal,

9    those things.  And all of those things are in process.

10        THE COURT:  Right.  But shouldn't that have

11   been done a long time ago?

12        MS. KENNEDY:  Perhaps.

13        MR. MULLANEY:  One other thing, if I might.

14   It also seems to me that, talking about the design is

15   looking backwards here.  And I know the Government of

16   Guam in its brief wanted a pat on the back for having

17   done some of the things right, but what our major

18   concern is going forward in 2007, and what I see in

19   their papers is that there's no money for this.  And

20   that's the critical thing.  And I don't see that being

21   addressed in their papers, and I don't see that just

22   giving them another year or another two years is going

23   to solve that problem.

24        THE COURT:  Ms. Kennedy, do you want to

25   address that concern, or not at the moment?

1      MS. KENNEDY: (No response.)

2      THE COURT: Is the funding issue dependent

3  upon the Guam Legislature passing some bond issues or

4  bond legislation?

5      MS. KENNEDY: If the Government of Guam is

6  going to pursue a revenue bond, then under the Organic

7  Act the Legislature has to approve legislation allowing

8  the bond to go forward. The next step after that is

9  that the PUC has to approve both the projects and the

10 amount, the specific amounts for the bonds for the

11 various projects.

12     THE COURT: But in terms of complying with the

13 consent decree, which direction are you looking at;

14 outright appropriation or seeking legislation for some

15 bonding authority?

16     MS. KENNEDY: Currently, DPW and the

17 administration are looking at both a private finance

18 for the landfill construction and revenue bonds.

19     THE COURT: And the revenue bonds must go

20 through an act of the Guam Legislature, right?

21     MS. KENNEDY: Yes, Your Honor, under the

22 Organic Act.

23     THE COURT: And has there been some

24 cooperative effort to get the Legislature involved so

25 that it knows exactly what type of legislation to

```
 1   enact?

 2           MS. KENNEDY:  DPW would take the position that

 3   it has kept the Legislature abreast of efforts, the

 4   Guam Economic Development Authority, which is the

 5   entity within GovGuam that assists agencies in bonding,

 6   as well as the independent agencies, and they've

 7   retained an underwriter.  The underwriter has met with

 8   GECDA and DPW, the Governor's Office, and at least some

 9   of the legislators all in the same room.

10           THE COURT:  And they're aware of the consent

11   decree, and the -- the deadline for closure of Ordot

12   Dump is October 23, 2007.  So are they aware of that

13   deadline as far as closure of the dump is concerned?

14           MS. KENNEDY:  Yes, Your Honor.

15           THE COURT:  Let me ask this.  Is the closure

16   or is compliance with the consent decree a priority for

17   the government or not?

18           MS. KENNEDY:  I think the fair way for the

19   Attorney General's Office to answer that question is

20   that there are numerous priorities that the Government

21   of Guam is facing.  So, yes, it is a priority.

22           THE COURT:  Just as much as COLA is?

23           (Chuckling.)

24           MS. KENNEDY:  For the staff at DPW and Guam

25   EPA, that's certainly true.
```

1    MR. MULLANEY: And one of the things that is

2  very frustrating to EPA in this process, I'll be honest

3  with you, is that we get people from EPA going to Guam

4  twice a year, and when they went out in 2006 and spoke

5  with the Governor's Office, we saw that the governor

6  issued an emergency proclamation saying that this was

7  a priority, and that it needed to be addressed

8  immediately in an emergency proclamation. And yet, we

9  did not see the followup from that. And then when you

10  look in the brief of the government, one of the things

11  that Helen mentions is that DPW can't even get its

12  scales bought and it can't even get priority for its

13  procurement orders.

14    We can't understand how it could be that

15  something could be an emergency declaration from the

16  Governor, and yet you can't even get the Department of

17  Administration to issue procurement orders in a timely

18  fashion. It seems to us that the system just isn't

19  working at all.

20    THE COURT: Ms. Kennedy, anything else you

21  want to advise the court and the parties?

22    MS. KENNEDY: I guess just to reiterate that

23  DPW is part of a larger system of the Government of

24  Guam. And things, things do take time. And there is

25  a commitment within DPW to continue to work towards

1    meeting the consent decree requirements.

2            Thank you, Your Honor.

3            THE COURT: See, one of the problems with

4    that, really, is my understanding of the whole consent

5    decree was that the parties actually met, and they

6    actually took into consideration that the time limits

7    so that in setting these deadlines, it was with

8    agreement that the Government of Guam foreseeably

9    thought that closure of the Ordot Dump was possible

10   within these time streams, in light of its limited

11   cash flows and in light of its limited problems.

12   And that was -- that was four years ago.

13           All right. Thank you very much.

14           MR. HADDOCK: Your Honor?

15           THE COURT: Sir, yes, you want to come up,

16   address the podium?

17           MR. HADDOCK: Your Honor, you might well know

18   that the closure of the Ordot Dump is dependent upon

19   the closure -- upon the opening of the new dump.

20   Significant achievements have been accomplished in

21   opening this new dump, which --

22           THE COURT: Let me just see if I understand

23   that statement. You're saying that as long as you

24   don't have a new landfill, Ordot Dump will continue to

25   exist and it won't be closed?

1    MR. HADDOCK:  Yes, Your Honor, we have to --

2  there has to be somewhere for Guam to deposit its waste

3  and -- but the government has been --

4    THE COURT:  All right, let's assume the

5  government comes in here, the plaintiff, and asks to

6  close the dump on October 23rd.

7    MR. HADDOCK:  Yes, Your Honor, they're asking

8  to close it on October 23rd.  We have, the government

9  has been -- been incurring substantial --

10    THE COURT:  I guess my question is, is the

11  court without authority to close the dump on the 23rd?

12    MR. HADDOCK:  Your Honor, I wouldn't be

13  prepared to answer that at this time.  However --

14    THE COURT:  It would seem that the court would

15  have the authority to close the dump on October 23rd if

16  it wanted to enforce the decree, as the government

17  wants it to be enforced, irrespective of whether or not

18  there is another landfill.

19    MR. HADDOCK:  Your Honor, but what I would

20  like to emphasize is how close we are getting to

21  opening the new landfill.  We have been 90 percent --

22  we've completed a 90 percent design completion, so the

23  designs are 90 percent complete.  The only -- the

24  problem that we noticed is after we got the design

25  completed, we noticed that there's substantial savings

1    that could be made on that design.  And that's what

2    Mrs. Kennedy alluded to, that there might be a

3    potential seven million dollars in savings, if, once

4    we get the -- Your Honor, once we get this new landfill

5    completed --

6           THE COURT:  Is that for the landfill or the

7    closure of the dump?

8           MR. HADDOCK:  The new landfill, Your Honor.

9    The new landfill has a 90 percent design completion.

10   Once we get this new landfill open, Your Honor, it will

11   alleviate most of the problems in the old landfill.

12   When we have accom -- you know, when we are able to

13   divert all of that refuse from that the old landfill to

14   the new landfill, then we could start maintaining and

15   closing the old landfill in a expeditious manner.

16   Seeing that, DPW seeing that they might not be able to

17   close the landfill immediately, did take some actions

18   to remedy some of the situations contemplated within

19   the consent decree.

20          One of the main -- one of the main reasons

21   why this consent decree was formed was because of the

22   seepage into, into the nearby river from the landfill.

23   What DPW has started and they should be issuing their

24   RFP now, they are identifying the funds for it, was to

25   install a interceptor trench.  This was part of the

1   design -- this is part of the design of the closure.

2   It's not meant to be a quick fix to the closure of the

3   Ordot landfill, but it's actually contemplated in the

4   final design of the landfill, and it's one part that

5   DPW believes will actually help benefit the closure

6   now and in the future.

7       But, bringing into light that we are moving

8   forward in regards to opening a new landfill to

9   facilitate the closure of the old landfill, we did

10  complete a 90 percent design -- 90 percent of the

11  design was completed. There's large cost savings that

12  have been -- there's large costs savings in our design

13  that have been identified that we could possibly go

14  after. We are in the -- we are in the process right

15  now of -- we've actually awarded a bid to a -- we

16  awarded a bid to a value engineer, we are in the

17  process of negotiating their fees. Once we have the

18  value engineer on board, we believe that we'll be able

19  to complete the designs very shortly of the new

20  landfill.

21      We also are very conscious of the funding

22  issues. We are at this point trying to complete some

23  final bond legislation to submit to the Legislature.

24  We are also looking into -- we have just recently had

25  some -- two private investors actually that are looking

1  into privately funding the dump, and they actually

2  claim that they could have the dump open and running

3  within six months. One of the -- one of the -- using,

4  possibly using our plans, we're not quite sure what,

5  but they believe that they could have our dump open and

6  running in six months. And we're looking very closely

7  at these options and we're trying to weigh them, and

8  see what would be in the best benefit of Guam in trying

9  to get this dump closed immediately.

10  The Governor's Office is very conscious of the

11  importance of this, and we're trying to move very

12  quickly in trying to evaluate what would be the best

13  solution. We see that there's a lot of problems with

14  having these RFPs that go out.

15  We have -- we've experienced substantial

16  changes. We've created a design which was 90 percent

17  complete, and then at the 90 percent completion date we

18  acknowledge that we found out that there was a large

19  amount of cost savings that could be done in these

20  designs. We're trying to -- we're trying to realize

21  those cost savings by hiring this environmental

22  engineer, which I did state we are in negotiations with

23  right now for their fee contract.

24  And we're also at this same time exploring the

25  possibilities of a public private partnership with some

1      of these firms that expressed interest in opening a

2      private landfill on Guam using the -- using the designs

3      that we've provided and taking over the plans. That as

4      well, if it's more expeditious for us in this case,

5      Your Honor, to submit our RFP for also the closure and

6      management in whole instead of doing it a sort of

7      piecemeal, how it has been up to this point.

8      THE COURT: All right. If all of those plans

9      go forward, and if what you envision actually moves

10      forward on schedule, by your estimates, when would the

11      Ordot Dump be closed?

12      MR. HADDOCK: Your Honor, we would like to

13      start -- we would like to be able to start the closure

14      as soon as we get the new landfill open. We're taking

15      the measures right now to start the closure, we've

16      built and inter -- we're going to hopefully issue our

17      RFP for our interceptor trench, which will be

18      alleviating one of the environmental consequences of

19      the dump which was the leeching of the dump into the

20      clean water. But I'd have to -- I'd have to --

21      THE COURT: But that really doesn't --

22      MR. HADDOCK: I'd have to speak with one of

23      the engineers regarding that. I don't have the exact

24      dates with me at this time. I wasn't aware that we're

25      going to go to this extent, Your Honor.

1          THE COURT:  But is the construction of the

2     trench actually going to stop pollutants from going

3     into the river?

4          MR. HADDOCK:  The interceptor trench will, it

5     will take all the water that's been going inside, as I

6     understand it, Your Honor, all the water that comes

7     into the trench and all the seepage that -- or all the

8     water that goes into the dump and seeps out through the

9     sides of the dump, this would intercept it and it would

10    allow them to redivert it into our, into our sewer

11    system that we have established.

12         THE COURT:  But isn't it possible for water to

13    seep all the way down, perhaps make its way to the

14    river?

15         MR. HADDOCK:  May I defer, Your Honor?

16         THE COURT:  Yes.

17         MS. KENNEDY:  Thank you, Your Honor.

18         It's a little bit of a complicated answer.

19    But, there -- as long as there's rainfall that comes

20    down on the trash that is in the dump, it seeps out and

21    collects material as it seeps, it goes down towards the

22    bottom, towards gravity, and for the most part in this

23    situation, it then hits somewhat of an impermeable

24    layer and then slides sideways and makes its way

25    towards Lonfit River.

1       The interceptor trench is designed to capture
2   as much as that leachate -- it's called leachate
3   because it has contaminants in it, it has chemicals and
4   biological animals and turbidity and so forth in it.
5   So the interceptor trench is part of the final design,
6   and it will collect that leachate which can then be
7   pumped to a storage tank, from the storage tank then
8   delivered, transferred  into the sewer system.

9       What DPW plans to do, and has planned for a
10  number of years and informed US-EPA of, is build the
11  interceptor trench and get it going, get it operating
12  sooner rather than later in the construction process.
13  So that is what DPW is proposing that it does now,
14  because it does have the 1.5 million estimated cost to
15  start that construction project.

16      Your Honor, I just wanted to make a little bit
17  of a -- I know you were taking notes with respect to
18  the landfill.  And on Page 4 of the brief, the value
19  engineering analysis for the landfill at Layon came up
20  with possibilities that estimated cost savings of up to
21  13.7 million.  So the seven million dollars savings
22  would be for Ordot construction, but for the landfill,
23  for Layon, it could be up to 3.7 million.

24      MR. MULLANEY:  Your Honor, I wanted to address
25  something, because I did get a chance to talk to an

1    engineer about the interceptor trench that's been

2    talked about here, and I just wanted to bring this to

3    the court's attention.

4         The interceptor trench was always part of the

5    design here for closure of Ordot, but surface water

6    capacity, in other words, what is coming down from the

7    sky to the dump and sitting on the trash, the runoff

8    capacity is much different if the dump is closed or if

9    it's open.  And one of the things that concerns our

10   engineers is that there are incredible data gaps that

11   would need to be addressed in order to make this work.

12        And that applies to the interceptor trench and

13   the pump maintenance for it, you know, how often the

14   pump would have to work, what the size of the pump

15   would be, all of that differs quite a bit in a closed

16   landfill or an open landfill.  So it's one of the

17   things that definitely concerned the EPA engineers when

18   this came up.

19        And it strikes us as being a partial --

20   perhaps a partial answer to the problem of the dump,

21   but it doesn't address at all issues like fires at the

22   dump, or like the fact that the dump operators can't

23   seem to get cover on the trash on a daily basis, or

24   can't seem to get, you know, the equipment to work to

25   make it possible to cover the trash.  All of those

1    things will be kind of like gaping wounds that the

2    people of Guam will suffer from for as long as this

3    dump is open.  And it's something that an interceptor

4    trench does only marginally address.  So, for what

5    that's worth.

6              MS. KENNEDY:  May I respond, Your Honor?

7              THE COURT:  Yes.

8              MS. KENNEDY:  With respect to the concerns

9    regarding pump capacity to deal with the larger

10   leachate flows and so forth, DPW is fully aware of

11   that.  The design, the hundred percent design did the

12   calculations for how much leachate would be generated

13   without the final cover system in place as well as with

14   the final cover system in place.  And so those

15   calculations have been made.  But the plan that DPW has

16   is to put out a design build request for proposal so

17   that the those concerns would be taken into account and

18   a new design, if necessary, for larger pumps and for

19   also installing a sewer line, if you'll say, or

20   leachate line that goes from the dump to the nearest

21   GWA sewer main.

22              As to the operational issues, those are noted,

23   but those are covered -- or they're taken cared under

24   Guam law, with respect to the landfill operations

25   regulations at 22 GAR.  And DPW has taken steps to come

1  into partial compliance with its permits from Guam EPA

2  by placing newly at the landfill -- I'm sorry -- at the

3  dump a person who is trained and has experience in

4  modern solid waste management in general and is trained

5  by the Solid Waste Association of America.  And even

6  though this man does not have the certification from

7  the association for a manager of landfill operations,

8  it is a first step in the right direction.

9       THE COURT:  Mr. Haddock, anything else, sir?

10       MR. HADDOCK:  No.

11       THE COURT:  You know, I guess I still have a

12  question that hasn't been answered, really, just in

13  terms of expectation, when you say that you're trying

14  to move forward to start the landfill as soon as

15  possible.  So in terms of we have time frames under the

16  consent decree, so if you move forward with what you

17  say you're going to do, you know, fruitfully, what are

18  the expected timetables?  I think we deserve to know

19  what these dates would be in light of the current dates

20  as they are set in the consent decree.  Do you have

21  some indication or you don't?

22       MR. HADDOCK:  Your Honor, the problem that

23  I think the government has had over the past several

24  years is -- dealt with funding, and the reason why this

25  has been such a large issue is because the government

1   really didn't know how much this -- how much the new

2   landfill was going to cost. We've completed the

3   design; now we know how much -- we have a good idea of

4   how much this landfill is going to cost. We believe

5   that there's going to be savings. So now is the time

6   that we could move forward with plans on the funding.

7   You know, it wouldn't --

8           THE COURT: But, see, I think it's premature

9   to say now is the time to move forward because we still

10  have these dates --

11          MR. HADDOCK: Yes, Your Honor.

12          THE COURT: -- set in the consent degree. So

13  I think it behooves the defendant, the government, to

14  at least file moving papers to extend these deadlines

15  and to give a -- well, you know, when we extend the

16  deadlines, I mean, are we extending it two years from

17  today, three years from today? We need to have these

18  dates in order to realistically evaluate the moving

19  papers.

20          MR. MULLANEY: One other thing, Your Honor.

21  We knew at the outset that there were issues about

22  funding, so the consent decree actually has a section

23  that required the Government of Guam to look at funding

24  issues at the outset, and that was done years ago. So

25  I'm not sure what, what really is the mystery here. It

```
 1    seems to me that a lot of this has been available to
 2    the government for more than three years.
 3              MR. HADDOCK:  Your Honor --
 4              THE COURT:  Mr. Haddock.
 5              MR. HADDOCK:  Your Honor, if I -- the issue
 6    of the funding was we didn't have a design plan set
 7    forward to -- that had specifics as to the amount of
 8    what was going to be required.  Now we are very close
 9    to having a complete design of the new landfill, we
10    know what's going to be needed to complete this
11    landfill.  We're looking into, right now, two funding
12    situations.  We have private companies that say they
13    could -- that they could not only fund the, fund the
14    completion of the landfill, but they also could build
15    it and maintain it at the same time.  And we're also
16    looking at having the funding done through the
17    government as well.  We're not ruling out either one
18    of these two issues.
19              But we believe that we should be able to move
20    forward on one of these two issues very shortly, Your
21    Honor.  But we want to keep -- at this point as we have
22    not entered into any contracts with any party in
23    regards to the funding, we still -- we're still
24    exploring both options to see which one would be the
25    most beneficial to the government.
```

1        THE COURT:  And does the government, you know,

2  intend to file papers to move these deadlines?

3        MR. HADDOCK:  Your Honor, I believe we have

4  requested -- Would you like to address, Ms. Kennedy?

5        THE COURT:  Ms. Kennedy.

6        MS. KENNEDY:  That's certainly something that

7  we have discussed --

8        THE COURT:  Well, it just seems to the court

9  that it's a must, really, because you have a deadline

10  that's set in the consent decree of October 23rd, 2007.

11  And if your position before the court today is that

12  that's an impossible date to meet, it just seems it's

13  urgent that papers need to be filed or that you work

14  together with the United States Attorney to see what

15  they're willing to give in terms of perhaps extending

16  deadlines in a cooperative effort.

17        MS. KENNEDY:  Yes, Your Honor, I guess the

18  preference so far within the Government of Guam is to

19  dialogue with the United States and US-EPA.  And we did

20  present a proposed schedule changes to US-EPA, and U.S.

21  Attorney's Office, DOJ, in late June of this year.

22        In addition to that, Director Perez had

23  submitted a proposed revised schedule in September of

24  2005, and the United States has -- has not accepted

25  those proposed schedules and has not really been

1    willing to dialogue about them.

2         With respect to the landfill schedule, we do

3    have a new revised schedule that, a draft, in draft

4    form that I received just this morning, that we would

5    be willing, after internal review, to submit to the

6    court, and to US-EPA, you know, in the next few days.

7         THE COURT:  It seems like the best procedure,

8    really, now that the United States Government has

9    advised the court just where the parties stand in terms

10   of performance in meeting the deadlines as set forth in

11   the consent decree, and it seems to bear that the

12   consensus is it's impossible to meet that deadline at

13   the present time.  So it seems to me that perhaps the

14   parties need to dialogue.  I'm not too sure whether the

15   United States Government is willing to bend based on

16   performances that it has seen in the past.  That

17   certainly doesn't stop the defendant from filing papers

18   with the court to extend these deadlines.

19        A lot of it depends -- the court isn't taking

20   any action here today, it's meeting for the purpose of

21   determining where the parties are in terms of

22   compliance with the consent order.  However, it doesn't

23   prevent the government from coming to the court and

24   asking for sanctions, really, for failure to comply

25   with the consent decree.  That's always an option

1    that's available to the court.  It also doesn't prevent

2    the defendant at the same time from coming to court and

3    moving these deadlines.

4         I'm hoping that perhaps the parties can meet

5    together and determine what's best for the people of

6    Guam at this point, in terms of closure of the Ordot

7    Dump, and the opening of a new landfill.  And to the

8    extent that you're not able to do so, we have a court

9    that's here to determine issues that are raised by the

10   parties.  Like I said, it certainly doesn't prevent the

11   United States Government from asking the court to

12   impose sanctions in this matter, and we certainly can.

13        As far as Ordot being closed on October 23rd,

14   2007, it appears to me that certainly the court has the

15   authority to close the dump and enforce the consent

16   decree, regardless whether or not a new landfill is in

17   place.  Whether or not it will do that depends on the

18   circumstances and what's best for the people.  But

19   these are things and issues, I think, that the parties

20   need to talk about seriously.  We need to get all

21   government entities that appear to have some bearing on

22   issues here together, and go from there.

23        But let me hear from Mr. Schwab.  Mr. Schwab,

24   do you have anything to advise the court, or tell us in

25   terms of how you would wish to proceed after today?

1          MR. HADDOCK:  Your Honor, can I just make

2     one -- one last request.

3          THE COURT:  Mr. Haddock, yes.

4          MR. HADDOCK:  Your Honor, it wouldn't

5     necessarily be the position of the Governor's Office

6     that the closure of Ordot couldn't be completed.  We

7     believe there has been some -- there has been a

8     statement made by the public companies that are

9     interested in opening the new landfill that they could

10    have a new landfill open within six months.  If that

11    would be the case, Your Honor, then at that time that

12    we could cease -- we could close the gates of the Ordot

13    Dump and have Ordot, you know, begin the -- Ordot would

14    essentially be closed, and then we could initiate the

15    actual closure, or the closure proceedings of Ordot and

16    start having it capped and move on in that venture,

17    Your Honor.

18         THE COURT:  So you're saying it's possible

19    then?

20         MR. HADDOCK:  I wouldn't -- we've still got to

21    weigh the credibility of some of these companies that

22    would -- that are making these representations and

23    evaluate their plans and, you know, that's something

24    that we're looking at right now.  As we speak, we are

25    starting negotiations with private companies to see if

1    it really can be done, as they believe it could be done

2    within six months.

3           And that being taken into account, Your Honor,

4    we wouldn't -- we wouldn't admit that it's impossible

5    to do this within this amount of time.  It would be

6    very difficult, we would acknowledge, to have every-

7    thing done.  And, but we believe that the way to have

8    this done in such a expeditious manner would be through

9    a public private partnership, where we would be able to

10   escape some of the -- some of the problems that we've

11   been experiencing over the past three years, which is

12   having to do lengthy RFPs -- several of our RFPs have

13   gone unanswered.  We've done RFPs for technical

14   expertise regarding value engineering and some of the

15   other aspects, which don't even go answered in the

16   public when we submit proposals -- when we ask for

17   proposals from the community to submit their proposals

18   to the government, some of them just completely go

19   unanswered.

20          We believe that if we were to enter into a

21   public private partnership, having a private enterprise

22   take over the solicitation would increase the responses

23   and facilitate the closure in a more expeditious

24   manner, which is something that the Governor's Office

25   is looking at and trying to move forward in very, very

1    closely, Your Honor.  Thank you.

2              THE COURT:  Thank you, Mr. Haddock.

3              MR. MULLANEY:  The difficulty, Your Honor --

4    this is Rob Mullaney -- that we've had in the past

5    is that we just don't get the attention from the

6    Government of Guam side that we need to really focus

7    on this problem.  It's been very difficult to get any

8    movement on very critical issues.

9              And the proposals that the Government of Guam

10   sent to us to extend deadlines, even the deadlines that

11   they ask to be extended, they then violate it, you

12   know, while we looked at the proposal.  So there has

13   been no meat to the bone on this.  And that's why we

14   brought this to the court's attention; we really think

15   that unless the court offers its assistance, there

16   won't be a response from the Government of Guam that is

17   worth the paper it's printed on.

18             THE COURT:  Thank you, Mr. Mullaney.

19             Mr. Schwab?

20             MR. SCHWAB:  Thank you, Your Honor, for the

21   opportunity to summarize.

22             Unacceptable.  Abysmal.  Chronic failure.

23             These are words I'm taking out of the latest

24   Georgetown Report that the PUC had done to focus on

25   management on this issue.  And they focused on DOA and

1    DPW and their ability to handle this.

2         And I'll point out that the court, when we

3    fashioned this consent decree, went through a great

4    deal of effort to make sure that this was the

5    Government of Guam that was involvement by different

6    levels, Governor's Office, Legislature.  This is a,

7    truly a case against the Government of Guam, as the

8    court pointed out.  And the reason for that is that

9    this is a grave and immediate threat to the health of

10   people on this island.

11        Your Honor talked about being a child and

12   going to Ordot.  I'm guessing in those days you went

13   down to Ordot; today it's a mountain, and it is an

14   immediate threat to children who would visit there and

15   the people who live here on this island.  And that's

16   why the court and the United States Government has paid

17   such close attention to this and spent so much time on

18   it.

19        Now the Georgetown Report talks about poor

20   service, that is, poor service in actually collecting

21   this trash.  It's talked about the inability to raise

22   or handle funds.  We're talking about the basic

23   elements of institutional failure.  The use of less

24   extreme measures is not working.  There's a lack of

25   leadership, and I'm focusing on leadership because

1   it's not line item employees at fault here, it's a

2   lack of leadership in the big system.  Resources are

3   being wasted.

4        Now, the Georgetown Report says the solid

5   waste management should be taken away from this

6   institution and put in a public corporation and handled

7   and focused properly.  The United States isn't here

8   today to tell you what we want the court to do.  Not

9   yet.  What I can tell you is what the court should not

10  do, and that's accept any excuse that it's a matter of

11  time.  It's not just a time problem.

12       Our purpose today is to set the stage for what

13  we believe is an institutional failure, and we're going

14  to be reporting back to the court in the future about

15  solutions.  We're going to be exploring those solutions

16  and suggesting them to the court.

17       And we thank the court for the status

18  conference.  Thank you, Your Honor.

19       THE COURT:  Ms. Kennedy.

20       MS. KENNEDY:  The Government of Guam would

21  like to thank the court for also having the status

22  conference.

23       I think with respect to the formation of

24  a public corporation, that that's something that is

25  -- the PUC and the Guam EPA have made very real

1    possibilities.

2              THE COURT:  Is that cost then again added on

3    another cost, formation of a public corporation?

4              MS. KENNEDY:  I don't -- I don't know that

5    that has necessarily been evaluated.  In 1998, or 1999

6    Guam EPA proposed that the solid waste be --

7              THE COURT:  I don't want to go any further,

8    really, other than to say whether if there was a

9    recommendation to create some public corporation that

10   would handle the billing procedures for collecting the

11   contingent fees, but that's up to the government

12   really.  That's in your goal.

13             MS. KENNEDY:  Yes.  I guess one other thing

14   that I wanted to state that if the United States has

15   some proposals, we in the Government of Guam don't

16   really know what they are, and would be anxious to see

17   what they are.  Thank you, Your Honor.

18             THE COURT:  All right, a couple of things to

19   suggest.  I'm not so sure whether -- does the plaintiff

20   want another status hearing or are you satisfied with

21   today's hearing, Mr. Schwab?

22             MR. SCHWAB:  Your Honor, we'll be filing

23   documents with the court as we explore the solutions

24   and court orders that we think are necessary to get

25   this under control.

1    THE COURT:  All right.  When do you anticipate
2   filing those documents?
3        MR. SCHWAB:  If I can refer to Mr. Mullaney on
4   that, on any timelines for subsequent status.
5        MR. MULLANEY:  My sense, Your Honor, is that
6   we would be able to file something probably in mid-
7   January.  And the reason for that is the time of year.
8   I actually have not had a whole lot of luck contacting
9   people in Washington today.  I think it's likely that
10  I won't be able to confer with the right folks on this
11  until January 2nd.  So, that's why I would suggest that
12  we probably will be able to get something to the court
13  in mid-January.
14       THE COURT:  All right.  Now let me address the
15  defendant, the Government of Guam.
16       Ms. Kennedy, should there be no agreement with
17  the plaintiff regarding extensions, and that seems to
18  be the case at the present, would you be able to file
19  modification motions by the end of next year -- January
20  next year?
21       MS. KENNEDY:  Yes, Your Honor, we would.
22       THE COURT:  All right.  So why don't I ask
23  that if you intend to move the court to modify the
24  consent decree, that you file these papers no later
25  than January 31st, 2007.

1    MS. KENNEDY:  Very well, Your Honor.

2    THE COURT:  And assuming that the Government

3  of Guam does file papers to modify the consent decree,

4  I'm assuming that the plaintiff would be opposing it.

5    Is that a fair assumption, Mr. Schwab?

6    MR. SCHWAB:  That is a fair assumption, Your

7  Honor.

8    THE COURT:  So when would you be able to file

9  your response to such motion, 14 days after that?

10    MR. SCHWAB:  Again I'll defer to Mr. Mullaney.

11    THE COURT:  Mr. Mullaney?

12    MR. MULLANEY:  Yes, I think that's a

13  reasonable timeframe.

14    THE COURT:  All right, so let's say 14 days

15  after that, February 14th.

16    And, Ms. Kennedy, assuming an opposition is

17  filed on the 14th, would you be able to reply within

18  seven days after the 14th, again taking normal

19  timeframes for motion procedures?

20    MS. KENNEDY:  Yes, Your Honor.

21    THE COURT:  All right.  Let me go ahead and

22  order that then, that if the Government of Guam desires

23  to file papers to modify the deadline as it is set

24  forth in the consent decree, that that motion be filed

25  by January 31st, 2007, and let's make it no later than

```
 1    3:00 o'clock in the afternoon.  And opposition should
 2    be filed no later than February 14, by 3:00 p.m., and a
 3    reply to the opposition to be filed by the 21st of
 4    February.  And I suppose we can set a hearing on that
 5    motion a week thereafter, so the 28th of February I
 6    suppose we can have a hearing.  You're shaking your
 7    head.
 8              MS. KENNEDY:  I'm afraid I'll be taking the
 9    bar exam, Your Honor.
10              THE COURT:  All right.  Can somebody take your
11    seat at the bar exam?
12              (Laughter.)
13              MR. SCHWAB:  Not legally.
14              THE COURT:  Okay.  So when does the bar exam
15    end?
16              MS. KENNEDY:  I believe that's the last day.
17              THE COURT:  The 28th is the last day.  So the
18    following week, maybe for you, would that be convenient
19    for you, the following week?
20              MS. KENNEDY:  Yes, Your Honor.
21              THE COURT:  I don't have a calendar.
22              THE CLERK:  March 7th.
23              THE COURT:  March 7th.
24              MR. MULLANEY:  Yes.
25              THE COURT:  Is that fine, March 7th?
```

1       MS. KENNEDY:  Yes, Your Honor.

2       THE COURT:  All right.  March 7, at 1:30 in

3  the afternoon.  And I also understand that the

4  plaintiff will be filing papers, so I'm not so sure --

5  do you want to take the same deadline, the 31st?

6       MR. MULLANEY:  Excuse me, Your Honor, 1:30 in

7  the afternoon doesn't work all that well here, I think.

8  Because this hearing started at ten, right, ten in the

9  morning, and it's already 4:00 p.m. at the start here.

10  So, let's see, 1:30, that's three and a half hours

11  later, the hearing would start here at 7:30 p.m.

12       Is it possible to have it in the morning?

13       THE COURT:  All right, let me move the date

14  then, let me make it March 8 at 9:00 o'clock in the

15  morning.

16       MR. MULLANEY:  Thank you very much.

17       THE COURT:  You're welcome.  So March -- 9:00

18  in the morning would be 3:00 o'clock your time?

19       MR. MULLANEY:  Yes.  That's great.

20       THE COURT:  Now the other question I wanted to

21  ask you, Mr. Mullaney, do you want to take the January

22  31st deadline also to file your papers and we'll just

23  follow that scheduling --

24       MR. MULLANEY:  That would work for us.  That

25  would be great.

```
 1          THE COURT:  So why don't we also say that
 2   whatever papers the plaintiff will file in this matter
 3   be filed on January 31st at 3:00 p.m., and any
 4   objections to that opposition by the 14th, by the
 5   defendant, and reply by the plaintiff to the opposition
 6   by the 21st, and the hearing on those motions, again,
 7   March 8th at 9:00 o'clock in the morning.
 8          MR. MULLANEY:  Okay.
 9          THE COURT:  Any other matters that the parties
10   want the court to address at this point?  Mr. Schwab?
11          MR. SCHWAB:  No, Your Honor.
12          THE COURT:  Ms. Kennedy?
13          MS. KENNEDY:  No, Your Honor, thank you.
14          THE COURT:  Mr. Haddock?
15          MR. HADDOCK:  No, Your Honor.
16          THE COURT:  Ms. Cruz.
17          MS. CRUZ:  No, Your Honor.
18          THE COURT:  Well, let me thank you for being
19   here this morning and providing the information.  So
20   Merry Christmas to all of you, and Happy New Year.
21          MR. SCHWAB:  Thank you, Merry Christmas.
22          MS. KENNEDY:  Thank you, Happy Holidays.
23          (Proceedings concluded at 11:33 a.m.)
24                    *  *  *
25
```

CERTIFICATE OF REPORTER

CITY OF AGANA          )
                       ) ss.
TERRITORY OF GUAM      )


        I, Wanda M. Miles, Official Court Reporter

of the District Court of Guam, do hereby certify the

foregoing pages 1-54, inclusive, to be a true and

correct transcript of the shorthand notes taken by me

of the within-entitled proceedings, at the date and

time therein set forth.

        Dated this 18th day of January, 2007.


                    _Wanda M. Miles_

# ATTACHMENT 16

Terrence M. Brooks

Joseph M. McDonald
Edward C. Crisostomo
Rowena E. Perez

Suite 207, GCIC Building
Post Office Box 862
Hagatna, Guam 96932

Telephone: (671) 472-1907
Fax: (671) 472-1917
Email: info@guampuc.com

Harry M. Boertzel
Administrative Law Judge

Lourdes R. Palomo
Administrator

May 2, 2006

**VIA HAND DELIVERY**
The Honorable Joann Brown
Vice Speaker, 28th Guam Legislature
Chairman, Committee on Utilities and Land
155 Hesler Street
Hagåtña, Guam 96910

Dear Vice Speaker Brown:

During its recently concluded regulatory session, the Guam Public Utilities Commission [PUC] reviewed and approved the five recommendations contained in the enclosed April 20, 2006 report from Administrative Law Judge Boertzel. The report summarizes the challenges, which must be resolved in order to secure the financing necessary to enable the Government of Guam to comply with the Federal Consent Decree.

The purpose of this letter is to share with you PUC's serious concern whether Department of Public Works [DPW], a line agency, has adequate authority and resources to comply with the covenants and requirements, which will be imposed by the bond documents. It should be recalled that it took Guam Waterworks Authority, under the Consolidated Commission on Utilities' [CCU] governance and with a capable management team *[experienced general manager, engineer, chief financial officer and legal counsel]* almost three years to prepare itself for its first bond financing. DPW is being expected, without comparable resources or lead time, to assume the same responsibilities. These realities persuade PUC that the recommendation made in Guam Environmental Protection Agency's 2005 *Guam Integrated Solid Waste Management Plan*, that solid waste management be transferred to a public corporation under CCU's oversight, should be given serious consideration.

PUC stands ready to work with the Guam Legislature as it considers the legislation, which will be necessary to authorize the important revenue bond financing discussed in this letter.

Respectfully,

Terrence Brooks
Chairman

*Memorandum*

To:       Commissioners
From:     ALJ Boertzel
Date:     April 20, 2006

RE:       Docket 05-9 [Department of Public Works [DPW] – Revenue
          Bonds]

### *Overview*

Under a schedule driven by the Federal Consent Decree, the government of
Guam and its financial consultants are working under a May 2006 deadline to
secure $90 million dollars in revenue bond financing to fund the capital
requirements for the Ordot landfill closure, the construction of the new landfill
and associated costs.

As the repayment of these bonds will be funded through DPW rates, financial
consultants emphasize the importance of a strong PUC commitment to approve
such rates increases [estimated at 400% over current rates within the next 26
months] to enable DPW to meet its bond obligations.

PUC customarily issues two orders in support of utility bond financing: a] an
order drafted by bond counsel, which provides formal approval of the
transaction terms and conditions and a regulatory commitment to provide
adequate rates to fund bond commitments; and b] an order which approves and
establishes regulatory oversight over the use of bond proceeds.

### *Challenges*

The fact that DPW is a line agency of the Executive Branch creates significant
regulatory challenges, which PUC does not encounter in regulating GPA and
GWA, which are autonomous public corporations. These challenges have come
into sharp focus during this April regulatory session as a result of consultations
with DPW's financial advisor and management. DPW does not have the power
to contract and its revenues are held under the Department of Administration's
[DOA] custody.  These challenges are reflected in the following facts:

1.  On December 20, 2005 PUC gave its regulatory approval for DPW to
    employ a procurement advisor to craft the documentation for the
    privatization of the Ordot closure, the construction and operation of the
    new landfill and for the privatization of residential trash collection. The
    contract, which also requires the Attorney General's approval, has sat in

1

the AG's office since early February. As a result, DPW has no resources to move forward with procurements mandated by the Consent Decree and is incurring fines as a result.

2. On October 27, 2005, PUC awarded DPW a 25% rate increase, effective for services rendered after November 1, 2005. DPW has still not implemented this increase for its residential customers. The rate order is enclosed as *Attachment A.*

3. The October rate order was premised on DPW's assurance that it would improve its collection rate to 95% for commercial customers and 70% for residential customers. DPW has failed to meet this assurance – its current collection rate is at 30%. As a result, there will be a substantial FY06 revenue shortfall.

4. The October rate order mandated that all revenue created by the rate increase shall be deposited into a restricted DOA account, which could not be withdrawn without PUC approval. Georgetown estimates that the current balance in the restricted account *[even excluding the residential rate increase]* should be in the range of $400,000. DOA has reported that it currently has only $47,000 on deposit in the restricted account. The government's financial advisor recommends that the bond covenants mandate that a "locked box" be created under the Trustee's custody for all rate revenues. PUC should strongly support this recommendation, with the condition that the Trustee observe PUC orders, which restrict the use of funds and establish reporting requirements. *Attachment B* is a presentation by the advisor *[Municipal Services Group]* regarding the challenges of marketing the DPW revenue bonds.

5. As PUC's rate authority is derived from statute, it is essential that the legislation, which approves this financing include a covenant from the Legislative and Executive branches that they will not take any action, which would impair PUC's independent rate making authority. Similar covenants have been provided in GPA and GWA bond financing legislation.

6. DPW is not in compliance with Guam law, which mandated that 2 of 3 residential collection districts be privatized by October 2002. No residential collection has yet been privatized. As a result, residential customers receive poor service and are unlikely to favorably receive the reality of a 400% rate increase over the next 26 months unless service is dramatically improved. In its December 20, 2005 Order *[Attachment C]*, PUC directed DPW to prioritize the privatization of residential trash

2

collection. As discussed in paragraph 1 above, this effort has been obstructed by DPW's inability to employ a procurement advisor.

### Recommendations

PUC has a dual responsibility in regulating DPW's rates: a] the obligation to provide adequate rate revenues to enable DPW to meet its financial obligations; and b] the obligation to assure that DPW's customers pay *just and reasonable* rates for reliable, quality service. Unless the above challenges are resolved, these dual responsibilities will likely put PUC on the proverbial *horns of a dilemma*. I offer the following recommendations to address this dilemma:

1. PUC should make it clear that it will not make bond rate commitments unless DPW is empowered to employ a procurement advisor, which must occur before residential service can be improved through privatization.

2. Bond counsel, who will be crafting the legislation, which authorizes the bond financing, should be requested to include a covenant to protect PUC's independent rate making authority.

3. PUC should support a *"locked box"* bond covenant.

4. PUC should immediately initiate a focused audit by Georgetown of DPW's billing and collection practices and DOA restricted account management, which would be ready for regulatory review and implementation at the next regulatory session.

5. PUC should support the recommendation made in Guam Environmental Protection Agency's 2006 *Integrated Solid Waste Management Plan* that solid waste management be transferred to a public corporation under the oversight of the Consolidated Commission on Utilities.

I recommend that PUC adopt these recommendations by resolution, which authorizes me, in consultation with Chairman Brooks, to implement them.

3

# BEFORE THE GUAM PUBLIC UTILITIES COMMISSION

**DEPARTMENT OF PUBLIC WORKS
ESTABLISHMENT OF TIPPING AND
USER FEES PURSUANT TO P.L. 28-56**

· **DOCKET 05-09**



RECEIVED
OCT 2 7 2005
Public Utilities Commission
of Guam

## RATE ORDER

Public Law 28-56 directs the Guam Public Utilities Commission *[PUC]* to establish commercial, government and residential tipping and user fees to fund the activities of the Department of Public Works' *[DPW]* Division of Solid Waste Management *[DSWM]* in discharging its statutory duties and those imposed by Federal District Court of Guam Consent Decree *[Consent Decree]* in Civil Case No. 02-22.

On September 20, 2005 Georgetown Consulting Group *[GCG - PUC's regulatory consultant]* issued a Report, which recommends the following *interim* service fee increases:

| Service Fee | Current | Proposed [Interim] |
|---|---|---|
| Residential pick-up | $8 per month | $10 per month |
| Tipping fee [compacted] | $16/cubic yd. | $20/cy |
| Tipping fee [uncompacted] | $4/cy | $5/cy |
| Self drop [under 3 cy] | $2/pickup | $2.50/pickup |
| Self drop [over 3 cy] | $4/cy | $5/cy |

On October 17, 2005, GCG and DPW entered into a stipulation, which recommends that:

1. PUC adopt the above proposed fees as a first step toward volume and cost based rates.

2. The GCG report should be found to satisfy the requirement in 10 GCA 51118[e] that fees be based on an actuarial cost of service analysis.

3. The additional revenues created by the proposed fee increases, which are estimated to be $1.3 million in FY06 *[net of uncollectible allowance]*, should be restricted and spent only pursuant to PUC order.

4. PUC should await the management audit required under 10 GCA 51118[e] before establishing a variable residential tipping fee.

# ATTACHMENT A

· 1

5. A targeted residential lifeline tipping fee should be established with other permanent fees during the April 2006 regulatory session.

6. DPW should provide PUC with quarterly reports, commencing with quarter beginning October 2005, on DSWM's revenues and expenses, including income statements and balance sheets. Reports should be filed within 21 days after the close of each quarter *[the first report due January 21, 2006]*.

7. PUC should conduct a quarterly review of DPW's compliance with this rate order and of the adequacy of the proposed interim rates.

8. PUC should immediately undertake the focused management audit of DSWM operations as required by 10 GCA 51118[e].

9. Any DPW procurement or obligation relating to DSWM in excess of $50,000 should require PUC's prior review and approval. The contract review protocol, which PUC established to regulate the procurements of Guam Power Authority and Guam Waterworks Authority should be adopted as the review protocol for these procurements and obligations.

PUC conducted a public workshop at 6:00 p.m. on October 17, 2005 to receive a briefing on the GCG report and the Stipulation. In addition, PUC conducted public rate hearings at 6:00 p.m. October 25, 2005 in Hagatna, at 5:00 p.m. October 26, 2005 in Agat and at 6:30 p.m. October 26, 2005 in Dededo on the proposed interim fee increases.

After due consideration of the record in this docket, including public comments regarding the proposed interim fee increases, for good cause shown and on motion duly made, seconded and carried by the affirmative vote of the undersigned commissioners, the Guam Public Utilities Commission **HEREBY FINDS AND ORDERS THAT:**

1. DPW, including DSWM, is subject to PUC jurisdiction pursuant to 10 GCA 51118[e].

2. The stipulated recommendations from GCG and DPW, as discussed above, should be and are hereby adopted. DPW is ordered to comply with the recommendations, subject to instructions from PUC's administrative law judge *[ALJ]*.

2

3. The proposed interim fee increases are hereby approved for services rendered on and after November 1, 2005. PUC recognizes that this is but the first of a series of rate increases, which will be necessary to support the $93 million borrowing required to enable DPW to comply with the Consent Decree. The GCG Report satisfies the requirement in 10 GCA 51118[e] that fees shall be based on an actuarial cost of service analysis.

4. Under separate order, ALJ will be authorized to oversee the focused management audit of DSWM's existing operations.

5. The contract review protocol, in form attached hereto, shall govern the regulatory review of DSWM procurements and obligations.

6. ALJ is hereby authorized and directed to oversee regulatory proceedings, which will lead to PUC's consideration of a variable residential rate, including a lifeline component, and of the implementation of permanent fees.

7. PUC emphasizes that the revenue created by the interim fee increases shall be restricted funds and shall not be spent without prior PUC authorization.

Dated this 27th day of October 2005.

_____
Terrence M. Brooks

_____
Edward C. Crisostomo

_____
Joseph M. McDonald

_____
Rowena E. Perez

3

**Municipal Securities Group**

*Presentation to Guam PUC*



# Guam Department of Public Works

**April 2006**

**UBS** Investment Bank

UBS Investment Bank is a business group of UBS AG.
UBS Securities LLC is a subsidiary of UBS AG.

ATTACHMENT B

Case 1:02-cv-00022    Document 69-13    Filed 01/31/2007    Page 16 of 43

# Guam Department of Public Works

## Current Situation

■ Need to finance approximately $90 million* through the capital markets:

   — Closure costs for Ordot

   — Construction of the new Municipal Solid Waste Landfill

   — Two years of Capitalized Interest

   — Costs of Issuance

   — Debt Service Reserve Fund

■ Driven by EPA consent decree

■ Funds needed by May to avoid further fines

\* Preliminary, subject to change.

UBS Investment Bank

# Challenges Faced by DPW for Proposed Financing

■ Landfill financings are challenging credits from investors perspective

— The Government's credit situation also impacts market acceptance

■ Tipping-fee backed revenue bond financing appears to be only feasible means of providing bond security in current political environment

— No broader excise tax possible

— No real property lien for security

■ Residential Collection rates have been poor relative to other comparable municipal solid waste enterprises

■ Tipping fees must be increased dramatically just to cover operating expenses and projected debt service

■ Continuity and timing of required rate increases are unknown

■ In addition, bond investors typically require additional coverage to be structured to provide adequate bondholder security (e.g. 1.25x coverage)


UBS Investment Bank

2

● Guam Department of Public Works

# Residential Collection System Goals

- Provide curbside pickup service for those paying for service

- Easily identify those entitled to the service

- Reliably bill and collect from recipients of service

- Create stable and predictable revenue stream

UBS Investment Bank



# Guam Department of Public Works

## Charlottesville, VA Example

- Charlottesville residents have two options for trash disposal
  - Individual trash stickers
  - Annual trash decals

- Individual trash stickers can be purchased at grocery and convenience stores; annual decals must be purchased at City Hall

| Benefits | Risks |
| --- | --- |
| — Increased administrative efficiency | — Lack of History |
| — Predictable revenue stream | — Waste Diversion |
| — Equitable | — Counterfeiting |
| — Payment of services prior to service (reliability) | |

UBS Investment Bank



**Guam Department of Public Works**

# Structure and Security Considerations for Proposed Financing

- Coverage
  - 1.75x PUC target
  - 1.25x rate covenant

- Determine the necessary amount of capitalized interest

- What level of rate increases are necessary to support the proposed debt?
  - How will this vary based on collection improvement?

- Gross Revenue versus Net Revenue pledge

- "Lock Box" structure (revenues as received directed immediately to the trustee)

- Cash flow considerations (as related to 1.75x coverage target)

<image name="UBS logo">UBS Investment Bank</image>

5

Case 1:02-cv-00022   Document 69-13   Filed 01/31/2007   Page 21 of 43



**Guam Department of Public Works**

## Cash Flow Observations

■ The Department's current financial projections indicate <u>significant</u> rate increases will be necessary to support new debt service and coverage

■ Currently only 31% of billed residential charges are collected from customers

■ Improving collections will minimize the required rate increases

■ Even if relatively low interest rates are achieved, the Department will need large rate increases

■ Improving the residential collection rate is very important

🍂 UBS Investment Bank

# Guam Department of Public Works

## Cash Flow Scenario #1

*6.50% Interest Rate Assumption*

### Guam Department of Public Works
Preliminary Cashflow Statement (Fiscal Year Ending September 30th)

| | FY 2002 | FY 2003* | FY 2004* | FY 2005 (Annual) | FY 2006 (Proj.) | FY 2007 (Proj.) | FY 2008 (Proj.) | FY 2009 (Proj.) | FY 2010 (Proj.) | FY 2011 (Proj.) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses:** | | | | | | | | | | |
| O&M[1] | | | | | | | | | | |
| Salary - Residential Collection[5] | $ — | $ — | $ — | $ — | 1,994,252 | 2,074,023 | 2,156,983 | 2,243,263 | 2,332,993 | 2,426,313 |
| Salary - Ordot Landfill[3] | — | — | — | — | 553,628 | 679,774 | 706,965 | 735,243 | 764,653 | 795,239 |
| Salary - Other[3] | — | — | — | — | 1,215,651 | 1,264,277 | 1,314,848 | 1,367,442 | 1,422,140 | 1,479,025 |
| Other Expenditures[3][2] | — | — | — | — | 1,566,680 | 1,629,555 | 1,694,737 | 1,762,527 | 1,833,028 | 1,906,349 |
| O&M New MSWLF[3] | — | — | — | — | — | — | 2,382,764 | 2,418,506 | 2,553,497 | 2,643,287 |
| Recycling and PUC Costs[4] | — | — | — | — | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 |
| Projected Debt Service @ 6.5%[5] | — | — | — | — | — | — | — | 9,127,575 | 9,130,763 | 9,129,000 |
| **Total Expenditures** | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,388 | $5,798,412 | $6,015,628 | $8,624,298 | $18,022,555 | $18,465,064 | $18,747,214 |
| | | | | | | | | | | |
| Revenue Requirement for 1.25x Coverage | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,388 | $5,798,412 | $6,015,628 | $8,624,298 | $20,304,450 | $20,687,734 | $21,029,464 |
| Revenue Requirement for 1.75x Coverage | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,388 | $5,798,412 | $6,015,628 | $8,624,298 | $24,868,237 | $25,233,138 | $25,593,964 |
| | | | | | | | | | | |
| **Revenues** | | | | | | | | | | |
| Commercial Collections | $2,425,362 | $2,605,554 | $2,653,587 | $3,181,296 | 2,876,640 | 2,991,706 | 3,111,374 | 3,235,829 | 3,365,262 | 3,499,872 |
| OCH Collections | 36,831 | 39,869 | 50,468 | 85,087 | 55,120 | 57,335 | 59,618 | 62,003 | 64,483 | 67,062 |
| Residential Collections | 691,575 | 608,286 | 472,978 | 611,242 | 620,880 | 645,715 | 671,544 | 698,406 | 726,342 | 755,395 |
| Other Collections | 485,676 | 648,599 | 774,069 | 758,053 | 693,680 | 721,427 | 750,284 | 780,296 | 811,507 | 843,968 |
| **Total Available Revenues** | $3,639,444 | $3,902,288 | $4,156,103 | $4,635,678 | $4,246,320 | $4,416,173 | $4,592,820 | $4,776,533 | $4,967,594 | $5,166,298 |
| | | | | | | | | | | |
| Debt Service Coverage[6] | | | | | | | (0.45x) | (0.46x) | (0.47x) | (0.49x) |
| | | | | | | | | | | |
| Debt Service Coverage w/100% Collection[6] | | | | | | | (0.20x) | (0.20x) | (0.21x) | (0.22x) |

*Note: Projected revenues are calculated based on 4% escalation annually using the averages from FY 2000-2005.*

(1) Based on Georgetown reports from Exhibit 24 dated 6/20/2005 which assume projections increased 4% annually using FY 2005 as base year. Operation figures of new landfill, recycling and PUC admin are estimates from DPW.

(2) Other expenditures include travel, contractual services, supplies/materials, utilities (i.e. power, water & telephone), and capital outlays.

(3) TG Engineering study data 6/1/05S public own/private operate scenario.

(4) Recycling at $216k, PUC at $150k estimates per DPW.

(5) Based on an estimated 30-year level debt service financing (for initial investment) and 15-year level debt service (for cell construction costs) with assumed interest rate of 6.5% and two-years of capitalized interest plus a debt service reserve fund. Bond sizing based on proceeds in HDR report dated 4/2005 consisting of $25.8mm in initial investment and first three years of cell construction ($17.6mm, $11.9mm and $12.8mm) totaling $68.6/mm.

(6) Equals Net Revenues (Revenues less O&M) divided by debt service. When negatives (as shown in red) that means Net Revenues are negative.



UBS Investment Bank

7



# Guam Department of Public Works

# Cash Flow Scenario #2

*7.0% Interest Rate Assumption*

## Guam Department of Public Works
### Preliminary Cashflow Statement (Fiscal Year Ending September 30th)

| | FY 2002* | FY 2003* | FY 2004* | FY 2005 (Annual) | FY 2006 (Proj.) | FY 2007 (Proj.) | FY 2008 (Proj.) | FY 2009 (Proj.) | FY 2010 (Proj.) | FY 2011 (Proj.) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses:** | | | | | | | | | | |
| **O&M(1)** | | | | | | | | | | |
| Salary – Residential Collection(1) | $ – | $ – | $ – | $ – | $ 1,994,252 | $ 2,074,023 | $ 2,156,983 | $ 2,243,263 | $ 2,332,993 | $ 2,426,313 |
| Salary – Ordot Landfill(1) | – | – | – | – | 653,628 | 679,774 | 706,965 | 735,243 | 764,653 | 795,239 |
| Salary – Other(1) | – | – | – | – | 1,215,651 | 1,264,277 | 1,314,848 | 1,367,442 | 1,422,140 | 1,479,025 |
| Other Expenditures(2)(3) | – | – | – | – | 1,566,880 | 1,629,555 | 1,694,737 | 1,762,527 | 1,833,028 | 1,906,349 |
| O&M New MSWLF(3) | – | – | – | – | – | – | 2,382,764 | 2,418,506 | 2,553,487 | 2,643,287 |
| Recycling and PUC Costs(4) | – | – | – | – | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 |
| Projected Debt Service @ 7.0%(5) | – | – | – | – | – | – | – | 9,582,875 | 9,585,300 | 9,585,750 |
| **Total Expenditures** | $ 3,479,551 | $ 3,668,454 | $ 3,970,427 | $ 5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $ 18,477,856 | $ 18,859,601 | $ 19,203,064 |
| | | | | | | | | | | |
| Revenue Requirement for 1.35x Coverage | $ 3,479,551 | $ 3,668,454 | $ 3,970,427 | $ 5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $ 20,873,575 | $ 21,255,926 | $ 21,600,401 |
| Revenue Requirement for 1.75x Coverage | $ 3,479,551 | $ 3,668,454 | $ 3,970,427 | $ 5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $ 23,665,012 | $ 24,048,576 | $ 24,393,276 |
| | | | | | | | | | | |
| **Revenues:** | | | | | | | | | | |
| Commercial Collections | $ 2,425,362 | $ 2,605,554 | $ 2,853,587 | $ 3,181,236 | $ 2,876,640 | $ 2,991,706 | $ 3,111,374 | $ 3,235,829 | $ 3,365,262 | $ 3,499,872 |
| OCH Collections | 36,831 | 39,849 | 50,469 | 85,087 | 55,120 | 57,325 | 59,618 | 62,003 | 64,483 | 67,062 |
| Residential Collections | 691,575 | 608,286 | 477,978 | 611,242 | 620,880 | 645,715 | 671,544 | 698,406 | 726,342 | 755,395 |
| Other Collections | 485,676 | 648,599 | 774,069 | 758,053 | 693,680 | 721,427 | 750,284 | 780,296 | 811,507 | 843,968 |
| **Total Available Revenues** | $ 3,639,444 | $ 3,902,288 | $ 4,156,103 | $ 4,635,578 | $ 4,246,320 | $ 4,416,173 | $ 4,592,820 | $ 4,776,533 | $ 4,967,564 | $ 5,166,298 |
| | | | | | | | | | | |
| Debt Service Coverage(6) | | | | | | | (0.43x) | (0.43x) | (0.43x) | (0.46x) |
| | | | | | | | | | | |
| Debt Service Coverage w/100% Collections | | | | | | | (0.19x) | (0.43x) | (0.20x) | (0.21x) |

*Note: Projected revenues are calculated based on 4% escalation annually using the averages from FY 2002-2005.*

(1) Based on Georgetown reports from Exhibit 2-4 dated 8/29/2005 which assume projections increased 4% annually using FY 2005 as base year. Operation figures of new landfill, recycling and PUC admin are estimates from DPW.
(2) Other expenditures include travel, contractual services, supplies/materials, utilities (i.e. power, water & telephone), and capital outlays.
(3) TG Engineering study dated 6/15/05 public own/private operate scenario.
(4) Recycling at $216k, PUC at $150k estimate as per DPW.
(5) Based on an estimated 30-year level debt service financing (for initial investment) and 15-year level debt service (for cell construction costs) with assumed interest rate of 7.0% and two-years of capitalized interest plus a debt service reserve fund. Bond sizing based on proceeds in HDR report dated 4/2/05 consisting of $26.8mm in initial investments and first three years of cell construction ($17.5mm, $11.9mm and $12.5mm) totaling $68.6mm.
(6) Equals Net Revenues (Revenues less O&M) divided by debt service. When negative (as shown in red) that means Net Revenues are negative.

UBS Investment Bank

8

# Guam Department of Public Works

## Cash Flow Scenario #3

### 7.5% Interest Rate Assumption

#### Guam Department of Public Works
Preliminary Cashflow Statement (Fiscal Year Ending September 30th)

| | FY 2002* | FY 2003* | FY 2004* | FY 2005 (Annual) | FY 2006 (Proj.) | FY 2007 (Proj.) | FY 2008 (Proj.) | FY 2009 (Proj.) | FY 2010 (Proj.) | FY 2011 (Proj.) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses:** | | | | | | | | | | |
| **O&M[1]** | | | | | | | | | | |
| Salary - Residential Collection[1] | $ — | $ — | $ — | $ — | $ 1,894,252 | $ 2,074,023 | $ 2,155,983 | $ 2,243,263 | $ 2,332,993 | $ 2,426,313 |
| Salary - Ordot Landfill[1] | | | | | 653,628 | 679,774 | 706,965 | 735,243 | 764,653 | 795,239 |
| Salary - Other[1] | | | | | 1,215,651 | 1,264,277 | 1,314,848 | 1,367,442 | 1,422,140 | 1,479,025 |
| Other Expenditures[1][6] | | | | | 1,566,880 | 1,629,555 | 1,694,737 | 1,762,527 | 1,833,028 | 1,906,349 |
| O&M New MSWL[2][3] | | | | | | | 2,382,764 | 2,418,506 | 2,553,487 | 2,643,287 |
| Recycling and PUC Costs[4] | | | | | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 |
| Projected Debt Service @ 7.5%[5] | | | | | | | | 10,066,875 | 10,066,688 | 10,066,563 |
| **Total Expenditures** | $ 3,479,551 | $ 3,668,454 | $ 3,970,427 | $ 5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $ 18,961,856 | $ 19,342,989 | $ 19,684,776 |
| Revenue Requirement for 1.25x Coverage | $ 3,479,551 | $ 3,668,454 | $ 3,970,427 | $ 5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $ 21,478,575 | $ 21,860,161 | $ 22,201,417 |
| Revenue Requirement for 1.75x Coverage | $ 3,479,551 | $ 3,668,454 | $ 3,970,427 | $ 5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $ 26,512,012 | $ 26,894,504 | $ 27,234,698 |
| **Revenues:** | | | | | | | | | | |
| Commercial Collections | $ 2,425,362 | $ 2,605,554 | $ 2,653,557 | $ 3,181,296 | $ 2,876,640 | $ 2,591,706 | $ 3,111,374 | $ 3,235,829 | $ 3,365,262 | $ 3,499,872 |
| OCH Collections | 36,831 | 39,843 | 50,469 | 85,087 | 55,120 | 57,325 | 59,618 | 62,003 | 64,483 | 67,062 |
| Residential Collections | 691,575 | 608,286 | 471,978 | 611,243 | 620,380 | 645,715 | 671,544 | 698,406 | 726,342 | 755,395 |
| Other Collections | 485,676 | 648,599 | 774,099 | 758,053 | 693,680 | 721,427 | 750,284 | 780,296 | 811,507 | 843,968 |
| **Total Available Revenues** | $ 3,639,444 | $ 3,902,288 | $ 4,156,103 | $ 4,635,678 | $ 4,246,320 | $ 4,416,173 | $ 4,592,820 | $ 4,776,533 | $ 4,967,594 | $ 5,166,298 |
| Debt Service Coverage[4] | | | | | | | (0.41x) | (0.41x) | (0.43x) | (0.44x) |
| **Debt Service Coverage w/100% Collections** | | | | | | | (0.18x) | (0.18x) | (0.19x) | (0.20x) |



*Note: Projected revenues are calculated based on 4% escalation annually using the averages from FY 2002-2005.*

(1) Based on Georgetown reports from Exhibit 24 dated 8/29/2005 which assumes projections increased 4% annually using FY 2005 as base year. Operation figures of new landfill, recycling and PUC admin are estimates from DPW

(2) Other expenditures include travel, contractual services, supplies/materials, utilities (i.e. power, water & telephone), and capital outlays.

(3) TG Engineering study dated 9/1999 public cost/private operate scenario.

(4) Recycling at $218K, PUC at $150K estimates per DPW.

(5) Based on an estimated 30-year level debt service financing (for initial investment) and 15-year level debt service (for cell construction costs) with assumed interest rate of 7.5% and two-years of capitalized interest plus a debt service reserve fund. Bond sizing based on proceeds in HDR report dated 4/2006 consisting of $26.8mm in initial investments and first three years of cell construction ($17.3mm, $11.9mm and $12.5mm) totaling $68.6mm.

(6) Equals Net Revenues (Revenues less O&M) divided by debt service. When negative (as shown in red) that means Net Revenues are negative.

UBS Investment Bank

9



**Guam Department of Public Works**

## Next Steps

- Determine preferred collection system adjustments and take necessary legislative and regulatory steps to institute the changes

- Confirm project costs to be financed

- Evaluate structuring alternatives

  — Follow-on issue in 2011 for future cell construction costs

- Continue discussions with credit rating agencies

- Determine schedule of rate increases and adjust rates as soon as feasible

- Resolve legal issues related to billing in advance

%%UBS Investment Bank

10

BEFORE THE GUAM PUBLIC UTILITIES COMMISSION



RECEIVED
DEC 2 0 2005
Public Utilities Commission
of Guam

**DEPARTMENT OF PUBLIC WORKS –
PROCUREMENT ADVISOR
CONTRACT**

**DOCKET 05-9**

## ORDER

On December 14, 2005, the Department of Public Works *[DPW]* petitioned the Guam Public Utilities Commission *[PUC]* for expedited review of its procurement of a consultant to assist it in broad scope of work required under the February 11, 2004 Federal Consent Decree in Docket 02-22 and under Guam law. The contract scope would include: a] the development of plans and bid documents for the privatization of the operation and closure of the Ordot landfill; the operation of the transfer stations; and the construction and operation of the Layon landfill; b] planning and study necessary to create residential collection districts pursuant to P.L. 26-99; c] consultation regarding other solid waste management activities; and d] optional post-completion activities. As the fees paid under the proposed contract will exceed $50,000, it requires prior PUC review and approval pursuant to PUC's October 27, 2005 Order in this docket *[Contract Review Order]*.

DPW has requested expedited regulatory review of the proposed contract because it faces near term deadlines, under threat of substantial Consent Decree penalties, to commence procurement activities on the work product, which will be produced by the consultant. On December 19, 2005 PUC's consultant Georgetown Consulting Group *[GCG]* submitted its report on the proposed procurement, which recommends its approval subject to conditions.

After review of the GCG report, in consultation with its administrative law judge, for good cause shown and on motion duly made, seconded and carried by the affirmative vote of the undersigned commissioners, the Guam Public Utilities Commission **HEREBY ORDERS THAT** the procurement is approved subject to the following conditions:

1. DPW shall file with PUC an executed copy of the contract, with all attachments and enclosures.

2. The consultant shall provide PUC with progress reports, in form and frequency established by PUC's administrative law judge, which will enable PUC: a] to monitor the potential impact of its work on DPW rates,

## ATTACHMENT C

which are subject to PUC jurisdiction; and b] to enable PUC to conduct a timely review, under the Contract Review Order, of proposed procurements which result from its work and which require regulatory review.

3. The proposed contract shall be amended: a] to require consultant to participate, upon request, in regulatory and legislative proceedings related to its work scope; and b] to include a conflict of interest clause, which will prohibit consultant from participating or having an economic interest in any DPW procurement which results from its contractual services.

4. DPW is in serious default of its statutory duty under P.L. 26-99 to establish three residential collection districts and to privatize collection services in 2 of the 3 districts by October 2002. As a consequence, residential customers have suffered with poor collection service. The proposed contract shall be amended to accelerate the consulting work necessary to create these districts and to privatize collection service as required by P.L. 26-99.

5. ALJ is authorized and directed to oversee the administration and interpretation of this Order.

Dated this 20th day of December 2005.

_____
Terrence M. Brooks

_____
Joseph M. McDonald

_____
Edward C. Crisostomo

_____
Rowena E. Perez

# ATTACHMENT 17



**Douglas B. Moylan**
Attorney General

**Joseph A. Guthrie**
Deputy
Solicitors Division

# Office of the Attorney General

July 13, 2006

Mr. Mikel W. Schwab
Assistant US Attorney
108 Herman Cortez Avenue, Suite 500
Hagatna, Guam 96910

Mr. Robert D. Mullaney
Env. &Natural Resources Division
US Dept. of Justice
301 Howard Street, Ste 1050
San Francisco, CA 94105

Ms. Julia Jackson
Assistant Regional Counsel
US Environmental Protection Agency
75 Hawthorne Street
San Francisco, CA 94195

Via fax and e-mail (671) 472-7334 (415) 744-6476 (415) 947-3560
**Confidential Settlement Negotiations - subject to ER 408 Do not Disclose**

Re:    **United States v. Government of Guam, Civil Cause No. 02-00022**

Dear Attorneys:

In response to the telephone call and email from Mr. Arora of USEPA, enclosed is a revised proposed schedule with corrections as the first one differed from the tables in my letter. I have also changed the following dates due to the fact that the contractors and others are taking longer than anticipated to accomplish the tasks.

1. Technical Advisor.   The closing date for the technical advisor currently is July 28, 2006. I have not been given any explanation for the change in the time frame. So, it in not likely that we will have a technical advisor before October.

2. Layon Hydrogeological Investigation.   We are still in negotiations with TG Engineers and GeoMatrix. We have a goal of having the contract signed and a notice to proceed by July 24, 2006. Depending on how soon the contractor can get going, the dates on the design decision and all other dates may need to be moved. We should know more by July 24, 2006.

3. Ordot.   We have initiated negotiations with Duenas & Bordallo on settling its claim and the additional work, but they could not meet this week. Hence, I have changed the dates that the contract amendment and notice to proceed will not likely be until August 4, 2006, instead of July 24, 2006.

---

The Justice Building ● 287 West O'Brien Drive ● Hagåtña, Guam 96910 ● USA
(671) 475-3324 ● (671) 477-3390 (Fax) ● www.guamattorneygeneral.com ●
guamattorneygeneral@hotmail.com

4. Bond. Work by GEDCA on the bond legislation and by the Team on the Implementation Plan to go with the bond legislation will take a few days longer in large part because of a site visit this week by the Department of Defense on infrastructure and due to folks being out of the office. Legislation should be introduced by July 18, 2006.

As to the questions regarding the assumptions for the subtasks, we will do what we can to provide a summary of the construction subtasks for the Layon Landfill. The reasons for the construction times include, but are not limited to the following factors: (1) daily drive time to and from the location, (2) the shortage of skilled workers, which is on the rise and will continue for several years, (3) the site conditions and the weather, (4) the lack of mass earth moving equipment, (5) as currently designed, the construction of the subdrain, (6) the opinions of the TG Engineers, A-Mehr and Brown Vence (now HDR) engineers, and the opinion of Steve Hiney, who is familiar with the construction of the Marpee landfill on Saipan.

For Ordot, the time lines were provided by URS and at the moment we do not have contract with URS to provide an explanation.

Let me know soon when you would like to conference as folks are planning summer vacations. We look forward to resolving this matter amicably with you.

Sincerely,



Helen M. Kennedy
Assistant Attorney General


Cc: client

# ATTACHMENT 18



FELIX P. CAMACHO
Governor of Guam
KALEO C. MOYLAN
Lt. Governor of Guam


**public works**
DIPATTAMENTON CHE'CHO' PUPBLEKO
LAWRENCE P. PEREZ
Director
ANDREW LEON GUERRERO
Deputy Director

November 10, 2006

**Mr. John McCarroll**
**Chief, Pacific Islands Office**
**USEPA, Region IX**
**75 Hawthorne Street**
**San Francisco, CA 94105**

Dear Mr. McCarroll:

The Department of Public Works (DPW) is in receipt of your November 2nd letter on the above subject. Thank you for the opportunity to clarify our position, as it was never DPW's intention not to comply with the conditions set forth in Paragraphs 8(g) and 8(h) of the Consent Decree.

It is the Department of Public Works intention to begin compliance with Paragraphs 8(g) with the award of a design/build contract that would construct the interceptor trench. This trench as a component of the Closure Construction Design is viewed as a fundamental immediate action that the Government of Guam can afford, to prevent further threat to human health and the environment. Construction of this trench is not a ruse to avoid addressing the numerous USEPA/GEPA closure design concerns or the timelines of Paragraphs 8(g) and 8(h).

Two critical issues prevent the Government of Guam from moving forward with the RFP for the construction of the Ordot Dump Closure, lack of funding and design integrity issues. These issues and the escalating penalties of Paragraphs 8(g) and 8(h) have forced the Consent Decree Teams of both DPW and GEPA to rethink the process of compliance of these two paragraphs with respect to the RCRA/CERCLA Closure Process. In doing so, two options were presented by GEPA:

1. Use existing design (extravagant remedy, and with information presented by the WERI Technical Report No. 113, probably not required)*
2. Design/Install leachate interceptor trench (comply with Consent Decree) and perform investigations to determine the type of capping system required (design and build an appropriate remedy).

The Department of Public Works Consent Decree Team and the majority of the Governor's Consent Decree Compliance Team are in favor of the second option. Justification being that:

- Ordot Closure Design must be modified
- Modify Design appropriately upon conducting thorough investigation to fill in data gaps presented in the Environmental Baseline Study.
- Financially sound, given the current Closure Design Construction cost.

542 North Marine Corps Drive
Tamuning, Guam 96911
Tel: 671. 646-3131 / 3259
Fax: 671.649-6178

 

- Based on new information presented in the WERI technical report, the urgency to "cap" Ordot is not critical. Building the new landfill is critical.

The Department of Public Works can assure the US EPA, that work will continue with both projects concurrently. Should you wish to discuss this further, please contact me at (671)646-3131.

*All the best,*

**LAWRENCE P. PEREZ**
**Chairperson, Consent Decree**
**Compliance Team**

* WATER AND ENVIRONMENTAL RESEARCH INSTITUTE OF THE WESTERN PACIFIC, UNIVERSITY OF GUAM, Technical Report No. 113, May 2006.

542 North Marine Corps Drive
Tamuning, Guam 96911
Tel: 671. 646-3131 / 3259
Fax: 671.649-6178

# ATTACHMENT 19



GOVERNOR
Felix P. Camacho
LT. GOVERNOR
Kaleo S. Moylan



DIRECTOR
Lawrence P. Perez
DEPUTY DIRECTOR
Andrew Leon Guerrero

0 5 DEC 2006



RECEIVED
DEC 0 5 2006
Public Utilities Commission
of Guam

**Mr. Harry M. Boertzel**
Administrative Law Judge
Public Utilities Commission of Guam
Suite 401, GCIC Building
P.O. Box 862
Hagåtña, Guam 96932

> *Reference:    SWM FY07 Rate Proceeding – Docket 07-1*

Hafa Adai Señot Boertzel:

Referencing your November 3rd email on the above issue, I would like to request a ninety (90) day extension for the scheduled January rate increase proceedings.

The current plan of action is for DPW to file for a rate increase in January based on the decal system and then return in April for another rate increase filing based on the bid results of the outsourcing of the residential waste. The DPW is concerned that this course of action may raise public outcry, especially in light of the short timing between rate increases.

DPW would like to request for your consideration an alternative plan that addresses the DPW's need for a rate increase possibly in April, with a comprehensive review of all impacts to the rate structure by the different improvements to the current Solid Waste system. The DPW would like approval to advertise an RFP for all the current projects of the Consent Decree and the planned improvements to the Solid Waste system in one bid action. A copy of the RFP concept is attached for your review and approval.

The objective behind this alternative course of action is to allow DPW and all the necessary stakeholders to capture at one time, the necessary market data that will impact the rate structure. The RFP will be advertised, with bids received by DPW and evaluated. No contract awards will be made until the bids have been reviewed and approved by the PUC.

Senseramente,

Lawrence P. Perez
Director

542 North Marine Drive, Tamuning Guam 96913 ● Tel (671) 646-3131 / 3259 ● Fax (671) 649-6178



public works

Proposed Bidding for Consent Decree Projects and PUC related task

| Item | Description | Estimated Cost | | |
|---|---|---|---|---|
| | | 1 yr. | 2 yrs. | 3yrs. |
| **A. New MSWLF** | | | | |
| I. | New MSWLF (Layon) "As-Is" | | | |
| II. | New MSWLF (Layon) with Value Engineering | | | |
| III. | New MSWLF Other site | | | |
| **B. Ordot Dump Closure** | | | | |
| I. | Ordot Dump Closure "As-Is" | | | |
| II. | Ordot Dump Closure with Value Engineering | | | |
| **C. Household Hazardous Waste** | | | | |
| I. | Chamorro Land Trust Property and Building | | | |
| II. | HHW Program ( As per compliance with Consent Decree) | | | |
| **D. Residential Waste Collection** | | | | |
| I. | Outsourcing of Residential Waste Collection for 2/3 of the Island | | | |
| II. | Islandwide Outsourcing of Residential Waste Collection | | | |
| **E. Transfer Station and MRF (Municipal Recycling/Recovery Facility)** | | | | |
| I. | Existing PMC ( Performance Management Contract) | | | |
| II. | Existing and Proposed | | | |

Proposed Bidding for Consent Decree Projects and PUC Related Task

1 of 2



**Boiler Plates:**

1. "Turn Key" FDBO (Finance –Design-Build-Operate) through private activity bond with government guarantee. NO CHANGE ORDERS.
2. Compliance to ALL Federal and Local Regulatory bodies (USEPA, GEPA) having jurisdiction.
3. Liquidation of Damages plus penalties.
4. Bid Bond and Performance Bond.
5. Government of Guam can award all parts of bid or one.
6. Bid Prices/Costing will be held for six (6) months.

**Selection Criteria:**

1. Experience (been there done that)     ___%
2. Financial Stability     ___%
3. Clean History     ___%

# ATTACHMENT 20

# G E O R G E T O W N   C O N S U L T I N G   G R O U P,   I N C.
### 7 1 6   D A N B U R Y   R D.
### R I D G E F I E L D,   C T.   0 6 8 7 7

Jamshed K. Madan
Michael D. Dirmeier

Edward R. Margerison
Jean Dorrell



Telephone (203) 431-0231
Facsimile (203) 438-8420
jkmadan@gmail.com

December 12, 2006

Harry Boertzel, Esq. ALJ
The Guam Public Utilities Commission
Suite 207, GCIC Building
Hagatna, Guam 96932

Re:     Response to DPW 12/5/06 Letter to Delay Rate Proceeding

Dear Harry:

This letter is in response to the letter you received form Larry Perez, Director of DPW, in which
he makes the following requests:
1. PUC's consideration of SWM's FY07 revenue requirements be deferred from January to
   April 2007; and
2. PUC approval of the RFP concept for "the current projects of the Consent Decree and the
   planned improvements to the Solid Waste system in one bid action".

This letter raises some complex and difficult issues that should be carefully considered. As you
know, Ed Margerison of our firm has just returned from a trip to Guam during which the primary
purpose was to work with DPW on collaboratively filing a request for a rate increase to be
reviewed for approval by the PUC at the January 2007 Regulatory Session. It was during this
trip that DPW and GCG both came to the conclusion that filing a rate case in January 2007 did
not make sense. DPW states in its letter to you that they are reluctant to have the public be
subjected to a rate increase in January and then another one in April 2007. While it is not clear
to us that a second rate increase request in April 2007 was a foregone conclusion, we concur with
the decision to defer the January request for several reasons. Our rational is developed below.
We believe that before another rate increase request is reviewed by the PUC, several significant
policy issues should be evaluated and addressed by the PUC.

Since the first DPW rate increase in October 2005 that was approved by the PUC, there have
been a number of significant events:
1. A management of the revenue and billing cycle was undertaken by GCG under ALJ
   oversight and the findings approved by the PUC.
2. DPW has missed many of the deadlines that have been imposed by the Consent Decree of
   February 11, 2004. As a result the U.S. Attorney, on behalf of the USEPA, has requested
   a status conference in Federal District Court to apprise the Court of the violations and the
   need for measures to bring about compliance with the Consent Order. We understand
   that the conference is to take place on December 20, 2006. DPW could be subject to

significant fines and other possible disciplinary actions. The U.S. Attorney alleges that in the meantime significant environmental damage continues.

3. The issuance of revenue bonds to fund the closing of the Ordot landfill and the opening and construction of a new landfill has been delayed from the anticipated date sometime during the mid to latter half of 2006. No firm date for the issuance of these bonds has been set. We understand that the legislation required to issue the bonds has not yet been introduced in the Guam Legislature. It is absolutely clear that without funding the projects required to meet the Consent Decree cannot go forward.

It would be useful at this juncture to summarize some of the conclusion and recommendations that we made in our Management Audit of the revenue cycle and billing system. We do this because we believe that many of those recommendations are key to DPW moving forward and it appears that little or no progress has been made on these key recommendations that were adopted by the PUC. A portion of our recommendations were as follows:

This audit report finds that:

a.    DPW's current billing and collection system is unable to competently handle even current rate revenue levels much less the increased burden necessary to support the revenue bonds.

b.    Substantial remedial action, including operational changes, legislation, regulatory action and rulemaking must immediately occur to enable DPW to bill and collect the revenue necessary to fund revenue bond requirements.

c.    If this remedial action does not occur, DPW will not be able to bill and collect the rate revenues necessary to fund revenue bond obligations and this burden would fall, in part, on    the General Fund. Regulatory principles could obstruct the PUC: i] from awarding rate   increases to compensate for DPW billing and collection mismanagement; and ii] from    increasing    SWM residential customer rates  unless the  quality of residential service is dramatically improved.

The key legislative findings that were contained in the report were as follows:

| Recommendation | Action Date |
|---|---|
| Legislation: | |
| Establish SWM as public corporation under CCU governance. | ASAP |
| Consolidate administration of SWM finances. | ASAP |
| Privatize third residential collection district. | ASAP |

Convert commercial tipping fee to hauler business expense or bring haulers

under PUC regulation and Public Auditor audit authority.                     ASAP

The major recommendation we reached in the prior report was as follows:

> Concurrent with the improvement of billing and collection practices, there also needs to be significant improvements in operational practices and the poor current level of services in order to collect in the face of the rate increases. Current collection rates for residential service are extremely low. GCG believes a significant cause of the low collection rate for residential SWM customers is resistance to paying amounts owed due to poor and sporadic service.
>
> **To solve these important issues it is our primary recommendation that SWM be transferred to a public corporation under the oversight of the Consolidated Commission on Utilities ("CCU"). With this recommendation all functions will be consolidated in one corporation, there will be an experienced Chief Financial Officer, experience with billing and collection systems and potential assistance available from the sister utilities – GPA and GWA plus experience in dealing with the Guam Environmental Protection Agency.**

## ANALYSIS

It has now been over a year that the PUC awarded a first rate increase to DPW. The logic of awarding the increase was to "phase in" the expected large rate increase that would accompany the rates requires to support the debt service associated with what is expected to be the first set of bonds floated to implement the Consent Order. The cash flow associated with the rate increase was to be escrowed and used only for specific purposes. After the first rate increase the PUC moved to undertake a Management Audit of the revenue cycle and billing and collection functions. Significant and systemic problems were encountered and a series of recommendations were adopted.

During the 14 months since the last rate award DPW has attempted to make limited improvements to its operations. We believe that it successes have been limited, predictably, because it is a fractured organization. Continuing without a sense of purpose and without a strategic plan should not be an option in our opinion. It is also difficult to make sense of the apparent paradox of the Director of DPW asking for a delay in the rate proceeding and at the same time stating that DPW does not have adequate resources to safely operate the existing landfill. Clearly there continues to be a crisis for all to see:

- Collection operations for residential customers continue to be inadequate.
- Operations at the landfill continue to harm the environment.
- USEPA deadlines continue to be breached.
- Financing plans to offer bonds have been deferred from mid year 2006 to some indefinite timeframe.
- Privatization for two thirds of the residential districts appears to be moving ahead – we have recommended that all residential collection be privatized.
- There continues to be no scale at the landfill.

- There appears to be no movement for SWM to be transferred to a public corporation under the oversight of the CCU. The PUC believes this to be a critical element in moving DPW forward.
- The U.S. Attorney has requested a status conference in the District court to apprise the District Court of DPW violations and the need for measures to bring about compliance with the Consent Order.

Given all of the above, we now have grave reservations as to what purpose a rate proceeding during the April 2007 Regulatory session would serve other than "kicking the ball down the field". Clearly a lot remains to be done but we believe a plan for the essential elements are not in place.

We note that Larry Perez has requested approval to advertise an RFP for all of the current projects of the Consent Decree and the planned improvements to the solid Waste system in one bid. He indicates that a copy of the RFP is attached for your review and approval. We have reviewed the documentation and do not see a full RFP. When the documentation is provided it should meet the requirements of the Contract Review Protocol. We also believe that the concept of putting all items in one bid package should be carefully evaluated. Some of the projects would be revenue funded and others would be financed. We would recommend that a focus of the January Regulatory Session should be the appropriate path forward for these projects. We would work collaboratively with him on the effort if requested by him and approved by you.

It is our current evaluation that under the current structure DPW is not in a position to discharge its duties under the Consent Decree and proposed revenue bonds.

If you wish to discuss any and all of the above, please do not hesitate to call.

Cordially,

Jamshed K. Madan

Cc:     Jim Baldwin, ESQ
        Larry Gawlik
        Ed Margerison