

Office of the Attorney General
Alicia G. Limtiaco
Attorney General of Guam
Civil Division
287 West O'Brien Dr.
Hagåtña, Guam 96910 • USA
(671) 475-3324 • (671) 472-2493 (Fax)
www.guamattorneygeneral.com

Attorneys for the Government of Guam

FILED
DISTRICT COURT OF GUAM
JAN 31 2007
MARY L.M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT OF GUAM
# TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL CASE NO. 02-00022 |
| Plaintiff, | |
| vs. | **MOTION TO MODIFY CONSNET DECREE** |
| GOVERNMENT OF GUAM, | |
| Defendant. | |

Comes now the Government of Guam ("Government"), pursuant to *FRCP 60 (b),* and respectfully moves this Court to modify the Court's February 11, 2004 order in this case (the "Consent Decree"). Significant changes in circumstances have made compliance with the Consent Decree timelines unworkable. Therefore modification of it is in the public interest in order to meet the overarching goal a municipal solid waste landfill and closure of the Ordot Dump in full compliance with Guam's solid waste laws and regulations. Herein the

Page 1
Declaration of Lawrence P. Perez
US District of Guam - Civil Case No. CV02-00022

Government proposes changes to Consent Decree that are suitably tailored to the changed circumstances.

## FACTS

### I. Significant Changes in Circumstances since signing and entry of the Consent Decree.

The Government signed the Consent Decree on October 21, 2003, and the Court order became final on February 11, 2004. Since then, significant changes have occurred in fact and in law that impact the Government's ability to meet the Consent Decree deadlines. The critical changes involve (1) regulation by the Public Utilities Commission ("PUC"), (2) contracting mistakes made by an inexperienced chief engineer in combination with the difficulty the Government has in recruiting and keeping qualified employees, (3) the results of the Value Engineering Analysis ("VEA") for the Layon Landfill and Ordot closure, plus the need for additional hydrogeological investigations at the Layon landfill site, (4) the fact that actions were required by others over whom the Government has no control, (5) other changes in law which limit the Government's financing options, (6) the decision by the United States to significantly increase the number of active military personnel on Guam, and (7) the political opposition to locating the landfill at Layon. As discussed below, none of these circumstances was foreseen in 2003 when the parties entered into the Consent Decree.

In 2003, the PUC did not have the ability to regulate the Department of Public Works ("DPW") solid waste operations. Although the PUC had been given rate making authority effective July 2002, the PUC lacked a revenue source to cover its administrative costs. Consequently, the PUC regulatory process was not incorporated into the Consent Decree deadlines. The Consent Decree incorporated the Guam EPA regulatory process, but not the PUC's. In contrast, the PUC's regulatory processes are included in the Stipulated Order this

Court issued in *United States v. Guam Waterworks Authority, cause no. 02-00035( June 5, 2003 Stipulated Order at 9,20-21).*

However, beginning June 30, 2005, with Public Law 28- 58, the PUC's administrative costs could be charged to DPW and the PUC began regulating DPW by auditing DPW's solid waste program, conducting hearing and workshops, and issuing orders. *E.g., Declaration of Lawrence Perez at Exhibit 2.* A little over a year later, the PUC's consultant, Georgetown Consulting Group ("Georgetown"), completed its <u>Focused Audit Report and Recommendations</u> ("Audit"), which the United States submitted to the Court on December 15, 2006. On January 5, 2007, Georgetown provided an update of the Audit. *Id. at Exhibit 1.* The PUC found that both the DPW's solid waste collection services and its billing and collection of fees need to improve significantly before the PUC can justify the rate increases that will pay for the construction and operations of the landfill, a household hazardous waste facility and for closure of the Ordot dump. *Id. at Exhibits 1-2.* In addition, the PUC needs time to review and approve the construction procurement documents before DPW advertises them, and the funding mechanism used to pay for these capital improvement projects. *E.g., Id. at Exhibit 2, 7.*

Between May of 2004 and May of 2006, the Chief Engineer at DPW, due to his inexperience with landfill design and construction, made numerous significant mistakes in contracting for the Consent Decree projects. *Id. at ¶¶ 3-5, Exhibits 3 and 4.* For example, he failed to contract for (VEA) or any analysis of alternative designs for the projects. In 2004, he failed to advertise for the Ordot wetlands mitigation plan and he deleted the design of a leachate treatment system from the final contract. *Id.* For Layon, he deleted groundwater monitoring wells from the final contract and overlooked certain groundwater monitoring requirements of the Guam EPA landfill regulations. *Id.* In addition, due to the low government pay grades DPW has

experienced difficulty in recruiting and retaining experienced and qualified engineers for the Consent Decree and other projects. *Id. at ¶ 6.*

Because of the contracting mistakes, the lack of staff, and the PUC's findings, in 2006 the DPW Director decided that the only way for the Government to meet the Consent Decree requirements of constructing a landfill and Ordot closure in compliance with Guam laws is for DPW to contract as much work as possible with professional engineering firms. *Id. at ¶ 7.* Consequently, DPW has contracted with both a technical advisor, Shaw Environmental, and a procurement advisor, HDR. *Id.*

The consequences of the contracting errors and DPW's inexperience have been significant and numerous. For example, the VEA study had to be conducted after completion of the pre-final 100% design for each project. For Layon, the VEA identified design changes that could greatly reduce the amount of initial earthwork and eliminate the need to stockpile soil. *Declaration of Tor Gudmundsen at ¶ 3 and Exhibit 1.* The VEA for the Ordot Design identified potential design modifications that could result in substantial savings: a change from a high density, multilayer barrier to a soil cover was estimated to result in an estimated potential savings in excess of $ 6 million. *Id. at ¶ 4 and Exhibit 2.* The contract errors also resulted, in large part, in a breach of contract dispute with the Ordot designers, and the need for contract amendments for Layon. Resolution of the Ordot design contract dispute has been protracted, and on January 26, 2007 the DPW issued a letter of intent for the design modifications to continue. *Exhibit 5 to Perez Declaration.*

The negotiations for contract amendments to the Layon design have also been protracted. In addition to the contracting errors, hydrogeological data collected in 2005 indicated that the hydrogeology of the Lyon area was more complex than the designers previously thought based in large part on the data collected earlier. *Declaration of Cynthia Jackson at ¶ 2 and Exhibit 1.*

This new information was significant because it dictated that more hydrogeological information is needed for the final design. Hence the prime contractor hired a subcontractor highly experienced in ground water, who, due to its other commitments, was not able to finalize quickly the contract amendment. *Id.*

The Government has encountered other impediments to implementing the Consent Decree projects, but these have been due to actions or inactions by those over whom the Government has no control. For example, the United States withheld for over eight months federal grant money, which it had previously approved for the Layon project due to a new policy by the U. S. Department of Interior ("Interior") of applying the National Environmental Policy Act ("NEPA") procedural requirements to its construction grant funds. *Jackson Declaration at ¶3.* The Government sought assistance from both U.S. Environmental Protection Agency ("USEPA") and management at Interior, but neither agency made the release of Layon grant funds a priority. *Id.* The Government has also asked the USEPA for assistance in contacting and obtaining agreement from the National Aeronautics and Space Administration ("NASA") for DPW to improve the portion of the dirt access road to Layon, which traverses NASA property, but none has been given. *Id.*

In addition, after several months of allowing DPW and its contractors access to the Layon landfill site, in June of 2006 the owners denied access. *Id. at ¶4.* Consequently, in August of 2006 the Government offered to purchase the land from the recorded owners, who are involved in a partition action over the property. *Declaration of Cynthia Jackson at ¶ 9.* One of the owners declined the offer. The other owner showed interest, and on January 25, 2007 it granted the Government a license to use the property for the groundwater investigation, design work, road improvements, and applications for the zoning change. *Id. at Exhibits 4.*

Also since 2003, there have been changes in law that have resulted in severe limitations the Government's financing options. On June 6, 2005, Public Law 28-05 became effective. Under it the Legislature is required to appropriate annually from the general fund and other funds "all amounts necessary to provide an adequate public educational system as required by Section *29(b)* of the Organic Act." *Guam Public Law 28-45: 13*. Because this law places education above other government programs, it severely limits the availability of general fund and other fund monies for the Consent Decree projects. In addition, under the recent settlement in the earned income tax credit case, the Government must pay $90 million dollars, and on October 5, 2006, the Guam Superior Court issued a judgment against the Government to pay some $123 million to certain retirees for their cost of living allowance that was not paid earlier in accordance with Guam law. *Declaration of Helen Kennedy at Exhibit 1*. Because of these changes in law, the Government is not able to use the general fund or other fund monies to pay for the capital improvement projects mandated by the Consent Decree.

Another significant change in circumstances is the United States' decision in 2005 to increase significantly its military presence on Guam, including the relocation of approximately 8,000 Marines. The Department of Defense ("DOD") will need to use the Layon landfill for solid waste disposal because the Air Force's landfill is running out of space in 2007, and the Navy does not have a sanitary landfill, it has a dump. *Declaration of Barbara Torres*. The 2004 landfill planning during the environmental impact statement (EIS) process, done under paragraph 9(a) of the Consent Decree, did not include this unprecedented military build up. *Jackson Declaration at Exhibit 3*. Consequently, this change requires additional planning and potential federal funding for the Layon landfill construction. *Perez Declaration at ¶ 8*.

Finally, the Government has encountered political opposition to locating the landfill at Layon. Since Layon was identified in March of 2004, Senators in the Guam Legislature have

introduced at least four bills to change the landfill location. *Jackson Declaration at ¶ 3.* As a consequence, the Government and its contractors have conducted public outreach far greater than required by law and than DPW initially planned to have. *Id.* at ¶ 6 . These matters have also contributed to longer time frames in implementing the Consent Decree projects.

**II.     The Proposed Schedule.**

In response to the changed circumstances discussed above, the Government has developed a revised schedule for completion of the Consent Decree projects.   This proposed schedule takes into account the PUC's process, the design changes, the changed financial limitations, and to the extent possible the funding opportunities with the DOD. *Perez Declaration at ¶ 8 and Exhibit 1.* For example, under this new schedule, the financing of the projects will be decided at the end of the bidding process for the construction but before final PUC approval. *Id.*

### LEGAL ARGUMENT

A court can grant relief from a judgment when "it is no longer equitable that the judgment should have prospective application." *FRCP 60(b); See also, Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).* A "significant change in circumstances" can cause a judgment to no longer be equitable and thus may "warrant" the revision of it. *Rufo, 502 U.S. at 383, 112 S.Ct. at 760.* Significant changes in factual conditions or in the law which warrant modifications of a decree include "unforeseen obstacles" that make compliance with a consent decree "more onerous," "unworkable" or "detrimental to the public interest." *Id. at 384, 112 S.Ct. at 760.* In particular, it is important for a court to modify a consent decree when " 'a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes.' " . *Keith v. Volpe, 784 F.2d 1457, 1460 (9th Cir.1986)(citing King-Seeley Thermos Co. v. Aladdin*

*Industries*, 418 F.2d 31, 35 (2nd Cir.1969). As detailed above and in the declarations and exhibits, there have been significant changes, both in fact and in law, which warrant modification of the Consent Decree. None of the changes were foreseen by the parties. The PUC and its approval process were not included in the Consent Decree. Neither party foresaw that DPW lacked lack the engineering expertise and could not hire experienced engineers that could oversee adequately the designs in order to meet the overarching goal of a landfill and dump closure in compliance with Guam's highly technical landfill regulations, which mirror the federal regulations that were applicable before USEPA's enforcement authority was delegated to Guam EPA. *65 Fed. Reg. 35927-8 (June 6, 2000).* Likewise, they did not foresee that DPW's Chief Engineer would overlook the need for VEA of the projects which documents their costs effectiveness, and which is needed to support the just and reasonable rate increases that will pay the construction costs. The parties did not foresee the acts of Interior, the landowners, or the subcontractors, all of whom did not make the Consent Decree timelines a priority, or the political obstacles that have demanded valuable staff time away from the projects.

These changed circumstances are the type of changes under which federal courts modify consent decrees in order to achieve the decree's overarching purpose and not be in derogation of its primary objectives. *Pigford v Veneman, 292 F.2d 918 (D.C. Cir. 2002); New York State Association for Retarded Children, Inc. v. Carey, 706 F.2d 956 (2d Cir. 1983); Earth Island Institute v. Southern California Edison, 166 F.Supp. 2d 1304 (S.D. Cal 2001).* In *Pigford*, the court found that the errors of an attorney in a class action lawsuit had failed to meet critical consent decree deadlines for filing arbitration claims for minority farmers were unforeseen obstacles that made the decree unworkable. Because the class members did not choose or hire the class attorney, they could not be held responsible for his errors in derogation of the decree's objective to give them just compensation. *Pigford v Veneman, 292 F.2d at 927-8.* The same is

true here. Neither the Governor, nor Director Perez chose the Chief Engineer for DPW, and they could not foresee that he would make critical mistakes. Hence it would be inequitable for the rate payers to incur the costs of constructing significantly more expensive designs than the more cost effective ones.

In *NY State,* the court found that the defendants, the Governor and health agencies, had encountered unforeseen obstacles in implementing a decree that required them to relocate patients from a large institution to low density housing units that would provide better health care and living services because the housing market conditions, neighborhood opposition, and revised expert opinion that intermediate sized housing provided higher quality and cost effective health care than low density housing. *New York State, 706 F.2d at 965-69 (2d Cir. 1983);* the court found that the changes in facilities size met the comprehensive goals of relocating the patients in a reasonable time frame to facility that provided higher quality care. Here, incorporating the VEA recommendations into the designs will meet the overall objectives of improving the solid waste services to Guam both at higher quality – compliance with the regulations, - and cost effectively. *Id. at 969-71.*

In *Earth Island,* the original consent decree had been ineffective and not achieved its original purpose of restoring Southern California wetlands when eight years had past since the money for restoration had been secured, but difficulties were encountered concerning the land. *Earth Island, 166 F.Supp. 2d at 1308-9 (S.D. Cal 2001).* The amendment was necessary to allow the funds to be used by the entities experienced in wetlands mitigation and "more effectively" accomplish the decree's purpose of restoring wetlands. *Id. at 1312.*

Moreover, financial constraints are a legitimate concern of the government in institutional reform litigation such as in this case, and counts discretive to local administrators regarding institutional reform. *Grier v. Goetz, 402 F. Supp. 2d 876 (M.D. TN 2005)( citing Rufo, 502 U.S.*

*at 392-93, 112 S.Ct. 748,* and *Frew ex. rel. Frew v. Hawkins, 540 U.S. 431, 442, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004).* In *Grier*, the court modified the consent decree because of Tennessee's Medicaid program's fiscal crisis. The public interest is a particularly significant reason for the court to apply flexible standards in modifying consent decrees because they reach beyond the parties and impacts the public's right to sound and efficient operations of it institutions. *Rufo, 502 U.S. at 381, 112 S.Ct. 748 (citing Heath v. De Courcy, 888 F.2d 1105, 1109 (6th Cir.1989)).* Here, after the errors and obstacles, DPW has contracted with professional engineers to assist it in the design, construction and PUC processes. However, as the PUC has determined, it is in the public's interest that the Government improve its billing and collection of user and tipping fees and that DPW out source solid waste collection services before the PUC can approve the increased rates needed to pay for the construction of the landfill, Ordot closure, and the household hazardous waste facility ("HHW"). Likewise, the changes in law have essentially made general fund and other fund monies unavailable and so the Government will undergo a procurement process that allows for bids which include private financing as an alternative to revenue bond or private activity bond financing.

Once the moving party has demonstrated that the changes in circumstance warrant a consent decree modification, and that it has "made a reasonable effort to comply with the decree," *Rufo, 502 U.S. at 385, 112 S.Ct. 748,* the court must determine that the modifications are "suitably tailored to the changed circumstances." *502 U.S. at 391, 112 S.Ct. at 763.* Despite the obstacles and numerous changes in circumstances discussed above, the Government has made the necessary adaptations, and it has made "reasonable efforts" to meet the Consent Decree deadlines. *Rufo, 502 U.S. at 385, 112 S.Ct. 748.* These efforts are summarized in Exhibit 4 of Cynthia Jackson's declaration. For example, with respect to the withholding of federal grant

money by Interior, as the testimony and numerous emails show, DPW acted reasonably. *Jackson Declaration at Exhibit 2.*

The deadlines for the Ordot design and Guam EPA's issuance of the permit were met on time. For the landfill, the EIS and site selection were achieved within two months of the Consent Decree deadline. Given the public interest in the project and the need for informed and reasoned decision making, the Government's actions were reasonable. In addition, the Government has worked diligently with the Guam Economic Development Authority, bond counsel, and underwriters on the financing of the construction projects, and presented the revenue bond option to legislative leaders and the PUC. *Jackson Declaration at ¶ 7.* As a result, in January of 2007 DPW petitioned for PUC approval to implement a fee program for residential solid waste under which residents will prepay for solid waste collection and disposal services. *Id.; Perez Declaration at ¶2, Exhibit 2.* This program will also need amendments to DPW's regulations or new legislation. In sum, the Government has made reasonable efforts, as required by *Rufo*, to comply with the Consent Decree deadlines and hence the court should modify the Consent Decree.

The Government's proposed schedule is attached as Exhibit 7 to Director Perez' declaration. Director Perez consulted with government agencies, the design firms, the procurement advisor and the technical advisor on the time lines, and he emphasized that these time lines include a buffer for reasonable delays. *Perez Declaration at ¶ 8..* In light of the experience over the past three years, DPW believes that the original Consent Decree deadlines did not have sufficient flexibility to account for reasonable delays. DPW's newly hired technical advisor, Shaw Environmental, will be responsible for tracking the compliance and alerting the parties of any future changes in circumstance which would likely affect the compliance schedule. *Id. at Exhibit 6.* DPW also believes that the modified court order should

clearly state that it is binding on all Government agencies, including the independent ones such as the PUC and the Ancestral Lands Commission, which has control over the land where the HHW facility will be built.

Finally, although the Government's proposed schedule is detailed, the Government was not able to estimate with any precision the timelines the United States needs for it to fulfill its obligations to achieve the goal of building a landfill and closing the Ordot and Navy dumps, and the Air Force's landfill, which is above Guam's primary drinking water source, the Northern Aquifer. *Id. at* ¶ 8. Any funding from DOD for construction will need Congressional approval, and hence must go though that process of which the DPW has little knowledge and no control. Likewise, the NASA will need time for review and approval of the temporary road improvements. Consequently, the Government respectfully requests the Court to obtain proposed timelines from the United States so that they may be incorporated into the Government's schedule.

## CONCLUSION

A lot of changes have occurred in the three years since this Court entered the Consent Decree, and many of the decree's deadlines have been met. After many years of uncertainty, the Government selected a landfill site through a thorough process guided by scientific, engineering, environmental and land use considerations instead of cursory planning and politics. The PUC has become fully engaged in regulating the quality of solid waste service DPW provides to the rate payers, and is taking steps to insure that rates are paid timely by all rate payers, and not just the 50% percent of residential customers as was the case in 2006. DPW's solid waste operations division has adapted to the PUC's regulations, and has contracted with Shaw Environmental and HDR to oversee design, procurement and construction of the landfill, Ordot Closure and the HHW facilities. DPW has assumed the responsibility for HHW collection from Guam EPA, and

it will be out sourcing solid waste collection services. However, obstacles, financial constraints, and the public interest in efficient operations of the DPW's solid waste operations make the timelines in the Consent Decree unworkable. For all of these reasons, the Court should modify the Consent Decree to include the Government's proposed schedule, and to include a schedule of time commitments for the United States in assisting the Government to provide one solid waste landfill for the civilian and military populations of Guam.

Respectfully submitted this 31st, day of January 2007.

_____
Helen M. Kennedy,
Assistant Attorney General
Counsel for Defendant, Government of Guam