**Office of the Attorney General**
**Alicia G. Limtiaco**
Attorney General of Guam
**Civil Division**
287 West O'Brien Dr.
Hagåtña, Guam 96910 ● USA
(671) 475-3324 ● (671) 472-2493 (Fax)
www.guamattorneygeneral.com

**Attorneys for the Government of Guam**



**FILED**
DISTRICT COURT OF GUAM

JAN 3 1 2007

MARY L.M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT OF GUAM

# TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL CASE NO. 02-00022 |
| Plaintiff, | |
| vs. | |
| GOVERNMENT OF GUAM, | **DECLARATION OF LAWRENCE P. PEREZ** |
| Defendant. | |

I, Lawrence P. Perez say and declare of my own personal knowledge:

1.     I am the Director of the Guam Department of Public Works ("DPW") and the Chair of

the Ordot Consent Decree Compliance Team. I became the Director of DPW in February of

2005.  I hold Bachelor degrees in Industrial Management and in Mechanical Engineering

Technology from the Oregon Institute of Technology.  Before becoming the DPW Director , I

was the General Manager of the Guam Telephone Authority.

2.      The Guam Public Utilities Commission ("PUC") began regulating DPW's solid waste

operations in 2005.  A copy of the PUC's consultant's January 2007 update of its audit findings

is attached as Exhibit 1.  Copies of PUC order and letters are attached as Exhibit 2.  I anticipate

the PUC to issue a new decision on February 1, 2007, and upon my receipt of the decision, I will

supplement this declaration with a copy of it.

3.      In May of 2005, I retained the services of Brown Vence & Associates ("BVA"), an

environmental engineering firm experienced in procurement of construction for dump closures

and for landfills, to assist DPW on the Consent Decree.  BVA reviewed, among other things, the

90% design for Ordot Closure which the design contractors had prepared, and DPW had

submitted same to the United States Environmental Protection Agency ("USEPA") and the

Guam EPA by the Consent Decree deadline.  When BVA informed DPW that the Ordot Closure

$30 million plus costs estimates were extremely high, and were not typical of closure costs at

dumps of similar sizes elsewhere, I asked DPW's then Chief Engineer, Marc Gagarin why the

costs were so high.  He informed me when DPW contracted for the design it did not have the

money to include value engineering analysis as part of the contract, and such analysis would

have identified and analyzed the different design options.  Consequently, I directed that a value

engineering analysis be performed, and Mr. Gagarin directed the design engineers to develop

more accurate cost estimates on the 100% design.  The value engineering analysis identified a

potential savings of up to $11 million from the revised costs estimate of around $24 million.

4.      Later in 2005 and in early 2006 I learned of other decisions Mr. Gagarin had made

concerning the Consent Decree projects which affected significantly the designs and the process.

For example, from the 2004 Ordot Design Contract he had eliminated the design of a leachate

treatment system and the development of the wetlands mitigation plan.  The elimination of the

wetlands mitigation plan resulted in the Government of Guam ("Government") obtaining a time

extension of the Consent Decree deadline.  Copies of the contractor's proposal and the final

scope of work , and comments from the United States EPA regarding the leachate are attached as

Exhibit 3. For the Layon Landfill, in September of 2005 Mr. Gagarin eliminated from the scope

of work a task that would have combined the wetlands mitigation plan for Ordot with the one for

the Layon landfill, and he failed to require value engineering analysis of the 40 % design before

proceeding to the 90% design. Hence the Government had to pay USEPA over $50,000 in

stipulated penalties for a task that cost the Government around $67,000, and had to amend the

design contract in 2006 to obtain a value engineering analysis on the pre-final design.

5.      In May of 2006, Mr. Gagarin retired from the Government. Later in 2006, I learned that

Mr. Gagarin, in respect to the groundwater investigations for the Layon Landfill, had reduced the

number of groundwater wells and had not contracted for the groundwater monitoring be in

compliance with Guam EPA's regulations. Attached as Exhibit 4 is the memorandum

documenting the changes Mr. Gagarin required.

6.      In addition, because of the Government's low pay system, DPW has had extreme

difficulty in attracting and keeping qualified engineers to work on the Consent Decree projects

and other projects. DPW has not been able to replace an engineer who was working on the

Consent Decree projects but resigned in August of 2005. The remaining engineer has limited

experience.

7. As a consequence of Mr. Gagarin's oversights, since 2005 DPW and the Ordot Closure

design firm have been in a contract dispute, which I believe is now resolved. Attached as Exhibit

5 is a letter to the firm stating DPW intent to contract with them for the design changes. Also as a

consequence of  Mr. Gagarin's oversights, the inability of DPW to attract qualified experienced

engineers, the limited experience of the DPW staff in landfill design and construction, and

DPW's obligations under Guam laws and orders issued by the Guam Public Utilities

Commission, I believe that DPW is incapable of implementing the Consent Decree projects

without significant assistance. Hence, DPW has sign a contract with both a technical advisor,

1 Shaw Environmental and a procurement advisor, HDR Inc., who have provided license and

2 experienced professional engineers to assist it with implementing and negotiating the design

3 contracts and preparing the bid packages for construction and operation of the Landfill and

4 Ordot. Enclosed is as Exhibit 6 is a copy of the contract with Shaw Environmental, which is

5 currently undergoing the final governmental approvals before the Governor with sign it.

6 8.      When DPW planned for the landfill, it did not know that that U.S. military would be

7 significantly increasing the military employees on Guam in the next ten years. In January of

8 2007 I met with Major General Bice who had just been hired as the Guam director of Defense

9 Department Office of Economic Adjustment. Both the Government and the US Military need

10 time for the federal agencies to prepare requests to Congress for federal appropriations to assist

11 in constructing the Consent Decree projects. The time lines for this effort are determined by the

12 Department of Defense, other federal agencies and Congress, and not by Guam.

13 9.      I have reviewed the efforts that DPW and other Guam agencies have made in

14 implementing the Consent Decree projects and I believe that they are reasonable. The DPW staff

15 and I have gathered information from other Guam agencies, from the design consultants, and

16 from the technical and procurement consultants with which DPW could develop a schedule for

17 the Consent Decree projects which is workable given all the changes that have occurred since

18 2003. I have personally reviewed the schedule with DPW staff and I believe that the schedule is

19 as aggressive as it can be without exposing the Government to missing the future milestones. A

20 copy of the proposed schedule is attached as Exhibit 7.

21      I declare under penalty of perjury that the foregoing is true and correct to the best of my

22 knowledge this _31st_ day of January, 2007.

23

24      _Lawrence P. Perez_

25

# G E O R G E T O W N   C O N S U L T I N G   G R O U P,   I N C.
### 716 DANBURY RD.
### RIDGEFIELD, CT. 06877

Jamshed K. Madan
Michael D. Dirmeier

Edward R. Margerison
Jean Dorrell



Telephone (203) 431-0231
Facsimile (203) 438-8420
jkmadan@gmail.com

January 5, 2007

Harry Boertzel, Esq. ALJ
The Guam Public Utilities Commission
Suite 207, GCIC Building
Hagatna, Guam 96932

**Re:    Docket 06-2 (Focused Management Audit of Department of Public Works' Solid Waste Management Division Billing and Collection System).**

Dear ALJ Boertzel:

This letter is in response to your December 14, 2006 request that Georgetown Consulting Group (GCG) provide the Guam Public Utilities Commission (PUC) with an update on the findings contained in GCG's September 2006 audit report (Audit) of the Department of Public Works' (DPW) solid waste management division (SWM)[1]. This update is based upon GCG's November 2006 on-site visit with SWM.

Both the Audit and this update focus on GovGuam's inability to meet the requirements of the Consent Decree dated February 2, 2004 in Federal District Court Civil Case 02-22. Although the Government of Guam (GovGuam) is the defendant this proceeding, it delegated to SWM and a management team created by Executive Order 2006-12 the duty of complying with the Consent Decree, including the closure of the Ordot dump and the construction and operation of a new landfill.[2] It is estimated that the capital cost of these mandated projects is in the range of $90-100 million dollars. GovGuam's failure to meet Consent Decree compliance timelines caused the Federal government to recently commence an enforcement proceeding before the District Court, which is currently in progress.

Within the context of the Consent Decree, PUC is directed by Guam law[3] to establish just and reasonable rates for residential waste collection and landfill dumping ("tipping fees"), which are

---

[1] PUC's 9/28/06 Order in Docket 06-2 *(Attachment A)* directed its administrative law judge (ALJ) to oversee GCG's preparation of a rate proceeding to address SWM's FY07 revenue requirements. After reviewing SWM's 12/5/06 request that the rate proceeding be postponed, ALJ, in consultation with GCG, cancelled the proceeding by letter dated 12/14/06 *(Attachment B)* and directed GCG to use the information, which it had collected during its November on-site visit, as a basis for this update letter.

[2] In this letter report, reference is often made to GovGuam as it is the government rather than either its line agency Department of Public Works or the operational division thereof Solid Waste Management. GovGuam is the entity that will prepare and sign contracts as it is the defendant in District Court Civil Case No. 02-22.

[3] 10 GCA section 51118.

adequate (with grants and other revenue sources) to fund GovGuam's compliance with the Consent Decree. The Audit found that SWM as currently organized[4] was incapable of billing, collecting and managing the expenditure of SWM rate revenues in keeping with normal business practices that would assure investors in the required capital program associated with compliance with the Consent Decree. This letter enforces this Audit finding. An effective SWM billing and collection system is central to GovGuam's ability to comply with the Consent Decree[5].

## SUMMARY OF UPDATED FINDINGS

As is further discussed in the balance of this letter, GCG respectfully submits the following updated findings to PUC:

1. GCG expresses serious concern that GovGuam is revisiting the October 2004 finding in DPW's Landfill Financial Plan[6] that special activity bonding is the preferred means of financing the $90 million dollar cost of Consent Decree compliance. In its December 5, 2006 letter to you, DPW informed PUC that GovGuam now intends to solicit private interest in financing the construction and operation of the Consent Decree projects. GovGuam's December 15, 2006 Response in the Federal enforcement proceeding states that "some legislators appear to prefer private financing for the Layon Landfill development, even though GEDCA's advisor recommends a revenue bond as more economical to Govguam and the ratepayers. Consequently, DPW is now also pursuing private financing for the Layon Landfill construction."[7] Based upon GCG's observations, GovGuam's two year effort to obtain special activity bond financing has been marred by indecision and a lack of urgency and leadership to address operational and organizational problems, which has frustrated the financial advisors tasked assisting GovGuam in securing it. Under PUC's October 27, 2005 Order in Docket 05-9, GovGuam (*DPW*) must obtain PUC approval of the means (private or bond financing) by which it will obtain the funding necessary for Consent Decree compliance[8]. To date, GovGuam has not petitioned PUC to review and approve any financing for Consent Decree compliance. In addition, legislation must be enacted to authorize this financing. There is a

---

[4] See the Audit for recommendations to address these critical issues.

[5] In GovGuam's December 15, 2006 *Response to the United States' Concerns Raised in its Request for a Status Conference*, District Court of Guam Civil Case No. 02-22 *(Response)*at page 8, it has asserted that PUC's focus on the immediate need to resolve substantial deficiencies in SWM's billing and collection system and on the privatization of residential waste collection is distracting the Government from its ability to meet Consent Decree timelines. GCG respectfully disagrees. The recommendation to fix a non-functioning billing and collection system, with which the Government intends to repay over $90 million dollars of debt necessary for Decree compliance, is not a "distraction" but the only hope there is to provide for access to the capital markets to fund the necessary SO projects.

[6] This document can be reviewed at *guamlandfill.org*. Select public documents from public link menu.

[7] *See* Govguam's Response at pages 8 and 9.

[8]As with the other regulated utilities, PUC adopted a contract review protocol by Order dated 10/27/05, under which GovGuam (DPW?) must obtain PUC approval before undertaking procurement activities, including borrowing, in excess of $50,000. This Order is supported by a Stipulation dated 10/17/05, signed by authorized representatives of the Department of Public Works, the Attorney General of Guam and GCG. The reason for this regulatory review is that rate revenues will be expected to fund such procurements and the repayment of the financing. Accordingly, to protect the interests of ratepayers, PUC must determine that the financing alternative selected by the government is reasonable and prudent.

compelling need for the legislative and executive branches to join in a unified effort to promptly secure this financing.

2. In its May 2, 2006 letter to the 28[9] Guam Legislature[9], PUC expressed its serious concern whether the Department of Public Works, a GovGuam line agency, had adequate authority and resources to comply with the covenants and requirements of revenue bonds. PUC recommended that legislation be enacted to transform SWM into a public corporation under the oversight of the Consolidated Commission on Utilities. The Audit strongly supported this recommendation, which is also embodied in the Guam Environmental Protection Agency's 2006 Guam Integrated Solid Waste Management Plan. In its September 28, 2006 Order, PUC offered its assistance, upon request, to propose specific legislation, which is necessary to implement key Audit recommendations, including the transformation of SWM into a public corporation[10]. No such request has been received by PUC. It is essential that the legislative and executive branches join in an expedited collaborative effort to implement the Audit recommendations for remedial legislation. This legislation is indispensable to enable GovGuam to meet the financial obligations incident to Consent Decree compliance.

3. GCC recommends that PUC defer any further SWM rate proceedings until findings 1 and 2 above are addressed by the executive and legislative branches. SWM's current rate revenues are derived 41% from residential customers with the remainder coming from the tipping fees paid by commercial haulers and "self haul" customers. As is discussed later in this letter, SWM currently only collects 50% of its residential billings. GCG concludes that it would be manifestly unfair and unreasonable to increase the collection fees for the 50% of residential customers who actually pay for service[11], without first: a) fixing SWM's billing and collection system and b) privatizing island-wide residential collection service. GCG is encouraged by draft procurement documents, not yet filed for PUC review, by which GovGuam would procure services to implement a prepaid decal system to bill and collect for residential collection service and to privatize residential service. SWM should file a petition for PUC review of these procurements at the earliest possible date. The Audit also establishes that flawed legislation, under which commercial haulers serve as government agents for the collection of commercial tipping fees without any duty or authority to enforce collection, must be fixed before it would be reasonable to increase tipping fees. PUC's first SWM rate proceeding (October 2005) was grounded on the premise that rates needed to be gradually increased to prepare for the impact of revenue bonding. GCG submits that, in light of the GovGuam's reconsideration of its decision to pursue revenue bonding, further rate proceedings should await PUC's review and approval of the means of financing, which may have a substantial bearing on the level and timing of future rate increases.

4. PUC should continue to offer its support and cooperation to GovGuam in its efforts to comply with Consent Decree requirements. Subject to the GovGuam's commitment (either voluntarily or under judicial order) to promptly address findings 1 and 2 above, PUC should support

---

[9] *Attachment C.*

[10] *Attachment D* summarizes this proposed remedial legislation.

[11] Even with improved SWM collection rates, the audit estimated that residential rates would increase 220% and tipping would increase 380% to cover anticipated expenses related to a $90 million dollar bond issue and the implementation of required SO projects.

GovGuam's request in ongoing District Court enforcement proceedings that the timelines in the Consent Decree be reasonably amended.

We also observe that in contrast to the GWA Stipulated Order, PUC is not tasked by the DPW Consent Decree with reviewing and approving the Financial Plan, by which GovGuam will meet its duties under the Consent Decree. We recommend that PUC communicate to USEPA its availability to provide this service by PUC order in this proceeding.

This letter will now review in greater detail GCG's findings during its recent visit with SWM.

Detailed findings

1. Financing of Consent Decree compliance.

During our recent visit with SWM, a decision was made to defer filing an application for a rate increase that had tentatively been scheduled for hearing at the January 2007 Regulatory Session. One of the reasons for the requested deferral was that SWM informed us that bond financing of Consent Decree projects is not a certainty and that other options were now being evaluated. Bond financing was the basis of our previous recommendations to increase revenues. Alternative financing measures are being evaluated by SWM and any final decision would have to be reviewed and approved by the PUC for the costs and benefits. Prior to our receiving this information, we were not aware of any other alternatives under consideration. In fact, in the Landfill Financial Plan available on the website (www.guamlandfill.org) prepared by Duenas & Associates and Ernst & Young, LLP in October 2004, the following conclusion is reached:

It would appear that the preferred alternative for financing the sanitary landfill and costs associated with the closure of the Ordot dump would be the private activity bond. Assuming qualification of the bond issue and approval by the Guam Legislature, it would be anticipated that the bond issue can be accomplished within 90 to 120 days. As noted above, successful financing through the private activity bonds is dependent on the Governor of Guam and the Guam Legislature

We contacted SWM financial advisor and potential bond underwriter, UBS and Bank of America (BOA), to investigate whether they were aware of any alternative to bond financing that was under consideration. They indicated to us that they did not have any such information. Based on our analysis and our conversations with UBS and BOA we believe that any alternative to bond financing and project structure would have to show a net benefit over the following benefits that bond financing would offer:

- Benefits arising from the issuance providing tax free interest to investors
- Potential additional charges by the private investor to offset the risks of assuming a privatized structure
- Potential loss of control of operations assuming a privatized structure
- Potential request for a GovGuam guarantee of payment given SWM's poor history of billing and collection

- Potential delay in gearing up for an alternate project structure and means of financing[12]
- Potential consideration of the amount privately financed as being GovGuam debt in any financial evaluation

Given that all of the prior planning studies relied upon bond financing and the most recent advice of SWM financial advisors does not include evaluating private financing and changing fundamentally the structure of the project, we view this potential change of course as having a considerable risk for delay and not meeting an adequate cost-benefit threshold. Since we are unaware of the basis on which this alternative is being considered, we are unable to provide further analysis. SWM should be required to show why this change in course is prudent, upon whose advice it is being considered and whether and upon what basis it has the potential to meet a cost-benefit standard and overcome the concerns listed above.

We caution again that any plan will be subject to the fundamental reality that SWM must get into a position that those customers who are paying for service receive good service and those customers that do not pay for service are cut off from further service until payment is made. Our recommendations to accomplish this are contained in the Audit.

2. Financial update.

In this section we provide an update on various financial issues discussed in the prior Auditor in the prior rate proceeding.

a. Examination of Accounts Receivable

In our Audit Report to the PUC we highlighted what appeared to be a significant problem regarding collections not only from the residential customers, but from large commercial and other haulers. The following table provides an update of the level of receivables being carried by SWM and shows that this chronic problem remains:

---

[12] A substantial amount of work has already been completed assuming an initial revenue bond issue of $90 – 95 million.

Table 1
Accounts Receivable Gross

| Month Ending | Large Commercial | Other Commercial | Residential | TOTAL |
|---|---|---|---|---|
| September 30, 2005 | 3,255,241 | 222,761 | 6,305,891 | 9,783,893 |
| October 31, 2005 | 3,271,957 | 226,853 | 6,429,969 | 9,928,779 |
| November 30, 2005 | 3,099,224 | 230,819 | 6,605,100 | 9,935,143 |
| December 31, 2005 | 3,141,201 | 233,290 | 6,804,152 | 10,178,643 |
| January 31, 2006 | 3,076,025 | 237,605 | 7,004,435 | 10,318,065 |
| February 28, 2006 | 3,119,295 | 232,262 | 7,208,661 | 10,560,218 |
| March 31, 2006 | 3,177,542 | 234,567 | 7,420,362 | 10,832,471 |
| April 30, 2006 | 3,234,900 | 236,982 | 7,495,591 | 10,967,473 |
| May 31, 2006 | 3,216,904 | 236,527 | 7,454,734 | 10,908,165 |
| June 30, 2006 | 3,197,945 | 239,948 | 7,593,970 | 11,031,863 |
| July 31, 2006 | 3,128,425 | 241,448 | 7,577,267 | 10,947,141 |
| August 31, 2006 | 3,203,980 | 242,597 | 7,530,771 | 10,977,348 |
| September 30, 2006 | 3,287,960 | 260,760 | 7,677,862 | 11,226,582 |

We inquired of the Department of Administration (DOA) whether or not these amounts were collectible, especially from the large commercial and other commercial haulers.[13] DOA provided evidence that, according to its records, there was an allowance for bad debt of nearly $9 million against this amount – i.e. over 80% could have problems being collected. The gross balances equate to almost two year's worth of revenues, making collection of these amounts difficult if not impossible. Current annual revenues are slightly less than $6 million.

In addition to obtaining account information from DOA, we met with the Public Auditor (PA) during our visit. In the last report filed with the Commission, GCG suggested that the PUC and SWM contact the PA to have her review the commercial accounts. We discussed the collection problem with the PA and she agreed to consider use of her time and efforts for follow-up on the commercial accounts, particularly the large commercial accounts. SWM was to meet with her again to discuss the matter further, but we do not know whether or not this meeting has occurred.

---

[13] At the current time, DOA does the bookkeeping for SWM.

DOA indicated that of the $3.3 million of outstanding receivables for large commercial customers, $1.7 million were for receivables in excess of 120 days. With the Ordot landfill facility a necessary component of the private haulers to conduct their business, we do not understand why this receivable was allowed to reach this magnitude. The Ordot facility should have been closed to haulers with large outstanding receivables, or to those customers of the haulers that have not paid their bills, until some arrangement had been made to pay down the large balance.

DOA also provided a detailed schedule of the gross balance of accounts receivable during our on-site review. That schedule shows that within the large balance of AR in excess of 120 days is an amount of $1.3 million due from one provider, Commercial Sanitation Systems. It is our understanding that key employees of this commercial hauler have been indicted for fraud and bribery related to dumping at the Ordot facility. We are unclear as to whether the AG is seeking recovery of this amount from the hauler. SWM management was going to meet with the AG (at the suggestion of the PA), but we do not know at this time whether such meeting has occurred or if management has even made an appointment to meet with the AG.

b.      Results for Fiscal 2006 and Cash Balances

Attached to this testimony is an attachment (**Attachment E**) that contains two exhibits. The first exhibit shows the accrued revenues and the collection of those revenues for the year ending September 2006. As can be seen in the exhibit, the overall collection ratio was 80% of cash to accrued revenues. This is an improvement over the period when the PUC last adjusted rates (November 2005). The current rates were approved by the PUC using an assumption that SWM would collect about 96% of its commercial hauling revenues[14] and 70% of its residential revenues. While the Large Commercial collection ratio was about 96% on an actual basis (the level assumed by the PUC in setting rates), the residential collection ratio was only 50%, which is lower than the assumption used to set the current rates (albeit improved over prior periods) when the collection ratio was approximately 30%. This means that SWM would have less revenue than the PUC assumed in setting rates at a reasonable collection level. Even though the current level of residential collection has shown an improvement, it is still abysmal. No ongoing business could survive with a collection ratio of 50%. The inherent unfairness of requiring half of the customers to support the entire residential population should be obvious. This level of collection could not support bond financing – or any other form of financing.

The following table shows the "net" revenues achieved over the entire fiscal year 2006 and compares that with the net revenues assumed by the PUC when setting rates in November 2005 for FY 2006:

---

[14] Weight Average of Large and Other Commercial Haulers collection ratio.

Table 2
SWM Net Revenue
($000's)

|  | PUC Forecast | SWM Actual |
|---|---|---|
| Commercial Tipping Fees | $ 3,397 | $ 3,610 |
| Allowance For Bad Debt | (170) | (160) |
| Residential Hauling Fees | 2,495 | 2,765 |
| Allowance For Bad Debt | (748) | (1,382) |
| Self Hauling Fees | 733 | 266 |
| Total Revenues | $ 5,706 | $ 5,100 |

The shortfall between the PUC forecasted revenues for Fiscal 2006 and the actual SWM revenues for Fiscal 2006 can only be balanced by either a decrease in actual Fiscal 2006 expenditures or by transferring other funds in the general fund to the SWOF account. In other words, while SWM had budgeted expenses of $5.7 million based on expected revenues, only $5.1 million of expenses could have been funded with actual revenues. We were informed by DOA that during Fiscal 2006 SWM only expended approximately $4.7 million for operational expenses. That implies that SWM "under spent" its 2006 expense budget. We do not understand the reasons for this under spending, especially when the Director constantly indicates that he is short of resources.[15] SWM personnel indicate that there was "no variance" in the actual level of 2006 expenses compared to budget. We have not analyzed this conflict further. At the end of the fiscal year 2006, SWM had approximately $840 thousand of cash recognized on its balance sheet. This represents an increase over the Fiscal Year-end 2005 balance of cash of about $515 thousand or a net increase of $325 thousand on a cash basis.

SWM did comply with the PUC order and establish a bank account into which DOA would deposit and escrow funds, as ordered by the PUC in the last rate proceeding. This reserve or escrow account was set up in the Bank of Guam. We were provided a copy of the bank statement as of September 30, 2006 showing that this account had a balance of $575,657 on deposit. We have appended Exhibit 2 of *Attachment E* to this testimony. That exhibit shows that at the end of September 2006, DPW should have a total $716 thousand in reserve and not the $584 thousand. Therefore, DOA needs to transfer the difference $132 thousand to the account to complete the required deposits through September 2006. There was verbal acceptance of our proposed computation, but we still do not have an official acceptance.

c.      Residential Collection and Hauling

The PUC Order required that SWM accelerate the process that would lead to the privatization of residential collection and hauling for the entire island. This could make a profound difference in the entire residential participation in the billing and collection process. SWM was supposed to submit to the PUC by October 2006 a list of any additional required

---

[15] We also enquired of the director statements regarding to not having the budget to deal with the recent fire at the dump. We understand this statement to mean that the budget did not specifically allocate expenses for such an incident. As indicated later in this section SWM had cash balance to over $800,000 at the end of FY 2006.

resources that it would need to fully privatize this portion of SWM's business by July 2007. No request has been made. We assume that this means that no additional resources are required. We have recently received a nearly completed draft IFB for this project. The IFB will seek bidders for all of its proposed franchises ("Zones 1, 2 & 3). The bidder may select to bid on any one, two or all three Zones. The IFB is still in draft form and needs additional information to complete. The most significant missing piece of information is the estimate of the number of customers by Zone. This is the same informational hang-up that delays the Decal program proposal. SWM should file the IFB with the PUC before the January 2006 session for review and approval (assuming that the bid is completed).

3. Remedial legislation.

In this section we review issues that we believe require legal intervention.

a. Use of the SWOF by the General Fund

Our counsel informs us that a conflict exists between PL28-56 which gave the PUC regulatory authority to adjust rates and that required that the SWOF used for solid waste management operations and regulatory costs and PL28-150 establishing the budget for the General Fund. The concern centers on the failure of PL28-150 to include the SWOF in the list of special funds that are exempted from the Executive branch's "use and restore" powers.. We have included our Counsel's legal opinion regarding this matter in this report (*Attachment D*).

We believe that the failure to exempt the SWOF from use for purposes other than the uses stated in PL28-56 was an inadvertent omission by the Legislature rather than an implicit attempt to repeal PL28-56. Nonetheless, GCG believes that the Commission should approach the Legislature to amend PL28-150 to exempt the SWOF from uses other than SWM operations and regulatory expenses.

b. Other Legal Issues

There are other legal impediments that should also be addressed by the Legislature in an expedited fashion and if possible before the next rate increase is reviewed by the PUC. We have provided a brief summary of legislative changes as part of *Attachment D* as well our legal counsel's opinions regarding the Focused Management Audit Report that we issued in August 2006. In addition to those recommended changes we are informed by counsel that large portions of Chapter 51-Title 10 of the Guam Code Annotated were affected by the invalidation of PL24-272 by the Guam Supreme Court in Pangelinan and Wesley v. Gutierrez, 2004 Guam 16. The result is that Chapter 51 contains several gaps caused by having to delete each provision of Chapter 51 that was enacted into law by PL24-272 and not amended by subsequent legislation. In addition, there are numerous existing statutes that conflict with the plans developed by the Governor's Ordot Consent Decree Compliance Team. These plans include adopting a pre-paid decal program, creating an autonomous Solid Waste Management Authority under the auspices of the Consolidated Commission on Utilities, making commercial collectors responsible for the collection of tipping fees from their customers and floating revenue bonds to finance the tasks that are required pursuant to the Consent Decree in U.S. v. Government of Guam, District Court of Guam Case No. 02-00022. During our recent visit with SWM management, we inquired whether SWM or other members of the Consent Decree Team had created a list of proposed changes to Guam Code Annotated Title 10-Chapter 51 that would essentially make SWM an autonomous agency and permit

unencumbered management decisions regarding operations and cash management. We were informed that the parties had not yet proposed nor even drafted any such "cleansing" legislation.

If you wish to discuss any and all of the above, please do not hesitate to call.

Cordially,

Jamshed K. Madan

Cc:    Larry Perez, Director, DPW
        Jim Baldwin, Esq.

Attachment A
PUC Order Docket 06-02

BEFORE THE GUAM PUBLIC UTILITIES COMMISSION

FOCUSED MANAGEMENT AUDIT
OF DEPARTMENT OF PUBLIC
WORKS' SOLID WASTE MANAGEMENT          DOCKET 06-02
DIVISION

## ORDER

Public Law 28-56 authorizes and directs the Guam Public Utilities Commission
[PUC] to undertake a focus management audit of the existing operations of the
Department of Public Works' [DPW] Division of Solid Waste Management
[DSWM]. The law provides that the audit will be funded by the *Solid Waste
Operations Fund.*

In furtherance of this statutory duty, after review of the protocol used by PUC to
conduct management audits of Guam Power Authority, Guam Telephone
Authority and Guam Memorial Hospital Authority, for good cause shown and
on motion duly made, seconded and carried by the affirmative vote of the
undersigned commissioners, the Guam Public Utilities Commission HEREBY
ORDERS THAT:

1.  PUC's administrative law judge [ALJ] is authorized and directed to:

    a.  Conduct a competitive selection process for the procurement of a
        firm to perform the audit, using a request for proposal [RFP],
        which is crafted in consultation with the Committe created under
        subsection [b] below;

    b.  Organize and oversee the activities of a management audit
        committee [*Committee*], which shall be comprised of a DPW
        representative, ALJ as chair, and a representative from Georgetown
        Consulting Group; provided, however, that: I] DPW's failure to
        either appoint a Committee member or to attend Committee
        meetings, as scheduled by ALJ, shall not delay the Committee's
        business; and ii] the DPW representative shall be expected to have
        full authority to make recommendations on its behalf; and

    c.  After consulting with the Committee, make all decisions on behalf
        of the Committee as required herein and under the RFP, when a
        consensus among the Committee members is not reached.

2.  The Committee is authorized and directed to:

1

a. Review the proposals submitted in response to the RFP and establish an unranked list of the three best qualified offerors;

b. Interview the best qualified offers;

c. Rank the three offerors in order of their respective qualifications; and

d. Negotiate a contract with the best qualified offeror, in form as attached hereto, subject to such amendments as it may deem appropriate and necessary during the course of the negotiation, including the determination of the compensation which is deemed to be fair and reasonable, and thereafter to submit the negotiated contract to the PUC chairman for signature.

3. PUC authorizes and directs ALJ to under take the following:

a. In his capacity as Committee chairman, to oversee the audit as the duly authorized PUC representative with delegated authority to take such action as may be reasonably necessary or appropriate in furtherance thereof.

b. To keep PUC fully advised on the audit's progress and to submit the final audit report to PUC for review and approval.

4. DPW is ordered and directed to:

a. Pay for the auditor's fees and expenses from the Solid Waste Operations Fund in accordance with the contract terms and all other fees and expenses, which are incurred by PUC in this docket;

b. Provide the logistical and office support which the auditor may require during the course of the audit; and

c. Fully cooperate with the audit process under ALJ oversight.

Dated this 27th day of October 2005.

Terrence M. Brooks

Edward C. Crisostomo

Joseph M. McDonald

Rowena R. Perez

2

Attachment B
December 14, 2006 Letter From ALJ

# PUBLIC UTILITIES COMMISSION
## OF GUAM

Terrence M. Brooks

Edward C. Crisostomo
Filomena M. Cantoria
Joseph M. McDonald
Rowena E. Perez
Jeffrey C. Johnson

Suite 207, GCIC Building
Post Office Box 862
Hagatna, Guam 96932

Telephone: (671) 472-1907
Fax: (671) 472-1917
Email: info@gcampuc.com

Harry M. Boertzel
Administrative Law Judge

Lourdes R. Palomo
Administrator

December 14, 2006

**VIA ELECTRONIC TRANSMISSION**
Lawrence P. Perez, General Manager
Department of Public Works
542 North Marine Drive
Tamuning, Guam 96913

RE:     Docket 07-1 [SWM FY07 Rate Proceeding]

Dear Mr. Perez:

In response to your December 5, 2006 letter:

1.  I am canceling the DPW rate hearing previously scheduled for January 24, 2007. Enclosed is Georgetown's December 12, 2006 letter, which supports your request, with observations and reservations. The issue of when and under what circumstances the rate proceeding should be rescheduled will be reviewed by PUC during the January 2007 regulatory session. The Georgetown rate report, previously deadlined for December 27, 2007, will now focus instead on Mr. Margerison's findings during his recent Guam visit. Georgetown principal, Jim Madan, will present this report to PUC at a multi-purpose regulatory workshop, which will be held at 6:00 p.m. on January 23, 2007.

2.  Your request that PUC approve the omnibus RFP *concept* mentioned in your letter is premature. DPW is required under PUC's October 27, 2005 Docket 05-9 Order *[contract review protocol]* to file with PUC the detailed information described in section 4[b] of the Order, including the full text of the proposed RFP, in support of a petition for PUC review of a proposed procurement. The Order emphasizes that DPW must obtain PUC's approval *before the procurement process begins.* PUC awaits this long overdue filing from DPW so that Georgetown can be authorized to begin its review of the omnibus RFP.

1

3. A SWM regulatory conference has been scheduled for 2:00 p.m. January 18, 2006 at Suite 207 GCIC Building to review the status of DPW's efforts to prepare and submit for regulatory review: a] a petition for approval of financing for Consent Decree projects; and b] a petition for approval of the omnibus RFP discussed in paragraph 2 above.

4. In its September 28, 2006 Order [Docket 06-2] PUC emphasized the importance of privatizing residential collection for the entire island by July 2007. The Order required DPW to inform PUC not later than October 15, 2006 of the additional resources it would require to successfully meet this deadline. PUC has not received any filing from DPW in response to this order.

I look forward to meeting with you on January 18, 2007 to discuss the above matters. Please let me know if there is any regulatory assistance which PUC can provide in the interim.

With best wishes for a merry Christmas and successful New Year,

Harry M. Boertzel

cc: Jim Madan, Georgetown
Terrence Brooks, Esq.

Encl: Georgetown 12/12/06 letter

2

Attachment C
PUC Letter to Legislature

# PUBLIC UTILITIES COMMISSION
## OF GUAM

RECEIVED
DATE:

Terrence M. Brooks

Joseph M. McDonald
Edward C. Crisostomo
Rowena E. Perez

Suite 207, GCIC Building
Post Office Box 862
Hagatna, Guam 96932

Telephone: (671) 472-1907
Fax: (671) 472-1917
Email: info@guampuc.com

Harry M. Boertzel
Administrative Law Judge

Lourdes R. Palomo
Administrator

May 2, 2006

**VIA HAND DELIVERY**
The Honorable Joann Brown
Vice Speaker, 28th Guam Legislature
Chairman, Committee on Utilities and Land
155 Hesler Street
Hagåtña, Guam 96910

Dear Vice Speaker Brown:

During its recently concluded regulatory session, the Guam Public Utilities
Commission [PUC] reviewed and approved the five recommendations contained
in the enclosed April 20, 2006 report from Administrative Law Judge Boertzel.
The report summarizes the challenges, which must be resolved in order to secure
the financing necessary to enable the Government of Guam to comply with the
Federal Consent Decree.

The purpose of this letter is to share with you PUC's serious concern whether
Department of Public Works [DPW], a line agency, has adequate authority and
resources to comply with the covenants and requirements, which will be
imposed by the bond documents. It should be recalled that it took Guam
Waterworks Authority, under the Consolidated Commission on Utilities' [CCU]
governance and with a capable management team *[experienced general manager,
engineer, chief financial officer and legal counsel]* almost three years to prepare itself
for its first bond financing. DPW is being expected, without comparable
resources or lead time, to assume the same responsibilities. These realities
persuade PUC that the recommendation made in Guam Environmental
Protection Agency's 2005 *Guam Integrated Solid Waste Management Plan*, that solid
waste management be transferred to a public corporation under CCU's
oversight, should be given serious consideration.

PUC stands ready to work with the Guam Legislature as it considers the
legislation, which will be necessary to authorize the important revenue bond
financing discussed in this letter.

Respectfully,

Terrence Brooks
Chairman

Attachment D
Summary of Required Legislation
And Legal Memoranda

The following statutes and regulations that have identified as being problematic for the reason stated:

1.  10 GCA §51101 (enacted by invalidated statute);
2.  10 GAC §51102 (enacted by invalidated statute);
3.  10 GCA §51103(b) (enacted by invalidated statute);
4.  10 GCA §51103(c) (enacted by invalidated statute);
5.  10 GCA §51118(a) (DPW reference needs to be changed if autonomous agency created);
6.  10 GCA §51118(f) (control of Solid Waste Operating Fund);
7.  10 GCA §51118(h) (DPW reference needs to be changed if autonomous agency created);
8.  10 GCA §51118(h)(1) (GHURA low income housing criteria over-inclusive for use as residential tipping fee lifeline criteria);
9.  10 GCA §51118(l) (Governor's authority to suspend tipping fees after force majeure incompatible with pledge of revenues for revenue bond);
10. 29 GAR §2100 (enacted by invalidated statute);
11. 29 GAR §2101 (target date of January 1, 2001);
12. 29 GAR §2105(j) (billing after services provided with payment due 60 days thereafter);
13. 29 GAR §2105(m) (commercial haulers must be responsible for payment of tipping fees in order to avoid need for PUC oversight); and
14. 29 GAR §2105(n) (commercial haulers currently face no consequences if solid waste collected from customer delinquent in tipping fees is brought to landfill).

# MEMORANDUM

**TO:**        **GEORGETOWN CONSULTING GROUP**

**FROM:**    **JAMES F. BALDWIN, ESQ.**

**SUBJECT:** **EFFECT OF 2007 BUDGET BILL ON INTEGRITY OF SOLID WASTE OPERATING FUND**

**DATE:**      **JANUARY 5, 2007**

## ISSUE PRESENTED

Whether the government of Guam 2007 budget bill ("PL 28-150") adversely affects the integrity of the Solid Waste Operating Fund ("SWOF") and is in conflict with stated intention in PL 28-56 to limit the use of the SWOF to solid waste management operations and regulatory costs.

## ANALYSIS

Section 1(g)-Chapter IV of PL 28-150 provides two lump sum appropriations to the Department of Public Works ("DPW"), one of which appropriates $5,822,582[16] to the SWOF. Section 5-Chapter IV of this same public law provides:

> **Special Fund Transfer.** I Maga'lahen Guåhan is authorized to transfer to the General Fund any cash available from any Special Fund or Revolving Fund to fund the appropriations authorized in this Act, provided that such authority shall not extend to Trust Funds; the Historic Preservation Trust Fund; the Tourist Attraction Fund; the Customs, Agriculture and Quarantine Inspection Services Fund; the Healthy Futures Fund; the Wildlife Conservation Fund; Special Funds under the purview of the Guam Environmental Protection Agency; and funds under the purview and administration of I Liheslaturan Guåhan, the Judiciary, the Guam Memorial Hospital Authority, the Guam Public School System and those departments

---

[16] The level of the Fiscal 2007 budget for Solid Waste Management

and agencies exempted in this Act from the Governor of Guam's transfer authority.

All cash from Special Funds or Revolving Funds transferred to cover the appropriations authorized by this Act <u>shall be reimbursed to the Special or Revolving Fund from which it was transferred promptly as cash becomes available.</u>

*I Maga'lahen Guåhan* shall submit a report to the Speaker of *I Liheslaturan Guåhan* on the fifth (5th) day of every month on all transfers made pursuant to this Section. Said report shall include detailed information on the amount of such transfers and identify the fund from which the transfers were made and the purposes of the transfers.[emphasis added]

The SWOF is not among the various special funds specifically exempted from the Governor of Guam's transfer authority. As a result, the Governor of Guam may transfer funds from the SWOF and need only restore funds so transferred "as cash becomes available" in his sole discretion.

DPW has announced plans to pursue a revenue bond to fund the solid waste management projects required of the government of Guam pursuant to the Consent Decree in District Court of Guam Case No. 02-00022. Any such bond offering would need to be approved by the Guam Legislature. Since the legislation approving of the bond offering would presumably include authorization to pledge the revenue of the SWOF as the source of funds for repayment of the bond, this subsequent legislation would supersede the Governor of Guam's authority to borrow funds from the SWOF granted in PL28-150 since the funds would already be encumbered. Thus, the integrity of the SWOF would presumably be restored once this pledge of SWOF revenue is authorized by the Guam Legislature and effectuated by issuance of the revenue bond.

The key problem caused by granting the Governor of Guam an unrestricted ability to borrow funds from the SWOF is the effect it will have short-term ability of DPW to convince potential bidders for upcoming solid waste management projects (such as residential trash collection) that there will be sufficient funds available in the SWOF for payment of services rendered. Should DPW abandon or delay its bond borrowing plans, then these problems will extend beyond the short-term horizon because the legislation authorizing the pledge of

revenues that are required to be deposited in the SWOF will not have been enacted.

In simple terms, the Governor of Guam has the ability to remove cash from the SWOF and replace it with an IOU that only need be honored "as cash becomes available." Such an open-ended obligation is likely to cause great uncertainty among potential bidders as to whether the SWOF will have sufficient cash on deposit to pay their invoices should they be awarded contracts. If the potential bidders instead are convinced that the SWOF will soon have on deposit more open-ended IOUs from the Governor of Guam than cash and that vendors will need to wait for payment "as cash becomes available" in the Governor of Guam's sole discretion, these potential bidders are likely to increase their bid prices if they decide to bid at all.

The ability to borrow from the SWOF also undermines the October 27, 2005 PUC regulatory order restricting the use of the additional tipping fees authorized by this order to regulatory expenses and other uses authorized by subsequent PUC order, as these earmarked funds are also subject to the Governor of Guam's transfer authority notwithstanding the October 27, 2006 PUC order. If the Governor has the ability to withdraw funds that the PUC has ordered to be segregated and reserved for specific purposes authorized by PUC order, it makes it difficult for the PUC to enforce its orders concerning these segregated funds because there may not be cash on deposit for these necessary expenditures once they have been authorized by the PUC.

## CONCLUSION

Section 5-Chapter IV of PL 28-150 completely destroys the "lock box" concept for the SWOF that was set forth in Public Law 28-56. The reason is that this section permits the Governor of Guam to borrow funds on deposit in the SWOF, with the only requirement to repay said funds being the vague condition "as cash becomes available" in the Governor of Guam's sole discretion. This unfettered ability to tap into the SWOF for purposes other than solid waste management operations is likely to undermine the confidence of potential bidders in the upcoming Invitation for Bids for residential trash collection services. Section 5-Chapter IV of PL 28-150 would also permit the Governor of Guam to drain off the current balance of the escrow account established by the October 27, 2005 PUC order that was earmarked for the payment

of regulatory and other PUC approved expenses.  These problems can easily be solved by adding the SWOF to the list of special funds identified in Section 1(g)-Chapter IV of PL28-150 that are exempt from the Governor of Guam's transfer authority.

JFB

F\24931-95
G:\WORDDOC\DRAFT\JFB\07 01 05 GCG FOLLOW UP LETTER (WITH BSJ RED LINE EDITS).DOC
G:\WORDDOC\DRAFT\JFB\07 01 05 GCG FOLLOW UP LETTER (with BSJ red line edits).doc

ATTACHMENT E
Financial Analysis

Exhibit 1

| | Oct. 2005 | Nov. 2005 | Dec. 2005 | Jan. 2006 | Feb. 2006 | Mar. 2006 | Apr. 2006 | May. 2006 | June 2006 | July 2006 | Aug. 2006 | Sep. 2006 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| Commercial Billings | 241,820 | 308,089 | 307,260 | 287,564 | 278,315 | 317,952 | 302,555 | 313,645 | 289,435 | 289,650 | 310,570 | 342,955 | 3,609,790 |
| OCH Billings | 8,532 | 8,440 | 7,795 | 8,200 | 4,190 | 5,100 | 5,210 | 5,325 | 7,345 | 5,385 | 6,485 | 8,025 | 80,032 |
| Residential Billings | 187,384 | 231,954 | 232,146 | 234,360 | 234,778 | 235,270 | 233,740 | 234,092 | 234,364 | 234,806 | 235,746 | 236,622 | 2,765,262 |
| **Total Billed Revenue** | 437,736 | 548,463 | 547,201 | 540,124 | 517,283 | 558,322 | 541,505 | 553,062 | 541,144 | 529,841 | 552,801 | 587,602 | 6,455,084 |
| Self Haul Collections | | | | | | | | | | | | | |
| Ordot Landfill | 9,338 | 13,413 | 11,980 | 12,529 | 11,911 | 12,883 | 12,348 | 17,225 | 12,503 | 14,178 | 14,055 | 16,625 | 159,088 |
| Agat Transfer Station | 1,644 | 1,377 | 1,750 | 2,100 | 1,980 | 1,630 | 1,430 | 1,675 | 1,510 | 2,290 | 1,400 | 1,830 | 20,616 |
| Dededo Transfer Station | 4,108 | 6,123 | 6,140 | 6,995 | 5,270 | 5,230 | 4,828 | 5,740 | 5,640 | 6,270 | 5,885 | 5,935 | 68,174 |
| Malojoj Transfer Station | 1,224 | 1,298 | 1,720 | 1,855 | 1,270 | 1,440 | 1,260 | 1,720 | 1,390 | 1,950 | 1,695 | 1,545 | 18,367 |
| **Total Revenues** | 454,050 | 570,674 | 588,791 | 563,603 | 537,714 | 579,605 | 561,371 | 579,422 | 562,187 | 554,530 | 575,846 | 613,537 | 6,721,329 |
| Commercial Payments | 225,104 | 480,802 | 356,283 | 362,740 | 235,015 | 259,705 | 245,197 | 274,283 | 332,760 | 264,554 | 138,550 | 286,311 | 3,461,303 |
| OCH Payments | 4,440 | 4,474 | 5,324 | 3,885 | 5,336 | 9,633 | 2,795 | 3,340 | 3,924 | 9,755 | 3,595 | 5,830 | 62,331 |
| Residential Payments | 63,306 | 46,823 | 33,092 | 34,077 | 30,552 | 23,969 | 158,511 | 275,055 | 94,878 | 251,509 | 282,252 | 89,541 | 1,383,564 |
| Transfer Payments | 16,314 | 22,211 | 21,590 | 23,479 | 20,431 | 21,283 | 19,866 | 26,360 | 21,043 | 24,689 | 23,045 | 25,935 | 266,245 |
| **Total Collections** | 309,164 | 554,310 | 416,289 | 424,181 | 291,334 | 314,589 | 426,369 | 579,037 | 452,605 | 550,507 | 447,442 | 407,616 | 5,173,443 |
| Collection Success | | | | | | | | | | | | | |
| Commercial Haulers | 93.1% | 156.1% | 116.0% | 121.9% | 84.4% | 81.7% | 81.0% | 87.4% | 111.1% | 91.3% | 44.6% | 83.5% | 95.9% |
| Other Commercial Haulers | 52.0% | 53.0% | 68.3% | 47.4% | 127.4% | 188.9% | 53.6% | 62.7% | 53.4% | 181.2% | 55.4% | 72.6% | 77.9% |
| Residential Customers | 33.8% | 20.2% | 14.3% | 14.5% | 13.0% | 10.2% | 67.8% | 117.5% | 40.5% | 107.1% | 119.7% | 37.8% | 50.0% |
| Transfer Stations | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Total Collection | 70.6% | 101.1% | 76.1% | 78.5% | 56.3% | 56.3% | 78.7% | 104.7% | 83.6% | 103.9% | 80.9% | 69.4% | 80.1% |

Exhibit 2

| Customer Classification | Nov. 2005 | Dec. 2005 | Jan. 2006 | Feb. 2006 | Mar. 2006 | Apr. 2006 | May-06 | Jun. 2006 | Jul. 2006 | Aug. 2006 | Sept. 2006 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Payments** | | | | | | | | | | | | |
| CH - Payment | 480,802 | 356,283 | 362,740 | 235,015 | 259,705 | 245,197 | 274,283 | 332,760 | 264,554 | 138,550 | 286,311 | 3,236,199 |
| OC - Payment | 4,474 | 5,324 | 3,885 | 5,336 | 9,633 | 2,795 | 3,340 | 3,924 | 9,755 | 3,695 | 5,830 | 57,891 |
| Residential - Payment | 46,823 | 33,092 | 34,077 | 30,522 | 23,969 | 158,511 | 275,055 | 94,878 | 251,509 | 282,253 | 89,541 | 1,320,230 |
| Total Payments - CH/OC/Residential | 532,099 | 394,699 | 400,702 | 270,873 | 293,307 | 408,503 | 552,678 | 431,562 | 525,818 | 424,398 | 381,682 | 4,614,319 | 25% |
| **Payments adjusted to "old" rates** | | | | | | | | | | | | |
| Commercial Haulers | 384,642 | 285,026 | 290,192 | 188,012 | 207,764 | 196,158 | 219,426 | 266,208 | 211,643 | 110,840 | 229,049 | 2,588,959 |
| Other Commercial Haulers | 3,579 | 4,259 | 3,108 | 4,269 | 7,706 | 2,236 | 2,672 | 3,139 | 7,804 | 2,876 | 4,664 | 46,312 |
| Residential | 37,458 | 26,474 | 27,262 | 24,418 | 19,175 | 126,809 | 220,044 | 75,902 | 201,207 | 225,802 | 71,633 | 1,056,184 |
| Total Payments - CH/OC/R/Old Rates | 425,679 | 315,759 | 320,561 | 216,698 | 234,646 | 325,202 | 442,142 | 345,250 | 420,654 | 339,518 | 305,346 | 3,691,456 | 25% |
| **Uncomp/Cash Transactions** | | | | | | | | | | | | |
| Uncompacted (Ordot - 34166100S) | 13,413 | 11,960 | 12,529 | 11,911 | 12,983 | 12,348 | 17,225 | 12,503 | 14,179 | 14,055 | 16,625 | 149,729 |
| **Cash Collection - Transfer Stations:** | | | | | | | | | | | | |
| Agat (341661005) | 1,377 | 1,750 | 2,100 | 1,980 | 1,630 | 1,430 | 1,675 | 1,510 | 2,290 | 1,400 | 1,830 | 18,972 |
| Dededo (341661008) | 6,123 | 6,140 | 6,995 | 5,270 | 5,230 | 5,923 | 5,740 | 5,640 | 6,270 | 5,895 | 5,935 | 65,161 |
| Malojloj (341661008) | 1,298 | 1,720 | 1,855 | 1,270 | 1,440 | 1,260 | 1,720 | 1,390 | 1,950 | 1,695 | 1,545 | 17,143 |
| Total Ordot/Transfer Stations | 22,211 | 21,570 | 23,479 | 20,431 | 21,283 | 20,960 | 26,360 | 21,043 | 24,689 | 23,045 | 25,935 | 251,005 |
| Total Ordot/Transfer @ old rates | 17,769 | 17,256 | 18,783 | 16,345 | 17,026 | 16,788 | 21,088 | 16,834 | 19,751 | 18,436 | 20,748 | 200,804 | 25% |
| **Percent of Payments with Increase** | | | | | | | | | | | | |
| CH - Payment | 0.0% | 0.0% | 33.3% | 66.7% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |
| OC - Payment | 0.0% | 0.0% | 33.3% | 66.7% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |
| Residential - Payment | 0.0% | 0.0% | 33.3% | 66.7% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |
| Ordot/Transfer Stations | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | |
| **PUC Escrow** | | | | | | | | | | | | |
| CH - Payment | 0 | 0 | 24,183 | 31,335 | 51,941 | 49,039 | 54,857 | 66,552 | 52,911 | 27,710 | 57,262 | 415,790 |
| OC - Payment | 0 | 0 | 259 | 711 | 1,927 | 559 | 668 | 785 | 1,951 | 719 | 1,166 | 8,745 |
| Residential - Payment | 0 | 0 | 2,272 | 4,070 | 4,794 | 31,702 | 55,011 | 18,976 | 50,302 | 56,451 | 17,908 | 241,485 |
| Ordot/Transfer Stations | 4,442 | 4,314 | 4,696 | 4,086 | 4,257 | 4,192 | 5,272 | 4,209 | 4,938 | 4,609 | 5,187 | 50,201 |
| Total Escrow (25% Increase) | 4,443 | 4,315 | 31,411 | 40,205 | 62,921 | 85,496 | 115,810 | 90,524 | 110,104 | 89,492 | 81,526 | 716,220 |

Total Escrow @ 9/30/06    $ 584,832    *Includes Interest*




RECEIVED
SEP 2 8 2006
Public Utilities Commission
of Guam

**BEFORE THE GUAM PUBLIC UTILITIES COMMISSION**

FOCUSED MANAGEMENT AUDIT
OF DEPARTMENT OF PUBLIC
WORKS' SOLID WASTE MANAGEMENT      **DOCKET 06-2**
DIVISION BILLING AND COLLECTION
SYSTEM

## ORDER

In response to its administrative law judge's [ALJ] April 20, 2006 memorandum
[*Attachment A*], the Guam Public Utilities Commission [PUC] at its April 20, 2006
meeting directed ALJ to oversee a focused management audit by Georgetown
Consulting Group [GCG] of the Department of Public Works' [DPW] solid waste
management's [SWM] billing and collection practices and the Department of
Administration's restricted account management. On August 18, 2006, GCG
filed its audit report [*Attachment B*] with PUC. On September 21, 2006 GCG
presented its report to PUC at a workshop.

After careful review of the GCG audit report and the record herein, including
comments from DPW, for good cause shown and on motion duly made,
seconded and carried by the undersigned commissioners, the Guam Public
Utilities Commission **HEREBY FINDS AND ORDERS THAT:**

1. The audit report presents compelling and convincing evidence that DPW
   is not prepared to assume the financial responsibilities, which would be
   imposed upon it by the proposed $90 million dollar revenue bonds
   financing, which is necessary to fund the Government of Guam's
   compliance with the Federal Consent Decree[1].

2. DPW does not have adequate resources [*management, staff, financial, legal,
   engineering and systems*] to implement the audit recommendations in a
   timely manner.

3. Accordingly, it is critical that the legislation recommended in the audit
   report be implemented *concurrently* with any legislative authorization for
   the Government to proceed with the revenue bond financing - *paramount
   of which is the recommendation that SWM be reconstituted as a public
   corporation under the governance of the Consolidated Commission on Utilities.*
   PUC respectfully cautions the Government of Guam, in furtherance of its
   May 2, 2006 letter to Vice Speaker Brown [*Attachment C*] that without

---

[1] Consent Decree dated February 11, 2004 in *USA v. Government of Guam*, District Court Civil Case
02-22.

1

these legislative reforms, PUC has material concern over DPW's ability to collect, deposit, account for and properly expend the *just and reasonable* rate revenues awarded by PUC in a manner which will enable DPW and the Government of Guam to comply with its proposed bond covenants.

4. PUC stands ready, upon request, to propose specific legislation to implement the audit recommendations.

5. In the interim, PUC is committed to do its part in implementing those audit recommendations, which are within its power to address. Accordingly, the following regulatory activities shall be commenced under ALJ's oversight:

   a. In anticipation of the revenue requirements, which would be imposed on DPW by the revenue bond financing, DPW has requested GCG's assistance in preparing a petition for FY07 rate relief for PUC consideration during the January 2007 regulatory session. ALJ is authorized and directed to oversee the preparation of this petition by GCG in collaboration with DPW. As part of this rate proceeding, GCG shall: i] propose a residential lifeline rate, a variable residential rate and a prepaid decal system for residential service; ii] propose necessary amendments to SWM's service rules; and iii] examine and make recommendations regarding SWM's $10 million dollar accounts receivable.

   b. PUC is encouraged by DPW's acceleration of the timeline for outsourcing the collection of residential waste for the entire island not later than July 2007. On or before October 15, 2006, DPW shall inform PUC of the additional resources, which it will require to successfully meet this deadline. DPW's progress under the timeline will be examined during the January 2007 rate proceeding.

6. PUC stands ready to issue necessary regulatory orders, which will be required to secure revenue bond financing; subject to its strong reservation that without the concurrent legislation recommended above, it is questionable whether DPW and the Government of Guam will be able to meet the requirements of the bond covenants.

7. Except as provided herein, the deadlines for action recommended in the audit report will be suspended pending further consideration during the January 2007 regulatory session.

2

8. A copy of this Order shall be transmitted to the Speaker of the 28th Guam Legislature, to the Governor of Guam, to the Department of Public Works and to the Consolidated Commission on Utilities.

Dated this 28th day of September 2006.

_____
Terrence M. Brooks

_____
Edward C. Crisostomo

_____
Rowena E. Perez

_____
Joseph M. McDonald

_____
Filomena M. Cantoria

_____
Jeffrey C. Johnson

3

# PUBLIC UTILITIES COMMISSION
## OF GUAM

Terrence M. Brooks

Joseph M. McDonald
Edward C. Crisostomo
Rowena E. Perez

Suite 207, GCIC Building
Post Office Box 862
Hagatna, Guam 96932

Telephone: (671) 472-1907
Fax: (671) 472-1917
Email: info@guampuc.com

Harry M. Boertzel
Administrative Law Judge

Lourdes R. Palomo
Administrator

May 2, 2006

**VIA HAND DELIVERY**
The Honorable Joann Brown
Vice Speaker, 28th Guam Legislature
Chairman, Committee on Utilities and Land
155 Hesler Street
Hagåtña, Guam 96910

Dear Vice Speaker Brown:

During its recently concluded regulatory session, the Guam Public Utilities Commission [PUC] reviewed and approved the five recommendations contained in the enclosed April 20, 2006 report from Administrative Law Judge Boertzel. The report summarizes the challenges, which must be resolved in order to secure the financing necessary to enable the Government of Guam to comply with the Federal Consent Decree.

The purpose of this letter is to share with you PUC's serious concern whether Department of Public Works [DPW], a line agency, has adequate authority and resources to comply with the covenants and requirements, which will be imposed by the bond documents. It should be recalled that it took Guam Waterworks Authority, under the Consolidated Commission on Utilities' [CCU] governance and with a capable management team *[experienced general manager, engineer, chief financial officer and legal counsel]* almost three years to prepare itself for its first bond financing. DPW is being expected, without comparable resources or lead time, to assume the same responsibilities. These realities persuade PUC that the recommendation made in Guam Environmental Protection Agency's 2005 *Guam Integrated Solid Waste Management Plan,* that solid waste management be transferred to a public corporation under CCU's oversight, should be given serious consideration.

PUC stands ready to work with the Guam Legislature as it considers the legislation, which will be necessary to authorize the important revenue bond financing discussed in this letter.

Respectfully,

Terrence Brooks
Chairman

*Memorandum*

| | |
|---|---|
| To: | Commissioners |
| From: | ALJ Boertzel |
| Date: | April 20, 2006 |

RE:　　　　Docket 05-9 [Department of Public Works [DPW] – Revenue Bonds]

*Overview*

Under a schedule driven by the Federal Consent Decree, the government of Guam and its financial consultants are working under a May 2006 deadline to secure $90 million dollars in revenue bond financing to fund the capital requirements for the Ordot landfill closure, the construction of the new landfill and associated costs.

As the repayment of these bonds will be funded through DPW rates, financial consultants emphasize the importance of a strong PUC commitment to approve such rates increases [estimated at 400% over current rates within the next 26 months] to enable DPW to meet its bond obligations.

PUC customarily issues two orders in support of utility bond financing: a] an order drafted by bond counsel, which provides formal approval of the transaction terms and conditions and a regulatory commitment to provide adequate rates to fund bond commitments; and b] an order which approves and establishes regulatory oversight over the use of bond proceeds.

*Challenges*

The fact that DPW is a line agency of the Executive Branch creates significant regulatory challenges, which PUC does not encounter in regulating GPA and GWA, which are autonomous public corporations. These challenges have come into sharp focus during this April regulatory session as a result of consultations with DPW's financial advisor and management. DPW does not have the power to contract and its revenues are held under the Department of Administration's [DOA] custody. These challenges are reflected in the following facts:

1. On December 20, 2005 PUC gave its regulatory approval for DPW to employ a procurement advisor to craft the documentation for the privatization of the Ordot closure, the construction and operation of the new landfill and for the privatization of residential trash collection. The contract, which also requires the Attorney General's approval, has sat in

1

the AG's office since early February. As a result, DPW has no resources to move forward with procurements mandated by the Consent Decree and is incurring fines as a result.

2. On October 27, 2005, PUC awarded DPW a 25% rate increase, effective for services rendered after November 1, 2005. DPW has still not implemented this increase for its residential customers. The rate order is enclosed as *Attachment A.*

3. The October rate order was premised on DPW's assurance that it would improve its collection rate to 95% for commercial customers and 70% for residential customers. DPW has failed to meet this assurance – its current collection rate is at 30%. As a result, there will be a substantial FY06 revenue shortfall.

4. The October rate order mandated that all revenue created by the rate increase shall be deposited into a restricted DOA account, which could not be withdrawn without PUC approval. Georgetown estimates that the current balance in the restricted account *[even excluding the residential rate increase]* should be in the range of $400,000. DOA has reported that it currently has only $47,000 on deposit in the restricted account. The government's financial advisor recommends that the bond covenants mandate that a "locked box" be created under the Trustee's custody for all rate revenues. PUC should strongly support this recommendation, with the condition that the Trustee observe PUC orders, which restrict the use of funds and establish reporting requirements. *Attachment B* is a presentation by the advisor *[Municipal Services Group]* regarding the challenges of marketing the DPW revenue bonds.

5. As PUC's rate authority is derived from statute, it is essential that the legislation, which approves this financing include a covenant from the Legislative and Executive branches that they will not take any action, which would impair PUC's independent rate making authority. Similar covenants have been provided in GPA and GWA bond financing legislation.

6. DPW is not in compliance with Guam law, which mandated that 2 of 3 residential collection districts be privatized by October 2002. No residential collection has yet been privatized. As a result, residential customers receive poor service and are unlikely to favorably receive the reality of a 400% rate increase over the next 26 months unless service is dramatically improved. In its December 20, 2005 Order *[Attachment C]*, PUC directed DPW to prioritize the privatization of residential trash

2

collection. As discussed in paragraph 1 above, this effort has been obstructed by DPW's inability to employ a procurement advisor.

## Recommendations

PUC has a dual responsibility in regulating DPW's rates: a] the obligation to provide adequate rate revenues to enable DPW to meet its financial obligations; and b] the obligation to assure that DPW's customers pay *just and reasonable* rates for reliable, quality service. Unless the above challenges are resolved, these dual responsibilities will likely put PUC on the proverbial *horns of a dilemma*. I offer the following recommendations to address this dilemma:

1. PUC should make it clear that it will not make bond rate commitments unless DPW is empowered to employ a procurement advisor, which must occur before residential service can be improved through privatization.

2. Bond counsel, who will be crafting the legislation, which authorizes the bond financing, should be requested to include a covenant to protect PUC's independent rate making authority.

3. PUC should support a *"locked box"* bond covenant.

4. PUC should immediately initiate a focused audit by Georgetown of DPW's billing and collection practices and DOA restricted account management, which would be ready for regulatory review and implementation at the next regulatory session.

5. PUC should support the recommendation made in Guam Environmental Protection Agency's *2006 Integrated Solid Waste Management Plan* that solid waste management be transferred to a public corporation under the oversight of the Consolidated Commission on Utilities.

I recommend that PUC adopt these recommendations by resolution, which authorizes me, in consultation with Chairman Brooks, to implement them.

3

BEFORE THE GUAM PUBLIC UTILTIES COMMISSION

DEPARTMENT OF PUBLIC WORKS
ESTABLISHMENT OF TIPPING AND
USER FEES PURSUANT TO P.L. 28-56 · DOCKET 05-09



RECEIVED
OCT 2 7 2005
Public Utilities Commission
of Guam

## RATE ORDER

Public Law 28-56 directs the Guam Public Utilities Commission *[PUC]* to establish commercial, government and residential tipping and user fees to fund the activities of the Department of Public Works' *[DPW]* Division of Solid Waste Management *[DSWM]* in discharging its statutory duties and those imposed by Federal District Court of Guam Consent Decree *[Consent Decree]* in Civil Case No. 02-22.

On September 20, 2005 Georgetown Consulting Group *[GCG - PUC's regulatory consultant]* issued a Report, which recommends the following *interim* service fee increases:

| Service Fee | Current | Proposed [Interim] |
|---|---|---|
| Residential pick-up | $8 per month | $10 per month |
| Tipping fee [compacted] | $16/cubic yd. | $20/cy |
| Tipping fee [uncompacted] | $4/cy | $5/cy |
| Self drop [under 3 cy] | $2/pickup | $2.50/pickup |
| Self drop [over 3 cy] | $4/cy | $5/cy |

On October 17, 2005, GCG and DPW entered into a stipulation, which recommends that:

1. PUC adopt the above proposed fees as a first step toward volume and cost based rates.

2. The GCG report should be found to satisfy the requirement in 10 GCA 51118[e] that fees be based on an actuarial cost of service analysis.

3. The additional revenues created by the proposed fee increases, which are estimated to be $1.3 million in FY06 *[net of uncollectible allowance]*, should be restricted and spent only pursuant to PUC order.

4. PUC should await the management audit required under 10 GCA 51118[e] before establishing a variable residential tipping fee.

**ATTACHMENT A** 1

5. A targeted residential lifeline tipping fee should be established with other permanent fees during the April 2006 regulatory session.

6. DPW should provide PUC with quarterly reports, commencing with quarter beginning October 2005, on DSWM's revenues and expenses, including income statements and balance sheets. Reports should be filed within 21 days after the close of each quarter *[the first report due January 21, 2006]*.

7. PUC should conduct a quarterly review of DPW's compliance with this rate order and of the adequacy of the proposed interim rates.

8. PUC should immediately undertake the focused management audit of DSWM operations as required by 10 GCA 51118[e].

9. Any DPW procurement or obligation relating to DSWM in excess of $50,000 should require PUC's prior review and approval. The contract review protocol, which PUC established to regulate the procurements of Guam Power Authority and Guam Waterworks Authority should be adopted as the review protocol for these procurements and obligations.

PUC conducted a public workshop at 6:00 p.m. on October 17, 2005 to receive a briefing on the GCG report and the Stipulation. In addition, PUC conducted public rate hearings at 6:00 p.m. October 25, 2005 in Hagatna, at 5:00 p.m. October 26, 2005 in Agat and at 6:30 p.m. October 26, 2005 in Dededo on the proposed interim fee increases.

After due consideration of the record in this docket, including public comments regarding the proposed interim fee increases, for good cause shown and on motion duly made, seconded and carried by the affirmative vote of the undersigned commissioners, the Guam Public Utilities Commission **HEREBY FINDS AND ORDERS THAT:**

1. DPW, including DSWM, is subject to PUC jurisdiction pursuant to 10 GCA 51118[e].

2. The stipulated recommendations from GCG and DPW, as discussed above, should be and are hereby adopted. DPW is ordered to comply with the recommendations, subject to instructions from PUC's administrative law judge *[ALJ]*.

2

3. The proposed interim fee increases are hereby approved for services rendered on and after November 1, 2005. PUC recognizes that this is but the first of a series of rate increases, which will be necessary to support the $93 million borrowing required to enable DPW to comply with the Consent Decree. The GCG Report satisfies the requirement in 10 GCA 51118[e] that fees shall be based on an actuarial cost of service analysis.

4. Under separate order, ALJ will be authorized to oversee the focused management audit of DSWM's existing operations.

5. The contract review protocol, in form attached hereto, shall govern the regulatory review of DSWM procurements and obligations.

6. ALJ is hereby authorized and directed to oversee regulatory proceedings, which will lead to PUC's consideration of a variable residential rate, including a lifeline component, and of the implementation of permanent fees.

7. PUC emphasizes that the revenue created by the interim fee increases shall be restricted funds and shall not be spent without prior PUC authorization.

Dated this 27th day of October 2005.

_____                 _____
Terrence M. Brooks                               Joseph M. McDonald

_____                 _____
Edward C. Crisostomo                             Rowena E. Perez

3



# Municipal Securities Group

*Presentation to Guam PUC*

# Guam Department of Public Works



**April 2006**

 **UBS** Investment Bank

UBS Investment Bank is a business group of UBS AG.
UBS Securities LLC is a subsidiary of UBS AG.

ATTACHMENT B

## Guam Department of Public Works

## Current Situation

- Need to finance approximately $90 million* through the capital markets:
  - Closure costs for Ordot
  - Construction of the new Municipal Solid Waste Landfill
  - Two years of Capitalized Interest
  - Costs of Issuance
  - Debt Service Reserve Fund

- Driven by EPA consent decree

- Funds needed by May to avoid further fines

* Preliminary, subject to change.

**UBS** Investment Bank

## Challenges Faced by DPW for Proposed Financing

■ Landfill financings are challenging credits from investors perspective

— The Government's credit situation also impacts market acceptance

■ Tipping-fee backed revenue bond financing appears to be only feasible means of providing bond security in current political environment

— No broader excise tax possible

— No real property lien for security

■ Residential Collection rates have been poor relative to other comparable municipal solid waste enterprises

■ Tipping fees must be increased dramatically just to cover operating expenses and projected debt service

■ Continuity and timing of required rate increases are unknown

■ In addition, bond investors typically require additional coverage to be structured to provide adequate bondholder security (e.g. 1.25x coverage)

⚜ UBS Investment Bank

**Guam Department of Public Works**

# Residential Collection System Goals

■ Provide curbside pickup service for those paying for service

■ Easily identify those entitled to the service

■ Reliably bill and collect from recipients of service

■ Create stable and predictable revenue stream

3

**UBS** Investment Bank



## Charlottesville, VA Example

- Charlottesville residents have two options for trash disposal

  — Individual trash stickers

  — Annual trash decals

- Individual trash stickers can be purchased at grocery and convenience stores; annual decals must be purchased at City Hall

| Benefits | Risks |
|---|---|
| — Increased administrative efficiency | — Lack of History |
| — Predictable revenue stream | — Waste Diversion |
| — Equitable | — Counterfeiting |
| — Payment of services prior to service (reliability) | |

4

UBS Investment Bank

# Structure and Security Considerations for Proposed Financing

- **Coverage**
  - 1.75x PUC target
  - 1.25x rate covenant

- **Determine the necessary amount of capitalized interest**

- **What level of rate increases are necessary to support the proposed debt?**
  - How will this vary based on collection improvement?

- **Gross Revenue versus Net Revenue pledge**

- **"Lock Box" structure (revenues as received directed immediately to the trustee)**

- **Cash flow considerations (as related to 1.75x coverage target)**

5

UBS Investment Bank

# Cash Flow Observations

■ The Department's current financial projections indicate <u>significant</u> rate increases will be necessary to support new debt service and coverage

■ Currently only 31% of billed residential charges are collected from customers

■ Improving collections will minimize the required rate increases

■ Even if relatively low interest rates are achieved, the Department will need large rate increases

■ Improving the residential collection rate is very important

**UBS** Investment Bank

# Guam Department of Public Works

## Cash Flow Scenario #1

### 6.50% Interest Rate Assumption

**Guam Department of Public Works**
**Preliminary Cashflow Statement (Fiscal Year Ending September 30th)**

| | FY 2002* | FY 2003* | FY 2004* | FY 2005 (Annual) | FY 2006 (Proj.) | FY 2007 (Proj.) | FY 2008 (Proj.) | FY 2009 (Proj.) | FY 2010 (Proj.) | FY 2011 (Proj.) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses:** | | | | | | | | | | |
| **O&M[1]** | | | | | | | | | | |
| Salary - Residential Collection[1] | $ - | $ - | $ - | $ - | $ 1,994,252 | $ 2,074,023 | $ 2,156,983 | $ 2,243,263 | $ 2,332,993 | $ 2,426,313 |
| Salary - Other Landfill[1] | - | - | - | - | 653,628 | 679,774 | 706,965 | 735,243 | 764,653 | 795,239 |
| Salary - Other[1] | - | - | - | - | 1,215,651 | 1,264,271 | 1,314,848 | 1,367,442 | 1,422,140 | 1,479,025 |
| Other Expenditures[2][3] | - | - | - | - | 1,566,880 | 1,629,555 | 1,694,737 | 1,762,527 | 1,833,028 | 1,906,349 |
| O&M New MSWLF[3] | | | | | | | 2,382,764 | 2,418,506 | 2,553,487 | 2,643,287 |
| Recycling and PUC Costs[4] | | | | | | | | | | |
| Projected Debt Service @ 6.5%[5] | | | | | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 |
| | | | | | | | | | 9,127,575 | 9,130,763 | 9,129,000 |
| **Total Expenditures** | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $5,798,412 | $6,015,628 | $8,624,298 | $18,022,556 | $18,405,064 | $18,747,214 |
| Revenue Requirement for 1.25x Coverage | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $5,798,412 | $6,015,628 | $8,624,298 | $20,304,450 | $20,687,794 | $21,028,464 |
| Revenue Requirement for 1.75x Coverage | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $5,798,412 | $6,015,628 | $8,624,298 | $24,866,237 | $25,253,136 | $25,593,964 |
| **Revenues:** | | | | | | | | | | |
| Commercial Collections | $2,425,362 | $2,605,554 | $2,853,587 | $3,181,296 | 2,876,640 | 2,991,706 | 3,111,374 | 3,235,829 | 3,365,262 | 3,499,872 |
| CCU Collections | 36,831 | 39,849 | 50,469 | 85,087 | 55,120 | 57,325 | 59,618 | 62,003 | 64,483 | 67,062 |
| Residential Collections | 691,575 | 608,286 | 477,978 | 611,242 | 620,080 | 645,715 | 671,544 | 698,406 | 726,342 | 755,395 |
| Other Collections | 485,676 | 648,599 | 774,069 | 758,053 | 693,680 | 721,427 | 750,284 | 780,295 | 811,507 | 843,968 |
| **Total Available Revenues** | $3,639,444 | $3,902,288 | $4,156,103 | $4,635,678 | $4,246,320 | $4,416,173 | $4,592,920 | $4,776,533 | $4,967,594 | $5,166,298 |
| Debt Service Coverage[3] | | | | | | | | (0.49x) | (0.47x) | (0.49x) |
| Debt Service Coverage w/100% Collections[6] | | | | | | | | (0.20x) | (0.21x) | (0.22x) |

Note: Projected revenues are calculated based on 4% escalation annually using the averages from FY 2002-2005.
(1) Based on Georgetown reports from Exhibit 2-4 dated 6/29/2005 which assume projections increased 4% annually using FY 2005 as base year. Operation figures of new landfill, recycling and PUC admin are estimates from DPW
(2) Other expenditures include travel, contractual services, supplies/materials, utilities (i.e. power, water & telephone), and capital outlays.
(3) TG Engineering study dated 6/16/05 public own/private operate scenario.
(4) Recycling at $218k, PUC at $160k estimates per DPW.
(5) Based on an estimated 20-year level debt service financing (for initial investment) and 15-year level debt service (for cell construction costs) with assumed interest rate of 6.5% and two-years of capitalized interest plus a debt service reserve fund. Bond sizing based on proceeds in HDR report dated 4/2005 consisting of $28.8mm in initial investments and first three years of cell construction ($17.9mm, $11.9mm and $12.5mm) totaling $68.9mm.
(6) Equals Net Revenues (Revenues less O&M) divided by debt service. When negative (as shown in red) that means Net Revenues are negative.



**UBS** Investment Bank

7

# Guam Department of Public Works

## Cash Flow Scenario #2

### 7.0% Interest Rate Assumption

**Guam Department of Public Works**
**Preliminary Cashflow Statement (Fiscal Year Ending September 30th)**

| | FY 2002* | FY 2003* | FY 2004* | FY 2006 (Annual) | FY 2006 (Proj.) | FY 2007 (Proj.) | FY 2008 (Proj.) | FY 2009 (Proj.) | FY 2010 (Proj.) | FY 2011 (Proj.) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses:** | | | | | | | | | | |
| O&M[1] | | | | | | | | | | |
| Salary - Residential Collection[1] | $ - | $ - | $ - | $ - | $ 1,994,252 | $ 2,074,023 | $ 2,156,983 | $ 2,243,263 | $ 2,332,993 | $ 2,426,313 |
| Salary - Ordot Landfill[1] | - | - | - | - | 653,628 | 679,774 | 706,965 | 735,243 | 764,653 | 795,239 |
| Salary - Other[1] | - | - | - | - | 1,215,651 | 1,264,277 | 1,314,848 | 1,367,442 | 1,422,140 | 1,479,025 |
| Other Expenditures[1][2] | - | - | - | - | 1,566,880 | 1,629,555 | 1,694,737 | 1,762,527 | 1,833,028 | 1,906,349 |
| O&M New MSWLF[3] | | | | | | | 2,382,764 | 2,418,506 | 2,553,487 | 2,643,287 |
| Recycling and PUC Costs[4] | | | | | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 |
| Projected Debt Service @ 7.0%[5] | | | | | | | | 9,582,875 | 9,585,300 | 9,585,750 |
| **Total Expenditures** | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $18,477,856 | $18,859,601 | $119,203,964 |
| | | | | | | | | | | |
| Revenue Requirement for 1.25x Coverage | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $20,873,975 | $21,255,926 | $21,600,401 |
| Revenue Requirement for 1.75x Coverage | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $25,665,012 | $25,048,576 | $26,393,276 |
| | | | | | | | | | | |
| **Revenues:** | | | | | | | | | | |
| Commercial Collections | $ 2,425,362 | $ 2,605,554 | $ 2,853,587 | $ 3,181,296 | 2,876,640 | 2,991,706 | 3,111,374 | 3,235,829 | 3,365,262 | 3,499,872 |
| OCH Collections | 36,831 | 39,849 | 50,469 | 85,087 | 55,120 | 57,325 | 59,618 | 62,003 | 64,483 | 67,062 |
| Residential Collections | 691,575 | 608,286 | 477,978 | 611,242 | 620,880 | 645,715 | 671,544 | 698,406 | 726,342 | 755,395 |
| Other Collections | 485,676 | 648,599 | 774,069 | 758,053 | 693,680 | 721,427 | 750,284 | 780,295 | 811,507 | 843,958 |
| **Total Available Revenues** | $3,639,444 | $3,902,288 | $4,156,103 | $4,635,678 | $ 4,246,320 | $ 4,416,173 | $ 4,592,820 | $ 4,776,533 | $ 4,967,594 | $ 5,166,298 |
| | | | | | | | | | | |
| Debt Service Coverage[6] | | | | | | | (0.48x) | (0.48x) | (0.45x) | (0.46x) |
| | | | | | | | | | | |
| Debt Service Coverage w/100% Collections | | | | | | | (0.19x) | (0.19x) | (0.20x) | (0.21x) |

Note: Projected revenues are calculated based on 4% escalation annually using the averages from FY 2002-2005.
(1) Based on Georgeform reports from Exhibit 2-4 dated 8/24/2005 which assume projections increased 4% annually using FY 2005 as base year. Operation figures of new landfill, recycling and PUC admin are estimates from DPW.
(2) Other expenditures include travel, contractual services, supplies/materials, utilities (i.e. power, water & telephone), and capital outlays.
(3) TG Engineering study dated 8/15/05 public own/private operate scenario.
(4) Recycling at $216K, PUC at $160K estimates per DPW.
(5) Based on an estimated 30-year level debt service financing (for initial investment) and 15-year level debt service (for cell construction costs) with assumed interest rate of 7.0% and two-years of capitalized interest plus a debt service reserve fund. Bond sizing based on proceeds in NOR report dated 4/2005 consisting of $26.9mm in initial investments and first three years of cell construction ($11.5mm, $11.0mm and $12.5mm) totaling $98.9mm.
(6) Equals Net Revenues (Revenues less O&M) divided by debt service. When negative (as shown in red) that means Net Revenues are negative.

UBS Investment Bank

# Guam Department of Public Works

# Cash Flow Scenario #3

## 7.5% Interest Rate Assumption

### Guam Department of Public Works
### Preliminary Cashflow Statement (Fiscal Year Ending September 30th)

| | FY 2002' | FY 2003' | FY 2004* | FY 2005 (Annual) | FY 2006 (Proj.) | FY 2007 (Proj.) | FY 2008 (Proj.) | FY 2009 (Proj.) | FY 2010 (Proj.) | FY 2011 (Proj.) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses:** | | | | | | | | | | |
| O&M[1] | | | | | | | | | | |
| Salary - Residential Collection[1] | $ - | $ - | $ - | $ - | $ 1,994,252 | $ 2,074,023 | $ 2,156,983 | $ 2,243,263 | $ 2,332,993 | $ 2,426,313 |
| Salary - Ordot Landfill[1] | - | - | - | - | 653,628 | 679,774 | 706,965 | 735,243 | 764,653 | 795,239 |
| Salary - Other[1] | - | - | - | - | 1,215,651 | 1,264,277 | 1,314,848 | 1,367,442 | 1,422,140 | 1,479,025 |
| Other Expenditures[2][3] | - | - | - | - | 1,566,880 | 1,629,555 | 1,694,737 | 1,762,527 | 1,833,028 | 1,906,349 |
| O&M New MSWLF[3] | | | | | - | - | 2,382,764 | 2,418,906 | 2,553,487 | 2,643,287 |
| Recycling and PUC Costs[4] | | | | | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 |
| Projected Debt Service @ 7.5%[5] | | | | | | | | 10,066,875 | 10,068,688 | 10,065,563 |
| **Total Expenditures** | **$3,479,551** | **$3,668,454** | **$3,970,427** | **$5,183,888** | **$5,798,412** | **$6,015,628** | **$8,624,298** | **$18,961,856** | **$19,342,989** | **$19,684,776** |
| Revenue Requirement for 1.25x Coverage | **$3,479,551** | **$3,668,454** | **$3,970,427** | **$5,183,888** | **$5,798,412** | **$6,015,628** | **$8,624,298** | **$21,476,575** | **$21,860,161** | **$22,201,417** |
| Revenue Requirement for 1.75x Coverage | **$3,479,551** | **$3,668,454** | **$3,970,427** | **$5,183,888** | **$5,798,412** | **$6,015,628** | **$8,624,298** | **$26,512,012** | **$26,894,504** | **$27,234,698** |
| **Revenues:** | | | | | | | | | | |
| Commercial Collections | $2,425,362 | $2,605,554 | $2,853,597 | $3,181,296 | 2,876,640 | 2,991,706 | 3,111,374 | 3,235,829 | 3,365,262 | 3,499,872 |
| OCH Collections | 36,831 | 39,849 | 50,469 | 85,087 | 55,120 | 57,325 | 59,618 | 62,000 | 64,483 | 67,062 |
| Residential Collections | 691,575 | 608,286 | 477,978 | 611,242 | 620,880 | 645,715 | 671,544 | 698,406 | 726,342 | 755,395 |
| Other Collections | 485,676 | 648,599 | 774,069 | 758,053 | 693,680 | 721,427 | 750,284 | 780,296 | 811,507 | 843,968 |
| **Total Available Revenues** | **$3,639,444** | **$3,902,288** | **$4,156,103** | **$4,635,678** | **$4,246,320** | **$4,416,173** | **$4,592,820** | **$4,776,533** | **$4,967,594** | **$5,166,298** |
| Debt Service Coverage[6] | | | | | | | (0.41x) | (0.43x) | (0.44x) |
| Debt Service Coverage w/100% Collections | | | | | | | (0.18x) | (0.19x) | (0.20x) |

Notes: Projected revenues are calculated based on 4% escalation annually using the average from FY 2002-2005.

(1) Based on Georgetown reports from Exhibit 2-4 dated 8/24/2005 which assume projections increased 4% annually using FY 2005 as base year. Operation figures of new landfill, recycling and PUC admin are estimates from DPW.

(2) Other expenditure include travel, contractual services, supplies/materials, utilities (i.e. power, water & telephone), and capital outlays.

(3) TG Engineering study dated 6/15/05 public own/private operate scenario.

(4) Recycling at $316k, PUC at $160k estimates per DPW.

(5) Projected as estimated 30-year level debt service financing (for initial investment) and 15-year level debt service (for capital construction costs) with assumed interest rate of 7.5% and two-years of capitalized interest plus a debt service reserve fund. Bond sizing based on proceeds in HDR report dated 4/2/00 consisting of $38.8mm in total investments and first three years of cell construction ($17.5mm, $11.9mm and $12.5mm) totaling $58.8mm.

(6) Equals Net Revenues (Revenues less O&M) divided by debt service. When negative (as shown in red) that means Net Revenues are negative.

**UBS** Investment Bank

**Guam Department of Public Works**

## Next Steps

■ Determine preferred collection system adjustments and take necessary legislative and regulatory steps to institute the changes

■ Confirm project costs to be financed

■ Evaluate structuring alternatives

— Follow-on issue in 2011 for future cell construction costs

■ Continue discussions with credit rating agencies

■ Determine schedule of rate increases and adjust rates as soon as feasible

■ Resolve legal issues related to billing in advance

10

**UBS** Investment Bank

## BEFORE THE GUAM PUBLIC UTILITIES COMMISSION



DEPARTMENT OF PUBLIC WORKS –
PROCUREMENT ADVISOR
CONTRACT

DOCKET 05-9

## ORDER

On December 14, 2005, the Department of Public Works *[DPW]* petitioned the Guam Public Utilities Commission *[PUC]* for expedited review of its procurement of a consultant to assist it in broad scope of work required under the February 11, 2004 Federal Consent Decree in Docket 02-22 and under Guam law. The contract scope would include: a] the development of plans and bid documents for the privatization of the operation and closure of the Ordot landfill; the operation of the transfer stations; and the construction and operation of the Layon landfill; b] planning and study necessary to create residential collection districts pursuant to P.L. 26-99; c] consultation regarding other solid waste management activities; and d] optional post-completion activities. As the fees paid under the proposed contract will exceed $50,000, it requires prior PUC review and approval pursuant to PUC's October 27, 2005 Order in this docket *[Contract Review Order]*.

DPW has requested expedited regulatory review of the proposed contract because it faces near term deadlines, under threat of substantial Consent Decree penalties, to commence procurement activities on the work product, which will be produced by the consultant. On December 19, 2005 PUC's consultant Georgetown Consulting Group *[GCG]* submitted its report on the proposed procurement, which recommends its approval subject to conditions.

After review of the GCG report, in consultation with its administrative law judge, for good cause shown and on motion duly made, seconded and carried by the affirmative vote of the undersigned commissioners, the Guam Public Utilities Commission **HEREBY ORDERS THAT** the procurement is approved subject to the following conditions:

1. DPW shall file with PUC an executed copy of the contract, with all attachments and enclosures.

2. The consultant shall provide PUC with progress reports, in form and frequency established by PUC's administrative law judge, which will enable PUC: a] to monitor the potential impact of its work on DPW rates,

**ATTACHMENT C**

which are subject to PUC jurisdiction; and b] to enable PUC to conduct a timely review, under the Contract Review Order, of proposed procurements which result from its work and which require regulatory review.

3. The proposed contract shall be amended: a] to require consultant to participate, upon request, in regulatory and legislative proceedings related to its work scope; and b] to include a conflict of interest clause, which will prohibit consultant from participating or having an economic interest in any DPW procurement which results from its contractual services.

4. DPW is in serious default of its statutory duty under P.L. 26-99 to establish three residential collection districts and to privatize collection services in 2 of the 3 districts by October 2002. As a consequence, residential customers have suffered with poor collection service. The proposed contract shall be amended to accelerate the consulting work necessary to create these districts and to privatize collection service as required by P.L. 26-99.

5. ALJ is authorized and directed to oversee the administration and interpretation of this Order.

Dated this 20th day of December 2005.


Terrence M. Brooks


Joseph M. McDonald


Edward C. Crisostomo


Rowena E. Perez

RECEIVED
OCT 2 7 2005
Public Utilities Commission
of Guam

| | | |
|---|---|---|
| ADMINISTRATIVE DOCKET | ) | |
| CONTRACT REVIEW PROTOCOL FOR | ) | DOCKET 05-09 |
| DEPARTMENT OF PUBLIC WORKS | ) | |
| DIVISION OF SOLID WASTE | ) | |
| MANAGEMENT | ) | |

## ORDER

Pursuant to its authority under 10 GCG Section 51118 (e), the Guam Public Utilities Commission [PUC] establishes the following protocol to identify and review regulated contracts and obligations of Department of Public Works' Division of Solid Waste Management [Division], which are funded by the Solid Waste Operations Fund.

1. The following Division contracts and obligations shall require prior PUC approval under 10 GCG Section 5118 (e), which shall be obtained before the procurement process is begun:

    a) All capital improvement projects (CIP) in excess of $50,000 whether or not a project extends over a period of one year or several years;

    b) All capital items by account group, which in any year exceed $50,000;

    c) All professional service procurements in excess of $50,000;

    d) All externally funded loan obligations and other financial obligations such as lines of credit, bonds, etc. in the excess of $50,000 and any use of said funds;

    e) Any contract or obligation not specifically referenced above which exceeds $50,000, not including individual contracts within an approved CIP or contract;

    f) Any agreement to compromise or settle disputed charges for services by Division, when the amount of the waived charges would exceed $50,000.

1

2. Emergency procurements, which are made by Division under 5 GCA section 5215, shall not require PUC approval; provided, however that Division shall file its section 5215 determination, the governor's written approval of same, and the procurement details, as set forth in paragraph 5(b) below, within 20 days of the declaration.

3. With regard to multi-year contracts:
   a) The term of a contract or obligation *[procurement)* will be the term stated therein, including all options for extension or renewal.
   b) The test to determine whether a procurement exceeds the $50,000 threshold for PUC review and approval *[the review threshold]* is the total estimated cost of the procurement, including cost incurred in any renewal options.
   c) For a multi-year procurement with fixed terms and fixed annual costs, Division must obtain PUC approval if the total costs over the entire procurement term exceed the review threshold. No additional PUC review shall be required after the initial review process.
   d) For multi-year procurements with fixed terms and variable annual costs, Division shall seek PUC approval of the procurement if the aggregate cost estimate for the entire term of the procurement exceeds its review threshold. On each anniversary date during the term of the procurement, Division will file a cost estimate for the coming year of the procurement. Division shall seek PUC approval in the event a procurement subject to this paragraph should exceed 120% of the aggregate cost initially approved by PUC.
   e) Unless for good cause shown, any petition for PUC approval of a multi-year procurement must be made sufficiently in advance of the commencement of the procurement process to provide PUC with reasonable time to conduct its review.

2

4.   On or before September 15 of each year, Divsion will use best efforts to file with PUC:

    a)   Its budget for the coming fiscal year beginning October 1 plus estimates for the subsequent two fiscal years. The filing shall contain a description of each CIP contained with the budget and estimates. Project descriptions should be sufficiently detailed to identify the specific location and type of equipment to be purchased, leased or installed.

    b)   The following information should be provided with regard to each CIP project / contract or obligation requiring PUC approval under paragraph 1:

        i)   Scheduled start, completion and in service dates.

        ii)   Capital requirements by year of the expected expenditure and anticipated source of funding (i..e., bonds, internal, etc.)

        iii)   Impact on service of delaying or canceling the project, contract or obligation.

        iv)   Copies of all economic and engineering studies, where relevant.

5.   If during any fiscal year, Division desires to undertake a contract or obligation covered by paragraph 1, for which approval has not otherwise been received, it may file an application with the PUC for approval of such contract or obligation, which shall contain the information required in paragraph 4(b) above. Division shall obtain PUC approval thereof before the procurement process is begun.

6.   Division shall, on or before December 1 of each year, file a report on the contracts and obligations approved by PUC for the prior fiscal year pursuant to this stipulation. This report shall show the amount approved by PUC and the actual expenditures incurred during the preceding fiscal year for each such contract and obligation and other changes from the prior filing in cost estimateds, start dates and inservice or completion dates.

7.   Division shall not incur expenses for PUC approved contracts and obligations in excess of 20% over the amount authorized by PUC without prior approval. In the event Division estimates that it will exceed the PUC approved level of expenditures by more than 20%, it shall submit to PUC the revised estimate and full explanation of all additional cost.

3

8. To the extent Division submits a filing to PUC under this order which PUC staff believes in incomplete or deficient, it shall notify Division and the PUC with in 15 calendar days thereof with specific indication of the alleged incompleteness or deficiency.

9. PUC staff will use best efforts to be prepared for hearing within 45 days of a complete Division filing under the terms of paragraph 4 above. PUC's administrative law judge, is authorized, in his judgment, to shorten the above 45 day period, for good cause shown by Division.

10. PUC's administrative law judge is authorized to interpret the meaning of any provision of this order, in furtherance of the contract review process.

Dated this 27th day of October, 2005.

_____
Terrence M. Brooks

_____
Joseph M. McDonald

_____
Edward C. Crisostomo

_____
Rowena E. Perez

4

# BEFORE THE GUAM PUBLIC UTILITIES COMMISSION

COMMISSION ADMINISTRATIVE   )
DOCKET                            )
                                             )
                                             )
——————————————————————)



## ASSESSMENT ORDER

**WHEREAS,** the Commission's operational expenses can be divided into two categories and are budgeted and collected under the following protocols: i] general administrative expenses, which are budgeted each fiscal year by the Commission and divided and assessed among the regulated utilities; and ii] regulatory expenses, which are incurred pursuant to Commission resolution dated February 2, 1996. Regulatory expenses include professional and out-of-pocket expenses, which are billed to specific utilities under regulatory dockets assigned to them to cover the expense of handling specific regulatory proceedings related to them. This order addresses the Commission's FY06 budget of administrative expenses.

**WHEREAS,** the administrative budget covers the Commission's administrative expenses, including staff, office facilities, Commissioner stipends and training, professional fees and other operational expenses;

**WHEREAS,** at a duly noticed and convened Commission meeting held on October 27, 2005, the Commission considered and adopted its FY06 administrative budget in the amount of $160,000.00;

**WHEREAS,** the utilities subject to Commission regulation include Guam Power Authority [GPA], Guam Waterworks Authority [GWA], Guam Telecom LLC [GTA] and Department of Public Works [DPW];

**WHEREAS,** after due consideration, the Commission has resolved that its' FY06 administrative budget of $160,000.00 should be allocated among the regulated utilities, as follows:

| | |
|---|---|
| GTA | $ 40,000.00 |
| GPA | $ 40,000.00 |
| GWA | $ 40,000.00 |
| DPW | $ 40,000.00 |
| Total | $160,000.00 |

**NOW, THEREFORE**, in consideration of the above recitals and under authority invested by 12 GCA section 12024, the Commission hereby **ORDERS THAT:**

1. GTA, GPA , GWA and DPW shall pay the assessment allocated to them, as stated above, to the Commission not later than November 30, 2005. The regulated utilities are reminded that these assessed revenues are necessary to enable the Commission to have the staff and office facilities to entertain their requests for regulatory services. It is, therefore, essential that these assessments be paid in a timely manner.

2. A copy of this assessment order shall be served on each regulated utility.

Dated this 27th day of October, 2005.

_____
Terrence M. Brooks

_____
Joseph M. McDonald

_____
Edward C. Crisosotomo

_____
Rowena E. Perez

**BEFORE THE GUAM PUBLIC UTILITIES COMMISSION**



RECEIVED
OCT 2 7 2005
Public Utilities Commission
of Guam

**ADMINISTRATIVE ORDER**

In furtherance of its mission of making the regulatory process transparent to utility ratepayers, the Guam Public Utilities Commission [PUC] has launched a website at guampuc.com to provide the public with convenient access to current and historic regulatory proceedings.

In furtherance of this mission, for good cause shown, after discussion and on motion duly made, seconded and carried by the affirmative vote of the undersigned commissioners, the Guam Public Utilities Commission **HEREBY ORDERS THAT:**

1. Commencing on the date of this Order, any document, which is filed for record in a regulatory proceeding before PUC shall be filed in hard copy [via mail, fax or delivery] and in electronic form via email to guampuc@kuentos.guam.net.

2. On or before December 1, 2005 Guam Power Authority, Guam Waterworks Authority and GTA Telecom LLC shall post and maintain on their website their current tariff, in form approved by PUC.

3. A copy of this Order shall be posted on PUC's website.

Dated this 27th day of October 2005.

_____
Terrence M. Brooks

_____
Joseph M. McDonald

_____
Edward C. Crisostomo

_____
Rowena E. Perez



**public works**
DIPATTAMENTON CHE'CHO' PUPBLEKO

DIRECTOR
**Lawrence P. Perez**
DEPUTY DIRECTOR
**Andrew Leon Guerrero**

*Delivered During Regulatory Session*

*FILE*

18 JAN 2007

**Mr. Harry M. Boertzel**
Administrative Law Judge
Public Utilities Commission of Guam
Suite 401, GCIC Building
P.O. Box 862
Hagåtña, Guam 96932

Reference:     *Docket 07-1 (SWM FY07 Rate Proceedings)*

Hafa Adai Señot Boertzel:

In receipt on your December 14th letter, the Department of Public Works looks forward to meeting with you this afternoon and the January 23rd PUC multi-purpose regulatory workshop.

At both these meetings the DPW will be prepared to discuss both the petition for approval of financing for Consent Decree Projects and the petition for approval of the omnibus RFP.

During today's meeting, the DPW will be submitting a petition for the PUC's approval for the implementation of a Pay-As-You-Throw (PAYT) program which is an integral component of the RFP for the outsourcing of the island's residential waste collection. Approval of this program is key to the DPW's prepared compliance to the September 28, 2006 PUC Order (Docket 06-02). This program utilizes a decal/bag collection system that DPW has previously described to PUC.

On a related issue to the anticipated petition filing for approval of the bond financing for the Consent Decree Projects and a separate issue of the establishment of the SWM as a public corporation under the CCU governance, the DPW would like to request assistance from the PUC. The DPW would appreciate action by the PUC to initiate discussions with the Government's Administration officials regarding these two important policy issues.

As Chairperson of the Consent Decree Compliance Team, I have encouraged other Team members and legal counsels to join me and participate in this afternoon's meeting.

Seneramente,

**Lawrence P. Perez**
Director

CUJACKSON:cuj
1/18/07

Cc:     *Consent Decree Project File*
        *Dir's Chrono*

542 North Marine Drive, Tamuning Guam 96913 ● Tel (671) 646-3131 / 3259 ● Fax (671) 649-6178



RECEIVED
JAN 18 2007
Public Utilities Commission
of Guam

LAWRENCE P. PEREZ
Director
Department of Public Works
Government of Guam
542 North Marine Corps Drive
Tamuning, Guam  96913

IN RE: PETITION BY THE DEPARTMENT OF ) DOCKET NO. 07-01
PUBLIC WORKS FOR THE GUAM PUBLIC )
UTILITIES COMMISSION'S APPROVAL OF A ) Request for PUC approval for
DECAL/BAG PROGRAM. ) implementation of a "Pay As You
                         ) Throw" (PAYT) Program.
                         )
_____ )

     **COMES NOW**, the Solid Waste Management (SWM) division of the Department

of Public Works (DPW) through is Executive Director Lawrence M. Perez a

petition before the Public Utilities Commission (PUC or Commission) for its

review and approval of a proposed PAYT (Program) to be implemented as soon as

legal impediments are removed[1] and necessary cost data is refined.  This

program utilizes a decal/bag collection system that DPW has previously

described to the PUC.

     SWM believes after review of other options that its proposed program

will result in accomplishing several of the goals outlined in the Focused

Management Audit presented to the PUC by its Consultant in September 2006.

Among the items that will be addressed with the implementation of the

proposed program will be a complete database of residential customers,

significantly increased collection results, implementation of a targeted

lifeline rate and establishing a more cost based tariff.  SWM has reviewed

similar programs employed by other municipal refuse collection agencies such

as Chatham County Waste and Rivanna Solid Waste Authority and several other

municipalities employing PAYT programs as described in USEPA's website

(http://www.epa.gov/epaoswer/non-hw/payt/links.htm) and believes that the

results of these programs are a positive indication that SWM would be able to

accomplish the PUC goals with its Program as tailored for Guam.

---

[1] 29 GAR §2105 (J) (Billing after services provided with payment due 60 days thereafter.)

Summary of Petition

Under the provisions of the Commission rules regarding Contract Review protocol Docket No. 05-09 SWM has attached the following documents that will support SWM's petition.

Complete Explanation of the Program (**Attachment A**)

SWM understands that the PUC may not be able to approve specific items until additional supporting data is assembled and legal impediments are removed, but SWM seeks to present the details of the program during January 2007 regulatory session. If deemed advisable by the PUC, SWM also seeks "approval in kind" with final approval given at a subsequent session.

SWM stands ready to respond to any inquiries by the PUC or its Consultants and looks forward to presenting this Program with the Commissioners.

Respectfully submitted this 18th day of January, 2007

**LAWRENCE P. PEREZ**
**Director**
**Dept. of Public Works**

**Solid Waste Management**
**Proposed Pay-As-You-Throw (PAYT) Program**

**Attachment A**

## Background

Solid Waste Management (SWM) is currently under a Consent Decree with the United States Environmental Protection Agency to Close the Ordot Dump facility and to open a new landfill. The cost impact of these projects will ultimately impact the ratepayers of SWM. In order to pay for these large projects, SWM will need to improve its collection of revenues derived from rates approved by the Public Utilities Commission (PUC).

The history of collections from the residential ratepayer by SWM has been abysmal. While SWM management has attempted to improve collections, the improvement is still far from any reasonable standard. In Fiscal 2006, DPW billed its residential customers a total of $2.8 million and collected $1.4 million or a 50% collection ratio. While this is an improvement over prior, SWM understands that any additional rate increase awarded by the PUC must be collected in order to be able to meet the requirements of the Consent Decree, while maintaining sufficient funds to pay for ongoing operations. If the collection ratio does not approach 100%, the Consent Decree costs will fall upon only those ratepayers with good payment history. The poor collection ratio experienced by SWM is a function of poor record keeping by SWM who is currently billing for residential collection and the Department of Administration (DOA) which had the responsibility for billing in the past.

There also exists an Island-wide culture of ignoring invoices from SWM for residential services. This culture has evolved in part from the poor services of SWM plus the inability to specifically identify delinquent customers and cease service until payment in full. Unlike the power, water and telephone companies who can suspend service until payment is received utilizing accurate customer identification and billing history, SWM

is unable to cease service as simply as the other utility companies. Unlike GPA, GWA and GTA is not a matter of removing a meter or flipping a switch. The cessation of service by SWM would not only affect the delinquent customer as in the case of the three referenced utilities, but would result in unsightly curbside litter that would increase the potential for vermin, insects and disease. Currently, SWM does not have an effective and acceptable method of cessation of service.

In addition, SWM is required by **PL28-56** to establish a lifeline rate and the "Pay As You Throw" (PAYT) Program would address that issue as well. It is anticipate that if approved by the PUC, this Program would continue for at least a three year period, consistent with the proposed length of the prospective contractor with private haulers. This program will be reviewed once full outsourcing of residential services is in place and sufficient experience by the private contractors is achieved.

The program would be on a "pre-paid" basis which would both eliminate the billing and collection risk of SWM. At the current time SWM is precluded from billing in advance of service. Legislation that would remove this restriction is currently being prepared.

## **Overall Summary.**

After sufficient Island-wide education, SWM will create Service Decals for purchase by any residential customer (single swelling, duplex and quadraplex) at a cost to be determined by a rate design and the bid amounts figured of the residential outsourcing IFB. The Decal would be purchased at offices of the Treasurer of Guam and SWM Customer Service. The Decal would be affixed to the customers' containers that are compliant with the current service rules of SWM. The Decal would be effective for a period of three months and would be color coded to indicate the period for which service

has been purchased. SWM personnel and private contractors would be instructed to pick up only those containers with Decals.

To make the process easier for the customer, Decals for subsequent periods would be mailed to the customer upon receipt of the appropriate payment by the SWM customer service. The customer would still be able to purchase the Decal at the services locations described above.

If the customer wishes to have service that would include the hauling of more than two (2) containers per week, the customer may purchase trash bags that identify the individual as a paid customer. Purchase of the bags would be at various locations, including those locations where the decal purchase transactions take place or at various private sector locations yet to be determined. The cost per bag again will be determined based upon an on-going rate structure design and the residential collection bid figures provided by the private haulers and would be subject to change with PUC approval as the cost of service for SWM and the costs of the Consent Decree become known and measurable. SWM personnel and private contractors will be instructed to pick up all bags that specifically identify the SWM customer.

For customers in public housing or receivable housing assistance, SWM would provide GHURA with sufficient Decals to distribute to these lifeline customers at a cost of **$ TBD**. Service beyond the limit of two (2) cans would still require purchase of SWM bags at the rate approved by the PUC.

## Island-Wide Education

There is a significant learning curve that must be addressed before implementation of this program. The first step in educating the populace is a mass mailing to all households on

Guam. Such mailing would contain a summary of the program with a list of locations

dates and times that open forums will be held to respond questions by the residential

customers or any other interested party. The will also be weekly advertising in the local

press and ads on local television. SWM personnel will hold open meetings in all of the

villages on the Island. SWM will request that local radio and television provide several

segments of airtime so that SWM management can describe the program and answer any

questions from the consumer. SWM will request time to present the details of the

programs to various service organizations such as the Chamber of Commerce, Rotary,

etc. and will personally meet with all of the mayors and request open forums with their

community.

SWM understands that no program will work without full cooperation of the community.

The enforcement of the issue of the illegal dumping of trash and theft of service decals

needs to be addressed, including fines and possible imprisonment. Enforcement will

require the efforts of SWM, the Attorney General and GEPA.


**Cost Benefit Analysis**

The implementation cost for this program is estimated to be $70,000.00 consisting of the

following:

| Mass Mailing | $10,000.00 |
|---|---|
| Decal Production (24k/sht.) | $4,000.00 |
| Bag Production | TBD |
| Handouts and Flyers (20k | $5,000.00 |
| Advertising | $45,000.00 |
| Other (overtime) | $6,000.00 |
| TOTAL | $70,000.00 |

Ongoing costs will be limited to additional Decal and Bag Production.

There are other currently un-quantified benefits such as the potential for; (a) Reduced outsourcing fees to private contractors for residential pick-up and hauling services; (b) Revenue stability; (c) Generating revenues to cover Municipal Solid Waste cost; (d) Providing equity among customers; and (e) Increases recycling rates with an effective PAYT program.

# PUBLIC UTILITIES COMMISSION
## OF GUAM

Terrence M. Brooks

Edward C. Crisosotomo
Filomena M. Cantoria
Joseph M. McDonald
Rowena E. Perez
Jeffrey C. Johnson

Suite 207, GCIC Building
Post Office Box 862
Hagatna, Guam 96932

Telephone: (671) 472-1907
Fax: (671) 472-1917
Email: info@guampuc.com

Harry M. Boertzel
Administrative Law Judge

Lourdes R. Palomo
Administrator

December 14, 2006

## VIA ELECTRONIC TRANSMISSION
Lawrence P. Perez, General Manager
Department of Public Works
542 North Marine Drive
Tamuning, Guam 96913

RE: Docket 07-1 [SWM FY07 Rate Proceeding]

Dear Mr. Perez:

In response to your December 5, 2006 letter:

1. I am canceling the DPW rate hearing previously scheduled for January 24, 2007. Enclosed is Georgetown's December 12, 2006 letter, which supports your request, with observations and reservations. The issue of when and under what circumstances the rate proceeding should be rescheduled will be reviewed by PUC during the January 2007 regulatory session. The Georgetown rate report, previously deadlined for December 27, 2007, will now focus instead on Mr. Margerison's findings during his recent Guam visit. Georgetown principal, Jim Madan, will present this report to PUC at a multi-purpose regulatory workshop, which will be held at 6:00 p.m. on January 23, 2007.

2. Your request that PUC approve the omnibus RFP *concept* mentioned in your letter is premature. DPW is required under PUC's October 27, 2005 Docket 05-9 Order *[contract review protocol]* to file with PUC the detailed information described in section 4[b] of the Order, including the full text of the proposed RFP, in support of a petition for PUC review of a proposed procurement. The Order emphasizes that DPW must obtain PUC's approval *before the procurement process begins.* PUC awaits this long overdue filing from DPW so that Georgetown can be authorized to begin its review of the omnibus RFP.

1

3. A SWM regulatory conference has been scheduled for 2:00 p.m. January 18, 2006 at Suite 207 GCIC Building to review the status of DPW's efforts to prepare and submit for regulatory review: a] a petition for approval of financing for Consent Decree projects; and b] a petition for approval of the omnibus RFP discussed in paragraph 2 above.

4. In its September 28, 2006 Order [Docket 06-2] PUC emphasized the importance of privatizing residential collection for the entire island by July 2007. The Order required DPW to inform PUC not later than October 15, 2006 of the additional resources it would require to successfully meet this deadline. PUC has not received any filing from DPW in response to this order.

I look forward to meeting with you on January 18, 2007 to discuss the above matters. Please let me know if there is any regulatory assistance which PUC can provide in the interim.

With best wishes for a merry Christmas and successful New Year,

*Harry M. Boertzel /HRP*

Harry M. Boertzel

cc:  Jim Madan, Georgetown
     Terrence Brooks, Esq.

Encl:  Georgetown 12/12/06 letter

2

# GEORGETOWN CONSULTING GROUP, INC.
### 716 DANBURY RD.
### RIDGEFIELD, CT. 06877

Jamshed K. Madan
Michael D. Dirmeier

Edward R. Margerison
Jean Dorrell



Telephone (203) 431-0231
Facsimile (203) 438-8420
jkmadan@gmail.com

December 12, 2006

Harry Boertzel, Esq. ALJ
The Guam Public Utilities Commission
Suite 207, GCIC Building
Hagatna, Guam 96932

Re:  <u>Response to DPW 12/5/06 Letter to Delay Rate Proceeding</u>

Dear Harry:

This letter is in response to the letter you received form Larry Perez, Director of DPW, in which he makes the following requests:

1. PUC's consideration of SWM's FY07 revenue requirements be deferred from January to April 2007; and
2. PUC approval of the RFP concept for "the current projects of the Consent Decree and the planned improvements to the Solid Waste system in one bid action".

This letter raises some complex and difficult issues that should be carefully considered. As you know, Ed Margerison of our firm has just returned from a trip to Guam during which the primary purpose was to work with DPW on collaboratively filing a request for a rate increase to be reviewed for approval by the PUC at the January 2007 Regulatory Session. It was during this trip that DPW and GCG both came to the conclusion that filing a rate case in January 2007 did not make sense. DPW states in its letter to you that they are reluctant to have the public be subjected to a rate increase in January and then another one in April 2007. While it is not clear to us that a second rate increase request in April 2007 was a foregone conclusion, we concur with the decision to defer the January request for several reasons. Our rational is developed below. We believe that before another rate increase request is reviewed by the PUC, several significant policy issues should be evaluated and addressed by the PUC.

Since the first DPW rate increase in October 2005 that was approved by the PUC, there have been a number of significant events:

1. A management of the revenue and billing cycle was undertaken by GCG under ALJ oversight and the findings approved by the PUC.
2. DPW has missed many of the deadlines that have been imposed by the Consent Decree of February 11, 2004. As a result the U.S. Attorney, on behalf of the USEPA, has requested a status conference in Federal District Court to apprise the Court of the violations and the need for measures to bring about compliance with the Consent Order. We understand that the conference is to take place on December 20, 2006. DPW could be subject to

significant fines and other possible disciplinary actions. The U.S. Attorney alleges that in the meantime significant environmental damage continues.

3. The issuance of revenue bonds to fund the closing of the Ordot landfill and the opening and construction of a new landfill has been delayed from the anticipated date sometime during the mid to latter half of 2006. No firm date for the issuance of these bonds has been set. We understand that the legislation required to issue the bonds has not yet been introduced in the Guam Legislature. It is absolutely clear that without funding the projects required to meet the Consent Decree cannot go forward.

It would be useful at this juncture to summarize some of the conclusion and recommendations that we made in our Management Audit of the revenue cycle and billing system. We do this because we believe that many of those recommendations are key to DPW moving forward and it appears that little or no progress has been made on these key recommendations that were adopted by the PUC. A portion of our recommendations were as follows:

This audit report finds that:

a.    DPW's current billing and collection system is unable to competently handle even current rate revenue levels much less the increased burden necessary to support the revenue bonds.

b.    Substantial remedial action, including operational changes, legislation, regulatory action and rulemaking must immediately occur to enable DPW to bill and collect the revenue necessary to fund revenue bond requirements.

c.    If this remedial action does not occur, DPW will not be able to bill and collect the rate revenues necessary to fund revenue bond obligations and this burden would fall, in part, on the General Fund. Regulatory principles could obstruct the PUC: i] from awarding rate increases to compensate for DPW billing and collection mismanagement; and ii] from increasing SWM residential customer rates unless the quality of residential service is dramatically improved.

The key legislative findings that were contained in the report were as follows:

| Recommendation | Action Date |
|---|---|
| Legislation: | |
| Establish SWM as public corporation under CCU governance. | ASAP |
| Consolidate administration of SWM finances. | ASAP |
| Privatize third residential collection district. | ASAP |

Convert commercial tipping fee to hauler business expense or bring haulers

under PUC regulation and Public Auditor audit authority.                    ASAP

The major recommendation we reached in the prior report was as follows:

> Concurrent with the improvement of billing and collection practices, there also needs to be significant improvements in operational practices and the poor current level of services in order to collect in the face of the rate increases. Current collection rates for residential service are extremely low. GCG believes a significant cause of the low collection rate for residential SWM customers is resistance to paying amounts owed due to poor and sporadic service.
> **To solve these important issues it is our primary recommendation that SWM be transferred to a public corporation under the oversight of the Consolidated Commission on Utilities ("CCU"). With this recommendation all functions will be consolidated in one corporation, there will be an experienced Chief Financial Officer, experience with billing and collection systems and potential assistance available from the sister utilities – GPA and GWA plus experience in dealing with the Guam Environmental Protection Agency.**

## ANALYSIS

It has now been over a year that the PUC awarded a first rate increase to DPW. The logic of awarding the increase was to "phase in" the expected large rate increase that would accompany the rates requires to support the debt service associated with what is expected to be the first set of bonds floated to implement the Consent Order. The cash flow associated with the rate increase was to be escrowed and used only for specific purposes. After the first rate increase the PUC moved to undertake a Management Audit of the revenue cycle and billing and collection functions. Significant and systemic problems were encountered and a series of recommendations were adopted.

During the 14 months since the last rate award DPW has attempted to make limited improvements to its operations. We believe that it successes have been limited, predictably, because it is a fractured organization. Continuing without a sense of purpose and without a strategic plan should not be an option in our opinion. It is also difficult to make sense of the apparent paradox of the Director of DPW asking for a delay in the rate proceeding and at the same time stating that DPW does not have adequate resources to safely operate the existing landfill. Clearly there continues to be a crisis for all to see:

- Collection operations for residential customers continue to be inadequate.
- Operations at the landfill continue to harm the environment.
- USEPA deadlines continue to be breached.
- Financing plans to offer bonds have been deferred from mid year 2006 to some indefinite timeframe.
- Privatization for two thirds of the residential districts appears to be moving ahead – we have recommended that all residential collection be privatized.
- There continues to be no scale at the landfill.

- There appears to be no movement for SWM to be transferred to a public corporation under the oversight of the CCU. The PUC believes this to be a critical element in moving DPW forward.
- The U.S. Attorney has requested a status conference in the District court to apprise the District Court of DPW violations and the need for measures to bring about compliance with the Consent Order.

Given all of the above, we now have grave reservations as to what purpose a rate proceeding during the April 2007 Regulatory session would serve other than "kicking the ball down the field". Clearly a lot remains to be done but we believe a plan for the essential elements are not in place.

We note that Larry Perez has requested approval to advertise an RFP for all of the current projects of the Consent Decree and the planned improvements to the solid Waste system in one bid. He indicates that a copy of the RFP is attached for your review and approval. We have reviewed the documentation and do not see a full RFP. When the documentation is provided it should meet the requirements of the Contract Review Protocol. We also believe that the concept of putting all items in one bid package should be carefully evaluated. Some of the projects would be revenue funded and others would be financed. We would recommend that a focus of the January Regulatory Session should be the appropriate path forward for these projects. We would work collaboratively with him on the effort if requested by him and approved by you.

It is our current evaluation that under the current structure DPW is not in a position to discharge its duties under the Consent Decree and proposed revenue bonds.

If you wish to discuss any and all of the above, please do not hesitate to call.

Cordially,

Jamshed K. Madan

Cc:   Jim Baldwin, ESQ
      Larry Gawlik
      Ed Margerison

# DEPARTMENT OF PUBLIC WORKS (DPW)

# REQUEST FOR PROPOSALS

## Environmental & Engineering Services

## For

## The Preparation Of Environmental Report, Construction Plans, Specifications, and Estimates (PS&E) For The Ordot Dump Closure

## March 2004

Approved By:

**JOSEPH W. DUENAS**
Acting Director of Public Works

*Exhibit 3*

**STATEMENT OF WORK**

**ORDOT DUMP CLOSURE**

## I.    INTRODUCTION

This Statement of Work describes the Scope of Work required of the Consultant in providing the engineering services for the preparation of reports, plans, specifications, and estimates (PS&E) and other supporting data for the closure of the Ordot Dump.  This also provides the schedules for the different tasks, items to be submitted by the Consultant  and other contractual obligations of the Government and the Consultant.

## II.    PROJECT DESCRIPTION AND LOCATION

The project involves the preparation of an Environmental Baseline Survey, PS&E,  permit applications for temporary operation, post closure plan, and other supporting documents for the **Ordot Dump Closure**.  The project is located within the Lumico Area in the village of Ordot.

## III.    SCOPE OF WORK

The contractor shall provide the engineering services and perform the different tasks as described below and furnish the required reports and PS&E for the project.

All entry permits in conjunction with the engineering services shall be the responsibility of the Consultant.    Right of entries to private and government lands will be provided by DPW.

The Consultant shall coordinate his work with the agencies whether Local or Federal having jurisdiction in permit approval and review.  It will be the responsibility of the Consultant to ensure that all requirements of the Ordot Dump Closure conform to the requirement of Federal and Local laws.

Progress review meetings shall be held monthly to review progress and discuss any design issues or problems.  The meetings will be held at the firm's office or Public Works office on a mutually agreed schedule.

Case 1:02-cv-00022    Document 79-3    Filed 01/31/2007    Page 18 of 25

**TASK I - Site Assessment**

A.     **Environmental Baseline Survey.**    Conduct a scientific survey and assess the existing physical and biological conditions of the Ordot Dump site and its vicinity. All work plans, investigations, and sampling analysis plans shall conform to RCRA, Part D Requirements. The assessment shall include but not limited to:

- **Chemical Characteristics.** Characterize the nature and extent of onsite soil (waste and liquids) contamination. Characterize the nature and extent of subsurface soils, liquids, and waste contamination. Assess whether contamination occurs due to run-on or run-off, and whether sediments are contaminated. Assess Groundwater Quality and migration routes. Assess and characterize landfill fires.

- **Flora and Fauna.** Conduct survey utilizing the standard survey methods to determine relative types and abundance of the biological resources, including plant communities.

- **Wetland Determination and Delineation.** Conduct a wetland assessment in accordance with the methods and procedures provided in the "Technical Report Y-87-I Corps of Engineers Wetlands Delineation Manual ('87 Manual)." In the event wetlands are identified, perform a wetland (jurisdictional) delineation to include boundary flagging for field verification and surveying by a registered land surveyor. A wetland delineation map shall be prepared in accordance with the Guam Environmental Protection Agency wetland mapping policy.

- **Physical Characteristics.** Assess the project site's geological and general soils conditions, and surface and subsurface hydrology. Describe the surrounding land uses and regional context, including historical uses, infrastructure, air quality, noise levels, natural and mammade hazards, and proximity to sensitive or protected areas.

An assessment report shall be submitted addressing the items listed above to includes maps, data sheets, tables, (check) list,

graphs, photographs, references, and documentation to support the findings.

**B.** **PLANIMETRIC AND TOPOGRAPHIC SURVEY.** Perform an as-built planimetric and topographic survey with one foot contour interval of the active dump and its surrounding area. Include sufficient area to address the dump's impact on the Lonfit River and adjacent properties. It is estimated that the survey area will encompass approximately 35 acres. Survey work shall be under the direct supervision of a Guam Registered Land Surveyor.

**C.** **ORDOT DUMP PERMIT -** Prepare the necessary permit application for the continuing operation of the dump until a new MSWLF is constructed and in operation. The new MSWLF is planned to be operational by September 2007.

**TASK II.** **PRELIMINARY CLOSURE PLAN, SPECIFICATIONS AND ESTIMATES (PS&E)**

The preliminary closure PS&E shall be at least 50% complete and the following shall be prepared.

A. **PLANS:**

1. Title Sheet;
2. Site Plan. Show existing property lines, survey base line(s), proposed dump cap and covers limits, erosion and drainage run-on/run-off control system, vegetative and/or landscaping access roads, any wetlands or waterways affected by the dump, leachate control system, landfill gas control system, and other mitigation measures necessary to ensure environmental compliance of the dump;
3. Sectional elevations representative of the proposed closure plan;
4. Preliminary details of proposed drainage system, leachate control system and landfill gas monitoring and/or recovery system, and other environmental mitigation measures;
5. Preliminary horizontal and vertical alignment of all access roads;
6. Other plans or details necessary to conduct review of any proposed items of work; and

7. Post closure plan, a separate descriptive preliminary operations manual for post closure monitoring and maintenance shall be submitted.

B. **SPECIFICATION** – A preliminary technical specifications shall be prepared for each item of work describing the construction methods, material requirements, test procedures required, payment and measurement for the item of work, etc.

C. **ESTIMATES** – A preliminary estimates shall be prepared commensurate with the preliminary plans and specifications.

Ten (l0) copies of the preliminary PS&E and design calculations shall be submitted. A "plans-in-hand" field review to be jointly conducted by the Government and Consultant shall be scheduled by the consultant after submittal of preliminary PS&E.

The Firm's key personnel shall participate in the Plans-in-Hand field review and resolution meeting(s) to resolve all comments on the project. The firm shall be responsible for the preparation of the "Minutes of Meeting" for approval and distribution by DPW.

## TASK III. PREFINAL PS&E

The prefinal PS&E shall be 100% complete incorporating all approved comments from the preliminary PS&E. The following shall be submitted:

1. Plans - Complete plans, including title sheet, summary of quantities and schedules, details cross sections, etc.;
2. Technical specifications - Complete technical specifications to properly construct each item of work, including test procedures required, and any special conditions to be required;
3. Estimates - Each unit pay items shall be supported with a detailed quantity take-off computation and corresponding unit price analysis deriving the unit prices. Any lump sum pay item shall also be supported with detailed breakdown arriving to the lump sum cost;
4. Design Analysis and computation sheets;
5. CPM to establish project construction time;
6. Design Narrative - The design narrative shall describe the design approach, assumption and/or basis of design and other supporting data not shown on the plans and specifications; and

7. Post Closure Plan - Complete operations manual for the required post closure monitoring and maintenance of the closed dump. The post closure plan shall address the operational and/or maintenance of the final cover, the drainage system, leachate collection system, landfill gas collection/monitoring system, and for any appurtenances for the proper compliance of the dump closure.

The Firm's key personnel shall participate in the resolution meeting to resolve all comments on the submittal. Prepare a "Minutes of Meetings" for approval and distribution by DPW.

## TASK IV.    FINAL CLOSURE PS&E

After approval of the prefinal PS&E, submit five (5) copies for final review. Upon approval of the final PS&E, submit one original, five sets of PS&E, and two copies of other items listed below:

1. Plans;
2. Specifications;
3. Estimates;
4. Quantity take-off and computation sheets;
5. Unit price analysis;
6. Design analysis and computations;
7. CPM for construction time;
8. Design narratives; and
9. Post Closure Plan Operations Manual.

An electronic non-PDF workable file in AUTO CADD format, latest version, shall be submitted in a separate disks for the plans, specifications, estimates, and post closure plan operations manual.

## IV.    SCHEDULE OF SUBMITTALS

**TASK I**        _____
**TASK II**       _____
**TASK III**      _____
**TASK IV**       _____

## V.  SCHEDULES OF FEES

The following fees less, 10% retainage, will be processed for payment after submittal and approval of the following:

| | |
|---|---|
| **TASK I** | $_____ |
| **TASK II** | $_____ |
| **TASK III** | $_____ |
| **TASK IV** | $_____ |

## VI.  AVAILABILITY OF MAJOR SUPPORTING DOCUMENTS

Major supporting documents which will be of interest to offerors and eventually be required to carry out the project include the Integrated Solid Waste Management Plan for the Island of Guam (Phase II Report), the Guam Solid Waste Disposal Regulations and applicable local and federal wetland protection regulations, mitigation policy and guidelines and similar documents.  These documents are attached.



# Letter of Transmittal

| | |
|---|---|
| **Date:** | May 15, 2004 |
| **To:** | **DPW Solid Waste Management** |
| **Attn.:** | **Mr. Marc Gagarin, P.E.** |
| **cc:** | John P. Dueñas, P.E. |
| **From:** | **Miguel C. Bordallo, P.E.** |
| **Re:** | **Ordot Landfill Closure** |
| **Via:** | Hand Delivery |

We are sending herewith the following:

☐ Drawing Originals  ☐ Copies of Drawings  ☐ Specifications  ☐ Electronic File on Diskette(s)
☐ Shop Drawings  ☐ Letter  ☐ Others  ✓ **Initial Fee Estimate**

IF YOU DID NOT RECEIVE THE COMPLETE PACKAGE LISTED BELOW OR IF ENCLOSURES ARE NOT AS INDICATED, PLEASE CONTACT OUR OFFICE IMMEDIATELY AT (671) 646-7991

**This package includes the following:**

| Qty | Unit | Description |
|---|---|---|
| 1 | Ea | Fee Proposal Package (Summary Sheet, Manhour Breakdown, Expense Breakdown, Task Summaries) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

These are transmitted as indicated below:

☐ For you use  ✓ As Requested  ☐ For Approval  ☐ For Review and Comment  ☐ Others
☐ Submittal Package ( )  ☐ Return after loan to us (thanks)  ☐ Return after Shop Drawing Review

**Remarks:**

Hafa Adai Marc:
Please find enclosed initial fee proposal. The estimates for effort are conservative based on the fact that we have not had the opportunity to determine the quantity or quality of existing data regarding the landfill. Reductions in effort and expenses can be made once we confirm the existing data and clarify scope items with our sub-consultants. I will attempt to meet with them prior to our scheduled negotiation meeting so we can have suggestions on possible reductions in hand. Thank you.

Received By: _____  Date: _____  _____ Sender

**ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT**
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164, Saipan, MP 96950 / Chalan Pale Arnold, Pacific Plaza Bldg., Unit 5, South Garapan, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

DPW Fee Xmittal 15MAY04.doc

# TASK SERIES 3

MANPOWER ESTIMATE

| Project: | DEPARTMENT OF PUBLIC WORKS |
|---|---|
|  | ORDOT LANDFILL CLOSURE |
| Location: | GUAM |
| Date: | 5/15/2004 10:15 |
| By: | J. Duenas |
| Phase: | Pre-Final Plans, Specifications and Estimates (PS&E) |
| Notes: | See Subtask Breakdown |

Column groups: **Duenas & Associates** — PM (Project Manager), CES (Chief Env Scientist), SS (Staff Scientist), CE (Civil Engineer), EPE (Env Proj Engr), GSP (GIS Staff Planner), CAD (SA CAD Tech), Cst (Cost Estimator), AA (Admin Assistant), CS (Chief Surveyor), Cat (Categories survey crew), 3MS (3-man survey crew); **URS** — P5, P4, P3, P2, P1, S5, S4, S3, S2, S1, T4, T3, T2, T1, C4; **Mink & Yuen** — PH (Principal Hydrogeologist), PE (Principal Engineer), SE (Staff Engineer), Dr (Draftsman); **GET** — PE (Principal Engineer), GE (Geotechnical Engineer), Geo (Geologist), Cl (Clerical).

| # | Task | LEAD FIRM | PM | CES | SS | CE | EPE | GSP | CAD | Cst | AA | CS | Cat | 3MS | P5 | P4 | P3 | P2 | P1 | S5 | S4 | S3 | S2 | S1 | T4 | T3 | T2 | T1 | C4 | PH | PE | SE | Dr | PE | GE | Geo | Cl | Total Hours by Task |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | **Pre-Final Closure Plan, Specifications & Estimates** | | 128 | 0 | 0 | 102 | 16 | 0 | 20 | 72 | 0 | 0 | 0 | 0 | 333 | 200 | 1284 | 184 | 488 | 0 | 0 | 0 | 0 | 0 | 312 | 648 | 0 | 700 | 0 | 32 | 8 | 16 | 0 | 24 | 0 | 0 | 0 | 3362 |
| 1 | Grading design | | 2 | | | 4 | | | | | | | | | 12 | 4 | 24 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70 |
| 2 | Capping system - soils | | | | | 4 | | | | | | | | | 4 | 4 | 16 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |
| 3 | Capping system design | | | | | | | | | | | | | | 24 | 0 | 24 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 88 |
| 4 | Soils management | | 4 | | | | | | | | | | | | 12 | 4 | 56 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 76 |
| 5 | Leachate management system design | | 2 | | | 6 | | | | | | | | | 8 | 0 | 8 | 16 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80 |
| 6 | Leachate management - treatment system | | | | | | | | | | | | | | 2 | 0 | 16 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42 |
| 7 | Landfill gas collection system design | | 2 | | | | | | | | | | | | 20 | 16 | 144 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 222 |
| 8 | Landfill gas flare system design | | | | | | | | | | | | | | 12 | 12 | 64 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 104 |
| 9 | Landfill gas monitoring well design | | | | | | | | | | | | | | 10 | 2 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 36 |
| 10 | Stormwater management system design | | 2 | | | 6 | | | | | | | | | 16 | 0 | 128 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 192 |
| 11 | Sedimentation basin design | | 2 | | | 6 | | | | | | | | | 8 | 0 | 72 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 40 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 152 |
| 12 | Erosion control systems design | | 2 | | | 6 | | | | | | | | | 4 | 8 | 0 | 16 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 60 |
| 13 | Project drawings - landfill closure | | 20 | | | 40 | | | 40 | | | | | | 44 | 24 | 168 | 40 | 80 | 0 | 0 | 0 | 0 | 0 | 200 | 600 | 0 | 700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1956 |
| 14 | Cutoff wall design | | 2 | | | 6 | | | | | | | | | 2 | 24 | 64 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 98 |
| 15 | Project drawings - cutoff wall | | 8 | | | 4 | | | | | | | | | 10 | 32 | 40 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 146 |
| 16 | Groundwater treatment system design | | | | | | 6 | | 6 | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| 17 | Project drawings - treatment system | | 12 | | | | 6 | | 12 | 12 | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42 |
| 18 | Lonfit River cleanup design | | | | | | 2 | | 2 | | | | | | 2 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| 19 | Project drawings - Lonfit River cleanup | | 6 | | | | 2 | | 8 | | | | | | 4 | 16 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 84 |
| 20 | Technical specifications | | 2 | | | 4 | | | | | | | | | 16 | 4 | 48 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 98 |
| 21 | Bidding documents | | 8 | | | 4 | | | | | | | | | 5 | 0 | 64 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 121 |
| 22 | Engineer's cost estimate | | 4 | | | 4 | | | | | | | | | 4 | 0 | 28 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |
| 23 | Design Report | | 12 | | | 4 | | | | | | | | | 4 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 48 |
| 24 | Closure Plan | | 6 | | | | | | | | | | | | 9 | 0 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 51 |
| 25 | Post-closure Care and Maintenance Plan | | 2 | | | | | | | | | | | | 9 | 0 | 28 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 39 |
| 26 | Construction Quality Assurance Plan | | 2 | | | | | | | | | | | | 2 | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 |
| 27 | Project Schedule | | | | | | | | | | | | | | 2 | 2 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 |
| 28 | Project Design Meetings | | 4 | | | | | | | | | | | | 48 | 40 | 128 | 40 | 80 | 0 | 0 | 0 | 0 | 0 | 24 | 48 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 412 |
| 29 | DPW Meetings | | 24 | | | 8 | | | | | | | | | 40 | 0 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 112 |
| 30 | Design Consultation | | | | | | | | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 32 | 8 | 16 | 0 | 24 | 0 | 0 | 0 | 80 |
| | **PHASE 3 TASK SERIES** | | 128 | 0 | 0 | 102 | 16 | 0 | 20 | 72 | 0 | 0 | 0 | 0 | 333 | 200 | 1284 | 184 | 488 | 0 | 0 | 0 | 0 | 0 | 312 | 648 | 0 | 700 | 0 | 32 | 8 | 16 | 0 | 24 | 0 | 0 | 0 | 3362 |

Duenas and Associates, Inc.

**REVISED FEE PROPOSAL**
Environmental & Engineering Services
For the  Ordot Dump Closure
June 09, 2004

Prepared for

Consent Decree Task Force
Department of Public Works
Government of Guam
542 N. Marine Corps Drive
Tumon, Guam 96913

Prepared By

Dueñas & Associates, Inc.
155 ET Calvo Memorial Parkway
Suite 200
Tamuning, Guam 96913

TASK SERIES 3

MANPOWER ESTIMATE

Project: DEPARTMENT OF PUBLIC WORKS / ORDOT LANDFILL CLOSURE

Location: GUAM
Date: 6/9/2004 14:05
By: J. Duenas
Phase: Phase 2: Pre-Final Plans, Specifications and Estimates (PS&E)
Notes: See Subtask Breakdown

| # | Task | Duenas & Associates | | | URS | | | | | | | | Mink & Yuen | GET | Total Hours by Task |
|---|------|---------------------|---|---|-----|---|---|---|---|---|---|---|-------------|-----|---------------------|
| 3 | Pre-Final Closure Plan, Specifications & Estimates | PM 108; Civ Eng 132; EGS 2; Cost 88 | | | 412; 680; 2600; 488; 1272 | | | | | 612; 1100; 1100 | | | 32; 10; 10; 18; 24 | | 6358 |
| 1 | Grading design | 2 | 4 | | 10; 42; 184; 100; 124 | | | | | | | | | | 466 |
| 2 | Capping system - soils | | | | 10; 24; 100; 0; 78 | | | | | | | | | | 212 |
| 3 | Capping system design | | | | 24; 72; 144; 0; 160 | | | | | | | | | | 400 |
| 4 | Soils management | | 4 | | 4; 12; 68; 0; 40 | | | | | | | | | | 128 |
| 5 | Leachate management system design | | 6 | | 10; 40; 60; 36; 100 | | | | | | | | | | 254 |
| 6 | Leachate management - treatment system | | | | 0 | | | | | | | | | | 0 |
| 7 | Landfill gas collection system design | | 2 | | 30; 72; 200; 0; 120 | | | | | | | | | | 424 |
| 8 | Landfill gas flare system design | | | | 12; 50; 76; 88; 16 | | | | | | | | | | 242 |
| 9 | Landfill gas monitoring well design | 2 | | | 12; 42; 74 | | | | | | | | | | 130 |
| 10 | Stormwater management system design | 2 | 6 | | 36; 0; 240; 0; 110 | | | | | | | | | | 394 |
| 11 | Sedimentation basin design | 2 | 6 | | 26; 0; 172; 0; 100 | | | | | 128 | | | | | 434 |
| 12 | Erosion control systems design | 2 | 6 | | 8; 20; 0; 36; 44 | | | | | | | | | | 130 |
| 13 | Project drawings - landfill closure | 20 | | 80; 80 | 50; 68; 240; 80; 80 | | | | | 300; 1060; 1100 | | | | | 3158 |
| 14 | Cutoff wall design | | | | 0; 0; 0; 0; 0 | | | | | | | | | | 0 |
| 15 | Project drawings - cutoff wall | | | | 0 | | | | | | | | | | 0 |
| 16 | Groundwater treatment system design | | | | 0; 0; 0; 0; 0 | | | | | | | | | | 0 |
| 17 | Project drawings - treatment system | | | | 0 | | | | | | | | | | 0 |
| 18 | Lonfit River cleanup design | | | | 0 | | | | | | | | | | 0 |
| 19 | Project drawings - Lonfit River cleanup | 2 | | 2; 8 | 8 | | | | | | | | | | 10 |
| 20 | Technical specifications | 2 | 4 | | 8; 36; 30; 40; 0 | | | | | 76 | | | | | 206 |
| 21 | Bidding documents | 8 | 4 | | 14; 36; 160; 0; 80 | | | | | | | | | | 296 |
| 22 | Engineer's cost estimate | 4 | 4 | | 0; 0; 62; 0; 40 | | | | | | | | | | 118 |
| 23 | Design Report | 12 | 4 | | 0; 0; 68; 0; 20 | | | | | 0 | | | | | 100 |
| 24 | Closure Plan | 6 | | | 4; 0; 44; 8; 0 | | | | | 4 | | | | | 76 |
| 25 | Post-closure Care and Maintenance Plan | 2 | | | 4; 12; 40; 0; 0 | | | | | 4 | | | | | 66 |
| 26 | Construction Quality Assurance Plan | 2 | | | 16; 0; 40; 0; 0 | | | | | 0 | | | | | 58 |
| 27 | Project Schedule | | | | 8; 0; 100; 0; 0 | | | | | 0 | | | | | 110 |
| 28 | Project Design Meetings | | 8 | | 28; 20; 80; 20; 40 | | | | | 0 | | | | | 188 |
| 29 | DPW Meetings | 4 | | | 24; 64; 128; 40; 80 | | | | | 24; 40 | | | | | 404 |
| 30 | Design Consultation | 24 | 8 | | 40; 0; 40; 0; 0 | | | | | 0 | | | | | 94 |
| 31 | Additional geotechnical investigation | | | | | | | | | | | | 32; 10; 10; 18; 24 | | 94 |
| | Finalize operations plan for landfill | | | | 4; 0; 30; 40 | | | | | 0 | | | | | 74 |
| | Finalize filling plan for landfill | 6 | 24 | | 40; 0; 12 | | | | | 12; 0 | | | 12 | | 94 |
| | Finalize landfill drawings for permit | 4 | 12 | | 40; 0; 8 | | | | | 24; 0 | | | 24 | | 90 |
| | Finalize permit application, obtain permit | 4 | 16 | | 120; 0; 20 | | | | | 40; 0 | | | | | 200 |
| | | | | | | | | | | | | | | | 34 |
| | | | | | | | | | | | | | | | 0 |
| | **PHASE 3 TASK SERIES** | 108 | 0 | 132; 2; 88 | 412; 680; 2600; 488; 1272 | | | | | 612; 1100; 1100 | | | 32; 10; 10; 18; 24 | | 6358 |

Duenas and Associates, Inc.



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 9
75 Hawthorne Street (CED-6)
San Francisco, CA 94105

October 26, 2005



HIGHWAYS

<u>Via Email and Facsimile</u>

Larry Perez, Acting Director
Department of Public Works
542 North Marine Drive
Tamuning, GU 96911

Re: EPA Comments on the Ordot Final Closure Plan and Post-Closure Plan

Dear Mr. Perez:

The Environmental Protection Agency, Region 9 (EPA) at this time is providing comments to the Department of Public Works (DPW) regarding the Ordot Final Closure Plan and Post Closure Plan prepared under paragraph 8 of the Civil Case No. 02-00022 Consent Decree (Consent Decree). The comments are detailed in the two enclosed memorandums from CH2M Hill to Lance Richman, dated October 4, 2005 and October 18, 2005.

These memorandums raise two issues that are of particular concern to EPA:

1) Steep slopes: DPW must demonstrate that slopes of 1.5:1 will remain stable and that the liner system can be preserved. Cover material will be needed to protect the liner, yet it is unclear that a foundation can be sustained on these steep slopes.

2) Leachate collection system: The 20,000 gallon Leachate Storage Tank appears inadequate. The tank would not be large enough to contain a day of peak flows. It is also unrealistic to expect a system of trucking leachate to adequately handle flows during peak events. If DPW plans to demonstrate that all leachate will be contained by the deadline in the Consent Decree, October 23, 2007, DPW will need to develop a more reliable method of managing leachate flows.

It would also be prudent for DPW to assess different geomembrane thicknesses. With further analysis, DPW can determine if other thicknesses would be adequate.

OCT 27

Pursuant to paragraph 7 of the Consent Decree, DPW has 30 days from receipt of this letter to respond and incorporate the above comments as well as those presented in the enclosures. Please call me at (415) 972-3770 if you would like to discuss this matter further.

Sincerely,

Ben Machol
Guam Program Manager, P.E.

Enclosures

cc:     Douglas Moylan, Attorney General of Guam
        Randel Sablan, Guam EPA
        Mikel Schwab, Assistant U.S. Attorney



OCT 24 2005
# MEMORANDUM

TO:         Lawrence P. Perez
            Acting Director

FROM:       Marc A. Gagarin, P.E.
            Chief Engineer, Division of Highways

SUBJECT:    **Negotiation Memorandum – Phase II, Task III & IV, Pre-final and
            Final Design for the Environmental and Engineering Services for
            Design of the New Municipal Solid Waste Facility, Project No. DPW-
            SW-2004(003).**

The negotiation process for the optional tasks to complete the construction plans and bid
documents for the new Guam Municipal Solid Waste Landfill Facility (MSWLF) started with
the Consultant's submittal of fee proposals on September 6, 2005.  The optional tasks, as
identified under Contract No. C050603180 and C050603181 consists of completing the 40%
design to final design plans, specifications, and engineer's estimates (PS&E) and other
related design documents to secure a construction bid for the project to be procured under
competitive sealed bidding.

The representatives for the negotiation were:

Department of Public Works              TG Engineers, P.C. and Sub Consultants
Marc A. Gagarin, P.E., Chief Engineer   Tor Gumundsen, P.E., Principal
Perlita Sucgang, Engineer Supvr-HP&C    Glenn O'del, Amehr Inc
Kristina Alam, Project Coordinator

Notes:      Cynthia Jackson, the Project Manager and an original member of the DPW
            negotiation panel, was unable to participate.  However, she along with other
            negotiating members of the consultant was on standby at their Guam, San
            Francisco and Honolulu offices to conference call, if necessary, for the
            negotiation.

*Exhibit 4*

The consultant initial fee proposal of *$2,948,902.00* was submitted on September 6, 2005 based on the general Statement of Work provided by the government.

The negotiation started on September 12, 2005, 1:00 p.m., with the discussions on the tasks identified in the Statement of Work to arrive at a common understanding of the different tasks. The major discussions were as follows:

1) *Topographic Survey and Severance Map.* This task must read, as Survey Services and the Consultant need to clarify the limits of the work accomplished on the original contract (40% PS&E) and identifies additional survey required.

2) *Wetland Mitigation Work.* The Consultant assured the negotiating team that there are no wetlands affected by the construction of the new landfill. The wetland affected by the Ordot Dump closure amounts to less than 1-acre; and since the mitigation work will likely be on the same watershed as the Lonfit River it is advisable to separate the task and include it with the Ordot Dump Closure.

3) *Construction of Monitoring Wells.* Consultant to proposed acceptable and realistic number of monitoring wells required for Cell Nos. 1 –3.

4) *Ground Water Sampling and Testing.* Consultant to re-visit and review the proposed groundwater sampling and testing requirements from the 40 CFR 258 and Guam Solid Waste Rules and Regulations.

5) *Design Issues.* Consultant to re-visit original design services and identify all the work accomplished and the necessary additional services to complete the final design PS&E.

6) Delete the dye traces study in the scope of work.

7) Consultant to include services for the Inarajan Waste Water Treatment Plan.

8) Consultant to submit their proposed fee in accordance with the tasks as presented in the Statement of Work (SOW).

The Consultant need to adjust their fee proposal based on the above discussions, and the final Scope of Work rewritten to reflect the changes as identified above. The meeting was adjourned at 4:00 p.m.

The negotiation was resumed the following day, September 13, 2005 at 10:00 a.m. The consultant's revised fee proposal was *$2,678,482.00* based on the above mentioned discussions.

DPW reviewed the revised fee and negotiated with the consultant based on the man-hours for the different discipline for each task as described in the Statement of Work. The hours then converted to dollar value based on the overhead rate and salaries submitted by the consultant. Other items of negotiation that also attributed to the changes on the cost are:

1) Consultant to use the same overhead rate of 103% as in the original contract instead of the proposed 115%.

2) Consultant's coordination fee of 10% must only be applied to the sub-consultant's direct labor cost instead of the total cost submitted by each sub-consultant.

3) The cost of construction of monitoring wells was reduced to about $100,000.00.

4) Consultant includes an evaluation of the leachate volumes and chemistry and will coordinate with GWA. It also includes any plant improvement that might be required. This is an added cost.

At 3:30 pm, after a lengthy discussion the on the man-hours and corresponding cost for each task the DPW offered a lump sum fixed price of *$2,250,000.00* for their services. The Consultant stated that they will review and rework their proposal based on the amount and will re-submit a revised proposal.

The revised proposal was submitted on September 28, 2005, on Guam. The amount of $2,250,000.00 was reflected, however after close scrutiny, the Statement of Work (SOW) did not completely reflect the Hawaii negotiated SOW agreement. The Consultant stated he could not meet the Government offer of $2,250,000.00 for the Hawaii negotiated SOW, thus the reduction of two water sampling and testing events.

He counter offered at *$2,300,000.00*, an additional $50,000.00 to completely reflect the negotiated SOW and correct cost for the Ground Water Sampling and Testing Task.

The consultant submitted their best and final fee proposal as follows:

|  | Task III | Task IV | Subtotal |
|---|---|---|---|
| Fixed Fees | $1,746,313 | $ 264,263 | $ 2,010,576 |
| Direct Reimbursable | $ 180,305 | $ 109,119 | $ 289,424 |
| **Totals** | **$ 1,926,618** | **$ 373,382** | **$ 2,300,000** |

The detailed distributions of the fees for the prime and sub-consultants and by discipline are attached as follows:

1) Initial fee proposal - **$2,948,902.00**
2) Second fee proposal - **$2,678,482.00**
3) Government Offer - **$ 2,250,000.00**
4) Best and Final - **$2,300,000.00**
5) General Scope of Work
6) Final Statement of Work

**Recommendations:**

The DPW negotiation team considers the final fee proposal of $2,300,000.00 as fair and reasonable and, therefore, recommends award of contract to the TG Engineers.

Should you have any questions, the negotiating team are available at your convenience.

Approved as recommended:

LAWRENCE P. PEREZ, Acting Director

Date: ___Z/_____

# T G   E N G I N E E R S ,   P C

September 28, 2005

Mr. Lawrence P. Perez, Director
Department of Public Works
Government of Guam
Consent Decree Section
542 North Marine Drive
Tamuning, Guam 96913

Attn:   Ms. Cynthia Jackson, Project Manager

## RE   MSW LANDFILL PROJECT – PHASE II DESIGN
## SUMMARY OF FEE PROPOSAL STATUS

Dear Cynthia:

1.0   Enclosed please find 4-copies of the following:

1.1   Phase II Scope and Fee Negotiation Meetings, Summary issued (9/28/2005).

1.2   GEPA Comments on Draft SOW, TGE Response issued (9/28/2005).

1.3   Fee Proposal Interim Spreadsheet No. 1.

1.4   Fee Proposal Interim Spreadsheet No. 2

2.0   Other Comments

    2.1   The Interim Proposals attached indicate the negotiated fee status during the meetings.  This included the revisions agreed to as of the beginning and end of Day 2, September 13, 2005.

    2.2   The negotiations ended on Day 2 with the final budget of $2,250,000 identified as the fee for the Phase II project.  We have worked hard with the team to determine ways to make the additional fee cuts and keep the scope required to design and permit the facility.  We note the significant additive and deductive scope revisions included with the final Statement of Work and Fee Proposal.

        a.   Add the leachate evaluation and meetings with GWA to discuss the Inarajan WWTP and leachate disposal requirements.

Page 1 of 2

*Exhibit 4*

b.  Add conversion of 2-additional piezometers (TG-10 & TG-11) into monitoring wells (total of 6-Phase I piezometers converted). The groundwater sampling will include these wells.

c.  Add locating the other piezometers from the EIS project and using them for monthly groundwater depth measurements if possible.

d.  Add in monthly groundwater depth measurements at the functioning wells and reporting.

e.  Add in monthly surface water monitoring station observations and reporting.

f.  Reduce the number of groundwater sampling events from 4 to 2, this will include a sampling event in October 2005 and February 2006. We assume sampling and testing will continue on a quarterly basis beyond the Phase II contract as the landfill construction and operations proceed.

We appreciate your assistance to move the Phase II contract forward and we look forward to beginning the work. Please contact me at 647-0808 with any comments or questions. Thank you again for selecting TG Engineers, PC for this project.

Si Yu'os Ma'ase,
TG Engineers, PC

Tor Gudmundsen, PE
President

RECEIVED: _____

PRINTED NAME: _____

DATE: _____

# TG ENGINEERS, PC

Environmental & Engineering Services for the New MSWLF
Phase II Scope and Fee Negotiation Meetings
Meeting Nos. 1 & 2 – September 12-13, 2005
Pacific Guardian Center, Honolulu, Hawaii
<u>SUMMARY Issued (9/28/2005)</u>

## 1.0     ATTENDANCE

| | |
|---|---|
| Marc Gagarin | DPW |
| Perlita Sucgang | DPW |
| Tina Alam | DPW |
| Glen O'Dell | Amehr, Inc. |
| Tor Gudmundsen | TG Engineers |

## 2.0     STATEMENT OF WORK (Revised 9/5/2005)

### 2.1     GENERAL COMMENTS
a.     Delete the reference to "Optional Task" in the Statement of Work.
b.     The Phase 2 work shall be, "Amendment No. 2" to the contract.
c.     It was clarified that the final Statement of Work from the Phase I contract was labeled as, "Revised 4/28/2005".

### 2.2     FIELDWORK
#### 2.2.1 Topographic Survey
a.     The title for survey work on the Statement of Work will be revised from "Topographic Survey" to "Survey Services".
b.     The Route 4 survey is for improvements to Route 4 north and south of the Landfill road intersection. The Phase I survey included the Route 4 intersection, this is for an additional 2,500lf such that the vertical alignment of Route 4 can be adjusted to improve and meet sight-distance requirements. This improvement was identified due to poor visibility for north-bound traffic on Route 4 and the potential for conflicts with slow moving trucks that would be exiting from the landfill road.
c.     The survey scope for Severance Map preparation between Phase I and Phase II was clarified. In accordance with the Phase I scope, Balagtas prepared a draft map based on the information available from the design. The final map can only be prepared once the road and facility footprint is confirmed. At this time there are still variables on the footprint that may result in minor adjustment. The scope and fee included for Severance Map preparation is for the final map preparation and then processing the approval at DLM.

Case 1:02-cv-00022    Document 79-4    Filed 01/31/2007    Page 11 of 26

d.      The existing landfill footprint includes encroachment into the adjacent Government of Guam land to the south of LOT B-3REM. It was clarified with Balagtas that if the footprint is pulled back and kept inside LOT B-3REM then the scope is reduced because the southern boundary line for LOT B-3REM does not have to be surveyed in the field and confirmed with DLM. It was decided by DPW to pull the landfill boundary back within LOT B-3REM and avoid the GovGuam land encroachment.

**NOTE: A decision was made by DPW to pull the landfill footprint back within LOT B-3REM and avoid the GovGuam land encroachment to the south.**

e.      On the Severance Map, the new road R-O-W will be labeled as a separate R-O-W parcel. This is the new right-of-way extending from LOT B-2R/W to the Landfill Site.

f.      Wetland mitigation work is not required for the Dan Dan site. The scope included a small impacted wetland parcel (0.4-acre) at Ordot to be mitigated at the Dan Dan site. We have learned from the Army Corps of Engineers that the wetland mitigation process requires that mitigation for impacted wetlands is completed within the same watershed if possible. As such, it appears the mitigation will be required in the Lonfit River watershed and not at Dan Dan. It was recommended and confirmed that the Ordot wetland mitigation work would be removed from the Phase II scope of services and completed by others.

**NOTE: A decision was made by DPW to delete the Ordot wetland mitigation work from the Phase II Scope of Work.**

g.      The scope item for the Severance Map will be revised to be clear that the map preparation and processing for approval is inclusive.

2.2.2   Monitoring Well Construction

a.      The scope of work included construction of 12-new monitoring wells, as recommended by Guam EPA. This is the complete monitoring well network for the fully developed landfill. Amehr disagrees with this recommendation and considers it additional expense for wells that are not necessary for construction and operations of the first 3-cells. It was decided that 4-new wells will be constructed as shown on the 40% design plan. The monitoring well network for Cell Nos. 1 – 3 will be developed.

**NOTE: A decision was made by DPW to construct 4-new monitoring wells and focus on the monitoring well network required for Cell Nos. 1 – 3.**

b.     The GEPA comments issued on the Draft Statement of Work included a request to complete a dye tracer study. Amehr disagrees with this request and believes the extremely low permeability of the soils will prevent timely results that can be useful reference for the design or start-up operations.

**NOTE: A decision was made by DPW to not include a dye tracer study in the scope of services.**

c.     The GEPA comments include a request for groundwater sampling parameters to follow 40 CFR 258, the Guam Solid Waste Rules and Regulations (Title 22, Division 4, Chapter 23) and the Guam Water Quality Standards. It was confirmed that the Phase II work would focus on meeting the requirements listed in the 40 CFR 258 and Guam SW Rules and Regulations for groundwater sampling and testing. The Guam Water Quality Standards will be reviewed to clarify if there are any differences from the 40 CFR 258 and Guam SW Regulations.

**NOTE: A decision was made by DPW to focus on meeting the groundwater monitoring, sampling and testing requirements from the 40 CFR 258 and Guam Solid Waste Rules and Regulations.**

d.     It was confirmed that 1-year of groundwater data is required by GEPA / Subtitle D regulations for opening the landfill. The project scope includes sampling and testing events for collecting data. In addition, there will be another year of time for data collection between the Phase II contract completion and the opening of the new landfill on the Consent Decree schedule in October 2007.

e.     Other scope review comments / suggestions from GEPA are included or will be addressed in a separate letter.

f.     Amehr recommends that a quarterly sampling and testing program should be completed between 2006 – 2007; this will provide a second year of data for reference.

g.     The 40% design monitoring well map will be attached with the Statement of Work for reference.

2.2.3  Piezometer Conversion to Monitoring Wells (4-each) – Ok.

2.2.4  Groundwater Sampling & Testing – Ok.

2.2.5  Surface Water Sampling & Testing – Ok.

2.2.6  Wetland Mitigation – Deleted from scope as noted above.

2.2.7 Building Geotechnical Investigation

a.  It was clarified that soil borings were completed as part of the Phase I geotechnical and hydrogeological investigations. At the beginning of the field work the location of the buildings and facilities was unknown. The Phase II geotechnical scope is to use the boring data from Phase I to provide recommendations and a report for the buildings and onsite facilities.

2.3  <u>DESIGN</u>

2.3.1 Landfill Design, Analysis and Computations

a.  Delete the references to the 40% design review and comments.

b.  It was confirmed the HELP model will be used by Amehr for both the bottom liner and cover.

2.3.2 Preparation of Pre-Final Plans, Specifications & Estimates

a.  Update the scope document to indicate the Pre-Final work status is 100% complete. This means the design is 100% complete and the following Final Submittal will only pick-up and incorporate review comments from the Government review.

<u>On-site (Landfill) Facilities</u>

a.  It was confirmed the scope will include the complete design for bidding and construction of Cells 1 & 2 with the adjacent Cell 3 concept shown as appropriate on the drawings.

<u>Entrance Facilities – Ok.</u>

<u>Off-Site Facilities – Ok.</u>

a.  It was confirmed there will be just 1-set of Bid Documents for the project. This will include the Off-site, Entrance and On-site facilities.

2.4  <u>REGULATORY PLAN DOCUMENTS</u>

2.4.1 Wetland Mitigation Plans – deleted from scope as noted above.

2.4.2 Landfill Construction & Operations Plans – Ok.

2.4.3 Landfill Closure & Post-Closure Plans – Ok.

2.5  <u>PERMITS</u> – Ok.

2.6  <u>OTHER CONSULTING</u>

2.6.1 Cost – Revenue Model – Ok.

2.6.2 GEPA Landfill Facility Permit – Ok.

2.7  <u>TASK IV FINAL PS&E</u>

2.7.1 Bid & Construction Document Final Submittal – Ok.

2.7.2 Final Submittal – Ok.

2.8　　**PROJECT MANAGEMENT AND COORDINATION**

2.8.1　Project Kick-off Meeting.

a.　　Delete the references to the 40% design review and comments.

2.8.2　Tri-Weekly Progress Meetings – Ok.

2.8.3　Interim Submittal – Ok.

2.8.4　Submittal Presentations – Ok.

2.8.5　Consent Decree Quarterly Reports – Ok.

2.8.6　Meetings – Ok.

2.8.7　Schedule Updates – Ok.

2.8.8　Data Compilation & Maintenance – Ok.

2.8.9　Bid Phase Services

a.　　Revise the wording to indicate "Attendance" at the Pre-Bid Conference and Site Visit instead of "Conduct" these events. DPW personnel will conduct the events and TGE will attend and participate.

b.　　Revise Task F to, "Provide a Bid Analysis".


2.9　　**SCHEDULE AND DELIVERABLES**

2.9.1　Schedule to Match Consent Decree Requirements

a. ·　The Final Submittal date is tentative and may shift dependent on the GEPA Permit comments and when they are issued.

2.9.2　Deliverables

a.　　Dates in 2006 after the February submittal are tentative and depend on the Government review.


2.10　**TRAVEL, EQUIPMENT AND DIRECT EXPENSES**

2.10.1 Reproduction Costs – Ok.

2.10.2 Travel Expenses – Ok.

2.10.3 Water Sampling Equipment & Supplies – Ok.

2.10.4 Miscellaneous Equipment – Ok.


2.11　**RESPONSIBILITIES OF THE GOVERNMENT – Ok.**


3.0　　**OTHER SCOPE ITEMS**


3.1　　Inarajan Wastewater Treatment Plant

a.　　An email was received from Cynthia Jackson with comments from GEPA. It is required that the Inarajan WWTP is included as an option for leachate disposal. It was agreed that the TGE team would include an evaluation of the leachate volumes and chemistry, also to meet and discuss this with GWA. It is assumed that GWA will provide plant information and complete an evaluation to determine the capability of the plant to handle the leachate, also to complete any plant improvements that might be required.

4.0     FEE PROPOSAL

4.1     The Phase II work will be an amendment to the existing contract, as such the labor, overhead and profit rates for team members must stay as agreed on in the Phase I contract.

4.2     The TGE OH shall adjust to match the Phase I contract rate.

4.3     TGE is allowed a 10% mark-up only on the direct labor of the subconsultants.

4.4     DPW will provide a form such that the pyramid GRT payment can be eliminated, the double payment will be deleted.

4.5     The budget available for the Phase II work from DPW is $2,250,000. In addition to rate, overhead and GRT adjustments, the TGE team shall determine how to reduce the fee to meet the $2.25M budget.

End of meeting.

Please respond with any comments to this meeting summary within 3-days of receiving the file. If no comments are received the summary will become the official record of the meeting.

**Miguel Bordallo, P.E.**
Vice-President
Dueñas, Bordallo & Associates, Inc.
238 East Marine Drive Corps Drive
Diamond Plaza, Suite 101
Hagatña, Guam 96910

**Reference:** **Ordot Dump Closure Contract, Project No. DPW-SW-2004(002)**

Subject: Request for Non-PDF Workable Closure Plans/ Drawings & Additional Design Services

Hafa Adai Mr. Bordallo:

The Department of Public Works (DPW) has reviewed your conditions regarding the release of electronic non-PDF workable files for the closure project, i.e. 100% Closure Design Plans, Specifications & Estimates (PS&E), and hereby acknowledges and confirms DPW's previous verbal authorization of Task IV work for the referenced contract.

In an effort to work cooperatively with your firm and to progress the project, DPW and the Consent Decree Compliance Team (CDCT) intends to:

1. Compensate your firm for Task IV work already completed

2. Finalize negotiations with your firm for additional design services requested, which shall include:

   a) **Ordot Dump Assessment Report**, which includes but is not limited to the following:
      i. Perform topographic survey of the site to reflect current dump conditions
      ii. Evaluate the current topographic survey with the topographic survey performed by your firm in October 2004 to determine the dumps remaining life span and the adequacy of the current closure design considering that dump operations will continue past the initial closure date of October 2007
   b) **Field Investigations** to complete Guam Environmental Protection Agency (EPA) requirements to fill in data gaps presented in the Environmental Baseline Study (EBS), Ordot Dump, dated July 2005
   c) **Feasibility and Cost-Benefit Analysis** of Value Engineering Report's design alternatives and suggestions

*Exhibit 5*

d) **Closure design modifications and finalize closure design PS&E** based on the previous three tasks above **and** the Ordot Dump Solid Waste Management Permit conditions issued by Guam EPA, 12/14/05

Finalization of negotiations shall conclude within 30 days from issuance of this letter.

DPW has approved and submitted your payment invoice for Task III work completed (Invoice 6J-11, Sequence No. 6, dated 15OCT2006 in the amount of $30,393) to the Department of Administration (DOA) on November 21, 2006. According to you, payment for this invoice has been received as of January 24, 2007.

DPW would like to meet with your firm as soon as possible to finalize negotiations for the additional closure design work. Please coordinate meeting(s) with Ms. Cynthia U. Jackson, Project Manager, at 646-3239. Attached is the latest revised Draft Scope of Work as of August 29, 2006 for the additional design services for the closure design project for your review, revision and finalization based on the tasks presented above and the negotiation meetings. An electronic workable file of this version of the Scope of Work will be sent to you via e-mail. Should you have any questions please contact Ms. Cynthia U. Jackson.

Sincerely,

Lawrence P. Perez
Director

*EKC/CUJ:ECRUZ*
*1/16/07*

*cc:*    *Dir's Chrono*
        *CD Project File*

**REVISED STATEMENT OF WORK**
**FOR PHASE 2: TASK IV (amended)**

**Environmental and Engineering Services**
**For the Preparation of Environmental Report,**
**Construction Plans, Specifications and Estimates**
**(PS&E) for the Ordot Dump Closure**
**Project No. DPW-SW-2004 (002)**

**1.0**     <u>Intent</u>

It is the intent of this amendment to the original contract, environmental and engineering services, to provide final modifications to the construction PS&E for the Ordot Dump Closure, as well as to provide additional work necessary to support the final Ordot Dump Closure (hereinafter referred to as the "Project"). This project is needed to meet the requirements listed under Section IV.8.a of the "Ordot Dump" Consent Decree, U.S. Civil Case No. 02-00022. The Department of Public Works (hereinafter referred to as "DPW") has solicited for environmental and engineering services to complete the Project. Dueñas & Associates, Inc., now known as Dueñas, Bordallo & Associates, Inc., (hereinafter referred to as the "Consultant") was selected by DPW to complete the Project. Specifically, the Consultant shall undertake the necessary environmental and engineering tasks to finalize Task IV of the original statement of work, and complete the Project in accordance with the requirements of the Consent Decree Task Force and in the manner outlined in the following sections.

**2.0**     <u>General Statement of Work</u>

The Consultant shall undertake the Project in phases as follows:

- **Phase 1 (Environmental Baseline Survey (EBS) and Preliminary PS&E)**: This phase of the Project involves those investigative and study requirements which must be undertaken to adequately assess the existing condition of the site and form the basis of subsequent design activities. Phase 1 also involves the development of an interim operational plan and application for authorization for continued operation of the Ordot Dump. Finally, Phase 1 activities will include the development of a preliminary closure plan. *This portion of the work has been completed; however, additional Limited Remedial Investigation (RI) work and related groundwater monitoring has been requested as a result of the EBS. This additional work shall be presented and conducted under a separate phase.*

- **Phase 2 Pre-Final and Final PS&E**: This phase of the Project involves the finalization of the Preliminary PS&E developed under Phase 1. Phase 2 works will further refine the various elements of the closure plan and incorporate review comments by DPW and the EPA. *This portion of the work has been partially completed. The Consultant shall complete the Final PS&E documents in accordance with the amended Task IV statement of work presented in the following Section, and summarized below:*

**Task IV. Final PS&E (Amended):**

**Basis for Design Modifications:** This subtask of the Project will fully evaluate three (3) key elements prior to making any design changes:

1. Evaluate current dump conditions and determine if the current closure design is still adequate considering that dump operations will continue past the initial closure date of October 2007 by approximately 12 months (*this portion of work is new and has not been started*).

2. Evaluate the feasibility and cost-effectiveness of design modifications contained in the Value Engineering (VE) Report (*this portion of work is new and has not been started*).

3. Determine the need to respond to all outstanding Preliminary and Final PS&E comments based on evaluation of the Ordot Dump Assessment Report, VE feasibility and cost/benefit analysis, and the evaluation of the current cap design (*this portion of work is new and has not been started*).

These three (3) evaluations shall be presented and discussed with DPW and Guam EPA to determine the basis to modify the existing design and finalize the PS&E (*this portion of work is new and has not been started*).

**Finalization of Closure PS&E:** This subtask of the Project includes the incorporation of review comments by DPW, Guam EPA, and USEPA to complete and Finalize the Ordot Dump Closure PS&E based on the results of the Basis of Design Modifications and additional scope items. These design revisions will satisfy the Guam EPA permit conditions and meet the requirement for extended operations at the Ordot Dump. Based on the results and decisions made during the Basis of Design Modifications, any design modifications/revisions that are outside the original contract's scope of work would be considered an additional scope item.

**3.0    Scope of Consultant Services for Phase 2**

**Task IV. Final PS&E (Amended):**

**Basis for Design Modifications:**

1. **Ordot Dump Assessment Report\*:** The Consultant shall provide a topographic survey of relevant portions of the active dump site at the same level of detail required for previous design efforts and submit a detailed **Ordot Dump Assessment Report** to DPW and Guam EPA. The **Ordot Dump Assessment Report** shall include, but not be limited to:

   a. A topographic survey of the site to reflect current dump conditions;
   
   b. An evaluation of the current topographic survey with the topographic survey performed by Duenas & Associates in October 2004.
   
       i. Determine the volume of waste received by the dump from October 2004 to the time of the survey;
   
       ii. Compare the final filling plan points (*Operations Plan* (July 2005), Appendix A) to the latest topographic survey;
   
       iii. Identify all areas that extend beyond the final limit of waste;
   
       iv. Calculate the waste volumes that extend beyond the final limit of waste;
   
       v. Calculate the remaining air space volume; and
   
       vi. Based on survey data and evaluation, determine the dump's

Draft as of 8/29/06

remaining life span using the final limit of waste, and the adequacy of the current closure design considering that dump operations continue past the initial closure date of October 2007.

*Note: This is an additional scope item.*

2. **Feasibility and Cost-Benefit Analysis for Recommendations Contained in the Value Engineering Report*:** The Consultant shall conduct a feasibility and cost-benefit analysis of value engineering recommendations contained in the Value Engineering (VE) Report for the Ordot Dump Closure dated December 2005. The goal of this task will be to identify value engineering recommendations that can be implemented without adversely impacting the effectiveness, construction, or function of the designed closure, and affording the government an appropriate cost savings through the use of alternative materials, methods, or other reasonable means. The end product of this task will be an engineering cost-benefit analysis report, with supporting calculations and analysis, which provides recommendations for implementing the identified VE items.

   a. <u>Review of VE Report -</u> The Consultant will thoroughly review the entire VE Report and recommendations prepared by *Value Management Strategies, Inc.*

   b. <u>Analysis -</u> For each recommendation reviewed, the Consultant will analyze the recommendation for applicability and effectiveness in achieving added value or function, or some combination of the two. The analysis will include comparative evaluation of both benefit and costs to establish a means to prioritize and/or rank each valid recommendation. A specific response to each recommendation reviewed will be prepared on the basis of this analysis.

   c. <u>Feasibility and Cost-Benefit Analysis Report -</u> The Consultant shall prepare a report detailing the findings of these analyses. The report shall include a prioritized list of acceptable VE recommendations along with the engineer's estimate of cost impact. The Consultant shall also develop a program of alternatives incorporating various VE recommendations that result in an overall reduced cost for the Ordot Closure.

   *Note: This is an additional scope item.*

3. **Evaluate and Respond to Pre-Final and 100% Design Submittal Comments:** The Consultant has submitted a Final Closure PS&E (September 2005) based on verbal authorization to proceed issued by DPW. The Final Closure PS&E was deemed incomplete, since the Final Closure PS&E did not fully address or implement the outstanding/unresolved comments generated from the Pre-final Submittal and subsequent Final Closure PS&E.

Considering that the Ordot Dump will receive approximately 12 months of additional waste, the need to immediately address and incorporate the outstanding/unresolved comments is not a priority.

The consultant shall evaluate the need to respond to the outstanding/unresolved comments based on the results from the Ordot Assessment Report and VE Feasibility and Cost-Benefit Analysis.

a. If substantial design modifications or redesign is required, meaning the current cap design cannot accommodate the expected volume of waste, the consultant shall take these comments into account when performing these design modifications.

b. If substantial design modifications or redesign is NOT required, meaning the current design can accommodate the expected volume of waste; the consultant shall evaluate, respond and incorporate all applicable outstanding/unresolved comments.

**4. Presentation of Findings and Decisions for Design Modifications**

a. The Consultant shall attend a review conference with the CDM and with staff from DPW and Guam EPA, where the Consultant shall perform the following tasks, which includes but are not limited to 1) present reports, analyses, and recommendations generated from Section A.3 of this SOW, 2) Present potential design modifications and Discuss and evaluate the potential design modifications with the Government of Guam. The goal of the review conference is to examine available alternatives and decide on an overall course of action to proceed with the project.

b. The Consultant shall provide an **Ordot Dump Design Modification Report** detailing the decisions made during the review conference and listing the elements of the design that will be modified. **This summary report will be reviewed and approved by the CDM F.**

*Note: This is an additional scope.*

**B. Prepare and Submit Revised 100% Pre-Final Closure PS&E Package**

**1. Incorporate Basis of Design Modifications***

The Consultant shall use the approved Ordot Dump Design Modification Report as a basis to make necessary design modifications/revisions. Any design modifications/revisions outside of the original contract's scope of work, will be considered as additional scope item.

The following subtasks shall be performed:

*Design:* The Consultant shall develop plans, specifications, estimates, along with supporting calculations, analyses and other supporting design documents, for the approved closure design modifications/revisions.

b. *Coordination:* The Consultant shall provide necessary coordination between the DPW, Guam EPA, and other local and federal agencies to facilitate the design of the required modifications/revisions. Any permits required for the construction of the modifications/revisions will be the responsibility of DPW and/or its contractor.

*\* Fees for this effort shall be developed upon approval of the Ordot Dump Design Modification Report.*

**2. Incorporate Additional Scope Items:**

The following items shall also be incorporated into the Closure PS&E package:

**Filling Plan\*:**

    a. The Consultant shall submit to DPW and Guam EPA a ***Draft Final Filling Plan*** to include but not be limited to the following:

        i. A phased filling approach that uses a grid and numbering system to divide the site and provide clear direction for the filling of active areas by lift or section; and

        ii. An estimated time frame for completion of each lift based on the data generated in the Ordot Dump Assessment Report.

    b. Within <u>thirty (30) calendar days</u> of receiving written comments from DPW and Guam EPA on the ***Draft Final Filling Plan***, incorporate and address those comments and submit a ***Final Filling Plan*** to DPW and Guam EPA for review and approval.

*\* Fees for offsite filling, should it be required, shall be developed upon approval of the Ordot Dump Design Modification Report and identification of the location by DPW.*

**Leachate Disposal System:**

The Consultant shall provide additional survey, engineering and design services to incorporate a leachate disposal system into the 100% PS&E Final PS&E.

    c. *Survey:* The Consultant shall provide a strip topographic survey from the limits of the existing dump, along a route toward Route 4, to the nearest point of connection to the existing sanitary sewer system (assumed to be approximately at Agueda Johnston Middle School). Topographic maps will be prepared to support the design of the leachate disposal piping running from the 'as-designed' collection system to the discharge point in the existing sewer system.

    d. *Design:* The Consultant shall develop plans, specifications, estimates, along with supporting calculations and analyses, for the necessary improvements to discharge the collected leachate into the Guam Waterworks Authority (GWA) sanitary sewer system. This includes the following elements:

        i. Connection to the 'as-designed' leachate collection and/or storage system. If feasible, elimination of the storage system may be accomplished to reduce costs.

        ii. Leachate piping and appurtenances to be located within the existing right-of-way / public access easements. Design shall meet the requirements and standards of GWA.

        iii. Connection to the existing sanitary sewer system meeting requirements and standards of GWA.

        iv. Design of a pre-treatment facility, as required to meet specific conditions for waste discharge in accordance with GWA rules and regulations, shall be included as a separate amendment upon DPW's transmittal of such conditions to the Consultant.

        v. Design of a pump station, should it become necessary, is not included in the scope.

e. *Coordination:* The Consultant shall provide necessary coordination between DPW, Guam EPA and GWA to facilitate the design of the required improvements. Any permits required for the construction of the improvements described above will be the responsibility of DPW and/or its contractor.

f. *Other:* The consultant shall provide, if required by GWA, additional leachate analysis and testing to characterize leachate and determine if pre-treatment is required. Historical leachate data are available from DPW.

**3. Submit Revised Pre-Final Closure PS&E Package**
*Submittals:* The consultant shall submit to DPW, Guam EPA, and US EPA for review and comment the Pre-Final closure design PS&E, along with supporting calculation analyses, and other supporting design documents, which support the proposed closure design modifications/revisions. Within thirty (30) calendar days of receiving written comments from US EPA, Guam EPA, and DPW on the 100% Pre-Final closure design PS&E, the Consultant shall address and incorporate those comments into Final closure design PS&E. (See Section **Prepare and Submit Final Closure PS&E Package**).

**C. Prepare and Submit Final Closure PS&E Package**

**Final Submittals\***
After addressing all outstanding/unresolved comments generated in the 100% Pre-Final Closure Design PS&E and incorporating those comments on the additional design items, as described above in Section B.2, the Consultant will submit five (5) copies of the 100% Final Closure Design PS&E for final review. Upon approval of the 100% Final Closure Design PS&E, submit one original and five copy sets of Final PS&E and two copies of other items listed below:
1. Plans;
2. Specifications;
3. Estimate including Closure Construction Management and Post-Closure cost estimate;
4. Quantity takeoffs and computation sheets;
5. Hydraulic analysis;
6. Design analysis and computations;
7. CPM for construction time and for Closure Operations showing the phasing/overlap into the Closure Construction;
8. Design narratives;
9. Post-Closure Plan and Operations Manual;

Electronic, non-PDF workable files in AUTO CADD format (drawings), Microsoft Word (Narrative), and Microsoft Excel (Spreadsheets), latest versions, shall be submitted on separate discs for the plans, specifications, estimates, and the post closure plan and operations manual.

*\* Fees for this effort shall be developed upon approval of the Ordot Dump Design Modification Report.*

## 4.0 Project Assumptions and Requirements

The following explains the working relationship between the Consultant, DPW, Government of Guam support/regulatory agencies, and the federal government to ensure the project meets the requirements of the Consent Decree.

### 4.1 Consent Decree Task Force/ Guam EPA & DPW Technical Group

The Consent Decree Task Force (CDTF) will provide work guidance for all elements of the project and shall have final authority to decide issues of controversy where professional opinions and expertise conflict in any way. Each project phase report or other deliverable product, interim, draft, or otherwise, is subject to the approval and action of the CDTF. If, for any reason, the CDTF is not available for guidance or approval, the joint Guam EPA & DPW Technical Group shall be consulted and possess the same authority as the CDTF on issues specifically related to the scope of this contract amendment. Members of the joint Guam EPA/DPW Technical Group shall be identified during contract amendment negotiations.

### 4.2 Statutes and Regulations

The closure plan must be based on requirements contained in 10 GCA, DIV. 2 Chapter 51, Solid Waste Management and Litter Control, and the Guam Solid Waste Disposal Rules and Regulations, GAR Title 22 DIV. 4 Chapter 23, as well as applicable requirements of the federal Resource Conservation and Recovery Act (RCRA). Other relevant legal requirements can be found in 10 GCA Chapter 47 (Water Pollution Control Act), Water Quality Standards, historic preservation and similar/applicable rules.

### 4.3 Resource Agency Coordination

The Consultant shall be responsible for coordinating and consulting with local and federal resource agencies and any other stakeholder agencies to facilitate preparation of the work described herein.

### 4.5 Technical Review and Concurrence

The work described herein will not be considered final without addressing and incorporating review comments provided by the USEPA, Guam EPA and other regulatory agencies.

## 5.0 Schedule of Deliverables

Schedule of Deliverables shall conform to ..........

## 6.0 Schedule of Payments

The Consultant shall be paid in monthly increments based on effort and submittal of deliverables for Phase 2 work in accordance with a payment schedule acceptable to both the Consultant and DPW/CDTF.

The Consultant shall submit a payment schedule for approval within 5 days after NTP. The approved payment schedule will be incorporated into the contract documents.

**7.0    Responsibilities of the Consent Decree Task Force (CDTF)**

1.    Right-of-Entry Permits for the site and surrounding properties upon NTP.
2.    Rights-of-Way maps, drawings, reports and other relevant documents in its possession.
3.    As-built drawings of roadway and infrastructure facilities within or near the project area.
4.    Timely reviews of submittals and decisions required to advance the progress of work.

***   *** End of Attachment to the Statement of Work ***

**Accepted By:**                                  A          ed By:

_____        _____
**JOHN P. DUENAS, P.E.**                      ame
**DUENAS, BORDALLO &**                       ency
 **ASSOCIATES, INC.**





**Professional and Technical Services of a
Technical Specialist Consultant for Consent Decree Projects**

**Project No. DPW-SW-2006 (003)**

*Exhibit 6*

# AGREEMENT

## BETWEEN GOVERNMENT AND CONSULTANT

**THIS** agreement made as of the _____ day of _____, 2007, by and between the **Government of Guam** (hereinafter called the Government) and **Shaw Environmental Inc.,** (hereinafter called the Consultant).

**WITNESSETH**, that whereas the Government intends to engage services of an **Professional** and **Technical Specialist Consultant for Consent Decree Projects, Project No. DPW-SW-2006 (003).**

**WHEREAS**, the services to be rendered are ordered under a Consent Decree, U.S. Civil Case No. 02-00022, issued by the District Court of Guam to comply with federal environmental regulations relating to the closure of Guam's existing dump and opening of a new Municipal Solid Waste Landfill Facility. The Consent Decree also requires the implementation of a Supplemental Environmental Project (SEP), specifically the diversion of household hazardous waste (HHW) to a compliant facility. The services to be performed has been determined to be in the best public interest to be performed under contract by professional personnel other than employees in the classified service of the Government; and

**WHEREAS**, the Government has provided adequate public announcement of the need for such services through a request for proposals describing the type of services required and specifying the type of information and data required of each offeror and the relative importance of particular qualifications; and

**WHEREAS**, the Consultant has submitted a statement of qualifications and an interest in providing such services; and

**WHEREAS**, the award of this contract to the Consultant has been made pursuant to a written finding by the Governor's Chairperson, Consent Decree Compliance Team that the Consultant is best qualified based upon factors set forth in the Statement of Work, and that negotiations of compensation have been determined to be fair and reasonable;

**WITNESSETH**, the Government and the Consultant, in consideration of mutual covenants hereinafter set forth, agree as follows:

Section 1. **SCOPE OF WORK:** The Consultant agrees to provide technical assistance and perform the different tasks as defined in the "Statement of Work" and described under **Section I of the Statement of Work**, which is incorporated herein by reference and made an integral part hereof.

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 1 -

Case 1:02-cv-00022    Document 79-5    Filed 01/31/2007    Page 2 of 32

Section 2. **REVIEWING AUTHORITIES:** The Statement of Work, shall be subject to the review and approval of the Governor's Chairperson Consent Decree Compliance Team or his/her authorized representatives, and other agencies as necessary or as requested by the Chairperson.

Section 3. **SCHEDULE OF SUBMITTALS:** The Consultant shall complete the services pursuant to this agreement in accordance with the schedules as specified in **Section IV** of the Statement of Work and made an integral part of this agreement.

Section 4. **CONTRACT TERM:** Subject to Section 7, the term of this agreement shall commence after the Governor signs the contract and a Notice to Proceed is issued thereafter and continue for a period of **Two (2) years with the option to renew annually, not to exceed five (5) years.** The option to renew annually will be based on the Consent Decree Team's future need for technical assistance, completion of Consent Decree tasks, and the evaluation of performance of the Consultant during the previous year (s) of service.

Section 5. **COMPENSATION:** The total contract price for Phase I work (includes Tasks 1 and 2 as described in the attached Statement of Work) is Two Hundred Thirty Seven Thousand Seven Hundred Seventy Two ($237,772) **U.S. Dollars.** The Government will compensate the Consultant for services rendered, pursuant to Section 1, Scope of Work, as follows:

A. The Government shall compensate the Consultant by progress payments based upon satisfactory delivery and acceptance of services performed pursuant to the scope of work and as described herein not to exceed **$237,772.** Projects/tasks outside the primary responsibility of the Consultant may be added at the government's discretion upon written agreement (e.g., email of the consultant to perform additional projects/tasks). The Consultant shall provide the service at the fees stated in the Cost Proposal, unless otherwise agreed in writing. The Cost Proposal is attached as Attachment B and contains the following information:

1. **Time and Materials:** The attached cost proposal provides a current schedule of fees charged by the Consultant for personnel assigned to the project, and also lists the basis for other project related costs and reimbursement costs.

2. **Estimated Costs of Individual Task:** The Government shall compensate the Consultant in amounts not to exceed the fees for each task and subtask as listed in Cost Proposal Attachment B.

3. **Reimbursable Costs:** Reimbursable costs shall be paid upon submittal of monthly invoices, based on the acceptance of the level of

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 2 -

Case 1:02-cv-00022     Document 79-5     Filed 01/31/2007     Page 3 of 32

effort performed and the submittal of deliverables for the work. Invoices shall display breakdown of hours charged and work performed for each respective invoice period, and proof of purchase or receipts for all expenditures. All reimbursable costs shall be approved by the government prior to expenditures, performance of work, and actual purchase of any items. Profit margin and overhead shall not be applied to reimbursable charges. Invoices should be sent to:

**Department of Public Work, Solid Waste Division**
Address: 542 North Marine Corps Drive
City: _Tamuning, Guam 96913_____
Telephone #: _(671) 646-3239_____
Facsimile #: _(671) 649-3777_____
Attention: Ms. Cynthia U. Jackson, Consent Decree Project Manager

B.    The Consultant shall certify in writing, at the time of submitting each of his invoices for payment, that the work performed during the invoicing period is paid with hourly rates at least equal to the rates used in fee negotiations. The Government shall have complete access to the Consultant's payroll records to verify hourly rates.

C.    Subject to Guam Procurement Regulations, an adjustment to the fee stated herein may be requested by the Consultant and authorized by the Government if the physical scope of work, time of completion, or services requested are increased over that agreed to.

D.    The Government is not obligated to compensate the Consultant for work that is not completed in accordance with the schedules stated in the Statement of Work.

E.    Disputed Invoices and Late Fees

If the Government disputes any items in Consultant's invoice for any reason including the lack of supporting documentation, Government may temporarily delete the disputed item and pay the remaining amount of the invoice. Government will promptly notify the Consultant of the dispute and request clarification and/or correction. After dispute(s) have been settled, the Consultant will include the disputed item on a subsequent, regularly scheduled invoice, or on a special disputed items invoice.

§22501. Title: Prompt Payment Act: Sections 22502 – 22507 of this Article may be cited as the Prompt Payment Act which applies to late payments by the government. In the event undisputed portions of Consultant's invoices are not paid when due, Consultant also reserves the

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 3 -

Case 1:02-cv-00022    Document 79-5    Filed 01/31/2007    Page 4 of 32

right, after thirty (30) days prior written notice, to suspend the performance of its services under this Agreement until all past due amounts have been paid in full.

F.     The Government shall make payments to the Consultant of each invoice within thirty (30) days of the receipt by the Controller or her designee of the invoice and the signed "Request for Direct Payment Form" from the Consent Decree Compliance Team Chairperson. On or before that thirtieth day, such payments shall be made available for Consultant to retrieve in person at the Department of Administration Office. However, if the Consultant does not retrieve payment by 4 p.m. of the thirtieth day, then the Controller shall place the payment in the U.S. mail first class, no later than 5 p.m. on the thirtieth day directed to one of the following addresses:

**First Class Mail:**
Shaw Environmental and Infrastructure, Inc.
39001 Treasury Center
Chicago, IL 60694-9000

**Overnight Delivery:**
Shaw Environmental and Infrastructure, Inc.
c/o Harris Trust and Savings Bank
Attn: Remittance Processing Division
311 W. Monroe Street
Chicago, IL 60606

**Wire Transfer Instructions:**
Bank:  Harris, N.A
         Chicago, IL 60603
ABA #: 071 000 288
Beneficiary:   The Shaw Group
Account No.:   407-304-5
Reference:     Guam DPW Invoice No.

Section 6.     **CONSULTANT AGREES:**
A.     That there shall be no employee benefits occurring from this agreement, such as:

6.1     Insurance coverage provided by the Government;
6.2     Participation in the Government of Guam retirement system;
6.3     Accumulation of vacation leave or sick leave.

B.     That there shall be no withholding of taxes by the Government, or taxes owed to the Government resulting from the work performed by Consultant under this Agreement.

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 4 -

Case 1:02-cv-00022     Document 79-5     Filed 01/31/2007     Page 5 of 32

Section 7.    **SCOPE OF AGREEMENT:**  This agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the retainment of Consultant by the Government with regard to the Consent Decree Project No. DPW-SW-2006 (003) and contains all of the covenants and agreements between the parties with respect to such retainment in any manner whatsoever.  Each party to this agreement acknowledges that no representation, inducements, promises or agreements, orally or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this agreement shall be valid or binding.  Any modification of this agreement will be effective only if it is in writing signed by the party to be charged.  For the purposes of this paragraph and of the entire agreement the signature of the Governor of Guam is the only signature that will bind the Government.

Section 8.    **RESPONSIBILITY OF THE CONSULTANT:**  The Consultant shall be responsible for the professional and technical accuracy of all work and materials furnished under this agreement.  The Consultant shall, without additional cost to the Government, correct or revise all errors or deficiencies in his work.  The Government's review, approval, acceptance of, and payment of fees for services required under this agreement shall not be construed to operate as a waiver of any rights under this agreement or of any cause of action arising out of the Consultant's failure to performance of this agreement and the Consultant shall be and remain liable to the Government for negligent performance of any of the services performed under this agreement.

**PROGRESS REPORTS:**  Consultant agrees to provide monthly progress reports in a form stated in the Statement of Work.

Section 9.    **GOVERNMENT RESPONSIBILITIES:**  The Government's responsibilities are defined in the Statement of Work for this project as mentioned in Section 1 of this agreement.

Section 10.    **COOPERATION WITH CONSULTANT:**  The Government agrees to cooperate fully with the Consultant on the project.

Section 11.    **DEFECTS:**  The Government shall give prompt written notice to the Consultant whenever the Government observes or otherwise becomes aware of any defect in project or other event which may substantially affect the Consultant's performance of services under this agreement.

Section 12.    **ACCESS:**  The Government, without cost to the Consultant, shall provide access to and make all provisions for the Consultant to enter upon public and private lands as required for the Consultant to perform his work.

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 5 -

Case 1:02-cv-00022    Document 79-5    Filed 01/31/2007    Page 6 of 32

**Section 13.** **OWNERSHIP OF DOCUMENTS AND EQUIPMENT:** All plans, reports and other incidental work, materials equipment furnished hereunder as described in the fee proposal, including electronic files shall be and remain the property of the Government and may be used by the Government without any additional cost to the Government.

**Section 14.** **GENERAL COMPLIANCE WITH LAWS:** The Consultant shall be required to comply with all Federal and territorial laws and ordinances applicable to the work. Consultant shall attach a copy of appropriate business license or a statement of exemption pursuant to Section 16024 of the Government code.

**Section 15.** **CHANGES:** The Government may at any time by written order, make any changes in the services to be performed hereunder. If such changes cause an increase or decrease in the costs of doing the work under this agreement, or in the time required for this performance, an equitable adjustment shall be made and the agreement shall be modified in writing accordingly.

**Section 16.** **TERMINATION:** The Government may, by providing at least thirty (30) days prior written notice to the Consultant, terminate this agreement in whole or part at any time, either for the Government's convenience or the default of the Consultant. Upon such termination, all data, plans, reports, estimates, summaries, completed work and work in progress, and such other information and materials as may have been accumulated by the Consultant in performing this agreement shall, in the manner and to the extent determined by the Government, become the property of and be delivered to the Government after Consultant has been paid for the work performed up to the effective date of termination. If the termination is for the convenience of the Government, an equitable adjustment shall be made to the agreement between the Consultant and the government in the compensation to be paid to the Consultant under this agreement to cover expenses reasonably incurred by Consultant resulting from the termination, but no amount shall be allowed for anticipated profit or unperformed work.

**Section 17.** **MANDATORY DISPUTES CLAUSE:**

A. The Government and the Consultant agree to attempt resolution of all controversies which arise under, or are by virtue of, this Agreement through mutual agreement. If the controversy is not resolved by mutual agreement, then the Consultant shall request the Government in writing to issue a final decision within sixty (60) days after written request for a final decision, or within such longer period as may be agreed upon by the

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 6 -

Case 1:02-cv-00022    Document 79-5    Filed 01/31/2007    Page 7 of 32

parties, then the Consultant may proceed as though the Government had issued a decision adverse to the Consultant.

B.  The Government shall immediately furnish a copy of the decision to the Consultant, by certified mail with a return receipt requested, or by any other method that provides evidence of receipt.

C.  The Government's decision shall be final and conclusive, unless fraudulent or unless the Consultant appeals the decision.

D.  This subsection applies to appeals of the Government's decision on a dispute. For money owed by or to the Government under this Agreement, the Consultant shall appeal the decision in accordance with the Government Claims Act by initially filing a claim with the Claims Officer of the Office of the Attorney General no later than eighteen months after the decision is rendered by the Government or from the date when a decision should have been rendered. For all other claims by or against the Government arising under this Agreement, the Office of the Public auditor has jurisdiction over the appeal from the decision of the Government. Appeals to the Office of the Public Auditor must be made sixty days of the Government's decision or from the date the decision should have been made.

E.  The Consultant shall exhaust all administrative remedies before filing an action in the Superior Court of Guam in accordance with applicable laws.

F.  The Consultant shall comply with the Government's decision and proceed diligently with performance of this Agreement pending final resolution by the Superior Court of Guam of any controversy arising under, or by virtue of, this Agreement, except where the Consultant claims a material breach of this Agreement by the Government. However, if the Government determines in writing that continuation of services under this Agreement is essential to the public's health or safety, then the Consultant shall proceed diligently with performance of the Agreement notwithstanding any claim of material breach by the Government.

**Section 18.    CLAIMS AGAINST GOVERNMENT:**   The Consultant expressly recognizes that the Government Claims Act (Title 5 of the Guam Code Annotated, Chapter 6) applies with respect only to claims of money owed by or to the Consultant against the Government if the claim arises out of or in connection with this Agreement. The Consultant also expressly recognizes that all other claims by the Consultant against the Government are subject to the Guam Procurement Law (Title 5 of the Guam Code Annotated, Chapter 5).

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 7 -

Case 1:02-cv-00022    Document 79-5    Filed 01/31/2007    Page 8 of 32

Section 19.    **CONSENT TO JURISDICTION.**    The Consultant hereby expressly consents to the jurisdiction of and the forum of the courts of Guam with respect to any and all claims which may arise by reason of this Agreement, except as otherwise may be provided by the Guam Procurement Law. The Consultant waives any and all rights it may otherwise have to contest the same or to proceed in a different jurisdiction or forum.

Section 20.    **GOVERNING LAW.**    The validity of this Agreement and any of its terms or provision, as well as the rights and duties of the parties to this Agreement, shall be governed by the laws of Guam.

Section 21.    **MANDATORY REPRESENTATION BY CONSULTANT**

    A.    **EHTICAL STANDARD.**  With respect to this Agreement and any other contract that the Consultant may have, or wish to enter into, with any Government of Guam agency, the Consultant represents that it has not knowingly influenced, and promises that it will not knowingly influence, any Government employee to breach any of the ethical standards set forth in ht e Guam Procurement Law and in any of the Guam Procurement Regulations.

    B.    **PROHIBITION AGAINST GRATUITIES AND KICKBACKS.** With respect to this Agreement and any other contract that the Consultant may have or wish to enter into with any Government of Guam agency, the Consultant represents that it has not violated, is not violating, and promises that it will not violate the prohibition against gratuities and kickbacks set forth in the Guam Procurement Regulations.

    C.    **PROHIBITION AGAINST CONTINGENT FEES.** The Consultant represents that it has not retained any person or agency upon an agreement or understanding for a percentage, commission, brokerage,  or other contingent arrangement, except for retention of bona fide employees or bona fide established commercial selling agencies, to solicit or secure this Agreement or any other contract with the Government of Guam or its agencies.  For breach or violation of this warranty, the Government shall have the right to annual this contract without liability, or, in its discretion to deduct from the contract price of consideration, or otherwise recover, the full amount of such fee, commission, percentage, brokerage fee, gift or contingent fee.

    D.    **RESTRICTION ON EMPLOYMENT OF SEX OFFENDERS.** The Consultant warrants that no person in its employment who has been convicted of a sex offense under the provision of Chapter 25 of Title 9 of the Guam Code Annotated, or convicted of an offense defined in Article 2 of Chapter 28 Title 9 of the Guam Code Annotated regardless of the jurisdiction in which the conviction was obtained, shall provide service on

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 8 -

Case 1:02-cv-00022    Document 79-5    Filed 01/31/2007    Page 9 of 32

behalf of the Consultant relative to this Agreement. If any person employed by the Consultant and providing service under this agreement is convicted subsequent to the parties entering into this Agreement, then the Consultant warrants that it will notify the Government of the conviction within twenty-four hours of the conviction, and will immediately remove such convicted person from providing services under this Agreement. If the Consultant is found to be in violation of any of the provisions of this paragraph, then the Government shall give notice to the Consultant to take corrective action. The Consultant shall take corrective action within twenty-four hours of notice from the Government, and the Consultant shall take corrective action within twenty four hours of notice from the Government. And the Consultant shall notify the Government when action has been taken. If the Consultant fails to take corrective steps within twenty-four hours of notice from the Government, then the Government in its sole discretion may suspend this Agreement temporarily.

Section 22.    **ACCESS TO RECORDS AND AUDIT.**   The Consultant, including the Consultant's subcontractor, if any, shall maintain all books, documents, papers, accounting records and other evidence pertaining to costs incurred and to make such materials available at the Consultant's office at all reasonable times during the contracts initial or renewal terms and for a period of three (3) years from the date of the final payment under this Agreement, for inspection by the Government or its agents. Each subcontract by the Consultant relative to this Agreement shall include a provision containing the conditions of this paragraph.

Section 23.    **EFFECTIVE DATE OF AGREEMENT:**   This agreement and any amendment to it shall take effect upon the date such is signed by the Governor of Guam and the date of this agreement shall be the date upon which the Governor affixes his signature.

Section 24.    **GOVERNMENT NOT LIABLE:**

The Government assumes no liability for any accident or injury that may occur to the Consultant, his agents, dependents, or personal property while en route to or from this territory or during any travel mandated by the terms of this agreement.

Section 25.    **ASSIGNMENT OF AGREEMENT:**  The Consultant shall not assign this agreement, or any sum becoming due the Consultant under the provisions of this agreement, without prior consent of the Government.

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 9 -

Case 1:02-cv-00022     Document 79-5     Filed 01/31/2007     Page 10 of 32

Section 26.    **MISCELLANEOUS PROVISIONS:**

    A.    Invalid or Unenforceable Provisions: In the event any provisions of this agreement shall be held to be invalid and unenforceable, the remaining provision shall be valid and binding upon the parties. One or more waivers by either party of any provision, term, condition or covenant shall not be construed by the other party as a waiver of a subsequent breach of the same by the other party.

    B.    Delays: Time is of the essence in completion of all work, including research that need to be completed so as to allow sufficient time for completion of all elements of the work required. Consultant shall develop a schedule, which allows for timely completion of all work, including incidental works necessary to complete the project. Delays caused by Consultant's negligence will be assessed accordingly by the Government.

    C.    Contract Priority, Time is of essence: All work under this contract shall be given top priority over all other works or contracts with the Government of Guam, as established in Executive Order Nos. 2004-02 and 2006-12, a copy of which is attached as Exhibit B and C. Time is of the essence in completion of the work under this contract by the Consultant. Consultant shall be liable for any stipulated penalties as detailed in the Consent Decree, including any interest thereon, to the extent that such delays are a direct result of the Consultant's negligence. A copy of the Consent Decree in the litigation case of *United States vs. Government of Guam*, Civil Case No. 02-00022 in the Federal District Court of Guam, is available on the landfill web site at www.guamlandfill.org.

Section 27.    **COVENANT AGAINST CONTINGENT FEES:** The Consultant warrants that he has not employed or retained any company or person, other than a bona fide employee working solely for the Consultant, to solicit or secure this contract, and that he has not paid or agreed to pay any company or person, other than a bona fide employee working solely for the Consultant, any fee, commission, percentage, brokerage fee, gifts or any other consideration, contingent upon or resulting from the award or making of this contract. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability, or, in its discretion to deduct from the contract price of consideration, or otherwise recover, the full amount of such fee, commission, percentage, brokerage fee, gift or contingent fee.

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 10 -

Case 1:02-cv-00022    Document 79-5    Filed 01/31/2007    Page 11 of 32

Section 28.    **INDEMNITY AND LIMITATION OF LIABILITY:**

    A.    Consultant agrees to save and hold harmless the Government, its officers, agents, representatives, successors and assigns and other governmental agencies from any and all suits or actions of every nature and kind, which may be brought for on or account of any injury, death, or damage arising or growing out of the actual physical negligence or willful misconduct of the Consultant, Consultant's officers, agents, servants or employees under this agreement.

    B.    Consultant's liability for all causes of action arising hereunder shall not, to the maximum extent permitted by law, exceed in the cumulative aggregate with respect to all claims arising out of or relating to this agreement, the amount of compensation for such services or $237,772.

    C.    In no event, and notwithstanding anything to the contrary herein, whether arising in contract, tort (including negligence) warranty, indemnity or otherwise, shall Contractor be responsible for loss of use, loss of profits, or for any special, indirect or consequential damages.

Section 29.    **CONFLICT OF INTEREST:** Consultant agrees that they have not engaged or will not engage in participating or having an economic interest in any DPW procurement which results from its contractual services.

Section 30.    **COUNTERPARTS:** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which, when taken together, shall be deemed one agreement, but no counterpart shall be binding until copies of all counterparts shall have been received by the Office of the Attorney General or the of the Governor, and Governor affixes his signature to the Agreement. Further, all original counterparts shall be delivered to the Department of Administration, Attention:

*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

- 11 -

Case 1:02-cv-00022    Document 79-5    Filed 01/31/2007    Page 12 of 32

**IN WITNESS HEREOF**, the parties hereto have executed this agreement in the day and year first above written.

CONSULTANT                                        GOVERNMENT

_____                   _____
**GERHARD E. LOCKE, Ph. D., P.E.**                **LAWRENCE P. PEREZ**
District Manager                                  Director
Shaw Environmental & Infrastructure, Inc.

Date: _____                             Date: _____


CERTIFIED FUNDS AVAILABLE:                         CLEARED AS PER BBMR'S REVIEW:
Amount: $237,772.00
Account No.: 5100A071000GA005230


_____                   _____
**CYNTHIA U. JACKSON**                            **CARLOS P. BORDALLO,** Director
Certifying Officer                                 Bureau of Budget and Management Research
Department of Public Works

Date: 1/25/07                                      Date: _____


APPROVED AS TO LEGALITY AND FORM:                 APPROVED:


_____                   _____
**ALICIA LIMTIACO**                               **FELIX P. CAMACHO**
Attorney General of Guam                           Governor of Guam

Date: _____                             Date: _____


*Agreement for Professional and Technical Specialist Consultant*
*For Consent Decree Projects*
*Project No. DPW-SW-2006(003)*

CERTIFIED TRUE COPY

**IN WITNESS HEREOF,** the parties hereto have executed this agreement in the day and year first above written.

CONSULTANT

_____
**GERHARD E. LOCKE, Ph. D., P.E.**
District Manager
Shaw Environmental & Infrastructure, Inc.

Date: ___1/25/07___

GOVERNMENT

_____
**LAWRENCE P. PEREZ**
Director

Date: ___1/26/07___

CERTIFIED FUNDS AVAILABLE:
Amount: $237,772.00
Account No.: 5100A071000GA005230

_____
**CYNTHIA U. JACKSON**
Certifying Officer
Department of Public Works

Date: 1/25/07

CLEARED AS PER BBMR'S REVIEW:

_____
**CARLOS P. BORDALLO,** Director
Bureau of Budget and Management Research

Date: _____

APPROVED AS TO LEGALITY AND FORM:

_____
**ALICIA LIMTIACO**
Attorney General of Guam

Date: _____

APPROVED:

_____
**FELIX P. CAMACHO**
Governor of Guam

Date: _____

_Agreement for Professional and Technical Specialist Consultant_
_For Consent Decree Projects_
_Project No. DPW-SW-2006(003)_

- 12 -

**Shaw Environmental, Inc.**

4005 Port Chicago Highway
Concord, California 94520-1120
Phone: 925.288.9898
Fax: 925.288.0888

 Shaw Environmental, Inc.

January 23, 2007

Ms. Cynthia Jackson
Project Manager, Department of Public Works
Solid Waste Management Division, Second Floor
Department of Public Works
Government of Guam
542 North Marine Drive, Building A
Upper Tumon, Guam 96913

**Proposal: Scope of Work, Cost Proposal, and Schedule**
**for**
**Professional and Technical Services of a**
**Technical Specialist Consultant for Consent Decree Projects**
**Project No. DPW-SW-2006 (003)**

Hafa Adai Cynthia:

This proposal is based on our understanding of the discussions and meetings with the Department of Public Works (DPW), composed of yourself and Erwin Cruz, and Mick Williams and Larry Bacon of Shaw Environmental & Infrastructure, Inc. (Shaw) on December 21, 2006 at your office and subsequent telephone conversations. Shaw understands the urgency of the Consent Decree projects for the Government of Guam, Department of Public Works (DPW) and accordingly has prepared this proposal for the first phase (Phase 1) of the technical services and in accordance with your Statement of Work (SOW).

As you requested in your email dated January 17, 2007 and telephone discussion on January 19, 2007, Shaw has revised the scope in Part 1 of the SOW by deleting Task 3 Procurement, which will be done by the procurement consultant, HDR-BVA. Also, Shaw has incorporated Parts II through VI from your email into the SOW. Shaw's revised SOW is included in Attachment A.

The estimated costs have increased due to the additional work requested by DPW's revised SOW on January 17, 2007. Task 1, the revision of the Consent Decree schedule, assumes HDR-BVA will take the lead, as they produced the original estimate and would be in the best position to complete the revision. Shaw will provide technical review comments on the revised schedule. In Task 2, Technical Assistance, Shaw would like to point out that the revised SOW indicates numerous meetings in Guam and uses open-ended wording such as "all," "as-needed basis," "as instructed by DPW" and the "consultant shall be on Guam 100% of the time" that makes it difficult to produce an accurate cost estimate to complete the work when the work is not well defined. However, Shaw has calculated that the average rate of work or "burn rate" is approximately $80,000 per month, which means that Shaw can provide service continuously 100% of the time for 3 months, which is what is reflected in this revised budget. Therefore, Shaw suggests proceeding and awarding the contract now, using this budget to accomplish the immediate items of concern, and spreading the remainder of the budget out over a longer period. Our project manager will keep DPW abreast of the current burn rate, the amount remaining with the monthly status reports, and progress schedules. Part of the report will include an estimate to complete the work based on current progress and burn rate of the contract amount. Shaw will make a recommendation to DPW in the first

report on whether or not the goals in the SOW are being met in a timely and cost-effective manner. The costs are included in our revised Project Estimate, Attachment B, and summarized in the table below.

Work is performed under your direction or designee and in accordance with the terms and conditions in the Agreement between Government and Consultant in Attachment C. The explanation of the authority matrix to contractually bind Shaw with this Contract is included in Attachment D.

The estimated costs are as follows:

| Task Number | Task Description | Amount |
|---|---|---|
| 1 | Review the revised Consent Decree Schedule | $3,604 |
| 2 | Provide technical assistance for Consent Decree and other Projects | $234,168 |
| Total | | $237,772 |

Shaw proposes to assign Mr. Mick Williams as the technical consultant lead to DPW for work related to the Consent Decree projects and other work outside of the Consent Decree. Shaw has the ability to draw from other professionals and support staff to assist in the timely production of work that is included in the cost estimate in Attachment B. The work will be conducted on Guam or in California, depending on the schedule, DPW's requests, and the need to be on-inland. Cost savings can be accomplished by keeping on-island work and meetings to a minimum and maximizing home office (California) work. In any event, Shaw is willing to serve DPW as it so requests.

Mick Williams will be the point of contact. He can be reached in Guam at 671.479.5409 or in California at 619.533.7313. Gary Locke will be the Shaw executive sponsor for this project, so should you have concerns, please do not hesitate to call Gary or Mick at the contact numbers listed below. Shaw thanks you for this opportunity and is looking forward to working with you.

Sincerely,

Gerhard (Gary) E. Locke, PhD, P.E.
District Manager
Shaw Environmental & Infrastructure, Inc.
4005 Port Chicago Highway
Concord, CA 94520-1120
(925) 288-2499 direct
(925) 827-2029 fax
gary.locke@shawgrp.com


Mick Williams
Project Manager
Guam
Shaw Environmental & Infrastructure, Inc.
414 West Soledad Avenue, Suite 602
Hagatna, Guam 96910-5065
671.479.5409 direct
671.687.7236 cell
671.472.0551 fax
mick.williams@shawgrp.com

California
Shaw Environmental & Infrastructure, Inc.
1230 Columbia Street, Suite 1200
San Diego, CA 92101
619.533.7313 direct
619.261.1003 cell
619.239.1238 fax
mick.williams@shawgrp.com

Attachment A – Statement of Work and Schedule
Attachment B – Project Estimate Detail and Summary by Task
Attachment C – Draft Agreement between Government and Consultant
Attachment D – Authority Matrix to Contractually Bind Company



Attachment A

Statement of Work and Schedule

 Shaw® Shaw Environmental, Inc.

# I.    SCOPE OF WORK-PHASE I

## Task 1 – Review the revised Consent Decree Schedule

**Scope of Work**: Review the revised schedule for the Consent Decree for presentation at the next hearing of the District Court in Guam on March 8, 2007.

**Technical Approach/Key Issues**:
- Shaw understands that the original June 21, 2006 Consent Decree schedule was prepared by HDR-BVA in consultation with DPW, landfill consultants, and Guam legal counsel.
- DPW will meet with Ordot closure and Layon Landfill design consultants and revise the June 21, 2006 Consent Decree schedule to update the schedule events.
- DPW will forward the proposed revisions to Shaw and HDR-BVA for review
- Shaw will discuss schedule with HDR-BVA and forward comments HDR-BVA
- HDR-BVA, as originator, will take the lead and make revisions
- Revised schedule will go to DPW for comments
- Review schedule with HDR-BVA and DPW until accepted by DPW

**Shaw Deliverables and Schedule:**
- Draft Final Revised Consent Decree schedule comments – 2 days after receipt of comments from DPW and discussion with HDR-BVA
- Final review of revised Consent Decree schedule – 2 days after receipt of draft comments from DPW and discussion with HDR-BVA
- Shaw is available to attend or meet with DPW and landfill consultants in Guam, if requested, however this travel and time expense is not included in the budget under this task.

**DPW Deliverables/Responsibilities**:
- Provide latest version of Consent Decree Schedule in MS Project
- Provide revised milestones from landfill consultants
- Review and provide comments on draft final schedule revision

**Assumptions**:
- Current electronic version of Consent Decree schedule is available for editing
- Schedule will be revised by HDR-BVA in MS Project program and sent electronically as an email attachment for Shaw use or as a marked up electronic PDF copy showing changes.
- Schedule will be submitted and revised in draft version until approved by all parties of the Consent Decree
- Work will be performed in California, in conjunction with HDR-BVA

## Task 2 – Provide technical assistance for Consent Decree and other Projects

**Scope of Work**:
- Make recommendations to DPW and HDR-BVA on modifying completed on nearly completed engineering drawings, plans, specifications, cost estimates for bid packages (design work to be done by existing design consultant) for procurement purposes
- Recommend approved VE alternatives for incorporation into bid documents as options, if feasible
- Prepare conceptual drawings for bidding purposes on design-build contracts, such as the Construction Debris Recycling Facility and transfer stations
- Review cost benefit analysis (prepared by others) and make recommendations
- Make technical recommendations on proposed RFPs and bids for contract award
- Consult with HDR-BVA about technical concerns relating to procurement

1


- Meetings with DPW, HDR-BVA, design consultants, stakeholders, and potential bidders
- Oversee and critically analyze technical documents, as needed, as they pertain to activities associated with Ordot Dump Facility operations, closure design, closure construction and post-closure care and maintenance; design, construction and operations of the new MSWLF; design, construction and operation of a HHWRF; and implementation of a comprehensive Household Hazardous Waste Diversion Plan
- Comprehend and ensure compliance with all Federal, and local rules, regulations, laws, polices, permit, orders governing solid wastes and household hazardous wastes
- Observe and monitor consultants performing site geotechnical, hydrology, and hydrogeologic investigations
- Perform site inspections and facilitate tours at the Ordot Dump Facility, and the new MSWLF
- Communicate with management, subordinates, and representatives from other departments, sections, divisions, consultants, vendors, contractors, and the general public to establish and maintain effective working relationships
- Perform mathematical calculations, statistical computations, cost analyses, etc.
- Assist, participate, and, when necessary, conduct public hearings and meetings related to the permitting, operations, design, closure construction and post-closure of Ordot Dump Facility, and design, construction, operation and permitting of a new MSWLF
- Prepare quarterly Consent Decree project reports

**Technical Approach/Key Issues:**
- Discuss VE alternatives with DPW, HDR-BVA, and design contractors (if possible) and recommend design and contractual changes to facilitate the procurement process with the idea to provide the best value, and make the projects attractive to bidders
- Discuss proposed design-build contracts with DPW and submit recommendations, concept designs, or examples of similar projects

**Shaw Deliverables and Schedule:**
- Procurement package modifications – depending on the size of the package – typically 1 week per small sub package, 4 weeks for larger sub-packages, i.e., closure of Ordot dump
- Review of cost benefit analysis or spreadsheets to back up recommendations -- typically 1 to 2 weeks after request from DPW, depending on the complexity
- Concept drawings – typically 1 to 4 weeks depending on the complexity

**DPW Deliverables/Responsibilities:**
- Participate in discussions with Shaw, HDR-BVA, and potential design-build contractors prior to advertising for bids
- Select, request modifications, or approve concepts including VE alternatives
- Travel approval for on-island attendance from DPW made no later than one week in advance to obtain reasonable airfare rate.

**Assumptions:**
- Scope of Work does not include preparation of extensive engineering and design details, or environmental testing or sampling, reports or studies
- Design documents prepared by other consultants suitable for bidding, including incorporation of recommended VE alternatives, will be done by the original design contractor to maintain professional liability
- Shaw cannot assume liability or schedule impacts for work done by others
- Permits and approvals will be in hand or done by others
- Procurement activities will be done by HDR-BVA

2


## II.    DUTIES AND RESPONSIBILITIES OF THE CONSULTANT

The Consultant shall be responsible for the following:

1. The Consultant shall review all documents provided by DPW necessary or relevant to the Consent Decree and its projects, which include but are not limited to permitting, operations, closure construction and post-closure care and maintenances of the Ordot Dump Facility; siting, permitting, design, construction and operation of the new MSWLF and the HHWRF. All relevant documents will be provided to the Consultant upon commencement of contract.

2. The Consultant shall properly coordinate and conduct meetings with the Consent Decree Team, other local departments, appropriate local and federal regulatory agencies, design consultants and the contractors on an as-needed basis. It will be the responsibility of the Consultant to ensure that all Consent Decree projects and activities conform to the requirements of all Federal and Local rules, regulations, and laws.

3. **Weekly Progress Meetings.** The Consultant shall arrange progress meetings with the Consent Decree team, DPW Consent Decree Compliance Team Representative and other government personnel, as needed, on a weekly basis, or as instructed by the DPW Consent Decree Compliance Team representative, as appropriate, for the items to be addressed at the coordination meetings. At the meetings, the Consultant and Consent Decree Team shall review progress and address any issues to ensure proper compliance of the Consent Decree tasks. The Consultant shall ensure that all responsible parties involved are informed of the discussions at the meetings. Any issues or problems shall be discussed and resolved in a timely manner. The meetings will be held at the Solid Waste Management Division (SWMD) office on a mutually agreed schedule. The Consultant must notify Consent Decree Team no later than 24 hours before the meeting that they are unable to attend and must reschedule the meeting as soon as possible.

4. **Progress Schedules.** The Consultant shall develop and maintain an updated schedule of the various Consent Decree Projects using Microsoft Project or Suretrak software. The schedule shall be updated, at a minimum, monthly to coincide with the progress report. The schedule shall reflect closure and post-closure activities of the Ordot Dump Facility, and design and construction activities of the new MSWLF and the HHWRF, and each schedule shall include durations and completion dates of each activity

5. The Consultant shall update and maintain a library to add documents or files as they are produced. Electronic files shall be transferred electronically between the Consent Decree staff on as needed basis. Hard copies of the up-to-date versions of files shall be stored and made available to the Consent Decree staff as needed.

   The Consultant must turn over all files (electronic and hard copies) maintained throughout the contract time to be submitted to DPW's Consent Decree section once the contract is completed. Files shall be bounded, divided by sections, and organized in chronological order. Electronic files may be provided on compact disc.

6. The Consultant shall attend and conduct meetings with other Government Agencies or Departments with regulatory authority as instructed by DPW's Consent Decree Compliance Team representative.

3


7.  An initial meeting will be held between the Consultant, Consent Decree staff and Compliance Team, and any other appropriate DPW personnel/official, as needed, upon commencement date to clarify or discuss the job tasks and duties. The meeting will be held on a mutually agreed time and location. The Consultant shall ensure that all responsible parties involved are informed of the discussions at the meeting.

8.  The Consultant shall be responsible for the preparation and distribution of an **approved** Minutes of Meetings within five (5) day after each meeting. Minutes of Meetings shall include the date, time, and place of meeting, name and company/agency/division of representative present at the meeting, list of items discussed containing a brief description of the discussion and the matters that were resolved.

## III.   REQUIREMENTS AND CONDITIONS

The Consultant shall be responsible for complying with the following requirements and conditions of this statement of work:

1.  All Consent Decree Projects, i.e., Ordot Dump Closure, Opening of the New Landfill, Wetland Mitigation and Household Hazardous Waste Facility and Events, shall take priority over all other matters, tasks, and subtasks of this project. All tasks which are directly related to complying with Guam and federal laws, rules and regulations, Guam EPA permits and orders, and Public Utilities Commission orders follow the Consent Decree Project in that order of priority, and all other matters are of lesser priority (e.g., green waste, construction debris, transfer station).

2.  The Consultant shall be on Guam 100% of the time for any and all bid process activities (e.g., site visits, pre-bid conference, bid evaluation, etc.), fieldwork, public hearings/meetings/presentations, court hearings, site investigations, and other technical related activities associated with Ordot Dump Facility closure design, closure construction; design, and construction of the new MSWLF; the design, and construction of the HHWRF, and other matters related to the Consent Decree. In addition, DPW may, at any time throughout the course of the contract term, request in advance for the presence of the Consultant on Guam to perform services associated with the contract.

3.  The Consultant shall ensure that they meet all the minimum knowledge, abilities and skills, and the minimum qualifications listed in the Request for Proposals, i.e., Statement of Work, Sections IV and V.

4

 Shaw Environmental, Inc.

# VI.    SCHEDULE OF SUBMITTALS

**Submittals:**

**Task 1:**
1)  Draft review of Revised Consent Decree Schedule

2)  Final review of Revised Consent Decree Schedule

**Task 2:**
3)  Provide technical assistance for Consent Decree and other Projects

4)  Review of cost benefit analysis or spreadsheets to back up recommendations

5)  Concept Drawings

**Other Tasks:**

10)  Monthly Status Reports

11)  Updated Monthly Progress Schedules

12)  Quarterly Status Reports

**Deadlines:**

**Task 1:**
1)  2 days after Notice to Proceed or signed contract

2)  2 days after receipt of draft comments on Draft Schedule no later than 8 a.m. Guam time

**Task 2:**
3)  Typically 1 week per small sub package, 4 weeks for larger sub-packages, i.e., closure of Ordot dump
4)  Typically 1 to 2 weeks after request from DPW, depending on the complexity

5)  Typically 1 to 4 weeks depending on the complexity

**Other Tasks:**

10)  5 calendar days following the end of each month

11)  5 calendar days following the end of each month

12)  15 calendar days following the end of each quarter

All task deliverables must be submitted within the specified time. All other submittals/deliverables required as part of the Consultant's services, not specifically identified in this section, will be submitted on a mutually agreed timeline, as approved by DPW at the initial kickoff meeting. Unless otherwise specified, the Consultant shall submit one (1) original copy, two (2) hard copy sets, and one (1) electronic file for all submittals. Written documents shall be prepared on Microsoft Word, spreadsheets on Microsoft Excel. Electronic files may be submitted in PDF format, but must make the workable files (non-PDF format) upon request of DPW.

5

 Shaw® Shaw Environmental, Inc.

## V.    CONTRACT TERM

The contract term of this agreement shall commence after the Governor signs the contract and a Notice to Proceed is issued thereafter and continue for a period of **Two (2) years with the option to renew annually, not to exceed five (5) years.**  The option to renew annually will be based on the Consent Decree Team's future need for technical assistance, completion of Consent Decree tasks, and the evaluation of performance of the Consultant during the previous year (s) of service.

## VI.    SCHEDULE OF FEES

Fees for tasks shall be paid in monthly increments based on effort and submittal of deliverables for work in accordance with a payment schedule acceptable to both the Consultant and the DPW.  DPW will retain 10% of the amount of each invoice.  The 10% retained for each invoice will be processed for payment on the following invoice, but only after approval and acceptance of work accomplished during the preceding invoice period.

| | |
|---|---|
| Task 1: | $   3,604 |
| Task 2: | $ 234,168 |
| **Total Fee** | **$ 237,772** |

6


Shaw® Shaw Environmental, Inc.

**Attachment B**

**Project Estimate
Detail and Summary**



# Project Estimate
# Summary By Task
### GovGuam Consent Decree Projects
### Guam Dept Public Works

| Task Number | Task Name | Labor | Subcontractors | Equipment | Materials | Other Costs | Total |
|---|---|---|---|---|---|---|---|
| 1. | Review Consent Decree Schedule | $ 3,604.00 | $ | $ | $ | $ | $ 3,604.00 |
| 2. | Technical Assistance 1 | $ 192,050.40 | $ 13,240.00 | $ | $ 500.00 | $ 28,378.50 | $ 234,168.90 |
| 3. | | $ | $ | $ | $ | $ | $ - |
| 4. | | $ | $ | $ | $ | $ | $ - |
| 5. | | $ | $ | $ | $ | $ | $ - |
| 6. | | $ | $ | $ | $ | $ | $ - |
| 7. | | $ | $ | $ | $ | $ | $ - |
| 8. | | $ | $ | $ | $ | $ | $ - |
| 9. | | $ | $ | $ | $ | $ | $ - |
| 10. | | $ 195,654.40 | $ 13,240.00 | $ | $ 500.00 | $ 28,378.50 | $ 237,772.90 |

| | |
|---|---|
| Submitted By: | Gary Locke - Shaw Enviromental, Inc |
| Submitted To: | Cynthia Jackson-Guam DPW |
| Submission Date: | 01/19/07 |

C:\Documents and Settings\Gary.Locke\Local Settings\Temporary Internet Files\OLK37\Proposal Tech Consultant Guam Consent Decree Rev M 7-Client Output-Summary 1/19/2007 3:48 PM

Case 1:02-cv-00022     Document 79-5     Filed 01/31/2007     Page 26 of 32

Shaw The ~~~ahvGroup,Inc

SHAW-REVISION: PROFIT
Release Date: 00/00/00

**PROJECT NUMBER:** 00100000
**PROPOSAL NUMBER:** 100000001

## Project Estimate
## Detail By Task
Gov/Guam Consent Decree Projects
Guam Dept Public Works

| Category | Title | Rate | Review Consent Decree Schedule Hrs | Price | Technical Assistance Hrs | Price | Total Hrs | Price |
|---|---|---|---|---|---|---|---|---|
| M | Technical Publications Asst 1 | $40.00 | | | | | | |
| M | Laborer 1 | $40.00 | | | | | | |
| M | Administrative Asst 1 | $47.00 | | | | | | |
| M | Drafter 1 | $47.00 | | | | | | |
| M | Laborer 2 | $47.00 | | | | | | |
| M | Equipment Operator 1 | $47.00 | | | | | | |
| M | Technician 1 | $47.00 | | | | | | |
| M | Administrative Asst 2 | $57.00 | | | | | | |
| O | Transaction Processing Asst 3 | $57.00 | | | | | | |
| O | Laborer 3 | $57.00 | | | | | | |
| O | Equipment Operator 2 | $57.00 | | | | | | |
| O | Technician 2 | $57.00 | | | | | | |
| O | Scientist 1 | $57.00 | | | | | | |
| P | Administrative Asst 3 | $66.00 | | | | | | |
| P | Project Controls Cost Sch 1 | $66.00 | | | | | | |
| P | Project Accountant 1 | $66.00 | | | | | | |
| P | Drafter 2 | $66.00 | | | | | | |
| P | Equipment Operator 3 | $66.00 | | | | | | |
| P | Purchaser | $66.00 | | | | | | |
| P | Technician 3 | $66.00 | | | | | | |
| P | Engineer 1 | $88.00 | | | | | | |
| Q | Administrative Asst 4 | $78.00 | 4 | $ 304.00 | 313 | $ 24,510.00 | 317 | $ 24,814.00 |
| Q | Subcontract Administrator 1 | $78.00 | | | | | | |
| Q | EH&S Specialist 1 | $78.00 | | | | | | |
| Q | Scientist 2 | $78.00 | | | | | | |
| R | Subcontract Administrator 2 | $86.00 | | | | | | |
| R | Project Controls Cost Sch 2 | $86.00 | | | | | | |
| R | Drafter 3 | $86.00 | | | | | | |
| R | Engineer 2 | $86.00 | | | | | | |
| S | Project Accountant 2 | $96.00 | | | | | | |
| S | Technician 4 | $96.00 | | | | | | |
| S | Scientist 3 | $96.00 | | | | | | |
| T | Subcontract Administrator 3 | $104.00 | | | 27 | $ 2,808.00 | 27 | $ 2,808.00 |
| T | Drafter 4 | $104.00 | | | 116 | $ 12,074.48 | 116 | $ 12,074.48 |
| T | EH&S Specialist 2 | $112.00 | | | | | | |
| U | Project Accountant 3 | $112.00 | | | | | | |
| U | Project Controls Cost Sch 3 | $112.00 | | | | | | |
| U | EH&S Specialist 3 | $112.00 | | | | | | |
| U | Project Scientist 3 | $112.00 | | | | | | |
| V | Project Accountant 4 | $120.00 | | | | | | |
| V | Site Superintendent 1 | $120.00 | | | | | | |
| V | Engineer 3 | $120.00 | | | | | | |
| V | Scientist 4 | $120.00 | | | | | | |
| W | Project Controls Cost Sch 4 | $126.00 | | | | | | |
| W | Subcontract Administrator 4 | $126.00 | | | | | | |
| W | Site Supervisor 2 | $126.00 | | | 27 | $ 3,483.00 | 27 | $ 3,483.00 |
| W | Engineer 4 | $126.00 | | | | | | |
| W | Project Engineer 3 | $128.00 | | | | | | |
| W | Project Scientist 4 | $126.00 | | | | | | |
| W | Client Program Manager 1 | $126.00 | | | | | | |
| W | Project Manager 1 | $126.00 | | | | | | |
| X | Site Supervisor 1 | $145.00 | | | 323 | $ 48,375.00 | 323 | $ 48,375.00 |
| X | Project Engineer 4 | $145.00 | | | 27 | $ 4,050.00 | 31 | $ 4,050.00 |
| X | Client Program Manager 2 | $145.00 | 4 | $ 600.00 | | | | |
| X | Business Line Manager 1 | $145.00 | 18 | $ 2,700.00 | | | | |
| Y | Engineer 5 | $150.00 | | | | | 640 | $ 99,430.00 |
| Y | Scientist 5 | $150.00 | | | | | | |
| Y | Project Engineer 5 | $150.00 | | | | | | |
| Y | Project Scientist 5 | $150.00 | | | | | | |
| Y | Client Program Manager 3 | $150.00 | | | | | | |
| Y | Project Manager 2 | $150.00 | | | | | | |
| Y | Business Line Manager 2 | $150.00 | | | | | | |
| | **Total Labor** | | 28 | $ 3,604.00 | 1,487 | $ 102,094.49 | 1,513 | $ 105,654.40 |

C:\Documents and Settings\lettuce and Settings\Temporary Internet Files\OLK37\Proposal Tech Consent Decree Consent Decree Rev 5a C-sent Output Detail 11/07/2002 3:44 PM

Shaw ... ewGroupinc.

## Project Estimate
## Detail By Task
GovGuam Consent Decree Projects
Guam Dept Public Works

| Expenses | Review Consent Decree Schedule | | Technical Assistance | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Category | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | | 7 | | 8 | | 9 | | 10 | | | |
| | Price | | Price | | Price | | Price | | Price | | Price | | Price | | Price | | Price | | Price | | Price | |
| Subcontractors | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Rental Equipment & Vehicles | $ | - | $ | 13,440.00 | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | 13,440.00 |
| Special Equipment | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| In-Stock Materials | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - |
| General Materials | $ | - | $ | 500.00 | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | 500.00 |
| Other Direct Costs | $ | - | $ | 28,278.50 | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | 28,278.50 |
| Total Expenses | $ | - | $ | 42,118.50 | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | - | $ | 42,118.50 |

Total Price $ 237,772.90

Submitted By: _____
Submitted To: _____
Submitted Date: _____

C:\Documents and Settings\harryLokal.Lokal.Settings\Temporary Internet Files\OLK7\Proposal Tool Generated Guam Consent Decree Rev M 6-Task.Output Date 1/19/2007 2:48 PM


**Attachment C**

**Agreement between Government and Consultant**



Shaw Environmental, Inc.

4005 Port Chicago Highway
Concord, California 94520-1120
Phone: 925.288.9898
Fax: 925.288.0888

January 19, 2007

Ms. Cynthia Jackson
Project Manager, Department of Public Works
Solid Waste Management Division, Second Floor
Department of Public Works
Government of Guam
542 North Marine Drive, Building A
Upper Tumon, Guam 96913

**Attachment D - Authority Matrix to Contractually Bind Company
for
Professional and Technical Services of a
Technical Specialist Consultant for Consent Decree Projects
Project No. DPW-SW-2006 (003)**

Hafa Adai Cynthia:

Shaw Environmental & Infrastructure, Inc. (Shaw) does not have a contractual authority form
that authorizes a signature on behalf of the company. What Shaw does have is an Authority
Matrix that dictates who is allowed to obligate the company for a given contract type and
dollar amount. My limits as a District Manager are as follows:

Time-and-material contract -              $2.5 million.

Lump sum or fixed-fee contract -          $0.5 million.

Shaw's proposal for the Scope of Work is below both limits and therefore I am authorized to bind the
company contractually with this proposal.

Shaw thanks you for this opportunity and is looking forward to working with you.

Sincerely,

*[signature]*

**Gerhard (Gary) E. Locke, PhD, P.E.**
**District Manager**
Shaw Environmental & Infrastructure, Inc.
4005 Port Chicago Highway
Concord, CA 94520-1120
(925) 288-2499 direct
(925) 827-2029 fax
gary.locke@shawgrp.com



| ID | Task Name | Duration (5-day work week) | Start | Finish |
|---|---|---|---|---|
| 1 | **Ordot Dump Closure** | 1277 days | Thu 1/25/07 | Fri 12/16/11 |
| 2 | Dump design consultant contract amendment | 22 days | Thu 1/25/07 | Fri 2/23/07 |
| 3 | Scope and Fee negotiations | 12 days | Thu 1/25/07 | Fri 2/9/07 |
| 4 | Contract Amendment Processing | 10 days | Mon 2/12/07 | Fri 2/23/07 |
| 5 | Notice to Proceed (NTP) | 0 days | Fri 2/23/07 | Fri 2/23/07 |
| 8 | A. Basis for Design Modifications | 46 days | Mon 2/26/07 | Mon 4/30/07 |
| 7 | 1. Ordot Dump Assessment Report | 35 days | Mon 2/26/07 | Fri 4/13/07 |
| 8 | a. Topographic Re-Survey | 15 days | Mon 2/26/07 | Fri 3/16/07 |
| 9 | b. Evaluation and Analysis | 20 days | Mon 3/12/07 | Fri 4/6/07 |
| 10 | c. Develop Assessment Report | 5 days | Mon 4/9/07 | Fri 4/13/07 |
| 11 | 2. Value Engineering (VE) Feasibility and Cost Benefit Analysis (CBA) | 35 days | Mon 2/26/07 | Fri 4/13/07 |
| 12 | a. Review VE Report | 5 days | Mon 2/26/07 | Fri 3/2/07 |
| 13 | b. Analysis | 20 days | Mon 3/5/07 | Fri 3/30/07 |
| 14 | c. Develop F&CBA Report | 10 days | Mon 4/2/07 | Fri 4/13/07 |
| 15 | 3. Presentation of Findings and Decisions for Design Mods | 11 days | Mon 4/16/07 | Mon 4/30/07 |
| 16 | a. Prepare Technical Memorandum | 10 days | Mon 4/16/07 | Fri 4/27/07 |
| 17 | b. Review Conference | 1 day | Mon 4/30/07 | Mon 4/30/07 |
| 18 | Government Review | 20 days | Tue 5/1/07 | Mon 5/28/07 |
| 19 | B. Prepare Closure Re-Design Plans, Specs, & Estimate (PS&E) Package | 138 days | Mon 3/19/07 | Wed 9/26/07 |
| 20 | 1. Re-Design based on tech-memo | 80 days | Thu 5/10/07 | Wed 8/29/07 |
| 21 | 2. Additional Design Scope Items | 68 days | Mon 3/19/07 | Wed 6/20/07 |
| 22 | a. Filling Plan | 30 days | Thu 5/10/07 | Wed 6/20/07 |
| 23 | b. Leachate Disposal System | 45 days | Mon 3/19/07 | Fri 5/18/07 |
| 24 | i. Survey | 10 days | Mon 3/19/07 | Fri 3/30/07 |
| 25 | ii. Analysis | 5 days | Mon 4/2/07 | Fri 4/6/07 |
| 26 | iii. Design | 30 days | Mon 4/9/07 | Fri 5/18/07 |
| 27 | Government Review | 20 days | Thu 8/30/07 | Wed 9/26/07 |
| 28 | C. Final Closure Re-Design PS&E Package | 16 days | Thu 9/27/07 | Thu 10/18/07 |
| 29 | 1. Design Revisions | 15 days | Thu 9/27/07 | Wed 10/17/07 |
| 30 | 2. Submit Package | 1 day | Thu 10/18/07 | Thu 10/18/07 |
| 31 | **Procurement Process and PUC Review** | 400 days | Fri 10/19/07 | Thu 4/30/09 |
| 32 | Bid packaging (Ordot closure, HHW, New landfill) | 65 days | Fri 10/19/07 | Thu 1/17/08 |
| 33 | PUC review prior to advertisment | 65 days | Fri 1/18/08 | Thu 4/17/08 |
| 34 | Government Bid Advertisement / Bid Period | 80 days | Fri 4/18/08 | Thu 8/7/08 |
| 35 | Bid Evaluation | 20 days | Fri 8/8/08 | Thu 9/4/08 |
| 36 | Construction Contract Processing | 60 days | Fri 9/5/08 | Thu 11/27/08 |
| 37 | PUC Review of bid evaluation and contract agreement | 22 days | Fri 11/28/08 | Mon 12/29/08 |
| 38 | Award Contract | 1 day | Tue 12/30/08 | Tue 12/30/08 |
| 39 | Bond financing completion | 86 days | Wed 12/31/08 | Wed 4/29/09 |
| 40 | Issue NTP | 1 day | Thu 4/30/09 | Thu 4/30/09 |
| 41 | **Construction - dump closure** | 1255 days | Mon 2/26/07 | Fri 12/16/11 |
| 42 | Interim Operation/Waste Placement as per Filling Plan | 326 days | Fri 5/1/09 | Fri 7/30/10 |
| 43 | Construction Period | 360 days | Mon 8/2/10 | Fri 12/16/11 |
| 44 | Limited Remedial Investigation | 160 days | Mon 2/26/07 | Fri 10/5/07 |
| 45 | **Layon Landfill** | 1168 days | Tue 12/19/06 | Thu 6/9/11 |
| 46 | **Landfill design consultant contract amendment** | 1168 days | Tue 12/19/06 | Thu 6/9/11 |
| 47 | VE Alternatives Re-design negotiations | 45 days | Tue 12/19/06 | Mon 2/19/07 |
| 48 | NTP | 0 days | Mon 2/19/07 | Mon 2/19/07 |
| 49 | **Fieldwork** | 700 days | Tue 12/19/06 | Mon 8/24/09 |
| 50 | Right-of-Entry Permit | 35 days | Tue 12/19/06 | Mon 2/5/07 |
| 51 | Surveys | 60 days | Tue 2/6/07 | Mon 4/30/07 |
| 52 | Geotechnical | 90 days | Tue 2/6/07 | Mon 6/11/07 |
| 53 | Hydro-Geological | 93 days | Tue 2/6/07 | Thu 6/14/07 |
| 54 | GW / SW Baseline Sample / Test | 340 days | Tue 5/6/08 | Mon 8/24/09 |
| 55 | **Re-Design for VE and USEPA comments** | 270 days | Tue 12/19/06 | Mon 12/31/07 |
| 56 | Access Road | 50 days | Tue 12/19/06 | Mon 2/26/07 |
| 57 | Hydro-Geological Model / Report | 120 days | Tue 7/17/07 | Mon 12/31/07 |
| 58 | Entrance Area | 165 days | Tue 2/20/07 | Mon 10/8/07 |
| 59 | Cell 1 & 2 | 165 days | Tue 2/20/07 | Mon 10/8/07 |
| 60 | Monitoring Well Network | 45 days | Tue 10/30/07 | Mon 12/31/07 |
| 61 | **Procurement Process and PUC Review** | 400 days | Fri 10/19/07 | Thu 4/30/09 |
| 62 | Bid packaging (Ordot closure, HHW, New landfill) | 65 days | Fri 10/19/07 | Thu 1/17/08 |
| 63 | PUC review prior to advertisment | 65 days | Fri 1/18/08 | Thu 4/17/08 |
| 64 | Government Bid Advertisement / Bid Period | 80 days | Fri 4/18/08 | Thu 8/7/08 |
| 65 | Bid Evaluation | 20 days | Fri 8/8/08 | Thu 9/4/08 |
| 66 | Construction Contract Processing | 60 days | Fri 9/5/08 | Thu 11/27/08 |
| 67 | PUC Review of bid evaluation and contract agreement | 22 days | Fri 11/28/08 | Mon 12/29/08 |

Case 1:02-cv-00022    Document 79-5    Filed 01/31/2007    Page 31 of 32

Exhibit 7



| ID | | Task Name | Duration (5-day work week) | Start | Finish |
|---|---|---|---|---|---|
| 68 | | Award Contract | 1 day | Tue 12/30/08 | Tue 12/30/08 |
| 69 | | Bond financing completion | 86 days | Wed 12/31/08 | Wed 4/29/09 |
| 70 | | Issue NTP | 1 day | Thu 4/30/09 | Thu 4/30/09 |
| 71 | | Construction | 898 days | Tue 1/1/08 | Tue 6/9/11 |
| 72 | | Monitoring Well Network | 90 days | Tue 1/1/08 | Mon 5/5/08 |
| 73 | | Clear and Grub (C&G)- Building Permit | 35 days | Thu 3/12/09 | Wed 4/29/09 |
| 74 | | Construction | 550 days | Fri 5/1/09 | Thu 6/9/11 |
| 75 | | Cell 1 & Road - Open | 0 days | Fri 7/30/10 | Fri 7/30/10 |
| 76 | | Cell 2 - Open | 0 days | Thu 6/9/11 | Thu 6/9/11 |
| 77 | | Permitting | 375 days | Tue 12/19/06 | Mon 5/26/08 |
| 78 | | Assume Land Acquisition Phase | 150 days | Tue 12/19/06 | Mon 7/16/07 |
| 79 | | GLUC Zone Variance | 225 days | Tue 7/17/07 | Mon 5/26/08 |
| 80 | | GEPA MSW Landfill Permit | 225 days | Tue 7/17/07 | Mon 5/26/08 |
| 81 | | HHWRF | 786 days | Thu 1/4/07 | Thu 1/7/10 |
| 82 | | Design | 786 days | Thu 1/4/07 | Thu 1/7/10 |
| 83 | | Design NTP | 0 days | Thu 1/4/07 | Thu 1/4/07 |
| 84 | | Task I. SITE SURVEY & FIELD INVESTIGATION | 31 days | Thu 1/4/07 | Thu 2/15/07 |
| 85 | | Topographic Survey / Property Map Development | 17 days | Thu 1/4/07 | Fri 1/26/07 |
| 86 | | Geotechnical Investigation | 19 days | Mon 1/22/07 | Thu 2/15/07 |
| 87 | | Preliminary Environmental Site Assessment | 17 days | Thu 1/4/07 | Fri 1/26/07 |
| 88 | | Task II. Final Design Plans, Specifications & Construction Cost Estimates & Conceptual Master Plan of Combined Site 30%,60%,90% | 108 days | Thu 1/4/07 | Mon 6/4/07 |
| 89 | | Establishing Design Criteria | 32 days | Thu 1/4/07 | Fri 2/16/07 |
| 90 | | Prepare Conceptual Plan of Material Resource Recovery Facility and HHW Facility | 33 days | Thu 1/4/07 | Mon 2/19/07 |
| 91 | | 30% Preliminary Operations Description | 33 days | Thu 1/4/07 | Mon 2/19/07 |
| 92 | | 30% (PS&E) Plans Specifications and Estimates | 32 days | Fri 2/16/07 | Mon 4/2/07 |
| 93 | | 60% (PS&E) Plans Specifications and Estimates | 28 days | Tue 4/3/07 | Thu 5/10/07 |
| 94 | | 90% (PS&E) Plans Specifications and Estimates | 10 days | Fri 5/11/07 | Thu 5/24/07 |
| 95 | | 100% (PS&E) Plans, Specifications and Estimates | 7 days | Fri 5/25/07 | Mon 6/4/07 |
| 96 | | Final Operations Plan | 30 days | Tue 2/20/07 | Mon 4/2/07 |
| 97 | | Procurement Process and PUC Review | 400 days | Fri 10/19/07 | Thu 4/30/09 |
| 98 | | Bid packaging (Ordot closure, HHW, New landfill) | 65 days | Fri 10/19/07 | Thu 1/17/08 |
| 99 | | PUC review prior to advertisement | 65 days | Fri 1/18/08 | Thu 4/17/08 |
| 100 | | Government Bid Advertisement / Bid Period | 80 days | Fri 4/18/08 | Thu 8/7/08 |
| 101 | | Bid Evaluation | 20 days | Fri 8/8/08 | Thu 9/4/08 |
| 102 | | Construction Contract Processing | 60 days | Fri 9/5/08 | Thu 11/27/08 |
| 103 | | PUC Review of bid evaluation and contract agreement | 22 days | Fri 11/28/08 | Mon 12/29/08 |
| 104 | | Award Contract | 1 day | Tue 12/30/08 | Tue 12/30/08 |
| 105 | | Bond financing completion | 86 days | Wed 12/31/08 | Wed 4/29/09 |
| 106 | | Issue NTP | 1 day | Thu 4/30/09 | Thu 4/30/09 |
| 107 | | Construction | 180 days | Fri 5/1/09 | Thu 1/7/10 |
| 108 | | Construct HHWRF | 180 days | Fri 5/1/09 | Thu 1/7/10 |
| 109 | | Operate HHWRF | 0 days | Thu 1/7/10 | Thu 1/7/10 |

Project: Revised Consent Decree 31Ja
Date: Wed 1/31/07

Task    Split    Progress    Milestone    Summary    Project Summary    External Tasks    External Milestone    Deadline

Revised Consent Decree 31Jan07 RevM

Page 2

Case 1:02-cv-00022    Document 79-5    Filed 01/31/2007    Page 32 of 32