

**Office of the Attorney General**
**Alicia G. Limtiaco**
Attorney General of Guam
**Civil Division**
287 West O'Brien Dr.
Hagåtña, Guam 96910 • USA
(671) 475-3324 • (671) 472-2493 (Fax)
www.guamattorneygeneral.com
**Attorneys for the Government of Guam**



FILED
DISTRICT COURT OF GUAM
FEB - 9 2007
MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

GOVERNMENT OF GUAM,

                Defendant.

)
)
)
)
)
)
)
)
)
)
)

CIVIL CASE NO. 02-00022

**CORRECTED AND SUPPLEMENTAL**

**DECLARATION OF LAWRENCE P. PEREZ**

    I, Lawrence P. Perez say and declare of my own personal knowledge:

1.    Copies of PUC order and letters are attached as Exhibit 2, which included copies corrected so as to conform to the District Court's requirements of one inch borders, and which also is supplemented to include the February 1, 2007 order.

2.    A copy of the Ordot contractor's proposal and the final scope of work, and comments from the US EPA are attached as Exhibit 3, which has been corrected so as to conform to the District Court's requirements of one inch borders.

ORIGINAL

1   3.      A copy of the proposed schedule is attached as Exhibit 7, which has been corrected so as

2   to conform to the District Court's requirements of one inch borders.

3

4         I declare under penalty of perjury that the foregoing is true and correct to the best of my

5   knowledge this _____ day of February, 2007.

6

7                     _____ 2/8/07

                         Lawrence P. Perez

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

BEFORE THE GUAM PUBLIC UTILITIES COMMISSION



RECEIVED
SEP 28 2006
Public Utilities Commission
of Guam

FOCUSED MANAGEMENT AUDIT
OF DEPARTMENT OF PUBLIC
WORKS' SOLID WASTE MANAGEMENT          DOCKET 06-2
DIVISION BILLING AND COLLECTION
SYSTEM

## ORDER

In response to its administrative law judge's [ALJ] April 20, 2006 memorandum
*[Attachment A]*, the Guam Public Utilities Commission [PUC] at its April 20, 2006
meeting directed ALJ to oversee a focused management audit by Georgetown
Consulting Group [GCG] of the Department of Public Works' [DPW] solid waste
management's [SWM] billing and collection practices and the Department of
Administration's restricted account management. On August 18, 2006, GCG
filed its audit report *[Attachment B]* with PUC. On September 21, 2006 GCG
presented its report to PUC at a workshop.

After careful review of the GCG audit report and the record herein, including
comments from DPW, for good cause shown and on motion duly made,
seconded and carried by the undersigned commissioners, the Guam Public
Utilities Commission **HEREBY FINDS AND ORDERS THAT:**

1.  The audit report presents compelling and convincing evidence that DPW
    is not prepared to assume the financial responsibilities, which would be
    imposed upon it by the proposed $90 million dollar revenue bonds
    financing, which is necessary to fund the Government of Guam's
    compliance with the Federal Consent Decree[1].

2.  DPW does not have adequate resources *[management, staff, financial, legal,
    engineering and systems]* to implement the audit recommendations in a
    timely manner.

3.  Accordingly, it is critical that the legislation recommended in the audit
    report be implemented *concurrently* with any legislative authorization for
    the Government to proceed with the revenue bond financing - *paramount
    of which is the recommendation that SWM be reconstituted as a public
    corporation under the governance of the Consolidated Commission on Utilities.*
    PUC respectfully cautions the Government of Guam, in furtherance of its
    May 2, 2006 letter to Vice Speaker Brown *[Attachment C]* that without

---

[1] Consent Decree dated February 11, 2004 in *USA v. Government of Guam*, District Court Civil Case
02-22.

1

*Exhibit 2*

these legislative reforms, PUC has material concern over DPW's ability to collect, deposit, account for and properly expend the *just and reasonable* rate revenues awarded by PUC in a manner which will enable DPW and the Government of Guam to comply with its proposed bond covenants.

4. PUC stands ready, upon request, to propose specific legislation to implement the audit recommendations.

5. In the interim, PUC is committed to do its part in implementing those audit recommendations, which are within its power to address. Accordingly, the following regulatory activities shall be commenced under ALJ's oversight:

   a. In anticipation of the revenue requirements, which would be imposed on DPW by the revenue bond financing, DPW has requested GCG's assistance in preparing a petition for FY07 rate relief for PUC consideration during the January 2007 regulatory session. ALJ is authorized and directed to oversee the preparation of this petition by GCG in collaboration with DPW. As part of this rate proceeding, GCG shall: i] propose a residential lifeline rate, a variable residential rate and a prepaid decal system for residential service; ii] propose necessary amendments to SWM's service rules; and iii] examine and make recommendations regarding SWM's $10 million dollar accounts receivable.

   b. PUC is encouraged by DPW's acceleration of the timeline for outsourcing the collection of residential waste for the entire island not later than July 2007. On or before October 15, 2006, DPW shall inform PUC of the additional resources, which it will require to successfully meet this deadline. DPW's progress under the timeline will be examined during the January 2007 rate proceeding.

6. PUC stands ready to issue necessary regulatory orders, which will be required to secure revenue bond financing; subject to its strong reservation that without the concurrent legislation recommended above, it is questionable whether DPW and the Government of Guam will be able to meet the requirements of the bond covenants.

7. Except as provided herein, the deadlines for action recommended in the audit report will be suspended pending further consideration during the January 2007 regulatory session.

2

8. A copy of this Order shall be transmitted to the Speaker of the 28th Guam Legislature, to the Governor of Guam, to the Department of Public Works and to the Consolidated Commission on Utilities.

Dated this 28th day of September 2006.

Terrence M. Brooks

Joseph M. McDonald

Edward C. Crisostomo

Filomena M. Cantoria

Rowena E. Perez

Jeffrey C. Johnson

3

# PUBLIC UTILITIES COMMISSION
## OF GUAM

Terrence M. Brooks

Joseph M. McDonald
Edward C. Crisostomo
Rowena E. Perez

Suite 207, GCIC Building
Post Office Box 862
Hagatna, Guam 96932

Telephone: (671) 472-1907
Fax: (671) 472-1917
Email: info@guampuc.com

Harry M. Boertzel
Administrative Law Judge

Lourdes R. Palomo
Administrator

May 2, 2006

**VIA HAND DELIVERY**
The Honorable Joann Brown
Vice Speaker, 28th Guam Legislature
Chairman, Committee on Utilities and Land
155 Hesler Street
Hagåtña, Guam 96910

Dear Vice Speaker Brown:

During its recently concluded regulatory session, the Guam Public Utilities Commission [PUC] reviewed and approved the five recommendations contained in the enclosed April 20, 2006 report from Administrative Law Judge Boertzel. The report summarizes the challenges, which must be resolved in order to secure the financing necessary to enable the Government of Guam to comply with the Federal Consent Decree.

The purpose of this letter is to share with you PUC's serious concern whether Department of Public Works [DPW], a line agency, has adequate authority and resources to comply with the covenants and requirements, which will be imposed by the bond documents. It should be recalled that it took Guam Waterworks Authority, under the Consolidated Commission on Utilities' [CCU] governance and with a capable management team *[experienced general manager, engineer, chief financial officer and legal counsel]* almost three years to prepare itself for its first bond financing. DPW is being expected, without comparable resources or lead time, to assume the same responsibilities. These realities persuade PUC that the recommendation made in Guam Environmental Protection Agency's 2005 *Guam Integrated Solid Waste Management Plan*, that solid waste management be transferred to a public corporation under CCU's oversight, should be given serious consideration.

PUC stands ready to work with the Guam Legislature as it considers the legislation, which will be necessary to authorize the important revenue bond financing discussed in this letter.

Respectfully,

Terrence Brooks
Chairman

## Memorandum

To:      Commissioners
From:   ALJ Boertzel
Date:    April 20, 2006

RE:      Docket 05-9 [Department of Public Works [DPW] – Revenue
         Bonds]

### Overview

Under a schedule driven by the Federal Consent Decree, the government of
Guam and its financial consultants are working under a May 2006 deadline to
secure $90 million dollars in revenue bond financing to fund the capital
requirements for the Ordot landfill closure, the construction of the new landfill
and associated costs.

As the repayment of these bonds will be funded through DPW rates, financial
consultants emphasize the importance of a strong PUC commitment to approve
such rates increases [estimated at 400% over current rates within the next 26
months] to enable DPW to meet its bond obligations.

PUC customarily issues two orders in support of utility bond financing: a] an
order drafted by bond counsel, which provides formal approval of the
transaction terms and conditions and a regulatory commitment to provide
adequate rates to fund bond commitments; and b] an order which approves and
establishes regulatory oversight over the use of bond proceeds.

### Challenges

The fact that DPW is a line agency of the Executive Branch creates significant
regulatory challenges, which PUC does not encounter in regulating GPA and
GWA, which are autonomous public corporations. These challenges have come
into sharp focus during this April regulatory session as a result of consultations
with DPW's financial advisor and management. DPW does not have the power
to contract and its revenues are held under the Department of Administration's
[DOA] custody. These challenges are reflected in the following facts:

1. On December 20, 2005 PUC gave its regulatory approval for DPW to
   employ a procurement advisor to craft the documentation for the
   privatization of the Ordot closure, the construction and operation of the
   new landfill and for the privatization of residential trash collection. The
   contract, which also requires the Attorney General's approval, has sat in

1

the AG's office since early February. As a result, DPW has no resources to move forward with procurements mandated by the Consent Decree and is incurring fines as a result.

2. On October 27, 2005, PUC awarded DPW a 25% rate increase, effective for services rendered after November 1, 2005. DPW has still not implemented this increase for its residential customers. The rate order is enclosed as *Attachment A*.

3. The October rate order was premised on DPW's assurance that it would improve its collection rate to 95% for commercial customers and 70% for residential customers. DPW has failed to meet this assurance -- its current collection rate is at 30%. As a result, there will be a substantial FY06 revenue shortfall.

4. The October rate order mandated that all revenue created by the rate increase shall be deposited into a restricted DOA account, which could not be withdrawn without PUC approval. Georgetown estimates that the current balance in the restricted account *[even excluding the residential rate increase]* should be in the range of $400,000. DOA has reported that it currently has only $47,000 on deposit in the restricted account. The government's financial advisor recommends that the bond covenants mandate that a "locked box" be created under the Trustee's custody for all rate revenues. PUC should strongly support this recommendation, with the condition that the Trustee observe PUC orders, which restrict the use of funds and establish reporting requirements. *Attachment B* is a presentation by the advisor *[Municipal Services Group]* regarding the challenges of marketing the DPW revenue bonds.

5. As PUC's rate authority is derived from statute, it is essential that the legislation, which approves this financing include a covenant from the Legislative and Executive branches that they will not take any action, which would impair PUC's independent rate making authority. Similar covenants have been provided in GPA and GWA bond financing legislation.

6. DPW is not in compliance with Guam law, which mandated that 2 of 3 residential collection districts be privatized by October 2002. No residential collection has yet been privatized. As a result, residential customers receive poor service and are unlikely to favorably receive the reality of a 400% rate increase over the next 26 months unless service is dramatically improved. In its December 20, 2005 Order *[Attachment C]*, PUC directed DPW to prioritize the privatization of residential trash

2

collection. As discussed in paragraph 1 above, this effort has been obstructed by DPW's inability to employ a procurement advisor.

*Recommendations*

PUC has a dual responsibility in regulating DPW's rates: a] the obligation to provide adequate rate revenues to enable DPW to meet its financial obligations; and b] the obligation to assure that DPW's customers pay *just and reasonable* rates for reliable, quality service. Unless the above challenges are resolved, these dual responsibilities will likely put PUC on the proverbial *horns of a dilemma*. I offer the following recommendations to address this dilemma:

1. PUC should make it clear that it will not make bond rate commitments unless DPW is empowered to employ a procurement advisor, which must occur before residential service can be improved through privatization.

2. Bond counsel, who will be crafting the legislation, which authorizes the bond financing, should be requested to include a covenant to protect PUC's independent rate making authority.

3. PUC should support a *"locked box"* bond covenant.

4. PUC should immediately initiate a focused audit by Georgetown of DPW's billing and collection practices and DOA restricted account management, which would be ready for regulatory review and implementation at the next regulatory session.

5. PUC should support the recommendation made in Guam Environmental Protection Agency's *2006 Integrated Solid Waste Management Plan* that solid waste management be transferred to a public corporation under the oversight of the Consolidated Commission on Utilities.

I recommend that PUC adopt these recommendations by resolution, which authorizes me, in consultation with Chairman Brooks, to implement them.

3

## BEFORE THE GUAM PUBLIC UTILITIES COMMISSION

DEPARTMENT OF PUBLIC WORKS
ESTABLISHMENT OF TIPPING AND
USER FEES PURSUANT TO P.L. 28-56 · DOCKET 05-09



RECEIVED
OCT 2 7 2005
Public Utilities Commission
of Guam

## RATE ORDER

Public Law 28-56 directs the Guam Public Utilities Commission *[PUC]* to establish commercial, government and residential tipping and user fees to fund the activities of the Department of Public Works' *[DPW]* Division of Solid Waste Management *[DSWM]* in discharging its statutory duties and those imposed by Federal District Court of Guam Consent Decree *[Consent Decree]* in Civil Case No. 02-22.

On September 20, 2005 Georgetown Consulting Group *[GCG - PUC's regulatory consultant]* issued a Report, which recommends the following *interim* service fee increases:

| Service Fee | Current | Proposed [Interim] |
|---|---|---|
| Residential pick-up | $8 per month | $10 per month |
| Tipping fee [compacted] | $16/cubic yd. | $20/cy |
| Tipping fee [uncompacted] | $4/cy | $5/cy |
| Self drop [under 3 cy] | $2/pickup | $2.50/pickup |
| Self drop [over 3 cy] | $4/cy | $5/cy |

On October 17, 2005, GCG and DPW entered into a stipulation, which recommends that:

1. PUC adopt the above proposed fees as a first step toward volume and cost based rates.

2. The GCG report should be found to satisfy the requirement in 10 GCA 51118[e] that fees be based on an actuarial cost of service analysis.

3. The additional revenues created by the proposed fee increases, which are estimated to be $1.3 million in FY06 *[net of uncollectible allowance]*, should be restricted and spent only pursuant to PUC order.

4. PUC should await the management audit required under 10 GCA 51118[e] before establishing a variable residential tipping fee.

# ATTACHMENT A

1

5.  A targeted residential lifeline tipping fee should be established with other permanent fees during the April 2006 regulatory session.

6.  DPW should provide PUC with quarterly reports, commencing with quarter beginning October 2005, on DSWM's revenues and expenses, including income statements and balance sheets. Reports should be filed within 21 days after the close of each quarter *[the first report due January 21, 2006]*.

7.  PUC should conduct a quarterly review of DPW's compliance with this rate order and of the adequacy of the proposed interim rates.

8.  PUC should immediately undertake the focused management audit of DSWM operations as required by 10 GCA 51118[e].

9.  Any DPW procurement or obligation relating to DSWM in excess of $50,000 should require PUC's prior review and approval. The contract review protocol, which PUC established to regulate the procurements of Guam Power Authority and Guam Waterworks Authority should be adopted as the review protocol for these procurements and obligations.

PUC conducted a public workshop at 6:00 p.m. on October 17, 2005 to receive a briefing on the GCG report and the Stipulation. In addition, PUC conducted public rate hearings at 6:00 p.m. October 25, 2005 in Hagatna, at 5:00 p.m. October 26, 2005 in Agat and at 6:30 p.m. October 26, 2005 in Dededo on the proposed interim fee increases.

After due consideration of the record in this docket, including public comments regarding the proposed interim fee increases, for good cause shown and on motion duly made, seconded and carried by the affirmative vote of the undersigned commissioners, the Guam Public Utilities Commission **HEREBY FINDS AND ORDERS THAT:**

1.  DPW, including DSWM, is subject to PUC jurisdiction pursuant to 10 GCA 51118[e].

2.  The stipulated recommendations from GCG and DPW, as discussed above, should be and are hereby adopted. DPW is ordered to comply with the recommendations, subject to instructions from PUC's administrative law judge *[ALJ]*.

2

3. The proposed interim fee increases are hereby approved for services rendered on and after November 1, 2005. PUC recognizes that this is but the first of a series of rate increases, which will be necessary to support the $93 million borrowing required to enable DPW to comply with the Consent Decree. The GCG Report satisfies the requirement in 10 GCA 51118[e] that fees shall be based on an actuarial cost of service analysis.

4. Under separate order, ALJ will be authorized to oversee the focused management audit of DSWM's existing operations.

5. The contract review protocol, in form attached hereto, shall govern the regulatory review of DSWM procurements and obligations.

6. ALJ is hereby authorized and directed to oversee regulatory proceedings, which will lead to PUC's consideration of a variable residential rate, including a lifeline component, and of the implementation of permanent fees.

7. PUC emphasizes that the revenue created by the interim fee increases shall be restricted funds and shall not be spent without prior PUC authorization.

Dated this 27th day of October 2005.

_____
Terrence M. Brooks

_____
Edward C. Crisostomo

_____
Joseph M. McDonald

_____
Rowena T. Perez

3

## Municipal Securities Group

*Presentation to Guam PUC*

# Guam Department of Public Works



**April 2006**

 UBS Investment Bank

UBS Investment Bank is a business group of UBS AG.
UBS Securities LLC is a subsidiary of UBS AG.

ATTACHMENT B

## Current Situation

- Need to finance approximately $90 million* through the capital markets:
  - Closure costs for Ordot
  - Construction of the new Municipal Solid Waste Landfill
  - Two years of Capitalized Interest
  - Costs of Issuance
  - Debt Service Reserve Fund

- Driven by EPA consent decree

- Funds needed by May to avoid further fines

Preliminary, subject to change.

UBS Investment Bank

1

**Guam Department of Public Works**

# Challenges Faced by DPW for Proposed Financing

■ Landfill financings are challenging credits from investors perspective

— The Government's credit situation also impacts market acceptance

■ Tipping-fee backed revenue bond financing appears to be only feasible means of providing bond security in current political environment

— No broader excise tax possible

— No real property lien for security

■ Residential Collection rates have been poor relative to other comparable municipal solid waste enterprises

■ Tipping fees must be increased dramatically just to cover operating expenses and projected debt service

■ Continuity and timing of required rate increases are unknown

■ In addition, bond investors typically require additional coverage to be structured to provide adequate bondholder security (e.g. 1.25x coverage)



● Guam Department of Public Works

# Residential Collection System Goals

■ Provide curbside pickup service for those paying for service

■ Easily identify those entitled to the service

■ Reliably bill and collect from recipients of service

■ Create stable and predictable revenue stream

❖ UBS Investment Bank

3

## Charlottesville, VA Example

■ Charlottesville residents have two options for trash disposal

— Individual trash stickers

— Annual trash decals

■ Individual trash stickers can be purchased at grocery and convenience stores; annual decals must be purchased at City Hall

| Benefits | Risks |
|---|---|
| — Increased administrative efficiency | — Lack of History |
| — Predictable revenue stream | — Waste Diversion |
| — Equitable | — Counterfeiting |
| — Payment of services prior to service (reliability) | |

4

❖ UBS Investment Bank

# Structure and Security Considerations for Proposed Financing

■ Coverage

   — 1.75x PUC target

   — 1.25x rate covenant

■ Determine the necessary amount of capitalized interest

■ What level of rate increases are necessary to support the proposed debt?

   — How will this vary based on collection improvement?

■ Gross Revenue versus Net Revenue pledge

■ "Lock Box" structure (revenues as received directed immediately to the trustee)

■ Cash flow considerations (as related to 1.75x coverage target)


UBS Investment Bank

Case 1:02-cv-00022   Document 84   Filed 02/09/2007   Page 19 of 36

 **Guam Department of Public Works**

# Cash Flow Observations

■ The Department's current financial projections indicate <u>significant</u> rate increases will be necessary to support new debt service and coverage

■ Currently only 31% of billed residential charges are collected from customers

■ Improving collections will minimize the required rate increases

■ Even if relatively low interest rates are achieved, the Department will need large rate increases

■ Improving the residential collection rate is very important

**UBS** Investment Bank



# Guam Department of Public Works

## Cash Flow Scenario #1

### 6.50% Interest Rate Assumption

**Guam Department of Public Works**
**Preliminary Cashflow Statement (Fiscal Year Ending September 30th)**

| | FY 2002* | FY 2003* | FY 2004* | FY 2005 (Annual) | FY 2006 (Proj.) | FY 2007 (Proj.) | FY 2008 (Proj.) | FY 2009 (Proj.) | FY 2010 (Proj.) | FY 2011 (Proj.) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses:** | | | | | | | | | | |
| **O&M[1]** | | | | | | | | | | |
| Salary - Residential Collection[1] | $ - | $ - | $ - | $ - | $ 1,994,252 | $ 2,074,023 | $ 2,156,983 | $ 2,243,263 | $ 2,332,993 | $ 2,426,313 |
| Salary - Ordot Landfill[1] | | | | | 653,628 | 679,774 | 706,965 | 735,243 | 764,653 | 795,239 |
| Salary - Other[1] | | | | | 1,215,651 | 1,264,277 | 1,314,848 | 1,367,442 | 1,422,140 | 1,479,025 |
| Other Expenditures[1][2] | | | | | 1,566,880 | 1,629,555 | 1,694,737 | 1,762,527 | 1,833,028 | 1,906,349 |
| O&M New MSWLF[3] | | | | | - | - | - | 2,382,764 | 2,553,487 | 2,643,287 |
| Recycling and PUC Costs[4] | | | | | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 |
| Projected Debt Service @ 6.5%[5] | | | | | | | | 9,127,575 | 9,130,763 | 9,129,000 |
| **Total Expenditures** | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $5,798,412 | $6,015,628 | $8,624,298 | $18,022,556 | $18,405,064 | $18,747,214 |
| Revenue Requirement for 1.25x Coverage | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $5,798,412 | $6,015,628 | $8,624,298 | $20,304,450 | $20,687,754 | $21,029,464 |
| Revenue Requirement for 1.75x Coverage | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $5,798,412 | $6,015,628 | $8,624,298 | $24,666,237 | $25,253,136 | $25,593,964 |
| **Revenues:** | | | | | | | | | | |
| Commercial Collections | $ 2,425,362 | $ 2,605,554 | $ 2,853,587 | $ 3,181,296 | $ 2,976,640 | $ 2,991,706 | $ 3,111,374 | $ 3,235,829 | $ 3,365,262 | $ 3,499,872 |
| OCH Collections | 36,831 | 39,849 | 50,469 | 85,087 | 55,120 | 57,325 | 59,618 | 62,003 | 64,483 | 67,062 |
| Residential Collections | 691,575 | 608,286 | 477,978 | 611,242 | 620,880 | 645,715 | 671,544 | 698,406 | 726,342 | 755,395 |
| Other Collections | 485,676 | 648,599 | 774,069 | 758,053 | 693,680 | 721,427 | 750,284 | 780,295 | 811,507 | 843,966 |
| **Total Available Revenues** | $ 3,639,444 | $ 3,902,288 | $ 4,156,103 | $ 4,635,678 | $ 4,246,320 | $ 4,416,173 | $ 4,592,820 | $ 4,776,533 | $ 4,957,594 | $ 5,166,298 |
| **Debt Service Coverage[1]** | | | | | | | | (0.45x) | (0.47x) | (0.49x) |
| **Debt Service Coverage w/(100% Collections)[6]** | | | | | | | | (0.20x) | (0.21x) | (0.22x) |

Note: Projected revenues are calculated based on 4% escalation annually using the averages from the averages from FY 2002-2005.
(1) Based on Georgetown reports from Exhibit 2-4 dated 8/29/2005 which assume projections increased 4% annually using FY 2005 as base year. Operation figures of new landfill, recycling and PUC admin are estimates from DPW
(2) Other expenditures include travel, contractual services, supplies/materials, utilities (i.e. power, water & telephone), and capital outlays.
(3) TG Engineering study dated 6/15/05 public own/private operate scenario.
(4) Recycling at $218K, PUC at $150K estimates per DPW.
(5) Based on an estimated 30-year level debt service financing (for initial investment) and 15-year/level debt service (for cell construction costs) with assumed interest rate of 6.5% and two-years of capitalized interest plus a debt service reserve fund. Bond sizing based on proceeds in HDR report dated 4/2/06 consisting of $28.8mm in initial investments and first three years of cell construction ($17.5mm, $11.9mm and $12.5mm) totaling $69.8mm.
(6) Equals Net Revenues (Revenue less O&M) divided by debt service. When negative (as shown in red) that means Net Revenues are negative.

**UBS** Investment Bank

7

Guam Department of Public Works

# Cash Flow Scenario #2

## 7.0% Interest Rate Assumption

**Guam Department of Public Works**
Preliminary Cashflow Statement (Fiscal Year Ending September 30th)

| | FY 2002* | FY 2003* | FY 2004* | FY 2005 (Annual) | FY 2006 (Proj.) | FY 2007 (Proj.) | FY 2008 (Proj.) | FY 2009 (Proj.) | FY 2010 (Proj.) | FY 2011 (Proj.) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses:** | | | | | | | | | | |
| **O&M[1]** | | | | | | | | | | |
| Salary - Residential Collection[1] | $ - | $ - | $ - | $ - | $ 1,994,252 | $ 2,074,026 | $ 2,156,983 | $ 2,243,263 | $ 2,332,993 | $ 2,426,313 |
| Salary - On-lot Landfill[1] | - | - | - | - | 653,628 | 679,774 | 706,965 | 735,243 | 764,653 | 795,239 |
| Salary - Other[1] | - | - | - | - | 1,215,651 | 1,264,277 | 1,314,848 | 1,367,442 | 1,422,140 | 1,479,025 |
| Other Expenditures[1][2] | - | - | - | - | 1,566,880 | 1,629,555 | 1,694,737 | 1,762,527 | 1,833,028 | 1,906,349 |
| O&M New MSWLF[3] | - | - | - | - | - | - | 2,382,764 | 2,418,506 | 2,553,487 | 2,643,287 |
| Recycling and PUC Costs[4] | - | - | - | - | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 |
| Projected Debt Service @ 7.0%[5] | - | - | - | - | - | - | - | 9,582,875 | 9,585,300 | 9,585,750 |
| **Total Expenditures** | $ 3,479,551 | $ 3,668,454 | $ 3,970,427 | $ 5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $ 18,477,856 | $ 18,859,601 | $ 19,203,964 |
| **Revenue Requirement for 1.25x Coverage** | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $20,973,575 | $21,255,926 | $21,600,401 |
| **Revenue Requirement for 1.75x Coverage** | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $ 5,798,412 | $ 6,015,628 | $ 8,624,298 | $25,665,012 | $25,048,576 | $26,393,276 |
| **Revenues:** | | | | | | | | | | |
| Commercial Collections | $ 2,425,362 | $ 2,605,554 | $ 2,653,587 | $ 3,181,296 | $ 2,876,640 | $ 2,991,706 | $ 3,111,374 | $ 3,225,829 | $ 3,365,262 | $ 3,499,872 |
| OCH Collections | 36,831 | 39,849 | 50,469 | 85,987 | 55,120 | 57,325 | 59,618 | 62,003 | 64,483 | 67,062 |
| Residential Collections | 691,575 | 608,286 | 677,578 | 611,342 | 620,880 | 645,715 | 671,544 | 698,406 | 726,342 | 755,395 |
| Other Collections | 485,676 | 648,399 | 774,269 | 758,053 | 693,680 | 721,427 | 750,284 | 780,296 | 811,507 | 843,968 |
| **Total Available Revenues** | $ 3,639,444 | $ 3,902,288 | $ 4,156,103 | $ 4,635,678 | $ 4,246,320 | $ 4,416,173 | $ 4,592,820 | $ 4,776,533 | $ 4,967,594 | $ 5,166,298 |
| **Debt Service Coverage[5]** | | | | | | | | (0.43x) | (0.45x) | (0.46x) |
| **Debt Service Coverage w/100% Collections** | | | | | | | (0.19x) | (0.19x) | (0.20x) | (0.21x) |

Note: Projected revenues are calculated based on 4% escalation annually using the averages from FY 2002-2005.

(1) Based on Georgetown inputs from Exhibit 24 dated 9/24/2005 which assume projections increased 4% annually using FY 2005 as base year. Operation figures of new landfill, recycling and PUC admin are estimates from DPW

(2) Other expenditures include travel, contractual services, supplies/materials, utilities (i.e. power, water & telephone), and capital outlays.

(3) TG Engineering salary above 6/15/05 public own/private operate scenario.

(4) Recycling at $274k, PUC at $160k estimates per DPW.

(5) Based on an estimated 30-year level debt service financing (for initial investment) and 15-year level debt service (for cell construction costs) with assumed interest rate of 7.0% and two-years of capitalized interest plus a debt service reserve fund. Bond sizing based on proceeds in HDR report dated 4/2/06 consisting of $28.8mm in initial investments and first three years of cell construction ($17.5mm, $11.9mm and $12.5mm) totaling $88.8mm.

(6) Equals Net Revenues (Revenues less O&M) divided by debt service. When negative (as shown in red) that means Net Revenues are negative.

UBS Investment Bank

8

Case 1:02-cv-00022   Document 84   Filed 02/09/2007   Page 23 of 36


**Guam Department of Public Works**

# Cash Flow Scenario #3

## 7.5% Interest Rate Assumption

### Guam Department of Public Works
### Preliminary Cashflow Statement (Fiscal Year Ending September 30th)

| | FY 2002* | FY 2003* | FY 2004* | FY 2005 (Annual) | FY 2006 (Proj.) | FY 2007 (Proj.) | FY 2008 (Proj.) | FY 2009 (Proj.) | FY 2010 (Proj.) | FY 2011 (Proj.) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses:** | | | | | | | | | | |
| **O&M[1]** | | | | | | | | | | |
| Salary - Residential Collection[1] | $ - | $ - | $ - | $ - | $ 1,994,252 | $ 2,074,023 | $ 2,156,983 | $ 2,243,263 | $ 2,332,993 | $ 2,426,313 |
| Salary - On-lot Landfill[1] | - | - | - | - | 653,628 | 679,774 | 706,965 | 735,243 | 764,653 | 795,239 |
| Salary - Other[1] | - | - | - | - | 1,215,651 | 1,264,277 | 1,314,848 | 1,367,442 | 1,422,140 | 1,479,025 |
| Other Expenditures[1][2] | - | - | - | - | 1,556,880 | 1,629,555 | 1,694,737 | 1,762,527 | 1,833,028 | 1,906,349 |
| O&M New MSWLF[3] | - | - | - | - | - | - | 2,382,764 | 2,418,506 | 2,553,487 | 2,643,287 |
| Recycling and PUC Costs[4] | - | - | - | - | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 | 368,000 |
| Projected Debt Service @ 7.5%[5] | - | - | - | - | - | - | - | 10,056,875 | 10,058,608 | 10,066,563 |
| **Total Expenditures** | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $5,798,412 | $6,015,628 | $8,624,298 | $18,961,856 | $19,342,989 | $19,684,776 |
| | | | | | | | | | | |
| Revenue Requirement for 1.25x Coverage | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $5,798,412 | $6,015,628 | $8,624,298 | $21,478,575 | $21,860,161 | $22,201,417 |
| Revenue Requirement for 1.75x Coverage | $3,479,551 | $3,668,454 | $3,970,427 | $5,183,888 | $5,798,412 | $6,015,628 | $8,624,298 | $26,512,012 | $26,894,504 | $27,234,698 |
| | | | | | | | | | | |
| **Revenues:** | | | | | | | | | | |
| Commercial Collections | $2,425,362 | $2,605,554 | $2,853,597 | $3,181,235 | $2,876,640 | $2,991,706 | $3,111,374 | $3,235,829 | $3,365,262 | $3,499,872 |
| OCH Collections | 35,831 | 39,469 | 85,087 | | 55,120 | 57,325 | 59,618 | 62,003 | 64,493 | 67,062 |
| Residential Collections | 691,575 | 608,286 | 477,978 | 611,242 | 620,880 | 645,715 | 671,544 | 698,406 | 726,342 | 755,395 |
| Other Collections | 485,676 | 648,599 | 774,059 | 758,053 | 693,080 | 721,427 | 750,284 | 780,296 | 811,507 | 843,968 |
| **Total Available Revenues** | $3,639,444 | $3,902,288 | $4,156,103 | $4,635,678 | $4,246,320 | $4,416,173 | $4,592,820 | $4,776,533 | $4,967,594 | $5,166,298 |
| | | | | | | | | | | |
| **Debt Service Coverage[6]** | | | | | | | | (0.41x) | (0.43x) | (0.44x) |
| | | | | | | | | | | |
| Debt Service Coverage w/100% Collections | | | | | | | (0.18x) | (0.18x) | (0.19x) | (0.20x) |

Note: Projected revenues are calculated based on 4% escalation annually using the averages from FY 2002-2005.
(1) Based on Georgetown reports from Exhibit 2-4 dated 8/25/2005 which assume projections increased 4% annually using FY 2005 as base year. Operation figures of new landfill, recycling and PUC admin are estimates from DPW.
(2) Other expenditures include travel, contractual services, supplies/materials, utilities (i.e. power, water & telephone), and capital outlays.
(3) TG Engineering study dated 6/15/05 public own/private operate scenario.
(4) Recycling at $21/hh, PUC at $165k estimates per DPW.
(5) Based on an estimated 30-year level debt service financing (for initial investment) and 15-year level debt service (for cell construction cost) with assumed interest rate of 7.5% and two-years of capitalized interest plus a debt service reserve fund. Bond sizing based on proceeds in HDR report dated 4/2/06 consisting of $26.8mm in initial investments and first three years of cell construction ($17.5mm, $11.9mm and $12.6mm) totaling $58.8mm.
(6) Equals Net Revenues (Revenues less O&M) divided by debt service. When negative (as shown in red) that means Net Revenues are negative.

UBS Investment Bank

● **Guam Department of Public Works**

# Next Steps

■ Determine preferred collection system adjustments and take necessary legislative and regulatory steps to institute the changes

■ Confirm project costs to be financed

■ Evaluate structuring alternatives

— Follow-on issue in 2011 for future cell construction costs

■ Continue discussions with credit rating agencies

■ Determine schedule of rate increases and adjust rates as soon as feasible

■ Resolve legal issues related to billing in advance

UBS Investment Bank



RECEIVED
DEC 2 0 2005
Public Utilities Commission
of Guam

DEPARTMENT OF PUBLIC WORKS –
PROCUREMENT ADVISOR          DOCKET 05-9
CONTRACT

## ORDER

On December 14, 2005, the Department of Public Works *[DPW]* petitioned the Guam Public Utilities Commission *[PUC]* for expedited review of its procurement of a consultant to assist it in broad scope of work required under the February 11, 2004 Federal Consent Decree in Docket 02-22 and under Guam law. The contract scope would include: a] the development of plans and bid documents for the privatization of the operation and closure of the Ordot landfill; the operation of the transfer stations; and the construction and operation of the Layon landfill; b] planning and study necessary to create residential collection districts pursuant to P.L. 26-99; c] consultation regarding other solid waste management activities; and d] optional post-completion activities. As the fees paid under the proposed contract will exceed $50,000, it requires prior PUC review and approval pursuant to PUC's October 27, 2005 Order in this docket *[Contract Review Order]*.

DPW has requested expedited regulatory review of the proposed contract because it faces near term deadlines, under threat of substantial Consent Decree penalties, to commence procurement activities on the work product, which will be produced by the consultant. On December 19, 2005 PUC's consultant Georgetown Consulting Group *[GCG]* submitted its report on the proposed procurement, which recommends its approval subject to conditions.

After review of the GCG report, in consultation with its administrative law judge, for good cause shown and on motion duly made, seconded and carried by the affirmative vote of the undersigned commissioners, the Guam Public Utilities Commission **HEREBY ORDERS THAT** the procurement is approved subject to the following conditions:

1. DPW shall file with PUC an executed copy of the contract, with all attachments and enclosures.

2. The consultant shall provide PUC with progress reports, in form and frequency established by PUC's administrative law judge, which will enable PUC: a] to monitor the potential impact of its work on DPW rates,

# ATTACHMENT C

which are subject to PUC jurisdiction; and b] to enable PUC to conduct a timely review, under the Contract Review Order, of proposed procurements which result from its work and which require regulatory review.

3. The proposed contract shall be amended: a] to require consultant to participate, upon request, in regulatory and legislative proceedings related to its work scope; and b] to include a conflict of interest clause, which will prohibit consultant from participating or having an economic interest in any DPW procurement which results from its contractual services.

4. DPW is in serious default of its statutory duty under P.L. 26-99 to establish three residential collection districts and to privatize collection services in 2 of the 3 districts by October 2002. As a consequence, residential customers have suffered with poor collection service. The proposed contract shall be amended to accelerate the consulting work necessary to create these districts and to privatize collection service as required by P.L. 26-99.

5. ALJ is authorized and directed to oversee the administration and interpretation of this Order.

Dated this 20th day of December 2005.

_____
Terrence M. Brooks

_____
Joseph M. McDonald

_____
Edward C. Crisostomo

_____
Rowena E. Perez

RECEIVED
OCT 2 7 2005
Public Utilities Commission
of Guam

|  |  |  |
|---|---|---|
| ADMINISTRATIVE DOCKET | ) | |
| CONTRACT REVIEW PROTOCOL FOR | ) | DOCKET 05-09 |
| DEPARTMENT OF PUBLIC WORKS | ) | |
| DIVISION OF SOLID WASTE | ) | |
| MANAGEMENT | ) | |

## ORDER

Pursuant to its authority under 10 GCG Section 51118 (e), the Guam Public Utilities Commission [PUC] establishes the following protocol to identify and review regulated contracts and obligations of Department of Public Works' Division of Solid Waste Management [Division], which are funded by the Solid Waste Operations Fund.

1. The following Division contracts and obligations shall require prior PUC approval under 10 GCG Section 5118 (e), which shall be obtained before the procurement process is begun:

   a) All capital improvement projects (CIP) in excess of $50,000 whether or not a project extends over a period of one year or several years;

   b) All capital items by account group, which in any year exceed $50,000;

   c) All professional service procurements in excess of $50,000;

   d) All externally funded loan obligations and other financial obligations such as lines of credit, bonds, etc. in the excess of $50,000 and any use of said funds;

   e) Any contract or obligation not specifically referenced above which exceeds $50,000, not including individual contracts within an approved CIP or contract;

   f) Any agreement to compromise or settle disputed charges for services by Division, when the amount of the waived charges would exceed $50,000.

1

2. Emergency procurements, which are made by Division under 5 GCA section 5215, shall not require PUC approval; provided, however that Division shall file its section 5215 determination, the governor's written approval of same, and the procurement details, as set forth in paragraph 5(b) below, within 20 days of the declaration.

3. With regard to multi-year contracts:

   a) The term of a contract or obligation *[procurement)* will be the term stated therein, including all options for extension or renewal.

   b) The test to determine whether a procurement exceeds the $50,000 threshold for PUC review and approval *[the review threshold]* is the total estimated cost of the procurement, including cost incurred in any renewal options.

   c) For a multi-year procurement with fixed terms and fixed annual costs, Division must obtain PUC approval if the total costs over the entire procurement term exceed the review threshold. No additional PUC review shall be required after the initial review process.

   d) For multi-year procurements with fixed terms and variable annual costs, Division shall seek PUC approval of the procurement if the aggregate cost estimate for the entire term of the procurement exceeds its review threshold. On each anniversary date during the term of the procurement, Division will file a cost estimate for the coming year of the procurement. Division shall seek PUC approval in the event a procurement subject to this paragraph should exceed 120% of the aggregate cost initially approved by PUC.

   e) Unless for good cause shown, any petition for PUC approval of a multi-year procurement must be made sufficiently in advance of the commencement of the procurement process to provide PUC with reasonable time to conduct its review.

2

4. On or before September 15 of each year, Divsion will use best efforts to file with PUC:

    a) Its budget for the coming fiscal year beginning October 1 plus estimates for the subsequent two fiscal years. The filing shall contain a description of each CIP contained with the budget and estimates. Project descriptions should be sufficiently detailed to identify the specific location and type of equipment to be purchased, leased or installed.

    b) The following information should be provided with regard to each CIP project / contract or obligation requiring PUC approval under paragraph 1:

        i) Scheduled start, completion and in service dates.

        ii) Capital requirements by year of the expected expenditure and anticipated source of funding (i..e., bonds, internal, etc.)

        iii) Impact on service of delaying or canceling the project, contract or obligation.

        iv) Copies of all economic and engineering studies, where relevant.

5. If during any fiscal year, Division desires to undertake a contract or obligation covered by paragraph 1, for which approval has not otherwise been received, it may file an application with the PUC for approval of such contract or obligation, which shall contain the information required in paragraph 4(b) above. Division shall obtain PUC approval thereof before the procurement process is begun.

6. Division shall, on or before December 1 of each year, file a report on the contracts and obligations approved by PUC for the prior fiscal year pursuant to this stipulation. This report shall show the amount approved by PUC and the actual expenditures incurred during the preceding fiscal year for each such contract and obligation and other changes from the prior filing in cost estimateds, start dates and inservice or completion dates.

7. Division shall not incur expenses for PUC approved contracts and obligations in excess of 20% over the amount authorized by PUC without prior approval. In the event Division estimates that it will exceed the PUC approved level of expenditures by more than 20%, it shall submit to PUC the revised estimate and full explanation of all additional cost.

3

8. To the extent Division submits a filing to PUC under this order which PUC staff believes in incomplete or deficient, it shall notify Division and the PUC with in 15 calendar days thereof with specific indication of the alleged incompleteness or deficiency.

9. PUC staff will use best efforts to be prepared for hearing within 45 days of a complete Division filing under the terms of paragraph 4 above. PUC's administrative law judge, is authorized, in his judgment, to shorten the above 45 day period, for good cause shown by Division.

10. PUC's administrative law judge is authorized to interpret the meaning of any provision of this order, in furtherance of the contract review process.

Dated this 27th day of October, 2005.

_____
Terrence M. Brooks

_____
Joseph M. McDonald

_____
Edward C. Crisostomo

_____
Rowena E. Perez

4

# BEFORE THE GUAM PUBLIC UTILITIES COMMISSION

COMMISSION ADMINISTRATIVE )
DOCKET )
)
)
)
_____)



RECEIVED
OCT 2 7 2005
Public Utilities Commission
of Guam

## ASSESSMENT ORDER

**WHEREAS**, the Commission's operational expenses can be divided into two categories and are budgeted and collected under the following protocols: i] general administrative expenses, which are budgeted each fiscal year by the Commission and divided and assessed among the regulated utilities; and ii] regulatory expenses, which are incurred pursuant to Commission resolution dated February 2, 1996. Regulatory expenses include professional and out-of-pocket expenses, which are billed to specific utilities under regulatory dockets assigned to them to cover the expense of handling specific regulatory proceedings related to them. This order addresses the Commission's FY06 budget of administrative expenses.

**WHEREAS**, the administrative budget covers the Commission's administrative expenses, including staff, office facilities, Commissioner stipends and training, professional fees and other operational expenses;

**WHEREAS**, at a duly noticed and convened Commission meeting held on October 27, 2005, the Commission considered and adopted its FY06 administrative budget in the amount of $160,000.00;

**WHEREAS**, the utilities subject to Commission regulation include Guam Power Authority [GPA], Guam Waterworks Authority [GWA], Guam Telecom LLC [GTA] and Department of Public Works [DPW];

**WHEREAS**, after due consideration, the Commission has resolved that its' FY06 administrative budget of $160,000.00 should be allocated among the regulated utilities, as follows:

| | |
|---|---|
| GTA | $ 40,000.00 |
| GPA | $ 40,000.00 |
| GWA | $ 40,000.00 |
| DPW | $ 40,000.00 |
| Total | $160,000.00 |

**NOW, THEREFORE**, in consideration of the above recitals and under authority invested by 12 GCA section 12024, the Commission hereby **ORDERS THAT:**

1. GTA, GPA , GWA and DPW shall pay the assessment allocated to them, as stated above, to the Commission not later than November 30, 2005. The regulated utilities are reminded that these assessed revenues are necessary to enable the Commission to have the staff and office facilities to entertain their requests for regulatory services. It is, therefore, essential that these assessments be paid in a timely manner.

2. A copy of this assessment order shall be served on each regulated utility.

Dated this 27th day of October, 2005.

_____
Terrence M. Brooks

_____
Joseph M. McDonald

_____
Edward C. Crisosotomo

_____
Rowena E. Perez

# BEFORE THE GUAM PUBLIC UTILITIES COMMISSION

RECEIVED
OCT 2 7 2005
Public Utilities Commission
of Guam

## ADMINISTRATIVE ORDER

In furtherance of its mission of making the regulatory process transparent to utility ratepayers, the Guam Public Utilities Commission [PUC] has launched a website at guampuc.com to provide the public with convenient access to current and historic regulatory proceedings.

In furtherance of this mission, for good cause shown, after discussion and on motion duly made, seconded and carried by the affirmative vote of the undersigned commissioners, the Guam Public Utilities Commission **HEREBY ORDERS THAT:**

1. Commencing on the date of this Order, any document, which is filed for record in a regulatory proceeding before PUC shall be filed in hard copy [via mail, fax or delivery] and in electronic form via email to guampuc@kuentos.guam.net.

2. On or before December 1, 2005 Guam Power Authority, Guam Waterworks Authority and GTA Telecom LLC shall post and maintain on their website their current tariff, in form approved by PUC.

3. A copy of this Order shall be posted on PUC's website.

Dated this 27th day of October 2005.

_____
Terrence M. Brooks

_____
Joseph M. McDonald

_____
Edward C. Crisostomo

_____
Rowena E. Perez



GOVERNOR
**Felix P. Camacho**

**public works**
DIPATTAMENTON CHE'CHO' PUPBLEKO

DIRECTOR
**Lawrence P. Perez**
DEPUTY DIRECTOR
Andrew Leon Guerrero

**18 JAN** 2007

**Mr. Harry M. Boertzel**
Administrative Law Judge
Public Utilities Commission of Guam
Suite 401, GCIC Building
P.O. Box 862
Hagåtña, Guam 96932

Reference:     *Docket 07-1 (SWM FY07 Rate Proceedings)*

Hafa Adai Señot Boertzel:

In receipt on your December 14th letter, the Department of Public Works looks forward to meeting with you this afternoon and the January 23rd PUC multi-purpose regulatory workshop.

At both these meetings the DPW will be prepared to discuss both the petition for approval of financing for Consent Decree Projects and the petition for approval of the omnibus RFP.

During today's meeting, the DPW will be submitting a petition for the PUC's approval for the implementation of a Pay-As-You-Throw (PAYT) program which is an integral component of the RFP for the outsourcing of the island's residential waste collection. Approval of this program is key to the DPW's prepared compliance to the September 28, 2006 PUC Order (Docket 06-02). This program utilizes a decal/bag collection system that DPW has previously described to PUC.

On a related issue to the anticipated petition filing for approval of the bond financing for the Consent Decree Projects and a separate issue of the establishment of the SWM as a public corporation under the CCU governance, the DPW would like to request assistance from the PUC. The DPW would appreciate action by the PUC to initiate discussions with the Government's Administration officials regarding these two important policy issues.

As Chairperson of the Consent Decree Compliance Team, I have encouraged other Team members and legal counsels to join me and participate in this afternoon's meeting.

Seneramente,

**Lawrence P. Perez**
Director

*CUJACKSON:cuj*
*1/18/07*

Cc:     *Consent Decree Project File*
        *Dir's Chrono*

542 North Marine Drive, Tamuning Guam 96913 ● Tel (671) 646-3131 / 3259 ● Fax (671) 649-6178

LAWRENCE P. PEREZ
Director
Department of Public Works
Government of Guam
542 North Marine Corps Drive
Tamuning, Guam 96913



RECEIVED
JAN 18 2007
Public Utilities Commission
of Guam

IN RE: PETITION BY THE DEPARTMENT OF )   DOCKET NO. 07-01
PUBLIC WORKS FOR THE GUAM PUBLIC )
UTILITIES COMMISSION'S APPROVAL OF A )   Request for PUC approval for
DECAL/BAG PROGRAM. )   implementation of a "Pay As You
    )   Throw" (PAYT) Program.
    )
    )
_____ )

     **COMES NOW**, the Solid Waste Management (SWM) division of the Department of Public Works (DPW) through is Executive Director Lawrence M. Perez a petition before the Public Utilities Commission (PUC or Commission) for its review and approval of a proposed PAYT (Program) to be implemented as soon as legal impediments are removed[1] and necessary cost data is refined. This program utilizes a decal/bag collection system that DPW has previously described to the PUC.

     SWM believes after review of other options that its proposed program will result in accomplishing several of the goals outlined in the Focused Management Audit presented to the PUC by its Consultant in September 2006. Among the items that will be addressed with the implementation of the proposed program will be a complete database of residential customers, significantly increased collection results, implementation of a targeted lifeline rate and establishing a more cost based tariff. SWM has reviewed similar programs employed by other municipal refuse collection agencies such as Chatham County Waste and Rivanna Solid Waste Authority and several other municipalities employing PAYT programs as described in USEPA's website (http://www.epa.gov/epaoswer/non-hw/payt/links.htm) and believes that the results of these programs are a positive indication that SWM would be able to accomplish the PUC goals with its Program as tailored for Guam.

---

[1] 29 GAR §2105 (J) (Billing after services provided with payment due 60 days thereafter.)

Under the provisions of the Commission rules regarding Contract Review protocol Docket No. 05-09 SWM has attached the following documents that will support SWM's petition.

Complete Explanation of the Program (**Attachment A**)

SWM understands that the PUC may not be able to approve specific items until additional supporting data is assembled and legal impediments are removed, but SWM seeks to present the details of the program during January 2007 regulatory session. If deemed advisable by the PUC, SWM also seeks "approval in kind" with final approval given at a subsequent session.

SWM stands ready to respond to any inquiries by the PUC or its Consultants and looks forward to presenting this Program with the Commissioners.

Respectfully submitted this 18th day of January, 2007

**LAWRENCE P. PEREZ**
**Director**
**Dept. of Public Works**

**Solid Waste Management**
**Proposed Pay-As-You-Throw (PAYT) Program**

**Attachment A**

## Background

Solid Waste Management (SWM) is currently under a Consent Decree with the United States Environmental Protection Agency to Close the Ordot Dump facility and to open a new landfill. The cost impact of these projects will ultimately impact the ratepayers of SWM. In order to pay for these large projects, SWM will need to improve its collection of revenues derived from rates approved by the Public Utilities Commission (PUC).

The history of collections from the residential ratepayer by SWM has been abysmal. While SWM management has attempted to improve collections, the improvement is still far from any reasonable standard. In Fiscal 2006, DPW billed its residential customers a total of $2.8 million and collected $1.4 million or a 50% collection ratio. While this is an improvement over prior, SWM understands that any additional rate increase awarded by the PUC must be collected in order to be able to meet the requirements of the Consent Decree, while maintaining sufficient funds to pay for ongoing operations. If the collection ratio does not approach 100%, the Consent Decree costs will fall upon only those ratepayers with good payment history. The poor collection ratio experienced by SWM is a function of poor record keeping by SWM who is currently billing for residential collection and the Department of Administration (DOA) which had the responsibility for billing in the past.

There also exists an Island-wide culture of ignoring invoices from SWM for residential services. This culture has evolved in part from the poor services of SWM plus the inability to specifically identify delinquent customers and cease service until payment in full. Unlike the power, water and telephone companies who can suspend service until payment is received utilizing accurate customer identification and billing history, SWM

is unable to cease service as simply as the other utility companies. Unlike GPA, GWA and GTA is not a matter of removing a meter or flipping a switch. The cessation of service by SWM would not only affect the delinquent customer as in the case of the three referenced utilities, but would result in unsightly curbside litter that would increase the potential for vermin, insects and disease. Currently, SWM does not have an effective and acceptable method of cessation of service.

In addition, SWM is required by **PL28-56** to establish a lifeline rate and the "Pay As You Throw" (PAYT) Program would address that issue as well. It is anticipate that if approved by the PUC, this Program would continue for at least a three year period, consistent with the proposed length of the prospective contractor with private haulers. This program will be reviewed once full outsourcing of residential services is in place and sufficient experience by the private contractors is achieved.

The program would be on a "pre-paid" basis which would both eliminate the billing and collection risk of SWM. At the current time SWM is precluded from billing in advance of service. Legislation that would remove this restriction is currently being prepared.

**Overall Summary.**

After sufficient Island-wide education, SWM will create Service Decals for purchase by any residential customer (single swelling, duplex and quadraplex) at a cost to be determined by a rate design and the bid amounts figured of the residential outsourcing IFB. The Decal would be purchased at offices of the Treasurer of Guam and SWM Customer Service. The Decal would be affixed to the customers' containers that are compliant with the current service rules of SWM. The Decal would be effective for a period of three months and would be color coded to indicate the period for which service

has been purchased. SWM personnel and private contractors would be instructed to pick up only those containers with Decals.

To make the process easier for the customer, Decals for subsequent periods would be mailed to the customer upon receipt of the appropriate payment by the SWM customer service. The customer would still be able to purchase the Decal at the services locations described above.

If the customer wishes to have service that would include the hauling of more than two (2) containers per week, the customer may purchase trash bags that identify the individual as a paid customer. Purchase of the bags would be at various locations, including those locations where the decal purchase transactions take place or at various private sector locations yet to be determined. The cost per bag again will be determined based upon an on-going rate structure design and the residential collection bid figures provided by the private haulers and would be subject to change with PUC approval as the cost of service for SWM and the costs of the Consent Decree become known and measurable. SWM personnel and private contractors will be instructed to pick up all bags that specifically identify the SWM customer.

For customers in public housing or receivable housing assistance, SWM would provide GHURA with sufficient Decals to distribute to these lifeline customers at a cost of **$ TBD**. Service beyond the limit of two (2) cans would still require purchase of SWM bags at the rate approved by the PUC.

### **Island-Wide Education**

There is a significant learning curve that must be addressed before implementation of this program. The first step in educating the populace is a mass mailing to all households on

Guam. Such mailing would contain a summary of the program with a list of locations dates and times that open forums will be held to respond questions by the residential customers or any other interested party. The will also be weekly advertising in the local press and ads on local television. SWM personnel will hold open meetings in all of the villages on the Island. SWM will request that local radio and television provide several segments of airtime so that SWM management can describe the program and answer any questions from the consumer. SWM will request time to present the details of the programs to various service organizations such as the Chamber of Commerce, Rotary, etc. and will personally meet with all of the mayors and request open forums with their community.

SWM understands that no program will work without full cooperation of the community. The enforcement of the issue of the illegal dumping of trash and theft of service decals needs to be addressed, including fines and possible imprisonment. Enforcement will require the efforts of SWM, the Attorney General and GEPA.

## Cost Benefit Analysis

The implementation cost for this program is estimated to be $70,000.00 consisting of the following:

| | |
|---|---|
| Mass Mailing | $10,000.00 |
| Decal Production (24k/sht.) | $4,000.00 |
| Bag Production | TBD |
| Handouts and Flyers (20k | $5,000.00 |
| Advertising | $45,000.00 |
| Other (overtime) | $6,000.00 |
| TOTAL | $70,000.00 |

4 of 5

Ongoing costs will be limited to additional Decal and Bag Production.

There are other currently un-quantified benefits such as the potential for; (a) Reduced outsourcing fees to private contractors for residential pick-up and hauling services; (b) Revenue stability; (c) Generating revenues to cover Municipal Solid Waste cost; (d) Providing equity among customers; and (e) Increases recycling rates with an effective PAYT program.

# PUBLIC UTILITIES COMMISSION
## OF GUAM

Terrence M. Brooks

Edward C. Crisosotomo
Filomena M. Cantoria
Joseph M. McDonald
Rowena E. Perez
Jeffrey C. Johnson

Suite 207, GCIC Building
Post Office Box 862
Hagatna, Guam 96932

Telephone: (671) 472-1907
Fax: (671) 472-1917
Email: info@guampuc.com

Harry M. Boertzel
Administrative Law Judge

Lourdes R. Palomo
Administrator

December 14, 2006

**VIA ELECTRONIC TRANSMISSION**
Lawrence P. Perez, General Manager
Department of Public Works
542 North Marine Drive
Tamuning, Guam 96913

RE:     **Docket 07-1 [SWM FY07 Rate Proceeding]**

Dear Mr. Perez:

In response to your December 5, 2006 letter:

1. I am canceling the DPW rate hearing previously scheduled for January 24, 2007. Enclosed is Georgetown's December 12, 2006 letter, which supports your request, with observations and reservations. The issue of when and under what circumstances the rate proceeding should be rescheduled will be reviewed by PUC during the January 2007 regulatory session. The Georgetown rate report, previously deadlined for December 27, 2007, will now focus instead on Mr. Margerison's findings during his recent Guam visit. Georgetown principal, Jim Madan, will present this report to PUC at a multi-purpose regulatory workshop, which will be held at 6:00 p.m. on January 23, 2007.

2. Your request that PUC approve the omnibus RFP *concept* mentioned in your letter is premature. DPW is required under PUC's October 27, 2005 Docket 05-9 Order *[contract review protocol]* to file with PUC the detailed information described in section 4[b] of the Order, including the full text of the proposed RFP, in support of a petition for PUC review of a proposed procurement.  The Order emphasizes that DPW must obtain PUC's approval *before the procurement process begins.* PUC awaits this long overdue filing from DPW so that Georgetown can be authorized to begin its review of the omnibus RFP.

1

3. A SWM regulatory conference has been scheduled for 2:00 p.m. January 18, 2006 at Suite 207 GCIC Building to review the status of DPW's efforts to prepare and submit for regulatory review: a] a petition for approval of financing for Consent Decree projects; and b] a petition for approval of the omnibus RFP discussed in paragraph 2 above.

4. In its September 28, 2006 Order [Docket 06-2] PUC emphasized the importance of privatizing residential collection for the entire island by July 2007. The Order required DPW to inform PUC not later than October 15, 2006 of the additional resources it would require to successfully meet this deadline. PUC has not received any filing from DPW in response to this order.

I look forward to meeting with you on January 18, 2007 to discuss the above matters. Please let me know if there is any regulatory assistance which PUC can provide in the interim.

With best wishes for a merry Christmas and successful New Year,

*Harry M Boertzel /HRP*

Harry M. Boertzel

cc:     Jim Madan, Georgetown
        Terrence Brooks, Esq.

Encl:   Georgetown 12/12/06 letter

2

# G E O R G E T O W N   C O N S U L T I N G   G R O U P,  I N C.
### 716 DANBURY RD.
### RIDGEFIELD, CT. 06877

Jamshed K. Madan
Michael D. Dirmeier



Telephone (203) 431-0231
Facsimile (203) 438-8420
jkmadan@gmail.com

Edward R. Margerison
Jean Dorrell

December 12, 2006

Harry Boertzel, Esq. ALJ
The Guam Public Utilities Commission
Suite 207, GCIC Building
Hagatna, Guam 96932

Re:   Response to DPW 12/5/06 Letter to Delay Rate Proceeding

Dear Harry:

This letter is in response to the letter you received form Larry Perez, Director of DPW, in which he makes the following requests:

1. PUC's consideration of SWM's FY07 revenue requirements be deferred from January to April 2007; and
2. PUC approval of the RFP concept for "the current projects of the Consent Decree and the planned improvements to the Solid Waste system in one bid action".

This letter raises some complex and difficult issues that should be carefully considered. As you know, Ed Margerison of our firm has just returned from a trip to Guam during which the primary purpose was to work with DPW on collaboratively filing a request for a rate increase to be reviewed for approval by the PUC at the January 2007 Regulatory Session. It was during this trip that DPW and GCG both came to the conclusion that filing a rate case in January 2007 did not make sense. DPW states in its letter to you that they are reluctant to have the public be subjected to a rate increase in January and then another one in April 2007. While it is not clear to us that a second rate increase request in April 2007 was a foregone conclusion, we concur with the decision to defer the January request for several reasons. Our rational is developed below. We believe that before another rate increase request is reviewed by the PUC, several significant policy issues should be evaluated and addressed by the PUC.

Since the first DPW rate increase in October 2005 that was approved by the PUC, there have been a number of significant events:

1. A management of the revenue and billing cycle was undertaken by GCG under ALJ oversight and the findings approved by the PUC.
2. DPW has missed many of the deadlines that have been imposed by the Consent Decree of February 11, 2004. As a result the U.S. Attorney, on behalf of the USEPA, has requested a status conference in Federal District Court to apprise the Court of the violations and the need for measures to bring about compliance with the Consent Order. We understand that the conference is to take place on December 20, 2006. DPW could be subject to

significant fines and other possible disciplinary actions. The U.S. Attorney alleges that in the meantime significant environmental damage continues.

3. The issuance of revenue bonds to fund the closing of the Ordot landfill and the opening and construction of a new landfill has been delayed from the anticipated date sometime during the mid to latter half of 2006. No firm date for the issuance of these bonds has been set. We understand that the legislation required to issue the bonds has not yet been introduced in the Guam Legislature. It is absolutely clear that without funding the projects required to meet the Consent Decree cannot go forward.

It would be useful at this juncture to summarize some of the conclusion and recommendations that we made in our Management Audit of the revenue cycle and billing system. We do this because we believe that many of those recommendations are key to DPW moving forward and it appears that little or no progress has been made on these key recommendations that were adopted by the PUC. A portion of our recommendations were as follows:

This audit report finds that:

a.  DPW's current billing and collection system is unable to competently handle even current rate revenue levels much less the increased burden necessary to support the revenue bonds.

b.  Substantial remedial action, including operational changes, legislation, regulatory action and rulemaking must immediately occur to enable DPW to bill and collect the revenue necessary to fund revenue bond requirements.

c.  If this remedial action does not occur, DPW will not be able to bill and collect the rate revenues necessary to fund revenue bond obligations and this burden would fall, in part, on the General Fund. Regulatory principles could obstruct the PUC: i] from awarding rate increases to compensate for DPW billing and collection mismanagement; and ii] from increasing SWM residential customer rates unless the quality of residential service is dramatically improved.

The key legislative findings that were contained in the report were as follows:

| Recommendation | Action Date |
|---|---|
| Legislation: | |
| Establish SWM as public corporation under CCU governance. | ASAP |
| Consolidate administration of SWM finances. | ASAP |
| Privatize third residential collection district. | ASAP |

Convert commercial tipping fee to hauler business expense or bring haulers

under PUC regulation and Public Auditor audit authority.                    ASAP

The major recommendation we reached in the prior report was as follows:

> Concurrent with the improvement of billing and collection practices, there also needs to be significant improvements in operational practices and the poor current level of services in order to collect in the face of the rate increases. Current collection rates for residential service are extremely low. GCG believes a significant cause of the low collection rate for residential SWM customers is resistance to paying amounts owed due to poor and sporadic service.
>
> **To solve these important issues it is our primary recommendation that SWM be transferred to a public corporation under the oversight of the Consolidated Commission on Utilities ("CCU"). With this recommendation all functions will be consolidated in one corporation, there will be an experienced Chief Financial Officer, experience with billing and collection systems and potential assistance available from the sister utilities – GPA and GWA plus experience in dealing with the Guam Environmental Protection Agency.**

## ANALYSIS

It has now been over a year that the PUC awarded a first rate increase to DPW. The logic of awarding the increase was to "phase in" the expected large rate increase that would accompany the rates requires to support the debt service associated with what is expected to be the first set of bonds floated to implement the Consent Order. The cash flow associated with the rate increase was to be escrowed and used only for specific purposes. After the first rate increase the PUC moved to undertake a Management Audit of the revenue cycle and billing and collection functions. Significant and systemic problems were encountered and a series of recommendations were adopted.

During the 14 months since the last rate award DPW has attempted to make limited improvements to its operations. We believe that it successes have been limited, predictably, because it is a fractured organization. Continuing without a sense of purpose and without a strategic plan should not be an option in our opinion. It is also difficult to make sense of the apparent paradox of the Director of DPW asking for a delay in the rate proceeding and at the same time stating that DPW does not have adequate resources to safely operate the existing landfill. Clearly there continues to be a crisis for all to see:

- Collection operations for residential customers continue to be inadequate.
- Operations at the landfill continue to harm the environment.
- USEPA deadlines continue to be breached.
- Financing plans to offer bonds have been deferred from mid year 2006 to some indefinite timeframe.
- Privatization for two thirds of the residential districts appears to be moving ahead – we have recommended that all residential collection be privatized.
- There continues to be no scale at the landfill.

- There appears to be no movement for SWM to be transferred to a public corporation under the oversight of the CCU. The PUC believes this to be a critical element in moving DPW forward.
- The U.S. Attorney has requested a status conference in the District court to apprise the District Court of DPW violations and the need for measures to bring about compliance with the Consent Order.

Given all of the above, we now have grave reservations as to what purpose a rate proceeding during the April 2007 Regulatory session would serve other than "kicking the ball down the field". Clearly a lot remains to be done but we believe a plan for the essential elements are not in place.

We note that Larry Perez has requested approval to advertise an RFP for all of the current projects of the Consent Decree and the planned improvements to the solid Waste system in one bid. He indicates that a copy of the RFP is attached for your review and approval. We have reviewed the documentation and do not see a full RFP. When the documentation is provided it should meet the requirements of the Contract Review Protocol. We also believe that the concept of putting all items in one bid package should be carefully evaluated. Some of the projects would be revenue funded and others would be financed. We would recommend that a focus of the January Regulatory Session should be the appropriate path forward for these projects. We would work collaboratively with him on the effort if requested by him and approved by you.

It is our current evaluation that under the current structure DPW is not in a position to discharge its duties under the Consent Decree and proposed revenue bonds.

If you wish to discuss any and all of the above, please do not hesitate to call.

Cordially,

Jamshed K. Madan

Cc:    Jim Baldwin, ESQ
        Larry Gawlik
        Ed Margerison

# EXHIBIT 3

DEPARTMENT OF PUBLIC WORKS (DPW)

# REQUEST FOR PROPOSALS

## Environmental & Engineering Services

For

## The Preparation Of Environmental Report, Construction Plans, Specifications, and Estimates (PS&E) For The Ordot Dump Closure

### March 2004

Approved By:

**JOSEPH W. DUENAS**
Acting Director of Public Works

*Exhibit 3*

# STATEMENT OF WORK

## ORDOT DUMP CLOSURE

### I.   INTRODUCTION

This Statement of Work describes the Scope of Work required of the Consultant in providing the engineering services for the preparation of reports, plans, specifications, and estimates (PS&E) and other supporting data for the closure of the Ordot Dump.  This also provides the schedules for the different tasks, items to be submitted by the Consultant  and other contractual obligations of the Government and the Consultant.

### II.   PROJECT DESCRIPTION AND LOCATION

The project involves the preparation of an Environmental Baseline Survey, PS&E,  permit applications for temporary operation, post closure plan, and other supporting documents for the **Ordot Dump Closure**.  The project is located within the Lumico Area in the village of Ordot.

### III.   SCOPE OF WORK

The contractor shall provide the engineering services and perform the different tasks as described below and furnish the required reports and PS&E for the project.

All entry permits in conjunction with the engineering services shall be the responsibility of the Consultant.    Right of entries to private and government lands will be provided by DPW.

The Consultant shall coordinate his work with the agencies whether Local or Federal having jurisdiction in permit approval and review.  It will be the responsibility of the Consultant to ensure that all requirements of the Ordot Dump Closure conform to the requirement of Federal and Local laws.

Progress review meetings shall be held monthly to review progress and discuss any design issues or problems.  The meetings will be held at the firm's office or Public Works office on a mutually agreed schedule.

Case 1:02-cv-00022     Document 84-2     Filed 02/09/2007     Page 15 of 29

**TASK I - Site Assessment**

A. **Environmental Baseline Survey.** Conduct a scientific survey and assess the existing physical and biological conditions of the Ordot Dump site and its vicinity. All work plans, investigations, and sampling analysis plans shall conform to RCRA, Part D Requirements. The assessment shall include but not limited to:

- **Chemical Characteristics.** Characterize the nature and extent of onsite soil (waste and liquids) contamination. Characterize the nature and extent of subsurface soils, liquids, and waste contamination. Assess whether contamination occurs due to run-on or run-off, and whether sediments are contaminated. Assess Groundwater Quality and migration routes. Assess and characterize landfill fires.

- **Flora and Fauna.** Conduct survey utilizing the standard survey methods to determine relative types and abundance of the biological resources, including plant communities.

- **Wetland Determination and Delineation.** Conduct a wetland assessment in accordance with the methods and procedures provided in the "Technical Report Y-87-I Corps of Engineers Wetlands Delineation Manual ('87 Manual)." In the event wetlands are identified, perform a wetland (jurisdictional) delineation to include boundary flagging for field verification and surveying by a registered land surveyor. A wetland delineation map shall be prepared in accordance with the Guam Environmental Protection Agency wetland mapping policy.

- **Physical Characteristics.** Assess the project site's geological and general soils conditions, and surface and subsurface hydrology. Describe the surrounding land uses and regional context, including historical uses, infrastructure, air quality, noise levels, natural and mammade hazards, and proximity to sensitive or protected areas.

An assessment report shall be submitted addressing the items listed above to includes maps, data sheets, tables, (check) list,

graphs, photographs, references, and documentation to support the findings.

**B. PLANIMETRIC AND TOPOGRAPHIC SURVEY.** Perform an as-built planimetric and topographic survey with one foot contour interval of the active dump and its surrounding area. Include sufficient area to address the dump's impact on the Lonfit River and adjacent properties. It is estimated that the survey area will encompass approximately 35 acres. Survey work shall be under the direct supervision of a Guam Registered Land Surveyor.

**C. ORDOT DUMP PERMIT -** Prepare the necessary permit application for the continuing operation of the dump until a new MSWLF is constructed and in operation. The new MSWLF is planned to be operational by September 2007.

**TASK II. PRELIMINARY CLOSURE PLAN, SPECIFICATIONS AND ESTIMATES (PS&E)**

The preliminary closure PS&E shall be at least 50% complete and the following shall be prepared.

A. **PLANS:**

1. Title Sheet;
2. Site Plan. Show existing property lines, survey base line(s), proposed dump cap and covers limits, erosion and drainage run-on/run-off control system, vegetative and/or landscaping access roads, any wetlands or waterways affected by the dump, leachate control system, landfill gas control system, and other mitigation measures necessary to ensure environmental compliance of the dump;
3. Sectional elevations representative of the proposed closure plan;
4. Preliminary details of proposed drainage system, leachate control system and landfill gas monitoring and/or recovery system, and other environmental mitigation measures;
5. Preliminary horizontal and vertical alignment of all access roads;
6. Other plans or details necessary to conduct review of any proposed items of work; and

Page 3 of 6

7. Post closure plan, a separate descriptive preliminary operations manual for post closure monitoring and maintenance shall be submitted.

**B.** **SPECIFICATION** – A preliminary technical specifications shall be prepared for each item of work describing the construction methods, material requirements, test procedures required, payment and measurement for the item of work, etc.

**C.** **ESTIMATES** – A preliminary estimates shall be prepared commensurate with the preliminary plans and specifications.

Ten (l0) copies of the preliminary PS&E and design calculations shall be submitted. A "plans-in-hand" field review to be jointly conducted by the Government and Consultant shall be scheduled by the consultant after submittal of preliminary PS&E.

The Firm's key personnel shall participate in the Plans-in-Hand field review and resolution meeting(s) to resolve all comments on the project. The firm shall be responsible for the preparation of the "Minutes of Meeting" for approval and distribution by DPW.

### TASK III.    PREFINAL PS&E

The prefinal PS&E shall be 100% complete incorporating all approved comments from the preliminary PS&E. The following shall be submitted:

1. Plans - Complete plans, including title sheet, summary of quantities and schedules, details cross sections, etc.;
2. Technical specifications - Complete technical specifications to properly construct each item of work, including test procedures required, and any special conditions to be required;
3. Estimates - Each unit pay items shall be supported with a detailed quantity take-off computation and corresponding unit price analysis deriving the unit prices. Any lump sum pay item shall also be supported with detailed breakdown arriving to the lump sum cost;
4. Design Analysis and computation sheets;
5. CPM to establish project construction time;
6. Design Narrative - The design narrative shall describe the design approach, assumption and/or basis of design and other supporting data not shown on the plans and specifications; and

7. Post Closure Plan - Complete operations manual for the required post closure monitoring and maintenance of the closed dump. The post closure plan shall address the operational and/or maintenance of the final cover, the drainage system, leachate collection system, landfill gas collection/monitoring system, and for any appurtenances for the proper compliance of the dump closure.

The Firm's key personnel shall participate in the resolution meeting to resolve all comments on the submittal. Prepare a "Minutes of Meetings" for approval and distribution by DPW.

## TASK IV. FINAL CLOSURE PS&E

After approval of the prefinal PS&E, submit five (5) copies for final review. Upon approval of the final PS&E, submit one original, five sets of PS&E, and two copies of other items listed below:

1. Plans;
2. Specifications;
3. Estimates;
4. Quantity take-off and computation sheets;
5. Unit price analysis;
6. Design analysis and computations;
7. CPM for construction time;
8. Design narratives; and
9. Post Closure Plan Operations Manual.

An electronic non-PDF workable file in AUTO CADD format, latest version, shall be submitted in a separate disks for the plans, specifications, estimates, and post closure plan operations manual.

## IV. SCHEDULE OF SUBMITTALS

| | |
|---|---|
| **TASK I** | _____ |
| **TASK II** | _____ |
| **TASK III** | _____ |
| **TASK IV** | _____ |

## V.    SCHEDULES OF FEES

The following fees less, 10% retainage, will be processed for payment after submittal and approval of the following:

| | |
|---|---|
| **TASK I** | $_____ |
| **TASK II** | $_____ |
| **TASK III** | $_____ |
| **TASK IV** | $_____ |

## VI.    AVAILABILITY OF MAJOR SUPPORTING DOCUMENTS

Major supporting documents which will be of interest to offerors and eventually be required to carry out the project include the Integrated Solid Waste Management Plan for the Island of Guam (Phase II Report), the Guam Solid Waste Disposal Regulations and applicable local and federal wetland protection regulations, mitigation policy and guidelines and similar documents. These documents are attached.

Case 1:02-cv-00022    Document 84-2    Filed 02/09/2007    Page 20 of 29



# Letter of Transmittal

| | |
|---|---|
| **Date:** | May 15, 2004 |
| **To:** | **DPW Solid Waste Management** |
| **Attn.:** | **Mr. Marc Gagarin, P.E.** |
| **cc:** | John P. Dueñas, P.E. |
| **From:** | **Miguel C. Bordallo, P.E.** |
| **Re:** | **Ordot Landfill Closure** |
| **Via:** | Hand Delivery |

We are sending herewith the following:

☐ Drawing Originals    ☐ Copies of Drawings    ☐ Specifications    ☐ Electronic File on Diskette(s)

☐ Shop Drawings    ☐ Letter    ☐ Others    ✓ **Initial Fee Estimate**

IF YOU DID NOT RECEIVE THE COMPLETE PACKAGE LISTED BELOW OR IF ENCLOSURES ARE NOT AS INDICATED, PLEASE CONTACT OUR OFFICE IMMEDIATELY AT (671) 646-7991

**This package includes the following:**

| Qty | Unit | Description |
|---|---|---|
| 1 | Ea | Fee Proposal Package (Summary Sheet, Manhour Breakdown, Expense Breakdown, Task Summaries) |
| | | |
| | | |
| | | |
| | | |
| | | |

These are transmitted as indicated below:

☐ For you use    ✓ As Requested    ☐ For Approval    ☐ For Review and Comment    ☐ Others

☐ Submittal Package ( )    ☐ Return after loan to us (thanks)    ☐ Return after Shop Drawing Review

## Remarks:

Hafa Adai Marc:

Please find enclosed initial fee proposal. The estimates for effort are conservative based on the fact that we have not had the opportunity to determine the quantity or quality of existing data regarding the landfill. Reductions in effort and expenses can be made once we confirm the existing data and clarify scope items with our sub-consultants. I will attempt to meet with them prior to our scheduled negotiation meeting so we can have suggestions on possible reductions in hand. Thank you.

_____    _____

Received By:      Date:                  Sender

DPW Fee Xmittal 15MAY04.doc

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164, Saipan, MP 96950 / Chalan Pale Arnold, Pacific Plaza Bldg., Unit 5, South Garapan, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

**Project:** ORIENT LANDFILL CLOSURE
DEPARTMENT OF PUBLIC WORKS
**Location:** GUAM
**Date:** 5/15/2004 10:15
**By:**
**Phase:** Pre-Final Plans, Specifications and Estimates (PF&SE)
**Name:** Task Subtask Breakdown

Duenas & Associates — MANPOWER ESTIMATE — URS — Winzler & Kelly — GET

## 3 Pre-Final Closure Plan, Specifications & Estimates

1. Grading design
2. Capping system design - soils
3. Capping system design
4. Soils management
5. Leachate management system design
6. Leachate management - treatment system
7. Landfill gas collection system design
8. Landfill gas flare system design
9. Landfill gas monitoring well design
10. Stormwater management system design
11. Sedimentation basin design
12. Erosion control systems design
13. Project drawings - landfill closure
14. Cutoff wall design
15. Project drawings - cutoff wall
16. Groundwater treatment system design
17. Project drawings - treatment system
18. Lonfit River cleanup design
19. Project drawings - Lonfit River cleanup
20. Technical specifications
21. Bidding documents
22. Engineer's cost estimate
23. Design Report
24. Closure Plan
25. Post-closure Care and Maintenance Plan
26. Construction Quality Assurance Plan
27. Project Schedule
28. Project Design Meetings
29. DPW Meetings
30. Design Consultation

PHASE 3 TASK SERIES

**REVISED FEE PROPOSAL**
Environmental & Engineering Services
For the  Ordot Dump Closure
June 09, 2004

Prepared for

Consent Decree Task Force
Department of Public Works
Government of Guam
542 N. Marine Corps Drive
Tumon, Guam 96913

Prepared By

Dueñas & Associates, Inc.
155 ET Calvo Memorial Parkway
Suite 200
Tamuning, Guam 96913

Case 1:02-cv-00022   Document 84-2   Filed 02/09/2007   Page 24 of 29

**TASK SERIES**

Project: DEPARTMENT OF PUBLIC WORKS
Location: GUAM
Date: 5/6/2004 14:00

Phase: Phase 3: Pre-Final Plans, Specifications and Estimates (PS&E)

Notes: See Subtask Breakdown

**MANPOWER ESTIMATE**

| # | PHASE 3 TASK SERIES | Downey & Associates | URS | Mink & Yuen | GET |
|---|---------------------|---------------------|-----|-------------|-----|
| | **3  Pre-Final Closure Plan, Specifications & Estimates** | | | | |
| 1 | Grading design | | | | |
| 2 | Capping system - soils | | | | |
| 3 | Capping system - turbidity | | | | |
| 4 | Soils management | | | | |
| 5 | Leachate management system design | | | | |
| 6 | Leachate management - treatment system | | | | |
| 7 | Landfill gas collection system design | | | | |
| 8 | Landfill gas flare system design | | | | |
| 9 | Landfill gas monitoring well design | | | | |
| 10 | Stormwater management system design | | | | |
| 11 | Sedimentation basin design | | | | |
| 12 | Erosion control systems design | | | | |
| 13 | Project drawings - landfill closure | | | | |
| 14 | Cutoff wall design | | | | |
| 15 | Project drawings - cutoff wall | | | | |
| 16 | Groundwater treatment system design | | | | |
| 17 | Project drawings - treatment system | | | | |
| 18 | Landfill River cleanup design | | | | |
| 19 | Project drawings - Landfill River cleanup | | | | |
| 20 | Technical specifications | | | | |
| 21 | Bidding documents | | | | |
| 22 | Engineer's cost estimate | | | | |
| 23 | Design Report | | | | |
| 24 | Closure Plan | | | | |
| 25 | Post-closure Care and Maintenance Plan | | | | |
| 26 | Construction Quality Assurance Plan | | | | |
| 27 | Project Schedule | | | | |
| 28 | Project Design Meetings | | | | |
| 29 | DPW Meetings | | | | |
| 30 | Design Consultation | | | | |
| 31 | Additional geotechnical investigation | | | | |
| | Finalize operations plan for landfill | | | | |
| | Finalize filling plan for landfill | | | | |
| | Finalize landfill drawings for permit | | | | |
| | Finalize permit application, obtain permit | | | | |



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 9**
75 Hawthorne Street (CED-6)
San Francisco, CA 94105

October 26, 2005





**Via Email and Facsimile**

Larry Perez, Acting Director
Department of Public Works
542 North Marine Drive
Tamuning, GU 96911

**Re: EPA Comments on the Ordot Final Closure Plan and Post-Closure Plan**

Dear Mr. Perez:

The Environmental Protection Agency, Region 9 (EPA) at this time is providing comments to the Department of Public Works (DPW) regarding the Ordot Final Closure Plan and Post Closure Plan prepared under paragraph 8 of the Civil Case No. 02-00022 Consent Decree (Consent Decree). The comments are detailed in the two enclosed memorandums from CH2M Hill to Lance Richman, dated October 4, 2005 and October 18, 2005.

These memorandums raise two issues that are of particular concern to EPA:

1) Steep slopes: DPW must demonstrate that slopes of 1.5:1 will remain stable and that the liner system can be preserved. Cover material will be needed to protect the liner, yet it is unclear that a foundation can be sustained on these steep slopes.

2) Leachate collection system: The 20,000 gallon Leachate Storage Tank appears inadequate. The tank would not be large enough to contain a day of peak flows. It is also unrealistic to expect a system of trucking leachate to adequately handle flows during peak events. If DPW plans to demonstrate that all leachate will be contained by the deadline in the Consent Decree, October 23, 2007, DPW will need to develop a more reliable method of managing leachate flows.

It would also be prudent for DPW to assess different geomembrane thicknesses. With further analysis, DPW can determine if other thicknesses would be adequate.

OCT 27

Pursuant to paragraph 7 of the Consent Decree, DPW has 30 days from receipt of this letter to respond and incorporate the above comments as well as those presented in the enclosures. Please call me at (415) 972-3770 if you would like to discuss this matter further.

Sincerely,

Ben Machol
Guam Program Manager, P.E.

Enclosures

cc:     Douglas Moylan, Attorney General of Guam
        Randel Sablan, Guam EPA
        Mikel Schwab, Assistant U.S. Attorney

# EXHIBIT 7

Government of Guam Revised Consent Decree Schedule March 08, 2007

Exhibit 7

