# ORIGINAL

MATTHEW J. MCKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division
ROBERT D. MULLANEY
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6483
Fax: (415) 744-6476

LEONARDO M. RAPADAS
United States Attorney
MIKEL W. SCHWAB
Assistant United States Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez
Hagåtña, Guam 96910
Tel: (671) 472-7332
Fax: (671) 472-7215

Attorneys for United States of America

FILED
DISTRICT COURT OF GUAM

FEB 14 2007

MARY L.M. MORAN
CLERK OF COURT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL CASE NO. 02-00022 |
| | ) | |
| Plaintiff, | ) | UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY CONSENT DECREE |
| | ) | |
| v. | ) | |
| | ) | |
| GOVERNMENT OF GUAM, | ) | |
| | ) | Date:  March 8, 2007 |
| Defendant. | ) | Time:  9:00 a.m. |
| | ) | |

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................... 1

II. ARGUMENT ............................................................... 1

    A.   GovGuam Has Failed to Meet its Burden to Modify the
        Consent Decree under Rule 60(b)(5) ................................... 1

    B.   GovGuam Has Failed to Establish a Significant Change
        in Circumstances under Rufo ......................................... 4

        1.   The PUC as Regulator ......................................... 5

        2.   DPW's Inexperienced Chief Engineer and Lack
            of Qualified Employees ....................................... 7

        3.   Additional Engineering Studies ................................ 7

        4.   The "Actions of Others" ...................................... 9

        5.   Changes in Law that Limit GovGuam's
            Financing Options ........................................... 11

        6.   A Future Increase in Military Personnel ....................... 12

        7.   Political Opposition ......................................... 14

    C.   GovGuam Cannot Rely on Anticipated Events to Establish
        a Change in Circumstances ......................................... 14

    D.   GovGuam Has Failed to Show that any Change in Circumstances
        Made the Consent Decree Unworkable ............................... 16

    E.   GovGuam's Proposed Modification Should be Rejected
        Because it Defies the Consent Decree's Original Purpose
        and Is Not Suitably Tailored to the Changed Circumstances ............... 17

III. CONCLUSION ............................................................. 18

# TABLE OF AUTHORITIES

FEDERAL CASES

Agostini v. Felton, 521 U.S. 203 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

Bellevue Manor Associates v. U.S., 165 F.3d 1249 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 3

Federated Department Stores, Inc. v. Moitie, 452 U.S. 394 (1981) . . . . . . . . . . . . . . . . . . . . . . . 1

Keith v. Volpe, 784 F.2d 1457 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

Maraziti v. Thorpe, 52 F.3d 252 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

N.L.R.B. v. Harris Teeter Supermarkets,
        215 F.3d 32 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 7, 11, 17

Philadelphia Welfare Rights Org'n v. Shapp, 602 F.2d 1114 (3d Cir. 1979) . . . . . . . . . . . . . 2, 6

Pigford v. Veneman, 292 F.3d 918 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Plyler v. Evatt, 924 F.2d 1321 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Rufo v. Inmates of Suffolk County Jail,
        502 U.S. 367 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 5,  6, 12, 14, 15, 16, 17, 18

Safe Flight Instrument Corp. v. United Control Corp., 576 F.2d 1340 (9th Cir. 1978) . . . . . . . . 9

Schwartz v. U.S., 976 F.2d 213 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Sierra Club v. Meiburg, 296 F.3d 1021 (11th Cir. 2002) ........................... 2, 4

Thompson v. Enomoto, 915 F.2d 1383 (9th Cir. 1990) ............................... 3

Thompson v. U.S. Dept. Of H.U.D., 220 F.3d 241 (4th Cir. 2000) ..................... 14

Twelve John Does v. District of Columbia, 841 F.2d 1133 (D.C. Cir. 1988) .............. 8

U.S. v. Pauley, 321 F.3d 578 (6th Cir. 2003) ....................................... 16

U.S. v. State of Colo., 937 F.2d 505 (10th Cir. 1991) ............................... 17

U.S. v. Wayne County, Michigan, 369 F.3d 508 (6th Cir. 2004) ............... 2, 6, 13, 14

U.S. v. Western Elec. Co., Inc., 46 F.3d 1198 (D.C. Cir. 1995) ....................... 4

United States v. Armour & Co., 402 U.S. 673 (1971) ................................ 3

United States v. Asarco, Inc., 430 F.3d 972 (2005) ..................... 3, 4, 5, 11, 14, 18

United States v. Bishop Processing Co., 423 F.2d 469 (4th Cir. 1970) ................. 5

United States v. United Shoe Machinery Corp., 391 U.S. 244 (1968) .................. 18

W.L. Gore v. C.R. Bard, Inc., 977 F.2d 558 (Fed Cir. 1992) ......................... 1, 2

<u>GUAM STATUTES</u>

10 G.C.A. § 51101 .................................................... 1, 17

10 G.C.A. § 51118 .......................................................  11

iv

## I. INTRODUCTION

After reciting a long litany of perceived obstacles that have purportedly hindered its efforts at compliance, the Government of Guam ("GovGuam") has requested this Court to modify the Consent Decree pursuant to Rule 60(b)(5). Despite its lengthy recitation, however, GovGuam has not met its burden of establishing that a significant change in circumstances warrants a revision of the decree. Moreover, GovGuam's proposed modification, which would more than double the length of time contemplated in the Decree to close the Ordot Dump and open a new landfill, would defy the purpose of the Decree and is not suitably tailored to the change in circumstances that it purports to address. This Court should not reward GovGuam's recalcitrance by granting an extension of the Decree's 2007 deadlines for the opening of a new landfill and the closure of the Ordot Dump, particularly in light of the Guam Legislature's 1995 finding that "the closure of the dump is necessary in order to eliminate this existing serious environmental hazard." 10 G.C.A. § 51101 (Legislative Findings). Accordingly, the United States requests the Court to deny GovGuam's motion, to grant the United States' motion to enforce the Decree, and to fashion an equitable remedy that would ensure GovGuam's prompt compliance with the Decree's mandates.

## II. ARGUMENT

### A. GovGuam Has Failed to Meet its Burden to Modify the Consent Decree under Rule 60(b)(5).

The Consent Decree in this case was carefully negotiated by the United States and GovGuam over the course of many months and is a final judgment. See Decree, ¶ 62. As the Supreme Court has recognized, "public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." Federated Department Stores, Inc. v. Moitie, 452 U.S. 394, 401 (1981) (citations omitted). Because a consent decree is a final judgment, "it is accompanied by finality as stark as an adjudication after a full trial." W.L. Gore v. C.R. Bard, Inc., 977 F.2d 558, 560 (Fed Cir. 1992). In fact, "[w]hen litigation is ended by the deliberate choice of the parties, a movant's burden for modification of a consent

1

order is particularly heavy." Id. at 561. Courts have concluded that when defendants made a "free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment, their burden under Rule 60(b) is perhaps even more formidable than had they litigated and lost." Philadelphia Welfare Rights Org'n v. Shapp, 602 F.2d 1114, 1119 (3d Cir. 1979); see also U.S. v. Wayne County, Michigan, 369 F.3d 508, 511-12 (6th Cir. 2004) (because a decree is a final judgment entitled to a presumption of finality, the standard for justifying the modification of a consent decree is a strict one); N.L.R.B. v. Harris Teeter Supermarkets, 215 F.3d 32, 35 (D.C. Cir. 2000) (court approaches the modification of a judgment under Rule 60(b)(5) with caution because it is an "extraordinary remedy" that allows a party "to escape commitments voluntarily made and solemnized by a court decree"). In sum, "[a] party seeking to modify a consent decree has a high hurdle to clear and the wind in its face." Sierra Club v. Meiburg, 296 F.3d 1021, 1034 (11th Cir. 2002).

Rule 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application." Fed. R. Civ. P. 60(b)(5). A party seeking to modify a decree under Rule 60(b)(5) bears the burden of "establishing that a significant change in circumstances warrants revision of the decree." Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383 (1992). To meet its initial burden, the moving party must show "a significant change either in factual conditions or in law."[1] Id at 384. The Supreme Court noted that a modification may be warranted when: (1) changed factual conditions make compliance with the decree "substantially more onerous;" (2) a decree proves to be unworkable because of "unforeseen obstacles;" or (3) enforcement of the decree without modification would be "detrimental to the public interest." Id. If a party has met its burden of establishing that a change in circumstances may warrant a modification, the district court should focus on "whether the proposed modification is tailored to resolve the problems created by the change in circumstances." Id. at 391. "A court should do no more, for a consent decree is a final

---

[1] No deference is accorded the moving party in this threshold inquiry. Rufo, 502 U.S. at 392 n. 14.

1 | judgment that may be reopened only to the extent that equity requires." Id.[2]/

2 | The Supreme Court emphasized in Rufo that Rule 60 is not intended to provide relief to a
3 | party "when it is no longer convenient to live with the terms of a consent decree." Id. at 383.
4 | Thus, ordinarily, a court should not grant a modification "where a party relies upon events that
5 | actually were anticipated at the time it entered into a decree." Id. at 385. Under those
6 | circumstances, the party would have to satisfy a "heavy burden" to establish that "it agreed to the
7 | decree in good faith, made a reasonable effort to comply with the decree, and should be relieved
8 | of the undertaking." Id.

9 | In construing a consent decree, courts use contract principles. Thompson v. Enomoto,
10 | 915 F.2d 1383, 1388 (9th Cir. 1990). As the Supreme Court observed, "[c]onsent decrees are
11 | entered into by parties to a case after careful negotiation has produced agreement on their precise
12 | terms." United States v. Armour & Co., 402 U.S. 673, 681 (1971). Similar to a contract,
13 | therefore, "the scope of a consent decree must be discerned within its four corners, and not by
14 | reference to what might satisfy the purposes of one of the parties to it . . . [T]he instrument must
15 | be construed as it is written." Id. at 682. In United States v. Asarco, Inc., 430 F.3d 972, 981
16 | (2005), the Ninth Circuit applied these same principles in ruling on a motion to modify a consent
17 | decree under Rule 60(b)(5), determining that modification of a decree "invariably hinges on
18 | interpretation of the very terms of the decree . . . which embodies the parties' careful negotiation
19 | and enforceable commitments." Accordingly, the Ninth Circuit concluded that a court "must
20 | first interpret the terms and provisions of the decree as it would a contract to determine if the
21 | moving party anticipated a significant change in factual conditions, thereby making modification
22 | improper." Id. at 976.

23 | The Ninth Circuit has noted that a court, in ruling on a motion to modify a consent
24 | decree, "should consider the original expectations of the parties." Keith v. Volpe, 784 F.2d
25 | 1457, 1462 (9th Cir. 1986). Consequently, a motion to modify a consent decree that would defy

26 | _____

27 | [2]/ The Ninth Circuit has determined that the Rufo standard applies to all Rule 60(b)(5)
28 | petitions brought on equitable grounds. Bellevue Manor Associates v. U.S., 165 F.3d 1249, 1257 (9th Cir. 1999).

3

the decree's original purpose should be rejected by the court. See Asarco, 430 F.3d at 983; Meiburg, 296 F.3d at 1031 n. 11 (modification is not appropriate when motion seeks to modify a term of decree that is central to the basic purpose of decree); U.S. v. Western Elec. Co., Inc., 46 F.3d 1198, 1207 (D.C. Cir. 1995) (court's modification of decree allowed the decree's central purpose to remain intact). As the Ninth Circuit concluded: "To hold otherwise would also strip the decree of its broader purpose, 'which is to enable parties to avoid the expense and risk of litigation while still obtaining the greater enforceability (compared to an ordinary settlement agreement) that a court judgment provides.'" Asarco, 430 F.3d at 983 (citations omitted).

As discussed below, GovGuam has failed to meet its burden under Rule 60(b)(5). According to GovGuam, innumerable obstacles have prevented its compliance with the Decree. However, these events do not constitute a significant change in circumstances that may warrant a modification of the Decree. Moreover, GovGuam's proposed modification, which seeks to delay the opening of a new landfill and the closure of Ordot by more than four years, would frustrate the central purpose of the Decree and is not "suitably tailored" to the purported change in circumstances. Therefore, this Court should deny GovGuam's motion to modify the Decree.

B.     GovGuam Has Failed to Establish a Significant Change in Circumstances under Rufo.

GovGuam claims it has encountered a number of impediments to the closure of the Ordot Dump and construction of the new landfill. Specifically, GovGuam lists the following categories of events: (1) the regulation of Department of Public Work's ("DPW") Solid Waste Management ("SWM") operations by the Guam Public Utilities Commission ("PUC"); (2) the inexperience of DPW's Chief Engineer and GovGuam's difficulty in recruiting and keeping qualified employees; (3) subsequent information provided by engineering studies and the need for additional investigations; (4) actions required by others over whom GovGuam has no control; (5) changes in law affecting finances; (6) a future increase in U.S. military personnel; and (7) political opposition. These categories are examined below.

1          1.     The PUC as Regulator

2          GovGuam asserts that the PUC did not have the ability to regulate DPW in November

3    2003, and that its regulation of DPW was an unanticipated change that caused delay because the

4    PUC required time to review and approve procurement documents and the funding mechanism

5    used to pay for Decree projects. GovGuam also argues that Consent Decree in this case did not

6    include the PUC regulatory process, but that the PUC process was included in the Stipulated

7    Order for Preliminary Relief in U.S. v. Guam Waterworks Authority ("GWA") and the

8    Government of Guam. See Kennedy Decl. (GovGuam's Mtn to Mod.), Exh. 1.

9          Two facts undermine these bare assertions. First, as GovGuam stated, the PUC was

10   provided with rate-making authority effective in July 2002, well before the Decree was entered in

11   this case. GovGuam's Motion to Modify Decree at 2 ("Mtn to Mod."). Second, GovGuam is a

12   defendant in the GWA case; the Stipulated Order in that case was entered by this Court in June

13   2003. GovGuam signed that Stipulated Order months before the entry of the Decree in this case.

14   Mtn to Mod. at 2-3. The United States included references to the PUC regulatory process in the

15   GWA Stipulated Order at GovGuam's request. Machol Decl. (U.S. Opposition to Mtn to Mod.),

16   ¶ 2. Presumably, GovGuam was aware in 2003 that the PUC regulatory process could be built

17   into a settlement. The fact that GovGuam did not choose to propose the inclusion of the PUC

18   process in this Decree does not qualify as a change in circumstance. As the court reasoned in

19   United States v. Bishop Processing Co., 423 F.2d 469, 472 (4th Cir. 1970), defendant "had ample

20   opportunity to propose incorporation in the decree of any protection it may have felt necessary . .

21   . . [defendant] cannot now ask the court to revise the decree by inserting language or to interpret

22   it to embrace matters which, if present at all, were lurking in the recesses of [defendant's]

23   corporate mind." Accord, Asarco, 430 F.3d at 982.

24         If GovGuam is claiming that regulation by the PUC qualifies as change in law that could

25   support a modification, that claim is meritless. Even assuming that regulation of DPW by the

26   PUC constitutes a change in Territorial law, such a change did not "make legal what the consent

27   decree was designed to prevent" and did not make obligations under the Decree "impermissible

28   under federal law," as the Supreme Court contemplated in Rufo when it discussed a change in

5

statutory or decisional law as a possible basis to modify a decree under Rule 60(b)(5). 502 U.S. at 388. Because the change in Territorial law could not affect the federal Clean Water Act's ("CWA") prohibition on GovGuam's illegal discharges of leachate from the Ordot Dump, it is not the type of "change in law" that may support a Rule 60(b)(5) motion. See Wayne County, Michigan, 369 F.3d at 515 (because state law limiting municipal tort liability for spills did not legalize City's discharges regulated by CWA, it did not constitute a change in law under Rufo).

Furthermore, GovGuam is the defendant in this case. The PUC is part of the government of Guam. Modification of a decree should be granted only when "the change of circumstances urged by the movant was largely beyond that party's control." Plyler v. Evatt, 924 F.2d 1321, 1324 (4th Cir. 1991); see also Philadelphia Welfare Rights Org'n, 602 F.2d at 1121. GovGuam cannot rely on the PUC's regulation of DPW as a circumstance beyond its control. "Self-imposed hurdles and hurdles inherent in a consent decree's entry do not count as 'obstacles'" that would justify relief under Rule 60(b)(5). Harris Teeter Supermarkets, 215 F.3d at 36.

Finally, GovGuam failed to show that the PUC's regulatory role caused any delay in this case. As GovGuam noted, the PUC ordered the audit of SWM by the Georgetown Consulting Group ("GCG"); this audit revealed that both SWM's waste collection services and its billing and collection of fees need to be dramatically improved before a rate increase could be approved. U.S. Submission of Authorities in Support of Motion to Enforce ("Subm."), Att. 12, Executive Summary. However, the audit neither created the underlying problem nor caused a delay in obtaining bond funds -- it merely exposed the extent of DPW's mismanagement. The PUC's September 2006 Order stated the problem plainly: "DPW is not prepared to assume the financial responsibilities, which would be imposed upon it by the proposed $90 million dollar revenue bonds financing, which is necessary to fund the Government of Guam's compliance with the Federal Consent Decree." Subm., Att. 9 at 1. Regarding the PUC's role, GCG's assessment bears repeating: The PUC's "recommendation to fix a non-functioning billing and collection system, with which the Government intends to repay over $90 million dollars of debt necessary for Decree compliance, is not a 'distraction' but the only hope there is to provide access to the capital markets to fund the necessary [Decree] projects." Subm., Att. 13 at 2 n. 5. In other

6

words, without a complete overhaul of SWM, GovGuam cannot qualify for the issuance of bonds necessary to fund the Decree's projects.

> 2.      DPW's Inexperienced Chief Engineer and Lack of Qualified Employees

GovGuam identifies the inexperience and mistakes of its Chief Engineer and its lack of qualified engineer employees as additional obstacles that should justify modification. Mtn to Mod. at 3-4; Perez Decl. (GovGuam's Mtn to Mod.), ¶¶ 3-7. However, GovGuam does not claim that these problems represent any change in circumstances. Because GovGuam lacked engineering expertise at the time of entry of this Decree and faced the same obstacles at that time in hiring and retaining qualified employees, it cannot now rely on these issues to support modification of the Decree. See Agostini v. Felton, 521 U.S. 203, 216 (1997) (petitioner knew at time of entry of decree that cost of providing service would increase and cannot subsequently rely on increased cost as a change in factual conditions). Furthermore, these type of problems are fundamentally within GovGuam's control. It can train or replace inexperienced employees, determine to pay enough to attract competent employees, or decide to obtain needed expertise through contracting with outside firms. "Self-imposed hurdles" do not justify relief under Rule 60(b)(5). Harris Teeter Supermarkets, 215 F.3d at 36.

> 3.      Additional Engineering Studies

The Consent Decree in this case established a series of compliance deadlines starting in 2004 that were intended to culminate in Ordot Dump's closure and the cessation of GovGuam's illegal discharges on October 22, 2007. In order to achieve the opening of a new landfill and the Dump's closure in a timely manner, the Decree expressly required the completion of preliminary engineering and design tasks at specific times. For example, the draft closure plan for the Dump was required on December 7, 2004, a 90% draft final closure plan on May 6, 2005, and a final closure plan on September 3, 2005. Decree, ¶ 8.a., b., and c. Similar interim milestones applied to the opening of the new landfill. See Decree, ¶ 9.c. (draft plan by August 4, 2005), 9.d. (90% draft final plan by February 5, 2006), and 9.f. (100% final plan by June 5, 2006).

GovGuam now points to the results of additional Value Engineering Analysis ("VEA") reports for the landfill and the Ordot Dump and hydrogeologic data from 2005 as a reason for

7

1   modifying the Decree under Rule 60(b)(5). Generally, Value Engineering Studies are planned
2   with the project's overall design schedule constraints in mind. Machol Decl. (U.S. Opposition to
3   Mtn to Mod.), ¶ 3. If a Value Engineering team is charged with evaluating major shifts in
4   concept or design, the study would typically be planned at an early design phase. Id. Thus,
5   major delays and redesign work can be avoided. Id. Notably, GovGuam's VEA studies were
6   completed long after the completion of the design for each project. The Value Engineering
7   Report for the Ordot closure is dated December 2005 and the report for the new Layon landfill is
8   dated January 2, 2007. Gudmundsen Decl. (GovGuam's Mtn to Mod.), Exh. 1, 2. The
9   hydrogeologic data was apparently acquired in December 2005 (Jackson Decl. (GovGuam's Mtn
10  to Mod.), Exh. 1), months after the Decree's August 2005 compliance milestone. Decree, ¶ 9.c.
11  If GovGuam had wanted to use a VEA study to evaluate major aspects of the Ordot closure and
12  the construction of the new landfill, it was incumbent on GovGuam to commence and conclude
13  such a study within a time frame that would not lead to delays in the Consent Decree deadlines.
14  GovGuam itself delayed generating the VEA study and cannot now rely upon such a study to
15  justify delaying the deadlines in the Decree. GovGuam's reliance on the belated results of the
16  VE studies should be rejected for this reason alone.

17          Pursuant to Rule 60(b)(5), a party may apply for relief from the "prospective application"
18  of a judgment. Based on these VEA studies, GovGuam is apparently seeking to revise the
19  closure plan for Ordot (completed in December 2005) and to revise the final plan for the new
20  landfill (required to be completed in June 2006).[3]/ Under governing Ninth Circuit law, "the
21  standard used in determining whether a judgment has prospective application is 'whether it is
22  executory or involves the supervision of changing conduct or conditions.'" Maraziti v. Thorpe,
23  52 F.3d 252, 254 (9th Cir. 1995), quoting Twelve John Does v. District of Columbia, 841 F.2d
24  1133, 1139 (D.C. Cir. 1988).[4]/ As a matter of equity, a court should deny a motion to modify

25  _____

26  [3]/    GovGuam has never completed the final plan for the new landfill and is currently in
        violation of the Consent Decree. Wolfram Decl. (U.S. Mtn to Enforce), ¶ 4.

27
28  [4]/    "That a court's action has continuing consequences, however, does not mean that it has
        'prospective application' for the purposes of Rule 60(b)(5)." Twelve John Does, 841 F.2d at

8

when the order being challenged does not have prospective application. See Schwartz v. U.S., 976 F.2d 213, 218 (4th Cir. 1992) (court found that duties already carried out under order were not subject to a motion for relief under Rule 60(b)(5)); Safe Flight Instrument Corp. v. United Control Corp., 576 F.2d 1340, 1344 (9th Cir. 1978) (court distinguished between the "conclusive res judicata effect properly accorded decrees adjudicating accrued rights and those prospective features of a decree that involve the supervision of changing conduct or conditions"). In this case, the Court should deny GovGuam's requested relief for "accrued rights," such as the closure plan for Ordot and the final construction plan for the new landfill, which should have already been completed under the Consent Decree and do not have prospective application. Such relief should be denied because it would require an "unscrambling of the past." Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d ¶ 2863 at 332-33. This is particularly true when GovGuam's explanation for the timing of these belated studies is its own mismanagement of these projects. Mtn to Mod. at 3-4.

4.    The "Actions of Others"

In this category, GovGuam listed three problems it has faced: (1) a delay of several months in funding by the Department of Interior ("DOI"); (2) an apparent delay in obtaining access to a dirt road that traverses NASA property; and (3) the denial of access to the new landfill site by the owners of the site. For the reasons stated below, none of these issues qualify as a significant change in circumstances under Rufo.

When the parties negotiated this Consent Decree, GovGuam's financing of the projects required by the Consent Decree was a central concern. The parties directly addressed the financing issue in the Decree, agreeing that GovGuam would prepare a financial plan to set forth the funding mechanisms for the compliance measures. Decree, ¶ 10. If the Solid Waste Operating Fund was not adequate to fund the Decree's projects, GovGuam was specifically directed to use its best efforts to obtain sufficient funds, including "legislative appropriation, loans, grants, and rates charged for consumer services such as tipping or user fees." Id. The

1138.

1  financial plan submitted by GovGuam pursuant to Paragraph 10 revealed the funding mechanism

2  chosen by GovGuam: it needed to raise approximately $100 million for these projects, had $3.2

3  million in hand, and planned to raise the rest of the money through the issuance of revenue

4  bonds. Subm., Att. 14 at 24.

5       In light of these facts, the issue of DOI funding is a red herring that merely distracts the

6  Court's attention from the true cause of GovGuam's noncompliance. As set forth in Paragraph

7  10 of the Decree and the financial plan it submitted, GovGuam never intended to exclusively rely

8  on DOI funding to fund its Decree obligations. Any delay in DOI funding is simply not relevant

9  to explain GovGuam's noncompliance. While GovGuam has now received the DOI funding, it

10 still cannot comply with the Consent Decree because it lacks the $90 million in bond revenue

11 that the PUC stated is necessary to fund GovGuam's obligations under the Decree. Subm., Att. 9

12 at 1. Those bonds should have been issued by May 2006 to ensure compliance with the Decree's

13 2007 compliance dates. Subm., Att. 16 at Att., p.1. At this point, however, GovGuam has not

14 even begun the process of PUC review and approval of the bonds because SWM cannot manage

15 to collect the trash or to collect fees from its customers, which GCG's audit identified as two

16 essential prerequisites for qualification for a bond. Subm., Att. 12 at 1. GovGuam's institutional

17 inertia caused GCG to observe: "GovGuam's two year effort to obtain special activity bond

18 financing has been marred by indecision and a lack of urgency and leadership to address

19 operational and organizational problems . . . ." Subm., Att. 13 at 2.

20      GovGuam's purported difficulties regarding access to NASA property is also a flimsy

21 makeweight. Under the Decree, GovGuam was required to identify its preferred site for the new

22 landfill by December 7, 2004. Decree, ¶ 9.a. GovGuam officially announced that it had chosen

23 the Layon site on January 31, 2005. U.S. Second Submission of Authorities and other

24 References ("2nd Subm."), Att. 4 at 1. Site access was among the site selection criteria

25 considered by GovGuam at that time. 2d Subm., Att. 1 at 29. Therefore, GovGuam has known

26 since at least January 2005 that it needed to obtain access to the site. With some modicum of

27 planning, GovGuam could have resolved any access issue in that time period. It simply strains

28 credulity for GovGuam to assert that access to this dirt road on NASA property has delayed

10

1  GovGuam's compliance with the Decree.

2  Moreover, even if GovGuam had promptly obtained access to the dirt road in 2005, two
3  other towering obstacles would have remained. First, as GovGuam has freely admitted, it
4  "currently lacks the funds for these large construction projects" under the Decree. GovGuam's
5  Status Conference Response at 2. Second, its access to the Layon site for the new landfill was
6  apparently blocked from June 2006 to January 2007.[5] GovGuam makes no attempt to explain
7  why it did not use its condemnation authority to obtain access to the landfill site. This issue, as
8  the Court noted at the status conference (Subm., Att. 15 at 22), is another example of a "self-
9  imposed hurdle." Harris Teeter Supermarkets, 215 F.3d at 36. As such, it does not amount to
10 the type of change in circumstances that could support a Rule 60(b)(5) motion.

11          5.      Changes in Law that Limit GovGuam's Financing Options

12  GovGuam lists three changes in law that affect its financing options: (1) a June 2005 law
13 funding an adequate public educational system; (2) a "recent" settlement in an earned income
14 credit case; and (3) a November 2006 judgment regarding a cost of living adjustment. Due to
15 these three events, GovGuam claims "it is not able to use the general fund or other fund monies
16 to pay for the capital improvement projects mandated by the Consent Decree." Mtn to Mod. at 6.

17  Strikingly, GovGuam chose not to address the financing mechanisms included in the
18 Consent Decree or that it had identified in the financial plan submitted under the Decree. In
19 Asarco, the Ninth Circuit instructed that modification of a consent decree "invariably hinges on
20 interpretation of the very terms of the decree . . . which embodies the parties' careful negotiation
21 and enforceable commitments." 430 F.3d at 981. Turning to the Decree in this case, Paragraph
22 10 states that the Decree's projects would be funded by the Solid Waste Operations Fund
23 established by 10 G.C.A. § 51118, which notes the Guam Legislature's intent that "tipping and
24 user fees shall provide a financing source for government of Guam costs and expenses directly
25 related" to both the Ordot Dump and the new landfill. Subm., Att. 4. In addition, because
26 Paragraph 10 provides that this Fund "shall not be regarded as the exclusive source of funding

27

28  [5]      Apparently, GovGuam has access to the site now. Mtn to Mod. at 5.

11

1    for the projects," it also required GovGuam to submit a financial plan to identify funding sources
2    and a schedule to secure funds. To reiterate, GovGuam's financial plan identified the issuance of
3    revenue bonds as the source of funds to pay for GovGuam's Decree obligations.

4         Given this background, it is difficult to understand the relevance of GovGuam's
5    argument. Certainly, every government must plan for contingencies such as education expenses
6    and litigation risks. However, GovGuam cannot assert that these recent expenses affected
7    SWM's longstanding failure to provide an adequate trash collection system for Guam's residents
8    or a functioning billing and collection system. Nor can these recent expenses serve to explain
9    why GovGuam failed to issue revenue bonds in May 2006 or to excuse its desultory efforts over
10   the past two years to issue these bonds. At most, these revenue issues may affect the likelihood
11   of "legislative appropriations," which Paragraph 10 identifies as a potential source of funding for
12   GovGuam. Because "legislative appropriations" are not the real source of GovGuam's failure to
13   comply, however, GovGuam's discussion of these issues is irrelevant.

14        Moreover, to the extent that GovGuam argues that these issues are a change in law that
15   could support a Rule 60(b)(5) motion, this argument is without basis. These events did not
16   "make legal what the consent decree was designed to prevent" and did not make obligations
17   under the Decree "impermissible under federal law," as required by the Rufo Court to constitute
18   a change in law for purposes of Rule 60(b)(5). 502 U.S. at 388.

19            6.    A Future Increase in Military Personnel

20        GovGuam makes a number of assertions relating to the military on Guam: (1) a
21   significant contingent of 8,000 Marines will be relocated to Guam; and (2) the Department of
22   Defense will need to use GovGuam's new landfill. Because its 2004 Environmental Impact
23   Statement did not take these factors into account, GovGuam argues that these changes require
24   additional planning for the landfill construction. GovGuam's assertions do not support a
25   modification of the Decree. First, GovGuam's design for the construction of Layon assumed that
26   the new landfill would be constructed in stages, allowing for the construction of future landfill
27   cells as the need arises. Arora Decl. (U.S. Opposition to Mtn to Mod.), ¶ 6. The design took into
28   account a future growth in population on Guam, including residential, military, and tourist

12

1  populations. Id. Therefore, if the Department of Defense decided to utilize GovGuam's new

2  landfill instead of constructing its own landfill, the design of the new landfill would be able to

3  accommodate that eventuality. Second, assuming that GovGuam is correct that the Air Force is

4  running out of landfill space in 2007, the Air Force would be sorely disappointed if it had

5  planned to rely on GovGuam's new landfill by September 22, 2007, the time frame in which

6  GovGuam is required to open the landfill under the Decree. According to GovGuam's proposal

7  it just submitted to the Court, one cell of the new landfill will be constructed by July 30, 2010.

8  Perez Decl. (GovGuam's Mtn to Mod.), Exh. 7 at 2.[6]/ Therefore, the Air Force will need to

9  locate another landfill if it lacks its own capacity.

10  Finally, the Department of Defense's inchoate solid waste disposal plans should not be

11  used to excuse GovGuam's current failure to comply with the Decree. Even if GovGuam has

12  correctly predicted the course of future events, nothing that the Department of Defense may plan

13  has impacted GovGuam's failure to close the Ordot Dump. Moreover, GovGuam's financial

14  plan to fund the Decree's construction projects never relied on a cost-sharing arrangement with

15  the military. When GovGuam submitted its financial plan under Paragraph 10 of the Decree,

16  EPA specifically asked GovGuam on July 1, 2004, whether it had discussed the possibility of

17  cost sharing portions of the new landfill with the military. 2nd Subm., Att. 2 at 2. GovGuam

18  responded that it had not had any discussions at that point. "Such discussions can be conducted

19  once the scope of the new landfill is more clearly defined, with any cost sharing arrangements

20  worked . . . into subsequent revisions of the plan." 2nd Subm., Att. 3 at 2-3. In February 2007,

21  with eight months left to construct the new landfill, GovGuam cannot now claim that its Consent

22  Decree obligations are suddenly unworkable without Department of Defense funding. The Court

23  should reject this argument as "a post-judgment attempt by a party to escape from obligations it

24  had voluntarily assumed." Wayne County, Michigan, 369 F.3d at 512.

25

26

27  ───────────────

[6]/    Given GovGuam's compliance track record thus far, it seems unlikely that GovGuam will

28  meet the July 2010 deadline.

1          7.    Political Opposition

2          GovGuam states that it has faced political opposition to the landfill's location at Layon,

3 and that Senators in the Guam Legislature have proposed four bills to change the location.

4 However, at the time of the Decree's entry, the parties understood that the decision regarding the

5 siting of the landfill would be controversial. Accordingly, in Paragraph 9.a. of the Decree, the

6 parties set a 30-day deadline for GovGuam to submit a list of 3 sites, and thereafter required

7 GovGuam to prepare and submit an Environmental Impact Statement analyzing the three sites by

8 December 7, 2004. Decree, ¶ 9.a. If the parties were unable to agree on a site, Paragraph 9.b.

9 established a dispute resolution procedure with the Court as the ultimate arbiter. Decree, ¶ 9.b.

10 The parties were able to agree on the Layon site without the Court's intervention. 2nd Subm.,

11 Att. 5 at 1. As GovGuam stated, there has been political opposition to the selection of Layon.

12 Similar to the situation in Agostini, however, the fact that the parties' predictions of potential

13 difficulties regarding the landfill siting decision "turned out to be accurate does not constitute a

14 change in factual conditions warranting relief under Rule 60(b)(5)." Agostini, 521 U.S. at 216.

15          C.    GovGuam Cannot Rely on Anticipated Events to Establish a Change in
               Circumstances.
16

17          A court should not grant a modification "where a party relies upon events that actually

18 were anticipated at the time it entered into a decree." Rufo, 502 U.S. at 385. Under those

19 circumstances, the party would have to satisfy a "heavy burden" to establish that "it agreed to the

20 decree in good faith, made a reasonable effort to comply with the decree, and should be relieved

21 of the undertaking." Id. Courts have uniformly followed this approach in denying motions to

22 modify a decree. Thus, when a party anticipated an increase in costs at the time of entry, that

23 party cannot rely on increased costs as a change in circumstances. Agostini, 521 U.S. at 216.

24 Similarly, the Ninth Circuit concluded that when the defendant understood that EPA had

25 reserved the right in the decree to pursue an additional enforcement action, it could not advance

26 the potential cost of that action as a reason to modify the decree. Asarco, 430 F.3d at 982-83, see

27 also Wayne County, Michigan, 369 F.3d at 514 (basement flooding and lawsuits for damages

28 were anticipated events). As the court observed in Thompson v. U.S. Dept. Of H.U.D., 220 F.3d

14

1  241, 247 (4th Cir. 2000), the modification of a decree "must be based on a change in facts, not a
2  change in opinion about the effect of unchanged facts."

3       In this case, GovGuam recites a veritable litany of perceived obstacles to compliance.
4  As explained in Section II.B. above, these obstacles were anticipated at the time of entry.
5  GovGuam knew that the PUC was authorized by law to regulate DPW and understood that the
6  PUC regulatory process could be incorporated into a settlement agreement. GovGuam was
7  aware that it lacked engineering expertise and that this would be required to manage the projects
8  required by the Decree. Concerns about the financing of the projects were a central focus of the
9  parties, as reflected in Paragraph 10 of the Decree. Access to the site chosen as the new location
10 of the landfill was identified early in the siting process. A possible future growth in population
11 was also reflected in early planning documents under the Decree. Finally, the parties and the
12 Court were fully aware that the siting decision for the new landfill would be controversial and
13 planned accordingly. Decree, ¶ 9.a., b.

14      Under these circumstances, GovGuam faces a "heavy burden" under Rufo to justify
15 modification. 502 U.S. at 385. GovGuam has failed to carry this burden because it has not
16 demonstrated that it "made a reasonable effort to comply with the decree." Id. As the Court is
17 aware, GovGuam is currently in violation of the central requirements of the Decree, having failed
18 to award a contract for the closure of the Ordot Dump, failed to submit a final plan to construct
19 the new landfill, and failed to award a contract to construct the new landfill. Wolfram Decl.
20 (U.S. Mtn to Enforce), ¶¶ 3, 4, 5. The reasons for these continuing violations are manifold,
21 including both a failure in management and a failure to finance the Decree's projects.
22 "Reasonable efforts" cannot be conjured up based on a declaration of DPW's Director.
23 GovGuam's compliance record speaks clearly for itself and demonstrates no such efforts.[2/] One
24 final example starkly illustrates GovGuam's approach to its obligations under the Decree. The
25 Legislature has neither introduced legislation to authorize the bond measures needed to fund the

26  ───────────────────

27  [2/]   GovGuam's list of Consent Decree "accomplishments" reflects only its compliance with
       early milestones of the Decree, and does not mention its violations of the central requirements of
28  the Decree in 2006. Jackson Decl. (GovGuam's Mtn to Mod.), Exh. 4 at 1.

15

1   work under the Decree, nor responded to the PUC's offer to draft legislation to address SWM's

2   fundamental flaws. Subm., Att. 13 at 3; Att. 20 at 2. This Court should not use its authority

3   under Rule 60(b)(5) to reward GovGuam for its recalcitrance and continuing violations of the

4   Decree. Cf. U.S. v. Pauley, 321 F.3d 578, 581 (6th Cir. 2003) (reversing court's order vacating a

5   civil penalty).

6       D.      GovGuam Has Failed to Show that any Change in Circumstances Made the
                Consent Decree Unworkable.
7
        As detailed in Sections II.B. and C., GovGuam has failed to establish any unexpected
8
    significant change in circumstances that could support its Motion to Amend. Moreover, even if
9
    this Court were to conclude that one of these events did constitute an unexpected change in
10
    circumstances, the Court should still deny GovGuam's motion because GovGuam has failed to
11
    show that the change was significant.
12
        For an unexpected change in circumstances, Rufo stated that a modification may be
13
    warranted when: (1) changed factual conditions make compliance with the decree "substantially
14
    more onerous;" (2) a decree proves to be unworkable because of "unforeseen obstacles;" or
15
    (3) enforcement of the decree without modification would be "detrimental to the public interest."
16
    502 U.S. at 384. GovGuam has made only one hollow claim in this regard, arguing that
17
    obstacles, financial constraints, and the public interest in DPW's efficient operations make the
18
    Decree's deadlines unworkable. Mtn to Mod. at 13. The Court should reject this argument.
19
    GovGuam has failed to demonstrate that any of its asserted obstacles were significant because
20
    there is no causal link between these obstacles and its failure to comply with the Decree's
21
    mandates. In this case, GovGuam intended to pay for the Decree's projects by issuing revenue
22
    bonds but it has never issued those bonds. The reasons for GovGuam's failure to issue these
23
    bonds are well documented and inextricably linked to events within GovGuam's control:
24
    (1) SWM's current billing and collection practices are in "disarray" and it provides "poor and
25
    sporadic service" to its residential customers (see GCG's audit report in Subm., Att. 12 at 1, 3);
26
    (2) GovGuam's efforts to obtain bond financing "has been marred by indecision and a lack of
27
    urgency and leadership to address operational and organizational problems" (see GCG's audit
28

16

1 report update in Subm., Att. 13 at 2); (3) a lack of competent staff (Mtn to Mod. at 3-4); and

2 (4) GovGuam's continuing failure to address the "serious environmental hazard" posed by the

3 Ordot Dump. 10 G.C.A. § 51101; compare Mtn to Mod. at 6-7 (Legislature introduced four bills

4 to change the landfill location) with Subm., Att. 20 at 2 (Legislature has failed to introduce the

5 legislation required to issue the bonds to pay for Decree's projects). None of these failings was

6 caused by an "unforeseen obstacle." None of these "self-imposed hurdles" qualifies as a change

7 in circumstances to support a Rule 60(b)(5) motion under Rufo. Harris Teeter Supermarkets, 215

8 F.3d at 36.

9     E.     <u>GovGuam's Proposed Modification Should be Rejected Because it Defies the</u>
<u>Consent Decree's Original Purpose and Is Not Suitably Tailored to the Changed</u>
10                 <u>Circumstances.</u>

11        The focus of the United States' Complaint in this action is GovGuam's illegal discharge

12 of leachate from the Ordot Dump into the Lonfit River. The Consent Decree contained specific

13 compliance measures in Section IV, in which the parties provided: "The Government of Guam

14 shall correct all compliance problems that form the basis for the Complaint filed in this action by

15 undertaking the actions below within the specified times." Decree, ¶ 7. The specified actions in

16 Section IV of the Decree include both the "Closure of Ordot Dump and Cessation of Discharge

17 of Pollutants from Ordot Dump into Waters of the United States" in Paragraph 8 and the

18 "Construction and Operation of New Municipal Solid Waste Landfill" in Paragraph 9.

19 Therefore, the Decree's central purpose, as discerned within its four corners, encompassed the

20 timely closure of the Ordot Dump, the timely operation of a new landfill, and the cessation of

21 GovGuam's illegal discharges.

22        The Consent Decree established a 3 ½ year schedule for GovGuam to accomplish the

23 compliance measures set out in Paragraphs 8 and 9. GovGuam proposes to extend the 2007

24 deadlines for closing Ordot and opening a new landfill by an additional three to four years.[8]

25 This is not a "minor change in extraneous details" of the decree, Rufo, 502 U.S. at 383 n.7, but

26

27 ──────────────
[8]     Ordot's final closure is scheduled to occur in December 2011. Perez Decl. (GovGuam's
28 Mtn to Mod.), Exh. 7.

1   is directed to the Decree's central purpose. As the court concluded in U.S. v. State of Colo., 937

2   F.2d 505, 510 (10th Cir. 1991), a modification of a decree should be made only "to further the

3   original goals of the agreement." A decree may not be changed if the purposes of the litigation,

4   as incorporated in the decree, have not been fully achieved. United States v. United Shoe

5   Machinery Corp., 391 U.S. 244, 248 (1968). In this case, GovGuam's proposed modification

6   would ignore the parties' original expectation that the new landfill would be opened and the

7   Ordot Dump would be closed in 2007. See Keith, 784 F.2d at 1462. In the place of these firm

8   2007 deadlines, GovGuam proposes to revise the design for both Ordot's closure and the

9   construction of the new landfill, leaving the Ordot Dump in operation for at least three more

10  years until a cell of the new landfill is constructed in July 2010. GovGuam's modification should

11  be rejected because it defies the Decree's purpose, and thwarts the enforceability that the Court's

12  judgment provides to the United States and the public. Asarco, 430 F.3d at 983.

13      Finally, approval of this modification is unwarranted because it would ignore the

14  Supreme Court's holding in Rufo that any proposed modification should be "suitably tailored to

15  the changed circumstances." 502 U.S. at 368; see also Pigford v. Veneman, 292 F.3d 918, 927

16  (D.C. Cir. 2002) (proposed modification was not suitably tailored because it failed to preserve

17  the essence of the parties' bargain). Because "a consent decree is a final judgment that may be

18  reopened only to the extent that equity requires," this Court should deny GovGuam's attempt to

19  radically rewrite the Decree. Rufo, 502 U.S. at 391.

20  **III.    CONCLUSION**

21      This Court should deny GovGuam's motion to modify the Consent Decree because

22  GovGuam has failed to demonstrate that a significant change in circumstances warrants relief

23  under Rule 60(b)(5). As the Supreme Court stated, "Rule 60(b)(5) provides that a party may

24  obtain relief from a court order when 'it is no longer equitable that the judgment should have

25  prospective application,' not when it is no longer convenient to live with the terms of a consent

26  decree." Rufo, 502 U.S. at 383. Moreover, GovGuam's proposed modification would defy the

27  purpose of the Decree and is not suitably tailored to the change in circumstances that it purports

28  to address. Instead of extending the Decree's deadlines, the United States requests the Court to

18

1    enforce the Decree and to fashion a remedy to ensure that GovGuam promptly implements its

2    requirements.

3                                              Respectfully submitted,

4                                              LEONARDO M. RAPADAS
                                             United States Attorney
5                                              Districts of Guam and NMI

6

7    Dated: **FEB 1 4 2007**
                                             _____
8                                              MIKEL W. SCHWAB
                                             Assistant U.S. Attorney

9    OF COUNSEL:

10   JULIA JACKSON
     Assistant Regional Counsel
11   U.S. Environmental Protection Agency
     75 Hawthorne Street
12   San Francisco, California  94105