# ORIGINAL

1  MATTHEW J. MCKEOWN
   Acting Assistant Attorney General
2  Environment & Natural Resources Division
   ROBERT D. MULLANEY
3  Environmental Enforcement Section
   United States Department of Justice
4  301 Howard Street, Suite 1050
   San Francisco, California 94105
5  Tel: (415) 744-6483
   Fax: (415) 744-6476
6
   LEONARDO M. RAPADAS
7  United States Attorney
   MIKEL W. SCHWAB
8  Assistant United States Attorney
   Suite 500, Sirena Plaza
9  108 Hernan Cortez
   Hagåtña, Guam 96910
10 Tel: (671) 472-7332
   Fax: (671) 472-7215
11
   Attorneys for United States of America
12

**FILED**
DISTRICT COURT OF GUAM

FEB 14 2007 mbr

MARY L.M. MORAN
CLERK OF COURT

13
               IN THE UNITED STATES DISTRICT COURT
14
                    FOR THE TERRITORY OF GUAM
15

16
   UNITED STATES OF AMERICA,          )   CIVIL CASE NO. 02-00022
17                                     )
                         Plaintiff,    )
18                                     )   UNITED STATES' SECOND
              v.                       )   SUBMISSION OF AUTHORITIES
19                                     )   AND OTHER REFERENCES
                                       )
20 GOVERNMENT OF GUAM,                 )   Date:  March 8, 2007
                                       )   Time:  9:00 a.m.
21                       Defendant.    )
                                       )
22

23

24

25

26

27

28

1        Pursuant to GR 4.1, the United States hereby submits a copy of cited authorities and other

2  references from its Opposition to Defendant's Motion to Modify Consent Decree that may not be

3  available in the Court's library or the Guam Territorial Law Library.

4                              **OTHER REFERENCES**

5  Consent Decree Report:

6  1.    Preliminary Site Selection Report, Environmental Impact Statement for the Siting of a

7       Municipal Solid Waste Landfill Facility, Guam (Excerpt Only - January 11, 2005)

8

9  Correspondence:

10  2.    July 1, 2004 letter from the Environmental Protection Agency to the Guam Department of

11       Public Works

12  3.    July 7, 2004 response from the Government of Guam to the Environmental Protection

13       Agency

14  4.    January 31, 2005 letter from the Guam Department of Public Works to the

15       Environmental Protection Agency

16  5.    February 14, 2005 letter from the Environmental Protection Agency to the Guam

17       Department of Public Works

18

19                       LEONARDO M. RAPADAS
                             United States Attorney

20                       Districk of Guam and NMI

21  Dated:  FEB 1 4 2007

22                         MIKEL W. SCHWAB
                           Assistant U.S. Attorney

23

24  OF COUNSEL:

25  JULIA JACKSON
    Assistant Regional Counsel

26  U.S. Environmental Protection Agency
    75 Hawthorne Street

27  San Francisco, California 94105

28

- 1 -

# ATTACHMENT 1

# Preliminary
# Site Selection Report

## Environmental Impact Statement
## For the Siting of a Municipal
## Solid Waste Landfill Facility,
## Guam

Prepared for
Guam Department of Public Works
Government of Guam
542 N. Marine Corps Drive
Tamuning, Guam 96913



**public works**
DIPATTAMENTON CHE'CHO' PUPBLEKO

http://www.guamlandfill.org

In Accordance with Civil Case No. 02-00022 Consent Decree
Filed February 11, 2004 in U.S. District Court, Territory of Guam

Prepared by
Dueñas & Associates, Inc.
155 E.T. Calvo Memorial Parkway, Suite 200
Tamuning, Guam 96913

In Association with
Black & Veatch, Mink & Yuen, Geo-Engineering, Inc.,
Micronesian Archaeological Research Services,
Paul H. Rosendahl, Ph.D., Inc., EMCE, and EA EST

January 11, 2005

common moorhen is potential species of concern since the wetlands in the property may serve as potential habitat for this species.

5.5.8    *Noise Concerns - A preferred sanitary landfill site would have no receptors close enough to the site where typical construction equipment noise would not be compatible or would have adequate screening capability to diffuse or adequately reduce the noise.*

The Dandan footprint is located over one mile (5,280 feet) from potential receptors in the residential areas of Malojloj to the east, and GHURA's Southern Rental Housing and private residences to the southeast. The Inarajan Middle School is also situated over one mile southeast of the footprint. Private homes along an approximately 2,500 linear-foot sector of Dandan Road would be potential receptors of noise from vehicle traffic hauling waste to the site.

**Table 6. Residential Uses In the Vicinity of Dandan Footprint**

|                           | Radius from Landfill Footprint |             |             |
| ------------------------- | ----------- | ----------- | ----------- |
|                           | 0.25 mile   | 0.50 mile   | 0.75 mile   |
| Total Residential Uses    | 0           | 0           | 0           |

5.5.9    *Property Acquisition - A preferred sanitary landfill site would have a single receptive owner for the acquisition of the entire property.*

Ownership of the Dandan site (Lot No. B Estate No.16, Suburban) is by joint tenancy involving First Island Industry, Inc. (a subsidiary of Oxford Properties and Facilities, Ltd.) and Calvo's Insurance Underwriters. Oxford Properties opposes the landfill development on the candidate site while the joint owner (Calvo's Insurance) has not gone on record as to whether or not they are receptive to the acquisition of a portion of the site for landfill development.

5.5.10  *Property Devaluation – A preferred sanitary landfill site would be designed to limit impact to surrounding property values.*

Although real estate values can be affected by nearby solid waste disposal facilities, modern laws, permit restrictions, and management technologies can make it possible to limit or even remove the potential negative impact of a nearby sanitary landfill.

Sanitary landfills can be designed and managed to limit their effect on the surrounding community. Examples of design and management techniques include: shielding the actual dumping area from sight, remote entrance to the facility, shielded access roads on site, control of litter on-site, and frequent patrols for litter off-site. Modern management techniques also target operational activities to limit the propagation of disease vectors, fires, odors, blowing litter, and scavenging. The techniques used to combat these undesirable conditions include the timely placement of daily cover, portable litter fences, and visual barriers such as soil berms or vegetation.

A study that examined the impact of a well-designed and managed landfill on surrounding property values concluded that a landfill, if well-designed and managed, can be a good neighbor and have no statistically measurable negative impact on surrounding property values[1].

---

[1] Donald H. Bleich, PhD, M. Chapman Findlay III, PhD, and G. Michael Phillips, PhD, "An Evaluation of the Impact of a Well-Designed Landfill on Surrounding Property Values," The Appraisal Journal (April 1991) pp. 247-252.

# ATTACHMENT 2



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 9**
75 Hawthorne Street (CMD-6)
San Francisco, CA 94105

July 1, 2004

## Via Email and Facsimile

Joseph W. Duenas, Acting Director
Department of Public Works
542 North Marine Drive
Tamuning, GU 96911

### Re: EPA Comments on the Financial Plan Prepared Under Paragraph 10 of the Consent Decree

Dear Mr. Duenas:

The Environmental Protection Agency, Region 9 (EPA) at this time is providing the following comments to the Department of Public Works (DPW) regarding the Financial Plan prepared under paragraph 10 of the Civil Case No. 02-00022 Consent Decree (Consent Decree):

#### Cost and Revenue Comments

1) Are costs of ancillary solid waste facilities incorporated into any of the eleven functional groups presented in the Financial Plan? For example, are collection costs, transfer station construction, material recovery facilities, and hauling costs incorporated? If so, in which functional groups? If not, what are the costs associated with these activities and how will funds be generated to support them?

2) How much revenue is collected from the $8/month residential service fee versus the volume-based fees presented in section 3.1?

3) Is the Solid Waste Management Fund used for any other expenses (beyond solid waste handling)? Has DPW or any other entity tapped the fund in past years to pay for non-solid waste expenses? If so, DPW must allow for this contingency when establishing tipping fees. Provide more information on how the SWMF was utilized in past years, and a better breakdown of the various revenue sources (e.g., residential fees vs. private haulers).

4) What is the PUC "actuarial analysis" of tipping and user fees discussed in the Executive Summary?

5) The landfill construction cost estimates of $60/ton are significantly higher than other similarly situated island facilities. It would be useful to compare Guam's construction and operations cost estimates with Saipan and other island facilities.

6) Section 5.6.1. should address expected (and best & worst case scenarios) for recycling rates. That would affect recycling and landfill operations cost estimates.

7) What assumptions are used to convert estimated annual costs to needed tipping fees? Are the fees based on current billing delinquency rates or an improved ability to collect fees in the future? Will there be different rates for commercial and residential customers? Are the administrative costs of managing the Solid Waste Management Fund and overseeing procurement, etc., included in the proposed tipping fees?

8) Has DPW met with FEMA or the military to discuss cost sharing portions of the new landfill?

9) Please provide the basis for the wetlands mitigation cost estimate of $10,000,000 ($100,000 per acre times 100 acres).

### Finance Comments

10) Are assumptions about special activity bonds interest rates affected by the expected large increase in the number of AMT taxpayers in the near future? That is, do you expect bond interest rates to rise as fewer taxpayers qualify to deduct private activity bond interest?

11) Section 4.2.1 notes that the federal government approved $100 million for solid waste disposal facility bonds. Which entity within the federal government provided this approval? Provide a copy of the approval by the federal agency.

12) How will DPW raise revenue for these projects if the bond financing and/or DBOT contract are not successful? Does Guam have a contingency plan (e.g., the development of an import tax)?

### Process Comments

13) Will it be too inefficient (and costly) if the preliminary design is completed by one firm and the full design/construction by another? Is it likely that the second firm will prefer to do a complete redesign? At a minimum, all design assumptions, drawings, and electronic data should be provided to the second firm.

14) What is the timing of the hiring and training of the Consent Decree Staff (Group C)?

15) Due dates must be added to the three tables of Section 6-3.

16) The status of each of the items discussed in the Financial Plan must be included in the quarterly progress reports.

17) Who will be the DPW lead for the activities discussed in the Financial Plan (e.g., working with GEDCA on bonds, Section 6.2.3)?

18) The Financial Plan must include the certification statement found in paragraph 42 of the Consent Decree.

Pursuant to paragraph 7 of the Consent Decree, DPW has 30 days from receipt of this letter to respond and incorporate these comments. Please call me at (415) 972-3770 if you would like to discuss this matter further.

Sincerely,

Ben Machol
Guam Program Manager, P.E.

cc:     Attorney General of Guam
        Fred Castro, Guam EPA

# ATTACHMENT 3

## Response to   US EPA Comments to LF Financial Plan 2004JUL07

*1) Are costs of ancillary solid waste facilities incorporated into any of the eleven functional groups represented in the Financial Plan? For example, are collection costs, transfer station construction, material recovery facilities, and hauling costs incorporated? If so, in which functional groups? If not, what are the costs associated with these activities and how will funds be generated to support them?*

No. The costs of the ancillary facilities such as collection, transfer stations and material recovery facility are not included in any of the eleven functional groups, as they are not required in the Consent Decree. DPW and GEPA agreed that the transfer stations, material recovery facility elements were not to be included at this time (see minutes of initial project meeting of April 21, 2004). Collection and hauling are provided by either commercial collection and disposal services (for businesses and organized residential communities) or the DPW. The costs for the DPW collection services are included in the current DPW operating costs. Should DPW continue providing such services, the user fee would continue to provide the needed funds for the service, with appropriate adjustments for actual cost of service established by the PUC actuarial analysis. Should DPW elect to privatize such services and the PUC sets rates in accordance with PL 24-272, the rates would change to reflect a two part charge: 1) cost of collection – set by the PUC based on actuarial analysis of the private service provider's cost of service; and 2) disposal costs based on the PUC approved tipping fee. The current $8/household per month user fee incorporates both collection and disposal.

In discussions with Guam EPA, it is anticipated that the impending update of Guam's Integrated Solid Waste Management Plan will likely involve legislative approval of upgrading the regional facilities. There is also a strong possibility that legislative appropriations for these ancillary facilities will be provided.

*2) How much revenue is collected from the $8/month residential service fee versus the volume based fees presented in section 3.1?*

This information was retrieved by DPW in cooperation with the Department of Administration. For FY02 and FY03, revenue collected from the residential tipping fees were 45.5% and 38.2% respectively. All other fees (volume-based fees presented in Section 3.1) made up the balance of the revenues collected. A table of this breakdown was added to the text of the plan.

*3) Is the SWMF used for any other expenses (beyond solid waste handling)? Has DPW or any other entity tapped the fund in the past years to pay for non-solid waste expenses? If so, DPW must allow for this contingency when establishing tipping fees. Provide more information on how the SWMF was utilized in past years, and a better breakdown of the various revenue sources (e.g., residential fees vs. private haulers).*

No. The SWMF is used only for SW related expenses. The fund has been used by DPW to pay for emergency contractual services (such as services for dealing with landfill fires), but not for any non-solid waste related items. Additional breakdown of expenses has been added to the plan.

*4) What is PUC actuarial analysis of tipping and user fees discussed in Executive Summary?*

Actuarial analysis is analysis of the actual cost of service to be used in setting the rates. Usually requires the presentation of audited financial statements and valid estimates of cost for planned expenses and operations.

**5) The landfill construction cost estimates of $60/ton are significantly higher than other similarly situated island facilities. It would be useful to compare Guam's construction and operations costs estimates with Saipan and other Island facilities.**

Actual construction costs were compared for another RCRA compliant landfill constructed on Guam, and were adjusted downward to account for features which will not be required at the new landfill site. Construction costs for Saipan, although similarly located, must be compared with qualifications for such factors as a significant disparity in labor costs. DPW has received Information from the CNMI regarding the construction and operation of their MSWLF facility. Based on this information, construction costs used in the estimates are within about 15% of actual costs in the CNMI. These costs reflect an approximate compaction rate at the CNMI facility and CNMI labor rates.

A comparison of other island facilities would be useful. DPW has requested this information and will incorporate any information received accordingly.

**6) Section 5.6.1 should address expected (and best and worst case scenarios) for recycling rates. That would affect recycling and landfill operations cost estimates.**

Information contained in this section of the report utilized solid waste generation rates with minimal waste diversion, which represents the worst-case scenario. As the materials recovery facility and regional transfer stations (with attendant recycling facilities) were not included, nominal or "best case" recycling rates are not justified under the agreed project basis of analysis. It was agreed during the initial stages of the project that as additional generation and cost data became available, the LF Financial Plan could be revised to reflect this information. It is anticipated that such information would be incorporated into the plan as the new landfill facility design scope is finalized, however, it is not anticipated that an increased recycling rate will affect the near term costs for the landfill construction.

**7) What assumptions are used to convert the annual costs to needed tipping fees? Are the fees based on the current delinquency rates or an improved ability to collect fees in the future? Will there be different rates for commercial or residential customers? Are the administrative costs of managing the solid waste management fund and overseeing procurement included in the proposed tipping fees?**

The numbers presented in the proposed tipping fees are the annual operation and maintenance costs, and the amortized annual cost of service for the identified program elements divided by the projected generation rate in tons. No data on delinquency rates was provided and is therefore not incorporated into the fees presented. The assumption is that the rates will be paid at the landfill on the per ton basis, regardless of whether the waste is residential or commercial. Hauling/collection fees are not included in the tipping fee for private haulers – this is an additional charge, which is not regulated or administered by the DPW. If residential collection is privatized, a similar arrangement will result. The actuarial analysis conducted by the PUC will set the residential user fee. Administrative costs for managing the SWMF and procurement of contracted services are incorporated in the existing DPW budget; additional personnel needed to administer the program have been incorporated into the program costs.

**8) Has DPW met with FEMA or the military to discuss the possibilities of cost sharing portions of the new landfill?**

No. At this time, DPW has not had discussions with FEMA or the military. Such discussions can be conducted once the scope of the new landfill is more clearly defined, with any cost sharing

arrangements worked incorporated into subsequent revisions of the plan. DPW and GEPA will continue their dialogue with FEMA and the military to explore possible contributions to the financing of jointly used facilities.

### 9) Please provide the basis for the wetlands mitigation cost estimate of $10,000,000 ($100,000 per acre times 100 acres).

Conservative estimates of impacted wetlands at both the Ordot site and worst-case of the three prospective landfill sites were used to arrive at the potential mitigation area, applying a ratio of impacted wetlands to created wetlands of 1:2. The estimated area of Ordot wetlands impacted is 15 acres and the estimated area of wetlands impacted for the Sabanan Batea site is 35 acres. Applying the ratio yields a potential area of 100 acres.

### 10) Are assumptions about special activity bonds interest rates affected by the expected large increase in the number of AMT taxpayers in the near future? That is, do you expect bond interest rates to rise as fewer taxpayers qualify to deduct private activity bond interest?

No. The reduced number of taxpayers qualified to deduct private activity bond interest is not anticipated to affect the interest rates as the bonds will not be issued for purchase locally, but rather on an institutional level on the financial market. The Guam Economic Development and Commerce Authority (GEDCA) will be primarily responsible for the issuance of qualified private activity bonds and has the authority to engage financial consultants, bond agents and other professionals to facilitate the purchase of the bonds.

### 11) Section 4.2.1 notes that the federal government approved $100 million for solid waste disposal facility bonds. Which entity within the federal government provided this approval? Provide a copy of the approval by the federal agency.

Guam is allocated a fixed dollar amount of potential Qualified Private Activity Bonds by the Internal Revenue Service each year ($200 Million). The authorized agency within the Government of Guam – GEDCA - must apply to the IRS for this allocation each year and specify the nature of the use of potential bond issuances that qualify for the "tax-exempt" private activity status. The IRS has already approved $100 Million in prior years to be used for solid waste facilities under this QPAB status. DPW has requested documentation from GEDCA relating to this approval. The response received is attached.

### 12) How will DPW raise revenue for these projects if the bond financing and/or DBOT contract are not successful? Does Guam have a contingency plan (the development of an import tax)?

The broad authority granted by the creation of the "tipping and user fees" to fund the Solid Waste Management Fund, and the protection of those funds by the restrictions on their use make the pursuit of bond financing very feasible. The Financial Plan presents several options for financing, including QPABs, General Obligation Bonds and direct appropriations. The latter two remain contingent options, while the former is the preferred financing method.

The stability of a PUC regulated fee based on the actual cost of service and the existing legislative authority for the privatization of solid waste management operations, coupled with a captive market with no disposal alternatives, make the DBOT concept an attractive contract vehicle. However, in the event that these options are not successful, the Government of Guam has the option of pursuing legislated increases in real property taxes or creation of an import tax to fund the annual capital outlay required for the program elements. This information has been

included in the Financial Plan.

**13) Will it be too inefficient (and costly) if the preliminary design is completed by one firm and the full design/construction by another? Is it likely that the second firm will prefer to do a completed redesign? At a minimum, all design assumptions, drawings and electronic data should be provided to the second firm.**

No. The Design-Build-Operate-Transfer contract vehicle is a well established method of achieving fast-track design and construction with the benefit of utilizing private sector financial capabilities in situations where municipalities or other organizations would be hard pressed to obtain financing necessary to quickly complete the project. The development of a preliminary design prior to the issuance of the DBOT contract is typical for this contracting method and is desirable for the following reasons: ·
   1. It allows the owner to establish the development program, project design and construction criteria and constraints, general design plans and specifications in order to adequately convey the intent of the project to the prospective bidders;
   2. It affords sufficient information to the bidders to develop accurate and efficient bids;
   3. It provides a baseline of design data for the completion of the design.
   4. The preliminary design is still general enough to allow for flexibility and the incorporation of innovative design and construction techniques in the completion of the design phase.
Under this contracting method, it is not likely that the DBOT team would "redesign" from the ground up. Those elements of the design subject to change would be changed; those required to meet the design intent and critical to the overall program requirements would be fully developed to complete the design. All preliminary design data, drawings and specifications would be made available to the DBOT team.

**14) What is the timing and hiring of the Consent Decree Staff (Group C)?**

The additional positions for the additional staff necessary to manage the implementation of these program elements are funded under the FY2005 budget. Advertising and hiring were begun soon after the publication of the draft plan. Several positions have been filled as of the beginning of FY 2005.

**15) Due dates must be added to the three tables of Section 6-3.**

Dates were added to the tables.

**16) The status of each of the items discussed in the Financial Plan must be included in the quarterly progress reports.**

The quarterly report will include status updates on these items.

**17) Who will be the DPW lead for the activities discussed in the Financial Plan (e.g., working with GEDCA on bonds, Section 6.2.3)?**

The DPW lead for the implementation of the Financial Plan will be Marc Gagarin, P.E., Chief Engineer.

**18) The Financial Plan must include the certification statement found in paragraph 42 of the Consent Decree.**

The certification has been incorporated into the Financial Plan.

# ATTACHMENT 4



GOVERNOR
Felix P. Camacho
LT. GOVERNOR
Kaleo S. Moylan



**public works**
DIPATTAMENTON CHE'CHO' POPBLEAO

ACTING DIRECTOR
Joseph W. Duenas

DEPUTY DIRECTOR
Michael C. James

Mr. Ben Machol
Manager, Pacific Islands Office (CMD-6)
U. S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105

Dear Ben,

Pursuant to further compliance to the CONSENT DECREE; CIVIL CASE No. 02-00022, The Government of Guam herewith presents the reports required as ordered, adjudged and decreed item numbered: part (a) of paragraph 9: Construction and Operation of New Municipal Solid Waste Landfill ("MSWLF").

# CERTIFICATION   STATEMENT

I certify under penalty of law that I have examined and am familiar with the information submitted in this document and all attachments and that this document and its attachments were prepared either by me personally or under my direction or supervision in a manner designed to ensure that qualified and knowledgeable personnel properly gathered and presented the information contained therein. I further certify, based on my personal knowledge or on my inquiry of those individuals immediately responsible for obtaining the information, that the information is true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing and willful submission of a materially false statement.

JOSEPH W. DUENAS
DEPARTMENT OF PUBLIC WORKS

1/31/05
DATE

FRED M. CASTRO
GUAM ENVIRONMENTAL PROTECTION AGENCY

1/31/05
DATE

542 North Marine Drive, Tamuning, Guam 96913 • Tel (671) 646-3131 / 3259 • Fax (671) 649-6178




GOVERNOR
Felix P. Camacho
LT. GOVERNOR
Kaleo S. Moylan

**public works**
DIPATTAMENTON CHE'CHO' PUPBLEKO

ACTING DIRECTOR
Joseph W. Duenas
DEPUTY DIRECTOR
Michael C. James

Mr. Ben Machol
Manager, Pacific Islands Office (CMD-6)
U. S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105

RE: Guam Landfill Site Selection

Dear Ben,

Pursuant to the CONSENT DECREE; CIVIL CASE No. 02-00022, The Government of
Guam would like to announce its preferred alternative site for Guam's new Municipal
Solid Waste Landfill Facility ("MSWLF"). The ongoing Environmental Impact
Statement and site selection process is being performed in compliance with part (a),
paragraph 9: Construction and Operation of New Municipal Solid Waste Landfill
("MSWLF") of the Consent Decree.

A Landfill Site Evaluation Team ("LSET") was assembled by the Government of Guam
to review the Preliminary Site Selection Report, dated January 11, 2005, and formulate a
site selection recommendation for the preferred alternative. The LSET has recommended
that the Dandan site, located in Inarajan, Guam, be the preferred location for Guam's new
MSWLF.

Attached is the Municipal Solid Waste Landfill Site Evaluation Report, which details the
work performed by the LSET along with other information reviewed by the LSET prior
to formulating a site selection recommendation.

We look forward to your review and concurrence with the alternative as we continue to
meet consent decree compliance deadlines.

JOSEPH W. DUENAS
Director, Department of Public Works

1/31/05
DATE

Landfill Site Selection
Page 2

_(signature)_                                    1/31/05

FRED M. CASTRO                                    DATE
Administrator, Guam Environmental Protection Agency

Cc:    Honorable Felix P. Camacho, Governor
       Douglas B. Moylan, Attorney General

Enclosures(s):    MSWLF Site Evaluation Report
                  Preliminary Site Selection Report Amendments

# Municipal Solid Waste Landfill (Guam)
## Site Evaluation Report
### January 26, 2005

## Introduction

Seven members of the Consent Decree[1] project team from the Department of Public Works (DPW) and Guam Environmental Protection Agency (GEPA) were empanelled as a Landfill Site Evaluation Team (LSET).  The LSET reviewed the Preliminary Site Selection Report (PSSR)[2] and related information to evaluate three candidate sites as required by paragraph 9.a. of the Consent Decree during the week of January 24, 2005.  Initial efforts to site a new landfill began in February of 2004 with the Preliminary Landfill Site Suitability study conducted by GEPA and DPW.

This report summarizes the efforts of the LSET to identify a preferred landfill site based on the relevant available scientific and technical data from preliminary site investigations, existing studies, and stakeholder input.  This site evaluation is an integral component of the Environmental Impact Statement for the siting of a Municipal Solid Waste Landfill Facility (MSWLF) in Guam.

The primary goal in siting a MSWLF is to select a location which will pose the least environmental impact to onsite resources, adjacent properties, to the host community, and regionally.  Impacts to the human, biological and physical environment, including infrastructure, were assessed by applying thirty-nine environmental/landfill development siting criteria to each candidate site.

The results of this evaluation are summarized as total scores and rank order in the table below. The LSET determined that the Dandan candidate site located in the Municipality of Inarajan is best suited for the development of a MSWLF.  A decision on the location of Guam's new MSWLF will be made by the Director of DPW with the concurrence of the Administrator of GEPA and approval by the U.S. Environmental Protection Agency.

## Evaluation Process

The LSET evaluation process involved a four-step facilitated discussion format:

---

[1] Civil Case No. 02-00022 Consent Decree U.S. District Court Territory of Guam
[2] Preliminary Site Selection Report Environmental Impact Statement For the Siting of a Municipal Solid Waste Landfill Facility, Guam January 11, 2005

Municipal Solid Waste Landfill Site Evaluation Report, January 28, 2005
Page 3

## Results

The LSET completed the evaluation component of its work by requiring that each
member evaluate and formally score the three candidate sites and that a the
cumulative points assigned would determine the final rank.  The site given the
highest total points would be ranked as the best potential landfill site.   The
following table summarizes the evaluation results.

Table 1. Total Score and Rank of Candidate Landfill Sites

| Site | Dandan | Sabanan Batea | Lonfit |
|------|--------|---------------|--------|
| Total Score | 2552 | 2094 | 1898 |
| Rank | 1 | 2 | 3 |

**Landfill Site Evaluation Team (LSET)**

_(signature)_                                         1/31/05
C. Omar Damian, E.I.T. Project Manager, GEPA          Date

_(signature)_                                         1/31/05
Sonya P. Dancoe, Project Engineer, DPW                Date

_(signature)_                                         1/31
Marc A. Gagarin, P.E. Chief Engineer, DPW             Date

_(signature)_                                         1/31/05
Michael J. Gawel, Acting Chief Planner, GEPA          Date

_(signature)_                                         1/31/05
Cynthia U. Jackson, Project Manager, DPW              Date

# ATTACHMENT 5



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 9**
**75 Hawthorne Street (CMD-6)**
**San Francisco, CA 94105**

February 14, 2005

### Via Email and Facsimile

Joseph W. Duenas, Director
Department of Public Works
542 North Marine Drive
Tamuning, GU 96911

### Re:   U.S. EPA Acceptance of DPW's Preferred Landfill Site

Dear Mr. Duenas:

At this time the Environmental Protection Agency, Region 9 (EPA) is recognizing that the
Department of Public Works (DPW) has met its obligations under Paragraph 9.a. of the Consent
Decree. This letter notifies you that EPA accepts the Government of Guam's preferred landfill
site, Dandan.

Under Paragraph 9.a. of the Consent Decree, DPW shall, within 300 days: a) complete an
Environmental Impact Statement (EIS) that includes a detailed analysis and comparison of at
least three potential landfill sites and b) identify a preferred landfill site. As discussed in Fred
Castro's letter of August 5, 2004, the EIS process now consists of two distinct phases, a site
selection process followed by a more detailed analysis of mitigation options for the selected site.
As noted in EPA's November 30, 2004 letter, EPA determined that DPW would comply with
Paragraph 9.a. of the Consent Decree when it identified a preferred site alternative after the first
phase of the EIS. Based on the August 5, 2004 letter, this would occur after the Preliminary Site
Selection Report is: a) made available to the public, b) presented at three public meetings, and c)
reviewed by the Technical Advisory Committee.

On January 31, 2005, DPW submitted, via fax, a letter announcing that the Government of Guam
has selected Dandan, in the village of Inarajan, as the preferred location. The fax also included a
summary of comments received during the public comment period, amendments to the
Preliminary Site Selection Report, and a site evaluation report. The material presented with the
fax, in addition to the original Preliminary Site Selection Report dated January 11, 2005,
demonstrates that DPW and Guam EPA were very thorough in their evaluation of the three sites.

EPA recently received a draft petition supporting the elimination of Dandan as a potential landfill
site. The draft petition raises issues similar to those discussed in the public comment period and
subsequently addressed, namely: water resource concerns, existing local laws, mitigation costs,
roadway constraints, tourism impacts, and effects on quality of life. While there may be
concerns of a similar or greater magnitude for landfill sites anywhere on Guam (e.g., above the
Northern aquifer, on active faults, on sites with poor soil characteristics), these comments remind
us all of the heavy burden that DPW and Guam EPA face. The Government of Guam is tasked

with the very difficult duty of ensuring that the new landfill is properly planned (including mitigation), constructed, and, ultimately, maintained. To ensure success, Guam must similarly develop and implement a comprehensive solid waste plan that integrates collection, transfer, processing, recycling, composting, and all other aspects of solid waste management. Only with an effort of this magnitude can Guam ensure that: 1) the new landfill will not devolve into the next Ordot Dump, 2) the residents of Inarajan will not be overly impacted by Guam's siting decision, and 3) the new landfill will last for many years to come.

With the above considerations in mind, EPA finds that DPW and Guam EPA have conducted a detailed analysis and comparison of three sites, and have met their commitments for the first phase of the EIS. Therefore, EPA accepts DPW's decision to select Dandan as the site of the new municipal solid waste landfill. We expect that DPW and Guam EPA will proceed to analyze mitigation options for the Dandan site under the second phase of the EIS, and submit a draft plan for design, construction, and operation of the new municipal solid waste landfill pursuant to Paragraph 9.c. of the Consent Decree.

Please call me at (415) 972-3770 if you would like to discuss this matter further.

Sincerely,

Rn Muhl

Ben Machol
Guam Program Manager, P.E.

cc:     Douglas Moylan, Attorney General of Guam
        Fred Castro, Guam EPA Administrator
        Mikel Schwab, Assistant U.S. Attorney