ORIGINAL

1  MATTHEW J. MCKEOWN
   Acting Assistant Attorney General
2  Environment & Natural Resources Division
   ROBERT D. MULLANEY
3  Environmental Enforcement Section
   United States Department of Justice
4  301 Howard Street, Suite 1050
   San Francisco, California 94105
5  Tel: (415) 744-6483
   Fax: (415) 744-6476
6
   LEONARDO M. RAPADAS
7  United States Attorney
   MIKEL W. SCHWAB
8  Assistant United States Attorney
   Suite 500, Sirena Plaza
9  108 Hernan Cortez
   Hagåtña, Guam 96910
10 Tel: (671) 472-7332
   Fax: (671) 472-7215
11
   Attorneys for United States of America
12

13

14              IN THE UNITED STATES DISTRICT COURT

15                 FOR THE TERRITORY OF GUAM

16

17
   UNITED STATES OF AMERICA,           )   CIVIL CASE NO. 02-00022
18                                      )
                        Plaintiff,      )
19                                      )   UNITED STATES' THIRD
              v.                        )   SUBMISSION OF AUTHORITIES
20                                      )   AND OTHER REFERENCES
                                        )
21 GOVERNMENT OF GUAM,                  )   Date:  March 8, 2007
                                        )   Time:  9:00 a.m.
22                      Defendant.      )
   _____)
23

24

25

26

27

28

**FILED**
DISTRICT COURT OF GUAM

FEB 21 2007  nba

MARY L.M. MORAN
CLERK OF COURT

| 1 | Pursuant to GR 4.1, the United States hereby submits a copy of cited authorities and other |
| 2 | references from its Opposition to Defendant's Motion to Modify Consent Decree that may not be |
| 3 | available in the Court's library or the Guam Territorial Law Library. |

**CASES AND AUTHORITIES**

1.  Plata v. Schwarzenegger, 2005 WL 2932253 (N.D. Cal. 2005)

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

Dated: _2/21/07_

MIKEL W. SCHWAB
Assistant U.S. Attorney

OF COUNSEL:

JULIA JACKSON
Assistant Regional Counsel
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, California 94105

## Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Plata v. SchwarzeneggerN.D.Cal.,2005.Only the
Westlaw citation is currently available.
United States District Court,N.D. California.
Marciano PLATA, et al., Plaintiffs,
v.
Arnold SCHWARZENEGGER, et al., Defendants.
**No. C01-1351 TEH.**

Oct. 3, 2005.

Donald Howard Specter, Sara Linda Norman,
Steven Fama, San Quentin, CA, Caroline N.
Mitchell, Shawn Hanson, Jones Day, Warren E.
George, Bingham McCutchen LLP, San Francisco,
CA, John Morrisey, Bingham McCutchen LLP, Los
Angeles, CA, for Plaintiffs.
Jerrold C. Schaefer, Paul Brian Mello, Hanson,
Bridgett, Marcus, Vlahos & Rudy, LLP, Jonathan
L. Wolff, Attorney General's Office, San Francisco,
CA, Maria G. Chan, Attorney General's Office,
Sacramento, CA, for Defendant.

*FINDINGS OF FACT AND CONCLUSIONS OF
LAW RE APPOINTMENT OF RECEIVER*
HENDERSON, J.

### INTRODUCTION

**\*1** On June 30, 2005, after six days of evidentiary
hearings, this Court ruled from the bench that it
would establish a Receivership to take control of
the delivery of medical services to all California
state prisoners confined by the California
Department of Corrections and Rehabilitation ("
CDCR"). The purpose of this written decision is to
amplify upon this Court's June 30, 2005 oral ruling
by providing the specific Findings of Fact and
Conclusions of Law that underlay this decision, as
well as to address further proceedings in this case.

**\*1** By all accounts, the California prison medical

care system is broken beyond repair. The harm
already done in this case to California's prison
inmate population could not be more grave, and the
threat of future injury and death is virtually
guaranteed in the absence of drastic action. The
Court has given defendants every reasonable
opportunity to bring its prison medical system up to
constitutional standards, and it is beyond reasonable
dispute that the State has failed. Indeed, it is an
uncontested fact that, on average, an inmate in one
of California's prisons needlessly dies every six to
seven days due to constitutional deficiencies in the
CDCR's medical delivery system. This statistic,
awful as it is, barely provides a window into the
waste of human life occurring behind California's
prison walls due to the gross failures of the medical
delivery system.

**\*1** It is clear to the Court that this unconscionable
degree of suffering and death is sure to continue if
the system is not dramatically overhauled. Decades
of neglecting medical care while vastly expanding
the size of the prison system has led to a state of
institutional paralysis. The prison system is unable
to function effectively and suffers a lack of will with
respect to prisoner medical care.

**\*1** Accordingly, through the Court's oral ruling and
with this Order, the Court imposes the drastic but
necessary remedy of a Receivership in anticipation
that a Receiver can reverse the entrenched paralysis
and dysfunction and bring the delivery of health
care in California prisons up to constitutional
standards. Once the system is stabilized and a
constitutionally adequate medical system is
established, the Court will remove the Receiver and
return control to the State. Progress toward that goal
will be enhanced and quickened by the support of
the defendants. Fortunately, the Court is confident
that the leaders of the State prison system recognize
the gravity of the problem and are committed to
facilitating the Receivership.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

### PROCEDURAL BACKGROUND

**\*1** Plaintiffs filed this class action on April 5, 2001, alleging that defendants were providing constitutionally inadequate medical care at all California state prisons.[FN1] Defendants agreed to enter into a consent decree and to implement comprehensive new medical care policies and procedures at all institutions. *See* June 13, 2002 Stipulation for Injunctive Relief. The Stipulated Injunction provides in part: "The Court shall have the power to enforce the Stipulation through specific performance and all other remedies permitted by law." It also provides that it "shall be binding upon, and faithfully kept, observed, performed and be enforceable by and against the parties." *Id.* at 14. Defendants also agreed to the court appointment of medical and nursing experts to assist with the remedial process. *See* June 13, 2002 Order Appointing Experts.

> FN1. This suit exempts Pelican Bay State Prison, which is under Court jurisdiction in the case of *Madrid v. Woodford,* No. C90-3094 TEH. *See* June 13, 2002 Stipulation for Injunctive Relief at 3-4.

**\*2** Defendants were ordered to implement new policies and procedures on a staggered basis, with seven prisons to complete implementation in 2003, and five additional prisons for each succeeding year until state-wide compliance is achieved. The Court Experts submitted a report on July 16, 2004 which found an "emerging pattern of inadequate and seriously deficient physician quality in CDC facilities." July 16, 2004 Report (part 2) at 1. In response, defendants agreed to address the very serious issues identified in the report through a Stipulated Order re Quality of Patient Care and Staffing, which this Court approved on September 17, 2004 ("Patient Care Order"). The Patient Care Order required defendants to engage an independent entity to (a) evaluate the competency of physicians employed by the CDCR and (b) provide training to those physicians found to be deficient. It also required defendants to undertake certain measures with respect to the treatment of high-risk patients, to develop proposals regarding physician and nursing

classifications and supervision, and to fund and fill Quality Management Assistance Teams ("QMAT") and other support positions. Defendants failed to come close to meeting the terms of the Patient Care Order, even with generous extensions of time from the Court.

**\*2** On May 10, 2005, this Court issued an Order to Show Cause ("OSC") as to (1) why a Receiver should not be appointed to manage health care delivery for the CDCR until defendants prove that they are capable and willing to do so without Court intervention, and (2) why defendants should not be held in civil contempt of this Court's prior orders. On May 31, and June 1-2 and 7-9, 2005, the Court conducted an evidentiary hearing in which the parties presented evidence relating to the OSC. That evidence took the form of testimony from the Court Experts, state employees in positions critical to the prison medical system, and the state's medical consultant, as well as eighty-two exhibits.

**\*2** On May 17 and June 1, 2005, the Court received correspondence from the president of the Service Employees International Union ("SEIU") Local 1000, on behalf of SEIU and other unions representing state prison medical personnel, asking to participate in the evidentiary hearings. The Court responded by inviting the unions to submit an amicus brief.

**\*2** The parties subsequently submitted legal briefs addressing the issues of contempt and Receivership in light of the evidence elicited at the hearing, and the unions filed an amicus brief. On June 30, 2005 the Court held a hearing on the OSC. Based on the arguments of counsel, the evidence presented, the full record in this case, and the Court's own observations on prison tours, the Court delivered an oral ruling at the conclusion of the hearing that it would take control of the medical delivery system of the CDCR and place it under the auspices of a Receivership. This Order is consistent with that ruling and provides a full discussion of the Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

### A. Background

**\*3** 1. Over the past 25 years, the California correctional system has undergone a vast expansion in size and complexity. Ex. 42 at 1 (Governor's Reorganization Plan 2-"A Government for the People for a Change: Reforming California's Youth and Adult Correctional System"). Since 1980, the inmate population has grown well over 500 percent and the number of institutions has nearly tripled from 12 to 33. *Id.* Currently, the CDCR has approximately 164,000 inmates, 114,000 parolees, and 45,200 employees. Id. at 1, 3.

**\*3** 2. Defendants concede that this rapid growth of the correctional system was not accompanied by organizational restructuring to meet increasing system demands and that it requires fundamental reform in a variety of areas, including management structure, information technology and health care services in order to function effectively and in compliance with basic constitutional standards. *Id.* at 6-7.

**\*3** 3. A prevailing lack of accountability within California's struggling correctional system has resulted in a failure to correct basic problems and an increase in tell-tale signs of dysfunction. *Id.* at 5. The CDCR has functioned for years under a decentralized structure in which individual wardens wielded extensive independent authority in determining prison standards and operating procedures. *Id.* These "operational silos" resulted in a lack of accountability and responsibility among the various institutions. *Id.*

**\*3** 4. In the area of health care services, the consequences of system expansion without reform have been shocking. The Department's annual health care budget has risen to over $1 billion. Ex. 41 at 103 (06/04 "Reforming Corrections"-Report of the Corrections Independent Review Panel, Chapter 6-Risk Management and Care). The CDCR's spending on health care is so poorly managed, however, that this increase in budget has been tantamount to throwing good (taxpayer) money after bad.

### B. Defendants' Failure to Provide Constitutionally Adequate Medical Care has Caused Plaintiffs Extreme Harm

**\*3** 5. As required by the Court's June 13, 2002 Stipulation for Injunctive Relief, the Court's Medical Experts visited nine prisons that had begun implementation of the Inmate Medical Policies and Procedures. Reporter's Transcript of Evidentiary Hearing ("RT") 263:9-14 (LaMarre); RT 28:19-22 (Puisis); RT 339:11-340:10 (Goldenson). As set forth in their reports, the Experts concluded that defendants' failure to implement the required remedies had the effect of placing CDCR prisoners at serious risk of harm or death. *See, e.g.,* Exs. 51-64 and 95 (reports by Court Experts regarding conditions in various prisons). The extensive and disturbing findings of the Expert's reports are essentially uncontested, and the Court finds that they accurately describe an extreme crisis in CDCR's medical delivery system.

### (1) Lack of Medical Leadership

**\*3** 6. The leaders of the CDCR medical system lack the capability and resources necessary to deliver adequate health care, much less fix the abysmal system that now exists. Dr. Rene Kanan, Acting Director of Health Care Services for the CDCR, testified that the CDCR lacks an adequate system to manage and supervise medical care, both in the central office and at nearly all of its prisons. RT 572:1-5 (Kanan).

**\*4** 7. Indeed, Undersecretary of Corrections Kevin Carruth testified that medical care simply is not a priority within the CDCR, is not considered a "core competency" of the Department, and is "not the business of the CDC, and it never will be the business of the Department of Corrections to provide medical care." RT 554: 4-15. Mr. Carruth could not even estimate when significant improvements to the system might be made if the State were left to its own devises. RT 549:1-4 (Carruth); RT 571:11-22 (Kanan).

**\*4** 8. In order to implement medical care policy, Dr. Kanan must seek assistance from non-medical

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

administrators with higher authority. RT 727:22-729:7 (Rougeux). To make matters worse, many prison medical staff believe that the warden is their "real boss" even though organization charts indicate that medical staff report to Dr. Kanan. RT 243:3-16 (Puisis). The Court finds, as defendants' own expert consultant Dr. Ronald Shansky testified, that the Deputy Director is inhibited "internally, organizationally," and in her dealings with external governmental organizations to implement Court Orders because the Deputy Director lacks the perceived and ultimate authority over the health care program. RT 671:14-672:15 (Shansky).

**\*4** 9. Furthermore, central office staff do not have the tools they need to handle the vast quantity of information necessary to manage a billion dollar, 164,000 inmate system. RT 545:8-546:10 (Carruth). Data management, which is essential to managing a large health care system safely and efficiently, is practically non-existent. RT 138:8-139:4; 140:3-9 (Puisis). The CDCR's system for managing appointments and tracking follow-up does not work. RT 140:12-24 (Puisis). These data management failures mean that central office staff cannot find and fix systemic failures or inefficiencies. As just one of innumerable examples, there are patients in the general prison population who need specialized housing, but the CDCR does not track them and headquarters staff is unaware of how many specialized beds are needed. Ex. 48 at 4.

**\*4** 10. The CDCR is aware of the actions required to improve the prison health care system, but its leaders have not been able to address issues requiring systemic change. RT 390:19-391:22 (Goldenson), RT 152:23-154:5 (Puisis). For example, although the Experts noted repeatedly in reports to the CDCR headquarters staff that the health care delivery system in San Quentin posed "a risk of imminent harm and death to patients," it took a year for the CDCR to take notice, due in part to a " lack of resource capacity in the Health Care Services Division to address problems at multiple sites." Ex. 56 at 1 (04/09/05 Expert LaMarre's Report on San Quentin State Prison from February 7-8, 2005 Visit). Dr. Kanan frankly testified that the CDCR lacks an adequate system to manage and supervise medical care. RT 572:1-5 (Kanan).

**\*4** 11. The State reorganized the prison system into a new organizational structure effective July 1, 2005. Ex 86 (Department of Corrections and Rehabilitation Organization Chart). While the new structure holds promise for some improvements in the Department, it fails to provide sufficient authority to the medical leadership, and may well exacerbate the problems that currently exist. RT 677:8-14 (Shansky). The highest ranking health care operations director is several levels down from the Secretary in the organizational hierarchy, and thus does not have sufficient authority. RT 670:11-19 (Shansky); RT 149:18-152:1 (Puisis). The new organization also splits health care operations and policy, thereby creating unnecessary room for conflict and inefficiency. RT 677:15-23 (Shansky).

**\*5** 12. The Court finds that the CDCR leadership simply has been-and presently is-incapable of successfully implementing systemic change or completing even minimal goals toward the design and implementation of a functional medical delivery system.

### (2) Lack of Qualified Medical Staff

#### a. Medical Administrators

**\*5** 13. Of the higher level management positions in the CDCR's Health Care Services Division, *80% are vacant,* making effective supervision or management impossible. RT 572:6-8 (Kanan); RT 543:10-16 (Carruth). This is akin to having a professional baseball team with only a relief pitcher and no infielders.

**\*5** 14. Furthermore, the CDCR has not hired regional medical directors as ordered. RT 392:20-25 (Goldenson). These regional medical directors are needed to provide supervision of medical staff at the institutional level. RT 93:11-94:17 (Puisis). Court Expert Goldenson accurately described the absence of regional management, coupled with incompetent prison staff, as resulting in "the blind leading the blind." RT 387:21-388:10 (Goldenson).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

**\*5** 15. There also is no central office leadership in nursing. This makes it difficult to initiate and ensure compliance with nursing policy and practice. Ex. 48 at 6 (07/09/04 Plata Experts' Second Report, Part One); RT 270:1-17 (LaMarre). Moreover, there is a severe shortage of nursing supervisors at the prisons. RT 274:12-19 (LaMarre).

#### b. Physicians

**\*5** 16. The CDCR sorely lacks sufficient qualified physicians to provide adequate patient care to prisoners. While there certainly are some competent and dedicated doctors working within the system, they are unable to service even a fraction of the entire prisoner population. RT 682:14-22 (Shanksy). Many other CDCR physicians are inadequately trained and poorly qualified as, for many years, CDCR did not have appropriate criteria for selecting and hiring doctors. RT 669:4-17 (Shansky). Dr. Shansky testified that historically the CDCR would hire any doctor who had "a license, a pulse and a pair of shoes." RT 669:7-9 (Shanksy). According to Dr. Puisis, 20-50% of physicians at the prisons provide poor quality of care. RT 51:17-19 (Puisis). Many of the CDCR physicians have prior criminal charges, have had privileges revoked from hospitals, or have mental health related problems. Ex. 49 at 3 (07/16/04 Plata Experts' Second Report, Part Two); Ex. 54 at 1 (03/17/05 Email from Expert Puisis re: Visit to Substance Abuse Treatment Facility State Prison (" SATF")). An August 2004 survey by CDCR's Health Care Services Division showed that approximately 20 percent of the CDCR physicians had a record of an adverse report on the National Practitioner Databank, had a malpractice settlement, had their license restricted, or had been put on probation by the Medical Board of California. RT 580:1-7 (Kanan). The Court Experts testified that the care provided by such doctors repeatedly harms prisoner patients. RT 350:18-355:21 (Goldenson); RT 51:12-13 (Puisis). The Court finds that the incompetence and indifference of these CDCR physicians has directly resulted in an unacceptably high rate of patient death and morbidity.

**\*6** 17. Inadequate medical care in CDCR is due not

merely to incompetence but, at times, to unprecedented gross negligence. RT 366:25-367:4 (Goldenson). Indeed, the evidence from multiple sources establishes that medical care too often sinks below gross negligence to outright cruelty. Ex. 54 at 1; RT 74:6-75:8 (Puisis).

**\*6** 18. The Court will give just a few representative examples from the testimonial and documentary evidence. In one instance, a prisoner reported a two to three week history of fever and chills and requested care. RT 346:9-10 (Goldenson). The prisoner repeatedly visited medical staff with an increasingly serious heart condition but was consistently sent back to his housing unit. RT 347:1-19 (Goldenson). Eventually, the patient received a correct diagnosis of endocarditis, a potentially fatal heart condition treatable with antibiotics, but did not get appropriate medication. *Id.* Finally, the prisoner went to the prison emergency room with very low blood pressure, a high fever and cyanotic (blue) fingertips, indications of seriously deficient blood flow and probable shock. RT 347:20-25; 350:3-10 (Goldenson). Despite the objections of a nurse who recognized the severity of the prisoner's condition, the physician attempted to return the patient to his housing unit without treatment. RT 348:1-5 (Goldenson). Rather than being sent to a community hospital emergency room for immediate treatment, as would have been appropriate, the patient was sent to the prison's Outpatient Housing Unit for observation. RT 348:7-12 (Goldenson). He died shortly thereafter from cardiac arrest. *Id.* Dr. Goldenson found that this course of treatment was " the most reckless and grossly negligent behavior [he had] ever seen by a physician." RT 350:21-24; Ex. 80 at 4 (10/09/04 Investigation into Patient Death).

**\*6** 19. In another example, a prisoner repeatedly requested to see a doctor regarding acute abdominal and chest pains; the triage nurse canceled the medical appointment, thinking the prisoner was faking illness. RT 63:10-20 (Puisis). When the prisoner requested transfer to another prison for treatment, his doctor refused the request without conducting an examination. RT 63:21-24 (Puisis). A doctor did see the prisoner a few weeks later but refused to examine him because the prisoner had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:02-cv-00022    Document 99    Filed 02/21/2007    Page 7 of 16

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

arrived with a self-diagnosis and the doctor found this unacceptable. RT 63:25-64:7 (Puisis); Ex. 54 at 1. The prisoner died two weeks later. RT 64:11-12 (Puisis). Sixty-two grievances had been filed against that same physician, but when interviewed by the Court Expert, the physician advised that most of the prisoners she examined had no medical problems and were simply trying to take advantage of the medical care system. Ex. 54 at 1.

**\*6** 20. In a further example, in 2004 a San Quentin prisoner with hypertension, diabetes and renal failure was prescribed two different medications that actually served to exacerbate his renal failure. RT 64:13-19 (Puisis). An optometrist noted the patient's retinal bleeding due to very high blood pressure and referred him for immediate evaluation, but this evaluation never took place. RT 65:3-7 (Puisis). It was not until a year later that the patient's renal failure was recognized, at which point he was referred to a nephrologist on an urgent basis; he should have been seen by the specialist within 14 days but the consultation never happened and the patient died three months later. RT 64:22-65:4 (Puisis). Dr. Puisis testified that "it was like watching the natural history of high blood pressure turn into chronic renal failure somewhat similar to the Tuskegee experiment." RT 65:8-14 (Puisis).

**\*7** 21. Defendants have made some efforts to identify and remove from patient care those practitioners believed to be providing substandard care; in 2004, twelve such doctors were removed. RT 595:10-21 (Kanan). The Quality In Corrections Medical ("QICM") program, developed in conjunction with the Court Experts, Dr. Kanan, Dr. Shansky, and the University of California at San Diego ("UCSD"), seeks to evaluate the work of identified CDCR physicians in order to improve and assure physician quality. RT 606:25-609:6 (Kanan). However, QICM has encountered considerable obstacles to implementation and as of yet has not satisfactorily addressed the problems of incompetence and indifference. RT 539:7-13.

### (I) Death Reviews

**\*7** 22. Death reviews provide a mechanism for medical delivery systems to identify and correct problems. RT 37:7-11 (Puisis); RT 367:10-17 (Goldenson). These reviews should determine whether there has been a gross deviation from the adequate provision of care and whether the death was preventable. RT 342:14-344:20 (Goldenson). These reviews should be conducted even when death is expected, such as with a terminal condition, to determine if appropriate care has been provided. *Id.; see also* RT 587:2-7 (Kanan).

**\*7** 23. Expert review of prisoner deaths in the CDCR shows repeated gross departures from even minimal standards of care.[FN2] In 2004, the Court Experts and Dr. Shansky reviewed approximately 193 deaths, the majority from August 2003 to August 2004. These death reviews were the result of an Order of this Court after CDCR failed to perform the death reviews independently. RT 38:10-21 (Puisis); *see also* Ex. 34 (Report on death reviews conducted by Drs. Puisis, Goldenson, and Shansky in December 2004). These were only a portion of the backlogged death review cases. RT 38:22-24 and 195:12-17 (Puisis); *see also* 370:1-7 (Goldenson).

> FN2. As stated in the Stipulated Order, the Court applies a "community standard," i.e. the standard of care imposed under the laws of the State of California upon health care providers licensed to practice in California. *See* Stipulation for Injunctive Relief at 11 n. 3; *see also U.S. v. DeCologero,* 821 F.2d 39, 43 (1st Cir.1987) (defining constitutionally adequate medical services as being "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards"); *Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir.1990) (measuring standard of care under Eighth Amendment by " professional standards").

**\*7** 24. The Court Experts concluded, and the Court finds, that thirty-four of the deaths were serious and probably preventable. RT 42:21-24 (Puisis). CDCR

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932213 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

sent these thirty-four cases to physicians at UCSD for review. RT 370:22-371:1 (Goldenson). On May 31, 2005, the UCSD physicians provided reviews for 23 cases. RT 356:10-13 and 371:10-14 (Goldenson). In twenty cases, the UCSD physicians found serious errors that contributed to death. RT 372:2-9 (Goldenson); *see also* Ex. 84 (UCSD Physician Assessment and Clinical Education Program Review of CDC Death Records). The conclusions of the UCSD physicians confirmed that the medical care provided by the prison medical staff prior to the inmates' deaths was well below even minimal standards of care. Ex. 84. The reviewing physicians used the following language to describe some of their conclusions: "a gross" departure from the standard of care (Ex. 84, Case A at 2); "standard of care definitely not met" (Ex. 84, Case D at 17); "a number of deviations" and "a severe systemic problem" (Ex. 84, Case F at 24); "a gross departure" and "treatment ... far below the standard" (Ex. 84, Case I at 32); "the corrections medical system failed the patient" and the inmate " died of what quite likely was a preventible process" (Ex. 84, Case K at 39 & 41); "an egregious deviation" (Ex. 84, Case Q at 59; Case X at 85); "a fatal omission" and "a gross deviation" (Ex. 84, Case U at 74); "multiple gross deviations" (Ex. 84, Case W at 83). A Court Expert also testified: "You would not expect [ ] one death like this in a relatively large-sized facility for years. As an example, if I took one of the most problematic deaths that we reviewed, I don't think I saw one of these in my entire 20 years" experience in managing prison facilities. RT 44:7-13 (Puisis); RT 350:18-351:4 (deaths were the result of the "most reckless and grossly negligent behavior" he has ever seen) (Goldenson).

**\*8** 25. The Court will provide just one of many examples to illustrate the problems revealed by the death reviews. An inmate arrived at 4:30 a.m. at the prison infirmary due to complaints of shortness of breath and tiredness. Ex. 84, Case W at 2-3. About a week prior, the inmate had reportedly been swollen all over with a blood pressure of 150/126 and a heart rate of 100. The night before his death the inmate had been brought to the infirmary for very similar complaints. *Id.* The following morning at 6:00 a.m., the nurse and physician determined

that further care was unnecessary at that time and released the inmate from the infirmary. *Id.* On his return to the transport van, the inmate began staggering, went down on his hands and knees and went prone. *Id.* As the inmate was helped into the van, a medical provider told a correctional officer that the inmate "was fine and just needed sleep." *Id.* When the inmate arrived at his housing unit fifteen minutes later, he stumbled out of the van, went down on his hands and knees, then went prone and became unresponsive. *Id.* By 6:30 a.m., the inmate had no vital signs, and at 7:02 a.m. he was pronounced dead. *Id.* The UCSD physicians determined that there were "multiple gross deviations from the standard of care" in this case, including an inadequate monitoring of the inmate's diabetes and hypertension in the years before his death, a lack of concern for high blood pressure readings in the days and weeks before his death, the lack of a personal physician's evaluation of the inmate when he came to the infirmary, and the failure to diagnose or treat the congestive heart failure from which the inmate presumably died. Ex. 84, Case 22 at 3.

**\*8** 26. The Court Experts have made even further findings based on their reviews of additional death records beyond those sent to UCSD. In March 2005, a Court Expert reviewed the death files of ten prisoners at SATF prison and determined that at least seven deaths were preventible, and two more might have been preventible. Ex. 54 at 2. The Court Expert concluded that the care provided in most of the cases constituted medical incompetence. *Id.*

**\*8** 27. In February 2005, the Court Experts made similar conclusions regarding the review of ten deaths at San Quentin; most of the deaths had been preventible. Ex. 55 at 13. The Court adopts these uncontested expert findings regarding preventible deaths.

**\*8** 28. All of this information led Dr. Puisis to the uncontested conclusion, as referenced in the Introduction, that on average, every six to seven days one prisoner dies unnecessarily. RT 44:2-18, 86:8-13 (Puisis) ("based on estimates of deaths, there is probably one to two preventible deaths per site per year.").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

### (ii) Morbidity

**\*8** 29. The lack of adequate care in prisons also has resulted in a significant degree of morbidity to inmate-patients. RT 86:7-13 (Puisis); 372:14-373:14 (Goldenson). Morbidity is defined as any significant injury, harm or medical complication that falls short of death. RT 31:1-5 (Puisis).

**\*9** 30. In one instance, a physician's cruelty may have caused a prisoner to suffer paralysis. RT 74:6-75:8 (Puisis). The prisoner arrived at the clinic after a fight and was unable to move his legs. *Id.* As the patient had sustained a neck injury, the medical staff should have immobilized his neck to prevent further injury. *Id.* When the patient failed to respond as the doctor stuck needles in his legs, the doctor said that the patient was faking, and moved his neck from side to side, paralyzing the patient, assuming he was not already paralyzed. *Id.* Dr. Puisis termed his actions "fairly amazing" and cruel. *Id.*

**\*9** 31. In addition, the CDCR has a significant number of preventable acute care hospitalizations. RT 161:7-20 (Puisis). Due to the lack of appropriate care, the health of high risk chronic care patients is particularly compromised, and though such care may not lead to death, lives are markedly shortened. RT 372:14-373:2 (Goldenson). Considering the general risk to patients due to inadequate medical care, the unnecessary deaths are just "the tip of the iceberg." *Id.*

**\*9** 32. Given the Court's findings regarding inmate deaths, it should be no surprise that the Court also finds that there is an inordinately high level of morbidity among CDCR prisoners.

### c. Nurses

**\*9** 33. The evidence establishes beyond a doubt that the CDCR fails to provide competent nurses to fill the needs of the prison medical care system. According to the Court's nursing Expert, Maddie LaMarre, CDCR nurses often fail to perform basic functions and refuse to carry out specific physician's

orders. RT 279:16-280:6 (LaMarre). She also found that a number of nurses were not even certified in basic CPR. Ex. 53 at 10 (02/28/05 Expert LaMarre's Report on CSP-Sacramento from January 24-25, 2005). At certain prisons, nurses often fail to identify urgent medical issues that require immediate referral to a physician. RT 285:17-286:7 (LaMarre). Even where face-to-face triage is implemented, nurses often fail to take vital signs or conduct examinations. Ex. 56 at 4; RT 286:8-24 (LaMarre). Nurses then often fail to adequately assess patients and dispense appropriate over-the-counter medications for problems. RT 286:25-287:7 (LaMarre).

**\*9** 34. Additionally, the evidence shows that those nurses who fail to perform basic duties over an extended period of time are not disciplined. Ex. 62 at 10 (05/16/05 Experts' Report on Visit to Substance Abuse Treatment Center); RT 275:7-276:7 (LaMarre).

### (3) Lack of Medical Supervision

**\*9** 35. The Court finds that the lack of supervision in the prisons is a major contributor to the crisis in CDCR medical delivery.

**\*9** 36. At the institutional level, there are very few managers and supervisors that are competent. RT 386:9-23. (Goldenson). Thus, it is difficult to carry out central office directives. RT 94:5-8 (Puisis). Just five or six prisons have an adequate Chief Physician and Surgeon, and only one-third of the prisons have an adequate Health Care Manager. RT 578:7-579:2 (Kanan). For example, the Experts report that San Quentin is "a completely broken system bereft of local medical leadership." Ex. 55 at 9.

**\*10** 37. A large part of the problem is simply a lack of personnel and a chronic high vacancy rate. Ex. 51 at 2 (02/18/05 Expert LaMarre's Report on Salinas Valley State Prison from January 26-27, 2005 Visit); Ex. 55 at 11; Ex. 60 at 1 (05/04/05 Email from Expert Puisis re: Experts' concerns from visit to Pleasant Valley State Prison). Many line-staff, including both physicians and nurses,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

work without any supervision whatsoever. Ex. 39 at 5 (01/03 OIG Management Audit Review from California Substance Abuse Treatment Facility and State Prison (and supplement to report), pages 5-7, 22-38, Attachment A); Ex. 62 at 4; Ex. 63 at 2 (05/16/05 Experts' Report on Visit to California State Prison-Corcoran); Ex. 64 at 6 (Experts' Report on Visit to Pleasant Valley State Prison Miscellaneous); Ex. 95 at 2 (Email from Dr. Puisis re: Conference Call re: CSP-SAC); RT 273:18-25 (LaMarre).

**\*10** 38. This lack of leadership and supervision has resulted in a failure to correct the myriad problems within the CDCR medical clinics. Ex. 51 at 2; RT 95:18-22 (Puisis). Such unaddressed problems have made the provision of adequate medical care impossible and clearly have resulted in patient deaths. Ex. 54 at 1, 2; Ex. 62 at 5; RT 285:11-286:4 (LaMarre).

**\*10** 39. A further result of this non-supervision is that doctors responsible for patient death and morbidity receive little if any discipline from supervising physicians. RT 44:24-45:6 (Puisis). Beyond the obvious problem of condoning malpractice and allowing incompetent doctors to remain on staff, the leadership vacuum and lack of discipline also fosters a culture of non-accountability and non-professionalism whereby "the acceptance of degrading and humiliating conditions [becomes] routine and permissible." Ex. 55 at 11; Ex. 51 at 2. No organization can function for long when such a culture festers within it, and it has become increasingly clear to the Court that this is a major factor in the current crisis.

(4) Failure to Engage in Meaningful Peer Review

**\*10** 40. Peer review is the periodic review of work by similarly qualified professionals. Ex. 49 at 3; RT 136:5-7 (Puisis). For quality control and the identification of bad practitioners, peer review is performed universally by health care organizations. RT 136:8-10, 137:9-13. (Puisis). But in the CDCR, peer review "is either bogus or it's not done at all." RT 136:21-23 (Puisis).

**\*10** 41. The peer review process sometimes fails because there is a paucity of qualified staff to engage in the process. Doctors with internal medicine qualifications are needed to review medical decisions, correct mistakes and provide training, but such doctors are rarely present at the institutions. Ex. 49 at 3-4. At some prisons, the doctors who engage in the peer review process are incompetent. As a result, "untrained physicians who make mistakes will continue to make them because there is no one to identify and correct their mistakes. " *Id.*

(5) Defendants Lack the Capacity to Recruit Qualified Personnel for Key Medical Positions

**\*11** 42. The CDCR also suffers from a significant vacancy rate in critical positions within the medical care line-staff. Ex. 1 at 2 (01/09/04 Letter from QMAT Members re: San Quentin Visit on January 7, 2004); Ex. 2 at 4 (01/07/05 QMAT Process Review of San Quentin); Ex. 10 at 4 (11/04 QMAP System Review of California Correctional Institute); Ex. 18 at 1 (08/25/04 QMAP Institutional Review Weekly Report from Salinas Valley State Prison); Ex. 23 at 1 (09/03/04 QMAP Institutional Review Weekly Report from California State Prison-Sacramento); Ex. 33 at 11 (Corrective Action Plan for July 9, 2004 Letter from Court Experts, Revised 03/03/05); Ex. 41 at 113; Ex. 48 at 6-7; Ex. 51 at 2; Ex. 56 at 11; Ex. 84 at 4. The vacancy rate for physician positions is over 15%, and this does not account for the additional significant percentage of incompetent doctors who need to be replaced. RT 579:11-13 (Kanan). The rates differ from institution to institution, depending partly on the desirability of the location and the culture of the prison. At one institution, there are only two doctors responsible for approximately 7,000 prisoners. RT 643:22-644:7 (Kanan).

**\*11** 43. The Court finds, based on estimates by the court Experts and CDCR's consultant, that the CDCR must hire approximately 150 competent physicians to fill vacancies and replace inadequate physicians throughout the system. RT 96:9-12 (Puisis); RT 680:19-23 (Shansky).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

**\*11** 44. The vacancy problem also plagues the Department in all other areas of health care staffing. Vacancy rates at some institutions are as high as 80% for Registered Nurses (RNs) and 70% for Medical Technical Assistants (MTAs) (i.e. licensed vocational nurses who are also custody officers). RT 287:20-22 (LaMarre).

**\*11** 45. The CDCR has made some efforts to recruit and retain qualified supervisors, doctors, nurses and MTAs. However, these efforts have paled in the face of the enormity of need. RT 58:3-60:5 (Puisis); RT 288:3-5 (LaMarre). The CDCR's efforts also have been stymied to large degree by the state bureaucracy, as discussed below.

**\*11** 46. The reality facing the CDCR is that its efforts to recruit qualified medical staff into the current system have been ill-fated from the start. For example, compensation levels for CDCR medical staff are simply too low. RT 59: 8-17 (Puisis) According to a CDCR commissioned study, compensation for CDCR staff registered nurses is 20-40% lower than for RNs in the private sector, and up to 57% lower for some supervising nurses. Ex. 81 at 8 and 11 (CDCR Nurses and Pharmacists Compensation Survey, November 2004). Yet the State has failed to pay heed to the study and the nurse staffing crisis continues unabated.

**\*11** 47. The difficulty in recruiting qualified medical staff is compounded by the poor working conditions offered. RT 295:21-24 (LaMarre). In one instance, the triage nurse at San Quentin had to walk through the men's shower room, while it was in use, in order to get to her "clinic" in which she had no sink, exam table or medical equipment. RT 295:1-12 (LaMarre). Many competent professionals simply will not work, at least not for long, under such conditions.

**\*12** 48. In addition, the long and bureaucratic hiring process at CDCR increases the difficulty of retaining competent doctors and nurses. RT 99:21-25 (Puisis); RT 291:11-21 (LaMarre). The testimony at the hearing makes it clear that the State bureaucracy is simply incapable of recognizing and acting upon the crisis in which the CDCR finds itself.

**\*12** 49. In all fairness, the CDCR has made some progress lately, though it is far too limited relative to the enormity of the need. Since July 1, 2004, the Department has hired and retained approximately 27 additional board-certified or board-eligible family practitioners or internists and has contracted with two outside entities to provide additional care for high acuity patients to address shortages at various prisons. RT 580:8-15; 588:16-589:9; RT 591:6-592:12 (Kanan). It also has intensified recruitment through the creation of a "physician strike team" that has conducted rounds at a local university and has established an interagency agreement with the University of California to have access to primary care residency programs. RT 604:2-15 (Kanan) In order to provide hiring incentives to qualified physicians, the CDCR has expanded the federal loan repayment program. RT 603:19-21 (Kanan). Although these improvements facilitate recruitment, they are piece-meal steps that fail to make the necessary transformations in the system; thus, they are insufficient to resolve the crisis. Consequently, the Court finds that vacancy rates in CDCR medical staff remain at a critical level.

### (6) Intake Screening and Treatment

**\*12** 50. At present, the reception center intake process, which involves only a brief medical examination, fails to adequately identify and treat the health care problems of new prisoners. RT 301:18-24 (LaMarre); RT 116:16-117:8, 120:5-10 (Puisis). This intake process is supposed to allow medical staff to identify the medical problems, in particular communicable diseases such as syphilis and tuberculosis, that pose a risk of transmission to other prisoners. RT 119:22-120:4 (Puisis); RT 301:2-12, 305:4-7 (LaMarre). In fact, tuberculosis is an "incredibly serious problem" in the prisons because it has the potential to affect other prisoners, the staff and the local community. RT 361:20-362:2 (Goldenson).

**\*12** 51. An adequate intake exam should take fifteen to twenty minutes for a young healthy prisoner and thirty to forty minutes for prisoners with more complicated health problems. RT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

308:8-14 (LaMarre). However, prisoners' exams in CDCR reception centers typically last no more than seven minutes. RT 119:11-18 (Puisis). Further, some prisoners are removed from the reception process before their examination is complete and do not receive medical screening or care until weeks later. RT 304:23-305:18 (LaMarre).

**\*12** 52. For example, at San Quentin one to two physicians are responsible for conducting intake examinations of approximately eighty to one hundred new prisoners every day. The volume of work is too large to allow for adequate screening of illnesses. Ex. 55 at 7. The Court personally toured San Quentin and has first-hand knowledge of the shocking inadequacy of the reception screening process. The lack of sanitation, the dearth of basic medical examination tools, and the failure to provide any semblance of confidentiality in the medical examining rooms were apparent at first glance.

**\*13** 53. At the California Institution for Men (CIM), which the Court also personally visited, a single nurse individually interviews 100 to 180 incoming prisoners each day within a period of approximately four hours, allowing just a few minutes for each prisoner. RT 116:22-117:2 (Puisis). In addition, a fellow prisoner completes the TB screening form for incoming prisoners (RT 302:7-11 (LaMarre)), which is an improper violation of medical confidentiality and harkens to the discredited and foregone practice in Southern prisons where so-called prisoner "trustees" were used to guard other prisoners. Following the nurse's examination, prisoners undergo an examination by a physician at which up to three prisoners are interviewed and examined simultaneously with no individual protection of the prisoners' privacy. RT 117:22-118:11 (Puisis). According to a Court Expert, this lack of privacy "virtually ensures that an adequate exam would not be done." RT 118:12-13 (Puisis). In fact, in some cases, serious conditions are not identified or are given no treatment. RT 306:10-22 (LaMarre) (prisoner with cirrhosis and swelling ankles was identified at screening but was provided no treatment or follow-up; three days later, he collapsed in the cell block and required transfer to an acute care

hospital).

### (7) Patients' Access to Medical Care

**\*13** 54. As a matter of medical policy, the CDCR requires that within one business day of the submission of a prisoner request for medical care, an RN shall triage the request using an in-person interview and standardized protocols. Inmate Medical Services Policy ("IMSP") Vol. 4, Chp. 4 & Vol. 5.[FN3] Unfortunately, this policy lives more on paper than in reality. The CDCR has left several basic nursing policy requirements only partially implemented and at some prisons face-to-face triage is nonfunctional. RT 268:1-7 (LaMarre); see also Ex. 4 at 1 (12/22/04 Email from Lilia Meyer re: Monthly Reports); Ex. 5 at 1 (QMAT Executive Summary of Medical Services Clinical Review of Corcoran from June 21-25, 2004 Visit); Ex. 15 at 2 (04/01/04 QMAT Executive Summary of Medical Services Process Review at Salinas Valley State Prison); Ex. 51 at 11; Ex. 53 at 8; Ex. 62 at 8; and Ex. 63 at 6-7. As a result, patients do not receive timely access to care and suffer a serious risk of harm and even death as a result. RT 267:5-268:7 (LaMarre).

> FN3. The Inmate Medical Policies and Procedures were lodged with this Court on February 15, 2002.

**\*13** 55. In addition, inmates do not have timely access to physicians. Appointments with physicians often do not take place within the time frame established by CDCR policy. Ex. 13 at 5 (QMAT Executive Summary of Medical Services Clinical Indicator Review of Valley State Prison for Women from June 21-24, 2004 Visit); Ex. 15 at 2; Ex. 25 at 6 (QMAT Executive Summary of Medical Services Clinical Indicator Review of High Desert State Prison from May 10-14, 2004 Visit); Ex. 39 at 24; Ex. 51 at 11. A number of prisons experience " serious backlogs in patients receiving medical care." Ex. 62 at 5; Ex. 64 at 2.

### (8) Medical Records

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*14** 56. The medical records in most CDCR prisons are either in a shambles or non-existent. RT 109:18-23 (Puisis). This makes even mediocre medical care impossible. Medical records are an essential component of providing adequate patient care and should contain comprehensive information about a patient that can assist a physician in determining the patient's history and future treatment. RT 109:5-17 (Puisis).

**\*14** 57. The amount of unfiled, disorganized, and literally unusable medical records paperwork at some prisons is staggering. RT 109:23-110:6 (Puisis); see also Ex. 2 at 4 (three and one-half feet of loose filing at San Quentin in December 2004); Ex. 20 at 3 (QMAT Report from SVSP Institutional Visit for January 4-6, 2005)(twelve to eighteen inches of loose filing at Salinas Valley in January 2005); and Ex. 53 at 10 (six to eight feet of loose filing at CSP-Sacramento in January 2005). At CIM, the records were kept in a 30 foot long trailer with no light except for a small hole cut into the roof and were arranged into piles without any apparent order. RT 126:4-127:3 (Puisis). Conditions are similar at other prisons as well. RT 127:20-21 (Puisis). At some prisons medical records are completely lost or are unavailable in emergency situations. RT 111:4-112:6 (Puisis).

**\*14** 58. At CIM, the use of temporary medical records creates a confusing and dangerous situation for practicing physicians who often have access only to little or none of a patient's history. RT 114:2-115:11 (Puisis). The Court observed first-hand at CIM that doctors were forced to continually open new files on patients simply because the doctors could not get access to the permanent files. As a result, the risk of misdiagnosis, mistreatment, and at a minimum, wasted time, increase unnecessarily.

**\*14** 59. The Court concurs with Dr. Puisis's testimony that the CDCR medical records system is "broken" and results in dangerous mistakes, delay in patient care, and severe harm. RT 110:7-8; RT 112:8-22 (Puisis).

(9) Medical Facilities

**\*14** 60. The physical conditions in many CDCR clinics are completely inadequate for the provision of medical care. Ex. 1 at 2; Ex. 2 at 8; Ex. 60 at 1. Many clinics do not meet basic sanitation standards. Ex. 3 at 7 (04/22/05 Health Care Services, Quality Improvement Plan for San Quentin); Ex. 51 at 2; Ex. 53 at 7; Ex. 55 at 8 and 10; Ex. 58 at 2 (03/02/05 Email from Expert LaMarre re: Two Systemwide Issues); Ex. 62 at 9; Ex. 63 at 6; RT 296:23-298:9 (LaMarre). Exam tables and counter tops, where prisoners with infections such as Methicillin-Resistant Staph Aureus (MRSA) and other communicable diseases are treated, are not routinely disinfected or sanitized. RT 297:2-13 (LaMarre). Many medical facilities require fundamental repairs, installation of adequate lighting and such basic sanitary facilities as sinks for hand-washing. Ex. 62 at 11; Ex. 63 at 8. In fact, lack of adequate hygiene has forced the closure of some operating rooms. Ex. 94 at 10 (Report on CDCR Hospitals and Skilled Nursing Care, October 9, 2004).

**\*15** 61. In addition, many of the facilities lack the necessary medical equipment to conduct routine examinations and to respond to emergencies. Ex. 1 at 2; Ex. 3 at 29; Ex. 10 at 1; Ex. 23 at 1; Ex. 33 at 4; Ex. 40 at 51 (03/16/05 Special Review into the Death of Correctional Officer Manuel A. Gonzalez, Jr. on January 10, 2005 at the California Institute for Men, pages 7, 49-63, Governor's Office and Related Materials); Ex. 48 at 3; Ex. 51 at 2 (02/18/05 Expert LaMarre's Report on Salinas Valley State Prison from January 26-27, 2005 Visit); Ex. 55 at 5; Ex. 58 at 1; Ex. 62 at 9; Ex. 94 at 10; RT 128:15-25 (Puisis); RT 295:4-12 (LaMarre). Clinics lack examination tables and physicians often have to examine patients who must sit in chairs or stand in cages. Ex. 48 at 3.

**\*15** 62. The Court observed first-hand at San Quentin that even the most simple and basic elements of a minimally adequate medical system were obviously lacking. For example, the main medical examining room lacked any means of sanitation-there was no sink and no alcohol gel-where roughly one hundred men per day undergo medical screening, and the Court observed that the dentist neither washed his hands nor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:02-cv-00022    Document 99    Filed 02/21/2007    Page 14 of 16

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

changed his gloves after treating patients into whose mouths he had placed his hands.

### (10) Interference by Custodial Staff with Medical Care

**\*15** 63. A major problem stemming from a lack of leadership and a prison culture that devalues the lives of its wards is that custody staff present a determined and persistent impediment to the delivery of even the most basic aspects of medical care. Too frequently medical care decisions are preempted by custodial staff who have been given improper managerial responsibility over medical decision-making. Ex. 60 at 1; Ex. 64 at 4; RT 162:18-23 (Puisis).

**\*15** 64. Correctional officers often are not available to take prisoners to medical appointments or to enable the physicians to do examinations. Ex. 94 at 10. In medical units that lack call buttons for prisoners to contact doctors, custody staff routinely fail to make rounds and check on patients. Ex. 61 at 1 (05/06/05 Email from expert Goldenson re: San Quentin OHU); Ex. 22 at 5 (QMAT Executive Summary of Medical Services Clinical Indicator Review of California State Prison-Sacramento from May 24-28, 2004 Visit).

**\*15** 65. All in all, there is a common lack of respect by custody staff for medical staff, and custody staff far too often actively interfere with the provision of medical care, often for reasons that appear to have little or nothing to do with legitimate custody concerns. Ex. 66 at 3 (02/18/05 and 04/26/05 Letters from Dr. Khoo to Chief Physician and Surgeon Dr. Williams re: issues with Medical Staff at San Quentin). Ex. 51 at 2. This exacerbates the problem of physician retention, and the evidence reflects that a number of competent physicians have left CDCR specifically due to conflicts with custodial staff. Ex. 84 at 4; RT 98:19-23 (Puisis).

### (11) Medication Administration

**\*16** 66. The Court concurs with Dr. Puisis that management of the prison pharmacy operations is "

unbelievably poor." RT 160:13-14 (Puisis). There is no statewide coordination between pharmacies and there is no statewide pharmacist. RT 236:2-6 (Puisis). At the individual institutions, the administration of medications is in various states of disarray. RT 160:14-17 (Puisis).

**\*16** 67. The CDCR has failed to adequately implement the Inmate Medical Policies and Procedures that require each prison to develop local procedures for medication management. IMPP, Vol. 4, Chp. 11 at 1; RT 283:2-10 (LaMarre).

**\*16** 68. There are serious, long-standing problems with dispensing medication, renewing prescriptions, and tracking expired prescriptions. *Id.* Chronically ill patients are not able to refill their prescriptions in a timely manner. RT 283:20-25 (LaMarre); Ex. 15 at 3; Ex. 16 at 4 (04/01/04 QMAT Executive Summary of Medical Services Clinical Indicator Review of Salinas Valley State Prison from June 7-10, 2004 Visit); Ex. 25 at 4; Ex. 51 at 15-16; Ex. 55 at 51; Ex. 63 at 16; Ex. 64 at 49; Ex. 84 at 9.

**\*16** 69. The Court observed the pharmacy at San Quentin first-hand. As discussed in the Order to Show Cause, the pharmacy was in almost complete disarray. Additionally, there is no system to identify expiring prescriptions for critical medications and patients wait two to three weeks for refills, which places many inmates at unnecessarily increased risk. Ex. 84 at 9.

**\*16** 70. To ensure continuity of treatment, the policies require that prescriptions continue to be filled when a prisoner transfers to another prison. IMPP, Vol. 4, Chp. 11 at 7. In practice, however, the prisons do not consistently transfer prescriptions along with the inmates, resulting in large quantities of medication being thrown out rather than administered. Ex. 22 at 4; Ex. 39 at 36; Ex. 51 at 9; Ex. 84 at 9. On the other end, the receiving prisons routinely disregard prescriptions from sending prisons. Ex. 26 at 3 (Report from March 22-25, 2004 Assessment of High Desert State Prison, written by Suzette Geary, Jerry Mobery, and Amy Perez); Ex. 27 at 2 (QMAT Executive Summary of Medical Services Process Review of California Institution for Women from March 22-24, 2004

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Visit); Ex. 64 at 12.

### (12) Chronic Care

**\*16** 71. A sizable portion of CDCR prisoners suffer from chronic illness, yet defendants have failed to devise and implement a system to track and treat these patients, and such patients suffer from a lack of continuity of care. RT 90:15-20 (Puisis); RT 284:15-19 (LaMarre); Ex. 10 at 3; Ex. 18 at 1; Ex. 53 at 4; Ex. 61 at 1-2; Ex. 63 at 14; Ex. 64 at 11; Ex. 84 at 4; RT 284:20-285:1 (LaMarre)

### (13) Specialty Services

**\*16** 72. Defendants have failed to provide patients with necessary specialty services. Patients with very serious medical problems often wait extended periods of time before they are able to see a specialist due to unnecessary and preventable delays. Ex. 60 at 2; Ex. 64 at 9 and 53; RT 312:5-15 (LaMarre). At Pleasant Valley State Prison ("PVSP") for example, it may take over a year to see certain specialists; as of May 2005, patients with consultation referrals from early 2004 had yet to be seen. Ex. 64 at 9-10; RT 313:3-12 (LaMarre). In one instance a patient with a colonoscopy referral had to wait ten months before his appointment; by the time he was seen the mass in his colon was so large that the colonoscope could not pass through. *Id.* at 9-10. Even when patients do see a specialty consultant, medical staff often do not follow-up on the specialist's recommendations. Ex. 64 at 10.

### (14) Medical Investigations

**\*17** 73. The CDCR's failure to perform adequate investigation of medical staff results in incompetent and abusive staff continuing to provide dangerous care. Ex. 85 (Category II Investigations dated May 5, 2005-Filed Under Seal); RT 582:24-583:24 (Kanan). Too often, medical investigations have been ineffective because of coverups. For example, when a CSP-Sacramento inmate died, a CDCR central office physician evaluated the prison physician's conduct through an Internal Affairs investigation. Ex. 80 (10/09/04 Investigation into Patient Death); RT 345:23-349:22 (Goldenson). The central office reviewing physician concluded that the patient was totally mismanaged and that the death was preventable. Ex. 80 at 4-5; RT 348:13-20 (Goldenson). Subsequently, a second central office physician reviewed the case and determined that care was adequate. Ex. 80; RT 348:13-349:13. Although this second report was superficial and totally inadequate, the CDCR accepted it, clearing the prison physician and disregarding the thorough findings of the earlier review. Ex. 80 at 5. Dr. Goldenson described this as a "cover-up of a very serious medical error." RT 349:21 (Goldenson). The prison doctor continued to practice for more than a year. RT 349:14-18 (Goldenson).

### (15) Defendants Have Been Unable to Overcome Various Obstacles to Providing Adequate Medical Care

**\*17** 74. The Court recognizes that certain obstacles external to the CDCR have hindered the Department's ability to effectively take action regarding medical care. RT 549:5-551:4 (Carruth); RT 671:23-672:23 (Shansky). These obstacles are presented by the State of California's civil service system and the related operations of the State Personnel Board ("SPB"), the Department of Personnel Administration ("DPA"), the State budget process, and the collective bargaining obligations of the CDCR with respect to its union-represented employee groups. RT 551:5-25 (Carruth). However, these obstacles do not in any manner excuse defendants, including the Governor, from taking effective action to cure constitutional violations.

#### a. Civil Service Obligations

**\*17** 75. Certain State civil service rules, grounded in the California Constitution and other laws and regulations, place the authority over creating new job classifications, hiring, setting compensation levels, and creating recruitment and retention bonuses within the authority of the State Personnel Board, the Department of Personnel Administration

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

and other agencies, thus preventing CDCR from acting unilaterally in these areas. RT 454:15-455:9, 465:19-466:13 (Duveneck). These requirements have directly affected the CDCR's ability to hire and recruit, because when the CDCR attempts to create new job classifications, or change the salary for an existing position, it generally must endure a lengthy process involving the DPA, SPB and the applicable bargaining unit representatives. RT 469:3-476:15, 479:23-480:24 (Duveneck).

### b. The Dills Act

**\*18** 76. Under the Dills Act (Government Code § 3512 *et seq.,*), employees have the right to collectively bargain with the State over wages, hours, and other terms and conditions of employment. RT 426:15-23 (Hanson). The State has interpreted coverage of the Dills Act to extend to virtually any change in the terms or conditions of employment, including changing the way an employee is required to fill out a form. RT 428:1-11 (Hanson); RT 426:25-427:4, 427:13-25, 428:1-11 (Hanson); Cal. Govt.Code § 3512 *et seq.*

### c. Procurement, Contracting, and Budgeting Rules

**\*18** 77. In general, the California Department of General Services must approve all State contracts, including contracts for personal services and contracts for information technology goods and services. Cal. Pub. Cont.Code §§ 10295, 10335-10381, 12102. Deputy Secretary for Information Technology for CDCR, Jeff Baldo, testified that the entire contracting process, from the initial stage of determining the need for goods or services for information technology to awarding a contract, can take up to two years. RT 493:9-18 (Baldo).

**\*18** 78. The State budgetary process similarly hinders defendants from instituting medical reforms. There is a lengthy process for obtaining resources for personnel, equipment or facilities. It generally takes between 14 months to two years for a budget concept to result in an appropriation of funds. RT 527:15-18 (Horel). An even lengthier capital outlay process must be used when the CDCR

seeks to build a new building or make significant changes to an existing structure. RT 527:20-528:6 (Horel).

**\*18** 79. Thus, the Court recognizes that reforming the CDCR medical system is neither simple nor easy. However, the question is whether defendants have used the full extent of their power to raise the system to constitutional standards, and the answer is quite definitively: no. Perhaps no better illustration epitomizes the problem than the following colloquy that occurred during the OSC hearing between the Court and one of the State's Deputy Secretary for Human Resources as to why defendants have been so stymied by the bureaucracy. RT 457:2-458:17 (Duveneck). The Deputy Secretary testified that the State "cannot contract out for [medical] services unless it's an emergency, if State workers could do the work." RT 456:4-6 (Duveneck). When asked for an example of an emergency that had justified contracting out in the past, the witness testified that an agency received emergency approval to hire contractors when immediate hiring was a prerequisite to receiving federal funds. RT 457:14-21 (Duveneck). The Court responded that in one to six months "we would have 3 to 18 people dying ... I can't think of a bigger emergency." RT 457:22-458:4 (Duveneck). Even in light of the Court's concern, the witness continued to balk at the idea of doing any emergency contracting whatsoever for prisoner medical services. RT 458:4-15 (Duveneck). This is exactly the kind of " can't do" attitude (or "trained incapacity," as discussed below) that has left the Court utterly frustrated and that has brought the Court to the point of establishing a Receivership.

### C. Defendants Have Failed to Comply with Court Orders

**\*19** The Court has attempted to move defendants toward meeting constitutional standards by issuing a series of court orders with detailed objectives and measures. Unfortunately, defendants have repeatedly delayed their progress and ultimately failed to achieve even a semblance of compliance.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 16

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

(1) The June 13, 2002 Stipulation for Injunctive
Relief

**\*19** 80. Defendants entered into a Stipulation for
Injunctive Relief which required CDCR to
implement specified remedial medical policies and
procedures designed to meet "the minimum level of
care necessary to fulfill the Defendants' obligation
to Plaintiffs under the Eighth Amendment of the
Constitution." Stipulation for Injunctive Relief at
2-3.

a. Roll-Out Implementation

**\*19** 81. The Stipulated Injunction required the
CDCR to implement the specified remedial medical
policies and procedures at all California state
prisons according to a staggered schedule beginning
in calendar year 2003. Stipulation for Injunctive
Relief at 3-4. The first "roll-out" institutions were
given a calender year to implement the requisite
policies and procedures. *Id.* As of this date, no
prison has implemented them. RT 34:2-19 (Puisis);
RT 267:15-25 (LaMarre); RT 341:17-24
(Goldenson); RT 666:3-7 (Shansky).

**\*19** 82. In fact, the roll-out institutions are not even
close to attaining compliance. RT 666:5-7
(Shansky). Specifically, the Court Experts' review
of San Quentin found that "overall compliance with
the Stipulated Order and subsequent Court Orders
was non-existent." Ex. 48 at 3. A May 2005 Expert
review of PVSP (a 2004 roll-out prison) found it "
substantially non-compliant." Ex 64 at 2. Fifteen
months after the roll-out started, QMAT reported
that Valley State Prison for Women ("VSPW") had
not met six of eight indicators for overall
compliance. Ex. 12 at 1.

**\*19** 83. Defendants rightly concede that they have
not complied with the Court's Order. Defendants'
Response to Order to Show Cause (filed June 20,
2005) at 2, 6. Moreover, Dr. Shansky testified that
there "isn't a realistic possibility of compliance with
the court orders ... unless something dramatically
changes." RT 666:13-25 (Shansky); RT 550:12-19
(Carruth).

b. January 1, 2003 Measures for all Institutions

**\*19** 84. In addition to the phase-in of the medical
policies and procedures discussed above, the
Stipulated Injunction also required the CDCR to
implement five particular policies or procedures
considered crucial to meeting class members' basic
needs at all prisons statewide, effective January 1,
2003. Stipulation for Injunctive Relief at 4. For
instance, the Stipulation mandated that, effective
January 1, 2003, all prisons follow the medical
protocol established for inter-institution transfers. *Id.*
Defendants have not met this requirement. Ex. 48
at 1-2; Ex. 51 at 4; Ex. 89 at 7 (Report by the Plata
Medical Experts: Review of Progress of Inmate
Medical Services Program Implementations at
California State Prison, San Quentin, June 1, 2005);
Ex. 51 at 4. Nor have they fully executed the other
four requirements.

c. Death Reviews

**\*20** 85. As discussed above, the Stipulated Order
required defendants to formulate "a minimally
adequate death review process." Stipulation for
Injunctive Relief at 11. Although defendants have
had over three years to comply, they have failed to
establish an adequate death review system, and
many of the unreviewed deaths present serious
problems, including neglect and cruelty. RT 367:
18-21 (Goldenson); Ex. 36 at 18-24 (03/03 OIG
Management Audit Review from California State
Prison, Solano, pages 3-6, 11-14, 18-22, 28-30); Ex
54 at 2; Ex 55 at 16-17; Ex. 57 at 1-3 (04/22/05
Expert Goldenson's Report of Dr. Wu). The CDCR
has a backlog of over 300 deaths that have not been
reviewed. RT 585:9-586:10 (Kanan). In addition,
almost all the deaths that occurred (at an
approximate rate of one per day) in March, April
and May of this year have not been reviewed. *Id.*

d. Hiring Procedures

**\*20** 86. The Stipulated Order mandated that "Prior
to Calendar Year 2003, CDCR shall initiate
appropriate hiring procedures to hire medical staff
for employment beginning January 1st." Stipulation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

for Injunctive Relief at 4. The CDCR failed miserably in meeting this requirement. Ex. 49 at 2. Unfortunately, low standards in the hiring process have continued to plague the CDCR in recent times as well, with physicians being hired without primary care qualifications, with no background checks or primary care credential assessments, and with questionable practice histories. RT 669:4-17 (Shansky); RT 51:2-8 (Puisis). Dr. Puisis testified that the hiring procedures in California are "really the worst I have ever seen in my life ... This is absolutely the worst." RT 100:25-101:2 (Puisis).

**\*20** 87. New screening procedures that have been implemented very recently, while an improvement, are inadequate, and require further steps to ensure that physicians are qualified to provide care to inmate patients. Ex. 49 at 4-5.

### (2) 2004 Patient Care Order

**\*20** 88. In the Fall of 2004, it became apparent that further measures were required in light of the paltry progress that had been made to date. To this end, defendants stipulated to entry of the Patient Care Order.

**\*20** This order required defendants to: (a) engage an independent entity to undertake measures with respect to the treatment of high risk patients; (b) evaluate the competency of physicians employed by the CDCR and provide training to those found to be deficient; (c) develop proposals regarding physicians, nursing classifications, and supervision; and (d) fund and fill Quality Management Assistance Teams (QMAT) and other support positions. *Id.* Defendants have failed to meet the terms of the Patient Care Order.

### a. High Risk Patient Care

**\*20** 89. Under the Patient Care Order, the CDCR has the duty to identify "high risk patients" whose medical condition makes them more vulnerable to death or serious injury than other patients. Patient Care Order at 3-4; RT 67:18-25 (Puisis). However, only roughly one quarter of those patients with

complex medical problems are actually classified as high-risk. RT 87:25-88:23 (Puisis). High-risk patients should be treated by specialists, but instead are often treated by minimally qualified and incompetent doctors. RT 89:3-9 (Puisis). Furthermore, the plain fact is that the CDCR simply does not have enough qualified doctors to treat high-risk patients. RT 66:20-24 (Puisis). Although the CDCR does work with University of California system internists to provide medical care to high-risk patients, these sporadic consultations are inadequate to address the vastness of the problem. RT 54:21-55:2, 72:7-13 (Puisis).

### b. Quality in Corrections Medicine ("QICM") Evaluations

**\*21** 90. The Patient Care Order required Defendants to complete evaluations of its physicians, and, if appropriate, to provide training for all physicians with clinical responsibilities at the calender year 2003-2004 roll-out institutions by December 31, 2005. Patient Care Order at 2. In cooperation with UC San Diego Medical Center, defendants created the Quality in Corrections Medicine (QICM) evaluation program. RT 432:18-21 (Hanson).

**\*21** 91. The CDCR has failed to make reasonable progress towards putting the QICM program into practice. It was not until a week after the OSC hearing that clinicians began reporting for their evaluations. Kanan Decl. at 2.

### c. Credentialing Policy

**\*21** 92. The CDCR's high number of incompetent or unqualified doctors is due in part to defendants' failure to track physician credentials and to remain cognizant of the areas of practice in which their board-certified doctors are certified. RT 51:20-25 (Puisis). The Patient Care Order required CDCR to establish a policy of credentialing and privileging physicians as a critical step to preventing harm to prisoners. RT 79:11-14 (Puisis).

**\*21** 93. Defendants were allotted five and a half

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

months to institute a credentialing policy. Patient Care Order at 5. Credentialing is widely used in the health care industry, and the policies are "not that complicated." RT 79:21-23, 80:4-8 (Puisis); RT 645:3-6 (Kanan). Instead of developing this policy in house, the CDCR contracted out the task, waiting nine months to even sign a contract with the firm performing the work. RT 645:7-22. (Kanan).

**\*21** 94. At the beginning of 2005, the CDCR implemented a policy that forbade hiring independent contractors and primary care physicians who were not board-certified or board-eligible in internal medicine or family practice. Ex. 32 at 1 (Corrective Action Plan for Stipulated Court Order re: Quality of Patient Care and Staffing, Version updated 2/17/05); Patient Care Order at 3. The central office now investigates each new CDCR physician by doing a broad search of practitioner databases to ascertain whether other health care entities have reported adverse credentialing actions regarding them or malpractice settlements on their behalf that are indicative of problems with their patient care. RT 597:11-600:1 (Kanan). However, the CDCR has not formally adopted this or any other credentialing policy, which is evidence of a lack of will (or at a minimum a lack of competence) for systemic reform in this area. RT 79:15-20 (Puisis). Due to the lack of a credentialing policy, many CDCR doctors are not qualified to practice the type of medicine required by their position and practice outside their area of medical expertise. Ex. 40 at 52-53; Ex. 49. For example, within the CDCR, one OBGYN manages HIV patients and an incompetent neurosurgeon practices internal medicine. Ex. 49 at 3.[FN4]

> FN4. Although the Court has attempted to avoid commingling findings of fact with conclusions of law, any conclusions that are inadvertently labeled as findings (or vice versa) shall be considered "in [their] true light, regardless of the label that the ... court may have placed on [them]." *Tri-Tron International v. Velto,* 525 F.2d 432, 435-36 (9th Cir.1975).

CONCLUSIONS OF LAW

I. The Establishment of a Receivership is Warranted

A. Historical Background of Receivership Remedy

**\*22** The receivership remedy has its roots in the English Chancery Courts, where receivers were appointed to protect real property and monetary rents and profits. *See* Ralph Ewing Clark, A Treatise on the Law and Practice of Receivers (3d ed. 1959) ("Treatise on Receivers"), *citing Barnardiston's Reports* (1740-1741) 69, 27 Eng. Rep. 558; *Gordon v. Washington,* 295 U.S. 30, 37, 55 S.Ct. 584, 79 L.Ed. 1282 (1935). The traditional definition of a receiver is as follows:
**\*22** A receiver ... is a person who ... becomes an officer of the court to receive, collect, care for, administer, and dispose of the property or the fruits of the property of another or others brought under the orders of court by the institution of a proper action ...

**\*22** Treatise on Receivers at 13, *citing Spring Valley W. Co. v. City and County of San Francisco,* 225 Fed. 728, 731 (1918), *aff'd* 246 U.S. 391, 38 S.Ct. 356, 62 L.Ed. 790 (1918). Additionally, " [t]echnically property placed by a court in the hands of a receiver is not in the possession of the receiver but in the possession of the court through such receiver as its officer." Treatise on Receivers at 626; *Atlantic Trust Co. v. Chapman,* 208 U.S. 360, 371, 28 S.Ct. 406, 52 L.Ed. 528 (1907) (receiver is an officer of the court).

**\*22** The receivership process became incorporated into early American jurisprudence, where it has established a long historical tradition as part of the federal courts' equity jurisdiction, arising from Article III, section 2 of the Constitution ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution ..."). *See In re Reisenberg,* 208 U.S. 90, 28 S.Ct. 219, 52 L.Ed. 403 (1908) (upholding displacement of corporate management by court-appointed receiver); *Washington v. Washington State Commercial Passenger Fishing Vessel Assoc.,* 443 U.S. 658, 695, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (holding that district court has power to "assum[e] direct

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

supervision" of state property "if state recalcitrance or state-law barriers should be continued," and that the court may "displace local enforcement of [the court's] orders if necessary to remedy the violations of federal law found by the court"); Fed. R. Civ. P. 66 (providing district court with control over appointment and dismissal of receivers); 4 John Norton Pomeroy, Pomeroy's Equity Jurisprudence § 1330 *et seq.* (Spencer W. Symons ed., Bancroft-Whitney 5th ed.1941).

**\*22** While the historical roots of receivership lie in the protection of property and assets, and at times in the implementation of corporate reorganizations, its usage expanded during the civil rights era. In the second decision in *Brown v. Board of Education,* the Supreme Court invoked the chancery tradition by stating that "equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown v. Bd. of Educ.,* 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). The Court further discussed a "period of transition" during which the district courts should maintain jurisdiction over desegregation cases to "consider the adequacy of any plans the defendants may propose ... and to effectuate a transition to a racially nondiscriminatory school system," thus suggesting that federal courts might be called upon to engage in long-term institutional oversight. *Id.* at 300-01 (1955); *see also* Owen M. Fiss, *Foreword: The Forms of Justice,* 93 Harv. L.Rev.. 1, 3 (1979) (the second *Brown* decision "delegated the reconstructive task to the lower federal judges. They, in turn, discovered what the task required and adjusted traditional procedural forms to meet the felt necessities."). Subsequent intense resistence to integration presented certain federal district and appellate courts with no realistic choice other than taking control of school districts through the imposition of receiverships. *See, e.g., Turner v. Goolsby,* 255 F.Supp. 724, 730 (S.D.Ga.1966) (state superintendent appointed receiver for county school system); *Morgan v. McDonough,* 540 F.2d 527, 533 (1ˢᵗ Cir.1976) (approving temporary receivership of South Boston High School).

**\*23** The use of receivers to reform public institutions has spread to analogous contexts in the

civil rights arena, including prisons. *See, e.g.. Newman v. State of Ala..* 466 F.Supp. 628, 635-36 (1979) (appointing receiver for Alabama State Prisons, stating: "The extraordinary circumstances of this case dictate that the only alternative to non-compliance with the Court's orders is the appointment of a receiver for the Alabama prisons." ); *Shaw v. Allen,* 771 F.Supp. 760, 762 (S.D.W.Va.1990) ("Where more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances, a court acting with its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate."); *Wayne County Jail Inmates v. Wayne County Chief Executive Officer,* 178 Mich.App. 634, 444 N.W.2d 549, 556 (Mich.App.1989); *Inmates of D.C. Jail v. Jackson,* 158 F.3d 1357 (D.C.Cir.1998).ᶠᴺ⁵

> FN5. The appointment of receivers has extended to other areas as well, such as mental health and child protection services. *See, e.g., Dixon v. Barry,* 967 F.Supp. 535 (D.D.C.1997) (appointing receiver for Commission on Mental Health Services); *Gary W. v. Louisiana,* 1990 WL 17537, \*17, \*28-33 (E.D.La.1990) (appointing receiver to oversee state children's services agencies where court's mandates were continually met with "a dismal record of non-compliance and management by crisis"); *Judge Rotenberg Educ. Cntr., Inc. v. Comm'r of the Dep't of Mental Retardation,* 424 Mass. 430, 677 N.E.2d 127 (1997) (appointing receiver of state Department of Mental Retardation).

**\*23** Thus, the remedy being imposed through this Order follows a long historical line of precedent where nothing short of receivership could protect the plaintiffs' interests and remedy the violation of their constitutional rights.

B. Legal Analysis

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*23** The decision whether to appoint a receiver is a function of the court's discretion in evaluating what is reasonable under the particular circumstances of the case. *See Dixon,* 967 F.Supp. at 550; 12 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2983 (2005). As the case law concerning the receivership remedy for the reform of public institutions has developed over the past few decades, a multi-pronged test has developed to guide the trial courts in making this often difficult determination. The test includes the following elements, the first two of which are given predominant weight:

**\*23** (1) Whether there is a grave and immediate threat or actuality of harm to plaintiffs;

**\*23** (2) Whether the use of less extreme measures of remediation have been exhausted or prove futile;

**\*23** (3) Whether continued insistence that compliance with the Court's orders would lead only to confrontation and delay;

**\*23** (4) Whether there is a lack of leadership to turn the tide within a reasonable period of time;

**\*23** (5) Whether there is bad faith;

**\*23** (6) Whether resources are being wasted; and

**\*23** (7) Whether a receiver is likely to provide a relatively quick and efficient remedy.
**\*23** *See Dixon,* 967 F.Supp. at 550; *District of Columbia v. Jerry M.,* 738 A.2d 1206, 1213 (D.C.Ct.App.1999) (reversing appointment of receiver based on trial court's consideration of only the single factor of defendant's historical failure to comply with court mandates); *Morgan,* 540 F.2d at 533 (appointing receiver as "the only reasonable alternative to non-compliance with [the] court's plan "); 12 Federal Practice & Procedure § 2983 (factors relevant to establishing requisite need for receivership include "imminent danger," inadequacy of available legal remedies, probability of harm to plaintiff, and possibility of irreparable injury).

**\*24** The Court will review each of these factors in

turn.

### (1) *Threat of Harm*

**\*24** As the Findings of Fact amply demonstrate, the treatment of prisoners in California constitutes a " gross and extreme departure from the standard of care." The Supreme Court's discussion of prisoner medical care in *Estelle v. Gamble* was prescient in regard to the current situation in California:
**\*24** An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical " torture or a lingering death," the evils of most immediate concern to the drafters of the [Eighth] Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency ...

**\*24** *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

**\*24** Nothing beyond the Findings recited above need be said to express the severity of the health crisis facing California prisoners. Indeed, the findings in this Order scarcely do justice to the actual harm experienced by thousands upon thousands of individuals in the California prison system. As Judge Justice stated twenty-five years ago when describing the Texas prison system:
**\*24** [I]t is impossible for a written opinion to convey the pernicious conditions and the pain and degradation which ordinary inmates suffer ... [including] the physical suffering and wretched psychological stress which must be endured by those sick or injured who cannot obtain adequate medical care.

**\*24** *Ruiz v. Estelle,* 503 F.Supp. 1265, 1390 (S.D.Tex.1980).

**\*24** Based on the Findings, removing defendants from control of the medical system and imposing a Receiver to radically transform it is the only viable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

means of saving lives and creating a stable and effective health care delivery system in the CDCR. *See, e.g., Dixon,* 967 F.Supp. 535, 554 ("There is no doubt that without severe action by the Court [in the appointment of a receiver] ... suffering and loss of life will continue unabated"); *LaShawn A. v. Kelly,* 887 F.Supp. 297, 315 (D.D.C.1995) ("While it is true that the defendants have made some progress in various areas, the ... factual findings show the urgent need for a new, more fundamental approach to change."). Indeed, the suffering and deaths that have occurred since this Court's oral ruling on June 30, 2005 weigh most heavily on this Court's mind and conscience as it tries to move expeditiously through these complex proceedings.

### (2) *Least Intrusive Means*

**\*24** In fashioning an appropriate remedy, the Court must exercise restraint, using the least possible power adequate to the remediation of constitutional violations. *See, e.g., Missouri v. Jenkins,* 495 U.S. 33, 51, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990) (before intruding on local authority, district court must assure itself that no lesser alternatives are adequate to the task). However, the Court is not required to restrict its powers to those means that have proven inadequate, or that show no promise of being fruitful. Rather, as the Supreme Court has held, "federal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced." *Hutto v. Finney,* 437 U.S. 678, 690, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1979). The Ninth Circuit similarly has held that "where federal constitutional rights have been traduced, principles of restraint, including comity, separation of powers and pragmatic caution dissolve ..." *Stone v. City and County of San Francisco,* 968 F.2d 850, 861 (9 th Cir.1992).

**\*25** The Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626(a)(1)(A), which governs this case, codifies the Court's authority to issue prospective relief that fully remedies constitutional violations, while mandating that the relief not be overly broad. The relevant language of the PLRA is as follows:
**\*25** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

**\*25** 18 U.S.C. § 3626(a)(1)(A). The Second Circuit recently held that "the deference due prison administrators by courts is implicated primarily by questions relating to institutional security of a type not raised" in the context of health-related conditions. *Benjamin v. Fraser,* 343 F.3d 35, 52 (2nd Cir.2003). Nevertheless, this Court is able to abide in full with the " needs-narrowness-intrusiveness" standard of the PLRA, so it need not address whether a lesser standard is applicable in this case.

### a. Failure of the Court's Efforts to Use Lesser Intrusive Means

**\*25** The task of running the CDCR medical system is a complex and difficult one, especially given the number of prisoners, the breadth and depth of their medical needs, the special difficulties posed in a correctional setting, the number and geographic dispersion of the state's 33 prisons, the extreme state of overcrowding, and the failures of past administrations to take medical care seriously. The provision of adequate medical care in this situation presents a classic example of a "polycentric" problem. As then Professor of Law and now Ninth Circuit Judge William Fletcher has explained:
**\*25** The concept of polycentricity may help to clarify the problems involved in trial court remedial discretion in institutional suits. Polycentricity is the property of a complex problem with a number of subsidiary problem "centers," each of which is related to the others, such that the solution to each depends on the solution to all the others. A classic metaphor for a polycentric problem is a spider web,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

in which the tension of the various strands is determined by the relationship among all the parts of the web, so that if one pulls on a single strand, the tension of the entire web is redistributed in a new and complex pattern.

**\*25** William A. Fletcher, *The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy,* 91 Yale L.J. 635, 645 (1982) (citation omitted) *("Discretionary Constitution"* ). As just one example of the interrelatedness of multiple problem centers, the Court notes that the hiring of competent medical staff and the creation of a working medical records system are two pressing issues. Both tasks must be accomplished simultaneously. Good doctors and nurses cannot be recruited if they know that they will be forced to treat patients without adequate medical records. At the same time, qualified doctors and administrators must be brought on board to establish and maintain the medical records system. One cannot function well without the other, and each element of the solution requires "mutual spontaneous adjustment." *Discretionary Constitution* at 647.

**\*26** But to say that a problem is polycentric is not to say that it is insoluble. As expressed above, steps toward resolving this crisis have been ordered by the Court. Additionally, the Court Experts, plaintiffs, and the Court itself have provided specific achievable measures and have made innumerable informal suggestions as to how defendants can move forward. The Court invited the parties during monthly status conferences to contribute ideas as to possible remedies, and the Court especially encouraged defendants to consider ways in which they could take the actions necessary to solve the medical care problems through measures within their own control, including use of the extraordinary powers of the Governor. The Court went to the length of requesting that defendants present it with a series of proposed orders so that the Court could help empower them to overcome some of their bureaucratic hurdles on their own. *See* Order Following April 2005 Status Conference (filed April 29, 2005) at 2. Defendants did not submit a single proposed order. Finally, the Court issued the Order to Show Cause, which stated that "with respect to the substantive remedy itself,

the Court encourages all parties to think as creatively as possible, and the Court will remain open to all reasonable alternatives." OSC at 17. Even following issuance of the OSC-on the brink of possible contempt and the imposition of a Receivership-defendants were able to enact only very limited and piece-meal measures, with no prospect for system-wide reform or restructuring.

**\*26** In spite of all these efforts by the Court, defendants have been unwilling or incapable of breaking out of a deeply entrenched bureaucratic mind-set, and have refused or been unable to take the steps necessary to prevent further needless loss of life and suffering among its wards. As just one example, defendants have recognized that they need an immediate infusion of clinical and administrative staff, yet they have taken no measures to overcome the substantial barriers posed by the state bureaucracy. The result is that requests for medical staff, or for an increase in salary to attract qualified staff, or even for a salary survey, have been met with the same delay and resistance as requests for far less urgent matters.

**\*26** This mind-set is a classic example of what the sociologist Thorstein Veblen terms "trained incapacity." Thorstein Veblen, The Instinct of Workmanship and the State of the Industrial Arts 347-48 (Macmillan 1914). State officials have become so inured to erecting barriers to problems that appear to threaten the bureaucracy (or that at least appear to require the bureaucracy to bend or flex) that the officials have trained themselves into a condition of becoming incapable of recognizing, and acting in response to, true crisis. *See, e.g., Gary W.,* 1990 WL 17537 at \*32 ("In instances of justifying [receivership], the courts have typically found a lack of leadership that could be expected to improve conditions within a reasonable period of time, systemic deficiencies in administrative, organizational, and fiscal structures, institutional inertia, and similar indicia of bureaucratic morass.").

b. The Lack of Alternative Effective Remedies

**\*27** In its attempt to allow defendants to resolve this crisis, the Court has exhausted all reasonable means

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

of compulsion. Nonetheless, for the sake of thoroughness, the Court will briefly discuss the avenues that conceivably remain short of Receivership. First, the Court could impose contempt sanctions. However, the Court does not view a contempt remedy as having a realistic likelihood of proving effective. Pursuing a contempt remedy would greatly extend the future life-span of the current dysfunctional system, thereby placing innumerable lives in grave danger, with no hope that the sanctions would produce a positive result due to the State's self-professed inability to cope with the magnitude and complexity of this crisis. Even if this lack of will were overcome to some extent and the Court were to succeed in forcing the hand of certain individual defendants, the Court believes that other impediments-not least of which are the bureaucratic barriers discussed above and the long-standing culture of medical neglect-would largely subvert the effort and the system would still fall short of constitutional adequacy. Contempt simply is not an appropriate remedy in the current circumstances. As the court stated in *Gary W.:*
**\*27** [D]efendants have not only shown no capacity to implement corrective plans previously submitted, but also that they either are no longer willing or able to even devise remedial programs to address the clearly identified barriers to compliance with the Orders of the Court ... Given the history of this case, including the past efforts of this Court to facilitate, cajole, and even coerce compliance, the demonstrated inability of defendants to comply substantially with this Court's previous Orders (despite many opportunities to do so), and the flawed organizational structure [of defendants], this Court concludes that an Order holding the defendants in contempt is not an adequate remedy ... [S]uch measures "promise only confrontation and delay."

**\*27** *Gary W.,* 1990 WL 17537 at \*29-30 (citation omitted); *see also Wayne County,* 444 N.W.2d at 561 (affirming receivership of county jail system, stating: "[W]e do not feel contempt is an appropriate vehicle to remedy the panoply of noncompliance in this case ... The trial court correctly reached the realization that contempt proceedings would never bring full implementation of its orders."); *Newman,* 466 F.Supp. at 635;

*Morgan,* 540 F.2d at 533 (rather than instituting contempt proceedings or issuing further injunctions, which "were plainly not very promising, as they invited further confrontation and delay," a receivership was necessary "to get the job done.").

**\*27** The Court also could consider appointing a special master. However, given defendants' professed inability to take adequate measures to cure the constitutional violations even with the extraordinary guidance of the Court Experts and the mandates of the Court's orders, this would be an exercise in futility. As the court held in *Newman:*
**\*28** The lack of any significant progress since the original hearings in this case strongly suggests that the appointment of monitors offers little, if any, hope of swift compliance. The extraordinary circumstances of this case dictate that the only alternative to non-compliance with the Court's orders is the appointment of a receiver.

**\*28** *Newman,* 466 F.Supp. at 635.

**\*28** Another conceivable remedy is that of sequestration, whereby the courts traditionally have coerced compliance by detaining defendants' property, or by quasi-sequestration where the courts limit or shut off defendants' access to funds. *See, e.g., United States v. City of Chicago,* 549 F.2d 415 (7th Cir.1977) (affirming district court's suspension of distribution of general revenue sharing funds to Chicago as means of compelling city to end racial discrimination in police department). However, the effect of depriving the CDCR of funds that are desperately needed for medical care would not only be counter-productive, but would result in a perversion of the equities in this instance.

**\*28** The Court also could consider either closing some institutions or ordering the release of some prisoners (perhaps those who are at highest risk of receiving inadequate medical care, or those who pose the least security risk as a means of general population reduction). Since these options would be more onerous to defendants than the establishment of a Receivership, the Court need not entertain them at this time. *See Shaw,* 771 F.Supp. at 763 (receivership "is not as drastic and intrusive as the ultimate course of action this Court could, and may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

yet effectuate-that of ordering the [ ] jail closed."); *Newman,* 466 F.Supp. at 635 ("There is, of course, a more extreme alternative to a receivership ... [i.e.] the closing of several prison facilities. In light of that alternative, the more reasonable and the more promising approach is the appointment of [a] receiver for the prison system.").[FN6]

FN6. *See also Crain v. Bordenkircher,* 180 W.Va. 246, 376 S.E.2d 140, 142 (W.Va.1988) (issuance of "rule to show cause" for the appointment of a receiver to oversee the funding and construction of a new prison, costing roughly $50 million, despite the court's recognition of the state's "great economic distress," stating that such appointment would be "clearly a lesser evil than ... [the prisoners'] release from the penitentiary because of unconstitutional conditions of confinement."); *Feliciano v. Colon,* 1990 WL 83321 at *10 (D.Puerto Rico 1990) (placing defendants on notice that their failure to cure contempt could subject them to "compensatory fines," " coercive fines," "accelerated award of good time to prisoners to reduce population density," and "the imposition of a receivership."); *Wayne County,* 444 N.W.2d at 561 ("The receivership remedy is far from the most intrusive action [the trial court] might have taken ... He could have taken a different approach and closed the jail until the final judgment was fully implemented."); 18 U.S.C. § 3626(a)(3) (provision of PLRA governing prisoner release orders); Malcolm M. Feeley & Edward L. Rubin, Judicial Policy Making and the Modern State: How the Courts Reformed America's Prisons 93 (Alfred Blumstein & David Farrington eds., Cambridge University Press 1998) (" Judicial Policy Making" ) (describing process in *Ruiz v. Estelle* litigation in Texas whereby the court ordered the release of a certain number of inmates whenever crowding reached a certain level, and the state legislature responded by enacting legislation to permit the prison

authorities to select which inmates to release); *cf. Morgan,* 540 F.2d at 534 (establishment of receivership over school was less onerous than closing school, and district court "demonstrated both restraint and wisdom in selecting the receivership option," which was "not excessive but [rather] reasonably tailored to carrying out the court's responsibilities").

*28 Notably, defendants have proposed no alternative measures to resolve the crisis and have not opposed the appointment of a Receiver. *See* Defendants' Response to Order to Show Cause.

*28 Thus, having exhausted all reasonable coercive measures at its disposal, yet finding itself unable and unwilling to sit idly by while people are needlessly dying, the Court believes it is obligated to take control of the prison medical system. As the court stated in *Gary W.:*

*28 [T]he responsibility of this Court is "clear and compelling: to use its broad and flexible equitable powers to implement a remedy that, while sensitive to the burdens that can result from a decree and the practical limitations involved, promises, ' *realistically to work now.*" '

*28 *Gary W.,* 1990 WL 17537, *30, *quoting Green v. County School Bd.,* 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *see also Swann v. Charlotte-Mecklenburg Bd. of Ed.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (the scope of relief must be determined by the nature of the violation); *Feliciano,* 1990 WL 83321 at *11 (less than four years following stipulation to increase the size of prison cells, the court concluded: "[T]his court of equity will not suffer a wrong of such constitutional magnitude ... to go any longer without an adequate remedy," including a possible receivership). In essence, the time has now come when the number of options with any realistic chance of success has dwindled down to a single one-Receivership.

### (3) Continued Delay

*29 It is resoundingly clear to the Court that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

continued insistence on defendants' compliance with Court orders would lead to nothing but further delay, as well as further needless death and morbidity. As discussed above, the State sees itself as incapable of handling this crisis, and no degree of support or coercion is likely to help. *See Newman,* 466 F.Supp. at 635 ("Time does not stand still, but the Board of Corrections and the Alabama Prison System have for six years. Their time has now run out. The Court can no longer brook non-compliance with the clear command of the Constitution, represented by the orders of the Court in this case."); *Gary W.,* 1990 WL 17537 at *29-30 ( "The time for 'all deliberate speed' is long passed" ).

#### (4) *Leadership*

**\*29** While blame for the deplorable condition of prison medical care in the state can properly be attributed to multiple causes, there is a single root cause of this crisis: an historical lack of leadership, planning, and vision by the State's highest officials during a period of exponential growth of the prison population. *See, e.g., Newman,* 466 F.Supp. at 630 ( "The theme running throughout the evidence is a lack of professional leadership."). These State officials have the ultimate responsibility to hire, train, supervise, and audit their own staff, and to provide sufficient resources, technology, and support for those staff members to ensure that instances of negligent care and malpractice are kept to a minimum and that the system operates at least at the level of constitutionally adequate care.

**\*29** The past and current leaders of the prison system have failed to take the bold measures necessary to protect the lives of prisoners, to find solutions to the impediments posed by the State bureaucracy, and to make systemic improvements. Many of these measures, such as taking incompetent doctors out of patient care, hiring qualified new doctors and nurses, and providing a medical records system are neither obscure nor infeasible.

**\*29** Perhaps no better illustration exists of the lack of leadership than Dr. Shansky's testimony regarding the State's failure to maintain, and to

capitalize upon, improvements made in the medical delivery system at San Quentin years ago pursuant to the litigation in *Marin v. Rushen,* C-80-0012 MHP (N.D.Cal.1980). RT 698:2-699:11. The Court's first-hand observation of the depths to which that institution was allowed to sink in the aftermath of careful and productive judicial intervention in *Marin* has had a profound effect on this Court.

**\*29** Defendants also have failed to take a strong leadership position in resolving a long-standing impediment to medical care, which is the over-prioritization of custody interests even in the face of pressing medical needs. The testimony is replete with stories of prisoners suffering from obvious illness and injuries who are blocked from receiving medical attention by custody staff. While the Court is cognizant of the legitimate special difficulties posed in dealing with an incarcerated population, these challenges fail to explain or justify the severe imbalance of priorities in this case. *See* Susan Sturm, *Resolving the Remedial Dilemma: Strategies of Judicial Intervention in Prisons,* 138 U. Pa. L Rev. 805, 818 (1990) (describing phenomenon of "goal displacement" in prison administration).

**\*30** The numerous deaths and harm from medical misfeasance and neglect have been predictable consequences of what can best be described as a " non-system" of care in California's prisons. This is not mere hindsight; rather, it has been the foreseeable and unavoidable result of the State's failure to use the full extent of its powers to meet its constitutional obligations. *See, e.g., Palmigiano v. Garrahy,* 448 F.Supp. 659, 671 (D. R.I.1978 (governor's efforts did not constitute " 'all reasonable steps' toward achieving compliance" and "none of the reasons offered for delay by defendants related to an inability to comply"); *Bracco v. Lackner,* 462 F.Supp. 436, 449 (N.D.Cal.1978), *quoting Welsch v. Likins,* 550 F.2d 1122, 1132 (8th Cir.1977) (" 'The obligation of defendants to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do ...' ").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*30** In all fairness, the Court recognizes that the current administration inherited many of the problems identified above from past administrations, which must bear much of the blame for building California's vast prison system without regard for inmate medical care. As the Court has stated in the past, the Governor has appointed, and the State has hired, a number of dedicated individuals to tackle the difficult task of addressing the crisis in the delivery of health care in the CDCR. These leaders have been forthright in conceding their failures,[FN7] have not attempted to obstruct the Receivership process, and have shown good faith and even enthusiasm in discussions with the Court and plaintiffs' counsel about the prospect of working with a Receiver toward the goal of revamping, and perhaps redesigning, the prison medical delivery system.

> FN7. As discussed in the Findings, Undersecretary Kevin Carruth testified that medical care is not a "core competency" of the State prison leadership. This concession is a double-edged sword. On the one hand, defendants have had the wisdom to recognize and admit their failure, as opposed to many other individuals or institutions who in similar circumstances would pursue indefensible positions to the bitter end. On the other hand, as discussed below, it is an abdication of the public trust for these officials to throw up their hands in surrender, at least prior to exhausting all measures available to them.

**\*30** When appointing receivers, courts often remove the officials in charge of the entity responsible for the constitutional violations from power and place the receiver in their stead. *See, e.g., Newman.* 466 F.Supp. at 636 (relieving the Board of Corrections of all power and displacing the Board with a receiver); *Morgan,* 540 F.2d 527. As an expression of the Court's trust in the current State leadership, the Court will deviate from this practice and will not displace any State officials. This trust must continue to be earned. This Order shall serve as notice to the current leaders of the

prison system and of the State that they must do everything in their power to work cooperatively with the Receiver, to create substantial reform in the executive branch (within CDCR and in all other relevant agencies), to seek legislative reform where necessary, and take all other necessary measures to eradicate the barriers that have led to the current crisis. While these changes will take some time, the Court expects to see continual progress toward these goals. Ultimately, these changes will be essential to the Court's decision to return control to the State.

### (5) *Bad Faith*

**\*30** The question of motive is complicated. As in any case dealing with a governmental institution, circumstances are dictated by a combination of individual effort (or lack thereof) and bureaucratic and political forces. *See* Fiss, *Foreword: The Forms of Justice* at 22 ("In the structural context, there may be individual wrongdoers ... [but] the target of the suit [is] on a social condition ... and also on the bureaucratic dynamics that produce that condition. In a sense, a structural suit is an in rem proceeding where the res is the state bureaucracy."). The Court has discussed above a number of these forces, including the leadership vacuum and the trained incapacity of the bureaucracy. While lack of will thus is a key factor contributing to this crisis, the Court need not ascribe ill will to defendants as a predicate to appointing a Receiver, and the Court declines to do so.

### (6) *Wasted Resources*

**\*31** While the Court has not yet ordered a detailed accounting, all the evidence supports the Court's firm conviction that defendants have engaged in a huge waste of the taxpayer's resources. Certainly, spending over one billion dollars annually on a system that far too often neglects, mistreats, and at times literally kills those it is intended to serve is a massive waste of money and, more importantly, life. *See Palmigiano,* 448 F.Supp. at 674 ("[A]lready the heavy financial costs, which the prison administration imposes by maintaining many

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

prisoners [in unconstitutional conditions], fall on the taxpayers; this cost should soon be diminished. The citizens of this state also bear the human costs of operating a degraded prison system.").

**\*31** Even focusing just on money, the expert testimony indicates that there are substantial inefficiencies in the system, and the Court's own observations at San Quentin and the California Institute for Men mirrors that evidence. As just one example, from the testimony and the Court's discussion with staff at San Quentin it is clear that large amounts of pharmaceuticals end up being thrown away for no reason other than mismanagement. The Court has little doubt that the degree of waste experienced by the CDCR in the past can be reduced substantially by a Receiver.

### (7) *Likelihood of a Quick and Efficient Remedy*

**\*31** No doubt the reform of the CDCR medical system will be a monumental task. The preparation and execution of an effective plan to bring the prison medical system up to constitutional standards will require intimate knowledge and understanding of the way the CDCR operates from both the medical and custodial perspectives, a keen grasp of the reasons for the present crisis, an appreciation of the positions of each interested stakeholder, an understanding of financial and budgetary factors, and an ability to navigate the state bureaucracy and to make it responsive to the plaintiffs' needs. Making an appreciable impact may take many months, and a full remedy will take years. While this may not be "quick" in some contexts, the speed of reform must be judged relative to the scale of the project, which in this case is enormous. [FN8] The Court believes that steady progress here under the direction of a Receiver is possible, that gains in patient care will be made along the way, and that this is far preferable to the current state of paralysis.

> FN8. The Court has referred to this case, and the task at hand, as humongous, and indeed it is. Nevertheless, judicial control of state-wide prison systems is nothing new. In fact, the Court is aware of ten

other states in which court orders involving the totality of conditions in the entire prison systems were issued. *See* Judicial Policy Making at 41, 81.

### (8) *Additional Considerations*

#### a. The Problem of Democratic Debilitation

**\*31** Looking at the full spectrum of powers typically exercised by the courts, there is no doubt that the imposition of a Receivership is a drastic measure. But it is not a measure that the Court has sought, nor is it one the Court relishes. Rather, the Court is simply at the end of the road with nowhere else to turn. Indeed, it would be fair to say that the Receivership is being imposed on the Court, rather than on the State, for it is the State's abdication of responsibility that has led to the current crisis. *See Judge Rotenberg Educational Center,* 677 N.E.2d at 150 ("[W]hen the executive persists in indifference to, or neglect or disobedience of court orders, necessitating a receivership, it is the executive that could more properly be charged with contemning the separation principle."). Since the Court has jurisdiction over this matter, it has no choice but to step in and fill the void. But this is a disturbing result, not simply because it is a drastic measure for the Court, but because it exhibits a debilitation of the democratic process whereby the State executive branch has effectively turned over its obligations to the federal judicial branch. *See Shaw,* 771 F.Supp. at 763 ("In essence, it is the Court's view that the Defendants are, at least in part, 'passing the buck' to it. Well, if it may appropriately be said, the 'buck stops here' for the Court is constitutionally bound to 'pick up the gauntlet.' "). This dual problem implicating concerns of separation of powers and comity unfortunately will remain until the State proves itself ready to regain control of the prison medical system.

#### b. The Lack of Political Will

**\*32** The Court also recognizes the inherently political nature of this matter. To a significant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

extent, this case presents a textbook example of how majoritarian political institutions sometimes fail to muster the will to protect a disenfranchised, stigmatized, and unpopular subgroup of the population. This failure of political will, combined with a massive escalation in the rate of incarceration over the past few decades, has led to a serious and chronic abnegation of State responsibility for the basic medical needs of prisoners. This is a case where "the failure of the political bodies is so egregious and the demands for protection of constitutional rights [is] so importunate that there is no practical alternative to federal court intervention. " *Discretionary Constitution* at 697; *see also Shaw v. Allen,* 771 F.Supp. 760, 763 (S.D.W.Va.1990) (" [T]he Court is ... not so naive as to fail to recognize . .. that factors of a 'political' nature are also guiding the Defendants. Certainly, it may be said without a great deal of reservation that the expenditure of a significant portion of a limited budget so as to protect the constitutional rights of prisoners is not a paramount concern in the minds of many citizens. In fact, many may inappropriately consider it both an unnecessary and unwarranted expenditure of public funds."); *see also* John Irwin, The Warehouse Prison: Disposal of the New Dangerous Class 150 (Roxbury Publishing Company 2005) (explaining that state governments are unwilling to allocate resources to prisoners because their "needs rank at the bottom of the state's priorities."). The legal response to this political issue, however, is quite clear: When the state deprives individuals of their liberty, for whatever reason, it takes upon itself the obligation to provide those persons with certain services basic to their humanity, including medical care. *See Estelle,* 429 U.S. at 103 (citations omitted) (adopting "common-law view that '[i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." ').

### c. The Importance of Qualified and Dedicated Medical Staff

**\*32** The Court does not wish to give the impression that all doctors working within the CDCR are incompetent or uncaring. For those who have violated their Hippocratic oath, they must take

personal responsibility for their failures, even in light of the leadership failures discussed above. But the Court is personally aware of a number of doctors, nurses, and other medical staff members who have been struggling to provide quality care in dire circumstances. For these individuals the Court has nothing but praise. The Court wishes to encourage all of these medical professionals to continue their good work in the knowledge that California is about to embark on a dramatic transformation of its prison medical system. This message is intended as well for those medical professionals who have left CDCR employment in frustration, or who may consider applying for work in CDCR in the future.

**\*33** On a related point, the Court is encouraged by the role that the unions representing medical staff have played in this process by submitting an amicus brief in support of the Receivership. The Court looks forward to working with the unions toward the commonly shared goal of saving lives and improving health care in the CDCR.

### C. Conclusion

**\*33** In light of all of the above, the Court concludes that the relevant factors and considerations weigh heavily in favor of the imposition of a Receivership in this case. While this is a step that no court takes lightly, this Court concludes that the record in this case compels this result and offers no realistic alternative. The Court further finds that the establishment of a Receivership, along with those actions necessary to effectuate its establishment, are narrowly drawn to remedy the constitutional violations at issue, extend no further than necessary to correct a current and ongoing violation of a federal right, and are the least intrusive means necessary to correct these violations. The Court is amply satisfied that this relief will impose no unnecessary burden on defendants and will have no adverse impact on either the safety of the public or the operation of the criminal justice system.

**\*33** It bears emphasizing that establishment of the Receivership, while absolutely necessary, is intended as a temporary, not permanent, measure.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 29

The Court looks forward to the day, hopefully sooner rather than later, when responsible officials of the State will assume their legal obligations to run the CDCR in a manner that provides constitutionally adequate health care to all prisoners. As the Supreme Court has instructed, "[a] receivership is only a means to reach some legitimate end sought through the exercise of the power of a court of equity. It is not an end in itself." *Gordon,* 295 U.S. at 37. Once the Court is confident that defendants have the capacity and will to provide such care, the Court will relinquish control from the Receiver back to the State.

**\*33** Lastly, the Court wishes to make clear that it intends to remain actively involved in the Receivership phase of this case, working in tandem with the Receiver to ensure the design and implementation of a constitutionally adequate remedy, and the return of control to the defendants, in the shortest time possible. While the Receiver will be imbued with the power and authority to act in the name of the Court as the Court's officer, ultimate authority, as well as responsibility, lies with the Court alone.

### II. The Court Will Hold the Remedy of Contempt in Abeyance

**\*33** A contempt finding is not a prerequisite to the appointment of a receiver. *See, e.g., LaShawn A.,* 887 F.Supp. at 300 ("The Court, not eager to engender resentment among the defendants and their employees, declined to grant the plaintiff's motion for a finding of contempt and held it in abeyance, even though 'contempt may well [have been] justified.' "); *Gary W.,* 1990 WL 17537 at \*30; *Newman,* 466 F.Supp. at 635; *Morgan,* 540 F.2d at 533. In the discussion above, the Court has made explicit its expectations of defendants in terms of facilitating the Receivership and eradicating bureaucratic barriers to future success. While the Court has confidence that these expectations will be met, the contempt remedy remains an available tool to address any failures in this regard.

### FURTHER PROCEEDINGS

**\*34** During the course of the evidentiary hearing pertaining to the Order to Show Cause, plaintiffs filed an *ex parte* motion with the Court requesting the immediate appointment of a temporary receiver. Plaintiffs proposed that the Court's medical experts be appointed as temporary receivers and that they be given the limited role of improving physician staffing. There is support for the proposition that courts may appoint temporary receivers in appropriate circumstances. *See e.g., Morgan,* 540 F.2d at 533 (approving temporary receivership of South Boston High School to ensure immediate transfer of certain staff who were impeding desegregation goal); *cf. LaShawn A.,* 887 F.Supp. at 300 (court imposed two "limited receiverships" in child welfare system at time consent agreement was entered; after subsequent non-compliance, court imposed a full receivership); Treatise on Receivers at 21.

**\*34** Plaintiffs' motion was based on their understandable concern that class members were suffering continued harm as the legal proceedings progressed. The Court has openly shared this concern, as expressed in the oral ruling on June 30, 2005. In fact, the Court initially was strongly inclined to appoint a temporary receiver pending a more thorough, systematic search for a Receiver. Thus, in July 2005, the Court began the process for the selection of a temporary receiver by consulting with the parties and sending a request for proposals to potential candidates recommended by counsel.

**\*34** It became clear to the Court, however, during the process of reviewing proposals for a temporary receivership and interviewing candidates, that appointment of a temporary receiver would not be appropriate in this instance. The Receiver necessarily will have to engage in wholesale systemic reform given the polycentric and pervasive nature of the problems afflicting the CDCR. Such wholesale reform cannot effectively be initiated by a receiver with only very temporary authority. Furthermore, piecemeal reform that focuses on a limited aspect of the problem may actually prove counter-productive in the long run. Rather, the only effective approach to reforming the state prison

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

medical system, and reducing harm to plaintiffs in a sustainable fashion, must be comprehensive and systemic from the outset. As such, the Plaintiffs' request for appointment of a temporary receiver shall be denied.[FN9]

> FN9. Although Plaintiffs never formally withdrew their request for appointment of a temporary receiver they have informally indicated to the Court that, in light of information learned during the process of interviewing candidates for a temporary receiver, they concur in the conclusion that appointment of a temporary receiver is not a practical approach in this instance.

**\*34** Accordingly, the Court is presently engaged in the process of appointing a full Receiver with the leadership, commitment, experience, and vision to take on the monumental and critical task of bringing the level of medical care provided to California's 165,000 inmates up to constitutional standards. In undertaking this task, the Court is committed to discharging its obligation to ensure that it has appointed the best possible person to undertake this unusually complex and critically important challenge. To this end, the Court has concluded, based on its experience to date in this process, that it is essential to undertake a professionally organized national search for a Receiver. While the Court has initiated this process, and intends to proceed as expeditiously as possible, while also consulting counsel, it recognizes that this undertaking necessarily will take some time to conduct in a responsible manner. The Court concludes that any limited delay will be far outweighed by the benefit of ensuring the superiority of the Court's ultimate appointment.

**\*35** During the current interim period prior to the appointment of the Receiver, the Court wishes, of course, to minimize the ongoing injury to the plaintiff class, given the life threatening impact of the ongoing constitutional violations. To this end, and by a separate order filed contemporaneously herewith, the Court is appointing a Corrections Expert, experienced in prison medical care reform and with extensive knowledge of CDCR operations,

to make recommendations to the Court as to discrete remedial measures that can be undertaken immediately without interfering with the comprehensive and systemic reform that the Receiver necessarily will undertake. The Court emphasizes that the Corrections Expert will not be a temporary receiver and will not have the powers, authority, or responsibilities of a temporary receiver. Rather, the Corrections Expert will be limited to preparing recommendations to the Court regarding potential remedial orders that will not interfere with any systemic reform efforts that the Receiver may undertake. Once the Court selects a Receiver, the Court will issue a separate order of appointment outlining the responsibilities and powers of the Receiver.

**\*35** IT IS SO ORDERED.

N.D.Cal.,2005.
Plata v. Schwarzenegger
Not Reported in F.Supp.2d, 2005 WL 2932253 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 3:01cv01351 (Docket) (Apr. 05, 2001)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.