

Office of the Attorney General
Alicia G. Limtiaco
Attorney General of Guam
Civil Division
287 West O'Brien Dr.
Hagåtña, Guam 96910 • USA
(671) 475-3324 • (671) 472-2493 (Fax)
www.guamattorneygeneral.com

Attorneys for the Government of Guam

**FILED**
DISTRICT COURT OF GUAM
FEB 21 2007
MARY L.M. MORAN
CLERK OF COURT

# IN THE UNITED STATES DISTRICT COURT
## TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GOVERNMENT OF GUAM,<br><br>Defendant. | CIVIL CASE NO. 02-00022<br><br>**GOVERNMENT OF GUAM'S REPLY RE MOTION TO MODIFY CONSNET DECREE** |

The United States has provided no evidence that it, the Government of Guam ("Government"), or the Court anticipated the seven changes in circumstances outlined in the Government's Motion, and even if the Court were to find that these changes were anticipated, the Government has provided undisputed evidence of its good faith and reasonable efforts to comply. In the public interest, and to avoid a wrong against the rate payers, the deadlines should be modified. At the March 8, 2007 hearing, the Government

will provide additional testimony on these issues and on how its proposed schedule is suitably tailored to the unanticipated changes in circumstances.

## I. The Changes in Circumstances Were Unforeseeable or Unforeseen.

Under the *Rufo* standard, "[l]itigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree". *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 385, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992). Thus, the changes in circumstances only have to be unforeseen, not unforeseeable. *Id.* Nevertheless, as discussed below, some of the events were unforeseeable.

When deciding whether to modify a consent decree based on changed circumstances, a court must interpret the terms in the decree. *United States v. Bishop Processing 423 F.2d 469 (4th Cir.), cert. denied, 398 U.S. 904, 90 S.Ct. 1695, 26 L.Ed.2d 63 (1970).* Here, the Public Utilities Commission's ("PUC's") new exercise of regulatory control was an unforeseen circumstance that was not contemplated by the parties or the Court in 2003. The timelines in the decree do not include time needed for PUC reviews and approvals, including the focused management audit ("PUC Audit"). The changes in facts that triggered these additional time consuming steps include *Public Law 28-75*, which was not passed until June 30, 2005, or roughly twenty months after the parties signed the Consent Decree, and the PUC orders, the first of which was issued in October of 2005. Further, the parties could not have foreseen that the General Fund and other funds, which constituted the alternative funding sources to the solid waste user and tipping fees ("Fees"), would not be available in fiscal years 2006 and 2007, when *Public Law 28-45* became effective. In 2003, the parties could have only speculated that the cost of living allowance case and the earned income tax credit litigation would result, three to four years later, in significant judgments against the Government. More recently, *Public Law 28-171*, effective January 29, 2007, is another change in circumstance which was not foreseen in October of 2003. It imposes additional obligations upon the Department of Public

Works ("DPW") to contract for collection and recycling of scrap metal (*e.g.*, abandoned vehicles, large appliances), tires, and other recyclables.

Not only were the above changes unforeseen, they were unforeseeable. They certainly were not anticipated, and the United States assertions that the parties anticipated these changes are unsupported by any terms in the Consent Decree. The Consent Decree does not include any PUC timelines. Similar circumstance arose in *United States v. Armour & Co. 402 U.S. 673, 682-83, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971),* where the United States claimed that a consent decree which prevented a meat packing company from owning grocery stores also prevented a third company, which owned grocery subsidiaries, from owning stock in the meat packing company. The Court found significant the fact that words of such a prohibition were absent from the decree. Also here, the United States drafted the decree terms and failed to include PUC review and approval time lines, even though it included PUC time lines its settlement with the Guam Waterworks Authority. *Kennedy Declaration at Exhibit 1.*

In *Bishop Processing, 423 F.2d 469 (4th Cir.),* the court rejected the processing plant's request to insert words regarding investigative procedures, which were absent from the consent decree. Here, the opposite is true, the United States is asking this Court to interpret the deadlines in the Consent Decree as if the parties had discussed the time lines needed for the PUC's process and had agreed that ample PUC review and approval time was included in the negotiated deadlines.

Regarding the inexperience in solid waste of the DPW's engineer and its inability to hire new employees, there was essentially a mutual mistake of fact: that DPW could meet the deadlines without a technical advisor experienced in opening a landfill and closing a Dump. In contrast, when the United States entered into a consent order with the Commonwealth of the Northern Marianas, it required the local government to retain an experienced technical advisor, which it did, and Saipan has had an operating landfill for over two years. *Second Declaration*

of Helen Kennedy at Exhibit 1, page 7. More applicable to Guam's situation is the situation in *Vanguards of Cleveland v. City of Cleveland, 23 F.3d 1013 (6th Cir. 1994)*, in which the court granted a time extension for meeting minority employee promotion quotas because both parties had mistakenly anticipated that there would be a fixed number of qualified minority applicants to meet the quota by a certain date. The lower than expected pass rate had made it impossible for the city to reach the decree's overall goals by the deadlines which were negotiated at the time the decree was entered. *Id. at 1019*.

Likewise, DPW has experienced lower than anticipated rates of Fee payments by residential customers. The fact that a significant number of residents do not pay for the solid waste collection and disposal services is largely beyond the control of DPW, as is the fact that the commercial haulers do not follow the legal requirement to "remit the tipping fees paid by their customers in the prior month to the government by the twentieth (20th) day of the following month." *Public Law 25-93*. In *Philadelphia Welfare Rights Organization v. Shapp, 602 F.2d 1114 (3d. Cir. 1979), cert. denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980)*, the court modified the consent decree where the failure to meet the decree's Medicaid screening and treatment quotas was largely out of the local government's control due to recipients refusing medical care or failing to show for appointments, and due to the scarcity of health care providers. Moreover, as discussed below, achieving significant improvements to the Government's rate of collecting Fees will take several more months.

Further, in *Pigford v Veneman, 292 F.2d 918 (D.C. Cir. 2002)*, the court did not make the entire class suffer for the mistakes of the attorney, and in *New York State Association for Retarded Children, Inc. v. Carey, 706 F.2d 956 (2d Cir. 1983)*, the court found that it would be detrimental to the public interest to continue with expensive, low density housing units when intermediate sized housing provided higher quality and more cost effective health care than low density housing. Hence, as to Ordot, the Government maintains that the rate payers should

not have to pay for an expensive closure system, as the Value Engineering Analysis ("VEA") has identified cost saving changes that should meet Guam's environmental regulations. In any event, the engineer never stamped the design as complete and design modifications are unavoidable because (1) the permit issued by the Guam Environmental Protection Agency ("EPA") requires certain changes and (2) Ordot must accept more waste than contemplated in the closure design due to the fact that the Layon Landfill will not open in September 2007.

As to the Layon Landfill, the driving force for the design changes is the fact that the hydrogeologic information obtained in 2005 raises serious questions about whether the pre-final design, if completed, would be permitted by Guam EPA, of if permitted, would still require significant design changes before the first cell's construction could commence. Thus, DPW does not believe it should be required to complete and submit a design to Guam EPA if Guam EPA is likely to require significant design modifications. Moreover, Guam EPA should not be placed in the inequitable position, as it was with the Ordot closure design, of having to either deny the permit application or to extend massive man hours drafting detailed conditions and compliance timelines for the required design changes. Also, the added time and expense for the VEA was justified given the need for additional hydrogeological studies, and the need to provide proof that the overall costs would support the just and reasonable rate increases needed to pay for Layon's construction and operations. Hence, the Government respectfully requests that the Court give it more flexible time lines within the overarching goal of designing and constructing a landfill that meets the requirements of Guam environmental regulations.

The United States' claim that the delays caused by action or inaction of others are red herrings is both flimsy and unrealistic. The nine-month delay in receiving U.S. Department of Interior ("Interior") funds for the landfill design frustrated compliance with the Consent Decree deadlines. In *United States v. Detroit, 329 F.3d 515,524 (6th Cir. 2003)*, the court found that the U.S. Army Corps of Engineers ("Corps") had "frustrated the consent decree's" purpose of

dredging a creek when it refused to accept the City's dredged material in a "timely manner." The Corps had required Detroit to prepare an environmental assessment under the National Environmental Policy Act ("NEPA"), and the State of Michigan, the plaintiff requiring the dredging, to obtain approval from the U. S. EPA and the U. S. Fish and Wildlife Service, which would, just as in this case, greatly increase compliance times. *Id.* Here, Interior decided to apply retroactively a <u>new</u> (*i.e.,* unforeseeable) policy after it had approved the use of the funds in July of 2005. Hence, the Government, as it had done in the past, detrimentally relied upon receiving the funds in October of 2005. This reliance triggered a chain of events that took months to remedy. In reliance on the federal funds being forthcoming, and under the pressure of the Consent Decree deadlines, DPW issued a notice to proceed to the engineering firm, who began work in mid October, 2005. Upon completing the pre-final design in January of 2006, the firm would not release the 90 % design until it was paid. These actions resulted in both a contract that was void under Guam law, which meant new negotiations were necessary for the final work, and stipulated penalties which DPW paid to the U.S. EPA for missing the February 6, 2006 deadline. Further, as the emails indicate, breaking the federal funding log jam was no simple task; and the end result was rather bitter, given that Interior's attorney found, only after the staff had prepared the NEPA documents, that the NEPA requirements did not apply to this landfill's design. *Jackson Declaration at Exhibit 2.*

In addition, although they were neither foreseen nor foreseeable in 2003, (1) the lack of assistance in gaining consent and the lack of consent from the United States to improve the dirt road over federal property, and (2) denial of access by a landowner, have also frustrated compliance with the Consent Decree deadlines. The road improvements are needed in order to avoid delays caused when workers' vehicles get stuck in the mud. Hence, without further delay and with all due haste, the Court should order the United States to consent to the dirt road's improvements.

Likewise, the United States misses the mark on the new, additional military build up. In 2003, relocation of the Marines from Okinawa to <u>any</u> other location was mere speculation, and hence this increase in the military's solid waste needs in Guam were certainly was not foreseen by the Court, the US military, the USEPA or the Government. It is this unanticipated significant buildup, which was not considered in the Environmental Impact Statement, which gives rise to a new substantial military need, and hence the possibility of a Congressional appropriation to pay a portion of design and construction costs for the Layon landfill. To date, the Department of Defense has not presented the Government with a plan for solving its current anticipated solid waste needs. Hence, the Court should order the military to disclose its plans.

Although the parties did foresee political opposition to whatever location was selected for the landfill, the intensity and longevity of the significant political opposition to Layon were not foreseen. The parties did not anticipate that the political opposition would continue two years beyond the site selection and even after the 90% design, and more than $7 million had been spent. The fact that significant political opposition to Layon continues today is both time consuming and inexplicable to the employees who have worked on this project, especially given that (1) the Government has spent over $7 million on Layon investigations and design, (2) the Government's selection decision was upheld in Superior Court, (3) Ordot continues to discharge leachate into the Lonfit River, (4) the Ordot residents continue to suffer from the Dump's fires and odors, and (5) Ordot, which reached capacity in 1994, is rapidly running out of space without giving rise to expensive engineering and condemnation issues. Thus this case is distinguishable from *Thompson v. HUD, 220 F3d, 241, 247, 249 (4th Cir. 2000)*, where the reasons to exempt one housing area from the decree's area restrictions actually existed before the decree was entered, and the reasons to exempt the other project were essentially changes in policy. More to the point, the local governments wanted exemptions from the very location

restrictions to which it had agreed in the Consent Decree, not time extensions to meet the deadlines. Here, the Government, the Court and the United States did not foresee the changes in circumstances. Hence, the Court should grant the Motion to Modify the Consent Decree.

II. **Even if the Changed Circumstances Were Anticipated, the Government Agreed in Good Faith and Made a Reasonable Effort to Comply.**

"If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking" *Rufo, 502 U.S. at 385, 112 S. Ct at 761*. Even assuming that this Court were to find that the Government did anticipate the changed circumstances outlined in its Motion, the Government has met its heavy burden that it entered into the Consent Decree in good faith and made a reasonable effort to comply with the timelines. The Government's good faith in agreeing to the Consent Decree deadlines has never been questioned.

Further, DPW has made reasonable efforts to meet the deadlines. In *Philadelphia Welfare, 602 F.2d 1114*, the court modified the timelines in a decree when it found that the local agencies had made good faith efforts to comply with the deadlines, that significant institutional improvements had been made and that "in light of experience", more flexible quotas than originally foreseen were needed. *Id. at 1120-21*. It found that despite the good faith efforts to comply, where a significant increase in funds showed a commitment to achieving the overarching goals of the decree, the strict quotas and the 60 days treatment rule "proved impossible to meet." *Id. 1118-1120*. The same is true here where the Government has met many of the deadlines, has spent over $11 million, and is requesting time extensions.

In contrast, the cases upon which the United States relies are distinguishable. In those cases the party seeking modification either wanted to abandon the consent decree requirements entirely, or had not shown good faith, or both. In *Bishop Processing, 423 F.2d 469 (4th Cir.)*, an animal processing plant had not shown good faith in reducing its air pollution. In *NLRB v. Harris Teeter, 215 F.3d 32 (D.C.Cir. 2000)*, the company sought to have its consent decree vacated by asserting that because it had not been held in contempt for failure to comply, all requirement in the decree were burdensome. The court refused to vacate the decree because the company had a continuing record of labor law violations that had resulted in numerous separate actions before the Labor Board, and the company had not shown any additional burden. Here, the Government seeks extensions to the deadlines and related changes, not vacation of the Consent Decree's requirements.

In *United States v Asarco, 430 F.3d 972 (9th Cir. 2000)*, the court found that the trial court had erred when it modified a consent decree and ignored the express words in the decree reserving the United States' right to bring additional liability and cost recovery actions for cleanup of the area outside the "box" area of the Bunker Hill Superfund Site. The companies, in reaction to the United States seeking liability and cost recovery from them for contamination outside the "box" area, wanted a reduction in the dollar amount of liability they had agreed to pay for the cleanup inside the "box" area. The Ninth Circuit found that the companies, apparently for eight years, had not made reasonable efforts to comply with their consent decree duties to clean up the "box" area of Bunker Hill. *Id. at 984*. Further, the *Asarco* case is inapposite, as it is a Superfund cleanup case, not an institutional reform case. Although building a landfill and closing a Dump are engineering projects, and therefore similar to Superfund cleanups, this case involves institutional reform of the Government's entire solid waste operations, including Fee collections, and solid waste collection services.

Finally, the United State incorrectly relies on the vacation of a patent case under terms of its decree, *Safe Flight Instruments v. United Control Corp., 576 F.2d 1340 (9th Cir. 1978)*, the refusal to vacate a criminal forfeiture settlement following an acquittal, *Schwartz v. United States 976 F.2d 213 (4th Cir. 1992)*, and orders dismissing the United States from an action *Maraziti v. Thorpe, 52 F.3d 252 (9th Cir. 1995) and Twelve John Does v. District of Columbia, 841 F2d 1133( D.C. Cir 1988)*, when it claims that the Consent Decree here does not have prospective application. As the discussion in *Twelve John Does* makes clear, a prospective order includes institutional reform litigation or where equitable remedies such as future abatements are involved, whereas an order is not prospective if the action is at law, with resulting money damages. *Id. at 1139.* In any event, as discussed above, it is in the public interest for the Ordot design to be modified as the permit and U.S. EPA require changes and because the landfill will not open in September 2007, and also environmental concerns prevent implementation of the 90% Layon design. Moreover, the rate payers and the environment should not suffer the consequences of any mistakes by DPW. Hence to hold the Government to the original designs would convert the Consent Decree into an instrument of wrong. *See Railway Employees v. Wright, 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961).*

### III. The Proposed Modifications are Suitably Tailored to the Changed Circumstances.

Even if the Government had bond proceeds or other funds today, construction of the landfill cells could not start today because Guam law and the Consent Decree require a landfill design and construction permit from Guam EPA. The design is not complete, and in any event the regulations require one year, or at least nine months, of ground water monitoring to establish background levels before the landfill cell can start receiving solid waste, and the monitoring well network cannot be designed and installed until significant information is

Page 10
*Government of Guam's Reply Re: Motion to Modify Consent Decree*
US District of Guam - Civil Case No. CV02-00022

Case 1:02-cv-00022   Document 100   Filed 02/21/2007   Page 10 of 13

obtained from the additional hydrogeological studies. *Guam Landfill Regulations at §§23501-23506, Exhibit 2 to Kennedy's Second Declarations.*

In addition, the Government needs adequate time to improve the billing and collection of fees as required by the PUC. Absent Herculean efforts by the legislature, the executive branch and the Mayors, the United State's demand that the residential service fee collection rate increase to 75% by May 2, 2007 is not realistic. As the DPW, the PUC, and the underwriters envision it, the means of increasing this collection rate is to implement a prepay program in close conjunction with out-sourcing solid waste collection services.

Finally, as discussed above, progress on the hydrogeological studies has been frustrated by the United States and others. In order to meet the requirements of Guam law, and in light of the experience with the site conditions and the time which the consultants need, the new time lines the Government has requested are reasonable and suitably tailored to the changed circumstances. The Government intends to provide additional testimony on this and other issues at the March 8, 2007 hearing.

### IV. The Court Should Establish Deadlines for and Require Reports from the United States.

As discussed above, acts or omissions by the Untied States has frustrated the Consent Decree. In addition, the USEPA is not required to respond within any stated timeframe to drafts plans, final designs, etc. that the Government must submit to it. *Consent Decree at ¶7.* Hence, the Court should order the Untied States to:

(1) By March 14, 2007, file and serve written consent to the dirt road improvements; such consent can include reasonable conditioned as to time, control, restoration, and a reasonable release of liability.

(2) By April 2, 2007, file and serve official correspondence from the Administrator of USEPA and the Secretary of Defense, or the appropriate under Undersecretary, to Governor Camacho as to whether and under what time frame they will seek Congressional appropriations to the Governor for part of the construction costs of the landfill.

(3) Respond within five business days to all requests for assistance from the Government involving federal lands, federal funds, federal permits, NEPA requirements, or the like.

(4) Respond within 15 business days to any submittals from the Government to the USEPA.

(5) File and Serve monthly reports on the achievements, on any failures or impediments, and plans to correct such failures and impediments.

## CONCLUSION

Significant changes in circumstance were not foreseeable or foreseen, and even if they were, the Government has provided evidence of its good faith and reasonable efforts to meet the deadlines. To mandate construction of the expensive Ordot design and the potentially flawed Layon design would turn the Consent Decree into an instrument of wrong. In light of experience and in fairness to the rate payers, it is in the public interest for the Court to modify the Consent Decree timelines so that design modifications to Layon can meet Guam's environmental regulations, and cost saving changes to the Ordot closure design can be made while the Government increases the rate at which it collects the tipping and user fees.

Page 12
*Government of Guam's Reply Re: Motion to Modify Consent Decree*
US District of Guam - Civil Case No. CV02-00022

Case 1:02-cv-00022    Document 100    Filed 02/21/2007    Page 12 of 13

Respectfully submitted this 21ˢᵗ, day of February, 2007.

                                    OFFICE OF THE ATTORNEY GENERAL
                                    **Alicia G. Limtiaco, Attorney General**

                                    */s/ Helen M. Kennedy*
                                    HELEN M. KENNEDY
                                    Assistant Attorney General

OF COUNSEL:

Ray C. Haddock
Governor's Assistant Legal Counsel

Page 13
*Government of Guam's Reply Re: Motion to Modify Consent Decree*
US District of Guam - Civil Case No. CV02-00022

Case 1:02-cv-00022    Document 100    Filed 02/21/2007    Page 13 of 13