1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

UNITED STATES OF AMERICA,                              Civil Case No. 02-00022

     Plaintiff,

          vs.

GOVERNMENT OF GUAM,                              **REPORT & RECOMMENDATION**

     Defendant.

     This action came before the below-signed Magistrate Judge on March 8, 2007, for
hearing on two pending motions – the United States' Motion to Enforce Consent Decree
(Docket Nos. 68-69), and (2) the Government of Guam's ("GovGuam") Motion to Modify
Consent Decree (Docket No. 76). After listening to the parties' respective arguments and the
testimony offered at the March 8 hearing, and reviewing the pleadings, the extensive case file
and relevant authority, the Court issues the following Report and Recommendation.

**BACKGROUND**

     A.    <u>Historical Background and U.S. EPA Administrative Actions</u>

     The Ordot Landfill, more commonly referred to as the "Ordot Dump," is owned and
operated by GovGuam. Consent Decree (Docket No. 55) at 2. This site has been in operation
since the early 1950s. Complaint (Docket No. 1) at ¶19; Answer (Docket No. 7) at ¶1. The
Ordot Dump primarily receives municipal wastes from and serves Guam's civilian population
of about 150,000. Lee Decl. (Docket No. 75) at ¶2. It receives approximately 300 tons of

1  municipal solid waste per day.  Id.  It is unlined on its bottom and uncapped at its top.  Id. at ¶3.

2  Thus, it acts like a sponge, absorbing rain water and releasing it after it has percolated through

3  the landfill and picked up contaminants.  Id.  Because of these conditions, the United States

4  alleges that the Ordot Dump has discharged and continues to discharge leachate into the nearby

5  Lonfit River, located south of the Ordot Dump.  Id.

6        The Ordot Dump has a long history of operational and environmental problems.  In

7  1986, the U.S. Environmental Protection Agency ("U.S. EPA") issued an administrative order

8  under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, to the Guam Department of

9  Public Works ("DPW").  Id. At ¶4.  This 1986 administrative order directed DPW to cease

10  discharges of leachate from the Ordot Dump by May 1, 1987, but DPW failed to comply with

11  this order.  Id.

12        The U.S. EPA issued another administrative order on July 19, 1990, requiring, among

13  other things, that DPW submit plans and a compliance schedule for a cover system for the

14  Ordot Dump and complete construction of the cover system to eliminate discharges of

15  untreated leachate by June 30, 1992.  Complaint (Docket No. 1) at ¶29; Answer (Docket No. 7)

16  at ¶10; Consent Decree (Docket No. 55) at 2.  The U.S. EPA approved an extension of this

17  deadline to August 15, 1992.  Lee Decl. (Docket No. 75) at ¶5.  The extended deadline was

18  missed and capping of the Ordot Dump never occurred.  Id.

19        In April 1997, the U.S. EPA amended the 1990 administrative order to require the

20  submission of a schedule by July 9, 1997, for the design and construction of a cover system to

21  eliminate the untreated leachate discharges from the Ordot Dump.  Complaint (Docket No. 1)

22  at ¶31; Lee Decl. (Docket No. 75) at ¶6.  Although DPW submitted a proposed schedule, the

23  U.S. EPA rejected the schedule in September 1997 because it lacked funding commitments to

24  make the plan credible.  Id.

25        In 1998, the 24th Guam Legislature passed Public Law 24-139,[1] known as the "The

26

27        [1] Public Law 24-139 was subsequently invalidated by the Supreme Court of Guam in

28  *Vicente C. Pangelinan, et al.* v. Carl T. C. Gutierrez, *et al.*, 2000 Guam 11 ("*Pangelinan I*").

1  Ordot Dump Closure and Solid Waste Management Alternatives Act" (also referred to as the

2  "Act").  The Guam Legislature found that

3      (1) the Ordot Landfill is a threat to the health and safety of the residents of
        Guam, and specifically for the residents of Ordot-Chalan Pago, Yona and the
4        villages downriver and downwind;
        . . . [and]
5      (4) the Ordot Landfill reached its capacity in the 1990s, and the closure of the
        dump is necessary in order to eliminate this exiting serious environmental
6        hazard.

7  10 GUAM CODE ANN. § 51101(a).

8          After years of inaction or noncompliance with its administrative orders, the United

9  States initiated the present action by filing a Complaint on August 7, 2002,[2] asserting claims

10 under the CWA.  In filing the Complaint, the United States intended to force the closure of the

11 Ordot Dump and guide the opening of a new municipal solid waste landfill ("MSWLF") that

12 complied with federal environmental laws and regulations to avoid further environmental

13 degradation of Guam.  The suit sought to force such closure by requesting a court order

14 requiring GovGuam to take any measure needed to eliminate the un-permitted discharges.  The

15 Complaint sought both injunctive relief and civil penalties well above $50 million.

16     B.     The Consent Decree

17         Beginning in November 2002 (after the gubernatorial and senatorial elections), the

18  _____

19 Public Law 24-139 was later repealed and re-enacted by the 24th Guam Legislature through the
20 passage of Public Law 24-272.  However, because of the invalidation of Public Law 24-139,
   the Supreme Court of Guam in Vicente C. Pangelinan, *et al.* v. Carl T. C. Gutierrez, *et al.*, 2004
21 Guam 16 ("*Pangelinan II*"), held that Public Law 24-272 was without legal effect.  Id. at ¶43.
22 These cases and the effect of their holdings are further discussed *infra*.  Notwithstanding these
   court rulings, the legislative findings are included in this Report and Recommendation to
23 emphasize that the problems surrounding the Ordot Dump are a concern of not just the federal
   EPA but the Guam Legislature and the island's citizens as well.
24

25     [2] Prior to filing the Complaint herein, the United States and GovGuam officials
   engaged in intense negotiations for two (2) years.  At the conclusion of the negotiations, the
26 United States submitted a proposed consent decree to GovGuam for its approval and signature.
   The proposed consent decree was not signed until January 2003, just prior to former Governor
27 Carl T.C. Gutierrez leaving office.  The parties agreed to undergo further settlement
   negotiations with then Chief Judge John S. Unpingco in light of the change in administration.
28

page 3 of 31

1   parties participated in settlement conferences facilitated by Judge Unpingco. GovGuam was

2   represented in these negotiations by various individuals, including at some point then

3   Lieutenant Governor Kaleo S. Moylan, various senators including then Speaker of the Guam

4   Legislature Vicente C. Pangelinan, Attorney General Douglas Moylan, the DPW director, the

5   administrator of the Guam Environmental Protection Agency ("GEPA"), and various other

6   representatives from Guam's executive branch. These negotiations spanned approximately one

7   year and involved a concerted effort by various agencies of GovGuam. Judge Unpingco

8   stressed that whatever schedule was eventually reached, it had to be one that incorporated

9   "extra time" given GovGuam's limited resources and uncertain economic future. Judge

10  Unpingco emphasized that GovGuam must put forward its best efforts in complying with the

11  final schedule because the closure of Ordot Dump was a priority for the island's people. The

12  end product of these negotiations was the Consent Decree at issue herein.

13          In December 2003, the Consent Decree was lodged with the Court. The final Consent

14  Decree was the product of arm's length negotiations after close and careful scrutiny, with both

15  parties represented by counsel and engineers. Following publication on the Federal Register

16  and a period of public comment, on February 11, 2004, Judge Unpingco approved and entered

17  the Consent Decree (Docket No. 55).

18          Among other things, the Consent Decree established a schedule for the closure of the

19  Ordot Dump and the construction and operation of a new conforming MSWLF.  According to

20  this schedule, DPW was required to submit by December 2004 a draft closure plan that

21  included a site investigation, an environmental baseline survey, and the design of a landfill

22  cover system and operational plans to implement measures to stop discharge of pollutants.

23  Consent Decree (Docket No. 55) at ¶8(a)(i). Once the closure plan was approved, DPW was

24  required to award a construction contract for the closure of the Ordot Dump by April 2006. <u>Id.</u>

25  at ¶8(g).  Additionally, by March 2004, DPW was to submit a list of three potential landfill

26  sites to the U.S. EPA and GEPA.  <u>Id.</u> at ¶9(a).  After an EIS was completed, DPW was required

27  to advise the U.S. EPA of the preferred site.  <u>Id.</u> at ¶9(b).  No later than August 2005, DPW

28  was to submit to the U.S. EPA a draft plan for the design, construction, and operation of the

1  new MSWLF, which included a site investigation and survey and a hydrogeologic/subsurface

2  investigation. Id. at ¶9(c). By October 2006, DPW was required to award a construction

3  contract for the new MSWLF. Id. at ¶9(h). The Consent Decree required operations at a new

4  sanitary landfill to begin by September 23, 2007, with operations at the Ordot Dump to cease

5  by October 23, 2007. Id. at ¶¶8(i) and 9(i).

6          C.      Compliance with the Consent Decree

7          Subsequently, GovGuam met and completed certain preliminary tasks required by the

8  Consent Decree but was late on other critical deadlines and was assessed fines for the delays.

9  With regard to the closure of the Ordot Dump for instance, GovGuam completed the

10  environmental baseline survey and the 40% and 100% closure designs. See GovGuam's

11  Response (Docket No. 64) at 2. Unfortunately, GovGuam was assessed $51,500 in stipulated

12  penalties for its failure to timely submit a Wetland Mitigation Plan as required in ¶8(c)(iii) of

13  the Consent Decree. See Machol Decl. (Docket No. 74) at ¶5. The Wetland Mitigation Plan

14  was finally submitted on July 9, 2006. Id. The Consent Decree at ¶8(g) also required DPW to

15  award a construction contract for the closure of the Ordot Dump by April 21, 2006. On May 5,

16  2006, GovGuam was assessed stipulated penalties in the amount of $7,000 for failing to award

17  the construction contract. Id. As of this date, the contract has not been awarded. As of May

18  31, 2007, the accrued stipulated penalties for GovGuam's failure to award the contract was

19  $733,000, and will continue to accrue at a rate of $2,000 per day. See Wolfram Dec. (Docket

20  No. 72) at ¶3.

21          With regard to the Consent Decree's provisions regarding the construction and

22  operation of a new MSWLF, GovGuam completed an EIS of at least three potential sites for the

23  MSWLF and identified a preferred location. Unfortunately, GovGuam was assessed stipulated

24  penalties in the amount of $7,250 for failing to meet the deadline for such submission as

25  required by ¶9(a). See Machol Decl. (Docket No. 74) at ¶4. GovGuam untimely submitted its

26  90% Draft Final Plan for the new MSWLF as required by ¶9(d) so it was again assessed

27  penalties of $7,500 on February 13 and March 7, 2006. Id. To date, GovGuam has not

28  submitted the final plan as required by ¶9(f), nor has it awarded a construction contract for the

1  new MSWLF as required by ¶9(h). The accrued stipulated penalties for these missed deadlines

2  amount to hundreds of thousands of dollars, with penalties continuing to accrue daily.

3        Paragraph 10 of the Consent Decree required GovGuam to submit a financial plan for

4  funding the tasks associated with closing the Ordot Dump and opening a new MSWLF.

5  GovGuam submitted its financial plan in June 2004 as required, and after receiving the U.S.

6  EPA's comments, revised its financial plan and resubmitted it in October 2004.[3] Id. at ¶3.

7        D.    The Pending Motions

8        Because of GovGuam's continued inability to meet the terms of the Consent Decree, in

9  December 2006 the United States requested to have a status conference with the Court. See

10  Docket No. 56. At a hearing held on December 20, 2006, Assistant U.S. Attorney Mikel

11  Schwab stated that continued operations at the Ordot Dump posed a grave and immediate threat

12  to the health of the people of Guam. Furthermore, Mr. Schwab discussed the Georgetown

13  Consulting Group report[4] noting "basic elements of institutional failure" in GovGuam's poor

14  trash collection service and its inability to raise or handle funds.

15        Assistant Attorney General Helen Kennedy argued that contrary to the United States'

16  depiction, GovGuam was not just sitting idly by watching the Consent Decree deadlines pass.

17  Rather, she advised the Court that GovGuam had already contracted about $9.3 million in work

18  required under the Consent Decree. Nevertheless, when pressed by the Court's questions, she

19  conceded that it was impossible for GovGuam to meet the October 2007 deadline for the

20  closure of the Ordot Dump.[5] Ms. Kennedy further stated that even if GovGuam awarded a

21

22      [3] The financial plan is appended as Attachment 14 to the United States' Motion to
23  Enforce Consent Decree (Docket No. 69).

24      [4] See Docket No. 62. This report, dated August 18, 2006, was prepared at the Guam
Public Utilities Commission's ("PUC") direction to examine the capabilities of DPW and the
25  Department of Administration to efficiently bill and collect the increased rate revenue required
to fund GovGuam's obligations under a proposed revenue bond that would finance the Consent
26  Decree projects.

27      [5] In spite of Ms. Kennedy's admission, the Governor's counsel Ray Haddock stated
28  that while it would be "very difficult" to meet the October 2007 deadline, he would not

1    construction contract for the closure of Ordot Dump that very day, actual closure of the Ordot

2    Dump would not occur for another 20 to 21 months. Ms. Kennedy thus urged the Court to

3    modify the Consent Decree's deadlines.

4        At the conclusion of the hearing, the Court established certain deadlines for the filing of

5    motions by the parties. On January 31, 2007, the United States filed a Motion to Enforce

6    Consent Decree (Docket Nos. 68-69), requesting the Court to enter an order requiring

7    GovGuam to meet a series of interim milestones in order to achieve prompt compliance with

8    the Consent Decree. On the other hand, GovGuam filed a motion (Docket No. 76) requesting

9    the Court to modify the requirements of the Consent Decree by extending the dates for closing

10   the Ordot Dump and opening a new MSWLF. The parties thereafter filed their respective

11   opposition and reply briefs, and the Court heard argument and brief testimony from the parties

12   on March 8, 2007.[6]

13                                    **ANALYSIS**

14       Pursuant to ¶10(a) of the Consent Decree, GovGuam was required to submit a financial

15   plan for funding the various Consent Decree projects, including the funding source or sources

16   and a schedule to secure funds for the capital and operating costs necessary to implement said

17   actions. GovGuam's financial plan indicated a preference for financing the initial sum of

18   approximately $100 million through revenue bonds. See Motion to Enforce Consent Decree

19   (Docket No. 69), at Attachment 14. These revenue bonds would then be re-paid through the

20   collection of tipping fees.

21       In April 2006, the PUC contracted with the Georgetown Consulting Group ("GCG") to

22

23   concede that it was "impossible" to meet the deadline. Tr. (Docket No. 67-2) at 43-44. He
24   represented that GovGuam was currently negotiating with two private investors interested in
     constructing a new landfill, and these companies believed a new landfill could be up and
25   running within six (6) months. Id.

26       [6] Because the United States believed it did not have adequate notice of GovGuam's
27   intent to present certain witnesses' testimonies and could not prepare adequately, the Court
     agreed to permit the United States to file a sur-reply to the witnesses' testimonies. To date, no
28   sur-reply has been filed.

1  examine whether DPW was capable of efficiently billing and collecting the increased rate

2  revenue which would be required to fund GovGuam's obligations under a proposed revenue

3  bond.  The PUC had determined that in order to enable DPW to meet its bond obligation, the

4  tipping fees would have to be increased approximately 400% above the current rates within the

5  next 26 months.  The GCG's August 2006 "Focused Audit Report and Recommendations"

6  found that

    (a)    DPW's current billing and collection system is unable to competently handle even the current rate revenue levels much less the increased burden necessary to support the revenue bonds.

    (b)    Substantial remedial action, including operational changes, legislation, regulatory action and rule-making must immediately occur to enable DPW to bill and collect the revenue necessary to fund revenue bond requirements.

    (c)    If this remedial action does not occur, DPW will not be able to bill and collect the revenues necessary to fund revenue bond obligations and this burden would fall, in part, on the General Fund.  Regulatory principles could obstruct the PUC (i) from awarding rate increases to compensate for DPW billing and collection mismanagement; and (ii) from increasing SWM[7] residential customer rates unless the quality of residential service is dramatically improved.

16  See Motion to Enforce Consent Decree (Docket No. 69) at Attachment 12.

17         Because of GCG's finding regarding DPW's poor residential service and billing and

18  collection mismanagement, the PUC was reluctant to raise the residential tipping fee rates,

19  making bond financing unlikely.  Furthermore, the Guam Legislature did not appropriate any

20  funds for the Consent Decree projects.

21         The United States asserted that the essence of the Consent Decree was the timely

22  opening of a new landfill and the timely closing of Ordot Dump.  The United States was not as

23  concerned about collecting the stipulated penalties as it was in ensuring the proper and timely

24  closure of Ordot Dump and the opening of a new landfill.  Accordingly, the United States

25  sought Court intervention and the issuance of an order directing GovGuam to perform the

26  following tasks, among other things:

27

28       [7]  The acronym SWM stands for DPW's Solid Waste Management division.

page 8 of 31

•      Complete an audit report of the SWM's accounts receivable and provide copies of the report to the PUC and the United States;

•      Restructure DPW's SWM as a public corporation under the governance of the CCU, submit a copy of the proposed enabling legislation to the United States and the PUC for review and approval, and request Legislative authorization for this action; and

•      Provide monthly compliance reports, with each report signed by a "senior GovGuam official," that (a) document that GovGuam has provided sufficient daily cover over the trash at the Ordot Dump; (b) identify and explain any failures to comply with the compliance milestones; and (c) include the amount of revenue collected in the proceeding month, the amount of accounts receivable that have not been collected, a recitation of the percentage of accounts receivable collected, and an explanation of why GovGuam has not collected the unpaid accounts receivable.

See Reply (Docket No. 98) at 7-10.

Once SWM was reconstituted as a new public corporation, the United States requested the following further relief:

•      By July 30, 2007, the new corporation shall file with the PUC a plan for implementing a proposal to (i) to procure service of a company to collect residential waste for the island; (ii) to either privatize its billing and collection or establish a protocol under which GPA would undertake this responsibility; and (iii) to restructure its business relationship with commercial haulers.

•      PUC shall develop a financial plan by May 30, 2007, concerning issuance of revenue bonds necessary to finance the Consent Decree projects and the collection of SWM's accounts receivable. The new corporation shall then submit to the PUC a petition for approval of the revenue bonds no later than July 2, 2007. Within 60 days thereafter, the PUC shall award the new corporation adequate rate relief to allow it to comply with its indenture obligations. GovGuam shall request Legislative authorization of this bond financing no later than September 12, 2007.

•      No later than January 15, 2008, the new corporation shall have negotiated the acquisition of the Layon site for the new landfill or have initiated an eminent domain proceeding to acquire said site.

Id. Additionally, the United States requested the Court schedule monthly status conferences with the parties to ensure compliance by GovGuam. Id.

The United States conceded that requiring GovGuam to comply with these new interim "compliance milestones" would not directly result in the closure of Ordot Dump and the opening of a new landfill by the established deadlines. However, it asserted that direct and immediate Court intervention was necessary given GovGuam's "institutional inertia" (a.k.a.

1    bureaucratic obstacles), its failure to raise financial resources that would permit it to comply

2    with the Consent Decree's deadlines, and the mismanagement problems at DPW.   The United

3    States claimed these new tasks would help create the "basic building blocks" that would allow

4    GovGuam to eventually meet its obligations under the Consent Decree.   The United States

5    further asserted that these new compliance milestones would "sever the Gordian knot that has

6    prevented any meaningful progress in this case" by improving the quality of SWM's service to

7    residential customers and establishing a reliable billing and collection system for SWM, which

8    the PUC has identified as critical prerequisites for obtaining the bond financing necessary to

9    pay for the work required by the Consent Decree.  Only when GovGuam had the financial

10   mechanism in place to fund the Consent Decree's projects would the United States request the

11   Court to issue an additional order establishing new compliance dates for the closure of Ordot

12   Dump and the opening of a new conforming landfill.

13        If GovGuam was unable to comply with these interim deadlines, the United States

14   asserted that it reserved its right to request the Court to appoint a receiver to assume control of

15   the operations of SWM.  The United States argued that a receivership would be particularly

16   appropriate in this case since public health issues were implicated.

17        With regard to the United States' Motion to Enforce Consent Decree, the Court notes

18   that it has the inherent power to enforce compliance with its consent decrees.  <u>Spallone v.</u>

19   <u>United States</u>, 493 U.S. 265, 276 (1990).  "A consent decree is enforceable as a judicial decree

20   and is subject to the rules generally applicable to other judgments and decrees."

21   <u>Labor/Community Strategy Center v. Los Angeles County Metropolitan</u>, 263 F.3d 1041, 1048

22   (9th Cir. 2001) (internal quotation and citation omitted).  In this case, the terms of the Consent

23   Decree specifically provide that the decree shall remain in effect  until one year after GovGuam

24   completes all activities contained in Sections III (payment of civil penalties), IV (closure of the

25   Ordot Dump and opening of new landfill) and VII (supplemental environmental project) of the

26   Consent Decree.  Consent Decree (Docket No. 55) at ¶56.  Furthermore, the parties agreed that

27   the Court would retain jurisdiction to handle any disputes that arise under the Consent Decree

28   until said decree is terminated.  <u>Id.</u> at ¶59.

1    The United States now seeks enforcement of the Consent Decree and the

2    implementation of a remedial plan that it hopes will eventually permit GovGuam to meet its

3    obligations under the Consent Decree.  However, GovGuam contends that the remedies sought

4    by the United States are unduly burdensome on it, and instead requests the Court give

5    discretion to local government officials when establishing such priorities and deadlines.

6    "When imposing a remedial scheme on a state institution, a federal court must not unduly insert

7    itself into the institution's management." <u>Labor/Community Strategy Center</u>, 263 F.3d at 1050.

8    Nevertheless, "federalism concerns in institutional reform litigation . . . do not automatically

9    trump the powers of federal courts to enforce the Constitution or a consent decree. . . .  Several

10   courts have held that federalism concerns do not prevent a federal court from enforcing a

11   consent decree to which state officials have consented." <u>Id.</u> (internal quotations and citations

12   omitted).  <u>See</u> <u>also</u> <u>Frew</u> <u>ex. rel.</u> <u>Frew v. Hawkins</u>, 540 U.S. 431, 438 (2004) (a consent "decree

13   is a federal-court order that springs from a federal dispute and furthers the objectives of federal

14   law.")  Thus, while the Court will take GovGuam's concerns into consideration when

15   fashioning an appropriate remedial plan, the Court is not precluded from enforcing a consent

16   decree against local officers.  <u>Id.</u>

17       GovGuam maintains that instead of imposing additional requirements upon it, the Court

18   should instead modify the terms of the Consent Decree to afford it more time to achieve the

19   goals of closing the Ordot Dump and opening a new MSWLF.  Under GovGuam's revised

20   schedule, the new landfill at Layon would not begin operations until July 30, 2010, with the

21   eventual closure of the Ordot Dump slated for December 16, 2011.  <u>See</u> Perez Decl. (Docket

22   No. 79) and Exhibit 7 thereto.  GovGuam asserts that significant changes in circumstances

23   make the Consent Decree deadlines unworkable.

24       Rule 60(b)(5) permits a party to obtain relief from a court order when "it is no longer

25   equitable that the judgment should have prospective application."  Fed. R. Civ. P. 60(b)(5).

26   However,  a party that has entered into a consent decree bears a heavier burden in seeking

27   modification under Rule 60(b)(5) for it must "establish[] that a significant change in

28   circumstances warrants revision of the decree." <u>Rufo v. Inmates of Suffolk County Jail</u>, 502

1  U.S. 367, 383 (1992).  The moving party must initially show "a significant change either in

2  factual conditions or in law."  Id. at 384.  Modifications may be justified when (1) changed

3  factual conditions make compliance with the consent decree "substantially more onerous;"

4  (2) "unforeseen obstacles" make a consent decree unworkable; or (3) enforcement of the

5  consent decree without the requested modification would be "detrimental to the public

6  interest."  Id.

7      In this case, GovGuam asserts that significant changes have occurred in both fact and

8  law that warrant the modification of the Consent Decree.  The Court will now discuss each of

9  these changes or categories of events in the order of their submission in GovGuam's moving

10  papers.

11      Change #1: Regulation of SWM by the PUC.

12      GovGuam asserts that when the Consent Decree was entered into in December 2003,

13  the PUC had rate-making authority over DPW's solid waste operations but it did not exercise

14  this authority since there was no identified revenue source.  GovGuam contends it was only

15  after the passage of Public Law 28-56[8] that the PUC, beginning on June 30, 2005, began

16  regulating DPW and its tipping fee rates.  Based upon the GCG report, the PUC refused to

17  increase the tipping fee rates until SWM improved its services and revenue collection.

18  GovGuam appears to assert that this oversight and authority by the PUC constitutes a

19  significant change to its prior ability to set its own rates as it pleased.

20      The United States, on the other hand, argues that PUC regulation is not an obstacle to

21  compliance.  Were in not for the PUC's role and audit, the problems experienced by SWM

22  would not have come to light and would likely have continued.  Furthermore, the PUC is a part

23

24      [8] GovGuam's Motion to Modify Consent Decree makes reference to Public Law 28-58.

25  See Mot. Modify Consent Decree (Docket No. 76) at 3.  Public Law 28-58 is entitled "An Act
   to Reassign Rulemaking Authority and Contracting Authority and to Require an Economic

26  Impact Statement for Advance Disposal Fees by Amended Title 10 GCA Sections 51505 and
   51507."  After further review, however, the Court believes that GovGuam actually intended to

27  refer to Public Law 28-56 in its motion, which revoked DPW's rate-making authority and

28  authorized the PUC to set the tipping fee rates.

1   of GovGuam – the named defendant in this case.  Thus, the United States contends that this

2   alleged "hurdle" is one that was self-imposed by the GovGuam itself.  The United States

3   further asserts that GovGuam should not view PUC oversight as an obstacle but should instead

4   view the PUC as a partner in their road to compliance.

5          The Court notes that the PUC has recommended that GovGuam implement many of the

6   United States' proposed interim milestones in an order issued by the PUC on February 1, 2007.

7   See Second Perez Decl. (Docket No. 94), and Exhibit 1 thereto.  The PUC stated that it "is

8   prepared, within the scope of its enabling legislation, to provide any assistance and to perform

9   any task as may be assigned to it by the District Court under the Consent Decree."  Id. at 6.

10  Furthermore, because DPW has a limited staff, the PUC has also offered to assist in drafting

11  proposed legislation to convert the SWM into a public corporation.  It is obvious that the PUC

12  desires to work with DPW and all GovGuam branches and agencies to ensure that there is a

13  sufficient and stable revenue stream to fund any bond required to finance the Consent Decree

14  projects.

15         The Court has reviewed all the laws that apply to the PUC's regulatory supervision over

16  DPW and its role in the rule making process.  In reviewing these laws, the Court finds that the

17  PUC has always been the agency delegated the authority to set tipping fee rates.  The initial

18  legislation – Public Law 24-272 – added Section 51118 to Chapter 51, Division 2 of Title 10 of

19  the Guam Code Annotated and authorized the PUC to set tipping fee rates to replace the

20  legislative mandated rates five (5) years after enactment of "The Ordot Dump Closure and

21  Solid Waste Management Alternatives Act."  The provision was subsequently amended less

22  than one year later by Public Law 25-70 to allow the PUC to set tipping fee rates to replace the

23  legislative mandated rates three (3) years after enactment of the Act.  Public Law 28-56 further

24  reinforced the PUC's authority to set tipping fee rates.  While Public Law 28-56 does state that

25  "[r]ate-making authority . . . previously given to DPW under this Section, is hereby revoked,"

26  the Court notes that DPW was never given any rate-making authority under Section 51118(e)

27  of Title 10 of the Guam Code Annotated..

28         Not only has the Court reviewed the effect of Public Law 28-56 on the PUC's

1   regulatory supervision of DPW, it has also reviewed the initial legislation which mandated the

2   closure of the Ordot Dump, established tipping and user fees, and created the Solid Wastes

3   Operation Fund.  Having reviewed these laws, the Court finds that **fundamental legal issues**

4   **need to be addressed to insure compliance with the Consent Decree and that the processes**

5   **that have been established for compliance meet legal requirements.**

6           When the Consent Decree was approved, it contained a provision[9] which addressed

7   GovGuam's obligations in financing the closure of the Ordot Dump and the construction of a

8   new solid waste landfill.  The decree contemplated that initial funding was to be provided from

9   the Solid Wastes Operation Fund, established by 10 G.C.A. §51118 through the collection of

10  tipping, user, and commercial fees.  The Solid Wastes Operation Fund was initially established

11  by the Guam Legislature with the passage of Bill No. 495, "The Ordot Dump Closure and Solid

12  Waste Management Alternatives Act."  Its legislative history reveals the Guam Legislature

13  presumed the bill to have become law on February 28, 1998, without the governor's signature

14  and labeled the bill as Public Law 24-139.  It appears that shortly thereafter, litigation

15  commenced[10] to determine whether the bill actually became a public law or whether the

16  Governor of Guam effectively pocket vetoed the bill.  Public Law 24-139 amended Article 1 of

17  the Solid Waste Management provisions of Title 10 Guam Code Annotated, Chapter 51 and

18  also contained the Guam Legislature's policy with regard to the closure of the Ordot Dump.

19          Shortly after the presumed passage into law of Bill No. 495 as Public Law 24-139, the

20  Guam Legislature also passed Bill No. 520.  Bill No. 520 was vetoed by then Governor

21  Gutierrez on April 11, 1998.  The veto was overridden by the Guam Legislature on October 8,

22  1998 and Bill No. 520 became Public Law 24-272.  Therein, the Guam Legislature repealed

23  and re-enacted Sections 2 through 16 of Public Law 24-139, the pertinent provisions of the Act

24

25          [9] See Consent Decree (Docket No. 55) at ¶10 entitled Financing Closure of Ordot

26  Dump and Construction and Operation of New Municipal Solid Waste Landfill.

27          [10] See *Pangelinan I*, Superior Court of Guam Case No. SP0073-98, Supreme Court of

28  Guam Case No. CVA99-020.

1   relating to the Ordot Dump. Bill No. 520, enacted as Public Law 24-272, also became

2   embroiled in litigation[11] questioning its validity. The validity of these two public laws were

3   later determined in two Supreme Court opinions.[12]

4        In *Pangelinan I*, 2000 Guam 11, the Supreme Court of Guam held that P.L. 24-139 was

5   pocket vetoed by the Governor of Guam and thus invalid. This decision was issued on

6   March 10, 2000.

7        In *Pangelinan II*, 2004 Guam 16, the Supreme Court of Guam, among other holdings,

8   held Public Law 24-272 to be without legal effect since the statute it attempted to repeal and

9   reenact was *void ab initio.* 2004 Guam 16, ¶ 43. This latter decision came down on

10  September 9, 2004.

11       The Court notes that Guam's legislative policy regarding closure of the Ordot Dump

12  was contained solely in the above public laws. The initial creation and collection of tipping

13  and related fees and the deposit of the said fees into the Solid Wastes Operation Fund rested in

14  these two public laws. When the parties signed the Consent Decree in December 2003 and

15  when it was ultimately approved by the court in February 2004, the parties assumed that Guam

16  had a policy on the closure of the Ordot Dump. The parties also assumed a sound tipping fee

17  collection system within DPW and the Solid Wastes Operation Fund as a source for financing

18  projects required pursuant to the decree. However, approximately nine months after approval

19  of the Consent Decree, critical provisions of the law (Public Law 24-272) which were foreseen

20  to have an impact on GovGuam's ability to finance closure of the Ordot Dump were found

21  void. The Court also notes that the Guam Legislature subsequently passed laws amending

22  various sections of Public Law 24-272. It remains to be seen, however, what legal effect these

23  subsequent amendments have.

24       Commenting on these events, Guam's Compiler of Laws notes that the amendments

25  _____

26     [11] See *Pangelinan II*, Superior Court of Guam Case No. SP0212-00, Supreme Court

27  Case No. CVA02-003.

28     [12] See also footnote 1 *supra*.

1  made to Article 1 of Title 10, Guam Code Annotated, by Public Laws 24-139 and 24-272 "are

2  void and of no effect" pursuant to the court decisions *supra*.  The Compiler further states:

3        However, notwithstanding the aforementioned court holdings and without
         consideration thereof, parts of this Article were amended by P.L. 24-309 . . .,

4        P.L. 25-70 . . ., P.L. 25-93 . . ., P.L. 25-175 . . ., P.L. 26-35 . . ., P.L.28-11 . . .,
         and P.L. 28-56 . . . .  Therefore, until this Article is corrected by the legislature,

5        it is presented here in the form repealed and reenacted by P.L. 24-272 and
         amended by subsequent laws as indicated in the Source comments. **However,**

6        **reference must be made to the Article as it existed prior to P.L. 24-139.**

7  Compiler's Notes to Article I, Title 10, Guam Code Annotated (emphasis in original).

8        The Court has reviewed the public laws that amend Public Laws 24-139 and 24-272.

9  None of the latter public laws attempt to re-create and/or re-establish a policy for the closure of

10 the Ordot Dump.  If the Compiler's notes are not read at beginning of Article 1, the continued

11 inclusion of certain provisions of Public Law 24-272 creates an impression that the legislative

12 policy on the Ordot Dump continues to exist and that the important sections thereof which

13 establish a tipping fee and create a Solid Wastes Operation Fund continue to legally exist.  As

14 the Court has said above, the legal effect of the subsequent amendments come into question.

15       In *Pangelinan I*, the Supreme Court of Guam held that subsequent attempts to re-enact

16 or amend a void law are of no effect.  Thus, even though there was subsequent passage of

17 Public Law 24-272 which repealed and re-enacted Public Law 24-139, this remedial measure

18 did not validate Public Law 24-139.  In *Pangelinan II*, the Supreme Court of Guam held that a

19 subsequently passed public law (in this case Public Law 24-272) which repealed and re-enacted

20 the previous provisions of Article 1 as contained in Public Law 24-139 was void because

21 Public Law 24-139 was an invalid statute.

22       These court decisions therefore bring into question the current state of the Solid Waste

23 Management provisions of the Act.  Applying the legal effect of the Supreme Court of Guam

24 decisions, there was never a valid legislative creation of the Solid Waste Operations Fund.  Did

25 the Solid Waste Operations Fund come into existence on June 30, 2005, when Public Law 28-

26 56 was passed, amending 10 GUAM CODE ANN. § 51118(f), created by Public Law 24-272?

27 The Court notes that the Supreme Court held in the *Pangelinan II* case that Public Law 24-272

28 was void as the result of the invalidation of Public Law 24-139.  The same can then be said for

1  Public Law 28-56 and all the subsequent public laws that amend sections and portions of Public

2  Law 24-272.

3          Is there then a legitimate legislative scheme which contains a policy on the closure of

4  the Ordot Dump and the construction of a new landfill for Guam?  Is the current mechanism

5  (the Solid Waste Operations Fund) for financing many of the projects contemplated within the

6  Consent Decree legally constituted?   These questions will be addressed by the Court in its

7  proposed recommendations.

8          Change #2: DPW's Inexperienced Engineer and Lack of Qualified Employees.

9          GovGuam asserts that after the decree was entered, its chief engineer made significant

10 errors or omissions in contracting for the Consent Decree projects.  For instance, the chief

11 engineer failed to contract for a VEA (Value Engineering Analysis) on any of the design

12 projects and ignored or neglected certain environmental requirements that eventually led to

13 delays in the projects.  Based on these errors and omissions by its former chief engineer and the

14 lack of qualified staff, GovGuam asserts it has had to contract much of the work to outside

15 engineering firms, thus resulting in further delay on the compliance deadlines.

16         The United States contends that his is simply not a "significant change" to warrant a

17 modification since GovGuam faced these very same concerns – lack of an experienced or

18 knowledgeable staff – when it entered the Consent Decree.  Knowing this, GovGuam could

19 have remedied the problem early on by entering into the appropriate engineering contracts from

20 the start.  Instead, GovGuam decided to wait almost two years before contracting with qualified

21 engineers.

22         Addressing this issue, the Court finds that GovGuam officials knew or should have

23 known that DPW's current staff collectively did not have the experience to perform the tasks

24 required under the Consent Decree.  GovGuam negotiated and agreed to a date within which to

25 comply with the Consent Decree.  GovGuam should have foreseen the shortcomings of its

26 engineering staff at that point in time.  Thus, it was incumbent on GovGuam to enter into

27 appropriate contracts with qualified engineering firms in the early stages to ensure compliance

28 with the established deadlines.  Furthermore, based on documents it submitted, it appears that

1    GovGuam waited until August 2006 to advertise for the positions of manager of landfill

2    operations and solid waste technical advisor.  See GovGuam Response (Docket No. 64) and

3    Attachment 1 thereto.  This approximately two years and ten months after GovGuam signed the

4    Consent Decree.  Important positions critical to compliance with the Consent Decree should

5    have been advertised and filled sooner.  GovGuam's October 2004 Financial Plan also included

6    a projection that it would cost about $283,000 annually for additional personnel and training.

7    See Motion to Enforce Consent Decree (Docket No. 69) and Attachment 14 at ¶5.8.  Because

8    GovGuam never fully implemented this Financial Plan, it could not hire the personnel needed

9    or provide the training necessary to DPW's staff.  This claimed change circumstance is in

10   actuality a self-imposed hardship and does not merit the type of "substantial" change necessary

11   to modify the decree.  Moreover, placing blame for the delay on the inexperience of its chief

12   engineer who has since retired and thus is not able to defend himself does not speak well of

13   GovGuam.  At the outset, the Court is mindful that at the time in question, the chief engineer

14   was a government of Guam employee, acting on behalf of the government of Guam and was an

15   agent of the government of Guam.  Placing the blame on this individual does not take away

16   blame from the government.  Rather, it reinforces  placing blame for the delay with the

17   Defendant, the government of Guam, of which the chief engineer was an integral part thereof.

18   The Court surmises the failure to contract out a VEA study at an earlier date could have been

19   motivated by financial concerns plaguing GovGuam instead of the inexperience of any

20   individual employee.

21            Change #3: VEA Result and the Need for Further Hydrogeological Investigations.

22            Because of its inexperienced staff, GovGuam claims a VEA study was conducted after

23   the completion of the pre-final 100% design for each project.  GovGuam maintains that this

24   VEA report identified certain design changes that would result in substantial savings and

25   reduce or eliminate certain other tasks.  Additionally, follow-up hydrogeological data collected

26   in 2005 indicated that the hydrogeology of Layon was more complex that previously thought.

27   Thus, further studies must still be performed before construction can begin at Layon.

28            The United States asserts that normally, a VEA study is incorporated into a project's

1    overall design schedule.  In order to avoid major delays and re-design work, a value

2    engineering study is often planned at an early stage in the design.  Unfortunately, GovGuam

3    did not do this.  The United States argues that GovGuam should not be rewarded with an

4    extension of the compliance deadline since any delay is a result of its own mismanagement of

5    the projects and deadlines.

6         In addressing this issue, the Court again takes note of the fact that GovGuam negotiated

7    and agreed to the Consent Decree deadlines.  If GovGuam wanted to use a VEA study to

8    evaluate major aspects of the Consent Decree construction projects, it was incumbent upon

9    GovGuam to commence and conclude such a study within the time frame provided so as to

10   avoid delays.  Furthermore, the initial phase of the ground water analysis was performed in

11   2005 when GovGuam selected Layon as its preferred site.  GovGuam's own witness Thor

12   Gudmundsen testified that ground water information is needed in preparing the design for a

13   landfill.  In fact, he stated "[i]t's best to have [this information] as early as possible."  Tr.

14   (Docket No. 121) at 67.  Thus, GovGuam should have had this hydrogeological data already

15   when it submitted its initial draft plan as required by ¶9(c) and its 90% draft final plan as

16   required by ¶9(d).  Nevertheless, GovGuam now claims that further hydrogeological surveys of

17   Layon are necessary.  As the Court stated *supra*, if GovGuam did not have the required

18   expertise or if the delay was due to any of its employees, it must take responsibility for the

19   delay and not blame its employees or their mismanagement.  Employee delays or employee

20   mismanagement which resulted in the belated studies is GovGuam's own mismanagement.

21   This does not constitute and cannot constitute an "unforeseen obstacle" to warrant

22   modifications as requested by GovGuam because these obstacles were not caused by non-

23   government individuals or non-government parties who had contracts with the government but

24   the very government itself.

25        Change #4: Impediments Due to Others Over Whom GovGuam has no Control.

26        GovGuam asserts that the actions or inactions by those over whom it has no control has

27   also resulted in impediments to timely compliance with the Consent Decree.  These include (a)

28   a change in the procedural requirements for obtaining federal grant funds that resulted in an

page 19 of 31

1  eight-month delay of federal funds (one grant for $1.5 million and the other for $1.3 million);

2  (b) delay in obtaining an agreement from NASA to improve the dirt access road to Layon, a

3  portion of which traverses NASA property; and (c) in-fighting between the Layon landowners

4  which resulted in a delay to access to the property to conduct needed preliminary investigations

5  and design work.

6         The United States argues that none of the above stated reasons justifies the four-year

7  delay sought by GovGuam. The United States labels GovGuam's concerns over the

8  Department of Interior funding a "red herring" since GovGuam never intended to rely

9  exclusively on Department of Interior ("DOI") funding to complete the Consent Decree

10  projects.

11         The Court agrees with the position of the United States. While timely receipt of the

12  DOI funds would have been extremely beneficial and would have allowed the DPW staff to

13  concentrate compliance efforts more in those areas where needed, the Court finds that the delay

14  of these federal funds might justify some delay, but it does not justify the three or four-year

15  extension sought by the Defendant. GovGuam knew that this project would require more than

16  simply two or three million dollars. GovGuam's Financial Plan projected that the Consent

17  Decree projects would require $100 million in bond revenue. <u>See</u> Motion to Enforce Consent

18  Decree (Docket No. 69) and Attachment 14 at ¶6.1. Yet, GovGuam has not even begun the

19  process for PUC review and approval of the bond measure since DPW can not accurately bill

20  or collect fees from its residential customers.

21         On the issue dealing with NASA access to the property, GovGuam knew or should have

22  known when it selected the Layon site in 2005 that access to the property was a major factor in

23  the site selection process. Having selected Layon as the proposed site for the new landfill,

24  GovGuam should have developed a plan for access to the landfill area. It does not seem

25  reasonable to the Court for GovGuam to pick a site and then ask permission from private

26  landowners or non-GovGuam agencies to use their private lands to gain access to Layon. An

27  access plan should have long been developed and GovGuam's ability to get to the site should

28  have long been resolved by now. Yet more than two years have passed since the site selection

1    of Layon and GovGuam has yet to find a suitable access to the said site.  Again GovGuam

2    should exercised prudence in this matter and resolved the access issue by resorting to

3    condemnation proceedings so that its ability to move forward is not hampered by one

4    landowner or agency's refusal to provide access.  The Court also notes that no private

5    landowner or NASA for that fact is duty bound to provide access without some sort of

6    compensation.  Attempts should have been made to obtain a road access in early 2005 and not

7    at this late stage.  Thus, the Court is not too sympathetic at this point to an argument that this

8    federal agency or that any property owner has not given access to the proposed Layon site.

9    Furthermore, even if NASA approval had been received, GovGuam still could not begin the

10   projects since it did not have the necessary funds to proceed.

11           With regard to the dispute between the landowners, GovGuam could have avoided the

12   problems it has experienced by condemning the property through eminent domain.  Ms.

13   Kennedy admitted at the March 8 hearing that GovGuam presently has the funds to purchase

14   the property necessary for the new MSWLF.  Tr. (Docket No. 121) at 78-79.  If GovGuam has

15   the funds necessary to purchase the landfill, then it must reasonably pursue that direction (*i.e.*,

16   commence condemnation proceedings) rather than waiting and waiting and waiting for the

17   various land owners to willingly accept a purchase offer from GovGuam.  As late as July 28,

18   2006, GovGuam sent a letter[13] to Oxford Properties & Finance Co., Ltd. and Paul A. Calvo,

19   General Manager of Calvo's Insurance Underwriters, Inc., offering to purchase approximately

20   1,306,980 square meters for their interest in Lot B-3REM for approximately $1,450,748.00.

21   Therein, GovGuam suggested its offer was just compensation for their interest in Lot B-3REM,

22   the landfill site.  Oxford Properties rejected the offer by letter through their legal counsel.[14]

23   Calvo's Insurance Underwriters requested additional time to respond to the offer[15] and there is

24   no indication given whether such offer has since been accepted.  In passing, the Court notes

25
26       [13]  See Jackson Corrected Decl. (Docket No. 85) and Exhibit 5 thereto.

27       [14]  See Jackson Corrected Decl. (Docket No. 85) and Exhibit 6, Document 1 thereto.

28       [15]  See Jackson Corrected Decl. (Docket No. 85) and Exhibit 6, Document 2 thereto.

1   that Public Law 24-06 (effective March 20, 1997) requires GovGuam to acquire the landfill

2   area.[16]  It has been more than two years since the selection of the Layon site and GovGuam has

3   yet to acquire the property mandated by the 1997 public law.  With an impending decree

4   deadline nearing for the completion of the Layon landfill, the prudent thing for GovGuam to do

5   would be to pursue a condemnation action which would place the property within GovGuam's

6   hands so that the landfill construction can commence without further delays.

7        For the above reasons, the Court finds that the impediments outlined by GovGuam do

8   not justify further modification of the Consent Decree deadlines because these impediments

9   would not have been impediments if prudence had been exercised.  These are simply self-

10  imposed hurdles by GovGuam which do not justify further modification of the Consent Decree

11  deadlines.

12       Change #5: Changes in Law Hamper Financing Options.

13       GovGuam claims that another significant change since entering into the Consent Decree

14  in 2003 has been the passage of subsequent legislation and other court actions that limit its

15  access to General Fund monies or other revenues to pay for the Consent Decree projects.

16  These changes include the "Every Child is Entitled to an Adequate Public Education" law,

17  which prioritizes education above other government programs.  Additionally, the Superior

18  Court of Guam judgment in late 2006 which requires GovGuam to pay retirees approximately

19  $123 in cost of living adjustment ("COLA") and the Earned Income Credit ("EIC") settlement

20  agreement for $90 million in this Court also allegedly limit GovGuam's access to funds.

21       GovGuam, like all other governments, must plan for contingencies such as education

22  costs and litigation risks/expenses, as well as the normal cost of running government operations

23  in critical and non-critical areas.  It must tailor its expenses to meet revenue expectations.

24  Nevertheless, the aforementioned education expenses and court judgments/settlements can not

25  be blamed for GovGuam's lack of funds in providing a revenue source to fund the projects

26

27       [16]  Subsection 4(f) of Public Law 24-06 provides that "[o]wnership of the land used for
the MSWLF shall remain with the government of Guam, which shall lease the land to the

28  contractor."

1  required under the Consent Decree and ultimately its failure to meet the Consent Decree

2  deadlines.

3         Monies from the General Fund and appropriations therefrom were never contemplated

4  to be the *exclusive funding source* for the projects herein.  The General Fund was to be an

5  additional source of funding.  As the Court stated, *supra*, it was the intent of the parties to use

6  the Solid Waste Operations Fund through its tipping and user fees to generate much of the

7  funding for these required projects.  However, the parties also agreed that the Solid Waste

8  Operations Fund should not be regarded as the exclusive source of funding, but that GovGuam

9  may obtain funding from other sources, including the General Fund.  It is difficult for the Court

10  to accept the proposition that GovGuam's current financial condition is to blame for its

11  inability to meet current Consent Decree deadlines.  This does not mean that the Court is not

12  sympathetic to GovGuam's current financial problems.  Rather, the current General Fund

13  condition does not excuse compliance with the Consent Decree deadlines since GovGuam has

14  not yet attempted to procure funding through the use of the Solid Waste Operations Fund.

15         In this regard, the Court notes that GCG's report found GovGuam's financing problems

16  to be a result of the mismanagement of SWM rather than a lack of legislative appropriations.

17  Thus, when GovGuam tells the Court that changes in the law and other monetary judgments

18  against it hamper its financial ability to fund the projects herein, the Court must ask GovGuam

19  why it has not attempted to put in place the mechanism contemplated by the parties to fund the

20  projects required under the Consent Decree.  Until GovGuam attempts to put in place this

21  funding mechanism, it cannot reasonably expect the Court to believe that its ability to provide

22  funding has been hampered by the strain on its General Fund produced by said change in the

23  law and the aforementioned monetary judgments.

24         Again prudence must be exercised to put the contemplated mechanism for financing the

25  projects herein in place, and **effort** on that part must come from GovGuam.  **Is closure of the**

26  **Ordot Dump truly a priority of the Defendant, GovGuam?**   In assessing priority, the Court

27  must engage in some crude comparative analysis.  The Court notes that measures are being

28  undertaken to fund the $90 million EIC settlement, and payment for certain years of that

1  settlement has already been made by GovGuam.  The Court also further notes that measures are

2  being undertaken to find funding for the $123 million COLA judgement, a judgment that is

3  only a few months old.  Has the Ordot Dump closure received similar priority?  The Court

4  believes that only when effort is undertaken with respect to the implementation of the Solid

5  Waste Operations Fund as the means to the funding of the projects herein or the funding of

6  revenue bonds can the Court truly say that this judgment has received the necessary priority

7  from the Defendant.

8      Change #6: Expected Military Increase on Guam.

9      GovGuam asserts that with the expected increase in military personnel to the island and

10  the lack of space at the Andersen Air Force Base landfill,  additional planning is necessary to

11  accommodate the amount of garbage expected from this military build-up.  Specifically,

12  GovGuam argues that the Consent Decree did not anticipate an unprecedented military build-

13  up of approximately 8,000 U.S. Marines.  Furthermore, GovGuam anticipates that this will

14  result in potential federal funding for the Layon construction.

15      In this regard, the Court has reviewed the affidavits proffered by GovGuam as well as

16  the affidavit of Pankaj Arora, a U.S. EPA environmental engineer who is currently the

17  Remedial Project Manager for the Ordot Dump.  See Docket No. 89.  Arora states familiarity

18  with GovGuam's 2005 design for construction and operation of the new MSWLF and asserts

19  that the construction assumed the new landfill would be built in stages, allowing for the

20  construction of future landfill cells as the need arises.  More importantly, the design took into

21  account future growth in population for Guam, including *residential, military, and tourist*

22  *populations*.  Thus, the Court finds this claimed change in circumstance was anticipated at the

23  time of the execution of the Consent Decree and currently incorporated into the new landfill

24  construction design.

25      Furthermore, since GovGuam's Financial Pan never incorporated Department of

26  Defense contributions, it certainly can not now claim that its Financial Plan is unworkable

27  without such federal contribution.  While federal contribution was not initially anticipated to be

28  a funding source for the projects required under the Consent Decree, the Court welcomes any

page 24 of 31

1   new funding source and in this regard encourages GovGuam to seek federal funding to meet its

2   responsibilities under the Consent Decree.   However, if the military build-up occurs as

3   expected, GovGuam's landfill design has already taken into account the possible growth of

4   Guam's military population.

5          Change #7: Political Opposition.

6          GovGuam finally argues that political opposition has emerged subsequent to the

7   decision to locate the landfill at Layon.  It notes that senators have introduced at least four bills

8   in the Guam Legislature since the entry of the Consent Decree, attempting to change the

9   location of the new landfill.  In order to counter the negative public perceptions, GovGuam

10  further asserts that it has had to conduct more public outreach than it had originally

11  contemplated and its limited staff has been distracted by various legislative hearings and site

12  visits, thus resulting in further delays.

13         The Court remains unpersuaded by this final argument.  GovGuam's latest attempts to

14  place blame for the delay herein on the actions of Guam senators in introducing legislation to

15  change the Layon site is unconvincing.  GovGuam knew when it agreed to the terms of the

16  Consent Decree that site selection for the new landfill would be controversial, just as it is in

17  every jurisdiction.  Nevertheless, GovGuam went through the process and eventually selected

18  the Layon site.  The fact that there has subsequently been further opposition is nothing new and

19  should have been contemplated and anticipated.  The fact that senators are holding public

20  hearings to scrutinize and hold DPW accountable or to question the ultimate soundness of the

21  Layon selection is part of the American democratic process and the freedoms enjoyed by our

22  citizens.

23         The Court notes that GovGuam's VEA report for Layon addresses the fact that the area

24  is in proximity to four wetlands and three rivers.  It summed up as a critical issue the need for

25  the landfill to stay away from the four wetlands and at the same time the need to minimize its

26  impact to the three rivers.  If GovGuam's VEA report recognizes these critical issues, surely

27  there must be significant numbers of residents within the affected areas who also share the

28  same concerns and are still resorting to the legislative processes to remove the landfill from

1   their vicinity.  This reaction is quite expected.  In this regard, however, the Court notes that the

2   Guam Legislature is not conducting public hearings daily or even on a  weekly basis on this

3   issue.  Thus, the Court believes that DPW's limited staff is not as burdened or distracted by the

4   Legislature's actions as GovGuam claims it is, but at the same time acknowledges that their

5   time and effort could have been better utilized in matters that concentrate on the decree's

6   deadline compliance rather than in seeking alternatives to the selected Layon site.  Thus, the

7   Court concludes that subsequent political opposition to the Layon site does not constitute a

8   factual change in conditions to warrant the four-year delay sought by GovGuam.

9                           **Effect of Changes & Interim Milestones**

10          Given all the alleged "significant changes" mentioned above, GovGuam maintains that

11  the Consent Decree has become substantially more onerous than anticipated.  GovGuam also

12  asserts that even if the alleged "changed circumstances" were or should have been anticipated,

13  GovGuam has made a good faith effort to comply with the terms of the Consent Decree, and its

14  efforts should not be ignored.  GovGuam further claims that its proposed modifications are

15  "suitably tailored" to the changed circumstances.

16          Having reviewed the various contentions of the parties, the Court finds it evident that

17  the issue before it is not whether it should modify the Consent Decree deadlines.  Both parties

18  essentially concede that the current deadlines can not be met.  Instead, the Court must focus its

19  attention on the measures that it must impose to ensure compliance with the Consent Decree in

20  the most swift and reasonable manner, taking into consideration the reasons for GovGuam's

21  failure to timely comply with the Consent Decree's deadlines.  An outright modification or

22  extension of the current deadlines without intense supervision and monitoring by the Court will

23  not guarantee future compliance.  Thus, the Court concurs with the United States' assessments

24  that certain interim steps must be put into place and met before GovGuam can meet the

25  Consent Decree's mandates.

26          Before establishing these interim steps, the Court should attempt to restore the

27  government of Guam's prior findings that the Ordot Dump poses a threat to the health and

28  safety of the residents of Guam and in that sense reassure the public that GovGuam has

1  developed a public policy on the closure of the Ordot Dump.  Furthermore, the Court must

2  assure itself and the public that laws that have been enacted to meet compliance with the

3  deadlines of the Consent Decree are properly in place.  As the Court pointed out, *supra*, the

4  GovGuam's policy on the Ordot Dump, as evidenced by Public Law 24-139 and Public

5  Law 24-272, have been ruled null and void by the Supreme Court of Guam.  These policies

6  should be restored through the legislative process.  Important provisions within the said laws

7  deal with the establishment of tipping fees and user fees as well as the creation of the Solid

8  Waste Operations Fund.  While the Guam Legislature has passed laws in the interim which

9  amend the voided sections, there is a court decision which has held that a subsequent law void

10  because of the invalidation of the prior law it sought to amend or re-enact.  The Compiler of

11  Laws has taken note of the aforementioned Supreme Court of Guam cases and has stated that

12  the Legislature must correct the provisions of Article 1 of the Solid Waste Management Act.

13  This has yet to be done.  There remains then very serious questions whether subsequent

14  amendments by the Legislature with regard to the tipping provisions and the use of the Solid

15  Waste Operations Fund as contained in Public Law 24-272 are legally in place.  The Court can

16  only surmise that if there has been no priority given to the closure of the Ordot Dump, it may

17  be the fact that there is currently no mandated legislative policy thereon.

18      In order to resolve the above issues, the Court hereby recommends the appointment of a

19  Law Revision Committee ("LRC") to consist of

20      1.  the Governor of Guam or his designated representative;

21      2.  the Speaker of Guam Legislature or his designated representative;

22      3.  the Attorney General of Guam or her authorized representative;

23      4.  the Director of the Department of Public works or his authorized representative; and

24      5.  the Chairperson of the PUC or his authorized representative.

25      This LRC shall meet monthly with the Plaintiff and the Court.  The LRC shall be tasked

26  with developing a general legislative policy for GovGuam with regard to the closure of the

27  Ordot Dump and the construction of a new landfill.  It shall also seek introduction of all

28  legislation deemed necessary herein to carry out the mandates for compliance with obligations

1  of the Defendant herein.  Furthermore, the LRC shall address the concerns of the Compiler of

2  Laws that the Legislature take action to correct provisions of Article 1 of the Solid Waste

3  Management Act so that the authority given to the PUC to set tipping fee rates and the use the

4  Solid Waste Operations Fund are legally established in place.

5        In concurrence with the PUC and the United States, the Court recommends that DPW's

6  SWM be reconstituted as a public corporation in order to address its organizational deficits, to

7  improve the quality of SWM's services to residential customers, and to establish a reliable

8  billing and collection system – all of which are critical prerequisites for obtaining the bond

9  financing necessary to pay for the  Consent Decree projects.  To this end, the Court

10  recommends the following timeframe:

11      •      Within 60 days following the District Judge's order, GovGuam shall propose

12             legislation that reconstitutes SWM as a public corporation under the oversight of

13             the Consolidated Commission on Utilities ("CCU").  This proposed legislation

14             must include the new public corporation within the meaning of "public utility"

15             as set forth in 12 GUAM CODE ANN. § 12000(a).  This proposed legislation must

16             also empower and authorize the new public corporation to secure revenue bond

17             financing for Consent Decree capital projects.  Copies of the proposed

18             legislation must be provided to the United States, and the PUC for review and

19             approval.  Thereafter, GovGuam must forthwith request legislative authorization

20             for this action.  The proposed legislation may be dealt with through the LRC.

21      •      Within 90 days from its creation, the new public corporation shall file with the

22             PUC a plan for implementing a proposal to (i) to procure service of a company

23             to collect residential waste for the island; (ii) to either privatize its billing and

24             collection or establish a protocol under which GPA would undertake this

25             responsibility; and (iii) to restructure its business relationship with commercial

26             haulers.

27      •      Within 120 days from its creation, the new corporation shall submit to the PUC

28             a petition for the approval of the revenue bonds and for the use of bond

1   proceeds, with PUC action within 90 days from such filing.  The PUC shall
2   award the new corporation adequate rate relief to allow it to comply with its
3   indenture obligations.  Furthermore, GovGuam shall request Legislative
4   authorization of this bond financing no later 45 days following PUC approval.

5   •   Within 120 days from its creation, the new corporation shall have negotiated the
6   acquisition of the Layon site for the new landfill or have initiated an eminent
7   domain proceeding to acquire said site.

8       Additionally, in order to assist GovGuam in meeting its obligations, the Court further
9   recommends the following:

10  •   the Public Auditor must complete her audit findings and issue her report of the
11  SWM's accounts receivable no later than 90 days from the District Judge's
12  order.  GovGuam shall provide copies of the report to the PUC and the United
13  States.

14  •   within 30 days of the District Judge's order, and every 15th of the month
15  thereafter, GovGuam shall provide monthly compliance reports, with each
16  report signed by a the Governor and the DPW director, or the Governor and the
17  head of the new public corporation, that (a) document that GovGuam has
18  provided sufficient daily cover over the trash at the Ordot Dump; (b) identify
19  and explain any failures to comply with the compliance milestones; and
20  (c) include the amount of revenue collected in the proceeding month, the amount
21  of accounts receivable that have not been collected, a recitation of the
22  percentage of accounts receivable collected, and an explanation of why
23  GovGuam has not collected the unpaid accounts receivable.

24      Finally, the Court believes that GovGuam will more likely comply with any modified
25  schedule only with continued and intense Court supervision and monitoring.  The Court
26  therefore recommends scheduled monthly status conferences with the parties.  These status
27  conferences should be open to the public.  These status conferences may be held
28  simultaneously with the LRC meetings.

page 29 of 31

1   The Court does not make the above recommendations lightly.  The Court notes that the

2   previously retired Chief Judge worked diligently for one year with the parties, including

3   various GovGuam officials from both the executive and legislative branches representing both

4   political parties, to fashion an acceptable Consent Decree with deadlines that GovGuam could

5   realistically achieve.  More than three years later, GovGuam is again asking for more time  –

6   another four years – to complete what is long overdue. While imposition of the above tasks

7   may delay the closure of the Ordot Dump, without such remedial measures operations at the

8   Ordot Dump will not cease in the foreseeable future.  Moreover, if GovGuam does not meet

9   these goals, it risks the eventual appointment of a receiver to oversee all waste management

10  operations.  This simply should not be an option for the people of Guam.

11  **RECOMMENDATIONS**

12  Based on the above analysis, the below-signed Magistrate Judge hereby recommends

13  that the United States' Motion to Enforce Consent Decree be granted in part, and impose the

14  recommendations and interim milestones outlined above.  Furthermore, the below-signed

15  Magistrate Judge recommends that GovGuam's Motion to Modify Consent Decree be denied at

16  this time. Until a new policy is adopted by the Guam Legislature to replace the legislative

17  policy held null and void by the Supreme Court of Guam; until provisions of Article 1 of the

18  Solid Waste Management Act are corrected to assure that critical sections of the said act are

19  legally in place to carry out the mandates of the Consent Decree; and until the interim

20  milestones have been accomplished, further discussions about setting deadlines for the opening

21  of a new MSWLF and closing the Ordot Dump are futile.  Without a financial mechanism in

22  place to fund the Consent Decree projects, the Court believes that GovGuam will continue to

23  come to this Court and request for more time.  This would not be acceptable.  Most important,

24  without further Court monitoring  and intense Court supervision, the Court does not believe

25  GovGuam will be able to close the Ordot Dump within a reasonable time frame.  Accordingly,

26  the Court believes it has no other reasonable alternative but to propose the above

27  ///

28  ///

1  recommendations. The Court hopes that implementation of these recommendations will

2  eventually bring much needed relief to the people of Guam and especially the residents of the

3  villages surrounding the Ordot Dump.

4

5

6                                                            /s/ Joaquin V.E. Manibusan, Jr.

7                                                               U.S. Magistrate Judge

8                                                            Dated: Jul 06, 2007

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28