ORIGINAL

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division
ROBERT D. MULLANEY
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6483
Fax: (415) 744-6476

LEONARDO M. RAPADAS
United States Attorney
MIKEL SCHWAB
Assistant United States Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez
Hagåtña, Guam 96910
Tel: (671) 472-7332
Fax: (671) 472-7215

Attorneys for United States of America

FILED
DISTRICT COURT OF GUAM
OCT 29 2007
JEANNE G. QUINATA
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL CASE NO. 02-00022 |
| Plaintiff, | |
| v. | UNITED STATES' SUBMISSION OF AUTHORITIES AND OTHER REFERENCES |
| GOVERNMENT OF GUAM, | Date: November 19, 2007<br>Time: 11:00 a.m. |
| Defendant. | Judge Tydingco-Gatewood |

Pursuant to GR 4.1, the United States hereby submits a copy of cited cases, authorities, and other references from its Supplemental Brief in response to Status Hearing that may not be available in the Court's library or the Guam Territorial Law Library.

**CASES AND AUTHORITIES**

Cases:

1. Town of Greenwich v. Dep't of Transportation, 10 ELR 20178, 20181 (D. Conn. Nov. 7, 1979 & Jan. 21, 1980)
2. United States v. Alder Creek Water Co., No. 79-1090 (D. Or. Sept. 26, 1980), aff'd 823 F.2d 343 (9th Cir. 1987)

Respectfully submitted,

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

Dated: _____

MIKEL SCHWAB
Assistant U.S. Attorney

OF COUNSEL:

JULIA JACKSON
Assistant Regional Counsel
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, California 94105

- 1 -

Legislators also attacked proposed funding reductions for even the most obscure *individual programs*.[19] But no legislator at any time complained that the President had violated the Act by supplying inadequate *information*. No complaint was forthcoming even after the National Wildlife Federation sent to all the appropriations committee members a copy of its letter to President Carter. *See* note 4 and accompanying text *supra*.

The absence of congressional complaints is highly relevant, we think, in light of the Act's purpose. Congress in 1974 was frustrated by President Nixon's impoundment of appropriated funds. *See generally* Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297 (codified at 31 U.S.C. §§ 1301-53). The Renewable Resources Planning Act to some extent reflected these sentiments. *See* 16 U.S.C. § 1606(h) (1976). The Act was designed to help legislators understand when, and to what extent, budget requests were inadequate to fulfill policies approved by Congress."[20] In light of the Act's purpose, one would expect that legislators dissatisfied with the President's submissions would have made their dissatisfaction known. Appellant concedes that not one legislator did so.[21]

Second, appellant also concedes that no witness at the appropriations hearings—not even appellant's own witness—complained that the President's submission was inadequate, or that debate was handicapped by the inadequacy of the presidential statement."[22]

---

[19] [Representative] DUNCAN. Decreases of $1.6 million are requested to eliminate the noxious farm weed control program. The tanzi ragwort is very poisonous, and we have an epidemic of it in Oregon. I have difficulty in understanding why you are cutting down that program.

Mr. THORNTON [of the Forest Service]. The reason is that in the zero-based budget process it did not get the priority.

* * * *

[Representative] DUNCAN. So what you are telling me is control of the tanzi ragwort in Oregon is going to suffer?

Mr. THORNTON: Yes.

[Representative] DUNCAN. I want to know what you need in this budget to maintain this program at last year's level and what you need in your judgment, to adequately respond to the need for the eradication of noxious weeds in this country.

*Id.* at 711.

[20] "The intent of the legislation is to establish more Congressional control over the management activities and appropriation processes of National Forest System lands." H.R. Rep. No. 1163, 93d Cong., 2d Sess. 1 (1974). *See id.* at 8, 9, 10 & S. Rep. No. 686, 93d Cong., 2d Sess. 23-24, 28 (1974) (the Nixon administration feared the Act would unduly restrict presidential flexibility and discretion).

[21] Brief for Appellant at 14. We do not hold that Congress' uncomplaining appropriation of money in itself affirmed the legitimacy of the President's budget submissions. *See* Tennessee Valley Auth. v. Hill, 437 U.S. 153, 190-91 (1978); Realty Income Trust v. Eckerd, 564 F.2d 447, 458 & n.38 (D.C. Cir. 1977). We do think, however, that the absence of objection by legislators is highly relevant to the decision not to award *discretionary* relief.

[22] Brief for Appellant at 14. The record reveals, also, that appellant failed to complain about the adequacy of the President's submissions in its own newsletter. One issue of the newsletter, entitled *Conservation Report from the National Wildlife Federation*, was published within one month of the issuance of the President's proposed budget. It discussed the proposed Forest Service budget in some detail. The newsletter

---

Third, we are hesitant to venture to rule on the President's compliance with the Act because this issue may never arise again. As the District Court recognized, passage of time under the Act may produce a greater accommodation of appellant's view of the statutory requirements and the President's response to them. Indeed, this already may have occurred. The President's Statement of Reasons accompanying the proposed 1980 budget is more elaborate than that accompanying the 1979 budget. *Compare* 1980 Statement, *supra* note 5, *with* 1979 Statement, p. 7 *supra*. Moreover, the Assessment, Program, and Statement of Policy all have been newly revised during the pendency of this appeal, or are in the process of being revised. 16 U.S.C. §§ 1601(a), 1602, 1606(a). This controversy never will recur unless future budget statements diverge from the plans envisioned by the updated versions of these documents. That it is wholly speculative that this dispute will arise again militates against awarding discretionary relief.[23]

We think for all these reasons that it would be improvident, on the record before us, to afford mandamus or a declaratory judgment. We therefore ground our affirmance of the District Court's decision on the discretionary power federal courts possess to withhold such relief. Accordingly, we do not assess the adequacy of the President's submissions under the Act.[24]

*It is so ordered.*

## Town of Greenwich v. Department of Transportation

No. B-76-193 (D. Conn. Nov. 7, 1979 & Jan. 21, 1980)

The court grants plaintiffs' motion for partial summary judgment in a suit charging defendants with violating an Environmental Protection Agency (EPA) compliance order and appoints an administrator to oversee closure of the antiquated Cos Cob Power Plant by Dec. 31, 1980 in accordance with an amended abatement schedule. The court finds that the Connecticut Department of Transportation has admitted that it is "running" the plant and the commuter railroad line that it powers. There is, moreover, no dispute that defendants are in violation of the EPA order and the applicable air pollution control regulations. Ruling that continued "slippage" in the schedule for completing reelectrification of the railroad and closure of the plant is unacceptable in light of the potential for further air pollution and jeopardy to the continuation of commuter rail service, the court determines that judicial supervision, control, and management of the compliance process are needed. As an exercise of its broad remedial power, the court appoints an administrator vested with the powers necessary to achieve expeditious compliance with the EPA order.

Counsel for Plaintiff
Haynes N. Johnson
Parmelee, Johnson, Bollinger & Bramblett
460 Summer St., Stamford CT 06901
(203) 327-2650

---

at no point, however, expressed dissatisfaction with the President's submissions under the Act. *See* Plaintiff's Exhibit D at 24-26.

[23] "[S]ound discretion withholds the remedy where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted." A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 331 (1961).

[24] This decision does not prejudice the right of appellant, or any one else, to challenge the adequacy of the President's submissions with respect to future proposed budgets. *See, e.g.*, Baker v. Carr, 369 U.S. 186, 236-37 (1962) (discretionary denial of relief is nonprecedential), *quoting* Cook v. Fortson, 329 U.S. 675, 678 n.8 (1946).

Case 1:02-cv-00022   Document 148   Filed 10/29/2007   Page 3 of 13

Counsel for Defendants
   Bryan E. O'Neill, Ass't Attorney General
   State Office Bldg., Rm. 147, Hartford CT 06115
   (203) 566-2090

Daly, J.:

### Partial Ruling on Plaintiff's Motion for Partial Summary Judgment

Plaintiffs seek partial summary judgment against the Connecticut Department of Transportation (CDOT) and its Commissioner for

(1) Violation by CDOT of the Order of The Environmental Protection Agency (EPA) of January 7, 1976, as amended, relating to, *inter alia*, steps to be taken by CDOT to permit expeditious closing of the Cos Cob Power Plant.

(2) Violation of the following air pollution regulations of EPA:

  (a) §19-508-18(a)(1) relating to opacity of emissions;

  (b) §19-508-18(d) relating to emissions of particulate matter;

  (c) §19-508-19(a)(2)(i) relating to sulfur content of fuel used.

(3) Violation of the EPA primary ambient air standards for suspended particulate matter, §19-508-24(f) (adopted by EPA 40 Fed. Regis. 3279-80).

(P. motion for summary judgment June 8, 1979 at 1-2.)

There is no dispute that CDOT has failed to comply with the EPA order of January 7, 1976, or that CDOT has violated the EPA air pollution regulations mentioned above. The only issue in dispute is whether CDOT is "'running' the commuter railroad line or the Cos Cob electrical plant that is the power source for that commuter railroad line, in any meaningful sense . . . ." (D. Memo. in opposition to P. motion for summary judgment June 26, 1979 at 1.)

### Standard for Summary Judgment

On a motion for summary judgment pursuant to FED. R. CIV. P. 56 the Second Circuit requires the trier of fact to determine that "the moving party . . . [show] that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." *Robertson v. Seidman & Seidman*, No. 78-7278, slip op. at 4403 (2d Cir. Aug. 29, 1979). In addition "the inferences to be drawn from the underlying facts [must be] in the light most favorable to the [non-movant] . . . [and] [w]hen conflicting inferences can be drawn from the facts, . . . summary judgment is inappropriate." *Id.* at 4407, 4404.

On June 26, 1979 defendant responded to plaintiff's request for admissions pursuant to FED. R. CIV. P. 36 dated June 6, 1979. Defendant specifically admitted to D.3.(b) which states that "[p]rior to issuing said Order, EPA found that the contractual relationship between CDOT [CTA] and ConRail [Penn Central] made it clear that: '. . . both are principals whose actions directly affect the operation of the Cos Cob plant.' (Interim Ex. 2, p. 3)." (D. answers to P. request for admissions June 26, 1979 at 2.) Defendant failed to respond to plaintiff's request to admit D.4.(b) & (c) which state "(b) that [CDOT] has and has had its own consultant inspect and report on the plant on a regular basis . . . and (c) that [CDOT] meets on a monthly basis with personnel of ConRail and others to make decisions as to details of operation of the railroad, including the power plant." (P. request to admit June 6, 1979 at 9.)

FED. R. CIV. P. 36(a) requires each matter for which an admission is requested to be answered by a denial or detailed reasons why the answering party cannot truthfully admit or deny the matter. Failure to respond results in an admission which shall be deemed conclusively established under subsection (b).

Thus, while a party may respond in any one of three ways, (1) file an admission, (2) file a specific denial, or (3) file a statement setting forth why he cannot truthfully admit or deny the requests, nevertheless he must take affirmative action if he wants to avoid the consequences of failing to respond in accordance with the Rule.

20 ALR3d 756, 759 (1968).

The courts have held that the clear import of Rule 36 is that failure to respond to a request to admit results in having the party upon whom the request was made be deemed to have admitted the request as true. *Chess Music, Inc. v. Tadych*, 467 F. Supp. 819, 820 (E.D. Wisconsin 1979); *Comm'rs of Hwys. of Towns of Annawan et al. v. U.S.*, 466 F. Supp. 745, 748 n.1 (N.D. Illinois, E.D. 1979). On the basis of defendant's admissions and the arguments of counsel on November 6, 1979 this Court finds that CDOT participated in the operation and financing of the commuter railroad line and the Cos Cob electrical plant in material part so as to be "running" these two facilities. Therefore, there is no genuine issue of material fact to be resolved and the plaintiff is entitled to partial summary judgment as a matter of law.

It is so ORDERED.

### Order Appointing Administrator

On July 8, 1976 and September 21, 1976 plaintiffs' respectively filed lawsuits seeking to restrain the defendants from repeated and continuing violations of the United States Environmental Protection Agency (EPA) regulations, promulgated pursuant to The Clean Air Act, 42 U.S.C. §§7401-7642,[1] and an EPA Order issued on January 7, 1976, as amended July 21, 1976, requiring, *inter alia*, that the Cos Cob power generating facility terminate operations by September 15, 1978, in order to achieve compliance with applicable regulations, and the established interim timetable to ensure compliance.

The plaintiffs in B-76-193 seek the appointment of an Administrator following this Court's granting of plaintiff's motion for summary judgment on November 7, 1979.[2]

The plaintiff in B-76-282 seeks the appointment of an Administrator to effect compliance with the work schedule set forth in Schedule B of the consent judgment filed in its action on May 2, 1979 which amended the September 15, 1978 shut down date to extend the closing of the Cos Cob electric generating plant to December 31, 1980.

### Findings of Fact

The Cos Cob Power Plant is used to supply electricity to operate the commuting railroad to New York. It is antiquated and subject to temporary and possibly permanent failure. The plant is operated under the terms of the New Haven Suburban Passenger Train Service Agreement of October 27, 1970, between the Connecticut Transportation Authority, now succeeded by the Connecticut Department of Transportation (CDOT), and the Penn Central Transportation Company, now succeeded by the Consolidated Rail Corporation (ConRail).

The Cos Cob Power Plant, for more than ten years, has been charged by the Town of Greenwich and its residents with polluting the air in the surrounding area with substantial quantities of particulate matter, fly ash, and sulfur. This pollution, it is claimed, will not entirely cease until the Power Plant is closed.

The United States Environmental Protection Agency (EPA) adopted regulations relating to the air polluting emissions from the Cos Cob Power Plant. See note 1, *supra*. These regulations were held valid in *Blanchette v. U.S. Environmental P.A.*, 551 F.2d 906 [7 ELR 20282] (2d Cir. 1977). Those portions of the regulations dealing with opacity of emissions, emission of particulate matter and emission of sulfur are as follows:

(1) §19-508-18(a)(1) on *opacity* of emissions:

No person shall cause or permit the emission of visible

---

1. The applicable regulations may be found at 40 C.F.R. §§52.377(b), 52.380 (1976), effective June 30, 1975, 40 Fed. Reg. 23279-80 (1975). 42 U.S.C. §§7401-7642 was the result of a complete revision of the Clean Air Act, July 14, 1955, c. 360, 69 Stat. 322, on August 7, 1977. See 91 Stat. 685. The Act was formerly codified at 42 U.S.C. §§1857-1858a.

2. The motion for summary judgment and the requested relief by the plaintiffs in B-76-193 only applies to the Department of Transportation of the State of Connecticut and its Commissioner. The relief sought by the plaintiff in B-76-282 includes the Consolidated Rail Corporation in addition to the Connecticut Department of Transportation and its Commissioner.

Case 1:02-cv-00022    Document 148    Filed 10/29/2007    Page 4 of 13

air pollutants of a shade or density equal to or darker than that designated as No. 1 on the Ringelmann chart of 20 percent opacity.

(2) §19-508-18(d) on *particulate matter:*

No person shall cause or permit the emission from fuel-burning equipment of particulate matter in excess of 0.20 pounds per million BTU . . . of heat input.

(3) §19-508-19(a)(2)(i) on *sulfur* emissions:

No person shall use or burn fuel which contains sulfur in excess of one-half of one percent (0.5 percent) by weight (Dry Basis).

These regulations form part of the State Implementation Plan for ambient air quality required by The Clean Air Act, 42 U.S.C. §7410, formerly §1857c-5. The history of the Implementation Plan may be found in *Blanchette*, 551 F.2d at 908.

On January 7, 1976 after notice to, *inter alia*, CDOT and a hearing, the Regional Administrator of EPA for Region I issued findings and an Order against CDOT and others, jointly and severally, relative to emissions from the Cos Cob Power Plant. The Regional Administrator found that CDOT was operating the Cos Cob Power Plant in violation of those regulations cited above. Said findings and subsequent Order were not appealed by CDOT and remain in full force and effect.[1] CDOT has admitted said violations and acknowledges probable continuing violations until the Cos Cob Plant is shut down.[4]

The EPA Order of January 7, 1976, as amended July 21, 1976, ordered CDOT and ConRail to do, *inter alia*, the following:

(a) Not later than February 1, 1976, CDOT and ConRail shall enter into a force account agreement for Phase I-1, I-2, I-3 and I-4 of the signal conversion work and commence on-site work on signal conversion. (¶ 4).

(b) Not later than May 1, 1976, CDOT and ConRail shall submit all remaining necessary funding requests for the signal conversion work to the Urban Mass Transit Authority for approval. (¶ 5).

(c) CDOT and ConRail shall complete work on the signal conversion of the main line from Greenwich through New Haven, including the New Canaan Branch, designated on the Construction Schedule as "j" through "ii," according to the schedule set forth below:

(i) 9% by June 30, 1976

(ii) 27% by December 31, 1976

(iii) 56% by June 30, 1977

(iv) 82% by December 31, 1977

(v) 100% by August 15, 1978 (¶ 6(a).)

(d) Not later than September 15, 1977, CDOT and ConRail shall:

(i) Cut over to 60 hertz traction power on the Woodlawn to New Rochelle segment designated on the Construction Schedule as Major Work Items a. through d., and (ii) cease providing traction power from the Cos Cob Plant to operate this segment of the railroad. (¶ 7(a).)

(e) Not later than January 15, 1978, CDOT and ConRail shall:

(i) Cut over to 60 hertz traction power for the East Norwalk to New Haven segment designated on the Construction Schedule as Major Work Items t. through hh; (ii) cease providing power for that segment from the Cos Cob Plant; and (iii) operate boiler units 902 and 903 individually only and not at the same time. (¶ 7(b).)

(f) Not later than August 15, 1978, CDOT and ConRail shall:

(i) Cut over to 60 hertz traction power for the East Norwalk to Cos Cob segment designated on the Construction Schedule as Major Work Item m. through s., and (ii) cease providing power for that segment from the Cos Cob Plant. (¶ 7(c), as amended.)

(g) Not later than September 15, 1978, CDOT and ConRail shall cease operation of the Cos Cob Plant. (¶ 7(d), as amended.)

(h) Until all operations at the Cos Cob Plant cease, CDOT and ConRail shall:

(i) Limit visible emissions

(a) from the stack ducted to units 902 and 903 to forty percent (40%) opacity; and

(b) from the stack ducted to unit 904 to twenty percent (20%) opacity, with not greater than forty percent (40%) opacity for not more than five minutes in any sixty minutes. (¶ 8(a).)

Compliance with the EPA Order was not made subject to receipt of federal funding.

The defendants concede that there is no dispute that CDOT has failed to comply with the EPA Order of January 7, 1976, as amended July 21, 1976, or that CDOT has violated the EPA air pollution regulations mentioned above. CDOT has been participating in the operation, decision-making, and financing of the commuter railroad line and the Cos Cob electrical plant in material part so as to be running those two facilities. See note 3, *supra.*

By the terms of the EPA Order defendants were to have taken steps to re-electrify the railroad so that, in thirty-two months (by September 1978), electricity could be purchased elsewhere and the Cos Cob Power Plant closed, permanently abating the air pollution and protecting continuation of the commuter service against possible failure of the plant. Contrary to the EPA Order, defendants did not commence the re-electrification project until April 1978.

In May 1978 defendants supplied this Court with a month-by-month "Work Schedule" which provided that the electrification would be completed by December 1980, twenty-seven months after the date required by the EPA Order. In November 1978 defendants signed a Consent Judgment in B-76-282, incorporating the "Work Schedule" as Exhibit B thereto. The Consent Judgment required compliance with the "Work Schedule" and completion of the conversion project by December 1980. After due publication in the Federal Register, 28 C.F.R. §50.7, the Consent Judgment was entered by this Court on May 2, 1979.

Defendants have failed to meet the scheduled dates required by the "Work Schedule" in each and every month subsequent to the entry of the Consent Judgment and have advised the Court that they will be unable to meet the December 1980 completion date for converting the project and closing the Cos Cob Power Plant. On December 18, 1979 defendants submitted to this Court a "New Haven-Line Revised 60 Hz Power Conversion Schedule" which looks toward July 1981 for completion. This is seven months beyond the completion date agreed to in the consent decree entered on May 2, 1979.

By defendants' own admission, in order to satisfy the July 1981 completion date, work at three substations must be deferred and "Phase I" of the conversion project, which was to be completed six months prior to the final completion of the entire project,[5] will be completed at the same time as the rest of the project.

---

3. This Court found in its ruling of November 7, 1979 that "[t]here [was] no dispute that CDOT [had] violated the EPA air pollution regulations . . . ." The only issue in dispute for purposes of the summary judgment motion was whether CDOT was "running" the commuter railroad line or the Cos Cob electrical plant in any meaningful sense. This Court held that "CDOT participated in the operation and financing of the commuter railroad line and the Cos Cob electrical plant in material part so as to be 'running' [those] two facilities." Town of Greenwich, Connecticut *et al.* v. Department of Transportation of the State of Connecticut *et al.,* Civil No. B-76-193, slip op. at 2, 4 (D. Conn. Nov. 7, 1979).

4. See letter from CDOT to EPA (August 15, 1975): "[CDOT] . . . acknowledges that it may continue to be in violation of all three of the above mentioned regulations until such time as the plant is shut down."

5. Early completion of "Phase I" would have permitted purchase of power from elsewhere and allowed early partial shutdown of the power plant.

By not completing the additional work at the three substations the reliability of the system may be affected and possibly cause an additional four months delay.

Out of a total ninety-eight items to be completed over a twenty month period, according to the revised schedule, fifty-four are marked with an asterisk. The defendants define the significance of an asterisk beside an item as meaning it is critical and must be completed on the date specified to avoid further delay in the schedule. In effect, over fifty-five percent of all work to be done to complete the project by July 1981 is critical and delay in any one item could set back the completion date.

The present system for meeting critical dates on the project is not working. It is likely that unless some action is taken the pattern of "slippage" will continue, seriously jeopardizing a foreseeable completion date. Such delay is unacceptable in light of the potential for further air pollution and jeopardy to the continuation of commuter service to New York on the New Haven Division Line.

In view of the continued "slippage" in converting the electrification system, irrespective of the existence of the Consent Judgment requiring conversion on a specific schedule, court supervision, control, and management are needed. The failure of the defendants to comply with existing judgments and orders warrants the relief requested by the plaintiffs. A court appointed Administrator will be selected, not as an indicia of bad faith or incompetency, to secure compliance with the law and the judgment of this Court. The authority of this Court to exercise such broad remedial power is well articulated by Judge Feikens in *United States v. Detroit*, 476 F. Supp. 512 (E.D. Michigan 1979), and cases cited therein.

Upon consideration of the foregoing, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. That George J. Conklin, of North Haven, Connecticut be and he hereby is appointed as Administrator to perform all acts required to be performed by defendants Connecticut Department of Transportation (CDOT) and Consolidated Rail Corporation (ConRail) for the purposes of carrying out the order of the United States Environmental Protection Agency, dated January 7, 1976, directed to permanently closing the Cos Cob Power Plant and the obligations of the defendants under the Consent Judgment entered by this Court on May 2, 1979.

2. The Administrator is responsible solely to this Court and is vested with the power and authority provided under Rule 70 of the Federal Rules of Civil Procedure to perform all acts he deems necessary to achieve expeditious compliance with:

    (a) Said EPA Order;

    (b) The matters set forth in the "Signal Control and Traction Conversion Schedule," identified as Exhibit B attached to the Consent Judgment of May 2, 1979 in B-76-282 and also made part of the Consent Order of June 20, 1979 against defendant ConRail in B-76-193; and

    (c) The matters set forth in the "New Haven Line Revised 60 Hz Power Conversion Schedule" filed by defendants on December 18, 1979; the foregoing hereinafter being referred to as the "Conversion Project."

3. The Administrator shall forthwith procure the services of those persons and/or organizations deemed necessary by him to carry out the conversion project. Said persons or organizations shall be responsible solely to the Administrator. To this end the Administrator may solicit the advice of the parties to this action.

4. The Administrator shall have full power to manage, control, and deal with all items, assets, properties, contracts, and other matters associated with the conversion project and shall have the authority required or necessary for the complete management and control of the conversion project, including but not limited to:

    (a) The supervision of all employees of defendants associated with the conversion project, including removal of employees from the conversion project and/or hiring additional employees;

    (b) Entering into and performance of existing and future contracts deemed necessary by him for the conversion project. Said contracts shall not be subject to competitive bidding if, in the judgment of the Administrator, such action would prevent delay in the conversion project and fair and reasonable contracts can be entered into;

    (c) The hiring of all such special consultants, contractors, engineering firms or counsel which the Administrator deems necessary;

    (d) The borrowing of such funds and the pledging of security of defendants as he deems necessary to carry out his duties relating to the conversion project;

    (e) Preparing, filing, and processing all applications for Federal funds, or other Federal approvals; and

    (f) Acting without approvals or other consents or actions of the Urban Mass Transportation Agency (UMTA) in the event of delay in required actions by UMTA and/or when in the judgment of the Administrator the same might unduly delay or impede prompt and expeditious completion of the conversion project.

5. The Administrator shall initially make a full evaluation of the current status of the conversion project and report his findings to this Court.

6. All costs and expenses of carrying out this Order, including the fees of the Administrator, shall be submitted to this Court for approval and, except for those which may be paid by UMTA, shall be paid by defendants.

7. Defendants, their officers, agents, servants and employees, and all other persons in active concert or participation, are enjoined from failing to immediately comply with this Order and from interfering in any manner, or from failing to cooperate either directly or indirectly, with the Administrator in the performance of his functions and duties.

8. This appointment shall be for the period necessary to complete the conversion project unless:

    (a) The Administrator recommends termination of this Order as no longer necessary, or modification thereof, and said termination or modification is accepted by this Court;

    (b) The Administrator requests to be relieved and such request is approved by this Court; and

    (c) This Order is otherwise modified or terminated by this Court.

9. (a) The Administrator may at any time apply to this Court for instructions and/or modification of this Order;

    (b) The Administrator may seek instructions as to whether funds should be expended for a particular purpose, *ex parte*, upon application to this Court;

    (c) Any party may, for good cause, at any time apply to this Court for modification or termination of this Order or such other relief as may be appropriate.

10. This Court retains jurisdiction.

It is SO ORDERED.

## South Dakota v. Andrus

No. 79-1178 (8th Cir. Feb. 12, 1980)

Affirming the district court, 9 ELR 20128, the Eighth Circuit Court of Appeals rules that the Department of the Interior need not prepare an environmental impact statement (EIS) prior to the issuance of a mineral patent. The court first points out that as the issuance of a mineral patent is a ministerial act under the Mining Law of 1872, it is doubtful whether it would constitute an "action" by the federal government for purposes of the National Environmental Policy Act (NEPA). Non-discretionary actions such as this have generally been held outside the ambit of the EIS requirement. The court bases its decision, however, on the conclusion that granting a patent is not a "major" federal action under NEPA because it is not a federal determination to enable the applicant to begin mining operations. Locators of mining claims may extract minerals without such a patent if they have met the statutory prerequisites. Finally, the court declines to decide

Case 1:02-cv-00022    Document 148    Filed 10/29/2007    Page 6 of 13

## United States v. Alder Creek Water Co.

No. 79-1090-JU (D. Or. Apr. 23, 1984)

The court rules that defendants' repeated violations of the Safe Drinking Water Act (SDWA) demonstrate the willfulness required under §1414(b) of the Act for imposition of civil penalties. The court rules that plaintiff need not prove defendants had a "bad purpose" to establish "willfulness" under §1414. Plaintiff merely needs to show a careless disregard amounting to plain indifference. The court finds that the defendants violated the SDWA and its implementing regulations over 1,000 times in a three-year period, and holds the pattern of violations to be sufficient evidence of willfulness to permit assessment of civil penalties, despite defendants' arguments that they acted as reasonably as possible to conform to the Act. The court grants summary judgment and assesses penalties totaling $6,200 for those violations alleged by plaintiff and unrefuted by defendants.

[A digest of an earlier ruling in this case is published at 13 ELR 20989—Ed.]

Counsel for Plaintiff
Thomas C. Lee, Ass't U.S. Attorney
312 U.S. Crthse., 620 SW Main St., Portland OR 97205
(503) 221-2101

Counsel for Defendants
S. Ward Green
McMenamin, Joseph, Babener, Greene & Perris
729 SW Alder St., Portland OR 97205
(503) 295-2668

Stephen F. Crew
O'Donnell, Sullivan & Ramis
1727 NW Hoyt St., Portland OR 97209
(503) 222-4402

Michael E. Judd, Ass't Cty. Counsel, Clackamas Cty.
906 E. Main St., Oregon City OR 97045
(503) 655-8362

Juba, Mag.:

### Opinion and Order

The United States brought this action against the Alder Creek Water Company and its president, Gerald Bennett, for alleged violations of the Safe Drinking Water Act, 42 U.S.C. §300f et seq., and of regulations promulgated under the Act by the Environmental Protection Agency (EPA), 40 C.F.R. §141.1 to 149.19. The Alder Creek Water Company operated five community water systems in Clackamas County known as Alder Creek-Barlow, Country Club, Sleepy Hollow, Riverside, and Wildwood. After the Alder Creek Water Company failed to comply with a court order to lessen the health risks posed by the Alder Creek-Barlow and Country Club systems, and to comply with the Act's reporting and monitoring requirements, an equitable receivership was created.

The plaintiff now moves for summary judgment. FED. R. CIV. P. 56. The plaintiff asks that the court declare that defendants violated the Safe Drinking Water Act (SDWA) as a matter of law, and impose civil penalties for the violations. Defendants move to dismiss the case as to penalties.

### I. The Parties' Contentions

Plaintiff argues that there is no genuine issue of material fact that defendant committed 1,156 violations of the Act on 518 separate days, between the dates of July 1, 1977 (effective date of the SDWA regulations) and August 31, 1980 (the last full month before the company was placed into equitable receivership). Plaintiff argues that defendant failed to carry out water quality monitoring, reporting to the EPA, and public notification, as required by the Act. Plaintiff seeks total penalties of $23,350.

Defendant contends that no penalties should be assessed because the government exaggerated the seriousness of the violations and no substantial health problem existed; and because defendant did not willfully violate the Act.

### II. Discussion

Section 1414(b) of the Act, 42 U.S.C. §300g-3(b), provides that:

If the court determines that there has been a willful violation of the regulations . . . the court may, taking into account the seriousness of the violation, the population at risk, and other appropriate factors, impose on the violator a civil penalty of not to exceed $5,000 for each day in which violation occurred.

Although it is not necessary to establish a "bad purpose" to show wilful violation of a statute protective of health or safety, at least a "careless disregard" for lawful duties, amounting to a "plain indifference" to the requirements of a statute, is required. U.S. v. Neskowin Enterprises, Inc., 14 E.R.C. 1636, 1642 [10 ELR 20622] (D. Or. 1980) (Juba, J.) (citations omitted).

#### A. Violations

The plaintiff contends that the following violations were committed by the defendants.

#### 1. Violations of 40 C.F.R. §141.14

Plaintiff argues that defendants violated the maximum contaminant level for coliform bacteria set by 40 C.F.R. §141.14 during eight different periods. The EPA determined that violations occurred during the third quarter of 1978 at Barlow and Country Club; during the fourth quarter of 1978 at Barlow; during April 1979 at Barlow; June 1979 at Country Club; July 1979 at Country Club; September 1979 at Country Club; and August 1980 at Barlow. Affidavit of William Mullen at 5-10. Defendants submit an affidavit stating that plaintiff's samples were incorrectly taken. Affidavit of Gerald Bennett. However, affidavits must be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify as [sic] the matters stated therein. FED. R. CIV. P. 56(e). The defendants' affidavit does not meet this standard.

#### 2. Violations of 40 C.F.R. §141.13(b)

The EPA determined that defendant violated the two-day turbidity standard set forth in 40 C.F.R. §141.13(b) on four occasions, from August 28 to September 2, 1979. Affidavit of William Mullen at 3-4. Again, defendants have failed to present evidence to controvert these facts.

#### 3. Violation of 40 C.F.R. §141.21

Plaintiff argues that defendant violated 40 C.F.R. §141.21(b), which requires monthly samples for coliform bacteria, on eighteen occasions. Plaintiff alleges that defendants did not perform sampling for five months (March 1978, and February, May, July, and August 1980) at the Riverside, Wildwood, and Sleepy Hollow systems, one month (March 1978) at Country Club, and two months (March 1978 and July 1979) at Alder Creek-Barlow. Exhibits 1, 2, and 3; Affidavit of William Mullen at 10. Defendants have not disputed the violations in these particular months.

#### 4. Violation of 40 C.F.R. §141.22

Plaintiff alleges that defendants failed to take turbidity measurements once per day, required by 40 C.F.R. §141.22(a), on 972 occasions, at the Country Club and Alder Creek-Barlow systems. Affidavit of William Mullen at 10. Defendants do not controvert these violations.

#### 5. Violation of 40 C.F.R. §141.23

Plaintiff alleges defendants violated 40 C.F.R. §141.23(a)(1) and (2), on seven occasions, by failing to analyze for inorganic chemicals at Country Club and Alder Creek-Barlow by June 24, 1978, and at Riverside, Wildwood, Sleepy Hollow, Country Club, and Alder Creek-Barlow by June 24, 1979. Affidavit of William Mullen at 11. Defendants present no evidence to dispute these violations.

#### 6. Violation of 40 C.F.R. §141.24

Plaintiff alleges defendants failed to test for organic chemical contaminants at two surface water systems, Country Club and Alder Creek-Barlow, by June 24, 1978, in violation of 40 C.F.R. §141.24(a)(1). Affidavit of William Mullen at 11. Again, there is no evidence disputing these violations.

#### 7. Violation of 40 C.F.R. §141.31(a)

Plaintiff alleges that defendant submitted untimely microbio-

logical reports on eighty occasions, and untimely reports of turbidity measurements on twelve occasions, for a total of ninety-two violations of 40 C.F.R. §141.31(a). Affidavit of William Mullen at 12. Defendants state that these reports were actually made timely. Affidavit of Gerald Bennett at 6-9. Thus, there is an issue of fact as to whether these particular violations occurred.

### 8. Violation of 40 C.F.R. §141.32

Plaintiff argues that defendant violated 40 C.F.R. §141.32, which requires public notification when the level of any contaminant exceeds a maximum contaminant level, or when required monitoring has not been done. This violation includes failure to give notice of the eight MCL violations, and failure to give one notice of the four turbidity violations for a total of nine violations. Affidavit of William Mullen at 12-14. Also included are failure to give periodic public notice of the monitoring violations a total of forty-four times. Defendants present no evidence controverting these violations.

### B. Penalties

Defendants argue that plaintiff consistently exaggerated the hazards in the water system, to mislead the court into believing a substantial health hazard existed. Defendants also argue that plaintiff used improper tactics in their monitoring. Defendants state they never willfully violated the Act. They argue that Gerald Bennett acted as reasonably as possible to comply with the Act, and that this is demonstrated by the difficulty encountered in making the system conform to the Act since he lost control.

However, viewing the pattern of the violations as a whole, I find that defendants willfully violated the Act, and that plaintiff is entitled to recover statutory civil penalties. *Fairbanks v. Hardin*, 429 F.2d 264, 268 (9th Cir. 1970); *U.S. v. Neskowin Enterprises, Inc.*, 14 E.R.C. 1636, 1642 [10 ELR 20622] (D. Or. 1980).

Section 1414(b) of the Act states that the court "may . . . impose on the violator a civil penalty not to exceed $5,000 for each day in which such violation occurs."

In assessing penalties, the court must consider the "seriousness of the violations." 42 U.S.C. §300g-3(b). The eight violations of the microbiological contaminant regulations for drinking water are extremely serious, because they place public health in jeopardy. The four turbidity violations also pose a threat to the public health. A penalty of $100 per day for each of these twelve violations is appropriate.

The violations for failing to take samples, and failure to give notice of violations are less serious, although they still create potential health risks to the public, and the numerous violations that occurred demonstrates a careless disregard for lawful duties on the part of defendants. A penalty of $5,000 will be assessed for all of these violations. Since defendants raised a material issue of fact as to whether it submitted untimely reports, no penalties will be assessed for those alleged violations.

### III. Conclusion

Plaintiff's motion for summary judgment is granted. Defendants' motion to dismiss as to penalties is denied.

Defendants are ordered to pay the plaintiff statutory civil penalties in the sum of $6,200.

## United States v. Sami

No. R-81-3051 (D. Md. Apr. 18, 1984)

The court appoints a third-party trustee under FED. R. CIV. P. 70 to restore wetlands filled without a Federal Water Pollution Control Act §404 permit and holds the owner of the wetlands, who has ignored a previous restoration order, in contempt. Should the trustee fail to restore the wetland, the court empowers the Corps of Engineers to do the job.

Counsel for Plaintiff
  Carl Strass
  Land and Natural Resources Division
  Department of Justice, Washington DC 20530
  (202) 633-2682

Counsel for Defendant
  Gregory E. Kubash
  2600 Virginia Ave. SW, Suite 600, Washington DC 20037
  (202) 965-4980

Strass, J.:

### Order Pursuant to Rule 70 F.R.Civ.P. Holding Mohammad Sami to Be in Civil Contempt and Imposing Sanctions

1. On March 1, 1984, this Court entered an order in this case requiring the defendant, Mohammad Sami, to restore or cause the restoration of a fringe marsh which he destroyed by the bulkheading and fill which he placed, without a permit, at his property on St. Leonard Creek in Calvert County. The March 1, 1984 order requires removal of the bulkheading and fill, to be followed by revegetation of the affected area.

2. That March 1, 1984 order contains a schedule of activity which requires that the defendant, Mohammad Sami, post with the Court a $20,000 performance bond by March 16, 1984, and that the defendant, Mohammad Sami, provide to the Court, and to Mr. James E. Brogdon of the Corps of Engineers, a plan of work two weeks before commencement of restoration work, which restoration work, excepting revegetation, is to be completed by May 1, 1984.

3. The defendant, Mohammad Sami, has failed to post the $20,000 performance bond, and has failed to provide the restoration work plan.

4. On April 3, 1984, the defendant, Mohammad Sami, was sent, by certified and by regular mail, an order to show cause why he should not be held in civil contempt, and sanctions imposed. The order was returnable on April 13, 1984. The defendant, on receipt of that show cause order requested and obtained a postponement until April 18, 1984.

5. The defendant, Mohammad Sami, has still not posted the required bond, or provided the required restoration plan.

6. Wherefore, the defendant, Mohammad Sami, is hereby found to be in civil contempt, and it is ordered as follows:

7. Pursuant to Rule 70, F.R.Civ.P., Mr. William L. Want, c/o Environmental Law Institute, 1346 Connecticut Ave., N.W., Suite 600, Washington, D.C. 20036, is appointed as Trustee for the lands at issue in this case, to act on behalf of, and in the name of Mohammad Sami, for purposes of overseeing or carrying out the restoration of the lands at issue in this case. The Trustee is to keep strict time records, and is to be compensated at the rate of $100 per hour.

8. The defendant, Mohammad Sami, shall be civilly fined the sum of $1,000.00 per day for five days, and thereafter, the sum of $5,000.00 per day, the fine to be paid into the registry of the Court to the order of the Trustee, until the sum of $25,000 is reached or until such time as the defendant, Mohammad Sami, shall have deposited with the Clerk of the Court an executed construction contract to do the work required in this Court's March 1, 1984 order, a plan for the restoration work under that contract, and a bond or cash in the sum of $25,000 to secure the Trustee and the United States for the cost of the restoration work as well as any compensation and expenses (including reasonable attorneys' fees) in enforcing the instant order or this Court's March 1, 1984 order. The defendant, Mohammad Sami, shall provide copies of all papers filed or deposited with the Clerk of the Court to Mr. Brogdon and to the Trustee, as well as to government counsel.

9. In the event that the defendant, Mohammad Sami, has failed to deposit any one of the aforementioned, contract, plan of work, bond or cash, or in the event that the restoration work required in this Court's March 1, 1984 order, excepting revegetation, has not been completed for any reason by May 1, 1984, the Trustee, or any person acting on behalf of the Trustee, including private contractors and/or their employees may enter the lands at issue and do or complete the entire remaining restoration work, including revegetation, at the defendant, Mohammad Sami's, expense and risk, on behalf of the defendant, Mohammad Sami, and in his name, as provided for in Rule 70, F.R.Civ.P.

10. In the event that the defendant, Mohammad Sami, does not file a bond, post cash, or pay into the registry of the Court Civil Contempt fines, in the sum of $25,000 by April 25, 1984, then, pursuant to Rule 70 F.R.Civ.P., the Trustee is empowered to act in the name of the defendant, Mohammad Sami, to mortgage or otherwise encumber the land at issue in the amount of $25,000.00, and to deposit that sum into the registry of the Court to be used to pay for the restoration work and other costs.

11. In the event that the Trustee fails to act or is unable to act, the Corps of Engineers or its contractors may enter the lands

Case 1:02-cv-00022   Document 148   Filed 10/29/2007   Page 8 of 13

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | CIVIL NO. 79-1090 |
| v. ) | |
| ALDER CREEK WATER COMPANY, also known as ) ALDER CREEK WATER COMPANY, INC., ) and GERALD I. BENNETT, also known as ) "RED" BENNETT, individually, ) | ORDER FOR EQUITABLE RECEIVERSHIP |
| Defendants. ) | |

IT IS ORDERED THAT:

1. The Alder Creek Water Company, Water Company herein, and all water systems owned or operated by defendants, is placed into receivership.

2. Gene T. Ginther, Receiver herein, is appointed to exercise all administrative authority over defendant, including, but not limited to, full power to control, manage, and operate said water systems.

3. Receiver is authorized to administer all properties, assets, articles, and accounts of Water Company, including, but not limited to:

    a. the collection of its receivables, including, if necessary, the power to enforce such collection;

    b. entering into contractual obligations for the operation, maintenance, repair, and improvement of the water system;

   c. the payment of any costs or expenses incurred in administering the water systems, including their operation, maintenance, repair and improvement;

   d. the hiring or dismissal of employees needed to operate and maintain the water systems;

   e. the hiring of such special consultants, contractors, engineering firms (including Ginther Engineering, Inc.) and counsel which Receiver deems necessary;

   f. the borrowing of such funds and pledging security therefore as is necessary to carry out the duties of Receiver;

   g. the imposition of charges for water service upon the customers of all water systems and the collection of such charges.

  4. Receiver shall perform an evaluation of the current condition of the water systems, including the ascertainment of water rights and interests, physical plant, and any other properties pertaining to the water systems.

  5. Receiver shall determine the best method for providing continuous, reliable disinfection for those systems utilizing surface water sources. He shall take all steps, including purchase and installation of equipment, to provide such facilities. He may take interim control measures to protect the public health, including the acquisition and installation of equipment on a short-term basis.

  6. Receiver shall secure the reliable operation of all water systems by the following means:

   a. designing and engineering improvements to the water systems;

   b. submitting for all necessary approvals his plans and specifications for such improvements;

PAGE 2 - ORDER FOR EQUITABLE RECEIVERSHIP

      c.    contracting for the construction of such improvements;

      d.    purchasing equipment, obtaining easements, and acquiring any necessary properties for such improvements;

      e.    performing any tasks necessary for the completion of such improvements.

7. Receiver shall promptly mail notice to all customers of the water systems of the general terms of this receivership.

8. Receiver shall, to the extent feasible, fully comply with all applicable Federal and State laws and regulations, including the Safe Drinking Water Act regulations.

9. Receiver shall consult with and assist the customers of the affected water systems with regard to the formation of a service district.

10. Defendant, Gerald I. Bennett, hereinafter the individual defendant, shall forthwith relinquish and turn over to Receiver all records of accounts, including names, addresses, and amounts owed for water service, records of payment history, and record cards of each customer on each system. Individual defendant shall forthwith relinquish and turn over to Receiver all cash or cash-type assets on hand, all keys, instruments of title, records and pass books of bank accounts, all supplies, <u>all monitoring equipment</u>, and all other equipment employed in the operation of the water systems, except as noted in paragraph 12 below.

11. Receiver shall not be personally liable for acts done within the scope of his authority.

12. The three vehicles identified in Answer No. 4 to Plaintiffs' Interrogatories (attached hereto) and the four items of equipment identified in Answer No. 8 to Plaintiffs' Interrogatories and any other assets not required for the operation of the water systems, and all equipment mortgages, liens, tax claims and all rights and liabilities pertaining thereto shall be considered the property and sole responsibility of the individual defendant and shall be considered

PAGE 3 - ORDER FOR EQUITABLE RECEIVERSHIP

separate and apart from the Water Company. Receiver shall not be required to respond to any claims arising from any equipment loans, liens, or tax claims pertaining to the above-mentioned items.

13. The assets of the receivership shall not be liable for the previously-incurred debts of the defendants, including those identified in Answer No. 14 to Plaintiffs' Interrogatories. All creditors and other claimants against the Water Company are enjoined from proceeding against the assets of the receivership. Any creditor or other claimant of the Water Company may apply to this Court for relief from this injunction. No levy of execution or attachment shall be brought against any assets of the Water Company remaining in the receivership and not severed by this paragraph and paragraph 12. Individual defendant and the assets described in paragraph 12 shall continue to be liable to all existing debts and judgments.

14. The individual defendant is enjoined from failing to comply immediately with this Order and from interfering in any manner with the performance by Receiver and his agents of their duties or with the plaintiff and its agents in the performance of their duties.

15. Receiver shall report to the Court within three weeks of the entry hereof, and thereafter at the end of each calendar quarter thereafter, concerning the measures taken, problems encountered, and proposed additional measures for providing reliable safe water for the customers of the water systems, and further provide an accounting of any fees drawn by Receiver and of all receipts, disbursements, debts and claims of the receivership. No further authorization from the Court shall be required for Receiver to take action deemed by him to be necessary.

16. Receiver shall serve without bond.

17. Receiver may freely consult with all personnel of the Environmental Protection Agency (EPA) on any aspect of the management, planning, and operation of the water systems, and may secure any technical advice or assistance that might be available from the EPA for the purpose of assuring compliance with the Safe

PAGE 4 - ORDER FOR EQUITABLE RECEIVERSHIP

1    Drinking Water Act regulations. Receiver shall cooperate with EPA on reasonable
2    requests for water quality testing.
3        18. Receiver or any other party may apply to this Court for interpreta-
4    tion of this Order and for modification of the terms thereof and for enforcement
5    or termination of any of its provisions.
6        19. This Order and the Receivership created hereby shall expire on
7    September 26, 1981/3, unless extended by further Order. *EXTENDED*
8        DATED this 26th day of Sept, 1980.

                — S —
                GUS J. SOLOMON
                UNITED STATES DISTRICT COURT JUDGE

PRESENTED BY:

/s/ Thomas C. Lee
THOMAS C. LEE
Assistant United States Attorney

BARBARA J. LITHER
Attorney
Environmental Protection Agency

Attorneys for Plaintiff

PAGE 5 - ORDER FOR EQUITABLE RECEIVERSHIP

OBD-113
76 DOJ