1　RONALD J. TENPAS
　　Acting Assistant Attorney General
2　Environment & Natural Resources Division
　　ROBERT D. MULLANEY
3　Environmental Enforcement Section
　　United States Department of Justice
4　301 Howard Street, Suite 1050
　　San Francisco, California 94105
5　Tel: (415) 744-6483
　　Fax: (415) 744-6476
6
　　LEONARDO M. RAPADAS
7　United States Attorney
　　MIKEL W. SCHWAB
8　Assistant United States Attorney
　　Suite 500, Sirena Plaza
9　108 Hernan Cortez
　　Hagåtña, Guam 96910
10　Tel: (671) 472-7332
　　Fax: (671) 472-7215
11
　　Attorneys for United States of America
12

13

14

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CIVIL CASE NO. 02-00022 |
| ) | |
| Plaintiff, ) | DECLARATION OF PANKAJ ARORA |
| ) | IN SUPPORT OF UNITED STATES' |
| v. ) | REPLY BRIEF IN RESPONSE TO |
| ) | STATUS HEARING |
| GOVERNMENT OF GUAM, ) | |
| ) | Date: November 20, 2007 |
| Defendant. ) | Time: 9:00 a.m. |
| ) | Judge Tydingco-Gatewood |

FILED
DISTRICT COURT OF GUAM

NOV - 9 2007
2:45

JEANNE G. QUINATA
Clerk of Court

1    I, Pankaj Arora, declare:

2         1.    I am an Environmental Engineer for the Environmental Protection Agency,

3    Region IX ("EPA"). I began my employment for EPA as an Operations Research Analyst in the

4    Office of Program evaluation for the Office of EPA's Inspector General in August 2003. Since

5    January 23, 2006, I have worked in the EPA's Superfund Division as a Remedial Project

6    Manager. I am currently the Remedial Project Manager for the Ordot Dump. Based on my

7    educational background, professional experience, and review of EPA's administrative files on the

8    Ordot Dump and landfill issues on Guam, I have formed a professional opinion of the matters

9    stated herein and, if called upon to testify, could and would competently testify thereto.

10                              <u>Education and Background</u>

11        2.    I have a B.S. in Chemistry (University of Delhi 1983), an M.S. in

12   Organic/Biochemistry (University of Delhi 1985), an M.S. in Nuclear Engineering (Indian

13   Institute of Technology 1987), and an M.S. in Environmental Engineering (Oklahoma State

14   University 1991).

15        3.    I have extensive professional experience relating to both hazardous and

16   municipal landfills, including the following projects: (i) lead design engineer and task leader for

17   the evaluation and approval of an alternative soil monolithic final cover system for a mixed waste

18   (nuclear and organic contaminants) Resource Conservation and Recovery Act ("RCRA") Subtitle

19   C landfill located in Tucson, Arizona; (ii) landfill design engineer and task leader for the

20   assessment of leachate management of two landfills located in Kern County, California;

21   (iii) designed and negotiated approval of soil monolithic alternative final cover system for a

22   construction and demolition waste landfill located in Phoenix, Arizona; (iv) lead design engineer

23   and task manager for the preparation of a RCRA solid waste municipal landfill located in Rio

24   Rico, Arizona; (v) lead design engineer for performing: (1) extensive Hydrologic Evaluation of

25   Landfill Performance ("HELP") modeling for a proposed soil monolithic alternative cover design

26   system; and (2) evaluation of groundwater impact from the leachate using Multimedia

27   ("MULTIMED") computer model, in order to apply for a groundwater monitoring waiver for an

28   existing and proposed expansion area for a municipal landfill located in Apache Junction,

- 1 -

Arizona; (vi) lead design engineer for performing extensive HELP modeling on a proposed alternative final cover system for a municipal landfill located in Cochise County, Arizona; (vii) engineering design member for the design of a waste/municipal landfill located in Albuquerque, New Mexico, responsible for landfill cover and leachate collection and recovery system design performance assessment; and (viii) conducted performance assessment and analysis of landfill cover and leachate collection and recovery system using HELP model for a municipal landfill located in Alamogordo, New Mexico.

4.     At EPA, I am also currently working as a Remedial Project Manager on the Operating Industries Inc. ("OII") Landfill Superfund Site in Monterey Park, California. The work is focused on the closure remedy for the landfill, including the engineering design of various components related to the closure of the landfill (e.g., surface water management, leachate management, and landfill gas management). I am working on the issues involved with 45 acres of the 190-acre OII site.

<center>The Proposed Landfill at Layon</center>

5.     As EPA's Remedial Project Manager, I have worked since May 2006 on the Ordot Dump closure and opening of the new municipal solid waste landfill at Layon. During this time, I have personally reviewed various documents and participated in multiple meetings related to the opening of the new landfill. In addition, EPA also utilized a well respected technical consultant company to provide support in reviewing these documents and attending certain meetings. I am familiar with the Government of Guam's ("GovGuam") obligations under the Consent Decree in this case to construct a new landfill and understand that GovGuam has chosen to site the landfill at Layon.

6.     For the Layon Landfill, the following major documents were reviewed either personally by me or by EPA's consulting company under my direction: (1) 90% Draft Final Plan for the Layon Municipal Sanitary Landfill; (2) Pre-Final (100%) Submittal Plans, Specifications, and Estimates, Layon Municipal Sanitary Landfill; (3) Value Engineering Report, Layon Municipal Sanitary Landfill; (4) Engineering Review of Value Engineering Study Alternatives, Layon Municipal Solid Waste Landfill; (5) Statement of Work for Additional Hydro-geologic

<center>- 2 -</center>

Study for the Layon Municipal Sanitary Landfill; (6) Alternative Liner Design Analysis, Layon Municipal Solid Waste Landfill; (7) Engineering Review for South End Start, Layon Municipal Solid Waste Landfill; and (8) Memorandum, South Start Analysis - Groundwater Conditions.

7.    I also participated in various meetings with Guam Department of Public Works ("DPW") and technical consultants hired by DPW and the Guam Environmental Protection Agency ("Guam EPA"). These meetings were related to the engineering design of the Layon Municipal Solid Waste Landfill. Certain meetings specifically covered the issue of the need to conduct an additional hydrogeological study for the Layon Municipal Solid Waste Landfill. The meetings concerning the need for additional hydrogeological study included the following: (1) various monthly and quarterly Consent Decree status meetings held in 2006 with GovGuam (including Guam EPA and DPW); (2) meeting with DPW's consultants and Guam EPA in August 2007; and (3) meeting with DPW's consultants and Guam EPA in October 2007.

8.    Based on my review of the documents or comments provided by EPA's consultant under my direction, I determined that the major objectives of the additional hydrogeological study for the Layon Municipal Solid Waste Landfill were to: (1) establish design depths of the base of the landfill; (2) evaluate the need to manage potential negative impacts of groundwater fluctuations on the base liner; and (3) identify the need for a sub-drain system to mitigate negative impacts of groundwater fluctuations.

9.    The same objectives have been pointed out by DPW, its consultants, and GovGuam:

(i) in a letter to U.S. Department of Justice and EPA dated June 23, 2006, Helen Kennedy, Guam's counsel, stated: "These investigations and the resulting hydrogeologic model may affect the depth of the proposed liner and the design of the sub-drain system. Hence, the current 100% design may change."

(ii) pursuant to the Consent Decree, DPW submitted Quarterly Report No. 9 (July 21, 2006), which stated: "The Government of Guam has decided that additional hydro-geological investigations will be necessary to complete and remove any doubts and questions on the design. These investigations may affect the design depths of the proposed liner and sub-drain system, and

- 3 -

1 the design and location of the permanent groundwater monitoring well network."

2      (iii) Guam EPA, in a memorandum to DPW entitled "Proposed South End Start Design
3 and Analysis, Layon Municipal Solid Waste Landfill" (July 27, 2007) , stated: "However, a
4 complete hydrogeologic study of this site will be necessary to further define and finalize the
5 bottom of the landfill, liners, leachate collection system, and sub-drain systems as construction
6 towards the "North End" may further impact a proposed final design of the facility."

7      (iv) Technical meetings held in August and October 2007 with DPW's consultants and
8 Guam EPA also reiterated the same objectives.

9     10.    Therefore, I conclude that the additional hydrogeological study would aid in
10 finalizing the design components as defined in the objectives for the study, namely: (1) to
11 establish design depths of the landfill; (2) to identify if a sub-drain system is needed; and (3) to
12 design the sub-drain system (if needed). However, the outcomes of the study have no foreseeable
13 impact on the footprint of the new landfill. This conclusion was also independently presented by
14 DPW's consultants.

15     11.    In addition, the design of the Layon landfill, which is typical for this kind of
16 municipal solid waste landfill, includes a buffer zone of land around the actual footprint of the
17 landfill. Therefore, the buffer zone would provide GovGuam the flexibility to adjust the
18 footprint if, although not currently foreseeable, slight adjustments to the current footprint are
19 warranted. Hence, in my professional opinion, GovGuam's acquisition of the land for the Layon
20 landfill could start immediately and should be regarded as an independent activity that is not tied
21 to the completion of the hydrogeological study.

22 <center>The Ordot Dump</center>

23     12.    DPW's existing 100% design submitted in September 2005 for the closure of the
24 Ordot Dump is outdated and will need major revisions. Since the preparation of the closure
25 design, conditions have changed because the Dump continues to receive Guam's trash every day.
26 In addition, both EPA and Guam EPA provided extensive comments on DPW's closure design.
27 In order to respond to the comments, DPW has been working for more than a year to implement
28 an amendment for the contract with its consultant. The work to be performed under this

<center>- 4 -</center>

amendment would allow DPW to assess the current conditions at the Ordot Dump and to finalize the closure design. However, the amendment has not been exercised and the contractor's work is not yet under way.

13. In addition to the work performed by DPW's consultant under the proposed amendment, DPW should undertake activities related to the preparatory work needed to close the Ordot Dump, including, e.g., slope stabilization (wherever needed), covering the slopes where waste is exposed, and developing access routes for the heavy construction equipment needed to close the Dump.

<u>Solid Waste Management Issues</u>

14. Attached as Exhibit 1 is a copy of an excerpt of Public Law 29-19, which addressed the new landfill.

15. Attached as Exhibit 2 is a copy of an excerpt of Guam EPA's "Guam 2006 Integrated Solid Waste Management Plan," which recommended that solid waste management should be transferred to a public corporation under the CCU's oversight.

Executed this 8th day of November 2007 at San Francisco, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Pankaj Arora

- 5 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14

**EXHIBIT 1 TO PANKAJ ARORA'S DECLARATION**

Excerpt from Public Law 29-19

15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I MINA'BENTE NUEBI NA LIHESLATURAN GUÅHAN
### 2007 (FIRST) Regular Session

### CERTIFICATION OF PASSAGE OF AN ACT TO I MAGA'LAHEN GUÅHAN

This is to certify that Bill No. 174 (EC), "AN ACT MAKING APPROPRIATIONS FOR THE OPERATIONS OF THE EXECUTIVE, LEGISLATIVE AND JUDICIAL BRANCHES OF THE GOVERNMENT OF GUAM FOR THE FISCAL YEAR ENDING SEPTEMBER 30, 2008, MAKING OTHER APPROPRIATIONS, AND ENACTING MISCELLANEOUS AND ADMINISTRATIVE PROVISIONS," was on the 23rd day of September, 2007, duly and regularly passed.

Edward J.B. Calvo
**Acting Speaker**

Attested:

Ray Tenorio
Senator and Secretary of the Legislature

This Act was received by I Maga'lahen Guåhan this _04_ day of _Sept_, 2007, at _10:00_ o'clock _P_.M.

Assistant Staff Officer
Maga'lahi's Office

APPROVED:

FELIX P. CAMACHO
I Maga'lahen Guåhan

Date: _29 September 2007_

Public Law No. _29-19_

Case 1:02-cv-00022     Document 156     Filed 11/09/2007     Page 8 of 15

of the first ninety (90) day period. A final period of thirty (30) working days may be granted upon an additional certification from the attending medical doctor that additional time is needed for recovery.

(1) Employees of the government of Guam *shall* not transfer their unused annual leave *or* sick leave to another employee in exchange for any money, favors, *or* items of value. Employees who transfer or receive annual *or* sick leave in violation of this provision *shall* be guilty of official misconduct pursuant to Title 9 GCA §49.90.

(2) This provision *shall* apply to all government employees in the classified, appointed, elected, and unclassified positions, and all branches of the government of Guam, including line departments and agencies, autonomous agencies, public corporations, and all other government instrumentalities."

Section 97. The appropriation in Section 24 of Chapter IV, Part II of P.L. 28-150, *shall* not lapse and shall continue until all sums appropriated therein are expended. The Mayor of Agat may use said funds to repair and maintain the Agat Basketball Court and adjacent restroom facility.

Section 98. **Expenditure of Public Funds for Landfill. (a) Legislative Findings and Intent.** *I Liheslaturan Guåhan* finds that the government's proposed landfill site identified as *Dandan or Layon* is privately owned and that the government of Guam, upon final selection thereof, must purchase it. Failure to acquire the property before the government solicits a landfill design specific to that site will increase the market value of the property.

*I Liheslaturan Guåhan* additionally finds that a site-specific fiscal plan must be prepared that describes all the costs of the landfill project, including property acquisition; site mitigation requirements; infrastructure needs such as

122

Case 1:02-cv-00022    Document 156    Filed 11/09/2007    Page 9 of 15

1   power, water, wastewater and roadways; construction of the landfill itself, and a
2   detailed personnel budget. Therefore, *I Liheslaturan Guåhan* intends to save
3   millions of dollars by ensuring that the government acquires the property for a new
4   landfill before making site-specific expenditures and to determine the total cost of
5   constructing a landfill and preparing it for use.

6       (b)    **Prohibition on Expending Public Funds.** All government of Guam
7   agencies, departments, bureaus, boards, commissions, public corporations,
8   autonomous and semi-autonomous agencies, including the A. B. Won Pat
9   International Airport Authority, Guam, the Guam Power Authority, the Guam
10  Housing and Urban Renewal Authority, the Guam Housing Corporation, the Guam
11  Economic Development and Commerce Authority, the Guam Memorial Hospital
12  Authority, the University of Guam, the Jose D. Leon Guerrero Commercial Port,
13  the Guam Waterworks Authority, the Government of Guam Retirement Fund, and
14  the Guam Visitors Bureau, and all other government instrumentalities, *shall* not
15  expend funds on site-specific preparation, design work, mitigation, infrastructure
16  upgrade *or* installation, *or* construction of a new landfill, *unless* the government of
17  Guam has acquired and recorded fee simple ownership of the property in question.

18      (c)    Within sixty (60) days of the effective date of this Act, the Director of
19  Public Works *shall* submit to *I Maga'lahen Guåhan* and *I Liheslaturan Guåhan* a
20  financing plan enumerating in detail all costs associated with the new landfill,
21  including, but *not limited to:*

22          (1)    purchase of the property;

23          (2)    environmental mitigation within the landfill footprint, buffer
24                 zone, and other affected areas, including, *but not limited to,* water
25                 sources, rivers, streams, tributaries, wetlands, surface water, ground
26                 water, drainage, and erosion;

123

1        (3)    infrastructure needs, including, *but not limited to,* power, water,

2        wastewater and roadways, including climbing lanes for trucks,

3        mitigation of blind-curves and other hazards, shoulder widening,

4        roadway widening, addition of new traffic lanes, traffic management,

5        drainage and storm drainage improvements, access and utility roads,

6        upgrading road markings and signage, and upgrading bridges;

7        (4)    landfill construction; and

8        (5)    annual landfill operation and maintenance costs.

9    (d)    The Director of Public Works, the Administrator of the Guam

10   Environmental Protection Agency, and any other head of an executive

11   branch *or agency that has expended funds on a new landfill shall,* within

12   thirty (30) days of passage of this Act, submit a report regarding the purpose,

13   amount and source of that expenditure to the Speaker of *I Liheslatura*

14   *Guåhan.*

15   **Section 99.  Guam State Clearinghouse.** (a) Title 5 Guam Code Annotated

16   §2101.1(e) is *amended* to read as follows:

17      "(e)  Perform cost analysis on all Federal aid programs, grants, loans,

18   contracts, contributions, advances, direct Federal development *or other*

19   Federal funding for the financial impact on the government of Guam's

20   General Fund *or* special funds used to fund the local matching requirement

21   as prescribed by Federal law; and the financial impact on the government of

22   Guam of continuing the Federal program by the government of Guam *if* the

23   Federal funding expires.   Said analysis *shall* describe the indirect costs the

24   grantee is eligible for, the amounts applied for and received from each grant,

25   the previous year's funding level and funding estimate for future years.  Said

26   analyses *shall* be performed as an integral part of the state clearinghouse

27   process and submitted to the Speaker of *I Liheslaturan Guåhan,* the

124

1
2
3
4
5
6
7
8
9
10
11
12
**EXHIBIT 2 TO PANKAJ ARORA'S DECLARATION**
13
Excerpt from Guam EPA's 2006 Integrated Solid Waste Management Plan
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# Guam 2006
# Integrated Solid Waste
# Management Plan

**September 2006**

Guam Environmental Protection Agency • P.O. Box 22439 • Barrigada, Guam 96921
Tel.: (671) 475-1658 • Fax: (671) 477-9402

**www.guamepa.net**

additional costs upon the Government. These monetary penalties and hazard response costs are not budgeted or supported by the tipping fee revenues.

**Recommendation:** Solid waste operations should be outsourced in 2006 as required by the Solid Waste Operations Permit. The contractors should be required to have trained management in environmental compliance, including related costs. The contractors should be required to have policies and procedure that include the maintenance of equipment, proper operations and site maintenance and adequate cover material, and trained employees.

### 3.3 The CCU, Solid Waste Operations and the Guam Solid Waste Authority

By April 2006, the government was to have raised and/or borrowed over $10 million for Ordot Closure construction, and by November 2006, another $30 million or more for the landfill cell and buildings construction. The primary recommendation of the PUC's Audit Report is that the Solid Waste Division and activities be transferred to a public corporation under the oversight of the CCU. It stated:

> Time is of the essence and the solutions must be put in place immediately. Failure to do so could threaten the proposed bond financing that is required to fund critical compliance projects.

DPW faces similar financial management challenges that GWA and GPA faced in 2002. The result was the formation of the Combined Commission on Utilities (CCU) to oversee management of these agencies. The CCU did not exist in 2000 when the Guam Legislature found that creating a Board of Directors to oversee the Solid Waste Management Authority would be duplicative. The CCU has demonstrated success in overseeing contracting and financial management of the Guam Power Authority and Guam Waterworks Authority. Therefore, extending the CCU's powers to the solid waste operations can be achieved without unnecessary expense and without expanding government.

In addition, experience has shown that demands placed upon DPW management regarding roads, buildings, school buses, and assisting Mayors have impeded adequate implementation of its solid waste duties under the Solid Waste and Litter Control Act and recycling laws. The Government has fallen significantly behind in implementing the Consent Decree mandates, prompting E.O. 2006-12, forming an Ordot Consent Decree Compliance Committee, and E.O. 2006-13, to allow for emergency procurements to implement the Consent Decree projects and the Guam EPA permit conditions. The Committee's progress has been impeded by the demands of other government priorities and crises.

The necessary comprehensive and radical management changes have also been impeded by the frequent changes in the politically appointed Director, and the Government's resources dedicated to litigating with the United States about Ordot's pollution, to siting a landfill at Layon, and to the design of both the landfill and Ordot Closure. Consequently, Guam has fallen significantly behind the standards of solid waste management for developed communities that are

21

comparable to Guam in terms of population, solid waste composition, and solid waste volume. Therefore, extraordinary changes are needed to Guam's solid waste operations in 2006 and continuing into 2007.

The extraordinary changes extend well beyond tipping fee billing and collection. In order to obtain favorable bond rating or other financing, the revenue stream needs to be independent and not subject to reallocation. That can only be accomplished through an autonomous agency and its revenue. Significant management changes are needed for contract administration, not just for landfill operations and closure, but also for solid waste collection, solid waste separation, recycling, household hazardous waste operations, and transfer stations. Therefore, the GSWA should have a general manager who can effectively transition solid waste operations into an integrated and well-managed system of contract administration, billing and fee collection, and recycling activities.

Finally, experience has shown that GPA and GWA have benefited from the expertise of a chief financial officer. Therefore, because of the significant funds needed for capital improvements, and the complexity of financial management, the GSWA should have an experienced chief financial officer.

**Recommendation:** In 2006, the Guam Legislature should pass legislation creating the Guam Solid Waste Authority, a public utility overseen by the CCU. The legislation should: (1) transfer all DPW solid waste responsibilities and duties to the GSWA, (2) require the CCU to hire a general manager and a financial manager for the GSWA as soon as possible, (3) require the GSWA to have full-time staff trained in managing solid waste contracts, (4) require that all solid waste contractors have trained management in environmental compliance, including related costs, (5) require all solid waste contractors to have policies and procedures that include the maintenance of equipment, proper operations and site maintenance and adequate cover material, and trained technical employees, and (6) require data collection, analysis, and synthesis by the GSWA and all solid waste contractors.

## 3.4   Data Collection Needs

Management of the solid waste operations will depend heavily upon the data produced for collection, transport, disposal, recycling, special waste, and public education. Thus, the need in this category is not so much data collection as it is data analysis and synthesis. For example, waste composition data not only would help set recycling priorities, it also helps define the scope and magnitude of the recycling that is achievable. This information will be helpful in contract negotiations and contract administration.

## 3.5   Performance Standards

### 3.5.1 Billing and Fee Collection

A.     The residential services should be a prepaid system.
         Basis: Public Law 28-56, PUC Audit Report, and this ISWMP.

22