**OFFICE OF THE LEGISLATIVE COUNSEL**
*Raymond L. Souza, Jr.*
*I Mina'Bente Nuebi Na Liheslaturan Guåhan*
155 Hesler Street
Hagåtña, Guam 96910
**Telephone:** (671) 472-3419
**Facsimile:** (671) 472-3317
**E-mail:** rsouza61@gmail.com

**Attorney for** *I Mina'Bente Nuebi Na Liheslaturan Guåhan*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CIVIL CASE NO. 02-00022 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **SUPPLEMENTAL DOCUMENTS** |
| v. | ) | |
| | ) | |
| GOVERNMENT OF GUAM | ) | |
| | ) | |
| Defendant. | ) | |

*I Mina'Bente Nuebi Na Liheslaturan Guåhan*, the 29th Guam Legislature, by and through its counsel, requests that the attached Legislative Resolution No. 103 and supporting documents be placed into the record in the above-entitled action.

DATED: January 11, 2008

RAYMOND L. SOUZA, JR.
Legislative Counsel

# ORIGINAL

*I MINA'BENTE NUEBI NA LIHESLATURAN GUÅHAN*
2007 (FIRST) Regular Session

**Resolution No. 103 (LS)**
As amended.

Introduced by:

R. J. Respicio
Tina Rose Muña Barnes
Judith Paulette Guthertz
David L.G. Shimizu
A. B. Palacios, Sr.
Frank F. Blas, Jr.
Edward J.B. Calvo
James V. Espaldon
Mark Forbes
Frank T. Ishizaki
J. A. Lujan
v. c. pangelinan
J. T. Won Pat

**Relative to stating the sense of *I Mina'Bente Nuebi Na Liheslaturan Guåhan* that the location of Guam's new landfill has already been determined by Public Law 23-95 and that the selection of *Dandan/Layon* area for a landfill is contrary to existing Guam law, is in violation of the Federal Consent Decree, and also ignores the necessity of developing the water resources within the *Inarajan* Watershed for future use including addressing the need for as much as a 25% increase in the need for fresh water for the upcoming military buildup; and to request that the information contained herein and attached as exhibits, be included in the court record of Civil Case No. 02-00022 before the District Court of Guam, relative to the Consent Decree to close the *Ordot* Dump and open a new sanitary landfill in Guam.**

1

1    **BE IT RESOLVED BY** *I MINA'BENTE NUEBI NA LIHESLATURAN*
2    *GUÅHAN*:

3        **WHEREAS,** in an Order filed in the U.S. District Court on December 14, 2007
4    by Chief Judge Frances M. Tydingco-Gatewood, the Judge listed ten (10) issues
5    relative to United States of America v. Government of Guam, *Civil Case No. 02-*
6    *00022*, concerning the Consent Decree to close the Ordot Dump and open a new
7    sanitary landfill, the ten (10) issues including those that the Judge felt were essential
8    to ensure that the government of Guam come into compliance with the Consent
9    Decree; and

10            **WHEREAS,** upon review, it is apparent that several of Chief Judge
11   Tydingco-Gatewood's rulings were made without relevant information pertinent to the
12   ten (10) issues as well as to the entire Consent Decree; information that may not have
13   been made a part of the court record; and

14       **WHEREAS,** Chairman of the Legislative Committee on Judiciary, Natural
15   Resources, Infrastructure and Cultural Affairs, Senator James V. Espaldon and several
16   minority party members of *I Liheslaturan Guåhan* are also members of the Solid
17   Waste Law Review Commission (LRC), which was established by Executive Order
18   2007-09, promulgated by *I Maga'lahen Guåhan* on July 23, 2007, in response to a
19   U.S. Magistrate Judge's recommendation that such a Commission should be created to
20   be "tasked with developing a general legislative policy ... with regard to the closure of
21   the Ordot Dump and the construction of a new landfill...;" and

22       **WHEREAS,** in his recommendation to Chief Judge Tydingco-Gatewood, the
23   Magistrate Judge recommended that the LRC draft legislation to create a public
24   corporation that would assume and perform the functions of the Solid Waste
25   Management Division of the Department of Public Works, and transform DPW's
26   Solid Waste Management Division into an entity "that can effectively handle all

2

1   aspects of solid waste management without sacrificing the health and safety of the
2   people of Guam;" and

3   **WHEREAS,** Senator Tina Rose Muña Barnes, an alternate minority party
4   Legislative member to the LRC, wrote to Attorney General Alicia G. Limtiaco on
5   November 23, 2007 and December 5, 2007, concerning the Consent Decree, and
6   making specific requests to the Attorney General requesting that pertinent information
7   be made available to the U.S. District Court and Judge Tydingco-Gatewood; and

8   **WHEREAS,** in response to Senator Muña Barnes' requests, a December 14,
9   2007 letter from the Office of the Attorney General was hand delivered to the Senator
10  by Deputy Attorney General J. Patrick Mason stating that the Office of the Attorney
11  General was declining to make such information available to the Court, writing that:
12  "Pursuant to our Guam Rules of Professional Conduct and ethics rules to which we, as
13  legal counsel, must adhere, and the differing positions taken by the Executive and
14  Legislative branches in this matter; the Office (of the Attorney General) is not able to
15  file a motion on your behalf to place your letter(s) into the record;" and

16  **WHEREAS,** in the December 14 letter, Deputy Attorney General Mason also
17  wrote that "Senator James Espaldon, Chair of the (LRC), has already made an
18  appearance in Court regarding the case and has stated the LRC's position regarding
19  the site of the proposed landfill and other matters the LRC has discussed … The Chair
20  of the LRC … may be allowed to again address the Court at future status hearings;"
21  and

22  **WHEREAS,** based on the suggestion by the Deputy Attorney General,
23  Minority Representative to the LRC Senator Rory J. Respicio and Senators Muña
24  Barnes and Judith P. Guthertz, who is also an alternate LRC member, have written to
25  LRC Chair Senator Espaldon enclosing letters and information that they wish to make
26  part of the Court record; and

3

1      **WHEREAS,** in his meeting with Senator Muña Barnes, Deputy AG Mason
2      also verbally stated that *I Maga'Lahen Guåhan* (the Governor of Guam), a party to the
3      District Court proceedings, could also make documents a part of the Court record
4      based on a request from the LRC, and that a Resolution stating the sense of *I*
5      *Liheslaturan Guåhan* may also be considered by the Court; and

6      **WHEREAS,** *I Liheslatura* finds that there are a number of troubling issues
7      related to the proposed *Dandan/Layon* site, from the violation of existing Guam law,
8      to proposing the endangerment of existing fresh water resources, to the possibility of
9      expenditures contrary to Guam procurement law, and although LRC Chair Senator
10     Espaldon has been asked to present some documents to the District Court, *I*
11     *Liheslatura* believes that only in a resolution approved by a majority of its members
12     can the full measure of *I Liheslatura*'s intent be known; and

13     **WHEREAS,** *I Liheslatura* makes the following findings relative to the site-
14     selection process and the Consent Decree:

15          **Finding 1: The selection of the *Dandan/Layon* site is contrary to**
16          **Guam law**. Public Law 23-64 requires Guam EPA to prepare "legislative
17          action as may be required for new disposal sites." According to Title 10 GCA
18          §51103(a)(6), the next landfill site must be selected by *I Liheslatura*. Therefore,
19          the site-selection process contained in the Consent Decree does not comply with
20          Guam law as it excludes *I Liheslatura* from the site-selection process.

21          **Finding 2: Public Law 23-95 requires the landfill to be located at**
22          ***Guatali* or *Mala'a* or both.** In accordance with §51103(a)(6), *I Liheslaturan*
23          *Guåhan* selected *Guatali* or *Mala'a* or both as the location for the new landfill
24          via Public Law 23-95. This Law has never been repealed and is still in effect.
25          In *San Miguel v. Dept. of Public Works,* CV 892-04, taxpayer citizens are
26          seeking to enjoin government of Guam from proceeding with the *Dandan* site

4

1　　in light of P.L. 23-95. Although the trial court denied an injunction motion
2　　primarily on the basis that it was deferring to the administrative agency, the
3　　argument in favor of the validity of P.L. 23-95 is that an administrative agency,
4　　by employing certain criteria as "exclusionary" without a scientific basis, is
5　　acting in an arbitrary and capricious manner. Since Public Law 23-95 was
6　　enacted, there has been no enactment by *I Liheslatura* granting any executive
7　　agency the authority to select landfill sites other than *Guatali* or *Mala'a*. The
8　　Consent Decree requires compliance with Guam law.

9　　　　**Finding 3: Guam EPA not authorized to select a final site.** Under the
10　　provisions of Title 10 GCA §51119(a)(6), the Solid Waste Management Plan
11　　adopted by the Guam EPA includes "an identification of potential sites for future
12　　sanitary landfills" but does not grant authority to select a final site.

13　　　　**Finding 4: The site selection process excluded available Federal
14　　property.** The site selection process entered into by Guam EPA did not identify
15　　potential sites for a landfill on Federal property without discussing with the
16　　Federal Government the possibility of utilizing Federal property for a future
17　　landfill or entering into a land exchange with the government of Guam. It is
18　　appropriate to discuss such options with the Federal Government due to the
19　　need for such facilities by the United States Air Force and the United States
20　　Navy, as the sanitary landfills being utilized by these branches of the United
21　　States Armed Forces are near capacity.

22　　　　**Finding 5: Guam EPA selection criteria was not applied consistently
23　　to the sites considered.** The site selection process entered into by Guam EPA
24　　to identify potential sites for a landfill was flawed from the beginning when
25　　different criteria were used to rate potential sites; specifically:

5

1     (a)     Potential landfill sites in northern Guam were summarily
2     eliminated from consideration at the outset in order to assure protection
3     of valuable fresh water resources. This same criteria was extended to
4     valuable fresh water resources elsewhere in Guam, including the *Talofofo*
5     watershed which feeds the *Ugum* River dam, but was not extended to the
6     selection of the *Dandan/Layon* site, which had already been identified by
7     Guam Waterworks for future water resource development; and

8     (b)     Guam EPA crafted unnecessarily restrictive criteria to eliminate
9     potential sites from consideration. The additional restrictions were not
10     put in place by the U.S. Environmental Protection Agency to safeguard
11     the people of Guam *or* to protect our island's valuable environmental
12     resources, but rather to eliminate potential sites by setting an artificial
13     property size limit not contained in Federal law or regulation, as a basis
14     to remove the *Guatali or Mala'a* sites identified in Public Law 23-95
15     from consideration.

16    **Finding 6: The site selection process entered into by Guam EPA did**
17 **not follow the Consent Decree requirements because it included two (2)**
18 **sites ineligible by application of Federal Policy.** During the process of
19 narrowing its selection to the three (3) final sites pursuant to the Consent
20 Decree, two (2) sites, *Sabanan Batea* and *Lonfit* did not meet Federal criteria
21 and should have been automatically excluded. Based on the Department of
22 Transportation's Federal Aviation Administration Advisory Circular No.
23 150/5200-34 and the Aviation Investment and Reform Act for the 21st Century,
24 which forbid the construction or establishment of a new solid waste landfill
25 within six (6) statute miles of public use airports, the *Sabanan Batea* and *Lonfit*
26 sites, as well as the *Ordot* Dump, are well within that radius. An argument

6

| 1 | could be made that by selecting two (2) sites that could not be considered, the |
| 2 | *Dandan* site would have to be selected. Guam EPA did not select two (2) |
| 3 | alternate sites to replace *Sabanan Batea* and *Lonfit* on the short list, leaving |
| 4 | only *Dandan* for selection. |

5      **Finding 7:   The updated 2006 Solid Waste Management Plan**

6  **containing the *Dandan/Layon* site designation is not valid and was not**

7  **adopted pursuant to the Guam Administrative Adjudication Act.**

8      (a)  The updated 2006 Solid Waste Management Plan provides that the

9      new Municipal Solid Waste Landfill Facility (MLSWF) will be at

10    *Dandan/Layon,* and the agency's regulations were deemed approved

11    because they had not been disapproved by the Legislature within ninety

12    (90) days under the Administrative Adjudication Act (AAA), however,

13    regulations cannot supercede law, thus the 2006 Solid Waste

14    Management Plan is invalid. See AmJur 2d Administrative Law §223.

15    (b)  The AAA process requires an Economic Impact Statement (EIS) for

16    any regulation promulgated under the AAA that will cost the general

17    public in excess of Five Hundred Thousand Dollars ($500,000). Title 5

18    GCA §9301. The 2006 Solid Waste Management Plan was submitted

19    without an EIS, despite the presence of Sec 6.5.2 that specifically

20    requires the development of the *Dandan/Layon* site, the cost of which is

21    expected to be well over $180 Million Dollars. An EIS was never

22    prepared by Guam EPA because its administrator certified that the cost to

23    the public to implement the 2006 Solid Waste Management Plan would

24    be less than Five Hundred Thousand Dollars ($500,000). To date,

25    government of Guam has already spent in excess of Ten Million Dollars

26    ($10,000,000) on the proposed *Dandan/Layon* site that has never been

7

1    approved by public law, and the Federal court has ordered government of
2    Guam to spend at least $1.3 Million Dollars to condemn a site that was
3    selected absent any legal authority.  The Consent Decree requires
4    compliance with Guam law.

5    **Finding 8:  The United States Environmental Protection Agency is**
6    **complicit in the violation of Guam Law relative to the site selection process.**
7    The Consent Decree requires Guam law to be followed in the site selection
8    process. By virtue of the United States Environmental Protection Agency
9    approving the *Dandan/Layon* site without legislative approval, it has taken a
10   position contrary to Guam Law and the requirements of the Consent Decree.

11   **Finding 9:  Local legislation guarantees accountability, transparency,**
12   **and full-disclosure of landfill plans to *I Liheslatura* and the people of**
13   **Guam.** Assistant U.S. Attorney Mikel Schwab was quoted in Guam's media as
14   saying: *"Instead of seeking to expedite government of Guam's compliance, the*
15   *Guam Legislature chose to place additional hurdles in DPW's path."* This
16   statement was challenged in a November 23, 2007 letter to Attorney Schwab
17   from Senator Muña Barnes, who stated that the provisions in P.L. 29-19 require
18   fiscal accountability for the expenditure of government funds. Chief Judge
19   Tydingco-Gatewood wrote in her Order of December 14, 2007: *"The court is*
20   *deeply concerned that there is legislation enacted that seemingly prohibits the*
21   *opening of the new landfill. It cannot be ignored that GovGuam has already*
22   *contracted approximately $9.3 Million Dollars in work under the Consent*
23   *Decree."* *I Liheslatura* is unaware of legislation in place that would prohibit
24   opening a new landfill, however P.L. 29-19 does require that DPW must fully
25   account for the funds they are expending.  In her letter to Attorney Schwab,
26   Senator Muña Barnes wrote:

8

1    "The contract for the construction plans for the *Layon/Dandan* landfill
2    was initiated in 2005.  In subsequent change orders to this contract, the scope of
3    work was expanded to include an environmental impact study for the
4    *Layon/Dandan* site, the construction of a temporary road, and a hydrogeologic
5    study, among other items.  All of this was initiated without clear title to the
6    property and contrary to established government of Guam procurement
7    processes, perhaps done in a panicked response to Consent Decree
8    requirements.

9          With regard to the funding requirements for *Layon/Dandan,* DPW has
10   not yet provided *I Liheslatura* with the amount necessary to finance the closure
11   of the *Ordot* Dump and open a new landfill."  *I Liheslatura* was expressing
12   concern that "estimates of amounts as high as $10 Million Dollars that have
13   already been spent on work at the *Layon/Dandan* site without any of the
14   following:

15         (a)    Legislative appropriation, or

16         (b)    A statute identifying the site for the new landfill, or

17         (c)    Government of Guam possessing clear title to the property
18                containing the *Layon/Dandan* site.

19         For that reason *I Liheslatura* included in Public Law 29-19 a requirement
20   that government of Guam '...*shall* not expend funds on site-specific
21   preparation, design work, mitigation, infrastructure upgrade or installation, *or*
22   construction of a new landfill, unless the government of Guam has acquired and
23   recorded fee simple ownership of the property in question.'  This language can
24   be found in item (b) of Section 98, Chapter VI.  The intent of this provision of
25   law is *solely* to require accountability by our government on millions of dollars
26   of expenditures of government funds that are currently taking place on private

9

1  property, and most likely inflating its value, before government of Guam has
2  made a realistic attempt to acquire said property. Further, items (c) and (d) of
3  the same section specifically mandate the following:

4  " '(c) Landfill Financing Plan. Within sixty (60) days of the effective
5  date of this Act, the Department of Public Works *shall* submit to *I Maga'lahen*
6  *Guåhan* and *I Liheslaturan Guåhan* a financing plan enumerating in detail all
7  costs associated with the construction of the new landfill, including but *not*
8  *limited to*:

9       (a)    Property acquisition,
10      (b)    Environmental mitigation within the landfill footprint, buffer zone,
11             and other impacted areas including, but *not limited to* water sources,
12             rivers, streams, tributaries, wetlands, surface water, ground water,
13             drainage, and runoff erosion;
14      (c)    Infrastructure needs, including but *not limited to* power; water;
15             wastewater, and roadways including climbing lanes for trucks; mitigation
16             of blind-curves and other hazards; shoulder widening; roadway widening;
17             addition of new traffic lanes; traffic management; drainage and storm
18             drainage improvements; access and utility roads; upgrading road
19             markings and signage, and upgrading bridges;
20      (d)    Landfill construction, and
21      (e)    Annual landfill operations and maintenance costs'."

22  " '(d) The Director of Public Works, the Administrator of the Guam
23  Environmental Protection Agency, and any other head of an executive branch
24  *or* agency that has expended funds on a new landfill *shall*, within thirty (30)
25  days of passage of this Act, submit a report regarding the purpose, amount and
26  source of that expenditure to the Speaker of *I Liheslaturan Guåhan*."

10

1   "Strict time limits were placed on submittal of the financing plan and
2   reporting on expenditures so as to delay the process at little as possible. Please
3   note that while DPW has presented cost analyses for the closure of *Ordot* Dump
4   and the opening of a new landfill at the *Layon/Dandan* site, these cost-estimates
5   have fluctuated significantly. I recall that during the 27th Guam Legislature,
6   these costs were pegged at $80 Million Dollars. Now such estimates hover at
7   around $229 Million Dollars. We must be certain of this amount given the
8   challenging economic conditions currently being experienced in Guam."

9   **Finding 10. The *Dandan/Layon* site poses a detrimental impact to the**
10  **population of Guam.** Chief Judge Tydingco-Gatewood wrote in her Order of
11  December 14, 2007: "According to Messrs. Tor Gudmudsen, a professional
12  civil engineer, and Pankaj Arora, an environmental engineer for the USEPA
13  Region IX, the *Dandan* site will pose no risk to the nearby water sources and no
14  risk of leachate as the new landfill will have a minimum of a five-foot liner.
15  See Docket No. 170. Additionally, a site visit to *Dandan* conducted by the
16  court revealed the existence of monitoring wells designed to further prevent the
17  risk of contamination. There is nothing in the court's record to indicate that the
18  selection of *Dandan* – the landfill site selected by government of Guam – will
19  have a detrimental impact to the population of Guam…"

20  A U.S. Geological Survey Fact Sheet, No. FS-040-03 entitled *"The*
21  *Norman Landfill Environmental Research Site: What Happens to the Waste in*
22  *Landfills?"* has a very different perspective. The Fact Sheet states: "Although
23  liners and leachate collection systems minimize leakage, liners can fail and
24  leachate collection systems may not collect all the leachate that escapes from a
25  landfill. Leachate collection systems require maintenance of pipes, and pipes
26  can fail because they crack, collapse, or fill with sediment. The USEPA has

11

1 concluded that all landfills eventually will leak into the environment..." This is
2 a widely known and accepted fact, and it is the reason that USEPA requires
3 sensors and monitoring leak detection devices for all landfills.

4 **Finding 11: The *Dandan/Layon* site is located on a future water**
5 **source.** In her November 23, 2007 letter to U.S. Attorney Mikel Schwab,
6 Senator Muña Barnes quoted the following from a letter dated June 14, 2005,
7 from environmental engineers and consultants Brown & Caldwell (B&C) to
8 then-General Manager David Craddick of Guam Waterworks, in which B&C
9 Chief Hydrogeologist Martin G. Steinpress makes the following points:

10     (a) "Although GWA's *Fena* surface water reservoir and *Ugum* diversion
11     currently supply southern Guam, future needs may require groundwater
12     development. Since groundwater beneath *Layon* falls within the G-1
13     Resource Zone category, it must be protected to drinking water quality
14     standards."

15     (b) "The SEIS acknowledges that the *Inarajan* River has been identified
16     as a potential site for a surface water dam and/or reservoir. SEIS Figure
17     3-1 also shows proposed reservoir and/or diversion sites on the *Tinago*
18     River ... both of these proposed sites would be downstream of the
19     proposed landfill site."

20     (c) "In spite of the SEIS claim that "no plans are currently in place to
21     develop groundwater or surface water supplies in the *Layon* Area ...
22     GWA considers (the *Inarajan* and *Tinago* Rivers) as potentially viable
23     and necessary for the future water supply needs. In fact, the pre-draft
24     Guam Water Budget Report ... recommends that consideration be given
25     to investigating the feasibility of diversions at other rivers in addition to
26     the *Ugum*..."

12

1     (d) "No citations or evidence is provided that the limestone aquifer
2     tapped by the *Malojloj* wells is either limited in extent *or* that
3     groundwater within it is not continuous with that in the volcanic
4     formations in the *Layon* area."

5     (e) "...previous well yields do not rule out development of an economic
6     groundwater resource in either the limestone or volcanic aquifers of
7     Southern Guam ... well yields comparable to northern Guam are
8     possible."

**Finding 12: GEPA selection criteria relative to water sources was not consistently applied to the *Dandan/Layon* site.** Senator Guthertz has opined on several occasions on the seeming lack of common sense in the actions and decisions regarding closing the *Ordot* Dump and opening a landfill. In her column in the Marianas Variety of June 14, 2007, and with the knowledge that all landfills will eventually leak into the environment, Senator Guthertz pointed out that during the process to select sites for the proposed landfill, "... areas near water resources were excluded, including locations near *Ugum* River and northern Guam... the 'experts' excluded Guam's water resources to protect them from poisoning because landfill liners ALWAYS leak. Although the *Inarajan* watershed can produce seven million gallons of water every day, it was not eliminated (from the list of possible landfill sites), suggesting that something was wrong with the (site selection) process.

**Finding 13: The Consent Decree allows for the construction of a private sanitary landfill.** On December 11, 2007, U.S. Attorney Leonardo M. Rapadas was quoted in Guam's media as saying that the *Dandan/Layon* site was only one allowable under the Federal Consent Decree for a new landfill. This statement was challenged in a December 12, 2007 letter to U.S. Attorney

13

Rapadas from Senator Respicio, who pointed out that "*Dandan* may be the only approved site for a Government landfill, but the Consent Decree does not prohibit the use of a private landfill."

"The Consent Decree states that the *Ordot* Dump is to be closed and no longer allowed to receive solid waste as soon as a properly permitted landfill is opened in Guam."

Specifically, the Consent Decree, United States of America v. Government of Guam, *Civil Case No. 02-00022*, IV. COMPLIANCE, item 10 b. states:

"Notwithstanding any of the time frame set forth in Paragraph 8 or 9 above, upon the opening of a properly licensed and permitted municipal solid waste landfill prior to the times set forth in Paragraphs 8 and 9 above, no further dumping of any kind will be permitted at the *Ordot* Dump."

The private firm seeking to open the landfill at *Guatali* pursuant to P.L. 23-95 has stated that the first cell can be opened by as early as the end of July, 2008, should they receive their proper permitting in a timely manner.

"The positions taken by both the U.S. Attorney's office and USEPA seem to be concerned only with using the *Dandan* property for a landfill, and not with moving forward in the most rapid and cost effective manner possible to close *Ordot*. It is my understanding that closing *Ordot* as quickly as possible because of the contamination of the *Lonfit* River is the reason for the Consent Decree."

"I am also surprised and concerned that the U.S. Attorney would take this anti-private enterprise position, especially when your office must surely recognize the need for a twenty-five percent (25%) increase in fresh water generation for the Federal Government's military buildup. Please help me

14

| | |
|---|---|
| 1 | understand why Federal entities would want to insist on *Dandan* when the |
| 2 | *Guatali* site would be: |
| 3 | (a) more cost effective; |
| 4 | (b) allow the protection of water resources at *Dandan* needed for the |
| 5 | military buildup; and |
| 6 | (c) result in a much quicker closure of the *Ordot* Dump and resolution |
| 7 | of the Consent Decree." |
| 8 | **Finding 14: The Federal Government has not participated in efforts** |
| 9 | **to reduce the volume of solid waste generated on Guam, thereby hindering** |
| 10 | **government efforts.** In her November 23, 2007 letter to U.S. Attorney Mikel |
| 11 | Schwab, Senator Muña Barnes also took to task the lack of action by the |
| 12 | Federal Government, in the form of the U.S. military commands in Guam, by |
| 13 | refusing for many years to join with the civilian community in a container- |
| 14 | recycling (bottle bill) program. She wrote: |
| 15 | "In ten (10) states, including Hawaii and California, the military is a full |
| 16 | participant and those deposit programs prevent up to eighty percent (80%) *or* |
| 17 | more of recyclable containers from entering waste streams. It seems rather |
| 18 | disingenuous of the Federal government to criticize government of Guam for its |
| 19 | solid waste problems, when the military's lack of cooperation prevents an |
| 20 | important recycling effort from going forward. The Guam Chamber of |
| 21 | Commerce has estimated that as much as forty percent (40%) of all beverages |
| 22 | purchased in commissaries and exchanges are used and discarded off-base. |
| 23 | Local beverage distributors oppose any kind of "bottle bill" until and unless the |
| 24 | military is a full participant."and |

15

1      **WHEREAS,** all of the documents to which this Resolution refers, with the

2    exception of references to existing public laws and government codes, are attached to

3    this Resolution as exhibits; and

4      **WHEREAS,** *I Mina'bente Nuebi Na Liheslaturan Guåhan* presents this

5    resolution as an official statement of its sense that the location of Guam's new landfill

6    has already been determined by Public Law 23-95 and that the selection of

7    *Dandan/Layon* area for a landfill is contrary to existing Guam law, is in violation of

8    the Federal Consent Decree, and also ignores the necessity of developing the water

9    resources within the *Inarajan* Watershed for the future needs of the people of Guam;

10   now, therefore, be it

11     **RESOLVED,** that *I Mina'Bente Nuebi Na Liheslaturan Guåhan* does hereby,

12   on behalf of the people of Guam, request that the Legislative Counsel file a motion to

13   permit this Resolution and the attached information contained herein to be included in

14   the court record of Civil Case No. 02-00022 before the District Court of Guam,

15   relative to the Consent Decree to close the *Ordot* Dump and open a new sanitary

16   landfill in Guam; and be it further

17     **RESOLVED,** that *I Mina'Bente Nuebi Na Liheslaturan Guåhan* on behalf of

18   the people of Guam, considers this Resolution to be an expression of public policy,

19   and requests that the Governor of Guam and all members of his administration, and

20   the Attorney General of Guam, cease in referencing the site in *Dandan/Layon* as the

21   only site for Guam's sanitary landfill; and be it further

22     **RESOLVED,** that *I Mina'Bente Nuebi Na Liheslaturan Guåhan* on behalf of

23   the people of Guam, respectfully and officially conveys to U.S. District Court Chief

24   Judge Tydingco-Gatewood that the opening of landfill at *Guatali or Mala'a* is one of

25   a few alternative solutions to Guam's solid waste crisis that will result in a more

26   timely closing of the *Ordot* Dump and bring an end to the Consent Decree at a much

16

1     lower cost to the people of Guam and provide protection to our island's precious water

2     resources; and be it further

3         **RESOLVED,** that the Speaker certify, and the Secretary of the Legislature

4     attest to, the adoption hereof, and that copies of the same be thereafter transmitted to

5     U.S. District Court Chief Judge Frances M. Tydingco-Gatewood; to the U.S. Attorney

6     Leonardo M. Rapadas; to the Honorable Alicia G. Limtiaco, Attorney General of

7     Guam; and to the Honorable Felix P. Camacho, *I Maga'lahen Guåhan.*

**DULY AND REGULARLY ADOPTED BY** *I MINA'BENTE NUEBI NA LIHESLATURAN GUÅHAN* **ON THE 21ST DAY OF DECEMBER 2007.**

_____
**EDWARD J.B. CALVO**
**Acting Speaker**

**RAY TENORIO**
**Senator and**
**Secretary of the Legislature**

17

*adopted*

# I MINA' BENTE NUEBI NA LIHESLATURAN GUÅHAN
## 2007 (FIRST) Regular Session

Date: _12/21/07_

## VOTING SHEET

Bill No. _____
Resolution No. _103 (EC)_
Question: _____

| NAME | YEAS | NAYS | NOT VOTING/ ABSTAINED | OUT DURING ROLL CALL | ABSENT |
|---|---|---|---|---|---|
| BLAS, Frank F., Jr. | ✓ | | | | |
| CALVO, Edward J.B. | | | excused from voting | | |
| ESPALDON, James V. ✗ | | ✗✓ | | | |
| FORBES, Mark | ✓ | | | | WP |
| GUTHERTZ, Judith Paulette | ✓ | ✓ | | | |
| ISHIZAKI, Frank T. | ✓ | ✓ | | | |
| LUJAN, Jesse Anderson, | ✓ | | | | |
| MUNA-BARNES, Tina Rose | ✓ | | | | |
| PALACIOS, Adolpho Borja, Sr. | ✓ | ✓ | | | |
| PANGELINAN, vicente (ben) cabrera | ✓ | ✓ | | | |
| RESPICIO, Rory J. | ✓ | | | | |
| SHIMIZU, David L.G. | ✓ | ✓ | | | |
| TENORIO, Ray | | ✓ | | | |
| ~~████████████~~ | ✓ | | | | |
| WON PAT, Judith T. | ✓ | | | | |
| **TOTAL** | 8 | 4 | 1 | 0 | 1 |

**CERTIFIED TRUE AND CORRECT:**

_[signature]_

Clerk of the Legislature

\* 3 Passes = No vote
EA = Excused Absence

AN ACT TO DESIGNATE THE PRIMARY AND SECONDARY
SITES FOR A NEW LANDFILL SITE TO REPLACE THE ONE
AT ORDOT, AND TO REPEAL SECTION 3 AND AMEND
SECTION 4 OF P. L. 22-115 RELATIVE THERETO.

Section  1...  Legislative Intent.
Section  2...  Guatali designated as new landfill site.
Section  3...  Section 3 of P.L. 22-115 is repealed.
Section  4...  Section 4 of P.L. 22-115 is amended.

## BE IT ENACTED BY THE PEOPLE OF THE TERRITORY OF GUAM:

**Section 1. Legislative Intent.** It has been the intent of the Legislature to institute a new landfill site and then close the existing one at Ordot. Despite the best of intentions, this project has dragged on interminably with no fixed date in sight for accomplishment. Therefore, this Legislature has agreed to establish sites for the new landfill.

**Section 2.** The primary site for the new landfill shall be that area in central Guam, known as Guatali, located near the old GORCO Oil site. The government of Guam and its agencies shall immediately commence the planning and development of this new landfill site so that it can begin to be utilized at the earliest possible date. If for any legitimate reason, it is found that Guatali can not be used, the secondary site shall be that area known as Malaa. The same conditions shall apply to Malaa as stated for Guatali if Guatali can not be used. The scheduling for the operation of this new site shall be such that operations can begin this year or early next year.

**Section 3.** Section 3 of Public Law 22-115 is hereby repealed in its entirety.

**Section 4.** Section 4 of Public Law 22-115 is amended to read as follows:

"**Section 4. Submission of reports to the Legislature.** Within ninety (90) days after the effective date of this Act, the Governor shall submit to the Legislature a budget request to cover the costs of moving the solid waste disposal operations from Ordot to the new site. The Governor shall submit to the Legislature an annual report in March of each of the next three (3) years, which report shall include the status of the progress of activation of

610

the new landfill site, and the deactivation of the Ordot site. The report shall also include details of any alternative method of disposal of solid waste which is under consideration or is expected to be implemented on Guam and the proposed activation date."

~~~~~~~~~~~~~~~~~~~

## PUBLIC LAW NO. 23-96

Bill No. 526 (LS)
Date Became Law: May 8, 1996
Governor's Action: Approved

Introduced by:

M. C. Charfauros
A. L. G. Santos
T. S. Nelson
T. C. Ada
J. P. Aguon
E. Barrett-Anderson
A. C. Blaz
J. S. Brown
F. P. Camacho
H. A. Cristobal
M. Forbes
A. C. Lamorena V

C. Leon Guerrero
L. Leon Guerrero
S. L. Orsini
V. C. Pangelinan
D. Parkinson
J. T. San Agustin
F. E. Santos
A. R. Unpingco
J. Won Pat-Borja

AN ACT TO AMEND §73145, §73147, §73151 AND §73152, AND REPEAL AND REENACT §73146, ALL OF TITLE 5, GUAM CODE ANNOTATED, RELATIVE TO THE CUSTOMS,

611

List of Exhibits to *I Mina'bente Nuebi Na Liheslaturan Guåhan*
(29th Guam Legisature) Resolution No. 103 (LS) entitled:

**Relative to stating the sense of *I Mina'bente Nuebi Na Liheslaturan Guåhan* that the location of Guam's new landfill has already been determined by Public Law 23-95 and that the selection of *Dandan/Layon* area for a landfill is contrary to existing Guam law, is in violation of the Federal Consent Decree, and also ignores the necessity of developing the water resources within the *Inarajan* Watershed for future use including addressing the need for as much as a 25% increase in the need for fresh water for the upcoming military buildup; and to request that the information contained herein and attached as exhibits, be included in the court record of Civil Case No. 02-00022 before the District Court of Guam, relative to the Consent Decree to close the *Ordot* Dump and open a new sanitary landfill in Guam.**

Exhibit 1: Nov. 23, 2007 Letter from Sen. T.R. Muña Barnes to AG Limtiaco

Exhibit 2: Dec. 5, 2007 Letter from Sen. T.R. Muña Barnes to AG Limtiaco

Exhibit 3: Dec. 14, 2007 Letter from Office of Attorney General to Sen. T.R. Muña Barnes

Exhibit 4: Committee Report, Bill 240, 27th Guam Legislature

Exhibit 5: Department of Transportation's Federal Aviation Administration Advisory Circular No. 150/5200-34

Exhibit 6: News Story, Marianas Variety, November 12, 2007: "Feds: Guam Legislature hinders consent decree compliance"

Exhibit 7: November 23, 2007 Letter from Sen. T.R. Muña Barnes to Assistant U.S. Attorney Mikel Schwab

Exhibit 8: U.S. Geological Survey Fact Sheet, No. FS-040-03: "The Norman Landfill Environmental Research Site: What Happens to the Waste in Landfills?"

Exhibit 9: June 14, 2005 Letter from Brown & Caldwell to Guam Waterworks Authority General Manager David Craddick

Exhibit 10: Various Marianas Variety opinion columns by Senator J.P. Guthertz

Exhibit 11: News Story, KUAM TV, December 11, 2007: "Feds balk at planned Guatali groundbreaking"

Exhibit 12: December 12, 2007 Letter from Sen. R.J. Respicio to U.S. Attorney Leonardo M. Rapadas

Exhibit 13: Navy Exchange sale flyer for various military commands including Guam and displaying the message: "plus deposits as required" indicating cooperation with recycling efforts in other jurisdictions

# EXHIBIT 1



## SENATOR TINA ROSE MUÑA BARNES

I MINA' BENTE NUEBI NA LIHESLATURAN GUÅHAN • TWENTY NINTH GUAM LEGISLATURE
LOCATION: Suite 205 Ada Plaza Center, 173 Aspinall Avenue, Hagåtña, Guam 96910 • MAIL: 155 Hesler Place, Hagåtña, Guam 96910
(671) 475-8462 • Fax: (671) 472-3547

November 23, 2007

Alicia G. Limtiaco
Attorney General of Guam
Office of the Attorney General
287 West O'Brien Drive
Hagatna, GU 96910

Dear General Limtiaco:

*Hafa adai.* I am transmitting a copy of my letter to Attorney Mikel Schwab of the United States Attorney's office on a number of issues regarding Guam's solid waste dilemma, including my intent in authoring the provision in P.L. 29-19, which places certain conditions on the expenditure of funds for a possible landfill at *Dandan/Layon.*

I have also included a letter from environmental engineers and consultants Brown & Caldwell (B&C) to then-General Manager David Craddick of GWA relative to the water resources in the *Dandan/Layon* area.

It is my understanding that some discussion has already taken place in U.S. District Court proceedings regarding the intent and effect of this provision with regard to opening a landfill to replace the *Ordot* Dump. As the author of the provision, and as an active alternate member of the Solid Waste Law Review Commission, I would like to request your assistance in making my position, which is contained in the letter to Attorney Mikel Schwab, a part of the court record.

I thank you for your assistance.

*Senseramente,*

Tina Rose Muña Barnes

Enclosures (2):  Letter to Attorney Mikel Schwab (5 pages)
Letter from Brown and Caldwell to Mr. David Craddick (4 pages)

EXHIBIT 2



## SENATOR TINA ROSE MUÑA BARNES

I MINA' BENTE NUEBI NA LIHESLATURAN GUÁHAN • TWENTY NINTH GUAM LEGISLATURE
LOCATION: Suite 205 Ada Plaza Center, 173 Aspinall Avenue, Hagåtña, Guam 96910 • MAIL: 155 Hesler Place, Hagåtña, Guam 96910
(671) 475-8462 • Fax: (671) 472-3547

December 5, 2007


RECEIVED
DEC - 5 2007
2:58pm
ATTORNEY GENERAL'S OFFICE

Alicia G. Limtiaco
Attorney General of Guam
Office of the Attorney General
287 West O'Brien Drive
Hagatna, GU 96910

Dear General Limtiaco:

*Hafa adai.* I am writing to you about what I believe to be a topic of great concern relative to Guam's solid waste problems. At today's meeting of the Solid Waste Law Review Commission, also attended by Assistant Attorney General Pat Mason, it was revealed that a U.S. Environmental Protection Agency representative may have been improperly pressuring Guam EPA Administrator Lorilee Crisostomo to deny the issuance of permits for a proposed *Guatali* landfill.

According to Attorney Arthur Clark, who represents Guam Resource Recovery Partners (GRRP), a private firm seeking to develop the site, a USEPA official may have told Ms Crisostomo that *Dandan/Layon* is the only approved site for a landfill and that permits for the *Guatali* location should not be issued. The *Guatali* location is one of only two sites approved in Guam public law for siting a landfill.

This possible coercion is apparently taking place during USEPA's annual review of GEPA's performance. I know I don't need to remind you that Guam EPA is a federally funded entity, and any such actions on the part of a Federal official could be interpreted by Ms Crisostomo as a threat to her Agency's future funding. If this is actually taking place, it is totally inappropriate and this matter should be looked into immediately.

I would like to request your assistance in making my concerns a part of the court record, in relation to the Consent Decree. I am also sending copies of this letter to the U.S. Attorney's Office and to the USEPA Region 9 Office.

I realize that it is not your job to investigate hearsay. However I feel it is important that your office knows that improprieties could have occurred, especially when you consider that GWA has identified southern Guam surface water as a resource for future development, while USEPA continues to push the construction of a landfill on top of the very site identified by GWA.

I would also like to ask for your response to a basic question of representation. When the Government of Guam and the best interests of the people of Guam are at odds, who represents the people of Guam?

The selection of the *Dandan/Layon* area as the site for Guam's landfill is in example. As indicated in my letter to you dated November 23, 2007, I am among those who believe that the plentiful, valuable and needed water resources in the *Dandan/Layon* area would be threatened by the construction of a landfill, which is my primary reason for opposing the selection of this site to replace the Ordot Dump.

Case 1:02-cv-00022   Document 188-2   Filed 01/04/2008   Page 1 of 2


The Brown & Caldwell letter to former GWA General Manager David Craddick (and enclosed with my November 23 letter) helps to explain my reasons for concern.

GovGuam consultants KPMG also stress the need for developing new water resources and protecting them. The following quotes are from page 16 of the Executive Summary of KPMG's study on the military buildup:

*"Some 70% of the fresh water supplied by GWA is obtained from groundwater sources, which are considered sufficient to meet current and future demand but are susceptible to contamination..."*

*"The anticipated influx of new residents, military facilities, and businesses associated with the military expansion on Guam will place significant added burden on GWA's resources and will add to the challenges they face in providing high quality water... protecting the island's fresh water resources, and addressing ongoing operating challenges will need to be addressed."*

*"Adequate fresh-water resources, but aquifer and ground sources must be protected from contamination"*

*"Military expansion will significantly increase demand (at least 25%) on limited water resources"*

While GovGuam (specifically the Department of Public Works and Guam EPA) have been wanting to move forward with the *Dandan/Layon* site, and may be facing pressure from USEPA and the U.S. Attorney, it has become obvious to many observers that building a landfill over the *Inarajan* watershed is not in the best interests of the people of Guam. As KPMG has alluded, it may not in the best interests of the military buildup and future military needs for fresh water, either.

The U.S. Attorney can't care about protecting Guam's water resources; his job is to fight to get Guam to follow the Consent Decree. DPW and Guam EPA want to do as USEPA says, close Ordot and get the Feds off of their backs. Those agencies are clients of the Attorney General's Office. While arguments continue over how long it is taking to close the Dump and why more progress isn't being made on the *Dandan/Layon* site, which entity represents the best interests of the people of Guam which lie with protecting precious water resources and forcing the landfill to go elsewhere?

I look forward to your response.

Senseramente,

Tina Rose Muña Barnes

Enclosure    Page 16, Executive Summary, Conduct Studies Associated with Military Growth and
Integration Initiatives for the Island of Guam, KPMG

c:   The Honorable Felix P. Camacho, Governor of Guam
     Mikel Schwab, Assistant U.S. Attorney
     Wayne Nastri, Region 9 Administrator, USEPA
     Lorilee Crisostomo, Administrator, Guam EPA
     Members, Solid Waste Law Review Commission
     All Senators

## 3  Water and Wastewater.

The Guam Waterworks Authority (GWA) is the provider of water services to the civilian population and provides wastewater collection and treatment services to 58% of the civilian population and most military facilities on the Island. Some 70% of the fresh water supplied by GWA is obtained from groundwater sources, which are considered sufficient to meet current and future demand but are susceptible to contamination from septic systems and salt water intrusion. If the Island's existing fresh water sources cannot be protected or should prove to be insufficient, they could need to be augmented with fresh water produced by desalination facilities in the future.

GWA has improved and expanded dramatically the Island's water and wastewater system since 2003 by implementing a program of capital investment and organizational reform that will continue for the next several years. In particular, the water distribution system and the wastewater collection and treatment systems require substantial refurbishment. To address a history of non-compliance with environmental regulations, GWA has contracted with Veolia LLC to operate the wastewater system. The anticipated influx of new residents, military facilities, and businesses associated with the military expansion on Guam will place significant added burden on GWA's resources and will add to the challenges they face in providing high quality water and wastewater services. Key strategic challenges in funding, planning and managing large capital programs, protecting the Island's fresh water resources, and addressing ongoing operating challenges will need to be addressed.

GWA will need to evaluate these impacts carefully, updating their Master Plan to reflect increased capital investment needs and a larger operations and maintenance undertaking. Careful consideration will need to be given to developing funding alternatives (especially grant funding) including alternative ways of procuring and managing capital programs. Greater involvement with the private sector, through service contracts and public-private partnerships, could become a more important alternative in addressing these challenges.

---

### Water & Wastewater Findings

- Adequate fresh-water resources, but aquifer and ground sources must be protected from contamination

- Private sector (Veolia) currently manages the wastewater system, funded through a bond

- GWA operates under a EPA stipulated order

- Capital improvement program underway, however, cost control and funding issues need to resolved

- Military expansion will significantly increase demand (at least 25%) on limited water resources

---

This Report is intended to GovGuam and is for release only to those determined by GovGuam. The Report is based upon work conducted in an abbreviated six week period and is based on information, data and data provided by GovGuam and Island industry officials.

EXHIBIT 3



Alicia G. Limtiaco
Attorney General

Alberto E. Tolentino
Chief Deputy Attorney General



RECEIVED 12/14/07 @ 3:25pm

# Office of the Attorney General

December 14, 2007

**VIA FACSIMILE (671)472-3547 &**
**HAND DELIVERY**
Senator Tina R. Muña Barnes
Twenty-Ninth Guam Legislature
Suite 205, Ada Plaza Center
173 Aspinall Avenue
Hagåtña, Guam 96910

**Re:** Your Letters of November 23, 2007 and December 5, 2007

Dear Senator Muña Barnes:

This is in reference to your letters of November 23, 2007 and December 5, 2007, regarding the Ordot landfill and Consent Decree matter.

As you are aware and as has been articulated by the Court, this Office represents the Government of Guam in the Consent Decree case, specifically the Department of Public Works and Guam Environmental Protection Agency which are under the purview of the Governor's Office. Although the Office represents the Government of Guam, it does not represent the Legislature as a body or the individual members of the Legislature in the Consent Decree case. Pursuant to our Guam Rules of Professional Conduct and ethics rules to which we, as legal counsel, must adhere, and the differing positions taken by the Executive and Legislative branches in this matter; the Office is not able to file a motion on your behalf to place your letter into the record.

Senator James Espaldon, Chair of the Solid Waste Law Review Commission ("LRC"), has already made an appearance in Court regarding the case and has stated the LRC's position regarding the site of the proposed landfill and other matters the LRC has discussed. Should the LRC, through the Chair, decide to present the position expressed in your letter to the Court, that would be at the discretion of the LRC membership and the Court. The Chair of the LRC the been given the

RECEIVED EN DEC 1 4 2007

opportunity to address the Court at previous status hearings and may be allowed to again address the Court at future status hearings.

In reference to the permitting process of the Guam Environmental Protection Agency ("GEPA"), the Office of the Attorney General has met with and discussed the permitting process with GEPA. GEPA will follow all rules and regulations required for issuing permits to a private party to open a private landfill at *Guatali*. The permitting process will be the same as it would be for anyone. The Consent Decree is a separate matter that will not hamper the permitting process for a private landfill.

You have asked the following question:, "When the Government of Guam and the best interests of the people of Guam are at odds, who represents the people of Guam?" Determining what is in the best interests of the people of Guam is generally a debatable question of public policy, rather than a legal question. Questions and issues of public policy are within the purview of the Legislature in exercising its legislative function and the Governor acting as the head of the executive branch of the government. The Guam Supreme Court has stated that the Legislature's power to legislate extends to all rightful subjects of legislation not inconsistent with the provisions of the Organic Act and the laws of the United States applicable to Guam. *In Re Request of Governor Carl T.C. Gutierrez*, 2002 Guam 1 ¶ 38. The Guam Supreme Court has also stated that the Governor has authority to use discretion in applying the energies of the executive branch and the resources of the government as such resources are made available by the Legislature, to achieve the purposes or objectives of the laws. *Id.* ¶ 39. Hence, in policy matters, the people of Guam are represented by their elected officials serving in their respective roles as Governor or Legislator.

The Honorable Joaquin V. E. Manibusan, Jr., U.S. Magistrate Judge, states in his *Report & Recommendation* dated July 6, 2007, "[a] consent decree is enforceable as a judicial decree and is subject to the rules generally applicable to other judgements and decrees." U.S. Magistrate Judge *Report & Recommendation* dated July 6, 2007 at 10 (citing *Spallone v. United*, 493 U.S. 265, 276 (1990)). In addition, the U.S. Magistrate Judge states that a consent decree is a federal court order that springs from a federal dispute and furthers the objective of federal law. *Id.* at 11. The U.S. Magistrate Judge further states that while the Court will take the government of Guam's concerns into consideration when fashioning an appropriate remedial plan, the Court is not precluded from enforcing a consent decree against local officers. *Id.*

In accord with the U.S. Magistrate Judge's *Report & Recommendation*, the Consent Decree at issue is a judgment and order of the Court with the full force and effect of the law. The role of the Office of the Attorney General is to represent the government of Guam in its efforts to meet the objectives of the Consent Decree.

In this case, statements have been made to the Court about the appropriateness of having a landfill site at *Dandan*, and about the consideration given by the LRC to a landfill site at *Guatali*. The Court is also aware that local government officials have gone through a rigorous selection process resulting in the selection of the proposed landfill site at *Dandan*. The federal officials and the Court have concurred in the landfill site selection. Moreover, the United States Environmental

Protection Agency has made it unequivocally clear that any attempt to change the landfill site at this point in time would be vehemently opposed by the federal government. Furthermore, the federal government has reserved its right to request a receivership to take over the solid waste management division of the Department of Public Works to enforce compliance with the Consent Decree. This is the current status of the Consent Decree case regarding selection of a landfill site.

Sincerely,

**J. PATRICK MASON**
Deputy Attorney General

287 West O'Brien Drive • Hagåtña •Guam 96910-5174 • U.S.A.
(671) 475-3324 • (671) 477-3390 (Fax) • www.guamattorneygeneral.com

Case 1:02-cv-00022    Document 188-2    Filed 01/11/2008    Page 7 of 7

EXHIBIT 4

# COMMITTEE ON ECONOMIC DEVELOPMENT, RETIREMENT, INVESTMENTS, PUBLIC WORKS, AND REGULATORY FUNCTIONS
Twenty-Seventh Guam Legislature
155 Hesler Street, Hagatna Guam 96910



## COMMITTEE REPORT
### ON

**Bill No. 240 (COR) - AN ACT TO EXCLUDE THE *ORDOT-CHALAN PAGO* AREA AND PORTIONS OF GUAM LOCATED OVER THE NORTHERN WATER LENS AS POSSIBLE SITES TO BE CONSIDERED FOR A NEW LANDFILL AND TO REQUIRE THAT THE DEPARTMENT OF PUBLIC WORKS DESIGNATE, ON BEHALF OF THE GOVERNMENT OF GUAM, ENVIRONMENTALLY SUITABLE SITES FOR A NEW LANDFILL IN ACCORDANCE WITH THE CONSENT DECREE ISSUED PURSUANT TO CIVIL CASE NO. 02-00022 UNITED STATES OF AMERICA V. GOVERNMENT OF GUAM.**

### COMMITTEE MEMBERS
Chairperson  Senator Toni Sanford
Vice-Chairperson Senator Frank B. Aguon, Jr.

<u>Majority Members</u>
Senator Lou Leon Guerrero
Senator Tina Muña Barnes
Senator John M. Quinata
Senator Rory Respicio
Speaker ben c. pangelinan (ex-officio)

<u>Minority Members</u>
Senator Jesse A. Lujan
Senator Larry Kasperbauer

1

# I. <u>OVERVIEW</u>

## A. Purpose and Essential Elements

The primary purpose of Bill No. 240 (COR) is to exclude the *Ordot-Chalan Pago* area from consideration as the site for a court-ordered sanitary landfill. The bill also excludes consideration of any potential site above the northern water lens and proposes that the sanitary landfill be constructed in an area where prevailing winds would carry any odors and air-borne particles towards the open sea away from the general populace.

## B. Public Hearing Conducted

A joint public hearing was held by the Committee on Economic Development, Retirement, Investments, Public Works and Regulatory Functions, chaired by Senator Toni Sanford, and the Committee on Youth & Senior Citizens, Federal & Foreign Affairs, Veterans & Military Affairs, and Human & Natural Resources, chaired by Senator Rory Respicio, at 2 p.m. on Wednesday, February 11, 2004 in the Legislative Public Hearing Room on **Bill No. 240 (COR) - AN ACT TO EXCLUDE THE *ORDOT-CHALAN PAGO* AREA AND PORTIONS OF GUAM LOCATED OVER THE NORTHERN WATER LENS AS POSSIBLE SITES TO BE CONSIDERED FOR A NEW LANDFILL AND TO REQUIRE THAT THE DEPARTMENT OF PUBLIC WORKS DESIGNATE, ON BEHALF OF THE GOVERNMENT OF GUAM, ENVIRONMENTALLY SUITABLE SITES FOR A NEW LANDFILL IN ACCORDANCE WITH THE CONSENT DECREE ISSUED PURSUANT TO CIVIL CASE NO. 02-00022 UNITED STATES OF AMERICA V. GOVERNMENT OF GUAM.** The hearing was advertised on Feb. 2 and 9, 2004.

2

## II. <u>SUMMARY OF TESTIMONY</u>

Present at the hearing were the co-chairs of the joint hearing, Senators Sanford and Respicio, as well as Bill 240 author Senator Tina Muña Barnes, Speaker Ben Pangelinan, Senator Carmen Fernandez, Senator Lou Leon Guerrero, Senator Robert Klitzkie and Senator Joanne Brown. Senator Sanford noted that Bill No. 240 was being jointly heard because Senator Respicio's committee had oversight on environmental matters and the Guam Environmental Protection Agency, and her committee had oversight on the Department of Public Works, the department that operates the *Ordot* Dump.

Senator Sanford invited Senator Respicio to make an opening statement. Senator Respicio noted that the bill sets criteria for a new landfill. He said that it was unfortunate that the federal government had to step in with a consent decree to solve our problems. He said he supports the bill because EPA findings do not support the expansion of the dump for a landfill. He said that concern for the environment must come first.

Senator Sanford said that for too long there has been no resolution and felt that it was time to look the bull in the eyes and take care of the problem. She invited the bill's author, Sen. Muña Barnes to make a statement.

Senator Muña Barnes said she introduced the bill knowing that EPA had said that science alone should decide where the landfill belongs. She said that she believed that science cannot be the only deciding factor, arguing that policy makers must also take into account quality of life issues and psychological issues that play a major role in the lives of so many people, and weigh these factors along with the scientific evidence. She noted that the residents living near the *Ordot* Dump have had to endure that environmental disaster for more than 50 years, and said it was unfortunate

3

that their children and grandchildren had to be raised there. She said that it is the job of the Legislature to weigh the human factor along with the scientific evidence and find the best balance.

First to testify orally was Attorney Duncan McCully who noted that he lived near one of the parcels that had been previously identified as a potential site for the landfill. He spoke against Bill 240, saying it was not the Legislature's job to meddle with the process of selecting a site. He said it was discriminatory and unfair to the people in the villages that were not listed in the bill, and the decision should be made by the engineers and the professionals who would do a scientific study that would determine the right place for the landfill. He said the decision should not be affected by politics.

Joe Quichocho spoke next, reading his testimony (attached) in favor of the bill.

Peter Melnyk representing Guam Resource Recovery Partners said he would present a four part PowerPoint presentation. First was a discussion of the *Guatali* private landfill site, second was support of Bill 240, third the consistency of the project with the Consent Decree, and fourth the status of the Guam Supreme Court case.

Senator Sanford suggested that Mr. Melnyk wait until after the others had testified to make his PowerPoint presentation and he agreed.

Diana Blas San Agustin Bell then testified in favor of the bill. She said that she and her family had lived in the *Ordot* area for a number of years, then moved into the *Lonfit* Valley, close to the river. She said that her children had learned to swim in the river and played there frequently, until learning that leachates from the dump were polluting the river, especially during the rainy season. She thanked all Senators who supported the bill and

4

noted that it was sad that the Federal Government had to sue the Government of Guam to get any action on closure and opening a new site. She expressed concern with the option contained in the Consent Decree that opens the possibility that new cells could be opened adjacent to the existing dump. She said the affected residents were not given the option to testify during the negotiation phase for the Consent Decree. She also criticized the Pacific Daily News for their editorial stance on opening the landfill at the dump site. She said that in addition to the residents in the area there were two schools, a nursery and a church nearby, and felt that Bill 240 was one of the answers to their problems. She equated the dump to a cancer that continued to grow and affect the people. She begged the Senators to support the bill.

Angelo Gombar testified next, saying that those who do not support the bill are uneducated in the problems that affect the area. She said that since the sanitary landfill would be safe next to a residential area. In that case it could be built anywhere and should be built somewhere else. She urged Senators to support the bill.

Mark McCarthy testified in favor of the bill for two reasons. First, keeping the landfill away from the island's aquifer and on the leeward side of the island makes sense to protect the water supply and to prevent odors from plaguing the people. The Consent Decree calls for the end of the discharge into the *Lonfit* River. It makes no sense, he said, to end one polluting element and then add another possible polluter. He said that the *Lonfit* River, its tributaries and *Pago* Bay need to be given time to heal. Second, he said that private landowners had been lied to by the government, which had promised over the years that the landfill would be moved to another site. He said that GovGuam owed the residents that much. He said that Bill

5

240 was not pandering to the landowners of *Ordot*. He showed two photos of the dump, one taken in 1997 when he purchased land nearby after being told that GovGuam, by law, would be closing the dump the next year and moving it to another location. The second photo was of a much larger dump in the same location, taken in 2004, after their house had been built.

Next were the GEPA representatives, Fred Castro, Administrator of GEPA; Randy Sablan, Interim Deputy Administrator and Chief Planner; Conchita Taitano, Division Chief of the Air and Lands Program Division; and Victor Wuerch, licensed Territorial Hydrogeologist. Mr. Castro said this team would be working on the determination of the new site. He noted that the project leaders were off-island attending a seminar on the establishment of a sanitary landfill. He said that he believes the effort on behalf of the residents of *Ordot* and the Senators was valid and he understood it, but said that the determination of the site should be left to the experts, following federal laws. He noted a number of constraints existing in Guam regarding establishment of a sanitary landfill, and stated that there was no need to legislate that a landfill should not be located over the northern aquifer because federal law already prevents such an occurrence.

He said he hoped they would be able to gain the confidence of the Legislature with respect to selecting the location for the landfill. Mr. Sablan then began explaining the process in screening for the site and the exclusionary points that would disqualify certain sites automatically, based on 23 points of criteria. Mr. Sablan brought out a map to illustrate his points. Mr. Castro said the map was developed in coordination with the Water and Energy Research Institute (WERI).

Mr. Sablan said criteria for landfills were enacted into law in the early 1990s. He said that previous studies were used to begin the process of

6

selection of sites, including a Juan Tenorio and Associates study that included *Guatali*, *Malaa* and expansion of *Ordot*. He said that two areas of Guam were immediately excluded, the northern aquifer and the *Talofofo* watershed. Also excluded were flood plains and limestone sites in *Yona*, *Malojloj* and in the *Ordot* area, and also any areas with a slope of greater than 20°. When residential and other developed areas are also eliminated, as is land within 1/4 to 1/2 mile from these excluded sites, there are only a limited number of areas left in which a landfill could be placed. Senator Sanford asked Mr. Sablan to identify the villages in which potential landfill sites could be placed. He pointed out an area behind Nimitz Hill in the upper *Lonfit* Valley; an area near the Takayama Golf Course in the Cross Island Road area across from Our Lady of Peace; a site in *Dandan*, and nothing further south. He noted the top three sites identified would be pushed forward as potential landfill sites.

Senator Respicio thanked EPA and asked what process governed the screening. Mr. Castro said the federal framework of laws and the Environmental Impact Statement. Senator Respicio asked if Mr. Castro's opposition to Bill 240 was because it overlapped with federal law. Senator Sanford asked Mr. Castro if he was publicly stating that *Ordot* was not a potential site of the three. Mr. Castro said, "correct."

Mr. Wuerch said that there were ground and soil stability issues with the *Guatali* site, and displayed photos of the potential site. The photos, he said, shows that there is instability in the ground area. He said the process is to go out to each of the areas and look for clues such as those found in *Guatali*. He added that sites must be 200 feet or more away from faults.

Mr. Castro said that the total effort involves a greater context than just abiding with the Consent Decree. He said they were also pursuing an

7

integrated solid waste management plan for Guam that would insure the quality of life for everyone. He said that the three Solid Waste Transfer Stations would be upgraded to state-of-the-art facilities. This would promote separation and recycling, within a huge warehouse, he said.

Mr. Sablan said that the southern part of Guam is a long haul from other areas and that Transfer Stations would minimize the amount that has to be transported to the landfill.

Ms. Taitano said that the role of transfer stations in the future is different. They will be larger and all waste will go through them before heading to the landfill and recycling.

Former *Ordot-Chalan Pago* Mayor Rosanna San Miguel was next to testify. She said she was an active member of the Committee for the Closure of the *Ordot* Dump. Since the 20th Legislature, she said, many public hearings had been held on the closure of the *Ordot* Dump. She said that her concern with the Consent Decree was that it allows an option to open new cells adjacent to the *Ordot* Dump. She said that she was troubled that such an option even exists. She noted that the Department of Public Works has been in violation of federal laws concerning the dump and the clean water act for many years. She said the most important element was omitted in the Decree and that is the residents and landowners directly affected by the *Ordot* Dump. She said that no regard or input was given to these who had to live with the stench, filth and hazards for many, many years. She pointed out that the Consent Decree was prejudicial, mentioning only *Ordot* as a possible landfill site. The people of *Ordot* do not want to pit village against village, she said, they just want just compensation and fair treatment. She said that it was only fair and just that the new landfill not be placed in *Ordot*. She

8

asked that the Legislature end the further degradation of the *Lonfit* River and watershed by moving the landfill to another site.

Chris and LouAnn Mesa were next, both residents of *Ordot*. Chris said he is from *Ordot* and still lives in *Ordot*, having lived with the "nightmare" all of his life. Nine years ago they built their home within about 300 yards from the landfill, the house lot coming to them as a deed of gift from Chris' parents. We decided to build because we were promised that the dump would be closed many years ago. He said they have no business interests, just simple people who want the right things to be done.

LouAnn said that the reason they had to build a home was because Typhoon Omar destroyed their first home, and that was their only property. She said that she is a teacher at Agueda Johnston Middle School and had testimony from 80 of her students, who wrote in support of Bill 240 and urged the Legislature to prevent GEPA and DPW from building a landfill at or near the present *Ordot* site. The students also support the Integrated Solid Waste Management Plan to include all means of trash disposal including recycling and waste-to-energy, and urge Senators to honor the resolution from the Mayors Council making such a statement. She also provided testimony collected by a number of other school officials, teachers and school workers, signed by a number of students and others. She read the letter that was much the same as the earlier letter.

Roy Brown spoke next, against the Bill. He said he thought the Bill singled out *Agat* as the only place for the landfill to be constructed. He said that his tour company ran 16 boats out of the *Agat* Marina, about 1000 tourists a day or over 350,000 per year. He said he believed the *Agat* area and the southern coastline should be excluded from the bill because a landfill in *Agat* could destroy the visitor industry.

9

Jim Miller, operations manager of Micronesian Divers spoke next against the bill for the same reason as Mr. Brown. He said EPA's criteria makes sense, and let the science do the work. If it points to *Ordot*, that doesn't make sense, he said, or any other area with schools and residences, and he believes that should not be allowed to happen. He expressed concern that Bill 240 forced the landfill to be located in the *Agat* area.

Barbara Salas read testimony from former Senator John C. Salas, her brother-in-law. Senator Salas' testimony was in support of Bill 240. He wrote that he is a landowner in the area and his family has endured the problems of *Ordot* for generations. He wrote that GEPA stated to the 24th Legislature that the *Ordot* Dump was on the southern edge of the island's aquifer and that GEPA had discovered contamination in *Ordot* and *Hagåtña* area. Reports like this caused the Legislature at that time to enact legislation dealing with water contamination issues. Bill 240 addresses the underground water sources of our island. He stated that he believes that any landfill in the *Ordot* area would further endanger the people of Guam.

Ms Salas stated that she has lived about a quarter of a mile from the *Ordot* Dump and has live there for 12 years with her children and now her grandchildren. She has watched the Dump grow from a valley to what her family now refers to as "Mount Trashmore." She said she would like her children and grandchildren to live on the property but it can only be possible with the help of the Legislature.

Maria McDonald spoke next. She said that she was against Bill 240 for a number of reasons. She stated that she was against it because of Lot 480 in *Agat*. She said that the landfill would not be good for the people of *Agat*. Her concern was that she has already identified four erosion problems in a four-acre area at Lot 480, but from her experience it would be a problem if

10

the landfill were placed there. She said that she had a lot of trust in GEPA to do the right thing. She said that Bill 240 was serving a purpose of bringing people closer together and unifying everyone to follow the right path. I think that ll the mayors need to get together and own this responsibility and say "What can my village do?" She said she didn't want *Ordot* to be exclusively excluded even from being the site of a transfer station because if that is the case, then she wants *Agat* excluded also. She thinks that the ideas presented by GEPA are good and the choices should be left to the professionals.

Next to speak was Ben Gumataotao of *Piti* who said he had experience with incinerators and dump sites when he lived in Norfolk, Virginia. The land was filled and used to build apartments and a Naval Station. He said Bill 240 was overdue, and that there was an area next to *Cabras* Island that was about 1 to 1.5 miles long by a half mile wide that should be used for the landfill. He said it would be good for a park or an expansion of the commercial port and called for a re-study of where to place the landfill.

Former Senator Marcel Camacho commended Senator Muña Barnes to allow the issue to be discussed in greater detail. He hoped that the discussion would lead to a proper conclusion. He said that he was supportive of recycling and advance disposal fees and was head of a committee under the Guam Contractor's Association. He said there were only three options for the trash: bury it, burn it or recycle it. He said he hoped the 27th Legislature would continue to be pro-active concerning recycling. He said he was working on a regional recycling program for the islands of Micronesia.

Last to testify was Peter Melnyk representing Guam Resource Recovery Partners (GRRP), who gave a PowerPoint presentation. He started with a

discussion of the *Guatali*-B private landfill site on which GRRP held a lease from the Chamorro Land Trust and was pursuing the development of a private sanitary landfill. GEPA had discussed parcel A, he said, the site that had been included in the Tenorio Study. The GRRP parcel is below *Guatali*-A, with direct access from Route 2, along an industrial area, with close proximity to Marine Drive. It is an 88 Acre site in *Santa Rita* behind the Shell refinery, and adjacent to the site identified for landfill use by the 23rd and 24th Legislatures. The site is highly eroded and not compatible for agricultural use. He said the contractor for the site would be Maeda pacific and the operator of the landfill would be Waste Management, Inc., which also operates landfills on the island of Oahu, Hawaii and is the largest waste management firm in the United States.

Mr. Melnyk stated that GRRP was in support of Bill 240 because the residents of *Ordot* had been unfairly treated for so many years, and to support the preservation of the *Lonfit* watershed area. He said that the cost of expanding *Ordot* would be tremendous and recommended language be added to the Bill to include both *Guatali* sites as well as the *Malaa* site as candidates for the landfill. He said that the *Guatali* project was consistent with the Consent Decree because it would meet the EPA criteria for a new sanitary landfill and allow *Ordot* to be closed. He said that if the Legislature would authorize private activity bonds for the new landfill, the requirements of the Consent Decree could be satisfied. He said that the opening of *Guatali*-B would trigger the immediate closure of *Ordot*.

He also gave an update on the status of the Supreme Court case. He said that if the Supreme Court finds for GRRP, then they would be able to handle the financial obligation of providing the new landfill. If the

Supreme Court finds against GRRP, they would still be able to open their private landfill.

Senator Sanford asked Mr. Castro if *Guatali* was still among the sites being considered. Scientifically based, neither *Guatali* nor waste-to-energy are on the radar screen for GEPA, he said. He added that *Ordot*, the *Agat* shoreline and *Malaa* were also not on GEPA's list to answer the Consent Decree. Senator Sanford asked about Lot 480, and Mr. Castro said it was still under consideration, but was not ranked very high.

Senator Fernandez asked Mr. Castro which site was optimal. Mr. Castro asked Mr. Sablan to go over the criteria once again. Mr. Sablan did so, and reiterated that they would narrow the selection down to three sites, but that no single site had yet been identified. Senator Fernandez asked how quickly the Dump can be closed once the new site is located. Mr. Sablan said that within 45 months *Ordot* could be closed.

Senator Klitzkie asked Mr. Castro what he wanted the 27th Legislature to do. Mr. Castro said periodic oversight hearings would be able to keep all parties on the same page.

Senator Brown said that as a resident of the village of *Ordot-Chalan Pago* she would not support expansion of the existing site, even if the scientific data showed that it was feasible. She said that the scientific assessments needed to be made.

Senator Leon Guerrero asked Mr. Melnyk to elaborate on the fact that he said the Consent Decree is consistent with Bill 240. He said that by eliminating *Ordot*, it does not hinder or go against the Consent Decree in any way. Senator Leon Guerrero asked about the scientific data as it relates to *Ordot*. Mr. Castro said that mitigation of the hazards already existing at the site will be extremely costly. The engineering required to close *Ordot*

13

while at the same time expanding the site would be an enormous headache and expense.

Senator Leon Guerrero asked what would happen if the Government of Guam could not determine a site. Mr. Castro said the federal judge would be the final arbiter in deciding a site. Senator Sanford asked if the judge would pick a site that was not recommended. Mr. Castro said he would not.

Mr. Castro said that if a private developer wanted to come forward and develop a private landfill, the government could allow that. He emphasized that the process had to continue to move forward.

Senator Sanford asked if the three sites would include *Ordot*. Mr. Castro said that it would not but that areas near to *Ordot* were possible.

Senator Leon Guerrero said that if *Ordot* were not closed and progress was not made, the federal government would come in and tell us where the landfill would be.

Senator Sanford asked David Sablan to present testimony. Mr. Sablan said that he was a consultant for GNP and Associates within GRRP. He said they were trying to construct a landfill that would meet the requirements of the ISWMP to include waste-to-energy and recycling. He said that their studies of the *Guatali* and *Malaa* areas were also done by scientists and engineers and those areas fulfilled the requirements EPA has set for landfill sites.

Mr. Sablan noted that some of the standards that were set were by GEPA and were not required by federal EPA. He said there were humanitarian aspects that needed to be considered beyond the scientific evidence. If the science said that a landfill could be built in the middle of Marine Drive, he

said, would you build it? Other considerations have to come into consideration, not just the science, he said. He warned that there might be semantics being used when saying that Ordot was not being considered, because a site in Asan or Sinajana or Yona could be very near to Ordot, but not physically within the boundaries of Ordot. He said the Bill should be written so that nothing should be done within so many miles of Ordot.

He reiterated that valid scientific evidence showed that the *Guatali* and *Malaa* areas met the necessary conditions for landfill sites and should be considered. Mr. Sablan pointed out that GRRP was willing to float a private activity bond to help the government pay for the closure of *Ordot*.

Margie Falanruw said that she believed that the government was going to close the Dump, so she built a house in *Asan* near the Dump site. If you say you are not going to expand *Ordot* that does not mean you are not going to build in *Asan*, she said. She asked, I'm concerned, does *Ordot* include the area around the Dump such as *Asan*? It should include the entire watershed, she stated.

Mr. Castro said that the Environmental Impact Statements (EIS) for *Guatali* and *Malaa* were preliminary at best. Senator Sanford asked if there would be a public hearing on the three sites before the names are submitted to court. Mr. Castro said there would be a public hearing for the draft EIS for the selected sites before the final site determination is made.

Senator Respicio told Mr. Castro that at the oversight in *Ordot* he stated that there would be a public hearing prior to submitting the three choices to the courts. Mr. Castro said the public input is needed prior to the final determination of a site after the three potential sites have been identified.

Senator Respicio challenged Mr. Castro, saying that it appeared that he did not support Bill 240 because he did not want to rule out the expansion of

15

*Ordot* as stated in the Consent Decree. Senator Respicio noted that DPW was already expanding the Dump site.

Mr. Castro said the Dump will expand until it is closed. He said he was not playing semantics, they were just trying to do their jobs.

Senator Respicio said he thought that Bill 240 would insulate the GEPA from the politics by eliminating Ordot as a choice.

Mr. Castro said that Guam EPA objects to Bill 240 and the Governor objects to Bill 240.

Senator Sanford said she was disappointed that there would be no public hearing before the final three sites were announced.

Senator Muña Barnes noted that the Mayors Council had written a letter to the Legislature in full support of the closure of *Ordot*, and also in support of the ISWMP including waste-to-energy and recycling. She noted that there were many factors and reasons to exclude *Ordot* from consideration, including WERI findings that show that the level of contaminants are incredibly high in the Lonfit area, and that information had not been made public.

Senator Muña Barnes said that as a policy maker she would remain open minded about all of the options and choices that were brought before the Legislature.

Senator Sanford said that she was a co-sponsor of the bill and was in full support. It is the only right thing to do for the people of *Ordot*, she said.

Also providing written testimony were 258 citizens who signed copies of two similar letters, each expressing support of Bill 240. Forty six (46) signed a letter that asked for common sense management of Guam's solid waste program, and also asked that the bill be amended to add a section to

16

prevent landfilling or dumping in the watershed of the *Lonfit* and *Pago* Rivers and to initiate a cleanup of the entire watershed from *Lonfit* to *Pago*. The remaining 212 citizens signed a letter that also asked for the cleanup of the *Lonfit* area and called for supporting the Mayor's Council resolution in favor of an integrated solid waste management plan comprising of all facets of solid waste management, including waste reduction, recycling and waste-to-energy.

Also received were written testimony from Maeda Pacific; the Mayors Council; the Guam Society of Professional Engineers and the *Dededo* Mayors Office.

**NOTE 1:** A second public hearing was held on the subject of the landfill site in *Inarajan* on Tuesday, September 21, 2004.

Notes for the hearing are incomplete and the recording tapes contain barely discernible audio information, insufficient to prepare a detailed report. The primary thrust of the testimony was that the residents of *Inarajan* and *Malojloj* were not in support of the proposal of *Dandan* as a potential landfill site. Many residents testified that the site is located within the *Inarajan* River watershed containing several sources of fresh water including the *Tinaga, Fensu,* and *Finatasa* Rivers; as well as various other tributaries, and wetland areas comprising a potentially significant source of fresh water for drinking, farming and other uses.

**NOTE 2:** On October 26, 2004, Senator F. Randall Cunliffe wrote to GEPA Administrator Castro concerning construction or establishment of landfills near public airports, noting federal regulations that prohibit the construction of new landfills within six (6) statute miles of public-use airports. The sites of *Ordot, Sabanan Batea* and *Lonfit* are all within the six-mile radius.

Case 1:02-cv-00022    Document 188-3    Filed 01/11/2008    Page 17 of 32

### III. COMMITTEE FINDINGS

Following the public hearing, the author has amended Bill 240 in the following manner:

a. The Legislative Findings and Intent have been substantially and significantly revised. New cases for eliminating all three areas chosen by Guam EPA as possible landfill sites have been stated;

b. Mention of the northern water lens has been removed from the bill;

c. Subsection 2 of Section 2 of Bill 240 has been amended to note the Department of Transportation's Federal Aviation Administration Advisory Circular No. 150/5200-34 and the Aviation Investment and Reform Act for the 21st Century which forbid the construction or establishment of a new solid waste landfill within six (6) statute miles of public use airports, which includes the *Ordot, Sabanan Batea* and *Lonfit* sites;

d. A new Subsection 3 of Section 2 of Bill 240 has been added to state that a new landfill shall not be constructed on any property located within any watershed containing rivers, tributaries and wetland areas comprising a potentially significant source of fresh water for drinking, farming and other uses as found in the *Dandan* site;

e. A new subsection 4 has been added to Section 2 of Bill 240 to require that the DPW and GEPA reevaluate all other possible landfill sites, beginning with those already identified and required by Public Law 23-95 to serve as the primary and

18

secondary sites for location of a sanitary landfill, the statute identifying the primary site for the construction of a sanitary landfill for Guam as *Guatali-A*, near the old Guam Oil and Refining Co. (GORCO) site; and the secondary site as *Malaa*, in *Agat*, and to add a third site for evaluation, *Guatali-B*, adjacent to *Guatali-A*, as a potential site;

f.    The original Subsection 3 of Section 2 of Bill 240 has been deleted.

## IV. COMMITTEE RECOMMENDATIONS

The Committees on Economic Development, Retirement, Investments, Public Works and Regulatory Functions; and Youth & Senior Citizens, Federal & Foreign Affairs, Veterans & Military Affairs, and Human & Natural Resources recommend that Bill No. 240, as Substituted by the Author, be passed as substituted.

19



# Airport Certification Program – 14 CFR Part 139
## Program Policy And Guidance
### Policy # 82

139.337                                                                        September 9, 2004

SUBJECT: WASTE DISPOSAL FACILITY COORDINATION.

CANCELLATION: Program Policy and Guidance Policy Number 65, Waste Disposal Facility Coordination, Issued October 4, 1999 is cancelled.

**Contact:** Ed Cleary, (202) 267-3389 .

PURPOSE:

This policy establishes the procedures for coordinating and documenting Federal Aviation Administration (FAA) determinations on developing new or expanding existing waste disposal sites within 5 miles of a public-use airport. Guidance on siting various types of landfills is provided in FAA Advisory Circular 150/5200-33A — *Hazardous Wildlife Attractants on or Near Airports*, and FAA Advisory Circular 150/5200-34 — *Construction Or Establishment Of Landfills Near Public Airports*.

BACKGROUND:

The increasing pressure to develop new or expand existing waste disposal sites necessitates coordinating responses to ensure that the agency has a consistent response to these proposals. This practice has been in effect in the Great Lakes and Southwest Regions for several years and has worked well.

PROCEDURES:

When a landfill proponent notifies FAA under Title 40, Code of Federal Regulations, part 258.10, of a proposal to establish a new or expand an existing landfill, the Regional Coordinator, usually the Airport Certification Safety Inspector (ACSI), responsible for waste disposal and wildlife hazards in that region will:

1. Evaluate the proposal and determine whether on not it is compatible with the provisions of AC 150/5200 – 33A, AC 150/5200 – 34, and safe airport operations;

2. Complete a copy of the attached Waste Disposal Facility Coordination Form, based on that determination, including any recommended permitting conditions;

3. Forward the completed form, together with any supporting material to the FAA Staff Wildlife Biologist (AAS-300) for evaluation and coordination.

4. If the potentially affected airport is a joint use facility with military aviation, a courtesy copy of the completed form, together with any supporting material should be forwarded to the FAA regional military liaison.

Any disagreement between the recommendations of the Regional Coordinator and the Staff Wildlife Biologist will be resolved by consultation between the

Region and Headquarters. When agreement is reached, the Staff · Wildlife Biologist will sign the Coordination Form and return a copy to the Regional Coordinator.

All applicable recommended permitting conditions (Section 4 of the Waste Disposal Facility Coordination Form) should be included in the Letter of Determination sent to the proponent or state agency. The completed form will be made a part of the region's permanent file.

|  |  |
|---|---|
| OSB | September 9, 2004 |
| Benedict D. Castellano, Manager | Date |
| Airport Safety & Operations Division | |

## SECTION 1 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) INFORMATION

| Site / Facility Name: | Greater Phoenix Landfill | AWP-622.1 File No: 99-012 |
|---|---|---|
| Associated City / State: | Phoenix, AZ | |

### Check as appropriate

| | | | |
|---|---|---|---|
| New Site: | Expand/Modify Existing Site: X | Re-Permit Existing Site: | Other: |
| Sanitary Landfill: X | Waste transfer Station: | Demolition/Construction Debris: X | Recycling Center: X |
| Compost: | Water Treatment/Oxidation: | Water Detention/Retention: | Other: |

### Circle as appropriate

| | |
|---|---|
| Facility will process or store putrescible waste material outdoors: | (Y) - N |
| Facility is within 5,000 feet of a public-use airport utilized by piston engine aircraft: | Y - (N) |
| Facility is within 10,000 feet of a public-use airport utilized by turbine engine aircraft: | (Y) - N |

| Facility is within a 5 mile radius of a public-use airport: | (Y) - N | Distance to nearest runway end (FT): 9,575 | |
|---|---|---|---|
| Reported hazardous wildlife activity at airport: | (Y) - N | Reported hazardous wildlife activity at facility: | (Y) - N |
| State EPA licensing requirements: | (Y) - N | State EPA enforcement/mitigation procedures: | (Y) - N |
| USDA/WS evaluation conducted: | (Y) - N | Non-hazard: _____ Hazard: __X__ (check one) | |

## SECTION 2 - AIRPORT INFORMATION

**Associated Public Use Airports: Phoenix Sky Harbor**

| LOC ID: PHX | ATCT: (Y) - N | Military Aviation On-Site: (Y) - N (If yes, notify FAA regional military liaison) | |
|---|---|---|---|
| Type Airport: (GA) - (Com Serv) | Longest Runway (Ft): 11,000 | Instrument Runway: (Y) - N | Jet fuel Available: (Y) - N |
| Total Annual Operations:200,000 | Piston Operations: 75,000 | Turbine Operations: 125,000 | |

## SECTIONS 3 – COMPATIBILITY

**Proposed wildlife attraction is considered compatible with provisions of FAA AC 150/5200-33**

| WP-621 concur: | Non-concur: X | Signature: Elizabeth Louie | Date: 9/9/99 |
|---|---|---|---|

Supporting documentation, correspondence, site maps, etc., attached

| A.AS-300 agree: | Disagree: X | Signature: Ed Cleary | Date: 9/9/99 |
|---|---|---|---|

## SECTIONS 4 – CONDITIONS FOR CONCURRENCE

| X | 1 | The WD/PF must be properly supervised to assure that bird populations are not increasing and that appropriate control procedures are being followed. |
|---|---|---|
| X | 2 | Any increases in bird activity that might be hazardous to safe aircraft operations will result in prompt mitigation actions and/or closure of the WD/PF. |
| X | 3 | Garbage shall not be handled or stored outside the WD/PF at any time, for any reason, or in a partially enclosed vehicle/structure that is accessible to birds or other wildlife. |
| X | 4 | The WD/PF shall be totally enclosed and shall be operated without any outward indications that waste disposal operations are underway indoors. |
| | 5 | Only non-putrescible demolition/construction waste material will be accepted in the WD/PF. |
| | 6 | Only composting materials shall be accepted in the referenced WD/PF. No other putrescible materials shall be accepted. |
| X | 7 | The above checked conditions must be clearly defined via state/local licensing procedures associated with establishment of the WD/PF. |

## SECTIONS 5 – COMMENTS

| |
|---|
| |
| |
| |

AGL-600 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) COORDINATION FORM

# SECTION 1 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) INFORMATION

| Site / Facility Name: | | AGL-600 File No |
|---|---|---|

**Associated City / State:**

## Check as appropriate

| New Site: | Expand/Modify Existing Site: | Re-Permit Existing Site: | Other: |
|---|---|---|---|
| Sanitary Landfill: | Waste transfer Station: | Demolition/Construction Debris: | Recycling Center: |
| Compost: | Water Treatment/Oxidation: | Water Detention/Retention: | Other: |

## Circle as appropriate

| | |
|---|---|
| Facility will process or store putrescible waste material outdoors:: | Y - N |
| Facility is within 5,000 feet of a public-use airport utilized by piston engine aircraft: | Y - N |
| Facility is within 10,000 feet of a public-use airport utilized by turbine engine aircraft: | Y - N |

| Facility is within a 5 mile radius of a public-use airport: | Y - N | Distance to nearest runway end (FT): |
|---|---|---|
| Reported hazardous wildlife activity at airport: | Y - N | Reported hazardous wildlife activity at facility: Y - N |
| State EPA licensing requirements: | Y - N | State EPA enforcement/mitigation procedures: Y - N |
| USDA/WS evaluation conducted: | Y - N | Non-hazard: _____ Hazard: _____ (check one) |

## SECTION 2 - AIRPORT INFORMATION

**Associated Public Use Airports:**

| LOC ID: | ATCT: Y - N | Military Aviation On-Site: Y - N (If yes, notify FAA regional military liaison) |
|---|---|---|
| Type Airport: GA - Com Serv | Longest Runway (Ft): | Instrument Runway: Y - N | Jet fuel Available: Y - N |
| Total Annual Operations: | Piston Operations: | Turbine Operations: |

## SECTIONS 3 – COMPATIBILITY

**Proposed wildlife attraction is considered compatible with provisions of FAA AC 150/5200-33**

| AGL-600 concur: | Non-concur: | Signature: | Date: |
|---|---|---|---|

Supporting documentation, correspondence, site maps, etc., attached

| AAS-300 agree: | Disagree: | Signature: | Date: |
|---|---|---|---|

## SECTIONS 4 – CONDITIONS FOR CONCURRENCE

| 1 | The WD/PF must be properly supervised to assure that bird populations are not increasing and that appropriate control procedures are being followed. |
|---|---|
| 2 | Any increases in bird activity that might be hazardous to safe aircraft operations will result in prompt mitigation actions and/or closure of the WD/PF. |
| 3 | Garbage shall not be handled or stored outside the WD/PF at any time, for any reason, or in a partially enclosed vehicle/structure that is accessible to birds or other wildlife. |
| 4 | The WD/PF shall be totally enclosed and shall be operated without any outward indications that waste disposal operations are underway indoors. |
| 5 | Only non-putrescible demolition/construction waste material will be accepted in the WD/PF. |
| 6 | Only composting materials shall be accepted in the referenced WD/PF. No other putrescible materials shall be accepted. |
| 7 | The above checked conditions must be clearly defined via state/local licensing procedures associated with establishment of the WD/PF. |

## SECTIONS 5 – COMMENTS

**AAL-600 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) COORDINATION FORM**

## SECTION 1 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) INFORMATION

Site / Facility Name: Case 1:02-cv-00022    Document 188-3    Filed 01/11/2008    Page 24 of 32

| | AAL-600 File No |
|---|---|

**Associated City / State:**

## Check as appropriate

| | | | |
|---|---|---|---|
| New Site: | Expand/Modify Existing Site: | Re-Permit Existing Site: | Other: |
| Sanitary Landfill: | Waste transfer Station: | Demolition/Construction Debris: | Recycling Center: |
| Compost: | Water Treatment/Oxidation: | Water Detention/Retention: | Other: |

## Circle as appropriate

| | |
|---|---|
| Facility will process or store putrescible waste material outdoors:: | Y - N |
| Facility is within 5,000 feet of a public-use airport utilized by piston engine aircraft: | Y - N |
| Facility is within 10,000 feet of a public-use airport utilized by turbine engine aircraft: | Y - N |

| | | |
|---|---|---|
| Facility is within a 5 mile radius of a public-use airport: Y - N | Distance to nearest runway end (FT): | |
| Reported hazardous wildlife activity at airport: Y - N | Reported hazardous wildlife activity at facility: | Y - N |
| State EPA licensing requirements: Y - N | State EPA enforcement/mitigation procedures: | Y - N |
| USDA/WS evaluation conducted: Y - N | Non-hazard: _____ Hazard: _____ | (check one) |

## SECTION 2 - AIRPORT INFORMATION

**Associated Public Use Airports:**

| | | | |
|---|---|---|---|
| LOC ID: | ATCT: Y - N | Military Aviation On-Site: Y - N (If yes, notify FAA regional military liaison) | |
| Type Airport: GA - Com Serv | Longest Runway (Ft): | Instrument Runway: Y - N | Jet fuel Available: Y - N |
| Total Annual Operations: | Piston Operations: | Turbine Operations: | |

## SECTIONS 3 – COMPATIBILITY

**Proposed wildlife attraction is considered compatible with provisions of FAA AC 150/5200-33**

| AAL-600 concur: | Non-concur: | Signature: | Date: |
|---|---|---|---|

Supporting documentation, correspondence, site maps, etc., attached

| AAS-300 agree: | Disagree: | Signature: | Date: |
|---|---|---|---|

## SECTIONS 4 – CONDITIONS FOR CONCURRENCE

| 1 | The WD/PF must be properly supervised to assure that bird populations are not increasing and that appropriate control procedures are being followed. |
|---|---|
| 2 | Any increases in bird activity that might be hazardous to safe aircraft operations will result in prompt mitigation actions and/or closure of the WD/PF. |
| 3 | Garbage shall not be handled or stored outside the WD/PF at any time, for any reason, or in a partially enclosed vehicle/structure that is accessible to birds or other wildlife. |
| 4 | The WD/PF shall be totally enclosed and shall be operated without any outward indications that waste disposal operations are underway indoors. |
| 5 | Only non-putrescible demolition/construction waste material will be accepted in the WD/PF. |
| 6 | Only composting materials shall be accepted in the referenced WD/PF. No other putrescible materials shall be accepted. |
| 7 | The above checked conditions must be clearly defined via state/local licensing procedures associated with establishment of the WD/PF. |

## SECTIONS 5 – COMMENTS

ACE-600 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) COORDINATION FORM

## SECTION 1 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) INFORMATION

| Site / Facility Name: | ACE-600 File No |
|---|---|

**Associated City / State:**

| Check as appropriate | | | |
|---|---|---|---|
| New Site: | Expand/Modify Existing Site: | Re-Permit Existing Site: | Other: |
| Sanitary Landfill: | Waste transfer Station: | Demolition/Construction Debris: | Recycling Center: |
| Compost: | Water Treatment/Oxidation: | Water Detention/Retention: | Other: |

Circle as appropriate

| | |
|---|---|
| Facility will process or store putrescible waste material outdoors:: | Y - N |
| Facility is within 5,000 feet of a public-use airport utilized by piston engine aircraft: | Y - N |
| Facility is within 10,000 feet of a public-use airport utilized by turbine engine aircraft: | Y - N |

| | | |
|---|---|---|
| Facility is within a 5 mile radius of a public-use airport: Y - N | Distance to nearest runway end (FT): | |
| Reported hazardous wildlife activity at airport: Y - N | Reported hazardous wildlife activity at facility: | Y - N |
| State EPA licensing requirements: Y - N | State EPA enforcement/mitigation procedures: | Y - N |
| USDA/WS evaluation conducted: Y - N | Non-hazard: _____ Hazard: _____ | (check one) |

## SECTION 2 - AIRPORT INFORMATION

**Associated Public Use Airports:**

| | | | |
|---|---|---|---|
| LOC ID: | ATCT: Y - N | Military Aviation On-Site: Y - N (If yes, notify FAA regional military liaison) | |
| Type Airport: GA - Com Serv | Longest Runway (Ft): | Instrument Runway: Y - N | Jet fuel Available: Y - N |
| Total Annual Operations: | Piston Operations: | Turbine Operations: | |

## SECTIONS 3 – COMPATIBILITY

**Proposed wildlife attraction is considered compatible with provisions of FAA AC 150/5200-33**

ACE-600 concur:     Non-concur:     Signature:     Date:

Supporting documentation, correspondence, site maps, etc., attached

AAS-300 agree:     Disagree:     Signature:     Date:

## SECTIONS 4 – CONDITIONS FOR CONCURRENCE

1. The WD/PF must be properly supervised to assure that bird populations are not increasing and that appropriate control procedures are being followed.

2. Any increases in bird activity that might be hazardous to safe aircraft operations will result in prompt mitigation actions and/or closure of the WD/PF.

3. Garbage shall not be handled or stored outside the WD/PF at any time, for any reason, or in a partially enclosed vehicle/structure that is accessible to birds or other wildlife.

4. The WD/PF shall be totally enclosed and shall be operated without any outward indications that waste disposal operations are underway indoors.

5. Only non-putrescible demolition/construction waste material will be accepted in the WD/PF.

6. Only composting materials shall be accepted in the referenced WD/PF. No other putrescible materials shall be accepted.

7. The above checked conditions must be clearly defined via state/local licensing procedures associated with establishment of the WD/PF.

## SECTIONS 5 – COMMENTS

AEA-600 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) COORDINATION FORM

## SECTION 1 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) INFORMATION

| Site / Facility Name: | AEA-600 File No |
|---|---|

**Associated City / State:**

| Check as appropriate | | | |
|---|---|---|---|

Case 1:02-cv-00022    Document 188-3    Filed 01/11/2008    Page 27 of 32

| Compost: | Water Treatment/Oxidation: | Water Detention/Retention: | Other: |
|---|---|---|---|

<center>Circle as appropriate</center>

| | |
|---|---|
| Facility will process or store putrescible waste material outdoors:: | Y - N |
| Facility is within 5,000 feet of a public-use airport utilized by piston engine aircraft: | Y - N |
| acility is within 10,000 feet of a public-use airport utilized by turbine engine aircraft: | Y - N |

| | | |
|---|---|---|
| Facility is within a 5 mile radius of a public-use airport: Y - N | Distance to nearest runway end (FT): | |
| Reported hazardous wildlife activity at airport: Y - N | Reported hazardous wildlife activity at facility: | Y - N |
| State EPA licensing requirements: Y - N | State EPA enforcement/mitigation procedures: | Y - N |
| USDA/WS evaluation conducted: Y - N | Non-hazard: _____   Hazard: _____ | (check one) |

## SECTION 2 - AIRPORT INFORMATION

**Associated Public Use Airports:**

| | |
|---|---|
| LOC ID: | ATCT: Y - N    Military Aviation On-Site: Y - N  (If yes, notify FAA regional military liaison) |
| Type Airport: GA - Com Serv   Longest Runway (Ft): | Instrument Runway: Y - N    Jet fuel Available: Y - N |
| Total Annual Operations:   Piston Operations: | Turbine Operations: |

## SECTIONS 3 – COMPATIBILITY

<center>Proposed wildlife attraction is considered compatible with provisions of FAA AC 150/5200-33</center>

AEA-600 concur:        Non-concur:        Signature:        Date:

Supporting documentation, correspondence, site maps, etc., attached

AAS-300 agree:        Disagree:        Signature:        Date:

## SECTIONS 4 – CONDITIONS FOR CONCURRENCE

1. The WD/PF must be properly supervised to assure that bird populations are not increasing and that appropriate control procedures are being followed.

2. Any increases in bird activity that might be hazardous to safe aircraft operations will result in prompt mitigation actions and/or closure of the WD/PF.

3. Garbage shall not be handled or stored outside the WD/PF at any time, for any reason, or in a partially enclosed vehicle/structure that is accessible to birds or other wildlife.

4. The WD/PF shall be totally enclosed and shall be operated without any outward indications that waste disposal operations are underway indoors.

5. Only non-putrescible demolition/construction waste material will be accepted in the WD/PF.

6. Only composting materials shall be accepted in the referenced WD/PF. No other putrescible materials shall be accepted.

7. The above checked conditions must be clearly defined via state/local licensing procedures associated with establishment of the WD/PF.

## SECTIONS 5 – COMMENTS

## ANE-600 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) COORDINATION FORM

## SECTION 1 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) INFORMATION

| Site / Facility Name: | ANE-600 File No |
|---|---|

**Associated City / State:**

<center>Check as appropriate</center>

| | | | |
|---|---|---|---|
| New Site: | Expand/Modify Existing Site: | Re-Permit Existing Site: | Other: |
| Sanitary Landfill: | Waste transfer Station: | Demolition/Construction Debris: | Recycling Center: |
| Compost: | Water Treatment/Oxidation: | Water Detention/Retention: | Other: |

| Facility will process or store putrescible waste material outdoors:: | Y - N | | |
|---|---|---|---|
| Facility is within 5,000 feet of a public-use airport utilized by piston engine aircraft: | Y - N | | |
| Facility is within 10,000 feet of a public-use airport utilized by turbine engine aircraft: | Y - N | | |
| cility is within a 5 mile radius of a public-use airport: | Y - N | Distance to nearest runway end (FT): | |
| Reported hazardous wildlife activity at airport: | Y - N | Reported hazardous wildlife activity at facility: | Y - N |
| State EPA licensing requirements: | Y - N | State EPA enforcement/mitigation procedures: | Y - N |
| USDA/WS evaluation conducted: | Y - N | Non-hazard: _____ Hazard: _____ | (check one) |

## SECTION 2 - AIRPORT INFORMATION

### Associated Public Use Airports:

| LOC ID: | ATCT: Y - N | Military Aviation On-Site: Y - N (If yes, notify FAA regional military liaison) | |
|---|---|---|---|
| Type Airport: GA - Com Serv | Longest Runway (Ft): | Instrument Runway: Y - N | Jet fuel Available: Y - N |
| Total Annual Operations: | Piston Operations: | Turbine Operations: | |

## SECTIONS 3 – COMPATIBILITY

### Proposed wildlife attraction is considered compatible with provisions of FAA AC 150/5200-33

| ANE-600 concur: | Non-concur: | Signature: | Date: |
|---|---|---|---|

Supporting documentation, correspondence, site maps, etc., attached

| AAS-300 agree: | Disagree: | Signature: | Date: |
|---|---|---|---|

## SECTIONS 4 – CONDITIONS FOR CONCURRENCE

1. The WD/PF must be properly supervised to assure that bird populations are not increasing and that appropriate control procedures are being followed.

2. Any increases in bird activity that might be hazardous to safe aircraft operations will result in prompt mitigation actions and/or closure of the WD/PF.

3. Garbage shall not be handled or stored outside the WD/PF at any time, for any reason, or in a partially enclosed vehicle/structure that is accessible to birds or other wildlife.

4. The WD/PF shall be totally enclosed and shall be operated without any outward indications that waste disposal operations are underway indoors.

5. Only non-putrescible demolition/construction waste material will be accepted in the WD/PF.

6. Only composting materials shall be accepted in the referenced WD/PF. No other putrescible materials shall be accepted.

7. The above checked conditions must be clearly defined via state/local licensing procedures associated with establishment of the WD/PF.

## SECTIONS 5 – COMMENTS

ANM-600 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) COORDINATION FORM

## SECTION 1 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) INFORMATION

| Site / Facility Name: | | ANM-600 File No | |
|---|---|---|---|

### Associated City / State:

| Check as appropriate | | | |
|---|---|---|---|
| w Site: | Expand/Modify Existing Site: | Re-Permit Existing Site: | Other: |
| Sanitary Landfill: | Waste transfer Station: | Demolition/Construction Debris: | Recycling Center: |
| Compost: | Water Treatment/Oxidation: | Water Detention/Retention: | Other: |

| Circle as appropriate | | | |
|---|---|---|---|

| Facility is within 5,000 feet of a public-use airp... utilized by piston engine aircraft: | Y - N | |
|---|---|---|
| Facility is within 10.000 feet of a public-use airport utilized by turbine engine aircraft: | Y - N | |
| Facility is within a 5 mile radius of a public-use airport: | Y - N | Distance to nearest runway end (FT): |
| Reported hazardous wildlife activity at airport: | Y - N | Reported hazardous wildlife activity at facility: Y - N |
| State EPA licensing requirements: | Y - N | State EPA enforcement/mitigation procedures: Y - N |
| USDA/WS evaluation conducted: | Y - N | Non-hazard: ____ Hazard: ____ (check one) |

## SECTION 2 - AIRPORT INFORMATION

**Associated Public Use Airports:**

| LOC ID: | ATCT: Y - N | Military Aviation On-Site: Y - N (If yes, notify FAA regional military liaison) | |
|---|---|---|---|
| Type Airport: GA - Com Serv | Longest Runway (Ft): | Instrument Runway: Y - N | Jet fuel Available: Y - N |
| Total Annual Operations: | Piston Operations: | Turbine Operations: | |

## SECTIONS 3 – COMPATIBILITY

### Proposed wildlife attraction is considered compatible with provisions of FAA AC 150/5200-33

ANM-600 concur:     Non-concur:     Signature:     Date:

Supporting documentation, correspondence, site maps, etc., attached

AAS-300 agree:     Disagree:     Signature:     Date:

## SECTIONS 4 – CONDITIONS FOR CONCURRENCE

1. The WD/PF must be properly supervised to assure that bird populations are not increasing and that appropriate control procedures are being followed.

2. Any increases in bird activity that might be hazardous to safe aircraft operations will result in prompt mitigation actions and/or closure of the WD/PF.

3. Garbage shall not be handled or stored outside the WD/PF at any time, for any reason, or in a partially enclosed vehicle/structure that is accessible to birds or other wildlife.

4. The WD/PF shall be totally enclosed and shall be operated without any outward indications that waste disposal operations are underway indoors.

5. Only non-putrescible demolition/construction waste material will be accepted in the WD/PF.

6. Only composting materials shall be accepted in the referenced WD/PF. No other putrescible materials shall be accepted.

7. The above checked conditions must be clearly defined via state/local licensing procedures associated with establishment of the WD/PF.

## SECTIONS 5 – COMMENTS

---

### ASO-600 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) COORDINATION FORM

## SECTION 1 – WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) INFORMATION

| **Site / Facility Name:** | ASO-600 File No |
|---|---|

**Associated City / State:**

### Check as appropriate

| New Site: | Expand/Modify Existing Site: | Re-Permit Existing Site: | Other: |
|---|---|---|---|
| Sanitary Landfill: | Waste transfer Station: | Demolition/Construction Debris: | Recycling Center: |
| Compost: | Water Treatment/Oxidation: | Water Detention/Retention: | Other: |

### Circle as appropriate

| Facility will process or store putrescible waste material outdoors:: | Y - N |
|---|---|
| Facility is within 5,000 feet of a public-use airport utilized by piston engine aircraft: | Y - N |

| Reported hazardous wildlife activity at airport: | Y - N | Reported hazardous wildl.. .ctivity at facility: | Y - N |
|---|---|---|---|
| State EPA licensing requirements: | Y - N | State EPA enforcement/mitigation procedures: | Y - N |
| USDA/WS evaluation conducted: | Y - N | Non-hazard: _____ Hazard: _____ (check one) | |

## SECTION 2 - AIRPORT INFORMATION

**Associated Public Use Airports:**

| LOC ID: | ATCT: Y - N | Military Aviation On-Site: Y - N (If yes, notify FAA regional military liaison) | |
|---|---|---|---|
| Type Airport: GA - Com Serv | Longest Runway (Ft): | Instrument Runway: Y - N | Jet fuel Available: Y - N |
| Total Annual Operations: | Piston Operations: | Turbine Operations: | |

## SECTIONS 3 - COMPATIBILITY

**Proposed wildlife attraction is considered compatible with provisions of FAA AC 150/5200-33**

ASO-600 concur:     Non-concur:     Signature:     Date:

Supporting documentation, correspondence, site maps, etc., attached

AAS-300 agree:     Disagree:     Signature:     Date:

## SECTIONS 4 - CONDITIONS FOR CONCURRENCE

| 1 | The WD/PF must be properly supervised to assure that bird populations are not increasing and that appropriate control procedures are being followed. |
|---|---|
| 2 | Any increases in bird activity that might be hazardous to safe aircraft operations will result in prompt mitigation actions and/or closure of the WD/PF. |
| 3 | Garbage shall not be handled or stored outside the WD/PF at any time, for any reason, or in a partially enclosed vehicle/structure that is accessible to birds or other wildlife. |
| 4 | The WD/PF shall be totally enclosed and shall be operated without any outward indications that waste disposal operations are underway indoors. |
| 5 | Only non-putrescible demolition/construction waste material will be accepted in the WD/PF. |
| 6 | Only composting materials shall be accepted in the referenced WD/PF. No other putrescible materials shall be accepted. |
| 7 | The above checked conditions must be clearly defined via state/local licensing procedures associated with establishment of the WD/PF. |

## SECTIONS 5 - COMMENTS

ASW-600 - WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) COORDINATION FORM

## SECTION 1 - WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) INFORMATION

| Site / Facility Name: | | ASW-600 File No |
|---|---|---|

**Associated City / State:**

| Check as appropriate | | | |
|---|---|---|---|
| New Site: | Expand/Modify Existing Site: | Re-Permit Existing Site: | Other: |
| Sanitary Landfill: | Waste transfer Station: | Demolition/Construction Debris: | Recycling Center: |
| Compost: | Water Treatment/Oxidation: | Water Detention/Retention: | Other: |

| Circle as appropriate | |
|---|---|
| Facility will process or store putrescible waste material outdoors:: | Y - N |
| acility is within 5,000 feet of a public-use airport utilized by piston engine aircraft: | Y - N |
| Facility is within 10,000 feet of a public-use airport utilized by turbine engine aircraft: | Y - N |

| Facility is within a 5 mile radius of a public-use airport: | Y - N | Distance to nearest runway end (FT): | |
|---|---|---|---|
| Reported hazardous wildlife activity at airport: | Y - N | Reported hazardous wildlife activity at facility: | Y - N |
| State EPA licensing re<del>Cuise 02-cv-00022</del> | <del>Document 188-</del>3 tate <del>Filed 09/11/2008</del> on pr<del>Ppage:</del>30 of 32 | | Y - N |

## SECTION 2 - AIRPORT INFORMATION

Associated Public Use Airports:

| LOC ID: | ATCT:  Y  -  N | Military Aviation On-Site:  Y  -  N  (If yes, notify FAA regional military liaison) | |
|---|---|---|---|
| Type Airport:  GA  -  Com Serv | Longest Runway (Ft): | Instrument Runway:  Y  -  N | Jet fuel Available:  Y  -  N |
| Total Annual Operations: | Piston Operations: | Turbine Operations: | |

## SECTIONS 3 - COMPATIBILITY

### Proposed wildlife attraction is considered compatible with provisions of FAA AC 150/5200-33

| ASW-600 concur: | Non-concur: | Signature: | Date: |
|---|---|---|---|

Supporting documentation, correspondence, site maps, etc., attached

| AAS-300 agree: | Disagree: | Signature: | Date: |
|---|---|---|---|

## SECTIONS 4 - CONDITIONS FOR CONCURRENCE

1  The WD/PF must be properly supervised to assure that bird populations are not increasing and that appropriate control procedures are being followed.

2  Any increases in bird activity that might be hazardous to safe aircraft operations will result in prompt mitigation actions and/or closure of the WD/PF.

3  Garbage shall not be handled or stored outside the WD/PF at any time, for any reason, or in a partially enclosed vehicle/structure that is accessible to birds or other wildlife.

4  The WD/PF shall be totally enclosed and shall be operated without any outward indications that waste disposal operations are underway indoors.

5  Only non-putrescible demolition/construction waste material will be accepted in the WD/PF.

6  Only composting materials shall be accepted in the referenced WD/PF.  No other putrescible materials shall be accepted.

7  The above checked conditions must be clearly defined via state/local licensing procedures associated with establishment of the WD/PF.

## SECTIONS 5 - COMMENTS

### AWP-600 - WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) COORDINATION FORM

## SECTION 1 - WASTE DISPOSAL/PROCESSING FACILITY (WD/WP) INFORMATION

| Site / Facility Name: | | AWP-600 File No |
|---|---|---|
| Associated City / State: | | |

### Check as appropriate

| New Site: | Expand/Modify Existing Site: | Re-Permit Existing Site: | Other: |
|---|---|---|---|
| Sanitary Landfill: | Waste transfer Station: | Demolition/Construction Debris: | Recycling Center: |
| Compost: | Water Treatment/Oxidation: | Water Detention/Retention: | Other: |

### Circle as appropriate

| | | |
|---|---|---|
| Facility will process or store putrescible waste material outdoors:: | | Y - N |
| Facility is within 5,000 feet of a public-use airport utilized by piston engine aircraft: | | Y - N |
| Facility is within 10,000 feet of a public-use airport utilized by turbine engine aircraft: | | Y - N |
| Facility is within a 5 mile radius of a public-use airport:  Y - N | Distance to nearest runway end (FT): | |
| ported hazardous wildlife activity at airport:  Y - N | Reported hazardous wildlife activity at facility: | Y - N |
| State EPA licensing requirements:  Y - N | State EPA enforcement/mitigation procedures: | Y - N |
| USDA/WS evaluation conducted:  Y - N | Non-hazard: _____  Hazard: _____  (check one) | |

# SECTION 2 - AIRPORT INFORMATION

**Associated Public Use Airports:**

| LOC ID: | | ATCT: Y - N | | Military Aviation On-Site: Y - N (If yes, notify FAA regional military liaison) |
|---|---|---|---|---|
| Type Airport: GA - Com Serv | Longest Runway (Ft): | | Instrument Runway: Y - N | Jet fuel Available: Y - N |
| Total Annual Operations: | Piston Operations: | | Turbine Operations: | |

## SECTIONS 3 – COMPATIBILITY

### Proposed wildlife attraction is considered compatible with provisions of FAA AC 150/5200-33

AWP-600 concur:        Non-concur:        Signature:        Date:

Supporting documentation, correspondence, site maps, etc., attached

AAS-300 agree:        Disagree:        Signature:        Date:

## SECTIONS 4 – CONDITIONS FOR CONCURRENCE

1. The WD/PF must be properly supervised to assure that bird populations are not increasing and that appropriate control procedures are being followed.

2. Any increases in bird activity that might be hazardous to safe aircraft operations will result in prompt mitigation actions and/or closure of the WD/PF.

3. Garbage shall not be handled or stored outside the WD/PF at any time, for any reason, or in a partially enclosed vehicle/structure that is accessible to birds or other wildlife.

4. The WD/PF shall be totally enclosed and shall be operated without any outward indications that waste disposal operations are underway indoors.

5. Only non-putrescible demolition/construction waste material will be accepted in the WD/PF.

6. Only composting materials shall be accepted in the referenced WD/PF. No other putrescible materials shall be accepted.

7. The above checked conditions must be clearly defined via state/local licensing procedures associated with establishment of the WD/PF.

## SECTIONS 5 – COMMENTS

EXHIBIT 5



**U.S. Department
of Transportation**

**Federal Aviation
Administration**

# Advisory
# Circular

| | | |
|---|---|---|
| **Subject:** CONSTRUCTION OR ESTABLISHMENT OF LANDFILLS NEAR PUBLIC AIRPORTS | **Date:** August 26, 2000 **Initiated by:** AAS-300 | **AC No:** 150/5200-34 **Change:** |

**1. Purpose.** This advisory circular (AC) contains guidance on complying with new Federal statutory requirements regarding the construction or establishment of landfills near public airports.

**2. Application.** The guidance contained in the AC is provided by the Federal Aviation Administration (FAA) for use by persons considering the construction or establishment of a municipal solid waste landfill (MSWLF) near a public airport. Guidance contained herein should be used to comply with recently enacted MSWLF site limitations contained in 49 U.S.C. § 44718(d), as amended by section 503 of the Wendell H. Ford Aviation Investment and Reform Act for the 21$^{st}$ Century, Pub. L. No. 106-181 (April 5, 2000), "Structures interfering with air commerce." In accordance with § 44718(d), as amended, these site limitations are not applicable in the State of Alaska.

In addition, this AC provides guidance for a state aviation agency desiring to petition the FAA for an exemption from the requirements of § 44718(d), as amended.

**3. Related Reading Materials.**

    a. AC - 150/5200-33, Hazardous Wildlife Attractions On or Near Airports, May 1, 1997.

    b. Wildlife Strikes to Civil Aircraft in the United States 1990-1998, FAA Wildlife Aircraft Strike Database Serial Report Number 5, November 1998.

    c. Report to Congress: Potential Hazards to Aircraft by Locating Waste Disposal Sites in the Vicinity of Airports, April 1996, DOT/FAA/AS/96-1.

    d. Title 14, Code of Federal Regulation, Part 139, Certification and Operations: Land Airports Serving Certain Air Carriers.

    e. Title 40, Code of Federal Regulation, Part 258, Municipal Solid Waste Landfill Criteria.

Some of these documents and additional information on wildlife management, including guidance on landfills, are available on the FAA's Airports web site at www.faa.gov/arp/arphome.htm.

**4. Definitions.** Definitions for the specific purpose of this AC are found in Appendix 1.

**5. Background.** The FAA has the broad authority to regulate and develop civil aviation under the Federal Aviation Act of 1958, 49 U.S.C. § 40101, et. seq., and other Federal law. In section 1220 of the Federal Aviation Reauthorization Act of 1996, Pub. L. No. 104-264 (October 9, 1996), the Congress added a new provision, section (d), to 49 U.S.C. § 44718 to be enforced by the FAA and placing limitations on the construction or establishment of landfills near public airports for the purposes of enhancing aviation safety. Section 503 of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21), Pub. L. No. 106-181 (April 5, 2000) has replaced section 1220 of the 1996 Reauthorization Act, 49 U.S.C. § 44718 (d), with new language. Specifically, the new provision, § 44718(d), as amended, was enacted to further limit the construction or establishment of a MSWLF near certain smaller public airports.

In enacting this legislation, Congress expressed concern that a MSWLF sited near an airport poses a potential hazard to aircraft operations because such a waste facility attracts birds. Statistics support the fact that bird strikes pose a real danger to aircraft. An estimated 87 percent of the collisions between wildlife and civil aircraft occurred on or near airports when aircraft are below 2,000 feet above ground level (AGL). Collisions with wildlife at these altitudes are especially dangerous as aircraft pilots have minimal time to recover from such emergencies.

Databases managed by FAA and the United States Air Force show that more than 54,000 civil and military aircraft sustained reported strikes with wildlife from 1990 to 1999 (28,150 civil strikes and 25,853 military strikes). Between 1990-1999, aircraft-wildlife strikes involving U. S. civil aircraft result in over $350 million/year worth of aircraft damage and associated losses and over 460,000 hours/year of aircraft down time.

From 1990 to 1999, waterfowl, gulls and raptors were involved in 77% of the 2,119 reported damaging aircraft-wildlife strikes where the bird was identified. Populations of Canada geese and many species of gulls and raptors have increased markedly over the last several years. Further, gulls and Canada geese have adapted to urban and suburban environments and, along with raptors and turkey vultures, are commonly found feeding or loafing on or near landfills.

In light of increasing bird populations and aircraft operations, the FAA believes locating landfills in proximity to airports increases the risk of collisions between birds and aircraft. To address this concern, the FAA issued AC 150/5200-33, *Hazardous Wildlife Attractions On or Near Airports*, to provide airport operators and aviation planners with guidance on minimizing wildlife attractant. AC 150/5200-33 recommends against locating municipal solid waste landfills within five statute miles of an airport if the landfill may cause hazardous wildlife to move into or through the airport's approach or departure airspace.

**6.     General.**  Using guidance provided in the following sections, persons considering construction or establishment of a landfill should first determine if the proposed facility meets the definition of a new MSWLF (see Appendix 1).  Section 44718(d), as amended, applies only to a new MSWLF.  It does not apply to the expansion or modification of an existing MSWLF, and does not apply in the State of Alaska.  If the proposed landfill meets the definition of a new MSWLF, its proximity to certain public airports (meeting the criteria specified in Paragraph 8 below) should be determined.  If it is determined that a new MSWLF would be located within six miles of such a public airport, then either the MSWLF should be planned for an alternate location more than 6 miles from the airport, or the MSWLF proponent should request the appropriate State aviation agency to file a petition for an exemption from the statutory restriction.

In addition to the requirements of § 44718(d), existing landfill restrictions contained in AC 150/5200-33, *Hazardous Wildlife Attractions On or Near Airports* (see Paragraph 5, Background) also may be applicable.  Airport operators that have accepted Federal funds have obligations under Federal grant assurances to operate their facilities in safe manner and must comply with standards prescribed in advisory circulars, including landfill site limitations contained in AC 150/5200-33.

**7.     Landfills Covered by the Statute.**  The limitations of § 44718(d), as amended, only apply to a new MSWLF (constructed or established after April 5, 2000).  The statutory limitations are not applicable where construction or establishment of a MSWLF began on or before April 5, 2000, or to an existing MSWLF (received putrescible waste on or before April 5, 2000).  Further, an existing MSWLF that is expanded or modified after April 5, 2000, would not be held to the limitations of § 44718(d), as amended.

**8.     Airports Covered by the Statute.**  The statutory limitations restricting the location of a new MSWLF near an airport apply to only those airports that are recipients of Federal grants (under the Airport and Airway Improvement Act of 1982, as amended, 49 U.S.C. § 47101, *et seq.*) and to those that primarily serve general aviation aircraft <u>and</u> scheduled air carrier operations using aircraft with less than 60 passenger seats.

While the FAA does not classify airports precisely in this manner, the FAA does categorize airports by the type of aircraft operations served and number of annual passenger enplanements.  In particular, the FAA categorizes public airports that serve air carrier operations.  These airports are known as commercial service airports, and receive scheduled passenger service and have 2,500 or more enplaned passengers per year.

One sub-category of commercial service airports, nonhub primary airports, closely matches the statute requirement.  Nonhub primary airports are defined as commercial service airports that enplane less than 0.05 percent of all commercial passenger enplanements (0.05 percent equated to 328,344 enplanements in 1998) but more than 10,000 annual enplanements.  While these enplanements consist of both large and small air carrier operations, most are conducted in aircraft with less than 60 seats.  These airports also are heavily used by general aviation aircraft, with an average of 81 based aircraft per nonhub primary airport.

Case 1:02-cv-00022    Document 188-4    Filed 01/11/2008    Page 3 of 8

In addition, the FAA categorizes airports that enplane 2,500 to 10,000 passengers annually as non-primary commercial service airports, and those airports that enplane 2,500 or less passengers annually as general aviation airports. Both types of airports are mainly used by general aviation but in some instances, they have annual enplanements that consist of scheduled air carrier operations conducted in aircraft with less than 60 seats. Of the non-primary commercial service airports and general aviation airports, only those that have scheduled air carrier operations conducted in aircraft with less than 60 seats would be covered by the statute. The statute does not apply to those airports that serve only general aviation aircraft operations.

To comply with the intent of the statute, the FAA has identified those airports classified as nonhub primary, non-primary commercial service and general aviation airports that:

1. Are recipients of Federal grant under 49 U.S.C. § 47101, et. seq.;
2. Are under control of a public agency;
3. Serve some scheduled air carrier operations conducted in aircraft with less than 60 seats; and
4. Have total annual enplanements consisting of at least 51% of <u>scheduled</u> air carrier enplanements conducted in aircraft with less than 60 passenger seats.

Persons considering construction or establishment of a new MSWLF should contact the FAA to determine if an airport within six statute miles of the new MSWLF meets these criteria (see paragraph 11 below for information on contacting the FAA). If the FAA determines the airport does meet these criteria, then § 44718(d), as amended, is applicable.

An in-depth explanation of how the FAA collects and categorizes airport data is available in the FAA's National Plan of Integrated Airport Systems (NPIAS). This report and a list of airports classified as nonhub primary, non-primary commercial service and general aviation airports (and associated enplanement data) are available on the FAA's Airports web site at http://www.faa.gov/arp/410home.htm.

**9.     Separation distance measurements.** Section 44718(d), as amended, requires a minimum separation distance of six statute miles between a new MSWLF and a public airport. In determining this distance separation, measurements should be made from the closest point of the airport property boundary to the closest point of the MSWLF property boundary. Measurements can be made from a perimeter fence if the fence is co-located, or within close proximity to, property boundaries. It is the responsibility of the new MSWLF proponent to determine the separation distance.

**10.     Exemption Process.** Under § 44718(d), as amended, the FAA Administrator may approve an exemption from the statute's landfill location limitations. Section 44718(d), as amended, permits the aviation agency of the state in which the airport is located to request such an exemption from the FAA Administrator. Any person desiring

4

such an exemption should contact the aviation agency in the state in which the affected airport is located. A list of state aviation agencies and contact information is available at the National Association of State Aviation Officials (NASAO) web site at www.nasao.org or by calling NASAO at (301) 588-1286.

A state aviation agency that desires to petition the FAA for an exemption should notify the Regional Airports Division Manager, in writing, at least 60 days prior to the establishment or construction of a MSWLF. The petition should explain the nature and extent of relief sought, and contain information, documentation, views, or arguments that demonstrate that an exemption from the statute would not have an adverse impact on aviation safety. Information on contacting FAA Regional Airports Division Managers can be found on the FAA's web site at www.faa.gov.

After considering all relevant material presented, the Regional Airports Division Manager will notify the state agency within 30 days whether the request for exemption has been approved or denied. The FAA may approve a request for an exemption if it is determined that such an exemption would have no adverse impact on aviation safety.

**11. Information.** For further information, please contact the FAA's Office of Airport Safety and Standards, Airport Safety and Certification Branch, at (800) 842-8736, Ext. 73085 or via email at WebmasterARP@faa.gov. Any information, documents and reports that are available on the FAA web site also can be obtained by calling the toll-free telephone number listed above.

DAVID L. BENNETT
Director, Office of Airport Safety and Standards

# APPENDIX 1. DEFINITIONS.

The following are definitions for the specific purpose of this advisory circular.

a.    Construct a municipal solid waste landfill means excavate or grade land, or raise structures, to prepare a municipal solid waste landfill as permitted by the appropriate regulatory or permitting authority.

b.    Establish a municipal solid waste landfill (MSWLF) means receive the first load of putrescible waste on site for placement in a prepared municipal solid waste landfill.

c.    Existing municipal solid waste landfill (MSWLF) means a municipal solid waste landfill that received putrescible waste on or before April 5, 2000.

d.    General aviation aircraft means any civil aviation aircraft not operating under 14 C.F.R. Part 119, Certification: Air carriers and commercial operators.

e.    Municipal solid waste landfill (MSWLF) means publicly or privately owned discrete area of land or an excavation that receives household waste, and that is not a land application unit, surface impoundment, injection well, or waste pile, as those terms are defined under 40 C.F.R. § 257.2. A MSWLF may receive other types of RCRA subtitle D wastes, such as commercial solid waste, nonhazardous sludge, small quantity generator waste and industrial solid waste, as defined under 40 C.F.R. § 258.2. A MSWLF may consist of either a standalone unit or several cells that receive household waste.

f.    New municipal solid waste landfill (MSWLF) means a municipal solid waste landfill that was established or constructed after April 5, 2000.

g.    Person(s) means an individual, firm, partnership, corporation, company, association, joint-stock association, or governmental entity. It includes a trustee, receiver, assignee, or similar representative of any of them (14 C.F.R. Part 1).

h.    Public agency means a State or political subdivision of a State; a tax-supported organization; or an Indian tribe or pueblo (49 U.S.C. § 47102(15)).

i.    Public airport means an airport used or intended to be used for public purposes that is under the control of a public agency; and of which the area used or intended to be used for landing, taking off, or surface maneuvering of aircraft is publicly owned (49 U.S.C. § 47102(16)).

j.    Putrescible waste means solid waste which contains organic matter capable of being decomposed by micro-organisms and of such a character and proportion as to be capable of attracting or providing food for birds (40 C.F.R. § 257.3-8).

k.    Scheduled air carrier operation means any common carriage passenger-carrying operation for compensation or hire conducted by an air carrier or commercial operator for

6

# KUAM NEWS
## On-Air. Online. On Demand.

Fax/e-File/ Faxes · Decision 2005 · Blogs · NewsLinks · Week-in-Review · Holiday Calendar · Fugitive Files · KUAM Desktop · News Widgets · Village Voice · Weather · KUAM-TV8 · KUAM-TV11 · Sports · Serving America · Making a Difference · KUAM Coverage · Meet the Newsteam · Contact Us · Send a news tip · Jobs at KUAM

Listen Live   Streaming Webcasts   KUAM Search   KUAM Broadband   Mobile & Wireless   Original Productions   RSS   Podcasts

## Feds balk at planned Guatali groundbreaking

by Mindy Aguon, KUAM News
Tuesday, December 11, 2007
Subscribe to Mindy's newsfeed [RSS]

E-mail this article
Printable version
KUAM Toolbar
Web Widgets
[RSS] Get RSS headlines

Guam Resource Recovery Partners has announced a ground breaking set for Thursday in Santa Rita, as the company embarks on efforts to build a landfill at Guatali. For the last decade, the company has pushed to build a waste-to-energy facility, but as that case remains in litigation officials with the organization, as well as their partners, are moving forward with a landfill at the site. But those plans could be thwarted as the federal government is giving the idea two thumbs down, with one local lawmaker questioning the government's intentions.

With the clock ticking against the Government of Guam to close the Ordot Dump and open a new landfill, U.S. Attorney Lenny Rapadas says Guam Resource Recovery Partners' plans to build a landfill at Guatali may not be the government's solution to compliance with a consent decree. "At the time this incinerator contract was never part of the deal," he told KUAM News, "And I don't believe any of the people were involved in that didn't become involved in any of the public hearings or any of the hearings that went into the consent decree."

Rapadas stresses the feds' position that the consent decree must be followed through. And while the government now looks to GRRP as a solution for a new landfill, Rapadas isn't so quick to back the idea, saying Guatali was considered in the past but was rejected.

"Our concern is to see that the consent decree is fulfilled. Specifically, I bring up Guatali again that area being saw by anyone. I doubt it could be approved. Well, approved under federal standards and under the way that we went about with the approvals with working with the consent decree," he stated.

Several years ago there were concerns about the selection of Guatali as a potential site for the island's new landfill. The biggest were concerns about the property's slope. However, its something GRRP attorney Arthur Clark maintains is actually an advantage for building a sanitary landfill, saying, "It prevents the Jello effect, where you've got otherwise just piling trash you just got a mound of Jello, where it's just going to fall apart, but if you have slope it actually helps compact it.

"It's not the USEPA's job to tell Guam no don't do this one, don't do that one, especially when it's a private application that's the official word we've got."

Several months ago GRRP filed clearing and grading and landfill permits with the Guam Environmental Protection Agency. That agency's spokesperson Tammy Anderson says those applications are under review and have yet to be approved. While GRRP proceeds with its efforts to build a landfill and holds a groundbreaking on Thursday without those permits, the company plans to build a waste-to-energy facility remain tied up in the Supreme Court.

On Monday afternoon presiding justice pro-tem Richard Benson issued an order indicating that the court has finished its deliberations regarding all issues in the case, with the exception of two points that the court requires additional briefing on. Justices want to know if agreements complied with the law and whether the 1996 agreement provided GRRP an exclusive right to develop, finance, design, construct, and operate a waste reduction facility for the recycling and incineration of the solid waste collected within the territory of Guam. Briefs must be submitted by December 17, with each parties reply to the other to be filed by the 21st. Upon review of these briefs, justices are expected to make the final determination of the validity of the GRRP contract that has been appealed several times, which will determine whether the company can move forward with building a waste-to-energy facility.

Meanwhile, Senator Ben Pangelinan (D), who has opposed GRRP's contract with the Government of Guam to build a waste-to-energy facility believes GRRP's groundbreaking this week is not only premature, but evidence that there's some wheeling and dealing going on at the people's expense. "Deals are being cut here," said the senator. "If not political, then certainly financial deals to get this turn around all of a sudden. I think the people deserve a right to know exactly what type of deals our leaders are entering into in order to have this complete turnaround in terms of position on the incinerator contract as well as of course the landfill issue."

Guam Resource Recovery Partners has scheduled the Guatali groundbreaking ceremony for Thursday at 9:30 in the morning.

On an added note, in our story on Monday GRRP attorney Clark indicated that there were no definitive plans that a waste-to-energy facility would in fact be built at Guatali. Interestingly, president of Chevron Energy Solutions Jim Davis and president of Nava Services Steve Cammack are both scheduled to be at Thursday's groundbreaking. A reception will also be held later this evening in celebration of their new and growing alliance with GRRP.

### TODAY'S HEADLINES

It may be legit, but check out who's running a Tamuning casino...

Medical board discusses Cruz's certification

Suba talks improving response time with mayors

Discussions delayed surrounding legal fees for EITC case

Three arrested in connection with teen's sexual assault

Governor declares Christmas Eve a GovGuam holiday

San Agustin calls for reorg of GPSS

AAFB remembers sacrifices of Operation Linebacker II

DPW knew Ylig bridge needed fixing

Crews place roof on new FHB branch

which the air carrier, commercial operator, or their representatives offers in advance the departure location, departure time, and arrival location. It does not include any operation that is conducted as a supplemental operation under 14 C.F.R. Part 119, or is conducted as a public charter operation under 14 C.F.R. Part 380 (14 C.F.R. § 119.3).

l.      Solid waste means any garbage, or refuse, sludge from a wastewater treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semi-solid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved materials in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges that are point sources subject to permit under 33 U.S.C. § 1342, or source, special nuclear, or by-product material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) (40 C.F.R. § 258.2).

EXHIBIT 7

## SENATOR TINA ROSE MUÑA BARNES

I MINA' BENTE NUEBI NA LIHESLATURAN GUÅHAN • TWENTY NINTH GUAM LEGISLATURE
LOCATION: Suite 205 Ada Plaza Center, 173 Aspinall Avenue, Hagåtña, Guam 96910 • MAIL: 155 Hesler Place, Hagåtña, Guam 96910
(671) 475-8462 • Fax: (671) 472-3547

November 23, 2007

Mikel Schwab
Assistant U.S. Attorney
Sirena Plaza
108 Hernan Cortez Ave. Suite 500
Hagåtña, Guam 96910

Dear Attorney Schwab,

*Hafa Adai.* I am writing to take issue with and challenge several comments widely published in Guam's media recently relative to our island's solid waste problems. A number of stories in both island newspapers and in broadcasts on television and radio over the past several weeks have focused on our seeming inability to properly deal with our trash. While I am pleased that this important issue is finally getting the kind of attention it needs, I do want to make sure that my position on the issue is clear.

In a story that appeared in the Marianas Variety earlier this month headlined, "Feds: Guam Legislature hinders Consent Decree compliance," you were quoted as saying: *"Instead of seeking to expedite GovGuam's compliance, the Guam Legislature chose to place additional hurdles in DPW's path."* My position on the process to handle our solid waste may differ from some that have been reported in the media, but having a differing opinion does not make me wrong.

Mr. Schwab, you are absolutely correct that for more than 10 years now, certain individuals have been placing hurdles in the path of progress on our solid waste problems. This has been done for purely political reasons. However, the provision contained in P.L. 29-19 to stop the expenditure of funds on the *Layon/Dandan* landfill site until the property is acquired is absolutely NOT one of those politically motivated hurdles. The provision was passed by the Legislature and signed into law by Governor Camacho to ensure fiscal responsibility. It was neither to hinder the opening of a new landfill nor to interfere with the closure of *Ordot* Dump. In spite of other political rhetoric, when it was time to vote on the bill, Speaker Calvo agreed with ensuring fiscal responsibility and was one of the 10 Senators who voted for the bill. The voting sheet for P.L. 29-19 can be found on the Guam Legislature's web site, www.guamlegislature.com.

Like you, I have also been very critical of past Legislative efforts to prevent the resolution of Guam's solid waste problems. I wholeheartedly reject any assertion that my efforts are meant to politically derail the closure of *Ordot* Dump. I would also like to go on record as stating unequivocally that I have never supported either the possible contamination of Guam's future water resources, or the irresponsible and possibly illegal expenditure of taxpayer funds, which are the reasons for the provision in P.L. 29-19. I will discuss each point below.



**Possible illegal expenditure of taxpayer funds.** The contract for the construction plans for the *Layon/Dandan* landfill was initiated in 2005. In subsequent change orders to this contract, the scope of work was expanded to include an environmental impact study for the *Layon/Dandan* site, the construction of a temporary road, and a hydrogeologic study, among other items. All of this was initiated without clear title to the property and contrary to established GovGuam procurement processes, perhaps done in a panicked response to Consent Decree requirements.

With regard to the funding requirements for *Layon/Dandan*, the Department of Public Works (DPW) has not yet provided *I Liheslatura* with the amount necessary to finance the closure of the *Ordot* Dump and open a new landfill. The Legislature is extremely concerned because we have heard estimates of amounts as high as $10 Million that have already been spent on work at the *Layon/Dandan* site without any of the following:

    a. Legislative appropriation, or
    b. A statute identifying the site for the new landfill, or
    c. GovGuam possessing clear title to the property containing the *Layon/Dandan* site.

For that reason *I Liheslatura* included in Public Law 29-19 a requirement that GovGuam "...shall not expend funds on site-specific preparation, design work, mitigation, infrastructure upgrade or installation, or construction of a new landfill, unless the Government of Guam has acquired and recorded fee simple ownership of the property in question." This language can be found in item (b) of Section 98, Chapter VI.

The intent of this provision of law is solely to require accountability by our government on millions of dollars of expenditures of government funds that are currently taking place on private property, and most likely inflating its value, before GovGuam has made a realistic attempt to acquire said property. Further, items (c) and (d) of the same section specifically mandate the following:

"(c) Landfill Financing Plan. Within 60 days of the effective date of this Act, the Department of Public Works shall submit to *I Maga'lahen Guåhan* and *I Liheslaturan Guåhan* a financing plan enumerating in detail all costs associated with the construction of the new landfill, including but not limited to:

    a. Property acquisition,
    b. Environmental mitigation within the landfill footprint, buffer zone, and other impacted areas including but not limited to water sources, rivers, streams, tributaries, wetlands, surface water, ground water, drainage, and runoff erosion;
    c. Infrastructure needs, including but not limited to power; water; wastewater, and roadways including climbing lanes for trucks; mitigation of blind-curves and other hazards; shoulder widening; roadway widening; addition of new traffic lanes; traffic management; drainage and storm drainage improvements; access and utility roads; upgrading road markings and signage, and upgrading bridges;
    d. Landfill construction, and
    e. Annual landfill operations and maintenance costs."

"(d) The Director of Public Works, the Administrator of the Guam Environmental Protection Agency, and any other head of an executive branch or agency that has expended funds on a new landfill shall, within thirty (30) days of passage of this Act, submit a report regarding the purpose, amount and source of that expenditure to the Speaker of *I Liheslaturan Guåhan*."



Strict time limits were placed on submittal of the financing plan and reporting on expenditures so as to delay the process at little as possible. Please note that while DPW has presented cost analyses for the closure of *Ordot* Dump and the opening of a new landfill at the *Layon/Dandan* site, these cost-estimates have fluctuated significantly. I recall that during the 27th Guam Legislature, these costs were pegged at $80 Million. Now such estimates hover at around $229 Million. We must be certain of this amount given the challenging economic conditions currently being experienced in Guam.

**Possible contamination of Guam's future water resources.** Understandably, my concerns regarding the location of the new landfill are quite different than yours. I sincerely believe that the opening of a new landfill at *Layon/Dandan* does not serve the best interests of the people of Guam for a number of reasons:

    a. The *Layon/Dandan* site is located above the *Inarajan* Watershed, a source of water identified by Guam Waterworks Authority (GWA) for future development. (I will discuss this point in greater detail below.) All potential landfill sites in northern Guam were automatically excluded from consideration to protect water resources, yet that same consideration was not extended to the *Layon/Dandan* site;

    b. The natural environment of our island and the pristine nature of the proposed site was not taken into consideration;

    c. Solid waste transportation and operational costs due to site location were not considered;

    d. Volume reduction of solid waste based on existing and available technologies under review was not considered;

    e. Cost or devaluation to Tourism, Guam's most important industry, as a result of road expansion, the introduction of undesirable commercial activity, higher traffic, and related factors identified by the Guam Visitors Bureau, were not considered;

    f. No quantification has been made of the tremendous costs that our people would have to bear to construct not just a landfill that will essentially be floating atop a huge water resource in *Layon/Dandan,* but also to acquire the thousands of acres of property needed to widen many miles of narrow, two lane highways, replace inadequate bridges and provide the additional infrastructure required to run a modern solid waste operation in rural southern Guam.

I recognize that the U.S. Attorney and the District Court are charged with enforcing the Consent Decree, and I am aware that while you may acknowledge my concerns, they count for very little in the overall scheme of things. This does not mean that my concerns do not exist, or that they are not important to the welfare and lives of the people who live in Guam. The law is supposed to protect people, but in this case, it can harm them if there is a flaw in its foundation.

For your review and information, I am enclosing a copy of a letter from environmental engineers and consultants Brown & Caldwell (B&C) to then-General Manager David Craddick of GWA, dated June 14, 2005, in which B&C Chief Hydrogeologist Martin G. Steinpress makes the following points:

    a. "Without a thorough groundwater resource evaluation, it is not possible to rule out sufficient yields from deep wells for municipal supply or other development. In fact, wells have provided local water sources in the past in southern Guam (i.e. *Malojloj*), and others (*Asalonso*, GORCO and *Talofofo*) may have use in the future…"


b. "Although GWA's *Fena* surface water reservoir and *Ugum* diversion currently supply southern Guam, future needs may require groundwater development. Since groundwater beneath *Layon* falls within the G-1 Resource Zone category, it must be protected to drinking water quality standards."

c. "The SEIS acknowledges that the *Inarajan* River has been identified as a potential site for a surface water dam and/or reservoir. SEIS Figure 3-1 also shows proposed reservoir and/or diversion sites on the *Tinago* River ... both of these proposed sites would be downstream of the proposed landfill site."

d. "In spite of the SEIS claim that "no plans are currently in place to develop groundwater or surface water supplies in the *Layon* Area ... GWA considers (the *Inarajan* and *Tinago* Rivers) as potentially viable and necessary for the future water supply needs. In fact, the pre-draft Guam Water Budget Report ... recommends that consideration be given to investigating the feasibility of diversions at other rivers in addition to the *Ugum*..."

e. "No citations or evidence is provided that the limestone aquifer tapped by the *Malojloj* wells is either limited in extent or that groundwater within it is not continuous with that in the volcanic formations in the *Layon* area."

f. "...previous well yields do not rule out development of an economic groundwater resource in either the limestone or volcanic aquifers of Southern Guam ... well yields comparable to northern Guam are possible."

I find fault in the site selection process undertaken by the Government of Guam and approved by the Consent Decree because it did not adequately take into consideration the intention of GWA to develop the *Inarajan* Watershed resources, or the key socio-economic factors that will dramatically affect the people of Guam. Although the government officials involved in the site-selection process erred in their work, I do not believe that the people of Guam, now or in the future, should be made to pay for this blunder. I regret that the Solid Waste Law Review Commission (LRC) was not impaneled earlier by Governor Felix P. Camacho to conduct and oversee this process.

An additional impediment to properly dealing with our solid waste problem is the long-standing refusal of Guam's military commands to join with the civilian community in a container recycling (bottle bill) program. In 10 states, including Hawaii and California, the military is a full participant and those deposit programs prevent up to 80% or more of recyclable containers from entering waste streams. It seems rather disingenuous of the Federal government to criticize GovGuam for its solid waste problems, when the military's lack of cooperation prevents an important recycling effort from going forward. The Guam Chamber of Commerce has estimated that as much as 40% of all beverages purchased in commissaries and exchanges are used and discarded off-base. Local beverage distributors oppose any kind of "bottle bill" until and unless the military is a full participant.

I also believe that the *Guatali* and *Mala'a* sites were incorrectly excluded from the site selection process. A case filed in the Supreme Court of Guam relative to Public Law 23-95 is still pending, and the appeal currently being considered includes the submittal of facts and information contrary to those submitted to the Superior Court which were cited in the decision and order made by Judge Katherine Maraman.

The LRC has been diligently working on a final solution to our solid waste dilemma. We have already addressed many issues including the creation of the Recycling and Solid Waste



Authority (RASA) as an autonomous agency able to secure funds on the bond market. We have also just received a report analyzing the waste-to-energy contract and have received recommendations for minor changes that have already been accepted by the contractor. This analysis by Shaw Stone & Webster Management Consultants refutes the unsubstantiated claims by political opponents to progress that certain "sweetheart deals" were contained in the waste-to-energy contract. Now that private interests are proceeding with a proposed landfill at *Guatali*, one of only two sites approved by Guam law for a landfill, political forces are once again underway to interfere with the solid waste process, using the same incorrect data and misleading information that caused such a disruption in the process over the years.

Finally, the LRC has tasked DPW to prepare a matrix of the options available including specific analysis on environmental compliance, cost, and volume reduction options. This matrix will be submitted to the LRC in the next two weeks and will include a comparison of the cost to the people of Guam for a landfill at the two sites.

Our community is frustrated with these longstanding issues, but I must assure you that until today there has never before been such an integrated effort to evaluate all solid waste options by the elected leadership of this island. I firmly believe that the results of the LRC will provide the final and best solution for our island community that will effectuate the closure of *Ordot* Dump in a faster and more efficient manner than those plans being proposed and supported by the U.S. Attorney's Office. I also hope that this solution will acknowledge the need to protect our valuable water resources and take into consideration the best solution for the people of Guam and for our island's future.

The provision in Public Law 29-19 should not be the reason for the failure of our government to make progress in closing *Ordot* Dump and meeting its contractual obligations surrounding the management of solid waste. *I Liheslatura*, by virtue of the provision, has made it a top priority to ensure accountability of public funds.

I hope you will consider my comments as you deliberate. If you wish further clarification of my position, I am willing to meet with you at your convenience.

*Senseramente,*

Tina Rose Muña Barnes

Attachment: Brown and Caldwell letter to Mr. David Craddick (4 pages)
c:   The Honorable Felix P. Camacho, Governor of Guam
     Alicia G. Limtiaco, Attorney General of Guam
     Wayne Nastri, Region 9 Administrator, USEPA
     Lorilee Crisostomo, Administrator, Guam EPA
     Members, Solid Waste Law Review Commission
     All Senators
     All Media



# The Norman Landfill Environmental Research Site: What Happens to the Waste in Landfills?

### By Scott C. Christenson and Isabelle M. Cozzarelli

## DO LANDFILLS LEAK?

We call it "garbage" or "trash" but it is "municipal solid waste" to your city government and the waste industry. Municipal solid waste is a combination of non-hazardous wastes from households, commercial properties, and industries. The U.S. Environmental Protection Agency (USEPA) reports that the United States produced about 230 million tons of solid waste in 1999, about 57 percent of which is disposed of in landfills (U.S. Environmental Protection Agency, 1999).

Disposal of municipal solid waste in landfills was largely unregulated prior to the 1970s. Most solid waste was deposited in unlined pits. Precipitation and ground water seeping through this waste produces leachate, which is water contaminated from the various organic and inorganic substances with which it comes in contact as it migrates through the waste. Leachate seeping from a landfill contaminates the ground water beneath the landfill, and this contaminated ground water is known as a plume. The normal movement of ground water causes the leachate plume to extend away from a landfill, in some cases for many hundreds of meters. Many studies have shown leachate plumes emanating from old unlined landfills. Estimates for the number of closed landfills in the United States are as high as 100,000 (Suflita and others, 1992).

Federal and state regulations were passed in the 1980s and 1990s to manage disposal of solid waste. Those regulations require that most landfills use liners and leachate collection systems to minimize the seepage of leachate to ground water. Although liners and leachate collection systems minimize leakage, liners can fail and leachate collection systems may not collect all the leachate that escapes from a landfill. Leachate collection systems require maintenance of pipes, and pipes can fail because they crack, collapse, or fill with sediment. The USEPA has concluded that all landfills eventually will leak into the environment (U.S. Environmental Protection Agency, 1988). Thus, the fate and transport of leachate in the environment, from both old and modern landfills, is a potentially serious environmental problem.

## STUDYING LEACHATE PLUMES AT A MUNICIPAL SOLID-WASTE LANDFILL

### The Norman Landfill Environmental Research Site

The Norman Landfill (fig. 1) is a closed municipal solid waste landfill, formerly operated by the city of Norman, Oklahoma. The landfill is sited directly on the Canadian River alluvial aquifer and has no liner or leachate collection system, so a leachate plume has developed in ground water in the aquifer. The ground water and leachate plume flow away from the landfill toward the Canadian River, a large tributary of the Arkansas River that drains into the Mississippi River.

The Norman Landfill was designated a research site by the U.S. Geological Survey (USGS) through its Toxic Substances Hydrology Research Program. Monitoring wells and instruments have been installed in and adjacent to the leachate plume. A small stream and wetland overlie the leachate plume, and studies are in progress to determine the fate of leachate compounds that enter the wetland from the ground water. USGS hydrologists and technicians have accomplished comprehensive site characterization, which provides a wealth of information about the site hydrogeology and geochemistry. This site



Figure 1. Map of the Norman Landfill Environmental Research Site.

characterization provides essential information to the scientists conducting research about the chemical, biological, and hydrologic processes in ground water and surface water affected by landfill leachate. Research is in progress at the site by scientists from the University of Oklahoma, Oklahoma State University, other universities, the USEPA, and the USGS.

In addition to providing a laboratory for studies of ground and surface water contaminated by landfill leachate, the Norman Landfill Environmental Research Site is used to study other types of contaminant problems. The plume can be used to study microbiological and geochemical processes that are not specific to landfills.

All research at the Norman Landfill Environmental Research

Site is designed to investigate problems and processes that have a high transfer value to other subsurface contamination problems. Comprehensive physical, chemical, and microbial characterizations at this and other USGS Toxic Substances Hydrology Program sites provide fundamental knowledge of the processes that control important types of contamination problems. This knowledge of fundamental processes can be generalized to a wide range of field conditions by comparing results to field and laboratory experiments at other sites with differing conditions and properties. The resulting knowledge and methods improve the effectiveness and reduce the cost of characterization and remediation at contaminated sites across the nation.

## NATURAL ATTENUATION

### Can Microorganisms Reduce Landfill Contaminants?

Scientists who investigate environmental contamination problems are interested in an environmental cleanup approach known as natural attenuation. Natural attenuation refers to naturally occurring physical, chemical, and biological processes that can reduce concentrations of contaminants. In most contaminated aquifers, one aspect of natural attenuation involves the degradation of contaminants by microorganisms, which in some instances prevents contaminant migration. These microorganisms are naturally present in aquifers, even deep below the surface of the earth.

Natural attenuation can be a better alternative for remediation of certain types of contaminants compared to other methods of remediating contaminated ground water. Natural attenuation can be less expensive and more effective than other methods, such as extracting contaminated ground water with wells and treating it at water treatment plants. Much of the research at the Norman Landfill Environmental Research Site investigates different aspects of natural attenuation.

## BIOGEOCHEMICAL ZONES

### Where Does Natural Attenuation Occur?

University of Oklahoma and USGS scientists used a combined microbiological and geochemical approach to identify the important processes occurring in the aquifer contaminated by leachate from the Norman Landfill (Cozzarelli and others, 2000, Harris and others, 1999). The combined sciences of microbiology and geochemistry are called biogeochemistry. The Norman Landfill researchers identified zones in the leachate plume at Norman Landfill where different biogeochemical processes are occurring.

One method to identify different biogeochemical zones is to measure the concentration of certain chemicals and minerals, those that are involved in biogeochemical processes, in the ground water and in the aquifer. Electron acceptors are minerals or chemicals that can occur naturally in aquifer solids or ground water, such as iron oxides in the sediments or sulfate dissolved in ground water. These chemicals are called electron acceptors because microorganisms transfer electrons to them during respiration, which is part of the process the microorganisms use to obtain energy. During respiration, an electron is transferred from an electron donor, such as an organic contaminant compound, to an electron acceptor. This electron transfer occurs when microorganisms break down organic contaminant compounds. The availability of electron acceptors in an aquifer is therefore an important factor for evaluating the effectiveness and sustainability of natural attenuation in contaminated aquifers.

Some evidence of natural attenuation at Norman Landfill is shown in figure 2 (Cozzarelli and others, 2000), illustrated as

generalized hydrogeologic sections through the leachate plume in the aquifer. The three illustrations within figure 2 show chemical concentrations of important indicators of natural attenuation processes along the same vertical slice of the aquifer. These illustrations demonstrate that the leachate plume begins near







Vertical Datum is NAVD 1988
mM = millimoles per liter

Figure 2. Concentrations of electron acceptors and donors in the Norman Landfill leachate plume.

the surface (on the left side of the figure), where the solid waste is stored in the landfill. Ground water flows to the south toward the Canadian River. The leachate plume migrates toward the bottom of the aquifer as it flows toward the river.

Sulfate occurs naturally in ground water in the Canadian River alluvial aquifer. Sulfate is depleted in the center of the

leachate plume (fig. 2A) because the microorganisms use sulfate as an electron acceptor. When microorganisms transfer electrons to sulfate, sulfate changes chemically to form dissolved sulfide or hydrogen sulfide gas. The highest rates of sulfate reduction have been measured at the plume boundaries, such as where fresh water from rainfall infiltrating the aquifer mixes with the contaminant plume (Cozzarelli and others, 2000), and causes the sharp concentration gradients observed in figure 2A. The degradation of organic contaminants occurs most rapidly at the plume boundaries.

Iron occurs naturally as mineral coatings on sediments in the Canadian River alluvial aquifer. Dissolved iron concentrations increase in the leachate plume (fig. 2B) because microorganisms transfer electrons to the iron on the mineral coatings, which contain insoluble ferric iron, while degrading the organic contaminants. With the addition of an electron, the iron is reduced to ferrous iron, which dissolves in water. Although the solid-phase electron acceptor (ferric iron) cannot be measured in the ground water, the detection of the end product of the reaction (ferrous iron) in water provides evidence that iron reduction has occurred.

The concentration of non-volatile dissolved organic carbon (NVDOC) is shown in figure 2C. NVDOC is a measure of the organic contaminant compounds in the landfill. In the center of the plume, the concentration of NVDOC shows little change with distance, indicating that NVDOC is not efficiently degraded in this zone.

Researchers at Norman Landfill have learned that most of the natural attenuation occurs at the boundaries of the plume where electron acceptors are available. Sulfate concentrations are low in the center of the plume, as are measured rates of iron and sulfate reduction. The natural attenuation capacity of the aquifer, that is, its ability to attenuate contaminants, is depleted in the center of the leachate plume because microorganisms have used all the electron acceptors during migration of the leachate plume.

## VOLATILE ORGANIC COMPOUNDS
### Evidence for Natural Attenuation

USGS scientists have been investigating volatile organic compounds (VOCs) in the leachate at Norman Landfill (Eganhouse and others, 2001). VOCs are organic compounds that tend to vaporize at room temperature and pressure. Examples of VOCs include some of the compounds in gasoline, lubricants, paints, and solvents. Some VOCs are highly toxic or carcinogenic. VOCs end up in landfills in many ways, including the disposal of ordinary household items such as cleaners or marking pens. Although VOCs make up less than 0.1 percent of the mass of organic carbon in the leachate plume, they are useful indicators of natural attenuation.

At Norman Landfill, USGS scientists compared concentrations of two different alkylbenzene isomers, n-propylbenzene and i-propylbenzene, in landfill leachate. Isomers of alkylbenzene have the same number and type of atoms, but the molecules have slightly different chemical structures. These different isomers have similar physical properties, so they should be affected by volatilization, dilution, and sorption in a similar manner. The concentration of n-propylbenzene decreases much faster as leachate flows away from the landfill than does the concentration of i-propylbenzene (fig. 3). This decrease in concentration of n-propylbenzene is caused by biological degradation, indicating that biologically mediated natural attenuation is decreasing the concentrations of some contaminants at Norman Landfill. This technique of comparing alkylbenzene isomers as indicators of biological processes can be applied at sites with contaminants other than landfill leachate.





Figure 3. Distribution of the alkylbenzene isomers (a) n-propylbenzene and (b) i-propylbenzene in the leachate plume at Norman Landfill. Concentrations in micrograms per liter ($\mu$g/L) are proportional to bubble diameter. Maximum concentration: n-propylbenzene = 0.80 $\mu$g/L, i-propylbenzene = 1.24 $\mu$g/L (from Eganhouse and others, 2001).

## INVESTIGATING THE SUBSURFACE TO REVEAL THE RATE OF NATURAL ATTENUATION

Field experiments are being carried out at Norman Landfill to investigate how the rate of natural attenuation may vary with aquifer permeability (permeability is a measure of the ability of a material to transmit fluid). These experiments use push-pull or single-well injection-withdrawal tests (Istok and others, 1997). During the injection phase of the test, a solution consisting of ground water amended with tracers, electron donors, or electron acceptors is injected or "pushed" through a well into the aquifer. During the extraction phase, the test solution is pumped or "pulled" from the same well. Concentrations of tracers, reactants, and possible reaction products are measured as a function of time in order to construct breakthrough curves, measure reaction rates, and to compute mass balances for each solute.

These tests can be conducted anywhere in the aquifer, making it possible to investigate processes and rates in different geologic textures and geochemical environments.

Push-pull tests were conducted at Norman Landfill to measure biodegradation rates of simple organic acids in the leachate plume (Scholl and others, 2001). Wells were drilled into layers of three different types of sediments (medium sand, silt/clay lenses in sand, and poorly sorted gravel), each with a different permeability. Biodegradation rates of two simple organic acids, formate and lactate, were compared in the three different zones in the anoxic leachate plume at the site. These organic acids were used as microbial process indicators because they degrade at different rates depending on the dominant microbial processes. A conservative tracer (bromide) and the two organic acids were added to 50 or 100 liters of contaminated ground water pumped from each test well. The mixture was then re-injected and allowed to mix with the natural ground water. Daily samples were taken from the injection well until organic acids could no longer be detected. Although complete disappearance of the formate and lactate occurred within 7-9 days in all the wells, there were differences in degradation patterns. The results of the test show that the loss of lactate was due to natural attenuation and that there are differences in the rate of natural attenuation in areas of different permeability. These variable degradation rates may be related to microbial community structure, sediment chemistry, and water flow regime.

## IMPLICATIONS

Research at the Norman Landfill Environmental Research Site has shown that chemicals leaching from old unlined landfills are contaminating ground water, but that some of the contaminant concentrations are being reduced by natural attenuation. Modern landfills are designed to minimize contamination of ground water, but modern landfills eventually may leak contaminants into the environment. Research results from Norman Landfill will be useful to scientists and regulators trying to determine the effects of landfill leachate on the environment.

## REFERENCES

Cozzarelli, I. M., Suflita, J. M., Ulrich, G. A., Harris, S. H., Scholl, M. A., Schlottmann, J. L., and Christenson, Scott, 2000, Geochemical and microbiological methods for evaluating anaerobic processes in an aquifer contaminated by landfill leachate. Environmental Science and Technology, v. 34, p. 4025-4033.

Eganhouse, R.P., Cozzarelli, I.M., Scholl, M.A., and Matthews, L.L, 2001, Natural attenuation of volatile organic compounds (VOCs) in the leachate plume of a municipal landfill: Using alkylbenzenes as a process probe: Ground Water, v. 39, no. 2, p. 192-202.

Harris, S.H., Ulrich, G.A., and Suflita, J.M., 1999, Dominant terminal electron accepting processes occurring at a landfill leachate-impacted site as indicated by field and laboratory measures: in Morganwalp, D.W., and Buxton, H.T., eds., 1999, U.S. Geological Survey Toxic Substances Hydrology Program–Proceedings of the Technical Meeting, Charleston, South Carolina, March 8-12, 1999–Volume 3 – Subsurface Contamination from Point Sources: U.S. Geological Survey Water-Resources Investigations Report 99-4018C, pp. 541-548.

Istok, J.D., Humphrey, M.D., Schroth, M.H., Hyman, M.R., and O'Reilly, K.T., 1997, Single-well, "push-pull" test for in situ determination of microbial activities: Ground Water, v. 35, no. 4, p. 619-631.

Scholl, M.A., Cozzarelli, I.M., Christenson, S.C., Istok, J., Jaeschke, J., Ferree, D.M., and Senko, J., 2001, Measuring variability of in-situ biodegradation rates in a heterogeneous aquifer contaminated by landfill leachate: EOS, Transactions, American Geophysical Union, v. 82, no. 20, May 15, 2001, p. 146.

Suflita, J.M., Gerba, C.P., Ham, R.K., Palmisano, A.C., and Robinson, J.A., 1992, The world's largest landfill: Environmental Science and Technology, v. 26, no. 8, p. 1486-1495.

U.S. Environmental Protection Agency, 1988, Federal Register, v. 53, no. 168, August 30, 1988, p. 33345.

U.S. Environmental Protection Agency, 1999, Municipal solid waste in the United States: 1999 Facts and Figures – EPA530-R-01-014.

For information about the Norman Landfill site, contact:

Scott C. Christenson
U.S. Geological Survey
202 NW 66th Street (Building 7)
Oklahoma City, OK 73116
(405) 810-4409
Email: sc⋯⋯@usgs.gov

For information about USGS research at Norman Landfill, contact:

Dr. Isabelle Cozzarelli
U.S. Geological Survey
National Research Program (MS 431)
12201 Sunrise Valley Dr.Reston, VA 20192
Telephone: (703) 648-5899
Email: icozzare@usgs.gov

USGS Norman Landfill World Wide Web Sites:
Oklahoma District: http://ok.water.usgs.gov/norlan/
National Research Program: http://water.usgs.gov/nrp/organic/norman.htm

## EXHIBIT 9



June 14, 2005

Mr. David Craddick, General Manager
Guam Waterworks Authority
P.O. Box 3010
Hagatna, Guam 96932

Subject: Draft Supplemental Environmental Impact Statement (SEIS) for the Siting of a Municipal Solid Waste Landfill Facility, Guam.

Dear Mr. Craddick:

Brown and Caldwell, as per the amendment to the GWA Master Plan contract, has reviewed the Draft SEIS for the Siting of a Municipal Solid Waste Landfill Facility in the Layon area of Dandan, Inarajan, Guam and related pertinent documents. Brown and Caldwell provides the following comments with respect to potential impacts to groundwater and surface water resources:

2.2.1    Landfill Design and Operating Features

The SEIS essentially ignores the issue of the high water table and does not provide an explanation or description of how the excavations will be maintained dry during installation of the proposed liner system. According to the discussion in 4.2.1.2 Hydrogeology and Groundwater (see below), the base of some cells will be at or below the water table rather than above it as shown in Figure 2-7. In addition, even if dewatering and/or diversion systems can be devised for during construction of each cell, there should be a discussion on how the liner system will behave when submitted to the groundwater pressures after construction, not only at the base of the cells, but also along the side slopes. In general, there is a lack of construction details in the SEIS. At a minimum, the slope ratios for the excavation (typically 2:1) and final cover system (3:1) should be provided.

The proposed minimum slope of the bottom of each cell (0.5%) may be too flat to convey the leachate generated to the single collection sump for each cell and prevent the ponding of leachate on the liner. Ponding would likely lead to migration of leachate to groundwater.

Groundwater beneath new lined landfills becomes impacted mostly by migration of VOCs within landfill gas (LFG). The vapor permeability of liner systems is greater that the liquid permeability, especially when the landfill gas is

not properly collected and a significant positive pressure (i.e. driving force) is produced within the landfill. Section 4.2.1.4 of the SEIS indicated that only 80% of the LFG generated would be collected by an active extraction system. Therefore, 20% of the LFG generated would be available for migration and release into the environment, including downward to groundwater.

3.2.1.2 Hydrogeology and Groundwater – Aquifers (in Chapter 3.0 Affected Environment)

The Draft SEIS characterizes the volcanic geological formation at Layon as not supporting aquifers from which groundwater can easily be extracted. However, this opinion appears to be based on a single U.S. Geological Survey well in 1971, the construction details of which are not provided. Furthermore, the SEIS acknowledges that faults and fissures may harbor a potentially exploitable aquifer (p. 3-7), and apparently no groundwater recovery tests were performed in the deep borings at Layon.

Without a thorough groundwater resource evaluation, it is not possible to rule out sufficient yields from deep wells for municipal supply or other development. In fact, wells have provided local water sources in the past in southern Guam (i.e. Malojloj), and others (Asalonso, GORCO and Talofofo) may have use in the future, according to the pre-draft Guam Water Budget Report (Mink and Yuen, Inc., April 2005) prepared for the GWA Water Resources Master Plan (Brown and Caldwell, in preparation). Although GWA's Fena surface water reservoir and Ugum diversion currently supply southern Guam, future needs may require groundwater development. Since groundwater beneath Layon falls within the G-1 Resource Zone category, it must be protected to drinking water quality standards.

Groundwater

Water table depths and elevations at Layon are provided in Table 3-1, but dates of the measurements are not provided in the SEIS or in the Final Site Selection Report (SSR)/EIS. Unless the dates of measurement are close to simultaneous or other data to document consistent water table elevations are available, the groundwater contours in Figure 3-2 are unreliable.

Without separate measurements of distinct seasonal groundwater elevations, seasonal flow northward beneath the drainage divide into the Ugum River drainage cannot be ruled out. Although the Final Site Selection Report/EIS (GDPW, 2005) states that "based on the groundwater levels recorded at the site, a groundwater hydraulic divide exists between the Ugum River and the landfill footprint that will isolate groundwater flows from the landfill to the

Ugum River", no such hydraulic groundwater divide is shown or apparent
from the groundwater contours shown on Figure 3-2 of the SEIS. In fact, the
contours indicate that groundwater from beneath the North site would flow
northeast toward the Ugum River drainage.

Proximity to Drinking Water

The SEIS acknowledges that the Inarajan River has been identified as a
potential site for a surface water dam and/or reservoir. SEIS Figure 3-1 also
shows proposed reservoir and/or diversion sites on the Tinago River that have
been previously studied (Barrett, 1994) and are included in the pre-draft Guam
Water Budget Report (Mink and Yuen, Inc., 2005). Both of these proposed
sites would be downstream of the proposed landfill site. In spite of the SEIS
claim that "no plans are currently in place to develop groundwater or surface
water supplies in the Layon area" (p. 3-9), GWA considers both of the above
proposed reservoir and/or diversion sites as potentially viable and necessary
for the future water supply needs. In fact, the pre-draft Guam Water Budget
Report (Mink and Yuen, Inc., 2005) recommends that consideration be given
to investigating the feasibility of diversions at other rivers in addition to the
Ugum, and that opportunities to utilize the existing wells be reexamined (p.4).

The SEIS arguments against groundwater being a potential source of drinking
water are equally unconvincing. No citations or evidence is provided that the
limestone aquifer tapped by the Malojloj wells is either limited in extent or that
groundwater within it is not continuous with that in the volcanic formations in
the Layon area. In addition, until a groundwater exploration program
specifically designed to locate (using geologic mapping and geophysical tools
and drill test faults and fractures in the Umatac Formation) is conducted,
previous well yields do not rule out development of an economic groundwater
resource in either the limestone or volcanic aquifers of Southern Guam. The
GORCO well produced over 100 gallons per minute (gpm; Mink and Yuen,
Inc., 2005), which is evidence that well yields comparable to northern Guam
are possible.

3.2.2.1 Hydrology

The SEIS discounts the development of surface water supplies on the Inarajan
and/or Tinago Rivers, and rules out groundwater flow from the proposed
landfill site to the Ugum River. As detailed above, these statements are not
defensible based on the data presented in the SEIS and SSR/FIS and also in
this letter.

3.2.2.2 Water Quality

The SEIS correctly states that the Inarajan River could potentially be developed as a water source (p. 3-17) (in contradiction of statements to the contrary in previous SEIS sections).

4.2.1.2 Hydrogeology and Groundwater (in Chapter 4.0 Environmental Consequences)

The SEIS correctly notes that the Guam EPA's preferred hydrogeologic conditions of a deep water table and thick, low permeability deposits with a confining layer over any water bearing zone are not present at the site, and that in fact groundwater at the Layon footprint is at ground surface in some locations. Since the landfill base is to be located on average of 15 feet below grade, it is unclear how the landfill base could be maintained above the water table. Further, since seasonal fluctuations in groundwater levels have not been established, the basis for designing landfill cells to maintain separation between the base of the landfill and the water table at each cell is lacking. Since groundwater could flow north to the Ugum River, this issue should be of concern to the GWA.

4.2.2.2 Water Quality

The SEIS correctly acknowledges that minor long-term adverse impacts to water quality would occur throughout the life of the project from both erosion and leachate discharge. These impacts could affect GWA's ability to develop either surface water or groundwater resources downgradient of the site.

To summarize, the SEIS generally provides an incomplete and inadequate hydrogeological characterization of the proposed landfill site and its potential impacts on both groundwater and surface water resources.

Thank you for the opportunity to review and comment on the Draft SEIS. Should you have any questions, please contact me at 925-210-2408.

Very truly yours,

BROWN AND CALDWELL

Martin G. Steinpress, P.G., CHG.
Chief Hydrogeologist

cc:    Ray Matasci

## EXHIBIT 9



June 14, 2005

Mr. David Craddick, General Manager
Guam Waterworks Authority
P.O. Box 3010
Hagatna, Guam 96932

Subject: Draft Supplemental Environmental Impact Statement (SEIS) for the Siting
of a Municipal Solid Waste Landfill Facility, Guam.

Dear Mr. Craddick:

Brown and Caldwell, as per the amendment to the GWA Master Plan contract, has
reviewed the Draft SEIS for the Siting of a Municipal Solid Waste Landfill Facility in
the Layon area of Dandan, Inarajan, Guam and related pertinent documents. Brown
and Caldwell provides the following comments with respect to potential impacts to
groundwater and surface water resources:

2.2.1    Landfill Design and Operating Features

The SEIS essentially ignores the issue of the high water table and does not
provide an explanation or description of how the excavations will be
maintained dry during installation of the proposed liner system. According to
the discussion in 4.2.1.2 Hydrogeology and Groundwater (see below), the base
of some cells will be at or below the water table rather than above it as shown
in Figure 2-7. In addition, even if dewatering and/or diversion systems can be
devised for during construction of each cell, there should be a discussion on
how the liner system will behave when submitted to the groundwater pressures
after construction, not only at the base of the cells, but also along the side
slopes. In general, there is a lack of construction details in the SEIS. At a
minimum, the slope ratios for the excavation (typically 2:1) and final cover
system (3:1) should be provided.

The proposed minimum slope of the bottom of each cell (0.5%) may be too
flat to convey the leachate generated to the single collection sump for each cell
and prevent the ponding of leachate on the liner. Ponding would likely lead to
migration of leachate to groundwater.

Groundwater beneath new lined landfills becomes impacted mostly by
migration of VOCs within landfill gas (LFG). The vapor permeability of liner
systems is greater that the liquid permeability, especially when the landfill gas is

not properly collected and a significant positive pressure (i.e. driving force) is produced within the landfill. Section 4.2.1.4 of the SEIS indicated that only 80% of the LFG generated would be collected by an active extraction system. Therefore, 20% of the LFG generated would be available for migration and release into the environment, including downward to groundwater.

3.2.1.2 Hydrogeology and Groundwater – Aquifers (in Chapter 3.0 Affected Environment)

The Draft SEIS characterizes the volcanic geological formation at Layon as not supporting aquifers from which groundwater can easily be extracted. However, this opinion appears to be based on a single U.S. Geological Survey well in 1971, the construction details of which are not provided. Furthermore, the SEIS acknowledges that faults and fissures may harbor a potentially exploitable aquifer (p. 3-7), and apparently no groundwater recovery tests were performed in the deep borings at Layon.

Without a thorough groundwater resource evaluation, it is not possible to rule out sufficient yields from deep wells for municipal supply or other development. In fact, wells have provided local water sources in the past in southern Guam (i.e. Maloljoj), and others (Asalonso, GORCO and Talofofo) may have use in the future, according to the pre-draft Guam Water Budget Report (Mink and Yuen, Inc., April 2005) prepared for the GWA Water Resources Master Plan (Brown and Caldwell, in preparation). Although GWA's Fena surface water reservoir and Ugum diversion currently supply southern Guam, future needs may require groundwater development. Since groundwater beneath Layon falls within the G-1 Resource Zone category, it must be protected to drinking water quality standards.

Groundwater

Water table depths and elevations at Layon are provided in Table 3-1, but dates of the measurements are not provided in the SEIS or in the Final Site Selection Report (SSR)/EIS. Unless the dates of measurement are close to simultaneous or other data to document consistent water table elevations are available, the groundwater contours in Figure 3-2 are unreliable.

Without separate measurements of distinct seasonal groundwater elevations, seasonal flow northward beneath the drainage divide into the Ugum River drainage cannot be ruled out. Although the Final Site Selection Report/EIS (GDPW, 2005) states that "based on the groundwater levels recorded at the site, a groundwater hydraulic divide exists between the Ugum River and the landfill footprint that will isolate groundwater flows from the landfill to the

Ugum River", no such hydraulic groundwater divide is shown or apparent from the groundwater contours shown on Figure 3-2 of the SEIS. In fact, the contours indicate that groundwater from beneath the North site would flow northeast toward the Ugum River drainage.

Proximity to Drinking Water

The SEIS acknowledges that the Inarajan River has been identified as a potential site for a surface water dam and/or reservoir. SEIS Figure 3-1 also shows proposed reservoir and/or diversion sites on the Tinago River that have been previously studied (Barrett, 1994) and are included in the pre-draft Guam Water Budget Report (Mink and Yuen, Inc., 2005). Both of these proposed sites would be downstream of the proposed landfill site. In spite of the SEIS claim that "no plans are currently in place to develop groundwater or surface water supplies in the Layon area" (p. 3-9), GWA considers both of the above proposed reservoir and/or diversion sites as potentially viable and necessary for the future water supply needs. In fact, the pre-draft Guam Water Budget Report (Mink and Yuen, Inc., 2005) recommends that consideration be given to investigating the feasibility of diversions at other rivers in addition to the Ugum, and that opportunities to utilize the existing wells be reexamined (p.4).

The SEIS arguments against groundwater being a potential source of drinking water are equally unconvincing. No citations or evidence is provided that the limestone aquifer tapped by the Malojloj wells is either limited in extent or that groundwater within it is not continuous with that in the volcanic formations in the Layon area. In addition, until a groundwater exploration program specifically designed to locate (using geologic mapping and geophysical tools, and drill test faults and fractures in the Umatac Formation is conducted, previous well yields do not rule out development of an economic groundwater resource in either the limestone or volcanic aquifers of Southern Guam. The GORCO well produced over 100 gallons per minute (gpm) (Mink and Yuen, Inc., 2005), which is evidence that well yields comparable to northern Guam are possible.

3.2.2.1 Hydrology

The SEIS discounts the development of surface water supplies on the Inarajan and/or Tinago Rivers, and rules out groundwater flow from the proposed landfill site to the Ugum River. As detailed above, these statements are not defensible based on the data presented in the SEIS and SSR/EIS and above in this letter.

3.2.2.2 Water Quality

The SEIS correctly states that the Inarajan River could potentially be developed as a water source (p. 3-17) (in contradiction of statements to the contrary in previous SEIS sections).

4.2.1.2 Hydrogeology and Groundwater (in Chapter 4.0 Environmental Consequences)

The SEIS correctly notes that the Guam EPA's preferred hydrogeologic conditions of a deep water table and thick, low permeability deposits with a confining layer over any water bearing zone are not present at the site, and that in fact groundwater at the Layon footprint is at ground surface in some locations. Since the landfill base is to be located on average of 15 feet below grade, it is unclear how the landfill base could be maintained above the water table. Further, since seasonal fluctuations in groundwater levels have not been established, the basis for designing landfill cells to maintain separation between the base of the landfill and the water table at each cell is lacking. Since groundwater could flow north to the Ugum River, this issue should be of concern to the GWA.

4.2.2.2 Water Quality

The SEIS correctly acknowledges that minor long-term adverse impacts to water quality would occur throughout the life of the project from both erosion and leachate discharge. These impacts could affect GWA's ability to develop either surface water or groundwater resources downgradient of the site.

To summarize, the SEIS generally provides an incomplete and inadequate hydrogeological characterization of the proposed landfill site and its potential impacts on both groundwater and surface water resources.

Thank you for the opportunity to review and comment on the Draft SEIS. Should you have any questions, please contact me at 925-210-2408.

Very truly yours,

BROWN AND CALDWELL

Martin G. Steinpress, P.G., CHG.
Chief Hydrogeologist

cc:    Ray Matasci

EXHIBIT 10




# What happened to using common sense with Dandan?

IT SEEMS that the hardest problem this government has ever faced is figuring out how to take care of our trash. We don't seem to have any problem making trash. In Guam, we manage to create about 3 pounds every day for every person. Using the 2007 CIA Factbook population estimate of 173,456 people now living in Guam, we throw away more than 260 tons of refuse every single day of the year, and that's a conservative estimate.

With the expanding military presence, including support staff and dependents, we'll have 200,000 people living in Guam in just a few years, perhaps as soon as 2012, and nothing can keep our trash problem from growing.

We should have gotten really serious about our trash problem years ago, but we haven't been able to get past the posturing and politics. Even common sense can't seem to stand up to those that are so convinced they are right that they will risk the health and welfare of the people of Guam to prove their point.

Now we are spending a lot of money on road construction for a landfill that should never be built. We are expending public funds on privately owned property. If we don't own the property on which the construction is taking place, and if we haven't even reached agreement with all of the many landowners to acquire their property, common sense tells us that we should not have even started. So why are we moving forward?

Common sense should tell us that building a landfill over a future source of fresh water is just crazy, but many people are not using their common sense.

That is the crux of our problem. We were told and we believe that science should make the decision. We put aside our common sense in favor of the scientific view. But how can science make

the right decision if it doesn't have all the information? How can science be right if it is prevented from evaluating every possible option?

When Dandan was selected, scientists and engineers did a fairly good job narrowing the list of possible sites. But experts didn't have all the information they needed. When they picked Dandan, they couldn't consider sites on federal property. Who knows what the inclusion of those sites could have meant to the selection process? When they said Dandan was the best, they didn't know that the Guam Waterworks Authority was going to decide that the Inarajan Watershed would be needed for future freshwater development.

Guam's important water resources were automatically eliminated from the list of potential sites, including the northern aquifer and the area surrounding the Ugum River, the two major freshwater sources located on non-military land. If the Inarajan Watershed had already been listed for future development, I am certain it would have been crossed off the list of potential sites.

And who is to say that the federal government, which is so anxious to get us to close Ordot, would not have traded a piece of their property to speed up the process? Their trash will also be going into our landfill. I believe that the Guam Environmental Protection Agency did Guam a disservice by eliminating possible sites located on federal property. We should have looked at EVERY corner of our island to find the truly best place for EVERYONE'S trash.

We need to get serious about trash. We need to investigate the construction at Dandan. And we need to take Dandan off the list and bring common sense back into the site selection process.

*Marianas Variety*




# It's not hard to do the right thing

ABOUT 3 1/2 years ago, Senator Tina Muña Barnes began her fight against the proposed Dandan landfill. Guam's people were told to "let the experts do their job" and that "science would decide" where the landfill should be located. Many people were deceived by the site selection process, myself included.

The "experts" eliminated many potential sites:

• Land already in use;

• Land reserved for other purposes;

• Possible sites on federal property;

• The two sites identified in Public Law 23-95, which science had previously identified as the best landfill sites;

• Since leak-proof landfills don't exist, areas near water resources were excluded, including locations near Ugum River, Fena Lake, and northern Guam: partially because of development, primarily to protect the northern aquifer.

The "experts" excluded Guam's water resources to protect them from poisoning because landfill liners ALWAYS leak. Although the Inarajan watershed can produce seven million gallons of water every day, it was not eliminated, suggesting that something was wrong with the process.

Dandan was probably the target from the beginning, even though it sits over a huge source of fresh water. When the final sites were chosen, two of three were immediately rejected because of federal regulations. "Experts" should have predicted that would happen. No other options were offered, not even sites already listed in Public Law 23-95. All of the combined knowledge, science, and great expertise failed the people of Guam. It seemed that Dandan was where they wanted the landfill to go, and that's the site they chose.

People began suspecting that the final selection had been made before the "experts" even began. My colleague from Mangilao realized that the right choice was not made. At the end of 2004, Sen. Muña Barnes' Bill 240 passed with

12 votes. It required that P.L. 23-95 be followed, and the governor vetoed it. Meanwhile, more people began to realize that a Dandan landfill would be a disaster.

Over the past two years, questions and actions have accumulated that make the Dandan selection seem very wrong:

• Not all Dandan landowners have given permission to Public Works to enter their property; DPW may be illegally building a road.

• Democratic senators, myself included, have asked the attorney general to stop the project.

• Millions of dollars may have been expended on the project illegally, without adequate spending authority.

• The Consent Decree is not an excuse to break the law.

• What is the landfill's footprint? It has changed many times because everywhere DPW digs, they find water.

• The landfill won't be a big hole on the ground. It will be a seven-story high pile of trash because groundwater is just a few feet below the site's surface and the trash can't be buried.

• Documents indicate that there may be a link between the Inarajan and Ugum watersheds, meaning the landfill could poison TWO water resources at one time.

• The same documents indicate that Dandan is a bad choice for a landfill.

• Did the "experts" ask the feds if they would exchange, give or sell a landfill site to Gov-Guam? ALL civilian and military trash will go into our landfill, and the best site might be on federal property.

I've co-sponsored Sen. Muña Barnes' Bill 35 in the current Legislature that would require that P.L. 23-95 be followed. DPW failed to show up at the public hearing. It seems obvious what is going on.

It's easy to do the right thing and say "NO" to Dandan before it's too late to stop it. Let's pass Bill 35 and protect our water.

*Marianas Variety*
*June 14, 2007*



# We're making progress on solid waste

THE seemingly insurmountable problems related to solid waste collection and disposal in Guam may not be so impossible to solve after all, The Law Review Commission created by Executive Order on July 23, 2007, in response to the U.S. Magistrate Judge's recommendations, has been moving forward to help solve our solid waste problems.

The Magistrate Judge asked that the Commission be "tasked with developing a general legislative policy . with regard to the closure of the Ordot Dump and the construction of a new landfill." The Magistrate Judge also recommended that GovGuam draft legislation to create a public corporation and give it specific powers and authority.

While it may appear to be slow and time-consuming, a great deal of progress has been made in the Commission's three-plus months of existence. The Governor placed Sen. Jim Espaldon in the chairman's hot seat, with Public Works, Guam EPA, the Attorney General and the Governor's Office as members. Sen. Rory Respicio also sits on the Commission as the minority representative. I've been a regular attendee at the LRC meetings, along with alternate minority member Sen. David Shimizu as well as Sen. Tina Muña Barnes, because I have a great interest in our island's solid waste problems.

In the weeks since its creation, the LRC has tackled a number of issues and spent quite a bit of time developing the draft legislation, thanks to the invaluable assistance of Sen. Respicio. The draft bill has been transmitted to the Governor and presented to the U.S. District Court of Guam. The transmittal of the draft legislation meets a deadline set in the Executive Order, and proves to the court and federal officials that we are making progress.

The LRC draft legislation creates the Guam Recycling And Solid Waste Authority as a pub-

lic corporation and autonomous instrumentality of the Government of Guam. If enacted into law, RASA will inherit all Solid Waste Management Division personnel as well as all of their duties and responsibilities —but luckily not all of their problems. If RASA becomes law, they will have the authority to borrow against revenues from tipping and recycling fees to pay for the closure of the Ordot Dump, the opening of a new landfill, and the proper collection, recycling and disposal of solid waste.

Although the draft bill has been sent to the Governor, it was noted in the transmittal letter that the LRC would continue to revise the bill and include other concerns as they arose in deliberations.

At yesterday's meeting, the LRC concentrated on personnel and procurement issues, with Attorney Robert Kono from the General Services Administration and Civil Service Commission Director Vern Perez in attendance. Regarding personnel, the LRC members want to make sure that the current classified employees of DPW's solid waste division are not displaced by this conversion from line to autonomous agency.

Regarding procurement, the uniqueness of Guam's ongoing solid waste problems has caused some LRC members to wonder if temporary changes in the way that procurement statutes will be applied to RASA will be necessary to allow for greater flexibility.

The LRC still has a lot to do, but I think the members share my optimism that the process is working well. The Federal position against immediate receivership makes me believe that we are making progress. It is unfortunate that politics has always gotten in the way of progress in the past when it came to solid waste. In the LRC, politics have pretty much been set aside, and the welfare of the people of Guam is right where it should be, at the forefront.

*Marianas Variety*
*Nov. 21 2007*



# Common sense would help avoid unnecessary hurdles

AS far back as 1996, eleven long years ago, GovGuam had a plan in place to close the Ordot Dump, and had already identified sites for a new landfill: either Mala'a in Agat or Guatali in Piti. Since 1996, various individuals, including a few senators, have been putting hurdles in the path of taking care of our trash.

They turned the way we should dispose of our solid waste into a divisive factor, and this issue has caused tremendous political, social and legal problems in our community.

Guam's lack of progress on this issue has led to a federal consent decree requiring our action. Based on a Federal judge's suggestion, a Solid Waste Law Review Commission was formed and is meeting regularly. It submitted draft legislation to create an autonomous entity to oversee recycling, solid waste collection and disposal for Guam.

A court filing from the U.S. Attorney's office indicates that they aren't pleased with LRC's progress to find common ground on one of Guam's most contentious issues. If you missed it, Assistant U.S. Attorney Mikel Schwab was quoted in Monday's Variety: "Instead of seeking to expedite GovGuam's compliance, the Guam Legislature chose to place additional hurdles in DPW's path." Well, Attorney Schwab is partially right. But his statement indicates that the feds may not have a full historical perspective of why and how we got here.

Attorney Schwab should know that after Guam EPA ignored a site already listed in public law and ruled out northern Guam because a landfill could endanger the aquifer, they chose instead a site in Dandan that Waterworks has identified for future water development. DPW has already spent millions on that property, and it will cost several times more to develop this site as a landfill than the Guatali site already listed in law. Access to the remote Dandan site is on narrow two-lane roads, while the heavy trash trucks and equipment needed to operate a landfill and recycling center require wide roadways. In addition, the U.S. Attorney said a hydrogeologic study is not necessary prior to condemnation of land, even though the study may find the site unsuitable. Nothing in this paragraph passes the common sense test.

No appropriations have been made, yet huge sums have been spent, perhaps unlawfully. Is there any wonder the Legislature has blocked spending until a full accounting is made? I would think that full accountability is exactly what the U.S. Attorney would require.

These opponents to progress haven't seemed concerned that a Pyrrhic victory for them is not a victory for the people of Guam. No matter how well intentioned these people may be, they have increased our cost of living, put our environment at risk, and led us down a dangerous path.

Public laws were even passed to halt progress and outlaw the use of what has become commonplace solid waste technology in wide

COMMON continued on page 15

## Common...
Continued from page 14

use in many countries around the world. Hopefully we are past that stage in our political development. If the feds take over the process to close Ordot and build a new landfill, an enormous (and unnecessary) expense will be forced upon our people.

I believe we have reached a crossroads and if we are not careful, we will lose control of this process. After a series of rulings by a number of attorneys general, and after a number of losses in court, it is time for the naysayers to put aside their political interests and put the interests of our people first.

*Marianas Variety*

EXHIBIT 7



## SENATOR TINA ROSE MUÑA BARNES

I MINA' BENTE NUEBI NA LIHESLATURAN GUÅHAN • TWENTY NINTH GUAM LEGISLATURE
LOCATION: Suite 205 Ada Plaza Center, 173 Aspinall Avenue, Hagåtña, Guam 96910 • MAIL: 155 Hesler Place, Hagåtña, Guam 96910
(671) 475-8462 • Fax: (671) 472-3547

November 23, 2007

Mikel Schwab
Assistant U.S. Attorney
Sirena Plaza
108 Hernan Cortez Ave. Suite 500
Hagåtña, Guam 96910

Dear Attorney Schwab,

*Hafa Adai.* I am writing to take issue with and challenge several comments widely published in Guam's media recently relative to our island's solid waste problems. A number of stories in both island newspapers and in broadcasts on television and radio over the past several weeks have focused on our seeming inability to properly deal with our trash. While I am pleased that this important issue is finally getting the kind of attention it needs, I do want to make sure that my position on the issue is clear.

In a story that appeared in the Marianas Variety earlier this month headlined, "Feds: Guam Legislature hinders Consent Decree compliance," you were quoted as saying: *"Instead of seeking to expedite GovGuam's compliance, the Guam Legislature chose to place additional hurdles in DPW's path."* My position on the process to handle our solid waste may differ from some that have been reported in the media, but having a differing opinion does not make me wrong.

Mr. Schwab, you are absolutely correct that for more than 10 years now, certain individuals have been placing hurdles in the path of progress on our solid waste problems. This has been done for purely political reasons. However, the provision contained in P.L. 29-19 to stop the expenditure of funds on the *Layon/Dandan* landfill site until the property is acquired is absolutely NOT one of those politically motivated hurdles. The provision was passed by the Legislature and signed into law by Governor Camacho to ensure fiscal responsibility. It was neither to hinder the opening of a new landfill nor to interfere with the closure of *Ordot* Dump. In spite of other political rhetoric, when it was time to vote on the bill, Speaker Calvo agreed with ensuring fiscal responsibility and was one of the 10 Senators who voted for the bill. The voting sheet for P.L. 29-19 can be found on the Guam Legislature's web site, www.guamlegislature.com.

Like you, I have also been very critical of past Legislative efforts to prevent the resolution of Guam's solid waste problems. I wholeheartedly reject any assertion that my efforts are meant to politically derail the closure of *Ordot* Dump. I would also like to go on record as stating unequivocally that I have never supported either the possible contamination of Guam's future water resources, or the irresponsible and possibly illegal expenditure of taxpayer funds, which are the reasons for the provision in P.L. 29-19. I will discuss each point below.



**Possible illegal expenditure of taxpayer funds.** The contract for the construction plans for the *Layon/Dandan* landfill was initiated in 2005. In subsequent change orders to this contract, the scope of work was expanded to include an environmental impact study for the *Layon/Dandan* site, the construction of a temporary road, and a hydrogeologic study, among other items. All of this was initiated without clear title to the property and contrary to established GovGuam procurement processes, perhaps done in a panicked response to Consent Decree requirements.

With regard to the funding requirements for *Layon/Dandan*, the Department of Public Works (DPW) has not yet provided *I Liheslatura* with the amount necessary to finance the closure of the *Ordot* Dump and open a new landfill. The Legislature is extremely concerned because we have heard estimates of amounts as high as $10 Million that have already been spent on work at the *Layon/Dandan* site without any of the following:

    a. Legislative appropriation, or
    b. A statute identifying the site for the new landfill, or
    c. GovGuam possessing clear title to the property containing the *Layon/Dandan* site.

For that reason *I Liheslatura* included in Public Law 29-19 a requirement that GovGuam "…shall not expend funds on site-specific preparation, design work, mitigation, infrastructure upgrade or installation, or construction of a new landfill, unless the Government of Guam has acquired and recorded fee simple ownership of the property in question." This language can be found in item (b) of Section 98, Chapter VI.

The intent of this provision of law is solely to require accountability by our government on millions of dollars of expenditures of government funds that are currently taking place on private property, and most likely inflating its value, before GovGuam has made a realistic attempt to acquire said property. Further, items (c) and (d) of the same section specifically mandate the following:

"(c) Landfill Financing Plan. Within 60 days of the effective date of this Act, the Department of Public Works shall submit to *I Maga'lahen Guåhan* and *I Liheslaturan Guåhan* a financing plan enumerating in detail all costs associated with the construction of the new landfill, including but not limited to:

    a. Property acquisition,
    b. Environmental mitigation within the landfill footprint, buffer zone, and other impacted areas including but not limited to water sources, rivers, streams, tributaries, wetlands, surface water, ground water, drainage, and runoff erosion;
    c. Infrastructure needs, including but not limited to power; water; wastewater, and roadways including climbing lanes for trucks; mitigation of blind-curves and other hazards; shoulder widening; roadway widening; addition of new traffic lanes; traffic management; drainage and storm drainage improvements; access and utility roads; upgrading road markings and signage, and upgrading bridges;
    d. Landfill construction, and
    e. Annual landfill operations and maintenance costs."

"(d) The Director of Public Works, the Administrator of the Guam Environmental Protection Agency, and any other head of an executive branch or agency that has expended funds on a new landfill shall, within thirty (30) days of passage of this Act, submit a report regarding the purpose, amount and source of that expenditure to the Speaker of *I Liheslaturan Guåhan*."



Strict time limits were placed on submittal of the financing plan and reporting on expenditures so as to delay the process at little as possible. Please note that while DPW has presented cost analyses for the closure of *Ordot* Dump and the opening of a new landfill at the *Layon/Dandan* site, these cost-estimates have fluctuated significantly. I recall that during the 27th Guam Legislature, these costs were pegged at $80 Million. Now such estimates hover at around $229 Million. We must be certain of this amount given the challenging economic conditions currently being experienced in Guam.

**Possible contamination of Guam's future water resources.** Understandably, my concerns regarding the location of the new landfill are quite different than yours. I sincerely believe that the opening of a new landfill at *Layon/Dandan* does not serve the best interests of the people of Guam for a number of reasons:

a. The *Layon/Dandan* site is located above the *Inarajan* Watershed, a source of water identified by Guam Waterworks Authority (GWA) for future development. (I will discuss this point in greater detail below.) All potential landfill sites in northern Guam were automatically excluded from consideration to protect water resources, yet that same consideration was not extended to the *Layon/Dandan* site;

b. The natural environment of our island and the pristine nature of the proposed site was not taken into consideration;

c. Solid waste transportation and operational costs due to site location were not considered;

d. Volume reduction of solid waste based on existing and available technologies under review was not considered;

e. Cost or devaluation to Tourism, Guam's most important industry, as a result of road expansion, the introduction of undesirable commercial activity, higher traffic, and related factors identified by the Guam Visitors Bureau, were not considered;

f. No quantification has been made of the tremendous costs that our people would have to bear to construct not just a landfill that will essentially be floating atop a huge water resource in *Layon/Dandan*, but also to acquire the thousands of acres of property needed to widen many miles of narrow, two lane highways, replace inadequate bridges and provide the additional infrastructure required to run a modern solid waste operation in rural southern Guam.

I recognize that the U.S. Attorney and the District Court are charged with enforcing the Consent Decree, and I am aware that while you may acknowledge my concerns, they count for very little in the overall scheme of things. This does not mean that my concerns do not exist, or that they are not important to the welfare and lives of the people who live in Guam. The law is supposed to protect people, but in this case, it can harm them if there is a flaw in its foundation.

For your review and information, I am enclosing a copy of a letter from environmental engineers and consultants Brown & Caldwell (B&C) to then-General Manager David Craddick of GWA, dated June 14, 2005, in which B&C Chief Hydrogeologist Martin G. Steinpress makes the following points:

a. "Without a thorough groundwater resource evaluation, it is not possible to rule out sufficient yields from deep wells for municipal supply or other development. In fact, wells have provided local water sources in the past in southern Guam (i.e. *Malojloj*), and others (*Asalonso*, GORCO and *Talofofo*) may have use in the future…"


b. "Although GWA's *Fena* surface water reservoir and *Ugum* diversion currently supply southern Guam, future needs may require groundwater development. Since groundwater beneath *Layon* falls within the G-1 Resource Zone category, it must be protected to drinking water quality standards."

c. "The SEIS acknowledges that the *Inarajan* River has been identified as a potential site for a surface water dam and/or reservoir. SEIS Figure 3-1 also shows proposed reservoir and/or diversion sites on the *Tinago* River ... both of these proposed sites would be downstream of the proposed landfill site."

d. "In spite of the SEIS claim that "no plans are currently in place to develop groundwater or surface water supplies in the *Layon* Area ... GWA considers (the *Inarajan* and *Tinago* Rivers) as potentially viable and necessary for the future water supply needs. In fact, the pre-draft Guam Water Budget Report ... recommends that consideration be given to investigating the feasibility of diversions at other rivers in addition to the *Ugum*..."

e. "No citations or evidence is provided that the limestone aquifer tapped by the *Malojloj* wells is either limited in extent or that groundwater within it is not continuous with that in the volcanic formations in the *Layon* area."

f. "...previous well yields do not rule out development of an economic groundwater resource in either the limestone or volcanic aquifers of Southern Guam ... well yields comparable to northern Guam are possible."

I find fault in the site selection process undertaken by the Government of Guam and approved by the Consent Decree because it did not adequately take into consideration the intention of GWA to develop the *Inarajan* Watershed resources, or the key socio-economic factors that will dramatically affect the people of Guam. Although the government officials involved in the site-selection process erred in their work, I do not believe that the people of Guam, now or in the future, should be made to pay for this blunder. I regret that the Solid Waste Law Review Commission (LRC) was not impaneled earlier by Governor Felix P. Camacho to conduct and oversee this process.

An additional impediment to properly dealing with our solid waste problem is the long-standing refusal of Guam's military commands to join with the civilian community in a container recycling (bottle bill) program. In 10 states, including Hawaii and California, the military is a full participant and those deposit programs prevent up to 80% or more of recyclable containers from entering waste streams. It seems rather disingenuous of the Federal government to criticize GovGuam for its solid waste problems, when the military's lack of cooperation prevents an important recycling effort from going forward. The Guam Chamber of Commerce has estimated that as much as 40% of all beverages purchased in commissaries and exchanges are used and discarded off-base. Local beverage distributors oppose any kind of "bottle bill" until and unless the military is a full participant.

I also believe that the *Guatali* and *Mala'a* sites were incorrectly excluded from the site selection process. A case filed in the Supreme Court of Guam relative to Public Law 23-95 is still pending, and the appeal currently being considered includes the submittal of facts and information contrary to those submitted to the Superior Court which were cited in the decision and order made by Judge Katherine Maraman.

The LRC has been diligently working on a final solution to our solid waste dilemma. We have already addressed many issues including the creation of the Recycling and Solid Waste


Authority (RASA) as an autonomous agency able to secure funds on the bond market. We have also just received a report analyzing the waste-to-energy contract and have received recommendations for minor changes that have already been accepted by the contractor. This analysis by Shaw Stone & Webster Management Consultants refutes the unsubstantiated claims by political opponents to progress that certain "sweetheart deals" were contained in the waste-to-energy contract. Now that private interests are proceeding with a proposed landfill at *Guatali*, one of only two sites approved by Guam law for a landfill, political forces are once again underway to interfere with the solid waste process, using the same incorrect data and misleading information that caused such a disruption in the process over the years.

Finally, the LRC has tasked DPW to prepare a matrix of the options available including specific analysis on environmental compliance, cost, and volume reduction options. This matrix will be submitted to the LRC in the next two weeks and will include a comparison of the cost to the people of Guam for a landfill at the two sites.

Our community is frustrated with these longstanding issues, but I must assure you that until today there has never before been such an integrated effort to evaluate all solid waste options by the elected leadership of this island. I firmly believe that the results of the LRC will provide the final and best solution for our island community that will effectuate the closure of *Ordot* Dump in a faster and more efficient manner than those plans being proposed and supported by the U.S. Attorney's Office. I also hope that this solution will acknowledge the need to protect our valuable water resources and take into consideration the best solution for the people of Guam and for our island's future.

The provision in Public Law 29-19 should not be the reason for the failure of our government to make progress in closing *Ordot* Dump and meeting its contractual obligations surrounding the management of solid waste. *I Liheslatura*, by virtue of the provision, has made it a top priority to ensure accountability of public funds.

I hope you will consider my comments as you deliberate. If you wish further clarification of my position, I am willing to meet with you at your convenience.

*Senseramente,*

Tina Rose Muña Barnes

Attachment: Brown and Caldwell letter to Mr. David Craddick (4 pages)
c:    The Honorable Felix P. Camacho, Governor of Guam
     Alicia G. Limtiaco, Attorney General of Guam
     Wayne Nastri, Region 9 Administrator, USEPA
     Lorilee Crisostomo, Administrator, Guam EPA
     Members, Solid Waste Law Review Commission
     All Senators
     All Media

EXHIBIT X



# The Norman Landfill Environmental Research Site: What Happens to the Waste in Landfills?
## By Scott C. Christenson and Isabelle M. Cozzarelli

### DO LANDFILLS LEAK?

We call it "garbage" or "trash" but it is "municipal solid waste" to your city government and the waste industry. Municipal solid waste is a combination of non-hazardous wastes from households, commercial properties, and industries. The U.S. Environmental Protection Agency (USEPA) reports that the United States produced about 230 million tons of solid waste in 1999, about 57 percent of which is disposed of in landfills (U.S. Environmental Protection Agency, 1999).

Disposal of municipal solid waste in landfills was largely unregulated prior to the 1970s. Most solid waste was deposited in unlined pits. Precipitation and ground water seeping through this waste produces leachate, which is water contaminated from the various organic and inorganic substances with which it comes in contact as it migrates through the waste. Leachate seeping from a landfill contaminates the ground water beneath the landfill, and this contaminated ground water is known as a plume. The normal movement of ground water causes the leachate plume to extend away from a landfill, in some cases for many hundreds of meters. Many studies have shown leachate plumes emanating from old unlined landfills. Estimates for the number of closed landfills in the United States are as high as 100,000 (Suflita and others, 1992).

Federal and state regulations were passed in the 1980s and 1990s to manage disposal of solid waste. Those regulations require that most landfills use liners and leachate collection systems to minimize the seepage of leachate to ground water. Although liners and leachate collection systems minimize leakage, liners can fail and leachate collection systems may not collect all the leachate that escapes from a landfill. Leachate collection systems require maintenance of pipes, and pipes can fail because they crack, collapse, or fill with sediment. The USEPA has concluded that all landfills eventually will leak into the environment (U.S. Environmental Protection Agency, 1988). Thus, the fate and transport of leachate in the environment, from both old and modern landfills, is a potentially serious environmental problem.

### STUDYING LEACHATE PLUMES AT A MUNICIPAL SOLID-WASTE LANDFILL

#### The Norman Landfill Environmental Research Site

The Norman Landfill (fig. 1) is a closed municipal solid waste landfill, formerly operated by the city of Norman, Oklahoma. The landfill is sited directly on the Canadian River alluvial aquifer and has no liner or leachate collection system, so a leachate plume has developed in ground water in the aquifer. The ground water and leachate plume flow away from the landfill toward the Canadian River, a large tributary of the Arkansas River that drains into the Mississippi River.

The Norman Landfill was designated a research site by the U.S. Geological Survey (USGS) through its Toxic Substances Hydrology Research Program. Monitoring wells and instruments have been installed in and adjacent to the leachate plume. A small stream and wetland overlie the leachate plume, and studies are in progress to determine the fate of leachate compounds that enter the wetland from the ground water. USGS hydrologists and technicians have accomplished comprehensive site characterization, which provides a wealth of information about the site hydrogeology and geochemistry. This site



Figure 1. Map of the Norman Landfill Environmental Research Site.

characterization provides essential information to the scientists conducting research about the chemical, biological, and hydrologic processes in ground water and surface water affected by landfill leachate. Research is in progress at the site by scientists from the University of Oklahoma, Oklahoma State University, other universities, the USEPA, and the USGS.

In addition to providing a laboratory for studies of ground and surface water contaminated by landfill leachate, the Norman Landfill Environmental Research Site is used to study other types of contaminant problems. The plume can be used to study microbiological and geochemical processes that are not specific to landfills.

All research at the Norman Landfill Environmental Research

Site is designed to investigate problems and processes that have a high transfer value to other subsurface contamination problems. Comprehensive physical, chemical, and microbial characterizations at this and other USGS Toxic Substances Hydrology Program sites provide fundamental knowledge of the processes that control important types of contamination problems. This knowledge of fundamental processes can be generalized to a wide range of field conditions by comparing results to field and laboratory experiments at other sites with differing conditions and properties. The resulting knowledge and methods improve the effectiveness and reduce the cost of characterization and remediation at contaminated sites across the nation.

## NATURAL ATTENUATION

### Can Microorganisms Reduce Landfill Contaminants?

Scientists who investigate environmental contamination problems are interested in an environmental cleanup approach known as natural attenuation. Natural attenuation refers to naturally occurring physical, chemical, and biological processes that can reduce concentrations of contaminants. In most contaminated aquifers, one aspect of natural attenuation involves the degradation of contaminants by microorganisms, which in some instances prevents contaminant migration. These microorganisms are naturally present in aquifers, even deep below the surface of the earth.

Natural attenuation can be a better alternative for remediation of certain types of contaminants compared to other methods of remediating contaminated ground water. Natural attenuation can be less expensive and more effective than other methods, such as extracting contaminated ground water with wells and treating it at water treatment plants. Much of the research at the Norman Landfill Environmental Research Site investigates different aspects of natural attenuation.

## BIOGEOCHEMICAL ZONES

### Where Does Natural Attenuation Occur?

University of Oklahoma and USGS scientists used a combined microbiological and geochemical approach to identify the important processes occurring in the aquifer contaminated by leachate from the Norman Landfill (Cozzarelli and others, 2000, Harris and others, 1999). The combined sciences of microbiology and geochemistry are called biogeochemistry. The Norman Landfill researchers identified zones in the leachate plume at Norman Landfill where different biogeochemical processes are occurring.

One method to identify different biogeochemical zones is to measure the concentration of certain chemicals and minerals, those that are involved in biogeochemical processes, in the ground water and in the aquifer. Electron acceptors are minerals or chemicals that can occur naturally in aquifer solids or ground water, such as iron oxides in the sediments or sulfate dissolved in ground water. These chemicals are called electron acceptors because microorganisms transfer electrons to them during respiration, which is part of the process the microorganisms use to obtain energy. During respiration, an electron is transferred from an electron donor, such as an organic contaminant compound, to an electron acceptor. This electron transfer occurs when microorganisms break down organic contaminant compounds. The availability of electron acceptors in an aquifer is therefore an important factor for evaluating the effectiveness and sustainability of natural attenuation in contaminated aquifers.

Some evidence of natural attenuation at Norman Landfill is shown in figure 2 (Cozzarelli and others, 2000), illustrated as

generalized hydrogeologic sections through the leachate plume in the aquifer. The three illustrations within figure 2 show chemical concentrations of important indicators of natural attenuation processes along the same vertical slice of the aquifer. These illustrations demonstrate that the leachate plume begins near







Vertical Datum is NAVD 1988
mM = millimoles per liter

Figure 2. Concentrations of electron acceptors and donors in the Norman Landfill leachate plume.

the surface (on the left side of the figure), where the solid waste is stored in the landfill. Ground water flows to the south toward the Canadian River. The leachate plume migrates toward the bottom of the aquifer as it flows toward the river.

Sulfate occurs naturally in ground water in the Canadian River alluvial aquifer. Sulfate is depleted in the center of the

2

leachate plume (fig. 2A) because the microorganisms use sulfate as an electron acceptor. When microorganisms transfer electrons to sulfate, sulfate changes chemically to form dissolved sulfide or hydrogen sulfide gas. The highest rates of sulfate reduction have been measured at the plume boundaries, such as where fresh water from rainfall infiltrating the aquifer mixes with the contaminant plume (Cozzarelli and others, 2000), and causes the sharp concentration gradients observed in figure 2A. The degradation of organic contaminants occurs most rapidly at the plume boundaries.

Iron occurs naturally as mineral coatings on sediments in the Canadian River alluvial aquifer. Dissolved iron concentrations increase in the leachate plume (fig. 2B) because microorganisms transfer electrons to the iron on the mineral coatings, which contain insoluble ferric iron, while degrading the organic contaminants. With the addition of an electron, the iron is reduced to ferrous iron, which dissolves in water. Although the solid-phase electron acceptor (ferric iron) cannot be measured in the ground water, the detection of the end product of the reaction (ferrous iron) in water provides evidence that iron reduction has occurred.

The concentration of non-volatile dissolved organic carbon (NVDOC) is shown in figure 2C. NVDOC is a measure of the organic contaminant compounds in the landfill. In the center of the plume, the concentration of NVDOC shows little change with distance, indicating that NVDOC is not efficiently degraded in this zone.

Researchers at Norman Landfill have learned that most of the natural attenuation occurs at the boundaries of the plume where electron acceptors are available. Sulfate concentrations are low in the center of the plume, as are measured rates of iron and sulfate reduction. The natural attenuation capacity of the aquifer, that is, its ability to attenuate contaminants, is depleted in the center of the leachate plume because microorganisms have used all the electron acceptors during migration of the leachate plume.

## VOLATILE ORGANIC COMPOUNDS
### Evidence for Natural Attenuation

USGS scientists have been investigating volatile organic compounds (VOCs) in the leachate at Norman Landfill (Eganhouse and others, 2001). VOCs are organic compounds that tend to vaporize at room temperature and pressure. Examples of VOCs include some of the compounds in gasoline, lubricants, paints, and solvents. Some VOCs are highly toxic or carcinogenic. VOCs end up in landfills in many ways, including the disposal of ordinary household items such as cleaners or marking pens. Although VOCs make up less than 0.1 percent of the mass of organic carbon in the leachate plume, they are useful indicators of natural attenuation.

At Norman Landfill, USGS scientists compared concentrations of two different alkylbenzene isomers, $n$-propylbenzene and $i$-propylbenzene, in landfill leachate. Isomers of alkylbenzene have the same number and type of atoms, but the molecules have slightly different chemical structures. These different isomers have similar physical properties, so they should be affected by volatilization, dilution, and sorption in a similar manner. The concentration of $n$-propylbenzene decreases much faster as leachate flows away from the landfill than does the concentration of $i$-propylbenzene (fig. 3). This decrease in concentration of $n$-propylbenzene is caused by biological degradation, indicating that biologically mediated natu-

ral attenuation is decreasing the concentrations of some contaminants at Norman Landfill. This technique of comparing alkylbenzene isomers as indicators of biological processes can be applied at sites with contaminants other than landfill leachate.





Vertical Datum is NAVD 1988

Figure 3. Distribution of the alkylbenzene isomers (a) $n$-propylbenzene and (b) $i$-propylbenzene in the leachate plume at Norman Landfill. Concentrations in micrograms per liter ($\mu g$/L) are proportional to bubble diameter. Maximum concentration: $n$-propylbenzene = 0.80 $\mu g$/L, $i$-propylbenzene = 1.24 $\mu g$/L (from Eganhouse and others, 2001).

## INVESTIGATING THE SUBSURFACE TO REVEAL THE RATE OF NATURAL ATTENUATION

Field experiments are being carried out at Norman Landfill to investigate how the rate of natural attenuation may vary with aquifer permeability (permeability is a measure of the ability of a material to transmit fluid). These experiments use push-pull or single-well injection-withdrawal tests (Istok and others, 1997). During the injection phase of the test, a solution consisting of ground water amended with tracers, electron donors, or electron acceptors is injected or "pushed" through a well into the aquifer. During the extraction phase, the test solution is pumped or "pulled" from the same well. Concentrations of tracers, reactants, and possible reaction products are measured as a function of time in order to construct breakthrough curves, measure reaction rates, and to compute mass balances for each solute.

These tests can be conducted anywhere in the aquifer, making it possible to investigate processes and rates in different geologic textures and geochemical environments.

Push-pull tests were conducted at Norman Landfill to measure biodegradation rates of simple organic acids in the leachate plume (Scholl and others, 2001). Wells were drilled into layers of three different types of sediments (medium sand, silt/clay lenses in sand, and poorly sorted gravel), each with a different permeability. Biodegradation rates of two simple organic acids, formate and lactate, were compared in the three different zones in the anoxic leachate plume at the site. These organic acids were used as microbial process indicators because they degrade at different rates depending on the dominant microbial processes. A conservative tracer (bromide) and the two organic acids were added to 50 or 100 liters of contaminated ground water pumped from each test well. The mixture was then re-injected and allowed to mix with the natural ground water. Daily samples were taken from the injection well until organic acids could no longer be detected. Although complete disappearance of the formate and lactate occurred within 7-9 days in all the wells, there were differences in degradation patterns. The results of the test show that the loss of lactate was due to natural attenuation and that there are differences in the rate of natural attenuation in areas of different permeability. These variable degradation rates may be related to microbial community structure, sediment chemistry, and water flow regime.

## IMPLICATIONS

Research at the Norman Landfill Environmental Research Site has shown that chemicals leaching from old unlined landfills are contaminating ground water, but that some of the contaminant concentrations are being reduced by natural attenuation. Modern landfills are designed to minimize contamination of ground water, but modern landfills eventually may leak contaminants into the environment. Research results from Norman Landfill will be useful to scientists and regulators trying to determine the effects of landfill leachate on the environment.

## REFERENCES

Cozzarelli. I. M., Suflita, J. M., Ulrich, G. A., Harris, S. H., Scholl, M. A., Schlottmann, J. L., and Christenson, Scott, 2000, Geochemical and microbiological methods for evaluating anaerobic processes in an aquifer contaminated by landfill leachate. Environmental Science and Technology, v. 34, p. 4025-4033.

Eganhouse, R.P., Cozzarelli, I.M., Scholl, M.A., and Matthews, L.L, 2001, Natural attenuation of volatile organic compounds (VOCs) in the leachate plume of a municipal landfill: Using alkylbenzenes as a process probe: Ground Water, v. 39, no. 2, p. 192-202.

Harris, S.H., Ulrich, G.A., and Suflita, J.M., 1999, Dominant terminal electron accepting processes occurring at a landfill leachate-impacted site as indicated by field and laboratory measures: *in* Morganwalp, D.W., and Buxton, H.T., eds., 1999, U.S. Geological Survey Toxic Substances Hydrology Program--Proceedings of the Technical Meeting, Charleston, South Carolina. March 8-12, 1999--Volume 3 -- Subsurface Contamination from Point Sources: U.S. Geological Survey Water-Resources Investigations Report 99-4018C, pp. 541-548.

Istok, J.D., Humphrey, M.D., Schroth, M.H., Hyman, M.R., and O'Reilly, K.T., 1997, Single-well, "push-pull" test for in situ determination of microbial activities: Ground Water, v. 35, no. 4, p. 619-631.

Scholl, M.A., Cozzarelli, I.M., Christenson, S.C., Istok, J., Jaeschke, J., Ferree, D.M., and Senko, J., 2001, Measuring variability of in-situ biodegradation rates in a heterogeneous aquifer contaminated by landfill leachate: EOS, Transactions, American Geophysical Union, v. 82, no. 20, May 15, 2001, p. 146.

Suflita, J.M., Gerba, C.P., Ham, R.K., Palmisano, A.C., and Robinson, J.A., 1992, The world's largest landfill: Environmental Science and Technology, v. 26, no. 8, p. 1486-1495.

U.S. Environmental Protection Agency, 1988, Federal Register, v. 53, no. 168, August 30, 1988, p. 33345.

U.S. Environmental Protection Agency, 1999, Municipal solid waste in the United States: 1999 Facts and Figures -- EPA530-R-01-014.

For information about the Norman Landfill site, contact:

Scott C. Christenson
U.S. Geological Survey
202 NW 66th Street (Building 7)
Oklahoma City, OK 73116
(405) 810-4409
Email: sc     @usgs.gov

For information about USGS research at Norman Landfill, contact:

Dr. Isabelle Cozzarelli
U.S. Geological Survey
National Research Program (MS 431)
12201 Sunrise Valley Dr.Reston, VA 20192
Telephone: (703) 648-5899
Email: icozzare@usgs.gov

USGS Norman Landfill World Wide Web Sites:
Oklahoma District: http://ok.water.usgs.gov/norlan/
National Research Program: http://water.usgs.gov/nrp/organic/norman.htm

EXHIBIT 9



june 14, 2005

Mr. David Craddick, General Manager
Guam Waterworks Authority
P.O. Box 3010
Hagatna, Guam 96932

Subject: Draft Supplemental Environmental Impact Statement (SEIS) for the Siting
of a Municipal Solid Waste Landfill Facility, Guam.

Dear Mr. Craddick:

Brown and Caldwell, as per the amendment to the GWA Master Plan contract, has
reviewed the Draft SEIS for the Siting of a Municipal Solid Waste Landfill Facility in
the Layon area of Dandan, Inarajan, Guam and related pertinent documents. Brown
and Caldwell provides the following comments with respect to potential impacts to
groundwater and surface water resources:

2.2.1    Landfill Design and Operating Features

The SEIS essentially ignores the issue of the high water table and does not
provide an explanation or description of how the excavations will be
maintained dry during installation of the proposed liner system. According to
the discussion in 4.2.1.2 Hydrogeology and Groundwater (see below), the base
of some cells will be at or below the water table rather than above it as shown
in Figure 2-7. In addition, even if dewatering and/or diversion systems can be
devised for during construction of each cell, there should be a discussion on
how the liner system will behave when subjected to the groundwater pressures
after construction, not only at the base of the cells, but also along the side
slopes. In general, there is a lack of construction details in the SEIS. At a
minimum, the slope ratios for the excavation (typically 2:1) and final cover
system (3:1) should be provided.

The proposed minimum slope of the bottom of each cell (0.5%) may be too
flat to convey the leachate generated to the single collection sump for each cell
and prevent the ponding of leachate on the liner. Ponding would likely lead to
migration of leachate to groundwater.

Groundwater beneath new lined landfills becomes impacted mostly by
migration of VOCs within landfill gas (LFG). The vapor permeability of liner
systems is greater that the liquid permeability, especially when the landfill gas is

not properly collected and a significant positive pressure (i.e. driving force) is produced within the landfill. Section 4.2.1.4 of the SEIS indicated that only 80% of the LFG generated would be collected by an active extraction system. Therefore, 20% of the LFG generated would be available for migration and release into the environment, including downward to groundwater.

3.2.1.2 Hydrogeology and Groundwater – Aquifers (in Chapter 3.0 Affected Environment)

The Draft SEIS characterizes the volcanic geological formation at Layon as not supporting aquifers from which groundwater can easily be extracted. However, this opinion appears to be based on a single U.S. Geological Survey well in 1971, the construction details of which are not provided. Furthermore, the SEIS acknowledges that faults and fissures may harbor a potentially exploitable aquifer (p. 3-7), and apparently no groundwater recovery tests were performed in the deep borings at Layon.

Without a thorough groundwater resource evaluation, it is not possible to rule out sufficient yields from deep wells for municipal supply or other development. In fact, wells have provided local water sources in the past in southern Guam (i.e. Malojloj), and others (Asalonso, GORCO and Talofofo) may have use in the future, according to the pre-draft Guam Water Budget Report (Mink and Yuen, Inc., April 2005) prepared for the GWA Water Resources Master Plan (Brown and Caldwell, in preparation). Although GWA's Fena surface water reservoir and Ugum diversion currently supply southern Guam, future needs may require groundwater development. Since groundwater beneath Layon falls within the G-1 Resource Zone category, it must be protected to drinking water quality standards.

Groundwater

Water table depths and elevations at Layon are provided in Table 3-1, but dates of the measurements are not provided in the SEIS or in the Final Site Selection Report (SSR)/EIS. Unless the dates of measurement are close to simultaneous or other data to document consistent water table elevations are available, the groundwater contours in Figure 3-2 are unreliable.

Without separate measurements of distinct seasonal groundwater elevations, seasonal flow northward beneath the drainage divide into the Ugum River drainage cannot be ruled out. Although the Final Site Selection Report/EIS (GDPW, 2005) states that "based on the groundwater levels recorded at the site, a groundwater hydraulic divide exists between the Ugum River and the landfill footprint that will isolate groundwater flows from the landfill to the

Ugum River", no such hydraulic groundwater divide is shown or apparent from the groundwater contours shown on Figure 3-2 of the SEIS. In fact, the contours indicate that groundwater from beneath the North site would flow northeast toward the Ugum River drainage.

Proximity to Drinking Water

The SEIS acknowledges that the Inarajan River has been identified as a potential site for a surface water dam and/or reservoir. SEIS Figure 3-1 also shows proposed reservoir and/or diversion sites on the Tinago River that have been previously studied (Barrett, 1994) and are included in the pre-draft Guam Water Budget Report (Mink and Yuen, Inc., 2005). Both of these proposed sites would be downstream of the proposed landfill site. In spite of the SEIS claim that "no plans are currently in place to develop groundwater or surface water supplies in the Layon area" (p. 3-9), GWA considers both of the above proposed reservoir and/or diversion sites as potentially viable and necessary for the future water supply needs. In fact, the pre-draft Guam Water Budget Report (Mink and Yuen, Inc., 2005) recommends that consideration be given to investigating the feasibility of diversions at other rivers in addition to the Ugum, and that opportunities to utilize the existing wells be reexamined (p.4).

The SEIS arguments against groundwater being a potential source of drinking water are equally unconvincing. No citations or evidence is provided that the limestone aquifer tapped by the Malojloj wells is either limited in extent or that groundwater within it is not continuous with that in the volcanic formations in the Layon area. In addition, until a groundwater exploration program, specifically designed to locate (using geologic mapping and geophysical tools and drill test faults and fractures in the Umatac Formation is conducted, previous well yields do not rule out development of an economic groundwater resource in either the limestone or volcanic aquifers of Southern Guam. The GORCO well produced over 100 gallons per minute (gpm) (Mink and Yuen, Inc., 2005), which is evidence that well yields comparable to northern Guam are possible.

3.2.2.1 Hydrology

The SEIS discounts the development of surface water supplies on the Inarajan and/or Tinago Rivers, and rules out groundwater flow from the proposed landfill site to the Ugum River. As detailed above, these statements are not defensible based on the data presented in the SEIS and SSR EIS and as noted in this letter.

### 3.2.2.2 Water Quality

The SEIS correctly states that the Inarajan River could potentially be developed as a water source (p. 3-17) (in contradiction of statements to the contrary in previous SEIS sections).

### 4.2.1.2 Hydrogeology and Groundwater (in Chapter 4.0 Environmental Consequences)

The SEIS correctly notes that the Guam EPA's preferred hydrogeologic conditions of a deep water table and thick, low permeability deposits with a confining layer over any water bearing zone are not present at the site, and that in fact groundwater at the Layon footprint is at ground surface in some locations. Since the landfill base is to be located on average of 15 feet below grade, it is unclear how the landfill base could be maintained above the water table. Further, since seasonal fluctuations in groundwater levels have not been established, the basis for designing landfill cells to maintain separation between the base of the landfill and the water table at each cell is lacking. Since groundwater could flow north to the Ugum River, this issue should be of concern to the GWA.

### 4.2.2.2 Water Quality

The SEIS correctly acknowledges that minor long-term adverse impacts to water quality would occur throughout the life of the project from both erosion and leachate discharge. These impacts could affect GWA's ability to develop either surface water or groundwater resources downgradient of the site.

To summarize, the SEIS generally provides an incomplete and inadequate hydrogeological characterization of the proposed landfill site and its potential impacts on both groundwater and surface water resources.

Thank you for the opportunity to review and comment on the Draft SEIS. Should you have any questions, please contact me at 925-210-2408.

Very truly yours,

BROWN AND CALDWELL

Martin G. Steinpress, P.G., CHG.
Chief Hydrogeologist

cc:   Ray Matasci

## EXHIBIT 9



June 14, 2005

Mr. David Craddick, General Manager
Guam Waterworks Authority
P.O. Box 3010
Hagatna, Guam 96932

Subject: Draft Supplemental Environmental Impact Statement (SEIS) for the Siting of a Municipal Solid Waste Landfill Facility, Guam.

Dear Mr. Craddick:

Brown and Caldwell, as per the amendment to the GWA Master Plan contract, has reviewed the Draft SEIS for the Siting of a Municipal Solid Waste Landfill Facility in the Layon area of Dandan, Inarajan, Guam and related pertinent documents. Brown and Caldwell provides the following comments with respect to potential impacts to groundwater and surface water resources:

2.2.1   Landfill Design and Operating Features

The SEIS essentially ignores the issue of the high water table and does not provide an explanation or description of how the excavations will be maintained dry during installation of the proposed liner system. According to the discussion in 4.2.1.2 Hydrogeology and Groundwater (see below), the base of some cells will be at or below the water table rather than above it as shown in Figure 2-7. In addition, even if dewatering and/or diversion systems can be devised for during construction of each cell, there should be a discussion on how the liner system will behave when submitted to the groundwater pressures after construction, not only at the base of the cells, but also along the side slopes. In general, there is a lack of construction details in the SEIS. At a minimum, the slope ratios for the excavation (typically 2:1) and final cover system (3:1) should be provided.

The proposed minimum slope of the bottom of each cell (0.5%) may be too flat to convey the leachate generated to the single collection sump for each cell and prevent the ponding of leachate on the liner. Ponding would likely lead to migration of leachate to groundwater.

Groundwater beneath new lined landfills becomes impacted mostly by migration of VOCs within landfill gas (LFG). The vapor permeability of liner systems is greater that the liquid permeability, especially when the landfill gas is

not properly collected and a significant positive pressure (i.e. driving force) is produced within the landfill. Section 4.2.1.4 of the SEIS indicated that only 80% of the LFG generated would be collected by an active extraction system. Therefore, 20% of the LFG generated would be available for migration and release into the environment, including downward to groundwater.

3.2.1.2 Hydrogeology and Groundwater – Aquifers (in Chapter 3.0 Affected Environment)

The Draft SEIS characterizes the volcanic geological formation at Layon as not supporting aquifers from which groundwater can easily be extracted. However, this opinion appears to be based on a single U.S. Geological Survey well in 1971, the construction details of which are not provided. Furthermore, the SEIS acknowledges that faults and fissures may harbor a potentially exploitable aquifer (p. 3-7), and apparently no groundwater recovery tests were performed in the deep borings at Layon.

Without a thorough groundwater resource evaluation, it is not possible to rule out sufficient yields from deep wells for municipal supply or other development. In fact, wells have provided local water sources in the past in southern Guam (i.e. Malojloj), and others (Asalonso, GORCO and Talofofo) may have use in the future, according to the pre-draft Guam Water Budget Report (Mink and Yuen, Inc., April 2005) prepared for the GWA Water Resources Master Plan (Brown and Caldwell, in preparation). Although GWA's Fena surface water reservoir and Ugum diversion currently supply southern Guam, future needs may require groundwater development. Since groundwater beneath Layon falls within the G-1 Resource Zone category, it must be protected to drinking water quality standards.

Groundwater

Water table depths and elevations at Layon are provided in Table 3-1, but dates of the measurements are not provided in the SEIS or in the Final Site Selection Report (SSR)/EIS. Unless the dates of measurement are close to simultaneous or other data to document consistent water table elevations are available, the groundwater contours in Figure 3-2 are unreliable.

Without separate measurements of distinct seasonal groundwater elevations, seasonal flow northward beneath the drainage divide into the Ugum River drainage cannot be ruled out. Although the Final Site Selection Report/EIS (GDPW, 2005) states that "based on the groundwater levels recorded at the site, a groundwater hydraulic divide exists between the Ugum River and the landfill footprint that will isolate groundwater flows from the landfill to the

Ugum River", no such hydraulic groundwater divide is shown or apparent
from the groundwater contours shown on Figure 3-2 of the SEIS. In fact, the
contours indicate that groundwater from beneath the North site would flow
northeast toward the Ugum River drainage.

Proximity to Drinking Water

The SEIS acknowledges that the Inarajan River has been identified as a
potential site for a surface water dam and/or reservoir. SEIS Figure 3-1 also
shows proposed reservoir and/or diversion sites on the Tinago River that have
been previously studied (Barrett, 1994) and are included in the pre-draft Guam
Water Budget Report (Mink and Yuen, Inc., 2005). Both of these proposed
sites would be downstream of the proposed landfill site. In spite of the SEIS
claim that "no plans are currently in place to develop groundwater or surface
water supplies in the Layon area" (p. 3-9), GWA considers both of the above
proposed reservoir and/or diversion sites as potentially viable and necessary
for the future water supply needs. In fact, the pre-draft Guam Water Budget
Report (Mink and Yuen, Inc., 2005) recommends that consideration be given
to investigating the feasibility of diversions at other rivers in addition to the
Ugum, and that opportunities to utilize the existing wells be reexamined (p.4).

The SEIS arguments against groundwater being a potential source of drinking
water are equally unconvincing. No citations or evidence is provided that the
limestone aquifer tapped by the Malojloj wells is either limited in extent or that
groundwater within it is not continuous with that in the volcanic formations in
the Layon area. In addition, until a groundwater exploration program
specifically designed to locate (using geologic mapping and geophysical tools,
and drill test faults and fractures in the Umatac Formation is conducted,
previous well yields do not rule out development of an economic groundwater
resource in either the limestone or volcanic aquifers of Southern Guam. The
GORCO well produced over 100 gallons per minute (gpm) (Mink and Yuen,
Inc., 2005), which is evidence that well yields comparable to northern Guam
are possible.

3.2.2.1 Hydrology

The SEIS discounts the development of surface water supplies on the Inarajan
and/or Tinago Rivers, and rules out groundwater flow from the proposed
landfill site to the Ugum River. As detailed above, these statements are not
defensible based on the data presented in the SEIS and SSR/EIS and also in
this letter.

3.2.2.2 Water Quality

The SEIS correctly states that the Inarajan River could potentially be
developed as a water source (p. 3-17) (in contradiction of statements to the
contrary in previous SEIS sections).

4.2.1.2 Hydrogeology and Groundwater (in Chapter 4.0 Environmental Consequences)

The SEIS correctly notes that the Guam EPA's preferred hydrogeologic
conditions of a deep water table and thick, low permeability deposits with a
confining layer over any water bearing zone are not present at the site, and that
in fact groundwater at the Layon footprint is at ground surface in some
locations. Since the landfill base is to be located on average of 15 feet below
grade, it is unclear how the landfill base could be maintained above the water
table. Further, since seasonal fluctuations in groundwater levels have not been
established, the basis for designing landfill cells to maintain separation between
the base of the landfill and the water table at each cell is lacking. Since
groundwater could flow north to the Ugum River, this issue should be of
concern to the GWA.

4.2.2.2 Water Quality

The SEIS correctly acknowledges that minor long-term adverse impacts to
water quality would occur throughout the life of the project from both erosion
and leachate discharge. These impacts could affect GWA's ability to develop
either surface water or groundwater resources downgradient of the site.

To summarize, the SEIS generally provides an incomplete and inadequate
hydrogeological characterization of the proposed landfill site and its potential impacts
on both groundwater and surface water resources.

Thank you for the opportunity to review and comment on the Draft SEIS. Should
you have any questions, please contact me at 925-210-2408.

Very truly yours,

BROWN AND CALDWELL

Martin G. Steinpress, P.G., CHG.
Chief Hydrogeologist

cc:    Ray Matasci

EXHIBIT 10





# What happened to using common sense with Dandan?

IT SEEMS that the hardest problem this government has ever faced is figuring out how to take care of our trash. We don't seem to have any problem making trash. In Guam, we manage to create about 3 pounds every day for every person. Using the 2007 CIA Factbook population estimate of 173,456 people now living in Guam, we throw away more than 260 tons of refuse every single day of the year, and that's a conservative estimate.

With the expanding military presence, including support staff and dependents, we'll have 200,000 people living in Guam in just a few years, perhaps as soon as 2012, and nothing can keep our trash problem from growing.

We should have gotten really serious about our trash problem years ago, but we haven't been able to get past the posturing and politics. Even common sense can't seem to stand up to those that are so convinced they are right that they will risk the health and welfare of the people of Guam to prove their point.

Now we are spending a lot of money on road construction for a landfill that should never be built. We are expending public funds on privately owned property. If we don't own the property on which the construction is taking place, and if we haven't even reached agreement with all of the many landowners to acquire their property, common sense tells us that we should not have even started. So why are we moving forward?

Common sense should tell us that building a landfill over a future source of fresh water is just crazy, but many people are not using their common sense.

That is the crux of our problem. We were told and we believe that science should make the decision. We put aside our common sense in favor of the scientific view. But how can science make the right decision if it doesn't have all the information? How can science be right if it is prevented from evaluating every possible option?

When Dandan was selected, scientists and engineers did a fairly good job narrowing the list of possible sites. But experts didn't have all the information they needed. When they picked Dandan, they couldn't consider sites on federal property. Who knows what the inclusion of those sites could have meant to the selection process? When they said Dandan was the best, they didn't know that the Guam Waterworks Authority was going to decide that the Inarajan Watershed would be needed for future freshwater development.

Guam's important water resources were automatically eliminated from the list of potential sites, including the northern aquifer and the area surrounding the Ugum River, the two major freshwater sources located on non-military land. If the Inarajan Watershed had already been listed for future development, I am certain it would have been crossed off the list of potential sites.

And who is to say that the federal government, which is so anxious to get us to close Ordot, would not have traded a piece of their property to speed up the process? Their trash will also be going into our landfill. I believe that the Guam Environmental Protection Agency did Guam a disservice by eliminating possible sites located on federal property. We should have looked at EVERY corner of our island to find the truly best place for EVERYONE'S trash.

We need to get serious about trash. We need to investigate the construction at Dandan. And we need to take Dandan off the list and bring common sense back into the site selection process.




# It's not hard to do the right thing

ABOUT 3 1/2 years ago, Senator Tina Muña Barnes began her fight against the proposed Dandan landfill. Guam's people were told to "let the experts do their job" and that "science would decide" where the landfill should be located. Many people were deceived by the site selection process, myself included.

The "experts" eliminated many potential sites:

• Land already in use; -
• Land reserved for other purposes;
• Possible sites on federal property;
• The two sites identified in Public Law 23-95, which science had previously identified as the best landfill sites;
• Since leak-proof landfills don't exist, areas near water resources were excluded, including locations near Ugum River, Fena Lake, and northern Guam: partially because of development, primarily to protect the northern aquifer.

The "experts" excluded Guam's water resources to protect them from poisoning because landfill liners ALWAYS leak. Although the Inarajan watershed can produce seven million gallons of water every day, it was not eliminated, suggesting that something was wrong with the process.

Dandan was probably the target from the beginning, even though it sits over a huge source of fresh water. When the final sites were chosen, two of three were immediately rejected because of federal regulations. "Experts" should have predicted that would happen. No other options were offered, not even sites already listed in Public Law 23-95. All of the combined knowledge, science, and great expertise failed the people of Guam. It seemed that Dandan was where they wanted the landfill to go, and that's the site they chose.

People began suspecting that the final selection had been made before the "experts" even began. My colleague from Mangilao realized that the right choice was not made. At the end of 2004, Sen. Muña Barnes' Bill 240 passed with

12 votes. It required that P.L. 23-95 be followed, and the governor vetoed it. Meanwhile, more people began to realize that a Dandan landfill would be a disaster.

Over the past two years, questions and actions have accumulated that make the Dandan selection seem very wrong:

• Not all Dandan landowners have given permission to Public Works to enter their property; DPW may be illegally building a road.
• Democratic senators, myself included, have asked the attorney general to stop the project.
• Millions of dollars may have been expended on the project illegally, without adequate spending authority.
• The Consent Decree is not an excuse to break the law.
• What is the landfill's footprint? It has changed many times because everywhere DPW digs, they find water.
• The landfill won't be a big hole on the ground. It will be a seven-story high pile of trash because groundwater is just a few feet below the site's surface and the trash can't be buried.
• Documents indicate that there may be a link between the Inarajan and Ugum watersheds, meaning the landfill could poison TWO water resources at one time.
• The same documents indicate that Dandan is a bad choice for a landfill.
• Did the "experts" ask the feds if they would exchange, give or sell a landfill site to Gov-Guam? ALL civilian and military trash will go into our landfill, and the best site might be on federal property.

I've co-sponsored Sen. Muña Barnes' Bill 35 in the current Legislature that would require that P.L. 23-95 be followed. DPW failed to show up at the public hearing. It seems obvious what is going on.

It's easy to do the right thing and say "NO" to Dandan before it's too late to stop it. Let's pass Bill 35 and protect our water.

*Marianas Variety*



# We're making progress on solid waste

THE seemingly insurmountable problems related to solid waste collection and disposal in Guam may not be so impossible to solve after all. The Law Review Commission created by Executive Order on July 23, 2007, in response to the U.S. Magistrate Judge's recommendations, has been moving forward to help solve our solid waste problems.

The Magistrate Judge asked that the Commission be "tasked with developing a general legislative policy . with regard to the closure of the Ordot Dump and the construction of a new landfill." The Magistrate Judge also recommended that GovGuam draft legislation to create a public corporation and give it specific powers and authority.

While it may appear to be slow and time-consuming, a great deal of progress has been made in the Commission's three-plus months of existence. The Governor placed Sen. Jim Espaldon in the chairman's hot seat, with Public Works, Guam EPA, the Attorney General and the Governor's Office as members. Sen. Rory Respicio also sits on the Commission as the minority representative. I've been a regular attendee at the LRC meetings, along with alternate minority member Sen. David Shimizu as well as Sen. Tina Muña Barnes, because I have a great interest in our island's solid waste problems.

In the weeks since its creation, the LRC has tackled a number of issues and spent quite a bit of time developing the draft legislation, thanks to the invaluable assistance of Sen. Respicio. The draft bill has been transmitted to the Governor and presented to the U.S. District Court of Guam. The transmittal of the draft legislation meets a deadline set in the Executive Order, and proves to the court and federal officials that we are making progress.

The LRC draft legislation creates the Guam Recycling And Solid Waste Authority as a public corporation and autonomous instrumentality of the Government of Guam. If enacted into law, RASA will inherit all Solid Waste Management Division personnel as well as all of their duties and responsibilities —but luckily not all of their problems. If RASA becomes law, they will have the authority to borrow against revenues from tipping and recycling fees to pay for the closure of the Ordot Dump, the opening of a new landfill, and the proper collection, recycling and disposal of solid waste.

Although the draft bill has been sent to the Governor, it was noted in the transmittal letter that the LRC would continue to revise the bill and include other concerns as they arose in deliberations.

At yesterday's meeting, the LRC concentrated on personnel and procurement issues, with Attorney Robert Kono from the General Services Administration and Civil Service Commission Director Vern Perez in attendance. Regarding personnel, the LRC members want to make sure that the current classified employees of DPW's solid waste division are not displaced by this conversion from line to autonomous agency.

Regarding procurement, the uniqueness of Guam's ongoing solid waste problems has caused some LRC members to wonder if temporary changes in the way that procurement statutes will be applied to RASA will be necessary to allow for greater flexibility.

The LRC still has a lot to do, but I think the members share my optimism that the process is working well. The Federal position against immediate receivership makes me believe that we are making progress. It is unfortunate that politics has always gotten in the way of progress in the past when it came to solid waste. In the LRC, politics have pretty much been set aside, and the welfare of the people of Guam is right where it should be, at the forefront.

*Marianas Variety*

# Marianas Variety

**Micronesia's Leading Newspaper Since 1972**

Search
News

| In the past 30 days ▼ | Go | Advance Search | THU DEC 20, 1

Selpan
Loca
Opin
Spor
  Guam
Loca
Opin
Spor
  Palau
Loca
Opin
Spor
  Variety's
Paci
Bus
MVT
Obit

Ads by Google

Firefox

Best viewed this site using
FIREFOX

Ads by Google

Boat
Fish in style,
Exclusive Charters.
Over 20 years of
experience

## Guam News

Monday November 12, 2007

### Feds: Guam Legislature hinders consent decree compliance

By Gina Tabonares

Variety News Staff

THE United States government expressed disappointment with the decision of Guam lawmakers to hold any funds for a new landfill, branding the move an additional hurdle in complying with the requirements of a consent decree to close the Ordot Dump and build a new landfill.

In its latest filing in the District Court, the federal government attacked the government of Guam's failure to appropriate funds for the closure of the Ordot Dump in 2008, and renewed its request for the court's intervention to compel progress on consent decree compliance.

The consent decree requires GovGuam to begin operating the new landfill by Sept. 23, 2007.

Gov. Felix P. Camacho asked for a $4 million appropriation from the general fund to the Department of Public Works for costs associated with GovGuam's obligation, but the Guam Legislature did not appropriate money for such purpose. It instead passed a bill that does not permit GovGuam to spend funds on site-specific preparation or design work for the new landfill until the local government has acquired the site.

Assistant U.S. Attorney Mikel Schwab said GovGuam had set up large barriers to the construction of the new landfill.

"Instead of seeking to expedite GovGuam's compliance, the Guam Legislature chose to place additional hurdles in GovGuam's path," Schwab stated.

Because of the appropriation bill's prohibition and the continued unfunded projects for the consent decree, the United States doubted GovGuam's ability to comply with the consent decree.

Without funds in fiscal year 2008, DPW cannot begin any of the preparatory tasks that are necessary to close the Ordot Dump and with the prohibition, the federal government said it is difficult to understand how DPW can pay for the hydrogeological study that is scheduled to be completed by December 2007.

"It appears that any further preparatory or design work for the new landfill would necessarily be halted by the lack of funds. Therefore, the Guam Legislature has apparently created yet another impediment to hinder GovGuam's compliance with the consent decree," the U.S. government said.

The federal government asked the court not to tolerate GovGuam's inaction and reasoning about the delays in acquiring the Layon site.

According to the U.S. Environmental Protection Agency, GovGuam's acquisition of the land for the Layon landfill could start immediately and should be regarded as an independent activity that is not tied to the completion of the hydrogeological study.

DPW director Larry Perez told the court that the hydrological study is intended to ensure that a new landfill will not contaminate water sources in the area. He claimed that moving forward with condemnation of the property would be premature because the results of the study may affect the landfill's footprint.

"This explanation is implausible. The design of the landfill which is typical for this kind of landfill includes a buffer zone of land around the landfill's actual footprint. The buffer zone would provide GovGuam the flexibility to adjust the landfill's footprint," the U.S. government said.

The federal government also insisted that the new solid waste public corporation should be under Consolidated Commission on Utilities oversight based on CCU's experience and track record.

Citing the magistrate judge's recommendation and the suggestion of the Office of the Public Auditor, the United States government said an autonomous elected body like CCU would be in a better position to apply its independent judgment on issues affecting solid waste disposal operations on Guam and to reach decisions about policies, rates, tipping fees and personnel needs that are operationally driven rather than politically driven.

**Cheap Charters**      **Salpan's Sunset Cruises**
Great Diving & Fishing Rates Fish or Dive    Join us for a memorable evening aboard the
Remote Southern Guam      Stars and Stripes

Ads by Google

Other Sections

▸ CNMI News
▸ CNMI Sports
▸ CNMI Editorial
▸ Guam News
▸ Guam Editorial
▸ Guam Sports
▸ Palau News
▸ Palau Sports
▸ Palau Editorial
▸ Pacific Islands
▸ Forum
▸ Advertisement
▸ Business
▸ MVteen
▸ Literary Corner
▸ Contact Us
▸ Subscription
▸ Staffbox
▸ Guam Business
▸ Classifieds
▸ Obituaries
▸ News Update

Other Links

© 2007 Marianas Variety | Published by Younis Art Studio Inc. All Rights Reserved | Email : Sales | Webmaster




# Common sense would help avoid unnecessary hurdles

AS far back as 1996, eleven long years ago, GovGuam had a plan in place to close the Ordot Dump, and had already identified sites for a new landfill: either Mala'a in Agat or Guatali in Piti. Since 1996, various individuals, including a few senators, have been putting hurdles in the path of taking care of our trash. .

They turned the way we should dispose of our solid waste into a divisive factor, and this issue has caused tremendous political, social and legal problems in our community.

Guam's lack of progress on this issue has led to a federal consent decree requiring our action. Based on a Federal judge's suggestion, a Solid Waste Law Review Commission was formed and is meeting regularly. It submitted draft legislation to create an autonomous entity to oversee recycling, solid waste collection and disposal for Guam.

A court filing from the U.S. Attorney's office indicates that they aren't pleased with LRC's progress to find common ground on one of Guam's most contentious issues. If you missed it, Assistant U.S. Attorney Mikel Schwab was quoted in Monday's Variety: "Instead of seeking to expedite GovGuam's compliance, the Guam Legislature chose to place additional hurdles in DPW's path." Well, Attorney Schwab is partially right. But his statement indicates that the feds may not have a full historical perspective of why and how we got here.

Attorney Schwab should know that after Guam EPA ignored a site already listed in public law and ruled out northern Guam because a landfill could endanger the aquifer, they chose instead a site in Dandan that Waterworks has identified for future water development. DPW has already spent millions on that property, and it will cost several times more to develop this site as a landfill than the Guatali site already listed in law. Access to the remote Dandan site is on narrow two-lane roads, while the heavy trash trucks and equipment needed to operate a landfill and recycling center require wide roadways. In addition, the U.S. Attorney said a hydrogeologic study is not necessary prior to condemnation of land, even though the study may find the site unsuitable. Nothing in this paragraph passes the common sense test.

No appropriations have been made, yet huge sums have been spent, perhaps unlawfully. Is there any wonder the Legislature has blocked spending until a full accounting is made? I would think that full accountability is exactly what the U.S. Attorney would require.

These opponents to progress haven't seemed concerned that a Pyrrhic victory for them is not a victory for the people of Guam. No matter how well intentioned these people may be, they have increased our cost of living, put our environment at risk, and led us down a dangerous path.

Public laws were even passed to halt progress and outlaw the use of what has become commonplace solid waste technology in wide

COMMON continued on page 15

## Common...

Continued from page 14

use in many countries around the world. Hopefully we are past that stage in our political development. If the feds take over the process to close Ordot and build a new landfill, an enormous (and unnecessary) expense will be forced upon our people.

I believe we have reached a crossroads and if we are not careful, we will lose control of this process. After a series of rulings by a number of attorneys general, and after a number of losses in court, it is time for the naysayers to put aside their political interests and put the interests of our people first.

*Marianas Variety*

EXHIBIT 12



**Senator Rory J. Respicio**
*I Mina'Bente Nuebi Na Liheslaturan Guåhan*
Twenty-Ninth Guam Legislature

December 12, 2007

**US Attorney's Office**
**Districts of Guam & NMI**

DEC 12 2007

Time _____
Receiving name _____
Date keyed in Dbase _____
Entered into Dbase by: _____

Leonardo M. Rapadas, U.S. Attorney
Suite 500 Sirena Plaza
108 Hernan Cortez Suite 500
Hagatna, GU 96910

Dear Attorney Rapadas:

I was confused by your remarks carried on KUAM news last night, December 11, in which you said that Dandan was the only site allowable under the Federal Consent Decree for a new landfill. With all due respect, I believe you are mistaken. Dandan may be the only approved site for a Government landfill, but the Consent Decree does not prohibit the use of a private landfill.

The Consent Decree states that the Ordot Dump is to be closed and no longer allowed to receive solid waste as soon as a properly permitted landfill is opened in Guam. This leaves open the possibility of a private firm opening and operating a landfill, which is exactly what would be happening at Guatali if Guam EPA were not intimidated by the constant assertions from your office and the U.S. Environmental Protection Agency that Dandan MUST be the ONLY choice.

The positions taken by both the U.S. Attorney's office and USEPA seem to be concerned only with using the Dandan property for a landfill, and not with moving forward in the most rapid and cost effective manner possible to close Ordot. It is my understanding that closing Ordot as quickly as possible because of the contamination of the Lonfit River is the reason for the Consesnt Decree.

I am also surprised and concerned that the U.S. Attorney would take this anti-private enterprise position, especially when your office must surely recognize the need for a 25% increase in fresh water generation for the Federal Government's military buildup. Please help me understand why Federal entities would want to insist on Dandan when the Guatali site would be (a) more cost effective; (b) allow the protection of water resources at Dandan needed for the military buildup; and (c) result in a much quicker closure of the Ordot Dump and resolution of the Consent Decree.

I look forward to your reply.

Very truly yours,

Rory J. Respicio
Senator

RECEIPT ACKNOWLEDGED
By J.C. MATANANE
CFO

RECEIVED
DEC 12 20
4:52 PM
ATTORNEY GENERAL'S OFFICE

c:   Governor Felix P. Camacho
     Attorney General's Office        Date 12/12/07    Time 5:00 P.M.
     All Senators
     Members, Law Review Commission
     Wayne Nastri, Administrator Region 9, USEPA

e-mail: rjr@ite.net • Telephone: (671)472-RORY (7679) • Fax: (671)472-3547
Mailing Address: 29th Guam Legislature, 155 Hesler Place, Hagåtña, Guam 96910
Office Location: Guam Press Building, 415 Chalan San Antonio Suite 200, Tamuning, Guam 96913