

**Office of the Attorney General**
**Alicia G. Limtiaco**
Attorney General of Guam
**Civil Division**
287 West O'Brien Drive
Hagåtña, Guam 96910 ● USA
(671) 475-3324 ● (671) 472-2493 (Fax)
www.guamattorneygeneral.com

**Attorneys for the Government of Guam**

**FILED**
DISTRICT COURT OF GUAM

JAN 1 4 2008 ✗ 3:18 pr

**JEANNE G. QUINATA**
**Clerk of Court**

# IN THE DISTRICT COURT OF GUAM
## TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CIVIL CASE NO. 02-00022 |
| Plaintiff, | ) | |
| vs. | ) | **GUAM ENVIRONMENTAL PROTECTION AGENCY COMMENTS RE ORDOT DUMP CLOSURE REPORT** |
| GOVERNMENT OF GUAM, | ) | |
| Defendant. | ) | |

Attached hereto are the comments of the Guam Environmental Protection Agency regarding the Government of Guam's Ordot Dump Closure Report filed with the Court on January 8, 2008.

The attached comments are filed pursuant to the Court's December 17, 2007 Order Re: Conditions to Enforce Consent Decree.

/ / /

*Page 1*
*GEPA Comments Re Ordot Dump Closure Report*
*USA vs Government of Guam*
*District Court of Guam Case No. CV02-00022*

Case 1:02-cv-00022    Document 190    Filed 01/14/2008    Page 1 of 31

Respectively submitted this 14th day of January, 2008.

OFFICE OF THE ATTORNEY GENERAL
**ALICIA G. LIMTIACO**, Attorney General of Guam

By: _____
**J. PATRICK MASON**
Deputy Attorney General

*Page 2*
*GEPA Comments Re Ordot Dump Closure Report*
*USA vs Government of Guam*
*District Court of Guam Case No. CV02-00022*

Case 1:02-cv-00022    Document 190    Filed 01/14/2008    Page 2 of 31

**Office of the Attorney General**
**Alicia G. Limtiaco**
Attorney General of Guam
**Civil Division**
287 West O'Brien Drive
Hagåtña, Guam 96910 ● USA
(671) 475-3324 ● (671) 472-2493 (Fax)
www.guamattorneygeneral.com

**Attorneys for the Government of Guam**

# IN THE DISTRICT COURT OF GUAM
# TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA | ) CIVIL CASE NO. 02-00022 |
| Plaintiff, | ) |
| vs. | ) **GOVERNMENT OF GUAM** |
| | ) **BRIEF RE: CIVIL CONTEMPT** |
| GOVERNMENT OF GUAM, | ) |
| Defendant. | ) |

In its December 14, 2007 "Order Re: Conditions to Enforce Consent Decree," the Court ordered the parties to file briefs regarding the Court's civil contempt[1] powers. The Government of Guam submits this brief in response to the Court's order.

---

[1] Government of Guam understands civil contempt to mean a sanction that operates coercively because it applies continuously until the defendant performs the affirmative act required by the court; as opposed to a criminal contempt sanction which punishes the contemptor's past disobedience. International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 844-5 (1994), (Ginsburg, J. concurring in part and concurring in judgment).

## I. Consent Decree Provisions

A sanction of civil contempt for a violation of the Consent Decree would be based on the language of the Decree. Consequently, a brief look at some of the relevant provisions of the Decree would be appropriate. The Consent Decree is an agreement entered into by the United States and the "Government of Guam." On behalf of the Government of Guam, it was signed by a prior Attorney General, a prior Interim Director of the Department of Public Works, a prior Administrator of the Guam Environmental Protection Agency and the current Governor.

Regarding the inclusiveness of the Consent Decree, the document provides:

> This Consent Decree contains the entire agreement between the parties and no statement, promise, or inducement made by any of the parties or agent of the parties that is not contained in this written Consent Decree shall be valid or binding, and this Consent Decree may not be enlarged, modified, or altered except by using procedures described in this Consent Decree.

Consent Decree ("CD") ¶ 50 at 24. The parties have not agreed to expand or alter the terms of the Consent Decree.

Under the "Parties Bound" section, the Consent Decree provides:

> This Consent Decree shall apply and be binding upon the Government of Guam and its boards, directors, agencies, authorities, departments (including and not limited to DPW and the Guam Environmental Protection Agency ("GEPA")), and their successors and assigns, and on the United States on the behalf of U.S. EPA.

CD ¶ 2 at 3. Hence, the Government and individual agencies of the Government, rather than specific individuals, are required to perform the various tasks stated in the Consent Decree.

The Consent Decree refers to a funding source for implementation of its provisions:

> **WHEREAS**, Guam law, at 10 G.C.A. § 51118, provides for a financing source from tipping and user fees for the Government of Guam costs and expenses directly related to the closure of Ordot Dump and the development, design, construction, and operation of a new sanitary landfill;

CD at 2-3.

The Consent Decree has built-in penalties for failure to meet specified deadlines. *See* CD ¶ 12-15 at 12-14. The Consent Decree also has a provision for additional remedies:

> Stipulated penalties are not the Plaintiff's exclusive remedy for violations of this Consent Decree. The United States expressly reserves the right to seek any other relief it deems appropriate, including, but not limited to, action for statutory penalties, contempt, or injunctive relief *against the defendant*.

(italics added). CD ¶ 16 at 14. Thus, the "other relief," including contempt, authorized by the Consent Decree would be against the defendant Government of Guam.

## II. The Court's Civil Contempt Authority

"The facts essential to jurisdiction for a contempt proceeding are (1) the making of the order; (2) knowledge of the order; (3) ability of the respondent to render compliance; (4) willful disobedience of the order." (citations and internal quotes omitted). <u>Anderson v. Superior Court</u>, 80 Cal.Rptr.2d 891, 894 (Ct. App. 1998).

The case now before this Court, of course, involves the additional aspect of an exercise of federal judicial power over a government with inherent sovereignty, similar to the sovereignty of a State. *See* <u>Marx v. Government of Guam</u>, 866 F.2d 294 (9th Cir. 1989). When exercising its power to enforce a remedial order, a federal court "must exercise '[t]he least possible power adequate to the end proposed." <u>Spallone v. United States</u>, 493 U.S. 265, 280 (1990); *see also* <u>Stone v. City and County of San Francisco</u>, 968 F.2d 850, 861 (9th Cir. 1992). In exercising its least intrusive option, a federal court should at least make a finding that other alternatives were inadequate. *Id.* at 864.

"It is well established that before one may be punished for contempt for violation a court order, the terms of such order should be clear and specific, and leave no doubt or

uncertainty in the minds of those to whom it is addressed. (citations)." United States v. Joyce, 498 F.2d 592, 596 (7th Cir. 1974). Civil contempt is appropriate only when a party fails to comply with a court order that is both specific and definite. Gates v. Shinn, 98 F.3d 463, 472 (9th Cir. 1996) (holding that consent decree standard of "appropriate level of psychiatric evaluation and treatment" for prisoners was insufficiently specific to uphold a contempt order). In considering a civil contempt order based upon a consent decree, the Court must look to the language of the consent decree. Courts must find the meaning of a consent decree "within its four corners," and not by reference to the court's purposes or the purpose of the party seeking to hold the other in contempt. *Id.* 468.

Due process requires rigorous procedural safeguards before a party is found in contempt. In International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821(1994) (holding that serious contempt fines of $52 million for violations of labor injunction were criminal and could only be imposed through a jury trial), the Supreme Court addressed the procedures required for adjudication of indirect contempts, i.e., those occurring out of court. *Id.* at 827 n. 6. "Contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding." *Id.* at 833-34. In Bagwell, the substantial fine imposed by the court was considered a criminal sanction requiring a jury trial. In his concurring opinion, Justice Scalia makes the following comment on out-of-court contempt allegations involving complex injunctions:

> When an order governs many aspects of a litigant's activities, rather than just a discrete act, determining compliance becomes much more difficult. Credibility issues arise, for which the factfinding protections of the criminal law (including jury trial) become much more important. And when continuing prohibitions or obligations are imposed, the order cannot be complied with (and the contempt "purged") in a single act; it continues to govern the party's behavior, and pain of punishment-not unlike the criminal law.

*Id.* at 843 (Scalia, J., concurring in part and concurring in judgment).

Hence, under Bagwell, when acts allegedly constituting contempt do not occur in the presence of the court, do not obstruct the court's immediate ability to adjudicate pending proceedings, and require elaborate and reliable factfinding, then due process requires criminal-like procedural protections.

"The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." F.T.C. v. Affordable Media, 179 F.3d 1228, 1239 (9th Cir. 1999) (citing Stone v. City and County of San Francisco, 968 F2d 850, 856 n.9 (9th Cir. 1992).

In a civil contempt proceeding, a defendant may assert a present inability to comply with the order in question. U.S. v. Rylander, 460 U.S. 752, 757 (1983). "The power to impose coercive sanctions to compel obedience to an order in a civil contempt is limited by the individual's ability to comply with the court's order. (citations)." Falstaff Brewing Corp. v. Miller Brewing Co., 702 F.2d 770, 781 (9th Cir. 1983). Prior to issuing a coercive civil contempt order, the court should weigh all the evidence properly before it and determine whether or not there is actually a present ability to obey and whether failure to do so constitutes deliberate defiance or willful disobedience which a coercive sanction will break. *Id.* n. 6.

In Hook v. Arizona Dept. of Corrections, 107 F.3d 1397 (9th Cir. 1997), cited by the United States, the court drew a distinction between physical impossibility of compliance with a court order and a subsequent change in the law that allegedly makes compliance illegal. In Hook, a statute enacted subsequent to a consent decree and court injunctions, prohibited

payment of fees incurred by special masters appointed by a federal court without a State legislative appropriation. Although ordered to do so, a state official did not pay the fees of the court appointed special master.

The official argued that he was unable to get an appropriation to pay the fees. The court found that compliance was not physically impossible since funds were available and the bills were eventually paid. The court noted that the official did not assert that the State had insufficient funds and was financially incapable of making the payments. Hence, inability to comply with the order had not been shown. Of note is the fact that Hook only involved the payment of the special master's fees, not the payment of millions of dollars which is needed to close the Ordot Dump and open a new landfill.

Although financial constraints may not be used to justify the creation or perpetuation of constitutional violations, they are a legitimate concern of government defendants in institutional reform litigation and therefore are appropriately considered in tailoring a consent decree modification. Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 392-3 (1992). This principal can also be applied to civil contempt sanctions for violation of a court order. In fashioning its orders for enforcement the Consent Decree, the Court should take into consideration the Government of Guam's financial constraints.

In assessing the Government of Guam's ability to comply with the Consent Decree, the Court can also consider substantial compliance. Substantial compliance with a consent decree judgment is an acceptable defense to a motion for civil contempt. Hallett v. Morgan, 296 F.3d 732, 750 (9th Cir. 2002).

The United States cites In re Arthur Treacher's Franchise Litigation ("Arthur Treacher's"), 689 F.2d 1150, 1159 (3rd Cir. 1982) for the proposition that in exercising

remedial powers in civil contempt proceedings, courts may require the contemnor to perform affirmative acts, even though the acts were not mandated by the underlying decree. U.S. Br. Re Contempt Auth. at 5. Arthur Treacher's involved a temporary restraining order which was continued indefinitely by the consent of the parties. The court applied a clear and convincing standard of proof in determining whether a violation of both the letter and spirit of the judge's order had occurred. *Id.* at 1156-7. The court found that even though neither the restraining order nor the underlying franchise agreement required continuation of the franchisee's approved supplier, the district court did not exceed its powers when it required the franchisor to reinstate the supplier. The court pointed out that its order merely maintained the status quo of the parties. Hence, the court ordered an affirmative act (reinstatement of the franchise supplier), even though the act was not mandated by the underlying decree. The court did not order anything beyond the original status quo of the parties. Additionally, the affirmative act did not involve the expenditure of large sums of money to employ private companies in order to carry out the un-mandated requirement of the court.

### III. Who May be Held in Contempt

The Consent Decree provides for its own built-in penalties for failure to meet specified deadlines. CD ¶ 12 at 12-13. Although the United States reserves the option of asking for contempt against the Government of Guam, fines are the primary remedy for failure to meet requirements mandated by the Consent Decree. Financing has been a major problem in complying with the Consent Decree. Therefore, it is doubtful that additional fines against the Government for contempt will assist in accomplishing the Consent Decree goals. Also, the United States has not, at this time, asked the Court for a finding of contempt against the Government of Guam.

Since the Consent Decree provides for penalties solely against the defendant Government of Guam, the Government of Guam does not concede that it would ever be proper or appropriate to hold an individual government official or employee in contempt based on the provisions of the Consent Decree. Additionally, as is pointed out by the United States, _Spallone_ instructs that the Court must look to the Government of Guam to secure compliance before even considering a sanction against an individual. _Id._ 493 U.S. at 280.

Respectfully submitted this 14th day of January, 2008.

OFFICE OF THE ATTORNEY GENERAL
**Alicia G. Limtiaco, Attorney General of Guam**

By: _[signature]_

**J. PATRICK MASON**
Deputy Attorney General

 

# GUAM ENVIRONMENTAL PROTECTION AGENCY

## AHENSIAN PRUTEKSION LINA'LA GUAHAN

P.O. Box 22439 GMF • BARRIGADA, GUAM 96921 • TEL: 475-1658/9 • FAX: 477-9402

JAN 1 4 2008

Mr. Lawrence Perez
Director
Department of Public Works
542 North Marine Corps Drive
Tamuning, Guam 96913

RE: **Comments on the Ordot Dump Closure Report**

Dear Mr. Perez,

In accordance with Item 6.C of the **Order Re: Conditions To Enforce Consent Decree** (hereinafter referred to as "ORDER") (Civil Case No. 02-00022) issued by the Chief Judge, Frances M. Tydincgo-Gatewood on December 14, 2007, the Guam Environmental Protection Agency (hereinafter referred to as "Guam EPA") has reviewed and provides the following comments on the submitted **Revised 2008 Closure Plan** (hereinafter referred to as "PLAN" for the Ordot Dump dated January 2008.

Please be advised that detail discussion on the following comments were made during meetings with Guam EPA, Department of Public Works (DPW), and Duenas, Bordallo, Camacho & Associates (DBC&A) on January 10, 2008 and with US EPA, Guam EPA, DPW, and DBC&A via conference call on January 11, 2008.

## I. General Comments:

1) On November 23, 2005, the Guam EPA issued a **Notice of Violation, Order of Compliance, and Administrative Penalty Order (NOV/OC & APO) (SW 106-A001)** for the improper management of Ordot Dump addressing the need to provide daily cover at the end of each operating day on the entire working face and to other areas where solid waste were still exposed within the facility **(APPENDIX A)**. In addition, the NOV/OC & APO addresses the issue of providing proper safety equipments for facility operators.

2) On December 14, 2005, the Guam EPA issued a **Solid Waste Disposal Facility Permit for Ordot Dump, Permit No. 05-006LFL** ( hereinafter referred to as "PERMIT") as required by Item 8.e of the Consent Decree (hereinafter referred to as "CD") for the Ordot Dump **(APPENDIX B)**. At the time of PERMIT issuance, the application and supporting documents were not technically adequate to ensure compliance with Guam's Solid Waste Disposal Rules and Regulations and meet current industry standards for

landfill operation, closure design, and post-closure maintenance and monitoring. Therefore, the PERMIT included conditions that will bring its operations, closure, and post closure designs, construction, and activities into compliance. Timeframes were established on most of these conditions to ensure compliance with the timeframes established within the CD. These timeframes were summarized and included as Appendix D and Appendix E of the PERMIT. As a result of the noncompliance of the Compliance Schedule of Document Submittal (Attachment D of the PERMIT), Guam EPA issued a **Notice of Violation, Order of Compliance, and Administrative Penalty Order (NOV/OC & APO) (SW-107-A003)** on December 12, 2006 **(APPENDIX C).** Therefore, Guam EPA emphasizes that DPW incorporates the conditions of the PERMIT and provides a timeframe for compliance into the **Ordot Dump Closure Report** required by the ORDER. If DPW feels that a waiver is appropriate for any of the conditions identified in the permit, then Guam EPA requires DPW to petition or request such a waiver within 10 working days upon receipt of this letter.

3) The above PERMIT for Ordot Dump's operations toward closure had expired in September 23, 2007, and the closure activities had expired in October 23, 2007. These expiration dates were in line with the Consent Decree dates. To date, the DPW has not officially notified Guam EPA of its intention for continuance operation and/or a request for extension. Therefore, Guam EPA requests that DPW submits a status report and it intentions towards the operation of the dump.

4) The **Revised 2008 Closure Plan** submitted to the courts on January 14, 2008 does not clearly report the status of current activities and list details of required actions of the Ordot Dump's operations, closure, and post-closure activities that are needed to prepare the Ordot Dump site for closure and a schedule that corresponds to the implementation and completion of each action. In fact, the PLAN submitted is a revision to the **100% Submittal, Ordot Dump, Ordot-Chalan Pago, Guam, Closure Plan** dated July 2005 **(APPENDIX D).** This document was a part of the overall supporting documents to DPW's permit application for the above PERMIT. As noted in *Part III.A. SPECIAL CLOSURE DESIGN AND CONSTRUCTION REQUIREMENTS* of the PERMIT, the Closure Design Report (July 2005) and Closure Plan was **not** to be implemented until the Administrator provides written approval of the Closure Plan. This approval was based on the need for these documents to be updated and revised to include information necessary to ascertain and/or mitigate engineering and environmental impacts of the current design. Therefore, Guam EPA recommends that DPW coordinates with the DBC&A Project Team to resubmit the required **Ordot Dump Closure Report** addressing the following:

A. **Operations Towards Closure:**
1) Immediate implementation of the activities listed in the **Order of Compliance of the NOV/OC & APO (SW-106-A001)** dated November 23, 2005.

2) Implementation of outstanding activities of *Part II. OPERATIONS TOWARDS CLOSURE* of the PERMIT, *Appendix A, Operations Plan*, and its Permit Attachments, if applicable, and if it has been determined that air space for

additional waste is still available as it is currently established in the current closure design. Priorities shall be made on the following:

      i.)     Immediate implementation of a large scale recycling/waste diversion (green waste, paper, cardboard, wood, aluminum, etc) to reduce waste inputs to the dump (Part II.A.2). *See also comments provided below in item II.2.b.*

      ii.)    Implementation of an efficient and effective waste placement and lift development operation ((Part II.A.6)

      iii.)   Implementation of other operational conditions needed to prevent immediate impact to public health and the environment such as soil covering, personnel safety equipments, vector control, etc.

3)     Should DPW feel that its current resources and expertise are not able to meet the demands of these activities, they should outline the process of procurement of services necessary to implement the above activities.

**B.**     **Closure Design & Construction:**

1)     Implementation of *Part III. CLOSURE DESIGN AND CONSTRUCTION* of the PERMIT, and applicable recommendations made in the **Value Engineering Report, Ordot Dump Closure, Guam** dated December 2005 to ensure that a closure design will be approved and implemented **(APPENDIX E).**

2)     Implementation of parts of the **Revised 2008 Closure Plan** activities that may have no impact to a final approved closure design.

3)     Implementation of the remedial investigation activities necessary to be incorporated in Post-Closure Monitoring & Maintenance activities.

4)     Should DPW feel that its current resources and expertise are not able to meet the demands of these activities, they should outline the process of procurement of services necessary to implement the above activities.

**C.**     **Post-Closure Monitoring & Maintenance:**

1)     Implementation of *Part IV. POST CLOSURE CARE AND MAINTENANCE* of the PERMIT, and applicable recommendations made in the **Value Engineering Report, Ordot Dump Closure, Guam** dated December 2005 to ensure that a closure design will be approved and implemented.

2)     Should DPW feel that its current resources and expertise are not able to meet the demands of these activities, they should outline the process of procurement of services necessary to implement the above activities.

Case 1:02-cv-00022   Document 190   Filed 01/14/2008   Page 13 of 31

## II.    Comments on the Revised 2008 Closure Plan:

As noted above, the **Revised 2008 Closure Plan** was a revision to the **100% Submittal, Ordot Dump, Ordot-Chalan Pago, Guam, Closure Plan (July 2005)** to include the following sections:
4.0    Temporary Scale
5.0    Additional Waste Stream
6.0    Ongoing Closure Practices
7.0    Waste Stream and Volume Reduction

Comments and response to other sections of the 90% design submittal Closure Plan and Post-Closure Plan were provided in the **100% Submittal – Ordot Dump, Ordot-Chalan Pago, Response To Pre-Final Documents (July 2005)** (APPENDIX F). Furthermore, the December 2005 Value Engineering Report has provided recommendation to the 100% submittals and were not address or included in this January 2008 revision. Therefore, the following comments will only address the above listed sections.

1)    In addition to some spelling and grammatical errors, references to other sections of this revised plan in the unrevised portion of the 100% design submittal may not be applicable due to the change in the numbering of sections.

2)    **Temporary Scale:**
      Provide information on the need for the temporary scale, how the information collected is to be used during the continual operation and finalization of the closure and post-closure designs and plan, personnel/contract responsible to operate the scale and for how long, training of scale operators, and on the acquisition and installation of scale.

3)    **Additional Waste Stream:**
      a)    Provide information on how a "33-month time" was determined and how the amount of additional waste generated may impact the operation of the Ordot Dump and available air space. Is the 33-month time of waste generated going to impact the current 2004 proposed design and a redesign will be conducted? Or is the 33-month time of waste generated to be used to determine how much has to be diverted to other solid waste facilities such as recycling, composting, etc.

      b)    Please note that the referenced 2004 Closure Design has not been approved by Guam EPA per the PERMIT issued, and recommendations of the Value Engineering Report has not been reviewed, approved, and incorporated into a Guam EPA / USEPA approved Final Closure Design. Therefore, in determining the available airspace, ensure that an adequate amount of additional space for the most conservative design approval is included. Ensure that the top of the waste pile of the January 2008 survey to the top of the waste pile of the current, or most conservative approved design, is used to calculate the available air space.

c)    The 2004 filling plan referenced required to be updated to address the conditions of the PERMIT. Provide information as to how the referenced 2004 filling plan will be revised and who will be responsible to ensure that the final approved filling plan will be implemented. Appendix E reference a drawing of the filling plan, please provide a write-up as to how this filling plan is to be implemented and enforced.

**4)    On-going Closure Practices:**
a)    In the first paragraph, "may" should be replaced with "shall".

b)    In addition to the listed practices, references shall be made to also implement activities required of the Guam EPA revised *Operations Plan, Appendix A* of the PERMIT and its permit attachment.

c)    How many days of daily cover will the 75,000 cubic yards of Guam International Airport soil last? Does this apply to intermediate cover needed to address existing areas of exposed waste located on slopes, benches, and in-active locations of the dump? What are other sources of daily and intermediate cover and what are the estimated volume of cover material can be produced from these sources? What are DPW's contingency plans to address potential lack of cover material throughout the continued operation of the dump?

d)    To ensure compliance with operations, what resources, personnel and equipments will be utilized?

**5)    Waste Stream and Volume Reduction:**
a)    Should the title of the section be "Waste Diversion and Volume Reduction"?

b)    In addition to comments provided above in Item I.4.A.2.i., describe and provide information of on-going efforts to divert waste from the Ordot Dump, reduce waste generation, and volume reduction. What actions will be necessary to implement the **Guam 2006 Integrated Solid Waste Management Plan,** and ensure recycling initiatives are continuous and sustainable **(APPENDIX G)**?

c)    Describe the options to increase compaction, how in-situ waste density is to be evaluated, and how the selected option will be implemented if deemed feasible.

Should you have any questions, or required additional information, please contact Ms. Barbara Torres, Solid Waste Program Manager or myself at 475-1651 or 475-1622, respectively.

**LORILEE T. CRISOSTOMO**
**Administrator**

Appendices:

**Appendix A -** <u>Notice of Violation, Order of Compliance, and Administrative Penalty Order (NOV/OC & APO) (SW 106-A001)</u>
**Appendix B -** <u>Solid Waste Disposal Facility Permit for Ordot Dump, Permit No. 05-006LFL</u>
**Appendix C -** <u>Notice of Violation, Order of Compliance, and Administrative Penalty Order (NOV/OC & APO) (SW-107-A003)</u>
**Appendix D -** <u>100% Submittal, Ordot Dump, Ordot-Chalan Pago, Guam, Closure Plan</u>
**Appendix E -** <u>Value Engineering Report, Ordot Dump Closure, Guam</u>
**Appendix F -** <u>100% Submittal, Ordot Dump, Ordot-Chalan Pago, Guam, Response To Pre-Final Documents</u>
**Appendix G -** <u>Guam 2006 Integrated Solid Waste Management Plan</u>


CC:     Chief Justice, United States District Court of Guam
           United States Department of Justice
           Guam Attorney General's Office

# APPENDIX A

## Notice of Violation, Order of Compliance, And Administrative Penalty Order (NOV/OC/APO) (SW-106-A001) (November 23, 2005)




# GUAM ENVIRONMENTAL PROTECTION AGENCY

### AHENSIAN PRUTEKSION LINA'LA GUAHAN

P.O. Box 22439 GMF • BARRIGADA, GUAM 96921 • TEL: 475-1658/9 • FAX: 477-9402

NOV 23 2005

Mr. Lawrence Perez
Acting Director
Department of Public Works
542 North Marine Corps Drive
Tamuning, Guam 96913

Dear Mr. Perez,

RE: **NOTICE OF VIOLATION ORDER OF COMPLIANCE AND ADMINISTRATIVE PENALTY ORDER FOR IMPROPER MANAGEMENT OF ORDOT DUMP LOCATED ON LOT 3390-R2 & 3434, ORDOT (SW-106-A001)**

The Guam Environmental Protection Agency (Guam EPA) is charged with the responsibility of implementing the Solid Waste Management and Litter Control Act (SWMLCA), as amended, Chapter 51 of Title 10, Guam Code Annotated (GCA), Public Law No. 23-64, and the Guam Solid Waste Disposal Rules and Regulations (GSWDRR) Chapter 23, of Title 22 Guam Administrative Rules and Regulations (GAR).

Section 51103(a) states that "The Agency shall have the authority under this Act to prepare, issue, modify, remove, and enforce orders for compliance with any of the provisions of this Chapter or of any rules and regulations issued pursuant thereto and requiring the taking of such remedial measures for solid waste management as may be necessary or appropriate to implement or effectuate the provisions and purposes of this Chapter".

On September 15, 2005, a representative from Guam EPA performed an inspection of the Ordot Dump (hereinafter referred as Dump), located along Dero Road, Municipiality of Chalan Pago-Ordot. The inspection was conducted in response to a complaint alleging that daily cover was not being provided. Our investigation confirmed that there was no daily cover provided along the Southwest and Southeast slopes of the Dump.

On November 16, 2005, a representative from Guam EPA conducted an inspection of the Dump as part of this Agency's monthly inspection. In addition, the inspection was conducted in response to a complaint alleging that daily cover was not being provided. The inspection was conducted with the cooperation of Mr. Richard Naputi, Ordot Dump Site Supervisor. During the course of this inspection, information was gathered and photos taken. The inspection reports are attached.

*"ALL LIVING THINGS OF THE EARTH ARE ONE"*

## NOTICE OF VIOLATIONS

Based on discussions with the Site Supervisor and the site inspection, the Department of Public Works (DPW) is in violation of GSWDRR. The deficiencies and regulatory provisions that have been violated are indicated below and are the basis for this Notice of Violation and Order of Compliance (NOV/OC).

1. **§23304(a). Cover material requirements. The requirements state that "Except as provided in Subsection (b) of this § 23304, the owners or operators of all MSWLF units must cover disposed solid waste with Six (6) inches of earthen material at the end of each operating day, or at more frequent intervals if necessary, to control disease vectors, fires, odors, blowing litter, and scavenging".**

   DPW failed to meet the cover material requirements. During our investigation, approximately 300' X 300' of municipal solid wastes was left uncovered for 1.5 weeks.

2. **§23305(a) Disease vector control. The requirements state that "Owners or operators of all MSWLF units must prevent or control on-site populations of disease vectors using techniques appropriate for protection of human health and the environment".**

   DPW failed to meet the disease vector control requirements from September 15-November 16, 2005.

3. **§23313(a). Safety. The requirements state that " the land disposal site shall be designed, constructed, and operated in such a manner as to protect the health and safety of personnel associated with the operation and meet all appropriate federal and local Occupational Safety & Health Act requirements".**

   DPW failed to operate the Dump in such a manner as to protect the health and safety of personnel associated with the operations of the Dump. Specifically, DPW does not provide a safety plan, training, or safety devices to its employees.

4. **§23313(b)(1). Safety. The requirements state that "...personal safety devices such as hard hats, gloves, and footwear shall be worn by all facility employees while on the site."**

   DPW failed to provide appropriate gloves, hard hats, ear protection, respirator equipment, and first aid kits to facility employees.

5. **§23313(b)(2). Safety. The requirements state that "... fire extinguisher shall be provided and be located within the immediate vicinity of the working face."**

   DPW failed to provide fire extinguishers for the working face of the operation;

## ORDER OF COMPLIANCE

Based on the violations cited above, DPW has violated the provisions of the GAR. Therefore, Guam EPA hereby requires DPW, to take the following remedial measures at their facility within the time frame stated below from the date of receipt of this order:

1. Immediately place 6 inches of earthen material (i.e. daily cover) at the end of each operating day over the entire working face to minimize fire hazards, infiltration of precipitation, odors, and blowing litter; control gas venting and vectors; discourage scavenging; and provide an aesthetically pleasing site.

2. Immediately place at least 6 inches of earthen material (i.e. daily cover) on other solid waste exposed within the facility.

3. The DPW shall conduct daily inspections and maintain a log of daily coverage from November 21, 2005 to December 14, 2005 and submit a copy of the inspection report to GEPA on December 15, 2005.

4. Within seven (7) calendar days, provide all facility employees with personal safety devices such as hard hats, appropriate gloves, ear protection, respirator equipment, and first aid kits.

5. Immediately provide fire extinguishers for all heavy equipment operating on the active area or portion of the Dump.

6. Confirm in writing, within thirty (30) calendar days of your receipt of this letter, an affidavit that the above-referenced remedial measures have been taken, the date each was taken, including supporting documentation. If any of these objectives are not accomplished, additional administrative penalties may be assessed.

This Order of Compliance (OC) is issued under the authority of the Solid Waste Management and Litter Control Act, as amended, 10 GCA § 51103(a). If any of the above objectives are not accomplished in the specified time, additional administrative penalties may be assessed. Failure to comply with the terms of this OC may subject you to an administrative or civil penalty of up to $1,000 per day for each violation under 10 GCA § 51115(e) and/or 10 GCA § 51115(a), or a criminal conviction of a third degree felony and/or a criminal fine up to $1,000 per day per violation and restitution under 10 GCA § 51115(b).

Nothing in this OC limits the ability of the Guam EPA to enforce any and all provisions of applicable Guam Laws and regulations. Guam EPA does not waive any rights or remedies available to it.

Nothing in this order or in the Federal Ordot Consent Decree provides any excuse for you to not comply with Guam Laws and regulations. Failure to comply with Guam Laws and regulations may subject you to administrative, civil or criminal penalties.

## ADMINISTRATIVE PENALTY ORDER

In addition to this NOV/OC the Administrator of Guam EPA, pursuant to 10 GCA § 51115(e) and Addendum C to the regulations, where applicable, hereby imposes an administrative penalty. Based on the inspection report and the violations identified on the inspection date, the maximum administrative penalty would be up to $500 - $1,000 per day per solid waste violation, or **$20,500.00** for 2 violations for 11 days per violation and 6 violations for one day per violation.

The Administrator has used the statutory factors in assessing the amount of the penalty. The factors include, but are not limited to, the nature and history of these and prior violations, and the opportunity, difficulty and history of taking corrective action. Therefore, the Administrator hereby assess' a penalty of **$11,050.00**. This penalty amount is due and owing 15 days from the date of receipt of this APO.

If you believe you can meet the mitigating factors identified in the law for a lower penalty than that hereby imposed, then you may petition the Administrator for a penalty adjustment. A Petition for a Penalty Adjustment must reference the mitigating factors in the law, state the mitigating circumstance, and provide evidence (e.g., documents, sworn statements, pictures) of the mitigating circumstance. The petition must be in writing and submitted to the Administrator within 15 days of receipt of this Administrative Penalty Order (APO).

You are presumed under the law to be able to pay the penalty. The burden is upon you of proving that you do not have the ability to pay the penalty. If you believe that you are unable to pay the penalty, then you may file an Inability to Pay Statement with the Administrator. The Inability to Pay Statement must be sworn under penalty of perjury and must provide the supporting financial documentation (e.g., financial statement, tax returns). The Inability to Pay Statement must be submitted to the Administrator within 15 days of receipt of this APO. As an option, you may propose a Supplemental Environmental Project (SEP) that is environmentally beneficial to the public in lieu of fines.

The penalty amount is due and owing 15 days from the date of receipt of this APO. The payment due date will be stayed upon the timely filing of a complete Petition for Penalty Adjustment or an Inability to Pay Statement until such time as the Administrator issues a decision regarding the submittal.

Failure to comply with this APO may subject you to additional administrative penalties or civil or criminal actions as described above.

You may file within fifteen (15) calendar days of the date of this NOV/OC, a Notice of Intent to Appeal with the Guam EPA's Board of Directors, setting forth in such Notice a verified petition outlining the legal and factual basis for such an appeal.

The Guam EPA's Board shall then hold a public hearing, not more than sixty (60) days after receipt of such Notice, at which time you may appear and present evidence in person or through counsel in support of this petition.

The Notice of Intent to Appeal may be made by mailing the Notice of Intent to Appeal with the verified petition to the following address:

> Guam Environmental Protection Agency Board of Directors
> c/o Acting Administrator
> Attn: Air & Land Division
> Guam Environmental Protection Agency
> P.O. Box 22439 Guam Main Facility
> Barrigada, Guam 96921

Or the Notice of Intent to Appeal may be delivered to Guam EPA's main office located at Building 17-3304 Mariner Avenue, Tiyan, Guam 96913.

Failure to file a Notice of Intent to Appeal within the period specified above will constitute a waiver of your right to a hearing. Without further notice to you these Order of Compliance and Administrative Penalty Orders will become final and the Agency may proceed upon the Orders without a hearing. This also applies if you fail to attend or to participate in a hearing that you have requested.

If you have any questions concerning this memorandum, please contact Mr. Glenn San Nicolas or Ms. Barbara F. Torres at 475-1614/1651, respectively.

Sincerely,

RANDEL L. SABLAN
Acting Administrator

Enclosure:    Inspection Report
              Photo Log (pp 6-7)

cc:    Ms. Conchita Taitano, Air and Land Programs Administrator
       Ms. Helen Kennedy, Assistant Attorney General

Exposed
Solid
Waste

Ponding
Leachate



Photo No. 1    Date Taken:  11/16/05  Facility:  Ordot Dump
Location:        Lot 3390-R2, Municipality of Chalan Pago-Ordot
Description:    Ponding water top center of dump

Exposed
Solid
Waste



Photo No. 2    Date Taken:  11/16/05  Facility:  Ordot Dump
Location:        Lot 3390-R2 , Municipality of Chalan Pago-Ordot
Description:    SW active site 100'x100' of uncovered MSW/ 1.5 weeks/vectors

Subject:     **Ordot Dump Inspection**

On November 16, 2005, a representative from Guam Environmental Protection Agency (GEPA) conducted a site inspection along with Richard Naputi (DPW Ordot Dump Site Supervisor), Patrick T. Santos, and John P. Cruz (site workers) of Lot 3390-R2 & 3434 located in Ordot . The inspection was performed as a result of a complaint received by the Guam EPA Solid Waste Management Program. In addition, the Monthly 2006 SWLF inspection was also conducted.

The inspection revealed the physical evidence of approximately 100 X 100 feet of uncovered municipal solid waste (MSW) on the active area/portion located on the South West corner( Public side) of the dump and approximately 200 X 200 feet of uncovered municipal solid waste (MSW) on the active area/portion located on the South East corner( Commercial side). Also, observed were leachate smells, flies, and dogs in the facility. In addition, ponding water was also seen at the top center of the facility. Lastly, ponding leachate was sporadically visible around the dump site.

During the investigation it was found that the active area/portion (Commercial and Public) were left uncovered for approximately a week and a half due to heavy equipment failure (Track loader & excavator) and reallocation of other equipment. In addition, heavy equipment (dozer) used at the dump were reassigned to the DPW Quarry leaving one bull dozer on site. Also discovered during the investigation was heavy equipment failure due to the track loader not having a battery and the excavator having a leak on the hydraulic line.

After interviewing the site supervisor and a number of employees it was conveyed that support from DPW management in regards to PPE's, preventive maintenance on heavy equipment and poor personnel facilities (i.e. Restrooms) was needed.

According to our records, Guam EPA was not informed of the situation at Ordot dump by Dept. of Public Works.

Subject:     **Ordot Dump In adequate cover material**

On September 15, 2005, at approximately 1530 hours a duly authorized representative of Guam EPA conducted a visual inspection of the Ordot Dump, located along Dero Dr. in the municipality of Ordot. The inspection was performed as a result of a complaint received by the Guam EPA Solid Waste Management Program.

During the inspection, Guam EPA's representative observed exposed areas of Municipal Solid Waste (MSW) from other than the active area or portion. Specifically, along the South West and South East slopes of the dump. Furthermore, steam was also observed radiating from the active area or portion located in the SW side of the facility. The investigation revealed physical evidence that DPW is not providing the required cover material as specified by the Guam Solid Waste Disposal Rules (GSWDRR).

Due to the increase rain activity, decomposition of solid-waste generating heat, and the lack of cover material on or along the lifts and slopes introducing air into the waste create ideal fire conditions during dry days. Therefore, Guam EPA is requiring DPW place adequate daily cover material in accordance to the GSWDRR to help prevent the following: vectors; flying litter; leachate generation, smells, and fires.

Guam EPA redirected 6 dump truck loads of soil from the GWA Chaot sewer line upgrade project Route 4, Sinajana to the Ordot Dump to help with cover shortfall.



Exposed
Solid
Waste

Photo No. 3     Date Taken: 11/16/05  Facility: Ordot Dump
Location:         Lot 3434., Municipality of Chalan Pago-Ordot
Description:     SE active site 200'x200' MSW uncovered for a 1.5 weeks/ vectors



Exposed
Solid
Waste

Photo No.4     Date Taken. 11/16/05  Facility: Ordot Dump
Location:        Lot 3434., Municipality of Chalan Pago-Ordot
Description:    SE active site 200'x200' MSW uncovered for a 1.5 weeks/ vectors



Exposed Solid Waste

Ponding Leachate

Photo No. 1   Date Taken:  11/16/05   Facility:  Ordot Dump
Location:        Lot 3390-R2, Municipality of Chalan Pago-Ordot
Description:     Ponding water top center of dump

Exposed Solid Waste

Photo No. 2   Date Taken:  11/16/05   Facility:  Ordot Dump
Location:        Lot 3390-R2., Municipality of Chalan Pago-Ordot
Description:     SW active site 100'x100' of uncovered MSW/ 1.5 weeks/vectors



Exposed
Solid
Waste

Photo No. 3  Date Taken:  11/16/05  Facility:  Ordot Dump
Location:        Lot 3434.,  Municipality of Chalan Pago-Ordot
Description:    SE active site 200'x200' MSW uncovered for a 1.5 weeks/ vectors



Exposed
Solid
Waste

Photo No. 4  Date Taken:  11/16/05  Facility:  Ordot Dump
Location:        Lot 3434.,  Municipality of Chalan Pago-Ordot
Description:    SE active site 200'x200' MSW uncovered for a 1.5 weeks/ vectors




# GUAM ENVIRONMENTAL PROTECTION AGENCY

## Ahensian Proteksion Lina'la' Guahan

P.O. Box 22439 GMF ◦ BARRIGADA, GUAM 96921 ◦ TEL: 475-1658/9 ◦ FAX: 477-9402

Mr. Lawrence Perez
Acting Director
Department of Public Works
542 North Marine Corps Drive
Tamuning, Guam 96913

JAN 13 2006   COPY

Subject:   Ordot Dump Waste Management Permit Conditions

This is in reference to your request for an extension to submit information, specifically the following documents referenced in the Solid Waste Disposal Facility Permit for the Ordot Dump by December 30, 2005:

- Scale Repair Schedule (Section II.A.4.a)
- Ordot Dump Assessment Report (Section II.A.6.a.1)
- Vector Control Monitoring Plan and Deterrence (Section II.A.8.b)
- Personnel Training Plan (Section II.A.18.a)
- Updated and Revised Ordot Dump Closure Design Report (July 2005) and Closure Plan (Section III.B)

As discussed with your staff during the permitting negotiations, these documents are an integral part of the bid specifications for the Ordot Dump's continued operations and closure construction activities. The deadline specified in the Permit would have allowed this Agency sufficient time to perform its review for technical adequacy and meet the January 11, 2006 Consent Decree deadline.

Guam EPA approves your request for an additional thirty (30) days (until January 29, 2006) to submit the information delineated above. However, as a reminder, this extension does not change the subsequent deadlines specified in the Permit and does not preclude any deadline mandated by the Consent Decree.

Should you have any questions, please feel free to contact me.

Senseramente,

CHRISTOPHER A. LUND
Acting Administrator

"ALL LIVING THINGS OF THE EARTH ARE ONE"



GOVERNOR
Felix P. Camacho
LT. GOVERNOR
Kaleo S. Moylan

public works
DEPARTAMENTON CHE'CHO' PÚPBLEKO
ACTING DIRECTOR
Lawrence P. Perez
DEPUTY DIRECTOR
Michael C. James

DEC 3 0 2005

MEMORANDUM

TO:        Acting Administrator, Guam Environmental Protection Agency   *(Randy Sablan)*

FROM:      Acting Director

SUBJECT:   Ordot Dump Waste Management Permit Submittal


The Department of Public Works would like to request an extension of time in which to submit information relative to the requirements of the Ordot Dump Waste Management Permit issued December 14, 2005.

The DPW requires an additional thirty (30) days to satisfactorily comply with the permit submittal requirements.  The DPW offers a progress summary for the submittal requirements to be provided to your agency by January 9, 2006.

Consideration for this request would be greatly appreciated.


*Conchita's Ifo*
*Barbara Ifo*
*Tina's Ifo*
*Omar*


542 North Marine Drive, Tamuning Guam 96913 ● Tel (671) 646-3131 / 3259 ● Fax (671) 649-6178

# APPENDIX B

*Solid Waste Disposal Facility Permit*
*For*
*Ordot Dump*
*Permit No. 05-006LFL*
*(December 14, 2005)*

# Solid Waste Disposal Facility Permit
## ORDOT DUMP

Permit No. *05-060LFL*

Facility Location:

*Lot No. 3390 R2 &*

*Lot 3434, Dero Road, Ordot*

Issued: *12/14/05*

Expires: *10/23/07*




# GUAM ENVIRONMENTAL PROTECTION AGENCY

## AHENSIAN PRUTEKSION LINA'LA GUAHAN

P.O. Box 22439 GMF • BARRIGADA, GUAM 96921 • TEL: 475-1658/9 • FAX: 477-9402

DEC 14 2005

Mr. Lawrence Perez
Acting Director
Guam Department of Public Works
543 North Marine Drive
Tamuning, Guam 96913

**Re: Solid Waste Disposal Facility Permit for Ordot Dump
Permit No. 05-060LFL**

Dear Mr. Perez:

Enclosed for your review is the subject permit for the continued operations towards closure, closure design and construction, and post-closure maintenance and monitoring of the Ordot Dump. The public comment period began on October 4, 2005 and ended on November 17, 2005. Guam EPA has incorporated changes to address comments received during the public comment period.

Should you have any questions regarding this Permit, please contact Margaret Aguilar at 475-1658/59 to arrange a meeting.

Si Yuus Maase.

Sincerely,

RANDEL L. SABLAN
Acting Administrator

Enclosure: Guam EPA SWDF Permit No. 05-060LFL

CC: Ben Machol, USEPA

*"ALL LIVING THINGS OF THE EARTH ARE ONE"*

# GUAM ENVIRONMENTAL PROTECTION AGENCY

# WASTE MANAGEMENT PERMIT

IS HEREBY ISSUED TO

**GOVERNMENT OF GUAM - DEPARTMENT OF PUBLIC WORKS**

AUTHORIZING OPERATION OF

**A SOLID WASTE DISPOSAL FACILITY – ORDOT DUMP**

LOCATED AT

**LOT NO. 3390 R2 AND LOT NO. 3434, DERO DRIVE, ORDOT, GUAM**

THIS PERMIT IS NON-TRANSFERABLE AND CONDITIONED UPON THE HOLDER OBSERVING THE GOVERNMENT CODE OF GUAM AND ALL RULES, REGULATIONS AND ORDERS OF THE GUAM ENVIRONMENTAL PROTECTION AGENCY

NO PERSON SHALL WILLFULLY DEFACE, ALTER, FORGE, COUNTERFEIT OR FALSIFY THIS PERMIT. ANY SUCH ACTIVITY SHALL CAUSE THE IMMEDIATE REVOCATION OF THIS PERMIT.

THE RENEWAL APPLICATION FOR THIS PERMIT SHALL BE SUBMITTED TO GEPA A MINIMUM OF SIXTY (60) DAYS PRIOR TO THE EXPIRATION DATE.

12.14.05
ISSUANCE DATE

**RANDEL L. SABLAN**
AUTHORIZING OFFICIAL

SIGNATURE

**05-060LFL**
PERMIT NUMBER

**05-060LFL**
APPLICATION NUMBER

**October 23, 2007**
EXPIRATION DATE

*"ALL LIVING THINGS OF THE EARTH ARE ONE"*

# GUAM EPA
# SOLID WASTE DISPOSAL FACILITY
# PERMIT NO. 05-060LFL

**FACILITY AND PHYSICAL LOCATION:**

**ORDOT DUMP**
**LOT 3390 R2 & LOT 3434**
**DERO DRIVE, ORDOT**

**NAME AND MAILING ADDRESS OF OWNER:**

**GOVERNMENT OF GUAM**
**DEPARTMENT OF PUBLIC WORKS**
**542 NORTH MARINE CORPS DRIVE**
**TAMUNING, GUAM 96913**

**NAME AND MAILING ADDRESS OF OPERATOR:**

**GOVERNMENT OF GUAM**
**DEPARTMENT OF PUBLIC WORKS**
**542 NORTH MARINE CORPS DRIVE**
**TAMUNING, GUAM 96913**

**CONTACT NOS.:**

**Facility Phone No.: 472-2710**
**Operator Phone No.: 646-3131**
**Owner Phone No.: 646-3131**

_(signature)_        12.14.05
_____     _____
**RANDEL L. SABLAN**          **DATE**
**ACTING ADMINISTRATOR**

12/2/05

# GUAM EPA
## SOLID WASTE DISPOSAL FACILITY
## PERMIT NO. 05-060LFL

**SPECIFICATIONS:**
PERMITTED OPERATIONS:

Solid Waste Management Disposal Facility Authorization for Continued Operations towards Closure, Closure, and Post Closure Maintenance and Monitoring of the Ordot Dump

**KEY DESIGN PARAMETERS:**

Permitted Area (in acres):

47.1 acres (currently at 45.1 acres) additional filling to the east of the dump between 2005 – 2007

Design Capacity:
Current Capacity (late 2004):
Available Capacity to Closure:

4,400,000 yards$^3$ (estimated)
3,202,593 yards$^3$ (estimated)
1,170,000 yards$^3$ (estimated)

Maximum Elevation: (Ft.MSL):
Maximum Depth: (Ft. MSL):

360 Feet above MSL
175 Feet MSL

**SCHEDULE OF ACTIVITIES:**
Last day to receive waste:

The earlier of September 23, 2007 or the opening of a permitted municipal solid waste landfill.

Closure Date and Year:

October 23, 2007

Implementation of Post – Closure Plans and Post Closure Conditions:

October 23, 2007

Liability through:

Later of October 23, 2037 or 30 years after the expiration of the permit or any subsequently issued permit, or permit extension

2

12/2/05

# AUTHORIZATIONS OF CONTINUE OPERATION AND CLOSURE OF THE ORDOT DUMP

## TABLE OF CONTENTS

**PART I - GENERAL PERMIT CONDITIONS** ........................................................... 8

| | | |
|---|---|---|
| I.A. | GENERAL REQUIREMENTS | 8 |
| I.A.l. | Effect of Permit | 8 |
| I.A.2. | Permit Modification, Suspension, Revocation and Termination | 8 |
| I.A.3. | Permit Renewal | 8 |
| I.A.4. | Severability | 9 |
| I.A.5. | Definitions | 9 |
| I.A.6. | Duty to Comply | 9 |
| I.A.7. | Duty to Reapply | 9 |
| I.A.8. | Permit Expiration | 10 |
| I.A.9. | Need to Halt or Reduce Activity Not a Defense | 10 |
| I.A.10. | Duty to Mitigate | 10 |
| I.A.11. | Proper Operation and Maintenance | 10 |
| I.A.12. | Duty to Provide Information | 11 |
| I.A.13. | Inspection and Entry | 11 |
| I.A.14. | Monitoring and Records | 11 |
| I.A.15. | Reporting Planned Changes | 12 |
| I.A.16. | Reporting Anticipated Noncompliance | 12 |
| I.A.17. | Certification of Final Operation to Close | 12 |
| I.A.18. | Transfer of Permit | 13 |
| I.A.19. | Twenty-Four Hour Reporting | 13 |
| I.A.20. | Other Noncompliance | 14 |

3

12/2/05

I.A.21. Other Information ................................................................................................................. 14

I.B.  SIGNATORY REQUIREMENT ...................................................................................................... 14

I.C.  QUARTERLY REPORTING REQUIREMENTS .............................................................................. 15

I.D.  FINANCIAL ASSURANCE ........................................................................................................... 16

I.E.  INCAPACITY OF OWNERS OR OPERATORS, GUARANTORS, OR FINANCIAL INSTITUTIONS ..... 17

I.F.  CONFIDENTIAL INFORMATION .................................................................................................. 17

I.G.  COMPLIANCE SCHEDULE ......................................................................................................... 17

I.H.  DOCUMENTS TO BE MAINTAINED AT THE FACILITY DURING OPERATIONS ........................... 17

PART II – OPERATIONS TOWARDS CLOSURE ................................................................... 19

II.A.  OPERATING CONDITIONS ........................................................................................................ 19

II.A.1.  Design and Operation Facility ................................................................................................. 19

II.A.2.  Solid Waste Accepted .............................................................................................................. 19

II.A.3.  Solid Waste Excluded ............................................................................................................. 20

II.A.4.  Scale Requirements ................................................................................................................ 20

II.A.5.  Procedures for Excluding the Receipt of Hazardous Waste .................................................... 21

II.A.6.  General Waste Placement and Lift Development Requirements ............................................... 21

II.A.7.  Cover Material Requirements ................................................................................................... 23

II.A.8.  Vector, Bird, Odors, Noise, Dust, and Litter Control ............................................................... 23

II.A.9.  Explosive Gases Control .......................................................................................................... 24

II.A.10. Air Criteria .............................................................................................................................. 24

II.A.11. Access Requirements ............................................................................................................. 24

II.A.12. Leachate Management Requirements ..................................................................................... 25

II.A.13. Surface Water Run-on and Run-off Control Systems ............................................................. 25

II.A.14. Liquid Restrictions .................................................................................................................. 25

II.A.15. Record Keeping and Reporting Requirements ........................................................................ 25

II.A.16. Safety .................................................................................................................................... 26

4

12/2/05

II.A.17.  General Inspection Requirements ...................................................................................26

II.A.18.  Personnel Training ........................................................................................................26

II.A.19.  Emergency Response and Contingency Plan ..............................................................27

II.B.      GROUND-WATER MONITORING AND CORRECTIVE ACTION .............................................28

# PART III.        CLOSURE DESIGN AND CONSTRUCTION .......................................... 29

III.A.     SPECIAL CLOSURE DESIGN AND CONSTRUCTION REQUIREMENTS.....................................29

III.B.     CLOSURE DESIGN REPORT AND CLOSURE PLAN - REVISIONS......................................29

III.B.1.   LEACHATE SYSTEM .......................................................................................................29

III.B.2.   SURFACE WATER MANAGEMENT....................................................................................30

III.B.3.   GROUND-WATER MONITORING SYSTEM ........................................................................31

III.B.4.   LANDFILL GAS MANAGEMENT SYSTEM...........................................................................33

# PART IV.        POST-CLOSURE CARE AND MAINTENANCE ...................................... 35

IV.A.      SPECIAL POST-CLOSURE CARE AND MAINTENANCE REQUIREMENTS...............................35

IV.B.      POST-CLOSURE CARE AND MAINTENANCE PLAN - REVISIONS ......................................35

12/2/05

5

# APPENDICES

## A    OPERATIONS PLAN

| Permit Attachment | Plan or Document |
|---|---|
| **II-1** | *Final Filling Plan* (Reserved-Pending Revisions and Final Approval) |
| **II-2** | *Summary of Ordot Dump's Solid Waste Acceptance Policy* (Guam EPA Revisions, December 2005) |
| **II-3** | *Hazardous Waste Exclusion Program* (July 2005) |
| **II-4** | *Ordot Dump Procedures for Responding to Citizen Complaints* (July 2005) |
| **II-5** | *Safety Program* (Guam EPA Revision, December 2005) |
| **II-6** | *Emergency Contingency Plan* (Guam EPA Revisions December 2005) |
| **II-7** | *Groundwater Monitoring Plan* (See Permit Condition Part III) |
| **II-8** | *Operations & Monitoring Plan for the Ordot Dump* (Reserved-Pending Revisions and Final Approval) |
| **II-9** | *Solid Waste Diversion Program Plan* (Reserved-Pending Submittal and Final Approval) |
| **II-10** | *Personnel Training Program Plan* (Reserved-Pending Submittal and Final Approval) |
| **II-11** | *Inspection Plan* (Reserved-Pending Submittal and Final Approval) |
| **II-12** | *Vector Control Monitoring and Deterrence Program Plan* (Reserved-Pending Submittal and Final Approval) |

6

12/2/05

## APPENDICES CONTINUED

**B**    CLOSURE PLAN

**C**    POST-CLOSURE MAINTENANCE AND MONITORING PLAN

**D**    COMPLIANCE SCHEDULE ON DOCUMENT SUBMITTAL

**E**    COMPLIANCE SCHEDULE ON ACTIVITIES

12/2/05

7

# PART I - GENERAL PERMIT CONDITIONS

## I.A.  GENERAL REQUIREMENTS

### I.A.I.      Effect of Permit

a. The Permittee is allowed to dispose solid waste within the permitted area in accordance with the conditions of this Permit. Any disposal of solid waste not authorized in this Permit is prohibited. Subject to the 10 GCA, Chapter 51, Solid Waste Management and Litter Control (SWMLC), §51104(a), compliance with this Permit generally constitutes compliance, for the purposes of enforcement, with the Guam Solid Waste Disposal Rules and Regulations (GSWDRR).

b. Issuance of this Permit does not convey any property rights of any sort or any exclusive privilege; nor does it authorize any injury to persons or property, any invasion of other private rights, or any infringement of federal or local law or regulations.

c. Compliance with the terms of this Permit does not constitute a defense to any order issued or any action brought under 10 GCA, Chapter 51, SWMLC and Section 7003 of Resource Conservation and Recovery Act (RCRA); or any other law providing for protection of public health or the environment.

d. Issuance of this Permit does not provide approval of other applicable permit requirements of the federal or local government including but not limited to Guam air permits, and erosion control permits.

e. The Permittee and all contractors of the Permittee shall be bound by this Permit and all laws and regulations, including financial assurance and insurance requirements.

### I.A.2.      Permit Modification, Suspension, Revocation and Termination

This Permit may be modified, suspended, revoked, reissued, or terminated for cause, as specified in SWMLC §51104(f) and GSWDRR §23104. The filing of a request for a permit action, or the notification of planned changes or anticipated noncompliance by the Permittee does not stay the applicability or enforceability of any permit requirement or condition.

### I.A.3.      Permit Renewal

Parts I and IV of this Permit may be renewed as specified in GSWDRR §23104(k), Permit Condition I.A.7, and shall be consistent with I.A.8. Review of any application for a Permit renewal shall consider improvements in the state of control and measurement technology, as well

8

Case 1:02-cv-00022     Document 190-2     Filed 01/14/2008     Page 12 of 40

as changes in applicable law or regulations.

## I.A.4.    Severability

The provisions of this Permit are severable, and if any provision of this Permit, or the application of any provision of this Permit to any circumstance is held invalid, the application of such provision to other circumstances and the remainder of this Permit shall not be affected.

## I.A.5.    Definitions

For purposes of this Permit, terms used herein shall have the same meaning as those in 10 GCA, Chapter 51 (SWMLC), GSWDRR, and the Consent Decree, unless this Permit specifically provides otherwise; where terms are not defined in the regulations or the Permit, the meaning associated with such terms shall be defined by a standard dictionary reference or the generally accepted scientific or industrial meaning of the term. The following words used herein which are not defined in the SWMLC, GSWDRR, and the Consent Decree, are defined below:

   a. *Consent Decree* means the decree in the *United States of America v. Government of Guam, Civil Case No. 02-00022, issued* on February 11, 2004.
   b. *Issued date* means the date the Administrator signs this permit. The date is also on the cover page.
   c. *Permittee* means the Department of Public Works (DPW), or its designee, including the contractor(s) who operate(s) the Ordot Dump on behalf of the Department of Public Works.

## I.A.6.    Duty to Comply

The Permittee shall comply with all conditions of this Permit, except to the extent and for the duration the Administrator has issued prior authorization for such noncompliance. Any Permit noncompliance, other than noncompliance which has received prior authorization from the Administrator, constitutes a violation of the SWMLC and the GSWDRR and is grounds for enforcement action; for Permit termination, revocation, suspension, or modification; or for denial of a Permit renewal application.

## I.A.7.    Duty to Reapply

Pursuant to GSWDRR §23104(k), the Permittee shall submit a complete application for a new Permit at least 60 days prior to the Permit expiration date.

9

## I.A.8.  Permit Expiration

Pursuant to GSWDRR §23104(g) and as established within the Consent Decree, this Permit shall be effective as follows:

| | Term |
|---|---|
| Part I – General Conditions | Every five (5) years after the issued date of this permit for a minimum of thirty (30) years. |
| Part II – Operations towards Closure | The earlier of September 23, 2007 or the opening of a permitted municipal solid waste landfill. |
| Part III – Closure Conditions | October 23, 2007 |
| Part IV – Post Closure Maintenance | Every five (5) years after the issued date and Monitoring of this permit for a minimum of thirty (30) years. |

## I.A.9.  Need to Halt or Reduce Activity Not a Defense

It shall not be a defense for the Permittee, in an enforcement action that it would have been necessary, to halt or reduce the Permitted activity in order to maintain compliance with the conditions of this Permit.

## I.A.10.  Duty to Mitigate

In the event of noncompliance with this Permit, the Permittee shall take all reasonable steps to minimize releases to the environment and shall carry out such measures, as are reasonable, to prevent significant adverse impacts on human health or the environment, and to come into compliance as rapidly as possible.

## I.A.11.  Proper Operation and Maintenance

The Permittee shall at all times properly operate and maintain all facilities, equipment, contracts, and systems of treatment and control (and related appurtenances) which are installed or used by the Permittee or its contractors to achieve compliance with the conditions of this Permit. Proper operation and maintenance includes, but is not limited to, effective performance, adequate funding, operator staffing and training, equipment, monitoring, laboratory and process controls, including appropriate quality assurance/quality control procedures. This provision requires the

10

12/2/05

operation of back-up or auxiliary facilities or similar systems only when necessary to achieve compliance with the conditions of this Permit.

## I.A.12.  *Duty to Provide Information*

   a.  The Permittee shall furnish to the Administrator, within a reasonable time, any relevant information which the Administrator may request
       i.  to determine whether cause exists for modifying, revoking and reissuing, or terminating this Permit, or
      ii.  to determine compliance with this Permit or any applicable environmental requirements.
   b.  The Permittee shall also furnish to the Administrator, upon request, copies of records required to be kept by this Permit.

## I.A.13.  *Inspection and Entry*

Pursuant to the SWMLC §51106 and Section VIII of the Consent Decree, the Permittee shall allow the Administrator or his designee and USEPA (including their contractors and consultants), upon the presentation of credentials to:

   a.  Enter at reasonable times upon the Permittee's premises where a regulated facility or activity is located or conducted, or where records must be kept under the conditions of this Permit or regulations;
   b.  Have access to and copy, at reasonable times, any records that must be kept under the conditions of this Permit or regulations;
   c.  Inspect at reasonable times any facilities, equipment (including monitoring and control equipment), practices, or operations regulated or required under this Permit or regulations; and
   d.  Sample or monitor, at reasonable times, for the purposes of assuring Permit compliance or as otherwise authorized by the SWMLC, any substances or parameters at any location.

## I.A.14.  *Monitoring and Records*

   a.  Samples and measurements taken for the purpose of monitoring shall be representative of the monitored activity.  The methods used to obtain a representative samples of all monitoring requirements must be approved by the Administrator prior to use.
   b.  Record Retention.

       i.  Unless other conditions apply, the Permittee shall retain records of all monitoring information, including all calibration and maintenance records and

all original strip chart recordings for continuous monitoring instrumentation, copies of all reports and records required by this Permit, and as specified in the permit application documentations and records of all data used to complete the application for this Permit for a period of at least five (5) years from the date of the sample, measurement, report, record, certification, or application.

ii. These retention periods may be extended by the Administrator at any time and are automatically extended during the course of any unresolved enforcement action regarding this facility.

iii. The Permittee shall maintain records from all ground-water monitoring wells and associated ground-water surface elevations for the active life of the facility, and for disposal facilities throughout the post-closure care period, as required by GSWDRR §23312(a)(5).

c.  Records of all monitoring information shall specify:
   i.   The dates, exact place, and times of sampling or measurements;
   ii.  The individuals who performed the sampling or measurements;
   iii. The dates the analyses were performed;
   iv.  The individuals and laboratory who performed the analyses;
   v.   The analytical techniques or methods used; and
   vi.  The results of such analyses.

c.  Any contract between the Permittee and a consultant to collect or maintain data and records shall require that all information, including any data in computer database and files, are property of the Government of Guam.

## I.A.15.  Reporting Planned Changes

The Permittee shall give notice to the Administrator, as soon as possible, of any planned physical alterations or additions to the Permitted facility.

## I.A.16.  Reporting Anticipated Noncompliance

The Permittee shall give advance notice to the Administrator of any planned changes in the permitted facility or activity which may result in noncompliance with permit requirements. In addition, the Permittee shall comply with Section IX, paragraphs 31-37 of the Consent Decree for any claim of *force majeure*.

## I.A.17.  Certification of Final Operation to Close

The Permittee shall not commence closure construction until the Permittee has submitted to the Administrator, by certified mail or hand delivery, a letter signed by the Permittee and a registered professional engineer stating that the facility has been operating and the Permittee has placed

12

12/2/05

solid waste and cover materials in compliance with the Permit and the Guam EPA approved Final Filling Plan; and

    a. The Administrator has inspected the final operation activities and implementation of filling plan and finds it is in compliance with the conditions of the Permit; or

    b. The Administrator has either waived the inspection or the Administrator has not, within fifteen (15) calendar days after receipt of Permittee's notification, notified the Permittee of his intent to inspect.

## I.A.18.    *Transfer of Permits*

    a. This Permit is not transferable, whether by operation of law or otherwise, either from one location to another, from one solid waste disposal facility to another or from one person to another, without the written approval of the Administrator. The Administrator may require suspension, termination, modification, revocation, or reissuance of the Permit as required by GSWDRR §23104(h) and §23104(j).

    b. Before transferring ownership of or contracting for the operation of the facility or implementation of closure activities or post closure care, the Permittee shall notify the new owner or operator in writing of the requirements of the Consent Decree, SWMLC, GSWDRR and this Permit.

    c. Copies of notification described in I.A.18.(b) shall be provided to the Administrator concurrent with notification to the owner or operator.

## I.A.19.    *Twenty-Four Hour Reporting*

    a. The Permittee shall report to the Administrator any noncompliance which may endanger human health or the environment. Any such information shall be reported orally within twenty-four (24) hours or less from the time the Permittee becomes aware of the circumstances. The report shall include the following:

        i. Information concerning release of any hazardous waste, constituents of concerns (COC), or potential constituents of concerns (PCOC) that may endanger public drinking water supplies.

        ii. Any information of a release or discharge of hazardous waste, constituents of concerns (COC), or potential constituents of concerns (PCOC) or of a fire or explosion from the solid waste management facility which could threaten the environment or human health outside the facility.

        iii. The description of the occurrence and its cause shall include:

            a. Name, address, and telephone number of the owner or operator;

            b. Name, address, and telephone number of the facility;

            c. Date, time, and type of incident;

            d. Name and quantity of materials involved;

13

e. The extent of injuries, if any;

f. An assessment of actual or potential hazards to the environment and human health outside the facility, where this is applicable; and

g. Estimated quantity and disposition of recovered material that resulted from the incident.

b. A written notice shall also be provided within five (5) calendar days of the time the Permittee becomes aware of the circumstances. The written notice shall contain the following:

   i. A description of the noncompliance and its cause;

   ii. The period(s) of noncompliance (including exact dates and times);

   iii. Whether the noncompliance has been corrected; and if not;

   iv. The anticipated time it is expected to continue; and

   v. Steps taken or planned to reduce, eliminate, and prevent recurrence of the non-compliance.

c. The Administrator may waive the five (5) calendar days written notice requirement in favor of a written report within fifteen (15) calendar days.

## I.A.20. *Other Noncompliance*

The Permittee shall report all other instances of noncompliance not otherwise required to be reported above, Permit Conditions I.A.15 - 19, at the time monitoring reports are submitted. The reports shall contain the information listed in Permit Condition I.A.19.

## I.A.21. *Other Information*

Whenever the Permittee becomes aware that it failed to submit any relevant facts in the Permit application or in any report, notification or submission, or that it submitted incorrect information in a Permit application or in any report, notification or submission to the Administrator, the Permittee shall promptly submit such facts or information.

## I.B. SIGNATORY REQUIREMENT

1. All applications, reports, or information submitted to or requested by the Administrator shall be signed and certified by the Director of DPW or his designee as required by the GSWDRR §23104(b)(3) and paragraph 42 of the Consent Decree, as applicable.

2. Except as otherwise specifically stated, all reports, notifications, or other submissions required by this Permit or requested by the Administrator shall be either sent by certified mail to:

14

Administrator
Guam Environmental Protection Agency
Post Office Box 22439 GMF
Barrigada, Guam 96921

Or delivered to:

Administrator
Guam Environmental Protection Agency
Building 17-3304, Mariner Ave.
Tiyan, Barrigada, Guam 96921

3. All reports, notices and other submissions to Guam EPA shall be signed and affirmed by a responsible official of the Permittee using the following certification statement:

I certify under penalty of law that I have examined and am familiar with the information submitted in this document and all attachments and that this document and its attachments were prepared either by me personally or under direction or supervision in a manner designed to ensure that qualified and knowledgeable personnel properly gathered and presented the information contained therein. I further certify, based on my personal knowledge or on my inquiry of those individuals immediately responsible for obtaining the information, that the information is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for knowing and willful submission

## I.C.  QUARTERLY REPORTING REQUIREMENTS

1. For the quarter in which this Permit is issued, the Permittee shall submit to Guam EPA a written report within ten (10) calendar days, which at a minimum includes the outline of subsection I.C.4.a-e below, and the contents required by subsection I.C.4.e below.

2. Beginning with the first quarter following the quarter in which this Permit is issued and continuing until termination of this Permit, the Permittee shall submit to Guam EPA written quarterly reports on implementing the provisions of this Permit.

3. Quarterly reports shall be published within ten (10) calendar days after the last day of each quarter, in a major newspaper or newspaper of general circulation, and on the Permittee's website.

4. Quarterly reports shall be submitted within ten (10) calendar days after the last day of each

15

12/2/05

quarter. At a minimum, these Reports shall include:

   a. All tasks required under the Permit and performed during the reporting period;
   b. All deadlines in this Permit that the Permittee was required to meet during the reporting period;
   c. A report whether the Permittee met these deadlines;
   d. The reasons for any failure to meet these deadlines and all steps taken to remedy such failure; and
   e. A projection of the tasks to be performed pursuant to this Permit during the next reporting period.

## I.D. FINANCIAL ASSURANCE

The Guam Department of Public Works is not required to obtain financial assurance. However, financial assurance shall be required of any person, business, or company contracted by the Department of Public Works. For purposes of this section, the term "Permittee" does not include the Department of Public Works.

Financial assurance shall be provided to ensure that funds are available to pay for operation, closure, post-closure, and corrective action at the Ordot Dump. (§51104.c) The Permittee shall comply with the following conditions:

1. Prior to beginning work, provide, at a minimum, financial assurance of $10 million (Public Law 24-06, Section 4.9) to cover environmental liability, including the cost of hiring a third party to perform corrective actions and operate the facility, and financial assurance that it can comply with this Permit and with the GSWDRR. DPW may submit a request to decrease the amount of financial assurance. All requests shall include a detailed cost analysis to support the request.

2. Prior to beginning any work, obtain, at a minimum, general liability coverage for sudden and non-sudden accidental occurrences in the amount of at least $2 million per occurrence, with an annual aggregate of at least $4 million. DPW may submit a request to decrease the amount of liability. All requests shall include a detailed cost analysis to support the request.

3. Demonstrate continuous compliance with this section by providing documentation of financial assurance, if applicable, in at least the amount required by Permit Condition I.D.2.

4. Any changes in financial assurance mechanisms shall be approved by the Administrator before the changes are made.

16

12/2/05

## I.E. INCAPACITY OF OWNERS OR OPERATORS, GUARANTORS, OR FINANCIAL INSTITUTIONS

1. The Permittee shall notify the Administrator by delivery of the commencement of a voluntary or involuntary proceeding in any bankruptcy, including bankruptcy under Title 11, U.S. Code, naming the owner or operator as debtor, within 10 days after commencement of the proceeding. A guarantor of a contractor must make such a notification if he is named as debtor.

2. The Permittee who fulfills the requirements of financial assurance by obtaining a trust fund, surety bond, letter of credit, other local approved mechanism, or insurance policy will be deemed to be without the required financial assurance or liability coverage in the event of bankruptcy of the trustee or issuing institution, or a suspension or revocation of the authority of the trustee or institution to act as trustee or of the institution issuing the surety bond, letter of credit, or insurance policy to issue such instruments. The Permittee must establish other financial assurance or liability coverage within 60 days after such an event.

## I.F. CONFIDENTIAL INFORMATION

In accordance with 5 GCA, Chapter 10, Freedom of Information, §10108(i), the Permittee may claim confidential any information required to be submitted by this Permit.

## I.G. COMPLIANCE SCHEDULE

1. The Permittee shall comply with the Compliance Schedule referenced in Appendix D.

2. The Permittee shall implement the Activity Schedule referenced in Appendix E.

## I.H. DOCUMENTS TO BE MAINTAINED AT THE FACILITY DURING OPERATIONS

The Permittee shall maintain at the facility and at the Department of Public Works, Division of Solid Waste, until closure is completed and certified by an independent, registered professional engineer, and the Administrator provides written approval that the Permittee may remove them,

the following documents and all amendments, revisions and modifications to these documents:

1. Summary of Ordot Dump's Solid Waste Acceptance Plan, as required by GSWDRR §23312(a)(8) and this Permit.

2. Inspection schedules and plans, as required by GSWDRR §23312(a)(2) and this Permit.

3. Personnel Training Program Plan and personnel training documents and records, as required by GSWDRR 23312(a)(2) and this Permit.

4. Emergency Contingency Plan, as required by this Permit.

5. Hazardous Waste Exclusion Program, as required by this Permit and GSWDRR §23303.

6. Operating record, as required by GSWDRR §23312(a)(9) and this Permit.

7. Closure Plan as required by GSWDRR §23312(a)(6) and this Permit.

8. Post-Closure Care and Maintenance Plan, as required by GSWDRR §23312(a)(6) and this Permit.

9. Annually-adjusted cost estimate for facility closure and post-closure, as required by GSWDRR §23312(a)(7) and this Permit.

10. Gas Monitoring Plan and Sampling and Analysis Data, as required by GSWDRR §23312(a)(3) and this Permit.

11. Ground-water Monitoring Plan and Sampling and Analysis Data, as required by GSWDRR §23312(a)(5) and this Permit.

12. Surface Water Monitoring Plan and Sampling and Analysis Data, as required by this Permit.

13. Final Filling Plan and Ordot Dump Assessment Report, as required by this Permit.

14. Operations Plan, as required by GSWDRR §23104(b)(1)(C) and this Permit.

15. Vector Control Monitoring Plan and Deterrence Program, as required by GSWDRR §23312(a)(11) and this Permit.

18

12/2/05

# PART II – OPERATIONS TOWARDS CLOSURE

## II.A. OPERATING CONDITIONS

### II.A.1. Design and Operation Facility

a. The Permittee shall construct, maintain and operate the facility to minimize the possibility of a fire, explosion, or any unplanned, sudden or nonsudden release of solid waste constituents, including constituents dissolved or suspended in water, air, soil, surface water, or ground water which could threaten human health or the environment, including endangered or threatened species of plant, fish or wildlife, and as required by GSWDRR §23301 and §23401.

b. No later than April 21, 2006, the Permittee shall retain the services of a contractor that includes a certified Manager of Landfill Operations (MOLO), or its equivalency, with at least five (5) years experience in landfill operations. The MOLO personnel shall be stationed at the facility to oversee and be responsible for the implementation of all operating requirements, closure design and construction.

c. Within two (2) calendar days upon compliance with subsection (b) of this section, the Permittee shall notify Guam EPA in writing of the contractor, the MOLO certified personnel, and a copy of the MOLO personnel's certification.

### II.A.2. Solid Waste Accepted

a. The Permittee shall accept only those waste listed for disposal at the Ordot Dump per GSWDRR §23301. The Permittee shall implement the *Operations Plan*, Appendix A, Section 3.4-Select Waste Criteria, as amended by Guam EPA. In addition, the Permittee shall comply with the following conditions:

    i. Within sixty (60) calendar days of the issued date, submit a detailed, comprehensive Solid Waste Diversion Program Plan and implementation schedule for recyclable or reusable materials to Guam EPA. At a minimum, the Plan shall include the following:
        1. after July 1, 2006, yard waste that has not been processed through a chipper is excluded; and
        2. after July 1, 2007, no yard waste.

    ii. Within two (2) calendar days of the issued date, post a sign at the entrance of the facility that includes the waste accepted as stated in this section.

19

12/2/05

    iii. The Summary of Ordot Dump's Solid Waste Acceptance Policy, as amended by Guam EPA (Appendix A, Permit Attachment II-2) is subject to change only upon approved by and notice from Guam EPA (i.e., yard waste and recyclable materials).

  b. The Permittee shall request approval from Guam EPA in writing for any addendum or modification relating to *Summary of Ordot Dump's Solid Waste Acceptance Policy,* as amended by Guam EPA (Appendix A, Permit Attachment II-2).

## II.A.3. Solid Waste Excluded

The Permittee shall implement the *Operations Plan,* Appendix A, Section 3.4-Select Waste Criteria and §23302 of GSWDRR for those solid wastes excluded for disposal.

## II.A.4. Scale Requirements

Upon the issued date, the Permittee shall implement the *Operations Plan,* Appendix A, Section 3.1.2-Scale, as amended by Guam EPA. In addition, the Permittee shall comply with the following conditions:

  a. Within one-hundred twenty (120) calendar days of the issued date, and thereafter, operate and maintain a scale to measure weight of all incoming waste.

  b. Within fifteen (15) calendar days of the issued date, submit a schedule (not to exceed one-hundred twenty (120) calendar days) for the repair of the existing scale to industry standards or for the installation of a new scale to measure all incoming waste;

  c. If a new scale is to be purchased, the Permittee shall have two (2) calendar days of the issued date to submit information and documentation to Guam EPA on proof of purchase, specifications, expected installation date and expected operation date of the scale;

  d. For each vehicle entering the facility with waste, record the waste volume and waste weight per vehicle;

  e. Within thirty (30)calendar days of the issued date, submit to Guam EPA for review and approval Incoming Waste Tonnage reporting forms for recordkeeping; and

  f. Record and report weight and volume data according to the requirements as stated in GSWDRR §23312 and in this Permit.

20

## II.A.5. Procedures for Excluding the Receipt of Hazardous Waste

Upon the issued date, the Permittee shall implement the *Operations Plan*, Appendix A, Section 3.3.1- Detection and Prevention of Excluded Waste Disposal and §23303 of GSWDRR. In addition, the Permittee shall comply with the following conditions:

a. Conduct random vehicle inspections of all incoming loads at least once every week for the first six (6) months after the issued date of this Permit.

b. Conduct random off-load inspections at the working faces during the off-loading of waste at least once every week for the first six (6) months after the issued date of this Permit.

c. Complete the Incident Form 1 (*Hazardous Waste Exclusion Program*, Permit Attachment II-3) for each inspection required by this section.

d. Maintain records of these inspections reports and make them available to Guam EPA upon request.

e. After the first six (6) months, unless notified otherwise by Guam EPA, conduct random vehicle inspections and off-load inspections at the working faces at least once every two (2) weeks.

## II.A.6. General Waste Placement and Lift Development Requirements

Upon the issued date, the Permittee shall implement the *Operations Plan*, Appendix A, Section 3.2-General Waste Placement and Lift Development Plan, as amended by Guam EPA. In addition, the Permittee shall comply with the following conditions:

a. **Dump Assessment and Generation of a Final Filling Plan**

   i. Within <u>fifteen (15) calendar days</u> of the issued date, retain a registered surveyor and submit a detailed ***Ordot Dump Assessment Report*** to Guam EPA. The ***Ordot Dump Assessment Report*** shall include but not be limited to:
      1. A topographic survey of the site to reflect current dump conditions;
      2. An evaluation of the current topographic survey with the topographic survey performed by Duenas and Associates in October 2004 and a determination of the volume of waste received by the dump from October 2004 to the time of the survey; and
      3. A comparison of the final filling plan points (*Operations Plan* (July 2005),

21

Case 1:02-cv-00022    Document 190-2    Filed 01/14/2008    Page 25 of 40

Appendix A) to the latest topographic survey, which identifies all areas that exceed the control point limits along with waste volumes to be relocated to be within the control points.

ii. Within <u>thirty (30) calendar days</u> of the issued date, submit to Guam EPA a ***Draft Final Filling Plan*** to include but not be limited to the following:

   1. A phased filling approach that uses a grid and numbering system to divide the site and provide clear direction for the filling of active areas by lift or section;
   2. An estimated time frame for completion of each lift based on the data generated in the Ordot Dump Assessment Report;
   3. A detailed set of standard operating procedures which provide clear direction, and which include but are not limited to the following:
      A. Active Area Boundary Marking;
      B. Tipping floor preparation;
      C. Lift development;
      D. Compaction;
      E. Managing off-loading areas for commercial and residential customers;
      F. Litter control;
      G. Daily and intermediate soil cover requirements;
      H. Soil stockpile requirements;
      I. Site grading;
      J. Wet and dry season contingencies;
      K. Active Area Mapping;
      L. Progress Meetings;

iii. Schedule for filling in accordance with the deadlines in the Consent Decree.

iv. Within <u>thirty (30) calendar days</u> of receiving Guam EPA's written comments to the ***Draft Final Filling Plan***, incorporate and address those comments and submit a ***Final Filling Plan*** to Guam EPA for review and approval.

b. **Implementation of the Final Filling Plan**

   i. Within <u>five (5) calendar days</u> of receiving written notice from Guam EPA, conduct a Final Filling Plan Kick-Off Meeting with Guam EPA to discuss the implementation of the approved Final Filling Plan. At a minimum, the meeting shall have in attendance DPW Engineering and Operations personnel, any contractors involved in operations, and the registered surveyor, and members of Guam EPA.

22

12/2/05

## II.A.7.    *Cover Material Requirements*

The Permittee shall comply with the *Operations Plan*, Appendix A, Section 3.5-Soil Usage and §23304 of the GSWDRR. In addition, the Permittee shall comply with the following conditions:

   a.  Determine the <u>daily</u> amount of soil cover required for each lift as identified in the Guam EPA approved Final Filling Plan. (3.5.2)

   b.  Determine the <u>total</u> amount of soil required for daily cover as identified in the Guam EPA approved Final Filling Plan. (3.5.2)

   c.  Within forty-five (45) calendar days of the issued date, the Permittee shall identify and maintain a minimum of 14-days soil stockpile quantity on site per the Guam EPA approved Final Filling Plan and for fire suppression. (3.5.1)

   d.  Ensure that soil cover material meets specifications approved by Guam EPA. (3.5)

   e.  Should the required minimum amount of soil stockpiled on site as determined in (c) and (d) of this Section become depleted, or is insufficient, then the following shall be immediately implemented (3.5.4):
      i.   Close the non-commercial working face;
      ii.  Residential haulers shall no longer enter the facility's active face;
      iii. All non-commercial waste shall be deposited into roll-off bins located outside the working face; and
      iv.  Site operators shall transport the roll-off bins to the working face.

   f.  On a weekly basis, the Director of DPW, or his designee must certify in writing to the Guam EPA Administrator that an adequate supply of cover material would be provided by a defined source within 48 hours. (3.5.1)

   g.  Any alternative cover material to be used on the facility shall be approved by Guam EPA.(3.5.3)

## II.A.8.    *Vector, Bird, Odors, Noise, Dust, and Litter Control*

The Permittee shall comply with the *Operations Plan*, Appendix A, Section 3.8-Criteria for Reduction of Vectors, Bird, Odors, Noise, Dust, and Litter, as amended by Guam EPA and §23305 of GSWDRR. In addition, the Permittee shall comply with the following conditions:

   a.  Within five (5) calendar days of the issued date, place and maintain a portable fence

23

Case 1:02-cv-00022    Document 190-2    Filed 01/14/2008    Page 27 of 40

around the working face of the Dump to control litter dispersal.

b. Within thirty (30) calendar days of the issued date, provide to this Agency a *Vector Control Monitoring and Deterrence Program Plan* and Standard Operating Procedures, as described in Section 3.8.1. of the *Operations Plan*, Appendix A.

## II.A.9.    Explosive Gases Control

The Permittee shall comply with the *Operations Plan*, Appendix A, Section 7.0-Landfill Gas Control, as amended by Guam EPA and §23306 of GSWDRR to monitor for the presence of methane gas.

The Permittee shall conduct within fifteen (15) calendar days of the issued date the activities described in the *Operations Plan*, Appendix A, Section 7.2-Interim Methane Gas Monitoring, as amended by Guam EPA.

## II.A.10.    Air Criteria

The Permittee shall comply with the air criteria requirements, stated in GSWDRR §23307.

## II.A.11.    Access Requirements

The Permittee shall comply with the access requirements, stated in GSWDRR §23308. In addition, the Permittee shall comply with the following conditions:

a. Within sixty (60) calendar days of the issued date, ensure that the facility is provided with the following:

   i. A 24-hour surveillance system (e.g., television monitoring or surveillance by guards or facility personnel) which continuously monitors and controls entry onto the active portion of the facility; or

   ii. An artificial or natural barrier (e.g., a fence in good repair or a fence combined with a cliff), which completely surrounds the active portion of the facility; and

   iii. A means to control entry, at all times, through the gates or other entrances to the active portion of the facility (e.g., an attendant, television monitors, locked entrance, or controlled roadway access to the facility).

24

12/2/05

## II.A.12.  Leachate Management Requirements

The Permittee shall cease the discharge of leachate into the waters of the United States, by October 23, 2007 in accordance with Section IV.8.i of the Consent Decree. In addition, the Permittee shall comply with the following conditions:

a. Implement the Final Filling Plan that is approved by Guam EPA, as indicated in Sections II.A.6 and II.A.7 of this permit.

b. Minimize leachate generation at all times.

## II.A.13.  Surface Water Run-on and Run-off Control Systems

The Permittee shall comply with the *Operations Plan*, Appendix A, Section 6.0-Surface Water Run-On/Run-Off Control, as amended by Guam EPA and §23306 of GSWDRR to control surface water run-on and run-off.

The Permittee shall implement the Final Filling Plan that is approved by Guam EPA as indicated in Sections II.A.6 and II.A.7 of this permit in order to minimize the discharge of pollutants into waters of the United States as indicated in GSWRR §23310.

## II.A.14.  Liquid Restrictions

The Permittee shall comply with the liquid restriction requirements in the *Summary of Ordot Dump's Solid Waste Acceptance Policy*, Appendix A, Operations Plan, Permit Attachment II-2, as amended by Guam EPA and §23311 of GSWDRR.

## II.A.15.  Record Keeping and Reporting Requirements

The Permittee shall comply with the recordkeeping requirements in the *Operations Plan*, Appendix A, Section 10-Recordkeeping, as amended by Guam EPA and §23312 of GSWDRR. In addition, the Permittee shall comply with the recordkeeping and reporting requirements specified elsewhere in this Permit.

Case 1:02-cv-00022   Document 190-2   Filed 01/14/2008   Page 29 of 40

## II.A.16. Safety

The Permittee shall comply with the recordkeeping requirements in the *Operations Plan*, Appendix A, Section 3.10–Site Safety as amended by Guam EPA and §23313 of GSWDRR.

## II.A.17. General Inspection Requirements

Upon the issued date, the Permittee shall comply with the general inspection requirements in the *Operations Plan*, Appendix A, Section 3.9–Inspection Plan, as amended by Guam EPA. In addition the Permittee shall comply with the following conditions:

a. Within thirty (30) calendar days of the issued date, the Permittee shall submit to Guam EPA a revised Inspection Plan. (*Operations Plan*, Appendix A, Section 3.9). At a minimum, the Plan shall include the following information:

    i. A written schedule for inspecting monitoring equipment, safety and emergency equipment, security devices, and operating and structural equipment (such as dikes and sump pumps).

        ■ This schedule shall be posted at the facility.

        ■ The schedule shall identify the types of problems which are to be looked for during the inspection.

    ii. Inspection forms for use by the individuals performing the inspection.

b. Pending Guam EPA-approval of the revised Inspection Plan, the Permittee shall conduct interim inspections in accordance with the Operations Plan, Appendix A, Section 3.9–Inspection Plan, as amended by Guam EPA, to identify problems in time to correct them before they harm human health or the environment.

## II.A.18. Personnel Training

The Permittee shall conduct personnel training with the following conditions:

a. Within fifteen (15) calendar days of the issued date, submit to Guam EPA a Personnel Training Program Plan for Guam EPA review and approval.

    i. At a minimum, the Plan shall include the following training and information:
       1. Safety

12/2/05

2. Operations
3. Emergency Response
4. Training Schedule
5. Personnel List

ii.    Within thirty (30) calendar days of the issued date, submit to Guam EPA an updated listing of employees with certification as to the training for each.

iii.    The Personnel Training Program shall be directed by a person trained in solid waste management procedures, and shall include instruction which teaches facility personnel solid waste management procedures (including contingency plan implementation) relevant to the positions in which they are employed.

iv.    The Permittee shall maintain training documents and records, as required by GSWDRR §23312(a) (2) for at least five (5) years.

v.    Facility personnel shall successfully complete the entire program required in this section within six months after the issued date of this Permit or six months after the date of their employment or assignment to this facility, or any other MSWLF, or a new position at a facility, whichever is later. Employees hired after the effective date of this Permit shall not work in unsupervised positions until they have completed the training requirements of this section.

vi.    Facility personnel shall take part in an annual review of the initial training required in this section.

vii.    Training records on current personnel shall be kept until closure of the facility; training records on former employees shall be kept for at least three years from the date the employee last worked at the facility.

b.  Pending approval of the Personnel Training Program Plan, within thirty (30) calendar days of the issued date, provide the interim training described in the *Operations Plan*, Appendix A, Section 3.14.1-Personnel Training for all employees working at the Ordot Dump.

c.  Within thirty (30) calendar days of the issued date, submit to Guam EPA an updated listing of employees with their training certifications.

## II.A.19.   *Emergency Response and Contingency Plan*

The emergency and contingency plan shall be designed to minimize hazards to human health or the environment from fires, explosions, or any unplanned sudden or non-sudden release of harmful constituents to air, soil, or surface water.

Upon issued date, the Permittee shall implement the provisions of *Operations Plan*, Appendix A, Section 3.11–Emergency Response, as amended by Guam EPA. In addition, the Permittee shall comply with the following conditions:

27

a. Within thirty (30) calendar days of the issued date, the Permittee shall submit to Guam EPA, a revised Emergency Contingency Plan (Appendix A, Permit Attachment II-6) to include the following:

    i. Describe the arrangements agreed to by local police departments, fire departments, hospitals, contractors, and federal and local emergency response teams to coordinate emergency services.

    ii. List names, addresses, and phone numbers (office and home) of all persons qualified to act as emergency coordinator, and this list shall be kept up to date. Where more than one person is listed, one must be named as primary emergency coordinator and others shall be listed in the order in which they will assume responsibility as alternates.

    iii. Include a list of all emergency equipment at the facility (such as fire extinguishing systems, spill control equipment, communications and alarm systems (internal and external), and decontamination equipment), where this equipment is required. This list shall be kept up to date. In addition, the plan shall include the location and a physical description of each item on the list, and a brief outline of its capabilities.

    iv. Include an evacuation plan for facility personnel which describes signal(s) to be used to begin evacuation, evacuation routes, and alternate evacuation routes (in cases where the primary routes could be blocked by releases of hazardous waste, harmful constituents, or fires).

b. The Permittee shall implement the approved revised Guam EPA Emergency Contingency Plan.

## II.B. *GROUND-WATER MONITORING AND CORRECTIVE ACTION*

The Permittee shall install a ground-water system which consist of a sufficient number of wells, installed at appropriate locations and depths, to yield groundwater samples from the uppermost aquifer. In addition, the groundwater samples must represent the quality of groundwater passing the relevant point of compliance specified by the Administrator to ensures detection of groundwater contamination in the uppermost aquifer (GSWDRR §23401).

Guam EPA has determined that the proposed Groundwater Monitoring Plan (*Operations Plan, Appendix A, Section 9.0-Groundwater Monitoring and Permit Attachment II-7-Groundwater Monitoring Plan (July 2005)*) does not comply with the GSWDRR §23502. Therefore, the Permittee shall conduct a two (2) phased installation of a complete Groundwater Monitoring System for the Ordot Dump to provide hydrogeologic data in an iterative approach, as indicated

28

in Part III- Closure Design and Construction of this permit.

# PART III.    CLOSURE DESIGN AND CONSTRUCTION

The Permittee shall construct, maintain and operate the facility to minimize the possibility of fire, explosion, or any unplanned, sudden or nonsudden release of solid waste constituents to air, soil, surface water, or ground water which could threaten human health or the environment, including endangered or threatened species of plant, fish or wildlife, and as required by GSWDRR §23104(a)(5) and §23401.

## III.A. SPECIAL    CLOSURE    DESIGN    AND    CONSTRUCTION REQUIREMENTS

The Permittee shall **not** implement the submitted Ordot Dump Closure Design Report (July 2005) and Closure Plan (July 2005) or begin or any related activities <u>until the Administrator provides written approval of the Closure Plan.</u> In addition, the Permittee shall comply with the following conditions:

1. No later than January 11, 2006, the Permittee shall advertise for bids to construct Guam EPA approved Ordot Dump closure plans and specifications.

2. No later than April 21, 2006, the Permittee shall award a construction contract for the Ordot Dump closure and provide a Notice to Proceed.

3. Closure shall be completed no later than October 23, 2007. The Permittee shall submit an updated schedule to comply with the requirements for approval by Guam EPA.

## III.B. CLOSURE DESIGN REPORT AND CLOSURE PLAN - REVISIONS

The Permittee shall update or revise Ordot Dump Closure Design Report (July 2005) and Closure Plan and submit the revised report and plan (Appendix B-Reserved) no later than December 30, 2005. At a minimum, the updates or revisions shall include the information described in Permit Conditions III.B.1-4.

## III.B.1.    LEACHATE SYSTEM

Case 1:02-cv-00022    Document 190-2    Filed 01/14/2008    Page 33 of 40

Upon the issued date, the Permittee shall comply with the following conditions:

a. Within sixty (60) calendar days of the issued date, the Permittee shall submit a Draft Leachate Disposal System Design and Leachate Management Plan for the discharge of leachate directly from Ordot Dump into the sanitary sewer system. The Draft Leachate Disposal System Design and Leachate Management Plan shall include a construction schedule. In addition, include an analysis of the current infrastructure and the improvements needed, if any.

b. Within thirty (30) calendar days, of receiving comments from Guam EPA, incorporate Guam EPA's comments submit the Final Leachate Disposal System Design and Final Leachate Management Plan, reflecting such comments.

c. No later than September 23, 2007, complete construction of the Guam EPA approved Final Leachate Disposal System Design and fully implement the Final Leachate Management Plan.

d. Upon Guam EPA's approval of the Final Leachate Disposal System Design and Final Leachate Management Plan, ensure all leachate is discharged at a sewage system in accordance with Guam Water Works Authority requirements. No leachate shall be located outside of the leachate collection system and any leachate and sewer discharge system.

## III.B.2.    SURFACE WATER MANAGEMENT

The Permittee shall not cause discharge of pollutants into waters of the United States, including wetlands, that violates any requirements of the Clean Water Act, including, but not limited to, the National Pollutant Discharge Elimination System (NPDES) requirements, pursuant to Section 402, or cause the discharge of a nonpoint source of pollution to waters of the United States, including wetlands, that violates any requirement of an area-wide or territorial-wide water quality management plan that has been approved under Section 208 or 319 of the Clean Water Act, as amended, as required by the GSWDRR §23310.

a. In addition, the Permittee shall comply with the following conditions:
    i. Revise the 100% Construction Stormwater Control and Permanent Stormwater Management System to eliminate the single detention pond at the southwest corner of the dump and provide distributed flow off-site to surrounding water bodies.
    ii. Within thirty (30) calendar days of the issued date, submit to Guam EPA a Draft Design Schedule and a Draft Revised Basis of Design for the Construction Stormwater Control and Permanent Stormwater Management System.

30

12/2/05

iii.   Within fifteen (15) calendar days of receiving Guam EPA's comments, submit the Final Design Schedule and Final Revised Basis of Design for the Construction Stormwater Control and Permanent Stormwater Management System.

iv.   Within thirty (30) calendar days of receiving Guam EPA's comments, submit a Draft Revised Stormwater Management System Design and a construction and permanent Stormwater Pollution Prevention Plan (SWPPP).

v.   Within fifteen (15) calendar days of receiving Guam EPA's comments, submit a Final Revised Stormwater Management System Design and construction and permanent SWPPP.

b.  Begin construction of the Guam EPA approved Final Revised Stormwater Management System Design and implement the construction and permanent SWPPP's no later than April 21, 2006.

## III.B.3.   GROUND-WATER MONITORING SYSTEM

The Permittee shall install a groundwater monitoring system which consists of a sufficient number of wells, installed at appropriate locations and depths, to yield groundwater samples from the uppermost aquifer (§23502(a) and §23102). Groundwater samples must represent the quality of groundwater passing the relevant point of compliance specified by the Administrator under subsection (d) of GSWRR §23401 that ensures detection of groundwater contamination in the uppermost aquifer (§23502(a)(2), §23502(d), §23401). In addition, the Permittee shall comply with the following conditions:

a.  Conduct a two (2) phased, overlapping approach to establish a complete Groundwater Monitoring System for the Ordot Dump. This will provide hydrogeologic data in an iterative approach as follows:

i.  PHASE I

1.  Within ninety (90) calendar days of the issued date, submit to Guam EPA a detailed Draft Phase I Hydrogeologic Work Plan that includes a Sampling and Analysis Plan (SAP) and a Quality Assurance Program Plan (QAPP), and a draft Phase I Groundwater Monitoring Plan.

2.  Within thirty (30) calendar days after receiving comments and recommendations from Guam EPA, submit to Guam EPA for review and approval the Final Phase I Hydrogeologic Work Plan and the Final Phase I Groundwater Monitoring Plan that incorporates Guam EPA's comments and recommendations.

3.  Within fifteen (15) calendar days of receiving Guam EPA's written approval, secure all permits and clearances required prior to mobilizing equipment and implement the Final Phase I Hydrogeologic Work Plan .

31

Case 1:02-cv-00022    Document 190-2    Filed 01/14/2008    Page 35 of 40

4. Within one hundred five (105) calendar days of receiving written approval to implement the Final Phase I Hydrogeologic Work Plan, complete all field work, and within one hundred thirty-five (135) days submit to Guam EPA a detailed draft Phase I Hydrogeologic Report.
5. Within thirty (30) calendar days of receiving Guam EPA's comments and recommendations, submit to Guam EPA for review and approval a Final Phase I Hydrogeological Report that incorporates Guam EPA's comments and recommendations.
6. Upon written notification from Guam EPA, the Permittee shall perform groundwater monitoring in accordance with the Guam EPA approved Final Phase I Groundwater Monitoring Plan.

ii. PHASE II

1. Within ninety (90) calendar days of the issued date, submit to Guam EPA a detailed Draft Phase II Hydrogeologic Work Plan that includes a Sampling and Analysis Plan (SAP) and a Quality Assurance Program Plan (QAPP), and a draft Phase II Groundwater Monitoring Plan.
2. Within thirty (30) calendar days after receiving comments and recommendations from Guam EPA, submit to Guam EPA for review and approval the Final Phase II Hydrogeologic Work Plan and the Final Phase II Groundwater Monitoring Plan that incorporates Guam EPA's comments and recommendations.
3. Within fifteen (15) calendar days of receiving Guam EPA's written approval, secure all permits and clearances required prior to mobilizing equipment and implement the Final Phase I Hydrogeologic Work Plan.
4. Within one hundred five (105) calendar days of receiving written approval to implement the Final Phase II Hydrogeologic Work Plan, complete all field work, and within one hundred thirty-five (135) days submit to Guam EPA a detailed draft Phase II Hydrogeologic Report.
5. Within thirty (30) calendar days of receiving Guam EPA's comments and recommendations, submit to Guam EPA for review and approval a Final Phase II Hydrogeological Report that incorporated Guam EPA's comments and recommendations.
6. Upon written notification from Guam EPA, the Permittee shall perform groundwater monitoring in accordance with the Guam EPA approved Final Groundwater Monitoring Plan for Phase I wells.

b. SPECIAL CONDITIONS

1. Guam EPA or its official representative shall oversee all aspects of field work

32

performed in this effort.

2. No field work may be performed without direct oversight from Guam EPA or its official representative.

3. All changes or deviations from any Guam EPA approved Work Plan shall be approved by Guam EPA before the change or deviation is adopted or implemented.

4. Guam EPA reserves the right to review and amend any SAP or QAPP.

5. All plans must be submitted according to the EPA Requirements for Quality Assurance Project Plans (EPA QA/R-5). A guidance document is available at http://www.epa.gov/quality/qapps.html. At a minimum, the required components of any QAPP shall incorporate the USEPA's requirements.

6. The Permittee shall sample all the constituents on the comprehensive list provided by Guam EPA.

7. The Permittee shall require that all laboratories used receive prior approval and certification from Guam EPA, and maintain that certification for all samples analyzed. All laboratories are required to submit a Quality Assurance (QA) Manual along with the Standard Operating Procedures (SOP) for the target analyses as a condition to certification.

8. The Permittee may not commence sampling of the groundwater monitoring wells until the Administrator has received, by certified mail or hand delivery, a letter signed by the Permittee and a qualified ground-water hydrogeologist (one that has at least a Bachelor's degree in geological sciences from an accredited United States college or university and two (2) years of professional experience in hydrogeology) certifying under law that the ground-water monitoring wells have been constructed in compliance with the Permit, Guam regulations, and the Guam EPA approved work plan(s); and either

    A. The Administrator or his designee has inspected the ground-water monitoring wells and related logs and data, and finds the wells to be in compliance; or

    B. The Administrator has either waived the inspection or the Administrator has not notified the Permittee, within 15 calendar days his receipt of the certification, of his intent to inspect the wells, and/or the logs and/or related data.

## III.B.4.  LANDFILL GAS MANAGEMENT SYSTEM

The Permittee shall comply with the Guam EPA approved Landfill Gas Management System, and as required by GSWDRR §23601. In addition, the Permittee shall comply with the following conditions:

    a. Within sixty (60) calendar days of receiving comments and recommendations from Guam EPA, the Permittee shall submit a revised Landfill Gas Management System

which incorporates Guam EPA's comments and recommendations.

34

12/2/05

# PART IV. POST-CLOSURE CARE AND MAINTENANCE

## IV.A. SPECIAL POST-CLOSURE CARE AND MAINTENANCE REQUIREMENTS

The Permittee shall not implement the submitted Post-Closure Care and Maintenance Plan (July 2005) or begin any related activities until the Administrator provides written approval of the Post-Closure Care and Maintenance Plan.

## IV.B. POST-CLOSURE CARE AND MAINTENANCE PLAN - REVISIONS

The Permittee shall comply with the Guam EPA approved Post-Closure Care and Maintenance Plan and as required by GSWDRR §23602. In addition, the Permittee shall comply with the following conditions:

1. Within ninety (90) calendar days of receiving comments and recommendations from Guam EPA, the Permittee shall submit, for Guam EPA's review and approval, a revised Post-Closure Care and Maintenance Plan which incorporates Guam EPA's comments and recommendations, including a schedule under which the Post Closure Care and Maintenance Plan begins implementation no later than October 23, 2007.

2. Within thirty (30) calendar days of the dump ceasing to receive waste, but in no event later than October 23, 2007, implement the Guam EPA approved Post-Closure Care and Maintenance Plan.

12/2/05

Permit Attachment II-1
*Final Filling Plan*
Reserved-Pending Revisions and Final Approval

Permit Attachment II-2
*Acceptance Policy*
Guam EPA Revisions, December 2005



Permit Attachment II-3
*Hazardous Waste Exclusion Program*
July 2005



Permit Attachment II-4
*Ordot Dump Procedures for Responding to Citizen Complaints*
July 2005



Permit Attachment II-5
*Safety Program*
Guam EPA Revision, December 2005



Permit Attachment II-6
*Emergency Contingency Plan*
Guam EPA Revisions December 2005



Permit Attachment II-7
*Groundwater Monitoring Plan*
See Permit Condition Part III



Permit Attachment II-8
*Operations & Monitoring Plan for the Ordot Dump*
Reserved-Pending Revisions and Final Approval



Permit Attachment II-9
*Solid Waste Diversion Program Plan*
Reserved-Pending Submittal and Final Approval



Permit Attachment II-10
*Personnel Training Program Plan*
Reserved-Pending Submittal and Final Approval



Permit Attachment II-11
*Inspection Plan*
Reserved-Pending Submittal and Final Approval



Permit Attachment II-12
*Vector Control Monitoring and Deterrence Program Plan*
Reserved-Pending Submittal and Final Approval

# ORDOT DUMP
# ORDOT-CHALAN PAGO, GUAM

# Operations Plan

*Prepared for*
Department of Public Works, Government of Guam
542 North Marine Drive
Tamuning, Guam 96911

July 2005

*Prepared by*
Dueñas & Associates Project Team (Dueñas & Associates, Inc. & URS Corporation)

P.O. Box 8900 Tamuning,
Guam 96931 (671) 646-
7991

*With Guam EPA Revisions*
*December 2005*

# TABLE OF CONTENTS

Page

1.0 INTRODUCTION ............................................................................................................ 1
    1.1     PURPOSE ......................................................................................................... 1
    1.2     SCOPE ............................................................................................................. 2
    1.3     PROJECT SITE ............................................................................................... 2

2.0 CAPACITY AND EXPECTED LIFE ............................................................................ 6
    2.1 INCOMING WASTE TONNAGE ........................................................................ 6
    2.2 WASTE DENSITY ................................................................................................ 7
    2.3 ORDOT DUMP EXPECTED CAPACITY ........................................................... 7
    2.4 EXPECTED ORDOT DUMP LIFE ...................................................................... 8
           2.4.1 Consent Decree Timeline ........................................................................... 8

3.0 OPERATING PROCEDURES ...................................................................................... 11
    3.1 DAILY OPERATIONS ........................................................................................ 11
           3.1.1 Tipping Fees ............................................................................................. 11
           3.1.2 Scale ......................................................................................................... 11
    3.2 GENERAL WASTE PLACEMENT AND LIFT DEVELOPMENT ..................... 12
    3.3 EXCLUDED WASTE ......................................................................................... 12
           3.3.1 Detection and Prevention of Excluded Waste Disposal ........................... 12
           3.3.2 Record Keeping and Reporting ................................................................. 14
    3.4 SELECT WASTE CRITERIA ............................................................................. 14
           3.4.1 Materials to be used for Select Waste ...................................................... 14
           3.4.2 Bulky Items .............................................................................................. 14
    3.5     SOIL USAGE ............................................................................................. 14
           3.5.1 Available Onsite Cover Materials ............................................................. 14
           3.5.2 Estimated Ordot Dump Daily Cover Soil Usage ...................................... 14
           3.5.3 Rock Recycling and Alternate Daily Cover ............................................. 15
    3.6 ORDOT DUMP SLOPES .................................................................................... 15
    3.7 SPECIAL WASTE DISPOSAL PROCEDURES ................................................ 15
           3.7.1 Asbestos-Containing Waste ..................................................................... 15
           3.7.2 Sharps and Other Biomedical Waste ....................................................... 17
           3.7.3 Sewage Treatment Sludge ........................................................................ 17
           3.7.4 Catch Basin Wastes .................................................................................. 17
           3.7.5 Special Dangerous Wastes ....................................................................... 17
           3.7.6 Animal Carcasses ..................................................................................... 17
    3.8 CRITERIA FOR REDUCTION OF VECTORS, BIRD, ODORS, NOISE, DUST,
          AND LITTER ...........................................................................................17
           3.8.1 Vectors and Bird Control ..........................................................................17

July 2005

   3.8.2 Odor and Litter Control ................................................................18
   3.8.3 Noise Control ..............................................................................18
   3.8.4 Dust Control ...............................................................................18
  3.9 INSPECTION PLAN ...........................................................................19
  3.10 SITE SAFETY ...................................................................................20
   3.10.1 Record Keeping .........................................................................20
  3.11 EMERGENCY RESPONSE ................................................................21
   3.11.1 Emergency Contact List ...............................................................21
   3.11.2 Emergency Response Procedures ....................................................21
   3.11.3 Typhoon Emergency ...................................................................22
  3.12 CLOSURE COVER SYSTEM, CLOSURE, AND POST-CLOSURE CARE ......22
  3.13 ORDOT DUMP SLOPE STABILITY ...................................................22
  3.14 PERSONNEL TRAINING ....................................................................23
   3.14.1 Interim Personnel Training ............................................................23

4.0 STOCKPILING .......................................................................................25
  4.1 GENERAL GUIDELINES ....................................................................25

5.0 LEACHATE MANAGEMENT ....................................................................27

6.0 SURFACE WATER RUN-ON/RUN-OFF CONTROL .....................................29

7.0 LANDFILL GAS CONTROL .....................................................................31
  7.1 METHANE MONITORING PLAN .........................................................31
  7.2 INTERIM METHANE GAS MONITORING ...............................................31
  7.3 LANDFILL GAS HAZARD MITIGATION ...............................................32

8.0 EROSION CONTROL PLAN .....................................................................34
  8.1 BEST MANAGEMENT PRACTICES .....................................................34
   8.1.1 Operational Practices and BMPs .....................................................34
   8.1.2 Source Control BMPs ...................................................................34
   8.1.3 Erosion and Sediment Control BMPs .................................................35
   8.1.4 Treatment BMPs .........................................................................35
   8.1.5 Innovative BMPs ........................................................................35
  8.2 PLASTIC SHEETING ..........................................................................35
  8.3 SILT FENCE ....................................................................................36
  8.4 SLOPE BMPS ..................................................................................36
  8.5 INSPECTION AND MAINTENANCE OF STORMWATER AND EROSION
   CONTROL FACILITIES ....................................................................37
   8.5.1 Inspections ...............................................................................37
   8.5.2 Maintenance .............................................................................37
  8.6 SAND BAG BARRIERS AND SILT FENCE CHECK DAMS .......................40
  8.7 DITCHES AND DITCH LINING MATERIAL ...........................................40
  8.8 PREPARATION FOR WET SEASON OPERATION ....................................41
  8.9 CONTROL OF POLLUTANTS OTHER THAN SEDIMENTS .......................41
   8.9.1 Housekeeping ...........................................................................41

Case 1:02-cv-00022  Document 190-3  Filed 01/14/2008  Page 3 of 34

      8.9.2 Fueling and Equipment Maintenance Practices ....................................................42
      8.9.3 Use of Chemicals During Operations .................................................................42
      8.9.4 Managing Hazardous Products .........................................................................43
      8.9.5 Equipment Washing ........................................................................................43
      8.9.6 Treatment and Disposal of Contaminated Soils ...............................................44
      8.9.7 Spill Control and Cleanup Plan........................................................................44

9.0 GROUNDWATER MONITORING ..........................................................................54

10.0 RECORDKEEPING ...............................................................................................58
    10.1 REQUIREMENTS .............................................................................................58
    10.2 RECORDKEEPING PROCEDURES ................................................................59
    10.3 DAILY VEHICLE RECORD OF LANDFILL FORM ...................................60

11.0 REFERENCES ......................................................................................................61

| PERMIT ATTACHMENTS | PLAN OR DOCUMENT |
|---|---|
| II-1 | Final Filling Plan |
| II-2 | Summary of Ordot Dump's Solid Waste Acceptance Policy |
| II-3 | Hazardous Waste Exclusion Program |
| II-4 | Ordot Dump Procedures for Responding to Citizen Complaints |
| II-5 | Safety Program |
| II-6 | Emergency Contingency Plan |
| II-7 | Groundwater Monitoring Plan |
| II-8 | Operations & Monitoring Plan for the Ordot Dump |
| II-9 | Solid Waste Diversion Program Plan |
| II-10 | Personnel Training Program Plan |
| II-11 | Inspection Plan |
| II-12 | Vector Control Monitoring and Deterrence Program Plan |

**TABLES**
Page

Table 2-1 Ordot Dump Estimated Life ................................................................8
Table 2-2 Ordot Dump Consent Decree Timeline ...............................................9
Table 3-1 Ordot Dump Operations Personnel List .............................................12
Table 8-1 Daily Inspection of Erosion and Sediment Controls Ordot Dump ...........48
Table 8-2 Records of Maintenance and/or Repairs Ordot Dump ...........................48
Table 8-3 Housekeeping Inspection ...................................................................50
Table 9-1 Groundwater Monitoring Well Inventory .............................................55

**FIGURES**
Figure 1-1     Vicinity map ................................................................................3
Figure 1-2     Original Topography ....................................................................4
Figure 1-3     Site Map .....................................................................................5
Figure 2-1     Final Filling Plan ........................................................................10
Figure 3-1     Tipping Floor Schematic ..............................................................13
Figure 3-2     Existing Ordot Dump Operation Schedule Sign ...............................16
Figure 3-3     Closure Cover Section ..................................................................24
Figure 6-1     Typical Cross Section of East Ditch ...............................................30
Figure 8-1     Silt Fence Detail .........................................................................39
Figure 8-2     Typical Silt Fence Check Dam ......................................................51
Figure 8-3     Sand Bag Barrier ........................................................................52
Figure 8-4     Erosion Control Matting Lined Ditch on Sideslope ..........................53
Figure 9-1     Groundwater Monitoring Well Locations .........................................55
Figure 9-2     Typical Groundwater Monitoring Well ............................................56

iv

July 2005

# 1.0 INTRODUCTION

## 1.1 PURPOSE

The purpose of this document, the Ordot Dump Operations Plan (the Plan), is to identify key operating issues and provide a description of the various requirements, systems, and procedures pertaining to ongoing disposal activities at the Ordot Dump. Data from the Daily Vehicle Logs, *Guam MSWLF Site Selection EIS* (D&A, 2004)), and the *Guam Solid Waste Weight Composition and Recycling Feasibility Study* (GEPA, 1995) regarding the incoming waste stream, have been used to develop a final filling plan for the Ordot Dump. This final filling plan, which is consistent with the closure design plan, is a part of the Environmental Baseline Survey/Ordot Dump Closure design developed by the Dueñas & Associates Project Team (Dueñas & Associates, Inc., URS Corporation, Mink and Yuen, Inc., JP Giroud, Inc., and Geo-Engineering & Testing, Inc.).

This Plan is designed to be consistent with the overall requirements of the Statement of Work for the Ordot Dump Closure (DPW, 2004) and Section 2 – Specific Information, Subsection III, Site Operating Plans of the *Solid Waste Management Facility Permit Application, Landfill* (GEPA, 1999).

This document provides the capacity and life expectancy of the Ordot Dump, based on the fact that the facility needs to remain in operation until September 22, 2007 (the Consent Decree (USEPA, 2004) states that the new municipal solid waste landfill is to be opened by September 23, 2007). The Consent Decree (USEPA, 2004) was signed by the U.S. Environmental Protection Agency and the Government of Guam. In accordance with the Consent Decree, the Government of Guam agrees to a strict timeline in which the Ordot Dump shall be closed by October 23, 2007, thereby ceasing the discharge of leachate to the Lonfit River, and a new municipal solid waste landfill shall be opened by September 23, 2007.

The Plan outlines minimum standards for performance, and presents sufficient information and guidance to allow the Ordot Dump Operations staff to continue the day-to-day operation of the facility. Specifically, this document presents discussions of the following:

- Capacity and expected life;
- Operating procedures, including waste placement criteria and consideration of alternative daily cover procedures;
- Stockpiling procedures;
- Leachate handling;
- Surface water runoff control;
- Landfill gas (LFG) control;
- Erosion control;
- Groundwater monitoring; and
- Recordkeeping.

Where practical, existing documents that detail or support this Plan are referenced in the text and included as appendices. However, in some instances this was not feasible, and the reader is referred to separate documents.

Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 6 of 34

## 1.2 SCOPE

The scope of this Plan is to define operational procedures and prepare a final filling plan for waste filling at Ordot Dump through September 22, 2007, after which Guam's new solid waste disposal facility will be in operation, and the Ordot Dump will be closed.

This Plan was developed to provide operational, procedural, and initial plans for Ordot Dump as follows:

- Provide waste placement guidance to Operations personnel, via the *Final Filling Plan* included as Permit Attachment II-1, to facilitate the final closure grading plan;

- Identify procedures for unloading and placing waste;

- Identify activities that Operations should perform to limit the generation of leachate and to minimize the leachate discharge into the Lonfit River, prior to capping the Dump;

- Compute the Dump's estimated capacity (based on receiving waste through September 22, 2007);

- Present procedures and details for placing daily cover and closure cover;

- Provide guidelines for wet- and dry-season operations;

- Develop roadway geometry for haul vehicles; and

- Describe the leachate, contaminated storm water (CSW), and stormwater (SW) handling systems.

## 1.3 PROJECT SITE

The Ordot Dump is located approximately 2.5 miles south of Guam's capital, Hagåtña, and about 1 mile west of the Route 4-Dero Drive intersection (Figure 1-1). The area surrounding the Dump is a dense brush, wooded area with scattered residences. The nearest residences are approximately 200 feet from the Dump. The Dump is located approximately 200 to 500 feet north of the Lonfit River (Figure 1-3).

As determined during the closure design test pit program of 2004/2005, the plan footprint area contained within the limit of waste is approximately 45.1 acres. The filling, proposed in the Final Filling Plan, expands filling to the east between 2005 and 2007 and will increase the limit of waste to 47.1 acres. The Dump is an unlined disposal facility and has few to no control systems to manage landfill gas, leachate, surface water, erosion and sedimentation, or vectors.

The Dump occupies and borders property of the Government of Guam on the northeast, east, south, and southwest boundary lines of the Dump. The north and west limits of the Dump border public land in the form of a road and privately owned land, respectively.

The starting date for the use of the site as a dump is not documented, but it is known that the Ordot Dump was in use during World War II. The Dump was used as a disposal area by the Japanese during their occupation of Guam from December 8, 1941 to July 21, 1944 (Juan C. Tenorio & Associates, Inc., 1993). Following the liberation of Guam, the U.S. Navy continued to use the site as a disposal area. Ownership of the Ordot Dump was transferred from the United States Navy to the Government of Guam in 1950 under the Organic Act. Since then, the Government of Guam, and subsequently the Department of Public Works (DPW), has been operating Ordot Dump as Guam's only civilian municipal solid waste disposal facility.

Case 1:02-cv-00022     Document 190-3     Filed 01/14/2008     Page 7 of 34



Figure 1-1
VICINITY MAP

[SOURCE: DUEÑAS AND ASSOCIATES, INC.]

S:\centro\ORDOT DUMP VICINITYMAP.dwg Jun 07.2005 — 3:01pm

Ordot Dump
Ordot-Chalan Pago, Guam





## 2.0 CAPACITY AND EXPECTED LIFE

This section presents the required capacity of Ordot Dump, in order for it to remain in operation through the year 2007. The siting of Guam's new municipal solid waste (MSW) facility has been completed, and it is expected to be in operation by September 23, 2007. For the purpose of this Plan, we will present a final filling plan, which will accommodate the civilian population's incoming waste stream through the year 2007.

### 2.1 INCOMING WASTE TONNAGE

All non-hazardous municipal solid wastes generated on the island of Guam, excluding the wastes generated at the Naval and Air Force facilities, are currently accepted at the Dump for disposal. In 2000, the population of Guam was 154,805, including military personnel and dependents (U.S. Census, 2001). The population for the year 2007 is projected by Dueñas & Associates, Inc. (D&A) (Table 1B from the report titled *Guam MSWLF Site Selection EIS* (D&A, 2004)) to be 150,717.

A study on the composition of Guam's waste was conducted by the Rossi-Nayve Consultancy Services, Inc. (JCTA, 1993). The majority of the waste received at the Dump consists of non-hazardous residential and commercial solid waste. In the past, the Dump has received construction/demolition (C&D) waste, bulky metal, and other related wastes. Currently, C&D waste that can be used as daily cover is accepted at the Dump, but other C&D wastes are sent to hardfills and bulky metals are sent to the Dededo Transfer Station. DPW does not accept hazardous wastes. DPW is permitted to receive wastewater treatment sludge with prior approval from the Guam Environmental Protection Agency (GEPA). According to Operations personnel, sludge is rarely received at the Dump.

For the purpose of evaluating incoming waste volume and tonnage, three sources of waste data were used:

- DPW's Daily Vehicle Logs for complete months of January, June, July, and October of 2004 (data for other months were either unavailable or incomplete); · ·

- D&A projections from the report titled *Guam MSWLF Site Selection EIS* (D&A, 2004); and

- *Guam Solid Waste Weight Composition and Recycling Feasibility Study* (GEPA, 1995).

For the purpose of collecting tipping fees, Operations personnel record a volume of waste for each hauler into their daily vehicle logs. This recorded volume takes into account the full volumetric capacity of each vehicle, and does not consider whether the vehicle is full or partially full. An analysis of the data from the daily vehicle logs yield annual volumes of 404,395 and 433,377 cubic yards, based on complete monthly averages and complete weekly averages, respectively. This translates to required volumes of 1.11 million and 1.19 million cubic yards, respectively, through the end of the Dump's life (filling in year 2007, scheduled to end in September). These volumes include both the incoming waste and the daily cover used to cover that waste, in accordance with the DPW records. It has been concluded that the complete weekly average provides a better spread of data throughout the year, and is a better source to determine the annual incoming waste stream.

In the absence of more complete, actual data, a projection developed by D&A for the landfill EIS project was also analyzed. The projections yielded an annual incoming waste tonnage of 120,000 tons or 360,000 cubic yards (assuming 800 lbs/yd$^3$ in-place density, 10% for daily cover, and 10% for contingency). This translated to a required volume of 990,000 cubic yards through the end of the Dump's life (September 2007, when the new landfill is scheduled to begin receiving waste).

Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 11 of 34

Data collected for the *Guam Solid Waste Weight Composition and Recycling Feasibility Study* (GEPA, 1995) was performed during a 5-day period for both the wet and dry seasons. For both seasons, the weights were tallied to project the annual incoming waste. This analysis yielded an annual volume of 480,112 cubic yards, which translates to a required volume of 1.32 million cubic yards through the end of the Dump's life (filling in year 2007 scheduled to end in September).

The average of the three data sources (weekly average not monthly average used to represent the DPW daily vehicle log data set) yields an incoming waste stream volume of 1.17 million cubic yards through the end of the Dump's life. The *Final Filling Plan*, which is included as Permit Attachment II-1, was developed to accommodate this incoming waste stream volume of 1.17 million cubic yards.

## 2.2 WASTE DENSITY

A unit waste density is typically used to convert projected incoming waste tonnage into waste volume in order to estimate landfill life. Previous reports have assumed an as-placed waste density of 600 pounds per cubic yard ($lb/yd^3$) (D&M, 1978 and JCTA, 1993). As the waste management practices at the Dump have improved via the use of a compactor, it is more likely that current as-placed waste density is approximately 800 $lb/yd^3$. Aged waste at the bottom of the Dump that has had a chance to decompose and consolidate under the weight of ascending lifts of waste may have a higher as-placed waste density (as high as 1,200 $lb/yd^3$). In this regard, it can be assumed that there is a somewhat linear relationship between the waste densities of the older, deeper waste, up through the waste, to the recently placed waste at the Dump surface.

In summary, the capacity available in the upper lifts increases as the underlying waste settles under the weight of the overlying material. Therefore, the changing waste density of the underlying waste lifts must be considered as successive lifts are placed. An average as-placed density of 800 $lb/yd^3$ has been used to determine expected capacity and dump life.

## 2.3 ORDOT DUMP EXPECTED CAPACITY

A Final Filling Plan has been prepared as part of this Plan in support of the Ordot Dump Closure design. Figure 2-1 shows the Final Filling Plan through the completion of Ordot Dump, which includes waste placement through 2007. This coincides with the continued operation of Ordot Dump until Guam's new MSW landfill is in operation, which is expected to be on September 23, 2007.

When Ordot Dump is filled to the contours presented in Figure 2-1, it will have a maximum waste depth of approximately 175 feet. Except for a few anomalies, the maximum elevation of the Ordot Dump will be approximately 360 feet above Mean Sea Level (MSL).

As of late 2004, the Ordot Dump contains approximately 3,202,593 cubic yards of waste. The approximate existing volume was calculated using the original surface (1968 USGS Geology Map of Guam) and the existing surface (2004 D&A survey). It should be noted that the accuracy of the existing waste volume is limited, because the topography from the 1968 USGS Geology Map of Guam was hand drawn with contour intervals of 40-feet. The available volume within the Ordot Dump through 2007 was calculated using the existing surface (2004 D&A survey) and the Final Filling Plan. The available volume for the Dump, through 2007 (based on the Final Filling Plan), is estimated to be 1.17 million cubic yards. The total estimated volume of the Dump after closure is 4.4 million cubic yards.

Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 12 of 34

## 2.4 EXPECTED ORDOT DUMP LIFE

Based on an average compacted density of 800 lb/yd$^3$, the annual incoming waste will occupy approximately an additional 424,496 cubic yards for years 2005 and 2006 and 318,372 cubic yards for year 2007. The Dump will need to prepare for a volume growth of approximately 1.17 million cubic yards. If the actual density is greater than the estimated 800 lb/yd$^3$, then the expected life of Ordot Dump, based on the Final Filling Plan, could go beyond the design life of 2007.

| Table 2-1 Ordot Dump Estimated Life | | | |
|---|---|---|---|
| Year | Starting Month | Ending Month | Design Capacity (yd$^3$) |
| 2005 | January | December | 424,496 |
| 2006 | January | December | 424,496 |
| 2007 | January | September | 318,372 |
| Total | | | 1,167,364 |

### 2.4.1 Consent Decree Timeline

The Consent Decree governs the timeline of activities leading up to the closure of Ordot Dump. Table 2-2 presents the general schedule of the Consent Decree timeline.

Case 1:02-cv-00022     Document 190-3     Filed 01/14/2008     Page 13 of 34

| Table 2-2 Ordot Dump Consent Decree Timeline | | |
|---|---|---|
| **Due Date** | **Submittal** | **Days within Consent Decree Filing** |
| February 11, 2004 | Consent Decree Filed | |
| December 7, 2004 | DPW shall submit the Draft Closure Plan and Permit Application for Continued Use of the Ordot Dump, until its scheduled closure. | 300 |
| May 6, 2005 | DPW shall submit the 90% Draft Final Closure Plan and a draft final plan and schedule to implement post-closure requirements. | 450 |
| September 3, 2005 | DPW shall submit the Final Closure Plan, a final plan and schedule to implement post-closure requirements, and a 90% Draft Wetland Mitigation Plan for closure of Ordot Dump. | 570 |
| December 2, 2005 | GEPA shall approve/deny solid waste permit for the continued operation of the Ordot Dump, until its scheduled closure. | 660 |
| January 11, 2006 | DPW shall advertise for bids to construct the Ordot Dump Closure. | 700 |
| April 21, 2006 | DPW shall award Ordot Dump Closure Construction Contract and provide a notice to proceed to the selected contractor and submit evidence of such award and notice. | 800 |
| September 23, 2007 | DPW shall begin operations of the new landfill. | 1320 |
| October 23, 2007 | DPW shall complete the closure of Ordot Dump, begin implementation of the post-closure plan, and submit a certification to U.S.EPA that Ordot Dump no longer receives municipal solid waste. Also, DPW shall cease all discharges to waters of the United States and submit a certification to U.S.EPA that discharges to waters of the United States from the Ordot Dump have ceased. | 1350 |

Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 14 of 34



NOTES:

1. SITE TOPOGRAPHY IS BASED ON A SURVEY PERFORMED BY DNA BETWEEN JULY 2004 AND NOVEMBER 2004. THE SURVEYED TOPOGRAPHY HAS BEEN MODIFIED TO REFLECT THE PROJECTED EXISTING SURFACES AT THE TIME OF CLOSURE. THESE CONTOURS REPRESENT THE TOPOGRAPHY OF THE SITE PRIOR TO CLOSURE CONSTRUCTION.

2. FINAL FILL CONTOURS SHOW TOPOGRAPHY FOR FILLING THROUGH 2007.

3. THE AREA CONTAINED WITHIN THE FINAL LIMIT OF WASTE IS APPROXIMATELY 47.1 ACRES.

4. WETLAND DELINEATION WAS PERFORMED BY DNA DURING FIELD ACTIVITIES BETWEEN JULY 2004 AND NOVEMBER 2004. THE WETLAND DELINEATION WAS APPROVED BY THE U.S. ARMY CORPS OF ENGINEERS ON JANUARY 5, 2005 AND BY THE GUAM DEPARTMENT OF AGRICULTURE AND GEPA ON JANUARY 18 AND JANUARY 17, 2005, RESPECTIVELY.

LEGEND

———————— FINAL LIMIT OF WASTE

— — — — — WETLAND DELINEATION

SCALE IN FEET

100   0   100   200

N

GOVERNMENT OF GUAM

DEPARTMENT OF PUBLIC WORKS
SOLID WASTE DIVISION

GUAM

ORROTE DUMP CLOSURE

FINAL FILLING PLAN

FIGURE
2-1

SHEET
—— OF ——

PROJECT NO. DPW-GM-2004 (002)

PRIVATE RESIDENCE

OPERATIONS BUILDING

## 3.0 OPERATING PROCEDURES

This section presents a summary of the placement of waste in Ordot Dump through 2007. Waste placement will address: development of individual lifts; compaction of waste; and placement of cover over waste to control odors, seeps, litter, vectors, and erosion. This section places an emphasis on minimizing the extent of the open face and maximizing landfill life by providing good compaction of waste.

Operations shall work closely with the DPW Engineering Division throughout the remaining life of the Dump to ensure operating requirements and procedures are met, to resolve any problems encountered, or avoid complications.

### 3.1 DAILY OPERATIONS

Ordot Dump operates from 7:00 a.m. to 6:00 p.m. from Monday through Saturday and from 7:00 a.m. to 3:30 p.m. on Sundays and Government of Guam holidays. The Dump is closed on December 25th, January 1st, and Good Friday. Private, government and business hauler traffic into and out of the site is through the main gate, located off Dero Drive at the northeast corner. Employee parking is next to the Operations Building, located adjacent to the main gate. Overflow employee parking and visitor parking are on the south side of Dero Drive, to the east of the main gate.

There are 14 Operations personnel, with a varying number of them onsite at a time. Table 3-1 lists site employees, their position, primary responsibilities, and contact numbers. Onsite equipment that is available for use by Operations staff include: one truck loader (973C), one tracked excavator (EL 300), one compactor (816B 30-ton), and one dozer (D8). When equipment breaks down or requires regularly scheduled maintenance, the maintenance is usually performed at the Transportation Maintenance shop, located at the Department of Public Works compound in Tamuning.

#### 3.1.1 Tipping Fees

Tipping fees of $4.00 per cubic yard for uncompacted waste and $4.00 per cubic yard multiplied by the compaction ratio of the vehicle, for compacted trash, shall be collected from commercial vehicles entering Ordot Dump. This fee does not include collection charges, which are independently set by licensed, commercial haulers. A flat fee of $4.00 will be charged per vehicle for vehicles that are not classified as commercial or business.

#### 3.1.2    Scale

All incoming loads of wastes will be inspected and weighed per vehicle prior to acceptance for disposal. All information shall be recorded. In addition, the facility shall comply with Permit Condition II.A.4.

| Name | Position | Years Exp. | Primary Responsibility | Training Received | Contact Number |
|---|---|---|---|---|---|
| Richard Naputi | Equipment Supervisor | 9 | Dump Equipment Operator/Cashier | Excavator/Dozer Operations at Landfills, SWANA | 472-2710 |
| Peter O. Aguero | Equipment Operator III | 19 | Dump Equipment Operator | N/A | 472-2710 |
| Thomas Cepeda | Equipment Operator III | 9 | Dozer and Truck Loader Operator | N/A | 472-2710 |
| Joseph Borja | Equipment Operator III | 9 | Compactor Operator | N/A | 472-2710 |
| John Meno | Equipment Operator III | 15 | Dump Truck Operator | Army Training | 472-2710 |
| Patrick Santos | Equipment Operator II | 14 | Dump Equipment Operator | SWANA | 472-2710 |
| Harold Charfauros, Jr. | Equipment Operator II | 11 | Dump Truck Operator | Army Reserve Equipment Operator | 472-2710 |
| James Camacho | Solid Waste Technician | 11 | Dump Truck Operator | Commercial Driving | 472-2710 |
| Violet Blas | Solid Waste Technician | 10 | Cashier | Customer Service Training | 472-2710 |
| John Taimanglo | Equipment Operator II | 5 | Compactor Operator | N/A | 472-2710 |
| Benny Cruz | Solid Waste Technician | 7 | Dump Truck Operator | N/A | 472-2710 |
| John T. Cruz | Equipment Operator II | 19 | Dump Equipment Operator | Surveying | 472-2710 |
| Jose Pangelinan | Solid Waste Technician | 6 | Spotter for Dump Operations | N/A | 472-2710 |
| Joseph Tanguileg | Solid Waste Technician | 11 | Spotter for Dump Operations | N/A | 472-2710 |

Table 3-1 Ordot Dump Operations List

12

## 3.2 GENERAL WASTE PLACEMENT AND LIFT DEVELOPMENT

All waste placements into the Ordot Dump must be properly placed and compacted in accordance with Permit Condition II.A.6. and *Final Filling Plan* , Permit Attachment II-1 (pending submittal and Guam EPA approval).

## 3.3 EXCLUDED WASTE

Ordot Dump, an MSW disposal facility, in accordance with the Guam Code Annotated (GCA) Title 22, Division 4, Chapter 23, Section 23302 (c) (1), shall exclude from its incoming waste stream: *"waste oil and regulated hazardous waste; and whole or partially whole vehicles, vehicle parts, tires, batteries, appliances, septic tank pumping, sewage sludge and other petroleum products and oil based paints."* In addition to these excluded wastes, Ordot Dump does not accept: asbestos or sharps and other biological wastes (hypodermic needles, syringes with needles attached, IV tubing with needles attached, dental scalers, scalpel blades and lancets that have been removed from their original sterile packaging).

### 3.3.1 Detection and Prevention of Excluded Waste Disposal

The first step in preventing the disposal of excluded waste is to notify the public of the wastes that will not be accepted at Ordot Dump. GEPA shall approve the excluded waste list. Operators shall then produce a sign that lists all excluded waste. The sign should clearly state that violators will be fined. The sign should be similar in construction and posted at the same location as the existing Operation Schedule sign (See Figure 3-2). The existing sign is posted on the right side of the main entrance to the site. Violators shall be fined by DPW for knowingly dumping excluded waste at the Dump. The fine shall be $250 for first time offenders, $500 for second time offenders. After the third offense, the hauler shall not be allowed to haul waste to the Dump. In addition to the fine, the violator may be responsible for any necessary cleanup caused by their hauling of excluded waste.

In addition to posting a sign, DPW shall also run public notices in the local newspaper and other media to inform the public and private haulers of wastes that will not be accepted for disposal at the Dump.

The second step in preventing the disposal of excluded waste is the implementation of an effective detection program. According to GCA Title 22, Division 4, Chapter 23, Section 23303 (a), *"Owners or operators of all MSWLF units must implement a program at the facility for detecting and preventing the disposal of regulated hazardous wastes as defined in Guam 's Hazardous Waste Management Regulations and polychlorinated biphenyl (PCB) wastes as defined in 40 CFR Part 761. This program must include, at a minimum:*

*(1) random inspections of incoming loads;*
*(2) records of any inspections;*
*(3) training of facility personnel to recognize regulated hazardous waste and PCB wastes; and*
*(4) notification of Administrator if a regulated hazardous waste or PCB waste is discovered at the facility. "*

The *Hazardous Waste Exclusion Program Plan* for Ordot Dump is included as Permit Attachment II-3. It includes descriptions of acceptable and prohibited wastes, load-checking program, methods for determining acceptability of wastes, procedures for handling and disposition of prohibited wastes, additional waste acceptance control procedures, and reporting requirements.

Case 1:02-cv-00022   Document 190-3   Filed 01/14/2008   Page 18 of 34



15 FT

**AREA FILLING METHOD**

SCALE NTS

Figure 3–1
TIPPING FLOOR SCHEMATIC

P:\ACAD\PROJECT\Guam\ORDOT Closure\R01\TBASX11 ORDOT TIPPING FLOOR.dwg Nov 03,2004 - 1:54pm

Ordot Dump
Ordot-Chalan Pago, Guam

### 3.3.2 Record Keeping and Reporting

The reporting requirements for the Hazardous Waste Exclusion Program will consist of recording information and observations during the load-check inspection. The incident form (Form 1 in the *Hazardous Waste Exclusion Program*, Permit Attachment II-3 will be completed by the load-checking inspector and signed by the vehicle driver. The original of the incident form and any associated documents will be placed on file at the site and a duplicate copy will be given to the driver and another duplicate copy will be sent to GEPA immediately following the incident. The forms shall be on no carbon required (NCR) forms, if filled out manually, or multiple copies should be made if produced by a computer and printer.

## 3.4 SELECT WASTE CRITERIA

Select waste pertains to incoming residential waste that is free of large, bulky, or sharp items and meets the conditions delineated in the *Summary of Ordot Dump's Solid Waste Acceptance Policy*, Permit Attachment II-2, as amended by Guam EPA, and *Solid Waste Diversion Program Plan*, Permit Attachment II-9 (pending submittal and Guam EPA approval). The following is a summary of the guidelines for select waste and placement of waste near the sideslopes and future capping system components.

### 3.4.1 Materials to be used for Select Waste

Select Waste should be selected or screened residential or commercial waste which meets the conditions delineated in the *Summary of Ordot Dump's Solid Waste Acceptance Policy*, Permit Attachment II-3, as amended by Guam EPA, and the *Solid Waste Diversion Program Plan*, Permit Attachment II-9, (pending submittal and Guam EPA approval).

To quickly identify, sort, and place suitable select waste material, communication between the haul vehicle drivers and Operations personnel at the gatehouse is necessary. Haul vehicle drivers can indicate the type (residential or commercial) and source of the waste. Operations staff can use this information to help screen loads suitable for use as Select Waste.

### 3.4.2 Bulky Items

Bulky items should not be placed within 10-feet of sideslopes to prevent damage to the future capping system components. Prior to placement, bulky items should be broken down to smaller pieces, with the use of a dozer, backhoe bucket, or other similar means. Construction and demolition debris is prohibited for disposal at the Dump.

## 3.5 SOIL USAGE

### 3.5.1 Available Onsite Cover Materials

Based on observations during several site visits in August and October of 2004, onsite cover materials are not available. Daily cover material is hauled to the site from different sources. At present, these sources of daily cover include a GovGuam-owned quarry in Dededo (off of Y-Sengsong Road) or various on-going road construction projects.

### 3.5.2 Estimated Ordot Dump Daily Cover Soil Usage

Daily cover material must be placed over the active face at the end of each day. The purpose of daily cover is to prevent rodents, flies, and other vectors from feeding on and breeding in the waste, and to control odors and blowing debris. The daily cover materials consists of earthfill from the GovGuamowned quarry in Dededo, various on-going road construction projects, and select C&D waste. Coarsegrained soils are the preferred daily cover material, especially in wet-weather conditions. Their freedraining characteristics do not confine leachate or LFG movement within the waste. Finer-grained soils may also be used, but should, to the extent possible, be limited to dry-weather operations. In accordance with GCA Title 22, Division 4,

Chapter 23, Section 23304, disposed solid waste shall be covered with six (6) inches of earthen material at the end of each operating day, or at more frequent intervals, if necessary.

According to Operations personnel, when all five of their dump trucks are running, they use about 350 yd³/day of daily cover soil (25 truckloads at 14 cubic yards per truckload). This value can be reduced by operational approaches to reduce daily cover consumption during waste placement and with the use of alternate daily cover materials. These approaches are discussed in Section 3.5.3 Rock Recycling and Alternative Daily Cover.

### 3.5.3 Rock Recycling and Alternate Daily Cover

If the volume of available daily cover material is limited, Operations should begin recycling materials by utilizing a mobile screening unit to sieve rock and daily cover for reuse.

Daily cover can also be reduced by Operations' utilization of approved Alternative Daily Covers (ADC). Sand, bark (hog fuel), foam, plastic sheeting or other approved ADC could be used in place of the daily cover soil material. Following selection of an ADC by DPW, the GEPA Administrator must approve the ADC prior to its use at the Ordot Dump.

### 3.6 ORDOT DUMP SLOPES

The target maximum final exterior sideslope for additional filling at Ordot Dump is 2H:1V. To achieve this, the waste should be placed at an initial slope no steeper than 1.5H:1 V to 1.7H:1 V to accommodate the anticipated 1.0- to 1.5-feet of settlement per lift. Final sideslopes steeper than 2H:1V are undesirable for cover construction. It should be noted that the sideslopes, associated with the additional filling, shown on the Final Filling Plan are drawn with 2H:1V slopes.

### 3.7 SPECIAL WASTE DISPOSAL PROCEDURES

This section of this Plan describes general procedures and protocols for disposing of Special Wastes. Special Wastes include friable asbestos-containing wastes, sharps and biomedical wastes, sewage plant wastes, catch basin wastes, and special dangerous wastes. Accepted Special Wastes shall be segregated and disposed of in pits dug into the general waste or as stated otherwise. Operators shall note the table, *Summary of Ordot Dump's Solid Waste Acceptance Policy*, Permit Attachment II-2.

### 3.7.1 Asbestos-Containing Waste

Asbestos-containing waste (ACW) is not accepted at the Dump for disposal. There are no procedures in place to dispose of these materials, as they should not be included with the accepted waste stream. ACW should be added to the Waste Exclusion list. ACW is disposed of through private companies, who containerize and ship the materials off-island, where they are disposed at MSW landfill facilities that are approved to accept ACW.

Ordot Dump Operations Plan      16      July 2005
GEPA Revisions      Dec 2005
Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 21 of 34



**FIGURE 3-2**
**Existing Ordot Dump Operation Schedule Sign**
Ordot Dump
Ordot-Chalan Pago, Guam

Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 22 of 34

### 3.7.2 Sharps and Other Biomedical Waste

Sharps and other biomedical waste are not accepted at the Dump for disposal. There are no procedures in place to dispose of these materials, as they should not be included with the accepted waste stream. Sharps and other biomedical waste should be added to the Waste Exclusion list.

According to Operations personnel, sharps and other biomedical waste are usually burned in the incinerator at the Guam Memorial Hospital.

### 3.7.3 Sewage Treatment Sludge

GCA Title 22, Division 4, Chapter 23, Section 23302 (c) (1) (B) states that sewage sludge shall be excluded from municipal solid waste landfill facilities. According to Operations personnel, sewage sludge is accepted for disposal only after permission is granted by GEPA. Disposal of sewage sludge is a rare occurrence, but when it does happen it is usually utilized as daily cover.

Sewage treatment sludge may be disposed of at Ordot Dump if it is free of liquids and is accompanied by GEPA's consent.

### 3.7.4 Catch Basin Wastes

Catch basin wastes are accepted at the Dump for disposal only with GEPA's consent. Catch basin wastes that contain substantial liquids should not be disposed of at the Dump. Disposal of catch basin wastes are a rare occurrence, but when it does happen it is usually utilized as daily cover.

### 3.7.5 Special Dangerous Wastes

Special Dangerous Wastes are those dangerous wastes that are solid only (non-liquid, non-aqueous, non-gaseous) and that are not regulated hazardous waste under 40 CFR Part 261, and that are designated as only dangerous waste. Solid waste, that is extremely hazardous waste or that is regulated by the United States EPA as hazardous waste, cannot be considered Special Dangerous Waste.

According to Operations personnel, there are no Special Dangerous Wastes that qualify for disposal at Ordot Dump.

### 3.7.6 Animal Carcasses

Animal carcasses weighing less than 15 pounds may be disposed of in the general waste stream. Carcasses exceeding 15 pounds should be disposed of in pits excavated in waste and immediately covered with fill.

## 3.8 CRITERIA FOR REDUCTION OF VECTORS, BIRD, ODORS, NOISE, DUST, AND LITTER

Operations staff shall make every attempt possible to minimize nuisances commonly associated with landfills and other construction activities such as vectors, birds, odors, noise, dust, and litter.

The *Ordot Dump Procedures for Responding to Citizen Complaints*, Permit Attachment II-4 details actions to be taken in the event that a citizen issues a nuisance complaint.

### 3.8.1 Vectors and Bird Control

Waste compaction and daily cover effectively prevent the propagation of vectors (i.e., insects and rodents) on site.

To date, birds have not been a nuisance at the site by interfering with disposal operations. There is no existing bird deterrent system at the Ordot Dump. Due to the introduction and propagation of the brown tree snake, caused in no small part by its lack of natural predators, the bird population on Guam has decreased significantly. As a result, the Ordot Dump does not have a bird problem that is experienced at other similar municipal solid waste facilities, and no bird deterrent system is needed.

To date, pigs and dogs have been spotted at the site scavenging for food, but they have not been reported to cause any problems to the surrounding area. A Vector Monitoring and Deterrence Program Plan shall be submitted to Guam EPA. Upon approval, the Plan shall be implemented to control all potential vectors.

### 3.8.2 Odor and Litter Control

Odor and litter can be minimized by:

- Covering the active face and all newly placed waste on a daily basis with a minimum of six (6) inches of earthen material as a cover;

- Minimizing the area of the active face; and

- Placing and maintaining a portable fence around the working face of the Dump to control litter dispersal

The primary causes for litter around the Dump are wind, which at times carries waste away from the active face, and illegal dumping along the access road and dump perimeter. Control of litter is achieved by the placement of daily cover, minimizing the size of the tipping area, and unloading waste at the toe of the working face. Litter control shall be a continual part of the normal operation of the site and shall be conducted every working day by Operations personnel.

Litter shall be collected and removed on a weekly basis within 6 feet along the facility's perimeter fence.

### 3.8.3 Noise Control

Noise level impacts from on-site equipment are minimal due to the remote location of the Dump. Operations are limited to daylight hours. Equipment should be outfitted with proper engine mufflers to further reduce noise. Noise generated by the operation of the site does not cause a public nuisance.

### 3.8.4 Dust Control

Dust should be minimized by applying water to the adjacent roadways during the dry season and by street cleaning using sweeper trucks. Specific dust control requirements are described in the Guam Air Pollution Control Standards and Regulations (Section 1103.4). The dust control program to be performed by Operations shall include, but not be limited to:

- paving of permanent haul roads;

- watering and proper maintenance of haul roads; and

- water spraying of soil cover areas when conditions exist which may result in formation of fugitive dust.

## 3.9 INSPECTION PLAN

The *Operations & Monitoring Plan for the Ordot Dump* (DPW, 1997), which was prepared in November 1997 by the Department of Public Works, included a section entitled "Scheduled/Unscheduled On-site Operations Inspections". The inspection program discussed in that operations plan is included below and should be adhered to for the remaining life of Ordot Dump.

Weekly operations inspections will be conducted by a DPW Inspection Team composed of technical staff and will not include any landfill operations personnel. Also, joint monthly operations inspections will be conducted by the DPW Inspection Team with staff from GEPA. Furthermore, an operations and site inspection will be conducted with USEPA officials, which will be scheduled to coincide with their regular and special visits to Guam. Preliminary results from all the inspections will be discussed in a post-inspection briefing within a week of the inspection with the landfill operations staff and the Solid Waste Management Division Superintendent.

The team shall inspect current operational procedures, safety procedures, emergency equipment, security devices, structural equipment, and monitoring activities. The team shall note the conditions and procedures of daily cover material usage, surface water control features, and other control features that exist or are recommended by this Plan.

At a minimum, the frequency of inspections will be as follows:

| INSPECTOR | FREQUENCY OF INSPECTION |
|---|---|
| DPW Site Operations Manager Or MOLO Certified Personnel | DAILY |
| DPW Inspection Team (technical staff not landfill operations personnel) | WEEKLY |
| DPW Inspection Team | MONTHLY |

Records of each inspection shall be kept for a period of 5 years.

A detailed *Inspection Plan*, Permit Attachment II-11 (pending submittal and Guam EPA approval) shall be maintained and include, at a minimum, the following information:

  i.  A written schedule for inspecting monitoring equipment, safety and emergency equipment, security devices, and operating and structural equipment (such as dikes and sump pumps).

    &#10148;  This schedule shall be posted at the facility.
    &#10148;  The schedule shall identify the types of problems which are to be looked for during the inspection.

  ii.  Inspection forms for use by the individuals performing the inspection.

Case 1:02-cv-00022  Document 190-3  Filed 01/14/2008  Page 25 of 34

Pending Guam EPA approval of the revised Inspection Plan, the following interim inspections shall be conducted to identify problems in time to correct them before they harm human health or the environment:

i.  Daily inspections of the facility for malfunctions and deterioration, operator errors, and discharges which may be causing—or may lead to—(1) release of harmful constituents and other hazards to the environment or (2) a threat to human health. Inspections shall include, at a minimum, monitoring equipment, safety and emergency, security operating and structural equipment.

ii. A remedy shall be implemented for any deterioration or malfunction of equipment or structures which the inspection reveals on a schedule which ensures that the problem does not lead to an environmental or human health hazard. Where a hazard is imminent or has already occurred, remedial action shall be taken immediately.

iii. Inspections shall be recorded in an inspection summary. Inspection records shall be kept for at least three years from the date of inspection. At a minimum, these records shall include the date and time of the inspection, the name of the inspector, a notation of the observations made, and the date and nature of any repairs or other remedial actions.

## 3.10 SITE SAFETY

Before engaging in any activity at the Dump, all employees will complete a safety orientation given by qualified site personnel. The orientation will be designed to familiarize new employees with the facility and the areas of potential danger, and provide the employees with the necessary safety equipment and supplies required for his/her job function. The employee will also receive training on hazard recognition, protection, and emergency response. The supervisor will then provide hands-on training to the employee before allowing him/her to work unsupervised. For additional information, refer to the *Safety Program,* Permit Attachment II-5.

### 3.10.1 Record Keeping

The record keeping requirements for the Safety Program will consist of keeping training records by Operations personnel and when their training certification expires. This will ensure that certifications are renewed in a timely manner. Safety meeting minutes, including an attendance sheet, should also be kept for all meetings. A copy of the safety-related documents will be placed on file at the site and a duplicate copy will be sent to the Solid Waste Management Division office.

Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 26 of 34

## 3.11 EMERGENCY RESPONSE

### 3.11.1 Emergency Contact List

The following DPW personnel may be contacted at the address and telephone numbers listed below in the event of an emergency at the Ordot Dump.

Richard Naputi, Ordot Dump Assistant Site Supervisor
Department of Public Works
542 North Marine Drive
Tamuning, GU, 96913
Work Number: (671) 472-2710; I-connect: 13682

Dominic Muna, Solid Waste Management Division Superintendent / Acting Supervisor
Department of Public Works
542 North Marine Drive
Tamuning, GU, 96913
Work Number: (671) 647-4344; Home Number: (671) 734-1559; I-connect: 3789

Jesse Garcia, Chief of Operations
Department of Public Works
542 North Marine Drive
Tamuning, GU, 96913
Work Number: (671) 647-4311; I-connect: 1469

Lawrence Perez, Acting Director*
Department of Public Works
542 North Marine Drive
Tamuning, Guam 96911
Work Number: (671) 646-3131

* Mr. Perez will handle notifications of persons above his level within the Government of Guam.

The telephone number at the Ordot Dump is (671) 472-2710. After-hours emergency contacts are the Guam Police and Fire Departments; their telephone number is 911.

### 3.11.2 Emergency Response Procedures

The Dump has been in operation for over 50 years. Throughout its life, the island has experienced natural disasters in the form of earthquakes, typhoons and tropical storms. The Dump in particular has also experienced numerous landfill fires. An *Emergency Contingency Plan* is included as Permit Attachment II-6 and shall be used for the remaining life of the site.

Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 27 of 34

### 3.11.3 Typhoon Emergency

Typhoons/Tropical Storms on Guam are common events. In the event of a potential typhoon/tropical storm, the Guam Homeland Security, Office of Civil Defense will declare a Condition of Readiness (COR). The Conditions of Readiness are based on the onset of damaging winds of 39 mph sustained to the island. Prior to a declaration of COR 2 (damaging winds may arrive within 24 hours), Operations personnel should perform the following activities, at minimum:

- secure all windows and doors with available typhoon shutters and/or plywood;
- fill containers with water;
- secure all sensitive instrument/devices, computer, and other electronic devices and wrap them in plastic bags;
- secure all potential projectiles, roofing tins, rakes, lawnmower, containers, plywood, signs and things that may be airborne by the increase in wind speed; and
- move vehicles and equipment to a secure & protected area.

### 3.12 CLOSURE COVER SYSTEM, CLOSURE, AND POST-CLOSURE CARE

The closure cover system will be constructed as the finished surface of Ordot Dump. Closure cover system will be placed over the entire area of waste.

The upper layer of the closure cover system will include a vegetative soil layer, drainage layer, and geomembrane. The closure cover geomembrane will be underlain with a geocomposite layer that has been placed over prepared subgrade. This approach will allow surface water runoff from areas within the closure cover system to be conveyed to the stormwater collection system, and provide increased control of leachate seeps and LFG below the geomembrane.

Closure cover section and details are presented in Figure 3-3. However, more specific closure details are referenced in Permit Condition Part III.

Closure and Post-closure care will be described in detail in Permit Condition Part IV.

### 3.13 ORDOT DUMP SLOPE STABILITY

Slope stability can be divided into global stability, or the overall stability of the site, and veneer stability, which is the stability of the liner system. Slope stability, as it relates to Operations, requires that the lift final sideslopes have a 2H:1 V grade to facilitate closure. Veneer slope stability is considered as part of the design process for the closure and is not specifically addressed here. The results of slope stability calculations for the closure cover will be presented in Permit Condition Part III.

Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 28 of 34

## 3.14 PERSONNEL TRAINING

The facility shall implement a training program for its personnel in accordance with Permit Condition II.A.19 and the *Personnel Training Program Plan* as outlined Permit Attachment II-10.

### 3.14.1 – INTERIM PERSONNEL TRAINING

Pending approval of the *Personnel Training Program Plan*, the facility shall provide the following interim training:

i. On the recognition of each type of excluded waste, procedures for excluding the waste, and recordkeeping procedures for excluded waste, and the *Hazardous Waste Exclusion Program*, Permit Attachment II-3;

ii. Identification of selected and bulky waste, procedures for placement of each type;

iii. *Summary of Ordot Dump's Solid Waste Acceptance Policy*, Permit Attachment II-2;

iv. Procedures for using, inspecting, repairing and replacing facility emergency and monitoring equipment;

v. *Final Filling Plan*, Permit Attachment II-1;

vi. *Safety Program*, Permit Attachment II-5;

vii. *Emergency Contingency Plan*, Permit Attachment II-6; and

viii. On their duties in a way that ensures the facility's compliance with the requirements of the Guam EPA Permit, this Operation Plan, and all other activities relating to the Ordot Dump.



TYPICAL BENCH COVER SECTION
A

EXPOSED GEOMEMBRANE COVER DETAIL
2

SLOPE SOIL COVER DETAIL
1

GOVERNMENT OF GUAM
DEPARTMENT OF PUBLIC WORKS
SOLID WASTE DIVISION

GUAM

PROJECT NAME
ORDOT DUMP CLOSURE

CLOSURE COVER SECTION
AND DETAILS

PROJECT NO. DPW-SW-2004 (002)

SHEET 3-3

TERRITORY
GUAM

# 4.0 STOCKPILING

Currently, daily cover is stockpiled onsite. Daily cover is hauled to Ordot Dump and utilized, as needed. Operations shall follow some general guidelines for stockpiling. Prior to stockpiling, DPW Solid Waste Management Division may be required to obtain a stockpiling permit from GEPA. The following information shall be provided to GEPA:

- source of stockpile material;
- location, slope and height of stockpile;
- duration that the material is to be stockpiled;
- provisions to prevent erosion and sediment loss from rain and wind action; and
- plan for removing stockpiles at project completion.

## 4.1 GENERAL GUIDELINES

Grading and drainage of onsite stockpiles shall be in accordance with the following general guidelines:

- Prior to constructing a stockpile, the ground surface shall be graded in the direction that allows runoff to drain in the direction of existing site drainage.
- After grading, the ground surface shall be compacted to minimize damage to the natural surface when removing stockpiled material.
- Stockpile sideslopes shall have maximum grades of 3H:1 V.
- Removal of material from the stockpile should be performed uniformly and to maintain a minimum 5 percent slope at the top such that there are no depressions in which stormwater can collect.
- During wet weather, soil removal from the stockpile shall not be performed. When heavy rains are anticipated the stockpile shall be covered with plastic sheeting. The plastic sheeting shall be anchored using sandbags, tires or other appropriate means, to prevent wind uplift of the cover.
- If the stockpile is to remain untouched for two (2) days, it shall be covered with the plastic sheeting and anchored.
- Install silt fence around the perimeter of the stockpile, to prevent the migration of sediments.

Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 31 of 34

This page left intentionally blank.

# 5.0 LEACHATE MANAGEMENT

The Facility is required to implement the Guam EPA approved Final Filling Plan, Permit Attachment II-1, and as required in Section 3.2 of this Plan. This interim measure will minimize leachate generation during filling operations until closure construction is completed.

The Facility must cease the discharge of leachate into the waters of the United States, by October 23, 2007 in accordance with Section IV.8.i of the Consent Decree.

Case 1:02-cv-00022    Document 190-3    Filed 01/14/2008    Page 33 of 34

This page was intentionally left blank.

# 6.0 SURFACE WATER RUN-ON/RUN-OFF CONTROL

A run-on control system shall be designed, constructed, and maintained to prevent flow onto the active portion of the Dump during the peak discharge from a twenty-five (25) year storm.

A run-off control system shall be designed, constructed, and maintained to collect and control at least the water volume resulting from a twenty-four (24) hour, twenty-five (25) year storm.

In addition, run-off from the active portion of the Dump must be handled in accordance with §23310, Surface Water Requirements. Therefore, the Facility shall

➢ Maintain the existing run-on control roadside ditch (south side of Dero Drive); and

➢ Ensure that proper grading is implemented to prevent ponding and minimize generation of leachate in accordance with Sections 3.2.

Case 1:02-cv-00022     Document 190-4     Filed 01/14/2008     Page 1 of 34



EXISTING SURFACE

CONTROL POINT

Ȼ
EAST DITCH

VARIES

1



FIGURE 6-1
TYPICAL CROSS SECTION OF EAST DITCH

Ordot–Chalan    Ordot  Dump
                Paga,  Guam

# 7.0 LANDFILL GAS CONTROL

When disposal activities were initiated at the Ordot Dump, there were no landfill (LFG) control features installed. As landfilling at the Dump continued, LFG control features were not constructed. The current LFG generated at the site is allowed to be discharged into the atmosphere directly exiting the waste surface. As no improvements have been incorporated into the existing Dump, landfill gas control can only be addressed by gas monitoring and modification of operational procedures as necessary to mitigate potential hazards.

LFG generated at Ordot Dump will be controlled by a LFG Management System, which will be constructed during the closure. This system will be discussed in detail in the *Ordot Dump Closure Final Design Report* (DPT, 2005c).

## 7.1 METHANE MONITORING PLAN

The *Operations & Monitoring Plan for the Ordot Dump* (DPW, 1997) included a monitoring plan prepared by Unitek Environmental - Guam. Within the Monitoring Plan section, it was noted that a monthly gas test would be added to the Monitoring Plan to conduct surface airborne gas testing. Therefore, the Interim Methane Gas Monitoring in Section 7.2 will be performed at least monthly, prior to closure. A permanent monitoring program will be developed as part of the Ordot Dump Closure design (Permit Condition III).

## 7.2 INTERIM METHANE GAS MONITORING

The Facility shall conduct the following activities:

    **a.** Monthly monitor methane gas at the following locations:
      1. Inside the entrance booth;
      2. Inside the operations building; and
      3. At eight (8) locations on the facility boundaries, at least two (2) on each sides of the facility.
    **b.** The data collected must include:
      1. The date, time, and weather condition at the time of sample collection;
      2. The equipment utilized for the collection and analysis of sample;
      3. The methane gas concentration in percent;
      4. The specific location of the sample collection by a GPS; and
      5. Any other pertinent observation that may have significant effect of the data collected.
    **c.** The concentration of methane gas generated by the facility shall not exceed the following:
      1. Twenty-five Percent (25%) of the lower explosive limit for methane inside the entrance booth and the operations building (excluding gas control or recovery system components); and
      2. The lower explosive limit for methane at any of the eight locations on the facility boundary.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 3 of 34

d. If methane gas levels exceeds the limits specified above, the Facility must:
      1. Immediately, within ten (10) minutes, take all necessary steps to ensure protection of human health and notify the DPW Director and Guam EPA Administrator within two (2) hours, and by written report within twelve (12) hours;
      2. Within seven (7) days of detection, place in the operating record the methane gas levels detected and a description of the steps taken to protect human health;
      3. Within forty (40) days of detection, submit a complete methane gas remediation plan for review and approval to the DPW Director and Guam EPA Administrator;
      4. Within sixty (60) days of detection, implement a remediation plan for the methane gas releases, place a copy of the plan in the operating record, and notify the DPW Director and Guam EPA Administrator that the plan has been implemented; the plan shall describe the nature and extent of the problem and the proposed remedy; and
      5. The Guam EPA Administrator may establish alternative schedules for demonstrating compliance within Items (2) and (3) of subsection (ii) of this section.

   e. In addition to the data collection, the Facility shall submit monthly summary report on the data collection to the DPW Director and the Guam EPA Administrator, and any actions taken to address the exceedences of the limits specified above.

## 7.3 LANDFILL GAS HAZARD MITIGATION

If the monthly methane monitoring yields high levels of landfill gas, Operations shall perform the following tasks:

- shut down the areas that have high level readings;
- post fire hazard warning signs at the main gate and at locations along Dero Drive;
- contact the Guam Fire Department; and
- contact the Engineer-of-Record for the closure design of Ordot Dump for consultation.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 4 of 34

This page intentionally left blank.

## 8.0 EROSION CONTROL PLAN

This section describes the requirements for temporary and permanent erosion control measures that should be provided in association with all excavations, stockpiles, and landfilling areas.

For further detail on the requirements and guidelines established for dust control, refer to the *Guam Air Pollution Control Standards and Regulations.*

### 8.1 BEST MANAGEMENT PRACTICES

Several erosion control measures are summarized below. The BMPs, both existing and those to be implemented, fall into five categories:

- Operational practices and BMPs;
- Source Control BMPs;
- Erosion and Sediment Control BMPs;
- Treatment BMPs; and
- Innovative BMPs.

### 8.1.1 Operational Practices and BMPs

Operational practices are intended to reduce pollutants and improve stormwater quality by changing everyday behavior. Six operational BMPs are identified below.

- <u>Implementation of an Erosion and Sedimentation Prevention Team</u> - The prevention team is responsible for developing, implementing, maintaining, and revising the erosion and sediment controls for the site. The team will meet at least twice per year to discuss erosion and sediment control activities.
- <u>Good Housekeeping</u> - Good housekeeping practices are intended to maintain potential pollution source areas in a clean and orderly condition.
- <u>Preventive Maintenance</u> - Preventive maintenance includes inspection and maintenance of the surface water conveyance systems.
- <u>Spill Prevention and Response</u> - Spill prevention is a primary objective of the preventative maintenance programs for the surface water system. Spill response actions are summarized in Section 8.9.
- <u>Employee Training</u> - Existing and new employees will be trained in the objectives and requirements of erosion and sediment control. In particular, training will focus on: spill prevention; response and reporting procedures; good housekeeping practices; material management practices; and proper procedures and locations for remote fueling, washing, lubrication, and light maintenance of the operations equipment at the Dump.
- <u>Inspection and Recordkeeping</u> - Two visual inspections per year are required to ensure that all elements of erosion and sediment controls are in place and working properly. One inspection is to be conducted in the wet season and one in the dry season. Section 8.5 outlines criteria for these inspections and documentation requirements.

### 8.1.2 Source Control BMPs

Source Control BMPs are intended to reduce the accumulation and potential contact of pollutants at the source. Source controls have been developed for each industrial activity/area identified as a potentially significant source of pollutants. The activity- or area-specific BMPs that will be implemented are summarized below.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 6 of 34

- Daily Cover Material Hauling - BMPs include: all-weather roads; sand bags or silt fences along roads to trap sediments; sediment ponds; and inspection, cleaning, and repair of facilities.

- Equipment Fueling, Light Maintenance, and Washing - BMPs include: preventive maintenance; equipment vacuum extraction systems; automatic shutoff controls for lubrication and fueling; and routing of runoff from equipment areas to treatment system facilities. Additional BMPs include: spill cleanup kits for remote fueling; equipment drip pans; maintenance of automatic shutoff controls; and employee training.

- Waste Hauling - BMPs include: stabilized entrances on roads into the active area; use of wood chips, bark, and gravel on access roads and tipping areas. Additional BMPs include: use of geotextile to construct temporary access roads; use of straw bales and silt fences; and use of street sweeper equipment.

- Erosion of Unpaved Roads – BMPs include: use of gravel, culverts, and ditches for drainage; use of sand bags and silt fences; sediment ponds; inspection, cleaning, and repair of facilities.

## 8.1.3 Erosion and Sediment Control BMPs

Erosion and sediment control BMPs are intended to limit soil erosion in areas that have a high potential for significant erosion. These areas include:

- Stockpile(s) in which daily cover is to be removed (See Section 4.0); and
- SLOPES (SEE SUBSECTION 8.4).

## 8.1.4 Treatment BMPs

Treatment BMPs are physical or structural measures designed to contain and treat surface water runoff. Typical treatment BMPs include detention ponds and biofiltration. Detention ponds allow for the detention of runoff to allow for the settling of particulates. Detention ponds also offer the ability to control flow. Biofiltration uses vegetation in conjunction with slow and shallow-depth flow for runoff treatment. As runoff passes through the vegetation, pollutants are removed through the combined effects of filtration, infiltration, and settling. These effects are aided by the reduction of the velocity of stormwater as it passes through the biofilter. Biofiltration facilities include swales that are designed to convey and treat concentrated runoff at shallow depths and slow velocities, and filter strips that are broad areas of vegetation for treating sheet flow runoff. There are no existing treatment BMPs at the Dump.

## 8.1.5 Innovative BMPs

Innovative BMPs can be in the context of operations, source reduction and recycling, source control, or treatment. Innovative BMPs are often original or unique and exceed the measures typically required.

## 8.2 PLASTIC SHEETING

Clear plastic sheeting may also be used as a temporary covering for erosion control. Clear plastic sheeting should have a minimum thickness of 6 mils. Plastic sheeting should be installed and maintained in place tightly, using sandbags or tires connected by ropes on a maximum 10-foot grid, in all directions. All seams should be taped or weighted down over their full length. There should be at least a 12-inch overlap, in the upstream direction, at all seams. Plastic sheeting should be buried in a 2-feet deep trench at the top of the slope, in order to anchor the sheeting and to prevent surface water flow beneath the sheeting. The downhill ends of the plastic should be located so that surface water running off the plastic will not cause erosion.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 7 of 34

## 8.3 SILT FENCE

A silt fence is constructed from synthetic materials and is effective in intercepting sediment from low-volume overland or sheet surface water flow. Silt fence can be prefabricated and sold as silt fence or constructed in the field. The following provide construction guidelines for silt fences (See Figure 8-1 for typical silt fence detail):

- Silt fences or similar silt barriers should be placed at the downslope boundaries of excavated or disturbed areas.

- The geotextile filter for the silt fence should be a non-woven fabric composed of polypropylene filaments that are formed into a stable network so that the filaments retain their relative position.

- The geotextile should be inert to biological degradation and naturally encountered chemicals, alkalis, and acids.

- The geotextile should be purchased in a continuous roll and cut to the length needed to avoid use of joints. When joints are necessary, the geotextile should be spliced together only at a support post, with a minimum 6-inch overlap, and both ends should be securely fastened to the post.

- Posts should be spaced a maximum of 6-feet apart and driven securely into the ground (minimum of 12-inches). Caution should be used when installing posts over lined or covered areas.

- Geotextile should not be stapled to trees.

- A trench to anchor the geotextile should be excavated, a minimum of 8-inches wide and minimum 4-inches deep, along the line of the posts and upslope from the barrier. The geotextile should be extended across the trench and the trench should be backfilled with native material and graded to drain (Figure 8-1).

- When standard-strength geotextile is used, a wire mesh support fence should be fastened securely to the upslope side of the posts using heavy-duty wire staples (at least 1-inch long), tie wires, or hog rings. The wire should extend into the trench a minimum of 4-inches and should not extend more than 36-inches above the original ground surface.

- When extra-strength geotextile and closer post spacing are used, the wire mesh support fence may be eliminated. In such a case, the geotextile is stapled or wired directly to the posts with all other above provisions applying.

- Silt fences should not be removed before the upslope area has been permanently stabilized.

- Silt fences should be inspected immediately after each rainfall and at least daily during prolonged rainfall. Any required repairs should be made immediately.

- Sediment must be removed when it reaches approximately one-third the height of the fence, especially if heavy rains are expected.

## 8.4 SLOPE BMPS

Grading or otherwise modifying slopes greatly increases the potential for erosion. Steeper slopes usually have faster runoff velocities, less infiltration, and more erosion than slopes that are less steep. Modifying a slope by clearing existing vegetative cover also increases its vulnerability to erosion.

Case 1:02-cv-00022     Document 190-4     Filed 01/14/2008     Page 8 of 34

Diversion measures, slope stabilization measures, or vegetative buffer strips may be incorporated for temporary or permanent slope protection.

- Diversion Measures - Diversions can intercept stormwater runoff before it reaches disturbed slopes or other exposed areas. They should collect the runoff and convey it to a suitable discharge location, such as a stabilized stormwater conveyance system. A typical diversion measure might consist of an interceptor dike or swale above an unprotected slope.

- Slope Stabilization Measures - Slopes can be stabilized both mechanically and with vegetation. Retaining walls, slope drains, surface roughening, soil binders, and cover materials are all common measures used for stabilizing disturbed slopes.

- Vegetative Buffer Strips - Maintaining a natural vegetative buffer or grass filter strip at the base of a slope helps retain sediment onsite. Alternatively, silt fence constructed at the toe of a slope will help retain sediment on site.

## 8.5 INSPECTION AND MAINTENANCE OF STORMWATER AND EROSION CONTROL FACILITIES

Inspections and maintenance of stormwater and erosion control facilities shall be performed for the purpose of preventative maintenance and the reduction of adverse effects of storm conditions on the construction site. This section outlines the general criteria for such inspections and indicates the forms that shall be used daily to record unusual conditions. This section also describes required maintenance, including periodic and as necessary restoration and repair of stormwater and erosion control facilities.

### 8.5.1 Inspections

The following periodic observations shall be performed, and the results shall be recorded on the inspection forms provided. Additional notes shall be made on the forms as needed. This includes both dry and wet-weather inspections. The preventive maintenance inspections are required to ensure that the erosion and sediment controls are functioning properly. The objective of these observations is to ensure that the drainage facilities perform properly during storm conditions. Inspections are to be carried out as follows:

- inspect all discharge locations for defects and maintenance needs;
- inspect all temporary erosion and sedimentation control (TESC) BMPs; and
- inspect all disturbed areas for evidence of erosion.

Inspections are to be performed daily. Additional inspections shall be done during storms in order to ensure that the drainage facilities are performing properly during storm conditions. It is important that during daily inspections the observer ensures that the erosion and sediment controls (ditches, silt fences, check dams, and sand bag barriers) are effectively maintained and functioning adequately. If any maintenance or sediment removal is needed, the observer shall note the location and how much sediment removal is needed. Table 8-1 (blank form) is provided for recording information on the daily BMP inspections.

### 8.5.2 Maintenance

Maintenance and sediment removal at drainage facilities shall be carried out as necessary but at least once a month and following each storm. If slopes rut, rill, or erode, Operations shall restore and repair the damage, using the eroded material where possible, and clean up any material that may find its way to ditches and culverts.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 9 of 34

Sand bag barriers and check dams shall be monitored for performance and sediment accumulation during and after each runoff-producing rainfall event. Maintenance and repairs shall be carried out as necessary.

Silt fences shall be monitored for performance and sediment accumulation. Sediment shall be removed when bulges occur or before sediment accumulation reaches 50 percent of geotextile height. Maintenance and repairs shall be carried out as necessary.

Table 8-2 (blank form) shall be used to record maintenance performed on erosion and sediment control structures.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 10 of 34



- Anchor post
- Welded wire fabric with silt fence geotextile
- Native backfill
- Staples or wire rings
- Geotextile extending across trench
- Flow →
- 4" min.
- 1'-0" min.
- 8"



- Welded wire fabric and geotextile
- Staples or wire rings (typ.)
- Fabric with wire mesh should extend minimum 4" into backfill
- 2'-0" min.
- 1'-0" min.
- 6' max. O.C.
- Bury bottom of filter fabric material in 8"x 4" trench

Figure B-1
**Silt Fence Detail**

Ordot Dump
Ordot-Chalan Pago, Guam

## 8.6 SAND BAG BARRIERS AND SILT FENCE CHECK DAMS

Sand bag barriers and silt fence check dams can be installed to intercept sediment from disturbed or excavated areas and to reduce sediment transport. These barriers are effective for low to moderate sheet and channel flows. Figure 8-2 shows a typical silt fence check dam construction. Figure 8-3 shows the typical sand bag barrier. The following provide construction guidelines for sand bag barriers:

- Sand bags should be filled with clean manufactured sand or hammer mill sand. Bags should be manufactured of clean fabric inert to biological degradation and naturally encountered chemicals, alkalis, and acids.

- Sand bags should be placed perpendicular to the flow direction for sheet flow and channel flow. A row of sand bags should be constructed a minimum of two bags wide, with each bag tightly abutted and offset from the adjacent bag.

- A trench should be excavated the width of the bags and the length of the barrier. The trench should be a minimum of 4-inches deep. The trench should be deep enough to remove material that might allow runoff to flow under the barrier. Silt screen fabric should be placed under the bags in the trench, extend over the top layer of bags on the uphill side, and anchored under the top layer of bags on the downhill side. Backfill material should be level with the ground on the downhill side and approximately 4-inches higher on the uphill side.

- Sand bag barriers should be inspected frequently and repaired or replaced as needed. Barriers should not be removed until upslope areas have been stabilized.

- Barriers should be inspected immediately after each rainfall and at least daily during prolonged rainfall. Sediment should be removed when it reaches approximately one half the height of the barrier.

The following provide construction guidelines for silt fence check dam:

- Install silt fence check dam perpendicular to flow. Anchor posts shall be spaced a maximum of 3 feet, and can be made of wooden stakes or similar product. Anchor posts shall be embedded at least 24 inches below the existing surface.

- The bottom of check dam silt fence geotextile and wire mesh support shall be a minimum 18 inches below the ditch invert. The top of check dams shall be constructed at least 18 inches above the ditch invert.

- Check dam anchorage, shall be 12 inches wide. Use excavated material for anchorage backfill.

- Check dams should be inspected frequently and repaired as needed.

- Check dams should be inspected immediately after each heavy rainfall event and at least daily during prolonged rainfall. Debris should be removed when it builds up to approximately one half the height of the check dam.

## 8.7 DITCHES AND DITCH LINING MATERIAL

The following provide guidelines for ditch lining materials:

- Ditches on stockpile sideslopes should be sloped to drain at a minimum of 1 percent.

- Ditches (roads and runoff control berms) should be lined with erosion control matting. Figure 8-4 shows a typical erosion control matting-lined ditch on a sideslope. In some cases, armoring of ditches by riprap or concrete may be desirable.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 12 of 34

- Erosion control matting should be placed with a minimum overlap of 6-inches at all joints. The upstream matting shall overlap on top of the downstream matting.

## 8.8 PREPARATION FOR WET SEASON OPERATION

In preparation for wet season operation, erosion control features should be inspected and the need for additional measures assessed and installed prior to August 1 of each year. Activities to be considered include:

- All silt fences should be checked, accumulated sediment removed, and the fence repaired or replaced as needed.

- New silt fences should be installed as necessary;

- Ditches and culverts should be cleaned and repaired;

- Culvert inlets and outlets should be inspected and repaired as necessary;

- Sand bags should be replaced as needed; and

- Areas with disturbed soils should be seeded.

## 8.9 CONTROL OF POLLUTANTS OTHER THAN SEDIMENTS

Housekeeping practices are important for reducing or eliminating pollutants in stormwater runoff. The pollutants, including fuel, equipment fluids, and chemicals that will be used during continued operation of the Dump, shall be controlled through taking precautionary measures and knowing the details of the pollutants described in this section.

### 8.9.1 Housekeeping

Housekeeping involves maintaining a clean and orderly work environment. Extra attention to surfaces draining to storm drains or ditches can significantly reduce pollutant washoff. An orderly work environment will reduce the chance for inadvertent spills, allow for the early detection of problems, and help to ensure unimpeded access to the site. The following practices are examples of housekeeping measures:

- all material that is a potential pollutant (e.g., fuel, paint, oil) shall be kept in a covered, contained area. Containers shall be well sealed, clean, and labeled with substance name, date, and hazards;

- all empty cleaner, oil, or chemical containers shall be promptly and properly disposed;

- drip pans or pads shall be used when working on equipment or with equipment fluids and cleaners;

- a designated individual shall keep a running inventory of all chemical substances and Material Safety Data Sheets (MSDS) in a fixed location onsite;

- any trash or debris that is present shall be picked up and properly disposed;

Case 1:02-cv-00022     Document 190-4     Filed 01/14/2008     Page 13 of 34

- containers or equipment shall be monitored for leaks; observed leaks shall be contained, and the item repaired or replaced promptly;

- vehicles shall be monitored for leaks; any observed leaks shall be cleaned up; and

- all wash water shall be kept onsite and away from drainage areas.

Housekeeping inspections shall be performed at the same time as the inspections of the erosion and sediment controls. Table 8-3 (blank form) shall be used to record the Housekeeping inspections.

### 8.9.2 Fueling and Equipment Maintenance Practices

If an onsite fueling service is used, then the service provider must practice proper procedures and precautions during fueling. A dedicated area for fueling and equipment maintenance shall be located away from any direct runoff areas. Minor spill-control BMPs shall be practiced as presented below, and a contingency plan for bigger spills shall be implemented.

- Spills and leaks shall be avoided during equipment fueling.

- Fuel tanks shall not be topped off.

- Absorbent pads or drip pans shall be placed beneath the fueling nozzle to collect drips. Drippings shall be deposited in appropriate disposal containers.

- The automatic shutoff on the fueling nozzle shall be checked to verify that it works.

- In the case of leaks or spills, the spill shall be covered with absorbent, and if necessary, the absorbent worked in (e.g., with a rake) to absorb fluids penetrating the surface.

- Use of detergents shall be avoided in the fueling and maintenance areas. Detergents may serve to wash off absorbed oils into the drainage water.

- Use of cleaning solvents where drips or spills would not be captured by drip pans or equivalents shall be avoided.

- Vehicles, equipment, and fuel containers shall be inspected regularly for leaks and repaired as necessary.

### 8.9.3 Use of Chemicals During Operations

Chemicals used during operations shall be managed as follows.

- Chemicals shall be stored such that they will not spill or be exposed to rain or stormwater.

- Chemicals shall be used in the recommended amounts and manner.

- Chemicals shall be used completely before disposing of the container.

- Empty containers and used materials shall be deposited in the appropriate receptacle. Oil based paints, solvents, thinners, and mineral spirits must be disposed of through a licensed waste management firm.

### 8.9.4 Managing Hazardous Products

General guidelines for managing or minimizing any of the above hazardous wastes are as follows.

- Only the amount that is needed shall be bought and used. Leftovers need to be stored, reused, recycled, or disposed of safely.
- Users shall read labels and follow directions on the label. Hazardous products should be appropriately labeled as follows.

    | - Danger | - Explosive |
    |---|---|
    | - Poisonous | - Warning |
    | - Volatile | - Corrosive |
    | - Combustible | - Flammable |
    | - Caustic | - Caution |

- An inventory of chemicals used or stored onsite and Material Safety Data Sheets (MSDS) shall be maintained in a fixed location onsite.
- Products shall be kept in original containers and always kept well-labeled. If the product must be transferred to a smaller container, the proper-sized funnel shall be used to avoid spills. All containers shall be labeled.
- Labels can fall off with weathering. To prevent this, labels can be covered with transparent tape. To replace the label, a metal tag attached to the container or a stencil and spray paint shall be used.
- Chemical substances shall not be mixed unless recommended by the manufacturer.
- Chemicals shall be used in well-ventilated areas. Skin, eyes, nose, and mouth shall be protected as necessary through use of gloves, respirator, or other protective clothing.
- Corrosive liquids shall be kept away from flammable liquids.
- Nontoxic or less toxic options should be investigated.
- All of the product shall be used before disposing of the container.
- Questions can be referred to the National Recycling Hotline at (480) 889-2650 or on their website at www.earth911.org.

### 8.9.5 Equipment Washing

General guidelines for minimizing the adverse environmental effects of equipment washing are as follows.

- Truck washing shall not result in the discharge of any water to drainage-ways. Truck wash water shall be appropriately disposed of by infiltration.
- Equipment washing detergent wash water shall be discharged to the sanitary sewer system.

Case 1:02-cv-00022      Document 190-4      Filed 01/14/2008      Page 15 of 34

- Cleaning solvents shall be used only where drips and spills can be captured and properly disposed.

## 8.9.6 Treatment and Disposal of Contaminated Soils

Soil that was contaminated previously or contaminated by a spill or leak of a hazardous material may be encountered. The following general procedure applies, depending on the circumstances:

- notify the Ordot Dump Supervisor;

- collect soil sample and test soil to determine type and concentration of contamination;

- remove soil for disposal; and

- dispose at the Dump if the soil is acceptable (not a hazardous waste); otherwise dispose through an appropriate hazardous waste contractor.

## 8.9.7 Spill Control and Cleanup Plan

The following plan details the steps and procedures that shall be followed in the event of a spill; in addition, the plan describes necessary cleanup materials, spill prevention and housekeeping techniques, reporting procedures and spill response monitoring.

**Accidental Release of Pollutant**

- Recognize and evaluate the emergency.
  - A liquid pollutant spill might involve substances such as diesel fuel, hydraulic fluid, or solvents.
  - Determine the amount of liquid, type of liquid, its characteristics (e.g., flammability), and the source of the spill.
  - Determine whether the spill may constitute an emergency situation.
  - Report to Ordot Dump Supervisor.
- Take safety precautions.
  - Provide first aid to any victims.
  - Call 911 if emergency assistance is required and provide the following information:
    - ➢ State that you are reporting a spill with exposure to a potentially hazardous liquid.
    - ➢ Your call may be routed to another individual; state the:

Facility name:                    Ordot Dump

Location: Off of Dero Drive, West of the Dero Drive and Leo Palace Access Road intersection,
              Ordot, Guam

> Describe the exact location of the spill and the number of persons affected. Do not
  hang up the telephone unless you are told to do so.

- Report the event within 24 hours of the time the event is first noted.
  – Notify the Ordot Dump Supervisor and Solid Waste Management Division
    Superintendent at (671) 647-4344(3143).
  – Notify GEPA and describe the spill and its location.
    – If possible, identify the spilled waste so as to improve the degree of safety and
      effectiveness of cleanup. Take proper precautions to avoid a dangerous, life-threatening, or
      environmentally damaging situation.
- Control or limit the emergency.
  – Turn off the source, if possible (e.g., clamp or plug fuel lines, close valves).
  – Action must be performed by personnel appropriately trained to handle the spilled
    material.
  – Contain/prevent the liquid from spreading within the soils or into the air, surface water,
    and groundwater using the following procedures:

    > use berms or sandbags to prevent the liquid from spreading;

    > excavate a temporary holding trench if the volume of liquid is large and the liquid is to
      be subsequently pumped to a tanker for treatment; and

    > remove contaminated soils to an approved location for treatment and disposal.


## Spill Kit Materials

Should a significant amount (more than 5 gallons) of oil or other liquid be spilled, absorbent will
probably not be adequate to contain the spill. For this contingency, a waste spill kit shall be made
available and contain, at least, the following materials:

- 2 absorbent oil booms, each 10-foot-long, 4-inch-diameter;
- 1 flat-edge short shovel;
- 25, 18-inch oil absorbent pads;
- 1 pair chemical-resistant long rubber gloves;
- 1 extra large Tyvek$^{TM}$ suit (worn over regular clothing) with foot coverings;
- 1 roll of "Caution" tape;
- 3, 6-mil-thick 30-gallon plastic bags;
- 1 clear plastic eye and face protection shield; and
- 2 plastic tarps.

Case 1:02-cv-00022     Document 190-4     Filed 01/14/2008     Page 17 of 34

**Spill Prevention**

Awareness will minimize the size of, if not eliminate the possibility of a spill. Being aware of and exercising the following may prevent spills.

- **Likely Spill Locations**—Spills are most likely to occur where fueling and maintenance will take place on the site. Spills could occur during pumping to refill a vehicle or during service of equipment and vehicles.

- **Leak Detection**—Visual inspection is required to identify spills or leakage of liquids where fueling and maintenance of equipment will take place.

- **Inspections**—One of the most effective prevention measures is the performance of routine visual inspections to detect potential spill situations. These should be done on a daily basis during routine operations.

**Spill Cleanup, Good Housekeeping**

Housekeeping can stop a significant amount of contaminants from entering runoff and promote safety by providing a clean workplace for employees. The following practices shall be followed.

- Containers shall be used to collect drips and leaks from equipment that is being worked on.

- Absorbent shall be used for any minor oil spills or leakage. Once the liquid has been absorbed, the absorbent, as well as any contaminated soil or gravel, shall be swept up and disposed. This will prevent or minimize the possibility that oil will be tracked away from the site of the spill into exterior areas where rainwater could carry contaminants into drainage features.

- Empty containers from cleaners, spare oil, or chemicals shall be disposed of promptly and properly.

- An adequate supply of absorbent shall be made available for cleanups.

**Reporting Procedures for Spills**

Any discharge of fuel or hazardous material to the environment, except for minor fuel or oil leaks, must be reported to GEPA within 24 hours of the discharge. A complete, detailed, chronological log of the events and actions taken to rectify the problem shall be kept from the time the condition is first noted until it is resolved. Specific reporting procedures are as follows.

1. Report the spill to GEPA.

2. Send a follow-up written report to GEPA within 5 days of the event.

3. The written report shall contain, but not be limited to, the following:

    - description of the spill and its cause;

    - exact dates and times of the spill; and

    - steps taken or planned to reduce, eliminate, and prevent recurrence of the problem.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 18 of 34

4. A complete report of action taken in response to the spill, including those intended to prevent future spills, is to be submitted to GEPA within 30 days of the event.

File copies of all correspondence and all records pertaining to the event as well as any emergency response shall be maintained.

## Spill Response Monitoring

Water monitoring shall be conducted by the following criteria.

- Monitoring for surface water quality impacts shall be carried out if a spill:
  - Discharges to any surface water;
  - Occurs on a runoff-producing area during rainfall or is not completely cleaned up before the next rainfall.
- Surface water samples shall be collected in the nearest surface water body downstream from the spill.
- Samples shall be collected in glass bottles immediately or when surface water flow begins (next rainfall). Samples shall be labeled with the location, date, and name of the sampler.
- Samples shall be analyzed for the chemicals spilled by a GEPA-accredited laboratory.
- Sample results shall be provided to GEPA.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 19 of 34

## Table 8-1 Daily Inspection of Erosion and Sediment Controls
## Ordot Dump

This inspection shall be performed and recorded daily to verify the functioning of erosion and sediment controls.
Inspect all drainage structures and erosion and sediment controls for defects and maintenance needs.

Date:                  Inspected by:                          Precipitation (inches):

| Inspection Location | Flow Present? (yes or no) | Conditions | Maintenance and Repairs Needed? (specify) |
|---|---|---|---|
| Daily Cover | | | |
| Silt Fences | | | |
| Sand Bag Barriers | | | |
| Check Dams | | | |
| Ditches | | | |
| Outlets | | | |
| Culverts | | | |
| Other | | | |
| Comments: | | | |

Inspections shall include inlets and outlets of culverts, sediment accumulation, offsite conditions, etc.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 20 of 34

## Table 8-2 Records of Maintenance and/or Repairs
## Ordot Dump

Any unusual conditions encountered during maintenance procedures shall be recorded.

| BMP | Maintenance and Repairs | | |
| --- | --- | --- | --- |
| | Date | Completed By | Description |
| Daily Cover | | | |
| Silt Fences | | | |
| Sand Bag Barriers | | | |
| Check Dams | | | |
| Ditches | | | |
| Outlets | | | |
| Culverts | | | |
| Other | | | |
| Comments: | | | |

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 21 of 34

# Table 8-3 Housekeeping Inspection

## Ordot Dump

Housekeeping inspections, though not specifically required, should be performed on a regular basis (along with Housekeeping practices) in order to keep the facility grounds clean and orderly. These visits shall also be used to detect any problems with stormwater drainage facilities or unusual conditions. Fill in the date of the inspection below and then observations and/or corrective action if any. The frequency of these visits is – as needed. Keep this form in accordance with Section 8.9 of the Ordot Dump Operations Plan.

| Date | Observations | Corrective Actions |
|------|-------------|-------------------|
|      |             |                   |
|      |             |                   |
|      |             |                   |
|      |             |                   |
|      |             |                   |
|      |             |                   |
|      |             |                   |
|      |             |                   |
|      |             |                   |
|      |             |                   |
|      |             |                   |

Case 1:02-cv-00022     Document 190-4     Filed 01/14/2008     Page 22 of 34

Figure 8-2

TYPICAL SILT FENCE CHECK DAM

Ordot Dump
Pago, Guam

Ordot-Chalan

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 23 of 34



FILTER FABRIC

3-STACKS SAND BAGS

SEDIMENT LADEN RUNOFF

GROUND SURFACE

FILTERED RUNOFF

4"

6"

18" MIN.

GROUND SURFACE

Job No. 33757077

Figure 8-3
**Sand Bag Barrier**

Ordot Dump
Ordot-Chalan Pago, Guam

Case 1:02-cv-00022   Document 190-4   Filed 01/14/2008   Page 24 of 34



Note: 1. Anchor erosion control matting according to
manufacturer's recommendations

Figure 8-4
**Erosion Control Matting
Lined Ditch on Sideslope**

Ordot Dump
Ordot-Chalan Pago, Guam

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 25 of 34

## 9.0 GROUNDWATER MONITORING

The Facility will conduct a two (2) phased installation of a complete Groundwater Monitoring System for the Ordot Dump, as indicated in the *Closure Plan and Post Closure Care and Maintenance Plan* (pending revision and approval).

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 26 of 34



56



END CAP

HINGE

STAINLESS
STEEL CASING

3" SQUARE

TYPICAL TRAFFIC
BARRIER, AS
REQUIRED

EXISTING
GRADE

BENTONITE SEAL

4" DIA. PVC PIPE, SCH. 40

BACKFILL
(CUTTINGS)

BENTONITE SEAL

FACTORY SLOTTED, 0.04"

FILTER PACK SAND
(12" ABOVE AND BELOW
SLOTTED PIPE SECTION)

GROUNDWATER LEVEL
(TO BE DETERMINED WHEN
DRILLING THE HOLE)

END CAP

BENTONITE SEAL

12" DIA.
BORING

**Figure 9-2**

**TYPICAL GROUNDWATER MONITORING WELL DETAIL**

NTS

Ordot Dump
Ordot—Chalan Pago, Guam

Case 1:02-cv-00022     Document 190-4     Filed 01/14/2008     Page 28 of 34

THIS PAGE INTENTIONALLY LEFT BLANK.

## 10.0 RECORDKEEPING

## 10.1 REQUIREMENTS

Section 23312 of the Solid Waste Disposal Rules and Regulations (GEPA) describes the recordkeeping requirements of a MSW landfill. DPW along with Operations personnel shall keep records, as required by the rules and regulations. The document states:

"(a) *The owner or operator of a MSWLF unit must record and retain near the facility in an alternative location approved by the Administrator, the following information as it becomes available:*

*(1)    any location restriction demonstration required under Article 2 of this Chapter;*

*(2)    inspection records, training procedures, and notification procedures required in Subsection (a) of §23303 of this Chapter;*

*(3)    gas monitoring results from monitoring and any remediation plans required by §23306 of this Chapter;*

*(4)    any MSWLF unit design documentation for placement of leachate or gas condensate in a*

*MSWLF unit as required under Item (2) of Subsection (a), §233011 of this Chapter;*

*(5)    any demonstration, certification, finding, monitoring, testing, or analytical data required*

*by Article 5 of this Chapter;*

*(6)    closure and post-closure care plans and any monitoring, testing, or analytical data as required by Article 6 of this Chapter;*

*(7)    any cost estimates and financial assurance documentation required by Article 7 of this Chapter;*

*(8)    description of solid waste materials received, identified by source of materials; and the license plate number of the vehicles transporting them for disposal; these records shall be maintained on a daily basis and summarized monthly as to the number of tons received, number of vehicles by type, and kinds of waste materials received;*

*(9)    operation problems, complaints or difficulties;*

*(10)   air quality and litter control efforts;*

*(11)   vector control efforts.*

*(b)  The owner/operator must notify the Administrator when the documents from Subsection (a) of this §23312 have been placed or added to the operating record, and all information contained in the operating record must be furnished upon request to the Administrator or be made available at all reasonable times for inspection by the Administrator.*

*(c)  The Administrator may set alternative schedules for recordkeeping and notification requirements as specified in Subsections (a) and (b) of this §23312, except for the notification requirements in Subsection (b) of §23201 and Item (3) of Subsection (g), §23506 of this Chapter. "*

## 10.2 RECORDKEEPING PROCEDURES

The Facility will maintain a written operating record at the facility. At a minimum, the following information must be recorded, and maintained in the operating record until closure of the facility:

A description and the quantity of solid wastes received, and the location of filling and date(s) of disposal at the facility.

    i.   The location and quantity of solid wastes waste must be recorded on a map or diagram of each disposal filling area.

    ii.  Records of all active area mapping generated by the Surveyor and the dates of completion of filling area per Guam EPA approved Final Filling Plan.

    iii. Records of results of random vehicle inspections of incoming and random off-loading inspections at the working face as required in Section II.A.5.

    iv. Summary reports and details of all incidents that require implementing the contingency plan as specified in Section II.A.20.

    v.  Records and results of general facility inspections as required by Section II.A.18.

    vi. Monitoring, testing or analytical data, and corrective action where required by this Operations Plan, the Closure Plan, and the Post Closure Care and Maintenance Plan.

    vii. All closure cost estimates required in the Guam EPA approved Closure Plan, and all post-closure cost estimates required in the Guam EPA approved Post Closure Care and Maintenance Plan.

    viii. A certification by the Facility no less often than annually, that the Facility has a program in place to reduce the volume of waste accepted through ·waste diversion and recycling activities to the degree determined by the Facility to be economically practicable.

    ix. Records of the daily quantities and placement of waste per Guam EPA approved Final Filling Plan.

**b.** All records, including plans, required under this part must be furnished upon request, and made available at all reasonable times for inspection, by any officer, employee, or representative of Guam EPA who is duly designated by the Administrator.

**c.** The retention period for all records required under this part is at least five (5) years and is extended automatically during the course of any unresolved enforcement action regarding the facility or as required by the Administrator.

**d.** A copy of records of waste disposal locations and quantities under by this Section must be submitted to the Administrator upon closure of the facility.

## 10.3 DAILY VEHICLE RECORD OF LANDFILL FORM

A form titled, "Daily Vehicle Record for the Ordot Dump" will be used as part of recordkeeping. This form includes the following information:

- type of vehicle;
- license plate number;
- type of waste;
- volume of waste; and
- time in.

In addition, Operations keep sign-in sheets for site visits and inspections and Accident/Incident Records, which document onsite equipment collisions and chemical spills.

# 11.0 REFERENCES

Dames & Moore (D&M), 1978. *Solid Waste Management and Resources Recovery Feasibility Study for The Territory of Guam.* July, 1978.

Department of Public Works (DPW), 1997. *Operations & Monitoring Plan for the Ordot Dump.* November, 1997.

Department of Public Works (DPW), 2004. *Request for Proposals, Environmental & Engineering Services for the Preparation of Environmental Report, Construction Plans, Specifications, and Estimates (PS&E) for the Ordot Dump Closure.* March, 2004.

Dueñas & Associates, Inc. (D&A), 2004. *Guam MSWLF Site Selection EIS.* 2004

Dueñas & Associates Project Team (DPT), 2005a. *Ordot Dump Closure Plan.* September, 2005.

Dueñas & Associates Project Team (DPT), 2005b. *Ordot Dump Post-Closure Plan.* September, 2005.

Dueñas & Associates Project Team (DPT), 2005c. *Ordot Dump Closure Final Design Report.* September, 2005.

*Guam Air Pollution Control Standards and Regulations.*

Guam Environmental Protection Agency (GEPA). *Solid Waste Disposal Rules and Regulations.*

Guam Environmental Protection Agency (GEPA), 1995. *Guam Solid Waste Weight Composition and Recycling Feasibility Study.*

Guam Environmental Protection Agency (GEPA), 1999. *Solid Waste Management Facility Permit Application, Landfill.*

Juan C. Tenorio and Associates, Inc. (JCTA), 1993. *Feasibility Study for the Expansion of Ordot Sanitary Landfill, Municipality of Chalan Pago Ordot, Territory of Guam.* 1993.

U.S. Census, 2001. United States Census Bureau. Press Release, United States Department of Commerce News: *Census Bureau Releases Census 2000 Population, Counts for Guam.* July 3, 2001.

U.S. Environmental Protection Agency (USEPA), 2004. United States District Court, Territory of Guam filing. Consent Decree – Civil Case No. 02-00022, United States of America versus the Government of Guam, February 11, 2004.

Case 1:02-cv-00022    Document 190-4    Filed 01/14/2008    Page 33 of 34

This page intentionally left blank

Case 1:02-cv-00022 Document 190-4 Filed 01/14/2008 Page 34 of 34

# APPENDIX A
## ATTACHMENT II-1

## FINAL FILLING PLAN

## RESERVED - PENDING REVISIONS AND FINAL APPROVAL
## SEE PERMIT CONDITION II.A.6.

*12/2/05*

# APPENDIX A
# ATTACHMENT II-2

# SUMMARY OF ORDOT DUMP'S SOLID WASTE ACCEPTANCE POLICY
## (GUAM EPA REVISIONS, DEC. 2005)

*12/2/05*

| TYPE OF WASTE | ACCEPTANCE POLICY | ALTERNATIVES |
|---|---|---|
| Rocks | ➢ See Construction, demolition and land clearing waste | |
| Sludge from sewage treatment | ➢ Not Accepted | |
| Soil, clean | ➢ Accepted | ➢ Use as topsoil or clean fill |
| Soil, contaminated (not dangerous or hazardous waste) | ➢ GEPA/DWP consent required | ➢ Contaminated soil treatment facility |
| Stumps | ➢ See Construction, demolition and land clearing waste | |
| Tanks | ➢ Not Accepted | |
| Thermostats, mercury-containing | ➢ Not accepted | |
| Tires | ➢ Not accepted | ➢ Scrap metal recycler<br>➢ Tire recycling and processing company |
| Vactor waste | ➢ See Catch basin residue | |
| White goods | ➢ Not accepted | ➢ Recycling company |
| Wood | ➢ See Construction, demolition and land clearing waste | |
| Wood and wood products, treated | ➢ Not accepted<br>➢ Treated wood includes but is not limited to creosote- and arsenical-treated wood | ➢ Hazardous waste disposal contractor |
| Wood preservatives | ➢ Not accepted | ➢ Hazardous waste disposal contractor |
| Yard waste | ➢ Accepted<br>➢ Composting is strongly encouraged | |

| TYPE OF WASTE | ACCEPTANCE POLICY | ALTERNATIVES |
|---|---|---|
| Human blood and blood products | ➤ Not accepted | ➤ Incinerate<br>➤ Other treatment/disposal approved by Department of Public Health and GEPA |
| Industrial waste | ➤ Accepted only with GEPA/DPW consent | ➤ Hazardous/industrial waste treatment or recycling facility |
| Infectious waste | ➤ Not accepted | |
| Insulation (non-asbestos) | ➤ Non-asbestos, non-dusty insulation accepted | |
| Liquids | ➤ Compliance with Liquid Restrictions requirements per Section 23311 of GSWRR | None |
| Masonry and brick | ➤ See Construction, demolition and land clearing waste | |
| Medical waste | ➤ Biomedical waste and Sharps waste not accepted<br>➤ Waste from medical facilities that is not biomedical (i.e. office waste, cafeteria waste) is accepted | |
| Motor oil | ➤ Not accepted | ➤ Service station, waste oil recycler, other waste oil collection facilities |

Original 7/05; GEPA amended 11/05

# SUMMARY OF ORDOT DUMP'S SOLID WASTE ACCEPTANCE POLICY

| TYPE OF WASTE | ACCEPTANCE POLICY | ALTERNATIVES |
|---|---|---|
| Aerosol cans | ➢ 10 or fewer mixed with household waste accepted at Ordot Dump provided they did not contain extremely hazardous waste or certain pesticides | |
| Animals, dead | ➢ Animals under 15 lbs. accepted<br>➢ Animals over 15 lbs. or large numbers of small animals accepted at Ordot Dump with Site Supervisor's approval | ➢ Veterinary clinic<br>➢ Pet cemetery<br>➢ Bury on own property<br>➢ Bury animals over 15 lbs. In pits dug into waste |
| Asbestos-containing waste | ➢ Not accepted | ➢ Contact private disposal company |
| Asphalt | ➢ Not accepted | ➢ Hardfill |
| Batteries, vehicle | ➢ Not accepted | ➢ Hazardous waste disposal contractor |
| Batteries, small household type | ➢ May dispose as household waste; however, recycling is strongly encouraged. | ➢ Recycle |
| Biomedical waste, untreated | ➢ Not accepted | ➢ Infectious waste collection, transportation and disposal company |
| Burning or smoldering material | ➢ Not accepted | |
| Cars | ➢ Not accepted | |
| Catch basin residue | ➢ Accepted only with GEPA's consent<br>➢ Liquids must be minimized | ➢ Composting facility |
| Computer monitors | ➢ Not accepted from residential or | ➢ Contact private company for disposal or |

Original 7/05; GEPA amended 11/05

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 5 of 71

**APPENDIX A**
**ATTACHMENT II-3**

**HAZARDOUS WASTE EXCLUSION PROGRAM**
**(JULY 2005)**

*12/2/05*

# ORDOT DUMP
# ORDOT-CHALAN PAGO, GUAM

# Hazardous Waste Exclusion Program Plan

*Prepared for*
Department of Public Works, Government of Guam
542 North Marine Drive
Tamuning, Guam 96911

July 2005

*Prepared by*
Dueñas & Associates Project Team (Dueñas & Associates, Inc. and URS Corporation)

155 E.T. Calvo Memorial Parkway, Suite 200
Tamuning, Guam 96913
(671) 646-7991

# CONTENTS

C.1  INTRODUCTION ................................................................................................1-1

C.2  DESCRIPTION OF ACCEPTABLE AND PROHIBITED WASTES ....................2-1
    C.2.1  ACCEPTABLE WASTES.........................................................................2-1
    C.2.2  PROHIBITED WASTES..........................................................................2-1

C.3  LOAD-CHECKING PROGRAM.....................................................................3-1
    C.3.1  OBJECTIVE ..........................................................................................3-1
    C.3.2  INITIAL SCREENING ...........................................................................3-1
    C.3.3  LOAD-CHECKING ...............................................................................3-1

C.4  METHODS FOR DETERMINING WASTE ACCEPTABILITY .......................4-1
    C.4.1  PHYSICAL ASSESSMENT ....................................................................4-1
    C.4.2  ADDITIONAL ASSESSMENT ...............................................................4-1
    C.4.3  DISPOSITION OF PROHIBITED WASTES ............................................4-1

C.5  PROCEDURES FOR HANDLING IDENTIFIED PROHIBITED WASTES...............5-1
    C.5.1  PROCEDURES FOR HANDLING AND REMOVING PROHIBITED
           WASTES..............................................................................................5-1
           C.5.1.1  Protective Clothing.................................................................5-1
    C.5.2  HOUSEHOLD HAZARDOUS WASTE HANDLING PROCEDURES.............5-1
    C.5.3  PROHIBITED WASTE HANDLING PROCEDURES ...................................5-2

C.6  ADDITIONAL WASTE ACCEPTANCE CONTROL PROCEDURES .........................6-1
    C.6.1  SIGNS  6-1
    C.6.2  SOURCE CONTROL ..............................................................................6-1
    C.6.3  OBSERVATION BY OPERATION PERSONNEL .....................................6-1
           C.6.3.1  Visual Inspection of the Working Face .......................................6-3
    C.6.4  KNOWN OFFENDERS ...........................................................................6-3

C.7  HAZARDOUS WASTE STORAGE AND REMOVAL .......................................7-1
    C.7.1  ONSITE STORAGE TIME LIMITATION.................................................7-1
    C.7.2  ACCUMULATION START DATE............................................................7-1
    C.7.3  STORAGE AREA INSPECTIONS............................................................7-1
    C.7.4  HAZARDOUS WASTE REMOVAL/DISPOSAL .....................................7-1

C.8  REPORTING ...............................................................................................8-1

## ATTACHMENTS

Attachment 1 - Sample Forms
Attachment 2 – Example Customer Notice and Information Sheet

## FIGURES

Figure 1 – Entrance Sign

Hazardous Waste Exclusion Program                    C-i
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix C - Haz. Waste
Exclusion\Appendix C - Haz. Waste Exclusion Program Plan.doc

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 9 of 71

## C.1   INTRODUCTION

This Hazardous Waste Exclusion Program (Program) was prepared at the request of the Department of Public Works (DPW) for the Ordot Dump in accordance with 40 CFR Subpart C, Section 258.20, "*Procedures for excluding the receipt of hazardous waste.*" Section 258.20 states that "*Owners or operators of all Municipal Solid Waste Landfill (MSWL) units must implement a program at the facility for detecting and preventing the disposal of regulated hazardous wastes as defined in part 261 of this chapter (40 CFR Ch. 1) and polychlorinated biphenyls (PCB) wastes as defined in part 761 of this chapter (40 CFR Ch. 1).*" This program must include, at a minimum:

- Random inspections of incoming loads unless the owner or operator takes other steps to ensure that incoming loads do not contain regulated hazardous wastes or PCB wastes;

- Records of any inspections;

- Training of facility personnel to recognize regulated hazardous waste and PCB wastes; and

- Notification of the Guam Environmental Protection Agency (GEPA) Administrator if a regulated hazardous waste or PCB waste is discovered at the facility.

For purposes of this discussion, regulated hazardous waste means "*A solid waste that is a hazardous waste, as defined in 40 CFR 261.3, that is not excluded from regulation as a hazardous waste under 40 CFR 261.4(b) or was not generated by a conditionally exempt small quantity generator as defined in subsection 261.5 of this chapter (40 CFR Ch. 1).*"

This Program was developed to discover and discourage attempts to place hazardous or other unacceptable wastes, including PCBs, in the Ordot Dump.

In recent years, the hazards posed by the intentional and unintentional disposal of hazardous wastes in landfills designed for non-hazardous solid wastes have become the subject of increasing concern. The repercussions of careless disposal practices include landfill worker injuries and illness, fires and explosions in collection vehicles and in the landfill, and contamination of air and groundwater.

The intent of this Program is to address the need for implementing a random load-checking program at the Ordot Dump, which is located about two-and-a-half miles south of Hagatna, Guam's capital. The site currently accepts approximately 750 cubic yards of waste daily, based on a seven-day work week, based on data from DPW for the months of July and August 2004.

The Program has been designed to prevent, to the extent possible, the acceptance of prohibited wastes into the Dump's waste stream. Specific elements of the program include:

- Descriptions of acceptable and prohibited wastes;

Case 1:02-cv-00022   Document 190-5   Filed 01/14/2008   Page 10 of 71

- Provisions for a random load-checking program for incoming wastes;
- Specifying methods for determining the acceptability of wastes; and
- Descriptions of other measures to discourage the disposal of prohibited wastes.

The details of the Program are presented in Sections C.2 through C.5.

Hazardous Waste Exclusion Program        C.1-2
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix C - Haz. Waste
Exclusion\Appendix C - Haz. Waste Exclusion Program Plan.doc

## C.2 DESCRIPTION OF ACCEPTABLE AND PROHIBITED WASTES

This section describes the types of waste that can be accepted at the Ordot Dump and those that are prohibited. In addition, the characteristics of hazardous and designated wastes are described.

### C.2.1 ACCEPTABLE WASTES

The Ordot Dump can accept the following wastes:

- Residential and commercial waste, including garbage and rubbish;

- Non-hazardous solid waste from industrial sources;

- Sewage sludge, when allowed by the Guam Environmental Protection Agency (GEPA);

- Construction and demolition waste; and

- Other non-hazardous solid wastes not prohibited from being accepted at the Dump.

### C.2.2 PROHIBITED WASTES

In accordance with the Rules and Regulations for the GEPA Solid Waste Disposal (Guam Code Annotated, Title 22, Division 4, Chapter 23, Section 23302 (c) (1)), Ordot Dump is prohibited from accepting the following wastes:

- Waste oil and regulated hazardous waste; and

- Whole or partially whole vehicles, vehicle parts, tires, batteries, appliances, septic tank pumping, sewage sludge and other petroleum products and oil based paints.

In addition to these excluded wastes, Ordot Dump does not accept asbestos and sharps and other biological wastes (hypodermic needles, syringes with needles attached, IV tubing with needles attached, dental scalers, scalpel blades and lancets that have been removed from their original sterile packaging).

Common examples of prohibited wastes include: oil-based paint, paint thinner, glues and solvents, flammable liquids, household cleaners and polishes, arsenic, pesticides, asbestos, acid and alkaline solutions, PCBs, inks, photographic and pool chemicals, oxidizers, gasoline, automotive products, poisons, explosives, pyrophorics, cyanides, sulfides, sulfuric and hydrochloric acid, and water reactives. Compressed gas cylinders, pharmaceuticals, and radioactive wastes also are prohibited.

## C.3    LOAD-CHECKING PROGRAM

### C.3.1  OBJECTIVE

A key element in the hazardous waste exclusion program for the Ordot Dump is a random load-checking program, which is designed to detect and discourage attempts to dispose of prohibited wastes. The load-checking program for the Dump will entail the checking of one random load each week. The schedule will be random to make the load-checks unpredictable to facility users and therefore deter attempts to conceal prohibited wastes in their loads.

DPW will designate and train members of the Operations staff who will be responsible for conducting the periodic load-checking program at the site. Back-up personnel will also be trained. The training program will consist of both classroom lectures and hands-on field training.

The procedures for the load-checking program are described below.

### C.3.2  INITIAL SCREENING

The initial step in the load-checking program is to visually inspect all incoming vehicles at the main gate upon entrance to the facility. The trained inspector will observe incoming loads for any indication (i.e., unusual odors or leaks) of prohibited wastes. If the inspector encounters suspicious looking loads, he will summon the Dump operator to determine if the waste is acceptable. If prohibited wastes are identified during inspection of a load, the driver will be notified that the wastes must be removed from the facility premises and arrangements made for their proper disposal.

### C.3.3  LOAD-CHECKING

In addition to the initial screening, an inspector at the Dump, on a random basis, will select a load for inspection. The driver will be asked to unload the wastes at a designated location. The driver will be instructed to pull forward while discharging the waste, resulting in the formation of a long, narrow windrow. The inspector will then tear down the windrow, using a rake or shovel. The discharged material will be carefully observed for the presence of any prohibited wastes in the load. The methods by which the acceptability of wastes will be determined are described in Section C.4. Information and observations will be recorded on the incident form for the load. If necessary, photographs and samples will be taken.

The load-checking inspector will record as much of the following information as needed to identify the responsible party: (1) date, (2) time, (3) the hauling firm or vehicle owner's name, (4) the driver's name and driver's license number, (5) telephone number for contacting the company, (6) vehicle's license plate number, and (7) the source of the waste as stated by the vehicle driver. This information will be recorded on the incident form (Form 1) shown in Attachment 1. Both the driver and the load-checking inspector will sign the form. A copy of the incident form and any associated documents will be placed on file onsite at the Ordot Dump. Duplicate copies will be submitted to the driver and GEPA for retention by that office.

If hazardous or other unacceptable wastes are identified, the responsible party for transporting the wastes to the Dump will be notified that the wastes must be removed from the facility premises and arrangements made for their proper disposal. Incidents will be reported to GEPA.

Case 1:02-cv-00022      Document 190-5      Filed 01/14/2008      Page 14 of 71

## C.4     METHODS FOR DETERMINING WASTE ACCEPTABILITY

### C.4.1  PHYSICAL ASSESSMENT

One means for determining the acceptability of a suspect waste is to examine a product label. Warning labels such as "harmful if inhaled", or "use only in a well-ventilated area" are often useful in identifying the waste type. In some cases, physical signs (i.e., odor, color) of the presence of a prohibited waste are detected. This observation, coupled with a customer's response to questions, often provides sufficient data to prohibit the wastes.

In physically assessing a waste load, the inspector may note an incompatibility in waste type that draws attention to a part of the load that seems out of place. An example would be one or more 55-gallon drums within a load of residential waste. Once noted, the customer would be questioned, and if needed, additional assessment undertaken.

### C.4.2  ADDITIONAL ASSESSMENT

In some cases, the steps outlined above may be insufficient to identify whether the waste can be accepted at the facility. Since it is the customer's responsibility to ensure that a waste is permissible, the load-checking inspector may require that additional measures be undertaken by the customer at the customer's expense prior to accepting the waste. When this occurs, the customer will be advised to exercise one or more of the following options in order to dispose of waste at the facility:

- Written clarification by regulatory agencies (including GEPA);

- Written clearance from the DPW, operator of the Ordot Dump; and

- Analysis by a Guam-certified hazardous waste laboratory.

Ultimately, the responsibility for obtaining the laboratory analysis and associated costs lies with the customer.

### C.4.3  DISPOSITION OF PROHIBITED WASTES

If prohibited wastes are discovered as a result of any of the waste identification activities listed above, the customer is informed that such wastes cannot be accepted by the facility. In addition, the customer is informed that these prohibited wastes must be removed from the facility premises and arrangements must be made for their proper disposal.

## C.5    PROCEDURES FOR HANDLING IDENTIFIED PROHIBITED WASTES

### C.5.1    PROCEDURES FOR HANDLING AND REMOVING PROHIBITED WASTES

To maintain the necessary level of safety training, all personnel involved with the identification, handling and storage of prohibited waste should be trained in the procedures outlined in this program as well as basic Occupational Safety and Health Administration (OSHA) hazardous waste training.

#### C.5.1.1 Protective Clothing

All personnel involved in the handling and/or removal of hazardous waste must wear, at a minimum, the following protective clothing:

- Chemical resistant gloves (heavy industrial or nitryl with cotton liner);

- Steel toe boots;

- Dust mask;

- Goggles;

- Hard hat; and

- High-visibility safety vest.

Other Protective Clothing/Equipment (optional):

- Tyvek suit: Required when used oil or other recyclable materials are bulked. A tyvek suit may also be worn at the discretion of personnel handling household hazardous waste in their routine duties.

- Half-facepiece respirator: All personnel handling household hazardous waste should be fit-tested for and should have accessible a half-facepiece air purification respirator. Each respirator shall be equipped with cartridges designed to remove dusts, acid gases, organic vapors, and radionuclide. (Such cartridges are typically color-coded yellow and magenta.)

### C.5.2    HOUSEHOLD HAZARDOUS WASTE HANDLING PROCEDURES

Household hazardous wastes are generally those unwanted chemical products found in homes such as pesticides, household cleaners, automotive products, paints, solvents, etc. These wastes may be detected through the random load-checking program or by site personnel in the working face. These materials should be removed and set aside for proper disposal. Handling and storage procedures are discussed in Section C.6.

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 16 of 71

## C.5.3 PROHIBITED WASTE HANDLING PROCEDURES

If hazardous or other unacceptable wastes are detected by site personnel, the area will be immediately cordoned off from the general public and site personnel not involved in the incident. The Site Manager will notify the response unit of the Guam Fire Department, which will conduct the cleanup, transport, and disposal of the wastes. The wastes will be disposed of at an approved facility. The incident and response will be recorded in the site records.

If the producer of the waste is known, the producer will be contacted and notified of the incident and the operations action. The producer will be billed for all costs incurred in the proper cleanup, transport, and disposal of waste.

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 17 of 71

## C.6    ADDITIONAL WASTE ACCEPTANCE CONTROL PROCEDURES

### C.6.1  SIGNS

Signs will be posted at the site entrance that clearly state the types of wastes not accepted at the site. In addition to stating that hazardous wastes are not accepted at the site, the signs will cite examples of such materials in non-technical language. In addition, a sign will be posted at the site entrance stating that a random load-checking program is in effect. Figure 1 shows an example of a sign, which could be posted at the main gate prohibiting hazardous wastes.

### C.6.2  SOURCE CONTROL

In order to further prevent the disposal of known hazardous wastes, franchised commercial haulers, as well as businesses with commercial/industrial accounts at the Ordot Dump, will receive notices by mail, through advertisements, or by handouts given out at the Dump by the main gate attendant alerting them to the Hazardous Waste Exclusion Program. Attachment 2 includes examples of customer notices and information fact sheets, which could be given out. This should discourage the deliberate disposal of hazardous material.

### C.6.3  OBSERVATION BY OPERATION PERSONNEL

In addition to observations for hazardous wastes that are conducted in the load-checking program, the Dump operator will be trained and directed to identify potentially prohibited wastes that may be delivered to the site. Equipment operators will also be trained to identify prohibited wastes as they are spread and exposed on the working face of the site. The following describes the procedures to be followed at the working face.

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 18 of 71

# NO HAZARDOUS WASTES ACCEPTED AT THIS FACILITY

**HAZARDOUS WASTES INCLUDE, BUT ARE NOT LIMITED TO:**

**PAINTS - SOLVENTS - PESTICIDES - ACID AND CAUSTIC SOLUTIONS - GASOLINE - EXPLOSIVES - PHOTOGRAPHIC AND POOL CHEMICALS - COMPRESSED GAS, CYLINDERS - INK - PHARMACEUTICALS - RADIOACTIVES AND INFESTIOUS WASTE**

## ASK BEFORE YOU DUMP

## ALL INCOMING LOADS MAY BE SUBJECT TO INSPECTION FOR PROHIBITED WASTES

## VIOLATORS WILL BE FINED

## DEPARTMENT OF PUBLIC WORKS SOLID WASTE MANAGEMENT DIVISION

**FIGURE 1. ENTRANCE SIGN**

### C.6.3.1 Visual Inspection of the Working Face

- As Waste Is Dumped and Compacted

  Bulldozer operators and other trained personnel shall observe the working face for suspicious objects and record findings on a daily log sheet. If no suspicious objects are found, "none" will be indicated to show that nothing was found. Objects to look out for are:

  - Red bags (infectious waste).
  - Containers which are 5 gallons or larger.
  - Other hazardous type material.

- If Any Suspicious Material is Spotted

  - Stop compacting operations in the immediate vicinity of the suspicious material.
  - Summon the Designated Supervisor.

- Discontinue Compacting Operations

  In the area where suspicious material is located, compacting operations shall be discontinued until the suspicious material is examined and further instructions are given by the Designated Supervisor.

- Secure the Area

  Designated Supervisor will secure the area where suspicious material is located and will summon the specially trained hazardous waste personnel to investigate.

- Procedure for Handling, Removal and Storage

  Hazardous waste personnel will follow procedures described in Sections C.5 and C.7 of this report for handling and removing hazardous waste and hazardous waste storage.

- Incident Form

  An incident form (Form 1 in Attachment 1) must be completed by hazardous waste personnel, for any dangerous or significant quantity of hazardous waste discovered.

### C.6.4 KNOWN OFFENDERS

Special caution will be taken when accepting wastes from sources that have previously attempted to deliver hazardous wastes to the site. Precautionary measures will include: (1) questioning of the vehicle driver by the main gate attendant concerning the contents of the load, (2) visually inspecting the load prior to discharging, when feasible, (3) additional recordkeeping at the main gate regarding the delivery of wastes from such sources, and (4) additional efforts by site

personnel at the working face to observe the wastes discharged from such sources. Repeat offenders will be banned from the site.

## C.7 HAZARDOUS WASTE STORAGE AND REMOVAL

DPW should set aside a temporary area for storing hazardous waste. Upon siting of a permanent hazardous waste storage area, this area will store only hazardous waste generated from the Dump's Hazardous Waste Exclusion Program and wastes illegally disposed of immediately outside the Dump.

This storage area will be inspected daily by trained personnel for signs of leaking or spilled hazardous waste. The inspector will immediately notify the designated supervisor of any incident and will fill out an incident form (see Form 1 in Attachment 1).

### C.7.1 ONSITE STORAGE TIME LIMITATION

Onsite hazardous waste storage will be limited to 90 days or as required by GEPA prior to off-site disposal. Waste may be transported to a permitted treatment, storage, and disposal facility (TSDF) any time prior to that.

### C.7.2 ACCUMULATION START DATE

The "Accumulation Start Date" on the EPA label of each drum containing hazardous waste should be monitored on a regular basis. At 60 days from the earliest "Accumulation Start Date", arrangements should be made to transport and properly dispose of the waste to allow time for the disposal site operator to review the inventory sheets for the drum shipment and accept the waste. If the "Accumulation Start Date" has a worn off label, information on the start date from the inventory sheets should be transferred to a new label.

### C.7.3 STORAGE AREA INSPECTIONS

The designated hazardous waste storage area shall be subject to a monthly inspection. The monthly inspection will be documented on the Storage Area Monthly Inspection Report (Form 2 in Attachment 1). This report addresses proper labeling of the containers, the integrity of containers and storage area and the presence and condition of safety equipment. The completed monthly report form will be retained on file at the Ordot Dump.

If it is found through the monthly inspection that problems exist with the drum labeling, container or storage area integrity or that necessary safety or spill containment equipment is absent or non-functional, the designated supervisor shall be notified immediately so that corrective measures can be taken.

### C.7.4 HAZARDOUS WASTE REMOVAL/DISPOSAL

Unsuitable wastes identified through the site's hazardous waste exclusion program are handled as follows: if the wastes pose an immediate risk to health, safety and/or the environment, a hazardous material spill contractor will be contacted for immediate clean-up, packaging,

transportation and disposal; wastes which are in adequate containers and can be safely handled are either returned to the hauler if possible, or stored onsite in a designated area (e.g., a chemical storage facility, a waste oil tank, etc.) to await proper disposition/ recycling within 90 days by a licensed hazardous waste hauler/recycler.

## C.8   REPORTING

The reporting requirements for the Hazardous Waste Exclusion Program will consist of recording information and observations during the load-check inspection and storage area inspection. The incident form (Form 1 in Attachment 1) will be completed by the load-checking inspector and signed by the vehicle driver. A copy of the incident form and any associated documents will be placed on file at the Dump and a duplicate copy will be sent to GEPA.

A report will be prepared and submitted on a monthly basis for inspection of the designated hazardous waste storage area (Form 2 in Attachment 1). These reports will document proper labeling of the containers, the integrity of the containers and storage area, and the presence and condition of safety equipment. Completed report forms will be retained on site.

Hazardous Waste Exclusion Program                                        C.8-1
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix C - Haz. Waste Exclusion\Appendix C - Haz. Waste Exclusion Program Plan.doc

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 24 of 71

**ATTACHMENT 1**

**SAMPLE FORMS**

## FORM 1

## ORDOT DUMP
## HAZARDOUS WASTE EXCLUSION PROGRAM
## INCIDENT FORM

1.     Date:                              Time:_____    a.m.
                                                         p.m.

Location:

___Main Gate                           ___Random Load Check

___Visual Inspection of Working Face     ___Storage Area

___Other _____

2.     Information on vehicle that is responsible for bringing waste to the landfill.

Driver's Name: _____
                  Last                 First                 Middle Initial

Driver's License No.:_____

Vehicle License Plate No.:_____

Vehicle Owner/Agency:

      ___City (specify)

      ___Other (specify)

Owner Telephone No.: _____

Vehicle Type:

___Refuse Truck

___Transfer Trailer Other

___Other_____

# FORM 1

## ORDOT DUMP
## HAZARDOUS WASTE EXCLUSION PROGRAM
## INCIDENT FORM

### (Continued)

3.    Description of Material Checked:

_____

_____

_____

Prohibited Materials Found or Suspected:

_____

_____

_____

Course of Action Taken:

_____

_____

_____

Contacts Made Regarding Incident:

_____

_____

_____

Driver's Signature:_____

Ordot Dump Employee Signature:_____

Hazardous Waste Exclusion Program
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix C - Haz. Waste
Exclusion\Attachment 1 - Sample Forms.doc

# FORM 2

## ORDOT DUMP
## HAZARDOUS WASTE EXCLUSION PROGRAM

### STORAGE AREA
### MONTHLY INSPECTION REPORT

Date: _____

Inspected by: _____

1.  Check the storage area for the presence of leakage, liquid or gaseous from any drum or pail containing waste.  Is there any leakage?

    Yes / No (circle and initial) _____

2.  Is/are the hazardous waste transport vehicles, properly placarded on all four sides?

    Yes / No (circle and initial) _____

3.  Is proper signage posted in the hazardous waste storage area?

    Yes / No (circle and initial) _____

4.  Are containers properly labeled with a Hazardous Waste sticker and is the sticker visible for inspection?

    Yes / No (circle and initial) _____

5.  Are containers in good condition and are those containers containing waste closed?

    Yes / No (circle and initial) _____

6.  Is the storage area structurally intact (the underlying surface, concrete or asphalt, should be void of cracks)?

    Yes / No (circle and initial) _____

Hazardous Waste Exclusion Program
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix C - Haz. Waste Exclusion\Attachment 1 - Sample Forms.doc

Case 1:02-cv-00022     Document 190-5     Filed 01/14/2008     Page 28 of 71

**FORM 2**

**ORDOT DUMP**
**HAZARDOUS WASTE EXCLUSION PROGRAM**
**STORAGE AREA**
**MONTHLY INSPECTION REPORT**
**(Continued)**

7.    Is necessary safety equipment available and operational for use in an emergency?

Fire Extinguishers:

      Yes / No (circle and initial) _____

Portable Eyewash:

      Yes / No (circle and initial) _____

First Aid Kit

      Yes / No (circle and initial) _____

Absorbent/Spill Containment Materials:

      Yes / No (circle and initial) _____

Comments: _____

_____

_____

_____

_____

_____

_____

_____

**ATTACHMENT 2**

**EXAMPLE CUSTOMER NOTICE AND INFORMATION SHEET**

## NOTICE TO SITE USERS
## CONCERNING WASTE ACCEPTANCE
## CONTROL PROGRAM

- Hazardous wastes are not accepted at the Ordot Dump and may not be placed in refuse containers.

- A load-checking program is in effect at the disposal site for detecting hazardous and other unacceptable wastes.

- If hazardous or other unacceptable wastes are delivered to the Ordot Dump, the party responsible for transporting the waste will be billed for the removal and disposal of such wastes in approved facilities.

- There are federal and local penalties for the improper disposal of hazardous and certain other types of wastes.

Hazardous Waste Exclusion Program
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix C - Haz. Waste Exclusion\Attachment 2 - Example Customer Notice and Info Sheet.doc

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 31 of 71

# FACT SHEET ON HOUSEHOLD
# HAZARDOUS WASTE

- Hazardous wastes present a significant danger to both human health and the environment. Hazardous wastes are therefore prohibited by law from disposal at sanitary landfills.

- Typical household wastes that are considered to be hazardous include oil-based paint, paint thinner, glues and solvents, pesticides, household cleaners and poisons, waste chemicals, treated wood, demolition debris, excavated soils, flammable liquids, poisons, and automotive products.

- Information on the proper disposal of household hazardous waste material is available by calling the Guam Environmental Protection Agency (GEPA).

- There are civil and criminal penalties for the improper disposal of hazardous wastes.

- An annual household hazardous waste collection program is held. Residents may dispose of their household hazardous wastes at this program free of charge. Watch the local newspaper for notice of the next scheduled program.

**APPENDIX A**
**ATTACHMENT II-4**

**ORDOT DUMP PROCEDURES FOR RESPONDING TO CITIZEN
COMPLAINTS
(JULY 2005)**

*12/2/05*

**100% SUBMITTAL**

# ORDOT DUMP
# ORDOT-CHALAN PAGO, GUAM

# Procedures for Responding to Citizen Complaints

*Prepared for*
Department of Public Works, Government of Guam
542 North Marine Drive
Tamuning, Guam 96911

July 2005

*Prepared by*
Dueñas & Associates Project Team (Dueñas & Associates, Inc. and URS Corporation)

155 E.T. Calvo Memorial Parkway, Suite 200
Tamuning, Guam 96913
(671) 646-7991

# CONTENTS

D.1    INTRODUCTION AND BACKGROUND ............................................................. 1-1
    D.1.1  PURPOSE ............................................................................................... 1-1
    D.1.2  DEFINITIONS ....................................................................................... 1-1
          D.1.2.1  Community Involvement Coordinator ........................................ 1-1
          D.1.2.2  Monitoring ........................................................................ 1-1
          D.1.2.3  Landfill Gas ....................................................................... 1-1
          D.1.2.4  Site Supervisor .................................................................. 1-1
D.2    GUIDELINES ..................................................................................................... 2-1
    D.2.1  HOURS OF RESPONSE ........................................................................ 2-1
    D.2.2  RESPONSE TO COMPLAINTS .............................................................. 2-1
    D.2.3  AFTER HOURS RESPONSE TO COMPLAINTS ................................... 2-1
D.3    CALL LIST ......................................................................................................... 3-1
    D.3.1  CONTACT LIST .................................................................................... 3-1
D.4    CITIZEN ACTION REQUEST FORM ............................................................... 4-1
    D.4.1  CITIZEN ACTION REQUEST FORM ................................................... 4-1

Ordot Dump Procedures for Responding to Citizen Complaints     D-i
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix D - Ordot Dump
Procedures for Responding to Citizen Complaints_rev01.doc

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 37 of 71

# D.1    INTRODUCTION AND BACKGROUND

## D.1.1  PURPOSE

The purpose of this plan is to document Odor, Fugitive Dust or Nuisance Complaint Response procedures adopted by the Department of Public Works (DPW) for the Ordot Dump.

## D.1.2  DEFINITIONS

### D.1.2.1  Community Involvement Coordinator

The permanent, full-time employee designated by the Solid Waste Management Division (SWMD) Superintendent to be the point of contact for the citizens with concerns about Ordot Dump Operations.

### D.1.2.2  Monitoring

The use of special equipment to analyze the gas stream, by measuring concentrations of methane, oxygen, carbon dioxide, and gas flow rate.

### D.1.2.3  Landfill Gas

Gas generated by decomposition of waste.

### D.1.2.4  Site Supervisor

The permanent, full-time employee responsible for direct operation of the Ordot Dump.

Ordot Dump Procedures for Responding to Citizen Complaints        D.1-1
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix D - Ordot Dump
Procedures for Responding to Citizen Complaints_rev01.doc

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 38 of 71

## D.2    GUIDELINES

### D.2.1  HOURS OF RESPONSE

During normal working hours (7:00 a.m. to 6:00 p.m., Monday through Saturday and 7:00 a.m. to 3:30 p.m. on Sundays and Government of Guam holidays), operations personnel will immediately respond to and investigate complaints.

After hours (after 6:00 pm, Monday through Saturday and after 3:30 p.m. on Sundays and Government of Guam holidays) and on December 25th and January 1st of each year, calls shall be made to the Department of Public Works, SWMD. If no one is there to answer the phone, a referral message shall be included on the main telephone advising the public of the weekend/holiday response services. The Superintendent will immediately notify the site supervisor of all the citizen complaints.

### D.2.2  RESPONSE TO COMPLAINTS

When the Community Involvement Coordinator (CIC) is notified of a complaint, he/she will attempt to identify its origin.

If it is determined that the odors or fugitive dust are being generated by Ordot Dump, Operations personnel or other authorized personnel will immediately check for sources.

A supervisor or designated representative and the CIC will be notified of actions taken to mitigate the problem.

Records of the findings and mitigation measures will be documented. The responsible SWMD staff shall record and investigate complaints regarding odor, fugitive dust, or nuisance as soon as possible, but not later than 12 hours after receipt of the complaint. Corrective measures will be taken on a case-by-case basis, using appropriate landfill practices. Implementation of corrective actions shall begin as soon as possible, but within 24 hours of each confirmed complaint.

### D.2.3  AFTER HOURS RESPONSE TO COMPLAINTS

Site supervisors shall be the first to be called when after hours complaints are made. A call list with phone and pager numbers will be provided in the referral message and on a sign at the gatehouse. These numbers will be the public's point of contact for inquiries.

If the site supervisor can anticipate an absence, it is the responsibility of the supervisor to find a replacement and include the replacement's name, phone and pager numbers.

In the event the primary supervisor and his/her authorized replacement is unavailable, the responsibility for responses will be delegated to the SWMD Superintendent.

Primary Supervisors are expected to:

Ordot Dump Procedures for Responding to Citizen Complaints        D.2-1
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix D - Ordot Dump
Procedures for Responding to Citizen Complaints_rev01.doc

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 39 of 71

- Determine the nature of the emergency and respond;

- Complete the Citizen Action Request (CAR) Form (See Section D.4); and

- Contact the lead assigned to the area involved in the emergency.

CAR forms will be reviewed on a daily basis and follow up actions delegated. CAR information shall be kept on file at the site and at the SWMD main office.

All contacts will be recorded in detail on the CAR form and submitted to the Ordot Dump front office no later than the next business day.

The superintendent will be provided with information on each emergency and disposition as soon as the information is available.

Ordot Dump Procedures for Responding to Citizen Complaints      D.2-2
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix D - Ordot Dump
Procedures for Responding to Citizen Complaints_rev01.doc

## D.3    CALL LIST

### D.3.1  CONTACT LIST

The table below lists the points of contact for Ordot Dump.

| Name | Title | Phone Number | Pager/ Cellular Number |
|------|-------|--------------|------------------------|
| Lawrence Pereze | Director, DPW | (671) 646-3131 | |
| Lewis Cruz | Acting Superintendent, SWMD | (671) 647-4344(3143) | |
| Nicanor Surigao | Supervisor, Ordot Dump | (671) 472-2710 | |
| Peter O. Aguero | Acting Shift Leader, Ordot Dump | (671) 472-2710 | |
| Henry W. Santos | Operations personnel | (671) 472-2710 | |
| Thomas Cepeda | Operations personnel | (671) 477-3344 | |
| Joseph Borja | Operations personnel | (671) 734-5058 | |
| Frank Santos | Operations personnel | (671) 653-5325 | |
| Isias Maratita | Operations personnel | --- | |

## D.4    CITIZEN ACTION REQUEST FORM

### D.4.1  CITIZEN ACTION REQUEST FORM

Name: _____ Time and Date: _____

Phone Number: _____


Time of Incident or Complaint: _____

Location of Incident or Complaint: _____

_____

Description of Incident or Complaint: _____

_____


Other Eye Witnesses

   ❑  Yes      Name: _____ Phone Number: _____

   ❑  No


Additional Remarks: _____

_____


FOR OFFICIAL USE ONLY:

Incident Recorded by: _____ Date and Time of Forward: _____


Name of Operator: _____ Date and Time of Completion: _____


Action Taken: _____

_____

Ordot Dump Procedures for Responding to Citizen Complaints        D.4-1
C:\Documents and Settings\All Users\Documents\July 25 Task 3 resubmittal\Operations Plan 080505\Appendices\Appendix D - Ordot Dump
Procedures for Responding to Citizen Complaints_rev01.doc

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 42 of 71

**APPENDIX A**
**ATTACHMENT II-5**

**SAFETY PROGRAM**
**(GUAM EPA REVISIONS, DEC. 2005)**

*12/2/05*

**100% SUBMITTAL**

# ORDOT DUMP
# ORDOT-CHALAN PAGO, GUAM

# Safety Program

*Prepared for*
Department of Public Works, Government of Guam
542 North Marine Drive
Tamuning, Guam 96911

July 2005

*Prepared by*
Dueñas & Associates Project Team (Dueñas & Associates, Inc. and URS
Corporation)

155 E.T. Calvo Memorial Parkway, Suite 200
Tamuning, Guam 96913
(671) 646-7991

December 2, 2005
Amended by Guam EPA

# CONTENTS

E.1    INTRODUCTION ............................................................................................1-1

E.2    SITE SAFETY ................................................................................................2-1

E.3    ACCIDENT PREVENTION ...........................................................................3-1
       E.3.1   GENERAL SAFETY TIPS.................................................................3-1
       E.3.2   OPERATIONS SAFETY....................................................................3-2

E.4    PERSONAL PROTECTION PROGRAM .......................................................4-1
       E.4.1   ISSUED PERSONNEL PROTECTIVE EQUIPMENT.......................4-1
       E.4.2   EYE WASH......................................................................................4-1

E.5    EQUIPMENT SAFETY PROGRAM ..............................................................5-1
       E.5.1   EQUIPMENT LIST............................................................................5-1
       E.5.2   OTHER SAFETY EQUIPMENT .......................................................5-1

E.6    OPERATIONS GUIDELINES........................................................................6-1
       E.6.1   CONTROL OF DUMPING................................................................6-1
       E.6.2   PROPER SPOTTING PROCEDURES ...............................................6-1
       E.6.3   SCAVENGING..................................................................................6-1
       E.6.4   CONTROL OF THE WORKING FACE .............................................6-1
       E.6.5   END OF SHIFT SHUTDOWN ...........................................................6-2
       E.6.6   MAINTENANCE ..............................................................................6-2

## E.1    INTRODUCTION

The requirement for preparing a **Safety Plan** (Plan) for Ordot Dump is from the <u>Solid Waste Management Facility Permit Application, Landfill</u> (Guam Environmental Protection Agency).

The purpose of this Plan, as described in the permit application, is:

*"h. A safety plan which shall include a description of the proposed measures to protect the facility and other personnel from injury during operation."*

The details of the Program are presented in Sections E.2 through E.4.

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 48 of 71

## E.2   SITE SAFETY

Operations shall be responsible for site safety. Site safety is one of the most important considerations for landfill operations. There exist normal safety concerns associated with equipment operation, site operations, and the nature of the waste (which has health issues). There are also risks to pedestrian traffic due to the traffic from waste hauling trucks, landfill spreading and compaction equipment, trucks hauling daily cover, and operations vehicle traffic. Care must be taken to coordinate traffic on the site and a traffic-control operations person should be responsible for the flow of traffic. Another person should be responsible and in control of traffic in the area of the working face.

As the Dump is isolated somewhat from concentrated areas of population, any accidents or injuries that occur on site will initially have to be dealt with by on-site personnel. Hence, designated operations personnel should have training in first aid and cardiopulmonary resuscitation (CPR), to ensure that accident victims can receive immediate emergency treatment while awaiting the response of emergency vehicles. First aid supplies should be readily available in all working areas of the site (e.g., in site operations vehicles).

Safety training is an important requirement for all site personnel. It is generally known that some people are inherently careless and some are inherently careful. The latter group invariably demonstrates a lower accident rate than the former. A safety-training program will benefit both groups, and will usually result in a safer workplace with fewer incidents.

A site safety program is an ongoing (continuous) program that is designed to regulate human behavior and the work place in order to prevent accidents. It is essential to make the site as safe as possible. In order to accomplish this, accident prevention is an important component of site safety, as described below.

## E.3    ACCIDENT PREVENTION

Statistical analysis of accidents in workplace environments shows that for every accident involving injury, there are ten accidents with no injury. Hence, it has been determined that the best way to prevent injury accidents is to eliminate those accidents that do not result in injuries. This also relates to individual attitudes. Some people are careless or are risk takers. These workers tend to have the most accidents. It is therefore important to ensure that attitudes change and that everyone on site is focused on safe working habits, through adequate training.

Accident prevention is the responsibility of every worker on the site. Training of workers is therefore an important element of accident prevention and is the responsibility of Operations. Safety tips associated with accident prevention are discussed below.

### E.3.1   GENERAL SAFETY TIPS

- Determine the characteristics of waste being disposed of in the Dump – dangerous wastes should be separated and disposed of appropriately, based on Ordot Dump's waste acceptance policy.

- Do not permit anyone under the influence of alcohol or drugs to work or use the site.

- Do not permit loitering or other unauthorized personnel in the area of operations.

- Smoking should be prohibited at all times on the Dump. Permissible areas for smoking, well away from any waste filling zones and other hazardous areas, should be designated. No smoking signs should be prominently displayed.

- Do not allow children out of vehicles at the Dump site at any time.

- Scavenging at the Dump should be prohibited.

- All visitors should be required to sign in and out for each visit. At the end of each shift, these records should be checked to ensure that all visitors are accounted for.

- All workers should be required to sign in and out for their working shift. At the end of each shift, these records should be checked to ensure that all workers are accounted for.

- Traffic rules (e.g., maximum speed) for the site should be established and enforced.

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 50 of 71

## E.3.2  OPERATIONS SAFETY

For the specific case of equipment operation, the following should apply:

- All automatic-dumping waste haul vehicles should maintain a minimum spacing from other vehicles of at least 10 feet.

- Dump equipment to be operated 25 feet away from customer vehicles especially around the waste receiving areas.

- Each piece of equipment should be inspected and a checklist maintained before startup. This should be repeated before leaving at the end of the shift. Any damage or required repairs shall be reported and the machine checked by a qualified mechanic before being put into service.

- Make sure that there is good visibility on all four sides of the equipment before moving, and make sure that workers and other equipment are clear.

- Inspect the ground surface on all four sides before moving. Conduct a walk-around to ensure that no obstacles exist.

- When moving, loader buckets and dozer/compactor blades should be kept low to ensure the best visibility and field of view.

- Observe on-site speed limits. Slow down if terrain conditions or weather require site speed restrictions to be further reduced.

- Be sure that the area ahead of a waste pile is clear of workers or other equipment before pushing the waste pile.

- Be aware of all other vehicles and equipment around the area. Working face areas and roads are frequently congested and other operators may not be aware of the proximity of the equipment.

- If spotters are available, spotters shall direct vehicles to back up no closer than 5 feet from the waste pile to reduce potential tripping and puncture injury.

- Obey the spotter or Dump operator's signals. When traffic is being directed, obey all signals given.

- Observe proper techniques when mounting and dismounting equipment. Use available rungs and handholds. Do not jump from the machine, especially while it is moving.

- Operate equipment only from the driver's seat.

- Carry only authorized passengers and then only in specified safe locations.

Case 1:02-cv-00022   Document 190-5   Filed 01/14/2008   Page 51 of 71

- Obey the manufacturer's safety recommendations for each piece of equipment at all times.

- Keep an adequate distance between waste being pushed and nearby people or equipment. The operator should make sure that any people near his/her equipment are aware of its presence.

- Operate straight up and down slopes and avoid side-hill travel at all times.

- Never exceed the speed that is appropriate for the operating conditions.

- Never leave the equipment unattended at the working face with the engine running.

- If night operations are permitted, do not operate the equipment after dark unless proper lighting is provided.

- Rest dozer/compactor blades and other attachments firmly on the ground before dismounting.

- Do not make the first crushing pass over dumped waste with the equipment in reverse. The operator is not well protected from the rear.

- Whenever working on the equipment for routine maintenance or repair, care must be taken to protect workers from the germs and other contaminants in the waste that previously contacted it. Where possible, wash the equipment before performing this work.

All site users must be advised of these requirements.

## E.5    EQUIPMENT SAFETY PROGRAM

This section describes the safety equipment required for the Ordot Dump.

### E.5.1   EQUIPMENT LIST

The following vehicles should be readily accessible to authorized trained employees/ operators:

- Truck loader (973C);

- Tracked excavator (EL 300);

- Compactor (816B 30-ton); and

- Dozer (D8).

### E.5.2   OTHER SAFETY EQUIPMENT

The following are other safety equipment devices that should be provided onsite:

- Fire extinguishers (in compliance with Guam Fire Department Requirements);

- Belly pans for tractors and compactors cleaned out once per month to remove debris and reduce fire hazards;

- Water tank with hydrant outlet;

- First Aid Kits; and

- Seat Belts and Roll-Over Protective Structures.

Safety Program                                              E.5-1
July resubmittal\Operations Plan 080505\Appendices\Appendix - Safety Program\Amended by Guam EPA 12/2/05

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 53 of 71

## E.4 PERSONAL PROTECTION PROGRAM

Protective clothing and safety equipment should be worn at all times and required by Operations. At a minimum, the equipment list should include: hard hats; safety shoes; full-length trousers; long sleeve shirts; gloves (especially if handling waste in any way); and a colorful vest. Safety goggles and respirators or dust masks should also be available, when needed.

### E.4.1 ISSUED PERSONNEL PROTECTIVE EQUIPMENT

List of equipment issued to employees:

- Respirator - Half Mask Respirator Face Piece with 7286 Cartridge Holder.

- Filter – High Efficiency Filter (Asbestos).

- Filter – Organic Vapor Cartridge.

- Filter – Dust/ Mist Filter.

- Goggles – Safety Protective Goggles. (eye protection from dust and flying debris.)

- Comfort mask for lighter dust affected areas. Available to gatehouse attendants for use at the gatehouse.

- Gloves – Standard construction leather working gloves.

- Standard Safety Vest

- Shoes – Mandatory steel-toe shoes

- Communication Equipment

- Hard Hats

- Ear Protection

### E.4.2 EYE WASH

The outdoor shower station is the designated eye wash station. It is located just outside the Operations building.

Case 1:02-cv-00022     Document 190-5     Filed 01/14/2008     Page 54 of 71

## E.6    OPERATIONS GUIDELINES

### E.6.1   CONTROL OF DUMPING

Each load of waste should be briefly examined before spreading and dumping, to ensure that disallowed or dangerous materials are not landfilled. Screening of the waste shall be performed during spreading to ensure that no excluded waste is dumped. Other considerations should address the need for efficient management of the working face. In general, the waste haulers will dump the load wherever convenient. The person in control of the dumping operations must direct every truckload of material to the proper dumping location.

### E.6.2   PROPER SPOTTING PROCEDURES

Operations shall provide a spotter as required. The spotter or designated person responsible for the dumping area must make sure that traffic is kept moving and there are a minimum of delays at the working face. He must ensure that all dump vehicles back right to the toe of the working face slope before starting to dump, and that they drive straight away from the area after dumping. Clear and well-defined traffic directions and drive areas should be defined, and vehicles should be directed to obey these flows.

### E.6.3   SCAVENGING

Scavenging in the waste, both during operations, and after hours, should never be permitted. In particular, no persons should ever be allowed to dig through the daily cover or into the compacted waste. A perimeter fence along Dero Drive shall serve to control public access to the facility and prevent unauthorized traffic, dumping of excluded/unauthorized wastes, and scavenging.

### E.6.4   CONTROL OF THE WORKING FACE

Operations shall be responsible for controlling the working face. The working face represents that area actively being filled on a day-to-day basis. It should generally be kept as small as possible, to minimize the exposed surface of waste, which in turn reduces the risk of litter and other operational problems. The primary factor determining the area of the working face is the frequency of haul vehicles dumping at the site, and the number of trucks that tend to be present at the working face at any time. In addition, the space needed for maneuvering of bulldozers and compactors used to spread and compact the waste should be considered, to ensure sufficient separation of equipment and haul/dump vehicles in a relatively small area.

Another consideration for maintaining a compact working face is the need to minimize the daily cover. Some combination of daily soil cover or other temporary cover materials (alternate daily covers) may be suitable for the most efficient operations.

## E.6.5  END OF SHIFT SHUTDOWN

At the end of each shift or day's operations, Operations personnel responsible for operations on the site should ensure that all equipment and working areas are properly secured. In particular, all of the equipment manufacturers' recommendations should be closely followed. A shutdown checklist should be completed and kept as a part of the site records. Cleaning of equipment should also be completed in accordance with a program developed for the facility. In addition, a standard final walkover inspection process should be formulated and followed by operations personnel.

## E.6.6  MAINTENANCE

Operations personnel shall perform the following maintenance activities:

- Spray down of the road and entranceway for daily dust control.

- Mowing and using a weed-eater to keep the weeds down around the site.

- Maintain fire extinguisher on-site. Hang extinguishers on holder. Maintain arrows and/or signs pointing to location of extinguisher. Check weight yearly and recharge as required.

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 56 of 71

**APPENDIX A**
**ATTACHMENT II-6**

**EMERGENCY CONTINGENCY PLAN**
**(GUAM EPA REVISIONS, DEC. 2005)**

*12/2/05*

# ORDOT DUMP
# ORDOT-CHALAN PAGO, GUAM

# Emergency Contingency Plan

*Prepared for*
Department of Public Works, Government of Guam
542 North Marine Drive
Tamuning, Guam 96911

July 2005

*Prepared by*
Dueñas & Associates Project Team (Dueñas & Associates, Inc. and URS
Corporation)

155 E.T. Calvo Memorial Parkway, Suite 200
Tamuning, Guam 96913 (671) 646-7991

December 2, 2005
Amended by Guam EPA

# CONTENTS

1.0    INTRODUCTION ........................................................................................1-1

  1.1    BACKGROUND ..................................................................................1-1
  1.2    PURPOSE ...........................................................................................1-1
  1.3    LOCATION OF CRITICAL INFORMATION AND RESOURCES...........1-1
  1.4    COPIES OF PLAN ..............................................................................1-2
  1.5    AMENDMENTS TO PLAN..................................................................1-2
  1.6    EMERGENCY COORDINATOR..........................................................1-2


2.0    MEDIA RESPONSES .................................................................................2-1

  2.1    DEALING WITH THE MEDIA: TIPS AND GUIDELINES.......................2-1
    2.1.1    Plan Ahead .................................................................................2-1
    2.1.2    When Disaster Strikes.................................................................2-1
    2.1.3    Availability ................................................................................2-1
    2.1.4    Accuracy ...................................................................................2-1
    2.1.5    Monitor .....................................................................................2-1


3.0    EMERGENCY RESPONSES ......................................................................3-1

  3.1    IMMEDIATE ACTIONS TO REDUCE IMPACT OF EMERGENCY .........3-1
    3.1.1    Act to Protect Life......................................................................3-3
    3.1.2    Notify Employees of Implementation of Emergency Contingency Plan.................3-3
    3.1.3    Disaster Aftermath Actions.........................................................3-3
  3.2    EMERGENCY HAZARD - FIRE ..........................................................3-4
  3.3    EMERGENCY HAZARD - BOMB THREAT .........................................3-4
  3.4    EMERGENCY HAZARD -- EXPLOSION..............................................3-5
  3.5    EMERGENCY HAZARD -- UNPLANNED SUDDEN OR NON-SUDDEN RELEASES
  OF HARMFUL CONSTITUENTS TO THE AIR, SOIL, OR SURFACE WATER .................3-5


4.0    EMERGENCY CONTACT NUMBERS .........................................................4-1

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 60 of 71

# 1.0 INTRODUCTION

## 1.1 BACKGROUND

The requirement for preparing an **Emergency Contingency Plan** (Plan) for Ordot Dump is from the <u>Solid Waste Management Facility Permit Application, Landfill</u> (Guam Environmental Protection Agency).

Ordot Dump has been in operation for over 50 years. Throughout its life, the island has experienced natural disasters in the form of earthquakes, typhoons and tropical storms. The Dump in particular has also experienced numerous landfill fires.

## 1.2 PURPOSE

The purpose of this Plan, as described in the permit application, is:

*"k. An emergency contingency plan which delineates procedures for responding to fire, explosions or any unplanned sudden or non-sudden releases of harmful constituents to the air, soil, or surface water. This emergency plan will be submitted to the local police and fire department, and to the nearby health care facilities when the permit will be issued. The emergency plan shall contain:*

> *(1)  A description of the actions facility personnel shall take in the event of various emergency situations;*

> *(2)  A description of arrangements made with the local police and fire departments which*
> *allow for immediate entry into the facility by their authorized representatives should*
> *the need arise, such as in the case of personnel responding to an emergency situation; and*

> *(3)  A list of names, addresses and phone numbers (ofice and home) of all persons qualified to act as emergency coordinator for the facility. This list shall be kept up to date. Where more than one person is listed, one shall be named as primary emergency coordinator and the other shall be listed in the order in which they will assume responsibility as alternatives."*

## 1.3 LOCATION OF CRITICAL INFORMATION AND RESOURCES

Information will be needed as various personnel and agencies respond to an emergency. Knowing the information that is available and where it is located will benefit the emergency response time and provide for a better decision-making process. The following documents can be found in the Ordot Dump Operations Building, located adjacent to the main gate:

- Site Maps;
- Operations Plan;

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 61 of 71

o   Records of Wastes Received; and
•   O & M Manuals for onsite equipment.


## 1.4    COPIES OF PLAN

A copy of the emergency contingency plan and all revisions to the plan shall be:

i.   Maintained at the facility; and
ii.  Submitted to all local police departments, fire departments, hospitals, and federal and local emergency response teams that may be called upon to provide emergency services.


## 1.5    AMENDMENTS TO PLAN

The emergency contingency plan shall be reviewed, and immediately amended, if necessary, whenever:

i.   The facility permit is revised;

ii.  The plan fails in an emergency;

iii. The facility changes—in its design, construction, operation, maintenance, or other circumstances—in a way that materially increases the potential for fires, explosions, or releases of hazardous waste or hazardous waste constituents, or changes the response necessary in an emergency;

iv.  The list of emergency coordinators changes; or

v.   The list of emergency equipment changes.


## 1.6    EMERGENCY COORDINATOR

A trained emergency coordinator shall be available at all times in case of an emergency.

i.   At all times, the trained emergency coordinator shall be on the facility premises or on call (i.e., available to respond to an emergency by reaching the facility within a short period of time) with the responsibility for coordinating all emergency response measures.

ii.  This emergency coordinator shall be thoroughly familiar with all aspects of the facility's contingency plan, all operations and activities at the facility, the location and characteristics of waste handled, the location of all records within the facility, and the facility layout.

iii. This person shall have the authority to commit the resources needed to carry out the contingency plan.

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 62 of 71

# 2.0 MEDIA RESPONSES

## 2.1 DEALING WITH THE MEDIA: TIPS AND GUIDELINES

During times of emergency, the media will make requests for detailed information. In such cases, the Director of the Department of Public Works (DPW) or his authorized representative shall be the only individuals authorized to address the media.

### 2.1.1 Plan Ahead

Media relations start before a disaster occurs. Take steps to be familiar with local media representative on an ongoing basis. The best way to do this is for the facility to be active in various public relations programs. Regular press releases and articles on routine operations not only keep the public informed on the facility, but serve to open a dialogue DPW and the various local news organizations. Before a disaster strikes, know the media and they should know DPW.

### 2.1.2 When Disaster Strikes

If a disaster occurs, the press will be on the scene relatively quickly. Make preparations before meeting the media. Check facts and organize the information DPW plans to release prior to the interview.

### 2.1.3 Availability

Do not hide from the media. The public has a right to know the situation. Take a pro-active approach and establish the spokesperson for the facility, to help keep the pressure off others where possible. Schedule a meeting with the media at the first reasonable time and at a location chosen by DPW management. Familiar surroundings can ease the situation. After the initial report, schedule regular updates. Adapt these updates to DPW's schedule, not the reporter's.

### 2.1.4 Accuracy

This is extremely important. Be sure of the facts and give only the facts. Do not be drawn into expounding on the present story or speculating on situations where there are no confirmed information. Avoid ad-libbing. Be brief and to the point. If injuries are involved, numbers may be provided, but avoid specifically naming the injured parties.

### 2.1.5 Monitor

If practical, monitor the finished news report whether electronic or in print. Make sure the facts are presented as reported and immediately take steps to correct the record if inaccuracies are noted. Misinformation can be more damaging than no information.

Case 1:02-cv-00022   Document 190-5   Filed 01/14/2008   Page 63 of 71

# 3.0 EMERGENCY RESPONSES

## 3.1 IMMEDIATE ACTIONS TO REDUCE IMPACT OF EMERGENCY

The following procedures shall be implemented in the event of an emergency:

a. Whenever there is an imminent or actual emergency situation, the emergency coordinator (or his designee when the emergency coordinator is on call) shall immediately:

    i. Activate internal facility alarms or communication systems, where applicable, to notify all facility personnel; and

    ii. Notify appropriate federal or local agencies with designated response roles if their help is needed.

b. Whenever there is a release, fire, or explosion, the emergency coordinator shall immediately identify the character, exact source, amount, and area extent of any released materials. He may do this by observation or review of facility records or manifests, and, if necessary, by chemical analysis.

c. Concurrently, the emergency coordinator shall assess possible hazards to human health or the environment that may result from the release, fire, or explosion. This assessment shall consider both direct and indirect effects of the release, fire, or explosion (e.g., the effects of any toxic, irritating, or asphyxiating gases that are generated, or the effects of any hazardous surface water run-off from water or chemical agents used to control fire and heat-induced explosions).

d. If the emergency coordinator determines that the facility has had a release, fire, or explosion which could threaten human health, or the environment, outside the facility, he shall report his findings as follows:

    i. If his assessment indicates that evacuation of local areas may be advisable, he shall immediately notify appropriate local authorities. He shall be available to help appropriate officials decide whether local areas should be evacuated; and

    ii. He shall immediately notify either the government official designated as the on-scene coordinator for that geographical area or the National Response Center (using their 24-hour toll free number 800/424–8802). The report shall include:

        1. Name and telephone number of reporter;

        2. Name and address of facility;

        3. Time and type of incident (e.g., release, fire);

        4. Name and quantity of material(s) involved, to the extent known;

        5. The extent of injuries, if any; and

Case 1:02-cv-00022   Document 190-5   Filed 01/14/2008   Page 64 of 71

6. The possible hazards to human health, or the environment, outside the facility.

e. During an emergency, the emergency coordinator shall take all reasonable measures necessary to ensure that fires, explosions, and releases do not occur, recur, or spread to other hazardous waste at the facility. These measures must include, where applicable, stopping processes and operations, collecting and containing release waste, and removing or isolating containers.

f. If the facility stops operations in response to a fire, explosion, or release, the emergency coordinator shall monitor for leaks, pressure buildup, gas generation, or ruptures in valves, pipes, or other equipment, wherever this is appropriate.

g. Immediately after an emergency, the emergency coordinator shall provide for treating, storing, or disposing of recovered waste, contaminated soil or surface water, or any other material that results from a release, fire, or explosion at the facility.

h. The emergency coordinator shall ensure that, in the affected area(s) of the facility:

    i. No waste that may be incompatible with the released material is treated, stored, or disposed of until cleanup procedures are completed; and

    ii. All emergency equipment listed in the contingency plan is cleaned and fit for its intended use before operations are resumed.

i. The owner or operator shall notify the Administrator, and appropriate federal and local authorities, that the facility is in compliance with paragraph (viii) of this section before operations are resumed in the affected area(s) of the facility.

j. The owner or operator shall note in the operating record the time, date, and details of any incident that requires implementing the contingency plan. Within 15 days after the incident, he shall submit a written report on the incident to the Administrator. The report shall include:

    i. Name, address, and telephone number of the owner or operator;

    ii. Name, address, and telephone number of the facility;

    iii. Date, time, and type of incident (e.g., fire, explosion);

    iv. Name and quantity of material(s) involved;

    v. The extent of injuries, if any;

    vi. An assessment of actual or potential hazards to human health or the environment, where this is applicable; and

    vii. Estimated quantity and disposition of recovered material that resulted from the incident.

### 3.1.1 Act to Protect Life

- Immediately get out of harms way;

- For a fire, chemical spill or any explosion, move upwind; and

- Do not go into a fire, contaminated area, or oxygen deficient area without protective equipment.

### 3.1.2 Notify Employees of Implementation of Emergency Contingency Plan

- Act quickly to ensure notification for safety of employees;

- Use whatever means available, to include radio/phone, driving, or walking, to notify employees;

- Maintain, to a practical extent, records and logs of actions taken;

- Coordinate efforts with other response and regulatory agencies; and

- Activate notification roster to call in additional response crews.

### 3.1.3 Disaster Aftermath Actions

In the aftermath of any disaster, natural or malevolent event, and after the all-clear is declared, the following actions should be taken as soon as possible:

- Conduct an on-site inspection of the site and all facilities;

- Check and examine the condition and operation of site equipment;

- Check for structural and other damage to facilities;

- Check for signs of instability and create a log which shall include: record findings, action required to remedy the situation;

- Clear the area of personnel and equipment, if needed;

- Prepare a preliminary damage report; and

- Report conditions to appropriate officials.

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 66 of 71

## 3.2   EMERGENCY HAZARD - FIRE

**Event Description:** This event is based on fire being detected at the site. **Immediate**

**Actions and Procedures to Lessen Impact of Identified Emergency:**

- Determine size of fire;

- Only attempt to fight fire at the start of the fire, determine if a fire extinguisher is enough protection at this stage;

- If the fire is large or out of control evacuate the area and call 911 (Guam Fire Department and Guam Police Department);

- Report to a designated area, conduct a head count and await further instructions;

- Call the Director of DPW and advise him/her of the situation, the Director shall contact the Guam Environmental Protection Agency and the Department of Public Health; and

- Wait for the all clear from the police/fire department before returning to the threatened area.

**Emergency Contact Numbers are located in Section 4.0.**

## 3.3   EMERGENCY HAZARD - BOMB THREAT
**Event Description:** This event is based on a bomb threat received by telephone or other means.

**Immediate Action and/or Procedures to Lessen Impact of Emergency:**

- Make a record of the call;

- Call the Guam Police Department;

- Evacuate the facility threatened;

- If requested, assist responders;

- Call the Director of DPW and advise him/her of the situation; and

- Wait for the all clear from the police before returning to the threatened area.

**Emergency Contact Numbers are located in Section 4.0.**

Ordot Dump Emergency Contingency Plan, July 2005

## 3.4    EMERGENCY HAZARD – EXPLOSION

**Event Description:** This event is based on an explosion occurring at the site.

**Immediate Action and/or Procedures to Lessen Impact of Emergency:**

- Evacuate the site;

- Call the Guam Fire Department and the Guam Police Department;

- If requested, assist responders;

- Call the Director of DPW and advise him/her of the situation; and

- Wait for the all clear from the police before returning to the site.

**Emergency Contact Numbers are located in Section 4.0.**


## 3.5    EMERGENCY HAZARD – UNPLANNED SUDDEN OR NON-SUDDEN RELEASES OF HARMFUL CONSTITUENTS TO THE AIR, SOIL, OR SURFACE WATER

**Event Description:** This event is based on an explosion occurring at the site.

**Immediate Action and/or Procedures to Lessen Impact of Emergency:**

- Evacuate the site;

- Call the Guam Fire Department and Guam Police Department;

- If requested, assist responders;

- Call the Director of DPW and advise him/her of the situation, the Director shall contact the Guam Environmental Protection Agency and the Department of Public Health; and

- Wait for the all clear from the police/fire departments before returning to the site.

**Emergency Contact Numbers are located in Section 4.0.**

Ordot Dump Emergency Contingency Plan, July 2005

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 68 of 71

## 4.0 EMERGENCY CONTACT NUMBERS

These pages provide contacts and resources that may be needed during an emergency. They provide a quick access to critical and support contacts. These listings should be reviewed and updated on a regularly scheduled basis.

### PRIORITY CONTACT INFORMATION -SITE OFFICIALS RESPONSIBLE FOR MANAGEMENT OF AN EMERGENCY (DPW)

| Name | Position | Home Phone | Office Phone | Cell | I-Connect Radio Number |
|---|---|---|---|---|---|
| Lawrence Perez | Acting Director | | (671) 646-3131 | | |
| Jess Garcia | Chief of Operations | | (671) 646-4311 | | 1469 |
| Dominic Muna | Superintendent | (671) 734-1559 | (671) 647-4344 | | 3789 |
| Dominic Muna | Acting Supervisor | (671) 734-1559 | (671) 647-4344 | | 3789 |
| Richard Naputi | Assistant Site Supervisor | | (671) 472-2710 | | 13682 |
| DPW Compound | Safety Officer | | (671) 646-3216 | | |
| DPW Compound | Security | | (671) 646-3216 | | |
| Felix Camacho | Governor of Guam | (671) 477-9850 (671) 477-9858 | (671) 472-931/6 | | |

Case 1:02-cv-00022    Document 190-5    Filed 01/14/2008    Page 69 of 71

# LAW ENFORCEMENT NUMBERS

| Name | Address | Phone Number |
|---|---|---|
| Emergency | | 911 |
| Police Department Office | 233 Central Avenue Tiyan, Guam 96913 | (671) 475-8508/12/85 |
| FBI | First Hawaiian Bank, 400 Route 8 Suite 402 Mongmong, GU 96910 | (671) 472-7422 or (671) 472-7465 |
| | | |

# LOCAL AGENCY EMERGENCY RESPONSE CONTACT LIST

| Agency Name | Agency Service | Phone Number #1 | Phone Number #2 |
|---|---|---|---|
| Fire Department | Fire/HAZMAT | 911 | (671) 475-4534 |
| DPW Highway Division | Roadway | (671) 647-5059 | (671) 646-3179 |
| Police Department | Police | (671) 475-8538 | (671) 475-8546 |
| Department of Public Health & Social Services | Health Department | (671) 735-7399 | (671) 735-7209 |
| Guam Homeland Security Office of Civil Defense | Emergency Management | (671) 475-9600 | (671) 475-9601/2 |
| Guam Environmental Protection Agency | Environmental Regulators | (671) 475-1658 | (671) 475-1659 |
| Guam Power Authority | Power Service | (671) 475-1568 | (671) 475-1472 or (671) 475-1473/4 |
| Guam Waterworks Authority | Water/Sewer Service | (671) 646-4311 or (671) 646-7319 | (671) 647-2603 |
| Guam Telephone Authority | Telephone Service | (671) 644-4482 | |

# FEDERAL EMERGENCY MANAGEMENT

| Name of Entity | Contact | Phone Number |
|---|---|---|
| **Federal Level** | | |
| National Weather Service | | (671) 472-0900 |
| EPA Poison Control | | 1-800-222-1222 |
| EPA - National Response Center | | 1-800-424-8802 |
| EPA – Region IX | Hotline/Ben Machol | (415) 947-8000 / (415) 972-3770 |
| FBI | | (671) 472-7465 / (808) 566-4300 |
| Federal Emergency Management Agency | Leo Espina | (671) 475-9600 |

Case 1:02-cv-00022     Document 190-5     Filed 01/14/2008     Page 70 of 71

# MEDIA CONTACT LIST

## LOCAL PRIMARY AND SECONDARY MEDIA SPOKESPERSON

| Name | Position | Work Phone Number | Home Phone Number |
|------|----------|-------------------|-------------------|
| Josephine Torres | DPW Public Information Officer | (671) 646-3259 | |
| | | | |

## MEDIA

| Media Entity | Contact Name | Location | Phone Number |
|--------------|--------------|----------|--------------|
| Pacific Daily News | | 244 Archbishop Flores Street Hagåtña, GU 96910 | (671) 475-6397 |
| Marianas Variety | | Tamuning | (671) 649-1378 |
| KUAM | | Pacific Telestations 600 Harmon Loop Dededo, GU 96912 | (671) 637-5826 |
| Power 98 | | Sorensen Pacific Broadcasting 111 Santo Papa Street Suite 800, Hagatna, GU 96910 | (671) 472-9800 |
| Hit Radio 100 | | KOKU FM 107 Julale Center 424 West O' Brien Dr. Hagatna, GU 96910 | (671) 477-1003 |
| Isla 94 | | Pacific Telestations 600 Harmon Loop Dededo, GU 96912 | (671) 637-5826 |
| News Talk K-57 | | Sorensen Pacific Broadcasting 111 Santo Papa Street Suite 800, Hagatna, GU 96910 | (671) 477-5757 |
| The Rock | | Sorensen Pacific Broadcasting 111 Santo Papa Street Suite 800, Hagatna, GU 96910 | (671) 472-7625 |
| KOLG The Light 90.9 FM | | 196 E. Cuesta San Ramon, Hagatna, GU 96910 | (671) 477-5654 / (671) 475-4448 |
| | | | |

Case 1:02-cv-00022     Document 190-5     Filed 01/14/2008     Page 71 of 71

**APPENDIX A**
**ATTACHMENT II-7**

**GROUNDWATER MONITORING PLAN**

**RESERVED - PENDING REVISIONS AND FINAL APPROVAL**
**SEE PERMIT CONDITION III.A.**

*12/2/05*

**APPENDIX A**
**ATTACHMENT II-8**

**OPERATIONS & MONITORING PLAN FOR THE ORDOT DUMP**

**RESERVED - PENDING REVISIONS AND FINAL APPROVAL**

*12/2/05*

**APPENDIX A**
**ATTACHMENT II-9**

**SOLID WASTE DIVERSION PROGRAM PLAN**

**RESERVED - PENDING SUBMITTAL AND FINAL APPROVAL**

*12/2/05*

# APPENDIX A
## ATTACHMENT II-10

## PERSONNEL TRAINING PROGRAM PLAN

## RESERVED - PENDING SUBMITTAL AND FINAL APPROVAL

*12/2/05*

**APPENDIX A**
**ATTACHMENT II-11**

**INSPECTION PLAN**

**RESERVED - PENDING SUBMITTAL AND FINAL APPROVAL**

*12/2/05*

**APPENDIX A**
**ATTACHMENT II-12**

**VECTOR CONTROL MONITORING AND DETERRENCE**
**PROGRAM PLAN**

**RESERVED - PENDING SUBMITTAL AND FINAL APPROVAL**

*12/2/05*

**APPENDIX B**

**CLOSURE PLAN**

**PENDING REVISIONS AND FINAL APPROVAL
SEE PERMIT CONDITION III.A.**

*12/2/05*

# APPENDIX C

## POST-CLOSURE MAINTENANCE AND MONITORING PLAN

### PENDING REVISIONS AND FINAL APPROVAL
### SEE PERMIT CONDITION IV.A.

*12/2/05*

# APPENDIX D

# COMPLIANCE SCHEDULE ON DOCUMENT SUBMITTAL

*12/2/05*

| Document Description | Due Date (DAYS) | Permit Reference |
|---|---|---|
| **Part I – General Requirements** | | |
| 1    Progress Report | Quarterly | I.C. |
| **Part II – Operations Towards Closure** | | |
| **Solid Waste Accepted** | | |
| 1    Solid Waste Diversion Program Plan | 60 | II.A.2.a.i. |
| 2    Implementation Schedule for recyclables/reusable materials | 60 | II.A.2.a.i. |
| **Scale Requirements** | | |
| 3    Scale Repair Schedule; | 15 | II.A.4.a. |
| 4    New Scale Information & Documentation | 2 | II.A.4.b. |
| 5    Incoming Waste Tonnage Report Form | 30 | II.A.4.d. |
| **General Waste Placement and Lift Development** | | |
| 6    Ordot Dump Assessment Report | 15 | II.A.6.a.1. |
| 7    Draft Filling Plan | 30 | II.A.6.a.2. |
| 8    Final Filling Plan (See Pemit Condition) | 30 | II.A.6.a.3. |
| **Cover Material Requirements** | | |
| 9    Certification of available daily cover on site | Weekly | II.A.7.f. |
| **Vector, Bird, Odors, Noise, Dust, and Litter Control** | | |
| 10    Vector Control Monitoring Plan and Deterrence Program | 30 | II.A.8.b. |
| **General Inspection Requirements** | | |
| 11    Inspection Plan | 30 | II.A.17. |
| **Personnel Training** | | |
| 12    Personnel Training Program Plan | 15 | II.A.18.a. |
| 13    Updated listing of employees w/certification training | 30 | II.A.18.ii. |
| **Emergency Response and Contingency Plan** | | |
| 14    Revised Emergency Contingency Plan | 30 | II.A.19.a. |
| **Part III – Closure Design & Construction** | | |
| **Closure Design Report and Closure Plan - Revisions** | | |
| 1    Update and revise Ordot Dump Closure Design Report (7/05) and Closure Plan | 12/30/05 | III.B. |
| **Leachate System** | | |
| 2    Draft Leachate Disposal System Design and Leachate Management Plan | 60 | III.B.1.a. |
| 3    Final Leachate Disposal System Design and Final Leachate Management Plan (upon Guam EPA approval) | 30 | III.B.1.b. |
| **Surface Water Requirements** | | |
| 4    Draft Design Schedule and a Draft Revised Basis of Design for the Construction | 30 | III.B.2.a.ii. |
| 5    Final Design Schedule and a Final Revised Basis of Design for the Construction (upon Guam EPA approval) | 15 | III.B.2.a.iii. |
| 6    Draft Revised Stormwater Management System Design and a construction and permanent Stormwater Pollution Prevention Plan (SWPPP) | 30 | III.B.2.iv. |
| 7    Final Revised Stormwater Management System Design and a construction and permanent SWPPP (upon Guam EPA approval) | 15 | III.B.2.v. |

*12/2/05*

| | Document Description | Due Date (DAYS) | Permit Reference |
|---|---|---|---|
| **Cont. Part III – Closure Design & Construction** | | | |
| **Ground-Water Monitoring System** | | | |
| 8 | Draft Phase I Hydrogeologic Work Plan to include:<br>• Quality Assurance Program Plan<br>• Sampling & Analysis Plan | 60 | III.B.3.a.i.1. |
| 9 | Final Phase I Hydrogeologic Work Plan (upon Guam EPA approval) | 30 | III.B.3.a.i.2. |
| 10 | Phase I Hydrogeologic Report | 120 | III.B.3.a.i.4. |
| 11 | Draft Phase II Hydrogeologic Work Plan | 30 | III.B.3.a.ii.1. |
| 12 | Final Phase II Hydrogeologic Work Plan (upon Guam EPA approval) | 30 | III.B.3.a.ii.2. |
| 13 | Phase II Hydrogeologic Report | 120 | III.B.3.a.ii.4. |
| 14 | Comprehensive monitoring reports | 10 day of ensuing quarter | III.B.3.a.iv.2. |
| **Landfill Gas Management System** | | | |
| 15 | Revised Landfill Gas Management System | 60 | III.B.4.a. |
| **Part IV – Post-Closure Care and Maintenance** | | | |
| **Post-Closure Care and Maintenance Plan – Revisions** | | | |
| 1 | Revised Post-Closure Care and Maintenance Plan | 90 | IV.B.1. |
| 2 | Final Revised Post-Closure Care and Maintenance Plan (upon Guam EPA approval) | 30 | IV.B.2. |

*12/2/05*

# APPENDIX E

## COMPLIANCE SCHEDULE ON ACTIVITIES

*12/2/05*

| | Activity Description | Implementation Date (DAYS) | Notification Date (DAYS) | Permit Reference |
|---|---|---|---|---|
| **Part II – Operations Towards Closure** | | | | |
| **Design & Operation Facility** | | | | |
| 1 | Retain contractor | 30 | 2 | II.A.1.b & c |
| 2 | Retain MOLO certified manager | 30 | 2 | II.A.1.b & c |
| **Solid Waste Accepted** | | | | |
| 3 | Post sign of waste accepted | 2 | | II.A.2.a.ii. |
| **Solid Waste Excluded** | | | | |
| 4 | Stop accepting unprocessed Yard waste | 7/1/06 | | II.A.2.a.i.1. |
| 5 | Stop accepting Yard waste | 7/1/07 | | II.A.2.a.i.2. |
| **Scale Requirements** | | | | |
| 6 | Operate and maintain a scale | 120 | | II.A.4.a. |
| **Procedures for Excluding the Receipt of Hazardous Waste** | | | | |
| 7 | Conduct random vehicle inspections for all incoming loads once every week | Immediately ( for the first 6 months) | | II.A.5.a. |
| 8 | Random Off-load Inspections at working face once every week | Immediately (for the first 6 months) | | II.A.5.b. |
| 9 | Condut random vehicle inspections and off-load inspections at working face once every 2 weeks | After the first 6 months of permit issue date | | II.A.5.e. |
| **Waste Placement and Life Development** | | | | |
| 9 | Retain a Registered Surveyor and perform updated topography survey assessment | 15 | | II.A.6.a.1. |
| 10 | Kick-off Meeting on Final Filling Plan (refer to Permit) | 5 | | II.A.6.b.1 |
| **Cover Material** | | | | |
| 11 | 14-day cover material stockpile on site | 45 | | II.A.7.c. |
| **Vector, Birds, Odors, Noise, Dust, and Litter Control** | | | | |
| 12 | Install litter control apparatus | 5 | | II.A.8.a. |
| **Explosive Gases Control** | | | | |
| 13 | Conduct the activities stated in Operations Plan, Appendix A, Section 7.2. | 15 | | II.A.9. |
| **Access Requirements** | | | | |
| 14 | 24-hour Surveillance System; OR | 60 | | II.A.11.a.i. |
| 15 | Barrier for active portion; AND | 60 | | II.A.11.a.ii. |
| 16 | Control Entry | 60 | | II.A.11.a.iii. |
| **Leachate Management Requirements** | | | | |
| 17 | Cease discharge of leachate | 10/23/07 | | II.A.12. |
| 18 | Implement Final Filling Plan | Upon approval | | II.A.12.a. |

*12/2/05*

| | Activity Description | Implementation Date (DAYS) | Notification Date (DAYS) | Permit Reference |
|---|---|---|---|---|
| **Cont. Part II – Operations Towards Closure** | | | | |
| **Run-on/Run-off Control Systems** | | | | |
| 19 | Maintain existing run-on control (as stated in Operations Plan, Appendix A, Section 6.0) | Immediately | | II.A.13. |
| 20 | Implement proper grading of the filling plan (as stated in Operations Plan, Appendix A, Section 6.0) | Immediately | | II.A.13. |
| **Safety** | | | | |
| 21 | Implement Site Safety Program | Immediately | | II.A.16. |
| **General Inspection** | | | | |
| 22 | Implement Facility Inspection Schedule | Immediately | | II.A.17. |
| 23 | Conduct Facility Inspection as stated in Permit | Immediately | | II.A.17. |
| **Personnel Training** | | | | |
| 24 | Conduct interim personnel training | 30 | | II.A.18.b. |
| **Emergency Response & Contingency Plan** | | | | |
| 25 | Implement Operations Plan, Appendix A, Section 3.11- Emergency Response | Immediately | | II.A.19. |
| 26 | Implement revised Emergency Contingency Plan | Upon Guam EPA Approval | | II.A.19.b. |
| **Part III – Closure Design and Construction** | | | | |
| **Special Closure Design and Construction Requirements** | | | | |
| 1 | Advertise for bid to construct | 1/11/06 | | III.A.1. |
| 2 | Award contract and provide Notice to Proceed | 4/21/06 | | III.A.2. |
| 3 | Ordot Dump Closure | 10/23/07 | | III.A.3. |
| **Leachate System** | | | | |
| 4 | Complete construction of the Guam EPA approved Final Leachate Disposal System Design | 9/23/07 | | III.B.1.c. |
| 5 | Fully implement Final Leachate Management Plan | 9/23/07 | | III.B.1.c. |
| **Surface Water Management** | | | | |
| 6 | Begin construction of the Guam EPA approved Final Revised Stormwater Management System Design | 4/21/06 | | III.B.2.b. |
| 7 | Implement the construction and permanent SWPPP | 4/21/06 | | III.B.2.b. |
| **Ground-water Monitoring System** | | | | |
| 8 | Secure all permits and clearances (upon Guam EPA approval of Plan) | 15 | | III.B.3.a.i.3. |
| 9 | Implement the Final Phase I Hydrogeologic Work Plan (upon Guam EPA approval of Plan) | 15 | | III.B.3.a.i.3. |
| 10 | Secure all permits and clearances (upon Guam EPA approval of Plan) | 15 | | III.B.3.a.ii.3. |
| 11 | Implement the Final Phase II Hydrogeologic Work Plan (upon Guam EPA approval of Plan) | 15 | | III.B.3.a.ii.3. |
| 12 | Monitoring on Guam EPA approved groundwater (for 4 consecutive quarters) | Quarterly | | III.B.3.a.iv.1. |
| 13 | Implement Guam EPA's Long-Term Groundwater Monitoring Requirements | 30 | | III.B.3.a.iv.4. |

*12/2/05*

# APPENDIX C

*Notice of Violation, Order of Compliance,
And Administrative Penalty Order
(NOV/OC/APO) (SW-107-A003)
(December 12, 2006)*



Mr. Lawrence Perez
Acting Director
Department of Public Works
542 North Marine Corps Drive
Tamuning, Guam 96913

DEC 1 2 2006

Dear Mr. Perez,

RE: **NOTICE OF VIOLATION, ORDER OF COMPLIANCE, AND ADMINISTRATIVE PENALTY ORDER FOR ORDOT DUMP WASTE MANAGEMENT PERMIT NO. 05-060LFL (SW-107-A003)**

The Guam Environmental Protection Agency (Guam EPA) is charged with the responsibility of implementing the Solid Waste Management and Litter Control Act (SWMLCA), as amended, Chapter 51 of Title 10, Guam Code Annotated (GCA), Public Law No. 23-64, and the Guam Solid Waste Disposal Rules and Regulations (GSWDRR) Chapter 23, of Title 22 Guam Administrative Rules and Regulations (GAR).

Section 51103(a) states that "The Agency shall have the authority under this Act to prepare, issue, modify, remove, and enforce orders for compliance with any of the provisions of this Chapter or of any rules and regulations issued pursuant thereto and requiring the taking of such remedial measures for solid waste management as may be necessary or appropriate to implement or effectuate the provisions and purposes of this Chapter".

On December 14, 2005, Guam EPA issued a Solid Waste Disposal Facility Permit (Permit No. 05-060LFL) to the Department of Public Works (DPW) for the Ordot Dump (hereinafter referred as Dump). As part of the Permit, specific conditions were provided to bring the Dump into compliance. These conditions, which include timeframes for the submittal of documents, are summarized in Appendix D of the Permit, *Compliance Schedule for Document Submittal.*

On December 30, 2005, DPW requested a 30-day extension to submit information. On January 19, 2006, Guam EPA approved the request and required DPW to submit the information by January 29, 2006. On March 8, 2006, Guam EPA received DPW's Progress Report dated March 8, 2006. However, the submittal did <u>not</u> include some of

*"ALL LIVING THINGS OF THE EARTH ARE ONE"*

the required information delineated in the Permit. A list of outstanding deliverables is found in Enclosure 1 (*Compliance Schedule on Document Submittal*), which summarizes their status.

## NOTICE OF VIOLATIONS

Based on the information above, the Department of Public Works (DPW) is in violation of the SWMLCA and the GSWDRR. The deficiencies and regulatory provisions that have been violated are indicated below and are the basis for this Notice of Violation and Order of Compliance (NOV/OC).

Guam Solid Waste Management and Litter Control Act

1. **10 GCA §51110(1). Prohibited Solid Waste Activities. This law states that "It shall be unlawful for any person to violate any provision of this Chapter or any rule, regulation, standard, or order issued pursuant to this Chapter."**

    DPW violated provisions in SWMLCA and GSWDRR by not complying with the conditions of the Permit.

Guam Solid Waste Disposal Rules and Regulations

1. **§23104(b)(6). Application for Permit. "The Administrator may issue to the applicant a conditional approval. Under such approval the Administrator may specify conditions which will bring the operation of the solid waste management facility described in the application within the requirement of this Chapter."**

    DPW failed to meet the specific conditions delineated in the Permit to bring the operation of the Dump to compliance.

Solid Waste Disposal Facility Permit – Ordot Dump (Permit Number 05-060LFL)

1. **Part I, Section I.A.6 - Duty to Comply**. The Permittee shall comply with all the conditions of this Permit. Any Permit noncompliance without authorization from the Administrator constitutes a violation of the SWMLC and the GSWDRR.

    DPW failed to comply with the conditions of their Permit, specifically the documents delineated in the Appendix D, *Compliance Schedule for Document Submittal*

2. **Part I, Section I.A.16 - Reporting Anticipated Noncompliance**. The Permittee shall give advance notice to the Administrator of any planned activity which may result in noncompliance with the permit requirements.

the required information delineated in the Permit. A list of outstanding deliverables is found in Enclosure 1 (*Compliance Schedule on Document Submittal*), which summarizes their status.

## NOTICE OF VIOLATIONS

Based on the information above, the Department of Public Works (DPW) is in violation of the SWMLCA and the GSWDRR. The deficiencies and regulatory provisions that have been violated are indicated below and are the basis for this Notice of Violation and Order of Compliance (NOV/OC).

### Guam Solid Waste Management and Litter Control Act

1. **10 GCA §51110(1). Prohibited Solid Waste Activities. This law states that "It shall be unlawful for any person to violate any provision of this Chapter or any rule, regulation, standard, or order issued pursuant to this Chapter."**

    DPW violated provisions in SWMLCA and GSWDRR by not complying with the conditions of the Permit.

### Guam Solid Waste Disposal Rules and Regulations

1. **§23104(b)(6). Application for Permit. "The Administrator may issue to the applicant a conditional approval. Under such approval the Administrator may specify conditions which will bring the operation of the solid waste management facility described in the application within the requirement of this Chapter."**

    DPW failed to meet the specific conditions delineated in the Permit to bring the operation of the Dump to compliance.

### Solid Waste Disposal Facility Permit – Ordot Dump (Permit Number 05-060LFL)

1. **Part I, Section I.A.6 - Duty to Comply.** The Permittee shall comply with all the conditions of this Permit. Any Permit noncompliance without authorization from the Administrator constitutes a violation of the SWMLC and the GSWDRR.

    DPW failed to comply with the conditions of their Permit, specifically the documents delineated in the Appendix D, *Compliance Schedule for Document Submittal*

2. **Part I, Section I.A.16 - Reporting Anticipated Noncompliance.** The Permittee shall give advance notice to the Administrator of any planned activity which may result in noncompliance with the permit requirements.

DPW failed to report their planned activities, which led to the noncompliance of the requirements delineated in Appendix D of the Permit, *Compliance Schedule for Document Submittal*

3.    **Part I, Section I.C - Quarterly Reporting Requirements.** The Permittee shall submit a written report for the quarter in which the Permit was issued within ten (10) calendar days after that quarter and within ten (10) calendar days after each quarter thereafter. The report shall include at a minimum the contents required by subsection I.C.4. of the Permit.

As of August 31, 2006, DPW failed to submit their 1st and 3rd quarterly report which was due on January 10, 2006, and July 10, 2006, respectively.

4.    **Part I, Section I.G.1 - Compliance Schedule on Document Submittal.** The Permittee shall comply with compliance schedule referenced in Appendix D of the Permit.

As of August 31, 2006, DPW failed to submit some of the documents within the timelines specified in Appendix D, *Compliance Schedule for Document Submittal.*

## ORDER OF COMPLIANCE

Based on the violations cited above, DPW has violated the provisions of 10 GCA Chapter 51 and 23 GAR. Therefore, Guam EPA hereby requires DPW, to take the following remedial measures within the time frame stated below from the date of receipt of this order:

1.  Immediately submit to Guam EPA the outstanding documents delineated in Appendix D, *Compliance Schedule for Document Submittal.*

2.  Confirm in writing, within thirty (30) calendar days of your receipt of this letter, an affidavit that the above-referenced remedial measures have been taken, the date each was taken, including supporting documentation. If any of these objectives are not accomplished, additional administrative penalties may be assessed.

This Order of Compliance (OC) is issued under the authority of the Solid Waste Management and Litter Control Act, as amended, 10 GCA § 51103(a). If any of the above objectives are not accomplished in the specified time, additional administrative penalties may be assessed. Failure to comply with the terms of this OC may subject you to an administrative or civil penalty of up to $1,000 per day for each violation under 10 GCA § 51115(e) and/or 10 GCA § 51115(a), or a criminal conviction of a third degree felony and/or a criminal fine up to $1,000 per day per violation and restitution under 10 GCA § 51115(b).

Nothing in this OC limits the ability of the Guam EPA to enforce any and all provisions of applicable Guam Laws and regulations. Guam EPA does not waive any rights or remedies available to it.

Nothing in this OC or in the Federal Ordot Consent Decree provides any excuse for you to not comply with Guam Laws and regulations. Failure to comply with Guam Laws and regulations may subject you to administrative, civil or criminal penalties.

## ADMINISTRATIVE PENALTY ORDER

In addition to this NOV/OC the Administrator of Guam EPA, pursuant to 10 GCA § 51115(e) hereby imposes an administrative penalty. Based on the violations identified above, the maximum administrative penalty would be up to $1,000 per day per solid waste violation, or **$6,259,000.00** for a total of **24** solid waste violations of up to **230** day(s) per violation through August 31, 2006.

The Administrator has used the statutory factors in assessing the amount of the penalty. The factors include, but are not limited to, the nature and history of these and prior violations, and the opportunity, difficulty and history of taking corrective action. Therefore, the Administrator hereby assess' a penalty of **$1,525,200.00**. The penalty amount is due and owing 15 days from the date of receipt of this APO.

If you believe you can meet the mitigating factors identified in the law for a lower penalty than that hereby imposed, then you may petition the Administrator for a penalty adjustment. A Petition for a Penalty Adjustment must reference the mitigating factors in the law, state the mitigating circumstance, and provide evidence (e.g., documents, sworn statements, pictures) of the mitigating circumstance. The petition must be in writing and submitted to the Administrator within 15 days of receipt of this Administrative Penalty Order (APO).

You are presumed under the law to be able to pay the penalty. The burden is upon you of proving that you do not have the ability to pay the penalty. If you believe that you are unable to pay the penalty, then you may file an Inability to Pay Statement with the Administrator. The Inability to Pay Statement must be sworn under penalty of perjury and must provide the supporting financial documentation (e.g., financial statement, tax returns). The Inability to Pay Statement must be submitted to the Administrator within 15 days of receipt of this APO.

As an option, you may propose a Supplemental Environmental Project (SEP) that is environmentally beneficial to the public, the value of which can be used to reduce the amount of the penalty. Such proposal must be made within 15 days of the receipt of this APO.

Nothing in this OC limits the ability of the Guam EPA to enforce any and all provisions of applicable Guam Laws and regulations. Guam EPA does not waive any rights or remedies available to it.

Nothing in this OC or in the Federal Ordot Consent Decree provides any excuse for you to not comply with Guam Laws and regulations. Failure to comply with Guam Laws and regulations may subject you to administrative, civil or criminal penalties.

## ADMINISTRATIVE PENALTY ORDER

In addition to this NOV/OC the Administrator of Guam EPA, pursuant to 10 GCA § 51115(e) hereby imposes an administrative penalty. Based on the violations identified above, the maximum administrative penalty would be up to $1,000 per day per solid waste violation, or **$6,259,000.00** for a total of **24** solid waste violations of up to **230** day(s) per violation through August 31, 2006.

The Administrator has used the statutory factors in assessing the amount of the penalty. The factors include, but are not limited to, the nature and history of these and prior violations, and the opportunity, difficulty and history of taking corrective action. Therefore, the Administrator hereby assess' a penalty of **$1,525,200.00**. The penalty amount is due and owing 15 days from the date of receipt of this APO.

If you believe you can meet the mitigating factors identified in the law for a lower penalty than that hereby imposed, then you may petition the Administrator for a penalty adjustment. A Petition for a Penalty Adjustment must reference the mitigating factors in the law, state the mitigating circumstance, and provide evidence (*e.g.*, documents, sworn statements, pictures) of the mitigating circumstance. The petition must be in writing and submitted to the Administrator within 15 days of receipt of this Administrative Penalty Order (APO).

You are presumed under the law to be able to pay the penalty. The burden is upon you of proving that you do not have the ability to pay the penalty. If you believe that you are unable to pay the penalty, then you may file an Inability to Pay Statement with the Administrator. The Inability to Pay Statement must be sworn under penalty of perjury and must provide the supporting financial documentation (*e.g.*, financial statement, tax returns). The Inability to Pay Statement must be submitted to the Administrator within 15 days of receipt of this APO.

As an option, you may propose a Supplemental Environmental Project (SEP) that is environmentally beneficial to the public, the value of which can be used to reduce the amount of the penalty. Such proposal must be made within 15 days of the receipt of this APO.

The penalty amount is due and owing 15 days from the date of receipt of this APO. The payment due date will be stayed upon the timely filing of a complete Petition for Penalty Adjustment or an Inability to Pay Statement until such time as the Administrator issues a decision regarding the submittal.

Failure to comply with this APO may subject you to additional administrative penalties or civil or criminal actions as described above.

You may file within fifteen (15) calendar days of the date of this NOV/OC, a Notice of Intent to Appeal with the Guam EPA's Board of Directors, setting forth in such Notice a verified petition outlining the legal and factual basis for such an appeal.

The Guam EPA's Board shall then hold a public hearing, not more than sixty (60) days after receipt of such Notice, at which time you may appear and present evidence in person or through0 counsel in support of this petition.

The Notice of Intent to Appeal may be made by mailing the Notice of Intent to Appeal with the verified petition to the following address:

> Guam Environmental Protection Agency Board of Directors
> c/o Acting Administrator
> Attn: Air & Land Division
> Guam Environmental Protection Agency
> P.O. Box 22439 Guam Main Facility
> Barrigada, Guam 96921

Or the Notice of Intent to Appeal may be delivered to Guam EPA's main office located at Building 17-3304 Mariner Avenue, Tiyan, Guam 96913.

Failure to file a Notice of Intent to Appeal within the period specified above will constitute a waiver of your right to a hearing. Without further notice to you these Order of Compliance and Administrative Penalty Orders will become final and the Agency may proceed upon the Orders without a hearing. This also applies if you fail to attend or to participate in a hearing that you have requested.

If you have any questions concerning this memorandum, please contact Ms. Barbara F. Torres or Mrs. Conchita Taitano at 475-1651 or 475-1609, respectively.

Sincerely,

JOHN M.U. JOCSON
Acting Administrator

Enclosure
CC:  Ms. Helen Kennedy, Assistant Attorney General
     Mr. Terrance Brooks, Chairman, Public Utility Commission

cc:  C h r o n o
     Bobbie's file  AND Conchita S.N. Taitano, Administrator,
     Glenn's info         Air & Land Division

## Compliance Schedule on Document Submittal

| Document Description | Due Date (DAYS) | Permit Reference | Comment | STATUS OF COMPLIANCE |
|---|---|---|---|---|
| **Part I – General Requirements** | | | | |
| 1 Progress Report | Quarterly | I.C. | March 8, 2006 - GEPA received Progress Report No. 2. GEPA has not received Progress Report No.3 | Per 12/30/05 memorandum, Progress Report No. 1 to have been submitted by 1/9/06. No record of Progress Report No. 1. and no record of Progress Report No.3 |
| | 1/10/2006 | | 8/31/2006 | 2 |
| **Part II – Operations Towards Closure** | | | | |
| **Design and Operation Facility** | | | | |
| 2 Written notification of contractor | 4/23/2006 | II.A.1.c. | DPW has sent out an RFP for said Contractor but has yet to obtain one as of August 31, 2006 | Noncompliant |
| | | | 8/31/2006 | 130 |
| 3 Written notification of MOLO certified personnel & copy of certification | 4/23/2006 | II.A.1.c. | DPW has sent out an RFP for said Contractor but has yet to obtain one as of August 31, 2006 | Noncompliant |
| | | | 8/31/2006 | 130 |
| **Solid Waste Accepted** | | | | |
| 4 Solid Waste Diversion Program Plan | 60 | II.A.2.a.i. | As of March 8, 2006 Progress Report - Preparation of SW Diversion Program Plan still on-going. | Noncompliant |
| | 2/12/2006 | | 8/31/2006 | 200 |
| 5 Implementation Schedule for recyclables/reusable materials | 60 | II.A.2.a.i. | As of March 8, 2006 Progress Report - Preparation of SW Diversion Program Plan still on-going. DPW requests GEPA to provide listing of Alternatives sites for recyclables. | Noncompliant |
| | 2/12/2006 | | 8/31/2006 | 200 |
| **Scale Requirements** | | | | |
| 6 Scale Repair Schedule; OR | 12/29/2006 | II.A.4.b. | 12/30/05 DPW request extension. 1/19/06, GEPA approves extension to 1/29/06. March 8, 2006 - GEPA received Progress Report No. 2 which states that repair of scale is not cost effective | Noncompliant until receipt of March 7, 2006 progress report. |
| | 1/29/2006 | | 8/31/2006 | 214 |

Case 1:02-cv-00022   Document 190-6   Filed 01/14/2008   Page 24 of 37

Solid Waste Disposal ~~~~~~~~
Ordot Dump

## Compliance Schedule on Document Submittal

| | Document Description | Due Date (DAYS) | Permit Reference | Comment | STATUS OF COMPLIANCE |
|---|---|---|---|---|---|
| 7 | New Scale Information & Documentation | 2 | II.A.4.c. | March 8, 2006 - GEPA received Progress Report No. 2 which states that DPW still obtaining data for Scale Information and Documentation. DPW also states that the selective Bidder for the Operation to Closure of the Ordot Dump will be required to purchase scale. | Noncompliant |
| | | | | 12/30/2005 | 14 |
| | Prior to extension request | 12/16/2005 | | 8/31/2006 | 214 |
| | After approved extension request | 1/29/2006 | | March 8, 2006 - GEPA received Progress | Noncompliant for 52 days from due date to March 7, 2006. |
| 8 | Incoming Waste Tonnage Report Form | 1/13/2006 | II.A.4.e. | Report Form No. 2 with attached Report Forms 3/7/2006 | 53 |
| **General Waste Placement and Lift Development** | | | | | |
| 9 | Ordot Dump Assessment Report | 15 | II.A.6.a.i. | 12/30/05 - DPW request extension. 1/19/06 - GEPA approves extension to 1/29/06. March 8, 2006 - GEPA received Progress Report No. 2 which states that assessment will be conducted by the selective bidder for the Operation to Closure of the Ordot Dump. | Noncompliant |
| | | 1/29/2006 | | 8/31/2006 | 214 |
| 10 | Draft Filling Plan | 30 | II.A.6.a.ii. | March 8, 2006 - GEPA received Progress Report No. 2 which states that Draft Filling Plan to be conducted by the selective bidder for the Operation to Closure of the Ordot Dump. | Noncompliant |
| | | 1/13/2006 | | 8/31/2006 | 230 |
| 11 | Final Filling Plan (See Permit Condition) *upon Guam EPA approval* | 30 | II.A.6.a.iv. | | |
| **Cover Material Requirements** | | | | | |
| 12 | Certification of available daily cover on site | Weekly | II.A.7.f. | March 8, 2006 - GEPA received Progress Report No. 2 which states that DPW has been providing GEPA with copies of Daily Dump Truck Lof and will continue to provide these log sheets to GEPA on a weekly basis. However, the required certifications regarding availability of daily cover has not been submitted. | Noncompliant for a total of 2398 days cumulative for the required 37 weekly report required up to August 31, 2006. Wherein the cumulative number of days is calculated from due date for each of the 37 weekly report due after the issuance of permit up to August 31, 2006. Number of cumulative days calculated can be found in the Penalty Assessment calculation for this NOV/OC. |
| | | 12/21/2005 | | 8/31/2006 | 2398 |

## Compliance Schedule on Document Submittal

| | | Document Description | Due Date (DAYS) | Permit Reference | Comment | STATUS OF COMPLIANCE |
|---|---|---|---|---|---|---|
| **Vector, Bird, Odors, Noise, Dust, and Litter Control** | | | | | | |
| 13 | | Vector Control Monitoring Plan and Deterrence Program Plan and Standard Operating Procedures | 30 | II.A.8.b. | 12/30/05 -DPW request extension. 1/19/06 GEPA approves extension to 1/29/06. March 8, 2006 - GEPA received Progress Report No. 2 which states that Plan is a compliance requirement to be conducted by the selective bidder for the Operation to Closure of the Ordot Dump. | Noncompliant |
| | | | | | 8/31/2006 | |
| | | | 1/29/2006 | | | 214 |
| **General Inspection Requirements** | | | | | | |
| 14 | | Revised Inspection Plan | 30 | II.A.17.a. | March 8, 2006 - GEPA received Progress Report No. 2 which states that Plan is a compliance requirement to be conducted by the selective bidder for the Operation to Closure of the Ordot Dump. Furthermore, DPW states that it will comply with the general inspection plan as established in Appendix A, Section 3.9 of the Operations Plan. | Noncompliant |
| | | | | | 8/31/2006 | |
| | | | 1/13/2006 | | | 230 |
| **Personnel Training** | | | | | | |
| 15 | | Personnel Training Program Plan | 15 | II.A.18.a. | 12/30/05 -DPW request extension. 1/19/06 GEPA approves extension to 1/29/06. March 8, 2006 - GEPA received Progress Report No. 2 with an attached training synopsis for SW Managers, Personnel, Technicians, and Operators. In addition, GEPA was notified that several DPW Solid Waste Personnel have become SWANA members and have attended SWANA training courses off-island. They also noted the intention to utilize SWANA's On-Demand Training PRogram and E-Training events. This update is not a training plan, but a summary of DPW's proposal to incorporate into a training plan. | Noncompliant |
| | | | | | 8/31/2006 | |
| | | | 1/29/2006 | | | 214 |

## Compliance Schedule on Document Submittal

| | Document Description | Due Date (DAYS) | Permit Reference | Comment | STATUS OF COMPLIANCE |
|---|---|---|---|---|---|
| 16 | Updated listing of employees w/certification training | 30 | II.A.18.c. | Per the March 8, 2006 Progress Report, DPW has developed and updated list of employees form for Solid Waste personnel and will be transmitted to GEPA. To date no list as been received. | Noncompliant |
| | | 1/13/2006 | | 8/31/2006 | 230 |
| **Emergency Response and Contingency Plan** | | | | | |
| 17 | Revised Emergency Contingency Plan | 30 | II.A.19.a. | March 8, 2006 - GEPA received Progress Report No. 2 which states that Emergency Contingency Plan is a compliance requirement to be conducted by the selective bidder for the Operation to Closure of the Ordot Dump. Furthermore, DPW states that it will comply with the Emergency Response and Contingency requirements in Appendix A, Section 3.11, Operations Plan. | Noncompliant |
| | | 1/13/2006 | | 8/31/2006 | 230 |
| **Part III – Closure Design & Construction** | | | | | |
| **Closure Design Report and Closure Plan – Revisions** | | | | | |
| 18 | Update and revise Ordot Dump Closure Design Report (7/05) and Closure Plan | 12/30/2005 | III.B. | 12/30/2005 -DPW request extension. 1/19/06 GEPA approves extension to 1/29/06. March 8, 2006 - GEPA received Progress Report No. 2 which states that the update and revision of the Ordot Dump Closure Design Report (7/05) and Closure Plan  is a compliance requirement to be conducted by the selective bidder for the Operation to Closure of the Ordot Dump. | Noncompliant |
| | | 1/29/2006 | | 8/31/2006 | 214 |

## Compliance Schedule on Document Submittal

| | Document Description | Due Date (DAYS) | Permit Reference | Comment | STATUS OF COMPLIANCE |
|---|---|---|---|---|---|
| **Leachate System** | | | | | |
| 19 | Draft Leachate Disposal System Design and Leachate Management Plan | 60 | III.B.1.a. | 12/30/05 -DPW request extension. 1/19/06 GEPA approves extension to 1/29/06. March 8, 2006 - GEPA received Progress Report No. 2 which states that the update and revision of the Ordot Dump Closure Design Report (7/05) and Closure Plan is a compliance requirement to be conducted by the selective bidder for the Operation to Closure of the Ordot Dump. | Noncompliant |
| | | 2/12/2006 | | 8/31/2006 | 200 |
| 20 | Final Leachate Disposal System Design and Final Leachate Management Plan *(upon Guam EPA approval)* | 30 | III.B.1.b. | | |
| **Surface Water Requirements** | | | | | |
| 21 | Draft Design Schedule and a Draft Revised Basis of Design for the Construction | 30 | III.B.2.a.ii | March 8, 2006 - GEPA received Progress Report No. 2 which states that draft Design Schedule and Final Revised Basis of Design is to be conducted by the selective bidder for the Operation to Closure of the Ordot Dump and Final Closure. | Noncompliant |
| | | 1/13/2006 | | 8/31/2006 | 230 |
| 22 | Final Design Schedule and a Final Revised Basis of Design for the Construction *(upon Guam EPA approval)* | 15 | III.B.2.a.iii | | |
| 23 | Draft Revised Stormwater Management System Design and a construction and permanent Stormwater Pollution Prevention Plan (SWPPP) *(upon Guam EPA approval)* | 30 | III.B.2.iv. | | |

H:\Solid Waste\NOV-OC\DPW NOV-OC FY2006\Ordot Dump Permit - Status of Compliance with Compliance Schedule(8-31-06).xls, Document Submittal Compliance
5 of 7
10/10/2006

Case 1:02-cv-00022    Document 190-6    Filed 01/14/2008    Page 28 of 37

| | Document Description | Due Date (DAYS) | Permit Reference | Comment | STATUS OF COMPLIANCE |
|---|---|---|---|---|---|
| 24 | Final Revised Stormwater Management System Design and a construction and permanent SWPPP *(upon Guam EPA approval)* | 15 | III.B.2.v. | | |
| **Ground-Water Monitoring System – PHASE I** | | | | | |
| 25 | Draft Phase I Hydrogeologic Work Plan to include: | 90 | III.B.3.a.i.1. | March 8, 2006 - GEPA received Progress Report No. 2 which states that draft Phase I Hydrogeologic Work Plan that includes a QAPP and SAP is to be conducted by the selective bidder for the Operation to Closure of the Ordot Dump and Final Closure. | Noncompliant |
| | • Quality Assurance Program Plan • Sampling & Analysis Plan | 3/14/2006 | | 8/31/2006 8/31/2006 | 170 |
| 26 | Draft Phase I Groundwater Monitoring Plan | 90 | III.B.3.a.i.1. | March 8, 2006 - GEPA received Progress Report No. 2 which states that draft Phase I Groudwater Monitoring Plan is to be conducted by the selective bidder for the Operation to Closure of the Ordot Dump and Final Closure. | Noncompliant |
| | | 3/14/2006 | | 8/31/2006 | 170 |
| 27 | Final Phase I Hydrogeologic Work Plan and Final Phase I Groundwater Monitoring Plan *(upon receipt of Guam EPA's comments)* | 30 | III.B.3.a.i.2. | | |
| 28 | Draft Phase I Hydrogeologic Report *(upon receipt of Guam EPA's written approval)* | 135 | III.B.3.a.i.4. | | |
| 29 | Final Phase I Hydrogeologic Work Plan *(upon receipt of Guam EPA's comments)* | 30 | III.B.3.a.i.5. | | |
| **Ground-Water Monitoring System – PHASE II** | | | | | |
| 30 | Draft Phase II Hydrogeologic Work Plan to include: • Quality Assurance Program Plan • Sampling & Analysis Plan | 90 after Phase I | III.B.3.a.ii.1. | | |

## Compliance Schedule on Document Submittal

| | Document Description | Due Date (DAYS) | Permit Reference | Comment | STATUS OF COMPLIANCE |
|---|---|---|---|---|---|
| 31 | Draft Phase II Groundwater Monitoring Plan | 90 after Phase 1 | III.B.3.a.ii.1. | | |
| 32 | Final Phase II Hydrogeologic Work Plan and Final Phase II Groundwater Monitoring Plan *(upon receipt of Guam EPA's comments)* | 30 | III.B.3.a.ii.2. | | |
| 33 | Draft Phase II Hydrogeologic Report *(upon receipt of Guam EPA's written approval)* | 135 | III.B.3.a.ii.4. | | |
| 34 | Final Phase II Hydrogeologic Work Plan *(upon receipt of Guam EPA's comments)* | 30 | III.B.3.a.ii.5. | | |
| **Landfill Gas Management System** | | | | | |
| 35 | Revised Landfill Gas Management System *(upon receipt of Guam EPA's comments)* | 60 | III.B.4.a. | | |
| **Part IV – Post-Closure Care and Maintenance:** **Post-Closure Care and Maintenance Plan – Revisions** | | | | | |
| 36 | Revised Post-Closure Care and Maintenance Plan | 90 | IV.B.1. | March 8, 2006 - GEPA received Progress Report No. 2 which states that a revised Post Closure Care and Maintenance Plan is to be conducted by the selective bidder for the Operation to Closure of the Ordot Dump and | Noncompliant |
| | | 3/14/2006 | | 8/31/2006 | 170 |
| 37 | Final Revised Post-Closure Care and Maintenance Plan *(upon dump ceasing to receive waste but no later than 10/23/04)* | 30 | IV.B.2. | | |

H:\Solid Waste\NOV\OCD\PW NOV-OC FY2006\Ordot Dump Permit - Status of Compliance with Compliance Schedule(8-31-06).xls, Document Submittal Compliance
7 of 7
10/10/2006

Case 1:02-cv-00022    Document 190-6    Filed 01/14/2008    Page 30 of 37

**HANDCARRY RECEIPT**

DATE: DEC 12 2000

TO: Mr. Laurence Perez, Acting Director, DPW

FROM: GUAM EPA

SUBJECT: Notice of Violation (SW-187-A003) Ordot Dump Waste Mgmt. Permit No. 05-060LFL

DELIVERED BY: Chet Holloway

RECEIVED BY: _____

TIME: _____ DATE: _____




# GUAM ENVIRONMENTAL PROTECTION AGENCY

### AHENSIAN PRUTEKSION LINA'LA GUAHAN

P.O. Box 22439 GMF • BARRIGADA, GUAM 96921 • TEL: 475-1658/9 • FAX: 477-9402

MAY 0 9 2006

Mr. Lawrence Perez
Acting Director
Department of Public Works
542 North Marine Corps Drive
Tamuning, Guam 96913

RE:   <u>Continuing Violations of Notice of Violation, Order of Compliance
(NOV/OC), and Administrative Penalty Order (APO) No. SW-106-
A001 for the Ordot Dump</u>

Dear Mr. Perez:

On December 7, 2005, Guam EPA received your memorandum dated December 6, 2005 in response to the subject above. This memorandum provided details on the proposed efforts by your Department to meet the requirements delineated in the Order.

On March 1, 2006, Guam EPA conducted a compliance inspection of the Ordot Dump and obtained various documents related to the safety equipment. Based on the information gathered, DPW continues to be in violation of the Order due to the following conditions:

1. DPW was ordered to <u>immediately</u> place 6 inches of daily cover on the <u>working face</u> at the end of each operating day. However, the documents (daily inspection and record log of daily coverage) submitted do not validate the placement of 6 inches of cover material at the end of each operating day over the entire working face.

   Visual inspections revealed the lack of daily cover on the working face. Furthermore, the facility operators stated that top soil was taken from previously covered areas of the dump to provide minimal cover over the working face. **Material already used to cover solid waste in other areas within the Dump cannot be removed and used as daily cover.**

2. DPW was ordered to <u>immediately</u> place 6 inches of cover material on <u>other solid waste exposed</u> within the facility. However, the documents (daily inspection and record log of daily coverage) submitted do not

*"ALL LIVING THINGS OF THE EARTH ARE ONE"*

validate the placement of 6 inches of cover material on other solid waste exposed within the Dump.

Visual inspections revealed the lack of soil cover on the top deck and side slopes. In addition, it was observed that the area of exposed solid waste within the dump footprint is increasing due to the scraping of top soil cover to cover the working face.

3. DPW was ordered to conduct daily inspections and maintain a log of daily coverage from November 21, 2005 to December 15, 2005, and submit copies to Guam EPA on December 15, 2006.

   However, on December 15, 2005 DPW submitted copies of log sheets (Ordot Landfill Weekly Cover Materials Dump Trucks – Log Sheet) which primarily describe the number of loads of cover material that were transported to the Ordot Dump from the Dededo Coral Pit. These documents do not provide information on daily inspections and a log record of actual daily coverage.

4. DPW was ordered to provide all facility employees with safety personnel equipment by November 30, 2006. However, based on the documents submitted conducted not all required safety personnel equipment was issued to employees on February 27, 2006. Visual inspection revealed personnel with the lack of appropriate work gloves.

5. DPW was ordered to immediately provide fire extinguishers for all heavy equipment operating on the active area of the Dump. However, based on the documents submitted, fire extinguishers were issued to some employees on February 27, 2006. Visual inspection revealed that only one heavy equipment (EQ22) was on site and with appropriate fire extinguisher.

6. DPW was ordered to provide an affidavit to Guam EPA on the status of the above referenced remedial measures by December 23, 2006. The DPW memoranda dated December 6, 2005 and December 15, 2005 do not provide an affidavit that the above reference remedial measures were taken. In addition, Guam EPA has not received all the supporting documents needed to verify compliance with these required remedial measures.

Additional penalties have accrued and will continue to accrue due to the non-compliance of meeting the deadlines of these remedial measures and compliance in meeting the deadline to submit affidavit on the status of the above referenced remedial measure. In addition to the $11,050 Administrative Penalty

imposed on November 23, 2005, the total penalty accrued up to March 10, 2006 due to non-compliance of the required remedial measures of the referenced NOV/OC and APO No. SW 0106-A001 within specified dates is $126,100.

Should you have any questions, feel free to contact Ms. Conchita Taitano or Barbara Torres at 475-1658.

Sincerely,

**RANDEL L. SABLAN**
**Acting Administrator**

cc:     Ms. Conchita Taitano, Air and Land Programs Administrator
        Ms. Helen Kennedy, Assistant Attorney General

 

# GUAM ENVIRONMENTAL PROTECTION AGENCY

## AHENSIAN PRUTEKSION LINA'LA GUAHAN

P.O. Box 22439 GMF • BARRIGADA, GUAM 96921 • TEL: 475-1658/9 • FAX: 477-9402

Mr. Lawrence Perez
Acting Director
Department of Public Works
542 North Marine Corps Drive
Tamuning, Guam 96913

MAY 22 2006

RE: Administrative Penalty Order (APO) No. SW-106-A001 for the Ordot Dump

Dear Mr. Perez:

The Guam Environmental Protection Agency (Guam EPA) imposes a total penalty of $137,150 as of March 10, 2006. The total penalty amount includes the penalty assessed for the above subject NOV/OC and APO No. SW-106-A001 of $11,050 issued on November 23, 2005, and additional penalties assessed for failure to comply with the order provision of $126,100 up to March 10, 2006. Upon receipt of this letter, additional penalties to be assessed for continued non-compliance are as follows:

1) $200 per day per violation for the first 30 days; then

2) $500 per day per violation for the next 30 days after; and then

3) $1000 per day per violation thereafter until full compliance is reached

Should you have any questions, feel free to contact Ms. Conchita Taitano or Ms. Barbara Torres at 475-1658.

Sincerely,

RANDEL L. SABLAN
Acting Administrator

cc: Ms. Conchita Taitano, Air and Land Programs Administrator
Ms. Helen Kennedy, Assistant Attorney General

*"ALL LIVING THINGS OF THE EARTH ARE ONE"*

Company Name: Department of Public Works

Facility: Ordot Dump

## Additional Penalties of Non-compliance with Order SW#0106-A001

Date of Review: 3/10/2006

| Requirement Violated | Description of Violation | Total Calculated Penalties per NOV/OC & APO[1] | Required Due Date Per Issued NOV/OC | Status as of Review Date | No. of Days exceeding required Due Date | Maximum Additional Penalties[2] | Total Additional Multiday Penalties[3] |
|---|---|---|---|---|---|---|---|
| Section 5110(1), (2), (3)(x), and (5), n 23304(a) | Noncompliance with Statute, Dump Operation, Not Permitted, Public Nuisance, and health and safety hazard | $ - | 11/23/2005 | Incomplete | 107 | $ 107,000.00 | $ 21,400.00 |
| Section 23305(a) | Daily Cover | $ 3,900.00 | 11/23/2005 | Incomplete | 107 | $ 53,500.00 | $ 10,700.00 |
| Section 23313(a), (b)(1) | Vector Control | $ 1,950.00 | 11/23/2005 | Incomplete | 107 | $ 107,000.00 | $ 21,400.00 |
| Section 23313(a), (b)(1) | Appropriate Hard Hats, Respirators, Ear Protection, Work Gloves | $ 2,600.00 | 11/30/2005 | 2/27/2006 | 89 | $ 44,500.00 | $ 35,600.00 |
| Section 23313(a), (b)(1), and (b)(2) | First Aid Kit | $ 1,300.00 | 11/30/2005 | 2/27/2006 | 89 | $ 89,000.00 | $ 17,800.00 |
| Section 23313(b)(2) | Fire Extinguishers | $ 1,300.00 | 11/23/2005 | 2/27/2006 | 96 | $ 96,000.00 | $ 19,200.00 |
| TOTAL(s) | | $ 11,050.00 | | | | $ 497,000.00 | $ 126,100.00 |

NOTE(S):

[1] Total Calculated Penalties Per NOV/OC & APO was determined at the time of the issuance of the NOV/OC.

[2] Maximum Additional Penalties is the maximum penalty of $500 or $1000 per violation per day as established in Addendum C of Chapter 23 GAR.

[3] Total Additional Multiday Penalties is the multiday penalty initially given in the issued NOV/OC times the number of additional days exceeding the required due date. Calculations of incomplete status is based on the date of review (3/10/06).

# APPENDIX D

## *100% Submittal*
## *Ordot Dump*
## *Ordot-Chalan Pago,Guam*
## *Closure Plan*
## *(July 2005)*

**1 0 0 %   S U B M I T T A L**

# ORDOT DUMP
# ORDOT-CHALAN PAGO, GUAM

## Closure Plan

*Prepared for*
Department of Public Works, Government of Guam
542 North Marine Drive
Tamuning, Guam 96911

July 2005

*Prepared by*
Dueñas & Associates Project Team (Dueñas & Associates, Inc. and URS Corporation)

155 E.T. Calvo Memorial Parkway, Suite 200
Tamuning, Guam 96913
(671) 646-7991

# TABLE OF CONTENTS

**SECTION**                                                          **PAGE**

**1.0     INTRODUCTION**                                                 **1**

**2.0     SITE CHARACTERISTICS**                                         **3**

2.1     CLIMATE ................................................................................................. 3
2.2     VEGETATION ......................................................................................... 3
2.3     TOPOGRAPHY ....................................................................................... 3
2.4     GEOLOGY ............................................................................................... 4
2.5     SOILS ...................................................................................................... 4
2.6     HYDROGEOLOGY ................................................................................. 4

**3.0     WASTE CHARACTERISTICS**                                        **5**

3.1     GENERAL ................................................................................................ 5
3.2     SERVICE AREA ...................................................................................... 5
3.3     WASTE PROPERTIES ........................................................................... 5
        3.3.1    DENSITY ................................................................................. 5
        3.3.2    INCOMING WASTE QUANTITIES ....................................... 5

**4.0     CLOSURE DESIGN**                                              **6**

4.1     ELEMENTS OF THE CLOSURE DESIGN ........................................... 6
4.2     FINAL GRADING ................................................................................... 7
        4.2.1    DECK ....................................................................................... 7
        4.2.2    COVER SIDESLOPES ............................................................ 7
        4.2.3    GENERAL REQUIREMENTS FOR ACCESS ROADS ........... 7
4.3     COVER SYSTEM ................................................................................... 8
        4.3.1    FINAL COVER SYSTEM ......................................................... 9
        4.3.2    COVER SYSTEM DESIGN CRITERIA .................................... 9
4.4     SURFACE WATER MANAGEMENT ................................................... 13
        4.4.1    GENERAL DESIGN CRITERIA ............................................ 13
        4.4.2    SPECIFIC DESIGN CRITERIA ............................................ 13
4.5     EROSION AND SEDIMENTATION CONTROL ................................... 15
        4.5.1    GENERAL DESIGN CRITERIA ............................................ 15
        4.5.2    SPECIFIC DESIGN CRITERIA ............................................ 15
4.6     LEACHATE SYSTEM ........................................................................... 16
4.7     LANDFILL GAS SYSTEM .................................................................... 16
        4.7.1    GENERAL DESIGN CRITERIA ............................................ 16
4.8     GROUNDWATER MONITORING SYSTEM ......................................... 17

**5.0     ADMINISTRATION REQUIREMENTS**                               **18**

5.1     CLOSURE PROCEDURES ................................................................... 18
5.2     HEALTH AND SAFETY ........................................................................ 18
5.3     QUALITY ASSURANCE/QUALITY CONTROL ................................... 19
5.4     CERTIFICATION OF CLOSURE ......................................................... 19
5.5     POST-CLOSURE MAINTENANCE ...................................................... 19

**6.0     REFERENCES**                                                 **20**

**LIST OF FIGURES** **PAGE**

FIGURE 1-1: VICINITY MAP ...........................................................................................2

**LIST OF APPENDICES**

APPENDIX A: Title 22, Division 4, Chapter 23, Article 6 (§23601) of the Rules and Regulations for the Guam Environmental Protection Agency (GEPA) Solid Waste Disposal

APPENDIX B: Design Sheet References

APPENDIX C: Closure Schedule

## 1.0   INTRODUCTION

This document presents the Closure Plan for the Ordot Dump (the Dump) and was prepared in accordance with Title 22, Division 4, Chapter 23, Article 6 (§23601) of the Rules and Regulations for the Guam Environmental Protection Agency (GEPA) Solid Waste Disposal (Appendix A) and Part IV of the Solid Waste Management Facility Permit Application, Landfill, at the request of the Government of Guam, Department of Public Works (DPW).

The starting date for the use of the site as a dump is not documented, but it is known that the Ordot Dump was in use during World War II. The dump was used as a disposal area by the Japanese during the Japanese occupation of Guam from December 8, 1941 to July 21, 1944 (Juan C. Tenorio & Associates, Inc. 1993). Following the liberation of Guam, the U.S. Navy continued to use the site as a disposal area. Ownership of the Ordot Dump was transferred from the United States Naval Government of Guam to the Government of Guam in 1950 under the Organic Act. Since then, the Government of Guam, specifically the DPW, has been operating the Ordot Dump as a municipal solid waste disposal facility.

The Dump is located approximately 2.5-miles south of Guam's capital, Hagatna, and about 1-mile west of the Route 4-Dero Drive intersection (Figure 1-1). The area surrounding the Dump is a dense brush, wooded area with scattered residences. The nearest residences are approximately 200-feet from the Dump. The Dump is situated in a ravine that is a tributary to the Lonfit River, located approximately 500-feet to the south of the site.

The Dump occupies and borders property of the Government of Guam on the northeast, east, south, and southwest boundary lines of the Dump. The north and west limits of the Dump border public land in the form of a road and privately owned land, respectively.

The Dump waste footprint area, based on the 2004 limits of waste delineation performed by Dueñas & Associates, Inc. and projected filling footprint per the Operations Plan (Dueñas & Associates Project Team (DPT, 2005a), has been estimated to be 46.8-acres. This waste footprint area will be reduced to approximately 45.8-acres during closure construction as waste will be relocated from the western edge of the Dump and consolidated behind a mechanically stabilized earth (MSE) wall (DPT, 2005b). The precise limits of waste will be defined as a part of the Dump closure construction. The final waste volume of the Dump at the time of closure will be approximately 4.4 million-cubic yards (DPT, 2005a).

The Dump is an unlined disposal facility and has few to no control systems to manage landfill gas, leachate, surface water, erosion and sedimentation, or vectors.



Figure 1-1
VICINITY MAP

(SOURCE: DUEÑAS AND ASSOCIATES, INC.)

P:\ACAD\PROJECT\Guam\ORDOT Closure\R01\Tb85x11ORDOT VICINITYMAP.dwg Nov 04,2004 — 9:57am

Ordot Dump
Ordot-Chalan Pago, Guam

## 2.0   SITE CHARACTERISTICS

### 2.1   CLIMATE

Guam has a tropical marine climate, which is primarily warm and humid throughout the year. The mean annual temperature is 81.2° F (27.3° C); the average maximum temperature is highest during the month of June (87.0° F, 30.6° C); and the average minimum temperature is lowest during the month of February (74.5° F, 23.6° C) (DPT, 2005c). Guam has northeasterly to easterly prevailing trade winds that are generally strongest during the dry season. During the wet season the wind pattern eddies and may develop into westward moving typhoons and tropical storms. One of the most damaging typhoons to ever strike Guam was Typhoon Karen, which passed over the southern part of the island in 1962. Wind gusts were estimated near 185-miles per hour (mph). During the time the Dump has been operational, Guam has suffered numerous typhoons and super-typhoons with recorded wind speeds of over 200-mph. Many of these storms have contributed to the significant waste generation and adverse conditions found at the Dump. This and other waste generation aspects are addressed in the Operations Plan (DPT, 2005a).

The wet season is from August through October. During the wet season, Guam receives 50% of its annual average 101-inch rainfall (National Climate Data Center, 2004). The dry season (December through June) experiences 30% of the annual rainfall. The remaining 20% of annual rainfall occurs during the transitional months of July and November.

### 2.2   VEGETATION

The following plant communities were identified at the Ordot Dump and its surroundings during pedestrian surveys by field biologists: disturbed vegetation, wetlands, savanna, and riparian forest. Generally, disturbed vegetation occurs within areas filled with waste. Savanna and riparian vegetation occurs outside of the dump footprint and are likely indicators of the original plant community. Wetland vegetation occurs along drainage courses, low-lying areas, and river valleys. An environmental impact assessment for the expansion of the Dump reported three vegetation communities in an approximately 59.5-acre area west of the dump footprint (Juan C. Tenorio and Associates, Inc., 1993); these communities were classified as highly disturbed weedy second growth; ravine and riparian forest; and savanna grasslands.

### 2.3   TOPOGRAPHY

The topography surrounding the Dump is characterized as hilly and primarily undisturbed. The original site was a southerly flowing ravine outletting to the Lonfit River. Even though the Dump has filled in the ravine, the general slope of the area remains southward, towards the river. The current 2005 Dump topography forms a hill rising out of the ravine to an elevation of 318-feet above mean sea level (MSL). As filling will continue until closure in 2007, the Dump is anticipated to have a final elevation of 391-feet MSL (DPT, 2005a).

The current 2005 Dump sideslopes are as steep as 1 horizontal to 1 vertical (1:1), benched at approximately every 15-feet of vertical ascent. The top and benches of the Dump are essentially flat with a minimal slope to provide drainage and prevent ponding of surface water.

More detail regarding the site topography can be found in the Environmental Baseline Survey (DPT, 2005c).

## 2.4    GEOLOGY

Guam is a volcanically derived island. The island is split geologically into two regions by the east/west Adelup-Pago fault. The surface of the northern region is primarily limestone while the southern region is primarily exposed volcanics. Ordot Dump is located just south of the fault, in the volcanic region.

The geology of the Dump region is made up of the Alutom formation and its residual surface products. The Alutom consists dominantly of tuffaceous shale and sandstone interbedded with basaltic and andesitic lava flows as well as beds of volcanic conglomerate and breccia. All of these rocks were originally deposited beneath the sea, and consequently the tuff and its derivative sediments settled in compact layers, and the lavas were quenched. Both processes are unfavorable to the creation of permeability in the rock mass. Subsequently, precipitation from hydrothermal fluids filled much of the porosity, reducing permeability even further. The final result is a sequence of layered rocks lacking intrinsic permeability. The permeability that does exist is mostly due to secondary fractures (Mink and Yuen, 2004).

More detail regarding the site geology can be found in the Environmental Baseline Survey (DPT, 2005c)

## 2.5    SOILS

The Dump is situated on volcanic soils and rocks of the Alutom formation. The site is underlain with a few inches to several feet thick of dark-brown to mottled red-orange-brown to green-grey-yellow clayey and silty soils which are the weathered products of the underlying volcanic rocks, except some alluvial soils at the low lying areas. The fine-grained, cohesive and relatively impermeable silty and clayey soils are generally firm. Underlying the silty and clayey soils are generally fine-grained, volcanic formation of tuffaceous siltstone and shale.

Additional data from the October 2004 test pitting activities at the site can be found in the Environmental Baseline Survey (DPT, 2005c).

## 2.6    HYDROGEOLOGY

The Alutom formation is a very poor medium for groundwater movement. The hydraulic conductivity is extremely small; normally less than 0.1-ft/day (3.5 x $10^{-5}$-cm/sec), and consequently the groundwater gradient is high, greater than 10-vertical feet to 100-horizontal feet. One of the earlier studies on the environment of the Dump (Greenleaf-Telesca-Ahn, 1970) reported hydraulic conductivities of 0.0386-ft/day (1.36 x $10^{-5}$-cm/sec) and 0.4535-ft/day (1.60 x $10^{-4}$-cm/sec) from samples taken at a depth of 10 to 15-feet in a borehole. These conductivities are so poor that ordinarily the rock mass would be considered a nearly impervious aquiclude rather than an aquifer. They are of he same magnitude as hydraulic conductivities determined from pumping tests in deep wells drilled in the Alutom formation.

Even though the permeability of the volcanics is very low, the rocks are not truly impervious. Groundwater accumulates and moves very slowly through them. In the typical volcanic terrain of Southern Guam, the water table slopes downward toward stream valleys, and groundwater discharge takes place in the stream channels and a zone on the valley walls several tens of feet above a channel. This slow, invisible seepage sustains ravine forests during the dry season.

Subsurface regional geological conditions in the vicinity of the Ordot Dump are complicated by the presence of the Adelup-Pago fault, which divides Guam into two provinces, the northern one covered by limestone and the southern one consisting chiefly of exposed volcanics. The vertical displacement caused

by the fault adjacent to the Dump is about 400 feet, which results in a down-throw of the original volcanic surface from 200-feet above MSL to 200-feet below MSL (Mink and Yuen, 2004).

## 3.0   WASTE CHARACTERISTICS

### 3.1   GENERAL

The majority of the waste received at the Dump consists of non-hazardous residential and commercial solid waste.   The Dump also receives construction/demolition waste, bulky metal, and other related wastes.

DPW does not accept hazardous wastes. DPW is permitted to receive wastewater treatment sludge with prior approval from GEPA. According to Operations personnel, the receipt of sewage sludge is a rare occurrence.

The current (as of April 2005) waste volume at the Dump is 3.2 million-cubic yards. At the time of closure in 2007, it is anticipated that the final waste volume of the Dump will be approximately 4.4 million-cubic yards. This analysis is detailed in the Operations Plan (DPT, 2005a).

### 3.2   SERVICE AREA

All non-hazardous, non-designated municipal solid wastes generated on the island of Guam, excluding those wastes generated at the Naval Station, Naval Magazine, Naval Computer and Telecommunications Station (NCTS), Naval Regional Medical Center (NRMC) and Andersen Air Force Base, are currently accepted at the Dump for disposal.   The majority of the waste is delivered to the site by commercial vehicles.  The Dump also accepts waste delivered by private and government vehicles.

### 3.3   WASTE PROPERTIES

### 3.3.1   DENSITY

Previous reports have assumed an *in situ* waste density of 600-pounds per cubic yard ($lb/yd^3$) (Dames & Moore, 1978 and Juan C. Tenorio & Associates, 1998). As the waste management practices at the Dump have improved via the use of a compactor it is more likely that current *in situ* waste densities are approximately 800-$lb/yd^3$ as placed.  Aged waste at the bottom of the Dump that has had a chance to decompose and consolidate under the weight of ascending lifts of waste may have an *in situ* waste density on the order of 1,200-$lb/yd^3$.  In this regard, it can be assumed that there is a somewhat linear relationship between the waste densities of the older, deeper waste grading up to the recently placed waste at the Dump surface.

### 3.3.2   INCOMING WASTE QUANTITIES

Incoming waste quantities have historically been recorded, based on visible haul vehicle capacity, with no consideration to percent full.  The volumes are recorded into daily vehicle logs that are then summarized as weekly and monthly averages, which yield an annual projection.  Other annual projections have been developed by GEPA and Dueñas & Associates, Inc.  The average of these annual incoming waste projections is 434,500-cubic yards.  From 2005 to the Dump closure in 2007, it is estimated that the Dump will receive 1.17 million-cubic yards of additional waste.

These quantities are discussed in further detail in the Operations Plan for the facility (DPT, 2005a).

## 4.0   CLOSURE DESIGN

The Dump closure design was developed in accordance with the Rules and Regulations for the Rules and Regulations for the GEPA Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 6. The primary purpose of the closure regulations is to minimize infiltration of surface water, and erosion of the cover, as well as prevent threats to human health and the environment. The closure design is discussed below and describes the final cover system as is required by the regulations. Additionally, other aspects and control systems are also explained to give a global understanding of the Dump closure design. A more detailed discussion of the closure design and accompanying analyses can be found in the 100% Design Report (DPT, 2005b). Closure Design Drawings supporting this plan are located in Appendix B.

REGULATION GUIDANCE

The guidance provided in GEPA Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 6 was used for the closure design. Specific attention was given to the following:

> *"§23601 Closure Criteria*
>
> *§23601(b)_The administrator may approve an alternate final cover design that includes:*
>
>> *(1) and infiltration that achieves an equivalent reduction as the infiltration layer specified in item (1) of subsection (a) of this §23601; and*
>>
>> *(2) an erosion layer that provides equivalent protection from wind and water erosion as the erosion layer specified in Item (1) of subsection (a) of this §23601"*

The steps necessary to comply with §23601(b) as well as the other requirements of §23601 are detailed in the following sections.

Subpart WWW-Standards of Performance for Municipal Solid Waste Landfills 61 FR 9919 was used as guidance for the active landfill gas system.

## 4.1   ELEMENTS OF THE CLOSURE DESIGN

The Dump closure design includes the following construction elements:

- Final grading and layout of the Dump, including provision of access roads and surface drainage features, constructed over the final cover area;
- A final cover system, constructed over an approximately 45.8-acre footprint area;
- A leachate management system;
- A surface water management system that intercepts clean surface water runoff from the closed area and conveys it to the on-site sedimentation ponds;
- Erosion and sedimentation control facilities; and
- An active landfill gas (LFG) management system.

Design criteria for each of these systems are presented in the following sections. These criteria are based on:

- The Rules and Regulations for the GEPA Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 6;
- Current waste management practices for landfill closure;
- Input from DPW; and
- Input from the GEPA.

## 4.2    FINAL GRADING

The overall objectives for final grading and access road design for the closure design are as follows:

- Provide access to areas and facilities requiring maintenance and inspection;
- Generate final filling levels that maximize the quantity of waste that can be placed within the Dump without compromising the landfill stability and provision of positive drainage; and
- Account for long-term settlement to promote positive drainage over time.

Proposed design criteria for the Dump closure are summarized in the following sections.

### 4.2.1    DECK

The deck is that area of the top of the Dump, for which minimum surface grades are maintained. The criteria for design of the deck include:

- The minimum surface gradient of the deck or top slopes, at the time of cover construction, will be 5 percent; and
- The final grading shall be accomplished so as to facilitate redevelopment for parkland uses.

### 4.2.2    COVER SIDESLOPES

The sideslopes of the cover system have been designed in accordance with the following criteria:

- The construction grades during closure will conform to the contours developed by Operations and according to the final filling levels prepared by the Dueñas and Associates Project Team;
- The maximum sideslope will not exceed 1:1 with intermediate benches within the sideslopes to enhance stability; and
- Liner grades at surface water runoff control berms and ditches will be benched into the Dump sideslopes.

### 4.2.3    GENERAL REQUIREMENTS FOR ACCESS ROADS

Access around, and to the top of, the closed Dump shall be maintained throughout the post-closure period. For purposes of this document, two types of roads are considered: perimeter access roads around the perimeter of the main Dump footprint; and top access roads up the sideslope benches and around the deck. Design Drawing Sheet C-1 (Appendix B) provides an illustration of the access road(s) layout.

General access road requirements include:

- LFG pipe alignments located near access roads, wherever possible, to permit access to clean-outs for inspection and maintenance;
- A 30-inch-minimum vertical separation provided between the cover barrier and the road finished grade;

- A roadside ditch constructed adjacent to the cover sideslope. The roadside ditch will collect and convey surface water runoff from the road and surrounding cover surface; and
- A 3-percent minimum cross-slope grade will be provided toward a roadside ditch along the road interior.

### 4.2.3.1    PERIMETER ACCESS ROADS

The perimeter access roads around the Dump embankment provide access for maintenance and monitoring personnel. Requirements specific to perimeter access roads are as follows:

- The perimeter access roads around the Dump shall be a single lane in width;
- Service Duty: Light duty maintenance and grounds-keeping vehicles;
- The maximum longitudinal road grade shall be 6-percent;
- A geo-textile & geo-cell shall be placed beneath the crushed surface aggregate
- Perimeter access roads will have a minimum width of 15-feet for single lane roads & 24-feet for two-way traffic; and
- Perimeter access road surfacing materials shall consist of crushed surfacing aggregate.

### 4.2.3.2    TOP ACCESS ROADS

Access to the top of the Dump from the perimeter road will be provided in one location. The west top access road will continue to the center of the deck where a turn-around will be constructed. Requirements specific to the top access road are as follows:

- Top access roads shall be two-lanes wide for two-way traffic;
- Service Duty: Light duty maintenance and grounds-keeping vehicles;
- Passenger vehicles for post-closure access;
- Downslope road embankment sideslopes shall not exceed 2 (horizontal) to 1 (vertical);
- The maximum longitudinal road grade shall be 10-percent;
- A geo-textile & geo-cell shall be placed beneath the crushed surface aggregate;
- Top access roads shall have a minimum width of 24-feet, including shoulders;
- Top access road surfacing materials shall consist of crushed surfacing aggregate; and
- Barrier system to preclude off-road travel.

### 4.2.3.3    ACCESS CONTROLS

The following shall be the provided to control access to various closure components:

- Barrier system to preclude off-road travel;
- Barrier system to provide protection against steep embankments;
- Signage shall be provided where necessary;
- All critical area (LFG systems, generators) shall be fenced; and
- Padlocks shall be provided on all LFG extraction & monitoring wells, fence gates and groundwater monitoring wells.

### 4.3    COVER SYSTEM

The cover system for the Dump closure will consist of approximately 46-acres of final cover system. The area of final cover will be permanently closed.

Design Drawing Sheet C-12 (Appendix B) of the closure design provides an illustration of the infiltration layer. Design Drawing Sheets C-1, C-4, C-10 & C-11 (Appendix B) provide an illustration of the final cover system and corresponding cut sections.

## 4.3.1    FINAL COVER SYSTEM

The final cover system shall be in accordance with the Rules and Regulations for the GEPA Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 6  Specific criteria that will govern the final cover system installed as part of the Dump closure require that for the final cover system:

- The infiltration layer must have a permeability less than or equal to the permeability of any bottom liner system or natural sub soils present, or a permeability no greater than $1 \times 10^{-5}$-centimeters per second (cm/sec), whichever is less as per section §23601 (a)(1) of the GEPA Rules and Regulations;
- Minimize infiltration to the cover by the use of an infiltration layer that contains a minimum 18-inches of earthen material; and
- Minimize erosion of the final cover by the use of an erosion control layer that contains a minimum of 6-inches of earthen material that is capable of sustaining native plant growth.

### 4.3.1.1     FINAL COVER CROSS SECTION

The Dump closure final cover system for the deck and benches consists of the following components, from top to bottom:

- 6-inch thick erosion/vegetative layer (topsoil);
- 18-inch thick soil layer);
- Geocomposite infiltration collection/drainage layer to collect and convey surface water that may percolate through the 24-inch soil layers;
- 80-mil thick high density polyethylene (HDPE) geomembrane barrier layer;
- Geocomposite leachate seepage/LFG collection layer; and
- Minimum 6-inch thick soil cover layer, including the existing daily cover, above the waste, prepared to provide a suitable surface for construction of the Dump closure cover system. Additional soil cover shall be placed in localized area where waste protrudes through the 6-inch soil cover layer.

The Dump closure final cover system for the sideslopes differs from that of the deck and benches due to the potential instability of the cover material on 1:1 sideslopes. In this case, the geomembrane will be left exposed and overlain by a geogrid to facilitate vine vegetation and restrain against excessive displacement of the geomembrane under high wind conditions.  The vine vegetation will partially protect the geomembrane from ultraviolet light while still allowing rapid removal of water from the geomembrane surface. The exposed geomembrane is sufficiently resistant to UV exposure to ensure long term integrity of the system. This vine coverage will provide an aesthetic look to the closure cap.  The exposed geomembrane is not subject to erosion.  The exposed sideslopes are no-traffic areas.

## 4.3.2    COVER SYSTEM DESIGN CRITERIA

The design of the cover system shall conform to the requirements of the regulations.  The barrier layer for the system is an alternative to the prescriptive barrier.  Justification for this alternative is presented herein,

based on the criteria for equivalency. The primary components of the cover system for which design criteria must be developed include:

- The top soil layer;
- The barrier layer; and
- The leachate seepage/LFG collection layer.

These components of the final cover system are described below.

## 4.3.2.1    TOP SOIL LAYER – DECK AND BENCHES

The infiltration collection system for the final cover shall consist of a geocomposite installed directly above the barrier layer and overlain by a soil layer. The vegetative/erosion layer at the surface of the cover system will be incorporated into the soil layer. This infiltration collection layer shall only be applied to the deck and benches. The purpose of the infiltration collection layer will be to protect the geomembrane, provide ballast for stability and to ensure that the seepage height above the barrier layer is maintained below the established maximum. There are no regulatory requirements governing the design of the infiltration collection system, other than provision of an infiltration layer at least 18-inches thick.

The design criteria, key components, and function of the infiltration collection layer are summarized as follows:

- The geocomposite shall be placed over the entire footprint of the final cover system deck and benches. The geocomposite will ensure the removal of water that is able to infiltrate through the cover soils above the barrier layer.
- The maximum allowable seepage height is 0.2-inches, approximately corresponding to the thickness of the geonet core of the geocomposite. The veneer stability calculations demonstrate that this restriction ensures the stability of the landfill cover. This calculation can be found in the Ordot Dump Closure 100% Design Report (2005) by the Dueñas and Associates Project Team.
- Infiltration collector pipes will collect and convey the water off the cover system by daylighting into surface water conveyance ditches.
- No clean-outs will be provided for infiltration collector pipes. Clean-outs are not considered necessary because the pipe will daylight directly into surface water ditches and are accessible from the Dump surface without penetration of the cover barrier layer.
- The soil layer will be constructed of non-granular fine-grained material. This will limit the quantity of water that is able to infiltrate through the cover soils and inhibit to the underlying geocomposite and barrier layer. The final gradation of the infiltration soil layer will be dependent on the materials available locally to the site. The surface water management system will be designed to be consistent with the limited infiltration allowed by the infiltration soil layer. This soil layer will also provide the necessary ballast needed for uplift stability.

## 4.3.2.2    EXPOSED SIDESLOPES

The sideslopes will have exposed geomembrane and will not have an infiltration collection layer. The sideslopes will remain protected because the steep 1:1 slope does not make them trafficable. UV protection will be provided by the use of HDPE geomembrane and the presence of vegetative layer supported by a geogrid.

Articulate block matting armored ditch will be provided at the toe of each sideslope. This ditch will convey the runoff generated by the sideslopes and protect against scour.

### 4.3.2.3    BARRIER LAYER

The barrier layer is the critical component of the cover system, which inhibits the influx of precipitation into the waste after closure. This low permeability barrier may consist of a 1.5-foot thick layer of low permeability soil, having a hydraulic conductivity not greater than $1.0 \times 10^{-5}$ cm/sec. It shall be at least as impermeable as the bottom liner for the landfill. In the case of Ordot Dump, there is no bottom liner, so the $1.0 \times 10^{-5}$ cm/sec criterion applies. The regulations provide opportunity for the substitution of a different barrier layer, provided that it can be demonstrated that the substitution has equivalent protection and performance as that of the soil barrier. This process is called an equivalency demonstration, whereby the equivalent performance of the alternative barrier is shown by technical analysis. This demonstration can be found in the Ordot Dump Closure 100% Design Report (2005), by the Dueñas and Associates Project Team.

**HDPE Geomembrane**

For this application, an HDPE geomembrane material having the following properties is proposed:

- Nominal thickness of 80-mils;
- Textured on both sides to enhance the frictional properties of the geomembrane;
- Minimum tensile strength at break of 60 lb/in; and
- Minimum puncture resistance of 44 lb.

**HELP Model Analysis**

The results of the Hydrologic Evaluation of Landfill Performance (HELP) Model analyses was utilized to compare existing leachate generation at Ordot Dump to leachate generation after closure. The results suggest that the cover system will reduce the total infiltration rate from about 119 gpm, for the existing site conditions, to about 25 gpm, a decrease in volume of approximately 80 per cent . Detailed results of the HELP Model analysis are presented in the Ordot Dump Closure 100% Design Report (2005) by the Dueñas and Associates Project Team (DPT, 2005b).

### 4.3.2.4    LEACHATE SEEPAGE/LFG COLLECTION LAYER

A leachate seepage/LFG collection layer will be included in the cover system to protect the cover from damage. The mechanisms by which leachate seepage could potentially damage the cover include: uplift forces and a reduction in the slope stability. LFG could similarly damage the cover via uplift forces and reduction in slope stability. There are no regulatory requirements governing the design of the leachate seepage/LFG collection layer.

Leachate collected in the seepage collection layer below the barrier layer will be collected in seepage collection pipes and conveyed to a sump at the south end of the Dump. LFG will be collected in the collection layer and actively collected with the LFG extraction wells. Standard design practice for landfill closure relies on the use of a high permeability drainage sand or geocomposite material for a leachate seepage/LFG collection layer.

Specific design criteria for the leachate seepage/LFG collection layer include the following:

- A geocomposite layer will be provided above the prepared base grading and below the cover barrier;

- Seepage collection trenches with perforated collection pipe will be installed at benches constructed in association with surface water ditches;
- LFG active extraction wells will be installed along the deck and benches; and
- The leachate seepage/LFG collection layer will also be sized to accommodate removal of LFG condensate generated.

## 4.4     SURFACE WATER MANAGEMENT

Surface water management constructed as part of the Dump closure is consistent with the operational requirements of the regulations. Specific criteria that will govern the surface water control system (Rules and Regulations for the GEPA Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 3) include:

- A run-on control system to prevent flow onto the active portion of the Dump at all times, but especially during the peak discharge from a twenty five-year storm; and
- A runoff control system from the active portion of the Dump to collect and control at least the water volume resulting from a 24-hour, 25-year storm.

In addition to these requirements, the surface water management design is in accordance with the guidelines provided in the Commonwealth of the Northern Mariana Islands and Guam Stormwater Management Criteria (Horsley Witten Group, 2004) as requested by the Guam Environmental Protection Agency and Guam Storm Drainage Manual (U.S. Army Corps of Engineers, 1980). The greater values produced the two referenced manuals was used in determining the storm events. Surface water management has been designed to conform to the National Pollutant Discharge Elimination System (NPDES) requirements for discharge of surface water from the Dump to the Lonfit River.

### 4.4.1     GENERAL DESIGN CRITERIA

The surface water management system was designed to collect surface water runoff from the Dump closure area. The surface water management system will convey the surface water from the Dump to an area of detention and/or a sedimentation pond. A system of runoff control berms, ditches, and culverts will be installed. The runoff will be routed via gravity drainage. Overflow from the sedimentation pond will discharge to the Lonfit River.

The required capacity and performance of the sedimentation pond was determined as part of the surface water management design. Surface water run-on controls around the perimeter of the Dump closure will be modified to ensure consistency with the appropriate regulations.

The general design criteria to be adopted include the following:

- The surface water collection and conveyance facilities shall be designed to withstand anticipated settlement. This will be achieved through the provision of a substantial freeboard allowance and construction at grades such that flow paths are maintained following the anticipated settlements.
- Erosion control measures provided as part of the surface water control ditch construction above the waste will be flexible, such that they are not compromised by the anticipated settlements. Examples of suitable erosion control measures utilized, include erosion control matting, turf reinforcement matting, and armoring of ditches using Armorform. Asphalt-lined ditches may be used on native ground or structural fill.
- Rock armor reinforcement will be provided at all points of discharge from one ditch to another to deter erosion.
- Rock armor reinforcement will be provided at all culvert entrances and discharge points to deter erosion.

### 4.4.2     SPECIFIC DESIGN CRITERIA

Specific design criteria for surface water management facilities include the following considerations.

## 4.4.2.1    FLOWS

Flow within ditches and other conveyance measures shall be determined from the following:

- The peak flow resulting from a 24-hour duration, 25-year recurrence interval storm event, in accordance with the requirements specified in the regulations.
- Flow for the 100-year recurrence interval storm event will be evaluated to confirm that the surface water conveyance features will not fail.

## 4.4.2.2    DITCHES

The critical component of the surface water conveyance system is surface ditches on and around the Dump. Design criteria include:

- Ditches should be triangular or trapezoidal in shape to facilitate conveyance of both low and high flow volumes.
- Ditches shall be benched into waste, as necessary.
- Ditch sideslopes will be a maximum of 1:1.

## 4.4.2.3    RUNOFF CONTROL BERMS

Runoff control berms shall be provided as an erosion-resistant barrier to focus flows. Design criteria include:

- Adopt a minimum berm crest width of 1-foot.
- Control berms should produce ditches of triangular or trapezoidal shape, to facilitate conveyance of both low and high flow volumes.
- Sideslopes of berms should be a maximum of 2:1.

## 4.4.2.4    CULVERTS

Culverts shall be provided below roads and through berms, as required. Design criteria include:

- Size culverts to convey the peak flow for the 24-hour, 25-year storm event, such that the depth of headwater above the culvert invert does not exceed:
  - 1.5 times the culvert diameter for culverts larger than 18-inches in diameter; and
  - 2.0 times the culvert diameter for culverts 18-inches in diameter and smaller.
- Check that culverts will convey the peak 24-hour, 100-year flow under surcharged conditions without causing flooding or erosion problems.

## 4.4.2.5    SEDIMENTATION BASIN

The capacity of the sedimentation basin was designed such that sufficient capacity is provided to retain the surface water runoff from a 1-hour, 50-year storm event that would originate from areas designed to drain into the sedimentation pond.

All surface water runoff must go through the sedimentation basin prior to being discharged to the Lonfit River. The sedimentation pond and associated conveyance facilities will be designed to convey the excess surface water runoff resulting from a 24-hour, 100-year storm event. Excess water shall be managed by decanting from the sedimentation ponds to the Lonfit River.

## 4.5    EROSION AND SEDIMENTATION CONTROL

The objective of post-closure erosion and sedimentation control is to minimize sedimentation damage to on-site sensitive areas and off-site drainage systems. Disturbance of natural vegetation and soil conditions following closure activities increases susceptibility to erosion and sediment loading of surface water runoff, until such time as natural vegetation re-establishes. A plan for minimizing sediment-laden runoff from leaving the site after closure will be implemented. The plan incorporates the use of erosion and sedimentation control, as specified in the Guam Soil Erosion and Sediment Control Regulations.

### 4.5.1    GENERAL DESIGN CRITERIA

The erosion and sedimentation control design criteria presented herein are consistent with the methods presented in the Guam Soil Erosion and Sediment Control Regulations; and best management practices (BMPs) commonly used in similar construction. The basic principles of erosion and sedimentation control are as follows:

- Design the project to fit the natural topography, soils, and drainage patterns;
- Emphasize erosion control, rather than sedimentation control;
- Minimize the extent to which, and duration for which an area is exposed;
- Keep runoff velocities low;
- Retain sediment on-site; and
- Thoroughly monitor and maintain all erosion and sedimentation control measures.

Requirements for the control of fugitive dust will also be developed based on the Guam Air Pollution Control Standards and Regulations.

### 4.5.2    SPECIFIC DESIGN CRITERIA

To achieve effective erosion and sedimentation control during construction, the following BMPs will be employed:

- Clearing limits will be established;
- Cover measures, including nets, blankets, hydro seeding, or plastic, will be used, as required, to reduce exposed surface erosion;
- Perimeter protection will be provided through use of silt fences;
- Surface water control measures will be provided, including runoff control berms, ditches, inlet and outlet protection, and piping;
- Sediment retention will be provided by directing surface water flows to a sedimentation pond;
- Dust control measures will be implemented to minimize wind transport of soil onto roadways, drainage ways, and surface waters;
- Maintenance of erosion and sedimentation control measures will be on a regular basis, as required, to maintain the system's effectiveness; and
- Final site stabilization will occur prior to removal of temporary erosion and sedimentation control facilities installed during construction. All disturbed areas of the site will be vegetated or otherwise permanently stabilized.

## 4.6    LEACHATE SYSTEM

Leachate is formed generally when migrating water comes in contact with waste. Secondary sources of leachate include liquids contained in the waste at the time of disposal and liquids formed during decomposition of the waste.

The Dump was constructed within a southerly flowing ravine outletting to the Lonfit River. No bottom liner system or leachate collection system was constructed as part of the development of the Dump; however it is presumed that the existing soil is of low permeability and tends to provide a natural barrier layer. This barrier layer greatly reduces leachate flow into the natural groundwater and directs leachate flow out the southern base of the Dump. This leachate will then be collected by the closure leachate collection system, which was discussed in detail in Section 4.3.2.4 above. Once collected in a sump, leachate will be discharged to an off-site wastewater treatment plant.

## 4.7    LANDFILL GAS SYSTEM

The LFG system for the Dump closure will be designed to comply with the requirements of the regulations. Design Drawing Sheet LFG-1 (Appendix B) is provided to illustrate the locations of the landfill gas extraction and landfill gas monitoring systems. Specific criteria that will govern the LFG system installed include:

- Rules and Regulations for the GEPA Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 3; and
- Title 40, Chapter 1, Parts 51, 52, and 60 of the Code of Federal Regulations, commonly referred to as the New Source Performance Standards and Emission Guidelines (NSPS/EG).
- 61 FR 9919 Subpart WWW – Standards for Performance for Municipal Landfills

### 4.7.1    GENERAL DESIGN CRITERIA

The basic principles for the control of LFG for the Dump closure are as follows.

- Collect LFG generated in the Dump and burn it in a flare;
- Minimize gas migration, through the unlined sides and bottom of the Dump, to neighboring property;
- Minimize gas emissions through the lined top surface of the Dump.
- Ensure the concentration of methane gas generated by the facility does not exceed twenty-five percent of the lower explosive limit for methane in facility structures (excluding gas control or recovery system components;
- Ensure the concentration of methane gas does not exceed the lower explosive limit (5%) for methane at the facility property boundary;
- Meet NSPS/EG requirements;
  - Reduce non-methane organic compounds (NMOC) by at least 98% (by weight);
  - Have oxygen concentration less than 5% in LFG;
  - Landfill temperature does not exceed 131°F; and
  - Methane emissions do not exceed 500 parts per million (ppm) over the surface of the Dump; and
- Reduce landfill odors.

The LFG system will have the following major components.

- Extraction Wells: to withdraw LFG from the lower levels of the Dump.
- Interceptors: to capture LFG beneath the surface cover of the Dump.
- Piping: to collect and transport the LFG to the Flare System.
- Valve stations: to control the flow of LFG at the wells, interceptors, or other piping locations.
- Blowers: to apply vacuum to the piping system and draw LFG to the flare station.
- Flare: to combust odorous LFG and render it non-explosive.
- Instrumentation and controls: to operate the LFG system and determine LFG flow rate, pressure and temperature.

The LFG monitoring system will be provided around the perimeter of the closed landfill. This monitoring system will include:

- LFG Monitoring probes
- Gas Sampling ports
- Traffic barriers (as required)

A post-closure landfill gas monitoring plan is provided in the Ordot Dump Closure 100% Post-Closure Plan (2005), by the Dueñas and Associates Project Team.

## 4.8    GROUNDWATER MONITORING SYSTEM

As part of the Ordot Dump Closure project, a groundwater monitoring plan was prepared. This plan shall be implemented through 2007. In addition to the planned groundwater monitoring, there have been occasional water quality investigations. Generally, these investigations compared concentrations of select constituents of upstream water from the Lonfit River, leachate, and downstream water from the Lonfit River. The constituents focused on nitrogen and some heavy metals such as iron and manganese.

Three investigations were performed at the site and are well documented: one analysis by Black and Veatch in 1983; one study by Camp-Dresser-McKee in 1987; and one analysis by UNITEK in 1998 (Mink & Yuen, 2004). All three investigations demonstrated the same result: that result being that there were higher concentrations of constituents localized where the leachate entered the Lonfit River, but that within a short distance downstream of the Dump, contaminant levels returned to the approximate background concentrations.

A post-closure groundwater monitoring system will be installed and implemented in accordance with the GEPA Rules and Regulations for Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 5. The groundwater monitoring system will be operated and maintained for the entire post-closure period in accordance with the GEPA Rules and Regulations for Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 6. Any damage to the groundwater monitoring system shall be repaired as soon as it is detected. These repairs shall be performed as a component of the ongoing care and maintenance of the facility. Repairs shall be carried out using the same types of materials as were damaged or destroyed. Any questions or issues that may arise with regard to the groundwater monitoring system should be addressed by the Dueñas and Associates Project Team, through DPW.

The locations of the existing and new groundwater monitoring wells may be found in Design Drawing Sheet G-1 (Appendix B).

## 5.0  ADMINISTRATION REQUIREMENTS

### 5.1  CLOSURE PROCEDURES

Closure procedures are fully documented by a set of construction documents, including the 100% Design Report, Design Drawings, Specifications, Construction Quality Assurance Plan, Construction Schedule, and Post-Closure Care and Maintenance Plan for the facility. These documents provide the minimum criteria for work activities. All work shall conform to the regulatory requirements prescribed in 40 Code of Federal Regulations (CFR), Part 258 (Subtitle D) and the GEPA Rules and Regulations for Solid Waste Disposal, Title 22, Division 4, Chapter 23. Closure construction will be monitored by the full-time presence of a representative of the design engineer, a construction manager, and construction quality assurance personnel for the design engineer, to ensure that the intent of the design is met and that the construction documents are adhered to.

Construction work will be product oriented with the contractor responsible for execution of the work, all forms of construction-related environmental compliance, and acceptance of the final end product. The contractor will be required to conform to 40 CFR Part 265 Subparts F through R. The important issues associated with these sections are:

- All workers, who may contact waste, are health and safety trained;
- The potential offsite migration of waste or waste products (e.g., leachate and landfill gas) will be controlled;
- Human health and the environment shall be protected;
- Safe working conditions shall be maintained;
- Safety records shall be maintained;
- Proper permits shall be obtained and maintained; and
- Emergency action plans shall be established for the event of a spill or accident.

DPW will obtain necessary approvals in accordance with the applicable regulations and provisions of the Consent Decree, and notify the Director of the GEPA before beginning closure of Ordot Dump.

### 5.2  HEALTH AND SAFETY

All engineering and contractor personnel who perform excavation, handling, sampling, and monitoring of the soils and water during the closure of the Dump will be subject to Occupational Safety and Health Administration standards for hazardous waste operations (29 CFR Part 1910). A Health and Safety Plan will be prepared describing procedures to be followed to protect all on-site personnel involved with or affected by closure activities. Of particular importance, the Health and Safety Plan will include the following information:

- Selection of adequate personal protective equipment;
- Establishment of work zones;
- Decontamination procedures;
- Emergency response procedures; and
- Personnel training program.

An on-site Safety Supervisor will be designated and be present on-site during construction. This person will be responsible for enforcing the Health and Safety Plan by conducting daily safety meetings for all on-site personnel performing closure activities, supervising all necessary workplace monitoring, documenting all health and safety related incidents, and requiring all personnel who enter the work area to wear appropriate protective clothing and follow all safety procedures.

## 5.3    QUALITY ASSURANCE/QUALITY CONTROL

Construction quality assurance and construction quality control (CQA/CQC) procedures will be implemented to ensure that closure activities are conducted in accordance with this Closure Plan and the contract documents. The on-site representative of the registered professional civil engineer responsible for certifying closure will be present on a regular basis to conduct inspections and on a full-time basis at critical stages of closure.

On-site QC will be conducted by the contractor to verify the documentation of the closure activities. An inspection of the sampling procedure will verify the sampling locations and methodology used during the collection of each sample. The CQA manager will be responsible for providing necessary oversight and audits to ensure compliance with the plan.

## 5.4    CERTIFICATION OF CLOSURE

Following the closure of Ordot Dump, DPW will notify the Administrator of GEPA that a certification, signed by a registered professional engineer, verifying that closure has been completed in accordance with the plan, has been placed in the operating record.

DPW will record a notation on the deed to the Dump facility property notifying any potential purchaser of the property that the land has been used as a disposal facility and its use is restricted.

## 5.5    POST-CLOSURE MAINTENANCE

The construction documents will also contain requirements for the on-going maintenance of the cover system and monitoring systems following final closure. A Post-Closure Plan has been prepared in accordance with Rules and Regulations for the GEPA Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 6. Key items of post-closure include:

- Maintaining the integrity and effectiveness of the final cover;
- Maintaining and operating the leachate collection system;
- Monitoring groundwater and maintaining the monitoring system; and
- Maintaining the LFG control system and monitoring LFG migration.

The post-closure maintenance period is anticipated to encompass 30 years.

## 6.0   REFERENCES

CFR, Title 29, Part 1910 – Occupational Safety and Health Standards.

CFR, Title 40, Part 257 – Criteria for Classification of Solid Waste Disposal Facilities and Practices.

CFR, Title 40, Part 258 – Criteria for Municipal Solid Waste Landfills.

CFR, Title 40, Part 265 – Interim Status Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities.

Dames & Moore (1978), Solid Waste Management and Resources Recovery Feasibility Study for the Territory of Guam.

DPT, 2005a, Dueñas and Associates Project Team (2005), Ordot Dump 100% Operations Plan.

DPT, 2005b, Dueñas and Associates Project Team (2005), Ordot Dump Closure 100% Design Report.

DPT, 2005c, Dueñas and Associates Project Team (2005), Environmental Baseline Survey.

DPT, 2005b, Dueñas and Associates Project Team (2005), Ordot Dump Closure 100% Post-Closure Plan.

Environmental Laboratory USAE Waterways Experiment Station (1997), Hydrologic Evaluation of Landfill Performance.

GEPA (2004), Guam Soil Erosion and Sediment Control Regulations.

GEPA, Rules and Regulations for the Guam Environmental Protection Agency Solid Waste Disposal, Title 22, Division 4, Chapter 23.

Greanleaf/Telesca Ahn (1970), Operational Plan for Solid Waste Management, Territory of Guam, December 1970.

Horsley Witten Group (2004), Commonwealth of the Northern Mariana Islands and Guam Stormwater Management Criteria.

Juan C. Tenorio & Associates (1998), Draft Environmental Impact Statement, Municipal Solid Waste Landfill for the Island of Guam, Volume I.

Mink & Yuen (2004), Geology and Hydrogeology of Ordot Dump.

National Climate Data Center (2004), www.ncdc.noaa.gov.

U.S. Army Corps of Engineers (1980), Guam Storm Drainage Manual.

USEPA Code of Federal Regulations, 1998. Title 40, Chapter 7, Parts 51, 52, and 60.

Weatherbase (2004), www.weatherbase.com/weather/weather.php3?s=121219.

**APPENDIX A**
Title 22, Division 4, Article 6 (§23601) of the Rules and Regulations for the Guam
Environmental Protection Agency (GEPA) Solid Waste Disposal

# RULES AND REGULATIONS FOR THE GUAM ENVIRONMENTAL PROTECTION AGENCY (GEPA) SOLID WASTE DISPOSAL

## Title 22

## Division 4

## Chapter 23

## Article 1

### General regulations

§23101.        Purpose, scope, and applicability.

§23102.        Definitions.

§23103.        Consideration of other federal laws.

§23104.        Solid waste management permit system.

## Article 2

### Location restrictions

§23201.        Airport safety.

§23202.        Flood plains.

§23203.        Wetlands.

§23204.        Fault areas.

§23205.        Seismic impact zones.

§23206.        Unstable areas.

§23207.        Closure of existing municipal solid waste landfill units.



## Article 6

### Closure and post-closure care

§23601.        **Closure criteria.**  (a)  Owners or operators of all MSWLF units must install a final cover system that is designed to minimize infiltration and erosion.  The final cover system must be comprised of an erosion layer underlain by an infiltration layer as follows:

(1)        the infiltration layer must be comprised of a minimum of Eighteen (18) inches of earthen material that has a permeability less than or equal to the permeability of any bottom liner system or natural subsoils present, or a permeability no greater than $1 \times 10^{-5}$ cm/sec, whichever is less, and

(2)        the erosion layer must consist of a minimum Six (6) inches of earthen material that is capable of sustaining native plant growth.

(b)        The Administrator may approve an alternative final cover design that includes:

(1)        an infiltration layer that achieves an equivalent reduction in infiltration as the infiltration layer specified in Item (1) of Subsection (a) of this §23601; and

(2)        an erosion layer that provides equivalent protection from wind and water erosion as the erosion layer specified in Item (2) of Subsection (a) of this §23601.

(c)        The owner or operator must prepare a written closure plan that describes the steps necessary to close all MSWLF units at any point during its active life in accordance with the cover design requirements in Subsections (a) or (b) of this §23601, as applicable.  This plan must be approved by Guam EPA prior to the initiation of closure activities.  The closure plan, at a minimum, must include the following information:

(1)        a description of the final cover, designed in accordance with Subsections

84

(a) of this §23601 and the methods and procedures to be used to install the cover;

    (2)    an estimate of the largest area of the MSWLF unit ever requiring a final cover as required under Subsections (a) of this §23601 at any time during the active life;

    (3)    an estimate of the maximum inventory of wastes ever on-site over the active life of the landfill facility; and

    (4)    a schedule for completing all activities necessary to satisfy the closure criteria in this §23601.

(d)    The owner or operator must notify the Administrator that a closure plan has been prepared and placed in the operating record immediately or by the initial receipt of waste, whichever is later.

(e)    Prior to beginning closure of each MSWLF unit as specified in Subsections (f) of this §23601, an owner or operator must notify the Administrator that a notice of the intent to close the unit has been placed in the operating record.



(f)    The owner or operator must begin closure activities of each MSWLF unit no later than Thirty (30) days after the date on which the MSWLF unit receives the known final receipt of wastes or, if the MSWLF unit has remaining capacity and there is a reasonable likelihood that the MSWLF unit will receive additional wastes, no later than One (1) year after the most recent receipt of wastes. Extensions beyond the One (1) year deadline for beginning closure may be granted by the Administrator if the owner or operator demonstrates that the MSWLF unit has the capacity to receive additional wastes and the owner or operator has taken and will continue to take all steps necessary to prevent threats to human health and the environment from the unclosed MSWLF unit.

85

(g)　The owner or operator of all MSWLF units must complete closure activities of each MSWLF unit in accordance with the closure plan within One hundred and eighty (180) days following the beginning of closure as specified in Subsection (f) of this §23601. Extensions of the closure period may be granted by the Administrator if the owner or operator demonstrates that closure will, of necessity, take longer than One hundred and eighty (180) days and he has taken and will continue to take all steps to prevent threats to human health and the environment from the unclosed MSWLF unit.

(h)　Following closure of each MSWLF unit, the owner or operator must notify the Administrator that a certification, signed by an independent registered professional engineer and approved by the Administrator, verifying that closure has been completed in accordance with the closure plan, has been placed in the operating record.

(i)　Following closure of all MSWLF units, the owner or operator must record a notation on the deed to the landfill facility property, or some other instrument that is normally examined during title search, and notify the Administrator that the notation has been recorded and a copy has been placed in the operating record.

(j)　The notation on the deed must in perpetuity notify any potential purchaser of the property that:

(1)　the land has been used as a landfill facility; and

(2)　its use is restricted under Item (3) of Subsection (c) of this §23602.

(k)　The owner or operator may request permission from the Administrator to remove the notation from the deed if all wastes are removed from the facility.

§23602.　Post-closure care requirements.　(a)　Following closure of each

86

MSWLF unit, the owner or operator must conduct post-closure care. Post-closure care must be conducted for Thirty (30) years, except as provided under Subsection (b) of this §23602, and consist of at least the following:

(1) maintaining the integrity and effectiveness of any final cover, including making repairs to the cover as necessary to correct the effects of settlement, subsidence, erosion, or other events, and preventing run-on and run-off from eroding or otherwise damaging the final cover;

(2) maintaining and operating the leachate collection system in accordance with the requirements in §23401 of this Chapter. The Administrator may allow the owner or operator to stop managing leachate if the owner or operator demonstrates that leachate no longer poses a threat to human health and the environment;



(3) monitoring the ground-water in accordance with the requirements of Article 5 of this Chapter and maintaining the ground-water monitoring system, if applicable; and

(4) Maintaining and operating the gas monitoring system in accordance with the requirements of §23306.

(b) The length of the post-closure care period may be:

(1) decreased by the Administrator if the owner or operator demonstrates that the reduced period is sufficient to protect human health and the environment and this demonstration is approved by the Administrator; or

(2) increased by the Administrator, if the Administrator determines that the lengthened period is necessary to protect human health and the environment.

87

(c)     The owner or operator of all MSWLF units must prepare a written post-closure plan that includes, at a minimum, the following information:

(1)     a description of the monitoring and maintenance activities required in Subsection (a) of this §23602, for each MSWLF unit, and the frequency at which these activities will be performed;

(2)     name, address, and telephone number of the person or office to contact about the facility during the post-closure period; and

(3)     a description of the planned uses of the property during the post-closure period. Post-closure use of the property shall not disturb the integrity of the final cover, liner(s), or any other components of the containment system, or the function of the monitoring systems unless necessary to comply with the requirements in this Chapter. The Administrator may approve any other disturbance if the owner or operator demonstrates that disturbance of the final cover, liner or other component of the containment system, including any removal of waste, will not increase the potential threat to human health or the environment. 

(d)     The owner or operator must notify the Administrator that a post-closure plan has been prepared and placed in the operating record immediately or by the initial receipt of waste, whichever is later.

(e)     Following completion of the post-closure care period for each MSWLF unit, the owner or operator must notify the Administrator that a certification, signed by an independent registered professional engineer and approved by the Administrator, verifying that post-closure care has been completed in accordance with the post-closure plan, has been placed in the

88

**APPENDIX B**
**Design Sheet References**







NOTES:

1. CONTOURS SHOWN WITHIN THE LINER LIMIT REPRESENT APPROXIMATE FINISHED GRADE CONTOURS. ACTUAL FINISHED GRADE CONTOURS WILL BE ADJUSTED, AS REQUIRED, IN THE FIELD BY THE ENGINEER OF RECORD TO ACCOUNT FOR SETTLEMENT AND FINE GRADING. FINISHED GRADE IS THE TOPOGRAPHY FOLLOWING THE COMPLETION OF CLOSURE CONSTRUCTION.

2. CONTRACTOR SHALL PROTECT ALL EXISTING FEATURES, UNLESS SPECIFICALLY NOTED (SEE C-2).

LEGEND:

| | STREAM |
| --- | --- |
| | LINER LIMIT |
| | WETLAND DELINEATION |
| | FINAL LIMIT OF WASTE |

SCALE IN FEET
100  0  100  200

GOVERNMENT OF GUAM
DEPARTMENT OF PUBLIC WORKS
SOLID WASTE DIVISION

| TERRITORY | PROJECT NAME | | |
| --- | --- | --- | --- |
| GUAM | ORDOT DUMP CLOSURE | | DWG. NO. |
| | FINAL COVER SYSTEM PLAN | | C-4 |
| | PROJECT NO. EPA-09-2004 (VXI) | | SHEET 13 of 80 |





Case 1:02-cv-00022     Document 190-7     Filed 01/14/2008     Page 37 of 39





**APPENDIX C**
**Closure Schedule**



# Ordot Dump Closure
## Guam Department of Public Works
## Construction Schedule

| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 1 | Landfill Receiving Waste | 692 days | Fri 7/8/05 | Sat 9/22/07 |
| 2 | Advertise for Bids | 0 days | Wed 1/11/06 | Wed 1/11/06 |
| 3 | Award Contract | 0 days | Fri 4/21/06 | Fri 4/21/06 |
| 4 | Contractor Mobilization | 24 days | Mon 4/24/06 | Sat 5/20/06 |
| 5 | Site Preparation (Staging Areas, Roads, Construction ESC, Pond) | 36 days | Mon 5/22/06 | Sat 7/1/06 |
| 6 | Waste Excavation and Relocation | 126 days | Mon 7/3/06 | Sat 11/25/06 |
| 7 | Grading | 450 days | Mon 7/3/06 | Sat 12/8/07 |
| 8 | Leachate Collection System (Perimeter Trenches, Manholes, Pump Station, Tank) | 78 days | Mon 8/14/06 | Sat 11/11/06 |
| 9 | MSE Wall | 48 days | Mon 9/4/06 | Sat 10/28/06 |
| 10 | LFG System (Interceptors, Headers, Wells, Probes, Flare Station) | 390 days | Mon 8/14/06 | Sat 11/10/07 |
| 11 | Cover System (Infiltration Trenches, Geosynthetics, Cover Soils, Infiltration Collection) | 414 days | Mon 8/28/06 | Sat 12/22/07 |
| 12 | Surface Water Management System (Chutes, Ditches, Berms) | 414 days | Mon 9/11/06 | Sat 1/5/08 |
| 13 | Vegetation and Final ESC | 414 days | Mon 9/25/06 | Sat 1/19/08 |
| 14 | Contractor Demobilization | 24 days | Mon 1/21/08 | Sat 2/16/08 |

Date: Fri 7/8/05    Active Waste Receipt [ ]    Task [ ]    Milestone ◆

Notes:
1. Duration reflects working days, based on 6 working days per week.
2. Construction Schedule does not account for delays caused by significant storm events. Not-To-Extend date should have buffer to accommodate such events.

# APPENDIX E

## *Value Engineering Report*
## *Ordot Dump Closure, Guam*
## *(December 2005)*

# *Value Engineering Report*



# Ordot Dump Closure, Guam

*December 2005*



**VMS**
Value Management Strategies, Inc.

*Conducted by*

**TG Engineers, P.C. and Value Management Strategies, Inc.**

# Table of Contents

# TABLE OF CONTENTS

Page No.

1. TABLE OF CONTENTS ........................................................................................ 1.1

2. EXECUTIVE SUMMARY ..................................................................................... 2.1

Introduction ................................................................................................................ 2.1
Project Description ..................................................................................................... 2.1
Consent Decree Summary .......................................................................................... 2.2
Project Constraints ..................................................................................................... 2.2
Project Issues ............................................................................................................. 2.3
Project Analysis ......................................................................................................... 2.3
VE Alternatives ......................................................................................................... 2.5
VE Team and Process ................................................................................................ 2.13

3. VALUE ENGINEERING ALTERNATIVES ........................................................ 3.1

Introduction ................................................................................................................ 3.1
VE Alternatives ......................................................................................................... 3.1
Evaluation of Alternatives ......................................................................................... 3.1
Design Suggestions .................................................................................................... 3.1
Summary of VE Alternatives and Sets ...................................................................... 3.2
Summary of VE Alternatives and Design Suggestions .............................................. 3.4
Performance Attributes Rating and Parameter Scales ............................................... 3.9
Design Suggestions .................................................................................................... 3.17
VE Alternative Documentation .................................................................................. 3.31

4. PROJECT ANALYSIS ......................................................................................... 4.1

Summary of Analysis ................................................................................................. 4.1
Constraints and Project Issues ................................................................................... 4.2
Cost Model ................................................................................................................. 4.3
Function Analysis ....................................................................................................... 4.6

5. PROJECT DESCRIPTION .................................................................................. 5.1

Introduction ................................................................................................................ 5.1
Project Description ..................................................................................................... 5.1
Estimated Cost ........................................................................................................... 5.2
Estimated Schedule .................................................................................................... 5.5

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 6 of 52

**6. IDEA EVALUATION** ........................................................................................ 6.1

Introduction ........................................................................................................ 6.1
Evaluation Process ............................................................................................. 6.1
Idea Evaluation Forms ....................................................................................... 6.2


**7. VALUE ENGINEERING PROCESS** ...................................................... 7.1

General ................................................................................................................ 7.1
Pre-Study Preparation ....................................................................................... 7.1
VE Study .............................................................................................................. 7.1
Post-Study Procedures ....................................................................................... 7.1
References ........................................................................................................... 7.3
VE Study Agenda ............................................................................................... 7.4
VE Study Participants ........................................................................................ 7.6

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 7 of 52

# Executive Summary

# EXECUTIVE SUMMARY

## INTRODUCTION

This Value Engineering (VE) Report summarizes the VE Study conducted by Value Management Strategies, Inc., October 24–28, 2005, for the Guam Department of Public works (DPW). The subject of the study was the 100% design submittal Closure Plan and Post-Closure Plan for the closure of the Ordot Dump, Guam.

The purpose of the VE Study was to identify viable alternatives to enhance the project's value and functionality.

## PROJECT DESCRIPTION

The Ordot Dump Closure Project is located in Ordot, Guam. The closure of this active municipal waste dump site will be performed in accordance with Title 22, Division 4, Chapter 23, Article 6 (§23601) of the Rules and Regulations for the Guam Environmental Protection Agency (GEPA) Solid Waste Disposal and Part IV of the Solid Waste Management Facility Permit Application, Landfill, at the request of the Government of Guam, Department of Public Works (DPW).

The starting date for the use of the site as a dump is not documented, but it is known that the Ordot Dump was in use during World War II. The dump was used as a disposal area by the Japanese during the Japanese occupation of Guam from December 8, 1941 to July 21, 1944. Following the liberation of Guam, the U.S. Navy continued to use the site as a disposal area. Ownership of the Ordot Dump was transferred from the United States Naval Government of Guam to the Government of Guam in 1950 under the Organic Act. Since then, the Government of Guam, specifically the DPW, has been operating the Ordot Dump as a municipal solid waste disposal facility.

The Dump is located approximately 2.5 miles south of Guam's capital, Hagatna, and about one mile west of the Route 4/Dero Drive intersection. The area surrounding the Dump is a dense brush, wooded area with scattered residences. The nearest residences are approximately 200 feet from the Dump. The Dump is situated in a ravine that is a tributary to the Lonfit River, located approximately 500 feet to the south of the site.

The Dump occupies and borders property of the Government of Guam on the northeast, east, south, and southwest boundary lines of the Dump. The north and west limits of the Dump border public land in the form of a road and privately owned land, respectively.

The Dump waste footprint area, based on the 2004 limits of waste delineation performed by Dueñas & Associates, Inc. and projected filling footprint per the Operations Plan (Dueñas & Associates Project Team (DPT, 2005a), has been estimated to be 46.8 acres. This waste footprint area will be reduced to approximately 45.8 acres during closure construction, as waste will be relocated from the western edge of the Dump and consolidated behind a mechanically stabilized earth (MSE) wall (DPT, 2005b). The precise limits of waste will be defined as a part of the Dump closure construction. The final waste volume of the Dump at the time of closure will be approximately 4.4 million cubic yards (DPT, 2005a).

Case 1:02-cv-00022　　Document 190-8　　Filed 01/14/2008　　Page 9 of 52

The Dump is an unlined disposal facility and has few to no control systems to manage landfill gas, leachate, surface water, erosion and sedimentation, or vectors.

The Dump closure design includes the following construction elements:

- Final grading and layout of the Dump, including provision of access roads and surface drainage features, constructed over the final cover area
- A final cover system, constructed over an approximately 45.8-acre footprint area
- A leachate management system
- A surface water management system that intercepts clean surface water runoff from the closed area and conveys it to the on-site sedimentation ponds
- Erosion and sedimentation control facilities
- An active landfill gas (LFG) management system

The cost estimate for the project, as developed by URS Corporation, is $22,398,925.

## CONSENT DECREE SUMMARY

The Ordot Consent Decree of February 11, 2004, signed by the Government of Guam and the United States of America (U.S. Environmental Protection Agency), mandates that Guam must implement an Ordot Closure Plan, close the Ordot Dump, and open a new municipal solid waste landfill by September 2007. The consent decree does not identify a specific location for the new landfill site. Rather, the decree requires the Government of Guam to prepare a detailed analysis, with public input, of at least three potential sites before it identifies its preferred alternative for the landfill site.

In a 45-month period, the consent decree requires the Government of Guam to:

- Complete an environmental impact statement analyzing at least three potential new landfill locations
- Complete design, permitting, and construction for the selected landfill location
- Begin operations at the new landfill
- Properly and permanently close the Ordot Dump

The Government of Guam will also complete a $1 million dollar supplemental environmental project to develop an island household hazardous waste diversion and management program. In addition, the Government of Guam will pay $200,000 to resolve the United States' claims.

## PROJECT CONSTRAINTS

The VE team identified the following constraint to be considered with the development of possible alternatives to improve the project:

- Design in accordance with Rules and Regulations of GEPA Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 6

**PROJECT ISSUES**

The VE team identified a number of issues to be considered with the development of possible alternatives to improve the project. These issues include:

- Meet requirements specified in Consent Decree of February 11, 2004, Civil Case No. 02-00022
- Need to meet the requirements of the draft permit for continued use of Ordot during closure construction
- Needs of Operations takes precedence over all aspects of closure work
- Coordination with ongoing landfill operations
- Provision of adequate anchorage for barrier against wind and water penetration; exposure of geomembrane on steep slopes to potential wind-generated uplift forces
- Limit seepage height and ensure that cover soil is not saturated
- Provision for adequate time for manufacturers to produce and deliver materials to Guam; it is imperative to the construction schedule that manufacturing and shipping delays be minimized
- Piping may be subject to clogging from biological growth, siltation, and chemical growth
- Minimize gas migration offsite and into atmosphere
- Impacts of significant storm events and annual rainfall
- Construction scheduling to avoid wet season problems
- Adequate airspace for final placement of material at Ordot and to meet the schedule for the new landfill
- Discharge of pollutants to the Lonfit River is the issue dictated by the consent decree rather than protection of groundwater
- Fire prevention
- Protection/encroachment to wetlands and private property
- Adequacy of prediction of leachate production volumes and rates, and assumptions made to HELP model
- Need for Environmental Compliance Officer
- Maximum allowable bench height and slopes
- Performance of covered dump under seismic forces
- Magnitude of future settlement of waste
- Public safety liability if access to the closed landfill is permitted

**PROJECT ANALYSIS**

The VE team used VE tools to analyze the project. The results of these analyses clarified the Ordot Dump Closure Project and identified *Protect Environment and Health* as the basic function, with key secondary functions of *Satisfy (CERCLA D) Regulations,* and *Satisfy Consent Decree* as other critical project functions that have a significant impact on the decisions that affect the project design decisions and costs.

The cost model developed clearly showed the cost drivers for the project, and it was used to guide the VE team during the VE Study. The general cost drivers were:

- Capping Systems = $7,848,105 (38.6%)
- Surface Water Systems = $44,038,920 (19.9%)
- MSE Wall System = $3,303,565 (16.3%)
- Mobilization and Miscellaneous Allowances = $2,126,500 (10.5%)

These items account for ~85% of the project cost. Looking deeper into the cost estimate, the following subcategories are found to be the key significant cost drivers:

- Capping System
  - Geocomposite = $2,301,845 (10.3%)
  - HDPE Geomembrane = $1,989,375 (8.9%)
  - Geogrid = $1,301,025 (5.8%)
  - Native Fill = $1,473,180 (6.6%)
- Surface Water Systems
  - Berms = $1,574,200 (7.0%)
  - Bench Ditches = $1,157,200 (5.2%)
- MSE Wall Systems
  - Waste Excavation & Replacement Relocation = $1,354,500.(6.0%)
  - Waste Excavation & Replacement = $1,006,000 (4.5%)
- Mobilization and Miscellaneous Allowances
  - Mobilization = $2,000,000 (8.9%)

These key items account for ~63% of the project cost.

**Performance Considerations**

The VE team identified five key performance considerations for this project. Listed below is a narrative of how the Original Concept satisfies each of the performance measures.

*Operational Impacts (OI).* Operational impacts involve how an alternative idea might interfere with the normal daily operations of the landfill at the same time that closure construction is occurring. The objective is to avoid or at least minimize such impacts, or to suggest ways to improve existing operations, recognizing that landfill operations take precedent.

*Materials Availability (MA).* Because of the difficulties associated with obtaining materials on Guam, provision for adequate time for manufacturers to produce and deliver materials to Guam is essential. Any alternative idea that creates the potential for greater difficulties procuring materials from on- and off-

island would not be preferred. In addition, any idea that allows the use of Guam resources without having to go off-island, would be preferred.

*Schedule (S)*. In order to meet the requirements contained in the consent decree, it is imperative that the construction schedule be met. Manufacturing and shipping delays should be minimized. Impacts of significant storm events and annual rainfall, as they relate to construction during the wet season, should also be minimized or avoided. Any alternative idea that can avoid these risks, optimize use of available airspace, and/or accelerate the construction schedule would be preferred.

**Construction Process (CP).** Construction complexity that will assess specific areas of construction difficulty, including planned process of installation, risk reduction, and the potential for change orders, claims and work stoppages; logistics; materials availability; adverse geotechnical conditions, etc. Any option that simplifies the construction process while reducing risks is preferred.

*Environmental Impacts (EI)*. The closure design, including post-closure operations and maintenance, for the dump, should take steps to improve and/or protect the existing environment, including existing wetlands, the Lonfit River, and groundwater, in addition to monitoring for future fires. Any idea that acts to improve environmental conditions of the immediate area and groundwater would be preferred.

## VE ALTERNATIVES

The VE team developed nineteen alternatives for improvement of the project. Thirteen of these alternatives improve cost and maintain or improve functionality, three alternatives add cost to improve functionality of the project, and three alternatives were found not to significantly influence the project costs, but were important to improving performance. Forty-two design suggestions were also developed to improve the project—the cost impact of these items being either insignificant or not possible to be quantified. In addition, three Estimate Corrections were documented to address items that were not adequately included in the initial cost estimate. Summary lists of the VE alternatives and design suggestions are in a following report section; descriptions the VE alternatives are given below. The alternative numbers reference the significant project function identified by the VE team: MF = Manage Fluid, ED = Enclose Dump, MS = Meet Schedule, and GI = General Ideas.

| Alternative Number | Description | Initial / *LCC* Savings Potential |
|---|---|---|
| MF-5 | **In lieu of Large Detention Pond, Use Smaller Independent Desiltation System in Various Areas (e.g., Distributive Flow)** | $23,000 |

The proposed distribution system will result in smaller, more flexible systems. It also eliminates the need for the large detention pond. It is anticipated that such an approach would provide better distribution of water to adjacent wetlands prior to reaching the Lonfit River. This would support the wetlands and also provide the desired filtration of any remnant sediment prior to reaching the river. In addition, by not constructing the detention pond, a large area of wetlands is preserved.

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 13 of 52

| Alternative Number | Description | Initial / LCC Savings Potential |
|---|---|---|

MF-6 **Put Gas Collection Headers and Piping Above Barrier Layer, but Below Grade**     $26,000

Revise the design to install the LFG header and lateral collection pipes above the barrier layer (but below grade where appropriate). Access to the LFG header and collection pipes is essential during the 30-year post-closure period, particularly in areas that are subject to differential settlement. By placing the LFG collection pipes above the barrier layer, they will be readily accessible for future modification and/or repair.

MF-7 **Utilize a Passive Gas Collection System**     $994,000

The current design is for an active gas extraction system with gas wells, underground collection piping, headers, pump, landfill gas leachate collection, and flare. The aboveground parts of an active landfill gas system are subject to typhoon damage. Replace with a passive landfill gas system that vents directly to the atmosphere, which will be a much simpler system with less piping, gas condensate production, and monitoring.

MF-10 **Treat Leachate Through a Constructed Wetland**     $280,000/ *$7,082,000*

The current design does not address removal of leachate from the storage tank. This assumes that the leachate will be removed from collection tanks and trucked to the sewer system. An Industrial wastewater discharge permit will be required, with testing for disposal into the sewer system. This alternative recommends feeding collected leachate into constructed wetland or a packaged wetland system for treatment. Strength and volume of the leachate will affect the choice. Monitoring and long-term operations are required. An NPDES will be required. NPDES will already be required for stormwater discharges from the site.

MF-12 **Utilize Pipeline to Convey Leachate to Sanitary Sewer System**     $90,000/ *$7,241,000*

The justification for the concept to construct a piping system for the leachate from the Ordot Dump centered on finding a more cost-effective and environmentally acceptable means, other than trucking over public highways. The costs issues focused on trucking equipment, operations and maintenance, and their availability—meaning having an ample number of trucks with enough capacity for the daily haul. The need to transport the leachate without having large numbers of trucks constantly traveling the highways loaded with waste liquids was also a driving point to use piping. The potential for spills and accidents further exposing the leachate to the public needed to be minimized. If a piping system is installed, the initial costs are incurred in the construction and then forgotten. There may be periodic maintenance cleanout

| Alternative Number | Description | Initial / LCC Savings Potential |
|---|---|---|

**MF-14**  **Eliminate Leachate Drainage Layer (Geocomposite) on Top Deck**  $29,000

The design calls for native fill above a geogrid, which is on top of a geocomposite. Underneath the geocomposite is a geomembrane, which overlays a second geocomposite that is underlain by at least six inches of a soil layer. The alternative design calls for the removal of the second geomembrane that lies just beneath the geomembrane on the top deck. There is no other change to the original design within this detail.

**MF-15**  **Replace Articulated Block Mattress with Asphalt**  $1,183,000

The current design will construct a stormwater collection system by using articulated block mattress (ABM). This alternative will use asphalt in place of ABM. Using asphalt will be advantageous, considering not only the initial cost but maintenance cost as well. Asphalt is readily available on the island, easy to repair, and maintenance cost is minimal.

**MF-27**  **Reevaluate Input Parameters to HELP Model for Site-Specific**  N/A
**Reasonableness to Ordot**

The existing HELP Model for the Ordot Dump Closure was provided with results for leachate generation. The VE team recommends that another HELP Model calculation be conducted using the latest version, which requires input of more accurate and representative data. A more accurate model will lead to a more accurate and efficient design, which will better protect the environment.

**MF-28**  **Hydroseed Slopes and Benches (with Tacking Compound)**  $2,163,000
**Early in the Construction Process to Eliminate Detention Pond**

The design calls for a large detention pond at the bottom (south side of landfill) of the existing dump. The alternative calls for hydroseeding the slopes and benches with seeds and a tactifying agent early on in the construction process, which is expected to eliminate the detention pond at the south edge of the site.

**ED-1**  **Use Prescribed Cover**  $6,314,000

The current design calls for an 80-mil HDPE cap to close the Ordot Dump waste mass. The Ordot Dump is an unlined solid waste disposal facility in an area of 100 inches of rainfall. Maintenance cost for a synthetic cover is higher than for a soil cover. This alternative replaces the complex multilayered design cover with a prescribed cover in accordance with Federal rule, 40CFR. The prescribed cover consists of a 6-inch erosion layer over an 18-inch 10E-5 cm/sec barrier layer, without needing any geo-synthetic layers. The side slopes will need to be regraded in the range of 2 to 1 in order to maintain stability of the prescribed cover. The prescribed cover is completely acceptable, in accordance with the regulations, for the Ordot Dump. This application appears feasible and should be given very serious consideration.

| Alternative Number | Description | Initial / LCC Savings Potential |
|---|---|---|
| ED-2 | **Change Site Geometry with Benches at a Height of 45 to 50 Feet (or Less, as Appropriate) as in California** | $1,722,000 |

By flattening the side slopes, the barrier layer may be revised from the designed HDPE geo-membrane and replaced with a soil layer. The benefits of a soil layer are significant with regard to both capital cost and long-term post closure maintenance (see ED-1). The savings related to replacing the HDPE geomembrane with soil is included in ED-1. The net effect of this change is to create a simpler, more efficient design, similar to those done for landfills in California, which further enhance the application of a Prescriptive Cover described in ED-1.

| Alternative Number | Description | Initial / LCC Savings Potential |
|---|---|---|
| ED-4 | **Replace MSE Wall at Toe of West Edge with Shorter Soldier Beam and Concrete Lagging Wall** | $4,149,000 |

The un-named drainage meanders along the westerly edge of the dump. In one location, the waste encroaches on the un-named stream. The proposed project is simply to remove the waste back from the stream, approximately 15-20 feet, prevent the waste from going back into the stream, and prevent the stream from carrying waste away from the toe of the dump. This is accomplished by placing a soldier beam and concrete lagging wall about 15-20 feet from the stream's edge. The wall will protrude approximately 15 feet above the stream's elevation, it will retain the waste, and it will improve the geometry of the slope by flattening the slope.

This approach removes the necessity of installing a very costly MSE wall. In addition to a significant capital cost savings, the safety of the project is improved. The 20- to 45-foot high portions of the MSE wall pose a long-term safety risk as an attractive nuisance to the government.

| Alternative Number | Description | Initial / LCC Savings Potential |
|---|---|---|
| ED-5 and ED-6 | **Relocate No-Name Brook on West Side Further West** | $3,280,000 |

The design will construct an MSE wall (approximately 700 feet long, 20 to 45 feet high) to reduce the extent of waste footprint in order to (1) remove waste from un-named drainage and provide a setback from the un-named drainage and (2) support the waste fill embankment, which rests on the existing materials that are to be removed in Item 1 above. The alternative will relocate the un-named drainage west, further away from the toe of the existing waste toe, thereby allowing construction of an earthen embankment to support the waste fill slopes. This approach removes the necessity of installing a very costly MSE wall. In addition to a significant capital cost savings, the safety of the project is improved by eliminating the MSE wall.

Case 1:02-cv-00022   Document 190-8   Filed 01/14/2008   Page 16 of 52

| Alternative Number | Description | Initial / LCC Savings Potential |
|---|---|---|
| ED-5 and ED-7 | **Convey No-Name Brook Through Culvert or Pipe** | $3,350,000 |

The design will construct an MSE wall (approximately 700 feet long, 20 to 45 feet high) to reduce the extent of waste footprint in order to (1) remove waste from un-named drainage and provide a setback from the un-named drainage and (2) support the waste fill embankment, which rests on the existing materials that are to be removed in Item 1 above. This alternative will redirect the un-named drainage using a culvert or pipe in a region near the existing toe of waste, thereby allowing construction of an earthen embankment to support upper waste fill slopes on the west side of the dump. Eliminate MSE wall. One disadvantage of installing a pipe beneath the fill embankment is that the inlet to the pipe will require maintenance. This approach also removes the necessity of installing a very costly MSE wall. In addition to a significant capital cost savings, the safety of the project is improved by eliminating the MSE wall.

| | | |
|---|---|---|
| ED-9 | **Replace HDPE with Geosynthetic Clay Liner on Top Deck** | $105,000 |

For the top deck of the site (where the slope is relatively flat and where the barrier layer is covered with soil), the design includes an HDPE geomembrane as the barrier layer throughout the site. The alternative will consider replacing the HDPE product by using a geosynthetic clay liner (GCL) as the barrier layer. GCLs are very easy to install and repair during the post-closure period when penetrating the barrier layer is necessary.

| | | |
|---|---|---|
| ED-13 | **Use Other Flexible Material Liners in lieu of HDPE** | $1,782,000 |

The current design uses an HDPE geomembrane product as the barrier layer. The alternative will consider other flexible material liners as the barrier layer, such as low-density HDPE, very-low density HDPE, PVC, or geosynthetic clay liner

| | | |
|---|---|---|
| MS-13 | **Satisfy Clean Water Issues Now (Stop Discharges of Leachate to River) and Request Modification Schedule in Consent Decree** | ($286,000) |

The design will wait for the closure process to correct leachate discharges from the Ordot Dump to Lonfit River, as directed under the Consent Decree. The alternative calls for acting at the earliest possible date to the first known discharge of leachate to the Lonfit River with correction effected *prior* to the effective date in the Consent Decree. This is the pollution discharge item resulting in the Consent Decree and placement on the National Pollution Levels (NPL) list. This alternative will allow removal of Ordot Dump from open dump status.

| Alternative Number | Description | Initial / LCC Savings Potential |
|---|---|---|
| GI-7 | **Monitor/Investigate for Internal Fires Prior to and After Post-Closure** | ($33,000) |

Currently, design report information is qualitative based on last known history, which is incomplete. The alternative is to collect regular qualitative and quantitative monitoring data for analysis by knowledgeable technical personnel for accurate determination of underground fire conditions and fire mitigation actions within the landfill. This would enable early and accurate control of response action

| | | |
|---|---|---|
| GI-9 | **Replace Candlestick Flare with Enclosed Flare** | ($161,000) |

The current design employs an open candlestick flare as the destruction device for landfill gases (LFG), which does not protect the flame from the surrounding environment (i.e., prevailing winds). This alternative will install an enclosed flare as the destruction device for LFG. The enclosed flare retains the flame for a specified amount of time. As the flame rises in the enclosed flare stack, various control devices may be included, such as thermocouples that monitor the performance of the flare. These devices increase the assurance that the gases are properly destructed.

Four key VE Design Suggestions are given below:

| Design Suggestion Number | Description |
|---|---|
| ED-24 | **Negotiate Purchase Option of Soil from Property Owner to the North** |

There is a plan by the Department of Public Works to purchase soil from the owner of Lot No. 3390-2NEW-R2, which is located north of the Ordot Dump. There was also a soil investigation report issued by Geo-Engineering conducted on January 18, 1994, which states that the clayey silty soil is a cohesive and relatively impermeable material and would be suitable for use as fill for the Ordot dump area. Estimates by the VE Team indicate roughly 200,000 cubic yards of suitable cover soil may be present on this property.

The plan to negotiate a deal from the lot owner at this time is highly recommended, in order to protect this source (for several years) from being sold to other buyer by initiating a "Contract to Purchase." The prospective fill site in its proximity to the dump area will decrease the construction cost significantly for fill materials.

Upon confirmation of the "Contract to Purchase" between DPW and the lot owner, DPW could then specify in the bid documents that field materials from the site of specified quantity (Quantity to Be Determined by DPW) shall be available for contractor's use. Material cost for the fill materials from this site shall not be included in the contractors' prospective bid.

**Open/Regular Communication/Meetings Among All Stakeholders**

Whenever public projects are planned and the process proceeds forward from the start, there will be a myriad of interests that will affect the project before, during, and after. The effect will be ongoing from beginning to end. The primary reason is that there are multiple stakeholders that all have interests in the project, and they all do not necessarily agree in the interest of the outcome. The Ordot Dump Closure project, particularly, has a greater sensitivity to all stakeholders because of the nature of the project. The Dump has been in existence for over 60, years and its effect on the community has been more negative than positive. Ironically, the service the Dump provides makes public lives more convenient in that it provides a place to dispose of our waste. The Ordot Dump Closure project has become more controversial because of scheduling, costs, and environmental impacts that have been ongoing for years.

The VE Team has discussed a need that can go a long way to help meet schedules vital for the project's success. This need requires that meaningful open and regular communication and meetings among *ALL* stakeholders be conducted on a regular basis.

From a simple and basic point-of-view, human nature will always have its conflicts; however, all stakeholders must develop relationships such that they can all "agree-to-disagree." The advantage and positive outcome to regular, open communications and meetings of stakeholders is that they can provide flexibility in the closure process. The numerous interests, as mentioned earlier, tend to have needs that may come in conflict with those or other interests just as important to the process. If meetings and communications among stakeholders occur, chances are that information exchange can lead to a better understanding amongst the interests, which can lead to solutions. It takes genuine effort on the part of all stakeholders to understand this relationship and work toward making it happen, versus fearing hidden agendas and simmering mistrust. Personal feelings, especially those disguised as "business only and nothing personal," will need to be left at the door in order to move forward and prove that open and productive meetings and communications will lead to a "win-win" solution. Given this, the advantages are:

- Provides flexibility in the closure process
- Enhances the potential for success
- Supports the interests of Guam residents
- Will be in the best interest for all schedules
- Creates common interest and goals

MS-19    **Combine Dandan and Ordot as a Single Privatized Contract (Construct/Operate/Maintain)**

This conceptual function will attract qualified operator contractors because the project will have the potential to meet private business return on investment. The combination of operating two projects will provide for a bigger contract. In addition, DPW will be relieved of direct obligations to maintain, close, and provide post-closure care.

As noted in MS-15, privatization of the Ordot Dump operations and closure, and MS-18, dedicating an Environmental Compliance Officer, the involvement and the potential to turn over operations to a private interest can go a long way toward obtaining schedule flexibility and meeting the milestones. Combining the new landfill project in Dandan with the Ordot Dump operations and closure can potentially attract interest from private parties, which in turn can open up other avenues for funding/financing the initial project effort.

MS-23    **Create Separate Solid Waste Authority to Manage and Finance Landfill Closure and Operations**

An autonomous, independent solid waste authority could be more efficient in providing funding, since it would not have to respond to the whims of politicians or other self-interested parties. It would have the authority to raise funds through various taxes and/or fees in a simpler and more straightforward manner. The disadvantage, however, is that it creates, by its very existence, a new level of bureaucracy within the government.

Detailed documentation of these key alternatives, as well as the remaining ones not described above, is in the VE Alternatives section of this report. The VE Job was followed to: gather information and perform a site visit,

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 20 of 52

## VE TEAM AND PROCESS

The five-day study was performed during the period of October 24-28, 2005 on Guam. Ron Tanenbaum, CVS, of Value Management Strategies, Inc., led the VE Study. The VE team members are listed below:

| | | |
|---|---|---|
| Ron Tanenbaum, CVS | Value Management Strategies, Inc. | Facilitator |
| Rico Arceo | TG Engineers, PC | Cost Estimator |
| Tor Gudmundsen | TG Engineers, PC | Team Coordinator |
| Joseph Hernandez | Latte Inc. | Hydrology, Landfill Gas |
| Tim Raibley | Brown, Vence, & Associates | Civil Design |
| Gary Siu | State of Hawaii - DOH | Permitting, Regulatory Issues, Landfill Design |
| Fred Otte | Otte Consultants | Geotechnical Engineering, Environmental |

Throughout the VE session, several members of Guam Department of Public Works and the Guam Environmental Protection Agency supported the VE team.

The VE Job was followed to gather information and perform a site visit, create and evaluate ideas for change, and develop and present alternatives to the project team. The study concluded with an informal presentation of the VE alternatives and design suggestions to the agency managers.

# VE Alternatives

# VE ALTERNATIVES AND DESIGN SUGGESTIONS

## INTRODUCTION

The results of this study are presented as individual alternatives to the original concept. In addition, design suggestions for improving the project are included for consideration by the stakeholders.

## VE ALTERNATIVES

Each alternative consists of a summary of the original concept, a description of the suggested change, a cost comparison, a listing of its advantages and disadvantages, and a brief narrative comparing the original design with the alternative. Sketches, calculations, and benefits are also presented. The cost comparisons reflect the comparable level of detail as the original estimate. A life cycle benefit-cost analysis for major alternatives is included where appropriate. Design suggestions are written summaries of partially developed ideas without supporting documentation. A summary of the VE Alternatives and Design Suggestions follow this page and precedes the documentation of each alternative. The process by which the VE team decided which ideas would be developed as alternatives and suggestions, and which would be dropped from further discussion, is presented in Section 7 of this report.

## EVALUATION OF ALTERNATIVES

The alternatives presented by the VE team represent viable alternatives to the current design, which represent items the VE Team would suggest to their own clients based on the information available at the time of the VE Study. The project stakeholders are encouraged to evaluate all VE alternatives based on their individual merit, selecting the ones, in whole or in part, to be implemented to further improve the project. The documentation provided as part of the VE alternative is structured to provide the rationale and justification for each alternative.

## DESIGN SUGGESTIONS

The VE team also developed a series of design suggestions. These suggestions present ideas generated by the team that are felt to add value to the project. The VE team encourages the design team and stakeholders to carefully review these suggestions for opportunities to improve the quality of the project. The reader may also find that a review of the suggestions presented herein will awaken new and/or modified ideas that they may wish to investigate further or implement.

Case 1:02-cv-00022     Document 190-8     Filed 01/14/2008     Page 23 of 52

Presented later in this section, in the general order in which they appear in the Idea Evaluation form found in the Idea Evaluation section of this report, are the value engineering alternatives and design suggestions put forth by the VE Team. They are numbered sequentially, with the speculation idea numbers also presented in parentheses for clarity. It should be noted that, where commonality of thought prevails, speculation ideas have been combined into a single alternative or comment. They are also grouped according to the major function category under which they fall – Manage Fluids (MF), Enclose Dump (ED), Meet Schedule (MS), and General Ideas (GI). These function categories were established by the VE team during the Function Analysis phase of the study. With the development of the Function Analysis System Techniques (FAST) Diagram (see Project Analysis section of this report). In tandem with the VE team's assessment of the budget and major cost drivers.

**It is the recommendation of the VE team that the reviewer assess all 62 of the constructibility recommendations and suggestions to determine which should be implemented, which may be set aside, and what combination of value engineering recommendations and/or suggestions will best serve this project.**

## SUMMARY OF VE ALTERNATIVES AND SETS

VE sets are established by the VE team as their "best value" solutions, based on improved performance, likelihood of implementation, least community impact, cost savings, or any combination of criteria. A VE set may contain one or more alternatives, and each set is typically mutually exclusive of other sets (i.e., implementing VE Set 1 precludes implementation of VE Set 2, VE Set 3 and/or VE Set 4).

VE sets are selected alternatives combined from mutually exclusive groups that can compete in whole, or in part, against the original design concept. This requires additional performance rating and totaling of costs for the sets.

The VE team developed four sets of alternatives to illustrate potential combinations that may be chosen for implementation. The alternatives included in the sets are those deemed by the team to represent the best value when considering the alternatives' impact on project performance and cost. All four VE sets have the following general components:

- Eliminate detention pond and discharge stormwater as districuted flow (MF-5)
- Discharge leachate into treated wetlands (MF-10)
- Close dump using a prescribed cover (ED-1)
- Change geometry to flatten slopes and reduce benches (ED-2)
- Satisfy clean water issues now (MS-13)

VE Sets 1 and 2 also have the following general components:

- Replace MSE wall at the toe of the west edge with a shorter soldier beam and concrete lagging wall, eliminating MSE wall (ED-4)

VE Sets 3 and 4 also have the following general components:

- On the west side, shift the toe of slope further west and relocate the no-name brook on the west side further west (ED-5 and ED-6)

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 24 of 52

VE Sets 1 and 3 also have the following general components:

- Gas collection piping above barrier layer (MF-6)
- Replace candlestick flare with enclosed flare (GI-9)

VE Sets 2 and 4 also have the following general components:

- Utilize a passive gas collection system (MF-7)

The VE Sets described above are summarized at the end of the table on the following pages.

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 25 of 52

## MANAGE FLUIDS

| Alt. No. | Description | Potential Cost Savings Initial /LCC | Change in Performance |
|---|---|---|---|
| MF-1 | Divert Stormwater Around Landfill | Design Suggestion | |
| MF-2 | Collect Storm Water in Drains and Chutes and Take Off Landfill – Before Closure Activities | Design Suggestion | |
| MF-4 | Regrade Existing Top Deck to Better Shed Fluid | Design Suggestion | |
| MF-5 | In lieu of Large Detention Pond, Use Smaller Independent De-Siltation System in Various Areas (e.g., Distributive Flow) | $23,000 | +21.7% |
| MF-6 | Put gas collection headers and piping above barrier layer, but below grade | $26,000 | 0% |
| MF-7 | Utilize a Passive Gas Collection System | $994,000 | +8.5% |
| MF-10 | Treat Leachate Through a Constructed Wetland | $280,000 *$7,082,000* | +7.5% |
| MF-11 | Treat leachate through an aerate system | Design Suggestion | |
| MF-12 | Utilize Pipeline to Convey Leachate to Sanitary Sewer System | $90,000 *$7,214,000* | +7.5% |
| MF-14 | Eliminate Leachate Drainage Layer (Geocomposite) on Top Deck | $29,000 | 0% |
| MF-15 | Replace Articulated Block Mat with Asphalt | $1,183,000 | +8.5% |
| MF-17 | Replace Articulated Block Mat geotextile erosion mat/vegetation | Design Suggestion | |
| MF-18 | Replace concrete chutes (Articulate Block Mat) with galvanized metal chutes | Design Suggestion | |
| MF-24 | Put shingle tarps on surface | Design Suggestion | |

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 26 of 52

| Alt. No. | Description | Potential Cost Savings Initial /LCC | Change in Performance |
|---|---|---|---|
| **SUMMARY OF VE ALTERNATIVES & DESIGN SUGGESTIONS** *Ordot Dump Closure, Guam* | | **VMS** | |
| MF-26 | Put a water quality monitoring system in place for leachate and surface water | Design Suggestion | |
| MF-27 | Reevaluate Input Parameters to HELP Model for Site-Specific Reasonableness to Ordot | Not Applicable | +15.1% |
| MF-28 | Hydroseed Slopes and Benches (with Tacking Compound) Early in the Construction Process to Eliminate Detention Pond | $2,163,000 | +6.6% |
| | **ENCLOSE DUMP** | | |
| ED-1 | Use Prescribed Cover | $6,314,000 | +49.0% |
| ED-2 | Change Site Geometry with Benches at 45- to 50-Foot Height (or Less as Appropriate) as in California | $1,722,000 | +18.9% |
| ED-4 | Replace MSE Wall at Toe of West Edge with Shorter Soldier Beam and Concrete Lagging Wall | $4,149,000 | +8.5% |
| ED-5 | On West Side, Shift Toe of Slope Further West | Included in ED-6 & ED-7 | |
| ED-6 | Relocate No-Name Brook on West Side Further West | $3,280,000 | +1% |
| ED-7 | Convey No-Name Brook Through Culvert or Pipe | $3,350,000 | +1% |
| ED-8 | Lay west slope back | Design Suggestion | |
| ED-9 | Replace HDPE with Geosynthetic Clay Liner on Top Deck | $105,000 | 0% |
| ED-13 | Use Other Flexible Material Liners in lieu of HDPE | $1,782,000 | 0% |
| ED-16 | Utilize green waste as a layer in the final cap | Design Suggestion | |
| ED-17 | Use Navy dredge spoils as cover material | Design Suggestion | |
| ED-23 | Mandate all grading projects deliver excess clean material be delivered to Ordot for cover use as daily cover | Design Suggestion | |

| ED-24 | Negotiate Purchase Option of Soil from Property Owner to the North | Design Suggestion | |
| ED-25 | Assure safety associated with exposed waste slope created during MSE wall construction | Design Suggestion | |
| ED-26 | Relocate residents west of dump during MSE wall construction | Design Suggestion | |

### MEET SCHEDULE

| MS-1 | Knowingly violate with notice | Design Suggestion | |
| MS-2 | Open/Regular Communication/Meetings Among All Stakeholders | Design Suggestion | |
| MS-3 | Add incentive clause to contractor to accelerate schedule | Design Suggestion | |
| MS-4 | Stop receipt of waste by October 2007 | Design Suggestion | |
| MS-10 | Modify schedule to make it more realistic | Design Suggestion | |
| MS-11 | Accelerate development of first Dandan cell (including access road) | Design Suggestion | |
| MS-13 | Satisfy Clean Water Issues Now (Stop Discharges of Leachate to River) and Request Modification Schedule in Consent Decree | ($286,000) | +15.1% |
| MS-14 | Clarify poorly defined areas in Consent Decree that makes it difficult to meet requirements | Design Suggestion | |
| MS-15 | Privatize remaining life of Ordot | Design Suggestion | |
| MS-17 | Institute regular environmental compliance monitoring program, immediately | Design Suggestion | |
| MS-18 | Bring environmental compliance officer on board as part of interim operations and through closure | Design Suggestion | |
| MS-19 | Combine Dandan and Ordot as a Single Privatized Contract (Construct/Operate/Maintain) | Design Suggestion | |

| MS-21 | Get all government agencies to comply with executive order, with penalties, mandating that processing of all documents relating to consent decree occur within 5 days | Design Suggestion | |
| MS-22 | Explore other funding mechanisms such as import taxes, tourist taxes, real estate taxes, etc. | Design Suggestion | |
| MS-23 | Create Separate Solid Waste Authority to Manage and Finance Landfill Closure and Operations | Design Suggestion | |

## GENERAL IDEAS

| GI-1 | Develop public outreach/education program | Design Suggestion | |
| GI-3 | Don't permit future public park | Design Suggestion | |
| GI-4 | Make site safe for public access and use | Design Suggestion | |
| GI-5 | Develop training program for staff | Design Suggestion | |
| GI-6 | Install complete perimeter fence | Design Suggestion | |
| GI-7 | Monitor/Investigate for Internal Fires Prior to and After Post-Closure | ($33,000) | +7.5% |
| GI-8 | Obtain reliable heavy equipment to serve site | Design Suggestion | |
| GI-9 | Replace Candlestick Flare with Enclosed Flare | ($161,000) | +7.5% |
| GI-10 | Assure that adequate redundancy exists in design | Design Suggestion | |
| GI-11 | Identify off site location of temporary waste storage stockpile areas associated with planned MSE wall construction | Design Suggestion | |
| GI-14 | Define procedures for following the filling plan to assure that work is staying within plan and matches the final grading plan | Design Suggestion | |
| GI-15 | Confirm adequacy of guardrail design as anchored into MSE fill | Design Suggestion | |

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 29 of 52

| | | | |
| --- | --- | --- | --- |
| GI-16 | Make Navy responsible partner in closure process and funding | Design Suggestion | |
| GI-17 | Encourage future political candidates to state position and plans associated with closure | Design Suggestion | |
| GI-18 | Permit conditions outside of 40CFR258 are not applicable/clarify draft permit | Design Suggestion | |

## SUMMARY OF VE SETS

| Set No. | Description | Cost Savings Initial | Change in Performance | Change in Value |
| --- | --- | --- | --- | --- |
| 1 | Gas Collection Headers Above HDPE & Replace MSE Wall (Creative Ideas MF-5, MF-6, MF-10, ED-1, ED-2, ED-4, MS-13 and GI-9) | $12,041,000 | +31% | +219% |
| 2 | Passive Gas Collection System and Replace MSE Wall (Creative Ideas MF-5, MF-7, MF-10, ED-1, ED-2, ED-4, and MS-13) | $13,196,000 | +18% | +211% |
| 3 | Gas Collection Headers Above HDPE and Shift West Toe Slope Further West (Creative Ideas MF-5, MF-6, MF-10, ED-1, ED-2, ED-5/ED-6, MS-13 and GI-9) | $11,172,000 | +30% | +206% |
| 4 | Passive Gas Collection System and Shift West Toe Slope Further West (Creative Ideas MF-5, MF-7, MF-10, ED-1, ED-2, ED-5/ED-6, and MS-13) | $12,327,000 | +15% | +195% |

## PERFORMANCE ATTRIBUTES RATING AND PARAMETER SCALES

In the course of developing each VE alternative, the team evaluated the effect of the VE alternative on overall project performance (see the Performance Measures form included with each alternative). The rating scales associated with the 1 to 10 ratings used by the team are shown below.

This analysis is accomplished by asking the study participants to decide the relative importance of each attribute. For example, in this case, Operational Impacts was considered more important than Materials Availability; Schedule was deigned more important that either Operational Impact or Materials Availability; Construction Process was considered less important than Schedule or Materials Availability, but of equal importance to Operational Impact; and, finally, Environment was considered more important than the other four attributes. These decisions are then mathematically weighted to produce the results in the matrix.

| Attribute | Definition | Rating Scale | Unit of Measure/Quantification |
|-----------|-----------|:------------:|-------------------------------|
| Operational Impacts | The impact of the idea in terms of interference in the normal daily landfill operations during closure construction | 10 | Significantly improves and reduces interference with daily operations when compared to existing design |
| | | 9 | Greatly improves and reduces interference with daily operations when compared to existing design |
| | | 8 | Moderately improves and/or reduces interference with daily operations when compared to existing design |
| | | 7 | Slightly improves and/or reduces interference with daily operations when compared to existing design |
| | | 6 | Operational impacts are comparable to existing design |
| | | 5 | Slightly degrades operational impact when compared to existing design |
| | | 4 | Moderately degrades operational impact when compared to existing design |
| | | 3 | Frequently interferes with facility operations than might occur with the existing design |
| | | 2 | Can be operated only intermittently or with considerable resource expenditures |
| | | 1 | Facility cannot be operated during construction |

| Attribute | Definition | Rating Scale | Unit of Measure/Quantification |
|---|---|---|---|
| Materials Availability | Refers to the ability of manufacturers to produce and ship required materials to Guam in a timely manner, so as not to delay construction. | 10 | Significantly improves and eases the time needed to produce and ship materials compared to existing design |
| | | 9 | Greatly improves and eases the time needed to produce and ship materials compared to existing design |
| | | 8 | Moderately improves and eases the time needed to produce and ship materials compared to existing design |
| | | 7 | Slightly improves and eases the time needed to produce and ship materials compared to existing design |
| | | 6 | The time needed to produce and ship materials are comparable to existing design |
| | | 5 | Slightly degrades and increases the time needed to produce and ship materials compared to existing facility |
| | | 4 | Moderately degrades and increases the time needed to produce and ship materials compared to existing design |
| | | 3 | Frequently increases the time needed to produce and ship materials compared to existing design |
| | | 2 | Delays in production and shipping cause severe impacts on closure construction |
| | | 1 | Delays cannot be tolerated |

| Attribute | Definition | Rating Scale | Unit of Measure/Quantification |
|---|---|---|---|
| Schedule | An approximation of how the schedule may be impacted by implementing the alternative idea, with the preferred result to shorten the construction schedule and avoid delaying impacts of inclement weather conditions | 10 | >50% reduction in schedule |
| | | 9 | 36-50% reduction in schedule |
| | | 8 | 21-35% reduction in schedule |
| | | 7 | 11-20% reduction in schedule |
| | | 6 | 1-10% |
| | | 5 | Current schedule |
| | | 4 | 1-10% increase in schedule |
| | | 3 | 11-20% increase in schedule |
| | | 2 | 21-35% increase in schedule |
| | | 1 | >35% increase in schedule |
| Construction Process | An approximation of construction difficulty, risk reduction, and potential for change orders, claims, and work stoppages; issues related to logistics and adverse geotechnical conditions. | 10 | No direct or indirect impacts. |
| | | 9 | No direct and minor indirect impacts. |
| | | 8 | Minor direct impacts. |
| | | 7 | Minor direct and indirect impacts. |
| | | 6 | Construction process comparable to existing design. |
| | | 5 | Minor direct and indirect impacts. |
| | | 4 | Minor direct impacts. |
| | | 3 | Moderate direct or indirect impacts. |
| | | 2 | Moderate direct and indirect impacts. |
| | | 1 | Major direct and indirect impacts. |

| Criteria | Definition | Rating Scale | Unit of Measure/Quantification |
|---|---|---|---|
| Environmental Impacts | An approximation of the concept's overall effect on the surrounding environment. This criterion includes the following areas:<br>• Water quality of Lonfit River and tributary brook<br>• Landfill fires<br>• Wetlands encroachment<br>• Groundwater quality | 10 | Major improvement upon existing environmental conditions |
| | | 9 | Minor improvement upon existing environmental conditions |
| | | 8 | No environmental impacts |
| | | 7 | Negligible degradation (i.e., does not require mitigation) |
| | | 6 | Minor degradation (i.e., requires limited mitigation) |
| | | 5 | Moderate degradation (i.e., requires significant mitigation in one area or limited mitigation in two) |
| | | 4 | Moderate degradation (i.e., requires significant mitigation in two areas or limited mitigation in three) |
| | | 3 | Major degradation (i.e., requires substantial mitigation in one area and limited/ significant mitigation in others) |
| | | 2 | Major degradation (i.e., requires substantial mitigation in two areas and limited/significant mitigation in others) |
| | | 1 | Severe degradation (i.e., requires substantial mitigation in multiple areas) |

Case 1:02-cv-00022     Document 190-8     Filed 01/14/2008     Page 34 of 52

**Performance Attribute Matrix**

The following matrix analysis is used to compare each of the performance measures to each other to establish a weighted rating for each measure that can be used to calculate the performance value.

| PERFORMANCE ATTRIBUTE MATRIX *Ordot Dump Closure, Guam* | | | | | | VMS, Inc. | |
|---|---|---|---|---|---|---|---|

| | | | | | | TOTAL | % |
|---|---|---|---|---|---|---|---|
| Operational Impacts | **A** | a | c | a/d | e | 1.5 | 15% |
| Materials Availability | | **B** | c | b | e | 1.0 | 10% |
| Schedule | | | **C** | c | e | 3.0 | 30% |
| Construction Process | | | | **D** | e | 0.5 | 5% |
| Environment | | | | | **E** | 4.0 | 40% |

| a | More Important |
|---|---|
| a/b | Equal Importance |

| 10.0 | 100% |
|---|---|

With this matrix, the VE team completed its evaluation of the original design as it relates to the performance measures defined above. The rationale for the rating selected was developed and is presented on the next page, with the numerical rating shown in bold print.

| Performance Attribute | Rationale |
|---|---|
| Operational Impacts | This requires that closure activities occurring during final operations of the dump not interfere with those operations. |
| Materials Availability | Materials and skilled labor needed for construction of the final closure of the dump come from on-island and off-island and, as the delay in the manufacture and delivery of materials may impede construction, this design considers what is required to produce and procure materials for the closure in a timely manner. |
| Schedule | The current mandate is to meet the schedule dates mandated in the Consent Decree, which is tied directly to the opening of the new landfill at Dandan. The construction schedule must stay on track and not be impeded by outside factors, principally weather-related conditions from normal storms during the wet season or significant storm events. |
| Construction Process | The construction process carries inherent risks of potential contractor claims and changes orders related to weather delays, handling of sophisticated materials, delays due to avoiding impacts to operations, the inability to obtain off-island materials, and find adequately skilled labor on island. The impacts of the proposed construction process should allow construction to occur in a manner that will reduce the risks associated with the potential for change orders, work stoppages, and contractor claims. |
| Environmental Impacts | The current dump footprint encroaches on wetlands and contributes leachate to the Lonfit River. Natural ground underlying the dump is considered an aquiclude retarding movement down into groundwater; however, monitoring of groundwater quality has been spotty at best and leachate impacts to groundwater cannot be verified. The dump runs the risk of internal fire development following closure. The proposed closure design addresses closure by relocating waste along the western edge and constructing an MSE wall. Additional protection of groundwater below an unlined dump cannot be provided, and a monitoring program is proposed. Monitoring for internal fires is not provided for in the design. Environmental impacts carry over to post-closure operations and maintenance. |

Case 1:02-cv-00022     Document 190-8     Filed 01/14/2008     Page 36 of 52

**Performance Rating Matrix**

When the weighted percentage and the numerical ratings are combined to determine the total performance value, the results can be presented graphically for the original design. The VE Team, in reviewing the alternatives and VE sets, assess how each set may alter the value of the performance criteria (increase or decrease) as related to the entire project. These assessments can then be compared to the original design.

The project cost for the VE sets is determined by adding up all of the cost savings (and losses if appropriate) for the alternatives contained in the set, and subtracting the savings from the original project cost to find the total cost for the set. By calculating the total performance for the original design and VE set, and dividing the total performance by the total cost, the value index may be determined. An increase in the value index indicates potential improvement to the project design. This improvement can be represented as a percent. For the alternative sets developed in this workshop by the VE team, VE Sets 1, 2, 3, and 4 were estimated to provide a 219%, 211%, 206% and 195% value improvement to the project design, respectively. This information is summarized graphically on the following page.

It should be noted that a reconciled cost estimate of about $29,800,000 was used in this analysis. A reconciled estimate was developed by the VE team during the study, the basis of which is discussed in Project Analysis, Cost Model section of this report.

| PERFORMANCE RATING MATRIX *Ordot Dump Closure, Guam* | | | | | | | | | | | | | **VMS, Inc.** |

| Attribute | Attribute Weight | Concept | Performance Rating | | | | | | | | | | | Total Performance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
| Operational Impacts | 15 | Original Concept | | | | | | 6 | | | | | 90 |
| | | VE Set 1 | | | | | | 6 | | | | | 90 |
| | | VE Set 2 | | | | | | 6 | | | | | 90 |
| | | VE Set 3 | | | | | | 6 | | | | | 90 |
| | | VE Set 4 | | | | | | 6 | | | | | 90 |
| Materials Availability | 10 | Original Concept | | | | | | 6 | | | | | 60 |
| | | VE Set 1 | | | | | | | | 8 | | | 80 |
| | | VE Set 2 | | | | | | | | | 9 | | 90 |
| | | VE Set 3 | | | | | | | | 8 | | | 80 |
| | | VE Set 4 | | | | | | | | 8 | | | 80 |
| Schedule | 30 | Original Concept | | | | | 5 | | | | | | 150 |
| | | VE Set 1 | | | | | | | 7 | | | | 210 |
| | | VE Set 2 | | | | | | | 7 | | | | 210 |
| | | VE Set 3 | | | | | | | | 8 | | | 240 |
| | | VE Set 4 | | | | | | | | 8 | | | 240 |
| Construction Process | 5 | Original Concept | | | | | | 6 | | | | | 30 |
| | | VE Set 1 | | | | | | | 7 | | | | 35 |
| | | VE Set 2 | | | | | | | 7 | | | | 35 |
| | | VE Set 3 | | | | | | | | 8 | | | 40 |
| | | VE Set 4 | | | | | | | | 8 | | | 40 |
| Environment | 40 | Original Concept | | | | | 5 | | | | | | 200 |
| | | VE Set 1 | | | | | | | 7 | | | | 280 |
| | | VE Set 2 | | | | | | 5 | | | | | 200 |
| | | VE Set 3 | | | | | | 6 | | | | | 240 |
| | | VE Set 4 | | | | 4 | | | | | | | 160 |

| OVERALL PERFORMANCE | Total Performance | % Perf. Improve. | Total Cost ($ Mil.) | Value Index (Performance / Cost) | % Value Improvement |
|---|---|---|---|---|---|
| Original Concept | 530 | | 29.8 | 17.79 | |
| VE Set 1 - Gas Headers Above HDPE + Replace MSE Wall | 695 | 31% | 17.8 | 39.04 | 219% |
| VE Set 2 - Passive Gas Collection + Replace MSE Wall | 625 | 18% | 16.6 | 37.65 | 211% |
| VE Set 3 - Gas Headers Above HDPE + Shift Toe West | 690 | 30% | 18.8 | 36.70 | 206% |
| VE Set 4 - Passive Gas Collection + Shift Toe West | 610 | 15% | 17.6 | 34.66 | 195% |

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 38 of 52

## DESIGN SUGGESTIONS

The VE Team developed 42 Design Suggestions that are submitted to Guam DPW for their review and consideration. The Design Suggestions are presented below.

### Divert off-site stormwater around landfill (Creative Idea No. MF-1)

The benefits of diverting off-site stormwater away from the waste area and around the site are significant. If surface water comes into contact with waste or its associated liquids, the surface water becomes contaminated. Consequently, it is important to prevent off-site surface water from entering the waste area.

Surface water can be directed away from the waste area by improving an existing but overgrown ditch on the north side of Dero Drive. This existing ditch should be cleaned of its vegetation, improved where necessary, and maintained to assure conveyance of surface waters away from the site.

### Collect stormwater in drains and chutes, and take off landfill before closure activities (Creative Ida No. MF-2)

Collect stormwater in drains and chutes and route off landfill with action completed before closure activities are even initiated. In other words—do it now. This action will reduce leachate production and supports early compliance. Stormwater management activity impacts to daily operations can be minimized with advance planning by knowledgeable staff. Stormwater management during the active life of the landfill is a required component of the RCRA D operations criteria to reduce leachate production. Ordot is presently being operated as an open dump, which is prohibited. This early stormwater collection system will need to be reconstructed during the closure and is subject to NPDES.

### Regrade existing cover to improve drainage (Creative Idea No. MF-4)

The benefits of reducing the infiltration of water into the waste prism are significant. If water comes into contact with waste or its associated liquids, additional leachate is generated. The presence of water also accelerates decomposition of waste, generation of methane gas, and accelerated settlement. Consequently, it is important to prevent off site surface water from entering the waste.

The top deck of the site should be graded to promote positive drainage of surface water off of the site. Existing low areas that allow water to pond should be filled. Assuming the operators follow proper waste fill sequencing, waste placement protocol, and placement of cover soils, there is no additional cost associated with this activity. Immediate action in this regard will be an excellent step toward demonstrating that the Guam DPW is taking positive action to operate the dump correctly and proceed to closure.

### Treat leachate through an aerate system (Creative Idea No. MF-11)

Treat leachate through an aeration system using biological methods. Biological methods are especially applicable for organic-type contaminates, and monitoring data is needed for method qualification. Aeration methods can eliminate the need for a sewer conveyance system (pipes and pumps) and simplify the industrial discharge process, as treated effluent may be released to the environment, provided discharge standards are met.

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 39 of 52

The applicability of method depends on the strength and composition of the leachate. Depending on the leachate strength and volume of flow, a pond or package plant may be used. For a package plant, the process is more complex and requires electricity, but it can handle larger flows and leachate strengths. Stopping the uncontrolled discharge of pollutants to the Lonfit River is the major goal of the Consent Decree.

## Replace ABM with erosion mat (Creative Idea No. MF-17)

Articulated Block Mat (ABM) is a useful but expensive erosion-resistant surface applied to the surface of various drainage ditches and chutes. Depending upon the speed of the water traveling in the drainageway, other erosive protection materials could be used. For this application, ABM provides a highly durable wear surface, in addition to being somewhat flexible to accommodate landfill settlement.

However, a wide variety of manufactured Erosion Mats have been developed which, if appropriate, could provide significant savings. Erosion mats are also flexible and may provide appropriate erosion resistance, depending upon the scouring affect of the water being transmitted. The designer should evaluate the design speed of various portions of the collection ditches. Where appropriate, the use of Erosion Mat materials should be employed.

## Replace ABM-lined chutes with metal-lined chutes (Creative Idea No. MF-18)

As described in MF-17 above, the use of ABM where necessary protects drainage ditches from erosive water scour. Down chutes collect surface water from tributary berms on the top and sides of the site and convey the water to the bottom of the site. The volume and velocity of water in these chutes is very high. Many landfill operators in the US employ a pre-manufactured metal chute for this purpose. The metal chutes are significantly less costly. However, the metal-lined chutes require additional maintenance and may deteriorate (rust) in the marine environment of Guam. The designer should evaluate the benefits and limitations of metal-lined chutes and revise the design as appropriate.

## Use tarps to shed water from the site (Creative Idea No. MF-24)

As described in MF 4 above, the benefits of reducing the infiltration of water into the waste prism are significant. If water comes into contact with waste or its associated liquids, additional leachate is generated. The presence of water also accelerates decomposition of waste, generation of methane gas, and accelerated settlement. Consequently, it is important to prevent off-site surface water from entering the waste.

If cover soils are not available, the uncovered portions of the site should be covered with tarps to promote positive drainage of surface water off of the site. Tarps can be secured to the site using waste tires, sand bags, etc. The use of tarps should be limited to a temporary application only and are generally equal to grading the site to promote surface drainage (MF 4).

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 40 of 52

**Put a water quality monitoring system in place for leachate, stormwater, surface water, and groundwater (Creative Idea No. MF-26)**

The current operations at Ordot Dump do not perform any water quality monitoring for leachate, stormwater, surface water bodies (i.e., rivers, streams, wetlands, etc), or groundwater. This lack of historical data precludes the evaluation of water quality conditions at and around the dump. Immediately establishing a consistent and approved water quality monitoring program will help to qualify and quantify current impacts to water quality, which will allow for appropriate revisions to minimize post-closure requirements. It will also demonstrate positive action by Guam DPW toward establishing acceptable operating procedures and progress toward closure while beginning to assemble essential data needed to manage the closed facility.

**Lay west slope back (Creative Idea No. ED-8)**

The un-named drainage meanders along the westerly edge of the dump. In one location, the drainage encroaches near the toe of the dump boundary. A variety of solutions to this condition are described (ED-4, ED-5&6, and ED-5&7). As an alternative, the slope above the drainage could be cut (lowered or laid back) thereby removing the steep sloping portions of waste above the drainage. The current design includes an excavation slope very similar to this alternative (see temporary excavation slope on the west side of the site, sheet C-2).

Unfortunately, the excavated waste will need to be relocated onto other portions of the site. This will consume valuable airspace that is needed for waste placement until the new landfill site is constructed and ready to receive wastes.

Once the drainage has been relocated, an earthen embankment may be installed to support a portion of the westerly toe of the dump. This approach removes the necessity of installing a very costly MSE wall. In addition to a significant capital cost savings, the safety of the project is improved. The 20-to 45-foot high portions of the MSE wall pose a long-term safety risk as an attractive nuisance to the government.

**Utilize green waste as a layer in the final cap (Creative Idea No. ED-16)**

The VE team had discussed alternative ideas to enclose the landfill dump with a variety of materials possible for use. The use of green waste was suggested as a possible alternative to liner or soil, although soil would more than likely be mixed in and be part of the cover material. The green waste reduces the volume of soil needed, as it is expected there would be a consistent and ample amount of green waste material available for disposal. Using green waste as cover to enclose the dump will also be taking up airspace, while at the same time acting as the cover layer. It is referred to as "revenue-generating-cover."

Green waste could be brought to the dump in specified sizes such that it can be spread and compacted to meet the cover layering format on the surface. Obviously, large, bulky, sizes not able to be spread can be further reduced through mulching, chipping, or cutting so that the size is reduced for ease of spread by landfill equipment.

There have been similar experiences on the use of green waste as cover material at other sites, such as the West Hawaii Landfill (although soil was also mixed in to obtain the needed effect.). The green waste was brought in by the disposer, placed and then heavy equipment compacted and broke down the material further. The effort eventually evolved into stabilizing the tipping area. Other sites, such as the Bradley Landfill used green waste as an alternative intermediate cover. The waste was chipped and mulched to obtain the desired, specified size for use.

Case 1:02-cv-00022     Document 190-8     Filed 01/14/2008     Page 41 of 52

In summary, green waste can be used as a substitute for soil on an on-going basis when the opportunity presents itself. As an ideal and completely permanent substitute, green waste will need to be processed into a specified size and also be available in ample amount to be able to meet the cover material requirement. Approval from the local regulatory agency for an alternative cover material will also have to be obtained first.

**Use Navy dredge spoils as cover material (Creative Idea No. ED-17)**

There is a potential source of daily cover that is in short supply at this point in time. The dredged soil may be appropriate for providing cover; however, the actual soil needs to be assessed for suitability. If the contractor needs to find a place for the dredged material, this could actually generate revenue or at least be a no-cost solution for DPW. It should be noted, however, that the soil/sediment may be contaminated from harbor activities over the past 60 years and that watertight trucks will be needed to transport the soil if the material is not dried out prior to transport.

**Mandate that all grading projects deliver excess soil material to the Ordot Dump for use as cover material (Creative Idea No. ED-23)**

The Ordot Dump's primary source of cover material is located at the Dededo quarry. Consistently transporting this material is costly and inefficient due to DPW's lack of resources, which results in large areas of uncovered waste and environmental non-compliance. Establishing an executive order that mandates all excess, clean material generated from grading projects be delivered to Ordot Dump for use as cover material will assist dump operators by providing one of the most essential resources for efficient and effective dump operations. Daily soil cover facilitates environmental compliance by reducing vectors, odors, and leachate generation, and improving aesthetics.

**Negotiate purchase option of soil from property owner to the north (Creative Idea No. ED-24)**

There is a plan by the Department of Public Works to purchase soil from the owner of Lot No. 3390-2NEW-R2, which is located north of the Ordot Dump. There was also a soil investigation report issued by Geo-Engineering conducted on January 18, 1994 which states that the clayey silty soil is a cohesive and relatively impermeable material and would be suitable for use as fill for the Ordot dump area. Estimates by the VE Team indicate roughly 200,000 cubic yards of suitable cover soil may be present on this property.

The plan to negotiate a deal from the lot owner at this time is highly recommended in order to protect this source (for several years) from being sold to another buyer by initiating a "Contract to Purchase." The prospective fill site in its proximity to the dump area will decrease the construction cost significantly for fill materials.

Upon confirmation of the "Contract to Purchase" between DPW and the lot owner, DPW could then specify in the bid documents that field materials from the site of specified quantity (Quantity to Be Determined by DPW) shall be available for contractor's use. Material cost for the fill materials from this site shall not be included in the contractor's prospective bid.

**Assure public safety and health associated with exposed waste slope created during MSE wall construction (Creative Idea Nos. ED-25 and ED-26)**

Case 1:02-cv-00022     Document 190-8     Filed 01/14/2008     Page 42 of 52

During the construction of the proposed MSE walls, and of the entire dump closure project, safety measures should be undertaken to prevent accidents, save lives, and avoid penalties from OSHA for safety violations. Specifically, the construction of MSE walls would generate an exposed slope of approximately 38 feet high, which would require workers' protection from falls. The placement and compaction of waste towards the MSE wall is also a hazard for personnel and equipment. The construction of scaffolds and other safety measures required, as well as the preparation of a safety plan, should be implemented prior to start of any construction activity. Part of the safety plan should be the appointment of a full-time safety manager to implement the safety program for this project.

In addition, residents to the west of the dump should be relocated during the construction of MSE walls, as the exposed waste will generate vectors and bad odors within the vicinity.

### Knowingly violate with notice (Creative Idea No. MS-1)

Knowingly violating the Consent Decree schedule with notice may be the only remaining option if available planning time has been expended. This may be the only way to provide scheduling flexibility and must be done with proper notice to Guam EPA. Operational improvements to remove Ordot from open dump status must be completed to enable this step to be successful. Written confirmation of removal from open dump status will increase success.

The notice of knowingly violating the Consent Decree Schedule must be justified with regular update reports on an agreed-upon schedule. The reports should provide the required Consent Decree schedule, a revised up-to-date schedule, task items, and explanations of task item delays, including resource limitations.

Consent Decree violations are subject to penalties. The Ordot dump is presently operated as an open dump. The operator must take steps to meet RCRA D operational criteria and manage the leachate seeps along the base of the landfill. Qualified technical staff, operations staff, and advance planning must be integrated to successfully meet operations criteria. Measures must be taken to stop pollution discharges from affecting the wetlands and reaching the Lonfit River.

Immediate steps to meet operational criteria include off-site/on-site stormwater management, daily cover, access controls, and an all-weather road to the workface, including a turnaround area. Failure to meet these minimum standards would mean that the landfill continues to operate as an open dump, which is prohibited.

**Open/regular communication/meetings among all stakeholders (Creative Idea No. MS-2)**

Whenever public projects are planned and the process proceeds forward from the start, there will be a myriad of interests that will affect the project before, during, and after. The effect will be ongoing from beginning to end. The primary reason is that there are multiple stakeholders that all have interests in the project, and they all do not necessarily agree in the interest of the outcome.

The Ordot Dump Closure project, particularly, has a greater sensitivity to all stakeholders because of the nature of the project. The Dump has been in existence for over 60 years, and its effect on the community has been more negative than positive. Ironically, the service the Dump provides makes public lives more convenient in that it provides for a place to dispose of our waste. The Ordot Dump Closure project has become more controversial because of scheduling, costs, and environmental impacts that have been ongoing for years.

The Value Engineering team has discussed a need that can go a long way to help meet schedules vital for the project's success. This need requires that meaningful open and regular communication and meetings among ALL stakeholders be conducted on a regular basis.

From a simple and basic point-of-view, human nature will always have its conflicts; however, all stakeholders must develop relationships such that they can all "agree-to-disagree". As mentioned earlier, the advantage and positive outcome to regular, open communications and meetings of stakeholders is it can provide flexibility in the closure process. The numerous interest as mentioned earlier, tend to have needs that may come in conflict with those or other interests just as important to the process. If meeting and communicating among stakeholders occur, chances are that information exchange can lead to a better understanding amongst the interests and can lead to solutions. It takes genuine effort on the part of all stakeholders to understand this relationship and work towards making it happen versus fearing hidden agendas and simmering mistrust. Personal feelings and especially those disguised as "business only and nothing personal" will need to be left at the door in order to move forward and prove that open and productive meetings and communications will lead to a "win-win" solution. Given this, the advantages are:

- Provides flexibility in closure process
- Enhances potential for success
- Supports interests of Guam residents
- Will be in the best interest for all schedules
- Creates common interest and goals

**Add incentive clause to contractor to accelerate schedule (Creative Idea No. MS-3)**

The contractor would be incentivized (depending on the incentive) to be more efficient and to increase the rate of site work. These activities and other creative ideas resulting from the incentive may well advance the schedule enough to meet the consent decree. A clause regarding the fact that safety must not be compromised in order to accelerate the schedule needs to be included in any incentive scheme.

**Stop receipt of waste by October 2007 (Creative Idea No. MS-4)**

Guam DPW would stop receipt of waste by October 2007 as a milestone to satisfy the Consent Decree, with notice to the governing agency that remaining capacity exists in a defined interim area. The governing agency has the option to extend the final closure date. If approved, this will allow more time to complete the final closure of the facility. Operations in the interim area must meet operations criteria. Outside of the interim area, intermediate cover that manages stormwater would need to be completed and maintained. A stakeholders meeting between all affected parties will need to be held to work out the details of the steps to be taken. The practical capability of Government Guam should be a consideration.

An extension of the closure date cannot be approved if operations at Ordot continue as an open dump. Operations in the defined interim area must meet the operations criteria without the release of pollutants to the environment. Operational criteria on which to focus include covering the active workface, stormwater management, leachate controls, and measures to control vectors.

**Modify Consent Decree Schedule to make it more realistic (Creative Idea No. MS-10)**

The Consent Decree (CD) schedule includes certain elements that pose challenges to implementing the Ordot closure improvements. For example, the new landfill at Dandan will not be operational until late September 2007. Yet, the CD requires the closure improvements to be complete one month later (October 2007). Insomuch as there is no other location waste may be managed on Guam, it is highly unlikely that landfill closure improvements can be completed while ongoing waste receipt and placement activities occur. As another example, the CD did not include certain necessary functions that must be completed prior to implementation of the project (securing necessary funds, acquiring property, securing easements, complying with local land use permit issues, etc.).

The Guam Department of Public Works (DPW) has expended considerable time and effort in recent months developing an alternative schedule that reflects the estimated schedule of various elements of the project. The revised schedule was submitted to the US EPA for consideration. The US EPA rejected the schedule, stating that the current CD reflected years of analysis and negotiation.

Aside from the unproductive conclusion of this effort, it remains advisable for Guam DPW to request clarification of certain undefined aspects of the CD. The key issues that should be clarified include, but not limited to, the following:

- Cease receiving waste
- Completion of the closure improvements
- Cease discharges to the Lonfit River

**Accelerate development of first Dandan cell (including access road) (Creative Idea No. MS-11)**

In order to better meet the project schedule, the VE Team recommends that the development of the first waste cell at the new proposed landfill in Dandan be accelerated. The notion behind this recommendation was to provide options and be in a better position that would assure the consent decree schedule can be met. It will also accelerate the time when the Ordot Dump will stop receiving waste.

Upon further review on the aspect of the closure project schedule and the consent decree requirements schedule, some flexibility appears to be needed. Estimates of timing for accomplishing milestones in the schedule and the reality of the work to be done and what time they need to get it done may conflict. The acceleration of the first cell development will afford a greater opportunity to modify the schedule. It would put DPW in a better position to review and pursue flexibility in meeting the schedule.

The development of the first cell and efforts to accelerate the schedule to accomplish it may meet hurdles from stakeholders and also from sufficiency of funds present. The process of modifying local land use zoning and acquiring the land can further delay any optimism for the cell development.

**Clarify poorly defined area in Consent Decree that makes it difficult to meet requirements (Creative Idea No. MS-14)**

There are some areas in the Consent Decree that require special attention. The intent of the Consent Decree is to stop pollution from discharging to the Lonfit River, and to close the Ordot dump in-order to prevent future discharges. The Consent Decree is a combined Clean Water and RCRA D action that must be satisfied.

The practical capability of the Government of Guam and resource limitations especially funding represent significant barriers that should be considered in negotiations with Guam EPA. At the present time, involved agencies appear to be having great difficulty communicating. The continued receipt of waste at Ordot remains in the public interest until the new landfill is constructed and starts operations. However, the Government of Guam is also responsible for taking reasonable action to stop the discharges of pollution to the Lonfit River and meet RCRA D operational controls.

Both parties need to negotiate with the goal of understanding each other's positions so that progress can be made. Technically knowledgeable staff is recommended for the Government of Guam with the authority for decision-making.

**Privatize remaining life of Ordot (Creative Idea No. MS-15)**

Privatizing the operations for the remaining life of the Ordot Dump was suggested. This idea relied on the proven experience that if operations of the Ordot Dump were to be privatized, the private operator would be better capable of running the landfill operations in a compliant nature and invest in resources to meet schedules required of them. The setup can be more efficient in that there would be one responsible party, which would eliminate multiple operators and any conflicts that can arise from having more than one entity operating the dump.

The current schedule and time allowed for privatizing may not provide ample time to make the privatization process complete. There is also the concern from any private entity seeking interest in the operations that any liability associated with the current operations may be inherited. From a business standpoint, the current schedule, any privatization conversion timeline, and the remaining site life may not meet the potential private entity's return on investment estimates.

**Institute regular environmental compliance monitoring program, immediately (Creative Idea No. MS-17)**

An ongoing environmental compliance monitoring program would greatly reduce the chance for Notice of Violations and fines due to non-compliance, and it would build up trust between the DPW and GEPA by being able to show compliance in the continued operations at the dump. Trust that DPW is doing the right thing (and documenting it) will lead to more flexibility in the regulatory relationship. A proactive stance in this area would go a long way in building confidence and trust between the agencies.

**Bring an Environmental Compliance Officer on board as part of interim operations and through closure (Creative Idea No. MS-18)**

The concept to create, designate, and assign a compliance officer to the Ordot Dump project and dedicate their responsibility was suggested. The Environmental Compliance Manager (ECM) will be able to oversee all compliance issues, and meet and communicate with regulatory agencies and perhaps other stakeholders. The ECM will also be tasked to assist in operational needs, such as train operations and develop programs that can nurture a culture within the operations of the Dump to a higher level of compliance and responsibility.

With the ECM in place, a respectable track record developed showing that Operations is operating efficiently and is compliant, and that open communications are ongoing, the facility can be in a better position to appeal for scheduling flexibility and perhaps show regulatory and public interests that the facility deserves consideration.

DPW may have to contend with another position to fill. If the operations are privatized, then the issue of an extra employee goes away.

**Combine Dandan and Ordot as a single privatized contract (construct/operate/maintain) (Creative Idea No. MS-19)**

This conceptual function will attract qualified operator contractors because the project will have the potential to meet private business return on investment. The combination of operating two projects will provide for a bigger contract. In addition, DPW will be relieved of direct obligations to maintain, close, and provide for post-closure care.

As noted in MS-15, privatization of the Ordot Dump operations and closure, and MS-18, dedicating an Environmental Compliance Officer, the involvement and the potential to turn over operations to a private interest can go a long way toward obtaining schedule flexibility and meeting the milestones. Combining the new landfill project in Dandan with the Ordot Dump operations and closure can potentially attract interest from private parties which, in turn, opens up other avenues for funding/financing the initial project effort.

**Get all government agencies to comply with a recent executive order, with penalties, mandating that processing of all documents relating to Consent Decree occur within 5 days (Creative Idea No. MS-21)**

Case 1:02-cv-00022     Document 190-8     Filed 01/14/2008     Page 47 of 52

This function recommended relates to MS-2, having open and regular communications and meetings with all stakeholders, but it is specific to the bureaucratic and political stakeholders. Like any project that concerns the public and tends to be controversial, politics and government can be obstacles. All stakeholders in the project will acknowledge this belief.

In order to better meet schedules in the Ordot Dump Closure project, these specific stakeholders need to do their part and comply with existing orders to process and administrate project documents, specifically relating to the Consent Decree, in the mandated timeline. If not, an enforceable penalty should be administered, in a timely manner, in order to effect results.

Everyone should do their part. Efficient administration should be a nurtured culture in government and politics. This function also has a mandated executive order. It should be enforceable.

The advantages to pursuing this function would be that progress can be accomplished for the Consent Decree schedule. Any delays can be avoided concerning the CD. The downside to this is that it will take political will and great effort not to stumble over bureaucratic hurdles.

**Explore other funding mechanisms such as import taxes, tourist taxes, real estate taxes, etc. (Creative Idea No. MS-22)**

Although many of these additional funding mechanisms have already been explored, some funding sources have not been fully explored. It would be worthwhile to spend some time ranking the most promising sources, investigate the possibilities with bureaucrats and politicians, and then create a list of those funding sources that are most likely to be acted upon *and* will also bring in the most money to the dump closure project.

**Create separate Solid Waste Authority to manage and finance landfill closure and operations (Creative Idea No. MS-23)**

An autonomous, independent solid waste authority could be more efficient in providing funding, since it would not have to respond to the whims of politicians or other self-interested parties. It would have the authority to raise funds through various taxes and/or fees in a simpler and more straightforward manner. The disadvantage, however, is that it creates, by its very existence, a new level of bureaucracy within the government.

**Develop public outreach/education program (Creative Idea No. GI-1)**

The public community interests are important stakeholders in the Ordot Dump Closure project, and communicating and keeping them up-to-date through outreach programs and educational forums is essential for the project's success.

There is a tendency to separate the public as though it is a standalone entity as a stakeholder when, in fact, we are all the public. We are only separated in terms of specific interests and agendas in relationship to the project. The community, as defined, includes those that will be affected by the process, and most likely will be everyone who will be impacted by the project.

An outreach program will need to be developed through educational forums and media. Provisions to allow for a two-way interchange of thinking and voicing concerns in a civilized manner need to be provided. This will help to facilitate understanding and to educate all those wanting to understand the project and its progress or impacts.

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 48 of 52

An outreach program can be as simple as periodic meetings, such as town hall meetings, that can present a forum for discussion. Education media, such as commercials, TV ads, radio talk show programs, and brochures, can all work towards conveying the project's details, process, and updates. These programs should be neutral and structured to inform only.

Other forms of outreach programs can be tours of the site during and after closure. In terms of the new landfill, a structured and formal tour of the site along, with all its operations and impacts, can be envisioned. Those responsible for the project should also create ongoing dialogue and schedule meetings periodically, as a forum to updating those in the surrounding areas who are directly impacted by the presence of the site.

## Delete future plans for public use of Ordot (Creative Idea No. GI-3)

As designed, the Ordot site is not conducive to public access. For example, the outer edges of the benches are constructed with a four-foot drop (MSE edge wall). Also, there are very steep slopes (1.5:1) between each of the benches. To reduce risk, the design includes a guardrail along the primary access roads. However, access to various regions of the site is not prohibited (particularly the 30-foot + high MSE wall).

In addition to the risk of falling, the site will be equipped with gas collection wells, valves, and other devices to collect and destroy these gases. Landfill gas is explosive and can contain toxic and carcinogenic materials. Also, leachate (landfill liquid) potentially contains toxic or carcinogenic materials.

Taken as a whole, the expectation of allowing public access to the site immediately after closure is not advisable. Legislation and/or policy should be revisited to restrict public access to the site.

## Make the site safe for the public (Creative Idea No. GI-4)

As described in GI-3 above, the site as designed will not be conducive for public access. This alternative addresses a brief review of the changes that need to be performed to make the site safe for public access. The changes for public access could be categorized into the following groups:

- Geometry safety issues
- Exposure to toxic, explosive or caustic materials

In order to make the site safe with respect to its site geometry, the following needs to be accomplished. The site design grades need to be flattened to prevent risk of falling. Vertical features (i.e., MSE walls) need to either be removed or secured to prevent public access. Roadways where the public are allowed to drive on the site need to be widened to allow two-way access.

In order to make the site safe with respect to exposure to toxic, explosive, or caustic materials, the following needs to be accomplished. The gas collection devices (wells, valves, pipes, etc.) need to be secured from public access. The leachate collection system (pipes, pumps, etc.) need to be secured from public access. The site will settle over time. As the site settles, the condition of the cap, gas collection system, and liquids management system will deteriorate, potentially exposing toxic, explosive, or caustic materials. A monitoring plan would need to be developed and implemented that evaluates the condition of the site prior to public access. The monitoring plan would need to identify, isolate, secure, and remove those areas from public access where emissions of gases or liquids could be exposed the public.

**Develop training program for staff (Creative Idea No. GI-5)**

One of the primary ways to enhance successful compliance and perform efficient operational activities is to develop a training program for those personnel directly involved in the daily operation and maintenance of the dump. A highly qualified maintenance or operation trainer should be hired to ensure proper and adequate training for the personnel involved. The hiring of a qualified trainer will be an additional cost, especially if hired from off island; however, the cost savings on a long-term basis will be significant. In addition, it is anticipated that this step will get a good reception from the public when improved, efficient operations of the dump are demonstrated by Guam DPW.

**Install complete perimeter fence at dump (Creative Idea No. GI-6)**

Site security is essential to prevent all access to the closed dump. The steep slopes in the current design are not safe for the public. In addition, feral animals (dogs, pigs, deer, and caribou) can damage the final cover system and greatly increase maintenance requirements.

**Obtain reliable heavy equipment to serve site (Creative Idea No. GI-8)**

The acquisition of reliable heavy equipment during operation will contribute to the efficient operation of the dump during closure. This will definitely increase the cost upfront, but with proper maintenance, the long-term cost benefit will be significant. Commonly used spare parts for this equipment should also be purchased and replenished on a regular basis to avoid disruption of operations.

**Assure that adequate redundancy exists in design (Creative Idea No. GI-10)**

In order to avoid disruption of services, standby equipment such as heavy equipment, generators, pumps, etc., should be acquired or ready for use in case of breakdowns. With continuous operation, the public health is being safeguarded and, possibly, public complaints would be minimized. This purchase of standby equipment will increase cost.

**Identify off-site location of temporary waste storage stockpile areas associated with planned MSE wall construction (Creative Idea No. GI-11)**

The cost estimate states a four-mile round trip for temporary storage of wastes during MSE wall construction. This implies the use of an off-site storage area. No further discussion of this off-site storage area is provided in the documents.

The identification of a suitable off-site location for the excavated waste resulting from the MSE wall construction is a critical path issue. The site not only needs to be physically located and approved by GEPA, but a Solid Waste Storage Permit needs to be obtained from GEPA. The siting and permitting issues are potentially long-lead items that need to be addressed as soon as possible, if the MSE wall construction is approved as a final design component.

**Define procedures for following the filling plan to assure that work is staying within plan and matches the final grading plan (Creative Idea No. GI-14)**

Case 1:02-cv-00022    Document 190-8    Filed 01/14/2008    Page 50 of 52

Define procedures for following a filling plan that directs sequential disposal activities on the top deck, which matches the final grading plan. This will minimize additional work during closure and ensure that positive drainage grades prevent the ponding of stormwater on the top deck. This will result in more effective operations and an efficient closure.

## Confirm Guardrail design is appropriate for MSE wall (Creative Idea No. GI-15)

The current design includes a four-foot high MSE wall along the primary access route that is equipped with guardrails (guardrail alignment per sheet C-4). The guardrail details (sheet C-38) demonstrate a 2-foot 6-inch deep support set in a 12-inch sonatube, backfilled with concrete. However, the Typical Bench Cover Section (sheet C-12) does not show the guardrail. The bench detail has a reinforced edge (four-foot high MSE wall) with geogrid Type 3 imbedded four feet behind the face of the wall.

It is unclear how the guardrail post will be installed with respect to interfering with the geogrid textiles. It is recommended that the designer evaluate these two details and clarify how these features should be properly constructed. The clarification should include an analysis of the anticipated resistance the guardrail post will provide in the event of a lateral load, insomuch as the post is located immediately adjacent to a nearly vertical four-foot drop (that presumably does not provide resistance if impacted by a lateral load).

## Make Navy responsible partner in closure process and funding (Creative Idea No. GI-16)

Make the Navy and Air Force responsible partners in the closure process and funding. The financial and practical capability of Gov Guam is limited. With a small population of 160,000 residents, the tax-base is limited. Of special concern are financial limits due to a primary tourist and service economy. The military has been a major, historic user of the Ordot dump bearing some responsibility for its contents, and will rely on the new landfill when it comes into service. The military must recognize that they are major stakeholders in the successful management of solid waste in Guam.

A responsible partnership should extend beyond seeking financial assistance. Other assistance may include technical, manpower, equipment, and material resources. The Government of Guam should include all major commercial and industrial parties in the solution. Assistance for materials, especially cover soils, should be requested.

**Encourage future political candidates to state position and plans associated with closure (Creative Idea No. GI-17)**

As recommended, all stakeholders need to make the effort to encourage our elected and future candidates for public office to make their position and understanding of these projects clear. Currently, future candidates seeking public office need to make it clear of their position on the Closure project. They should also strive to provide ideas toward productive processes that they can make happen for the success of the closure. With this function in mind and brought to realization, our political stakeholders can help in the process and account for their part in making the closure project a success. The project then will continue to be on the front burner and not be dragged on or ignored, which would not be in the best interest of anyone.

**Permit conditions outside 40CFR258 are not applicable/clarify draft permit (Creative Idea No. GI-18)**

The Ordot dump is an NPL site, under CERCLA. The CERCLA September 2002 Five-Year Review report makes a no-action determination, deferring corrective action to closure under RCRA D. The draft permit is designed to implement necessary environmental controls and close the dumpsite by October 2007. The Ordot dump has been in operation since the 1940s. It continues to be operated with minimal environmental controls, which qualifies it as an open dump. Open dumps are prohibited under RCRA D.

The draft RCRA D permit should be viewed as applying environmental controls under the RCRA D operations criteria that will correct the discharge of pollutants to the Lonfit River. The final goal of the draft permit is the timely final closure of Ordot dump.

The compliance history and the lack of trained knowledgeable personnel are causing Guam EPA to request privatization of the remaining life of the Ordot dump. The use of third-party technical assistance may be more effective if DPW provides a technically capable Environmental Compliance Officer counterpart. This Environmental Compliance Officer would be the appropriate staff to interface with Guam EPA. Third party assistance can provide training within DPW on the proper methods for planning and operating a solid waste landfill under RCRA D criteria. The Environmental Compliance Officer must have a technical background and decision-making authority in order to have a successful relationship with the regulatory agency. This relationship should start with the initial first step being regular delivery of sufficient soil to cover the active workface at the end of each week. The Environmental Compliance Officer should be involved with all solid waste facilities. Management, technical, and operations staff will need to be integrated within the same solid waste unit to be effective in providing the coordination for meeting the permit conditions.

Groundwater monitoring should be implemented during the permit period, and a remedial investigation of off-site contamination should be planned under EPA with input from Guam EPA. Past operations of the Ordot dump have resulted in wetlands encroachment.

# Project Analysis

# PROJECT ANALYSIS

## SUMMARY OF ANALYSIS

The following tools were used to study the project and better understand where opportunities for improvement exist:

- ♦ Project Issues
- ♦ Cost Model
- ♦ Function Analysis (FAST Diagram)
- ♦ Reconciled Cost Estimate

Case 1:02-cv-00022     Document 190-9     Filed 01/14/2008     Page 2 of 41

# PROJECT CONSTRAINTS AND ISSUES

Key constraints and issues affecting the project include:

**Project Constraint**

+ Design in accordance with Rules and Regulations of GEPA Solid Waste Disposal, Title 22, Division 4, Chapter 23, Article 6

**Critical Issues**

+ Meet requirements specified in Consent Decree of February 11, 2003, Civil Case No. 02-00022
+ Need to meet the requirements of the draft permit for continued use of Ordot during closure construction
+ Needs of Operations takes precedence over all aspects of closure work
+ Coordination with ongoing landfill operations
+ Provision of adequate anchorage for barrier against wind and water penetration, and exposure of geomembrane on steeps slopes to potential wind-generated uplift forces
+ Limit seepage height and ensure that cover soil is not saturated
+ Provision for adequate time for manufacturers to produce and deliver materials to Guam—it is imperative to construction schedule that manufacturing and shipping delays be minimized
+ Piping may be subject to clogging from biological growth, siltation, and chemical growth
+ Minimize gas migration offsite and into the atmosphere
+ Impacts of significant storm events and annual rainfall
+ Construction scheduling to avoid wet season problems
+ Adequate airspace for final placement of material at Ordot and to meet the schedule for the new landfill
+ Discharge of pollutants to the Lonfit River is the issue dictated by the consent decree rather than protection of groundwater
+ Fire prevention
+ Protection/encroachment to wetlands and private property
+ Adequacy of prediction of leachate production volumes and rates, and assumptions made to HELP model
+ Need for an Environmental Compliance Officer
+ Maximum allowable bench height and slopes
+ Performance of covered dump under seismic forces
+ Magnitude of future settlement of waste
+ Public safety liability if access to closed landfill is permitted

# COST MODEL

The VE team leader prepared a cost model from the designer's cost estimate. The model is organized to identify major construction elements or trade categories, the designer's estimated costs, and the percent of total project cost for the significant cost items.

This cost model clearly showed the cost drivers for the project and was used to guide the VE team during the VE Study. The key cost drivers were:

- Capping Systems = $7,848,105 (38.6%)
- Surface Water Systems = $44,038,920 (19.9%)
- MSE Wall System = $3,303,565 (16.3%)
- Mobilization and Miscellaneous Allowances = $2,126,500 (10.5%)

These items account for ~85% of the project cost.

Looking deeper into the cost estimate, the following subcategories are found to be the key significant cost drivers:

- Capping System
  - Geocomposite = $2,301,845 (10.3%)
  - HDPE Geomembrane = $1,989,375 (8.9%)
  - Geogrid = $1,301,025 (5.8%)
  - Native Fill = $1,473,180 (6.6%)
- Surface Water Systems
  - Berms = $1,574,200 (7.0%)
  - Bench Ditches = $1,157,200 (5.2%)
- MSE Wall Systems
  - Waste Excavation & Replacement Relocation = $1,354,500 (6.0%)
  - Waste Excavation & Replacement = $1,006,000 (4.5%)
- Mobilization and Miscellaneous Allowances
  - Mobilization = $2,000,000 (8.9%)

These key items account for ~63% of the project cost.

The VE team evaluated the estimate and suggested changes to bring it more in line as to what would be anticipated for this project. This reconciliation consisted of the following missing items and mark-ups, without altering the unit costs used to create the estimate:

1. Building Permit/Plan Checking Fee, which is a requirement from the Department of Public Works (DPW), was not include in the Engineer's Estimate. The Building Permit Fee is

Case 1:02-cv-00022   Document 190-9   Filed 01/14/2008   Page 4 of 41

determined as $5,025 for the first $1 million, plus $2.75 for each additional $1,000 or fraction thereof, of the direct costs. The Plan Checking Fee is then 65% of the Building Permit Fee.

2. The drawings depict MSE walls on each bench. The cost for these walls could not be found in the estimate provided. The VE Team developed an estimate for the bench MSE walls of $833,530 and included this in the total cost of the project.

3. The following are not specifically mentioned as part of the estimate:

   ♦ Contractor's Overhead = 10%
   ♦ Contractor's Profit = 15%
   ♦ Contingency = 5%

The resulting reconciled cost estimate raises the total project cost from the $22,398,925 given in the cost estimate to $29,797,912 which the VE team used in assessing the various alternatives.

The specific relationships of the major cost elements, as reconciled, are depicted in the following chart.

Case 1:02-cv-00022    Document 190-9    Filed 01/14/2008    Page 5 of 41

# COST HISTOGRAM- Project Cost

**PROJECT:  Ordot Dump Closure**

| PROJECT ELEMENT | | COST | PERCENT | CUMULATIVE PERCENT |
|---|---|---|---|---|
| Capping Systems | | 7,848,105 | 36.94% | 36.94% |
| Surface Water Systems | | 4,038,920 | 19.01% | 55.94% |
| MSE Wall System | | 3,303,565 | 15.55% | 71.49% |
| Mobilization and Miscellaneous Allowances | | 2,126,500 | 10.01% | 81.50% |
| Landfill Gas System | | 966,110 | 4.55% | 86.05% |
| Earthwork | | 857,190 | 4.03% | 90.08% |
| Leachate System | | 779,550 | 3.67% | 93.75% |
| Electrical System | | 210,008 | 0.99% | 94.74% |
| Erosion and Sedimentation Control | | 188,380 | 0.89% | 95.63% |
| *Construct MSE Benches* | | *833,530* | *3.92%* | *99.55%* |
| *Building Permit and Plan Checking Fee* | | *95,940* | *0.45%* | *96.08%* |
| | **Subtotal** | **$ 21,247,798** | **100.00%** | |
| **Gross Receipt Tax** | **4%** | **$ 849,912** | | |
| Cost Escalation due to Initiation Over 2 Years | 6% | $ 1,325,863 | | |
| Protection of Existing Facilities | 0% | $ - | | |
| *Contingency for Construction* | *5%* | *$ 1,062,390* | | |
| *Miscellaneous Markups (O&P)* | *25%* | *$ 5,311,950* | | |
| | | $ - | | |
| *Italicised items not in original cost estimate* | **TOTAL** | **$ 29,787,912** | **Comp Mark-up:** | **40%** |

The detailed costs estimates produced by Dueñas & Associates with support by URS Corporation follow:

# FUNCTION ANALYSIS

Function analysis was performed, which revealed the key functional relationships for the project. This analysis provided a greater understanding of the total project and how the issues, project cost, and function requirements are related.

The Function Analysis identified *Protect Environment and Health* as the basic function, with key secondary functions of *Satisfy (CRCLA D) Regulations* and *Satisfy Consent Decree* as other critical project functions that have a significant impact on the decisions that affect the project design decisions and costs. Following is a Function Analysis System Technique (FAST) diagram of the project prepared by the VE team.

Case 1:02-cv-00022     Document 190-9     Filed 01/14/2008     Page 7 of 41



FAST Diagram
Ordot Dump Closure
Guam

UNIVERSAL FUNCTIONS

| REDUCE COSTS | SATISFY NEIGHBORS | IMPROVE PRODUCTIVITY | IMPROVE SITE |

SCOPE LINE

CONTROL RUN-OFF

CONTROL RUN-ON

CONTROL STORM WATER

CONVEY FLUIDS

STORE FLUIDS

DISCHARGE FLUIDS

DISPOSE FLUIDS

RESIST UPLIFT

RESIST WIND

GROW VEGETATION

MAINTAIN SLOPE STABILITY

($3.1M)

LIMIT GAIN

MINIMIZE EROSION

ENCLOSE DUMP

MINIMIZE ODORS

($14.1M)

$95K

SECUR

RECEIVE WASTE / RECEIPT

RECLAIM WETLANDS

($51M)

SATISFY REGULATIONS

SATISFY CONSENT DECREE

Protect Environment & Health

SCOPE LINE

WHY?

HOW?

# Project Description

# PROJECT DESCRIPTION

## INTRODUCTION

This Value Engineering (VE) Report summarizes the VE Study conducted by Value Management Strategies, Inc., October 24–28, 2005, for the Guam Department of Public works (DPW). The subject of the study was the 100% design submittal Closure Plan and Post-Closure Plan for the closure of the Ordot Dump, Guam.

The purpose of the VE Study was to identify viable alternatives to enhance the project's value and functionality.

## PROJECT DESCRIPTION

The Ordot Dump Closure Project is located in Ordot, Guam. The closure of this active municipal waste dump site will be performed in accordance with Title 22, Division 4, Chapter 23, Article 6 (§23601) of the Rules and Regulations for the Guam Environmental Protection Agency (GEPA) Solid Waste Disposal (Appendix A) and Part IV of the Solid Waste Management Facility Permit Application, Landfill, at the request of the Government of Guam, Department of Public Works (DPW).

The starting date for the use of the site as a dump is not documented, but it is known that the Ordot Dump was in use during World War II. The dump was used as a disposal area by the Japanese during the Japanese occupation of Guam from December 8, 1941 to July 21, 1944 (Juan C. Tenorio & Associates, Inc. 1993). Following the liberation of Guam, the U.S. Navy continued to use the site as a disposal area. Ownership of the Ordot Dump was transferred from the United States Naval Government of Guam to the Government of Guam in 1950 under the Organic Act. Since then, the Government of Guam, specifically the DPW, has been operating the Ordot Dump as a municipal solid waste disposal facility.

The Dump is located approximately 2.5 miles south of Guam's capital, Hagatna, and about one mile west of the Route 4/Dero Drive intersection. The area surrounding the Dump is a dense brush, wooded area with scattered residences. The nearest residences are approximately 200 feet from the Dump. The Dump is situated in a ravine that is a tributary to the Lonfit River, located approximately 500 feet to the south of the site.

The Dump occupies and borders property of the Government of Guam on the northeast, east, south, and southwest boundary lines of the Dump. The north and west limits of the Dump border public land in the form of a road and privately owned land, respectively.

The Dump waste footprint area, based on the 2004 limits of waste delineation performed by Dueñas & Associates, Inc. and projected filling footprint per the Operations Plan (Dueñas & Associates Project Team (DPT, 2005a), has been estimated to be 46.8 acres. This waste footprint area will be reduced to approximately 45.8 acres during closure construction, as waste will be relocated from the western edge of the Dump and consolidated behind a mechanically stabilized earth (MSE) wall (DPT, 2005b). The precise limits of waste will be defined as a part of the Dump closure construction. The final waste volume of the Dump at the time of closure will be approximately 4.4 million-cubic yards (DPT, 2005a).

The Dump is an unlined disposal facility and has few to no control systems to manage landfill gas, leachate, surface water, erosion and sedimentation, or vectors.

The Dump closure design includes the following construction elements:

- Final grading and layout of the Dump, including provision of access roads and surface drainage features, constructed over the final cover area;
- A final cover system, constructed over an approximately 45.8-acre footprint area;
- A leachate management system;
- A surface water management system that intercepts clean surface water runoff from the closed area and conveys it to the on-site sedimentation ponds;
- Erosion and sedimentation control facilities; and
- An active landfill gas (LFG) management system.

The cost estimate for the project, as developed by URS Corporation, is $22,398,925.

## ESTIMATED COST

The reconciled cost estimate for this project is about $29.8 million. This does not include all of the items anticipated to be needed and required by Guam DPW for their end use. A copy of the URS Corporation cost estimate follows.

The VE Team's review of the estimate identified and questioned a number of additional items that are either underestimated or missing. A more detailed presentation of these items can be found in the Project Analysis section of this report.

Oneida Dump Closure
Pre-Final Cost Estimate

| Item | Description | Unit | Unit Price | Quantity | Cost | Basis / Justification |
|---|---|---|---|---|---|---|

**ESTIMATED SCHEDULE**

A schedule for the proposed construction of the closure of the Ordot Dump was provided to the VE Team and is reproduced on the following page. It calls for contractor mobilization in April 2006, with construction completion by February 2008.



Ordot Dump Closure
Guam Department of Public Works
Construction Schedule

Case 1:02-cv-00022    Document 190-9    Filed 01/14/2008    Page 15 of 41

# VE Process

# VALUE ENGINEERING PROCESS

## GENERAL

This report section describes the procedures used during the Value Engineering Study. It is followed by separate write-ups and conclusions concerning the topics noted below:

- VE Study Agenda
- VE Study Participants and Daily Attendance Sheets

A systematic approach was used in the VE study and the key procedures followed were organized into three distinct parts: (1) pre-study preparation, (2) VE study, and (3) post-study procedures.

## PRE-STUDY PREPARATION

In preparation for the VE study, the facilitator (CVS) and VE team members attended an Orientation Meeting. At this meeting the Agency representatives presented an overview of the project, decisions that have influenced the development of the project, and its current status. This included an overview of the project and its operational requirements, which enhanced the VE team's knowledge and understanding of the project. This was followed by a site trip.

In the weeks between the Orientation Meeting and the start of the VE study, the VE team reviewed documents provided by the designer to become better prepared for the study.

## VE STUDY

This value engineering study was a five-day study effort. The VE job plan was followed to guide the teams in the search of high cost areas in the design and in developing alternative solutions for consideration. The job plan phases are:

- Information Phase
- Function Analysis Phase
- Creative Phase
- Evaluation Phase
- Development Phase
- Presentation Phase

**Information Phase**

At the beginning of the VE study, the design team presented a more detailed review of the design and the various systems. This included an overview of the project and its operational requirements, which further enhanced the VE team's knowledge and understanding of the project. Guam DPW officials answered questions posed by the VE team regarding the design.

**Function Analysis Phase**

Key to the VE process are the function analysis techniques used during the Function Analysis Phase. Analyzing the functional requirements in a project design is key to assuring an owner that the project has been designed to meet the stated criteria. The analysis of these functions in terms of cost and design is a primary element in a VE study, and is used to develop alternatives without removing necessary items. This procedure is beneficial to the VE team, as it forces the participants to think in terms of functions and their related worth, and ensures that all the team members agree on the project scope. This facilitates a comprehensive analysis of the project design.

**Creative Phase**

This VE study phase involves identifying and listing creative ideas. During this phase, the VE team participates in a brainstorming session to identify as many means as possible to provide the necessary functions within the project. Judgment of the ideas is not permitted at this point. The VE team looks for a large quantity of ideas and association of ideas. The idea list is grouped by category.

The creative idea worksheets listing all ideas suggested during the study are provided in this report. These ideas should be reviewed, since they may contain ideas that are worthy of further evaluation and may be used as the design develops. These ideas could also help stimulate additional ideas by others.

**Evaluation Phase**

The purpose of the evaluation phase is to systematically reduce the large number of ideas generated during the creative phase to a number of concepts that appear promising in meeting the project objectives. The key criteria against which the ideas need to be evaluated were identified as cost, schedule, agency impact, and public impact. Each idea was tested with respect to these criteria to determine if it added or removed value from the original concept. Once each idea is fully evaluated, it is given a total rating number. This is based on a scale of 1 to 5, as indicated by the following rating index:

| | |
|---|---|
| 5 | Improves Cost & Performance—the project will benefit greatly. Significant cost and/or significant functional improvements. |
| 4 | Improves Cost or Performance—will improve the project. Some cost and/or other functional improvements. |
| 3 | Technically Feasible— but will require additional analysis to verify if cost and/or functional improvements are possible. May challenge design criteria. Needs further development. |
| 2 | Scope Reduction—will reduce cost, but at the expense of project performance. |
| 1 | Significant disadvantages – drop from consideration. |

Based upon the total rating, ideas rated positively were developed further and documented on the Value Engineering Alternative forms. Those rated as 4 or 5 were developed into alternatives. Those rated as as 3 were developed as suggestions. The balance were dropped from further consideration.

**Development Phase**

During the development phase, each idea was expanded into a workable solution. The development consisted of the recommended design, life cycle cost comparisons, and a descriptive evaluation of the advantages and disadvantages of the proposed alternatives. Each alternative was written with a brief narrative to compare the original design to the proposed change. Sketches and design calculations, where appropriate, were also prepared during this part of the study. The VE alternatives are included in the VE Alternatives section of this report.

**Presentation Phase**

The VE study concludes with a preliminary presentation of the VE alternatives that have been developed. This provides others impacted by the results of the study with an opportunity to preview the alternatives and develop an understanding of the rationale behind them.

## POST-STUDY PROCEDURES

The post-study portion of the VE study includes the preparation of this Draft Value Engineering Study Report incorporating a description of the VE study and the alternatives developed for consideration. The report will be reviewed by Guam Department of Public Works (DPW), and comments will be incorporated into the Final Value Engineering Study Report. An optional implementation meeting via teleconference may be scheduled with the DPW, if requested. The VE Team Leader will participate to help clarify any VE recommendations and assist in the resolution of the VE alternatives.

The proposed schedule for post-study procedures follows.

- Receive Draft Report ......................................................................... November 11, 2005
- MWD Review Report and Comments to VE Team.............................. November 25, 2005
- Final VE Report .............................................................................. December 13, 2005

## REFERENCES

The post-study portion of the VE study includes the preparation of this Draft Value Engineering Study

- Dueñas Project Team (DPT), 2005a Ordot Dump Operations Plan, May 2005
- Dueñas Project Team (DPT), Ordot Dump Closure, Final Environmental Baseline Survey, 2005
- USEPA Code of Federal Regulations, 1998, Title 40, Chapter 7, Parts 51, 52, and 60
- Title 22, Division 4, Chapter 23, Article 6 (§23601) of the Rules and Regulations for the Guam Environmental Protection Agency (GEPA) Solid Waste Disposal



*Day 1 – Monday, October 24, 2005*

| | |
|---|---|
| 8:00-8:15 | Introductions (All) |
| 8:15-8:45 | Brief Overviews of the VE Agenda and Process (Ron Tanenbaum) |
| 8:45-9:15 | Agency Comments: Issues, Objectives and Constraints (Guam DPS, Stakeholders) |
| 9:15-11:30 | Project Overview (Detailed Presentation by Designer Project Manager and Engineers) |
| 11:30-12:00 | Identify Performance Attributes and Rate Baseline (All) |
| 12:00-1:00 | Lunch |
| 1:00-3:00 | Site Visit |
| 3:00–5:00 | Identify Observations made on Site Visit, Critical Issues, Project Constraints |

*Day 2 – Tuesday, October 25, 2005*

| | |
|---|---|
| 8:00-8:30 | Recap of First Day/Additional Information Review |
| 8:30-9:00 | Cost Model – Review/Modification of Cost Estimate |
| 9:00-10:00 | Function Analysis/FAST Diagram – Cost/Function |
| 10:00-12:00 | Team Creativity – Generation of Ideas |
| 12:00-1:00 | Lunch |
| 1:00-4:00 | Team Creativity – Generation of Ideas |
| 4:00–5:00 | Evaluation of Ideas |

*Day 3 – Wednesday, October 26, 2005*

| | |
|---|---|
| 8:00-11:00 | Evaluation of Ideas |
| 11:00-12:00 | Team Assignments for Development, Review Alternative Development Process, Forms and Spreadsheets |
| 12:00-1:00 | Lunch |
| 1:00-5:00 | Alternative Development |

*Day 4 – Thursday, October 27, 2005*

| | |
|---|---|
| 8:00-12:00 | Alternative Development |
| 12:00-1:00 | Lunch |
| 1:00-5:00 | Alternative Development |

*Day 5 – Friday, October 28, 2005*

| | |
|---|---|
| 8:00-10:00 | Complete Alternative Development/Documentation |
| 10:00-10:30 | Finalize Team Review of VE Alternatives |
| 10:30-11:30 | Group Review, Ranking VE Alternatives/Sets, and Presentation Preparation |
| 11:30-3:00 | Lunch – sponsored by Guam DPW |
| | *Presentation of VE Alternatives Meeting (Presentation of VE Study Results to Management, Designers, Agencies, and Stakeholders)* |
| 3:00-4:30 | Study Closeout and Incorporation of Comments from Presentation |

# VALUE ENGINEERING STUDY PARTICIPANTS

The following pages include the VE study attendance lists for the VE Study.

## MEETING ATTENDEES
*Ordot Dump Closure, Guam*


VMS

| NAME | ORGANIZATION | POSITION | TELEPHONE | FAX | E-MAIL | 24 | 25 | 26 | 27 | 28 |
|------|-------------|----------|-----------|-----|--------|----|----|----|----|----|
| Ron Tanenbaum, PE, PhD, CVS | Value Management Strategies, Inc. | Facilitator | 858 204-7942 | | ron@vms-inc.com | X | X | X | X | X |
| Rico Arceo | TG Engineers, PC | Cost Estimator | 671 647-0808 | 647-0886 | ricoa@tg-engr.com | X | X | X | X | X |
| Tor Gudmundsen | TG Engineers, PC | Project Manager | 671 647-0808 | 647-0886 | tor@guam.net | X | X | X | | X |
| Joseph Hernandez | Latte Inc. | Landfill Operations & Management | 808 674-0526 | | latteinc@hotmail.com | X | X | X | X | X |
| Tim Raibley | Brown, Vence, & Associates | Civil Design | 916 652-2014 | 786-2438 | traibley@brownvence.com | X | X | X | X | X |
| Gary Siu | State of Hawaii – DOH (Unofficial Status) | Permit Engineer | 808 586-4244 | | gsiu@ehs.health.state.hi.us | X | X | X | X | X |
| Fred Otte | Otte Associates | Geotechnical, Environmental | 671 653-5100 | 653-5102 | otte@guam.net | X | X | X | X | X |
| Marc Gagarin | Guam DPW | Chief Engineer | | | | X | | | | |

# MEETING ATTENDEES
## Order Dump Closure, Guam

**VMS**

| | 2005 October | | | | | NAME | ORGANIZATION | POSITION | TELEPHONE E-MAIL | | FAX |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 24 | 25 | 26 | 27 | 28 | | | | | | |
| | X | | | | X | Jesse Garcia | Guam DPW | Chief Operating Officer | | | |
| | X | X | X | | X | Erwin Cruz | Guam DPW | Project Engineer | 671 | 646-3161 erwinc@mail.gov.gu | |
| | X | X | | | X | Dominic Muna | Guam DPW | Solid Waste Superintendent | 671 | 888-3789 dgmuna@gov.com @ | |
| | X | X | | | X | Cynthia Jackson | Guam DPW | Project Manager | 671 | 646-3289 cujackson@mail.gov.gu | |
| | X | X | X | X | X | Omar Damian | Guam EPA | CD Project Manager | 671 | 475-1619 odamian@guamepa.govguam.net | |
| | | X | | | X | Lawrence Perez | Guam DPW | Director | 671 | 646-3131 dpwdir@mail.gov.gu | 649-6178 |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |



**VMS**
Value Management Strategies, Inc.

---

**Value Management Strategies, Inc.**
Offices in Escondido and Alameda, California,
Portland, Oregon, Grand Junction, Colorado, and Seattle, Washington

Case 1:02-cv-00022    Document 190-9    Filed 01/14/2008    Page 24 of 41



*Value Engineering Report*
**Ordot Dump Closure, Guam**
**Guam Department of Public Works**

December
2005



*Value Engineering Report*
**Ordot Dump Closure, Guam**
**Guam Department of Public Works**

December
2005



*Value Engineering Report*
**Ordot Dump Closure, Guam**
**Guam Department of Public Works**

December
2005



*Value Engineering Report*
**Ordot Dump Closure, Guam**
**Guam Department of Public Works**

December
2005

# APPENDIX F

*100% Submittal*
*Ordot Dump*
*Ordot-Chalan Pago, Guam*
*Response to Pre-Final Documents*
*(July 2005)*

# ORDOT DUMP
# ORDOT-CHALAN PAGO, GUAM

# RESPONSE TO PRE-FINAL
# DOCUMENTS

*Prepared for*

Department of Public Works, Government of Guam
542 North Marine Drive
Tamuning, Guam 96911

July 2005

*Prepared by*

Dueñas & Associates Project Team

155 E.T. Calvo Memorial Parkway, Suite 200
Tamuning, Guam 96913
(671) 646-7991

# TABLE OF CONTENTS

| SECTION | DESCRIPTION |
|---|---|
| 1.0 | Response to Pre-final (90%) Closure Design Comments dated June 7, 2005 – Part I |
| 2.0 | Response to Pre-final (90%) Closure Design Comments dated June 14, 2005 – Part II |
| 3.0 | Response to Pre-final (90%) Closure Design Comments dated June 14, 2005 – Part III |
| 4.0 | Response to USEPA/GEPA Pre-final (90%) Closure Design Comments |
| 5.0 | Response to DPW Environmental Baseline Survey Comments dated January 18, 2005 |
| 6.0 | Response to GEPA/USEPA Environmental Baseline Survey Comments dated December 7, 2004 |
| 7.0 | Response to Guam EPA "Solid Waste Management Facility Permit Application Letter Dated July 27, 2005 |



/

# Response to Pre-final (90%) Closure Design Comments dated June 7, 2005

The following are responses to DPW's Consent Decree Staff Comments on the Pre-final Ordot Dump Closure Design submitted on May 6, 2005. Responses are in bold.

**Operations Plan:**

1.  Table of Contents – Please provide page numbers for the appendices.

    **Response: Page numbers for appendices are usually not included, as they are not a part of the text body of the report (Operations Plan). Appendices are documents, many of which have their own TOC.**

2.  Page 1 – Under bulleted information, to be consistent with the TOC, replace waste placement criteria with Operational Procedures, and include waste placement criteria with this bullet.

    **Response: Change has been made to the Operations Plan.**

3.  Page 2, Section 1.3 Project Site, 4th Paragraph, 2nd sentence – Revise to read as follows: "The Dump was used as a disposal area by the Japanese during their occupation of Guam from . . ." 4th Sentence- Revise to read as follows: "Ownership of the Ordot Dump was transferred from the United States Navy to the Government of Guam . . ."

    **Response: Change has been made to the Operations Plan.**

4.  Please include in the Introduction a section that provides background information on the Consent Decree, such as its purpose and strict deadlines and how the Ordot Closure came about from the Consent Decree. Page 10 discusses the Consent Decree Deadlines but there is no mention of what the consent decree is.

    **Response: Change has been made to the Operations Plan.**

5.  Figure 1-1 – Please change Ordot Landfill to Ordot Dump. This was requested of previously in the 40% design, but it has not changed. Use the vicinity map on the first sheet of the design drawings.

    **Response: Change has been made to the Operations Plan.**

6.  Page 9, Section 2.1 Incoming Waste Tonnage, Last Paragraph – Please state which incoming waste estimation was used for the filling plan.

DPW Ltr 25AUG05 - Response to DPW Prelim Comments to Prefinal                                                                                                    1
**ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT**
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164, Saipan, MP 96950 / Chalan Pale Arnold, Ada's Building South Garapan, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

**Response: The final filling plan was developed to accommodate the required airspace, as calculated in the incoming waste stream analysis, of 1.17 million cubic yards. This airspace volume is an average of the three data sources, as discussed in Section 2.1. The sentence, "The Final Filling Plan, which is included as Appendix A, was developed to accommodate this incoming waste stream volume of 1.17 million cubic yards.", has been added at the end of this paragraph.**

7.  Page 9, Section 2.3, Last Sentence – Please revise to read as follows: "The total estimated volume of the Dump after Closure is 4.7 million cubic yards."

    **Response: The volume has been reduced to 4.4 million cubic yards following the Pre-Final Submittal. The sentence has been revised to reflect the most recent volume.**

8.  Table 2-2 – The table does not mention all of the Consent Decree Deadlines for the elements of the Ordot Dump Closure and what is to be submitted, such as the 90% wetland mitigation, post-closure plan, cessation of discharge, etc. Please include.

    **Response: Change has been made to the Operations Plan.**

9.  Figure 2-1 – Please identify the uniformly dashed line in the legend.

    **Response: The uniformly dashed line was the preliminary final limits of waste, as presented in the preliminary design. The figure has been revised and the linetypes identified.**

10. Page 14, Table 3-1 – Please update the Ordot Dump Operations Personnel List throughout the Ops. Plan. *DPW will get you this information.*

    **Response: The list has been updated based on information from DPW.**

11. Page 18, Section 3.2.6 – Please provide an optimal working face width.

    **Response: In practice, the working face should reflect: the number of vehicles dumping at one time and the number of loads to be received each day. Typically, a working face 100 feet wide is workable. Verbiage describing this has been added to the Operations Plan.**

12. Page 18, Section 3.3.1 – Who will enforce the fines, and what will be the fines?

    **Response: The fines should be enforced by DPW. The fine fees have been included in the section.**

2

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

13. Page 21, Section 3.3.2 – Because the vehicle driver signs the incident form, the vehicle driver should also get a copy of the form.

   **Response: Agree. Change has been made to the Operations Plan.**

14. Page 25, Section 3.9 – Where is the Operations & Monitoring Plan? Please put in the appendix.

   **Response: The Operations & Monitoring Plan for the Ordot Dump has been appended (Appendix H) to the Operations Plan.**

15. Figure 3-3 – What is the purpose of the armorform, and why is it resting on the geogrid? If it is concrete, won't it damage the geogrid? Where is the infiltration geocomposite above the geomembrane, as stated in the 40% design submittals?
   Why is there an MSE wall on the bench? How can daily cover/prepared subgrade be placed on a 2:1 sideslope?

   **Response: The Pre-Final design included an evaluation of the flow conditions within the bench ditches. Characteristics including flow, velocity and Froude Number were estimated for the 25-year, 24-hour storm frequency. In order to accommodate future subsidence within the Dump, a longitudinal channel slope of 4% was used. This is a common practice in landfill design, however, in areas with substantial design storms, such as Guam, the result is a substantially armored ditch.**

   **The flow condition within the channel is nearly critical. In other words, the Froude number is 0.94, where critical flow is equivalent to a Froude Number of 1.0. In general, earth-lined, vegetated channels are typically able to withstand Froude Numbers up to 0.3, while channels lined with rock riprap or quarry spalls are generally stable at higher Froude Numbers. In this case, rock-lining was not considered because of the limited quantity available on-island. Armorform or its generic equivalent (Articulated Block Mat) was selected in order to protect the native fill on the bench from erosion. Armorform can be described as grout encapsulated in a reinforced, woven geotextile. The reinforcement will hold the channel lining together during subsidence, while the geotextile is expected to protect the 80-mil HDPE geomembrane.**

   **The geocomposite above the geomembrane on the benches in the Preliminary design is now shown on Figure 3-3.**

   **The MSE wall (really more a geogrid-reinforced facing) is used to keep the 4-foot high anchor bench intact. It is imperative that the anchor bench acts as a monolith, as noted in the Wind Uplift Analysis (Design Report Appendix A, Calculation No. C-2).**

   **The interface friction angle between waste and the daily cover/prepared subgrade is higher than the interface friction angle between the geomembrane and soil. Daily cover will be able to be placed at 2H:1V slopes, as we've observed it being placed on steeper**

3

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

slopes at the site. However, a soil cap alone will not be stable enough to serve as the final cover system, as it will continue to receive precipitation. With the geomembrane in place, the daily cover/prepared subgrade will no longer receive precipitation.

16. Page 31, Section 4.0 – Daily cover hauled to the Ordot Dump is currently being stockpiled onsite. Please revise. What is the regulated maximum height of daily cover stockpiles?

**Response: Agree. The verbiage in Section 4.0 has been reworded to reflect the current practice. There is no regulated maximum height of daily cover stockpiles.**

17. Page 33, Section 5.1 – Daily soil cover is being placed over the active face.

**Response: The verbiage in Section 5.1 has been reworded to reflect the current practice.**

18. Page 35, Section 6.0 – Isn't contaminated stormwater (CSW) the same as leachate, or should be treated as such? Delete the disposal of CSW to sanitary sewer system. This part of the design (disposal of the CSW and leachate) has not been established yet.

**Response: CSW and leachate are not the same, but they are usually treated as such. The discussion of the disposal of CSW to the sanitary sewer system, as mentioned in the first paragraph of Section 5.1, is included to describe what is the common situation at more modern landfills. It is not describing the Ordot Dump Closure system, as the leachate disposal method has not been established yet.**

19. Page 35, Section 6.0 – The last sentence on this page is incomplete.

**Response: The sentence has been completed.**

20. Figure 6-1 – Please indicate which side the dump or waste is on.

**Response: Figure 6-1 has been revised.**

21. Figure 6-2 – Where is the detention pond for the east side ditch? Is there a need for one since stormwater is not being discharged directly into the stream?

**Response: The East Detention Facility has been removed.**

22. Page 40, Section 7.1 – Where is the *Operations & Monitoring Plan*?

**Response: The Operations & Monitoring Plan for the Ordot Dump has been appended (Appendix H) to the Operations Plan.**

4

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel. (670)234-9017 / Fax: (670)234-3842

23. Page 42- Section 8.0 – Please indicate where the *Ordot Dump Stormwater Pollution Prevention Plan* and *Guam Air Pollution Control Standards and Regulations* can be found.

    **Response: The *Ordot Dump SWPPP* was initially prepared for closure construction activities and has since been determined to be the responsibility of the contractor. Reference to this plan has been removed. An electronic version of the *Guam Air Pollution Control Standards and Regulations* can be found on Guam EPA's website at: http://www.guamepa.govguam.net/regs/air_regs.pdf**

24. Page 42, Section 8.1.1 – What are the procedures of inspection/maintenance for surface water conveyance systems or where can they be found?

    **Response: A new section has been added to describe inspections and maintenance of stormwater and erosion control facilities. See Section 8.5.**

25. Page 43, Section 8.1.4 – Please provide general description of some physical and structural measures to contain and treat surface water runoff. This subsection just seems incomplete.

    **Response: Typical measures to contain and treat surface water runoff are detention ponds and biofiltration. None of these features exist at the Ordot Dump, and will not exist prior to closing.**

    **Following closure, surface water treatment is considered a component of water quality. Because the closure of the Dump will eliminate the discharge of leachate to the natural system and because the closure design includes lined channels designed to limit or prohibit channel erosion (through the use of ABM), no water quality features are considered necessary. However, under severe storm condition, limited erosion may occur. The Detention Pond will function to capture and store sediment caused by on-site erosion.**

26. Page 46, Section 8.4 – Where are the rock check dams construction guidelines?

    **Response: Construction guidelines for rock check dams have been included in the section (Section 8.6).**

27. Page 51, Section 9.0 – Please indicate who owns the groundwater monitoring wells.

    **Response: Change has been made to the Operations Plan.**

28. Page 55, Section 10.2 – Include sign-in sheets for site visits or inspections.

    **Response: Change has been made to the Operations Plan.**

5

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

Case 1:02-cv-00022    Document 190-9    Filed 01/14/2008    Page 33 of 41

29. Appendices – There are two sets of appendix cover sheets. Please remove the first set of appendix cover sheets.

   **Response: Change has been made to the Operations Plan.**

**Design Drawings:**

1. Drawing G-4 – The access road to the deck is at a 12% grade, which is difficult for vehicles and packer trucks to climb. This presents a liability to government.

   **Response: The access road to the deck has been revised to be no more than 10%, where the topography allows. It should be noted that after closure construction the road will be paved, allowing for easier travel.**

2. Stormwater Plan – The slope of the piping system from the deck of the dump to the base is too steep. Water velocities will buildup, in addition to the 90-degree bend in the piping system at the base. What will be the velocity of the water in the piping system coming from the deck? The plan is an aggressive expectation for water flow. The overflow direction of the detention pond in the South is in the wrong direction. East side ditch, which we believe is to be constructed during operations, does not have a stormwater detention pond to let sediment settle out, before being discharged. Why?

   **Response: The chutes may be the piping system being referred to here. Water collected on each bench is routed to a downslope open channel chute. At the toe of each slope (at each bench) the chute will outlet to a stilling basin. The size and shape of the stilling basin forces the hydraulic jump to occur on the bench within the stilling basin. Therefore, water flowing out of the stilling basin will be of a sub-critical condition before entering the chute to the next bench and stilling basin downslope. Additional details have been included to show how these chutes will transition to the sideslope berms/ditches.**

   **The top deck ditches were sized using the most conservative contributing area. The 25-year, 24-hour design flow is 20.7 cfs and the corresponding velocity where the channel enters the stilling basin prior to entering the downslope chute is 6.4 fps. Because of the nature of the flow, the ditch at the top deck requires lining with substantial turf reinforcement matting.**

   **The overflow direction is indeed shown flowing in the wrong direction; this was due to a linetype issue with CADD. It has been resolved for the final submittal.**

   **The east ditch detention facility has been removed from the design for the 100% Submittal. The west detention pond (now Detention Pond) has been resized to accommodate the required capacity. It was sized to meet the channel protection requirements, in accordance with the CNMI and Guam Stormwater Management Criteria, Phase I Final Report (Horsley Witten Group, 2004). During Operations, no**

6

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

means for stormwater detention were prescribed because of the amount of construction required to install such measures. It is, however, prescribed in the design drawings that the Detention Pond be constructed first in order to control the quantity and quality of stormwater runoff during construction.

Erosion is not expected to be excessive, as the design incorporates soils in areas with grades less than or equal to 2.8H:1V and exposed geomembrane in areas steeper than 2.8H:1V. In addition, the closure of the Dump will eliminate the discharge of leachate to the natural system and because the closure design includes lined channels designed to limit or prohibit channel erosion (through the use of ABM), no water quality features are considered necessary. However, under severe storm conditions, limited erosion may occur. The Detention Pond will function to capture and store sediment caused by on-site erosion.

3. MSE Wall –

a. Any other alternatives looked at, such as relocation of waste? Waste relocation plan vs. MSE wall?

Response: Waste relocation was considered and dismissed as a cost effective solution for the following reasons:

- Relocation of waste without an MSE Wall will require relocation of large quantity of waste, because the side slope on the west side will have to be at most 2H:1V or flatter to ensure a stable slope;
- Waste relocation will require an increased footprint of the Dump or an increased height of the deck, or both. This results in an increase in the closure area thus the increased cost of closure construction; and
- The lack of available space at the site for large quantity of relocated waste.

b. Phasing of the wall construction, such as temporary relocating waste and grading?

Response: The proposed sequence and methods for removal, transport, and placement of waste material is a required item in the Materials Handling Plan (as noted in Section 02317). The Contractor shall submit the MHP for approval. Agree.

c. Why is the MSE wall thickness uniform in the design drawings? It should be more like a dam structure, large at the base and decreasing thickness as height increases.

Response: Assuming that the word "thickness" is meant to imply the reinforcement length and/or the reinforced earth zone, and the dam structure compared to is an earth/rockfill dam, our response is:
- The stability of an earth/rockfill dam is controlled by the slope face, the shear strength characteristics of the materials used to construct the dam and the foundation, and the groundwater (phreatic) conditions within the dam. No reinforcements are usually included in the face to make the face slope steeper. Therefore, a stable earth dam is wider

7

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

Case 1:02-cv-00022    Document 190-9    Filed 01/14/2008    Page 35 of 41

at the base and narrower at the top.
- However, the stability of a Mechanically Stabilized Earth (MSE) Wall will depend on the characteristics (strength, length, spacing, etc) of the geosynthetic reinforcement used in the wall, in addition to the characteristics of materials that control the design of a dam. This reinforcement makes it possible to have steeper (up to vertical) slope at the face of the wall. This line of reasoning will explain the above comment, because steeper slopes would result in a uniform width in an earth dam. However, the comparison of width of an earth dam to the "wall thickness" (reinforcement length) of an MSE wall is somewhat inappropriate. Rather, the reinforcement requirement would be less (higher spacing, shorter length, less strength, or a combination of these) at the top than at the base of the dam.

d. Foundation requirements are not found in the plans.

   **Response: The foundation requirements and preparations have been clarified and specified in the "MSE Wall Notes" section on Sheet MSE-1 and on specifications.**

e. How deep is the waste on the west side where the wall will be built? If it is deep, how can you build the wall on waste?

   **Response: Assuming that the bottom of waste is represented by the 1940+/- USGS topo contours, the bottom of waste is well below the foundation of the MSE wall along the alignment. Since the accuracy of the survey or the validity of the above assumption is not certain, in order to avoid uncertainty during bidding and construction, the toe elevation of the wall was chosen independent of the waste elevation along the wall alignment. The waste beneath and downslope of the MSE wall (i.e., reinforced fill) will be excavated and relocated entirely. The subgrade will then be prepared with structural backfill to the design foundation elevation along the wall. In order to clarify these we have added:**
   **- an estimated profile of the waste depth to MSE wall elevations and cross sections.**
   **- additional notes on the Drawings to clarify the above.**

4. Phased Filling Plan
a. Sequencing of filling and amount of waste (in volume or tons) to be filled per sequence.

   **Response: The proposed sequence and methods for removal, transport, and placement of waste material is a required item in the Materials Handling Plan (as noted in Section 02317). The Contractor shall submit the MHP for approval.**

b. Why so many benches? Why aren't we considering fewer benches? Where are the calculations for the frequent benches?

   **Responses: The number of benches is based on the number of lifts. The number of lifts is based on the required airspace needed to continue operations until closure construction. There are no calculations for the frequent benches.**

8

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

5. Grading Plan – According to the plans, there is no access to benches for monitoring and maintenance during post closure.

   **Response: Topography has been modified to accommodate vehicle access on the benches. See 100% Design Drawing No. C-3.**

6. What is the extent of the cap limits in the design drawings?

   **Response: The cap limit is the liner limit. The liner limit will be at least 5 feet outside the leachate collector trenches on the north, south, and east sides and right at the MSE wall interior face on the west side. The liner limit is better defined with clearer linetypes in the 100% Design Drawings.**

7. Is there a landscaping plan?

   **Response: Yes. See 100% Design Sheet C-9.**

8. Where are the anchorage points on the benches and the deck for the geosynthetics in the design drawings/plans?

   **Response: The geosynthetics are anchored at the benches and the deck with the 4-foot and 2-foot thick cover soil layers, respectively. The anchor bench depth was designed, per the wind uplift analysis (included as Calculation No. C-2 in the Design Report). The geomembrane is also anchored in the downslope direction with the downslope anchor trenches. At the perimeter of the Dump, there are anchor benches, which indicate the liner limits.**

9. C-6 is not a pre-final sheet. Need more details.

   **Response: Sheet C-6 has been revised.**

10. What are your expectations of complying with the Consent Decree Schedule with respect to your design? There needs to be a plan to begin closure construction and yet still operate the Ordot Dump.

   **Response: The schedule in the Consent Decree may not work, even if construction started concurrent with final filling. The closure construction cannot be finished 1 month after the final waste receipt. This concern was brought up in a meeting with DPW and GEPA. See response to item 4 under Design Report.**

**Design Report:**

9

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

Case 1:02-cv-00022    Document 190-9    Filed 01/14/2008    Page 37 of 41

1. There is an inconsistency concerning the total area of the Dump footprint, between the design report, cost estimate, and the closure plan.

   **Response: The current waste footprint is 46.8 acres. The final filling plan waste footprint is 47.1 acres. Following waste pullback on the west side and the MSE Wall construction, the waste footprint will be 45.8 acres. The footprint areas are plan areas. The cost estimate uses surface area, which is higher than the plan area. Any inconsistencies between the closure plan and the design report have been corrected.**

2. If soil cannot be placed on sideslopes of 2:1, according to your justification to use geosynthetics, then how can 6 inches of daily cover soil stay on the 2:1 slopes to provide cushion to the geomembrane and geogrid. We cannot have geosynthetics laid in direct contact with waste on sideslopes.

   **Response: The interface friction angle between the soil and waste is higher than it is between soil and the geosynthetics. Based on the soil types used for daily cover now, we believe the soil will stay put above the waste. However, a soil cap alone will not be stable enough to serve as the final cover system, as it will continue to receive precipitation. With the geomembrane in place, the daily cover/prepared subgrade will no longer receive precipitation.**

3. Section 2.1 - Footprint area is contradicting with area given in Closure Plan. Explain.

   **Response: See response to comment no. 1 under Design Report.**

4. Section 2.3 - With this type of closure capping system design, will closure construction be completed by the expected completion date considering that operation is on-going (i.e. what are the constructability issues during closure)?

   **Response: According to the Consent Decree timeline, the new landfill is scheduled to start receiving waste on September 23, 2007, and the Ordot Dump Closure is scheduled to be complete by October 23, 2007. This gives a month from final receipt of waste to closure construction and cessation of leachate discharges to the Lonfit River, which is quite difficult if not impossible. A majority of the closure construction should be completed prior to September 23. It will be feasible to cease the discharge of leachate prior to October 23, 2007. This concern was brought up in a meeting with DPW, GEPA, URS, and D&A on April 5, 2005 at the Hilton Hotel and then again in a meeting with DPW, GEPA, URS, and D&A on April 6, 2005 at the D&A office. GEPA was going to look into it with the USEPA folks, prior to getting USEPA counsel involved. A resolution has not be shared with the D&A project team.**

   **Included in some of the challenges of constructing the closure is getting all the materials and equipment on the island in a timely manner. It is imperative that construction**

10

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

**activities are not dependent on the arrival of materials and equipment on island. Pre-procurement of materials (separate from the construction contract) may be an option.**

**The Construction Schedule is included under separate cover.**

5. Section 4.0 - Explain why final waste areas of 48.5 – acres, 45.1 – acres, and 47.2 – acres are used throughout the different submittals (inconsistencies throughout).

   **Response: See response to comment no. 1 under Design Report.**

**Closure Plan:**

1. Soil cover system in closure plan does not match design drawings and design report. Elements of the soil cover system that are not consistent are side slopes and certain layers of the cover cross-section.

   **Response: The description of the cover system in the 100% Closure Plan has been corrected to match the Design Drawings.**

2. In the 40% submittal, it is indicated in a memorandum from Duenas & Associates to the DPW and GEPA that Concept 3 was recommended, but will include a more detailed comparative analysis of the three concepts in Phase 2. 90% submittal did not include this analysis nor does it show any arguments that this concept of design is more desirable and advantageous over others. This concept does not take into account cost, constructability, and time factors. This may be further discussed during the on-board review meeting.

   **Response: This was discussed at our on-board review meeting in June.**

3. Page 1, Section 1.0, Paragraph 5- states that footprint area of 45.1 acres will be reduced to 45.1 acres. Do you mean the footprint area based on 2004 is 48.5 acres instead of 45.1, such as shown in page 2 of the operations plan? The footprint area is inconsistent throughout more than one submittal and should be corrected.

   **Response: The 2004 waste footprint is 46.8 acres, it will be expanded to 47.1 acres in accordance with the Final Filling Plan. Following the waste relocation and MSE Wall construction, the final waste footprint will be 45.8 acres. This has been clarified in the 100% Closure Plan.**

4. Page 1, Section 1.0, Paragraph 6 - Please add at least one statement regarding the leachate currently entering into the Lonfit River.

   **Response: Inclusion of the statement will be considered for the Final Submittal.**

11

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

Case 1:02-cv-00022    Document 190-9    Filed 01/14/2008    Page 39 of 41

5. Page 1, Section 1.0, Add new paragraph - Closure Cover Concepts and justification leading to the design is not mentioned.

   **Response: The closure cover concepts and justification leading to the resulting design were submitted under separate cover. The 100% Closure Plan will discuss the resulting design.**

6. Page 2, Fig. 1-1 - Change Ordot <u>Landfill</u> to Ordot <u>Dump</u> wherever it occurs.

   **Response: Revisions have been made to the 100% Closure Plan.**

7. Page 3, Section 2.0, Paragraph 1 - Page 9 of Operation plan indicates a max elev. Of dump will be 358 MSL. This paragraph states the dump is anticipated to have a final elev. Of 365 ft. MSL. Filling plan indicates final (top) elev. Of 358 ft. Please make correction.

   **Response: The final elevation of the deck is 358 feet MSL prior to closure construction. Following the waste relocated as a result of the MSE Wall construction, the deck is estimated to be at an elevation of 391 feet MSL. The Final Filling Plan deck elevation is described in the Operations Plan more clearly.**

8. Section 4.1, 2nd bullet – Shouldn't the final cover system be constructed over an approx. 45.1 acres not 48.5 acres since the cover will be installed after waste relocation (see statement on page 1)? Please correct where inconsistencies occur.

   **Response: The final cover system will be installed over the final waste footprint of 45.8 acres. This will be consistent in the 100% submittal.**

9. Section 4.2.2 - Change the first bullet to read as follows: The construction grades during closure will conform to the contours developed by Operations in accordance...

   **Response: Section has been revised in the 100% Closure Plan. This bullet has been revised to address comments received from others on the Pre-Final Submittal.**

10. Section 4.2.3 -Since access to the top of the dump will be for public use during post-closure to access the deck (park site), shouldn't design conform to Roadside Design Guide and AASHTO design guidelines? This is a problem since guardrails and other systems would not be an acceptable feature for this type of capping system design. Design does not address this concern.

    **Response: The design of the roadway is consistent with roads constructed over waste. Guardrails have been added.**

11. Section 4.3.1 - Explain the justification for having a 1:1 steep sideslope? Is this a hydraulic factor? If not please provide rationale for determining the sideslope, including repetitive benches.

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

**Response: The Final Filling Plan does not promote the construction of 1H:1V sideslopes. The only 1H:1V sideslopes that will exist just prior to closure are those that currently exist in the older parts of the Dump. A 2H:1V maximum sideslope, which was used for the Final Filling Plan, was chosen as it is more stable than current practice, and it promotes the ability to create more fill volume.**

12. Section 4.3.2.3 - Paragraph states that an equivalency demonstration can be found in the Ordot Dump Closure Design Report (2005). Cannot be located in the Design Report (pre-final submittal).

    **Response: The equivalency calculation has been included in the 100% Design Report.**

13. Section 5.0 and 5.4, Last paragraph – replace Director with Administrator.

    **Response: Change has been made to the 100% Closure Plan.**

13

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

Case 1:02-cv-00022      Document 190-9      Filed 01/14/2008      Page 41 of 41



## Response to Pre-final (90%) Closure Design Comments dated June 14, 2005

The following are responses to DPW's Consent Decree Staff Comments, Part II (additional comments) on the Pre-final Ordot Dump Closure Design submitted on May 6, 2005. Responses are in bold.

**Closure Plan:**

1. **Page 5, Section 3.1, Subsection 3.3.2** – Section 3.1 states that the current waste volume at the Dump (as of April 2005) is 3.2 million CY, and that it is anticipated that the final waste volume of the dump will be approximately 4.7 million CY. However, subsection 3.3.2 states the Dump will receive 1.23 million CY of additional waste. This does not match the 4.7 million CY as the final waste volume. 3.2 million CY plus the additional waste received, 1.23 million CY, provides a sum of 4.43 million CY of waste at the Dump at the time of closure in 2007, not 4.7 million CY. Please clarify.

   **Response: The volumes have been resolved between the plans. The most recent incoming waste stream analysis concludes that the Ordot Dump will see an additional 1.17 million CY. The 4.4 million CY is the sum of the air space provided by the Final Filling Plan and the estimated current waste volume.**

2. **Section 3.3.1-** What was your source for the waste densities of 800 and 1,200 lbs/yd$^3$?

   **Response: The waste density range of 800 to 1,200 lbs/yd$^3$ is from what URS has seen in other landfill sites.**

3. **Page 7, Section 4.2.2, Bullet No. 2** – Maximum sideslope in the Operations Plan, page 22, states 2:1, not 1:1 as stated in Section 4.2.2. Please clarify.

   **Response: The Final Filling Plan, which specifies continued filling from present until just prior to closure prescribes slopes of 2H:1V. The 1:1 slopes referred to in section 4.2.2 is referring to some of the existing slopes. Continued filling activities should not result in 1:1 slopes.**

4. **Page 7, Section 4.2.3, Section 4.2.3.2** – I thought there was only one top access road, see Post-Closure Plan. Please clarify. Any barriers to be installed along the shoulders of the top access road.

   **Response: There will be only one top access road. Barriers, to be constructed along the top access road, have been included in the 100% Design Drawings.**

DPW Ltr 25AUG05 - Response to DPW Prefinal Closure Design Comments Part II                                                                                    1
**ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT**
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164, Saipan, MP 96950 / Chalan Pale Arnold, Ada's Building South Garapan, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

5. **Page 8, Section 4.2.3.2** – Where are the methods or procedures to install cover system as required in the Rules and Regulations for the GEPA Solid Waste Disposal.

   **Response: The bid documents (Plans and Specifications) shall serve as "The methods and procedures to be used to install the cover". The Plans and Specifications instruct the contractor what the cover shall be and in what manner it should be constructed.**

6. **Page 8, Section 4.3.1.1** – The final cover cross section described is different from the Design Report Description. Please clarify.

   **Response: The Closure Plan has been corrected to reflect what is stated in the Design Report.**

7. **Page 9, Section 4.3.2.1** – The geocomposite for the infiltration collection layer is not in the design drawings.

   **Response: The Design Drawings have been revised accordingly.**

8. **Page 9, Section 4.3.2.2** – The 1:1 sideslopes do not match the Ops. Plan.

   **Response: See response to comment 3.**

9. **Page 10, Section 4.3.2.4** – How is leachate formed below the geomembrane? Mention that the leachate storage tank is located in the NE corner of the Dump. How is LFG condensate collection?

   **Response: Leachate is formed below the geomembrane by precipitation that may get through pinholes in the geomembrane cap. The discussion of the leachate storage tank will be included in the Final Submittal. LFG condensate is allowed to be directed back into the waste, via the surface collector trenches and the gas extraction wells. In addition, there is a moisture separator included in the blowers skid, illustrated in the LFG Design Drawing sheets.**

10. **Page 14, Section 4.4.2.5** – State where the basin will be located.
    **Response: The location of the detention pond shall be included in the Final Closure Plan. It is located south of the site, at the western corner.**

11. **Page 15, Section 4.6** – Leachate will transported from the sump to a storage tank locate in NE corner of the Dump and will either be pumped to the public sanitary sewer system or pumped and trucked to a off-site wastewater treatment plant. Please revise last sentence.

    **Response: Sentence has been revised.**

12. **Page 16, Section 4.7.1** – What about LFG condensate collection and transport?

2

**ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT**
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

Response: See response to comment 9.

13. **Page 17, Section 5.2** - Is the Health and Safety Plan the Safety Program located in the Ops. Plan?

**Response: The Safety Program in the Operations Plan covers the period of the continued use. The H&S Plan covers the period during closure activities.**

14. Where is the schedule of all activities necessary to satisfy the closure criteria?

**Response: The schedule as dictated by the Consent Decree will not work. Per our meeting on June 21, 2005, we have written a justification to that effect. In addition, we have provided a closure schedule on July 11, 2005 that may be proposed to GEPA that is more practical in getting the Dump closed. That Construction Schedule is provided under separate cover and as Appendix C in the Closure Plan.**

15. CPM to establish project construction time?

**Response: The schedule as dictated by the Consent Decree will not work. Per our meeting on June 21, 2005, we have written a justification to that effect. In addition, we have provided a closure schedule on July 11, 2005 that may be proposed to GEPA that is more practical in getting the Dump closed. That Construction Schedule is provided under separate cover and as Appendix C in the Closure Plan.**

**Post-Closure Care and Maintenance Plan:**

1. The acres of Dump footprint is not consistent with Closure plan, and design drawings. Please clarify through the design submittals.

**Response: The footprint area has been clarified in the 100% design submittals.**

2. **Page 4, Section 3.1.1.1** – Final cover system cross section does not match design drawings.

**Response: This has been resolved for the 100% submittal.**

3. **Page 6, Section 3.6.2** – The closure plans implies that there are more than one top access road, while this section states there is only one top access road. Also the post-closure plan states a single-lane, one-way traffic top access road, while the closure plan states a two-lane, two-way traffic top access road. These inconsistencies that must be clarified.

**Responses: The inconsistencies have been resolved between the Closure and Post-Closure Plans and the other submittal documents.**

4. Where are the monitoring and maintenance detailed plans to the closure systems? Where does it talk about monitoring lateral migration of LFG/LFG emissions/concentration of Methane

3

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

gas? Monitoring and Maintenance activities for the leachate, LFG, capping, groundwater systems, etc.? How frequent are the monitoring and inspections for the closure systems? Who will perform inspections? Who will accompany inspectors? Who will the inspections reports be submitted to? Any meetings to discuss results of the inspections? Who will be at these meetings? Where is the Closure systems monitoring plan?

**Response: The Post-Closure Plan has been revised to address post-closure monitoring but as far as what tests on samples will be performed is dependent on the results of the limited RI.**

5. **Page 9, Section 4.5.4 –** This section states there are three new wells, however, the GW Monitoring Plan in the appendix of the Ops. Plan states there are four new wells. Please clarify.

   **Response: An upgradient well was added (north of the site), and brings the number of wells to four. This has been corrected in the Post-Closure Plan.**

6. **Page 11, Section 4.6.4 –** Any leachate system inspections and how frequent?

   **Response: See response to comment 4.**


**Construction Quality Assurance Plan:**

1. **Page 1, Section 1.1 –** What is your justification for changing final cover system? How will 6" of daily cover be placed on slopes steeper than 3H:1V?

   **Response: Daily cover is currently placed on slopes steeper than 3H:1V. As an interim cover measure, the daily cover suffices. As far as having a capping system, which is solely comprised of soil on 3H:1V slopes, it will not stand up to Guam's climate. Erosion is a major concern in the long run, if a soil cap is used. In addition, the leachate generation will be much higher with a soil cap as compared to the geosynthetic cover.**

2. **Page 5, Section 3.0 –** Is the CQA Project Director the same as the CQA Engineer? If so, please indicate. If not, please identify.

   **Response: The CQA Engineer is the CQA Project Director. References to the CQA Project Director has been changed to CQA Engineer in the 100% CQA Plan.**

3. **Page 7, Section 3.3 –** Add a bullet stating preparing daily progress reports.

   **Response: Agree. The statement has been included in the 100% CQA Plan.**

4

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

Case 1:02-cv-00022    Document 190-10    Filed 01/14/2008    Page 4 of 29

4. **Page 9, Section 4.2** - Who is to be present at the progress meetings? When will progress reports be submitted? Frequency of submittals? Who will these progress reports be submitted to?

   **Response: The answers to these questions have been included in the 100% CQA Plan.**

5. **Page 11, Section 5.4.2** – Please state where the approved seam and panel layout can be found? In the specifications?

   **Response: Specification section 02077 – HDPE Geomembrane.**

**Bid Documents:**

1. Please provide a Table of Contents for the Specifications.

   **Response: TOC has been included in the 100% Design Submittal.**

2. Please specify that the vine vegetation for the exposed sideslopes should not be intrusive so as to penetrate or damage the capping system.

   **Response: Agree. Will incorporate change for the final submittal.**

3. Please include comments provided previously.

   **Response: We assume the "comments provided previously" is referring to the Response to Duenas & Associates' Questions on the DPW's Boiler Plates for the Ordot Dump Closure Construction. Agree. Those changes have been incorporated in the 100% Design Submittal.**

4. What was the basis for determining the Time of Completion (project construction time) in the Instructions to Bidders? I am assuming that it was determined based on the Consent Decree Schedule. However, is project construction time feasible and reasonable given the specific design of the closure and the situation of simultaneously operating the Dump and beginning closure construction? Was CPM used to establish a project construction time?

   **Response: The schedule as dictated by the Consent Decree will not work. Per our meeting on June 21, 2005, we will write a justification to that effect. In addition, we have provided a closure schedule that can be proposed to GEPA that is more practical in getting the Dump closed on July 11, 2005. That Construction Schedule is provided under separate cover and as Appendix C in the Closure Plan.**

**Design Report:**

1. Where are detailed quantity take-off computations and corresponding unit price analysis for the Earthwork, LFG system, Erosion and Sedimentation Control, and other pay items?

5

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax. (670)234-3842

**Response: The supporting documentation is included in the 100% Engineer's Estimate. For quantity takeoffs, several quantities are CAD provided and it will be noted in the supporting documents in the Final Submittal.**

6

**ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT**
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

Case 1:02-cv-00022    Document 190-10    Filed 01/14/2008    Page 6 of 29



## Response to Pre-final (90%) Closure Design Comments provided at the On-Board Review Meeting on June 22, 2005

The following are responses to DPW's Consent Decree Staff Comments, Part III (additional comments) on the Pre-final Ordot Dump Closure Design submitted on May 6, 2005. Responses are in bold.

### Plans

1. Where is the closure construction schedule? There should be a schedule for the list of closure construction activities to take place with respect to the design.

   **Response: The Construction Schedule is provided under separate cover and included as Appendix C in the Closure Plan.**

2. Where is the closure systems monitoring plan?

   **Response: The Post-Closure Plan is provided under separate cover.**

3. Plans and design drawings are missing grids, which would provide reference points and help locate closure systems in the field. There are also no profiles of the closure systems that indicate elevation or positioning of the systems in the field.

   **Response: The reference cross hairs and sections of the various management systems have been included in the 100% Design Drawings. The control plan includes coordinates for the various management systems.**

### Estimates

1. Not every pay item is supported with a detailed quantity takeoff computation and a corresponding unit price analysis for deriving unit prices. Such pay items include items under earthwork, the landfill gas system, and erosion and sedimentation control systems.

   **Response: The supporting documentation is included in the 100% Engineer's Estimate. For quantity takeoffs, several quantities are CAD provided and it will be noted in the supporting documents in the Final Submittal.**

### CPM

1. Was CPM used to establish the project construction time?

DPW Ltr 25AUG05 - Response to DPW Prefinal Closure Design Comments Part III     1
ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164, Saipan, MP 96950 / Chalan Pale Arnold, Ada's Building South Garapan, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

Case 1:02-cv-00022    Document 190-10    Filed 01/14/2008    Page 7 of 29

**Response: The schedule as dictated by the Consent Decree will not work. Per our meeting on June 21, 2005, we have written a justification to that effect. In addition, we have provided a closure schedule on July 11, 2005 that may be proposed to GEPA that is more practical in getting the Dump closed. That Construction Schedule is provided under separate cover and as Appendix C in the Closure Plan.**

## Post-Closure Plan

1. The post-closure plan does not reflect a complete operations manual for the required post closure monitoring and maintenance of the closed Ordot Dump. Where is the Ordot Closure systems monitoring plan. The post-closure plan only describes the requirements for post-closure care, monitoring and maintenance activities. Where are the descriptions of the methods and procedures for the post-closure monitoring and maintenance activities of the closed Dump and its systems?

   **Response: The Post-Closure Plan has been revised to address post-closure monitoring but as far as what tests on samples will be performed is dependent on the results of the limited RI.**

2

**ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT**
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

Case 1:02-cv-00022    Document 190-10    Filed 01/14/2008    Page 8 of 29



# Response to USEPA/GEPA Pre-final (90%) Closure Design Comments

The D&A Project Team presents the most recent responses to comments made by Ben Machol (USEPA Guam Program Manager), Lance Richman (USEPA Remedial Project Manager, Superfund Programs) and their consultant CH2M Hill and made necessary changes to the submittal package to reflect a 100% design submittal. Responses to the comments are as follows. Responses are in bold.

## I.    Responses to Ben Machol's Comments

There are five key findings in the memorandums that are of particular concern to EPA:

1) Settlement impacts on storm and surface water drainage - Guam must better assess the impacts of differential settlement on the closed dump. Given that post-closure settlement will affect the drainage systems as well as final contours, Guam must have a plan to address these impacts.

**Response: Due to the size, age, and variability of waste and waste placement, a settlement analysis would require very broad assumptions and would thus be an assumption in itself. As such, a settlement analysis will not be performed. Rather, drainage features have been designed with exaggerated grades, based on our landfill design experience, to provide adequate post settlement drainage.**

2) Leachate Collection - Given that the Ordot Dump is unlined, there will be a significant amount of leachate produced even after closure. Guam must have an effective method of processing leachate that will work in any foreseeable weather event. The option discussed in the design documents, trucking of leachate, does not appear to be viable during high flow periods, and is likely not the most cost-effective alternative. Guam must analyze other reasonable options.

**Response: The design scope as negotiated included only the facilities required for the management of leachate through collection and storage, and not disposal. However, DPW is currently analyzing the different options of leachate disposal, which include trucking the collected leachate, tying in the leachate management system into the existing sanitary sewer system, or pretreatment. Based on field measured leachate generation rates and the HELP model calculations, DPW will decide on which option is most feasible.**

**The D&A Project Team began dialogue with Guam Waterworks Authority (GWA) at the beginning of the project regarding the feasibility of transfer and disposal of the leachate into GWA's sewer system. However, no firm requirements/criteria were available. DPW**

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164, Saipan, MP 96950 / Chalan Pale Arnold, Pacific Plaza Bldg., Unit 5, South Garapan, Saipan 96950 /
Tel: (670)234-9017 / Fax: (670)234-3842

has sent a memo to GWA inquiring about the requirements for disposing of leachate into their sanitary sewer system, but there has been no response. DPW will follow-up with GWA and other regulatory agencies (as required) on this issue.

3) Access to benches via the haul road - As currently designed, the haul road does not provide access to the various benches. Given that operations and maintenance activities will occur at each bench, the road as currently envisioned is inadequate. Guam must design access routes to the landfill benches for the envisioned post-construction maintenance activities.

**Response: Revisions have been made to include access to the benches.**

4) Slope Stability - a slope of 1.5:1 presents very significant construction and stability issues. Guam must further evaluate whether slopes of that magnitude are feasible to construct and whether they will remain stable over the life of the landfill.

**Response: Just prior to closure only a few of the slopes will have a slope of 1.5H:1V. These slopes will not receive soil cover above the geomembrane cap. As for the slopes that are 1.5H:1V, these slopes are some of the older slopes and based on field visits, these slopes appear to be quite stable. A Global Stability Analysis was performed to confirm this, and it is submitted as Calculation No. G-2 in the Design Report.**

5) Construction Manager - There are too many construction items included within the design that are left open to interpretation by the Construction Manager. Design decisions should fall under the responsibility of the design firm, and should be completed prior to the procurement of construction services (in order to ensure that bidders have complete information). The Construction Manager's effectiveness is compromised if he or she must take on design duties as well as oversee construction. Guam must reevaluate and/or redefine the Construction Manager's role.

**Response: Concur. The design will be revised, where applicable, to ensure that design decisions are made by the design firm (Engineer of Record), so as to prevent any design interpretations by the Construction Manager and avoid compromise of the Construction Manager's effectiveness in overseeing the construction.**

Note that a draft wetland mitigation plan was not submitted with the draft closure plan. If impacts to wetlands are anticipated, Guam must submit a plan as outlined in paragraph 8 of the Consent Decree. Pursuant to paragraph 7 of the Consent Decree, DPW has 30 days from receipt of this letter to respond and incorporate the above comments as well as those presented in the enclosure.

**Response: Through previous discussion with GEPA, DPW had determined that the wetland mitigation for the closure of the Ordot Dump would be combined into one plan with the wetland mitigation for Construction of the New Municipal Solid Waste Landfill Facility (MSWLF).**

Currently at the 40% design level of the New MSWLF, it appears that there will be no need for wetland mitigation, because the 40% design is completely avoiding the wetland areas. However, confirmation on whether wetlands will be affected cannot be obtained until the 100% design is completed. Therefore, it is anticipated that the wetland mitigation for the closure of the Ordot Dump and the construction of the New MSWLF will be completed as part of the final design contract for the New MSWFLF. Acreage of wetlands affected by the closure of the Ordot Dump will be included in the Final Submittal, as well as a reference to the wetland mitigation plan being completed as part of the 100% Final Design of the New MSWLF.

## II.     Responses to Lance Richman's Comments

### Operations Plan

When will it be implemented? A number of these procedures should already be in place such as daily cover, Hazardous Waste Exclusion Program (Section 3.3.1), gas monitoring, etc.

**Response: The date of actual implementation is unknown at this time and will be determined by DPW.**

Pigs and dogs remain a concern (Section 3.8.1) that is not addressed in the plan. A proper deterrence program (fencing?) should be in place to eliminate these "vectors" of landfill pathogens that could affect folks in the area.

**Response: Following closure, the pigs and dogs should not be a nuisance to the site, as the waste will be contained under daily cover and capping system. Prior to closure, pigs and dogs have and will continue to roam the site, scavenging for food. Vector monitoring will be implemented, and if need be a deterrence program will be established and implemented.**

In the Groundwater Monitoring Plan (Appendix G) discusses a remedial investigation to be undertaken in the spring of 2005. I understand that this has been postponed until after the remedy is completed, if so it should be confirmed in this plan. Also, a complete "CERCLA compliant" remedial investigation may not be necessary at this site to address remedy protectiveness. Proper operations may be all that is necessary.

**Response: A limited remedial investigation (RI) has been proposed, as opposed to a full RI. The limited RI was expected to be performed as Task 5 of the closure design. The limited RI is to be completed after the final design documents are submitted. Any remediation design required as a result of the RI Report and any changes to post-closure monitoring resulting from the RI would be addressed after the report is completed. URS has submitted a scope of work and fee proposal for a limited RI on March 3, 2005 to D&A. D&A submitted the RI proposal to DPW on July 5, 2005 for our approval. DPW is currently analyzing the RI proposal, scheduling, and scope of work.**

One important note: to properly monitor GW movement/contaminants the depth and screen interval of the proposed monitoring wells must be defined. The success of the groundwater monitoring effort will depend on the collection of samples at the proper depth.

**Response: The data to be gathered during the limited RI and also during the drilling of the proposed wells will help define these parameters.**

## Post-Closure Care and Maintenance Plan

Guam will need to insure that any future use of the property does not compromise the remedy (Section 5.0). Additionally site controls (fencing, access restrictions) will need to be in place to eliminate any vandalism or damage to remedy components, especially the piping, blowers and flare. How this will be done should be discussed in Section 5.0.

**Response: Concur. Barriers such as fencing and bollards have been included in the 100% Design Drawings.**

## Closure Plan

I remain concerned about the impact of settlement on the stormwater/surface water drainages. Standard operating procedures (SOP) should be here or in the Operations Plan to address changes to the structure of runoff, diversion and ditches that will occur with settlement of the landfill mass. Settlement may change the required grades so that they no longer meet specifications.

**Response: Due to the size, age, and variability of waste and waste placement, a settlement analysis would require very broad assumptions and would thus be an assumption in itself. As such, a settlement analysis will not be performed. Rather, drainage features have been designed with exaggerated grades, based on our landfill design experience, to provide adequate post settlement drainage.**

## Design Report

I am concerned about the plan to store leachate at the site and then truck it for disposal (Section 5.3, LCRS Design Criteria). The volume of leachate produced will fluctuate as a function of groundwater level since the landfill is not lined. The trucking of leachate may be inefficient, messy and very expensive if the volume is large. The piping of the leachate to a local sewer line may be a better option and it should be explored. Pre-treatment of the leachate may also be necessary and should be evaluated.

**Response: The design scope as negotiated included only the facilities required for the management of leachate through collection and storage, and not disposal. However, DPW is currently analyzing the different options of leachate disposal, which include trucking the**

collected leachate, tying in the leachate management system into the existing sanitary sewer system, or pretreatment. Based on field measured leachate generation rates and the HELP model calculations, DPW will decide on which option is most feasible.

The D&A Project Team began dialogue with Guam Waterworks Authority (GWA) at the beginning of the project regarding the feasibility of transfer and disposal of the leachate into GWA's sewer system. However, no firm requirements/criteria were available. DPW has sent a memo to GWA inquiring about the requirements for disposing of leachate into their sanitary sewer system, but there has been no response. DPW will follow-up with GWA and other regulatory agencies (as required) on this issue.

<u>Landfill gas (LFG) issues:</u>

Does flaring of the LFG fit with Guam EPA's desire for energy recovery?

Response: Higher tropical temperatures and high rainfall are likely to result in a very rapid reduction in gas generation after closure. Any gas to electrical power scheme would most likely be 500 KWe or less if the power plant was to be run for any length of time (over approximately 5 years). The use of very low permeability capping with good stormwater drainage will significantly reduce the rate of water ingress and may reduce refuse degradation rates. Such an option would be of particular use in extending the gas production curve particularly in areas of more recent filling. Reducing the rate of gas generation extends the period over which a fixed gas-to-energy system can be used. The magnitude of this extended gas production period is, however, difficult to assess.

Current gas generation projections state that the gas will be able to sustain gas-to-energy operations for 5 years, which is not seen as enough time to recoup the initial capital investment. Accordingly, energy recovery at the Ordot Dump is not economically viable.

Current electrical power conditions in Guam indicate that there is an excess of power generation, therefore, the conversion of gas-to-energy at the Ordot Dump is not seen as a critical component of the closure.

Will high temperatures in the landfill destroy the PVC piping material proposed for use in pipes extracting the LFG? And, if so, an SOP will be necessary for the installation of new LFG extraction wells.

Response: No. The pipe may occasionally see some "hot" gases (up to 120 degrees Fahrenheit), but these temperatures are not high enough to degrade the pipe.

Due to the loudness of LFG blowers, noise abatement may be necessary.

Response: Specification Section 13180 states, "...the sound pressure shall be less than 85 dbA measured at a distance of 3 feet from the outer face of the equipment in a free field

environment. The equipment manufacturer shall certify the equipment furnished for this project does not exceed the specified sound pressure."

85 dbA is the minimum noise level regulated by OSHA. Paragraphs (i)(1) and (i)(2)(i) of OSHA's Occupational Noise Exposure standard (29 CFR 1910.95) states that an "employer shall make hearing protectors available to all employees exposed to an 8-hour time-weighted average of 85 decibels or greater at no cost to the employees" and "shall ensure that hearing protectors are worn by an employee (who is exposed to excessive amounts of noise (e.g., 90 decibels in 8-hour work day))."

A maintenance person is not expected to be within 3-feet of the blowers for 8-hours at a time. In addition, the flare/blowers area will be gated to prevent access to the public and to keep them beyond the 3-foot sound buffer. It is for these reasons, that noise abatement is not required.

III.    **Responses to CH2M Hill's Comments**

See Attachment 1.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 1 of 75

# Responses to CH2M Hill's Comments on the Pre-Final Closure Design Documents

**Design Drawings**
**General Comments**

1. Currently there are two very critical design/constructability issues regarding the haul road that should be addressed. The first issue is, the haul road has been designed such that there is no access to the benches. Each bench has substantial amounts of fill requiring moisture conditioning and dust control, installation of anchor trenches, placement of geosynthetics, concrete work, ditch construction, and MSE wall construction. In addition, there will be long-term maintenance required on all the benches that will require access (removal of waste, silt, vegetation, and other blockages within drainage ditches, as well as inspection and overall maintenance).

   The second issue is, the adjacent slope (north of the haul road) is very steep at 1.5:1. This will be very difficult to construct, including placement of foundation layer material. Additionally the geotechnical evaluation did not address the stability of these slopes at 1.5:1.

   **Response: Revisions have been made to include access to the benches. The access road sideslopes have been flattened to 2:1, where possible.**

2. So much is left to the Construction Manager. The Plans and Specifications should be stand-alone without decisions being made by the CM. Design-type decisions should be solely the responsibility of the Design Engineer. By making the CM responsible for design aspects of the work, there is a greater risk, and likely greater cost associated with the CM job. In addition, by leaving the decisions up to the CM, the design becomes more subjective, which could add additional costs in change orders.

   **Response: Concur. The design has been revised, where applicable, to ensure that design decisions are made solely by the design firm, so as to prevent any design interpretations by the Construction Manager, and to avoid compromise of the Construction Manager's effectiveness in overseeing the construction.**

3. There should be further work on the line types and thicknesses. Several drawings still remain unclear.

   **Response: Linetypes have been clarified, as necessary, in the drawing set.**

Case 1:02-cv-00022    Document 190-10    Filed 01/14/2008    Page 15 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 2 of 75

4. Several details and sections are not called out on plan views, or referenced to plan views, making it difficult to determine exactly what is required on each plan view.

   **Response: Callouts have been included and are properly referenced.**

5. In general, several sheets have redundant notes. These can be, or already are, included in the general notes sheets, and should not be repeated. By leaving redundant notes in a design, there is the chance for mistakes, such as the mislabeling redundant referenced sheets.

   **Response: The drawing set has been reviewed and, where applicable, redundant notes have been eliminated.**

6. In general, the waste footprint is not included on the drawings, but should be shown on all plans. This footprint is critical to proving the effectiveness of the design and must be shown to confirm that the entire waste footprint is being covered. If not, there is no way to verify that the design is adequate to cover the entire landfill.

   **Response: The waste footprint is shown on the upfront plans, and will be included in the final cover system plan (along with the liner limit). Following the final cover system plan, only the liner limit will be shown. The liner limit, shown on each plan drawing, is synonymous with the waste footprint. It will be evident in the final cover system plan that the liner will contain the waste, based on where the liner limits are shown.**

7. The wetlands delineation should be shown on all plan views since it affects almost all construction phases.

   **Response: Wetland delineation boundaries have been turned on all plan sheets.**

8. A grid or series of crosses should be added to all plan view drawings that shows the coordinate system for the surveyors, with the northings and eastings labeled at each cross or grid. The grid is typically shown on a 500 ft or 1000 ft grid.

   **Response: Series of crosses (tick marks) will be added on all applicable drawing sheets.**

9. The use of 1-ft contours makes the drawings very convoluted, and at times unreadable. Industry standard for this type of project is to use 2-ft contours or 10-ft contours to make the drawings readable.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 3 of 75

Response: The drawings have been modified to show the 2-ft contours. If needed during Closure Construction Phase, 5 ft. contour drawings will be provided.

10. In general, the contour labels are too small. They will be completely unreadable when the drawings are reduced in size.

Response: Contour labels, where appropriate, will be enlarged for the Final Submittal to be legible for half-sized drawings.

11. Check all callouts to make certain they are correctly cross-referenced. There are several that aren't called out at all, or are referencing the wrong sheets.

Response: Callouts are included and properly referenced.

12. There should be mechanical, process, and electrical legends on Sheet G-2.

Response: Legend will be updated for the Final submittal.

**Specific Comments**
**Sheet G-1**

1. L-5A, Leachate Storage Tank Details needs to be added.

Response: L-5A Leachate Storage Tank Details was a sheet added later, and instead of renaming sheets, we included it as L-5A. For the 100% Design, the leachate storage tank details are on a numbered L sheet. There are no sheets with a Drawing No. followed by an "A".

2. The plan set appears to have 61 sheets with the inclusion of L-5A. The Sheet # index needs to be updated.

Response: Additional sheets have been incorporated to the Drawing Set. There are now 80 sheets. The Index of Drawings has been updated to include all drawings from the Drawing set.

3. The Description of Drawing L-1 should include the term "Electrical" between Management and System to remain consistent with the title of Drawing L-1.

Response: L-1 should have been called Leachate Management System Plan, the Index of Drawings is correct, and the drawing name on L-1 has been corrected.

4. On the Vicinity Map, it is difficult to see the legal limits of the Ordot Dump in relation to adjacent roads/development.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 4 of 75

**Response: In general, the intent of the vicinity map is to show what is in the vicinity of the Dump. Refer to Dwg. No. G-3 (May 3 Submittal) or G-4 (July 100% Design) for the property boundaries in relation to adjacent roads/development. G-4 of the 100% Submittal contains the property boundaries.**

### Sheet G-2
### Abbreviations

1. In general, these should be checked against the drawing set for accuracy and Consistency. There are several missing or not included in the drawings. A few missing abbreviations include GGTN, CNMI, CMU, MD, and XMD. Others that are not consistent throughout include EL versus ELEV and VER versus VERT.

   **Response: This has been resolved.**

### General Legend of Symbols

1. The waste limit is not shown, and is critical in allowing the regulatory agencies to verify that the entire waste footprint is being covered. It is difficult to tell the differences between the major and minor line types. These should be made clearer.

   **Response: The liner limit, shown on each plan drawing, is synonymous with the waste footprint. Contour labels will be made clearer for half-size prints for the Final Submittal, which will aid in distinguishing major and minor contours.**

### Sections and Details

1. Check patterning against details and sections to confirm scale/linetype/line weight is in conformance.

   **Response: Concur. This has been resolved.**

2. Add additional patterning as necessary, such as "existing grade", "compacted fill", etc.

   **Response: Additional hatch patterns have been added, as necessary.**

### Section and Detail Designation

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 5 of 75

1. Typical convention is to use letters for sections, and numbers for details. This should be made clearer within the "reference to details and sections" note.

   **Response: Concur. This comment has been noted and has been addressed.**

### Sheet G-3 (100% Design Sheet G-4)

1. At this scale of drawing, and what it is trying to represent, 5-ft or 10-ft contours would be more than adequate, leaving the drawing more readable.

   **Response: The plan drawing has been revised to show the 2-ft contours. This will make the drawing more readable. If needed during the Closure Construction Phase, 5 ft. contour drawings will be provided.**

2. In general, check leaders and move them and associated text out of conflict with other graphics.

   **Response: Concur. This comment has been noted and will be addressed for the Final submittal.**

3. Drawing should show groundwater well GW-7, or label (due east of Well 8?).

   **Response: GW-7 is east of Well 8, and it will be labeled for the Final submittal.**

4. Note 2 states that waste materials excavated during construction are to be placed within the active landfill area. What happens when the landfill closes and there are no active areas? Where will the waste be placed after the landfill closes? Would it be removed from the site and disposed within the new landfill?

   **Response: Waste excavations associated with the closure construction will occur while the Dump is still open, hence there will be active on-site disposal area(s). Excavated waste shall be placed in on-site waste disposal area(s). These areas will include the deck and areas that are determined to be low or suitable for waste relocation. These areas will be described in Section 02317 of the Specifications.**

5. Suggest using different linetypes to differentiate between "actual" contours and "Projected." In addition, it is a good practice to screen back the existing contours Beneath the "projected" contours to allow the contractor to compare existing grades to projected grades.

   **Response: A new sheet (Drawing No. G-3) labeled "2004 Topography" has been added to the Drawing Set. 100% Design No. G-4 shows only one set of contours, which are the "projected existing" contours at the time the contractor**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 6 of 75

rolls into the site. It is not possible to show the "actual existing" contours, as we don't know if the topography will deviate from the projection, or to what extent the deviations are. A verification survey will be performed prior to closure construction to determine if the topography deviates from the design projections.

6. Note 5 indicates that the vertical control survey was based from Mean Sea Level. The note should indicate how the Mean Sea Level was determined (example, North American Vertical Datum 1988 used in the US).

   **Response: Elevations were determined using the Guam Geodetic Network of 1993 (GGN). The GGN is a network of 3,000 fixed monuments placed throughout the island. Each monument has a corresponding latitude and longitude position as well as an elevation. This elevation is provided in Mean Sea Level (MSL). Additional text has been added to the note.**

7. Note 9 (100% Design Note 8) indicates that the drawing reflects the approximate location of known utilities. Where is the overhead power line located? The site water line? Water line to hydrant? These should all be shown, and should be as accurate as possible to reduce the potential for claims based on unknown utilities.

   **Response: Power poles have been located and are identified in the drawing sheet. Approximate waterline locations based on visible features and available data are also identified in the drawing. As there is no readily available as-built documentation of existing underground utilities, the task of verifying underground utilities shall be the responsibility of the Contractor. Such notation has been included in the note.**

8. Note 12 (100% Design Note 11) shows that existing monitoring wells shall not be damaged, "unless specifically noted." Is there ever a case where an existing monitoring well is allowed to be damaged? If not, the last phrase should be removed from the sentence.

   **Response: Concur. There shall be no existing monitoring wells damaged, therefore, note has been revised.**

9. Note 14 (100% Design Note 13), same general comment as Comment 8 applies.

   **Response: "UNLESS OTHERWISE NOTED" will be deleted from the note.**

10. Note 15 (100% Design Note 14), states that waste must be covered at the end of each working day. What is it to be covered with? Soil, tarp, steel plates, etc.?

Case 1:02-cv-00022   Document 190-10   Filed 01/14/2008   Page 20 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 7 of 75

**Response: Waste shall be covered with daily cover material if permanently relocated or with alternate cover material if temporarily exposed. The note has been revised to reflect this.**

11. Note 16 (100% Design Note 15), indicates that the wetlands have been delineated. Who delineated the wetlands? Is the wetland limit officially recognized? Does the impact of construction to the wetlands require a 404 permit or any other permit? How is the "take" of a portion of the wetlands offset?

**Response: As noted in Note 16, the wetlands were delineated by Duenas & Associates, Inc. (Ramon Oberiano and Claudine Camacho). The wetland delineation was approved by the ACOE on January 5, 2005 and signed off by DOA (GovGuam) and GEPA.**

**Yes, the placement of fill material into waters of the United States, including wetlands, requires at a minimum, a 404 Permit from the Corps of Engineers, Federal Consistency review and concurrence from Guam Bureau of Statistics & Plans (Guam Coastal Management Program), and 401 Water Quality Certification from Guam EPA. U.S. Fish & Wildlife Service would also need to be consulted under Section 7 of the Endangered Species Act and for the development of mitigation plan.**

**A mitigation plan would be prepared in conjunction with the permit applications mentioned above, and would identify the location of mitigation site. No mitigation bank has been established yet on Guam. The offset ratio under the Corp's recent Compensatory Mitigation and Monitoring Guidelines (14 February 2005, Public Notice Number 200400448) "will be based on an acreage calculation with a typical requirement of, at a minimum, one replacement acre for every one acre of waters of the U.S. lost. If the functions and values of the aquatic resource to be impacted are high, but the project is in compliance with the Section 404(b)(1) Guidelines and is not found to be contrary to the public interest, the project may be permitted with a higher mitigation ratio requirement."**

12. The symbology for the contours does not match those shown on Sheet G-2.

**Response: This has been resolved.**

13. The actual location of the Survey Control Monuments should be shown on the drawing for visual reference.

**Response: Concur. The Survey Control Monuments are identified in the drawing.**

14. At a minimum, this drawing should show a grid or series of crosses showing the

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 8 of 75

coordinate system, with the northings and eastings labeled at each cross or grid.

**Response: Concur. Series of crosses (tick marks) have been added.**

### Sheet G-4 (100% Design Sheet G-5)

1. In general, the drawing is relatively difficult to read. The callouts and symbology should match the rest of the drawing set.

   **Response: Concur. Callouts and symbology match the rest of the drawing set.**

2. There should be access to all benches, along with haul patterns onto the benches. As an alternative, haul roads should be left to the contractor, with this plan covering controls such as where flaggers, barriers, or other controls will be located, access restrictions, etc.

   **Response: Access to benches have been incorporated. Haul roads shall be determined by the Engineer and not by the contractor, as active operational activities may still be in progress when construction begins.**

3. The contours are very confusing and do not match the rest of the drawing set or the symbology shown on Sheet G-2.

   **Response: The contours shown were 1-foot contours, but with the transition to 2-foot contours, the drawing will be made clearer.**

4. The hatching is difficult to see for the Contractor's Staging Area.

   **Response: The hatching has been revised to make the staging area more distinguishable.**

5. The existing contours are blending with what appears to be the design contours. This is very confusing.

   **Response: The contours shown reflect the projected existing contours at the time of construction. There are not two sets of contours. See Note 6 (100% Design Note 5).**

6. There should be a note that explains what the proposed contours are. Are they to top of vegetative cover/bare side slopes, top of foundation layer, etc.?

   **Response: See Note 6 (100% Design Note 5).**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 9 of 75

7. Note 6 (100% Design Note 5) is redundant with Sheet G-3 (100% Design Sheet G-4) and does not add anything to the drawing.

   **Response: The notes regarding topography are independent to each plan. G-3 (100% Design G-4) and G-4 (100% Design G-5) happen to have the same topography.**

8. Note 7 (100% Design Note 6), additional staging and storage areas should be provided by the Owner, not left up to the Contractor.

   **Response: As additional staging and storage areas will be required off-site, the Contractor will be responsible to provide the additional area needed.**

9. In the legend, who is considered "Government Traffic?" GEPA, DPW, USEPA? In addition, access should not be restricted. The Contractor will need access to the entire landfill, as will the Government agents.

   **Response: The term Government Traffic will be expanded upon in the legend. Routes shown depict main access and haul routes. Access is only restricted by landfill operations and at the direction of the Construction Manager.**

10. In general, this sheet could be eliminated, with traffic control requirements contained within the specifications (as they currently are). Per the specifications, a traffic control plan must be generated and approved. Haul routes and traffic control devices can be determined at that time.

    **Response: For purposes of bidding and design, main access and haul routes need to be established.**

### Sheet G-5 (100% Design Sheet G-6)

1. It is unclear if these drawings are included to comply with Guam Erosion and Sediment Control Regulations or NPDES General Permit Number GUR100000. If they are included to comply with NPDES permit, they should not be called a SWPPP. A SWPPP created in compliance with NPDES is a written document that contains many items (see NPDES General Permit for Storm Water Discharges from Construction Activities as modified effective January 6y 21, 2005), including the following drawings: "4. A general location map (e.g., USGS quadrangle map, a portion of a city or county map, or other map) with enough detail to identify the location of the construction site and waters of the United States within one mile of the site" and "C. The SWPPP must contain a legible site map, showing the entire site, identifying: 1. Direction(s) of storm water flow and approximate slopes anticipated after major grading activities; 2. Areas of soil disturbance and areas that will not be disturbed; 3. Locations of major structural and

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 10 of 75

nonstructural BMPs identified in the SWPPP; 4. Locations where stabilization practices are expected to occur; 5. Locations of off-site material, waste, borrow or equipment storage areas; 6. Locations of all waters of the United States (including wetlands); 7. Locations where storm water discharges to a surface water; and 8. Areas where final stabilization has been accomplished and no further construction-phase permit requirements apply."

**Response: The purpose of this sheet is to meet the requirements of the Guam Erosion and Sediment Control Regulations. The stipulations of the NPDES program on this project are currently being considered by the regulators. If required, a formal SWPPP report and figures can be prepared readily. Sheet G-5 (100% Design G-6) has been renamed "Erosion and Sediment Control".**

2. If this is meant to meet the requirements of the Guam Erosion and Sediment Control Regulations, suggest changing the name to Erosion and Sediment Control to eliminate confusion since this set of "SWPPP" plans does not meet the requirements of an official SWPPP, and an official SWPPP in conformance with NPDES General Permit Number GUR100000 will be required for this project.

**Response: See comment 1, above.**

3. The beginning and end of the rainy season should be defined somewhere on the sheet.

**Response: The wet season, as defined in Note 7, is from August 1 to November 30.**

**Erosion and Sediment Control Notes-General**

4. Note 8, the use of "and" at the end of the sentence implies that all three will be installed. May wish to change to "and/or" if they all do not have to be installed at the same time.

**Response: Concur. This change has been incorporated.**

**Project Specific Requirements**

5. Note 2 directly relates to the lined area. If it is lined, why would any ESC measures be required?

**Response: The geomembrane will be covered with earth on slopes of 2.8H:1V and flatter.**

6. Note 4 is unenforceable. There is nothing presented that will allow for measurement of when the work area exceeds its ability. The note is subjective, and is open for interpretation between the construction team.

**Response: Concur. The note has been deleted.**

7. Note 6 seems to have already been addressed under the general ESC notes. It would seem that the method for removing mud and soil from the roadways could be left up to the Contractor, and that requiring a vacuum sweeper may not be necessary as long as the requirements are met.

**Response: Concur. The note has been deleted.**

8. Note 7 (100% Design Note 4) appears to be relatively general, and not project specific.

**Response: Concur. The note has been revised to be project specific.**

9. Note 9 (100% Design Note 10), at what frequency should the silt and debris be checked and removed? This should be objective, and not subjective since it can impact the Contractor's bid, and can lead to potential claims.

**Response: This note will be revised to state that the item will be inspected weekly. Accumulated silt will be removed when 1 foot of sediment has accumulated.**

**Wet Season Requirements**

10. Note 2 conflicts with General Note 8.

**Response: Note 2 will be revised to match General Note 8.**

11. Note 3 should provide a quantity. A Contractor could take this as the entire 50± acres since there are generally no restrictions on the amount of area they can disturb at a time. Since this is possible, a quantity should be provided to allow for competitive bidding.

**Response: A minimum quantity of silt fence per acre has been included.**

**Additional Requirements for Stockpiles**

12. Note 4 is unclear. "After grading" what? Stockpile? Existing ground surface? Is this a continuation of Note 3?

Case 1:02-cv-00022    Document 190-10    Filed 01/14/2008    Page 25 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 12 of 75

**Response: This is a continuation of Note 3. The note has been included in Note 3.**

13. Note 8 (100% Design Note 7), how will the plastic sheeting be anchored? Sandbags? Tires? Other?

    **Response: Sheeting shall be anchored with Sandbags. The note has been revised.**

## Sheet G-6 (100% Design Sheet G-7)

1. The roads, lines, and planimetric features should be labeled in accordance with standard industry practice. Should show critical limits, such as wetland delineation and limits of waste.

    **Response: Concur. Revisions have been made to address this comment.**

2. The existing ditches are shown schematically. Why aren't they included as part of the topography map, especially with 1-ft contours?

    **Response: Revisions to the topography are underway and will be addressed in the Final Submittal.**

3. Note 3 does not reference the correct drawing. In addition, this is a redundant note since the referenced sheet is already a part of the Construction Documents.

    **Response: Concur. This note will be eliminated. See new Note 3.**

4. Note 4, what is temporary cover soil stabilization? If it is a TESC method, this note conflicts with notes on Sheet G-5 (see G-5 ESC Note 8 and Wet Season Requirements Note 2).

    **Response: Concur. This note is not necessary and has been deleted.**

5. The general location of the Lonfit River should be shown, whether limited to contoured areas or not.

    **Response: The Lonfit River has been identified on the drawing.**

6. The existing ditch located east of the southerly detention pond is shown as flowing upgradient.

    **Response: The linetype has been corrected.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 13 of 75

7. Note 6 (100% Design Note 4), should show "areas of cover" so Contractor can identify those areas easily.

   **Response: This note has been revised to specify "lined areas".**

8. Note 7 (100% Design Note 5) references the East Perimeter Ditch and the Southern Ditch. Based on the way this drawing is put together, the East Perimeter Ditch should not be shown as existing, and the Southern Ditch should be identified.

   **Response: This note has been clarified and the statement "NEW DITCH" has been added were appropriate.**

**Sheet G-7 (100% Design Sheet G-8)**

1. Note 1 seems more appropriate on Sheet G-6 since this sheet is supposed to be the erosion control features at the time construction is complete.

   **Response: The purpose of this sheet is to indicate what erosion and sediment control BMPs installed during construction shall remain in-place. For example, the silt fence, installed as shown on G-6 (100% Design G-7), is not shown on this sheet, as it shall be removed by the contractor prior to leaving the site. The statement "NEW DITCH" has been added were appropriate.**

2. All drainage control devices should be labeled for reference.

   **Response: Drainage control devices have been properly labeled.**

3. A good note to add would be to "see Sheet x/c-# for stormwater control design."

   **Response: Comment has been incorporated.**

4. Note 2 indicates disturbed areas to be vegetated or permanently stabilized. What other methods are proposed for permanent stabilization? These should be designed and left as options.

   **Response: Note 2 has been revised to state specific vegetative growth to be planted in areas with cover soil above geomembrane and at exposed geomembranes.**

5. The "clearing limit" shown on the drawings does not match the "clearing limit" shown on other drawings. This appears to be the "liner limit."

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 14 of 75

**Response: This appears to be a linetype issue with CAD. The linetype has been corrected and the legend revised to indicate "liner limits".**

6. Note 3 is redundant and appears to references the wrong sheet.

   **Response: Concur. The note is not required and has been deleted.**

7. Note 4 indicates that planting is to be performed on sloped areas. How can this be performed on the exposed geomembrane slopes?

   **Response: Grass will be planted in areas where there is cover soils above the geomembrane (deck, benches, and slopes with 2.8H:1V slopes or shallower). Over exposed geomembrane sideslopes, the intent is to have sponge gourd planted upgradient of the slope and have the vines "catch" on the geogrid placed above the geomembrane.**

8. Note 6 references the East Perimeter Ditch, Southern Ditch, and West Detention Pond. Where are these located?

   **Response: Callouts have been included in this sheet.**

9. It appears that the only long-term erosion control feature proposed is revegetation. What about discharge to the existing ditches? Flows will be concentrated, and may require rock filters, lining, riprap energy dissipaters or other measures to keep from heavy erosion around new discharge points.

   **Response: Permanent features, shown on sheet C-5, are shown on this sheet.**

**Sheet G-8 (100% Design Sheet G-9)**

1. Note 1 should not be left up to the Construction Manager. This is either designed or per the manufacturer's recommendations. By leaving this up to the CM, it could either be installed to a greater standard, thus leaving open the potential for a claim from the Contractor if it exceeds the designer's or manufacturer's recommendations, or it could be installed incorrectly, leading to failure and potential increase in costs to mitigate the situation.

   **Response: CM reference has been deleted.**

2. Notes 3 and 4 would be better explained with a detail. As they are now, they are open to interpretation.

   **Response: Detail 3 has been replaced with Silt Fence Check Dam. Notes 3, 4 and 5 have been deleted.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 15 of 75

3. Detail 2, will the Quarry Spalls crush the CPE? What size of CPE? Since it is temporary, may consider using lengths of steel pipe (6", 1', etc.) so crushing is not a concern.

   **Response: Design has taken this issue into consideration. If CPE is found to be insufficient this detail will be revisited for the final submittal.**

4. Where is Detail 3 used? This should be shown either on another detail, and that detail shown on the Plan, or it should be shown on the plan.

   **Response: Detail on "Triangular Silt Dike" is not used and has been replaced with a detail on "Silt Fence Check Dam", called out on 100% Design G-7 Locations of triangular silt dikes will be shown on the Final plan sheets, as appropriate.**

5. Where is Detail 4 used? What type of pipe is this being installed on? Existing? New? Is the pipe CSP, HDPE, etc.? Where are these located? Should be shown on the plans.

   **Response: See 100% Design C-23. Trash racks are to be installed at upstream of aligned and orthogonal ditches/culverts.**

6. Where is Detail 5 located?

   **Response: Detail on "Rock Check Dam" is not used and has been removed**

7. Detail 5, what is the width of the Dam? Need this to generate quantities.

   **Response: Detail is not used and will be removed from the drawing set.**

## Sheet C-1

1. This sheet is called "existing conditions." It does not reflect actual existing conditions. Suggest calling it something such as Civil Site Plan.

   **Response: This sheet reflects anticipated "Existing Conditions" at the time of construction. As far as the Contractor is concerned, these are Existing Conditions. The 2004 conditions are not relevant to the contractor, as it is not the condition the contractor will be working with. As additional information to the contractor, the 2004 Topographic Survey has been included as 100% Design G-3.**

2. Note 1 conflicts with the title of the sheet, "existing."

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 16 of 75

**Response: See response to Comment 1.**

3. In general, all known utilities should be shown. For instance, there is an overhead power line that can be approximated, and since there is running water at the site, the location of the water line should be confirmed or at a minimum approximated. If the Contractor damages a utility and it is not shown, it will not be his responsibility, even if he was generally warned through written text.

**Response: Utilities, including power poles, are identified on Sheet G-3 (100% Design G-4). Approximate waterline locations based on visible features and available data are also shown. As there is no readily available as-built documentation of existing underground utilities, the task of verifying underground utilities shall be the responsibility of the Contractor. Reference to G-4 is made in Note 3.**

4. What are the lines located on either side of the westerly stream/river line?

**Response: The lines shown are the survey-defined banks of the stream. The Plan has been revised to only show the flow centerline.**

5. This drawing should also show any existing groundwater wells/landfill gas probes.

**Response: Groundwater monitoring wells are shown on sheets G-3 (100% Design G-4). There are currently no existing LFG monitoring probes.**

6. The drawing should, at a minimum, identify all items that will be demolished.

**Response: Items to be demolished are shown on sheet C-2 Waste Relocation and Demolition Plan.**

7. There are areas of wetlands that will be disturbed. Make certain that all environmental documentation and permits have been obtained prior to construction.

**Response: All applicable local and Federal permits shall be secured prior to construction.**

8. The drawing should show the differences between "existing" and "proposed" features. May wish to show "existing" contours beneath the "proposed" contours by screening the "existing" contours beneath the "proposed."

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 17 of 75

Response: A new sheet (100% Design G-3) labeled "2004 Topographic Survey" has been included. The sheet shows only one set of contours, which are the "projected existing" contours at the time the contractor rolls into the site. It is not possible to show the "actual existing" contours, as we don't know if the topography will deviate from the projection, or to what extent the deviations are. A verification survey will be performed prior to closure construction to determine if the topography deviates from the design projections.

**Sheet C-2**

1. The existing limits of waste called out in the legend are not shown.

   Response: The "projected" limits of waste have been included.

2. Note 2 (100% Design Note 1) should be shown on the plan view using hatching/patterning so Contractor can identify the areas.

   Response: Hatching is included, but may not appear in an 11x17 copy. The issue has since been resolved.

3. Should show the MSE wall since it is called out in Note 2 (100% Design Note 1).

   Response: MSE Wall is identified in C-3, note has been revised to reference the wall shown in C-3.

4. Why leave the daily cover requirements up to the CM? The note works as a minimum without including the CM.

   Response: "Or as directed otherwise by the Construction Manager" has been deleted.

5. Demolition Note 1, there needs to be a design for this. How will the hydrant be removed, and the line capped? How will the new hydrant be installed? In addition, it would appear to be critical to show the water line for this item.

   Response: The note has been removed. The fire hydrant will be relocated prior to closure activities.

6. Demolition Notes 11 and 12, these wells should be officially abandoned as well as removed.

   Response: Items 11 and 12 (100% Design Notes 10 and 11) are not listed as historic monitoring wells, and have been described as 4 inch diameter metal pipes protruding from the ground.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1,
August 25, 2005
Page 18 of 75

7. Can the demolition material be placed within the limits of waste? Should have a note indicating whether demolished materials must be removed from the site, or whether they can be placed within the limits of the landfill.

**Response: A temporary and permanent waste relocation area has been identified on the sheet.**

### Sheet C-3

1. In general, this grading plan will not work. There is no access available to the benches. This access is critical for geosynthetic installation, MSE wall placement (per details), etc. In addition, the adjacent slopes north of the road appear to be very steep, up to 1.5:1. This will make it very difficult to add a foundation layer over the waste.

**Response: The grading plan has been revised to include access to all the benches. The slopes north of the main access road have been adjusted to make them as shallow as possible.**

2. The contours shown are hard to differentiate (majors versus minors, existing versus proposed). The symbology should be modified for better clarity, and should be consistent with other drawings.

**Response: There is only one set of contours shown, the contours shown represents the surface just after the MSE Wall construction and placement of relocated waste and just prior to the closure cap installation. All plans have been changed to show 2-foot contours, which make them easier to read.**

3. Some callouts have been cropped.

**Response: Corrected.**

4. It is typical to show the existing contours screened below the proposed grades. This allows for determination of quantities, comparison of slopes, etc.

**Response: See response to Comment 2. Quantities will be included with the Bid Sheet.**

5. Note 1 is unnecessary. This drawing is clearly a "Grading Plan" and cannot be mistaken as to reflect leachate or LFG elements.

**Response: Concur. The note has been removed.**

6. Note 2 places a huge responsibility on the CM. This will substantially increase the CM contract due to the risk the CM is taking by leading a design. Suggest leaving modifications up to the Engineer (designer) since they already hold the responsibility for the design.

    **Response: Concur. CM will be changed to the Engineer of Record.**

7. Note 2 indicates the grades shown are Finished Grade. Does that mean the grading includes the fill for the benches/access road/top deck? If so, the steep grades on each bench due to the 3.5 ft MSE walls should be shown. Should explain what the grades mean, i.e., prior to placement of cover soils, prior to placement of geomembrane (subgrade?), etc.

    **Response: Concur. Note has been revised to more clearly describe what the topography represents.**

8. Drawing should show existing monitoring wells, gas probes, and any other appurtenances that should remain undamaged. That way, if one is damaged during grading operations, the Contractor cannot claim he didn't know about it.

    **Response: Drawing C-2 cover this issue. A note has been added on this sheet to reinforce the statement.**

### Sheet C-4

1. What is the difference between the contours shown on this drawing and on the previous drawing? They do not appear to be different. If it does indeed show final cover, should have all cover soils represented.

    **Response: Concur. The contours reflect the topography with the closure cap constructed.**

2. Note 1 is unnecessary. This drawing is clearly a "Final Cover System Plan" and cannot be mistaken as to reflect leachate or LFG elements.

    **Response: Concur. The note has been removed.**

3. Note 2 places a huge responsibility on the CM. This will substantially increase the CM contract due to the risk the CM is taking by leading a design. Suggest leaving modifications up to the Engineer (designer) since they already hold the responsibility for the design.

    **Response: Concur. CM has been changed to Engineer of Record.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 20 of 75

4. Note 2 (100% Design Note 1) indicates the grades shown are Finished Grade. Does that mean the grading includes the fill for the benches/access road/top deck? If so, the steep grades on each bench due to the 3.5 ft MSE walls should be shown. Should explain what the grades mean, i.e., prior to placement of cover soils, prior to placement of geomembrane (subgrade?), etc.

   **Response: Concur. Note has been revised to more clearly describe what the topography represents.**

5. Note 3, where do these details apply, exactly? They should be called out on the plan itself. This note is too ambiguous.

   **Response: Note has been removed. Numerous references to section details have replaced the note.**

6. Note 4 (100% Design Note 2), this plan should show all the features noted. In addition, since this drawing or none of the others have anything "specifically noted", this phrase is unnecessary.

   **Response: Drawing C-2 covers this issue. The note includes reference to Sheet C-2.**

7. The "closure liner limit" shown in the legend does not continue around the entire landfill.

   **Response: Concur. This appears to be a linetype issue with CAD. It has been resolved.**

**Sheet C-5 (100% Design C-5 to C-8)**

1. Note 1 is unnecessary. This drawing is clearly a "Surface Water Management Plan" and cannot be mistaken as to reflect leachate, LFG, or final cover elements.

   **Response: Concur. The note has been removed.**

2. Note 2 places a huge responsibility on the CM. This will substantially increase the CM contract due to the risk the CM is taking by leading a design. Suggest leaving modifications up to the Engineer (designer) since they already hold the responsibility for the design. In addition, the minimum design standards for the channels should be met. If it is to be left up to the CM, should show the minimum channel slopes.

   **Response: Concur. CM has been changed to Engineer.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 21 of 75

3. Note 3, the existing stormwater control features should be accurately identified.

   **Response: Stormwater features more clearly identified in Sheets C-6 to C-8.**

4. Note 8 should reference a detail to trash racks.

   **Response: Note has been removed. Trash racks are now referenced in C-23.**

5. Note 9 should have a detail that shows what is meant by the note.

   **Response: Note has been removed.**

6. It is unclear what the dark solid line is located immediately west of the MSE wall.

   **Response: The Contour lines, closely spaced illustrating the backslope of the MSE Wall.**

7. The symbology for the Existing Waterway and SW Conveyance Channel is very similar, and should be more distinguishable.

   **Response: Linetypes have been corrected to show existing waterway as a lighter linetype.**

8. The grades on top of the MSE wall do not slope inward at 3% as shown on the detail.

   **Response: Detail C/C-13 has been revised.**

9. The width along the southerly portion of the MSE wall will not accommodate the drainage channel design for the MSE wall.

   **Response: Detail A and B in 100% Design C-13 have been revised to address this comment.**

10. Reference to "channel protection" detail 1/C-19 does not exist.

    **Response: See 100% Design C-7 and C-8. Channel protection has been replaced with an outlet to a square stilling basin and boulder weirs.**

11. The flow direction for the channel exiting the eastern side of the detention basin is pointing in the wrong direction.

    **Response: This has been corrected.**

Case 1:02-cv-00022     Document 190-11     Filed 01/14/2008     Page 6 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 22 of 75

12. There is no detail for the southerly perimeter stormwater channel.

    **Response: Section Detail A/C-16 has been revised.**

13. A detail should be developed to show how the culverts are installed over the benches, allowing for 2-feet of cover, and not damaging the underlying geosynthetics.

    **Response: Details have been included in 100% Design C-24.**

14. It is unclear where the drainage along the bottom portion of the ramp (south side) is directed to.

    **Response: See 100% Design C-8.**

15. Is the underground pipe located at the terminus of the eastern drainage channel new or existing? Is it large enough to handle the anticipated flows coming from the eastern drainage channel?

    **Response: This is a linetype issue. The line is indicating an existing channel, which is stable and is founded on bedrock. This will be clarified for the Final submittal.**

16. There is a line type located along the northerly portion of the site that looks like a fence. If this is a fence, is this existing or proposed?

    **Response: This is the existing fence line. It will be demolished and replaced, as needed to complete the liner installation. Additional notes and details will be included to address the fence issue for the Final submittal.**

17. How will the culvert located at the northern side of the site be anchored where it runs down the slope?

    **Response: The Final grading plan will eliminate the need for a culvert at this location.**

18. How is drainage from the bench located at the very top of the southern ramp terminate into the proposed ditch? This should have a detail.

    **Response: There will be ditch located on each bench at the toe of the 2H:1V slope, as shown on detail 1/C-9 of the Pre-Final submittal (100% Design detail A on C-12. This ditch will terminate into the roadside ditch located on the west (or uphill) side of the southern access road.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 23 of 75

19. How will the high velocity flows coming down the chutes be controlled when they terminate into the perimeter drainage channels? Suggest possibly adding a splash wall, and detailing how the chutes will be connected to the perimeter drainage channels.

**Response: In general, rapid flows will be dissipated using stilling basins and boulder weirs. Details on the boulder weirs are included in 100% Design C-27. A splash wall may also be a viable option and will be considered for the Final submittal. Details will be included in the Final drawing set.**

20. Reference to A/C-13 at the southeastern corner of the site: Not aware of where a headwall is, or culvert as it is referenced on the drawing.

**Response: This is a typographical error that will be revised for the final submittal.**

21. How do the Chutes terminate into the culverts?

**Response: See 100% Design C-24 and C-25.**

**Sheet C-6 (100% Design C-9)**

1. Note 2, is this to help with stability of the MSE wall faces?

**Response: The plant to be planted in the MSE Wall face is more for aesthetic purposes, to keep the exposed geomembrane from being fully exposed. It is being further investigated, whether this is still needed, desired.**

2. The linetype in the legend is not the same as the linetype on the drawing.

**Response: Linetypes in the legend and in the drawing have been corrected.**

3. Labels at the top of the drawing are cut off.

**Response: Concur. These callouts have been removed.**

4. This sheet should have hatching/patterning to show where the different types of vegetation should be planted.

**Response: Note 2 references detail on 100% Design C-31 which shows where the different types of vegetation should be planted.**

5. Sponge gourd is a climbing vine that, per literature, grows anywhere from 6 to 20 feet. If this is meant to cover the sideslopes, it may not grow long enough to

Mr. Lawrence Perez,
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 24 of 75

cover the exposed geosynthetics. Suggest a landscape architect or botanist look at this, and make a determination as to a vine that may be able to grow the entire length of the exposed geomembrane.

**Response: Local experts from the University of Guam and the Department of agriculture have been consulted for the most suitable and readily available vegetation for side slope cover. Complete cover if the exposed membrane is an aesthetics issue, and will not compromise the longevity of the cover system.**

### Sheet C-7 (100% Design C-10)

1. Would be helpful to indicate where "existing" waste is versus future waste.

   **Response: The linetypes identified in the legend have been renamed to provide clarification on what is the 2004 condition versus the projected "existing" conditions at closure.**

2. Note 1, cut lines are not shown on Sheet C-2.

   **Response: Note has been removed.**

3. What are the letters shown on the cross sections? Do these correspond with benches on the plan sheets? If so, they should be called out on the plan views for reference.

   **Response: Letters will be used to label individual lifts (15-foot height) and Numbers will be used to label individual benches. These designations will appear in a plan, most likely the Final Cover System Plan, for the Final submittal.**

4. Could likely fit Section C on this sheet, reducing the sheet count.

   **Response: Scale of the sections will be increased to enhance clarity, therefore, Section C shall remain on a separate sheet.**

5. Should call out some of the features, such as bench detail and property limits.

   **Response: Concur. This will be included with the Final submittal.**

### Sheet C-8 (100% Design C-11)

1. Would be helpful to indicate where "existing" waste is versus future waste.

Case 1:02-cv-00022    Document 190-11    Filed 01/14/2008    Page 9 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 25 of 75

Response: The linetypes identified in the legend have been renamed to provide clarification on what is the 2004 condition versus the projected "existing" conditions at closure

2. Note 1, cut lines are not shown on Sheets C-2 or C-3.

Response: Note has been removed..

3. What are the letters shown on the cross sections? Do these correspond with benches on the plan sheets? If so, they should be called out on the plan views for reference.

Response: Letters will be used to label individual lifts (15-foot height) and Numbers will be used to label individual benches. These designations will appear in a plan, most likely the Final Cover System Plan, for the Final submittal.

4. Could likely fit Section C on Sheet C-7, reducing the sheet count.

Response: Scale of the sections will be increased to enhance clarity, therefore, Section C shall remain on a separate sheet.

5. Should call out some of the features, such as bench detail and MSE wall.

Response: Concur. This will be included with the Final submittal.

**Sheet C-9 (100% Design C-12 and C-13)**

1. Note 1, is 6-inches of daily cover soil adequate to contain possible protrusions from the waste mass?

Response: Yes. The contractor will also be made responsible to remove all intrusions prior to placing the first geosynthetic layer (geocomposite). See Specification Section 02300.

2. Note 7 (100% Design Note 3) does not seem to apply to this sheet. There are no trenches located on this drawing.

Response: Although shallow, a trench is shown at the toe of the slope, below the geomembrane. In addition, depending on the method of construction of the geotextile-wrapped drain gravel above the geomembrane, a trench may also be created.

3. Note 9 (100% Design Note 5), what is a lift? Is this a panel of geomembrane?

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 26 of 75

**Response: A lift is the approximate 15-foot vertical height of waste, where the top and bottom of a lift is defined by the presence of a bench. Note will be made clearer for the Final submittal.**

4.  Suggest adding a note discussing the condition of subgrade prior to placement of geosynthetics.

    **Response: This is covered in Specification Section 02300.**

5.  Detail for cover section, why can't they run one continuous panel over the benches? Is this meant to keep welds from the sideslopes? What if the panels are long enough to go over several benches without welding?

    **Response: The reason is ease of construction. Note 9 (100% Design Note 5) has been be modified to state that if the contractor can successfully demonstrate that he can install more geomembrane than one lift at a time, as inspected by the CM, then he can do so.**

6.  How will vine vegetation root above or below the benches? Are the sponge gourds located in the side of the MSE wall supposed to cover the entire downslope exposed geomembrane?

    **Response: The intent is to get as much coverage from the sponge gourd. The sponge gourd will be planted on the exposed soil located on each bench.**

7.  How is the drainage from the sideslopes going to be directed into the drainage channel if there is a lip?

    **Response: Strip drain detail has been included. This issue is being investigated. Inquiry with the manufacturer to see if it was possible to have a ramp instead of a lip at that juncture is ongoing. At high flows, the water is expected to flow into the open channel. At low flows the water will potentially seep below the Armorform, but will be collected by the infiltration pipe.**

8.  Suggest staying away from calling out actual product, i.e. Armorform, and call it by its generic name (articulating block mat). There may be similar products that are cheaper but just as effective.

    **Response: Concur. ABM has replaced Armorform.**

9.  Where do the pipe boots apply? They should be located on sheets closer to where they are called out. In addition, the boots will fail and require repair as the landfill settles. Suggest minimizing penetrations where possible.

Case 1:02-cv-00022    Document 190-11    Filed 01/14/2008    Page 11 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 27 of 75

Response: Pipe boots apply to cleanouts and other such features. They have been relocated to 100% Design C-17. but will be properly referenced where they are used. Penetrations are only performed, as needed. Boots are associated with pipe cleanouts and landfill gas collection system, this is a standard provision and we have not experienced failures due to differential subsidence.

10. Should provide a detail for the proposed pipe perforations, showing the perforation pattern, hole size, location around circumference, etc.

Response: Perforations are described in the Specifications.

11. How will the infiltration pipes terminate, and where will they drain to? Should have detail.

Response: Infiltration pipes will terminate into the chutes. See Section Detail C/C-7 in 100% Design C-24.

12. Detail 1 (Detail A/C-4 in 100% Design C-12) shows 2:1 slopes. However, it would appear that the slopes vary.

Response: "Match Existing" will be sued to indicate the slope.

**Sheet C-10 (100% Design C-14)**

1. Note 1, is 6-inches of daily cover soil adequate to contain possible protrusions from the waste mass?

Response: Yes. The contractor will also be made responsible to remove all intrusions prior to placing the first geosynthetic layer (geocomposite). See Specification Section 02300.

2. Why use an AC pavement section? It will crack and degrade, creating maintenance problems. An aggregate base road should work, and would require much less maintenance.

Response: AC pavement is a type of flexible pavement and has been used at other landfill closures and have proven to be successful. In addition, an AC paved road offer trucks a better surface to travel on. The presence of a geocell will help reduce potential localized settlement. Asphalt treated aggregate base will be considered, and may replace the AC pavement detail for the Final submittal.

3. Suggest staying away from product names, such as Geoweb, and using the generic name cellular confinement system.

Case 1:02-cv-00022    Document 190-11    Filed 01/14/2008    Page 12 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 28 of 75

Response: Geocell has replaced Geoweb.

4. Detail 3 (Detail A/C-4 in 100% Design C-14), the callout for 28″ native fill should be 22 inches. Could even leave the reference to thickness off the drawing, or show a dimension.

Response: Drain sand has been replaced with geocomposite, due to high drain sand costs. With drain sand the native fill was 22 inches thick, but now it will be 28 inches thick.

5. Detail 3 (Detail A/C-4 in 100% Design C-14) shows 2:1 slopes. However, it would appear that the slopes vary.

Response: "Match Existing" will be used to indicate the slope.

6. Detail 3 (Detail A/C-4 in 100% Design C-14), a concrete drainage channel will be a maintenance nightmare as the landfill settles. Suggest using something more flexible, such as the channel lining proposed for the benches.

Response: Drainage channel changed to ABM.

7. Why isn't there an infiltration drainage system similar to the benches?

Response: Details have been included in 100% Design C-12.

8. How will stormwater from the sideslopes find its way into the drainage channel?

Response: This issue is being investigated. Inquiry with the manufacturer to see if it was possible to have a ramp instead of a lip at that juncture is ongoing. At high flows, the water is expected to flow into the open channel. At low flows the water will potentially seep below the Armorform, but will be collected by the infiltration pipe.

## Sheet C-11 (100% Design C-15 to C-18)

1. How will the liner system terminate at the toe of the landfill? Should have a detail.

Response: The geomembrane cap will terminate outside of the leachate collector trenches, as illustrated in 100% Design L-4.

2. It is unclear where these details are shown.

Case 1:02-cv-00022    Document 190-11    Filed 01/14/2008    Page 13 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 29 of 75

**Response: We will try and make it clearer for the Final submittal.**

3. Detail 2 (Detail 1 on 100% Design C-15) is unclear. It would help to show the drainage channel and any other identifying structures and grade breaks for reference, or make Detail 1 a section, and show it relative to Detail 2.

   **Response: Concur. Will be modified for the Final submittal.**

4. Detail 2, why not simply extend the upper patch all the way over to the full panel instead of having two patches?

   **Response: The detail will be revisited to see if it is possible. If so, detail will be modified for the Final submittal.**

**Sheet C-12 (100% Design C-22)**

1. Section C (Section A on 100% Design C-22) is a different side slope cover section than the typical sideslope section. Where does this apply? Should show on the final cover plan, possibly using hatching/patterning.

   **Response: Call outs for this section are provided to indicate the area where the detail applies**

2. Should show a cover section like Section C with the final cover details.

   **Response: Details for the**

**Sheet C-13 (100% Design C-23)**

1. Detail A, reference to Note 5, this note is not about backfill.

   **Response: Note has been removed.**

2. Note 4 references the same sheet.

   **Response: Note has been removed.**

3. Check detail references to notes. It would appear that there are several notes missing (referenced but not present) or are incorrectly noted.

   **Response: References have been checked and revised accordingly.**

4. Need to check callouts. It is unclear where the headwall details apply.

Case 1:02-cv-00022    Document 190-11    Filed 01/14/2008    Page 14 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 30 of 75

**Response: Callouts will be checked and revised accordingly.**

5.  Section C, the MSE wall becomes very narrow along the southerly end. This detail will likely not work for this area.

    **Response: This detail (located C-18 detail A) has been revised and the site topography has been revised to accommodate this area.**

6.  Drawing is sheet 21 of 60, not 24 of 60.

    **Response: Correction has been made.**


**Sheet C-14 (100% Design C-24 to C-27)**

1.  Suggest using culverts instead of chutes over the benches. As designed, the chutes eliminate any vehicular access around the benches. And, with stilling basins, there will be sediment that will have to be removed constantly, making it difficult to maintain.

    **Response: Because a significant portion of the site is exposed geomembrane and only flat slopes are earth-covered and will be established with vegetation, the potential for erosion is not considered a significant issue. Therefore, sediment removal from the stilling basins is not expected to create a maintenance issue. However, in order to provide adequate access to the benches, culverts have been designed in conjunction with a smaller stilling basin with baffle blocks used for energy dissipation.**

2.  The stilling basins likely will remain wet for much of the year, creating a mosquito breeding location.

    **Response: If a stilling basin is used, a mechanism to drain the basin will be included in the Final submittal.**

3.  There should be a plan view of the chute/bench connection showing how it will be connected.

    **Response: Plan view has been added to 100% Design C-24.**

4.  How will the underlying infiltration pipes terminate into the chutes?

    **Response: The infiltration pipes will daylight into the chute, which will be depressed into the sideslope. Details have been added to 100% Design C-24.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 31 of 75

5. Note 2, Chute and Bench numbers should be labeled on the plan view and not left up to interpretation. This is a quick addition that will eliminate ambiguity.

   **Response: Labels have been added to 100% Design C-6, C-7 and C-8.**

6. Where are Details 1 and 2 shown?

   **Response: Details have been deleted.**

### Sheet C-15 (100% Design C-28)

1. There are incorrect references to the inlet and outlet channel alignments.

   **Response: Correction has been made.**

2. Section A (100% Design C-28), should call out elevation at top of berm.

   **Response: Correction has been made.**

3. Details and contours show the pond bottom elevation at 48 ft, but drawing shows 49 ft.

   **Response: Correction has been made. Pond bottom elevation is 57 ft (Elevation 56 ft plus 12 inch gravel).**

4. Boulder weirs are not shown on Sheet C-19.

   **Response: Reference to boulder weirs have been removed from this sheet. Boulder weir plan, profile and section have been included in 100% Design C-8 and C-27.**

5. What does the linetype represent coming out of the spillway?

   **Response: Linetype (shown on 100% Design C-8) represents the emergency outlet channel, however, there was a linetype issue. The correction has been made.**

6. The linetype in the legend for the proposed final topography looks like it represents grade breaks, not contours. In addition, the linetype for existing topography does not match the plan.

   **Response: The plan view has been removed to eliminate confusion.**

7. Major contours should be easily discernable from minor contours.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 32 of 75

**Response: The plan view has been deleted from the sheet. 2-foot contours will be used instead of 1-foot contours, this should aid in making the major and minor contours discernable. In addition, the major contours will be the contours labeled, all others are minor contours.**

8. Typically ponds have a very shallow slope to the outlets to prevent ponding and breeding of mosquitoes. Suggest perhaps a 1% grade from north to south.

   **Response: The bottom of the pond will be sloped 0.5% (See 100% Design C-29) to facilitate drainage and reduce ponding.**

### Sheet C-16 (100% Design C-30)

1. Detail 2 (Detail 1 on 100% Design C-30), it is unclear where this is called out on Sheet C-15.

   **Response: Detail has been renamed and referenced appropriately.**

2. The orifice plate should be shown on Detail 3 (100% Design Section A).

   **Response: Concur. Orifice control plate has been included in Section A.**

3. Detail 3, what is the material that is "3/4" x 4" formed to fit in groove of C.B. Riser?"

   **Response: Galvanized steel. Note 1 has been inserted in the sheet to indicate that all metal parts shall be galvanized steel**

4. What material is the orifice plate made of?

   **Response: Galvanized steel. Note 1 has been inserted in the sheet to indicate that all metal parts shall be galvanized steel**

5. How will the geomembrane liner be connected to the structure shown in Details 2 and 3?

   **Response: The pond outlet control structure will sit on top of the drain gravel, which will be placed over the geomembrane pond liner on the bottom of the pond. The outlet pipe leaving the pond will be booted through the pond liner where the pipe penetrates the embankment. See Section C/C-8 in 100% Design C-28.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 33 of 75

6. The orifice plate shows the bottom elevation set at elevation 48.5 ft, but the plan view shows the bottom at elevation 49 ft.

   **Response: Typographical error, the correct orifice plate bottom elevation is 58.5 ft.**

7. What keeps the debris screen from swinging downward? Does it sit on the edge of the structure?

   **Response: The debris screen is bolted to the top of the structure.**

8. Detail 4, the plan indicates that the inlet is actually a ditch and not a pipe.

   **Response: Detail has been revised and can be found in 100% Design C-29.**

9. Section C, what is the height from the top of the spillway to the floor, and how far out from the toe of the outlet does the riprap extend? Should verify the dimension from top of berm to end of rock riprap.

   **Response: Detail 5 Overflow Spillway has been revised and Section C callout is now Section D callout. Section and relocated to 100% Design C-30. has been Section has been renamed The spillway crest is at elevation 60.5, as indicated on C/C-16. The top of the drain rock, at the base of the pond, is at elevation 49. The difference is 11.5.**

   **Because the riprap is intended for outlet protection, the riprap will be placed only on the downstream side of the spillway. In other words, no riprap will be placed within the pond at the location of the spillway.**

   **Some excavation of the outlet channel will be required to direct water away from the toe of the embankment. The outlet channel will require armoring for about 20 feet downstream of the outside toe.**

**Sheet C-17 (100% Design C-21)**

1. The profile does not match the plan in places, e.g. at Sta. 1+45, plan shows El 265, profile shows El 260; Sta. 5+71, plan shows El 247, profile shows El 246; Sta. 13+00, plan shows El 212, profile shows El 205.

   **Response: Plan and profile have been revised.**

2. The channel appears to discharge under high velocity onto unchannelized ground. This will cause scouring without proper energy dissipation.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 34 of 75

Response: The channel, in fact, does outlet to a stable channel. This is supported by survey data in this area. Boulder weirs placed in the existing channel have been successful in providing grade control on similar projects. However, as a cost-savings measure, there will be one common detention facility for the site.

3. Boulder weir is not shown on Sheet C-19.

   Response: Boulder weir plan, profile and section are shown on 100% Design C-8 and C-27.

4. From Sta. 0+00 to Sta. 0+50, plan shows channel flowing in opposite direction.

   Response: Plan and profile have been revised.

5. Is there really a spillway located at approximately Sta. 2+80?

   Response: A square stilling basin has replaced the spillway.

6. Why isn't the detention pond lined similar to the detention pond to the south?

   Response: The eastern detention pond has been eliminated. There will only be one common detention facility for the site, located south west of the Dump.

7. The grade is flat from approximately Sta. 3+53 to Sta. 7+42, and is not sloped at a 0.5% grade as shown in profile.

   Response: Plan and profile have been revised and sloped between 0.012 ft/ft to 0.25 ft/ft.

8. Need callout for "outlet structure."

   Response: The outlet structure is called out, where appropriate in the drawings.

9. Plan shows slope of approximately 20% from Sta. 13+00 to 13+66, not 10% shown on profile.

   Response: Plan and profile have been revised.

## Sheet C-18

1. Suggest placing geotextile beneath riprap to reduce the potential for scouring. Stormwater has a tendency to find preferential pathways beneath riprap.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 35 of 75

**Response: Concur. Geotextile will be incorporated into this application.**

2. Section A, why is there a MSE wall? Why is this not shown on any plan views? It is only shown in this detail for work along the eastern edge.

    **Response: The grading plan on the East side has been revised to eliminate the need for an MSE wall.**

3. Detail 1 should be called out on plan view, previous sheet.

    **Response: Sufficient callouts will be included for the Final submittal.**

4. Detail 2 should show the minimum slope on the berm.

    **Response: Detail 2 Plan-East Detention Outlet Structure is no longer required and has been deleted.**

5. Detail 2, what is the lining over the berm? Is this vegetative-lined, TRM/ECB/ABM?

    **Response: Detail 2 Plan-East Detention Outlet Structure is no longer required and has been deleted.**

6. Detail 2, should call out the detail for both trash racks (overflow and outlet pipe).

    **Response: Detail 2 Plan-East Detention Outlet Structure is no longer required and has been deleted.**

7. Detail 2, should call out the inlet and outlet invert elevations.

    **Response: Detail 2 Plan-East Detention Outlet Structure is no longer required and has been deleted.**

8. Need a detail on how the overflow structure is tied to the HDPE pipe. In addition, if the outlet pipe is full when the water gets to the elevation of the overflow, how will the overflow be effective? The outlet pipe will already be at capacity.

    **Response: If the outlet pipe is flowing full when water gets to the elevation of the overflow, the overflow is not effective. However, the outlet pipe is sized to pass the 100-year storm and is not expected to flow full under normal operating conditions. If a larger storm occurs, the water level in this facility will rise and eventually, water will spill over the berm.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 36 of 75

**Sheet C-19 (100% Design C-29)**

1. Section C, how wide is the anchor trench?

   **Response: 2 feet – this section has been revise.**

2. The pond will require anchoring on the sideslopes to keep from having a blowout. Suggest sandbags or old tires attached with ropes.

   **Response: Compacted backfill will be placed around the perimeter of the pond to secure the geo-membrane and geo-liner.**

3. Section D, where is LLDPE used?

   **Response: LLDPE is not used. Reference to LLDPE has been deleted.**

4. Section D, where does this section apply?

   **Response: It was intended for the outlet pipe shown in Section C of 100% Design C-28.**

5. Note 3 should reference pond liner, not cover system.

   **Response: Note 3 (Note 2 on 100% Design C-29) has been revised to reference pond liner.**

**Sheet C-20 (100% Design C-31)**

1. How will sponge gourd be planted on a vertical face? Seeding? Plants?

   **Response: The intent is to vegetatively plant them on the 6-inch wide horizontal face of the MSE wall.**

2. Note 3, how can sponge gourd be planted if there is no cover soil?

   **Response: See response to Comment no. 1.**

3. Suggest a botanist or landscape architect review this to verify that sponge gourd will cover the entire exposed geomembrane.

   **Response: Concur. We are inquiring about it with a soil scientist from the University of Guam.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 37 of 75

## Sheets C-21 and C-22 (100% Design C-31 and C-32)

1. Some sheets show the shown limit as edge of liner, others edge of waste. Need to be consistent.

   **Response: Revisions were made to maintain consistency of the limit as edge of liner and 450-R4 .**

## Sheet C-23 (100% Design C-34)

1. Note 1, these coordinates should NOT be affected by consolidation of waste and settlement of surface. These should be chosen to be outside the landfill footprint, and thus should not change.

   **Response: Concur. Note that the limit of waste was defined with test pits, and the limit between test pits was determined by drawing a straight line, between test pits. If the contractor discovers that there is waste outside of the defined limit of waste, he will be required to pull it into the defined limit of waste.**

2. These coordinates should be used as an absolute, and only be modified if waste has been identified outside the limits. The Contractor must have a basis for construction. Changes should only be made when waste is encountered.

   **Response: See response to Comment No. 1.**

3. There should be controls on the final grades. This should not be included until the final grades are close to being established.

   **Response: Elevations may be provided, but due to the fact that filling has not yet occurred as projected, field conditions may change.**

## Sheets C-24 and C-25 (100% Design C-32 and C-33)

1. There should be control points located on the benches. In general, there should be many more control points.

   **Response: Some control points have been located on the benches. Control points are included as guidance points and may be affected if field conditions differ.**

2. Placement of control points should be delayed until the end since the layout will likely be modified.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 38 of 75

Response: Concur.

### Sheet C-26 (100% Design C-35 and C-37)

1. Note 1, these should not be field adjusted by the CM since the operation of the channels are dependent on the Engineer's design. The design should be modified as necessary immediately before construction to minimize the potential for settlement.

   **Response: Concur. To take it further, the site should be surveyed just before bidding to ensure that the design still is valid for the field conditions. All necessary design modifications should be made by the Engineer.**

### Sheet L-1

1. Suggest adding a cleanout in the "Leachate Trench" along the southerly edge of the site.

   **Response: Cleanouts have been added along the trench.**

2. Note 2 (Note 3 on 100% Design L-1), unclear what a pullboxet is.

   **Response: "pullboxet" should have read "pullboxes". The typographical error has been corrected.**

3. Need a callout for the manholes

   **Response: Concur. A callout for the manholes has been added.**

4. Note 5 is redundant. These are already called out on the plan.

   **Response: Concur. Note 5 has been deleted.**

5. The leachate collector trench is running beneath waste along the southwestern edge, south of the MSE wall. What is the detail for this section of trench?

   **Response: There will not be any leachate collector trenches beneath waste. The leachate collector trenches will be located at the limit of waste, in all areas. This will be made clearer in the plan and detail drawings. Additional leachate collector trench details have been added to clarify this.**

6. Verify that the pump station and associated electronics are explosion proof.

Mr. Lawrence Perez        )      ATTACHMENT 1
Ordot Dump Closure                       August 25, 2005
Revised Response to USEPA/GEPA Pre-final Comments      Page 39 of 75

**Response: Concur. Explosion-proof requirements have been added to the Specifications.**

7. Air release valves may be needed at high points along the leachate conveyance pipe.

   **Response: The leachate collector pipe is perforated, therefore, it is unlikely that pressure will buildup due to air in the line. As for the leachate conveyance pipe, there will be no high points along the leachate conveyance pipe.**

8. In the northerly portion of the site, it appears that there as a portion of waste that lies outside the closure liner limit (man-made slope extends outside liner limit).

   **Response: The liner limit, shown on the plan drawing, is synonymous with the waste footprint.**

9. Please check callouts for accuracy.

   **Response: Concur. Callouts have been checked for accuracy.**

10. Where is the one-line diagram for the pump station?

    **Response: The pump station is included in the one-line diagram located as Detail 1 on LFG-8.**

11. Where is the detail for the tie-in to the existing system?

    **Response: Tie-in of the leachate management system at the Dump with the existing sanitary sewer system is currently an unfunded item in the designer's contract. The closest tie-in to the sanitary sewer system is located in front of Agueda Johnston Middle School, located northeast of the site.**

12. What size conduit?

    **Response: Conduit sizes are shown on the one-line diagram in Drawing No. LFG-8. Reference will be added for the Final submittal.**

13. What size wires?

    **Response: Wire sizes are shown on the one-line diagram in Drawing No. LFG-8. Reference will be added for the Final submittal.**

14. If this is an electrical system plan, why show the trenches, cleanouts, manholes, etc.? Shouldn't there be a separate piping plan to accompany the electrical plan?

**Response: The sheet was incorrectly labeled Leachate Management Electrical System Plan. It is now labeled Leachate Management System Plan.**

15. Why is there an enlarged Flare Station Area plan when this drawing is about leachate management?

    **Response: The enlarged plan was incorrectly labeled Flare Station Area. It is no labeled Leachate Storage Tank Area.**

16. Where is the leachate pump station control panel located?

    **Response The leachate pump station control panel is located adjacent to the valve vault and is above grade (See A/L-6 and L-10).**

**Sheet L-2 (100% Design L-4)**

1. Note 5, who will make the determination as to allowable cut slope? This should be determined by a geotechnical engineer or certified engineering geologist.

   **Response: Determination shall be made by a Professional Engineer. The note has been revised.**

2. Notes 7 and 8 are redundant since these dimensions are already called out on the details.

   **Response: Note 7 and 8 have been deleted.**

3. Detail 2 (Detail B on 100% Design L-4), suggest allowing HDPE geomembrane in trench to extend to top of trench, not just 2 feet up.

   **Response: Detail has been modified to show the HDPE geomembrane extended to the bottom of the waste (at the interface with the original grade).**

4. Detail 2 (Detail B on 100% Design L-4),, is there a minimum depth of burial for the collector pipe?

   **Response: The collector pipe invert shall be at the bottom of the trench, which is 6 ft minimum.**

5. There should be a detail showing the design for the perforations, i.e. hole diameter, hole layout, position around circumference, etc.

Case 1:02-cv-00022    Document 190-11    Filed 01/14/2008    Page 25 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 41 of 75

Response: The specifics of the perforations is included in Specification Section 02652 – Leachate Collection System.

### Sheet L-3 (100% Design L-5)

1. Please check callouts for accuracy.

   Response: Callouts have been checked for accuracy.

2. Note 7, who will make the determination as to allowable cut slope? This should be determined by a geotechnical engineer or certified engineering geologist.

   Response: Determination shall be made by a Professional Engineer. The note has been revised.

3. Note 8, the HDPE geomembrane should be attached to the manhole in the same manner.

   Response: The geomembrane will be outside the manholes, and will be terminated in anchor trenches, a minimum of 5 feet from the leachate collector trench (See 100% Design L-4).

4. Detail 1, should state that the pipe cleanout is solid pipe, and the leachate collector pipe is perforated.

   Response: The detail has been revised to clarify that the leachate collector pipe is perforated.

5. Detail 1, the 4′ dimension should be stated as a minimum since the depth of slope will vary, but not be less than 4′.

   Response: The text for the dimension has been revised to state "4′ MIN." and refers to Section A on 100% Design L-4.

6. Detail 2, the 4′ dimension should be stated as a minimum since the depth of slope will vary, but not be less than 4′.

   Response: The text for the dimension has been revised and refers to Sections A & B on 100% Design L-4.

7. Detail 2, the reference to an elbow should be a wye.

   Response: Concur. The reference has been corrected.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 42 of 75

8. What SDR of pipe is proposed?

   **Response: The SDR for the leachate collector pipe below the MSE wall (perforated HDPE pipe) is 17, as specified in the Specifications (Section 02614). The leachate collector pipe elsewhere (perforated CPE pipe) has no specified SDR.**

9. Detail 3, the 4' dimension should be stated as a minimum since the depth of slope will vary, but not be less than 4'.

   **Response: The text for the dimension has been revised and refers to Sections A & B on 100% Design L-4.**

10. What types of bolts are to be used to bolt down the manhole lid?

    **Response: Stainless steel bolts will be used. Detail A has been revised.**

11. What material is used for the manhole lid?

    **Response: HDPE.**

**Sheet L-4 (100% Design L-6)**

1. Detail 1, where is this detail used?

   **Response: The detail is used to illustrate the pipe support for the vertical 4-inch HDPE pipe in the wet well. Pipe supports and a callout has been included in Detail A.**

2. This pump station will have methane present. Verify that all connections are explosion proof.

   **Response: Explosion proof requirements have been included in the Specifications.**

3. Section A, the ladder should be specified, not just stated to meet OSHA standards.

   **Response: Specifications for the ladder have been added. See Note 1.**

4. Section A, there is reference to MDPE. Should this be HDPE?
   **Response: "MDPE" has been corrected to be "HDPE".**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 43 of 75

5. A pump should be chosen (using several manufacturers to help specify), and the clearance called out rather than leaving it up to the pump supplier.

   Response: Pump design specifications are included in the specifications. A clearance depth has also been included in the detail.

6. Section A, where and how is electrical wiring to be installed?

   Response: The wiring will be dropped down through the top of the vault.

7. Section A, where are the floats located that are needed to control the pumps and alarm?

   Response: Floats have been included in Section A.

### Sheet L-5 (100% Design L-7)

1. Has a structural design been performed for the pad and tank supports?

   Response: Yes, it is included in the design report.

2. Has there been a geotechnical investigation to verify the foundation soils are adequate for this size of tank?

   Response: There has been no geotechnical investigation into the foundation soils adequate for the size of the tank. The design uses conservative values for the soil properties.

3. How will the tank be unloaded? Should have a design for a truck pad that includes containment and ability to wash down.

   Response: Details has been included in 100% Design L-7 and L-8.

4. There should be inexpensive totalizers included at the tank unloading area. These could be placed just after the pump that will be used to empty the tank.

   Response: Flow meters are shown with meter symbols in 100% Design L-7 and L-8, and meter symbol has been added to the legend on 100% Design G-2.

### Sheet L-5A (100% Design L-7 to L-9)

1. Should include the design for the tank pad connection to the tank.

Case 1:02-cv-00022    Document 190-11    Filed 01/14/2008    Page 28 of 29

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 44 of 75

**Response: The tank pad connection to the tank shall be in accordance with the Manufacturer's recommendation. This requirement has been included in Specification Section 11240 – Leachate Storage Tank.**

2. Detail 3, may need an air release valve.

    **Response: Comment is noted. This will be addressed for the Final submittal.**

## Sheet L-6 (100% Design L-10)

1. What is the wire size for wires in conduit?

    **Response: The pumps are specified as 25 horsepower (34 Amps). Conduit from pump controller to pump #1 will be 1" with (3) 6 AWG, (1) 8 AWG, ground. Conduit from pump controller to pump #2 will be 1" with (3) 6 AWG, (1) 8 AWG, ground. Conduit from pump controller to float switches (low alarm, off, on, high alarm) will be 3/4" with (8) 14 AWG. Wire and conduit from the Operations Building to the pump station is shown on the one-line diagram on LFG-8. We will add reference to this diagram.**

2. Detail 1, what is the conduit size from control panel to operations building?

    **Response: Conduit sizes are shown on the one-line diagram in Drawing No. LFG-8. Reference will be added for the Final submittal.**

3. Detail 1, what does the detail callout refer to?

    **Response: It calls out the control panel. Reference to 100% Design L-1 and L-6 has been included.**

4. Detail 2, how will the alarm beacon be seen from the opposite side of the landfill? Suggest placing the control panel somewhere it can be easily seen, and/or add an automatic alarm system that will page the responsible maintenance person if the alarm goes off.

    **Response: The control panel will be provided by the pump station manufacturer and must be located adjacent to the pump station. There will be an alarm connection from the pump station to the flare autodialer.**

## Sheet L-7 (100% Design L-11)

1. What is the square located near control point 3026?

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 45 of 75

**Response: It was the initial, superceded location for the leachate storage tank, which was inadvertently included in this drawing. It has been deleted.**

### Sheet L-9 (100% Design L-13)

1. Notes 1 and 2 leave too much responsibility up to the Construction Manager. These control points should be set to allow the Contractor to actually have a reference for building this system. If things vary in the field, it should then be adjusted by the Engineer.

   **Response: The control points are included for the projected field conditions, as field conditions may change, field adjustments will be made. These field adjustments shall be directed by the CM, as long as the adjustments stay in line with the design intent (i.e., line grades, etc.). For any changes to the design intent, the Engineer of Record shall be consulted. Additional notes to this effect will be included for the Final submittal. The Engineer of Record shall imply the design engineer.**

### Sheet LFG-1 (100% Design LFG-1)

1. The line types and general symbology need to be modified to match the rest of the drawing set.

   **Response: This has been corrected.**

2. Where's the design for the condensate traps? Estimated condensate quantity?

   **Response: See Detail 5 on 100% Design LFG-4, and the condensate calculations will be provided in the Final Submittal**

3. The callout to the typical dual LFG extraction wells only shows one.

   **Response: The term "dual" has been removed from the description of the callout.**

4. At least one LFG monitoring probe should be located between each adjacent building, not just one building.

   **Response: The LFG probes are located in the vicinity of the adjacent structures and properties.**

5. Why is the leachate collection system shown on a LFG drawing?

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 46 of 75

> **Response: The leachate perimeter collector pipe is shown to illustrate the connection to the LFG collection system.**

### Sheet LFG-2 (100% Design LFG-2)

1. Typically monitoring probes are placed with the deep probe at the lowest depth of waste and the shallow probe placed half way between the bottom of waste mass and the ground surface. What is the maximum depth of waste with respect to the proposed probes?

   **Response: The maximum depth of waste is approximately 165 feet, but the bottom waste elevation is between elevation 100 and 250 depending on the location within the landfill footprint. In all cases, the LFG probes extend well below the limit of waste in that vicinity; this allows them to detect gas that is migrating downward as well as horizontally.**

2. Detail 2, what material is located within the annular space at the centralizer?

   **Response: Drain gravel, this will be clarified in the Final Submittal.**

3. Detail 3, where is the valve to allow balancing of the system?

   **Response: The valve is shown in the Valve Station Detail 1 on 100% Design LFG-4.**

4. LFG Well Schedule: how was the depth of waste estimated?

   **Response: The depth of waste was estimated by comparing the proposed grading to the digitized topography from a map included in the "1970 Operational Plan for Solid Waste Management, Territory of Guam".**

5. Detail 4, the 4″ dia PVC pipe is shown as 3″ in Detail 2.

   **Response: This has been corrected.**

### Sheet LFG-3 (100% Design LFG-3)

1. Why is the LFG header buried? It could be anchored to the slopes, making it easier to maintain, and buried beneath access roads and benches. In addition, with the temperate climate, there is no chance of freezing condensate.

   **Response: The pipe is buried to control thermal expansion and contraction caused by direct sunlight, to protect the pipe in high winds and because the pipe could not be adequately anchored with the exposed geomembrane cover system.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 47 of 75

2. Why is the system composed of both CPE, HDPE, and PVC?

   **Response: The different pipe materials were selected to control construction cost while providing the required material properties for the specific applications/functions.**

3. Detail 3, is the CPE LFG Interceptor perforated?

   **Response: Yes, this is indicated in the specification, and has been clarified in drawing.**

4. Detail 5, does this mean the site will be drawing from the leachate collector?

   **Response: Yes, the operator will be able to draw from this system as needed.**

**Sheet LFG-4 (100% Design LFG-4)**

1. Suggest specifying package well head assemblies. They are relatively inexpensive and provide greater control.

   **Response: This will be considered and addressed in the Final Submittal.**

2. Again suggest placing the header above-grade, except where it crosses benches.

   **Response: See previous response.**

3. Detail 3, where is this anchor block used?

   **Response: This anchor is not used and has been deleted.**

4. Detail 5, the pipe should be slotted, not perforated, per "5/LFG-2."

   **Response: Agreed, this has been corrected.**

5. Is the condensate drain located at low points? If so, should state.

   **Response: Yes, they are located at the low points; and Note 3 on LFG-1 has been revised to indicate this.**

6. Where are the calculations that show a 3' column depth is adequate to keep from drawing condensate back into system?

   **Response: No calculation is provided. The current design actually provides approximately 4 foot column depth, which is just adequate (maximum vacuum**

is about 50"of water column); however the design is being revised slightly to increase allowances for settlement and clogging. The revised detail will be provided in the Final Submittal.

### Sheet LFG-5 (100% Design LFG-5)

1. The design package should provide structural calculations for the design of the pads.

   **Response: A formal calculation has been included in the design report.**

2. Please verify that another gate is not required since this is a hazardous enclosure.

   **Response: Although not required, a second man-gate will be added at the opposite end of the enclosure for convenience.**

### Sheet LFG-6 (100% Design LFG-6)

1. Section A, rather than using an asterisk, should add "See Note 3" to remain consistent with rest of construction drawings.

   Response: Agreed, this will be corrected in the Final Submittal.

### Sheet LFG-8

1. There should be structural calculations for the generator pad.

   **Response: A formal calculation has been included in the design report.**

### Sheet LFG-11

1. Notes 1 and 2 leave too much responsibility up to the Construction Manager. These control points should be set to allow the Contractor to actually have a reference for building this system. If things vary in the field, it should then be adjusted by the Engineer.

   **Response: The control points are included for the projected field conditions, as field conditions may change, field adjustments will be made. These field adjustments shall be directed by the CM, as long as the adjustments stay in line with the design intent (i.e., line grades, etc.). For any changes to the design intent, the Engineer shall be consulted. Additional notes to this effect will be included for the Final submittal.**

### Sheet MSE-1

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 49 of 75

1. Where is the property boundary located?

   **Response: Property boundary has been included.**

2. Why show the sensitive area boundary? Is the contractor to stay out of this area? If so, should state on drawing.

   **Response: "Sensitive area boundary" is renamed "Wetland Delineation". The wetland delineation is shown for the contractor's information only.**

3. MSE Wall Notes, the majority of these notes should be included in the specifications, not on this drawing. To keep from having potential conflicts between the plans and specifications, the notes should be reviewed and reduced if they are already addressed in the specifications.

   **Response: The majority of the notes have been removed where appropriate and included in the specifications.**

3. MSE Wall Notes, why are the design parameters noted? These should be included as part of the Design Report.

   **Response: Design parameters will be included in the design report. However, the design report will not become part of the contract documents. Therefore, the design parameters are shown on the drawings to assist the Contractor in recommending material substitutions and design changes, which may have cost saving implications. Any such change to the design will need to be approved by the Engineer.**

4. Should include a Bodkin Connection Detail.

   **Response: The detail may be found in 100% Design MSE-8.**

6. Please check spelling, grammar, punctuation, etc. in the MSE Wall Notes.

   **Response: Concur. The notes have been reviewed and corrected, where necessary.**

7. A "designer" is called out. Is this the Engineer? If so, consider revising.

   **Response: "Designer" has been changed to "Engineer".**

8. Note 17, differential settlement is 1/100. Is this ft/ft?

   **Response: No, it is in inches/foot. Units have been added.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 50 of 75

### Sheet MSE-2 (100% Design MSE-2, MSE-3 and MSE-4)

1. The symbology for the 2004 topography is not the same as on the sections.

   **Response: The linetypes have been renamed and included in the sections, where appropriate.**

2. Is there a maximum distance for the keyway to be cut away from the bottom of the MSE wall?

   **Response: The bottom of waste elevation along the MSE wall was roughly estimated based on the pre-filling topography information obtained from the USGS contour map with a contour interval of 40-feet. Since, the accuracy of the waste depth is not known with certainty, the toe elevation of the wall was selected arbitrarily at an elevation higher than the estimated bottom of waste elevation. This requires that any waste or weak foundation materials encountered below the MSE wall foundation be excavated and backfilled with structural fill. Also, any waste encountered between the MSE wall and the stream will be excavated and relocated within the Dump; the area in front of the wall will be graded per the grading plan. Therefore, the maximum distance of excavation in front of the MSE wall depends on the distance to which waste is located between the wall and the stream.**

3. Is there supposed to be soil removed, backfilled, and compacted at the toe of the MSE wall? If so, this should be made clear.

   **Response: Yes; the depth of the waste along the MSE wall was roughly estimated based on the pre-filling topography information obtained from the USGS contour map, which had a contour interval of 40-feet. Because the bottom of waste elevation is not known with certainty, the toe elevation of the wall was selected arbitrarily and is higher than the estimated bottom of waste elevation. This requires that any waste or weak foundation materials encountered below the MSE wall foundation be excavated and backfilled with structural fill. The estimated waste profile and excavation plan on the cross-sections and additional notes were added for clarification purposes.**

### Sheet MSE-3 (100% Design MSE-5, MSE-6 and MSE-7)

1. The symbology for the 2004 topography in the legend is not the same as on the plan.

   **Response: The linetypes are called out in the sections.**

### Sheet MSE-4 (100% Design MSE-8 and MSE-9)

1. This drawing should be modified to remain consistent with the callouts, fonts, etc. used throughout the design package.

   **Response: This has been resolved.**

2. "Vegetated Wall Face Detail" indicates that the vegetation seeding will be performed by others. It is a part of this project, and should not be referred to as "by others."

   **Response: Concur. Callout has been revised.**

3. "Vegetated Wall Face Detail" indicates that the secondary geogrid will be embedded 4" min at top and bottom. Shouldn't this be 4'?

   **Response: Yes, it should be 4-feet. The typographical error has been corrected.**

4. "Vegetated Wall Face Detail" shows a dimension at the top of 1 ft. Where does this apply? Is it the top of the topsoil backfill?

   **Response: At each lift, the minimum width of topsoil at the bottom is 6-inches and the minimum width at the top is 12-inches. To clarify, the minimum dimensions have been shown on the same lift.**

**Sheet MSE-6**

1. It is unclear what this drawing is for.

   **Response: This sheet has been deleted. Additional sheets have been added to improve the clarity of the information contained in sheets MSE-1 through MSE-5 (100% Design MSE-1 through MSE-9).**

**Design Report**

1. There should be an analysis that shows the design for the thickness of the geomembrane, and that it meets the minimum factors of safety with respect to tensile properties.

   **Response: The geomembrane thickness was determined by the Wind-Uplift Calculation. The calculation defines the required tensile strength from which the thickness was determined through reference to Geosynthetic Research Institute Test Method GM13. This point shall be reflected in the text for clarity.**

Case 1:02-cv-00022    Document 190-12    Filed 01/14/2008    Page 7 of 31

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 52 of 75

2. Should have an analysis of the stability of the liner system.

   **Response: Veneer stability of the cover system has been calculated. This calculation will be included in the Final Design Report.**

3. There should be an analysis performed for sizing the pumps required to empty the tanks.

   **Response: Leachate disposal is not part of this current contract and as such leachate removal from the tank has not been designed. This will be noted in the report.**

   **The design scope for the closure as negotiated included only the facilities required for management of leachate through collection and storage, and not disposal. However, DPW is currently analyzing the different options of leachate disposal, which include trucking the collected leachate, tying in the leachate management system into the existing sanitary sewer system, or pretreatment. Based on field measured leachate generation rates and the HELP Model calculations, DPW will decide on which option is most feasible.**

4. There should be an analysis of culvert ring deflection for areas where maintenance (and perhaps active landfill haul) trucks will traverse culverts and pipes.

   **Response: Culvert ring deflection analysis will be included in the Final Submittal.**

5. There should be an analysis of the quantity of condensate that may be produced to verify the condensate in the trap does not get pulled back up into the pipe.

   **Response: No calculation is provided. The current design actually provides approximately 4 feet of column depth, which is just adequate (maximum vacuum is about 50"); however the design is being revised slightly to increase allowances for settlement and clogging. The revised detail will be provided in the Final Submittal.**

6. The HELP model analysis should only state the comparisons between two alternatives. The comparison of the landfill "without a cover" is not necessary. There should be an analysis that compares the prescriptive cover (6" topsoil and 18" low permeability layer) to the least conservative proposed cover scenario, i.e. exposed geomembrane over waste. Stay away from saying things such as "the annual average leachate production is..." since this is completely based on a model, and is generally used for comparison purposes, not to accurately estimate the amount of leachate generated.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 53 of 75

Response: The HELP Model is in the process of being revised. The revision will include the comparison of alternatives.

The design scope for the closure as negotiated included only the facilities required for management of leachate through collection and storage, and not disposal. However, DPW is currently analyzing the different options of leachate disposal, which include trucking the collected leachate, tying in the leachate management system into the existing sanitary sewer system, or pretreatment. Based on field measured leachate generation rates and the HELP Model calculations, DPW will decide on which option is most feasible.

7. Evaporative zone depth of 6 inches used in the HELP model is likely much deeper.

Response: An evaporative zone depth of 6-inches is a conservative value. Due to the humidity of the area, variability in cover soil, and initial lack of vegetation a conservative assumption was made.

8. For the stormwater evaluations, where is the hydrology analysis that is required to size ditches? This should be done using the Rational Method, TR-55, or other methods contained within the CNMI and Guam Stormwater Management guidance. This method should be used to account for the interactions between all subareas, including any lag times. The analysis performed is for small, specific drainage areas, and does not capture the interaction between the subareas.

Response: Because of the number of stormwater features in this calculation, where possible, one calculation with a conservatively sized drainage basin (relative to the other drainage basins) was used. This methodology was used for the on-bench ditches, the top-deck ditches, and the v-shaped berm/ditches on the sideslopes. The result of this methodology was a conservative, but practically sized ditch. Evaluation for the top-deck ditches and v-ditches was completed using TR-55. This included a lag time for basin routing (time of concentration).

The on-bench evaluation was completed using a spreadsheet (specifically the Santa Barbara Unit Hydrograph (SBUH) method). It is important to note that both TR-55 and SBUH are unit hydrograph methods and yield similar results, provided a 24-hour storm is used. In this case, it was determined that water flowing from the steep 2:1 sideslopes will reach the basin outlet in less than 6 minutes. TR-55 does not allow a time of concentration of less than 6 minutes, therefore the spreadsheet method was used. Again, this evaluation was conservative.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 54 of 75

The evaluation of the chute sizing used an additive method for considering peak flows from within the contributing sub-basins. While this method can be considered overly conservative for this approach (because routing was not considered), the resulting chute sizes were not considered excessive. In the interest of cost savings, this evaluation will be revisited prior to the Final submittal.

The pond was initially sized using TR-55. Routing of water through the outlet structure was completed using XP-SWMM, because TR-55 lacks adequate routing routines for this purpose. The remaining calculations use TR-55. We'll check to make sure it is sufficiently documented to show this.

9. The geotechnical analysis should address veneer stability of the cover system, not just global stability.

   Response: See response to Design Report Comment 2.

10. The geotechnical analysis should contain a seismicity or seismic hazard analysis to evaluate potential effects associated with the maximum probable seismic event within 250-years.

    Response: A seismic event with a return period of 475 years (10 % probability of exceedance within 50 years) was used in the design of the slopes and the MSE wall, which is more conservative than the 250-year event.

11. There should be a settlement analysis that shows the maximum potential differential settlement to verify the slopes are adequate to reduce potential for ponding.

    Response: Due to the size, age, and variability of waste and waste placement, a settlement analysis would require very broad assumptions and would thus be an assumption in itself. As such, a settlement analysis will not be performed. Rather, drainage features have been designed with exaggerated grades, based on our landfill design experience, to provide adequate post settlement drainage.

## Construction Quality Assurance Plan

1. Parties to the work generally include both the manufacturer's QC Laboratory and the CQA Laboratory (3rd party or in the case CM).

   Response: The manufacturer's QC laboratory is the manufacturer and is not a separate entity, instead it is associated with the Contractor. The CQA

laboratory is a subconsultant to the CQA firm and as such is not a separate entity.

2. The CQA of the access road and asphalt concrete ramp, the MSE walls, and the drainage appurtenances are missing from the description of CQA activities.

   **Response: CQA activities for the above have been included in the CQA Plan.**

3. There should be a figure or brief description detailing the chain-of-command and lines of communication.

   **Response: A description of the chain-of-command and lines of communication will be added for the Final submittal.**

4. There should be sections dedicated to MSE Wall CQA and AC Pavement CQA.

   **Response: Sections have been dedicated for the MSE Wall CQA and AC Pavement CQA.**

5. There should be general lists of "monitoring and observation" items that must be performed during construction. This includes observation of lift heights, allowable thicknesses of cover soils (both daily and final), and any other observable specification requirements.

   **Response: Concur. Monitoring and observation of general items such as thicnkness of cover soils has been included in the CQA Plan.**

**Operations Plan**

1. TOC - Table 1 does not provide information on sampling frequencies.

   **Response: Concur. Table 1 has been removed.**

2. Page 2; Sec 2; 1st Para. on page - The plan was prepared as Appendix G, not H.

   **Response: The GWMP was prepared as Appendix G to the Operations Plan, as stated in our hard copy of the GWMP.**

3. Page 2; Sec 2; 3rd Para. on page - Define "semiannual"; clarify that this means twice per year.

   **Response: Concur. "twice per year" will be added in parenthesis after "semiannual".**

Case 1:02-cv-00022   Document 190-12   Filed 01/14/2008   Page 11 of 31

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 56 of 75

4. Page 2; Sec 2; 3rd Para. on page -Sampling frequency is an important aspect of detection monitoring. The rationale for the selected frequency is not provided. Quarterly sampling may be appropriate until baseline concentrations of monitored constituents can be established.

**Response: The monitoring frequency specified in the GWMP was selected based on the requirements specified in Rules and Regulations for the GEPA Solid Waste Disposal - Guam Code Annotated (GCA) Title 22 Division 4 Chapter 23 Article 5 and in 40 CFR 258 Subpart E (the Regulations). 22 GCA §23505 specifies that the monitoring frequency shall be at least semi-annual; therefore, the semi-annual groundwater monitoring frequency identified in the GWMP satisfies the regulatory requirements for Detection Monitoring. The stated objective of the groundwater monitoring program is to determine whether a statistically significant increase from background conditions has occurred in groundwater as a result of leachate contamination from the Dump. As such, determination of baseline concentrations is not required for the detection monitoring program.**

5. Page 2; Sec 2; 3rd Para. on page -During which seasons will samples be collected and will samples be collected during the same periods each year?

**Response: For the semi-annual monitoring, one groundwater sampling event will be completed during the typical dry season (December 1 to July 31) and one monitoring event will be completed during the typical wet season (August 1 to November 30). The GWMP has been updated to identify the periods for sampling.**

6. Page 2; Sec. 3 -This section provides only a basic statement of project objectives. A more detailed discussion of data quality objectives should be provided.

**Response: At this time, the analytical laboratory who will be performing the chemical analysis of groundwater samples has not been identified. Once the laboratory has been identified, detailed data quality objectives (including reporting limits and quality control criteria) may be established.**

7. Page 3; Sec. 4 -No rationale is provided in this section for the selection of wells to be sampled, nor the placement of the 4 new wells.

**Response: Samples will only be collected from existing, field-verified wells. New wells will be installed as part of the closure construction and monitoring at those wells are discussed in the Post-Closure Plan. Locations for the new monitoring wells were selected by a qualified groundwater scientist as defined in 22 GCA §23501. The monitoring well location were selected based**

Case 1:02-cv-00022    Document 190-12    Filed 01/14/2008    Page 12 of 31

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 57 of 75

on site-specific considerations and the requirements for groundwater monitoring systems identified in 22 GCA §23502.

8. Page 3; Sec. 4 -Section 9 of the Operations Plan indicates that there are 11 existing wells, 4 existing wells have been located, and that *"the wells that have been field located are in good condition for sampling and permission to sample them has been acquired."* Why are the existing wells not being used for sampling?

   **Response: Existing wells that have been field located will be used for sampling. Those existing wells that are not used were not found.**

9. Page 3; Sec. 4 -Section 4.1 refers to *"three existing wells"* and Figure 2 depicts only the location of 3 existing wells. What rationale was used to include these wells, but exclude others from use? Irregardless of whether all of the existing wells are utilized, they should all be discussed and included on the figure to avoid confusion.

   **Response: The text, "three existing wells" should really read "four existing wells", as four have been field located and determined to be in good condition for sampling and permission to sample from them has been acquired. All the existing wells have been included in Figure 2.**

10. Page 3, Sec. 4.1 - Why will "four independent samples" be collected during the first sampling event? What will these samples and the resulting data be used for?

    **Response: The requirement for the collection of four independent samples from each well during the first sampling event is specified in the Regulations. 22 GCA §23505(b) states that "A minimum of four (4) independent samples from each well (background and down-gradient) must be collected analyzed for the Appendix I constituents...during the first semi-annual sampling event."**

11. Page 4; Sec. 4.1, 1st Para on page -Why will well 2005-MW01 be sampled using a different collection methodology? Because this well is the only background well and the data obtained from it will be compared to the other wells for detection purposes, the use of a different sampling methodology could introduce an unacceptable level of uncertainty into the program.

    **Response: Sampling methodologies identified in the GWMP were selected based on the planned screened interval depths for the wells, budgetary constraints, and the potential for cross-contamination. The sampling methodologies identified in the GWMP (low-flow sampling using a peristaltic pump and purging with a disposable bailer) were selected based on the ability to perform these methods using dedicated, disposable equipment. Low-flow sampling was selected for the shallow, downgradient wells due to the shallow**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 58 of 75

planned screened interval depths of these wells. As the planned screened interval for the deeper, upgradient (background) exceeds the maximum depth ,sampleable using a peristaltic pump, this well was identified to be sampled using a hand bailer. Dedicated, downhole well pumps were not considered due to the costs associated with these pumps and utilizing a single pump in multiple wells was not considered due to the potential for cross-contamination. To address EPA's concern that the use of a different sampling methodologies could introduce an unacceptable level of uncertainty into the program, the GWMP has been revised to specify that all groundwater samples will be collected using dedicated, disposable bailers.

12. Page 8, Sec. 6.3 -Again, the rationale for the use of two different groundwater sampling methodologies is unclear. The use of two different methodologies should be avoided.

    Response: As described in the response to Comment 11, the GWMP has been revised to specify that all groundwater samples will be collected using dedicated, disposable bailers.

13. Page 9, Sec. 6.3.2, bullet 5 -Will all parameters (pH, temperature, specific conductivity, DO, and turbidity) be required to be within 10% (0.1 SU for pH)?

    Response: Bullet will be revised in the final submittal to include the statement: "Repeat steps 4 and 5 until measured parameters from three successive casing volumes are stable within 10 % for temperature, specific conductivity, and turbidity and 0.1 standard units (SU) for pH."

14. Page 9, Sec. 6.3.3, bullet 54 -Why are the standards for stabilization different for this sampling methodology than for the bailer method (specific conductance is at 3% verses 10%)? What about the stabilization of temperature and turbidity?

    Response: As described in the response to Comment 11, the GWMP has been revised to specify that all groundwater samples will be collected using dedicated, disposable bailers. The standards for stabilization for the bailer method are described in the response to Comment 13.

15. Page 15, Sec. 7; general comment -The plan does not address project-specific analytical data QA/QC protocols such as reporting limit objects, QC criteria, and data validation requirements. DQOs and QA/QC procedures necessary to meet DQOs need to be more fully defined.

    Response: At this time, the analytical laboratory that will perform the chemical analysis of groundwater samples has not been identified. Once the laboratory has been identified, additional data quality objectives (including reporting

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 59 of 75

limits and quality control criteria) may be established. Data validation requirements are described in section 4.2.

16. Table 1 -According to the table, groundwater samples from well 2005-MW03 will not be analyzed for total metals or VOCs; this contradicts the text of the plan. Please clarify.

**Response: New wells will be installed as part of the Closure Construction and their monitoring will occur as part of the Post-Closure activities.**

17. Table 1 -The Environmental Data Summary Report (EDSR), Section 4 indicates that the following are COPCs: metals, cyanide, VOCs, SVOCs, pesticides, PCBs, PAHs, nitroaromatics, nitroamines, and dioxins/furans. These COPCs should be incorporated into the detection monitoring program.

**Response: The constituents of potential concern (COPCs) listed in the EDSR were identified for the purpose of conducting a limited remedial investigation (RI) at the site. The monitoring constituents identified in the GWMP satisfy the minimum requirements for detection monitoring under 22 GCA §23505. The limited RI was intended to occur before groundwater monitoring was to commence. The results of the limited RI was going to be used to help establish the GWMP COC.**

## Closure Plan

Many of the comments that were made on the draft Closure Plan document have been addressed. However, it was noted that minimal, if any, changes were made to either Chapter 4 or 5. The comments from a previous review of these chapters have been reiterated here.

1. Sec. 4.0. - This whole section should describe the results of the design, not the basis for the design. This section should present the goals and how those goals were or would be met.

**Response: Text is being revised with a greater focus on the design objectives and results. Revised text will be included in the Final Submittal.**

2. Sec. 4.0. - Generally the criteria stated should include the corresponding regulatory requirements, manufacturer's recommendations, or other means by which the criteria were established. This helps to establish the basis for the design. Examples include presenting the reason the following criteria were established:
   • minimum of 5% on landfill deck

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 60 of 75

- minimum of 30-inch vertical separation between cover barrier and road finished grade
- minimum of 3% cross slope along road interior
- maximum 10% longitudinal road grade
- sedimentation pond for site
- Design storm criteria (i.e., why 25-year, 24-hour; 100-year; 100-year, 24-hour; 50-year, 1-hour storm events?)

**Response: The Plan will focus on design objectives and results, not the basis of design. Basis of design is discussed in the Basis of Design Report and Design Report. This comment contradicts Comment 1.**

3. Sec. 4.0. -There is no mention in this section of the specific regulatory requirements as they relate to landfill closure. Two of the most important aspects of the closure design are to minimize infiltration and erosion and to take all steps necessary to prevent threats to human health and the environment.

**Response: Additional verbage has been added to section 4.0 to make reference to the regulatory requirements. Appendix A presents the Specific local regulations used in the closure plan**

4. Sec. 4.0. - It would be beneficial to provide the preliminary design drawings (permit drawings) of the landfill closure in this section. This would show the "final filling levels" and the assumed final configuration of the landfill.

**Response: Excerpts from the closure design, as they relate to the closure plan, have been included in Appendix B of the Closure Plan**

5. Sec. 4.0. - This section should include design for the active LFG system as well as a LFG monitoring plan. Several LFG monitoring probes will be required, and would be installed as part of the closure plan. In addition, there should be a section detailing the access controls, including fencing, barriers, and signage.

**Response: LFG is addressed in Section 4.7. LFG monitoring is discussed in detail in the Closure Systems Monitoring Plan provided in the Post-Closure Plan. The Closure Plan has been updated to reflect the LFG monitoring.**

**Discussion of access has been incorporated in a new section (Section 4.2.3.3 Access Controls).**

6. Sec. 4.2.2. -There needs to be backup detailing the stability of the 1:1 maximum slopes. Without backup, this criterion may not be acceptable.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 61 of 75

Response: Stability calculations may be found in the Design Report. Detailed design analysis is not part of the Closure Plan.

7. Sec. 4.2.3. - It is unclear how the roads will be designed to access the top deck of the landfill. Again, preliminary, or permit, drawings would be helpful.

Response: An additional figure has been incorporated for clarity.

8. Sec. 4.2.3. - There should be reference to access the LFG wellheads and monitoring ports, as well as access to clean-outs.

Response: Due to site limitations, not all systems cleanouts and monitoring locations are adjacent to roadways. However, wherever possible, the roads and facilities were designed to accommodate easy access. This has been noted in the Closure Plan.

LFG-1 in Appendix B of the Closure Plan presents the Landfill Gas Management Systems Plan. LFG-1 indicates the access ways to the LFG extraction wells.

9. Sec. 4.2.3.1. - Due to the high precipitation on Guam, a geotextile beneath the crushed surface aggregate is suggested to prevent the aggregate from commingling with the underlying soils.

Response: A geotextile has been utilized in the design. Detailed road design aspects are shown in the Design Documents and discussed in the Design Report.

10. Sec. 4.2.3.2, 3rd bullet. - It is unclear how downslope embankments will be installed at 2:1 when the sideslope embankments are 1:1. Again, a figure showing design of road embankment is suggested.

Response: This criterion shall be expanded upon to include a maximum 2:1 side slope unless an MSE wall is utilized. Design Drawing Sheet C-1 in Appendix B of the Closure Plan indicates the access roads.

11. Sec. 4.2.3.2, 5th bullet. - The minimum road width of 15-feet will not likely allow for two-way traffic as stated in the first bullet.

Response: Minimum road width will be changed to 24-feet.

12. Sec. 4.2.3.2. - A geotextile is suggested to be included for the reason stated above.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 62 of 75

**Response: A geotextile has been utilized in the design. Detailed road design aspects are shown in the Design Documents and discussed in the Design Report.**

13. Sec. 4.2.3.2. - The barrier system should be included as part of the access controls.

   **Response: Discussion of access has been incorporated in a new section (Section 4.2.3.3).**

14. Sec. 4.3.1, 1st bullet. - This bullet should state that the "infiltration layer" shall have a permeability less than or equal to...

   **Response: Disagree. "Less than or equal to" is the same as "no greater than". "No greater than" is the phrase used in the regulations. Reference to Regulations has been added to the bullet.**

15. Sec. 4.3.1.1. - The reference to infiltration layer should be removed. This is really not an infiltration layer as defined by the regulations. This is more of a vegetative layer supporting plant growth.

   **Response: Infiltration reference has been removed.**

16. Sec. 4.3.1.1, 6th bullet. - There should be justification as to how and why a minimum 6- inch thick soil layer would be acceptable as a foundation layer. This does not appear to be thick enough to allow for filtering of fines within the underlying waste, as well as protecting the geosynthetics from potential damage due to waste punching through the 6-inch layer.

   **Response: With a compacted, relatively smooth waste surface, 6-inches of soil on prepared subgrade is adequate. The geocomposite between the geomembrane and prepared subgrade acts as an additional cushion. In addition, Section 02300 specifies acceptable subgrade prior to the geocomposite installation. The requirement is to remove obtrusions. Additional verbiage has been added to address protruding debris**

17. Sec. 4.3.1.1. - Vine vegetation will not protect the underlying geosynthetics from UV exposure. The plant foliage will NOT have 100% coverage of the liner system, can be damaged during storms and increasing exposure, and may have difficulty growing on slopes located above benches. In addition, how will the geogrid be anchored? If it is laid directly over the benches without anchoring, there is a potential for the geogrid pulling out due to the weight of the vegetative matter.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 63 of 75

**Response: The vine vegetation is considered to be insurance for the protection/shading of the exposed geomembrane. It is not essential. Certainly, aesthetic issues for the visible condition of the dump (e.g., from Leo Palace or the Leo Palace Road) make it more eye-friendly if they see green instead of black. The geomembrane is sufficiently resistant to UV exposure to ensure long term integrity of the system.**

**The vegetation will tend to reduce the UV exposure. Our observations of the foliage behavior at the site suggest that the support afforded by the geogrid could very easily result in 100% coverage by its' intertwining with the geogrid. Whether it has 100% coverage or not is strictly an aesthetic issue and will not impact the performance of the system. The geogrid is anchored below the benches, with the soil on the benches providing the requisite ballast. The weight of the vegetative matter is negligible in comparison to the anchorage strength of the geogrid.**

18. Sec. 4.3.1.1. - Will there be a foundation layer beneath the sideslope geosynthetics? This will be necessary to reduce the potential for puncture due to adjacent waste. How will a foundation layer be placed on 1:1 slopes?

**Response: For the most part, cover soils have been placed on the steep slopes already and the operators have been going back and covering previously exposed slopes. The work includes improvement of this layer in locations where not provided (if any). The geocomposite will be placed directly onto this layer and the substrate will be inspected prior to placement for any potentially damaging protrusions, which would then be removed, if encountered.**

19. Sec. 4.3.2.1. - Reference to an infiltration layer should be removed.

**Response: Disagree. Reference to "Infiltration Layer" has been removed and replaced with "Top Soil Layer".**

20. Sec. 4.3.2.1. - Where did the established maximum seepage height come from? Is it to help with veneer stability? Should include the geotechnical analysis to demonstrate how this criterion was generated.

**Response: The seepage height is a design parameter established by URS to ensure veneer stability and limited head on the geomembrane while minimizing infiltration collection pipe spacing and construction costs. The seepage height is addressed in greater detail in the Design Report.**

21. Sec. 4.3.2.1. - How will the geocomposite be terminated?

Response: The infiltration collection layer will terminate in infiltration collection trenches, which will ultimately discharge to the surface water management system. This is detailed in the Design Documents and Design Report.

22. Sec. 4.3.2.1, last bullet. - Is the proposed design of this layer necessary? If there is a subdrain system (geocomposite), would this not reduce potential hydraulic head build up over the geomembrane? It would seem this layer should be designed based on establishing vegetative growth.

Response: The purpose of the infiltration layer is to minimize infiltration. A greater volume of infiltration will require a more substantial infiltration collection system. This is independent of vegetative growth requirements, which are in place to prevent erosion. This layer also provides the necessary ballast needed for stability of the geomembrane. This statement has been added to the Section 4.3.2.1

23. Sec. 4.3.2.2. - How will the toe of the exposed slopes be protected against erosion due to high-velocity sheet flow? How will the flows be transferred to the drainage system without undermining the drainage channels? Where will the roots for the proposed vines grow on areas above benches?

Response: The toe is an articulated block matting armored ditch to convey the runoff. Beneath the ditch is a gravel filled infiltration collection ditch, capable of receiving and conveying flows with out causing the ditch to be undermined. Roots will be established above the exposed slope. These details are addressed in the Design Documents and Design Report.

24. Sec. 4.3.2.3. - Why was 80-mil HDPE chosen as the barrier layer? Why is it textured on both sides when the sideslopes will be exposed, and the exposed surface does not require frictional properties?

Response: 80-mil HDPE was selected via the wind uplift calculation in the Design Report. Texturing is required because the exposed geomembrane is a continuous sheet beneath the benches, which requires friction interaction with the bench cover soil.

25. Sec. 4.3.2.3. - The equivalency demonstration indicates the use of the geosynthetic system in lieu of the "2-foot low permeability soil layer." This layer should be modeled as a prescriptive layer, that includes an 18-inch thick low permeability soil layer along with an erosion control layer. The HELP model evaluation should be included, detailing the layer properties, climatological data, and general design data used for the evaluation.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 65 of 75

**Response: The HELP Model has been revised and has been included in the Design Report.**

26. Sec. 4.3.2.4. - Leachate seepage out the sideslopes would be very minimal once the cover system is complete. The only seepage that would be anticipated would be from consolidation of waste, and this would likely be very slow. Vertical percolation due to gravity flows would appear to be the primary driver for seepage. This layer may not be required, unless as a temporary measure for LFG control prior to installation of the active LFG system.

**Response: Seepage is vertical percolation of leachate that encounters a semi impermeable horizontal layer (possibly such as a well compacted tipping floor). As such the leachate can flow horizontally until it exits the waste as a seep. If the landfill is closed with a geomembrane, the seep can apply pressure on the geomembrane and lower the interface friction between the geomembrane and the subgrade to the point of veneer failure. LFG can have a similar effect if allowed to build up beneath the geomembrane. The collection layer facilitates collection of both leachate and LFG and protects the veneer stability of the cover system.**

27. Sec. 4.4. - In general this section should include discussion as to why the various storm events were used. The regulations appear to reference the 25-year, 24-hour storm event only. If other criteria is required to meet other laws, rules, and regulations, these should be stated in this section.

**Response: Guam EPA requested the Project Design Team to use the CNMI and Guam Stormwater Management Criteria analysis. The values obtained from this analysis as well as values obtained from the Guam Strom Drainage Manual (the greater of the two was used) were used in the design analysis. This has been clarified in Section 4.4.**

28. Sec. 4.5. - An evaluation should be performed on the potential erosion-related soil loss using USLE or RUSLE methods. EPA guidance recommends soil loss should not exceed 2 tons per acre per year to minimize long-term maintenance.

**Response: This will be included in the design report with the Final submittal.**

29. Sec. 4.6. - This section indicates *"the existing soil is of low permeability and tends to provide a natural barrier layer"*. While this may be correct, the statement has not been substantiated. A more thorough understanding of local hydrogeology and the potential for leachate to impact groundwater must be established before a leachate collection system can be designed.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 66 of 75

**Response: This closure design does not include construction of a bottom liner and bottom leachate collection system, which would be installed to protect groundwater. The system was designed for a closure, which primarily intercepts leachate at the waste surface and protects surface water. As such, the collection system can be designed utilizing limited site-specific hydrogeologic information. More details regarding the hydrogeology of the site can be found in the Design Report.**

30. Sec. 4.8. - The groundwater monitoring plan should not be included in the EBS. A long-term plan should be prepared to monitor for the 30-year maintenance and monitoring period. This plan could be included as part of the post-closure plan.

**Response: A post-closure GWMP has been included as part of the Post-Closure Care and Maintenance Plan.**

31. Sec. 4.8. - This section is very general and does not provide a sufficient level of detail on the proposed groundwater monitoring program. Is should include at a minimum:
    • Location, construction details, and rationale for all monitoring wells;
    • Monitoring parameters;
    • Monitoring frequency;
    • Sampling procedures;
    • QA/QC procedures; and
    • Description of the methods that will be used to evaluate monitoring data (i.e., how will a "release" be determined).

**Response: A post-closure GWMP has been included as part of the Post-Closure Care and Maintenance Plan.**

32. Sec. 5.1. - Were the construction documents indicated here submitted concurrently with this Closure Plan?

**Response: Yes.**

**Post - Closure Care and Maintenance Plan**

1. Page 9, Sec. 4.5.4, 2nd Para. - The conclusion that the dump is not a significant threat to human life or the environment and does not require remediation has not been fully substantiated. In general, these studies did not include the development of conceptual site models nor did they include the evaluation of risk associated with potential exposure pathways.

**Response: The statement has been removed.**

Case 1:02-cv-00022     Document 190-12     Filed 01/14/2008     Page 22 of 31

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 67 of 75

2. Page 9, Sec. 4.5.4, 3rd Para. - The Groundwater Monitoring Plan (included as Appendix G to the Operation Plan) indicates the use of four new wells, not three as indicated here.

   **Response: The Post-Closure Care and Maintenance Plan will be updated to reflect four new wells.**

**40% Specifications**
**Contract Documents**

1. In general, the contract documents appear to be the standard Guam DPW documents, therefore there was limited review performed.

   **Response:  No response required.**

2. Under Formal Contract, Section III., suggest that the plans referenced be more than conceptual. The Contractor will not be able to provide an accurate estimate based on the conceptual drawings. In addition, suggest adding in the specifications as formal Contract Documents.

   **Response:  Agreed with both suggestions.**

**40% Technical Specifications**

1. There are several references to decisions being made by the Construction Manager. While this statement is very appropriate for design/build projects, it doesn't work well with bid projects. Leaving items to the CM leads to claims, and increased costs.

   **Response:  Agreed.  Where it is appropriate, CM has been changed to Engineer.**

2. There should be a section within one of the specifications defining who the different parties are, i.e., the Contractor, the Construction Manager, the Engineer, and the Owner, and what their responsibilities are. The defined names should be used throughout the plans and specifications.

   **Response:  Agreed.  Parties and roles have been defined in 1.03 Technical Representatives of Section 01110 – Summary of Work.**

3. There should be a section added to address the erosion control measures, such as silt fencing and triangular silt dike.

Case 1:02-cv-00022   Document 190-12   Filed 01/14/2008   Page 23 of 31

**Response:  Erosion control measures, such as silt fencing, are covered by Section 02370 – Erosion and Sedimentation Control.**

4.  Section 1110 There is a potential conflict-of-interest under 1.11 Quality Assurance and Quality Control. There are so many construction items included within the design that are left open to interpretation by the Construction Manager, yet the CM is responsible for QA/QC. This could lead to conflict between the Contractor and CM when there are quality issues related to decisions made by the CM.

**Response:  Disagree.  The specifications do not include text with statement "CM is responsible for QA/QC."  Section 01450 – Quality Control explains Contractor is responsible for QC, CM is responsible for QA and defines the differences between QC and QA.**

5.  Section 01350 has requirements for 40-hour HAZWOPER training. Is it anticipated to run into Hazardous Waste on the site? If not, it shouldn't be included. If a contractor sees this, he/she assumes that there will be some of this work, and they will charge extra for that person.

**Response:  Ordot Dump is an unlined solid waste facility, that began during the era prior to environmental considerations. It is for this reason that the leachate should be considered potentially hazardous, until it can be proven otherwise. The limited RI includes investigations to help characterize the leachate. Therefore, it is considered a conservative approach to leave the HAZWOPER training requirement in the Specifications.**

6.  Section 01350 requires odor control if detected within 100 feet of source. The existing conditions around the site far exceed 100 feet from the source. The Contractor will not be able to mitigate odors within 100 feet of the source. If this is enforced, it will add appreciable costs to the closure of the landfill.

**Response:  Typographical error. The sentence has been revised to state "If odors are detected beyond a 100 feet from the source…".**

7.  Section 01500 states that construction water will be obtained off-site. There appears to be a fire hydrant located on site property. Can this be used for construction water in lieu of hauling from off site?

**Response:  No. Fire hydrant will be removed because it is within the liner limit.**

8.  Section 1500, why is the Contractor responsible for setting up the Construction Manager's office and equipment? The Construction Manager contract should be

Case 1:02-cv-00022   Document 190-12   Filed 01/14/2008   Page 24 of 31

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 69 of 75

completely separate so there is no potential for conflict-of-interest. It would seem better to have the Contractor work in cooperation with the Construction Manager in setting up an office and services.

**Response: Contractor setting up the Construction Manager's office is standard industry practice. No changes to Section 01500 will be completed.**

9. Section 1570 says to use the plans for the primary haul route. There should be many haul routes available to the Contractor, all of which should be proposed by the Contractor, not the Engineer. These routes, even if general, will be a part of the Traffic Control Plan that must be submitted by the Contractor.

**Response: Disagree. The Contractor must follow the routes proposed by the Engineer or present alternate routes for approval by the Engineer.**

10. Specifications should require preparation of a SWPPP to comply with NPDES requirements.

**Response: Agreed. Contractor will have to develop a Construction SWPPP which will be approved by GEPA in order to comply with NPDES construction permit requirements as per Section 1500, Paragraph 1.25B and Section 02370, Paragraph 1.05G.**

11. Section 02073, Section 1.06 is redundant with Section 01450. This section should reference Section 01450 as well as present any product-specific QC requirements.

**Response: Agreed it is redundant, but text will remain in specification. Manufacturer QC requirements are in Part 2 and field QC requirements are covered in Part 3 of the specification.**

12. Typically government specifications within the United States are not allowed to call out specific manufacturers, or must list several possible manufacturers. I am not sure if this is true with the Government of Guam, but the specifications can generally be written with a product in mind by using their material specifications as the minimum. May wish to remove reference to specific products.

**Response: Specifications have been revised to include "or approved alternate" where a sole specific manufacturer is named.**

13. There are statements within the specifications that indicate approval by the Construction Manager. The Construction Manager should only provide approval of whether or not the items meet the requirements of the Construction Documents. The Engineer should be the only person that can determine whether anything that is out-of-compliance is acceptable for use.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 70 of 75

**Response:** Construction Manager functions as the Owner's on site representative and therefore has authority to provide approvals. The Engineer of Record shall provide acceptance of out-of-compliance issues relating to the design. Where it is appropriate, CM will be changed to Engineer.

14. Section 02073, 3.03 E indicates that sandbags will remain until replaced by cover material. Where there is exposed geomembrane on the sideslopes, there is no cover material. Does this mean the sandbags remain in perpetuity on the sideslopes?

**Response:** No. Sandbags will not be placed on sideslopes. Text has been modified to state that sandbags will be placed on benches, decks and slopes 3:1 or shallower.

15. The Construction Manager typically does not accept any part of the construction, rather confirms it is constructed in conformance with Construction Documents. Therefore, reference to the CM accepting any part of the construction should be removed from the specifications. The Owner can accept items since they own it, but the CM's job is not to approve any out-of-spec items or accept any construction items.

**Response:** Disagree. Construction Manager functions as the Owner's on site representative and therefore has authority to provide approvals. For CM acceptance of out-of-spec or construction items, the CM must have the owner's prior approval. The CM's responsibilities will be clearly defined in the owner/CM contract. Also see response to Comment No. 13.

16. Section 02702, 3.02A, where would the CM require the Contractor to place geotextile? How will the Contractor bid this item if it is left ambiguous?

**Response:** "...or as directed by the Construction Manager" has been deleted from Specification text.

17. For the geosynthetics sections, in lieu of having the CM accept the condition of the subgrade, there are subgrade acceptance forms that could be added that gets all parties involved, and does not leave the decision up to one person.

**Response:** Disagree. In Section 02077 – HDPE Geomembrane is included 1.05 Submittals I. "...Contractor shall... Submit a subgrade acceptance certificate signed by the installation supervisor for each area to be covered by the geomembrane." The CM alone does not accept the subgrade for the Contractor prior to geomembrane installation.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 71 of 75

18. Section 02230, suggest that rather than dispose of green waste, create a mulch and stockpile for use later when erosion control measures are required. This could potentially save costs in erosion control materials.

    **Response:   Disagree.  No available location to place such a stockpile on site?**

19. Section 02316, 2.07, where will this warning tape be used?

    **Response:   Warning tape will be for LFG system pipes.**

20. Section 02316, 3.02, exploratory test pits should be performed by the Engineer during design. This could add substantial cost to the construction.

    **Response:   Engineer completed a test pit program to delineate extent of waste. Because Ordot dump is still active and in the past had uncontrolled fill, waste may have been or could be placed outside delineated extent of waste. Contractor will install the leachate collector trench at the Engineer assumed extent of waste.  If Contractor encounters waste outside the assumed limit during excavation, the waste must be moved to within the limits.**

21. Section 02340, should stay away from calling out one singular manufacturer. There are several cellular confinement systems available that may meet the minimum Geoweb specifications and may be less expensive.

    **Response:   Specifications have been revised to include "or approved alternate" where a sole specific manufacturer is named.**

22. Section 02340, 3.02, 5. What is SPDD?

    **Response:   SPDD stands for Standard Proctor Dry Density.  Text has been modified to say  "…of dry density as determined by ASTM D698."**

23. Section 02376, should require that the straw be certified weed-free.

    **Response:   Specification includes "100 percent agricultural straw or approved equal" and so "weed-free" will not be added to text.**

24. Section 02600 is titles Surface Water Drainage, but only covers the Surface Water Drainage Pipe System, not the entire surface waste drainage system as implied by the title.

    **Response:   Agreed. The title has been revised to read Section 02600 – Surface Water Drainage Pipe.**

Case 1:02-cv-00022    Document 190-12    Filed 01/14/2008    Page 27 of 31

25. Section 02650, suggest using spark-resistant fusion welder if welding pipe near open trenches.

**Response:  Agreed.  The following text has been added in Section 02650, 3.04 Pipe Joining: "Spark-resistant fusion welder shall be used near open trenches."**

26. Section 02651, suggest specifying a package wellhead assembly here.

**Response:  Disagree, current design is simple and cost effective.**

27. Section 02830, please review this specification and either delete redundant statements or incorporate any notes from the drawings that should be in the specifications, and remove redundancies from the drawings.

**Response:  Agreed.**

28. Section 3 concrete specifications should be created to meet Japanese Industry Standards. Experience with concrete design on Guam has shown that batch plants consistently ask for approval of a JIS concrete mix over ASTM standards.

**Response:  Specification 03300 has been modified to include the following – "Japanese Industrial Standards (JIS): JIS (R5210) Japanese Industrial Standard Portland Cement" will be added to Part 1 1.03 References; and Part 2 2.01 A. will be revised to "Cement: ASTM C150, Type I, II, III Portland Type or JIS R5210." Other revisions will be made, as required, to include JIS standards.**

29. Section 05505, if the orifice plate is metal, it should be included here.

**Response:  Agreed.  The following text has been added in Section 05505, 2.04 Orifice Plate A. "Orifice Plate shall be constructed of galvanized steel plate in accordance with Table 1.  Sizes and dimensions shall be as shown on the Drawings."**

30. Section 11210, should stay away from calling out specific manufacturer. There could be many equivalent, but less expensive manufacturers on the market.

**Response:  Specifications has been revised to include "or approved alternate" where a sole specific manufacturer is named.**

31. Section 11210, where is the design for the pumps?

**Response:  The design is included in the Design Report, see Calculation L4 – Leachate Pump Station.**

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 73 of 75

32. Section 11210, pumps and control panels should be designed for hazardous use.

Response:   Agreed. The following text has been include in Section 11210:
2.02 Performance and Conditions of Service D. "Liquid will be leachate from a closed solid waste dump, likely to be of low pH and containing a variety of organic compounds."
2.03 Pump Station Design D. "Pumps, controls, electrical equipment and enclosures in the wetwell shall be explosion proof and designed for operation in a hazardous environment.  The control panel shall be located outside (in an unclassified area).  Seal-off fittings shall be provided for all conduits entering hazardous area as required by NEC."
2.04 Pumps, Piping and Valves A. "Casing: The pump casing material shall be selected by the manufacturer for operation in pumping highly corrosive landfill leachate." B. "Impeller: The pump impeller shall be selected by the manufacturer for operation in pumping highly corrosive landfill leachate..."
F. Immersible Motor:  Motor shall be explosion proof design..."

33. Section 11240, should have the structural design for the foundation already complete.

Response:   Agreed. The structural components of the foundation design have been incorporated in the concrete and reinforcement specifications in Division 3 and referenced in Section 11240.

34.    Section 16, where is the electrical requirements for the package control panels for both the pump station and LFG Flare System?

Response:   The electrical requirements for pump station control panel have been added in Section 11210 – Leachate Pump Station and for LFG Flare System control panel in Section 13180 – Landfill Gas Flare System.

Environmental Data Summary Report (EDSR)

1. Page 1, Sec. 1.1, 3rd Para. - This section refers to the RI being performed as part of Phase 2 of site closure. No information is provided on phasing of the work, how the phases relate, etc.

Response: The limited RI was expected to be performed during Phase 2 of the closure design. URS has submitted a scope of work and fee proposal for a limited RI on March 3, 2005 to D&A. The status of the limited RI approval and scheduling has yet to be determined.

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 74 of 75

2. Page 5, Sec. 3.1, 5th para. - Hydraulic conductivity for the Alutom formation is cited as normally less than 0.1 ft/day in the first sentence, yet reported hydraulic conductivities from samples collected from the dump ranged up to 0.4535 ft/day. In addition, the samples taken appear to be collected from one boring and at one depth, and there is no information on the specific lithology these numbers represent. Cited hydraulic conductivities need to be better substantiated.

**Response: The hydraulic conductivity, k, is an estimate based on several pump test in the Alutom formation. The tests have given k over an approximate range of less than 0.01 ft/day to about 1.0 ft/day. It is not possible to be more exact. None of the test were in the Ordot area. The n value is also an estimate based on the usual application of n=0.10 when n is not known. The pump tests in the Alutom formation were single well tests and therefore could not yield a value for n.**

**The sample was taken at approximately 13 ft below ground surface (BGS). A copy of the drillers log indicating the approximate location of the hydraulic conductivity test may be found in Volume II of the EBS, Geotechnical Summary Report, Appendix A, Plate A-3.**

3. Page 6, Sec. 3.2, 3rd Para; and Figure 4 - The locations of WERI wells 1, 2, 5, 6, and 7 are not depicted on Figure 4.

**Response: The locations of WERI wells 1, 2, 5, 6, and 7 are not presented in the 1989 WERI report (TR-82). At the time of preparation of the EDSR, these wells had not been field-located. WERI well 7 has subsequently been field-located and will be added to EDSR Figure 4. The locations of WERI wells 1, 2, 5, and 6 are still unknown.**

4. Table 1 - In the "Depth to water" column, it is unclear whether NA means the data are not available, or if no groundwater was encountered in the well.

**Response: Groundwater was not encountered in the 1970 GTA wells. For the WERI 1989 wells, depth to water information was not provided in the report; however, depth to water has been measured recently in those WERI wells which have been located at the site. (Well 3, Well 4, Well 8, and Well 9). Water level data is not available for the remaining WERI wells. For the 1970 GTA wells, the table has been revised to indicate that they were dry.**

5. Page 7, Sec. 3.3, 2nd para. - Why was a evaporation rate of 30 inches used; what is the basis of this number? The difference between field estimates of leachate drainage (10,000 to 20,000 gpd) and calculated infiltration rates (63,000 gpd) should be evaluated. A more realistic water budget should be developed to

Case 1:02-cv-00022    Document 190-12    Filed 01/14/2008    Page 30 of 31

Mr. Lawrence Perez
Ordot Dump Closure
Revised Response to USEPA/GEPA Pre-final Comments

ATTACHMENT 1
August 25, 2005
Page 75 of 75

assess how much water is infiltrating into the dump, and where the water may be discharged (as leachate or groundwater).

**Response: There are no current field evaluations of actual infiltration. The estimate is based on general knowledge considered applicable to the Dump area. The EDSR is a desktop review of the available data to date.**

**Per the design of the closure, a HELP model was run to estimate the leachate generation. Discussion and calculations on the HELP model can be found in the design report.**

6. Page 8, Sec. 3.4 - Please see comment # 2, the use of a hydraulic conductivity number (0.1 ft/day) that has not been fully substantiated may result in misleading discharge values.

   **Response: See response to Comment no. 2**

7. Page 24, Sec. 6.2.1 - It is awkward to include current trespassers and potential exposure to impacted soil outside the cap area, and yet ignore potential current exposure to impacted soil inside the cap area. In addition, why will contaminated areas be left outside the boundary of the cap? The cap should be designed to cover the entire impacted area or isolated areas of contamination should be removed and consolidated under the cap.

   **Response: The closure cap is being designed to contain the waste and any potentially contaminated soils in direct contact with the waste, within the waste footprint. If cleanup of soils outside of the closure area is required, based on the results of the limited RI, alternative disposal options for these contaminated soils will be determined later.**

8. Page 3; Sec. 4 - What will be the criteria for where the deeper monitoring wells will be screened?

   **Response: Following approval of a limited RI, a sampling and analysis plan will be developed that will include the criteria.**

9. General, Sec 7 - This section identifies data gaps and provides recommendations for further investigative work necessary to define the physical setting (e.g., hydrogeology) and the extent of contamination. These data gaps are reportedly going to be addressed in an upcoming RI. The timing of the RI is unclear and it appears that some of the data gaps identified in this document should be filled prior to completion of the cap design.

   **Response: See responses to comments 1 and 7.**

DATE:       JANUARY 18, 2005

TO:         DUENAS & ASSOCIATES, CONSULTANT

FROM:       DPW, CONSENT DECREE STAFF

SUBJECT:    COMMENTS ON THE ORDOT DUMP ENVIRONMENTAL
            BASELINE SURVEY (EBS)

RE:         ORDOT DUMP CLOSURE

The following are the comments regarding the Ordot Dump EBS.

**General Comments:**

1. Please ensure that the name of the solid waste facility is the Ordot Dump, not the Ordot Landfill. The public has mistaken the Ordot Dump to be a landfill. This must be corrected to ensure public that we are not building another dump, but landfill. Please be consistent.

*The solid waste facility will be called out in the EBS as the "Ordot Dump" or simply the "Dump" throughout the Final EBS*

2. Was there any Unexploded Ordinance (UXO) clearance and plan for boring and test pit locations?

*Based on the review of existing documentation, UXO may have been placed in the Dump prior to its transfer to the Government of Guam. The project team was able to ascertain the approximate location of the UXO site by using past Dump footprints. With this information the project team was able to plan accordingly for UXOs, and no clearance was obtained.*

*A new section on UXOs (section 2.4.4) will be added to Volume I of the Final EBS.*

**Specific Comments:**

1. **Section 1.0** – This section should mention that the Ordot Dump was used by the military and then handed over to the Government of Guam in 1950 under the Organic Act and from then operated by DPW.

*The statement "the Ordot Dump was used by the military and then handed over to the Government of Guam in 1950 under the Organic Act and from then operated by DPW" and a statement referring the reader to section 4.1 (Land Use) will be added to section 1.0.*

Page 1 of 6

2. **Section 1.3, Page 3, 1st Paragraph** – This paragraph seems out of place. The paragraph preceding this one discusses land usage, land condition, and property, while the paragraph succeeding also discusses land usage, land condition, and property. This paragraph also says that leachate is collected in three drainage ways on or adjacent to the dump's footprint. However, in the Solid Waste Management Facility Application For Continued Use of Ordot Dump, Section 2.II.J.12, it says that there is no leachate collection system. Please clarify.

*The paragraph in question will be placed at the end of section 1.3, which discusses the Lonfit River.*

*The statement in the paragraph in question will be revised to read "leachate is inadvertently collected..".*

3. **Section 2.3, 1st Paragraph, 2nd Sentence** – At what depth was the sample taken to determine this hydraulic conductivity?

*Sample was taken at approximately 13ft BGS (Below Ground Surface). A copy of the drillers log indicating the approximate location of the hydraulic conductivity test may be found in Volume II, Geotechnical Report, Appendix A Plate A-3.*

4. **Subsection 2.3.1** – Where did you get your $k$ and $n$ values? Please add a reference to these values.

*The hyrualic conductivity, k, is an estimate based on several pump test in the Alutom formation. The tests have given k over an approximate range of less than 0.01ft/day to about 1.0ft/day. It is not possible to be more exact. None of the test were in the Ordot area. The n value is also an estimate based on the usual application of n=0.10 when n is not known. The pump tests in the Alutom were single well tests and therefore could not yield a value for n.*

   **Last sentence of Page 6** – Where is the small stream located relative to the dump? South? West? Please clarify.

*This small stream is located on the northern side of the Dump. This will be clarified in the Final EBS.*

5. **Subsection 2.3.2** – Where did you get the Lonfit River Drainage Basin Direct Overland Runoff value of 44 in./yr? Please clarify.

*The average per acre flow in the Lonfit drainage basin is 3,250 gallon per day as mentioned in paragraph 1 on section 2.3.2. This Number was obtained from the USGS gaging station located along the Lonfit River (Feasibility Study for the Expansion of the Ordot Dump). We may convert this number to in/yr by the following*

Case 1:02-cv-00022    Document 190-13    Filed 01/14/2008    Page 2 of 13

*3250 gallon/(day-acre) \* 0.1336 cft/gal \* 1 acre/ 43560cft \* 365 day/year \* 12in/ft*

*= 44in/yr*

*However, this value will be removed from this section, as per USEPA/GEPA Comment No. 9.*

6. **Subsection 2.4.1** – Appendix A does not show the test pit locations for the confirmation of the limits of waste. The figure in Appendix A only displays the test pits for the northern limits of waste along Dero Road. Please clarify.

*The location of All test pits will be provided in the Final EBS*

7. **Subsection 2.4.2** – Where did the estimated rate of refuse that entered the dump from 1950 to 1990 come from? Any references? Please clarify. Will the daily solid waste summary reports that have recently been collected from Ordot Dump supervisor be included into the estimating of daily incoming waste tonnage at the Ordot Dump from the present to its closure in 2007?

*As stated in section 2.4.2 of the EBS no records of waste quantities exist for the Dump. However, estimates were provided in the following reports: <u>Operational Plan for Solid Waste Management</u> and the <u>Feasibility Study for the Expansion of the Ordot Dump</u>. Data from these reports and engineering estimates were used to determine the 1950-1990 rates. This will be clarified in the Final EBS*

*The data recently provided by DPW will be used to determine the current incoming waste at the Dump. These volumes will be included in the Final EBS. Appendix E presents the results from the data received form DPW.*

8. **Subsection 2.4.3** – Should this subsection mention that the daily solid waste summary reports currently being filled out and will provide specific records of the types and quantities of waste being placed at the dump? If so, please include the results from these reports.

*The results obtained from the daily solid waste summary report (Daily Logs) will ultimately be used for the closure design of the Dump. Section 2.4.2 Waste Quantities will present the results obtained form the daily logs. Section 2.4.3 will be reserved for the characteristics of the waste entering the Ordot Dump.*

9. **Subsection 2.6.1** – Where was the air quality monitoring located? Why was there no mention of the air quality monitoring being compared to the U.S. EPA's National Ambient Air Quality Standards? Where does it discuss the air quality monitoring of the fire events in 1995 and 2001-2003? Please clarify.

*An appendix will be added to the EBS to document all the information used for air quality. This appendix will include 1987 air sampling results and locations of samples, USEPA 1998 fire summery report and excerpts form various other reports.*

*Section 2.6.1 of the EBS discusses the fire events. Appendix D landfill Gas Documentation and Attachment 3 Landfill Fires Report presents the data concerning the Landfill fire monitoring*

10. **Subsection 2.6.2** - Please discuss the migration of landfill gas to neighboring properties? Any affects? Were there any field assessments of the landfill gas conducted? Were there any existing documentation on landfill gas and were they evaluated for data gaps?

*There is no migration of landfill gas below grade as there are no controls or barriers to emissions of gas from the face of the waste. Landfill gas at present is venting to the atmosphere by diffusion through the surface of the waste. Once the dump is closed, barriers will be emplaced within the cap to prevent the lateral migration of gas from the closure. The active landfill gas collection system will collect the gas and direct it to the flare. Perimeter gas monitoring probes will verify the absence of gas migration after closure.*

*This statement has been added to section 2.6.1. Section 2.6.2 will be reserved landfill gas and its potential for power production.*

*There were no field assessment for landfill gas conducted as part of this ENS.*

*Yes there is existing limited data on landfill gas. The 2002 USEPA Five Year Review Report for the Ordot Dump was used as a reference in this EBS. This 2002 USEPA report used available data and, a listing of data limitations and data gaps to ascertain the Ecological and Human Health Risks.*

11. **Subsection 2.7.4** – This subsection should discuss the high wind speeds during the wet season from the typhoons. Perhaps provide an average of the wind speed of a typical typhoon on Guam.

*A new paragraph discussing typhoons and various wind speeds has been added to this section.*

12. **Subsection 3.0** – Are there any previous or existing reports on biological conditions at the Ordot Dump?

*Yes, this report is references in section 3.1.1 of the Final EBS*

**13. Subsection 3.1.1** – The list of vascular plant species is found in Appendix B, not Appendix A.

*Corrected*

**14. Subsection 3.2.1** – When were the pedestrian surveys conducted? I suspect July through November 2004. If so, please mention.

*Yse, section 3.2.1 indicates the surveys*

**15. Section 3.3, 3rd sentence** – This sentence should say western stream, not eastern.

*Corrected*

**16. Section 4.1** – When was the Ordot Dump operated by the U.S. Military Government? When was it transferred to the Government of Guam? This is similar to my first comment.

*The US Military owned and operated the Dump up until 1950 when ownership was transferred via the Organic Act to the Government of Guam. This statement will be included in section 4.1 of the Final EBS*

**17. Section 4.1.1, Page 26** –When was the gatehouse constructed? Please mention.

*Information on the construction of the gatehouse (operations building) is not available, according to DPW personnel. Based on aerial photographs the operations building was constructed sometime between 1994 and 2000.*

18. **Section 4.3** – How far is the access road to Leo Palace Resort from the dump? A description of where Leo Palace Resort is relative to the dump should also be provided.

*This information is included in section 4.3.1 of the Final EBS*

19. **Subsection 4.3.2** – Who is currently using Well A12? Who does it provide water for?

*The Guam Waterworks Authority (GWA) owns and operators Well A12. Water produced by this well is consumed by the people of Ordot Chalan-Pago and its surrounding villages*

**2nd to the last sentence of this subsection** – How far is the lateral waterline from the Ordot Dump?

*The lateral waterline mentioned is located approximately 100ft away from the dump mass and directly adjacent to the Dump's property boundary. This information will be provided in the Final EBS submittal*

20. **Section 7.0** – Missing some information on the references.

*Missing references will be included in Final EBS submittal*

**Figures/Appendices:**

1. **Figure 2-1** should say Ordot Dump not Ordot Landfill.

*Corrected*

2. **Figure 2-5** – This figure is not that good, visually. It is too dark is some areas, such as the wetland limits area. Please enhance the figure.

*The figure has been replaced with a clearer more accurate topo map*

3. **Figure 4-8** –Please provide a better site map of Ordot, perhaps the map used in the Solid Waste Management Facility Application for Authorization of Continued Use of Ordot Dump, Drawing 1. This figure seems to be missing some roads.

*The figure will be modified*

4. Include a figure of the Ordot Dump that shows the property lots. This would be helpful for Section 4.1.1- Past Land Use.

*The property lots will be included in a new or modified figure in the Final EBS submittal. Figure 1-1 indicate the approximate property boundaries*

*NOTE: Based on the comments below, it appears that the complete Final Draft Environmental Baseline Study was not received by the reviewer. Comments appear to reflect an earlier submittal titled Draft Environmental Baseline Survey submitted 11/28/04 to Guam EPA.*

**General Comments:**

1. There are several references to the landfill footprint throughout the document. One portion of the document should address this (up front), and the concluded footprint used throughout the document.

*A new section 1.1.1 has been added to the EBS to address the current landfill (Dump) footprint.*

2. It would appear there have been no investigations regarding potential migration of landfill gas to adjacent properties. This would appear to be a very important factor to baseline. Once the landfill is closed, LFG will migrate to the adjacent property. Therefore, it is very important to have existing conditions well documented.

*There is limited data available regarding potential migration of landfill gas to adjacent properties. The USEPA 2002 Five-Year Review was used as a reference for this topic. Section 2.6.1 of the EBS presents the findings of the 2002 report. An additional appendix has been added to the EBS to document past finding and reports with respect to landfill gas and air quality*

*There is no migration of landfill gas below grade as there are no controls or barriers to emissions of gas from the face of the waste. Landfill gas at present is venting to the atmosphere by diffusion through the surface of the waste. Once the dump is closed, barriers will be emplaced within the cap to prevent the lateral migration of gas from the closure. The active landfill gas collection system will collect the gas and direct it to the flare. Perimeter gas monitoring probes will verify the absence of gas migration after closure.*

3. Generally, an EBS documents the physical conditions of the real property where the landfill is located based on existing information. It should address the release or disposal of contaminants over the property's history, while establishing a baseline to be used in making decisions on closing the site. The report should present the findings of the survey, providing the baseline for decision-making. While the recommendations appear to be necessary to help baseline the site, they do not appear to be appropriate in an EBS. The recommendations should be independent of the survey, and appear to be a consequence of the findings.

*The Environmental Data Summery Report (EDSR), Attachment 2 of Volume II of the EBS, provides a document review of the Ordot Dump with respect to the Dumps physical conditions. This document was mailed to USEPA and delivered to GEPA on December 7, 2004. Section 6 has been renamed "Summary".*

**Specific Comments**

1. Executive summary, second, fourth sentence. Leachate, by definition, is already contaminated. Groundwater, surface water, and sediments may be contaminated by leachate.

*The word leachate has been removed from the sentence.*

2.  Executive summary, last. It is unclear, and should be made clear as to how the potential environmental consequences increase as the site goes from operational to active construction.

*Clarification in this last statement is made in section 5.0 of the Final EBS.*

3.  Page 1, Sec. 1.1, first, second to last sentence. The EBS states residences are 1,500 feet from the dump. This appears to contradict the Closure Plan that states that the nearest resident is 200 feet from the dump.

*The correct distance is 200ft, and has been corrected in the Final EBS submittal.*

4.  Page 4, last. There is a statement that it is not known if the Lonfit River is used for recreation or agricultural purposes. Further investigation should be performed to conclude this statement.

*Further investigation into this topic was conducted. The Lonfit River is used for recreational purposes. The Lonfit River is not used for agricultural of potable water purposes. The section has been revised to reflect the additional information received.*

5.  Page 5, Sec. 2.2, second. Layers of coarse sand and conglomerate could have "intrinsic permeability" and may constitute preferential flow paths.

*Boring logs from past Dump investigations have been included in the Final EBS submittal. The paragraph as been revised.*

6.  Page 6, Sec. 2.3, first. A source for cited K and gradient values should be provided.

*The hydraulic conductivity, k, is an estimate based on several pump test in the Alutom formation. The tests have given k over an approximate range of less than 0.01ft/day to about 1.0ft/day. It is not possible to be more exact. None of the test were in the Ordot area. The n value is also an estimate based on the usual application of n=0.10 when n is not known. The pump tests in the Alutom were single well tests and therefore could not yield a value for n. The paragraph has been revised to state this.*

7.  Page 7, Sec. 2.3.2. Other sections of the EBS (e.g., Section 4.3.5) discuss "3 streams" located at or near the dump. These streams need to be discussed in this section.

*A paragraph discussing the "3 streams" and a referenced figure has been included in section 2.3.2*

8.  Page 7, Sec. 2.3.2, second. A source for field estimates of flow should be provided. Information on how estimated, when estimated (year, month), and corresponding precipitation rate should be included.

*Flow estimate for leachate have been removed from the EBS as per USEPA comment #9. The flow estimates for the Lonfit River and Lonfit River Valley are based on data collected by the USGS gaging station located along the Lonfit River.*

9.  Page 7, Sec. 2.3.2, last. A very rough estimate of potential infiltration is provided. This does not seem necessary since this report is meant to provide a baseline using existing/known information.

This analysis is very cursory, and should be based on an actual infiltration evaluation or not included at all.

***Statement has been removed from the EBS.***

`

10. Page 8, Sec. 2.4. Discussion of the extent of landfill is generally limited, and is incomplete/ inconclusive for areas of the landfill. This is a very important factor to baseline, and any current investigations should be completed and included in the investigation.

***The results of geo-borings and test pitting activities are incorporated in the EBS. Chemical characterization of the area surrounding the Dump will be included as part of the Limited Remedial Investigation. Additionally a report titled Geotechnical Summery Report provides the logs and geotechnical conditions surrounding the Dump was included as part of the EBS.***

***Additionally, information on Unexploded Ordinance has been mentioned. The Environmental Data Summery Report (EDSR), found in Attachment 2, Volume II of the EBS which discusses Hazardous waste at the Dump, has been referenced.***

11. Page 9, Sec. 2.5. Review of this important section was limited due to lack of appendices being provided.

***Appendices were mailed to USEPA, delivered to GEPA on December 7, 2004, and included in this submittal.***

12. Page 11, Sec. 2.5.6, third. Cannot review and/or comment on wetlands delineation due to lack of appendices.

***Appendices were mailed to USEPA, delivered to GEPA on December 7, 2004, and included in this submittal.***

13. Page 12, Sec. 2.6.1, second. Specifically the "other gases" found should be discussed here.

***This reference is to the 1987 report by Camp Dresser & McKee. The "other gases" are discussed in the subsection.***

14. Page 12, Sec. 2.6.1, third. Comparison of VOCs in air to PELs may be applicable to onsite workers, but does not address potential exposures to residential receptors.

***Additional reference to the USEPA 2002 results has been included.***

15. Page 12, Sec. 2.6.1, third. The first mention of the "notable fire in late 1998" should state that this was a tire fire or at least that is what is indicated later in the document.

***The 1998 fire has been clarified as a tire fire in the first paragraph.***

16. Page 14, Sec. 2.6.2 & 2.6.3, There appears to be no plans in this document to determine the nature and extent of Landfill Gas and the presence/extent of subsurface landfill fires in order to support closure design. In addition, no work is planned to determine closure design/schedule factors such as determining site specific settlement rates. Please explain how these factors critical to closure design will be addressed.

*The EBS is based on available existing reports on the Dump and modeling and assessment of landfill gas generation and fire potential. The design of an active LFG system for the Dump is intended to suppress any potential subsurface fires. Site specific settlement rates is expected to be minimal over the existing Dump footprint.*

17. Page 15, Sec. 2.6.3 provides reference to a report on Landfill Fires at Ordot. However, reference to the practice of fighting fires and prevention and elimination of fires at the dump does not appear to be necessary since this is a baseline report, and not a Contingency Plan.

*Statement will be removed from Final EBS submittal.*

18. Page 14, Sec. 2.6.3, second to last, last sentence. A monitoring strategy will not likely eliminate landfill fires. Monitoring in conjunction with active landfill gas control will help reduce the potential for landfill fires.

*This statement will be revised to read "An effective post-closure monitoring strategy in conjunction with an active landfill gas control system will help reduce the potential for landfill fires at the Ordot Dump."*

19. Pages 14 and 15, Sec. 2.7. Is there more recent data for temperature, precipitation, relative humidity, and wind? The information presented only goes up through the 1980s.

*Table 2-2 has been inserted and includes temperature and precipitation data as recent at 2000.*

20. Page 17, Sec. 3.1.5, fourth. The information presented in this paragraph seems to indicate that the top of the dump would be classified as a wetland. If this is the case it should be stated explicitly.

*Although hydrophytic vegetation is present at the top of the dump, the area sits on compacted fill material graded such that it receives stormwater and silt. The paragraph has been revised to clarify this.*

21. Page 28, Sec. 4.3.2. Additional information of the two potable wells should be provided. Information should include well construction details and historic/current use of wells (e.g., domestic, etc.), if available.

*Additional information has been received from both GEPA and GWA. All information received is presented in the Final EBS.*

22. Page 30, second to last complete. LFG will not be effectively contained through installation of the landfill cover system. LFG will be forced to migrate laterally to adjacent properties by installing a landfill cover system, but will be effectively managed through installation of an active LFG control system.

*Statement has been corrected.*

-- END OF COMMENTS --



August 25, 2005

Erwin, DPW
Via facsimile:

Erwin:

Here are our responses to Guam EPA's comments. Please see below.

1.   Part IV, p.2 – Fee. The permit application must be accomplished with a nonrefundable fee of $10,000.

     **DB&A RESPONSE: DPW TO RESPOND.**

2.   Part III, Section 2, Subsection I.A., p.3 – Site Development Plan. The vicinity Map in Figure 1-1 of the Operations Plan must be updated to include the following information:

     **DB&A RESPONSE: We will only address comments to the figures attached to the permit application. The Figure 1-1 of the Operations Plan will not be changed.**

a.   Vicinity Map shall have a minimum scale of 1"=200'.
     D&A RESPONSE: The Vicinity Map and Aerial Photo on Drawing No. 1 shall be revised to be at a minimum scale of 1" = 200'.

b.   The landfill boundaries, and the initial and proposed final topographies at contour intervals of 10 feet or less shall be depicted.

     **DB&A RESPONSE: Permit Drawing 3 shall be modified to have contour intervals of 10 feet or less. Figure 1-3 of the Operations Plan has a 2-foot contour interval.**

c.   Layout of the buildings which comprises the facility shall be depicted within the vicinity map.

     **D&A RESPONSE: See Drawing No. 2 of the Permit Application and Figure 1-3 of the Operations Plan.**

d.   Land use and zoning within ¼ mile of the site.

     **DB&A RESPONSE: The Design Team maintains that this requirement does not apply to the existing Dump and as such requests a variance.**

3.   Part III, Section 2, Subsection II.D, p.5 – Design Plans. Include an engineering modification plan sheet indicating the appearance of the site after installation of engineering modifications will be included during the course of operation, closure, and post-closure.

Permit responses 2005AUG22                                                                                          1
**ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT**
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 ET Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164, Saipan, MP 96950 / Chalan Pale Arnold, Ada's Building South Garapan, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

**DB&A RESPONSE: Engineering modifications to the site prior to filling at the site is unknown. Additional filling at the site, through September 2007, is discussed in the Operations Plan. Closure construction is detailed in the Ordot Dump Closure design package.**

4. Part III, Section 2, Subsection II.G, p.6 – Design Plans. Submit a Site Monitoring plan sheet showing the location of all devices for the monitoring plan sheet showing the location of all devices for the monitoring of leachate production, groundwater quality and gas production. Furthermore, this plan shall include a table indicating the parameters to be monitored for the frequency of monitoring before and during site development.

**DB&A RESPONSE: Groundwater monitoring, prior to closure construction, shall be performed in accordance with the Groundwater Monitoring Plan (Appendix G to the Operations Plan). Post-Closure monitoring of LFG and Groundwater are covered in the LFG Monitoring Plan and the Post-Closure Groundwater Monitoring Plan (under separate cover).**

5. Part III, Section 2, Subsection II.J.10, p.7 – Design Plans. Include in the plan sheet(s) all temporary and permanent fencing.

**D&A RESPONSE: Existing chain link fence is shown on Drawing No. 2. New chain link fence to be installed as part of the closure construction is shown on Drawing C-4 for the Design Drawings.**

6. Part III, Section 2, Subsection II.J.11, p.7 – Design Plans. Include in the plan sheets(s) the methods of screening such as berms, vegetation or special fencing.

**DB&A RESPONSE: Methods of litter control are discussed in the Operations Plan. Other methods of screening, such as silt fences and run-on control ditches are illustrated on the Design Drawings (G-7, G-8, and C-5).**

7. Part III, Section 2, Subsection II.J.12, p.7 – Design Plans. Include in the plan sheets(s) leachate treatment and disposal of leachate.

**DB&A RESPONSE: Leachate shall be collected by the Leachate Management System, depicted in the "L" Drawings of the Design Drawings. Currently, Leachate is to be collected and stored in the Leachate Storage Tank. DPW will make a decision if the stored leachate will be transported via truck or new sanitary sewer line to the GWA sewer treatment plant.**

8. Part III, Section 2, Subsection II.J.13, p.7 – Design Plans. Include in the plan sheets(s) gas, leachate and groundwater monitoring devices and systems.

**DB&A RESPONSE: LFG monitoring, at the perimeter of the liner limit, shall be performed at the LFG Monitoring Probes, shown on LFG-1 of the Design Drawings. Post-Closure Groundwater Monitoring shall be performed from the new monitoring wells to be installed as part of the closure construction. Approximate locations of these new monitoring wells are shown on G-4 of the Design Drawings.**

9. Part III, Section 2, Subsection II.J.14, p.7 – Design Plans. Include in the plan sheets(s) severe weather disposal areas.

**DB&A RESPONSE: There are currently no designated severe weather disposal areas nor are there areas planned for the continued use of the site. Filling shall be in accordance with the Operations Plan, ensuring that no excluded waste is accepted. In addition, filling activities shall be performed in accordance with Chapter 3 of the Operation Plan.**

10. Part III, Section 2, Subsection II.J.16, p.7 – Design Plans. Include in the plan sheets(s) special waste handling areas.

2

**DB&A RESPONSE: There are currently no special waste handling areas nor are there areas planned for the continued use of the site. Waste that is included on the waste exclusion list shall not be accepted at the Ordot Dump.**

11. Part III, Section 2, Subsection IV, p.11 – Closure Plans. The Closure Plan shall be prepared to include part one, which reflects those measures to be accomplished at the midpoint of the permit period.

**DB&A RESPONSE: According to the Consent Decree timeline, GEPA shall approve/deny the request to continue use of the Ordot Dump by December 2, 2005 and the new landfill shall open by September 23, 2005. This makes the midpoint of the permit period October 26, 2006. Measures to be accomplished, by at least the midpoint of the permit period, are discussed in the Operations Plan. The Operations Plan includes measures to be implemented by DPW prior to closure construction. The key activities to be performed by DPW include:**
- **Daily cover usage in accordance with the Rules and Regulations;**
- **Detection and prevention of excluded waste disposal;**
- **Filling in accordance with the Final Filling Plan;**
- **Proper recordkeeping;**
- **Odor, litter, noise, and dust control;**
- **Proper grading to minimize leachate generation;**
- **Implementing safety program;**
- **Implementing emergency contingency plan;**
- **Implementing erosion control; and**
- **Performing groundwater monitoring.**

GEPA also suggests that an Air Pollution Control Permit may be required for the construction and operation of the LFG system.

**DB&A RESPONSE: D&A is not able to prepare an air pollution control permit application for the LFG system in the next several weeks. However, D&A may prepare an application permit based on available information to date and include this item as part of Amendment IV. Since there are no plans to install a LFG management system until the closure activities begin, the submittal of an Air Pollution Control Permit Application may be deferred to the closure construction period.**

Finally, ensure that the plans/drawing/figures in the Operations Plan (or separately provided with the Permit) are referenced in the Permit application.

**DB&A RESPONSE: Permit drawings, as submitted in the December 7, 2004 submittal, will be modified accordingly.**

Should you have any questions, please do not hesitate to call me.

Sincerely,

Maria D. Garcia, DB&A

ENGINEERING * PLANNING * SURVEYING * ENVIRONMENTAL SERVICES * GEOGRAPHIC INFORMATION SYSTEM * CONSTRUCTION MANAGEMENT
GUAM P.O. Box 8900, Tamuning, Guam 96931 / 155 El Calvo Memorial Parkway, Suite 200, Tamuning, Guam 96913 / Tel: (671)646-7991 / Fax: (671)646-6315
SAIPAN Caller Box PPP, Suite 164 / Saipan, MP 96950 / Sablan Building, Room 2E / San Jose, Saipan 96950 / Tel: (670)234-9017 / Fax: (670)234-3842

# APPENDIX G

## *Guam 2006 Integrated Solid Waste Management Plan (September 2006)*



# Guam 2006 Integrated Solid Waste Management Plan

## September 2006

Guam Environmental Protection Agency • P.O. Box 22439 • Barrigada, Guam 96921
Tel.: (671) 475-1658 • Fax: (671) 477-9402

**www.guamepa.net**

Case 1:02-cv-00022    Document 190-14    Filed 01/14/2008    Page 2 of 36

THIS PAGE INTENTIONALLY LEFT BLANK

# EXECUTIVE SUMMARY

By this document, the Guam Environmental Protection Agency (Guam EPA), with assistance from the Guam Department of Public Works (DPW), updates and revises Guam's Integrated Solid Waste Management Plan, as mandated by Section 51103 of Title 10 of the Guam Code Annotated.

Guam's first Integrated Solid Waste Management Plan was developed for the Guam Environmental Protection Agency and approved by the Guam EPA Board in 1999. It was modified and adopted by the Guam Legislature on December 12, 2000. It called for major changes in solid waste management on Guam, including creation of a new legally conforming landfill and closing of the Ordot Dump.

This update to the Plan revises the solid waste management objectives, identifying the key elements of the integrated solid waste management system, which will be implemented during the five-year period 2006-2010 and beyond, as follows:

(1) SOLID WASTE COLLECTION AND TRANSPORT
- Fully implement user charges and prepaid tipping fees by December 31, 2006
- Establish private contracts for residential solid waste collection as soon as possible in 2006 or early 2007

(2) RECYCLING AND WASTE REDUCTION
- Reduce the annual quantity of the Guam-wide solid waste stream by a minimum of five percent through composting by July 1, 2007
- Reduce the annual quantity of Guam-wide solid waste stream by twenty percent through diversion at the source and recycling by July 1, 2009
- Reduce the annual quantity of the Guam-wide solid waste stream by thirty-five percent through diversion at the source and recycling by July 1, 2018

(3) SOLID WASTE DISPOSAL
- Final closure of the Ordot Dump by September 23, 2007, or by a court-approved revised Consent Decree schedule
- Privatize and open the Layon Landfill by September 23, 2007, or by a court-approved revised Consent Decree schedule

(4) PUBLIC EDUCATION
- Adopt the public education strategy recommendations from the updated ISWMP by December 31, 2006

(5) MANAGEMENT OF THE GOVERNMENT OF GUAM'S SOLID WASTE OPERATIONS
- Create a public utility and adopt the planning and operational recommendations from the updated ISWMP by December 31, 2006
- Implement an ongoing, comprehensive SWM data collection, analysis and planning process in 2007

i

- Establish Guam-wide solid waste management operations, inclusive of the military's collection, storage, processing and disposal operations by October 1, 2008

This update to the 2000 ISWM Plan reviews the accomplishments made during the time between the adoption of the Plan and September 2006, including the following

- The Guam EPA amended its solid waste disposal regulations and consequently received United States Environmental Protection Agency (U.S. EPA) delegated authority to enforce the federal solid and hazardous waste laws and regulations.

- Between May 1999 and September 2006, the Guam Legislature enacted more than 18 solid waste laws, as summarized in Appendix A. However, expected objectives of these laws and the Plan, including collection of sufficient tipping and user fees to match cost of services, financing and implementing the opening of a new landfill and the closing of Ordot Dump, composting of green waste, and administration of contracts for privatized collection and disposal were not met.

- Solid waste disposal resulted in a vertical and lateral expansion of the Ordot Dump and DPW's 2005 closure design became outdated.

- Because of the continued contamination of the Lonfit River from the Ordot Dump, the U.S. EPA had initiated negotiations for a federal court order, or Consent Decree, to resolve civil penalties and to establish a schedule for construction of a Municipal Solid Waste Landfill Facility (MSWLF) and closure of the Ordot Dump.

- During the almost four years (2000-2004) the Government of Guam (Government) took to negotiate the Consent Decree, Guam made no progress on a new landfill. The Ordot Consent Decree became effective on February 12, 2004. With its specific deadlines and stiff stipulated penalties for missed deadlines, this Consent Decree has suddenly forced the Government into modern solid waste disposal practices.

- The Consent Decree required the Government to conduct a screening process to identify the best landfill sites. Guam EPA and DPW implemented the site screening process of the 2000 Integrated Solid Waste Management Plan and selected the Layon area in the vicinity of Dandan, Inarajan, in January 2005.

- The Consent Decree also required the permitting of the closure and pre-closure operations of the Ordot Dump by December 2005.

- In January 2006, the Guam Environmental Protection Agency Board of Directors approved the first Update of the Integrated Solid Waste Management Plan, which is herein revised and further updated.

ii

- In 2006 PUC began actively regulating DPW's solid waste rates and service problems. The recommendations of its August 18, 2006 Audit Report are incorporated here in Appendix B.

Within the updates of the Plan, a change in management methods is proposed. This calls for the formation of a Public Utility Solid Waste Authority with oversight by the CUC to manage the collection of tipping fees or other financing resources and implement the privatization of Government operations as mandated by the Guam Legislature. Such an Authority had been included in the Guam EPA Board approved Plan of 1999; however, in 2000 the Legislature rejected the formation of the Solid Waste Authority. Since then, the Government's solid waste practices and other circumstances justify the creation of the Guam Solid Waste Authority with financial management consolidated under the services of its chief financial officer.

The Plan update revises Guam's solid waste load projections to the year 2037 (which approximates the conservative life-span of the new landfill) and includes future federal facilities waste in the island-wide management system and alternative levels of waste reduction. These projections will need to be revised in 2007-2008 when Guam has better projections on the population increases for the military buildup

It calls for mandatory source separation with curbside collection of all waste streams, and drop-off/collection capability at regional transfer stations. Recycling, composting, proper disposal of special waste, as well as the special considerations of waste reduction opportunities and curtailing of illegal dumping, are all components of the 2006 ISWMP. Special wastes, such as white goods, household hazardous waste, automotive batteries, and abandoned vehicles, are to be handled differently from recycling of other municipal solid waste recycling activities.

The approach to increasing public awareness and public involvement in waste management improvements and plan implementation calls for increased efforts by the Guam EPA. The update also provides performance standards for the components of the solid waste management system.

In December of 2005, Guam EPA issued a permit to the DPW to continue operating the Ordot Dump until the earlier of either (1) the opening of a Municipal Solid Waste Landfill Facility or (2) September 23, 2007, the date mandated by the Consent Decree; and for closure construction and post-closure monitoring and maintenance. Closure construction should have begun no later than April 21, 2006. Post-closure care will ensue for 30 years or more. Therefore, with the issuance of the permit, Guam has embarked upon modern solid waste management operations, which will be privatized as required by law. In 2007, Guam EPA will implement its regulations on landfill design and construction and those for post-closure care when the Ordot Dump closes.

The Consent Decree mandates that the Municipal Solid Waste Landfill Facility (MSWLF) open on or before September 23, 2007. Therefore, 2006 to 2008 will be pivotal years for Guam's solid waste management as DPW designs and constructs solid waste facilities and Guam EPA develops permit conditions that are protective of the environment.

THIS PAGE INTENTIONALLY LEFT BLANK

Case 1:02-cv-00022     Document 190-14     Filed 01/14/2008     Page 7 of 36

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY**................................................................................................i

**CHAPTER ONE: INTRODUCTION**.........................................................................1

    1.1   Plan Purpose..........................................................................................................1
    1.2   Planning Approach................................................................................................1
    1.3   Background............................................................................................................1

**CHAPTER TWO: SOLID WASTE MANAGEMENT GOALS AND OBJECTIVES**............................................................................................................7

    2.1   Collection/Transport............................................................................................7
        2.1.1   *Fully Implement Residential User Charges and Tipping Fees through a Prepaid System for Users by December 31, 2006 (Overdue- Range)*....................................................................7
        2.1.2   *Private Contracts for Residential Solid Waste Collection by December 31, 2006 (Overdue-Range and Short-Range)*...........................................................................................................8
    2.2   Waste Stream Reduction......................................................................................8
        2.2.1   *Reduce the Annual Quantity of the Guam-wide Solid Waste Stream by a Minimum of Five Percent through Composting by July 1, 2007 (Overdue- and Short-Range)*................................8
        2.2.2   *Reduce the Annual Quantity of Guam-wide Solid Waste Stream by Twenty Percent through Diversion at the Source and Recycling at Material Resource Recovery Facilities (MRRFs) by July 1, 2009 (Overdue- and Short-Range)*.......................................................................................9
        2.2.3   *Reduce the Annual Quantity of Guam-wide Solid Waste Stream by Thirty-five Percent through Diversion at the Source and Recycling by July 1, 2018 (Long- Range)*....................................9
    2.3   Disposal..................................................................................................................9
        2.3.1   *Final Closure of the Ordot Dump September 23, 2007 (Overdue-Range and Consent Decree)*.............9
        2.3.2   *Privatize and Open Layon Landfill by September 23, 2007 (Overdue-and Consent Decree Range)*...10
    2.4   Management.........................................................................................................10
        2.4.1   *Adopt the Planning and Operational Recommendations from the Updated ISWMP in 2006 (Short-Range)*........................................................................................................................10
        2.4.2   *Implement an Ongoing, Comprehensive SWM Data Collection, Analysis and Planning Process As Soon As Possible (Short-Range)*.................................................................................11
        2.4.3   *Establish Guam-wide Solid Waste Management Operations, inclusive of the Military's Collection, Storage, Processing and Disposal Operations by October 1, 2008 (Short-Range)*........................11

**CHAPTER 3: MANAGEMENT OF SOLID WASTE OPERATIONS AND THE FORMATION OF A PUBLIC UTILITY: THE GUAM SOLID WASTE AUTHORITY**....................................................................................................12

    3.1   Background: 1998-2000.......................................................................................12
    3.2   DPW Fiscal Management of Solid Waste Operations.....................................13
        3.2.1   *Tipping and User Fee Management*..........................................................................14
        3.2.2   *Debt Management*....................................................................................................16
        3.2.3   *Contract Administration*.........................................................................................17
        3.2.4   *PUC Rate Making*...................................................................................................19
        3.2.5   *Environmental Compliance*....................................................................................20
    3.3   The CCU, Solid Waste Operations and the Guam Solid Waste Authority......21
    3.4   Data Collection Needs........................................................................................22
    3.5   Performance Standards.......................................................................................22
        3.5.1   *Billing and Fee Collection*......................................................................................22
        3.5.2   *Debt Management*....................................................................................................23
        3.5.3   *Contract Administration*.........................................................................................24
        3.5.4   *PUC Rate Making*...................................................................................................24
        3.5.5   *Environmental Compliance*....................................................................................24

**CHAPTER FOUR: EXTENDED SOLID WASTE PROJECTIONS**....................26

    4.1   Population Projections.........................................................................................26

Case 1:02-cv-00022   Document 190-14   Filed 01/14/2008   Page 8 of 36

4.2   Solid Waste Generation Rates.................................................................................28
4.3   Projected Landfill Capacity Requirements ...........................................................31
    4.3.1   *Factors Affecting Landfill Capacity* ............................................................31
    4.3.2   *Landfill Capacity Projections* ....................................................................32
4.4   Volume of Recyclables in Guam's Solid Waste Stream ........................................33

# CHAPTER FIVE: COLLECTION AND TRANSPORT ................................34

5.1   Collection and Transport ......................................................................................34
5.2   Commercial Collection ..........................................................................................34
    5.2.1   *Mandatory Source Separation* ....................................................................35
    5.2.2   *The Recommended Commercial Collection and Transport Method* ...............37
5.3   Residential Collection ............................................................................................37
    5.3.1   *Mandatory Source Separation with Curbside Collection of All Waste Streams, and Drop-Off and Collection Capability at Transfer Stations* ......................................................38
    5.3.2   *Division of Residential Collection into Service Districts* ...............................40
5.4   Government Collection ..........................................................................................40
    5.4.1   *Mandatory Source Separation with Regular MSW Collection* ......................41
5.5   Regional Solid Waste Transfer Stations ...............................................................41
5.6   Performance Standards ..........................................................................................43
    5.6.1   *Collection and Transport Performance Standards* .......................................43
    5.6.2   *Municipal Solid Waste Collection* ..............................................................43

# CHAPTER SIX: DISPOSAL AND WASTE DIVERSION ..........................48

6.1   Landfill ...................................................................................................................49
6.2   Landfill With Minimal Waste Recycling ..............................................................51
6.3   Landfill with Moderate to Aggressive Recycling and Composting .....................52
6.4   Recommended Disposal, Waste Diversion, and Reduction Approach ..................54
    6.4.1   *Legal Considerations* ..................................................................................54
    6.4.2   *Economic Considerations* ...........................................................................54
    6.4.3   *Environmental Considerations* ...................................................................55
    6.4.4   *Social Considerations* .................................................................................56
    6.4.5   *Political Considerations* ..............................................................................56
6.5   Performance Standards ..........................................................................................57
    6.5.1   *Ordot Dump* ...............................................................................................57
    6.5.2   *Guam Municipal Solid Waste Landfill Facility* ...........................................57

# CHAPTER SEVEN: RECYCLING, COMPOSTING, AND SPECIAL WASTE ................................................................................................................61

7.1   Recycling ...............................................................................................................61
    7.1.1   *Guam's Recycling Facts and Figures* ..........................................................61
    7.1.2   *Recycling Efforts within the Community* ......................................................62
    7.1.3   *Future Recycling Efforts* .............................................................................63
    7.1.4   *Performance Standards* ..............................................................................64
7.2   Composting ............................................................................................................68
    7.2.1   *Yard Waste Composting Efforts within the Community* ................................70
    7.2.2   *Future Composting Efforts* ..........................................................................70
    7.2.3   *Performance Standards – Composting Operations* .......................................71
7.3   Special Waste .........................................................................................................72
    7.3.1   *White Goods* ...............................................................................................72
    7.3.2   *Household Hazardous Waste and Automotive Batteries* ................................73
    7.3.3   *Abandoned Vehicles* ...................................................................................74
    7.3.4   *Waste Reduction Opportunities* ..................................................................75
    7.3.5   *Illegal Dumping* .........................................................................................77

# CHAPTER EIGHT: PUBLIC EDUCATION STRATEGY ..........................78

8.1   Purpose and Objectives of this Strategy ...............................................................78
    8.1.1   *Purpose of this Strategy* ..............................................................................78

Case 1:02-cv-00022    Document 190-14    Filed 01/14/2008    Page 9 of 36

    *8.1.2   Objectives of the Public Information and Education Strategy* .................................................. 78
  8.2   Public Education Activities ............................................................................................................ 79
    *8.2.1   Coordination with Commercial Haulers, Educators, Federal Agencies, and Utilities* ............... 79
    *8.2.2   Source of Reference Materials* ............................................................................................... 79
    *8.2.3   Recycling Web Site* ............................................................................................................... 80
    *8.2.4   Arrange Community Events* ................................................................................................... 80
  8.3   School Community .......................................................................................................................... 80
    *8.3.1   Curriculum Development, Pre-K through 12* ......................................................................... 80
    *8.3.2   Teacher Training* ................................................................................................................... 81
    *8.3.3   Assembly Presentations* ........................................................................................................ 82
    *8.3.4   School Recycling Centers* ...................................................................................................... 82
    *8.3.5   Environmental Clubs* ............................................................................................................ 82
  8.4   The Commercial and Tourism Business Community ...................................................................... 83
    *8.4.1   Educational Materials and Events for the Commercial Sector* ............................................... 83
    *8.4.2   Awards Program* ................................................................................................................... 83
    *8.4.3   Recycling Bins for Public Events and Places* ......................................................................... 83
  8.5   The Government of Guam Agency and Institutional Community ................................................... 84
    *8.5.1   Setting the Example* .............................................................................................................. 84
    *8.5.2   In-house Communication* ...................................................................................................... 84
    *8.5.3   Training Government of Guam RCOs in the "Reduce, Reuse, Recycle" Philosophy* ............... 84
  8.6   The General Public ........................................................................................................................ 85
    *8.6.1   Logo and Theme* .................................................................................................................. 85
    *8.6.2   Coordination and Collaboration* ........................................................................................... 85
    *8.6.3   Community Events* ................................................................................................................ 86
    *8.6.4   Media* .................................................................................................................................... 86
  8.7   Federal Agencies on Guam ............................................................................................................ 86
  8.8   Funding ........................................................................................................................................... 86
    *8.8.1   Fees* ....................................................................................................................................... 87
    *8.8.2   Grants* ................................................................................................................................... 87
    *8.8.3   Initial Government Subsidy* ................................................................................................... 87
  8.9   Future Planning and Development ................................................................................................. 87
  8.10   Recommended Actions ................................................................................................................. 87

**LIST OF REFERENCES** ........................................................................................................... **89**

**APPENDIX A**        **Guam Waste Laws** ...................................................................... **91**

**APPENDIX B**        **Focused Audit Report & Recommendations** ................. **98**

THIS PAGE INTENTIONALLY LEFT BLANK

Case 1:02-cv-00022    Document 190-14    Filed 01/14/2008    Page 11 of 36

# CHAPTER ONE:  INTRODUCTION

## 1.1   Plan Purpose

This first update of the 2000 *Integrated Solid Waste Management Plan for the Island of Guam* is written in compliance with Section 51103 of Title 10 of Guam Code Annotated, which states that the *"Guam Environmental Protection Agency shall revise the Solid Waste Management Plan at least every five years, or sooner as needed."*  It identifies and describes the key elements of the integrated solid waste management system that will be implemented on Guam during the five-year period 2006-2010 and beyond.

## 1.2   Planning Approach

Based on review of the contents, data, and recommendations of the 2000 *Integrated Solid Waste Management Plan for the Island of Guam* (PL 25-175), a team of technical reviewers from within the Guam Environmental Protection Agency (Guam EPA) and the Solid Waste Division of Guam Department of Public Works (DPW) drafted this 2006 *Guam Integrated Solid Waste Management Plan* (2006 ISWMP or the Plan) update.  They assessed the progress in solid waste management since 1999, proposed revised goals and objectives for the ISWMP, and updated data and projections of waste generation to 2037.  They formulated a solid waste management system incorporating the components of a management authority, waste diversion and disposal, collection and transport, and public education.  Included are performance standards that define measures of plan implementation.  These components were assigned to chapters, each addressing (1) the current status ("where we are"), (2) desired objectives ("where we want to be"), (3) recommended actions ("how to get there"), and (4) the performance measures ("how we know whether we have succeeded").

All parts of this update were developed with a view to accommodate legal concerns expressed in the numerous local solid waste laws (Appendix A) and the District Court of Guam's imposed Consent Decree.  In 2004, the Government of Guam entered into a Consent Decree with the United States (U.S. District Court of Guam, 2004) establishing specific deadlines for (1) opening a legally permitted landfill, (2) closing of the Ordot Dump, (3) institutionalization of a household hazardous waste (HHW) collection program, including construction of a facility, and (4) producing a financial plan to achieve the first three tasks (Consent Decree tasks).  Therefore, the Consent Decree requirements heavily influence this 2006 ISWMP document.  However, since the Consent Decree schedule was not being met for either the Ordot Dump closure or new landfill construction, Government of Guam proposed a revised schedule to USEPA.  A decision on approval of the revised schedule was awaited in September 2006.

## 1.3   Background

Guam has seen many changes since it became a Territory of the United States in 1898.  It has become westernized, but has not lost all of its cultural and social

1

traditions. As is the case with any westernized society, the influence of capitalist economics and social trends have created in Guam's population the inevitable social patterns that can only be described as "commercialism" and "consumerism." As a result of these patterns, residents' buying habits, methods of consumption, and general lifestyle are characterized by an attitude that emphasizes the "disposable" nature of modern consumer products. Traditionally, Guam, like any other island in the Pacific, did not have this paying and consumption lifestyle that requires proper disposal and management of its solid waste. Everything was part of the earth and biodegradable – no plastics, glass, metal, or chemical contaminants. The islanders never actually had to worry about the negative impacts that result from the disposal of their wastes. Needless to say, both the islanders' disposal habits and westerners' commercialism and consumerism do not lend themselves well to the effective and efficient management of solid waste on Guam.

Another aspect of solid waste management on Guam is the government's historic approach to government utilities and services. In the fairly recent past, government's management of other critical utility services, such as power and water, revealed a pattern of insufficient planning and management, under-prioritized maintenance of facilities and equipment, insecure funding for operations, political controversy involving the Legislative and Executive Branches, and the eventual emergence of utility crises (load-shedding and water shortages) leading to, among other problems, a federal court stipulated order. Recently, the privatization of the Guam Telephone Authority has demonstrated that much of the government's services can be operated more efficiently and more economically by a private firm. The value of properly planned and controlled privatization of solid waste management operations is therefore emphasized in this plan.

Following use of the Ordot Dump as the official municipal solid waste disposal site for all residents and businesses on Guam, including some disposal of military wastes a half-century ago, its valley site has become a mountain. It has far outlived its acceptability, causing health and environmental risks that should not be tolerated. It not only affects neighboring residents with health, odor, noise, and animal vector problems, but has also caused fires generating toxic fumes that have required residents' repeated evacuations from their homes. It has polluted surface waters from its leachate, which has led to a federally forced Consent Decree (U.S. District Court of Guam, 2004) that requires the Government of Guam to close the dump. This Consent Decree imposes a strict schedule of related actions that must be taken, backed by the imposition of financial penalties for missed deadlines. This dump has been the primary reason for the development of solid waste management plans on Guam.

In 1999, the Guam EPA's first Guam Integrated Solid Waste Management Plan was drafted by a local consulting firm, Dueñas and Associates, Inc., with the coordination of a steering committee, under the guidance of the Guam EPA (Guam EPA, 1999). This was subsequently approved by the Guam EPA Board of Directors and submitted through the Guam Planning Council and the Governor of Guam to the Guam Legislature. It was modified and adopted by the Guam

2

Legislature through Public Law 25-175 on December 12, 2000, as the *Integrated Solid Waste Management Plan for the Island of Guam* (2000 ISWMP). It assessed solid waste generation and disposal volume requirements and evaluated disposal and volume reduction options and management. Waste collection and transport methods were then presented. These selected components were then examined to see how they would be best managed in order to yield a functional, efficient, and effective Integrated Solid Waste Management (ISWM) system. The desired performance levels for components were specified to complete the 2000 ISWMP. The requirements to establish a non-political Guam Solid Waste Authority and the option of waste reduction by incineration were removed from the Guam EPA Plan by the 25th Guam Legislature. Consequences of not having this proposed Authority appear very significant.

Before and after this Plan development, numerous local laws were passed to address the problems with the Ordot Dump and related solid waste concerns. These are summarized in Appendix A. Most of those laws enacted before 1999 (before the 25th Guam Legislature took office) were considered in the development of the 2000 ISWMP.

There have been many legislative attempts since the 2000 ISWMP to make the government solid waste activities operate more efficiently. In fact, during the six-and-a-half years between May 1999 and November 2005, the Guam legislature enacted more than 20 laws influencing solid waste management.

Regarding privatization, Public Laws 24-06, 24-139, and 24-272 mandate DPW to contract out all operations. Public Law 26-99 again mandates DPW to privatize collection and mandated the separation of Guam into three residential collection zones. Public-private partnerships have the potential to provide great advancements for solid waste management in terms of the improvement of operations and implementation of new technologies. However, it is imperative that careful consideration be given to all aspects of privatization. Viable options must be examined, including those that may not, at first glance, appear to be the most technologically advanced. Environmental and social goals also may counter the use of private business decisions on waste management.

Recycling efforts on Guam must be expanded and improved. The Asian market for both metal and waste paper is booming. Thousands of junk cars have been removed and shipped to recyclers since the 2000 ISWMP. The Guam Public School System is starting environmental clubs to address the collection of aluminum cans. Ambros, Inc., of Guam, in collaboration with other local businesses and in coordination with Guam EPA, is currently sponsoring a project to place aluminum can recycling bins in most of the public schools and some private schools by fall of 2006, and ultimately in all the schools on Guam. Although there appears to be a significant increase in recycling activities on Guam, the Government of Guam must ensure that plans support the integration of increasing recycling business opportunities within all solid waste management activities.

3

The 2000 ISWMP set performance criteria that can be used to measure whether tasks of the plan were accomplished. These criteria were developed for each of the components of the ISWM system and were based on functional, operational, and legal requirements. Table 1.1 includes key components and general guidance on steps to be taken from the existing solid waste management system in 2000 to a fully implemented integrated system. In general, very few of the proposed activities were accomplished within the transition period. It is therefore critical that this Plan update set guidelines and identify a Solid Waste Authority that is committed to the implementation of all the components of this Plan. The Consent Decree was not a component of the 2000 ISWMP nor is it a local mandate to enforce the implementation of the 2000 ISWMP. But it is a driving force that enabled the implementation of the two key factors of the Plan: the closure of Ordot Dump and the opening of the new landfill.

4

## Table 1.1  Summary of Solid Waste Management Plan Tasks of 2000 ISWMP

| Tasks | Description of Activities | Implementation | Present Status | Future Application |
|---|---|---|---|---|
| Operation at Ordot | Shredder Volume Reduction | DPW | Not done | Carry forward |
| | Coordination with Closure Design | DPW | Permitted Dec. 2005 | Ongoing |
| New Landfill | Opening Date 2001 | DPW | Not done; new opening date by Sept. 27, 2007 | Ongoing |
| Billing and Collection System | Interim Volume Base Fee Determination | DPW | Done | PUC to set fees |
| | Scales and Related Equipment Used | DPW | Not done; permit requirement | Carry forward |
| Data Collection | Interim Data Collection Facilities and Strategy | DPW | Not done | Carry forward |
| | Data Collection Personnel | DPW | Not done | Carry forward |
| Collection and Transport | Development of Container Standard | DPW | Done | Revise for source separation |
| | Development of Collection Standards, Rules and Regulations | DPW | Done | Revise for source separation |
| | Assessment of Fleet Service | DPW | Not done | Carry forward |
| | Develop Scope of Contract Services | DPW | Not done | Carry forward |
| | Assign Small Collection Contracts for Organized Subdivisions | DPW | Not done | Carry forward |
| | Coordinate with DLM to Identify Sites for New Regional Solid Waste Transfer Stations | DPW | Not done | Carry forward; use existing stations where practical |
| Recycling | Establish Recycling Program | Guam EPA | Not done | Carry forward |
| | Waiver at Port | Guam EPA, Legislature, Port Authority | Done | Ongoing |
| | Qualifying Certificate | Guam Economic Development and Commerce Authority | Done | Ongoing |
| | Recycling Collection Centers at Existing Transfer Stations and Community Centers | DPW, Mayor's office | Not done at transfer stations, and mayors' offices have informal recycling programs | Carry forward |
| | Grants for Recycling | Guam EPA, University of Guam | Not done | Carry forward |
| Composting | Establish Chipping/Shredding at Existing Transfer Stations | DPW | Not done | Carry forward |
| | Develop Interim Rules and Regulations for Composting | Guam EPA | Not done | Carry forward |
| | Legislation Requiring Government, Landscaping and Ground Maintenance to do Composting | Guam EPA | Not done | Carry forward |

5

The Solid Waste Management Program of Guam EPA issues solid waste permits to all companies engaging in the transport and management of solid waste. Within the last five years, Guam EPA issued 367 solid waste permits as shown in Table 1.2. An increase in the number of solid waste permits shows that local companies are now more aware of the need to properly dispose of and manage wastes. In 2005, there was an increase in the number of companies doing waste processing and storage. In fact, in 2005 there were 11 companies involved with waste recycling, processing, and transfer.

The composition of solid waste has changed in Guam since 2000. However, this has not been measured and studied for more than ten years. In order to capture the current waste composition and the amount of waste going to the planned landfill, a waste composition and characterization study will be performed within the next two years.

**Table 1.2 Annual Solid Waste Permits Issued**

| Permit Type | Collection | Processing | Storage/ Transfer | Disposal | TOTALS |
|---|---|---|---|---|---|
| Fiscal Year 2000 | 61 | 7 | 3 | 4 | 75 |
| Fiscal Year 2001 | 65 | 16 | 7 | 4 | 92 |
| Fiscal Year 2002 | 45 | 15 | 3 | 3 | 66 |
| Fiscal Year 2003 | 22 | 8 | 3 | 2 | 35 |
| Fiscal Year 2004 | 28 | 2 | 3 | 2 | 35 |
| Fiscal Year 2005 | 38 | 14 | 10 | 2 | 64 |

Additional developments and changes in solid waste management on Guam since the 2000 ISWMP are discussed in the following chapters.

6

# CHAPTER TWO: SOLID WASTE MANAGEMENT GOALS AND OBJECTIVES

The goals of this 2006 ISWMP are the following:

- Protect Guam's public health and environment during every aspect of Guam-wide solid waste storage, collection, processing, transfer, and disposal;

- Reduce Guam's waste stream through source reduction, recycling, public education, and other means;

- Privatize DPW's solid waste operations as mandated by Public Laws 24-06, 24-272, and 26-99; and

- Achieve the most appropriate balance of efficient and overall cost-effective integrated solid waste collection, reduction, and disposal systems.

The objectives are organized into four general categories: (1) collection/transport, (2) waste stream reduction, (3) disposal, and (4) management. The objectives are further categorized into five time frames: (1) overdue-range (1998-2003); (2) Ordot Consent Decree range (2004-2007); (3) short-range (years 2005-2009); (4) mid-range (years 2010-2014); and (5) long-range (years 2015-2035). These objectives form the framework of Guam's integrated solid waste management system. They are guidelines by which solid waste management will achieve mandated goals. These objectives do not manifest the level of detail required for implementation, but rather draw upon the performance criteria developed in the evaluation of various component alternatives to outline what should be expected from the ISWM system.

## 2.1 Collection/Transport

### 2.1.1 Fully Implement Residential User Charges and Tipping Fees through a Prepaid System for Users by December 31, 2006 (Overdue- Range)

The implementation of this objective was mandated by Public Law 24-272. Tipping and user fees are deposited into the Solid Waste Operations Fund (SWO Fund) and must be used for solid waste management practices. DPW implemented user charges and tipping fees on December 24, 1998; however, DPW has not been successful in billing and collecting. Between February 1, 2000, and March 2001, DPW fell behind in billing, so the Guam Legislature intervened. With Public Law 26-17, it limited to four months DPW's ability to backbill (billing for a number of prior months), and it required DPW to prorate collection of the fees backbilled before May 2001. Since 2001, DPW has been largely unsuccessful in billing and collecting from an acceptable number of customers. Both DPW and the Department of Administration have encountered difficulties in collecting from some commercial haulers.

7

Effective fee collection must occur in order to support the cost of service and ensure favorable interest rates on capital debt (e.g., new landfill, HHW facility, transfer stations, etc.). Moreover, the fees collected during 2000-2006 were not sufficient to pay for the Consent Decree mandated tasks because the SWO Fund did not have a reserve account for such projects. So, in October 2005, the Public Utilities Commission (PUC) approved an interim tipping fee rate adjustment to cover service costs and to create a reserve account for some of the Consent Decree project costs. For a detailed analysis of this fee adjustment and methods and basis for future incremental adjustments to meet Consent Decree mandates, please refer to the PUC Rate Report of September 2005. On August 18, 2006, the PUC consultant provided an Audit Report on DPW's billing, fee collection, and services. It recommended a prepayment system for residential waste. See Chapter 3 for more discussion.

### 2.1.2 Private Contracts for Residential Solid Waste Collection by December 31, 2006 (Overdue-Range and Short-Range)

Privatization of residential collection was mandated in early 1998 by Public Law 24-139. It was further mandated by Public Law 24-272. Four years later, because privatization had not occurred, the Guam Legislature intervened. On June 3, 2002, with Public Law 26-99, it mandated DPW to divide Guam into three solid waste management districts by July 3, 2002, and to contract for collection services in two of the districts by September 2002. DPW has reported progress in structuring a privatization bid offering. DPW issued a request for proposals of interest for a broad range of solid waste responsibilities in March 2006. However, private contracting of residential collection had not been implemented by September 2006.

Other financial considerations would be to impose a franchise fee for residential collections. This element is critical to the smooth and efficient operation of the system and is likely to be subject to public scrutiny and public complaint if mismanaged. Short-term franchises would ensure that performance standards and customer service standards are met consistently. Currently, DPW regulations require collection contracts to be short-term (five years or less).

### 2.2 Waste Stream Reduction

### 2.2.1 Reduce the Annual Quantity of the Guam-wide Solid Waste Stream by a Minimum of Five Percent through Composting by July 1, 2007 (Overdue- and Short-Range)

Reduction of Guam's solid waste stream was mandated by Public Law 24-272. In fact, the public law specifically sets the minimum reduction at twenty percent through reuse, recycling, and composting of solid waste generated on Guam. The 2000 ISWMP adopted the twenty percent reduction mandate, which was re-affirmed through passage of Public Law 25-175. Moreover, the use of these source reduction and waste minimization methods is discussed as a continuing means of promoting land conservation and diminishing our dependence on landfills.

8

The 2000 ISWMP estimated that composting could account for a five percent minimum reduction in the generated waste stream by the year 2003. The implementation of this objective will require taking the concept from the drawing board to complete construction and implementation, as there are currently no civilian facilities available for the manufacture of compost from organic wastes. In 2006 a private local company obtained equipment and applied for permits to store and process green waste adjacent to its hardfill operations. Also another company applied for a tire shredding and recycling and plastic recycling permits. The development of attendant programs and systems, such as public education programs, will be discussed in subsequent sections.

### 2.2.2 Reduce the Annual Quantity of Guam-wide Solid Waste Stream by Twenty Percent through Diversion at the Source and Recycling at Material Resource Recovery Facilities (MRRFs) by July 1, 2009 (Overdue- and Short-Range)

It is estimated that recycling can account for at least a twenty-percent reduction in the generated waste stream by the year 2009 through the implementation of source separation, separating at transfer stations, MRRFs, and recycling collection centers. Historically and currently Guam recycles less than ten percent of the total solid waste stream generated. This is due in large part to the fact that collection services for recyclables are limited, as are collection/drop-off centers, and that recycling is currently entirely voluntary and without adequate supporting public education programs. Implementation of this component of the 2006 ISWMP will require the construction of one or more MRRFs, more aggressive policies and laws, intensive public education efforts, and increased facilities for collection and processing of recyclable commodities. Details of the alternatives to achieve implementation are included in subsequent sections of this document.

### 2.2.3 Reduce the Annual Quantity of Guam-wide Solid Waste Stream by Thirty-five Percent through Diversion at the Source and Recycling by July 1, 2018 (Long- Range)

The implementation of this component will be achieved through increased recycling of generated solid waste prior to disposal into the municipal solid waste stream. This increase should be a product of the change in the public's attitude and waste disposal practices resulting from the recommended legislation and enhanced public education efforts initiated for the short-range recycling objective. It requires no additional needs beyond minor upgrades to those facilities and systems implemented for the short-range objective.

### 2.3 Disposal

### 2.3.1 Final Closure of the Ordot Dump September 23, 2007 (Overdue-Range and Consent Decree)

Public Law 22-115 mandated that the Ordot Dump be closed by April 25, 1997. Public Law 24-139 mandated the Ordot Dump be closed by September 11, 1998,

but that date was extended by Public Law 24-272 to April 8, 1999. These aggressive deadlines were not based on a realistic analysis of the tasks required to actually achieve this objective. Based on DPW's realistic assessment of tasks required to meet federal and Territorial requirements, the 2000 ISWMP identified July 1, 2001, as a best case for completing closure. However, the Government of Guam equivocated, and engaged in four years of negotiation with U.S. EPA for a Consent Decree to settle claims for polluting the Lonfit River, and to mandate a schedule for closing the Ordot Dump and opening a Municipal Solid Waste Landfill Facility (MSWLF).

Under the Ordot Consent Decree, closure construction must be completed by October 23, 2007, and the dump must stop receiving waste by the earlier of either the opening of the Layon Landfill or by September 23, 2007. This requires that steps be taken immediately to open a new landfill by committing to pick up the pace of development to make up for lost time and to complete the closure process as scheduled by the Consent Decree. Since some of these dates have been exceeded, new later dates have been requested for U.S. EPA approval in 2006. This component of the 2006 ISWMP will entail implementing the closure design plans, which are complete, and making any necessary modifications resulting from value engineering analysis which was completed in January 2006.

### 2.3.2 Privatize and Open the Layon Landfill by September 23, 2007 (Overdue- and Consent Decree Range)

Phase 1 of the 2000 ISWMP (Guam EPA, 1999), which was completed in August 1998, contained three alternative detailed fast-track schedules of planning and construction of the MSWLF. These schedules contemplated a start date of August 1998 and a completion date before the end of 2000. But because no progress was made between 1998 and 2004, the Consent Decree mandated a schedule for site selection and landfill construction. As indicated previously, this crucial solid waste management issue depends greatly on the Government of Guam's determination to take all necessary steps to open the landfill on or before September 23, 2007. This component of the 2006 ISWMP will include at a minimum a new MSWLF, compliant with Guam EPA regulations and federal RCRA Subtitle D, with access road, supporting infrastructure, and waste receiving facilities. It will also include recycling collection facilities and other solid waste management facilities as determined in the rest of this planning document. Specific issues associated with the new landfill facility are addressed in subsequent sections of this document and in the environmental impact statement and supporting design plans and specifications developed over the past two years for the landfill facility.

### 2.4 Management

### 2.4.1 Adopt the Planning and Operational Recommendations from the Updated ISWMP in 2006 (Short-Range)

This objective is the prerequisite for effective continued implementation of the ISWMP. As mentioned previously, several components of the 2006 ISWMP

10

required that immediate action be taken in order to meet the stated target and Consent Decree mandated dates. Since some of these dates have been exceeded, new later dates have been requested for US EPA approval in 2006.

### 2.4.2 Implement an Ongoing, Comprehensive SWM Data Collection, Analysis and Planning Process As Soon As Possible (Short-Range)

The planning process for solid waste management is dependent on the collection and analysis of data. Facilities and systems that handle solid waste can vary greatly in capacity and effectiveness. The use of improperly sized equipment or systems or poorly planned facilities will only serve to greatly magnify problems associated with the handling and disposal of solid waste. Guam is in critical need of actual data on solid waste generation, collection, storage, diversion, and disposal in order to practice active solid waste management. For these reasons, the implementation of this objective requires short-range execution through the effective and full compliance with permits and operational plans and procedures for all critical facilities, especially those operated by DPW pending privatization. The Consent Decree requires interim or continuing operational permits for this very reason, reinforcing the objectives contained in the 2000 ISWMP.

### 2.4.3 Establish Guam-wide Solid Waste Management Operations, inclusive of the Military's Collection, Storage, Processing and Disposal Operations by October 1, 2008 (Short-Range)

In order for the solid waste management system to be truly integrated, it should include the consolidation of all solid waste operations on Guam, both civilian and military. The locations of military facilities on Guam with respect to existing Government of Guam solid waste facilities lend themselves to assimilation into an integrated system, providing convenient service points in the northern and southern areas. The 2006-2008 time frame is ideal for consolidation because of the anticipated growth in recycling, the requirement that the permit for Andersen Landfill end in 2008 and the pending commitments for military expansion planning in partnership with Government of Guam. Subsequent sections will detail the plan of implementation for this element of the 2006 ISWMP.

11

# CHAPTER 3: MANAGEMENT OF SOLID WASTE OPERATIONS AND THE FORMATION OF A PUBLIC UTILITY: THE GUAM SOLID WASTE AUTHORITY

This Plan update calls for the transfer of DPW's solid waste duties to a newly formed public utility, the Guam Solid Waste Authority (GSWA or Authority). It reviews the history of Guam EPA's 1999 adoption of a public utility, the 2006 recommendation for the Authority in the Public Utilities Commission's (PUC) Focused Audit Report and Recommendations ("PUC Audit Report" and Appendix B), and DPW's financial and program management. It concludes that the GSWA, with a general manager and a chief financial officer, is the only viable management entity by which Guam can achieve effective solid waste operations.

## 3.1 Background: 1998-2000

In 1999, after several public meetings, the Guam EPA Board of Directors adopted an Integrated Solid Waste Management Plan (1999 Plan). The 1999 Plan included as Chapter Five "Management Options Analysis," which began with this statement:

> The deteriorating effectiveness of the DPW-operated public solid waste collection and disposal systems, coupled with the [outsourcing and tipping fee] mandates of PL 24-272 demand ... a radical change ... to the existing organizational and functional structure [of DPW's solid waste responsibilities]. This [radical change] must be the first step in assuring the efficient and effective implementation of the solid waste management strategy adopted in this plan.

It identified five organizational responsibilities for successful implementation of Guam laws and the ISWMP:

1. **Tipping Fee Management**: Implement and manage the collection, accounting, budgeting and expenditures of the solid waste tipping fees;
1. **Debt Management**: Pursue the financing for capital improvements, operation and maintenance of solid waste facilities;
2. **Outsource Operations**: Contract all solid waste operations as mandated by PL 24-272 (and privatize the new landfill through a finance/design/build/lease agreement as mandated by PL 24-06);
3. **Contract Administration**: Effectively manage contracts with private companies for collection, transfer stations and disposal; and

12

4.  **Environmental Compliance**:  Ensure that operations during transition to outsourcing and contractors meet environmental and health laws.

The 1999 Plan reviewed environmental, economic, political and social challenges to implementing the laws and the ISWMP, and compared advantages and disadvantages of: (1) a public utility, the "Solid Waste Management Authority," (2) a "Solid Waste Agency," similar in organization to the former Public Utility Agency of Guam; or (3) DPW management.   The 1999 Plan adopted the public utility as the organizational option, and listed the advantages of it to include:

1.  **Long-Term Debt**:  An autonomous public utility would have greater success in borrowing money because the tipping fee revenues would not be subject to transfer by elected or appointed officials;
2.  **Regulation by the Public Utilities Commission**:  PUC would regulate both the cost of service and standard of service;
3.  **Focused Mission**:  The public utility would be focused on service to rate payers and not be distracted by other DPW responsibilities;
4.  **Privatization**:   The utility would not be limited to service contracts, but could enter into agreements for franchises, concessions, joint ventures, etc.; and
5.  **Stability**:   Policy and operational decisions would be de-politicized.

It also included draft legislation.  On December 12, 2000, the Legislature disapproved of the public utility, and removed the Chapter from the final 2000 ISWMP.  Public Law 25-275 adopting the 2000 ISWMP stated:

> The Plan calls for the creation of a separate government agency to deal with waste management, a function which is adequately performed by the Department of Public Works and *I Liheslaturan Guahan* believes the creation of such an agency would result in unnecessary expense and duplication of effort within the Executive Branch of government.

Consequently, implementation of the ISWMP has been through continued management by DPW.  DPW management has been without the benefits of an experienced general manager and chief financial officer, and without autonomous control of revenues, expenses, and financing.

## 3.2   DPW Fiscal Management of Solid Waste Operations

Between 1999 and late 2005, Guam achieved only a few small steps towards effective fiscal management to support solid waste capital improvements, operations, and environmental compliance.  These small steps were driven by (1) U.S. EPA, through the Ordot Consent Decree, and (2) the PUC.  The Ordot

Consent Decree mandated DPW to prepare and implement a financial plan. The Consent Decree Financial Plan was required to include funding sources and a schedule to secure funds for the design, construction, and operating costs for Ordot Dump closure and landfill development. It also set a schedule that propelled DPW into the PUC rulemaking process. That process resulted in a cost of service analysis (PUC Rate Report), which the PUC's consultant completed in September 2005. The findings and recommendations of these two reports are incorporated into the following review of DPW's management of the tipping fee system, financing and debt, contract administration, rate making, and environmental compliance.

### 3.2.1 Tipping and User Fee Management

a.    Fee Management 1999 -2005

Although DPW had authority to assess commercial tipping fees starting in 1994 with PL 22-115, it never did so. The first tipping fees were initial commercial and residential rates established in 1998 by PL 24-139. They went into effect on January 1, 1999, the month after the Guam Legislature approved the tipping fee regulations. The regulations require monthly billing and payment within 60 days.

In 1999 irregularities in the law emerged. The commercial haulers complained that their costs of complying were excessive, as they believed that the law required them to convert their billing systems from being based on volume to being based on weight. The village Mayors claimed lack of funds to pay the commercial tipping fees. Also, there was no charge for residential customers who did self-drops at the transfer stations and the Ordot Dump. By the end of 1999, the Guam Legislature had passed two more laws. In PL 25-70, it changed the commercial tipping fee to be volume-based. In PL 25-93, it created: (1) a self-drop fee, (2) a one-year fee exemption for mayors when performing official duties, (3) a "good citizen" exemption for volunteer litter collection events, and (4) authority for the Governor to suspend fees for up to 60 days following a *force majeure*.

In 2000, DPW fell significantly behind in billing customers. In 2001, it met with public resistance when it billed customers for up to fourteen months of prior service. Customers claimed a credit for payments made but not billed, and for DPW's lack of consistent residential pick-up services. Consequently, the Guam Legislature passed PL 26-17 in May 2001. This law (1) limited collection of arrearages between February 2000 and March 2001 to seven months, (2) required DPW to prorate the arrearages into 12 equal payments, and (3) suspended future after-the-fact billing, or "backbilling," for residential service until the reconciliation and prorating had been completed. Further, for residential services after June 2001, the law limited DPW's ability to backbill to no more than four months. Also in 2001, the fiscal year 2002 budget law, PL 26-35, made permanent the Mayors' tipping fee exemption when performing official duties.

14

DPW's collection of fees continued to be inconsistent. At some point, the Department of Administration (DOA) began administering the billing and collection of the residential fees in addition to the commercial fees. In 2004, the Consent Decree Financial Plan found an anticipated shortfall of $ 2.2 million in uncollected fees. This finding prompted DPW and DOA to take corrective action. Also by 2004, the billing system needed an overhaul because it had not been purged of inactive accounts.

In September 2005, the PUC Rate Report found that having both DPW and DOA involved in billing and collection was inefficient and would not give much comfort to investors in the bond offering for capital improvements. It also found that DPW had not fully reviewed and purged the customer database of inactive accounts. It recommended that the 2006 management audit evaluate outsourcing billing and fee collection activities.

b.    Fee Management 2006.

In August of 2006, the Audit Report found that billing and collection system needed significant improvements to operate fully and fairly. For example, it found that DPW's customer list was incomplete and outdated, that DPW was serving a number of residences that had not paid or were using the mayors for free solid waste collection and free disposal, and that the commercial haulers often did not pay the tipping fees for more than 300 days after disposal. It found that the 2006 practice of revenue collection being dividing between DOA, the Treasure of Guam and DPW was awkward and ineffective. It also found that DPW's poor rate collecting residential fees was impacted by poor solid waste collection services.

The Audit Report recommended the immediate transfer of DPW solid waste operations to a public corporation, the GSWA, under the Combined Commission on Utilities ("CCU"). It also recommended that DPW implement a pre-paid solid waste user and tipping fee system by the end of 2006. The prepaid system would use a combination of prepaid stickers for residential containers and bags for self hauls and extra (e.g., holiday, moving) garbage. The prepaid system would eliminate the back billing problems and increase the cash flow needed for servicing the long-term debt.

The Audit Report contains 24 recommendations, and divides them into legislative, regulatory, and operational actions. DPW has made some progress in implementing the operational changes. By September 10, 2006, it had added staff with financial experience, and had advertised for a contracted Chief Financial Officer. The PUC will conduct a workshop with DPW on September 18, 2006, and the outcome of it appears to schedule for implementing the Audit Report recommendations. The Guam EPA agrees with the PUC's recommendations and adopts them as part of this Plan.

**Recommendation**: Solid waste operations and the GSWA should retain a general manager and a chief financial officer as soon as possible and expeditiously implement the Audit Report recommendations.

15

### 3.2.2 Debt Management

The tipping fees were to provide an income source to help pay for the capital improvements needed to close the Ordot Dump and open the landfill. However, it was clear that significant financing would be needed for these and other facilities in composting, recycling, household hazardous wastes, and for transfer stations.

Between December 2000 and 2005, DPW made little progress on financing any facilities. The PUC Rate Report found no reserve account within the Solid Waste Operations Fund. Between 1999 and 2005, when tipping fees had exceeded expenses, the funds were used for other purposes without long-range financial guidelines. It found that significant increases in the tipping fees would be needed to cover the debt service of the bonds or other loans needed to close Ordot and build the landfill. It recommended phasing in tipping fee increases over time. Further, DPW agreed to a PUC requirement that revenues from the rate increase would be held in reserve for Consent Decree tasks.

The Consent Decree Financial Plan provided the first small steps of financial management needed just to support the financing of closure of the Ordot Dump and the construction of the Layon Landfill. It found, however, that tipping fee revenues barely covered operating expenses (truck and equipment purchase, rental and maintenance, salaries and benefits for DPW employees who collected garbage, operated the transfer stations and dump, did billing, etc.). It established a strategy and a schedule for financing Ordot closure and landfill construction. The financing strategy for construction of Ordot closure was revenue-based, private activity bonds, including using any available federal grants and loans to reduce the amount of the bond financing. For the landfill, the strategy was private financing through a design/build/operate/transfer agreement.

The Consent Decree Financial Plan included an implementation schedule. The U.S. EPA's oversight of the Consent Decree prompted DPW into implementing the Consent Decree Financial Plan, and DPW's implementation has been partially successful. However, in February 2005, with a new politically appointed Director, DPW changed course. It abandoned the Financial Plan's schedule for landfill financing to pursue either revenue-based bonds or an asset sale. This change increased the amount of bond debt and the schedule for the Ordot construction bonds. Hence, the bond issuance was not completed before the April 21, 2006 Consent Decree deadline to award the closure construction contract. The government of Guam has been out of compliance since then.

The 2006 Audit Report concluded that the current billing and collection practices and the inefficient accounting procedures jeopardize the ability of the Solid Waste Division to obtain a favorable bond rating. It recommend (1) the formation of the GSWA,(2) for PUC establish by order appropriate collection standards, and (3) the prepaid solid waste fee, which would eliminate the back billing problems and increase the cash flow needed for servicing the long term debt.

**Recommendation**: Solid waste operations and the GSWA should retain a general manager and a chief financial officer as soon as possible and expeditiously implement the Audit Report recommendations.

### 3.2.3 Contract Administration

Public Law 17-87 (1985) had authorized DPW to contract out solid waste collection and disposal. By 2002, DPW had not contracted out any solid waste collection services. In June 2002, the Guam Legislature passed PL 26-99, which directed DPW to divide the residential collection system into three geographical districts and then to contract out the collection of two of the three districts within 4 months, by October 2002. It did not.

Customer complaints of inconsistent waste collection services continue to present billing disputes. Hence, the PUC Rate Report recommended that the focused management audit evaluate whether to outsource all of the collection services. The Audit Report found that DPW's poor rate collecting residential fees was impacted by poor solid waste collection services, which result from poor maintenance of 14 potentially operational trucks, and that on average only 5 to 7 of the trucks were in operation at any given time. It recommended that DPW contract out all solid waste collection services by January 2007 in compliance with Public Law 26-99 and through new legislation.

Administration of contracts for design, construction, and operations of solid waste facilities requires qualified staff with solid waste contracting experience. In May 2004, Governor Camacho received $309,000 from the U.S. Department of Interior to fund and train three engineers through September 2007 so that DPW would have qualified staff to administer the contracts and oversee the design and construction.

The Consent Decree Financial Plan included staffing with an Engineer Supervisor, an Engineer III, and an Engineer II. However, DPW has never hired the engineering supervisor. It hired two engineers on limited-term appointments, but not in the Solid Waste Management Division. One of the engineers left in August 2005 and has not been replaced; the other has limited work experience.

Instead, DPW has assigned other engineers and non-engineers to work part-time on the Consent Decree tasks. The result has been less than ideal for the island's solid waste management, for other DPW projects, and for Guam EPA. DPW has not provided the staff with professional landfill training. Staff participation has been fragmented between the solid waste tasks and other DPW duties, resulting in tasks being delayed and issues taking longer to resolve. To help make up for the shortfall, Guam EPA has invested an inordinate amount of staff effort addressing issues relating to engineering design, contractor performance, the operations plan in the permit application, public information, proposed legislation, and a lawsuit.

17

In 2004, Guam EPA and U.S. EPA recommended that DPW retain a solid waste expert to assist it in implementing the Consent Decree tasks, including contract management. After a few inquiries, DPW declined because the costs would exceed $200,000. In May 2005, during discussions of selling solid waste operations to a private entity(ies), U.S. EPA renewed its recommendation that DPW hire a solid waste expert.

Instead, DPW proceeded to contract out for a procurement advisor in early 2006. In June of 2006, USEPA informed the government that hiring of the technical advisor is essential to any resolution of the government's lack of Consent Decree compliance, which as of July 25, 2006 had exposed the government to $219,600 in stipulated penalties that are accruing at $5,000 per day. The GSA advertised for the advisor in July, but then withdrew the advertisement. DPW advertised for one in August 2006.

Because Guam EPA has experience in contracting household hazardous waste collection, Guam EPA will continue contract administration of this solid waste component until DPW staff is trained, with there being training of DPW staff in 2006 and 2007.

DPW is also responsible for contract administration of abandoned vehicle removal under Article III of the Solid Waste Management and Litter Control Act and recycling under Public Law 27-37 and Public Law 27-148. In 2005, DPW Division of Highways contracted for abandoned vehicle removal through a bid process. However, due to DPW's inexperience in solid waste contracting, DPW awarded a bid to a contractor who did not have a solid waste facility permit, and the 2006 contractor has experienced numerous environmental compliance problems.

In addition, in 1998, Public Law 24-246 required DPW to contract out to the highest bidder for a company to purchase recyclable paper from the public. DPW was also to subsidize the company $150,000 each year under two-year contracts with funds from the Solid Waste Operations Fund. DPW has never taken action on this requirement. Also, Public Law 24-272 created an Office of Recycling within the Solid Waste Management Division of DPW, with duties to establish recycling demonstration projects, and develop technical expertise in recycling operations. However, DPW has not created the office, in part because of lack of funds to carry out these duties. The Solid Waste Management Division needs permanent full-time employees that are trained in administration of solid waste contracts.

**Recommendation:** All of DPW's solid waste responsibilities, including the abandoned vehicle program, should be transferred to the GSWA as soon as possible and the GSWA should be required to have permanent full-time employees that are trained in administration of solid waste contracts.

18

### 3.2.4 PUC Rate Making

The initial tipping fee rates were to last until January 2001, after which the PUC would set rates based on a cost of service analysis and a focused management audit of existing operations. However, PL 25-70 extended the time frame for the initial rates to July 2002, but the PUC did not act to change the rates until October 2005.

The PUC did not set rates until 2005 in part because DPW did not change its organizational structure. DPW lacked experience in rate making before the PUC, and did not plan or implement the actions needed for rate making. It did not budget the funds for the cost of service analysis, and without it, DPW and the PUC had no revenue and expense data upon which to base the rates. In 2003, because DPW had no funds for the analysis, the PUC sent proposed legislation to the Guam Legislature that would ensure the studies would be funded by the tipping fees.

U.S. EPA's oversight of the Consent Decree Financial Plan prompted DPW to contact the PUC in January 2005 regarding rulemaking. As a result, in February 2005 the PUC sent the Guam Legislature its 2003 proposed legislation to fund the cost of service analysis and focused management audit from the tipping fees. The Guam Legislature adopted the changes in PL 28-56. A cost of service analysis was completed in September 2005 (PUC Rate Report) by the PUC's experts.

The PUC set an interim 25% rate increase in October 2005, effective November 1, 2005. The PUC required that the amounts collected for the increase be held in a reserve account to help pay for Consent Decree tasks.

The PUC's expert noted that even with the 2005 rate increase, the rates for all customers are "lifeline" rates. Such rate should apply only to very low-income residential customers. In order to pay for landfill construction and operations and for Ordot Dump closure and post closure care, improve collection services, etc., the expert predicted that the rates for residential customers rates would likely rise to $27 to $34 per month by 2007. Some people have claimed that the public will not tolerate such high solid waste rates. They have suggested a new tax, such as a beautification tax similar to the one instituted on Saipan, would be a better method. However, $27 to $34 per month residential rates are not uncommon for communities that have to borrow money to build new landfills and close dumps in the past few years, where there were little or no funds that had been held in a reserve account over time to pay for the capital investments.

The PUC ratemaking process forced DPW to take another small, but important financial management step. The PUC Rate Report recommended that the PUC require routine financial and operational reports from DOA and DPW staff to DPW management. Consequently, DPW agreed to provide the PUC with quarterly revenue and expense reports beginning October 1, 2005. The Audit Report and the workshop will prepare the solid waste program for the needed rate increases in 2007.

19

**Recommendation**: Solid waste operations and the GSWA should retain a general manager and a chief financial officer in 2006.

### 3.2.5 Environmental Compliance

Between December 2000 and September 2006, DPW did not outsource solid waste operations, as mandated by laws, to firms with expertise and experience with environmental compliance of solid waste operations. At the same time, it did not hire a solid waste expert or train employees in modern landfill operating procedures and solid waste collection/transport to ensure compliance with environmental and health laws. For example, it did not supply the dump with the requirement of daily cover material. As a result, the dump experienced frequent fires. To pay for the response to the fires, the Guam Legislature appropriated to the Office of Civil Defense over $200,000 for the May 14, 2001, fire (PL 26-35), and $250,000 for the October 25, 2002, fire (PL 26-153). The Governor has also issued executive orders declaring an emergency to respond to Ordot fires so that emergency funds could be used to pay the costs to control the fires [e.g., EO 98-07 (May 1998) and EO 98-34 (December 1998)].

As part of the Consent Decree settlement of unlawful leachate discharges to the Lonfit River, DPW paid $200,000 in civil penalties to the U.S. Treasury in 2004-2005, and by 2008 Guam must expend $1 million in local funds to conduct regular interim household hazardous waste collection events and to construct and operate a household hazardous waste collection facility. It is likely that Guam will have to pay additional civil penalties for the leachate discharges between the date of the Consent Decree, February 11, 2004, and the date the leachate control and treatment system eliminates the discharges to the Lonfit River.

In November 2005, DPW relocated equipment from the dump to the Dededo quarry. At the same time DPW did not supply the dump with adequate cover material for over two weeks. Consequently, the uncovered waste caused odor and leachate problems and increased the risks of fire. Further, Guam EPA fined DPW $11,050 for failure to maintain adequate cover material and adequate safety equipment for dump employees.

In December 2005, Guam EPA issued a solid waste permit to DPW for continued operations to closure and for the closure design, with required revisions. The permit contained numerous conditions regarding training of staff, out sourcing for a trained manager, and purchasing a scale. DPW has not complied with most of the provisions of its permits. In August of 2006, it advertised for a contract of a certified and experienced manager of landfill operations

DPW claimed lack of funds to pay for (1) additional solid waste collections after government holidays, (2) equipment repairs, (3) safety equipment and supplies, and (4) the environmental permit application fee. That is, DPW has not budgeted for the costs of environmental compliance. However, the noncompliance with environmental laws has lead to environmental hazards and ultimately to

additional costs upon the Government. These monetary penalties and hazard response costs are not budgeted or supported by the tipping fee revenues.

**Recommendation:** Solid waste operations should be outsourced in 2006 as required by the Solid Waste Operations Permit. The contractors should be required to have trained management in environmental compliance, including related costs. The contractors should be required to have policies and procedure that include the maintenance of equipment, proper operations and site maintenance and adequate cover material, and trained employees.

### 3.3 The CCU, Solid Waste Operations and the Guam Solid Waste Authority

By April 2006, the government was to have raised and/or borrowed over $10 million for Ordot Closure construction, and by November 2006, another $30 million or more for the landfill cell and buildings construction. The primary recommendation of the PUC's Audit Report is that the Solid Waste Division and activities be transferred to a public corporation under the oversight of the CCU. It stated:

> Time is of the essence and the solutions must be put in place immediately. Failure to do so could threaten the proposed bond financing that is required to fund critical compliance projects.

DPW faces similar financial management challenges that GWA and GPA faced in 2002. The result was the formation of the Combined Commission on Utilities (CCU) to oversee management of these agencies. The CCU did not exist in 2000 when the Guam Legislature found that creating a Board of Directors to oversee the Solid Waste Management Authority would be duplicative. The CCU has demonstrated success in overseeing contracting and financial management of the Guam Power Authority and Guam Waterworks Authority. Therefore, extending the CCU's powers to the solid waste operations can be achieved without unnecessary expense and without expanding government.

In addition, experience has shown that demands placed upon DPW management regarding roads, buildings, school buses, and assisting Mayors have impeded adequate implementation of its solid waste duties under the Solid Waste and Litter Control Act and recycling laws. The Government has fallen significantly behind in implementing the Consent Decree mandates, prompting E.O. 2006-12, forming an Ordot Consent Decree Compliance Committee, and E.O. 2006-13, to allow for emergency procurements to implement the Consent Decree projects and the Guam EPA permit conditions. The Committee's progress has been impeded by the demands of other government priorities and crises.

The necessary comprehensive and radical management changes have also been impeded by the frequent changes in the politically appointed Director, and the Government's resources dedicated to litigating with the United States about Ordot's pollution, to siting a landfill at Layon, and to the design of both the landfill and Ordot Closure. Consequently, Guam has fallen significantly behind the standards of solid waste management for developed communities that are

comparable to Guam in terms of population, solid waste composition, and solid waste volume. Therefore, extraordinary changes are needed to Guam's solid waste operations in 2006 and continuing into 2007.

The extraordinary changes extend well beyond tipping fee billing and collection. In order to obtain favorable bond rating or other financing, the revenue stream needs to be independent and not subject to reallocation. That can only be accomplished through an autonomous agency and its revenue. Significant management changes are needed for contract administration, not just for landfill operations and closure, but also for solid waste collection, solid waste separation, recycling, household hazardous waste operations, and transfer stations. Therefore, the GSWA should have a general manager who can effectively transition solid waste operations into an integrated and well-managed system of contract administration, billing and fee collection, and recycling activities.

Finally, experience has shown that GPA and GWA have benefited from the expertise of a chief financial officer. Therefore, because of the significant funds needed for capital improvements, and the complexity of financial management, the GSWA should have an experienced chief financial officer.

**Recommendation:** In 2006, the Guam Legislature should pass legislation creating the Guam Solid Waste Authority, a public utility overseen by the CCU. The legislation should: (1) transfer all DPW solid waste responsibilities and duties to the GSWA, (2) require the CCU to hire a general manager and a financial manager for the GSWA as soon as possible, (3) require the GSWA to have full-time staff trained in managing solid waste contracts, (4) require that all solid waste contractors have trained management in environmental compliance, including related costs, (5) require all solid waste contractors to have policies and procedures that include the maintenance of equipment, proper operations and site maintenance and adequate cover material, and trained technical employees, and (6) require data collection, analysis, and synthesis by the GSWA and all solid waste contractors.

## 3.4   Data Collection Needs

Management of the solid waste operations will depend heavily upon the data produced for collection, transport, disposal, recycling, special waste, and public education. Thus, the need in this category is not so much data collection as it is data analysis and synthesis. For example, waste composition data not only would help set recycling priorities, it also helps define the scope and magnitude of the recycling that is achievable. This information will be helpful in contract negotiations and contract administration.

## 3.5   Performance Standards

## 3.5.1 Billing and Fee Collection

A.    The residential services should be a prepaid system.
      **Basis:** Public Law 28-56, PUC Audit Report, and this ISWMP.

B.    The billing and fee collection system shall be designed and operated to accommodate the efficient coordination of various private contracted operators.

**Basis:** PL 24-06, PL 26-99 and 2006 ISWMP.

C.    The billing and fee collection system shall be designed and operated to work in conjunction with a data collection system to optimize coordination and efficiency.

**Basis:** Billing and collection operations will involve activities similar to those conducted as part of the data collection operations.

D.    The billing and fee collection system shall be expandable to include rate increases, any processing fees or payouts, or any subsidies associated with other components of this 2006 ISWMP.

**Basis**: A flexible system can incorporate subsidies such as grants or beautification tax, and other new revenue sources, as well as payouts for cancelled service or recycling refunds.

E.    The billing and fee collection system shall be maintained by Government employees or through a contract separate from the contracts for solid waste collection and disposal.

**Basis** Collection, disposal, and other contractors should focus on performance, not fee billing and collection. Accountability for collection and for performance is easier with separate contracts.

F.    Funds generated through the collection of tipping fees and user charges must be used for the closure of Ordot, opening of the new landfill and for other solid waste management practices (operations), the PUC's regulatory costs and expenses, and the recyclable paper contract.

**Basis:**    Public Laws 24-246 and 28-56.

### 3.5.2  Debt Management

A.    GSWA's general manager and chief financial officer provide accountability through monthly reporting to CCU on debt management.

**Basis:**    New legislation amending 12 GCA Chapter 79, CCU order or resolution.

B.    GSWA's general manager and chief financial officer provide proof of timely payments of interest on bonds, loans, etc., through monthly financial reports to the CCU and quarterly financial reports to the PUC.

**Basis:**    New legislation amending 12 GCA Chapter 79, and PUC orders.

23

### 3.5.3 Contract Administration

A.  CCU review and approval of all contracts.

    **Basis:**    New legislation amending 12 GCA Chapter 79.

B.  GSWA obtains general manager with solid waste contracting experience.

    **Basis:**    New legislation amending 12 GCA Chapter 79.

C.  Training plans for the GSWA staff shall be developed and budgeted by GSWA general manager and approved by CCU.

    **Basis:**    New legislation amending 12 GCA Chapter 79.

### 3.5.4 PUC Rate Making

A.  GSWA's general manager and financial officer shall provide timely reports and information on costs of service, debt service needs, and other information to the PUC.

    **Basis:**    PUC orders.

### 3.5.5 Environmental Compliance

A.  Employee and contractors working and managing the Ordot Dump facility, including closure construction, shall be trained in environmental compliance.

    **Basis:** Ordot Dump solid waste disposal permit for continued operations to closure, closure design and construction, and post-closure operations and maintenance, Guam solid waste regulations, and government contracts.

B.  Contractors of landfill design, construction, and operations shall be trained in environmental compliance.

    **Basis:** 10 GCA Section 51104; PL 24-06; solid waste facility permit for Layon design, construction, and operations; Guam solid waste regulations; and government contracts.

C.  Employees and contractors for solid waste transfer stations shall be trained in environmental compliance.

    **Basis:** 10 GCA Section 51104; solid waste facility permits for transfer stations; Layon design, construction, and operations; Guam solid waste regulations; and government contracts.

D.    Contractors for abandoned vehicle removal and other government contracts for recycling collection and / or processing of recyclable materials and compost shall be trained in environmental compliance.

> **Basis:** 10 GCA Section 51104; solid waste facility permits; Guam solid waste regulations; and government contracts.

# CHAPTER FOUR: EXTENDED SOLID WASTE PROJECTIONS

Data provided by the government and used for the *2000 Integrated Solid Waste Management Plan for the Island of Guam*, approved by the Legislature, were updated to provide the following:

- Corrected municipal solid waste (MSW) generation rates (based on *Guam Solid Waste Weight Composition and Recycling Feasibility Study* by Barrett Consulting Group [Guam EPA, 1995] and *Guam Landfill Final Site Selection Report* by Duenas and Associates, Inc. [Department of Public Works, 2005]).

- Population projections (based on U.S. Census data and projections by Department of Public Works, [2005] and D.E. Consulting [2005]).

- MSW composition projections (based on Department of Public Works, [2005[.

- MSW source projections (based on Department of Public Works, [2005])

These criteria were developed for the planning horizons of five, ten, fifteen, and twenty years. However, the key components of municipal solid waste management implementation often have life spans of greater than twenty years. Analyses of these components, especially in regard to their role in disposal and volume reduction of the waste stream, requires projections beyond the planning horizons stated. For this reason additional projections were made, arriving at the data detailed in the following Sections.

## 4.1 Population Projections

Solid waste load projections for this 2006 ISWMP are based on the population contributing to the waste stream. In order to make the necessary projections for the analysis and comparison of disposal and volume reduction alternatives, annual population numbers were needed to the year 2035. For determining the final numbers to be used in evaluating disposal options, the military populations are included. This is in contrast with the 2000 ISWMP, which used the sum of resident and non-resident populations, less the on-base military component.

**Table 4.1: Population of Guam: 1960 to 2000 based on US Census results**

| Year | 1960 | 1970 | 1980 | 1990 | 2000 |
|------|------|------|------|------|------|
| Population | 67,024 | 84,996 | 105,979 | 133,152 | 154,805 |
| Increase | n/a | 26.8% | 24.7% | 25.6% | 16.3% |

For this 2006 ISWMP, it was noted that population growth for Guam over the last sixty years, which appears to consistently increase through census periods, has not really been linear or fitting a typical formula for many reasons. It has,

Case 1:02-cv-00022    Document 190-15    Filed 01/14/2008    Page 1 of 22

therefore, been unpredictable. Military build-ups in World War II, the Vietnam War, and expected increases due to Asian political tensions have been countered by military downsizings affecting the military sector of the total population. These updated projections consider that the Department of Defense installations should not have separate landfills, as their current facilities become filled, but their populations and waste generation are included in the island-wide projections. Greatly increased immigration from the Federated States of Micronesia and the Republic of the Marshall Islands has arisen since their independence and treaty status as Freely Associated States of the U.S. in 1986 and likewise from Palau since 1994. Also flows of immigrants able to enter the U.S. are not limited as to numbers entering Guam, which is an easy and cheap entry point for nearby Asian countries. But, as the economy slowed in the last decade, there has been a major out-migration of Guam residents, often finding improved conditions elsewhere in the U.S.

Guam is facing the proposal of rapid development to accommodate the increase of tens of thousands of Department of Defense employees and families on Guam over the next decade. Therefore, forecasts for future populations cannot be as accurate as one might desire. It is safer for these to be considered between ranges of likely numbers.

In 2000 the population was 154,805. Based on the projections of the 2005 DPW Final Site Selection Report (FSSR) that twelve percent of Guam's population relocated off-island between 2000 and 2003, and factoring an annual increase of two percent since then, the population in 2005 was estimated to be 141,732. Projections to 2010, excluding possible large influxes of military residents, indicate the population will continue to grow to 156,484. A continued application of this annual rate of growth gives populations of 172,771 for 2015, and 190,753 for 2020. These projections are shown in Table 4.2, with the additions of estimated equivalent daily visitor populations, based on increasing visitor numbers. The annual visitor arrivals for 2010 are estimated to be 1.5 million and increases per decade after then are set at 0.5 million.

Table 4.2: Guam Population Projections for years 2010, 2015 and 2020

| YEAR | 2010 | 2015 | 2020 |
|------|------|------|------|
| POPULATION + VISITORS | 160,319 | 177,565 | 196,232 |

For more distant future projections, ranges are safer to use. Recognizing longer decennial trends from past censuses of 16%, 20% and 25% increase rates, and Guam's potential to sustain growth, these rates are applied to projections in Table 4.3 for years 2025, 2030, and 2035 [Department of Public Works, 2005].

Table 4.3: Guam Population Projections for years 2025, 2030 and 2035

| YEAR | 16%/decade | 20%/decade | 25%/decade |
|------|-----------|-----------|-----------|
| 2025 | 205,819 | 209,630 | 214,395 |
| 2030 | 221,065 | 228,688 | 238,216 |
| 2035 | 238,750 | 251,556 | 267,993 |

Case 1:02-cv-00022    Document 190-15    Filed 01/14/2008    Page 2 of 22

## 4.2    Solid Waste Generation Rates

Once population is known, a per capita per day (pcd) solid waste generation rate can then be applied to the population figure to develop total generation for any given period. DPW's revised estimates of generation rates use a low value of 4.4 pounds pcd which is the national average, and a high value of 5.28 pcd, which is 20% over the national average. This 2006 ISWMP uses the high value of 5.28 pcd. The projected generation data are presented in Tables 4.4 and 4.5 on the following two pages.

Table 4.4: Waste Generation at 5.28 pcd, diversion 2% and soil cover 20%

| YEAR | Total Population | Tons/Year Waste Generated (High Rate in Tons per Yr) | Tons/Year Waste Diverted from Waste Stream | Tons/Year of Residual Waste from MRF (To Be Landfilled) | C.Y./Year Waste to MSWLF from MRF (1,100 lbs/C.Y. in MSWLF) | Landfill Volume Required C.Y./Yr (Waste + Soil) | Landfill Accumulated Volume C.Y. (Waste+Soil) |
|------|------|------|------|------|------|------|------|
| 2007 | 150,717 | 145,231 | 2,905 | 142,327 | 285,776 | 323,470 | 323,470 |
| 2008 | 153,656 | 148,258 | 2,965 | 145,293 | 264,169 | 330,211 | 653,681 |
| 2009 | 157,058 | 151,342 | 3,027 | 148,315 | 269,663 | 337,079 | 990,759 |
| 2010 | 160,319 | 154,483 | 3,090 | 151,393 | 275,261 | 344,076 | 1,334,835 |
| 2011 | 163,640 | 157,684 | 3,154 | 154,530 | 280,964 | 351,205 | 1,686,040 |
| 2012 | 167,024 | 160,945 | 3,219 | 157,726 | 286,774 | 359,468 | 2,044,508 |
| 2013 | 170,472 | 164,267 | 3,285 | 160,982 | 292,694 | 365,868 | 2,410,376 |
| 2014 | 173,986 | 167,652 | 3,353 | 164,299 | 298,726 | 373,408 | 2,783,783 |
| 2015 | 177,565 | 171,102 | 3,422 | 167,680 | 304,872 | 381,090 | 3,164,873 |
| 2016 | 181,157 | 174,563 | 3,491 | 171,072 | 311,040 | 388,800 | 3,553,674 |
| 2017 | 184,819 | 178,092 | 3,562 | 174,530 | 317,322 | 396,658 | 3,950,332 |
| 2018 | 188,551 | 181,688 | 3,634 | 178,054 | 323,734 | 404,668 | 4,355,000 |
| 2019 | 192,355 | 185,353 | 3,707 | 181,646 | 330,266 | 412,832 | 4,767,832 |
| 2020 | 196,232 | 189,089 | 3,782 | 185,307 | 336,923 | 421,153 | 5,188,986 |
| 2021 | 200,880 | 193,568 | 3,871 | 189,696 | 344,903 | 431,128 | 5,620,114 |
| 2022 | 205,634 | 198,149 | 3,963 | 194,186 | 353,066 | 441,332 | 6,061,446 |
| 2023 | 210,498 | 202,836 | 4,057 | 198,779 | 361,416 | 451,770 | 6,513,216 |
| 2024 | 215,473 | 207,630 | 4,153 | 203,477 | 369,959 | 462,448 | 6,975,665 |
| 2025 | 220,563 | 212,534 | 4,251 | 208,284 | 378,698 | 473,372 | 7,449,037 |
| 2026 | 225,267 | 217,067 | 4,341 | 212,725 | 386,774 | 483,467 | 7,932,504 |
| 2027 | 230,067 | 221,693 | 4,434 | 217,259 | 395,017 | 493,771 | 8,426,274 |
| 2028 | 234,968 | 226,415 | 4,528 | 221,887 | 403,430 | 504,288 | 8,930,562 |
| 2029 | 239,969 | 231,235 | 4,625 | 226,610 | 412,018 | 515,023 | 9,445,585 |
| 2030 | 245,075 | 236,154 | 4,723 | 231,431 | 420,784 | 525,980 | 9,971,564 |
| 2031 | 250,882 | 241,750 | 4,835 | 236,915 | 430,754 | 538,442 | 10,510,006 |
| 2032 | 256,823 | 247,475 | 4,949 | 242,525 | 440,955 | 551,194 | 11,061,201 |
| 2033 | 262,903 | 253,333 | 5,067 | 248,267 | 451,394 | 564,243 | 11,626,443 |
| 2034 | 269,124 | 259,328 | 5,187 | 254,142 | 462,076 | 577,595 | 12,203,038 |
| 2035 | 275,491 | 265,463 | 5,309 | 260,153 | 473,006 | 591,258 | 12,794,296 |
| 2036 | 282,005 | 271,740 | 5,435 | 266,305 | 484,191 | 605,239 | 13,399,535 |
| 2037 | 288,671 | 278,163 | 5,563 | 272,600 | 495,637 | 619,546 | 14,019,081 |

29

**Table 4.5: Waste Generation at 5.28 pcd, diversion 15 to 42% and soil cover 20%**

| YEAR | Total Population | Tons/Year | Percentage of Waste Diverted | Tons/year Diverted | Tons/Year to Landfill | C.Y./Year to Landfill | C.Y. Waste+ Soil/Year | Accum. C.Y./Year |
|------|------|------|------|------|------|------|------|------|
| 2007 | 150,717 | 145,231 | 15% | 21,059 | 127,173 | 225,769 | 282,211 | 282,211 |
| 2008 | 153,858 | 148,258 | 15% | 21,497 | 126,761 | 230,474 | 288,092 | 570,303 |
| 2009 | 157,058 | 151,342 | 15% | 21,945 | 129,397 | 235,267 | 294,084 | 864,303 |
| 2010 | 160,319 | 154,483 | 15% | 22,400 | 132,083 | 240,151 | 300,189 | 1,164,576 |
| 2011 | 163,640 | 157,684 | 19% | 29,960 | 127,724 | 232,225 | 290,182 | 1,454,857 |
| 2012 | 167,024 | 160,945 | 19% | 30,579 | 130,365 | 237,028 | 296,285 | 1,751,142 |
| 2013 | 170,472 | 164,267 | 19% | 31,211 | 133,056 | 241,921 | 302,401 | 2,053,543 |
| 2014 | 173,986 | 167,652 | 19% | 31,854 | 135,798 | 246,906 | 308,633 | 2,362,176 |
| 2015 | 177,565 | 171,102 | 19% | 32,509 | 138,592 | 251,986 | 314,983 | 2,677,158 |
| 2016 | 181,157 | 174,563 | 24% | 41,022 | 133,541 | 242,802 | 303,502 | 2,980,660 |
| 2017 | 184,819 | 178,092 | 24% | 41,852 | 136,240 | 247,709 | 309,636 | 3,290,297 |
| 2018 | 188,551 | 181,688 | 24% | 42,697 | 138,991 | 252,711 | 315,889 | 3,606,186 |
| 2019 | 192,355 | 185,353 | 24% | 43,558 | 141,795 | 257,809 | 322,262 | 3,928,447 |
| 2020 | 196,232 | 189,089 | 24% | 44,436 | 144,653 | 263,006 | 328,757 | 4,257,205 |
| 2021 | 200,880 | 193,568 | 28% | 54,199 | 139,369 | 253,398 | 316,747 | 4,573,952 |
| 2022 | 205,634 | 198,149 | 28% | 55,482 | 142,667 | 259,395 | 324,244 | 4,898,196 |
| 2023 | 210,498 | 202,836 | 28% | 56,794 | 146,042 | 265,530 | 331,913 | 5,230,109 |
| 2024 | 215,473 | 207,630 | 28% | 58,136 | 149,494 | 271,806 | 339,758 | 5,569,867 |
| 2025 | 220,563 | 212,534 | 28% | 59,510 | 153,025 | 278,227 | 347,783 | 5,917,651 |
| 2026 | 225,267 | 217,067 | 33% | 70,547 | 146,520 | 266,400 | 333,000 | 6,250,651 |
| 2027 | 230,067 | 221,693 | 33% | 72,050 | 149,643 | 272,078 | 340,097 | 6,590,748 |
| 2028 | 234,968 | 226,415 | 33% | 73,585 | 152,830 | 277,873 | 347,341 | 6,938,089 |
| 2029 | 239,969 | 231,235 | 33% | 75,151 | 156,083 | 283,788 | 354,735 | 7,292,824 |
| 2030 | 245,075 | 236,154 | 33% | 76,750 | 159,404 | 289,826 | 362,282 | 7,655,106 |
| 2031 | 250,882 | 241,750 | 37% | 89,447 | 152,302 | 276,913 | 346,141 | 8,001,247 |
| 2032 | 256,823 | 247,475 | 37% | 94,566 | 155,909 | 283,471 | 354,339 | 8,355,586 |
| 2033 | 262,903 | 253,333 | 37% | 93,733 | 159,600 | 290,182 | 362,727 | 8,718,314 |
| 2034 | 269,124 | 259,328 | 37% | 95,951 | 163,377 | 297,049 | 371,311 | 9,089,624 |
| 2035 | 275,491 | 265,463 | 37% | 98,221 | 167,241 | 304,075 | 380,094 | 9,469,719 |
| 2036 | 282,005 | 271,740 | 42% | 112,772 | 158,968 | 289,032 | 361,291 | 9,831,010 |
| 2037 | 288,671 | 278,163 | 42% | 115,438 | 162,726 | 295,865 | 369,831 | 10,200,841 |

30

## 4.3  Projected Landfill Capacity Requirements

### 4.3.1 Factors Affecting Landfill Capacity

It is the ultimate goal of solid waste management to properly dispose of waste that survives diversion, source reduction and volume reduction systems. Deposition of such waste in a sanitary landfill in compliance with Guam law is the proper means of disposal. It is therefore important to understand the magnitude of the quantity of solid waste that must be managed, a portion of which will eventually be disposed of in a sanitary landfill. This waste quantity is best expressed in terms of the projected landfill capacity or volume in cubic yards for the planned life of the landfill in years.

Projected landfill capacity/volume is determined by the following factors:

1.  The quantity of municipal solid waste projected to be generated within the planning period, commonly expressed in terms of tons per year.

2.  The volume of the solid waste stream, which is reduced through diversion, recycling, composting and/or incineration, expressed in terms of tons per year.

3.  The density of properly compacted, landfilled solid waste, commonly expressed in terms of pounds per cubic yard. The density of compacted solid waste varies from 750 to 1,200 pounds per cubic yard, depending on the degree of compaction. Light compaction of waste will yield densities at the lower end of the range and heavy compaction at the upper end of the range. An average density of 1,100 pounds per cubic yard (0.55 tons/cy) of compacted solid waste was used to project landfill volumes [Guam DPW 2005(a)].

4.  Daily soil cover volume expressed in terms of a percentage of the total compacted waste plus soil cover volume or:

    [daily soil cover (cubic yards) x 100] divided by [daily soil cover (cubic yards) + compacted waste (cubic yards)]

    Twenty percent of the total volume of waste plus compacted waste will be used to determine the volume of daily soil cover.

5.  The solid waste disposal planning period expressed in terms of years. A term of thirty years was used as the basis for determining required landfill capacity/volume.

31

### 4.3.2 Landfill Capacity Projections

### 4.3.2.1 Landfill Volume Projections

Landfill volume requirements were generated as a part of the Department of Public Works 2005 Guam Landfill Final Site Selection Report (FSSR). The FSSR's volumetric projections are for the years 2007 to 2037 located in Tables 4.4 and 4.5. The information in Tables 4.4 and 4.5 is based on the following assumptions and industry standards:

1. Population projections by Department of Public Works (2005a).

2. For Table 4.4, a nominal two percent waste reduction through composting, recycling, etc. It is anticipated that Guam currently achieves a waste reduction rate greater than two percent. In Table 4.5, waste reduction increases over time from 15% to 42%.

3. A compacted solid waste density of 1,100 lbs/yd$^3$ or 0.55 tons/ yd$^3$.

4. A 20% ratio of (compacted soil cover) to (compacted soil cover + compacted waste).

5. A minimum landfill life of thirty years.

6. A waste generation rate of 5.28 lbs/capita/day (pcd). The 5.28 pcd waste generation rate is 20% above the national average.

Based on the above parameters, the landfill must have a minimum capacity of approximately 14.0 million cubic yards.

### 4.3.2.2 Landfill Volume and Life Expectancy

The 40% Layon Landfill Design of August 2005 (TG Engineers, 2005) provides approximately 18.1 million cubic yards of capacity assuming a compacted solid waste density of 1,200 lbs/yd$^3$. This is a 4.1 million cubic yard increase over the minimum required capacity of 14.0 million cubic yards. This increases the projected landfill life to approximately 51 years, which is 20 years greater than the minimum 30-year life.

As the Layon Landfill Design progresses to a 100% stage, the volume and life expectancy for the landfill will be refined. In addition to this, obtaining accurate and consistent solid waste generation and composition data at the Ordot Dump until closure in September 2007 will provide essential data for solid waste planning and management on Guam

### 4.3.2.3 Updated Landfill Volume Requirements

We have updated the solid waste generation projections and have determined landfill volume requirements based on the following assumptions:

32

1.  Updated population and solid waste generation rates and volumes as presented in §§4.1 and 4.2.

2.  Continuation of the minimal solid waste diversion rate of two percent of the solid waste stream. The use of a minimal diversion rate will reveal the magnitude of the volume of solid waste which Guam must dispose in a landfill if no significant volume reduction systems are implemented.

3.  A density of 1,100 pounds per cubic yard of compacted solid waste.
4.  A daily soil cover volume percentage of waste plus cover volume of twenty percent.
5.  A landfill life or planning period of thirty years, with 2007 as the base year for the opening of the new MSW landfill at Layon.

A volume of 14.0 million cubic yards of landfill capacity is projected to be used by the year 2037.

## 4.4   Volume of Recyclables in Guam's Solid Waste Stream

The percentage of Guam's civilian municipal solid waste stream consisting of materials which are considered to be recyclable or compostable is substantial. Calculations based on the latest data, which depends on the old 1993 data from W.B. Flores and Associates work (Guam Environmental Protection Agency, 1995), is estimated to exceed three-fourths of the waste stream over the planning period. Among the recyclables and compostables, paper and paperboard make up between thirty-eight percent (38%) to forty percent (40%) of the total MSW stream, followed by plastics (13.5% to 15.9%) and food wastes (10% to 12%). The large percentage of recyclable/compostable material in the waste stream provides optimism that large-scale, integrated, and well-executed programs for recycling and composting will significantly reduce the volume of Guam's solid waste.

# CHAPTER FIVE: COLLECTION AND TRANSPORT

## 5.1 Collection and Transport

In order to assure the successful implementation of this plan through waste diversion and minimization of the waste to be landfilled, the collection and transport methods must support source separation, recycling, and composting. Through the use of appropriate collection strategies, waste diversion, user fee billing and collection, data collection, and other key components should be enhanced. Final implementation of the selected collection and transport methods must be coordinated with the specific requirements of the receiving facility [Materials Resource Recovery Facility (MRRF), transfer station, and landfill] to ensure proper integration. The current plan for collection and transport requires the discussion and evaluation of three (3) categories of collection and transport: commercial, residential and government. This discussion is presented in the following sections.

## 5.2 Commercial Collection

Currently, commercial collection poses a multitude of options with regard to methods, as these services are provided by private, non-government haulers. However, the need for these services to support and promote recycling is crucial to the success of Guam's recycling-based ISWMP. The extent to which the commercial collection operations can be controlled or modified, to enhance recycling and composting, is limited to: (1) conditions placed upon the operations as part of the Guam EPA solid waste management permitting process; (2) rules and regulations of the MSW receiving facility (i.e., transfer station, MRRFs, and landfill); and (3) laws or mandates promulgated by *I Liheslaturan Guåhan* applicable to commercial generators.

This planning document is not intended to dictate the style and methods of operation for private business enterprises. However, the development of an integrated solid waste management plan requires the establishment of standards, rules, or procedures that relate to the collection of solid waste with the intended waste diversion and disposal operation to ensure that the ISWMP objectives for recycling and composting are achieved and maximum benefit is derived. Adaptation of existing commercial collection operations to these standards, procedures, and objectives is left to the forces of market competition.

As we have selected recycling, composting and landfilling as the recommended waste diversion and disposal options, the collection and transport methods must maximize diversion of recyclables and compostables prior to their introduction into the municipal solid waste stream, and also maximize the extent to which the waste delivered to the receiving facility is amenable to material recovery. Reduction of total waste stream volume prior to collection implies the application of source separation of recyclable materials and compostable wastes. This type of activity conducted for the outgoing waste stream can be considered as preparatory work for the material entering the MRRFs. The execution of such preparatory work will greatly increase the amount of recoverables by avoiding

34

volume lost due to poor condition and will reduce operational and maintenance expenses by reducing processing required prior to shipment of recyclables to market. Commercial collection shall incorporate these activities or be controlled and modified so as to ensure that they are performed.

The waste management strategy for this component will be influenced and managed through the implementation of mandatory source separation regulations and solid waste management operation (collection, transfer and landfilling) permit requirements. These management tools can effectively require commercial "curbside" collection to capture large quantities of recyclables and raw compost before they enter the solid waste stream as discards or are mixed with other components of the MSW stream. Many commercial generators are currently working with waste haulers to source separate their waste voluntarily.

The collection and transport of commercial MSW will be more clearly understood by examining the requirements of collection from the generators' point of view. Commercial generators will be required to separate wastes into seven categories:

1. Recyclables: Aluminum, glass, tin cans, plastic, paper
2. Green Waste: Vegetation cuttings from landscaping
3. Bulky Waste: Furniture, electronics
4. White Goods: Refrigerators, washer/dryer, air conditioning units, dishwashers, microwaves, ovens/stoves
5. Refuse: Solid waste that is either putrescible or does not belong in the other waste streams
6. Metal: Metal waste other than automobiles or does not belong in the other waste streams
7. Hazardous Waste: Waste defined to be hazardous according to regulations.

The commercial community is somewhat familiar with the majority of these categories because source separation is ongoing. However, this plan recognizes that education and a phased approach will be necessary. Transfer stations will be used to consolidate and transfer wastes from collection vehicles to transport vehicles or direct haul will be utilized for landfilled waste. Means and methods for collection and transport of commercially generated source separated wastes will be determined by market competition. They may also outsource to private companies for collection and transport of waste. New legislation is needed for the mandate of waste separation at commercial establishments to include the definition of specific waste streams.

## 5.2.1 Mandatory Source Separation

Currently commercial generators are not required to separate recyclable materials from their solid waste. This Plan advocates universal source separation and collection to the greatest extent possible. There are two approaches to achieve source separation: mandatory requirements and market incentives. Mandatory requirements would be implemented through laws or permit

35

conditions. Market incentives could include purchase of recyclable materials, refunds, higher disposal fees, a beautification tax, or other tax incentive.

Source separation legislation will serve to ensure that recycling and composting become the primary focus of solid waste operations at commercial establishments (Public Law 24-313 addresses residential mandatory recycling). The purpose of such legislation should be to facilitate the effective and efficient operation of the selected volume reduction or disposal method. It should incorporate general requirements of the receiving waste facility in terms of incoming waste categories (dry recyclables, wet compostable wastes, other MSW), and it should allow for more intensive voluntary separation. The legislation should also provide penalties for those establishments whose waste streams delivered to the facility do not meet established standards for incoming wastes.

Passing legislation that will require the source separation of recyclable and compostable wastes at commercial establishments will accomplish the following:

- **Increased Recycling and Composting:** The implementation of source separation practices will result in the immediate availability of more recyclable commodities than has ever been achieved previously. There will be a dramatic increase in "supply" of products available for brokers or recyclers. It will also mean the availability of material for composting operations.

- **Avoided Costs:** Source separation has the potential to lead to lower or avoided landfill tipping fee costs to the commercial entity should the separated wastes be diverted from the MSW waste stream to the transfer station or MRRF.

- **Provide Incentives for Recycling-Based Industries:** The immediate increase in supply of recyclable commodities may act to remove constraints upon businesses or industries that rely upon a continuous supply of such commodities for the success of their operation. Without such a supply, these enterprises will not be able to establish efficient and sustainable business operations.

- **Disposal Practices and Awareness of Solid Waste Management Issues:** Requiring source separation will impose changes upon the operations at commercial establishments. More attention will have to be paid to what is disposed and how it is disposed. This simple change will bring about more awareness of conditions surrounding the solid waste system. Disposal practices at the workplace will change, and such changes will make their way to the home and have a beneficial effect on residential waste disposal practices.

36

### 5.2.2 The Recommended Commercial Collection and Transport Method

Commercial generators are encouraged to implement source separation of as many recyclable materials as possible. Guam EPA and DPW should explore partnerships with commercial generators and are encouraged to include collection of recyclable materials in the contracts with commercial collectors. If source separation of commercial waste has not progressed significantly by October 2007, then Guam EPA should pursue mandatory source separation requirements through regulations and legislation, such as excluding recyclable material from the landfill, mandatory separation statutes, beautification taxes, and special fees.

### 5.3    Residential Collection

Residential collection of MSW has historically been performed by the local government and provided free of charge to single family homes. However, over the last several years the Department of Public Works has been under mandates (PL No. 24-272, 24-313, 26-99) to incorporate the privatization of residential solid waste management and recycle twenty percent of this waste. The legislative mandates embodied in Public Laws 23-64, 24-272, and 26-99 call for the privatization of residential collection operations. The Department of Public Works shall implement the Solid Waste Management Plan and privatize Guam's Solid Waste Management System subject to all applicable laws, including Public Laws 24-06 and 26-99. Public Law 24-313 adopted DPW's regulations for solid waste collection and transport. It specifies in Section 104 that recyclables will be collected separately, and Section 109 (a) states that the contracting of services shall be made to meet service requirements that cannot be met by the Department of Public Works (i.e., comprehensive residential waste collection throughout the island).

As a result of the development of this 2006 ISWMP, the following collection model for residential waste management should be put into operation as the various components of the integrated solid waste management system become operational over the next several years.

The collection and transport of residential MSW will be more clearly understood by examining the requirements of collection from the generator's point of view. Residential generators will be required to separate waste into seven categories:

1. Recyclables: Aluminum, glass, tin cans, plastic, paper
2. Green Waste: Vegetation cuttings from trees, plants, grass and leaves
3. Bulky Waste: Furniture, electronics
4. White Goods: Refrigerators, washers/dryers, air-conditioning units, dishwashers, microwaves, ovens/stoves
5. Refuse: Solid waste that is either putrescible or does not belong in the other waste streams
6. Metals: Metal waste other than automobiles or that does not belong in the other waste streams

Case 1:02-cv-00022    Document 190-15    Filed 01/14/2008    Page 12 of 22

> 7. Household Hazardous Waste: Waste defined to be
> hazardous according to regulations.

The residential community is somewhat familiar with the majority of these categories as a result of recent storm debris cleanups. However, it is recognized in this plan that education and a phased approach will be necessary. Collection will likely be conducted by regional contractors. Transfer stations will be used to consolidate and transfer waste from collection vehicles to transport vehicles. New legislation is needed for the mandate of waste separation at the curbside, to include the definition of specific waste streams.

### 5.3.1 Mandatory Source Separation with Curbside Collection of All Waste Streams, and Drop-Off and Collection Capability at Transfer Stations

This Plan for collection will involve the separation of MSW at the source (residential customer) into a number of predetermined categories of waste with the addition of dedicated recyclable drop-off and collection facilities at all transfer stations (and possibly other locations as well). The purpose of source separation is to facilitate the sorting of recyclable commodities and compostable materials and to minimize the adverse effects associated with mixed MSW. Examples of these categories include dry recyclables (paper/paperboard, cans, bottles, and plastics), wet compostable material (green waste), white goods, bulky waste, metals, household hazardous waste, and the remaining MSW.

These separated wastes may be placed into designated containers or location, supplied by the collector and stationed on the curbside at the scheduled time for regular collection. Multi-compartment collection vehicles may be used to gather separated wastes for transport to either the MRRF or a regional solid waste transfer station. MSW can be collected using typical packer trucks. If the wastes are taken to a regional solid waste transfer station, the compartments for recyclables will be emptied into roll-off containers for transport to the MRRF. For MSW and wet compostable materials, roll-off compactors or other means of compaction may be used to maximize transport efficiency.

The general public will be required to make a shift in the manner in which they dispose of their MSW. Separation at the source will require extra effort on the part of the consumer. People will have to be more aware of what they are throwing away and where they throw it. They will need to learn the types of materials that are acceptable for each category of waste – what is recyclable, what is compostable, what should be landfilled, what can be reused. In short, there will need to be an increase in the awareness of solid waste management issues. Public acceptance of this may be more challenging than the historical practice; however, acceptance and understanding will increase over time as increased awareness and public education take effect.

As with mixed MSW, dedicated containers will be provided for each waste category as appropriate. Other waste containers should be appropriate for the collection vehicle. User fees for the collection of the separated wastes could be

charged on a unit cost basis with increases in price for collection of containers beyond the allocated number. These user charges can also be structured to provide for credits for recyclables diverted from the collected waste stream through private recycling facilities or the MRRFs.

The residential collection schedules will continue for municipal solid waste destined for the landfill. However, additional, less frequent, collection schedules for white goods, green waste, and bulky waste will be added so that pickup is comprehensive at the "curbside" of each residential location.

The drop-off and collection service at transfer stations is the alternative to curbside service. The transfer stations will be equipped with containers for specific recyclable commodities, serviced regularly by either a commercial recycler or a commercial hauler as part of a contract for such services. These services, at a minimum, will be located at transfer stations.
If the transfer stations are operated by commercial recyclers, they may take all recyclable commodities obtained to their own processing facility. If the transfer stations are operated by a commercial hauler under a contract to provide regional collection and
transport services, the recyclables will be transported to the MRRFs.

The inclusion of drop-off and collection of compostable wastes at facilities such as these is possible if strict adherence to storage rules and regulations is observed to control odors and disease vectors. Ideally, managed facilities, such as the transfer stations, will be primary drop-off and collection locations of compostable wastes.

Judicious placement of these transfer stations and supporting public education efforts will go a long way in changing the disposal habits and practices of Guam residents. While it is anticipated that the drop-off and collection locations will be useful for those who elect to recycle and may not want curbside collection services, these types of users are already aware of solid waste issues and are doing their part. The potential to promote awareness and change disposal patterns among the public park, beach, and baseball field users, as an example, is perhaps the greater benefit and incentive to implement this collection and transport option.

This collection and transport method will certainly improve the capture rates and effectiveness of recycling and composting operations. At home, some residents recycle voluntarily, but most do not. With the implementation of curbside collection of recyclables, this will change. Away from home (at the beach, public park, and baseball field), many groups do not even pick up their garbage. Implementing this option will provide them with the knowledge and behavior to act as they do when at home. This will result in the capture of what otherwise would have been a large quantity of mixed MSW.

39

### 5.3.2 Division of Residential Collection into Service Districts

The implementation of privatized collection of residential wastes will be handled through the letting of contracts. The nature of the contract in terms of size (collection area), length (time), and cost will be determined based on several factors that will have to be examined by the implementing agency. Collection area will have the most significant effect on the contract and will also affect the other terms. The length of the contract will be affected by the time required to recuperate capital outlay for equipment appropriate for the collection area. This in turn will affect the cost of services. Another key consideration is ensuring that local businesses can compete for contracts, thereby stimulating the local economy and assuring the creation of jobs and recirculation of monies within the local economy. Taking these factors into consideration, it is recommended and assumed that residential collection will be provided through contracts for distinct solid waste management regions, established on the basis of, at a minimum, population, projected generation rates, distance and routes, and efficient service intervals. These considerations are handled on a general level here, but should be the subject of greater detail and analysis as part of the mandated privatization plan required by PL 24-272.

The privatization of waste collection was addressed in Public Laws 24-139 and 24-272. However, the contract to privatize the collection of solid waste was never implemented. Public Law 26-99 mandated DPW to divide the collection into three districts by July 3, 2002. The privatization process had not been implemented by September 2006.

### 5.4    Government Collection

Currently the majority of Government of Guam agencies contract with commercial haulers for collection and transportation and waste. The Department of Public Works and the Mayors self-haul their waste. The Department of Parks, Recreation and Historic Preservation collects and transports waste from public parks and recreational facilities. Implementation of commercial and residential collection alternatives described in the preceding Sections will result in the reduction of Government collection operations. However, this diminishment should not be construed to mean that the MSW generated by Government facilities should not be subject to the same requirements applied to other facilities or generators. As with commercial collection operations, the need for Government collection to support and promote recycling and composting is crucial to the success of Guam's recycling-based integrated solid waste management system. Government collection, with respect to this Section, is intended to be what remains of the Solid Waste Management Division of DPW after the privatization of residential collection occurs. As solid waste operations continue to be privatized, it is appropriate that most, if not all, of the government waste be handled by private entities. A small operation may be maintained for the collection and transport of MSW from government agencies, institutions, and public facilities.

40

The collection and transport of MSW will be more clearly understood by examining the requirements of collection from the generators' point of view. Government generators will be required to separate wastes into seven categories:

1.  Recyclables: Aluminum, glass, tin cans, plastic, paper
2.  Green Waste: Vegetation cuttings from trees, plants, grass and leaves
3.  Bulky Waste: Furniture, electronics
4.  White Goods: Refrigerators, washer/dryer, air-conditioning units, dishwashers, microwaves, ovens/stoves
5.  Refuse: Solid waste that is either putrescible or does not belong in the other waste streams
6.  Metals: Metal waste other than automobiles or does not belong in the other waste streams
7.  Hazardous Waste: Waste defined to be hazardous according to regulations.

The government institutions are somewhat familiar with the majority of these categories as a result of recent storm debris cleanups. However, it is recognized in this plan that education and a phased approach will be necessary. Transfer stations will be used to consolidate and transfer wastes from collection vehicles to transport vehicles. New legislation is needed for the mandate of waste separation at the institution to include the definition of specific waste streams. Means and methods for collection and transport of government generated source-separated wastes will be determined by market competition. They are anticipated to be outsourced to private companies for collection and transport of waste. Current government collection and transport will need to adjust to its downsizing, changes to promote recycling and possible phasing out.

### 5.4.1 Mandatory Source Separation with Regular MSW Collection

As discussed initially in Section 5.1, mandatory source separation is recommended as a part of the collection and transport component. Government facilities serviced by the Government collection operation should separate their waste by types as specified by the receiving facility. All wastes generated from these facilities shall be processed at the MRRFs. All containers used in the storage, collection and transport of the MSW (including recyclables and compostable waste) should meet any standards developed by DPW. Collection of wastes at government facilities shall be taken to include servicing of any recycling drop-off and collection centers at these facilities

### 5.5 Regional Solid Waste Transfer Stations

There are currently three solid waste transfer stations used in the collection and transport of MSW. However, these stations are used primarily for the transfer of MSW from self-haul vehicles to the Ordot Dump facility. They are not used for transfer of MSW from collection fleet vehicles to transport vehicles (dedicated to transporting waste from transfer station to an MRRF or disposal facility).

41

These solid waste transfer stations currently accept all municipal solid waste and green wastes; there is no waste sorting taking place at the transfer stations. The Department of Public Works also sets its own policies on the hours of operation, types of waste accepted, and how the waste must be packaged. The current cost varies from two dollars per load to four dollars. Only residential waste is being accepted.

During the operation of the landfill at Layon, only commercial hauling trucks will be accepted at the landfill. Transfer from fleet vehicles to the larger hauling vehicles will then become the accepted operational mode. The transfer stations will become the integral and pivotal component of the management system. A new fee schedule must be in place, and all types of waste must also be accepted. A ban on green waste and construction waste at the landfill will be part of its operating conditions.

For the privatization plan for residential collection and servicing of existing commercial and government collection streams, the operations at the existing transfer stations must be re-evaluated in terms of efficiency of operation, services, location, configuration, capacity, and number of stations. This re-evaluation will include the incorporation of recyclable collection and buy-back, compost distribution, weighing and fee collection facilities and other components of this ISWM plan.

When the Layon Landfill becomes operational, solid waste operations will be conducted in ways quite different from what is currently practiced. With respect to the solid waste transfer stations, two major differences will impact their operation. First, the number of different solid waste activities will increase. Second, these activities will be performed by potentially different entities by region. This will require functional and spatial expansion at the solid waste transfer stations. If such expansion is not possible within the boundaries of the existing stations, new sites may have to be found. At a minimum, the transfer stations should incorporate the following:

- Weighing, billing and fee collection facilities
- Data collection facilities
- Non-recyclable solid waste receiving, storage, and transport
- Recyclable collection (and potential processing: baling, packaging, etc.)
- Compostable waste receiving, storage, and transport (and possibly processing)
- Transfer facilities for all incoming components of MSW (recyclables, compostables, non-recyclable MSW)
- Finished compost distribution facilities.

A feasibility study is urgently required to identify the number and locations of transfer stations. This feasibility study should re-evaluate the number of transfer stations (currently three) needed on the island and their location relative, primarily, to population densities and haul routes to arrive at the number of transfer station(s), location(s), and size(s) that will be cost effective, flexible, and

42

convenient for operators, waste haulers and residential drop-off services. A detailed scope of work is required for this feasibility study.

## 5.6   Performance Standards

### 5.6.1 Collection and Transport Performance Standards

Currently, collection of municipal solid waste (MSW) on Guam is conducted through a combination of government operated and commercially operated fleets. What MSW collection will consist of, with the continued implementation of this plan, is source separation and collection of recyclables from residential, commercial, government and federal agency waste streams incorporating the use of transfer stations, with drop-off and collection center capabilities, for waste consolidation and diversion. To the maximum extent possible under the conditions as identified in this plan, waste diversion of recyclables and compostables will be required. The final residual MSW stream will then be transported to the sanitary landfill for final disposal.

### 5.6.2 Municipal Solid Waste Collection

The collection component of the ISWM system will, by mandate of PL 26-99, be performed primarily by private entities and will involve only minimal collection by the government. The performance criteria required for this component were developed with this in mind.

### 5.6.2. Functional Standards

A.    Collection system shall include provisions for self-haul of wastes to transfer stations.

   **Basis:**   As private collection will involve costs for collection as well as disposal (tipping fees), there may be a movement among the business community, especially smaller business, to employ self-haul practices for MSW disposal. Also for the convenience of the residential community, self-haul should remain an appropriate option to transport waste from homes to the transfer stations.

B.    DPW shall re-evaluate sites for regional solid waste transfer stations.

   **Basis:** As part of the implementation of the integrated solid waste management system, the functional expansion of solid waste transfer stations will occur. This functional expansion will likely necessitate a spatial expansion of facilities as well. Interim activities should include verification of the boundaries of each existing transfer station, determination of actual area, estimate of usable area at each station (based on topography or other constraints) and preliminary space estimates for the component to be implemented.

43

C.    Privatization of residential collection shall be such that any division or grouping of routes shall not adversely affect the rapid and efficient removal of solid waste from dwellings in all villages.

   **Basis:**   It is anticipated that the privatization strategy employed for the collection and transport component will involve the letting of several contracts for collection.   In establishing the areas covered by each contract, care should be taken to avoid groupings or routings that will be difficult to maintain, or which will cause delays in collection.   Operationally it shall be the most cost effective approach available.

D.    Privatization of residential collection shall be such that costs for collection and disposal will increase, and, therefore, costs to the consumer are to be minimized while still providing the minimum level of service specified herein.

   **Basis:** Establishment of collection areas should be optimized to minimize costs, considering such factors as haul distance, housing density, etc.   While collection rates will be determined by the Public Utilities Commission based upon actual costs, the actual costs can be minimized by optimizing layout of collection routes and contracts.

### 5.6.2.2 Operational Standards

A.    Residential collection shall be performed at each dwelling at least once per week on pre-scheduled days for the refuse waste stream as defined below.   Collection services for other waste streams are to be collected based on the anticipated volume of the other waste streams and the needs of the community, taking into account the most efficient and economical frequency of collection that is appropriate.

   **Basis:**   In order to ensure that residential solid waste storage meets applicable regulations (Public Law 24-313) and does not pose health concerns, consistent collection frequency in accordance with publicly announced schedules must be accomplished. Frequency of collection must be at least once per week for the refuse waste stream, but may be changed as appropriate considering the collection and storage standards developed (type and size of container, etc.).

B.    For residential collection, to ensure continuity and consistent collection practices for the consumer, regardless of changes in the collection system operator, all residential dwellings in every village island-wide should utilize a standard for collection procedures (separation categories, set-out and set-back, etc.) and container types for the implementation of source separation and collection of the various waste streams generated. Standards should be determined by DPW through the process of

44

outsourcing the solid waste collection services of the residential community. However, at a minimum, services for collection shall include the following separated waste streams:

1. Recyclables: Aluminum, glass, tin cans, plastic, paper
2. Green Waste: Vegetation cuttings from trees, plants, grass and leaves
3. Bulky Waste: Furniture, electronics
4. White Goods: Refrigerators, washer/dryer, air-conditioning units, dishwashers, microwaves, ovens/stoves
5. Refuse: Solid waste that is either putrescible or does not belong in the other waste streams
6. Metals: Metal waste other than automobiles or does not belong in the other waste streams
7. Hazardous Waste: Waste defined to be hazardous according to regulations.

**Basis:** Ease of use for the customer, in terms of storage and collection, is a crucial factor in the success of the volume reduction and disposal strategy. For this reason, the collection and storage procedures the residential customer will be asked to perform must remain unchanged even though the contractor providing collection services may change. Establishing of standards for collection and container type will accomplish this.

C. Refinement of Container Standards.

**Basis:** The container standards in DPW regulations (Public Law 24-313) should be reviewed and updated. The legislative mandate for the privatization of residential solid waste collection will involve the letting of contracts. There may be a different contractor or contractors providing MSW and recyclable collection services for residents. Each contract will have a limited term, and, therefore, the possibility exists that different contractors will provide these services over time. In the interest of providing consistent service to the consumer and minimizing the costs associated with the collection of MSW and recyclables, a standard will be developed which specifies the exact type of container and collection system to be used to implement this Plan. The standard will take into consideration performance criteria developed for this Plan. All residents, regardless of location and region, will be able to use the same containers for MSW and recyclable collection. Research into this aspect of collection and transport can be initiated by DPW and continued (if necessary) by any succeeding management entity.

45

D.      Development of Collection Standards, Rules, and Regulations.

>   **Basis:** With the refinement of the container standard, the manner in which MSW will be stored at and collected from each residence will change dramatically. In order to meet the performance standards specified for the collection and transport component of the integrated solid waste management system, the current practice of using any container and placing them in homemade container stands will have to be changed. DPW has developed a collection standard for containers, specifying that all residential waste must be placed in acceptable containers and all containers must be covered with a proper lid. DPW should initiate the development of a collection standard that specifies the acceptable placement of containers during collection and non-collection periods, acceptable number of containers per household, method of setting out containers and setting them back, as well as responsibilities of both the collection contractor and the resident.

E.      Assessment of Government Service Fleet.

>   **Basis:** In anticipation of the transfer of residential collection responsibilities to a contractor, DPW should assess the condition, value, and applicability of its remaining service fleet to meet the diminished service requirements this transfer will bring. The need for packer trucks used for residential collection will be decreased, depending on how soon contracts are implemented and when container and collection standards are developed and implemented.

### 5.6.2.3 Legal/Regulatory Standards

A.      DPW shall privatize collection, transportation, and disposal of solid waste from all dwellings in all villages of Guam.

>   **Basis:**      Public Laws 24-06, 24-272, and 26-94, and 2006 ISWMP.

B.      DPW will administer, supervise, and fulfill the responsibility of the Government of Guam in any legally established contract for solid waste collection activities and operations.

>   **Basis:**      Public Laws 23-64 and 26-99.

C.      Guam EPA to issue permits for the operation and modification of all solid waste collection systems.

>   **Basis:**      Public Law 23-64.

D.      Fees for residential collection to be set by the Public Utilities Commission (see performance standards for billing and collection).

46

**Basis:** Public Laws 25-70 and 28-56.

E.   All collection shall in no way violate any applicable rule or regulation of the Department of Public Health and Social Services (DPHSS).

   **Basis:** DPHSS Regulations, DPW Rules and Regulations, Public Law 24-313,
   29 GAR Chapter 2 Article 1.

F.   Collection contracts shall be for five years or less.

   **Basis:** DPW regulations, Public Law 24-313, 29 GAR Section 2109.

# CHAPTER SIX: DISPOSAL AND WASTE DIVERSION

Landfilling is currently the only viable and proper option for disposal of solid waste on Guam. Sending our waste off-island for disposal or ocean dumping are not considered viable or acceptable solid waste disposal methods. In contrast, recycling and composting of solid waste are waste diversion methods and should not be confused with ultimate waste disposal. Recycling and composting are two practical options available to Guam that, in suitable combinations, will divert a significant portion of and reduce the waste stream through the recovery of resources. The following briefly describes these options.

"Recycling" is the process by which materials are collected and used as raw materials for new products. There are several steps in recycling: collecting the recyclable components, separating recyclable materials by type (before or after collection), processing them into reusable goods, and purchasing and using the reprocessed materials to complete the recycling process. Recycling prevents potentially useful materials from being landfilled or incinerated, thereby preserving landfill space and conserving natural resources. Additionally, recycling removes some potentially hazardous waste from being improperly disposed or released into the environment.

A "Materials Resource Recovery Facility" (MRRF) is a centralized facility where recyclable waste streams are received in bulk from trucks, recyclables are sorted and separated, and then processed for shipping to available markets.

"Regional Transfer Stations" serve as consolidation stations for packer trucks and haulers of waste streams as well as self-haulers. At these sites, wastes streams are consolidated. The residual waste stream is transferred for disposal to larger transport vehicles to reduce traffic volume for delivery to the landfill. Recyclable materials are transferred to composting, recycling, or household hazardous waste facilities.

"Composting" is a form of recycling whereby organic waste is diverted from disposal and converted through a biological process (an accelerated form of natural decomposition) to useful soil-related products. Guam's municipal solid waste stream, similar to other industrialized communities, contains a high percentage of recyclable or compostable material as discussed in Chapter 7.

It is essential that solid waste disposal and practical volume reduction methods be considered together as the volume of solid waste that Guam must manage over the next twenty-five to thirty years will demand that significant volume and source reduction be part of the overall solid waste management strategy. Landfilling, in combination with alternative forms of solid waste source and volume reduction methods, must be analyzed in terms of effectiveness, costs, and environmental impacts, with the results compared and measured against the projected capacity of the Layon Landfill and other future landfill sites. Broad options considered include:

- Landfill + Minimal Waste Recycling (2% - 10%)
- Landfill + Moderate to Aggressive Recycling and Composting (15% to 42%)

## 6.1   Landfill

For many years, Guam has been plagued with the problems associated with the operation, maintenance, and violations of the Ordot Dump. Numerous Notices of Violation/Orders of Compliance (NOV/OC) from Guam EPA and an Administrative Order issued by U.S. EPA were not able to rectify the serious violations at this half-century old dump. Residents in the surrounding area have requested the immediate closure of the dump. Public laws 22-115 and 24-272 mandated its closure. Operational violations such as the lack of leachate management, lack of compaction, lack of daily cover, lack of vector control, and lack of gas control were magnified with occasional underground fires.

The 2000 ISWMP (Guam Legislature, 2000) identified Guatali in the Apra Harbor watershed as the site for the new landfill. However, Public Law 24-06 identifies both Malaa and Guatali as potential sites for the new landfill. The preferred site was the Malaa site. There were numerous problems associated with the location and the contract to build the landfill. Based on experts from U.S. EPA wetland programs, the Guatali site has more "better quality" wetlands than the Malaa site and the mitigation for the wetlands was enormous and costly. The access road must pass through Shell's property. There was a need to construct at least two bridges across some streams as part of the access road. On top of this problem was the contract with Guam Resource Recovery Partners (GRRP) to operate a waste-to-energy facility for the island. Additionally, the contract also gave the Government the option to have GRRP design and build a landfill for disposal of incinerator residues and waste not processed or reduced by the incinerator. While an ideal integrated solid waste management system would have recycling at the top of the waste reduction hierarchy and have incineration and landfill at the bottom, this contract provided for the opposite. As part of the contract, the Government of Guam must guarantee that waste reduction would be accomplished through waste-to-energy. As a result, the Guam Legislature passed Public Law 25-175 to make it illegal to reduce household waste by incineration and no public funds were to be used for any incineration. However, waste reduction by incineration has proven to be economical and environmentally safe in Hawaii and in many countries and can extend the life of a landfill.

As part of the Consent Decree, Guam is required to site and must design, construct, and operate a landfill that is fully compliant with Guam Solid Waste Disposal Rules and Regulations. As part of the agreement, the landfill must be in operation on September 23, 2007, or earlier. Within the constraints of the Consent Decree and in accordance with the 2000 ISWMP, the Government engaged in a site screening and site selection process. Based on the selection process, an area in Layon, Dandan, Inarajan, was selected for the future landfill site. An environmental impact statement and 40% design for the new landfill were completed as of August 4, 2005. The pre-Final (100%) Submittal Plans,

Specifications & Estimates for Layon Municipal sanitary Landfill, Inarajan, Guam, was submitted to Guam EPA in March 2006. The following environmental considerations were incorporated in the site selection process:

**Water Protection**
- Aquifer
- Ground Water
- Flood Plains
- Proximity to Drinking Water
- Surface Hydrology
- Wetlands
- Water Quality

**Geology**
- Bedrock
- Cover Soil Availability
- Fault Areas
- Hydrogeology
- Seismic Impact Zones
- Soils
- Topography
- Unstable Areas

**On-Site Environment**
- Air Quality and Wind Direction
- Wildlife Resources
- Archeological/Historical Resources
- Biological Resources (Habitat)
- Support Infrastructure
- Threatened and Endangered Species

**Transportation**
- Access
- Haul Routes
- Proximity to Waste Source
- Traffic Congestion
- Traffic Safety

**Land Use**
- Aesthetics
- Acreage Available
- Airport Safety
- Buffer Area Availability
- Existing Land Use
- Incompatible Adjacent Land Uses
- Mitigation Issues
- Noise Concerns
- Property Acquisition
- Property Devaluation
- Proximity to Sensitive Receptors
- Utility Availability
- Zoning

Case 1:02-cv-00022    Document 190-16    Filed 01/14/2008    Page 3 of 13

The Layon, Inarajan site will be designed, built, and operated in compliance with Guam Solid Waste Disposal Rules and Regulations and will incorporate the following:

- Access road
- Berms
- Liner system
- Leachate collection system
- Stormwater collection and disposal system
- Seismic design appropriate to site conditions
- Monitoring wells
- Security system.
- On-site soil cover source.
- Buffer zone.

More detail on the requirements for the landfill is contained in the performance standards section of this chapter.

## 6.2   Landfill With Minimal Waste Recycling

This solid waste disposal and waste diversion option addresses the scenario of continuing Guam's current practice consisting of the minimal recycling of two percent of generated waste, then landfilling the remainder as shown in Table 4.4. Although reliable recycling volume figures are not available at this time, the significant increase in recycling permits suggest that more than two percent of the total waste stream (municipal and others) is actually being recycled.

Relying solely on landfilling in combination with token minimal waste diversion will require a projected thirty-year landfill capacity of 14.0 million cubic yards (Chapter 4, Section 4.3.2.1). Based on a landfill and minimal recycling only scenario, the Layon Landfill site will have a capacity of approximately 18.1 million cubic yards based on the total footprint of 134.5 acres and a total site area of 330 acres, which will last for over thirty years. At this time, there are no plans to expand the Layon Landfill; however, significant additional capacity may be realized through efficient landfill operations, waste diversion, and advancements in future cell design technology. Preliminary design efforts suggest that as many as 40-50 years of landfill volume may be achieved without expanding the facility footprint.

Capital costs to construct the new MSWLF at $60 per ton are based on initial startup costs for landfill development, equipment, and two landfill cells. Each cell has a capacity of 500,000 tons and a lifespan of three years.

The cost for operating a sanitary landfill is estimated to be $20 per ton of waste, and must prudently include a sinking fund reserve to finance eventual closure and post-closure site improvements. Tipping fees are normally derived from sanitary landfill operating costs. In any event, landfill development and operating costs will be incurred under any combination of solid waste disposal and volume reduction schemes.

51

## 6.3 Landfill with Moderate to Aggressive Recycling and Composting

This scenario addresses the use of recycling and composting to achieve a significant diversion in solid waste volume and assumes the following:

1.  The percentage and volume of recyclables and compostable material in the Guam solid waste stream is substantial and will support the use of recycling and composting programs to achieve significant MSW diversion.

2.  The objective of achieving significant waste diversion through recycling and composting will require mandatory participation by commercial, institutional, and residential waste generators. Accordingly, for recycling and composting to be the primary solid waste diversion method, source separation, as follows, is expected to be mandatory:

    *   Commercial solid waste generators will separate recyclables by category, non-recyclable dry waste, and wet wastes (food and green waste) for composting.

    *   Residential solid waste generators will practice "curbside" separation and will separate dry recyclable and non-recyclable waste from wet waste, with the wet waste being suitable for composting.

3.  A percentage of the solid waste stream will be diverted through source reduction and private recycling initiatives before waste is processed at the transfer stations.

4.  Based on recent plans by DPW for the construction of the landfill in Layon, there is no proposed MRRF at the site. The waste transfer stations will be used as sorting stations, similar to MRRF's, as well as sites for the transfer of waste to be landfilled from collection trucks to larger transport vehicles. Tipping fees will be charged as required to fund construction, operation, and maintenance costs of the transfer stations and the landfill, as a profit-making enterprise.

5.  Recyclables from commercial and residential waste generators will be collected by private haulers and will be delivered to either the transfer stations, MRRFs, or to private recycling enterprises.

6.  The overall cost of recycling will be reduced by supporting recycling business enterprises through government-supported incentives such as GEDCA qualifying certificates, provision of land for operations, reduced tariffs, and other financial incentives.

The landfill capacity requirement for thirty years without increased recycling will be about 14 million cubic yards, with the Layon site providing for the ultimate disposal of waste. The life of this landfill will be greatly extended

beyond this design period as recycling and composting are implemented island-wide.

Landfilling in tandem with significant solid waste source diversion, household hazardous waste separation and separate disposal, recycling and centralized composting programs create an ecologically ideal MSW waste diversion and disposal reduction strategy for the following reasons:

1. Waste diversion will reduce the amount and toxicity of materials before they enter the waste stream and create benefits in terms of product reuse, reduced material volume, reduced toxicity, increased product lifetime and decreased consumption (See §7.8.5 for further discussion).

2. Growing public support for increased recycling and composting efforts is evident by recent public laws (e.g., PL 25-127, 27-37, and 27-38), which support recycling and composting programs and demonstration projects, and by the increase in number and size of recycling businesses.

3. Diversion of waste through recycling and composting will extend the useful life of the new MSW landfill for more than its thirty-year design.

4. Recycling promotes and supports the recovery of resources and the separation and removal of toxic and hazardous waste from the waste stream.

5. Composting transforms waste into soil conditioning products, which can be used by the community and Government of Guam agencies such as the Departments of Agriculture, Public Works, and Parks and Recreation, or be used to supplement soil cover material at the landfill.

6. Recycling and composting are environmentally friendly and treat solid waste as a renewable resource rather than a problem to be dealt with.

7. A full-fledged recycling industry will have a positive impact on the Guam economy through the creation of jobs and support services, such as trucking, storage, processing, and shipping of recycled products. Based on Guam EPA's research, there are currently 11 recycling facilities on Guam and the industry employs approximately 165 individuals. There are no materials recycling facilities on Guam, but storage and processing facilities collect, store, process, and ship recyclable materials overseas.

The biggest obstacles to establishing a recycling industry on Guam are the quality of recoverable recyclables and costs: cost for source separation, transport, waste processing, and shipping to markets in Asia and/or the U.S. mainland. The quality of recoverable recyclables will be significantly enhanced by mandatory source separation and materials recovery at transfer stations. Public Law 27-74 allows qualified companies engaging in recycling and transshipment of recyclable materials to receive qualifying certificates as per Public Law 25-127. Currently the market for all metals (ferrous and non-ferrous) is one of the highest. During the writing of the 2000 ISWMP, only two companies were

actively collecting metallic waste. Now there are 11 private collection sites that are permitted by Guam EPA. The overall cost for desired levels of recycling and composting might not be cost-effective. The planned approach here will be to privatize the collection, processing (through construction and operation of appropriate transfer station facilities), packaging, and shipment of recyclables to available markets that consistently produce the highest financial returns. The recycling process, in effect, will be a pay-as-you-go system. More to the point, the civilian community of Guam will pay for reduction of the solid waste stream by residential collection and transfer station or landfill tipping fees.

## 6.4    Recommended Disposal, Waste Diversion, and Reduction Approach

In order to arrive at an approach to the problem of proper and cost effective disposal and waste diversion, the combination of components to be considered must be evaluated on the basis of criteria, which are relevant to the attainment of the solid waste management goals and objectives. The evaluation criteria were grouped into five broad categories: (1) legal, (2) economic, (3) environmental, (4) social, and (5) political. Detailed discussions on each broad category, with respect to the recommended approach, are contained in the following sections.

### 6.4.1 Legal Considerations

Overriding criteria for selection of alternatives for waste diversion, recycling, and disposal are found in the federal and Guam laws and regulations and specifically in the Guam Consent Decree. These include PL 25-175, which prevents waste reduction by incineration. The laws and regulations are subject to change.

### 6.4.2 Economic Considerations

The policy of privatizing the collection, separation, recycling, and disposal of solid waste, including capitalization and costs of operations and maintenance, allows basic economic evaluations, assessments, and decisions to be made by the private companies involved. Although the Government of Guam will be expected to contribute some economic resources to the implementation of the 2006 ISWMP and will regulate the costs and fees for waste management services, the private companies licensed, contracted, and approved to implement waste management must be allowed to determine costs of doing business while meeting Government requirements. Their competitive bids based on their choices of alternatives will be grounded on economic considerations. Information on the economic factors considered by private bidders for management services can be provided under confidence to the Government during bidding processes. However, there should be no obstacle to independent, competitive, private development and operation of waste management facilities that meet legal requirements. Government requirements may include legal specifications on levels and methods of waste reduction, recycling, and disposal, with related costs being considered in the assessments and proposals by private operators.

54

### 6.4.2.1 Landfilling

Landfilling is unique in this analysis because it must occur as an integral part of any integrated solid waste system. The only true form of disposal for municipal solid waste is landfilling. Given that the recommended approach for solid waste management on Guam requires disposal of wastes in a landfill, it follows then that costs for landfilling will be required regardless of the combination of waste diversion selected. As the Government proceeds with development of the Layon Landfill, its development costs will be provided for. Operational cost alternatives will be proposed by the private companies bidding to operate the facility. For this reason, landfilling, and its attendant costs, was removed from the evaluation as an alternative in itself.

### 6.4.2.2 Landfill With Recycling and Composting (MSWLF/Recycle/Compost)

This recommended combination employs recycling and composting as the major methods of waste diversion, retaining landfilling of residuals and non-recoverable materials as the sole disposal option. Capital costs of land, facilities, equipment, etc., for recycling and for composting, and costs for operations and maintenance, will vary with Government requirements on timing, methods and relative amounts of waste to be recycled and composted and with subsidies and support by the Government.

### 6.4.3 Environmental Considerations

The evaluation of the recommended approach for waste diversion and disposal was based on following environmental criteria: (1) resource recovery; (2) production of useful material; (3) volume reduction; (4) impacts to air and land resources; (5) impacts to water resources; (6) impacts to living resources; (7) impacts to historical resources; and (8) sustainability.

Note: This evaluation was not a rigorous environmental impact analysis in the form of an assessment or study (i.e., EIA or EIS). An EIA must be project specific. The approach selected is therefore subjected to all applicable statutes, rules, and regulations, both local and federal.

### 6.4.3.1 Landfill with Recycling and Composting

This recommended combination of waste diversion methods achieves the best performance with respect to resource recovery and production of useful materials. The capture and beneficial reuse of recyclable commodities spans the spectrum of materials comprising Guam's MSW stream. The recovered materials can either be processed and reused (paper, aluminum) or converted into some other useful form (crushed glass aggregate, compost).

Recycling and composting operations will have minimal impacts to air, land, and water resources. Recycling involves limited processing, the majority of which is packaging-related and generates no emissions. Composting has the potential to generate noxious odors if not properly performed.

55

### 6.4.3.2 Landfill with Recycling, Volume Reduction, Incineration, and Composting

As a means of volume reduction, landfill with recycling and composting performs well, significantly extending landfill capacity. They do not achieve the best level of volume reduction as that afforded by incineration. However, incineration is eliminated from consideration on Guam by Public Law 25-175. Other technologies for waste reduction, which are established in the United States, are available and are being implemented on Guam. For example, in 2005 grinding and shredding methods were under development for reduction of tires, glass, green waste, and construction waste. The market for these volume-reducing technologies is expected to grow rapidly over the next five years. Maeda Pacific has been grinding concrete waste prior to hardfilling. These and other reduction methods are expected to become practical and economical for use on Guam.

### 6.4.4 Social Considerations

#### 6.4.4.1 Landfill with Recycling and Composting

In light of the tremendous controversy and public debate surrounding the Waste to Energy (WTE) facility, which was eliminated by the Guam Legislature as an alternative from the 2000 ISWMP, increasing public acceptance of the recycling and composting alternative will likely be met with greater enthusiasm. In addition, the attention placed on the Ordot Dump has primed the general population for the impending waste diversion programs in which they will be asked to participate. However, the success of this alternative is dependent on a strong economic market for the practice. This cannot be discounted amidst the exuberance of a population which has indeed adjusted to a "recycling" mindset. If implemented, the requirement to recycle and pay attention to the disposal of MSW will result in an increased awareness of solid waste management issues.

### 6.4.5 Political Considerations

Political constraints bear on solid waste management facilities through political posturing, both within and between parties, regarding the proposed solutions to a variety of issues. There exists an atmosphere of general reservation between the executive and legislative branches that renders immediate, critical suspicion about any initiative for facility improvement. This often deeply contested process of checks and balances rarely yields better answers as a result of bona fide debate and critique; rather, the proposals often become so emasculated by opponents that, in the end, they fail to adequately address the very problems intended to be solved. Fortunately, the nature of these particular political constraints are subject to change without notice, and the possibility for forging successful alliances always exists. The impositions of the Consent Decree have somewhat diminished the impacts of political considerations. In any case, the political arena, from which policy and implementation strategies emanate, must be taken into account. The following analysis is done given the current political climate.

### 6.4.5.1 Landfill with Recycling and Composting

The implementation of this combination will achieve the best performance with respect to the satisfaction of legislative mandates for solid waste management. Any initiatives to implement this alternative should continue to be met with legislative support necessary to carry out the mandate of law. Such support makes this combination the easiest to implement.

## 6.5    Performance Standards

### 6.5.1 Ordot Dump

The Ordot Dump Closure consists of four major tasks that are identified in the Ordot Dump Permit for Conditional Use. These major tasks are as follows: (1) interim operations until closure, (2) dump closure design, (3) dump closure construction, and (4) post-closure remediation, maintenance, and monitoring. Each major task includes numerous subtasks that are detailed in the permit's compliance schedule.

Guam must undertake a new solid waste composition study (SWCS) to characterize the types and quantity of municipal solid waste generated to guide future landfill facility and recycling program design. At a minimum, a SWCS must be completed at least one year before this plan is updated in 2010, but more importantly, a SWCS should be completed over the next 2 years to guide recycling efforts and the design of future waste cells at the Layon Landfill. It is recommended that Guam EPA take the initiative to produce this study.

The functional and operational criteria for the Ordot Dump are incorporated into Guam EPA permit no. 05-060-LFL (December 2005). The legal and regulatory criteria, including the Consent Decree requirement, are also applicable to the Ordot Dump. The Consent Decree requires that the Dump cease to receive waste on the day the landfill opens or September 23, 2007, whichever is earlier.

### 6.5.2 Guam Municipal Solid Waste Landfill Facility

The Guam Municipal Solid Waste Landfill Facility (MSWLF) will be located in Layon, Inarajan. Modern municipal solid waste sanitary landfills are designed to protect the environment from the hazards associated with deposited waste. Primary consideration is given to the protection of subsurface resources (soil and groundwater), as well as vector control. The protection against subsurface contamination is accomplished through the use of engineering and operational controls. Vector control is accomplished through operation procedures designed to ensure adequate daily cover of filled material. The execution of design and construction efforts will be subject to the following performance criteria.

### 6.5.2.1 Functional Standards

A.    The Layon facility is sized to receive thirty to fifty years of municipal solid waste.

**Basis:** The ISWMP and the Landfill Final Site Selection Report.

B. DPW must ensure a smooth transition for all billing and collection operations from the Ordot Dump to the Layon facility.

   **Basis:** ISWMP

C. Design of the Layon facility should incorporate data collection systems recommended as part of this ISWMP.

   **Basis:** ISWMP. The regular and consistent collection of data should be performed at all solid waste management facilities that receive and dispose, recycle, compost or otherwise handle solid waste. Such data can be used to verify or confirm estimated throughput, plan for future expansion or improvements, and as a management tool for streamlining operations.

### 6.5.2.2 Operational Standards

A. The Layon facility should be open for operation daily.

   **Basis:** ISWMP

B. The Layon facility and all MSWLFs shall accept municipal solid waste from all on-island sources.

   **Basis:** ISWMP. The MSWLF is sized for civilian, tourist, and military waste assuming minimal source reduction of 2%, an inflated (20% greater than the national average) waste generation rate of 5.28 pounds per capita per day (pcd), and a lifespan of at least thirty years, yielding a total capacity of 14,091,081 cubic yards, or greater. Source: DPW designs, plans, specifications, and estimates (Dec. 19, 2005).

C. Operation of the Layon MSWLF must achieve a minimum compacted landfill density of 1,100 to 1,200 pounds per cubic yard.

   **Basis:** The Layon facility is sized based on a compaction rate of 1,100 to 1,200 pounds per cubic yard for a 30-year lifespan.

### 6.5.2.3 Legal and Regulatory Standards

A. All MSWLFs must meet siting and location requirements in terms of location, which address airports, wetlands, floodplains, seismic impact zones, fault zones, and unstable areas.

   **Basis:** 22 GAR Article 2, Section 23201-07.

B.   All MSWLFs must be designed and constructed to ensure that contaminant levels in the uppermost aquifer at the relevant point of compliance are below those values listed in Table 1 of that section of the regulation, where the relevant point of compliance is defined as some point within one hundred fifty meters of the waste management unit boundary on land owned by the owner or operator.

**Basis:**   22 GAR Chapter 23, Article 4, Sections 23401 and 23403.

C.   As an option to Item B above, the MSWLF may be constructed with a composite liner, consisting of a flexible membrane liner (FML) and an underlying compacted soil layer with hydraulic conductivity of no more than $1 \times 10^{-7}$ cm/sec.

**Basis:**   22 GAR Section 23401

D.   MSWLF units must be designed and constructed with an approved groundwater monitoring system.

**Basis:**   22 GAR Chapter 23, Article 5.

E.   All MSWLFs must be designed, constructed, and maintained with stormwater (run-on/run-off) control systems for discharge from a twenty-five year storm.

**Basis:**   22 GAR, Section 23309.

F.   Operation of all MSWLF units must include provisions for excluding the receipt of hazardous waste, cover material, disease vector control, explosive gas control, air criteria, access requirements, preventing impacts to surface water, restricting receipt of liquids, and record-keeping.

**Basis:**   RCRA Subtitle D - 258.20.

G.   Operation of MSWLF units must include groundwater monitoring that addresses detection monitoring, assessment monitoring, and corrective action.

**Basis:** 22 GAR Chapter 23, Article 5.

H.   Landfill facilities and operations shall be privatized in accordance with the laws of Guam.

**Basis:**   Public Laws 24-06 and 24-272.

I.   DPW to administer, supervise, and fulfill the responsibility of Government of Guam in any contract for the development and operation of new landfill.

59

**Basis:**    Public Laws 24-06 and 24-272.

J.    Guam EPA to issue permits for the design, operation, maintenance, and modification of all solid waste management facilities.

**Basis:**    10 GCA, Chapter 51, Sections 51103 and 51104.

K.    Request for Proposals for new landfill facility to be finalized through the bidding process under Guam procurement law.

**Basis:**    Public Law 24-06.

# CHAPTER SEVEN: RECYCLING, COMPOSTING, AND SPECIAL WASTE

This Chapter focuses on the activities of recycling, composting, and proper disposal of special waste; it also focuses on the special considerations of waste reduction opportunities and curtailing of illegal dumping, all of which are components of integrated solid waste management. In general, waste separation and diversion allows for the activities of recycling, composting, and proper disposal of special waste. These activities lead to waste reduction prior to landfilling. Waste separation is the separation of recyclable, compostable, and special waste materials and occurs either at the source, or point, of waste generation, or at transfer stations and materials recovery facilities or at the final disposal site. Recyclable materials are then sent to processing facilities. Likewise, compostable materials are then sent to composting facilities. Special wastes such as white goods, household hazardous waste, automotive batteries, and abandoned vehicles are handled differently from recycling of other municipal solid waste. Other considerations include other waste reduction opportunities and addressing illegal dumping.

## 7.1  Recycling

Public Laws 24-304, 24-272, and 21-22 require the reduction of Guam's solid waste stream through various means. Recycling is the most effective and environmentally acceptable means of reducing the municipal solid waste stream. Based on a recent study, the average national recycling rate was thirty percent (U.S. EPA 2005). Guam's recycling rate is estimated to be between two and six percent.

### 7.1.1 Guam's Recycling Facts and Figures

Recycling practices on Guam provide for the recovery of paper and paperboard, non-ferrous metals (post-consumer aluminum, scrap copper, brass, lead), ferrous metals (vehicles and other ferrous metallic waste), waste tires, and waste oil from the municipal and non-municipal solid waste stream. The recycling efforts appear to have increased and improved since the 2000 ISWMP.

The atmosphere is right for doing recycling on Guam now. The Asian market for both metal and waste paper is bright. Thousands of junk cars have been removed and shipped to recyclers since the 2000 ISWMP. The Guam Public School System (GPSS) is creating environmental clubs to collect aluminum cans. Ambros, Inc., of Guam, in conjunction with other local businesses and in coordination with Guam EPA, is currently sponsoring a project to place aluminum recycling bins in most of the public schools, some private schools by fall of 2006, and ultimately in all the schools on Guam. There is an increase in the recycling of paper, paperboard, nonferrous metals and ferrous metals. Based on data obtained from the companies that receive recyclable materials (see Table 7.1), both the type of recycling activities and the amount of recyclables processed and diverted from the Ordot Dump increased from 2000 to 2005.

61

Table 7.1      Solid Waste Recycling from Recycling Facilities

| Waste Item | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|
| C&D (yd³) | 24,577 | 54,169 | 52,968 | 64,846 | 374,485 | 301,061 | 231,222 |
| Cardboard (tons) | 600 | 600 | 960 | 1569 | 1230 | 1911 | 1615 |
| Newsprint (lbs) | | | | | | | 145,700 |
| Loose Paper (lbs) | | | | | | | 232,542 |
| Automobiles (tons) | | | | 10 | 4,035 | 4,061 | 4,081 |
| Automobiles (units) | | | | | 6,025 | 6,127 | 6,335 |
| Heavy Equipment | | | | | 2,000 | 2,100 | 2,200 |
| Scrap metals (tons) | | | | 240 | 2,000 | 2,673 | 7,042 |
| White Goods (tons) | | | | | 2,003 | 2,070 | 2,016 |
| Alum. Cans (tons) | | | | | 37 | 14 | 200 |
| Other Alum (tons) | | | | | 108 | 55 | 97 |
| Copper (tons) | | | | | 15 | 15 | 97 |
| Brass (tons) | | | | | 15 | 15 | 55 |
| Automobile Batteries (units) | | | | | 1016 | 13,904 | 5348 |

However, there is a need to increase recycling activities to address plastics, green waste, and other recyclable materials. In addition, one must anticipate the rising and falling or the buying and selling power of recyclable materials, thereby requiring the need to support recycling activities of these unmarketable materials at such times. This could be accomplished through additional funding support from importers, businesses, consumers, governments, and grants.

### 7.1.2 Recycling Efforts within the Community

Behavioral change by residents, businesses, and government is one aspect of improving recycling on Guam. Through public outreach programs and incentives, as well as providing the convenience of recycling, the community of Guam must share its responsibility to recycle.

Residential recycling is currently voluntary. Residential recycling includes non-ferrous metals, scrap metals (including automobiles) and white goods, cardboard, and some newsprint. One of the driving forces for most residents to recycle is the "selling power" of recyclable materials. In the past, in order to recycle or dispose of bulky waste, one had to pay for the proper disposal, such as with metallic waste. Currently, some recycling companies are offering to pay consumers a small fee for bringing in certain types of recyclable materials to their recycling facilities, such as car batteries, computers, and ferrous metals. However, illegal dumping still exists due to the inconvenience of transporting these types of waste to recycling facilities.

Commercial recycling is also currently voluntary. Many businesses recycle cardboard, newsprint, and loose paper. The major reason for the limited recycling effort by the business sector is the need to generate sufficient quantities of recyclable materials to be cost effective. In addition, there is the need to provide convenient locations and facilities for recycling of other materials.

62

Guam EPA commenced a pilot project in late 2005 for the purpose of implementing various recycling and waste reduction laws within Government of Guam agencies. The program expanded in early 2006 to include all Government of Guam departments and agencies. Public Law 24-304 requires all Government of Guam agencies to recycle aluminum cans and paper and to assign a recycling officer within each agency. Previously, two laws were passed which also require Government of Guam agencies to recycle. Public Law 21-22 requires GSA to purchase biodegradable materials, and Public Law 21-73, known as the Government of Guam Aluminum Container Recycling Act, also requires the Government of Guam to recycle aluminum cans at all offices. Under these mandates, Governor Felix Camacho signed Executive Order 2003-17 (EO 2003-17) on May 13, 2003, for all Government of Guam agencies to implement the following:

1. Source Reduction
2. Pre-Sorting of Waste
3. Designation of a Recycling Compliance Officer (RCO) and alternate.

Each agency or department is required to designate an RCO and alternate whose charge is to educate and oversee implementation of recycling at their respective agency or department.

Guam EPA oversees the implementation of EO 2003-17, and has organized the Recycling Compliance Officer (RCO) group to implement it.

The Government of Guam can set the tone for the rest of the island by taking the lead in implementing recycling programs government-wide and can thus play a significant role in extending the lifespan of the Layon Landfill beyond the 30-year expected usage.

Guam has several groups that have been very active in promoting recycling and waste diversion within the community. There is the Recycling Association of Guam, the Friends United Through The Understanding of Recycling Efforts (FUTURE) Committee, and other groups referenced in Chapter 8 of this Plan update.

### 7.1.3 Future Recycling Efforts

To ensure that the life of the Layon Landfill is extended, recycling efforts on Guam must increase. Current activities such as public outreach, public support, and public programs must be encouraged to educate the community of Guam regarding the benefits of recycling. These activities may also create new jobs and minimize illegal dumping.

In addition, importers, consumers, businesses, and local and federal government must all do their part in supporting, participating in, and implementing recycling events and activities on Guam. In addition, the cost of recycling will also have to be shared by everyone in the community.

If voluntary recycling is not supported, then laws must be passed to require mandatory recycling. This will also help to ensure that recycling becomes a stable industry, which is critical to the continued implementation of the 2006 ISWMP.

The following laws are Guam's attempts to support recycling activities on Guam:

Public Law 27-37 - An Act to Create a Municipal Recycling Program. All fees collected from recycling activities from the Municipal Recycling Program within each village will be deposited into the respective Municipal Recycling Proceeds Fund. Currently, this law has not been implemented due to lack of funds and lack of trained employees at DPW.

Public Law 27-38, as amended by PL 27-148 and PL 28-05, entitled An Act to Create a Recycling Revolving Fund (also known as the Advance Disposal Fee Law) creates a Recycling Revolving Fund and imposes recycling fees at the point of sale on imported automobiles, buses, trucks, heavy equipment, white goods, and tires where applicable under the Use Tax laws. This law has not been implemented due to administrative difficulties and proposed alternatives.

Bill 232, introduced November 7, 2005, proposes to establish a Recycling Fund under Guam EPA administration, which will receive $25 annually for each motor vehicle registered on Guam. The funds would be administered by Guam EPA for grants and contracts. The contracted work to assist in recycling would be administered by the DPW or the Solid Waste Authority.

### 7.1.4 Performance Standards

Recycling is integral to long-term effective reduction of waste disposal at the landfill. Recycling will be affected by such factors as social policy, market demand, commodity supply, operational costs (labor, shipping and transport, collection) and tax incentives. In addition, recycling facilities and operations should be able to accomplish the stated objectives subject to applicable local and Federal laws.

### 7.1.4.1 Functional Standards

A.    Recycling must reduce the MSW stream by a minimum of twenty percent (20%) by the Year 2010. (See Chapter 3)

    **Basis:** PL 24-304 and this ISWMP.

B.    Recycling should incorporate the design and development of a Materials Resource Recovery Facility (MRRF) or similar facilities that can achieve the necessary recovery rates.

    **Basis:** MRRFs are an integral part of the volume reduction and disposal method recommended as part of the ISWM system. The recommended collection and transport method and the integrated

approach to solid waste management require the implementation of materials resource recovery.

C. Recycling operations and facilities should allow for the convenient collection and/or drop-off of recyclable commodities in order to encourage and promote widespread participation.

> **Basis:** By designing the collection of recyclable commodities to be convenient and easy, it encourages the recycling approach to waste reduction. The drop-off of recyclables at the transfer stations and/or other designated locations provides options for those who may not have access to curbside collection services.

D. Recycling collection and drop-off facilities should be provided, at a minimum, at transfer stations and village community centers (or mayor's offices).

> **Basis:** This defines the minimum locations essential to obtain the objective of Item B above. While the transfer stations provide convenience to those who may not have access to curbside collection services, they also promote public awareness and encourage a shift in disposal practices within each village community. Public Law 27-37, Municipal Recycling Law.

E. Design of recycling operations and facilities such as MRRFs shall be coordinated with data collection system activities to ensure that an adequate database exists for design purposes.

> **Basis:** Data collection activities shall include the identification of recyclable commodities (wet and dry), their quantities and collection and recycling methods.

F. The MRRFs and recycling operations shall include provisions for the regular or periodic recovery of the following materials:

- Paper and paperboard,
- Non-ferrous metals: aluminum, brass, copper, lead,
- Ferrous metals,
- White goods,
- Batteries (lead-acid, nickel-cadmium),
- Plastics,
- Glass,
- Rubber and tires,
- Used motor oil.

> **Basis:** Through the attainment of Item E, the collection frequency and recovery of the above items can be determined based on data collected.

G.  Recycling operations should include incentives, such as qualifying certificates and waivers of transshipment fees for recycling based industries. Restrictions calling for export of recycled products to obtain incentives should be revised to encourage end use of recycled products on Guam.

   **Basis:** PL 25-127 and 27-74. To encourage recycling, incentive programs should be initiated. Examples would include tax incentives for distributors who purchase recyclable plastics and glass containers; monetary incentives for individuals who transport recyclable commodities directly to any of the collection and/or drop-off facilities.

H.  Community, business, consumer, NGO and governmental subsidy and financial support of various recycling operations at certain times when the marketing of certain recyclable materials does not exist, or is not profitable.

   **Basis:** To encourage, support, and maintain recycling companies to continue operations and provide services to the community.

## 7.1.4.2 Operational Standards

A.  The MRRFs shall have a minimum operational capacity of 20% of the MSW stream and shall be expandable to accommodate the requirements of this plan and all future updates.

   **Basis:**    2006 ISWMP.

B.  The location determined for the MRRF sites and transfer stations must undergo a comprehensive study to ensure maximum usage and participation.

   **Basis:**    2006 ISWMP.

C.  The MRRF facilities must be designed to accommodate drop-offs from self-haulers and commercial haulers.

   **Basis:**    2006 ISWMP.

D.  The MRRF facilities must be designed to accept all types of recyclable materials for processing and marketing.

   **Basis:**    2006 ISWMP.

E.  The MRRF facilities must be designed to obtain data on the volume and weight of each type of recyclable material received, processed, and transported to on-island or off-island recycling companies.

**Basis:** 2006 ISWMP.

F. Recycling facility operator(s) must coordinate with Office of Recycling and Guam EPA in the promulgation and execution of a public education strategy.

**Basis:** Success of the public education strategy will be enhanced by the participation of actual recycling operators with valuable knowledge to pass along to target audiences.

G. Recycling facilities shall be open for the convenience of public access.

**Basis:** Promotes recycling, and the operating permit requires it.

### 7.1.4.3 Legal/Regulatory Criteria

A. Operation of recycling facilities must not violate applicable air, water quality, and other environmental standards or regulations, as well as safety, transport, and zoning laws.

**Basis:** All facilities must comply with federal and local laws and regulations.

B. Guam EPA to issue permits for the design, operation, maintenance, and modification of all solid waste management facilities, including recycling.

**Basis:** 10 GCA Sections 51103 and 51104.

C. Solid Waste Management Division of DPW to administer contract for selected recycling facilities and operations.

**Basis:** 10 GCA Chapter 51, Article III-IV, and other recycling laws.

D. Guam EPA and the Solid Waste Management Division shall establish and manage a promotional program for recycling on Guam.

**Basis:** Public Laws 24-272 and 24-304.

E. Department of Administration General Services Agency and other Government of Guam entities shall amend their procurement regulations and contracts to use recycled and biodegradable products. Guam EPA shall monitor and enforce purchase of biodegradable, reusable, recyclable, or recycled products by the Department of Administration General Services Agency and other Government of Guam entities.

**Basis:** Public Laws 21-22 and 24-304.

F. The Department of Public Works and other Government of Guam entities shall require paving projects to use crushed glass.

**Basis:** 5 GCA.

G.  All Government of Guam departments, agencies, and instrumentalities shall make every effort to reduce solid waste by recycling and buying recyclable and biodegradable products.

    **Basis:** Public Law 24-304.

H.  Each director, manager, or agency head shall insure regular collection of recyclable materials and maintain records and forward recorded data to Guam EPA, which shall post the data each year.

    **Basis:** Public Law 24-304.

## 7.2  Composting

Composting is an integral part of the volume reduction strategy. Composting is the biological decomposition of the biodegradable organic fraction of MSW under controlled conditions to a state sufficiently stable for nuisance-free storage and handling and for safe use in land applications. It differs from the natural decay of materials that takes place in landfills because it occurs under controlled aerobic conditions. Composting is an accelerated version of the natural decay process, which can include many types of waste in addition to yard waste, clippings, etc. Under certain conditions (i.e., optimal levels of oxygen, nutrients, moisture and temperature, along with small particle size), composting, and the consequent creation of humus, can be accomplished in a minimum of four to six weeks. Humus is the crumbly, pleasant smelling, soil-like final product of the composting process, which can be incorporated into vegetable and flower gardens or added as a soil amendment to lawns or other areas of land to improve soil quality and prevent erosion.

Some of the benefits of composting are:
- Keeps organic wastes out of landfills,
- Provides nutrients to the soil,
- Increases beneficial soil organisms (macro-organisms such as earthworms and centipedes, and micro-organisms such as bacteria, fungi and actinomycetes),
- Suppresses certain plant diseases,
- Reduces the need for fertilizers and pesticides,
- Protects soils from erosion,
- Assists pollution remediation.

Factors to consider in choosing a composting method are speed, labor, and costs. There are four general methods of composting: passive, aerated piles, windrows, and in-vessel. The first two methods are mainly used for home or small-scale operations. Windrows and in-vessel composting are utilized in farm scale or industrial sized operations.

68

Passive composting is the simplest, lowest cost method, and it requires little or no management. The materials are simply stacked into piles and left to decompose over a long period of time. This method can produce objectionable odors due to anaerobic conditions and is not suitable for large quantities.

Aerated piles are a more productive form of passive composting. Perforated pipes are placed within the pile, which supply the pile with oxygen and thus promote a faster rate of decomposition. Mixing the material well also speeds up the process. Blowers and chippers may be used to provide more efficient composting. Blowers force oxygen through the piles while chippers grind the materials to produce smaller particle size and provide for easier mixing. This method produces compost faster with minimal labor and costs. Costs are increased when blowers and chippers are used.

Windrow composting involves long narrow piles, called windrows, which can vary in height and width depending on the materials and equipment available for turning. Windrows are turned or incorporate forced aeration for efficient composting. This method allows large quantities of waste to be composted. Windrows can range from three feet high for dense materials, to as high as twelve feet for lighter, more porous materials like leaves. The process starts as the materials are mixed together, with the yard waste and paper waste having been processed through a chipper and shredder, respectively. Water is added to aid in decomposition and then the waste is formed into windrows. Windrows are turned periodically to add oxygen, mix the materials, release excess heat, and expose all materials to the high interior heat that kills pathogens. When using forced aeration, materials must initially be mixed well for windrows because they are not regularly turned. When turning windrows to provide oxygenation, it may be necessary to turn daily or even several times a day to maintain sufficient oxygen levels. If objectionable odors develop, that is a signal that turning is required to provide increased aeration and reduce moisture content. Turning can be labor intensive depending on the equipment being used. Turning equipment can include front-end loaders, an old plow and a farm tractor, or specialty machines such as windrow turners. In addition to requiring turning equipment and a large area for the windrows, the operation will also need a source of water, dial thermometers and an oxygen meter. The instruments are placed in the windrow for monitoring temperature and oxygen content and are removed for turning.

With frequent monitoring and essential turning, composting time can vary from weeks to a couple months depending on the material being composted. Once completed, the compost should be stored in large bins for further curing, screened, and either given away or sold. Larger particles that were screened are returned to the windrows. This method allows for large quantities to be composted in a relatively short period of time and produces a high quality product. However, this method requires a large land area, is labor intensive, and costs for equipment can be high.

With in-vessel composting, the materials are composted within a container such as a tank or reactor. This method provides for total control and optimization of

69

aeration, temperature and mixing. In-vessel composting eliminates weather problems and the dissemination of odors; therefore, operators are able to process compost in highly populated areas. Types of in-vessel composting are reactors in which the air goes in at the bottom and the exhaust is captured for odor control at the top, agitated bed systems, and rotating drums.

### 7.2.1 Yard Waste Composting Efforts within the Community

Guam residents are beginning to realize the benefits of recycling their leaves and yard waste; not only are these materials taken out of the waste stream, but they are recycled into beneficial products such as compost or mulch that can return nutrients to the soil or be used in residential landscaping projects. However, the residents of Guam are not fully implementing backyard composting, which can be beneficial for their personal use, and can minimize waste generation from their homes.

While we are anticipating industrial type composting, we can continue with wood chipping and grinding programs for residential, landscaping, and agricultural activities. This proved to be very effective following Supertyphoon Pongsona and Typhoon Chata'an, and other previous typhoons. Composting of green waste after typhoons has been successful. Residents, businesses, and government agencies have utilized the compost materials for agricultural and landscaping purposes. A ban on all green waste except those in trash bags will greatly reduce the amount of waste going to the landfill. Nearly forty percent of the waste disposed of at the Ordot Dump is green waste. Guam EPA has required the Department of Public Works to implement a waste diversion program for green waste by July 2006 as part of the Solid Waste Disposal Facility - Ordot Dump Permit.

Although there are no permitted composting facilities on Guam, the University of Guam (UOG) College of Natural and Applied Sciences, under the direction of Soil Scientist Dr. Mohammad Golabi, has been conducting research for the improvement of soil fertility using composted animal waste and green waste as part of the test variables. The Guam Legislature granted $50,000 to UOG for the purchase of a windrow turner in furtherance of this research. The windrow turner will be used to accelerate the composting process. This research could provide the basis for island-wide composting, which could ultimately divert up to 50-60% of the waste stream from entering our landfill.

### 7.2.2 Future Composting Efforts

Composting must be emphasized and encouraged at the residential and community level, since these are the major sources of yard waste. In addition, backyard composting can also handle other organic and food waste generated by residents. The village mayors and other village businesses should be able to support and participate in community composting efforts.

Composting by landscapers, grounds maintenance companies, nurseries, as well as farmers should also be encouraged and supported. Support of such activity

Case 1:02-cv-00022    Document 190-17    Filed 01/14/2008    Page 10 of 28

can be accomplished either through established regional composting facilities or self-composting activities by these companies.

Composting may also take place at the new Layon Landfill site or at local transfer stations. The method of composting that seems most suitable for application at these sites appears to be either windrow or in-vessel composting. Selection of the appropriate method will require a detailed analysis of the conditions at these sites and the available space. Such analysis should be conducted prior to final negotiations with a private contractor or during the design phase. More detailed information regarding specific performance requirements is included at the end of this chapter.

### 7.2.3 Performance Standards – Composting Operations

### 7.2.3.1 Functional Standards

A.  A minimum of 5% of the green waste stream must be composted by July 1, 2007, and a minimum of 15% must be composted by July 1, 2010.

   **Basis:** 2006 ISWMP

B.  Design of composting operations and facilities shall be coordinated with data collection system activities as support for design purposes.

   **Basis:** Data collected can confirm or verify the estimated throughput for a given period, the moisture content of the waste stream to be processed, and can be used to determine the most appropriate composting method for the site.

C.  Composting operations shall provide and encourage the use of their product in home gardening and farming to promote reuse of organic waste in the community.

   **Basis:** Encouraging the use of finished compost material by consumers creates demand for the finished material and contributes to the continued success of the program.

D.  Composting facilities shall include contingency provisions for the effects and after-effects of typhoons and earthquakes, which occur frequently on Guam.

   **Basis:** Green waste, such as yard landscaping debris and roadway maintenance debris, is generated at elevated quantities immediately after typhoons and earthquakes. Composting facilities should be designed and operated to manage these peaks in volume.

71

### 7.2.3.2 Operational Standards

A.     The composting facilities shall accept green waste from all on-island sources.

   **Basis:** To accommodate 15% of the island-wide green waste stream.

B.     Operation of composting facilities must not violate applicable air and water quality standards or regulations.

   **Basis:** All facilities must comply with federal and local laws and regulations.

### 7.2.3.3 Legal and Regulatory Standards

A.     Composting, in combination with recycling, must account for a minimum 20% reduction in volume of MSW on Guam.

   **Basis:**    2006 ISWMP

B.     The composting facilities must meet siting requirements in terms of location, with respect to flood plains and wetlands, etc.

   **Basis:** Local and federal land use and wetland laws and ISWMP. Composting facilities and landfills share functional concerns, such as odor and vector control.

C.     Composting rules and regulations shall be in place prior to the development of the facility.

   **Basis:** In order to effectively manage the design, construction, permitting and operation of the facilities, there will need to be, at the very least, interim operating rules and regulations against which to evaluate performance of the system.

### 7.3    Special Waste

### 7.3.1 White Goods

"White goods" are defined as household appliances such as washers, dryers, refrigerators, air conditioners, etc. Although the disposal of white goods has been historically problematic, currently Asian markets for metallic wastes have made it more convenient and profitable for customers to recycle their white goods.    The biggest problem with the redemption of white goods is the requirement to have freon in the units removed prior to delivery to the metal processing facilities.    In the past years local processing companies have charged $25 for each unit.    A pick-up truck full could cost nearly $200. In 2005, companies were buying air conditioners at nine cents a pound.    A unit now has a value of about $6.    Two metal recycling companies are now buying both ferrous and non-

ferrous metal. The general public should take advantage of the current market situation in Asia. Guam EPA has recently updated its Guam Recycling Guide, which identifies recycling companies and what recyclables they accept from the public.

In 2003, Public Law 27-38 and its amendments (PL 27-148 and PL 28-07) were passed to establish a recycling revolving fund to provide for proper disposal of white goods and other recyclable materials. In addition, this law required Guam EPA to establish regulations for the administration of the fund, for collection of recycling fees by the Guam Customs and Quarantine Agency, for creation of standards for recycling centers and recycling facilities, and at the same time provide for refunds for the recycling of recyclable materials to consumers. Guam EPA did create and submit regulations based on this law; however, due to concerns regarding the increased administrative responsibilities placed on those affected, the regulations were disapproved and new revisions to the law have been proposed in bill form by the Guam Legislature.

Proper disposal of white goods by residents has been inconsistent, just like the disposal of any recyclable material. The availability and convenience of disposal sites for white goods have always been a challenge. This leads to the illegal dumping of white goods, which are visible around our island. Unless curbside collection of white goods and other bulky materials is in place, illegal dumping will still occur.

Therefore, as required by Article 3 of 10 GCA Chapter 51, the Department of Public Works must also include the collection of white goods as part of its collection of abandoned vehicles.

### 7.3.2 Household Hazardous Waste and Automotive Batteries

Household hazardous waste, to include automotive batteries, is special waste generated by individual homes. This waste is excluded from sanitary landfills. Improper storage and disposal of household hazardous waste (HHW) is associated with accidental poisonings, worker health and safety, equipment damage, and environmental contamination of surface and groundwater. Heavy metals such as lead, zinc, copper, nickel, mercury and cadmium enter the waste stream via residential sewage and urban run-off. Because of its impact to the island's surface and groundwater, diversion of household hazardous waste must be implemented. Since the implementation of *Hasso Guam!* in 1993, Guam EPA has provided to the community a proper method for household hazardous waste disposal. Through this program of education and outreach, community awareness and participation has increased dramatically over the years.

The collection of household hazardous waste was implemented in 1993 and has continued on an annual or semi-annual basis since then. Table 7.2 provides a summary of some types of household hazardous waste collected in the *Hasso Guam!* events in 2004 and 2005. Combining the quantities collected each year, approximately 8,325 gallons of used oil, 9,745 gallons of used paint, and 6,776 lead acid batteries were diverted from the dump and recycled. Consolidated

73

grant funds from U.S. EPA have played a crucial role in funding this collection program. However, as part of the Consent Decree settlement, Government of Guam must perform a one million dollar supplemental environmental project (SEP) for the diversion of household waste. Guam must develop an interim collection system, establish a permanent collection facility for all household hazardous wastes, and prepare a *Household Hazardous Waste Diversion for Island Communities Guide*. The funding for this SEP program must be local.

**Table 7.2 Household Hazardous Waste Collection**

| Description of HHW | 2004 | 2005 |
|---|---|---|
| Used Oil (gallons) | 4200 | 4125 |
| Flammable Paints (gallons) | 2365 | 1480 |
| Latex Paints (gallons) | 2475 | 3425 |
| Lead Acid Batteries (Automobile) (pieces) | 3681 | 3095 |
| Fluorescent Light Bulbs (pieces) | 1151 | 2100 |

In addition to the Guam EPA's *Hasso Guam!* collection events, there is ongoing collection and acceptance by other local environmental companies of these waste items, but a fee is assessed.

### 7.3.3 Abandoned Vehicles

Recent experience on Guam has shown that the abandoned vehicle problem is quite significant. There have been major attempts by Guam EPA, DPW, and the Attorney General's Office to resolve this problem of abandoned vehicles. Within the last two years, the battle over the streetlight fund and recycling fees created much interest, as well as awareness for the need for a permanent funding program for the collection of special wastes. The so-called "Abandoned Vehicle Fund" (AVF) was for many years a misnomer. The name suggests that it is for the collection of all vehicles that are abandoned. Every automobile owner pays a fee every year for this program. However, only ten percent of the funds collected were to be used for the collection of abandoned vehicles. Unfortunately, the collection of abandoned vehicles under the program was a failure as evidenced by the staging of junk cars at the Malojloj, Agat, and Dededo transfer stations. Hundreds of cars were staged in these locations but were never processed and removed from the island. Based on statements from DPW, towing companies were charging DPW up to $200 for each vehicle that they removed under the AVF program. The program stopped but the collection of the funds continued. The spending of the AVF was never resolved.

In 2005, DPW implemented a pilot project for the collection, transport, recycling, and disposal of abandoned and junk vehicles. In the 2005 pilot project, DPW's contractor removed 1,189 vehicles just from the villages of Yona and Dededo. In addition to processing these individual vehicles, a total of 180 automobile batteries, 726 engine components, 706 transmissions, 68 auto air conditioners, and 1,417 tires were collected and properly disposed of. In 2006, DPW was

74

expanding this program to serve the entire island and to include the collection of white goods.

Public Law 23-64 requires the Director of Public Works to advertise and contract for the collection of abandoned metal implements over which DPW has jurisdiction and the right to dispose. DPW cannot charge the owner a fee for the scrap metal. However, abandonment of vehicles and other metallic waste on government land or rights of way is illegal. It can result in litter citations or prosecution for misdemeanor crimes for failure to abate a public nuisance under 10 GCA Chapter 20.

In order to address the abandoned vehicle problems, amendments to Public Law 27-38 (as amended by PL 27-148 and PL 28-07) were being considered by the Guam Legislature. Bill 232 would require annual recycling fees paid at vehicle registration to be administered by the Guam EPA and used to subsidize the collection, processing, recycling, and disposal of all recyclable materials in the priority of junk vehicles, tires, batteries, and white goods.

In late 2005, eleven recycling companies were actively collecting or accepting all types of metallic wastes. But because there is a requirement for the removal of engine oil, differential oil, freon and fuel from junk vehicles, recycling companies have been reluctant to deal with junk cars. Only one permitted recycling company was accepting junk cars in 2005. A continuous collection system will depend on a government subsidy program.

### 7.3.4 Waste Reduction Opportunities

It is unquestionable that reduction of the amount of waste generated at the source is one of the keys to effective solid waste management. Waste reduction can be achieved through the elimination of excess packaging, production of more durable goods, reuse of product packaging, and promotion of responsible consumer packaging. Potential source reduction options that involve regulating the production of packaging cannot be effectively implemented on Guam. However, with regards to the use of packaging, it is important that, to the extent practical, the "Three Rs" be followed as part of Guam's overall waste management strategy as follows:

1. Reduce use of containers
2. Reuse containers
3. Recycle containers.

Successful implementation of programs which address container and packaging use reduction and reuse could result in a significant reduction in Guam's (per capita) solid waste generation rate and, in turn, a significant reduction in recycling processing and required landfill capacity. The study of the feasibility and subsequent implementation where applicable of the following source reduction policies must be seriously considered by the government in cooperation and consultation with applicable private sector industries as public awareness of solid waste management issues increases:

Case 1:02-cv-00022   Document 190-17   Filed 01/14/2008   Page 15 of 28

| Policy | Description |
|---|---|
| • Taxation | A tax on one-way containers that is high enough to make refillable or reusable beverage containers an attractive alternative to consumers. |
| • Ban | Ban the sale of one-way containers. |
| • Quotas | Require beverage manufacturers to package a certain percentage of their products in refillable containers. |
| • Deposit | Require a deposit on one-way containers to create an environment in which refillable containers can effectively compete. |
| • Differential Deposits | Require deposits on one-way and refillable containers, but only a fraction of the deposit is refunded on one-ways to increase the competitive advantage for refillables. |
| • Deposit/Refund | Consumers pay a deposit (say, 10 cents) on each beverage container purchased. A refund (say, 5 cents) is given for each container returned. The remainder of the deposit is used to fund collection, recycling, and education programs. This can only be effective in conjunction with a one-way container ban, taxation, or quota system. |
| • Mandatory Recycling Rates | Set mandatory recycling goals for one-way container types (beer, soft drink, wine, liquor, etc.) or for material types (glass, steel, plastic, aluminum). Require deposits if goals are not met. |

Unfortunately, in a free market society such as ours, to reduce material consumption is viewed as economic meddling. To implement source reduction policies requires a radical change in current consumer attitudes, strong political will, and, in the final analysis, cooperation with the private sector.

Case 1:02-cv-00022    Document 190-17    Filed 01/14/2008    Page 16 of 28

We emphasize that the feasibility of implementing any or a combination of the above policies must be preceded by a thorough feasibility study and analysis that takes into consideration the impacts on consumer practices and acceptance, Guam beverage manufacturing and distribution industries, and achievable waste reduction gains.

### 7.3.5 Illegal Dumping

Illegal dumping activities are still an ongoing problem on Guam. According to Guam EPA data, there appears to be an increase in the illegal dumping activities around the island. The dumping appears mostly on isolated government properties, especially in the northern part of the island where the population is denser and more government (local and federal) properties are located. Illegal dumping is difficult to detect. The most that can be done is to minimize the conditions that contribute to the public's participation in this illegal act. These conditions are likely to be the following:

- Mistaken belief that dumping is legal and harmless: Illegal dumping is a crime punishable under both the Solid Waste and Litter Control Act, 10 GCA Chapter 51, Articles I and II, and the Public Health and Sanitation Law, 10 GCA Chapter 20, for failure to remove the material which creates a public nuisance.

- Dissatisfaction with MSW collection service: This can only be addressed by providing consistent collection service. Implementation of privatized residential collection may go a long way in achieving this end.

- Ignorance of the negative impacts associated with illegal dumping: Public education efforts to relay the negative impacts, as well as to encourage reporting of illegal dumping activities, should be undertaken as part of the SWM Plan's public education strategy.

- Perceived inconvenience of hauling waste to a transfer or disposal facility: For those who dump illegally because it is easier than proper disposal, only a fundamental shift in disposal attitudes will adequately address this problem. Public education and increased enforcement may be two solutions applicable to this problem. In order to facilitate enforcement and ensure reasonable penalties that can actually be assessed and collected, implementing a system of penalties that vary based on the severity of the violation may be appropriate. When combined with public education efforts, such a measure can effectively reduce illegal dumping.

- Resistance to pay costs of disposal: Charges from private operators for white goods and metallic waste disposal in the past have discouraged the public from properly disposing these wastes.

77

# CHAPTER EIGHT: PUBLIC EDUCATION STRATEGY

The development of a comprehensive public awareness and involvement program is central to the success of integrated solid waste management (ISWM). While incorporating elements from successful programs elsewhere, considerable effort has been made in this Plan to examine Guam's unique population and environment in order to meet the needs of the entire community.

## 8.1    Purpose and Objectives of this Strategy

### 8.1.1 Purpose of this Strategy

Five target audiences on Guam have been identified, and each will benefit from specific public education and information programs tailored to its situation. They are:

- Schools,
- Commercial and tourist businesses,
- Government of Guam agencies and institutions,
- General public,
- Military installations.

The purpose of this public education and information strategy is to outline the needs of these groups with regard to their public awareness and understanding of SWM, to suggest ways in which their participation in an ISWM public information and education program can be encouraged and secured, and to recommend some general activities to be promoted for, by, and among these groups.

### 8.1.2 Objectives of the Public Information and Education Strategy

Public information and education programs are expensive but essential for public acceptance of and participation in Guam's ISWM. Because the various target audiences require different approaches, a professional, consistent, and well-funded effort should be established with the following objectives:

- The Guam Environmental Protection Agency (Guam EPA), through its Solid Waste Management Program and Information Services Branch (Guam EPA), will oversee the development and distribution of ISWM information to the general public, consistent with the Solid Waste Reduction Act, PL 24-304.

- Upon full staffing and operation of its public information program, the Solid Waste Management Division of DPW (Solid Waste Management Division) will take on a more active role in public education activities under this Plan, and Guam EPA will propose to transfer some of its public education responsibilities under current law.

78

- Guam EPA will coordinate with the Solid Waste Management Division to enlist the participation of solid waste collectors to assist in disseminating SWM information and education materials, noting the different needs of small and large businesses. Guam EPA will provide educational materials to solid waste collectors as necessary.

- The Solid Waste Management Division of DPW and Guam EPA will encourage and coordinate with the federal agencies on Guam to implement SWM information and education programs and will assist federal agencies, wherever possible, to carry out those programs.

## 8.2    Public Education Activities

Public education activities will focus on "the big picture" of the solid waste challenges facing Guam, an understanding of each facet of ISWM, and how the various facets work together. The Guam EPA and the Solid Waste Management Division will be the community's primary resources for information on solid waste reduction and recycling issues. While a large part of these responsibilities will be to develop and implement "Reduce, Reuse, Recycle" educational programs throughout the Guam community, public presentations, the development of print materials, and producing media articles will necessitate a broad knowledge of ISWM practices. To facilitate the development of a comprehensive and effective educational program, Guam EPA is developing a "Waste Reduction Education Strategy" to cover, in detail, the activities included in this chapter.

### 8.2.1 Coordination with Commercial Haulers, Educators, Federal Agencies, and Utilities

Guam EPA will work closely with the Government of Guam Recycling Compliance Officers (RCOs) as designated in Executive Order 2003-17, commercial haulers, and educators, as well as other civilian and military entities in collaboration and coordination to ensure that each target audience receives the information it needs. One avenue for disseminating such information is through monthly billings by the Government of Guam utilities. Bills for power and water are currently distributed to more than thirty thousand residences and businesses every month. Guam EPA can capitalize on this distribution by including "Reduce, Reuse, Recycle" messages and other relevant public information, as well as encouraging the use of recycled paper for these bills.

### 8.2.2 Source of Reference Materials

Guam EPA will also serve as a repository and resource library on solid waste references, with an emphasis on recycling and source reduction. Current SWM industry periodicals, ISWM plans from other jurisdictions, sample brochures and flyers, and educational curriculum will be compiled.

Case 1:02-cv-00022    Document 190-17    Filed 01/14/2008    Page 19 of 28

### 8.2.3 Recycling Web Site

Guam EPA will also oversee a community recycling section on the Guam EPA Web site. As ISWM programs become operational, many questions from the public are likely to arise. New SWM procedures are more difficult to understand for some individuals and entities than for others, and problems occur in any newly established public program. A comprehensive Web site will serve to enhance public knowledge and confidence in the educational programs run by Guam EPA and the operational programs of the Solid Waste Management Division by providing answers from an informed source. Information should also be available in hard copy format and by telephone from the Guam EPA front office staff.

### 8.2.4 Arrange Community Events

Guam already has been actively participating in Earth Week in April of each year with displays and other events. Further, several business groups, clubs, and organizations presently provide litter pick-up several times a year. Guam EPA can build on this awareness and enthusiasm to include similar activities throughout the year, such as recycling and composting fairs, as well as other events that will be instructional, educational, and fun.

### 8.3    School Community

The most effective strategy for achieving long-term change to Guam-wide apathy about recycling is through education of Guam's school children. Consequently, school curriculum development and implementation at the elementary, middle, and secondary levels is one of the most important objectives in ISWM public education. It is through these school children that families can become informed and encouraged to participate in "Reduce, Reuse, Recycle" programs. Additionally, through such school programs, the children are inculcated with an environmental ethic that will become a habit for the rest of their lives, and this represents a long-range benefit.

### 8.3.1 Curriculum Development, Pre-K through 12

Attitudinal and behavioral changes to recycling will only occur through early intervention in the educational process. To that end, the Guam Public School System (GPSS), which currently teaches approximately thirty-two thousand school children, becomes a major role player in achieving Guam's SWM objectives.

GPSS already addresses SWM and recycling issues collaterally through its science curriculum, which includes a component on ecology. The summary of Content and Performance Standards for Ecology now establishes the following standards for student learning:

- Know that changes in ecosystems can be caused by natural and human activities, which may affect all members of the system.

80

- Understand how organisms are linked to one another and their surroundings by the exchange of energy and matter.

- Describe the responsibilities human beings have as the stewards of the environment.

Guam EPA shall coordinate assistance to GPSS in expanding its curriculum content and performance standards so as to address Guam SWM and recycling issues. While the majority of subject content will be addressed within the department's "Content Standards for Science," recycling issues can also surface in other subject areas, such as mathematics (e.g., exercises for converting tons of solid waste collected into volumes of compacted solid waste being disposed) and language arts (e.g., writing letters to elected officials and articles about SWM issues). Model curricula are already available through the U.S. EPA as well as several states, including Hawaii. This expanded content about recycling within the GPSS curriculum content and performance standards should meet the department's current standard of compliance with the National Science Teachers Association. Additionally, inasmuch as thirty percent of GPSS students speak English as a second language, course work must be prepared in the five secondary languages being used by GPSS. The costs for curriculum development and teaching materials can be funded in part through the budgets for public information and education of the Solid Waste Management Division of DPW and Guam EPA.

Guam EPA shall also coordinate assistance to Guam's private, parochial, and Department of Defense school systems in a manner similar to that employed with GPSS in order to reach all non-government of Guam school children with the same educational information about Guam's SWM and recycling issues.

Until such time as SWM and recycling become a permanent part of the GPSS curriculum, it is recommended that Guam EPA and GPSS organize a peer mentoring initiative to introduce recycling concepts at each Government of Guam public school.

### 8.3.2 Teacher Training

In order to introduce SWM and recycling issues at all levels of the Guam educational system, teacher training must be conducted. This can be accomplished through a new series of methodology courses within both the Pre-Service and In-Service programs at the College of Education, University of Guam. Within the Pre-Service program at the College of Education, new courses that specifically address environmental and recycling issues on Guam can be added to the current series of teaching methodology courses. This material can range from such topics as the need for and benefits of recycling to programs and strategies for achieving Guam's MSW recycling objectives. The UOG Media Lab could assist in developing support materials for this course work. At the In-Service level, a fifteen-credit methodology course, similar in subject matter to that developed about recycling in the College's Pre-Service Program, can be

81

developed for GPSS's Continuing Education Program. This would bring teaching methodology about recycling to current GPSS teaching staff.

The estimated budget for undertaking a new recycling methodology course within the College of Education's Pre-Service program can likely be limited to only the cost of teaching materials. At the In-Service level, however, the budget would be approximately $100.00 per credit hour per teacher, or about $1,500.00 per teacher.

### 8.3.3 Assembly Presentations

Presentations by the Guam EPA and other government and solid waste management specialists, business leaders, and organizations at various schools is another important way to gain participation in source reduction and recycling and to influence public opinion. Most children take note when government and business representatives take time to meet them at their level. Promotional items (made from recycled materials) can be distributed at such presentations. Colorful displays and drama skits will also gain the attention of students. A reasonable objective is for every school on Guam to be visited within the calendar year. Planning, coordination, and collaboration are the keys to success for school assembly presentations.

### 8.3.4 School Recycling Centers

Each elementary school could function as a local collection point for certain recyclable materials. Newspaper, mixed paper, and aluminum cans are particularly suitable for campus collection programs. The students should be encouraged to be involved in the design and maintenance of their school recycling center. This involvement will teach the importance of recycling, source reduction, and litter control. It will give the students another reason to take pride in their school and their stewardship of the environment. Schools could also receive money for the materials collected for recycling, and such funds could be applied to field trips, school supplies, etc. Since 2005, Guam EPA has been spearheading a public/private partnership to establish aluminum can collection sites at all Guam public schools, and this effort could be expanded to private schools and to cover additional materials.

### 8.3.5 Environmental Clubs

Every school should be encouraged to form an environmental club. Such clubs will engender groups of informed student leaders who will be instrumental in making their school recycling center a success. The clubs will also serve to build pride and awareness in the respective schools, thereby helping to reduce litter and graffiti. These clubs could be modeled after the 'WAVE' clubs in public high schools. The Environmental Education Committee and the Island Pride Campaign are forming 'Island Pride' clubs in public middle schools.

82

## 8.4 The Commercial and Tourism Business Community

Guam's commercial, tourism, and business communities continue to grow, contributing significantly to Guam's SWM challenges. Because commercial haulers are currently responsible for the collection of Guam's commercial waste and their role is likely to expand with more privatization of the island's SWM operations, it is important that they take a major role in assisting with the public information and education responsibilities. This will contribute to their business advantage, as well as to the advantage of the overall ISWM program. The haulers' involvement in the education of their customers will, first of all, improve their image and good will. Secondly, it may make the haulers' job easier, since new SWM programs will introduce more modern and efficient collection methods. Thirdly, active involvement will help to empower commercial haulers to shape the success of their respective commercial accounts.

### 8.4.1 Educational Materials and Events for the Commercial Sector

Guam EPA will work closely with the Guam Solid Waste Authority and the private haulers to provide the most up-to-date, successful educational materials and ideas available to meet the needs of the business community. Collaboration and/or review of applicable informational materials will also be provided, and Guam EPA may offer presentations and workshops for commercial haulers.

Meeting the needs of the various language groups related to our tourist businesses should be viewed as a responsibility of the individual businesses, the Guam Hotel and Restaurant Association, and the Guam Visitors Bureau. Presently, hotels on Guam are communicating in different "tourist" languages about Guam's need for water conservation; recycling and source reduction can use the same approach. Information about recycling and source reduction can also be added to the language-specific packets distributed by the Guam Visitors Bureau. However, because many visitors to Guam are already familiar with and participate in recycling activities in their home countries, the need to educate this group will be limited. Instead, providing opportunities to recycle (recycling bins in hotel common areas and public places, for example) may be a more effective way of engaging the visitor community.

### 8.4.2 Awards Program

Acknowledgment of efforts to make a significant impact on the environment through wise solid waste practices is important to encourage greater participation and creativity. An expansion of Guam EPA's annual awards ceremony during Earth Week will help spur the commercial sector to greater participation.

### 8.4.3 Recycling Bins for Public Events and Places

For special events such as fiestas, conferences, and other large gatherings, specialized containers for recyclable materials should be provided with the recycling logo and business name of sponsors and designed to accommodate a

Case 1:02-cv-00022    Document 190-17    Filed 01/14/2008    Page 23 of 28

thirty-gallon (or larger) trash bag liner. Such containers are inexpensive and appropriate for use in areas that remain sheltered from rain. Recycling containers should also be permanently placed (and maintained by the Department of Parks, Recreation, and Historic Preservation) at public parks.

## 8.5    The Government of Guam Agency and Institutional Community

### 8.5.1 Setting the Example

Guam EPA and the Solid Waste Management Division can continue to assist all the agencies of the Government of Guam, Guam's largest employer, to meet the requirements of Executive Order (EO) 2003-17 on government-wide recycling by encouraging agencies to participate in environmentally-friendly purchasing procedures, source reduction, office paper recycling, and solid waste collection. Guam EPA will be the primary entity responsible for the dissemination of information to various Government of Guam agencies and the implementation of responsible practices government-wide. These duties and responsibilities are generally described in the "The Solid Waste Reduction Act" (PL 24-304). The general public will be encouraged to participate in new activities and develop an improved environmental ethic when it sees the example set by the Government of Guam agencies and institutions. Guam EPA has been leading the government recycling initiative under EO 2003-17, having established a 'pilot' group of ten agencies in 2005 and expanding to a government-wide program in early 2006.

### 8.5.2 In-house Communication

Flyers, newsletters, in-house presentations, and incentives for participation are some of the ways to communicate the problem and the solutions to Government of Guam employees. Guam EPA will be responsible for the development and production of these items.

Guam EPA can assist in designing, developing, and/or utilizing present communication methods to assure that every employee, student, and client is informed about government recycling initiatives. Guam EPA can also make presentations and hold workshops for the various agencies as needed and/or requested.

### 8.5.3 Training Government of Guam RCOs in the "Reduce, Reuse, Recycle" Philosophy

Guam EPA will have to rely on assistance from other agency RCOs in assuring that the Government is successful in setting the example for the private sector on Guam for reducing, reusing, and recycling wastes. Those RCOs (and other select agency staff) must be both trained and then periodically retrained in undertaking MSW public information and education programs within their respective agencies. Guam EPA should organize such training at regular intervals.

## 8.6 The General Public

Guam EPA and the Solid Waste Management Division will serve as the primary source of "Reduce, Reuse, Recycle" and related programs for the residents and visitors on Guam. As such, it will be responsible for designing, developing, and implementing, among other activities, an advertising campaign to enhance existing knowledge and influence prevailing attitudes regarding solid waste management for the general public. A successful campaign will necessitate the help of an advertising agency, billboards, public service announcements, paid advertising in print and electronic media, printed materials, and promotional items. Guam EPA, working with the Chamorro Language Commission, will also identify and communicate the values of the Chamorro culture and show how source reduction, recycling, and new SWM projects are consistent with the traditional values and practices. Guam EPA should also seek to address the specific cultural needs of other ethnic groups on Guam, including the Filipino community and former residents of Palau and the Federated States of Micronesia.

Each and every hands-on activity in which the public can participate in aspects of a "Reduce, Reuse, Recycle" program becomes an educational opportunity. Variety in the activities, especially those that touch every part of the residents' lives (school, business and home), will instill in the public mind the importance and far-reaching impact of their behavior in dealing with waste. Recycling, source reduction, composting, new collection methods, and material recovery facilities all have the potential for influencing public opinion and behavior.

### 8.6.1 Logo and Theme

A logo and theme or slogans must be developed in the earliest stages of implementing a public information and education program. By employing a local professional advertising agency, these promotional items will be of high artistic quality, easily reproducible, and attentive to Guam's unique culture. Slogans expressing the "Reduce, Reuse, Recycle" ethic must be communicated over a prolonged period of time, to be diminished only after significant reduction in solid waste is realized. Guam EPA will be responsible for directing the development and implementation of this Guam-wide campaign, which can build upon the "Don't waste Guam's future" campaign launched in 2005.

### 8.6.2 Coordination and Collaboration

A task force made up of representatives from various sectors of the community who have a sincere interest in the environment and public education can prove to be very helpful to Guam EPA and the Solid Waste Management Division in moving a program along. The existing "Friends United through the Understanding of Recycling Efforts" (FUTURE) committee should develop a public outreach and education subcommittee to advise Guam EPA on ISWM education issues. Representatives on the committee come from Government, the tourist industry, commercial haulers, the environmental community, the school community, and residents-at-large. Bringing these diverse groups together

serves to build understanding of their respective SWM problems and provides an idea pool for greater program success.

The Environmental Education Committee, an inter-agency group made up of representatives from several local and federal agencies, NGOs, and the community, must also continue to be actively involved in planning public education campaigns and events. The Government's coordinated environmental education activities, through events such as Earth Week and the Island Pride Campaign events, attest to the value of an integrated, coordinated approach, and Guam EPA should continue to actively involve the Committee in recycling and waste reduction education activities and plans.

### 8.6.3 Community Events

The general public can also be accessed through community events, such as the Earth Week Island Pride Festival, village fiestas, the annual Liberation Day Carnival, GVB summer and winter festivals, and similar public gatherings.

### 8.6.4 Media

The media on Guam represents a major player in achieving public awareness about Guam's SWM issues. Specifically, the media can provide opportunities for feature articles, advertisements and public service announcements, as well as encourage general access by the public to discuss ISWM concerns. Guam EPA and the Solid Waste Management Division should aggressively engage the media through their Public Information Officers by regularly preparing press releases and fact sheets on ISWM-related topics, communicating with and educating journalists and media personalities on ISWM issues, appearing on radio and television talk shows, and actively responding to current ISWM issues in the media.

### 8.7 Federal Agencies on Guam

Although the Air Force and Navy installations and other federal agencies on Guam are undertaking their own public information and education programs with regard to reducing, reusing, and recycling military-generated solid waste, it is important that Guam EPA and the Solid Waste Management Division stay abreast of such work and participate wherever possible. The opportunities for jointly-sponsored events and sharing public information and education resources are beneficial to achieving objectives for both the military and the civilian side of Guam's SWM programs.

### 8.8 Funding

Currently there is no dedicated funding source to support the Solid Waste Management Program, including public education responsibilities within Guam EPA. In addition, Government of Guam agencies must rely on General Fund monies to support their solid waste management and their recycling

Case 1:02-cv-00022    Document 190-17    Filed 01/14/2008    Page 26 of 28

responsibilities under Executive Order 2003-17. The funding strategy is outlined below.

### 8.8.1 Fees

A portion of the tipping fee shall be deposited in the Solid Waste Management Fund for use by Guam EPA for public information and education programs. In order to accomplish this, legislation must be introduced to restructure the fee. Any recycling fees created by legislation or otherwise should also include a percentage earmarked for public information and education programs.

### 8.8.2 Grants

Grants, especially for start-up programs, are offered by federal agencies and certain foundations.

### 8.8.3 Initial Government Subsidy

The Government of Guam should commit to bearing the expense of the start-up program's information and education efforts. A minimum of two dollars ($2.00) per resident has been the standard budget in stateside communities. Guam needs additional money for an effective start-up program. The start-up funding should be $3.00 per resident, or $480,000, for 160,000 people for fiscal year 2007. This initial subsidy start-up money shall be deposited into the Solid Waste Management Fund.

### 8.9 Future Planning and Development

The overall public information and education program will benefit from an annual critique by various stakeholders, including the FUTURE Committee, the Environmental Education Committee, and the management of Guam EPA and the Solid Waste Management Division. Such an assessment may suggest that a phased approach to educating the public about SWM issues may be more cost effective and compatible with Guam's transition into a society which fully accepts a "Reduce, Reuse, Recycle" philosophy.

### 8.10 Recommended Actions

This Section will set out essential public information and education activities, already mentioned in the above text, which need to be implemented if Guam is to meet its MSW reduction goals. The effort demands participation by every resident, visitor, and business. It is not enough that only a few individuals, agencies, or businesses participate; everyone must also do whatever possible to educate and inform others, through both word and example.

1. Develop activities, curricula, and incentives to reach the audiences in the educational community.

87

2. Develop activities, incentives, and print and electronic materials to reach the commercial and tourist industry.

3. Implement government-wide source reduction, procurement, and recycling policies throughout Government of Guam agencies and institutions in accordance with Executive Order 2003-17.

4. Develop a long-range publicity and awareness campaign to meet the needs of the general public, including logo and slogans.

5. Develop, implement, and encourage source reduction activities in all sectors.

6. Commit to the need for funding of the program through earmarking a portion of the Solid Waste Management Division revenues.

7. Establish an education and outreach subcommittee of the FUTURE Committee to assist Guam EPA and the Solid Waste Management Division with ideas and meeting the community's information and education needs.

8. Commit to enforcement of all laws and regulations regarding Integrated Solid Waste Management.

# LIST OF REFERENCES

Dames & Moore. 1978 (July). Solid Waste Management and Resources Recovery Feasibility Study for the Territory of Guam. Prepared for the Guam Environmental Protection Agency. 154 pp.

D.E. Consulting. 2005. Preliminary Draft, Guam Population and Land Use Projections for the Guam Waterworks Authority Water Resources Master Plan.

Geo-Engineering & Testing, Inc. 1995 (September). Preliminary Subsurface Soil Investigation, New Municipal Solid Waste Landfill, Proposed Landfill Sites, Ordot, Malaa and Guatali Areas, Guam, Mariana Islands. In Juan C. Tenorio & Associates, Inc., 1995, Draft Environmental Impact Statement, Municipal Solid Waste Landfill for the Island of Guam. Volume II, Appendix D, 16 pp. + Appendices A-C.

Guam Department of Public Works. 2005(a). Guam Landfill Final Site Selection Report. Prepared by Dueñas and Associates for DPW.

Guam Department of Public Works. 2005(b). Guam Landfill Final Environmental Impact Statement. Prepared by Dueñas and Associates for DPW.

Guam Department of Public Works. 2004. Financial Plan for Ordot Dump Closure. Prepared by Dueñas and Associates and Ernst & Young for DPW.

Guam Environmental Protection Agency. 1999. Guam Integrated Solid Waste Management Plan. Phase I and Phase II Documents. Prepared by Dueñas and Associates.

Guam Environmental Protection Agency. 1997. Rules and Regulations for the Guam Environmental Protection Agency Solid Waste Disposal. 106 pp.

Guam Environmental Protection Agency. 1995 (May). Guam Solid Waste Weight Composition and Recycling Feasibility Study. Report prepared by W.B. Flores & Associates, Inc. for Guam EPA. Section I and II, with Appendices A-C.

Guam Environmental Protection Agency. 1993. Solid Waste Disposal Rules and Regulations. 126 pp.

Guam Environmental Protection Agency. 1986 (June). Solid Waste Collection Regulations. 9 pp.

Guam Environmental Protection Agency. 1983(?). Guam Solid Waste Management Plan. 529 pp.

Case 1:02-cv-00022    Document 190-18    Filed 01/14/2008    Page 1 of 40

Guam Legislature. 2000. Integrated Solid Waste Management Plan for the Island of Guam. Revised version of Guam Environmental Protection Agency's Guam Integrated Solid Waste Management Plan of 1999, approved under PL 25-175.

Juan C. Tenorio & Associates, Inc. 1995 (November). Draft Environmental Impact Statement, Municipal Solid Waste Landfill for the Island of Guam. Volume I: EIS Report and Volume II: Appendices. Submitted to Department of Public Works. 131 pp. + Appendices A-H.

Mink, J.F. 1995 (May). A Hydrogeological Evaluation of Proposed Landfill Sites, Island of Guam. In Juan C. Tenorio & Associates, Inc., 1995, Draft Environmental Impact Statement, Municipal Solid Waste Landfill for the Island of Guam, Volume II, Appendix C, 11 pp. + Appendix A.

TG Engineers. 2005. 40% Plans, Specifications & Estimates, Layon Municipal Sanitary Landfill, Layon, Inarajan, Guam.

U.S. District Court of Guam. 2004 (February). Ordot Dump Consent Decree.

U.S. Environmental Protection Agency. 2005. Municipal Solid Waste Generation, Recycling, and Disposal in the United States: Facts and Figures for 2003. http://www.epa.gov/epaoswer/non-hw/muncpl/pubs/msw05rpt.pdf

Winzler & Kelly Consulting Engineers. 1994 (December). Preliminary Plan and Feasibility Study for Materials Recovery Facility on Guam. Submitted to Department of Public Works. iii + 71 pp.

# APPENDIX A

# GUAM SOLID WASTE LAWS
# (SUBJECT TO REVISION)

## September 2006

Case 1:02-cv-00022     Document 190-18     Filed 01/14/2008     Page 3 of 40

# APPENDIX A

## SOLID WASTE LAWS   September 13, 2006

| Public Law No. | Date | Short title | Brief Description | Status |
|---|---|---|---|---|
| 28-92 | 12/12/05 | Recycling Enterprise Zone | Directs Port Commission to establish size and location at JD Leon Guerrero for recycling enterprise zone and only lease to companies which satisfy Qualifying Certificates under PL 25-127. | Port Decision due 2/10/06 |
| 28-70 | 10/14/05 | No ADF regulations | Disapproves Advance Disposal Fee regulations and the renumbering of SW regulations. | Bill 232 would replace ADF with recycling fee. |
| 28-58 | 6/30/05 | ADF rule making authority | Amended §51505 to make GEPA promulgate rules. GEPA to request economic impact assessment from Bureau of Statistics and Plans. Authorized again DPW to enter into contracts with recycling companies. | Rule authority Article I of Ch. 51. Bill 232 would delete economic impact and specific rule authority |
| 28-56 | 6/30/05 | PUC Tipping /User Fee Law | Amended Tipping and User fee §51118(e) and (f) to allow for PUC rate making charges to part of fees and paid from the Solid Waste Operations Fund., and repealing any DPW power to establish fees outside of PUC procedures. | PUC made rate in October, 2005, effective Nov 1, 2005. |
| 28-11 | 3/9/05 | No Combustibles in Hardfills | Defined Combustible materials per federal hazardous transportation regulation at 49 CFR and deleted "undecayed wooden materials attached to construction debris" from SW regulations as permissible in hardfills. | GEPA to incorporate in hardfill permits. |
| 28-07 | 3/3/05 | Advanced disposal fees amendments | Postpone the effective date of Advanced Disposal Fees (ADF) until the regulations become effective. | PL 28-70 disapproved regulations. Bill 232 would replace ADF with recycling fee. |
| 27-148 | 12/30/04 | Guam's Recycling Act Amendments | Revises the ADF for vehicles imported for resale to be collected at the point of sale. | PL 28-07 |

| | | | | |
|---|---|---|---|---|
| 27-74 | 2/10/04 | Regulations for Recycler Qualifying Certificate | Approves GEDCA rules for qualified companies engaging in recycling and transshipment | 1 company has certificate |
| 27-38 | 11/13/03 | Guam's recycling law (Advanced Disposal Fees) | Assess fees on items imported for resale, collected by Customs, established Revolving funds for GEPA to administer for recycling projects. Repealed abandon vehicle fee portion of 16 GCA § 7161 Abandoned Vehicle and Street Light Fund. | Revision made with PL 27-148. |
| 27-37 | 11/14/03 | Municipal Recycling Law | Municipal Recycling program; DPW to set up recycling programs at the village level. | Mayor's Council of Guam to implement |
| 27-07 | 2/28/03 | Feb 2003 Appropriation Act | Sections V.3 and V.4 made the Abandoned Vehicle and Street Light fee $25; and after April 1, 2004, $45. | Abandoned vehicle fee provision repealed by PL 27-38 |
| 26-153 | 10/31/02 | Ordot Fire appropriation | $250,000 for Dept. of Civil Defense to respond to fire of October 25, 2002. | Done |
| 26-132 | 9/17/02 | DPW SW Hazardous Pay | Hazardous pay for DPW Dump workers if emergency (e.g. fire, typhoon) | Ongoing |
| 26-99 | 6/3/02 | DPW Privatize Collections | DPW to Contract out collections for 2/3 island within 90 days. | PUC Audit Report recommends by January 2007 |
| 26-76 | 3/12/02 | CCU Act | Created the CCU to oversee GWA and GPA disbanded the boards of each. | DPW's solid waste duties should be moved to Solid Waste Authority |
| 26-35 | 9/30/01 | Mayor tipping fee exemption and Ordot Fire appropriation | Add subsection (m) to § 51118, Exempts Mayors from paying tipping fee for solid waste from village streets, public buildings, parks or facilities. $214,681 to Civil Defense for its response to Ordot fire on May 14, 2001. | Some Mayors are inappropriately providing trucks as dumpsters and residential customers are avoiding the fees. |

| | | | | |
|---|---|---|---|---|
| 26-17 | 5/20/01 | Prorate residential tipping fee backbilling | Required DPW to give credit for payments made but not billed, to prorate balances due for February 2000 to March 2001. Limits backbilling to seven months before July 2001, and four months thereafter. | Prorating done, rest is ongoing |
| 25-175 | 12/12/00 | ISWMP Amendment | Approves the ISWMP submitted by GEPA, eliminated the Solid Waste Management Authority, and eliminated waste reduction by incineration. | Updated September 2006 by GEPA |
| 25-173 | 10/20/00 | Administrative Adjudication law Amendments | Any rule or regulation for fees that has a cost to public of over $500,000 requires an economic impact statement. | Ongoing |
| 25-170 | 10/19/00 | Litter Fines on Guam | Litter fine reduced from $500 to $100 to encourage officers to encourage officers to issue more fines by Mayor's council, GPD, GEPA and certain peace officials in Superior Court. | Lt Gov. Litter Task Force to encourage litter citation issuance by Mayors, GPD, etc. |
| 25-127 | 5/22/00 | Tax Benefits For Recycling and Shipping Companies | Tax benefits for recycling companies; 100% Corp. income tax rebate for 40,000 lbs. The earned interest from rebate goes to GEPA. Gives 10 yr Waiver of docking and stevedoring fees if shipping company has permit from GEPA and CPA certifies type and volume of recyclable materials. | PL 27-74, ongoing |
| 25-119 | 3/24/00 | Litter fines for village beautification | Creates litter fine under Mayors power to issue. Deputizing powers to GEPA and other agencies if people are trained at GCC. Creates Municipal Litter and Defacement Fund. | Most Mayors do not get trained or levy fines |
| 25-93 | 12/29/99 | SW Tipping Fee Amendments | Mandates DPW to develop lifeline rates. Creates exemptions for Mayors (1 yr), force majeure, good citizen if permitted, and terminate service if 60 days in arrears. | DPW did not develop rates, so PUC will do so under PL 28-56. |
| 24-313 | 12/24/98 | DPW Solid Waste Collection Rules and Regulations | Approved DPW regulations. Residents shall segregate waste and recyclables, but no provision for "disposal" of recyclables. Standards for cans and placement. Commercial and govt. construction must design space for collecting and loading recyclable materials and solid waste. Collection contracts 5 yrs or less. | No enforcement by DPW. No collection contracts. |

| | | | | |
|---|---|---|---|---|
| 24-309 | 12/18/98 | Solid and Hazardous Waste Federal Approval Law | Added financial assurance, performance bonds, inspection authority and warrant authority to 10 GCA Chapter 51 | SW Program published on 10/5/99 approved 6/6/00 |
| 24-304 | 12/18/98 | An Act mandating the Government of Guam to Reduce waste | Requires Guam EPA SW program to: monitor and enforce PL 21-22, implement recycling efforts and coordinate with DPW Recycling office. Mandates GovGuam and schools to make every effort to decrease waste purchase recycled and biodegradable goods, and compost. Also created GEPA SW Management and Hazardous Waste Programs and positions. | Similar EO 2003-17 signed by Gov. Camacho. Ongoing |
| 24-272 | 10/8/98 | The Revised Ordot dump closure and SW management alternative act | Same law as 24-139 except it deleted: privatization of SW collection and transportation, DPW employee transfer, GEDCA bonding, mandated Ordot closure and open MSWLF for April 1999, and added to definition of hazardous waste, and that DPW, in cooperation with Parks and Recreation to convert Ordot to Park, and that Guam EPA shall monitor Ordot for compliance with Act and "take proper measures to mitigate environmental damage to protect health and welfare of resident and people of Guam." | DPW did not privatize and did not create recycling office. Law invalidated by Supreme court in Pangelinan and Wesley v. Gutierrez (2004 Guam 16). |
| 24-246 | 8/18/98 | Recycled Paper Collection Contract Law | DPW, after advertising for proposals, to enter into 2-year contract with company to collect recyclable paper from the public and implement a plan to prevent paper form entering into the waste stream. Award to highest bidder pre pound to pay public for recyclable paper. The contract to be granted $150,000 per year from the SW Operations Fund. Article 4 of Chapter 51. | DPW has not implemented. |
| 24-181 | 4/17/98 | SW Health Monitoring and Compensation Act | Requires 1% of a all tipping fees deposited into the solid waste management facility medical monitoring fund. The Director of DPHSS shall distribute the funds quarterly - 25% to village(s) with landfill for community health care needs and programs; 25% to village(s) with other solid waste management facilities; and 50% for DPHSS for health monitoring of people and animal around landfills and other designated solid waste facilities as specified by Guam EPA Administrator or DPHSS Director. | Unknown |

| Law No. | Date | Title | Description | Status |
|---|---|---|---|---|
| 24-166 | 4/11/98 | Priorities for Private Activity Bonds | Places restriction on private bonding section of PL 24-139 and requires legislative approval of any contracts related to bonding. Prevents Governor transfer of the $4 million dollars for Ordot. | Partially repealed with PL 24-272. |
| 24-139 | 3/11/98 | The Ordot Dump Closure and Solid Waste Management Alternatives Act | Changed DPW role from doing SW operations to contracting SW operations and promoting recycling; established tipping fees; requires dump to close by July 1998 and open new landfill in 6 months, $ 4million for Ordot, authority to GEDCA private bonds, 180 days to execute privatization of operations, ISWMP and sets details, Governor transfers DPW SW employees, Land Management Report on Ordot on private land, and notify DOI of law so to release funds for Ordot. | Repealed by 24-242:1 |
| 24-57 | 6/30/97 | Prohibited government funds for GRRP Agreement | Section 6 prohibited the commitment of any funds resources, assets or debt by any government entity for payment of the GRRP Agreement including the waste to energy facility and the landfill design and construction. | Invalidated by court decision. |
| 24-06 | 3/20/97 | Privatization of the MSWMF | Requires funding, design, construction and operation of the new landfill. Required Qualifications and insurance from bidders. | Not implemented, and then partially eclipsed by Consent Decree |
| 23-95 | 5/8/96 | Landfill Site Law | Stated Guatali as the preferred site and Malaa as the secondary site. Required budget within 90 days and annual reports for 3 years. | Nullified in San Miguel et al. v. DPW, et al. Sup. Ct No.CV0892- 04, ( April 22, 2005) |
| 23-64 | 12/5/95 | Solid Waste Management and Litter Control Act | Repealed and reenacted 10 GCA Chapter 51. Requires the ISWMP, required financial assurance for SW facilities and public notices for recycling, disposal and incineration, specified permit fees, inspection rights, prohibit activities, citizen suits, yearly scrap metal removals, littering fines between $500-$1000. | The Comprehensive solid waste law with the voidance of PL 24-272. By Supreme Ct. |

Case 1:02-cv-00022   Document 190-18   Filed 01/14/2008   Page 8 of 40

| | | | | Major components not implemented. Subsequent Public Laws |
|---|---|---|---|---|
| 22-115 | 4/25/94 | Close Ordot Act | Mandated closure of Ordot by April 25, 1997. Directed Governor to identify new site and submit budget for moving disposal to new site. Required DPW and Guam EPA to assess environmental impacts of Ordot and estimate clean up costs. Directed Guam EPA to develop an integrated solid waste management program including recycling of glass, metals, composting, and submit in 90 days. Directed DPW to within 180 days to develop commercial fees by regulation and created solid waste processing fund. | |
| 21-73 | 1/24/92 | Aluminum Can recycling Act | Mandated Agency directors to have monthly collection of Aluminum beverage cans, to sell the cans and to maintain records. | Repealed/replaced by 24-304 12/18/98 |
| 21-22 | 5/17/91 | Buy recyclable and biodegradable | An Act mandating GSA to purchase biodegradable products. | Partially implemented, ongoing |
| 17-87 | 1/18/85 | Solid Waste Management and Litter Control Act | Specifies Guam EPA and DPW powers and duties. Includes DPW authority to contract out collection and disposal, provided employees adversely affected are given first preference for other GovGuam jobs for which they qualify. | Repealed and reenacted by PL 23-64 |
| 17-26:46 | 10/11/83 | Supplemental Appropriations Act for FY84 | Section 46 repealed and reenacted the street light fund law to make the fund the Abandoned Vehicle and Street Light Fund. It mandated that 90% of funds to GPA to be used for street lights and 10% for removal of abandoned vehicles. | Abandoned Vehicle provision repealed by PL 27-38. |

# APPENDIX B

## BEFORE THE GUAM PUBLIC UTILTIES COMMISSION
# FOCUSED AUDIT REPORT AND RECOMMENDATIONS

## (WITHOUT ATTACHMENTS[1])

## August 18, 2006

---

[1] Attachments available for viewing and copy request at the Guam EPA Administrative Building.

Case 1:02-cv-00022    Document 190-18    Filed 01/14/2008    Page 10 of 40

**EXECUTIVE SUMMARY.**

Under the Federal Consent Decree[1], defendant Government of Guam (GovGuam) is required to: a) close the existing landfill; b) open and operate a new landfill; and c) undertake other solid waste remedial actions. GovGuam is currently in material violation of Consent Decree deadlines.

GovGuam intends to finance the initial sum of approximately $100 million dollars as part of the cost of Consent Decree compliance with revenue bonds. These bonds would be repaid, in substantial part, by rate revenue from Department of Public Works (DPW) Solid Waste Management (SWM) customers.

GovGuam financial advisors forecast that existing SWM rates will need to be increased by upto 400% in the next 36 months to produce the revenues necessary to support the revenue bonds. These substantial increases assume that SWM operations in the future attain a level of efficiency that is the norm in the industry and which currently does not exist. In the absence of making these efficiency and operational improvements the rates required to support the anticipated bonds would be even higher than those currently projected and service levels would continue to be unacceptable.

This audit report has been prepared at the Guam Public Utilities Commission's [PUC] direction[2] to examine whether DPW is capable of efficiently billing and collecting the increased rate revenue, which will be required to fund GovGuam's obligations under the proposed revenue bonds.

This audit report finds that:

      a.      DPW's current billing and collection system is unable to competently handle even current rate revenue levels much less the increased burden necessary to support the revenue bonds.

      b.      Substantial remedial action, including operational changes, legislation, regulatory action and rulemaking must immediately occur to enable DPW to bill and collect the revenue necessary to fund revenue bond requirements.

      c.      If this remedial action does not occur, DPW will not be able to bill and collect the rate revenues necessary to fund revenue bond obligations and this burden would fall, in part, on the General Fund. Regulatory principles could obstruct the PUC: i] from awarding rate increases to compensate for DPW billing and collection mismanagement; and ii] from increasing SWM residential customer rates unless the quality of residential service is dramatically improved.

This audit report will now examine each of the above findings and will propose a broad outline of immediate remedial action, which will be necessary to empower DPW to bill and collect the rate revenues necessary to meet the requirements of the proposed revenue bonds. A summary of the recommendations contained in our report together with the recommended implementation time lines are as follows:

---

[1] USA v. Government of Guam, Guam District Court Civil Case 02-22, Consent Decree dated February 11, 2004.
[2] PUC Resolution dated April 20, 2006.

## Summary – Audit Recommendations

| Recommendation | Action Date |
|---|---|
| **Legislation:** | |
| Establish SWM as public corporation under CCU governance. | ASAP |
| Consolidate administration of SWM finances. | ASAP |
| Privatize third residential collection district. | ASAP |
| Convert commercial tipping fee to hauler business expense or bring haulers under PUC regulation and Public Auditor audit authority. | ASAP |
| **Procurements:** [Action date is for PUC approval of procurement documents.] | |
| Outsource SWM billing and collection system with conversion to prepaid decal system | 1/07 |
| Privatize two of three residential collection districts. [Privatize 3 rd district if authorized.] | 1/07 |
| Retain accounting consultant to address accounts receivable, establish accounting system and issuance of reliable financial reports | 11/06 |
| **Regulatory Action:** [Preparation of documents for regulatory consideration would be collaborative effort between GCG and Compliance Team]. | |
| Approve recommended procurement documentation. | 1/07 |
| FY07 rate proceeding, including establishment of residential rate and variable residential rate | 1/07 |
| Review and approve revised residential service rules. | 1/07 |
| Establish customer hauler service rules [in event haulers are placed under PUC regulatory authority]. | 1/07 |
| Public Auditor financial audit of commercial haulers. | 4/07 |
| Phase II GCG audit of SWM $10 million accounts receivable | 1/07 |
| **Operational Action:** | |
| Repair landfill scales. | 11/06 |
| Institute rules for transfer site revenues. | 11/06 |
| Establish three residential collection districts. | 11/06 |
| Enforcement of revised residential service rules. | 2/07 |
| GEPA enforcement of illegal dumping laws. | ASAP |

# TABLE OF CONTENTS

I.  SUMMARY OF CONCLUSIONS AND RECOMMENDATIONS ................................... 1

II. FINDINGS AND RECOMMENDATIONS ................................................................ 10
    1.  Residential Collection and Revenue Problems ................................................ 10
    2.  Operational and Administrative Function Problems ........................................ 14
    3.  Commercial Collection and Revenue Problems ............................................... 16
    4.  Billing and Collection Problems ..................................................................... 17

III.  Attachment A: ALJ Memo and PUC Order Docket 05-09

Attachment B: Press Reports Regarding Service

Attachment C: Executive Order 2006-12

Attachment D: Legal Memorandum on Just and Reasonable Rates

Attachment E: Current SWM Service Rules

Attachment F: Inventory and Discussion of Proposed Legislative Changes

1  I.   **SUMMARY OF CONCLUSIONS AND RECOMMENDATIONS**

2          1.   It is essential that whatever entity is created or designated to handle SWM's

3      responsibilities discharge SWM operations in a prudent and efficient manner

4      including billing and collecting for its services in a businesslike manner.   The

5      financial hurdles facing SWM are daunting.   Recent projections for future residential

6      fees and tipping fees show increases of up to 400% in a period of 3 years as follows:[3]

7                                                FY 2006              FY2009

8          Residential Fee (Month)      $8.00                $22.22

9          Tipping Fee (Ton)               $20.00               $95.00

10     These projections assume that there will exist accurate billing and a collection rate of

11     95% for the residential fee.   As will be detailed in this report, current practices for

12     billing and collection are in disarray and must be corrected.   Time is of the essence

13     and the solutions must be put in place immediately.   Failure to do so could threaten

14     the proposed bond financing that is required to fund critical compliance projects.

15     Concurrent with the improvement of billing and collection practices, there also needs

16     to be significant improvements in operational practices and the poor current level of

17     services in order to collect in the face of the rate increases. Current collection rates

18     for residential service are extremely low. GCG believes a significant cause of the low

19     collection rate[4]  for residential SWM customers is resistance to paying amounts owed

20     due to poor and sporadic service.

21     To solve these important issues it is our primary recommendation that SWM be

22     transferred to a public corporation under the oversight of the Consolidated

23     Commission on Utilities ("CCU"). With this recommendation all functions will be

24     consolidated in one corporation, there will be an experienced Chief Financial Officer,

_____

[3] From the most recent draft estimate contained in the draft Engineer's Report, which is being prepared by
HDR Inc. to support the proposed revenue bonds.
[4] See paragraphs 5 and 6 below

1    experience with billing and collection systems and potential assistance available from

2    the sister utilities – GPA and GWA plus experience in dealing with the Guam

3    Environmental Protection Agency.

4

5    *2.*   The PUC has indicated that it has a dual role in regulating DPW's rates: a) the

6    obligation to provide adequate revenues to enable DPW to meet its financial

7    obligations; and b) the obligation to assure that DPW's customers pay *just and*

8    *reasonable* rates for reliable service.  P.L. 28-56 directs the PUC to audit SWM's

9    existing operations and by implication to issue such orders as may be necessary to

10   require SWM to provide competent service at a reasonable cost.

11

12   3.   GCG's audit review and recent press reports[5] establish that the current quality of

13   residential service is unacceptable.  Given the principle of just and reasonable rates

14   for reliable service, an unacceptable level of service invites the possibility of

15   disallowed or deferred rate increases by the PUC. Given that significantly higher

16   rates will be required[6] to support the anticipated bond offering, such a potential

17   disallowance or deferral would be a major problem to providing the required

18   financial resources to provide for adequate debt service.  The resolution of the

19   unacceptable level of service problem must be given the highest priority.

20

21   4.   DPW has failed to comply with the mandate of P.L. 26-99 that DPW establish

22   and privatize 2 of 3 residential collection districts by October 2002.   As of the date

23   of this audit report, DPW has not even defined the three collection districts. DPW has

24   recently reported that privatization would occur by the end of 2007. This timeframe

---

[5] See Attachment B
[6] Conclusion reached in the rate proceeding concluded on October 27, 2005, Docket 05-09.

2

| | |
|---|---|
| 1 | is, in GCG's judgment, unacceptable. DPW's chronic failure to regularly collect |
| 2 | residential waste raises public health concerns and will frustrate efforts to increase |
| 3 | revenues from residential service. Every effort must be made to have this effort fast |
| 4 | tracked. This is best approached by a combined collaborative effort between the |
| 5 | PUC, DPW and the Consent Decree Compliance Team ("Compliance Team").[7] All |
| 6 | options, including accelerating the procurement process by requesting an emergency |
| 7 | declaration from the Governor, should be considered. It is essential in GCG's |
| 8 | opinion that this privatization be concluded as early in 2007 as is reasonably possible. |
| 9 | We further recommend that all 3 residential districts be subject to privatization. |
| 10 | Privatization of residential collection would have the potential to quickly resolve the |
| 11 | unacceptable level of service issue. The failure to resolve this problem could |
| 12 | potentially lead to: |
| 13 |     a.  Continued poor collection rates from residential customers as a result of |
| 14 |         poor service and a backlash to substantial higher rates; |
| 15 |     b.  The PUC disallowing or deferring rate increases as a result of the PUC |
| 16 |         action based on the principle of *just and reasonable* rates. Simply stated, |
| 17 |         this is the *quid pro quo* of decent service for a fair rate.[8] |
| 18 | |
| 19 | 5. DPW collection rates from its residential customers are abysmal. Data collected |
| 20 | since the last rate proceeding showed that recent collection rates for residential |
| 21 | customers had averaged approximately 37%. DPW management stated during |
| 22 | GCG's audit that the collection rate has been improved from the data available in the |
| 23 | rate proceeding. The data we received does not support this contention. To fix this |
| 24 | problem the billing and collection systems together with the customer service |

[7] Under Executive Order 2006-12 [1] the Consent Decree Compliance Team has the responsibility to propose solutions and proposed legislation. See Attachment C.
[8] See Attachment D legal memorandum.

3

1 systems need to be completely overhauled. GCG recommends that CCU be
2 authorized and directed to oversee SMW billing and collection functions if SWM is
3 transferred into a public corporation and that the billing and collection function be
4 outsourced regardless of whether SWM is transferred into a public corporation or
5 becomes another entity.

6

7 6. During our audit SWM was in the process of evaluating a prepaid "sticker"
8 system for residential pickup. The implementation of this system was deferred or
9 abandoned. We recommend that such a system be developed and implemented after
10 appropriate input from stakeholders and approval from the PUC. The benefits of
11 such a system are significant in the current environment. It eliminates, on a
12 prospective basis, concerns about accounts receivable and about back billing
13 problems. It accomplishes our recommendation of prepayment for services to assist
14 with a severe cash flow problem. It eliminates concerns about establishing a reliable
15 customer list and assures that the drivers collect only customer trash. We
16 recommend that this system be implemented by the end of 2006, by which time we
17 have recommended that privatization of residential collection be implemented or in
18 the context of the next rate proceeding anticipated to be heard in January 2007.

19

20 7. Data from DOA regarding SWM collections from the largest commercial
21 customers[9] shows that *none or very little* of the October 25, 2005 interim rate
22 increase (effective November 1, 2005) was received by DPW through March 31,
23 2006. The explanation offered for this situation is that the commercial haulers have
24 not received payment from their commercial customers and only make payment after
25 they receive payment. This situation cannot be permitted to continue if there is to be

---

[9] See Table 1 in the report.

4

| 1 | any confidence in the financial integrity of SWM's billing and collection system. To |
| 2 | solve these SWM billing and collection problems: |

3     a.     GCG endorses the PUC's April 20, 2006 finding that the best solution is to transform DPW into a public corporation under the CCU's governance under whose guidance normal business practices would be implemented. The reasons for this recommendation are clear. Such a transformation would unify all financial matters under a single CFO at the CCU, establish a strong governing body and make support, experience and resources available from GPA and GWA. In GCG's opinion, it is unlikely that any other viable alternative could be implemented in a timely fashion in these critical circumstances. Implementation of this recommendation would *require immediate interaction* with the Legislature and the Governor. If this solution is not adopted by policy makers, then the less desirable second solution would be to implement other remedial actions contained in our report.

16     b.     In addition to the change of structure recommended, it is essential the current practice of dividing the revenue cycle functions between DOA, the Treasurer of Guam and DPW for certain aspects of cash management, accounting, customer interface and customer service cease. All revenue cycle operations should be consolidated under a single entity. The current practice leads to very poor financial and cash control and customer service. Putting DPW's SWM division under the CCU would solve this problem. In the absence of the CCU solution, we recommend that PUC require DPW under PUC oversight to evaluate all options to update its billing and collection and customer service systems, including contracting with the CCU for the implementation of an

5

| 1  | improved system, or outsourcing this task to a private entity and then |
| 2  | order the option it determines is the best. We recommend that evaluation |
| 3  | of the best option begin immediately, coupled with a requirement that an |
| 4  | improved billing and collection system be implemented no later than |
| 5  | April 1, 2007 |
| 6  | c.   The current problems in the billing and collection practices as well as |
| 7  | inefficient accounting procedures jeopardize the proposed bond issue. |
| 8  | The solution ultimately adopted to address these deficiencies should |
| 9  | include an understandable and reasonable list of milestones and a |
| 10 | timeline for correcting these deficiencies in accounting, billing and |
| 11 | collection In order to moderate the expected large rate increases that will |
| 12 | be required to fund the proposed bond issue[10], it is essential that PUC |
| 13 | establish an overall collection rate standard of at least 90% on all |
| 14 | accounts for the fiscal year 2007. The previously mentioned Engineer's |
| 15 | Report projects that there will be substantial rate increases in each of the |
| 16 | next three years. In evaluating the rate increases we recommend that the |
| 17 | PUC set appropriate collection standards that will be taken into account |
| 18 | in setting the revenue requirement.[11] The absence of such a standard |
| 19 | would potentially require higher rates to offset any cash shortfalls (if |
| 20 | permitted by the PUC). To achieve this goal of a 90% overall collection |
| 21 | rate for FY 2007, GCG recommends that as many of SWM accounting |
| 22 | billing and collection functions be privatized, even if SWM is put under |
| 23 | CCU's governance.  Timeframes are tight and CCU resources, while |
| 24 | available, are already burdened with complying with GWA's Stipulated |

---

[10] PUC Audit Report ¶1.a
[11] The Engineer's Report assumes that the residential collection rate will rise to 95% by FY 2008.

1    Order[12] while GPA personnel are dealing with the expanded
2    infrastructure requirements facing Guam as a result of expected increase
3    in the number of military personnel over the next three years.

4

5    *8.* During the audit, GCG found that the escrow account ordered by the PUC to hold
6    revenues received by DPW from the rate increase authorized by PUC's October 27,
7    2005 Order contained only $9,000 six months after an annual rate increase of
8    approximately $1.3 million dollars was approved.

9         a.    This unacceptable situation is illustrative of the consequences of a
10               dysfunctional, fragmented billing and collection system. We have
11               recommended consolidation of the functions under the CCU and
12               recommend privatization of the function whether or not these functions
13               are placed under the oversight of the CCU;

14        b.    Current legislation requires the commercial haulers serve as collection
15               agents for tipping fees and have no duty to take enforcement action to
16               pursue collection and remit to DPW payments only after tipping fees are
17               collected from their customers. Our audit indicated that there existed
18               business accounts that were approximately 6 months in arrears in
19               collecting and depositing fees. The current situation needs to be
20               corrected immediately. GCG concludes that corrections will require a
21               legislative solution that would:

22               i.    Amend current law to make the tipping fees a cost of business
23                     for the commercial haulers, which they should recoup from their
24                     customers. Consideration should be given to exempting the

---

[12] Guam Waterworks Authority, like the Government of Guam, is subject to a Federal order, which
mandates that its improvement of water and wastewater service to meet Federal standards, at a cost in
excess of $200 million dollars.

7

| | | tipping fee portion of the haulers' revenues from the Guam gross |
|---|---|---|
| 1 | | |
| 2 | | receipts tax (GRT). This would maintain the status quo. No GRT |
| 3 | | is currently paid on tipping fees, since these are government |
| 4 | | revenue. If implemented, this recommendation would shift the |
| 5 | | risk of nonpayment from the government to the commercial |
| 6 | | haulers, who would in the ordinary course of business terminate |
| 7 | | service to any customer who fails to pay the fee. |
| 8 | ii. | Impose sanctions on haulers who fail to make timely payments |
| 9 | | (consideration should be given to the suspension of a hauler's |
| 10 | | GEPA Solid Waste Collection Permit, cancellation of a hauler's |
| 11 | | business license, and imposition of penalties and interest). |
| 12 | iii. | Given the extraordinarily high level of accounts receivable from |
| 13 | | commercial haulers [see Table 2 below], a large portion of which |
| 14 | | GCG is informed represents tipping fees which have not been |
| 15 | | remitted to the haulers, GCG recommends that proposed |
| 16 | | legislation authorize an immediate audit of all commercial |
| 17 | | haulers' tipping fee collection records. We recommend that the |
| 18 | | Public Auditor be tasked with the audit and make the findings |
| 19 | | available to the PUC. We recommend that legislation empower |
| 20 | | the PUC to take appropriate action to enforce findings that the |
| 21 | | PUC concludes should be implemented. The scope of the audit |
| 22 | | should include: |
| 23 | | • Are commercial haulers billing the tipping fee to their |
| 24 | | customers? |
| 25 | | • Are they collecting it? |

8

1     • Are they providing services to customers who have paid

2      the commercial hauler's fees but not the tipping fee?

3     • Are they timely depositing with DOA all monies

4      collected consistent with P.L. 25-93, which prescribes

5      that payments shall be remitted within 20 days into the

6      month following receipt of payment from a customer?

7     • Are there any underlying reasons for businesses failing

8      to pay the tipping fee or haulers failing to remit the same

9      to DOA?

10

9

1     **II.     FINDINGS AND RECOMMENDATIONS**

2     **1.     Residential Collection and Revenue Problems**

3     Approximately 42% of SWM recorded revenues come from the collection fee[13] of $10

4 per month for weekly pickup of waste from residential customers. Guam residents have three

5 legal choices for the disposal of residential waste, i.e. pay SWM to pickup the waste at curbside,

6 contract the same services from a private hauler or "self-haul" the waste to the Ordot facility or

7 one of the three Transfer Stations operated by SWM. As mentioned before, recent collection

8 information indicates that there is only an approximate 37% collection rate for residential

9 customers. This could mean that only approximately 37% of those DPW regards as customers

10 are paying for their pickup. One method of expanding revenues could come from expanding

11 SWM's customers who pay their bills. It is critical that the collection rate increase to at least

12 90% in FY 2007 if rate increases are to be kept from being even higher than the high levels

13 already projected. SWM residential service is poor and sporadic,[14] causing customers to either

14 not pay their bills or use private contractors rather than SWM.[15] The collection function for two

15 out of three districts was already supposed to have been privatized by law by October 2002 but

16 this has not taken place. This issue is discussed later in this section.

17     GCG has found that many residential customers do not comply with SWM's rules for

18 collections, which are attached to this report.[16] For example, residential customers are required to

19 keep their waste in lightweight waterproof containers with handles (or lifting features). These

20 containers should have a capacity of between 5 and 35 gallons and be placed four feet from the

21 curb. GCG observed that many customers overload their containers, resulting in an overflow of

22 waste onto the ground. GCG also observed waste being placed in plastic bags and cardboard

23 boxes at curbside rather than in the required containers. In all instances that GCG observed,

---

[13] At times this collection fee is incorrectly referred to as a "Tipping" Fee,
[14] See Attachment B for recent articles in the press regarding the poor quality of service and collection.
[15] It is likely that DPW does not have an accurate count of current customers.
[16] See Attachment E

10

1    SWM's drivers picked up the garbage despite obvious violation of SWM rules. It is clear that

2    these violations are causing additional and unnecessary effort by the drivers as well as creating an

3    unsightly and unhealthy situation. GCG recommends that enforcement of the current rules be one

4    of SWM's highest short-term priorities. This would improve sanitation and provide customers

5    with the perception of receiving reasonable service. Implementation should occur as soon as

6    possible but in any event no later than the end of 2006. **[Finding and Recommendation #1]**

7    There is no current restriction on the number of containers placed at curbside by

8    residential customers. As part of the transition to mandated volume-based residential rates[17] this

9    policy needs to be changed. During the course of GCG's audit, it was observed that the number

10   of containers per customer ranged from as few as one to as many as eight! We recommend that

11   SWM establish a maximum number of containers that will be unloaded by the SWM drivers at

12   the interim residential rate (currently $10 per month). Once PUC approval is given, SWM should

13   begin to charge an additional rate for containers in excess of that maximum.

14   It is widely anticipated that a further rate case will be needed to support the anticipated

15   bond issue. We believe that it is realistic to estimate that this case will be heard by the PUC in

16   the January 2007 timeframe. SWM has a very large workload in front of it currently, assisting

17   with the bond process as well as keeping track of the Consent Decree compliance. We therefore

18   recommend that GCG assist SWM in the preparation of the next rate filing and that GCG should

19   also be directed to propose revisions to the service rules to accomplish the legislative mandate for

20   volume-based residential rates.[18] **[Finding and Recommendation #2]**

21   During our audit we were informed that DPW personnel had developed preliminary plans

22   for the handling of containers in excess of the base. Containers in excess of a base number could

23   be identified by a "one time use" receipt or sticker that would be purchased in advance and

24   attached to the container. SWM drivers would remove and discard the sticker in the course of

---

[17] 10 GCA § 51118 (e)
[18] GCG was advised that SWM will seek additional revenues from the PUC in a filing anticipated in late 2006.

Case 1:02-cv-00022    Document 190-18    Filed 01/14/2008    Page 24 of 40

1    each weekly collection. These "one time use" receipts or stickers would have been available for

2    purchase not only at SWM customer service locations, but also be made widely available for

3    purchase through local vendors and the mail. This concept has been temporarily deferred by

4    SWM. We recommend that in the forthcoming rate proceeding, discussed above, GCG be

5    authorized to consider the concept of stickers. While this concept needs further study there are

6    many attractive features including eliminating, on a prospective basis, concerns about accounts

7    receivable and about back billing problems. It accomplishes prepayment for service and it

8    eliminates concerns about establishing a reliable customer list and assuring that the drivers collect

9    only customer trash.  **[Finding and Recommendation #3]**

10   GCG's on-site investigation revealed that SWM does not have accurate lists for the

11   residential customers on each of its 35 collection routes, making it impossible to identify or

12   calculate the overall total number of SWM residential customers. SWM's drivers use their

13   "judgment" as to whether residential waste left at the curbside has been set out for collection by a

14   current SWM customer. GCG observed no instance where a SWM driver failed to collect waste

15   that was set out at curbside. It should, therefore, be a top priority of SWM to prepare a complete

16   and accurate database of residential customers, to update this list on a regular basis and to ensure

17   that the list of SWM residential customers is sorted by route number and distributed to SWM's

18   drivers before they begin their routes each day. The determination as to whether a household is a

19   current SWM customer should not be left to SWM's drivers. Without such a list it is possible

20   that trash would be collected from non-customers or customers that are delinquent in their

21   payments, essentially providing the service free to these households,[19]  **[Finding and**

22   **Recommendation #4]**

23   As previously discussed, SWM needs to update its rules and regulations concerning

24   residential collection services. While an informational hand-out[20] is provided to customers

---

[19] Many of these problems would be eliminated by the "sticker" system discussed above.
[20] See Attachment E

1    requesting new or continued service, it is not clear that all other residential customers are aware

2    of these service rules. The current hand-out, with input from SWM drivers, should be expanded

3    to list situations in which SWM will not provide services and widely publicized. In

4    Recommendation #2 above we recommended that GCG be instructed to prepare a revised

5    collection policy and present the policy to the PUC for review and approval during the anticipated

6    rate filing hearing in January 2007. **[Finding and Recommendation #5]**

7    Within the preparation of the revised service rules referred to above, GCG and SWM

8    should investigate whether the current rules and regulations for residential pick up services (as

9    described in a hand-out to new customers) are consistent with current laws[21] and that no new

10    legislation or amending legislation has been adopted that would invalidate any of these current

11    rules and regulations. We recommend that SWM and GCG be tasked with this legal review and

12    should be submitted to the PUC for approval during the rate hearing in January 2007. **[Finding**

13    **and Recommendation #6]**

14    GCG inquired how SWM's drivers knew whether households with containers set out in

15    front of them at curbside were not only SWM customers, but also customers who are not in

16    arrears to SWM. The simple answer is they do not. Regarding delinquent customers, SWM had

17    implemented a policy during the second quarter of calendar 2006 that if a customer is identified

18    as a delinquent, his containers are marked with an "X" and the SWM drivers are instructed not to

19    service this customer. Once the customer satisfies his indebtedness to SWM, the containers are

20    then marked with the circle surrounding the "X." SWM determined there may be legal issues

21    with this program, since at the current time the containers are not property of SWM and

22    terminated the program. This problem would be addressed by our Recommendation #4 where

23    accurate customer lists would be developed. These lists should be made current no later than the

---

[21] The handout references PL17-87; 23-64, 24-272, 24-313, 25-93 and its amendments.

1 end of 2006, the date by which we recommend that privatization of all residential collection

2 occur.[22] **[Finding and Recommendation #7]**

3   SWM has not segregated collection routes into roughly equal Northern, Central and

4 Southern districts for future privatization as required by PL26-99. SWM is already about four

5 years past the deadline required for the privatization of collection for two thirds of the residential

6 customers (October 2002). This requires that this program be provided the highest priority by

7 SWM. We noted that SWM customer service had on its own initiative begun to segregate

8 customer files into three territories, but it is not clear whether upper management and/or the

9 Consent Decree team is aware of this process. SWM is currently reviewing its data with the intent

10 of complying with the mandate in PL26-99. This should not be an overly complex exercise and

11 SWM must move toward compliance with the greatest urgency – we recommend no later than the

12 end of 2006. Furthermore, we recommend that the PUC should seek an amendment to PL26-99

13 that would provide that <u>all</u> of the residential collections be privatized. **[Finding and**

14 **Recommendation #8]**

15 **2.**  **Operational and Administrative Function Problems.**

16   **Truck Maintenance.**

17   GCG inspected DPW's maintenance department and interviewed its chief mechanic.

18 GCG observed that while SWM has sixteen packer trucks, only seven packers were operational at

19 the time of GCG's inspection. Of the remaining nine packer trucks, two had been cannibalized

20 for parts and the remaining packer trucks were in various states of disrepair, ranging from repairs

21 as simple as tire replacement to repairs as major as installing a new transmission. Some of these

22 packer trucks have been non-operational for many months while many of the ones that are in

23 operation are fifteen years old (most were purchased in 1992 and 1993 Recent press reports[23]

24 indicate that recently, since our audit, as few as one or two trucks have been working resulting in

---

[22] This would also be another relevant issue to consider in the analysis of implementing the "sticker" system.
[23] See Attachment B

1   frequent missed pick up days, a level of very poor service and customer frustration. Our

2   recommendation that all residential routes should be privatized for collection would eliminate this

3   issue. **[Finding and Recommendation #9]**

4         **Transfer Station Operations**

5         SWM is responsible for operating three transfer stations. These transfer stations are open

6   five days per week (Thursday through Monday 9-5 except for Holidays and Sundays when open

7   7-3:30). During GCG's inspection, operations at the Agat transfer station were observed. That

8   operation consisted of three employees, two trash containers ("roll offs") and a guard house.

9   Only one transaction occurred during GCG's on-site inspection. The SWM employee responsible

10  for collection of the self-haul fee is issued a book of blank invoices that are sequentially

11  numbered. Upon entry into the transfer station, a customer pays the self-haul fee and receives

12  one of the three triplicate invoices listing the customer's license plate number and the total

13  charged. The transfer station is a cash only operation. There is no scale or any device for cubic

14  yard measurement on premise. The one customer GCG observed arrived with a partially full

15  pickup truck and was charged the $5 self-haul rate. This rate covers anything over 3 cubic yards.

16        GCG was informed by the SWM employee who collected the self-haul fee that a SWM

17  runner is supposed to arrive at the transfer station toward the end of each day to pick up the

18  receipts and cash. Cash and one copy of the receipt are delivered to DOA, while the second copy

19  of the receipt is delivered to SWM. If the SWM runner fails to appear at the end of the day, a

20  SWM employee takes the cash home. This is bad policy and should cease in order to provide

21  security for the cash as well as appropriate internal control. **[Finding and Recommendation**

22  **#10]** The utilization rate of transfer stations and appropriate self-haul rate should be carefully

23  investigated in future proceedings, since a rate that is below the monthly curbside pickup rate

24  might encourage the public to bring the waste to the transfer station and from illegally disposing

25  of waste. Currently, in the face of no or irregular residential waste collection, many residences

26  are faced with the dilemma of health hazards associated with storing waste on premises, self-

15

1　hauling or illegal dumping. This issue will be important when the significant rate increases that

2　are imminent are implemented and customers will be strained to afford service.

3　　　　SWM employees reported that waste is frequently left at the gates of the transfer stations

4　as well as the Ordot facility. This situation is not only unsightly, but attracts vermin. The waste

5　left at the gate is swept up by SWM employees at the start of each day and deposited into

6　available receptacles. This "illegal" dumping of waste represents additional revenues that should

7　have been collected by SWM, but were not. This situation provides free service to the individual

8　or individuals responsible. Bond holders are adverse to free service and the bond indenture

9　usually prohibits free service. Enforcement of existing laws related to illegal dumping of waste

10　needs to be undertaken. SWM should seek police assistance in monitoring the transfer stations

11　during off hours. SWM and GEPA should establish a joint strategy to eliminate this situation,

12　including the possibility of installing surveillance cameras. **[Finding and Recommendation**

13　**#11]**

14

15　**3.　　Commercial Collection and Revenue Problems.**

16　　　　Approximately 57% of SWM revenue comes from services rendered to commercial

17　haulers at the Ordot facility. The tipping fees, which the customers of these haulers are required

18　to pay is determined by the whether the waste is un-compacted or compacted. This is determined

19　by weight. The scale at the Ordot facility is currently broken which makes it difficult, if not

20　impossible for SWM to correctly determine the tipping fee, which is due for each truck. The

21　amount of revenue which has been lost from this problem is difficult to calculate. However, what

22　is clear is that it must be immediately corrected. The current rates for per cubic yard are $5 un-

23　compacted and $20 compacted. Because of this significant differential it is important that SWM

24　have procedures in place to ensure that the correct fee is being charged for waste deposited. We

25　were approached with allegations that SWM was in certain cases charging an uncompacted fee

26　for compacted trash. We are not able to verify the allegations. SWM should be required to

1  immediately repair or replace the scale until such time as the new landfill facility is functional

2  and provide adequate controls to ensure that the commercial haulers are properly billed. **[Finding**

3  **and Recommendation #12]**

4

5  **4.      Billing and Collection Problems**

6          GCG's focus in this audit was a review of the billing and collection functions of both

7  SWM and DOA.    SWM has had the responsibility to bill for residential services for

8  approximately one year now and DOA bills for commercials services.   Historically, SWM has

9  been woefully unable to collect revenues from the residential segment of customers as indicated

10  by the following table:

11                                           **Table 1**

12                          **Four Year Average Collection Ratios**

| | |
|---|---|
| Commercial Haulers | 92% |
| Other Commercial Haulers | 65% |
| Residential Customers | 26% |
| Transfer Stations | 100% |
| Total Collection | 68% |

13

14          At the current time, SWM prepares all billings to the residential customers receiving

15  SWM collection services.  There are significant problems with these billings: customer lists are

16  incomplete and collection rates are very low and the paid up status of customers are also

17  incomplete and inaccurate. There was a massive six-month billing (containing retroactive

18  periods) that was prepared by SWM customer service and mailed out in early April 2006.  A total

19  of nearly 23,000 invoices were prepared.  In many cases customers do not agree with the invoices

20  prepared. Customers that dispute their bills must come in to the SWM customer service office

21  with their complaints.  In the instance where the customer claims that he is no longer a customer,

22  he must submit proof that his service was terminated by showing customer service disconnection

17

1     notices from GPA or GWA. Moreover, GCG is aware that in one instance it took a new customer

2     nearly two hours to become a customer.

3         We were informed that there is no written policy has been created by SWM to handle

4     complaints of this nature  SWM has only five customer service positions authorized and two of

5     these were vacant at the time of GCG's inspection.  A specific problem identified with the latest

6     residential billing is that there is a legal prohibition against back-billing for more than four

7     months of services (see PL26-17).  This public law was passed in the aftermath of Supertyphoon

8     Pongsonga. Collection of tipping fees had previously been suspended immediately after the super

9     typhoon struck Guam, and the intent of PL26-17 was to limit the economic hardship that was felt

10     by Guam residents once collection of tipping fees resumed.  This law needs to be reviewed and

11     amending legislation may need to be introduced to ensure that restrictions for time periods that

12     may be back-billed will be determined based on sound management decisions as this could

13     impact the financial condition of SWM and its ability to support debt service.  A sound Collection

14     Policy should be developed.  This should be done in conjunction with the development of service

15     rules that we have recommended and should be either approved through the Administrative

16     Adjudication Act (AAA) process or be approved by petitioning the PUC and heard in the same

17     time frame as the January 2007 rate hearing. SWM should bill no less than quarterly and should

18     do so immediately. Any legal impediment for this recommendation should be removed.  **[Finding**

19     **and Recommendation #13]**

20         GCG was informed by SWM management that a policy regarding promissory notes (or

21     payment plans) was evolving.  Currently, the decisions for such plans are made on an ad hoc

22     basis by SWM customer service personnel.  Though the concept of a promissory note permitting

23     a customer to make monthly payments against arrears may be desirable, a formal policy needs to

24     be created by SWM management and approved by the PUC so that SWM customer service is not

25     placed in the position of making policy decisions of a potentially arbitrary nature.  There should

26     be a written summary of this policy posted at all customer service locations that is also made

18

1  available to SWM customers through the mail or "on-line." Such a collection policy should

2  include specific timing from when an invoice is deemed late, interest or penalty charges for late

3  payments, fines for return of customer check for "insufficient funds" and written criteria for

4  promissory notes. Implementing such a policy would be a significant effort and before this effort

5  is made we recommend that its implementation be deferred to a later phase in the process. We

6  make this recommendation because current collection rates are so low and service currently and

7  historically has not been acceptable making the possibility of customer disputes multiply. We

8  recommend that GCG be tasked with this evaluation and that this recommendation should also be

9  made in the January 2007 time frame. Any legal impediment to in creating a collection policy

10  should be removed. **[Finding and Recommendation #14]**

11      The current situation of billing and collection for SWM residential service is abysmal.

12  While there has been considerable effort by SWM customer service employees to rectify this

13  matter, the situation will need significant time and effort to fully address all of the systemic

14  problems that have lead to a wholly unacceptable 26% SWM residential collection average over

15  the past four years. Except for the GovGuam accounts, GPA and GWA currently have collection

16  rates between 95 and 100% of billings. Based on information received from DOA, the most

17  recent estimate of accounts receivables is approximately $11 million broken down as follows:

18                                         **Table 2**

| Month Ending | Large Commercial | Other* Commercial | Residential |
|---|---|---|---|
| June 30, 2006 | 3,197,945 | 239,948 | 7,593,970 |
| Annual Revenue | 3,670,647 | 80,263 | 2,730,435 |
| Days Outstanding | 318 | 1,091 | 1,015 |

19

20      It is of course highly questionable whether the amounts in the table are collectible. For

21  residential customers the amounts of prior billings are questionable and the amounts subject to

19

1     collection are limited to a specific period of time if they are the result of back billing. For large

2     commercial customers the amounts may be more collectible. We recommend that the

3     investigation into the collection of receivables be put into a second phase under the oversight of

4     the ALJ. We have previously recommended that the Public Auditor undertake an audit of the

5     commercial haulers' billing and collection of their customers and amounts collected and remitted

6     from their customers to SWM. The amounts receivable from large commercial SWM customers

7     is approximately 10.5 months. These amounts can clearly be reduced.

8         Our recommendations to privatize the billing and collection functions, even if SWM is

9     made a public corporation and transferred under the oversight of the CCU we believe will

10     transform the billing and collection issues and reduce the high level of receivables. We

11     recommend that GCG be tasked with establishing a realistic level of receivables and to make

12     recommendations to bring the level down to reasonable levels and to provide a report to the PUC

13     in the January 2007 time frame. **[Finding and Recommendation #15]**

14         Currently, SWM bills and collects in arrears for residential services. Assuming that

15     SWM bills on a quarterly basis, this results in a lag between the date services are rendered and the

16     date payment is due of at least 120-150 days from the first month of service even when payment

17     is made within thirty days of the bill being issued. This is not a desirable effect considering the

18     need for sufficient cash flow for both routine operations and the cost of preparing SWM to be in a

19     financial situation that would improve investor confidence in the upcoming bond issuance. GPA

20     and GWA bill in arrears, but on a monthly basis. Late payment policies are also in place at both

21     GPA and GWA including interest payments and promissory notes. As a result, the average lag

22     between the time that services are rendered and the time that its customers' payments are due is

23     forty-five days or less.

24         As mentioned previously SWM had under consideration during the period of our audit a

25     proposed SWM Decal program that would be used to identify customers (including lifeline

26     customers) and to purge SWM's aging database of incorrect information. Although SWM has

1 deferred the "Decal" program pending the resolution of other matters SWM deems to be higher

2 priorities, one of the benefits of such a program is that it would result in a prepayment plan, i.e.

3 customers would pay prospectively for service. While the specific program has been deferred,

4 the concept of prepayment for services would be useful and would certainly help SWM both in

5 cash flow and in customer service. An appropriate prospective billing program for no more than

6 three months should be considered even if the decal program is not implemented. This change in

7 billing protocol would require PUC approval and should be submitted for approval in the January

8 2007 timeframe or earlier.

9  As noted, we have recommended the full privatization of the residential collection

10 function and we have also recommended the privatization of the billing and collection function.

11 We recommend that after the January 2007 set of hearings the concept of setting up independent

12 franchise areas where all aspects of trash collection, billing and collection would be undertaken

13 by a single entity and be subject to the oversight of the PUC be examined. **[Finding and**

14 **Recommendation #16]**

15  A lifeline rate as required by GCA 10 §51118h (1) does not exist at this time. P.L. 28-56

16 law requires that the PUC set rates that are "consistent with and meeting the low income

17 eligibility criteria, requirement policies or procedures established by the Guam Housing and

18 Urban Renewal Authority (GHURA) applicable to their Low Income Public Housing Program."

19 The PUC must approve both the rate for lifeline customers and the non-lifeline rate that combined

20 would develop sufficient revenues to cover SWM's operational costs and debt service

21 requirements.

22  PUC has determined that a lifeline rate should be established in the next rate case

23 (assumed to be heard in January 2007). PUC should task GCG with recommending a lifeline rate

24 and the criteria for determination of eligibility consistent with the GHURA's "low income"

25 eligibility criteria. Announcement of the proposed rate and eligibility requirements should be

26 published when SWM files its next rate case. We have previously indicated in our previous rate

1 case testimony that the current "low income" criteria has the potential to qualify too many
2 customers, making the lifeline program either too costly or the discount too small. We
3 recommend that consideration be given to using more targeted criteria for the population in
4 economic need. If income qualifications other than the GHURA "low income" eligibility criteria
5 are used, the Guam Legislature must first change the applicable law. GCG is awaiting additional
6 information from GEDA regarding the success of the new "swipe program"[24] to determine if it
7 can be used by SWM to more easily identify customers eligible for the lifeline rate. If SWM ties
8 eligibility for the lifeline rate to participation in that program, assuming that the number of
9 participants is not too large, SWM may be able to more easily enroll customers eligible for the
10 lifeline rate and reduce the administrative burden of the program. The specific discounted rate as
11 well as the eligibility criteria should be presented to the PUC in the upcoming rate case **[Finding**
12 **and Recommendation #17]**

13      After receiving a copy of an invoice for services for the commercial haulers at the Ordot
14 landfill, DOA (who is currently responsible for billing these customers) prepares and submits
15 bills to individual haulers which are due within sixty days. It is the responsibility of the
16 commercial hauler to collect the invoiced tipping fees from their customers and pay SWM in 60
17 days. we believe that the 60 day time frame set for payment is too long from time of receipt of
18 the bill and should be reduced to 30 days. We note here however, that a lot of progress need to be
19 made on this issue as our previous table showed that for commercial haulers the accounts
20 receivables are currently approximately 318 days. This recommendation should also be read in
21 conjunction with our finding and Recommendation #20 to make the commercial customer the
22 customer of the hauler and to make the tipping fee the responsibility of the hauler. **[Finding and**
23 **Recommendation #18]**

---

[24] The SWIPE program uses a credit type card in lieu of food stamps where the client "swipes" the card at the counter.

Case 1:02-cv-00022    Document 190-18    Filed 01/14/2008    Page 35 of 40

1        During GCG's meeting with DOA, it was discovered that there are occasions (apparently

2    not infrequent) where invoices from Ordot are delivered to DOA with invoices that are either out

3    of sequence or in no sequential order at all. This belies what GCG was told by SWM customer

4    service, who claimed that specific invoices were assigned to each SWM employee and that each

5    such employee was required to account for all of the numbered invoices in the sequence so

6    issued. DOA stated that it had upon occasion held invoices until SWM answered DOA inquiries

7    about the reasons for missing numbered invoices. Until such time as the Ordot facility is closed or

8    until such time as billing and collection are turned over to outside contractors, SWM employees

9    that issue receipts for commercial haulers (or at the transfer stations for self-haul) should be

10   required to sign for all blank numbered receipts and thereafter be required to account for <u>all</u>

11   numbered receipts issued to each such employee. **[Finding and Recommendation #19]**

12       Currently commercial haulers are merely agents for SWM in the collection of tipping

13   fees from their customers. Therefore, commercial hauler take the position that PL25-93 requires

14   that only those tipping fees actually collected from a commercial hauler's customers are required

15   to be forward to SMW. This places the collection burden on SWM and not on the commercial

16   haulers. In defense of this position, the commercial haulers cite the portion of PL25-93 that

17   provides:

18         Tipping fees for business or government generators that have their solid waste
19         collected by commercial collectors shall be collected by commercial collectors,
20         on behalf of the government of Guam. Commercial collectors shall remit the
21         tipping fees paid by their customers in the prior month to the government by the
22         twentieth (20th) day of the following month. The tipping fees collected by
23         commercial collectors, upon remittance to the government of Guam, shall be
24         considered as revenue for the government and *not* as income for commercial
25         collectors. *If* a commercial collector does *not* remit the tipping fees actually
26         collected from generators, as provided in this Section, then the commercial
27         collectors shall be liable for full payment to the government of all tipping fees
28         that are collected from generators, but *not* remitted to the government.
29

30       We recommend that this situation be changed so that the business or government

31   customers become customers of the commercial haulers and that the commercial hauler be

23

1    responsible for the collection of all fees from their customers and remittance to SWM. The

2    current situation results in a situation where SWM has no means of knowing what is owed by the

3    ultimate business or government customer and not being able to collect. While the

4    recommendations of this report are being evaluated and alternative implemented, we recommend

5    that the haulers be required to notify SWM monthly of customers that are delinquent in payments.

6    SWM should pursue collection efforts with these customers and the haulers should be put on

7    notice that any delivery that contains a delinquent customer's trash will not be accepted. Our

8    audit obtained information from DOA that indicated that collections from commercial haulers

9    lagged over 5 months while the accounts receivables show a 318 day balance. Under the

10    recommended scenario where commercial haulers would be responsible for all payments, the

11    billings to them should be made monthly and payments due in 30 days. When this

12    recommendation is adopted, appropriate service rules should be developed and approved by the

13    PUC, including penalties for delinquent payments. GCG also recommends that if the tipping fee

14    expense is shifted from the hauler's customer to the hauler, that it be exempt from gross receipts

15    tax to maintain the current status quo. . **[Finding and Recommendation #20]**

16          There does not appear to be a strong policy forcing full and timely payments from

17    commercial haulers. Information obtained from SWM indicates that there is a payment lag by

18    some of these haulers of as much as one year after the time service is rendered. This was also

19    confirmed by DOA in its communications regarding collections of the interim rate increases

20    effective November 2005. Service rules should be established by SWM and approved by the

21    PUC that would force full and timely payments from the commercial haulers, including denying

22    access to the SWM's solid waste disposal facility for non-payment of undisputed bills and for

23    payment for disputed bills after all appropriate remedies are exhausted. All commercial haulers

24    should be notified of this policy at least thirty days in advance of the implementation of this

25    policy. This policy should inform the commercial hauler of its ability to dispute bills and the

26    methods for the resolution of those disputes. Payment on all bills should be due, other than

1    disputed amounts, within thirty days. Any commercial hauler failing to pay its bills timely should

2    be denied access to the Ordot facility until such time as payments are brought current. **[Finding**

3    **and Recommendation #21]**

4            As mentioned in GCG's September 2005 report filed in the prior rate proceeding[25] many

5    of the requirements of the legislation transferring rate making authority to the PUC, including

6    cost-based and variable rates, could not be implemented without more detailed financial reports.

7    Internal financial reports are not routinely generated and are only provided by DOA at the request

8    of SWM. This lack of an ongoing flow of financial information from DOA to SWM management

9    prevents simple reports, such as accounts receivable aging or budget versus actual expenditures,

10   from being received and reviewed by the appropriate individuals at SWM on a timely basis. This

11   situation cannot continue, as fragmented financial information is viewed as a negative by the

12   investment community. GCG was advised that there is an accounting consultant at SWM who is

13   capable of creating these reports using the DOA accounting software and that a regularized

14   reporting process is in the process of being reviewed and implemented. This should be completed

15   by January 2007. This recommendation should be read with our primary recommendation to

16   make SWM a public corporation and put it under the CCU. **[Finding and Recommendation**

17   **#22]**

18           The PUC required that all additional revenues derived from the November 1, 2005

19   interim rate increase be deposited into a reserve fund for future use in payment of costs associated

20   with the management audit, regulatory review and debt service requirements. Establishing this

21   fund was a condition of PUC approval of the interim rate increases. During GCG's on-site

22   review, it was discovered that while the separate account into which DOA (SWM) was ordered

23   by the PUC to deposit the additional revenues has been established, the account is grossly under-

24   funded. The total amount in the fund as of May 2006 was less than $9,000, even though DOA

25   stated in its response to GCG that the amount should be $47,000. Recent correspondence from

---

[25] This report is available on the PUC web site.

25

1    SWM and DOA indicates that they now believe that the proper amount that should be in the

2    account as of June 30, 2006 should be approximately $580,000. Ensuring that the portion of

3    collected funds that is derived from the increase in rates is actually deposited into this reserve

4    account would improve SWM's ability to provide the necessary funding for its upcoming rate

5    case and implementation activities from this audit. The proper funding of this account should be

6    viewed as a priority item, because establishing permanent rates and implementing the

7    recommendations of this audit will be viewed as a positive development in SWM operations by

8    potential bond investors. We believe that the amount that should be in the fund as of June 30,

9    2006 should be approximately $465,000. This should be funded in 60 days and then be

10   maintained at the appropriate level. **[Finding and Recommendation #23]**

11          In several meetings attended by GCG, it became obvious that all of the parties (SWM,

12   DPW, EPA, GEPA, legislators, bond counsel, PUC, etc) are in agreement that some

13   independence from DOA and DPW would be beneficial to SWM. We believe that such

14   independence is a necessity and have recommended that we support the PUC's position that

15   SWM be a public corporation under the CCU. It is difficult to see how there could be any

16   support for the current situation to continue. This would cause consternation from bondholders

17   and put the contemplated financing in jeopardy. The CCU would bring seasoned management as

18   a resource, a Chief Financial Officer, and an organizational structure that has experience in

19   managing utility operations and making operational improvements using both in house and

20   outside resources as appropriate. These management skills will be extremely valuable in

21   reorganizing SWM and providing its customers with good service as well as to manage the

22   required operations at the landfill and bring SWM into compliance with the Guam EPA.

23   **[Finding and Recommendation #24]**

24          Again, GCG thanks the all SWM and other GovGuam employees and management for

25   their assistance provided to GCG during the course of its investigation, without which GCG

26

1    would not have been able to prepare this report.  GCG looks forward to a long-term relationship

2    with SWM in whatever form it will ultimately take.  This concludes GCG's report.