FILED
DISTRICT COURT OF GUAM
JAN 3 1 2008
JEANNE G. QUINATA
Clerk of Court

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division
ROBERT D. MULLANEY
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6483
Fax: (415) 744-6476

LEONARDO M. RAPADAS
United States Attorney
MIKEL W. SCHWAB
Assistant United States Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez
Hagåtña, Guam 96910
Tel: (671) 472-7332
Fax: (671) 472-7215

Attorneys for United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL CASE NO. 02-00022 |
| Plaintiff, | UNITED STATES' COMMENTS ON ORDOT DUMP ACTION REPORT |
| v. | |
| GOVERNMENT OF GUAM, | |
| Defendant. | |

On December 14, 2007, the Court issued an "Order re: Conditions to Enforce Consent Decree," requiring the Government of Guam ("GovGuam") to prepare an Ordot Dump Action Report, which GovGuam filed on January 22, 2008. At the status conference on January 24, 2008, the Court permitted the United States to respond to the Action Report by February 6, 2008. The United States submits this brief to comment on the Action Report.

I. **BACKGROUND**

Dominic Muna, the Superintendent for Guam's Department of Public Works ("DPW"), testified at a hearing that the Ordot Dump would have no available airspace by January 24, 2008. See Order re: Conditions to Enforce Consent Decree at 4. Based in part on DPW's representation, the Court directed GovGuam to file the Action Report to: (1) provide an estimate of remaining airspace; and (2) set forth a detailed explanation of the steps GovGuam intended to take concerning solid waste disposal when the Ordot Dump is closed and the new landfill is not yet operational. Id. at 4-5.

In its Action Report, GovGuam provided an estimate of available air space and daily waste volume. Based on these estimates, GovGuam calculated that the Ordot Dump had available air space for 720 days of operation. Action Report at 7.

For the reasons stated herein, the United States believes that this estimate is based on unsupported assumptions and represents a "best case scenario." GovGuam should revise the Action Report to provide a range of operating days that encompasses both a "worst case scenario" and a "best case scenario," and should set forth a plan to deal with a range of possible closing dates for the Ordot Dump.

II. **DISCUSSION**

A. Daily Waste Stream

Until a scale was installed in January 2008, GovGuam did not have an operating scale at the Ordot Dump to allow it to accurately measure the incoming waste to the Dump. Instead of basing the volume of trash on a measured quantity, the Action Report compared 2004 and 2008

1

surveys of the Dump, and then calculated a volume difference between the October 2004 and January 2008 topographic surfaces at the Dump. Action Report at 4.

We note several problems with this methodology. First, the Action Report does not indicate that the 2004 and 2008 surveys followed standard procedures for quality assurance and quality control. Second, solid waste in the Dump settles over time. GovGuam did not have any settlement monuments in place at the Dump to measure the settling of the waste pile between October 2004 and January 2008, and the calculation of the total volume of trash does not take the settling of the waste pile into account. Therefore, the total volume of trash deposited in that period may not be accurately estimated by a calculation of the difference between the October 2004 and January 2008 topographic surfaces. Third, GovGuam did not complete a site-specific investigation of the in-situ density of waste. In the Action Report, GovGuam used a range of 800 to 1,200 pounds per cubic yard of waste to estimate an incoming waste stream of between 160 and 240 tons per day, but did not explain the basis for its density assumption. Action Report at 5. The density assumption can dramatically change the result. For example, GovGuam could have relied on a measured value of 1,050 to 1,580 pounds per cubic yard, using an investigation from 1995 described on pages 5-6 of the Action Report. If GovGuam had used those measured values for density, the incoming waste stream would have ranged between 210 and 316 tons per day.

There is an unexplained discrepancy between: (1) the daily trash intake assumed in the Action Report, and (2) the monthly and annual estimates of incoming trash volume in reports submitted by DPW to Guam EPA. While the Action Report assumes a daily rate of 400 cubic yards (compacted), DPW's monthly and annual reports estimate the average daily rate as 1,332 cubic yards (uncompacted) for the year 2006. The same discrepancy applies to the tonnage coming into the Dump. For the new landfill, GovGuam used 5.2 lbs of trash per day per person. Assuming 150,000 residents (which excludes tourists and is a conservative number), use of GovGuam's figures for the new landfill would result in 390 tons per day of incoming trash for the Ordot Dump. Thus, these facts suggest that GovGuam's Action Report might be

underestimating the volume of trash that is being disposed of at the Ordot Dump.

Establishing an accurate estimate of the daily incoming waste stream is critical to any reliable calculation of remaining air space at the Ordot Dump. GovGuam should base its estimate on accurate measurements of the volume rate of the daily waste stream (both waste and cover) and the waste's density. Assuming that the installed scale is operational, GovGuam should use data obtained from the scale, and compare it to previous estimates. GovGuam's reply brief, which is due on February 21, 2008, should include data collected from the newly installed scale.

The Action Report states that GovGuam is currently conducting an Ordot Dump assessment to address open issues. Action Report at 6. DPW should immediately discuss a work plan for that assessment with the U.S. Environmental Protection Agency ("EPA") and Guam EPA, and the Court should set a firm schedule for completion of an Ordot Dump Assessment Report.

B. Remaining Airspace

GovGuam calculated the remaining air space as follows: Closure topography (from the 2004 closure design) minus January 2008 topography (based on the January 2008 survey) equals the remaining air space. As GovGuam noted, the 2004 closure design has not been approved by EPA or Guam EPA. Action Report at 7. Moreover, the 2004 design cap "is based on an eastern expansion of the Dump." Id. The Action Report specifically notes Guam EPA's "concern that this horizontal expansion will require approval from both Guam EPA and EPA." Id. at 34. Without discussing the potential regulatory barriers, GovGuam identifies this eastern expansion as "critical" and states that "without it the remaining airspace is limited." Id. at 7.

The Action Report's primary purpose is to evaluate contingencies, i.e., to explore a range of possibilities, in order to address the steps GovGuam intends to take concerning solid waste disposal if the Ordot Dump is closed and a new landfill is not yet opened. The United States believes the Action Report is inadequate because it assumes, in Sections 7.3 and 7.4, that an

3

eastern expansion of the Ordot Dump will take place without any hurdles. Based on this assumption, the Action Report estimated the remaining airspace to be 288,111 cubic yards. Action Report at 7. However, GovGuam does not consider the possibility that the eastern expansion may not be approved or could be significantly delayed. In order to address this problem, the Action Plan should clearly state what portion of the 288,111 cubic yards of airspace depends on the approval and immediate availability of the eastern expansion. GovGuam should also estimate the available airspace at the Ordot Dump without an eastern expansion, and should plan for the possibility that the eastern expansion is either not available or delayed. GovGuam should provide a revised available air space calculation in its reply brief filed on February 21, 2008.

C. <u>Waste Diversion Measures</u>

GovGuam should implement its own facility for recycling instead of solely relying on the voluntary participation of residents and businesses. This government-run recycling facility could sort out recyclable material from the trash and would provide an instant reduction in the daily waste stream at the Ordot Dump due to recycling. In order for the program to be successful, however, GovGuam needs to identify at the outset where the recycling material will go. The United States recommends that GovGuam confer with other neighboring government agencies (such as the Commonwealth of the Northern Mariana Islands DPW) that have designed and implemented successful recycling programs, and emulate those programs. According to information provided to EPA, the CNMI DPW has been maintaining a rate of 35 percent, by weight, of waste diverted from the landfill to recycling. Materials diverted to recycling include paper, cardboard, glass, plastic, aluminum, and scrap metal. By improving waste diversion, GovGuam may be able extend the life of the Ordot Dump until the new landfill is constructed at Dandan.

D. <u>Private Landfill</u>

The Action Report discusses the option of a "Private Landfill" proposed by Guam

Resources Recovery Partners ("GRRP") as an alternative disposal site if the Dandan site is not yet available. Action Report at 31-32. If GovGuam selected this alternative, DPW stated that the required minimum daily waste tonnage for the GRRP landfill would be 300 tons per day and the maximum would be 350 tons per day. Id. at 32. Under this alternative, even the minimum disposal rate would necessarily mean that a significant portion (approximately 80-90 percent) of the Island's trash would be directed to the private landfill. This alternative would seriously limit GovGuam's ability to construct the Dandan landfill because only 10 to 20 percent of the Island's waste stream -- and resulting revenue -- would be available for the Dandan project. Consequently, if the waste stream for Dandan (and revenue from it) is limited to between 50-100 tons per day, it would be difficult for GovGuam to find a private company willing to undertake a "Design-Build-Finance" project for the construction and operation of the Dandan site. In addition, such a low volume of waste and revenue could make it difficult for GovGuam to support a bond for the construction of a landfill at Dandan if no private company is willing to finance the construction and operation. In sum, we believe that the concurrent operation of two landfills on Guam would not be financially viable.

    E.    Construction of Dandan

The Action Report does not adequately discuss an alternative that offers the best chance of promptly resolving GovGuam's ongoing violations of the Consent Decree: the construction of a cell at the new landfill site in Dandan. Action Report at 34. Given the uncertainty regarding the eastern expansion of the Ordot Dump, the United States believes that the Action Report, and GovGuam's prioritized efforts, should immediately focus on the Dandan site. In particular, the United States believes that GovGuam's best available option is to expedite the construction of one cell at the Dandan site. For this to occur, GovGuam should promptly undertake the following actions:

1.     Immediately hire or laterally transfer a Project Engineer (Civil Engineer or an Environmental Engineer) to DPW's Solid Waste Division. The Project Engineer should

5

be responsible for: (1) finalizing the designs for construction of the Dandan landfill and closure of the Ordot Dump, (2) completing any supporting studies that are needed to finalize the designs, and (3) providing technical direction and management of DPW's contractors assisting with the closure of the Ordot Dump and the design and construction of the Dandan landfill.

2. Finalize the design for Dandan. This could be done within 3 months -- by April 30, 2008. The last design submitted by GovGuam (February 2006) for Guam EPA and EPA approval was at the pre-final (100%) stage. While the hydrogeological study could impact some of the design features for the base liner, EPA believes that these remaining design changes could be finalized within the next three months.

3. Start constructing the access roads and other infrastructure needed at Dandan immediately. The design for these items was already finalized by DPW's consulting engineers.

4. Start preparing the bid document for a "Design/Build/Finance" option for the construction and operation of the Dandan landfill. It should be finalized by no later than 1 month after finalizing the design.

5. Start working on the procurement process now and have it ready by the time the bid document is ready.

6. Select a contractor by July 1, 2008. Procurement papers should be ready by then. Start construction immediately.

7. Provide a performance incentive to the contractor to expedite the construction. In order to qualify for the performance incentive, the contractor should be required to construct an operational cell at Dandan within 6 months after the Notice to Proceed is issued.

This Court has already acted to remove the legislative impediment to progress on the Dandan site. Now GovGuam has to take the initiative to expedite the process of constructing a cell at Dandan so that the Ordot Dump can be properly closed.

6

### III. CONCLUSION

GovGuam remains in violation of the Consent Decree. In the Action Report, GovGuam has proposed several ways to expand the capacity of the Ordot Dump so that it can remain in operation for another two years. In this response, the United States has noted the uncertainties that underlie GovGuam's estimation of 720 days of available airspace at the Dump. For example, if the eastern expansion is unavailable or delayed, much less airspace would be available at the Dump than GovGuam suggests. Consequently, this Court should require GovGuam to focus its efforts on promptly opening a cell at the Dandan site in order to avoid having inadequate landfill space in the future.

Respectfully submitted this 31st day of January 2008,

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

By: _____
MIKEL W. SCHWAB
Assistant U.S. Attorney