IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL CASE NO. 02-00022 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ORDER RE: APPOINTMENT OF RECEIVER** |
| GOVERNMENT OF GUAM, | ) | |
| Defendant. | ) | |

In the four years since the Consent Decree was entered, which includes the court meeting with the parties and conducting site visits for the last several months, the following observations have become increasingly clear: (1) there has been an historical and present lack of commitment by the island's leaders in addressing this solid waste crisis, (2) the present Governor is committed to coming into compliance with the Consent Decree, and (3) despite the Governor's bests efforts and those of the employees of the Department of Public Works ("DPW"), they alone cannot solve this problem without a concerted effort by all sectors of the Government of Guam. The problem of a highly dysfunctional, largely mismanaged, overly bureaucratic, and politically charged solid waste system, which this Governor has inherited from past administrations, is beyond correction by conventional methods. Accordingly, this court invokes its equity jurisdiction and Rule 70 of the Federal Rules of Civil Procedure and hereby appoints a receiver to manage, supervise and oversee the Solid Waste Management Division ("SWM") of DPW.

///

///

# I. Background

The historical background of this case leading up to the entry of the Consent Decree on February 11, 2004, has been presented in several prior orders and need not be reiterated at length here. The court, however, will stress that the Consent Decree was entered into by the parties after extensive arms-length negotiations.

Since the Consent Decree was entered, protracted litigation has resulted from the Government of Guam's noncompliance, which has led to this court's further oversight.[1] Concerned over the Government of Guam's lack of progress, on December 6, 2006 the United States filed a Request for a Status Hearing. *See* Docket No. 56. Thereafter it filed a Motion to Enforce Consent Decree, and the Government of Guam filed a Motion to Modify Consent Decree. *See* Docket Nos. 69 and 76. Both motions were filed on January 31, 2007, and were heard by the U.S. Magistrate Judge on March 8, 2007. The Government of Guam requested another four years to complete its duties and responsibilities under the Consent Decree.[2] The U.S. Magistrate Judge subsequently recommended that this court deny that request. *See* Docket No. 125. This court adopted that recommendation. *See* Docket No. 177.

In October 2007, this court began conducting monthly status hearings and site visits. *See* Docket No. 146. For its failure to abide by the mandates of the Consent Decree, this court, *inter alia*, imposed stipulated penalties of more than $2.855 million against the Government of Guam.[3] *See* Docket No. 177.

More recently, the court invoked the Supremacy Clause, invalidating Section 98 of Public Law 29-19, thereby removing the impediment that officials from the Government of Guam

---

[1] Since the entry of the Consent Decree, there have been approximately 200 additional pleadings filed dealing with the enforcement of the Consent Decree.

[2] The Government of Guam's "revised schedule" proposed that operations at the new landfill in Dandan begin on or about July 30, 2010, with the eventual closure of the Ordot Dump slated for December 16, 2011.

[3] At the Government of Guam's request, the court stayed the imposition of these penalties in exchange for the Government of Guam's deposit of said funds with the court as proof of its good faith efforts to come into compliance with the Consent Decree.

argued had prohibited them from proceeding with the development of the Dandan landfill. *See*

Docket No. 218.

Despite this court's greater involvement and repeated calls for a unified approach in expeditiously resolving the solid waste crisis, there has been minimal progress. The actions undertaken by the Government of Guam were spurred by this court's orders, rather than out of a genuine commitment to meet its responsibilities to its citizenry. At the March 2008 status hearings, the court was again reminded of how little has been done.

## II. DISCUSSION

The court has repeatedly emphasized that time is of the essence. That time has now run out. The U.S. Environmental Protection Agency ("EPA") issued its first administrative order in 1986 directing that the Government of Guam cease discharging leachate from the Ordot Dump. Despite the passage of 22 years, this dump is still in operation with no realistic end in sight. Accordingly, the court must consider drastic remedies to ensure that this islandwide health and environmental hazard does not continue. These remedial measures include the imposition of monetary damages, the appointment of a special master or court monitor, the imposition of a moratorium and the immediate closure of the Ordot Dump, or the appointment of a receiver.

## A. ALTERNATIVE MEASURES

The court first considers whether it should impose monetary damages to exact compliance. "Courts of equity have traditionally viewed injuries to real property as incapable of being repaired by an award of money judgments. . . . A threat to public health may render legal remedies inadequate in environmental cases." Jason Feingold, *The Case for Imposing Equitable Receiverships Upon Recalcitrant Polluters*, 12 UCLA J. ENVTL. L. & POL'Y 207, 218 (1993) (hereinafter "*Recalcitrant Polluters*").

The environmental threat here cannot be disputed. The Ordot Dump is unlined on its bottom and uncapped at its top, and thus acts like a sponge, retaining rain water and releasing it after it has percolated through the dump and absorbed contaminants. *See* Docket No. 55. Mr. Pankaj Arora, Environmental Engineer for the U.S. EPA, stated that the "[f]ailure to close the Ordot Dump will cause other environmental and health problems in addition to the continued

3

discharge of leachate. During the DPW's operation of the Ordot Dump, the Dump has continued to pose a vector issue (*i.e.* flies, rodents, and other pests), an odor problem, and a fire hazard."[4]/ Arora Decl. Docket No. 73. The imposition of monetary damages is an inadequate remedy and would not resolve the continuing harm to the environment and the citizens of Guam.

Moreover, given the Government of Guam's limited financial resources, any monetary damages ordered would divert money better spent on Consent Decree projects. Furthermore, this court cannot ignore that a monetary judgment against the Government of Guam, could "eventually be passed on to nonculpable taxpayers." *See* Summary and Comments, 10 Envt'l Law Rep. 10059 (Mar. 1980).

Next, the court considers the appointment of a special master which is authorized by Rule 53 of the Federal Rules of Civil Procedure. At this point in the litigation, however, such an appointment would be a step backwards in terms of complying with the Consent Decree. The special master would oversee compliance with the Consent Decree and upon submission of a "master's report," this court would conduct "appellate-type review." Stuart P. Feldman, *Curbing the Recalcitrant Polluter: Post-Decree Judicial Agents in Environmental Litigation*, 18 B.C. Envt'l Aff. L. Rev. 809, 820 (1991). This additional level of judicial review would likely result in further delay and inaction by the Government of Guam.

The appointment of a special monitor would be even more problematic and subject to challenge. *See, e.g.*, *Hook v. Arizona*, 907 F.Supp. 1326 (D. Ariz 1995) (challenge to appointment of a special monitor to oversee Defendant's compliance with court-ordered remedial measures due to violations of prison inmates' constitutional rights). "In accomplishing their task, monitors generally play a less intrusive role than masters or receivers. Nevertheless, litigants frequently challenge references to monitors." Feldman, *Curbing the Recalcitrant Polluter*, 18 B.C. Envt'l Aff. L. Rev. at 826. Because there is no authority in statute or rule for such an appointment, this court would have to rely solely on its inherent authority to undertake this measure.

---

[4]/ From its own site visits, the court is well aware that not only are the surrounding residents exposed to these health hazards, but the DPW employees tasked to work at the Ordot Dump must likewise endure these deplorable conditions.

1    This court also rejects the imposition of a moratorium to immediately close the Ordot

2    Dump.  Although this prohibition would ensure that no future trash is deposited at the Ordot

3    Dump, it would almost certainly guarantee rampant and widespread illegal dumping.  Thus,

4    rather than a specific focus on the discharge of pollutants at one site, there would be an imminent

5    threat of leachate draining into the waters throughout the island.  This alternative is not realistic

6    and would indeed result in greater harm to the community.

7        In sum, these alternative remedies would do little to achieve compliance with the Consent

8    Decree.  Accordingly, the court must consider the appointment of a Receiver.

9    **B.  AUTHORITY TO APPOINT A RECEIVER**

10       The court is fully cognizant that the appointment of a receiver to ensure compliance with

11   federal environmental laws is a remedy reluctantly and rarely used.  Such an appointment is

12   rooted in traditional notions of an equitable receivership and in Rule 70 of the Federal Rules of

13   Civil Procedure.  Environmental receiverships have gained acceptance as a remedial measure by

14   the courts.

15       **1.  TRADITIONAL NOTIONS OF RECEIVERSHIP**

16       A traditional receivership involved a court in equity appointing a neutral third party to be

17   responsible for holding and protecting specific property, such as real property, estates, and failed

18   businesses.  *See generally* Joanne R. Denworth and James Burn, *Moyer's Landfill: Case Study of*

19   *a Federal Equity Receivership*, 4 TEMPLE ENVTL. L. & TECH. J. 17, 21 (1985).  "Receivers

20   historically have been appointed as custodians for property deemed to be in jeopardy of loss from

21   improper diversion or destruction."  Feingold, *Recalcitrant Polluters*, 12 UCLA J. ENVTL. L. &

22   POL'Y at 212.

23       The concept of a receiver has evolved from being simply a custodian of property, and has

24   been used in certain cases as an agent of reform.  "The most dramatic and controversial

25   receiverships of the late twentieth century, the institutional reform cases, exemplify the modern

26   exercise of equitable authority to appoint a receiver to address persistent non-compliance with

27   judicial decrees."  *Recalcitrant Polluters*, *supra* at 214.  A receiver was appointed to implement

28   court-ordered school desegregation in *Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976).

5

More recently, a receiver was appointed to oversee and administer medical services in California's state prison system. *See Plata v. Schwarzenegger*, No. C01-1351 THE, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) (Findings of Fact and Conclusions of Law Re Appointment of Receiver).

These modern remedial receiverships have also arisen in environmental cases. Environmental receiverships found its genesis in 1979, when the City of Detroit, the City's Water and Sewerage Department and the State of Michigan were sued by the United States Environmental Protection Agency for violating the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq. United States v. City of Detroit*, 476 F. Supp. 512 (1979). The parties entered into a consent judgment, but despite limited progress "failed to comply with the judgment of th[e] court and federal law governing water pollution." *Id.* at 520. The court *sua sponte* ordered the appointment of a receiver "to secure compliance with the law and th[e] court's judgment." *Id.* The court recognized that such authority to appoint a receiver was "founded in the broad range of equitable powers available to [a district] court to enforce and effectuate its orders and judgments." *Id.*

Relying on *City of Detroit*, the court in *Town of Greenwich v. Department of Transportation*, 10 Envtl. L. Rep. 20178 (1980), appointed a receiver to take control of the Connecticut Department of Transportation ("DOT") to close down a power plant for violating air pollution regulations promulgated pursuant to the federal Clean Air Act 42 U.S.C. § 7401 *et seq.* As in *City of Detroit*, the parties in *Town of Greenwich* entered into a consent judgment, but it was undisputed that the DOT did not comply and continued to violate the air pollution regulation. *Id.* The court appointed a receiver "to secure compliance with the law and the judgment of th[e] Court." *Id.*

Since *City of Detroit*, other courts have ordered receiverships when environmental laws were implicated and concerns regarding health and safety had been raised. *See, e.g., Ohio ex rel. Brown v. Chem-Dyne Corp.*, Case No. CA-80-03-0021, 1981 WL 5234 (Ohio App. Oct. 28, 2981) (unreported) (affirming the appointment of a receiver over a private company that had unlawfully accumulated hazardous waste that polluted the water, and then violated a stipulated

6

agreement to cease the pollution); *O'Leary v. Moyer's Landfill, Inc.*, 677 F.Supp. 807, 815 (E.D. Pa. 1988) (holding that the court "retain[ed] ongoing jurisdiction for the duration of the receivership over claims arising with respect to the property in the Receiver's control as a means of protecting the court's own judgment."); *Dep't of Envt'l Prot. v. Emerson*, 563 A.2d 762 (Me. 1989) (affirming the appointment of a receiver to oversee operation of a tire storage and disposal facility and ensure compliance with state laws regarding, *inter alia*, hazardous waste, solid waste management and hazardous clearance); *Ohio ex rel. Celebrezze v. Gibbs*, 573 N.E.2d 62, 67-68 (Ohio 1991) (affirming appointment of a receiver and further holding that state law "enabl[ed] the trial court to exercise its sound jurisdiction to limit or expand a receiver's powers as it deems appropriate."); *United States v. Acadia Woods Add. #2 Sewer Co.*, 41 F. Supp. 2d 632 (W.D. La. 1999) (appointing a receiver to run a wastewater city treatment plant to ensure compliance with federal Clean Water Act).

## 2. AUTHORITY TO IMPOSE A RECEIVERSHIP

A court has authority, as a court in equity, to establish a receivership. Federal courts are invested with jurisdiction over "all cases in law and equity." U.S. CONST. Art. III, § 2. Indeed, one court stated that its authority to appoint a receiver "is founded in the broad range of equitable powers available to this court to enforce and effectuate its orders and judgments." *City of Detroit*, 512 F.Supp. at 520. Other courts have followed *City of Detroit* and relied on equity jurisdiction to appoint federal receivers in cases where there were violations of environmental laws. *E.g.*, *Town of Greenwich*, 10 Envtl. L. Rep. 20178 ("A court appointed Administrator will be selected . . . [and t]he authority of this Court to exercise such broad remedial power is well articulated by Judge Feikens in *[City of Detroit]* and cases cited therein."); *Alisal Water Corp.*, 326 F.Supp. at 1026 (stating that the evidence at trial "suggests powerfully that significant equitable relief, including the appointment of a receiver for certain specified purposes, is warranted here"); *Acadia Woods*, 41 F. Supp. 2d at 633 (appointing a receiver "based upon the broad range of equitable powers available to this Court to enforce and effectuate its orders and judgment").

///

7

Courts have also relied on Rule 70 of the Federal Rules of Civil Procedure, which states: "[I]f a party fails to comply [with a judgment] within the time specified . . . the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court." Fed. R. Civ. P. 70. *See Town of Greenwich*, 10 Envtl. L. Rep. 20178 ("The Administrator . . . is vested with the power and authority provided under Rule 70 of the Federal Rules of Civil Procedure to perform all acts he deems necessary to achieve expeditious compliance . . . ."); *City of Detroit*, 476 F.Supp. at 516 (stating that the receiver was "vested with the power and authority as provided under Rule 70 of the Federal Rules of Civil Procedure to perform any act necessary to achieve expeditious compliance with the Consent Decree.").

Although neither party has moved for the appointment of a receiver, both parties have conceded this court's authority to appoint one. *See* Docket Nos. 147 and 152. At this court's request, both parties submitted the names of individuals and/or firms to serve as potential receiver. *See* Docket Nos. 204 and 206. The court advised the parties that it would interview these candidates, and subsequently met with seven out of the nine nominees.[5]/ These interviews were both educational and enlightening, and further bolsters the court's belief that nothing short of an appointment of a receiver will resolve this crisis.

**C. EVIDENCE IN THIS CASE SUPPORTS APPOINTMENT OF A RECEIVER**

The history of this case demonstrates that the Government of Guam is paralyzed by an institutional and systemic quagmire that has prevented it from effectively complying with the Consent Decree. The court acknowledges that the Government of Guam, and specifically DPW, has recently shown some advancement toward gaining some compliance with the Consent Decree. However, progress is limited and sporadic.

**1. HISTORY OF NONCOMPLIANCE WITH THE MANDATES OF THE CLEAN WATER ACT**

From the court's perspective, and in light of the record of this case, the Government of Guam should not be surprised by the court's resort to this drastic measure. The record reveals

---

[5]/ The court attempted to interview all nine candidates. One declined to be interviewed, and the court was unable to make contact with the other.

that the Government of Guam has been on notice of its violation of the Clean Water Act for

twenty-two years, when the U.S. EPA issued an Administrative Order in 1986 directing DPW to

cease discharge of leachate by May 1, 1987. *See* Lee Decl. Docket No. 75. DPW failed to

comply. *Id.* Another Administrative Order was issued in 1990, again requiring the cessation of

discharges by June 30, 1992. *See* Complaint, Docket No. 1; Answer, Docket No. 7; Consent

Decree, Docket No. 55. Although the U.S. EPA granted an extension until August 15, 1992,

DPW again failed to meet this deadline. In 1997, the U.S. EPA amended the 1990

Administrative Order that required DPW to submit a proposed schedule for the design and

construction of a cover system to eliminate the discharge of leachate from the Ordot Dump. *See*

Complaint, Docket No.1; Lee Decl., Docket No. 75. Although DPW submitted a proposed

schedule, it was rejected because it lacked the funding commitment to make the plan credible.

*See* Complaint, Docket No.1; Lee Decl., Docket No. 75. Moreover, for two years prior to the

filing of the Complaint, the United States and the Government of Guam engaged in intense

negotiations, and the United States submitted a proposed consent decree, which was signed by

the former governor, the Hon. Carl T.C. Gutierrez, in 2003 just before leaving office. *See* Report

and Recommendations, p. 3 n.2, Docket No. 125. In light of the change in administration, further

settlement negotiations began with new Government of Guam officials, *id.*, and ultimately, the

parties entered into the Consent Decree on February 11, 2004. *See* Docket No. 55. The Consent

Decree, herein at issue, was signed by the current governor, Hon. Felix P. Camacho. *See*

Consent Decree, Docket No. 55. Yet, more than four years after entering the Consent Decree,

compliance with its mandates are minimal: the Ordot Dump remains the island's only means of

solid waste disposal; construction of the new landfill at Dandan cannot begin until award of the

contract which is expected to occur in five months; the Government of Guam cannot, with any

certainty, articulate the means of funding either the closure of the Ordot Dump or the

construction of the new landfill; and the Government of Guam has not even decided on the

procurement method for the closure of the Ordot Dump or construction of the new landfill.

There are several reasons which lead this court to conclude that the Government of Guam

is unable to achieve true compliance with the mandates of the Consent Decree. These reasons

support the necessity of the appointment of a receiver in this case.

### 2. LACK OF FINANCIAL COMMITMENT

Most troubling to this court is the lack of financial commitment evinced by the Government of Guam toward funding Consent Decree projects. The Government of Guam has known it was in violation of the Clean Water Act since 1986, and was ordered, twenty-two years ago, to cease discharge of leachate. *See Lee Decl.* Docket No. 75.

Pursuant to ¶10(a) of the Consent Decree, the Government of Guam was required to submit a financial plan for funding the various Consent Decree projects, which included the funding source or sources and a schedule to secure funds for the capital and operating costs necessary to implement said actions. The Government of Guam's Revised Financial Plan indicated a preference for financing the initial sum of approximately $100 million through revenue bonds. *See* Motion to Enforce Consent Decree, Docket No. 69, at Attachment 14. These revenue bonds would then be re-paid through the steady collection of tipping fees and residential customer rates. Despite such a clear need to improve its collection rates in order to obtain these revenue bonds, Lawrence Perez, the director of DPW, testified that the agency has only increased its residential revenue collection rate from 30% to 50%.

This poor collection rate has been an ongoing problem. For example, back in April 2006, the Public Utilities Commission ("PUC") contracted with the Georgetown Consulting Group ("GCG") to examine whether DPW was capable of efficiently billing and collecting an increased rate revenue which would be required to fund the Government of Guam's obligations under a proposed revenue bond.[6] The GCG's August 2006 "Focused Audit Report and Recommendations" found that:

> (a) DPW's current billing and collection system is unable to competently handle even the current rate revenue levels much less the increased burden necessary to support the revenue bonds.

---

[6] At that time, it was anticipated that the existing rates would have to be increased 400% over the next three years in order to pay for the revenue bonds. *See* Motion to Enforce Consent Decree, Docket No. 69, at Attach. 12.

10

(b)     Substantial remedial action, including operational changes, legislation, regulatory action and rule-making must immediately occur to enable DPW to bill and collect the revenue necessary to fund revenue bond requirements.

(c)     If this remedial action does not occur, DPW will not be able to bill and collect the revenues necessary to fund revenue bond obligations and this burden would fall, in part, on the General Fund. Regulatory principles could obstruct the PUC (i) from awarding rate increases to compensate for DPW billing and collection mismanagement; and (ii) from increasing SWM residential customer rates unless the quality of residential service is dramatically improved.

*See* Motion to Enforce Consent Decree, Docket No. 69, at Attach. 12.

Because of GCG's findings regarding DPW's poor residential service and billing and collection mismanagement, the PUC would not approve any increase in rates. Despite such findings by GCG, DPW has not made any concerted effort to improve its billing practices. A year later in August 2007, the Guam Public Auditor conducted a Public Auditor's Performance Audit and again problems concerning collection procedures were identified. The Public Auditor estimated that $4 million in government revenues were lost due to thousands of residential customers who may not have been billed or had not been provided services. Regardless of the findings by the GCG in 2006 and the Public Auditor in 2007, little has been done in terms of improving DPW's collections. It is disconcerting that DPW's collection rates have not improved at a more significant level, particularly when financial resources are so limited.

The lack of a consistent revenue stream from collections is further exacerbated by the Guam Legislature's failure to provide funding for any of the Consent Decree projects. At the status hearings last week, Mr. Perez testified that DPW prepares two budget proposals annually. The first is an operating budget and the second is a supplemental budget, which he represented was a "wish list" of "unfunded mandates" that included Consent Decree projects. No funding has been provided by the Guam Legislature for the Consent Decree projects. In fact, he stated that the only funding for Consent Decree projects are from grants received and monies the Governor reallocates using his transfer authority. Without a commitment to fund the necessary projects, there is little chance that the closing of the Ordot Dump and opening of the landfill at Dandan will ever occur.

11

### 3. LACK OF COOPERATION BETWEEN THE EXECUTIVE AND LEGISLATIVE BRANCHES

The court finds that there has been an historical failure of the leadership of the Government of Guam to respond to the solid waste crisis. The past and current leaders have failed to take the bold measures necessary to protect the lives and welfare of the citizens of Guam. The record in this case reveals that the Executive and Legislative Branches, in several instances, have not been able to work cooperatively to ensure compliance with the Consent Decree.

The Legislature has not only failed to provide any funding for Consent Decree projects, but it has actively prohibited the expenditure of monies toward development of the landfill at the Dandan site. For example, the Legislature enacted Section 98 of Guam Public Law 29-19 ("Public Law 29-19"), which essentially prohibited the expenditures of funds for any landfill site that the Government of Guam did not yet own. Because the condemnation proceedings in Dandan had not begun, this public law prevented all expenditures that would have facilitated the opening of Dandan.[7] Therefore, the completion of a Hydrogeological Report on the Dandan site by Mr. Tor Gudmundsen was significantly delayed because of lack of payment. The actions of the Legislature left the court with no other alternative but to invoke the Supremacy Clause to strike down Section 98 of Public Law 29-19 as a means to enforce compliance with the mandates of the Consent Decree. *See* Docket No. 188.

Additionally, the court ordered the Government of Guam to pay $2.855 million in stipulated penalties by January 24, 2008.[8] The Governor used his transfer authority to take money from the budget of the Guam Public School System so that said funds could be deposited with the court. Thereafter, the Legislature, rather than collaborate with the Governor on how to

---

[7] This court notes that the Government of Guam did not initiate condemnation proceedings until this court imposed a deadline of January 24, 2008. Counsel for the Government of Guam represented to this court that the condemnation complaint was filed that day in the Superior Court of Guam.

[8] *See supra,* note 3.

resolve the government's financial woes, chastised the Governor for using his transfer authority in such a manner.

The Governor's transfer authority is an insufficient means of funding the Consent Decree projects. Guam's solid waste crisis can only be resolved with the concerted efforts of both the executive and legislative branches. This court has repeatedly requested that both branches work together and speak with a united voice in finding a solution to this problem so that this court would not have to resort to appointing a receiver. It is clear, unfortunately, that the court's pleas for cooperation have fallen on deaf ears.

### 4. LACK OF TANGIBLE PROGRESS

The lack of funding is only one of DPW's problems preventing it from completing the Consent Decree projects. There is a systemic inertia plaguing the Government of Guam. The Public Auditor made a number of recommendations in her August 2007 audit that do not necessarily require the expenditure of funds. For example, the Public Auditor recommended that the Government of Guam enter into service contract agreements with the commercial haulers. Despite having several months to draft these agreements, the Government of Guam is still working on them and is hoping to get them finished "soon."

Additionally, the road design work has been completed for over a year and half, there have been no requests for proposals or invitations to bid put out and no work done in this regard.[9] Mr. Perez testified that because of the Government of Guam's financial constraints, it is DPW's preference to enter into a private public partnership where a private company would fund the project and provide a "Design, Build, Operate" bid as to the combined road work and the building and operation of the new landfill. However, this possibility has been offered in the past when the court has asked how the Government of Guam was going to meet the mandates under the Consent Decree. *See* Docket No. 67. Despite these representations, no bid has been

---

[9] In fact, during the hearing last week, Mr. Perez testified that DPW had not decided on a precise procurement process to be used, whether an invitation to bid or request for proposal. At this late juncture, it is troubling that DPW is undecided as how to best proceed.

forthcoming and according to the timeline set forth by TG Engineering, a bid will not be ready for several months. *See* Docket No. 230 Ex. B. The lack of progress in this regard is alarming in light of the fact that the Government of Guam's own experts have stated that the "opening of a new landfill should be expedited and be no later than the end of 2009." *See* Government of Guam's Reply to United States' Comments on Action Report, Docket No. 230, at 9. The court is seriously concerned that the Government of Guam will not be able to meet this deadline and the Ordot Dump will run out of airspace before the new landfill is opened.[10]/

The condemnation of property in Dandan has not been perfected. At the hearing last week, counsel for the Government of Guam represented that not all parties in interest have been served with the condemnation complaint. Furthermore, a new appraisal of the property will be necessary because of the lapse in time in initiating the condemnation proceeding.

Only recently has DPW transferred a civil engineer to the SWM division, yet it is unclear exactly what type of assistance he will be able to provide in furtherance of complying with the Consent Decree, especially since he is neither a professional engineer, nor does he have extensive experience in solid waste management.

These reasons, among many, highlight the failings of the Government of Guam in complying with the mandates of the Consent Decree. There is no single root cause for the solid waste crisis facing the island. As in any case dealing with the Government of Guam, circumstances are sometimes dictated by a combination of individual effort (or lack thereof) and bureaucratic and political forces. In this instance, it is clear that there has been an historical lack of leadership, planning and vision by the island's leaders.

### III. CONCLUSION

In light of all of the above, the court concludes that the relevant factors and considerations weigh heavily in favor of the appointment of a Receiver. While the court

---

[10]/ The actual amount of remaining airspace is disputed. Testimony has been presented that the available airspace ranges anywhere from 0 days up to 720 days. The court is unsure of the actual figure, but notes that the Government of Guam bases its 720 day calculation on estimates and assumptions. *See* Docket No. 230. This kind of uncertainty needlessly creates public alarm.

14

recognizes the level of commitment shown by Governor Felix P. Camacho and appreciates the hard work and limited progress of DPW in the last few months, the Government of Guam lacks the resources, experienced personnel, and necessary support to comply with the Consent Decree on its own.  Governor Camacho expressed his frustration when he compared the Government of Guam to a rocking horse:  "There is much motion, but no progress."  The court concurs with the Governor's characterization of the situation, but cannot accept the lack of forward movement.

Accordingly, the court hereby appoints as Receiver Gershman, Brickner & Bratton, Inc. ("GBB") of Fairfax, Virginia, a solid waste management consulting firm included in the Government of Guam's list of potential receivers.  This appointment is, without a doubt, one of the most monumental decisions this court has ever made.  It is not made lightly or with relish.  Rather, this decision was reached after much deliberation and upon consideration of the complete record in this case.

Therefore, having conducted monthly hearings and site visits in the above-entitled matter to determine the progress made toward complying with the Consent Decree; having considered all the submissions heretofore filed by the parties; in light of the Government of Guam's lengthy history in failing to comply with the Consent Decree and violating the Clean Water Act, 33 U.S.C. § 1251, *et seq.*; and because of the failure of less drastic remedies to secure compliance with the Clean Water Act:

**IT IS HEREBY ORDERED** that under the broad range of equitable powers available to this court to enforce and effectuate its orders and judgment and Rule 70 of the Federal Rules of Civil Procedure, GBB, acting by and through its Special Principal Associate David L. Manning, is appointed as the Receiver and is vested with the power and authority provided under Rule 70 to perform all acts it deems necessary to achieve expeditious compliance with the Consent Decree.

**A.    RECEIVER'S AUTHORITY/DUTIES**

1.  **IT IS ORDERED** that the Receiver shall have full power and authority to enforce the terms of the Consent Decree, and assume all of the responsibilities, functions, duties, powers and authority of the Solid Waste Management Division of the Department of Public Works, and any and all departments, or other divisions of the Department of Public Works insofar as they affect

15

the Government of Guam's compliance with the Consent Decree.

2. **IT IS FURTHER ORDERED** that the Receiver shall have the authority required or necessary for the complete management and control of the Consent Decree projects, including but not limited to:

(a) The supervision of all of Government of Guam's employees associated with the Consent Decree projects;

(b) The performance of existing contracts;

(c) The entering into future contracts deemed necessary. In awarding any future contracts, the Receiver shall follow the procedures required in Guam's statutes and regulations, unless, in the best judgment of the Receiver, such compliance would unreasonably delay the progress in meeting the mandates of the Consent Decree;

(d) The hiring of all such consultants, professionals, contractors, engineering firms or counsel which the Receiver deems necessary for the performance of administrative, financial advisory, legal, accounting, engineering, construction, and operations services;

(e) The facilitation of financing and/or borrowing of such funds necessary to carry out the duties relating to the Consent Decree as set forth in the Government of Guam's Revised Financial Plan. If, in the best judgment of the Receiver, the Revised Financial Plan fails to provide the means or methods of financing necessary or would unreasonably delay the progress in meeting the mandates of the Consent Decree, the Receiver is authorized to modify the Plan to provide for alternative means or methods of debt financing it deems appropriate;

(f) The application to the Consolidated Commission on Utilities for rate increases for residential waste collection services and/or tipping fees on a temporary or permanent basis, as appropriate, unless, in the best judgment of the Receiver, such action would unreasonably delay the progress in meeting the mandates of the Consent Decree;

16

(g) The full and complete access to the staff, documents, books, records, electronic databases and facilities of any and all Government of Guam departments or divisions of the Department of Public Works and to make such employees and items available to any consultants, accountants, attorneys or other such persons employed by the Receiver;

(h) The full and complete access to the documents, books, records, electronic databases held by any Government of Guam entity that has in its custody records deemed necessary by the Receiver to ensure compliance with the Consent Decree; and

(i) Consultation with the United States Environmental Protection Agency with respect to any aspect of complying with the Consent Decree, and to secure technical advice or assistance from such agency for the purpose of assuring compliance with the Clean Water Act and all other applicable laws and regulations.

**B. TERMS OF APPOINTMENT**

1. This appointment shall be for the period necessary to achieve compliance with the Consent Decree, unless:

(a) The Receiver recommends termination of this Order as no longer necessary, or modification thereof, and said termination or modification is accepted by this court;

(b) The Receiver requests to be relieved and such request is approved by this court;

(c) This Order is otherwise modified or terminated by this court.

2. The Receiver may, at any time, apply to this court for instructions and/or modification of this Order, and may seek instructions as to whether funds should be expended for a particular purpose.

3. The Receiver shall submit quarterly reports to this court regarding the progress made toward compliance with the Consent Decree.

4. The Receiver is responsible solely to this court. The Receiver shall not be personally liable for any act done in compliance with this Order. No suit shall be filed against the Receiver

17

1    without the consent of the court.

2    **C. Remuneration**

3        1. **It is Hereby Ordered** that the Receiver shall receive remuneration at the rates set

4    forth in the attachment hereto and in the following manner:

5            (a) On or before the 7th day of each month, the Receiver shall file and serve the

6        court, with a copy to the Government of Guam, a summary of time expended and

7        expenses incurred during the month immediately preceding, along with a billing

8        statement and request for compensation.  The court shall review the request for

9        compensation for reasonableness by the 20th of each month, and shall direct that payment

10       be made to the Receiver for all compensation and expenses incurred and found by the

11       court to be reasonable by the 25th of each month.

12           (b) Payments shall be limited to 90% percent of fees and 100% percent of

13       all expenses deemed reasonable.  Ten (10%) percent of fees shall be held in trust

14       accruing interest at prevailing rates for trust accounts to the credit of the Receiver

15       and shall be payable upon completion of the project.

16       2. The Receiver shall file an application for the payment of fees to any consultant and/or

17   professional hired as authorized herein, such as accountants, legal counsel, and others hired to

18   assist in the performance of administrative duties.  Such professional fees shall be paid by the

19   same procedures as set forth for the payment of the Receiver.  However, with respect to 10%

20   retainage held in trust, the Receiver may request its release to other consultants and/or

21   professionals hired at the time their work is completed.

22       3. Defendant shall be responsible for compensation and expenses of the Receiver and of

23   any and all persons or entities employed or contracted by the Receiver in carrying out the

24   provisions of this Order.

25   **D. Orders as Regard to Other Parties/Entities**

26       1. **It is Hereby Ordered** that the parties, including but not limited to the United States

27   Environmental Protection Agency, Department of Public Works and Guam Environmental

28   Protection Agency, shall use their best efforts to assist the Receiver in the performance of its

18

duties.  Furthermore, the parties shall cooperate with, and assist, the Receiver to the extent necessary and appropriate to permit the Receiver to carry out its responsibilities under this Order.

2.  **IT IS FURTHER ORDERED** that the parties, including but not limited to the United States Environmental Protection Agency, Department of Public Works and Guam Environmental Protection Agency, are to immediately comply with this Order and are enjoined from interfering in any manner, or from failing to cooperate either directly or indirectly, with the Receiver in the performance of its functions and duties.

**E.  CONTINUING JURISDICTION**

1.  This court retains specific and continuing jurisdiction to enforce the provisions of this Order, and to enter such further orders to effectuate the purposes of the Receivership and compliance with the Consent Decree.

2.  This court retains jurisdiction to enable any party, subject to this Order, to apply to this court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Order, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

In conclusion, the appointment of GBB as Receiver is a positive step in moving the Government of Guam forward.  The Receiver has extensive experience in solid waste management operations and will ensure compliance with the Consent Decree and the Clean Water Act, thus, protecting the natural resources for future generations.  It is the court's hope that the Governor and the new Speaker of the Guam Legislature, the Hon. Judith Won Pat, will cooperate with this court's order to see that the Ordot Dump crisis is resolved as expeditiously as possible.

**IT IS SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Mar 17, 2008**

19



**GBB**

SOLID WASTE
MANAGEMENT
CONSULTANTS

March 15, 2008

Honorable Frances Tydingco-Gatewood
Chief Judge
District Court of Guam
520 West Soledad Avenue
Hagåtña, Guam 96910

Re:     Letter of Engagement for Services Pursuant to Designation as Receiver

Dear Judge Tydingco-Gatewood:

The purpose of the letter is to confirm the designation of Gershman, Brickner & Bratton, Inc. (GBB) as Receiver pursuant to your Court Order that you have told us will be dated March 17, 2008.

GBB herein designates David L. Manning to be signatory for GBB as Receiver.  He would sign correspondence as "David L. Manning, as Receiver Gershman, Brickner & Bratton, Inc. for the United States District Court Territory of Guam."  I will be GBB's overall Officer-in-Charge of this engagement.  Other GBB officers, staff, and associates will be utilized as the activities dictate.  In particular, Chace Anderson, GBB Vice President, will play a significant role.

<u>Approach to this Engagement</u>

In undertaking this assignment, our initial approach will be along the following lines:

1.  Review all information in this matter on file with the Court.

2.  Make an initial determination of other information needed by the Receivership and prepare a request for the information to be sent to the Defendant.

3.  Conduct a visit and associated meetings in Guam for the purpose of:

    a.  Becoming familiar with the Solid Waste Management Division, its staff, management, infrastructure, operations, and current set of consultants and contractors;
    b.  Establishing offices in facilities provided by the Court and meeting with Court officials who are involved in this matter;
    c.  Meeting with Guam Government officials and other stakeholders, including the U.S.E.P.A. Regional office officials who have relevance to accomplishing the objectives in the Consent Decree; and
    d.  Visiting the site of the Ordot Dump and the proposed site(s) for the new landfill.

Gershman, Brickner & Bratton, Inc.

8550 Arlington Boulevard, Suite 203
Fairfax, Virginia 22031-4620
(703) 573-5800  FAX (703) 698-1306
E-MAIL gbb@gbbinc.com
Printed on recycled paper

4. Prepare a draft Plan of Action and submit it to the Court and other parties as directed by the Court for review and comment.

5. Finalize the Plan of Action and submit it to the Court for approval.

6. Upon approval of the Court, distribute the Plan of Action throughout the Guam Government to appropriate parties and to other parties as necessary, conducting meetings with these individuals and groups as necessary to explain the Plan of Action.

7. Start implementation of the Plan of Action, reporting as necessary to the Court, and updating and issuing addenda to the Plan of Action as is necessary.

During the course of our work, GBB will plan, coordinate, and report on the activities among its staff and others who are involved from the Defendant and other parties as appropriate. GBB will keep the Court apprised of anticipated work activities, staffing, scheduling, and budgeting as they occur, including invoicing and activities reporting as outlined in the Court's Order. GBB will assess specific requirements and identify appropriate resources to be applied and update its work plan, schedule and budget estimates for the work required.

The effective commencement date of our services will be March 17, 2008.

<u>Invoicing and Reporting</u>

Attached to this letter is a compensation rate schedule that will be the basis for charges relevant to this matter. Because travel time to and from Guam will be significant, staff travelling to and from Guam will be allowed to charge up to one-half of their "gate-to–gate" travel time as billable time to this matter. Also, prior to our first trip to Guam, we will submit to the Court for review and approval our plan for our room and board arrangements when on Guam. In addition to our fees and the cost of our room and board arrangements, we will incur some other expenses in connection with our work for the Court in this matter. While these costs could be estimated and added to our fees, we are concerned that such an approach would add more cost to the Receivership than is necessary. Therefore, we prefer to exclude these expenses from our fees and develop a plan that will assure that we cover only our actual and reasonable expenses. We will also submit our plan for these expenses to the Court for review and approval prior to our first trip to Guam. We look forward to receiving guidance from you in this regard.

It is our understanding that the Court has available funds in the amount of approximately $2.8 million that can be used to cover the expenses of the Receivership and that the Court will assure that these funds are replenished from time to time as is necessary to assure that the Receivership is able to successfully achieve its purpose of full compliance with the Consent Decree in this matter.

Invoicing and activities reporting will be done formally on a monthly basis per the requirements of the Court Order. More frequent contact will be made with the Court either by phone, in person, or by e-mail as the situation requires.



We look forward to this assignment and in achieving the objectives of the Court to bring the Guam Government in compliance with the Consent Decree. If there are any questions, please do not hesitate to contact me.

Sincerely,

GERSHMAN, BRICKNER & BRATTON, INC.

Harvey W. Gershman
President

Attachment

cc:     David Manning, GBB
        Chace Anderson, GBB

**ATTACHMENT**

**GERSHMAN, BRICKNER & BRATTON, INC.**
**COMPENSATION RATE AND FEE SCHEDULE (1, 2)**
**FOR RECEIVER ASSIGNMENT PER COURT ORDER DATED MARCH 17,**
**2008**

| POSITION | ($ PER HOUR) |
|---|---|
| President (Gershman) | 250.00 |
| Special Principal Associate (Manning) | 250.00 |
| Executive Vice President (Brickner) | 225.00 |
| Sr. Vice President (Bratton) | 210.00 |
| Vice President (Anderson, Bernheisel) | 185.00 |
| Principal Associate/Principal Engineer | 165.00 |
| Sr. Project Manager/Sr. Project Engineer/ Sr. Associate Engineer | 160.00 |
| Project Manager/Sr. Associate | 140.00 |
| Project Engineer/Sr. Consultant/Support Director | 125.00 |
| Consultant II/Engineer II/Contract Administrator | 105.00 |
| Consultant I/Engineer I | 85.00 |
| Support Manager | 65.00 |
| Administrative Secretary/Word Processor/ Editor/Staff Accountant | 60.00 |
| Clerical/Support Staff/Research Assistant/Graphics Coordinator | 45.00 |

(1) Effective January 1, 2008, subject to 4 percent annual increase as of January 1, 2009.
(2) For payments not received within 30 days of invoicing date, interest charge of 1.00 % per month will be applied.



**GBB**

SOLID WASTE
MANAGEMENT
CONSULTANTS



March 15, 2008

Honorable Frances Tydingco-Gatewood
Chief Judge
District Court of Guam
520 West Soledad Avenue
Hagåtña, Guam  96910

Re:    Letter of Engagement for Services Pursuant to Designation as Receiver

Dear Judge Tydingco-Gatewood:

The purpose of the letter is to confirm the designation of Gershman, Brickner & Bratton, Inc. (GBB) as Receiver pursuant to your Court Order that you have told us will be dated March 17, 2008.

GBB herein designates David L. Manning to be signatory for GBB as Receiver.  He would sign correspondence as "David L. Manning, as Receiver Gershman, Brickner & Bratton, Inc. for the United States District Court Territory of Guam."   I will be GBB's overall Officer-in-Charge of this engagement.   Other GBB officers, staff, and associates will be utilized as the activities dictate.   In particular, Chace Anderson, GBB Vice President, will play a significant role.

Approach to this Engagement

In undertaking this assignment, our initial approach will be along the following lines:

1.  Review all information in this matter on file with the Court.

2.  Make an initial determination of other information needed by the Receivership and prepare a request for the information to be sent to the Defendant.

3.  Conduct a visit and associated meetings in Guam for the purpose of:

    a.  Becoming familiar with the Solid Waste Management Division, its staff, management, infrastructure, operations, and current set of consultants and contractors;
    b.  Establishing offices in facilities provided by the Court and meeting with Court officials who are involved in this matter;
    c.  Meeting with Guam Government officials and other stakeholders, including the U.S.E.P.A. Regional office officials who have relevance to accomplishing the objectives in the Consent Decree; and
    d.  Visiting the site of the Ordot Dump and the proposed site(s) for the new landfill.

Gershman, Brickner & Bratton, Inc.

8550 Arlington Boulevard, Suite 203
Fairfax, Virginia 22031-4620
(703) 573-5800  FAX (703) 698-1306
www.gbbinc.com
Printed on recycled paper

Case 1:02-cv-00022    Document 239-2    Filed 03/17/2008    Page 1 of 5

4. Prepare a draft Plan of Action and submit it to the Court and other parties as directed by the Court for review and comment.

5. Finalize the Plan of Action and submit it to the Court for approval.

6. Upon approval of the Court, distribute the Plan of Action throughout the Guam Government to appropriate parties and to other parties as necessary, conducting meetings with these individuals and groups as necessary to explain the Plan of Action.

7. Start implementation of the Plan of Action, reporting as necessary to the Court, and updating and issuing addenda to the Plan of Action as is necessary.

During the course of our work, GBB will plan, coordinate, and report on the activities among its staff and others who are involved from the Defendant and other parties as appropriate. GBB will keep the Court apprised of anticipated work activities, staffing, scheduling, and budgeting as they occur, including invoicing and activities reporting as outlined in the Court's Order. GBB will assess specific requirements and identify appropriate resources to be applied and update its work plan, schedule and budget estimates for the work required.

The effective commencement date of our services will be March 17, 2008.

<u>Invoicing and Reporting</u>

Attached to this letter is a compensation rate schedule that will be the basis for charges relevant to this matter. Because travel time to and from Guam will be significant, staff travelling to and from Guam will be allowed to charge up to one-half of their "gate-to–gate" travel time as billable time to this matter. Also, prior to our first trip to Guam, we will submit to the Court for review and approval our plan for our room and board arrangements when on Guam. In addition to our fees and the cost of our room and board arrangements, we will incur some other expenses in connection with our work for the Court in this matter. While these costs could be estimated and added to our fees, we are concerned that such an approach would add more cost to the Receivership than is necessary. Therefore, we prefer to exclude these expenses from our fees and develop a plan that will assure that we cover only our actual and reasonable expenses. We will also submit our plan for these expenses to the Court for review and approval prior to our first trip to Guam. We look forward to receiving guidance from you in this regard.

It is our understanding that the Court has available funds in the amount of approximately $2.8 million that can be used to cover the expenses of the Receivership and that the Court will assure that these funds are replenished from time to time as is necessary to assure that the Receivership is able to successfully achieve its purpose of full compliance with the Consent Decree in this matter.

Invoicing and activities reporting will be done formally on a monthly basis per the requirements of the Court Order. More frequent contact will be made with the Court either by phone, in person, or by e-mail as the situation requires.

We look forward to this assignment and in achieving the objectives of the Court to bring the Guam Government in compliance with the Consent Decree. If there are any questions, please do not hesitate to contact me.

Sincerely,

GERSHMAN, BRICKNER & BRATTON, INC.

Harvey W. Gershman
President

Attachment

cc:    David Manning, GBB
       Chace Anderson, GBB

# ATTACHMENT

## GERSHMAN, BRICKNER & BRATTON, INC.
## COMPENSATION RATE AND FEE SCHEDULE (1, 2)
## FOR RECEIVER ASSIGNMENT PER COURT ORDER DATED MARCH 17, 2008

| POSITION | ($ PER HOUR) |
|---|---|
| President (Gershman) | 250.00 |
| Special Principal Associate (Manning) | 250.00 |
| Executive Vice President (Brickner) | 225.00 |
| Sr. Vice President (Bratton) | 210.00 |
| Vice President (Anderson, Bernheisel) | 185.00 |
| Principal Associate/Principal Engineer | 165.00 |
| Sr. Project Manager/Sr. Project Engineer/ Sr. Associate Engineer | 160.00 |
| Project Manager/Sr. Associate | 140.00 |
| Project Engineer/Sr. Consultant/Support Director | 125.00 |
| Consultant II/Engineer II/Contract Administrator | 105.00 |
| Consultant I/Engineer I | 85.00 |
| Support Manager | 65.00 |
| Administrative Secretary/Word Processor/ Editor/Staff Accountant | 60.00 |
| Clerical/Support Staff/Research Assistant/Graphics Coordinator | 45.00 |

(1) Effective January 1, 2008, subject to 4 percent annual increase as of January 1, 2009.
(2) For payments not received within 30 days of invoicing date, interest charge of 1.00 % per month will be applied.

