# IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL CASE NO. 02-00022 |
| | ) | |
| Plaintiff, | ) | RE:  STATUS HEARING |
| | ) | |
| v. | ) | QUARTERLY REPORT OF THE RECEIVER |
| | ) | |
| GOVERNMENT OF GUAM, | ) | |
| | ) | JULY 10, 2008 |
| Defendant. | ) | |
| _____ | ) | |



**Presented to**

## Chief Judge Frances Tydingco-Gatewood
## U. S. District Court of Guam





**SOLID WASTE**
**MANAGEMENT**
**CONSULTANTS**
**R E C E I V E R**

**Presented by**

## Gershman, Brickner & Bratton, Inc.

Printed on recycled paper

# TABLE OF CONTENTS

**TAB**

Quarterly Report to the Court ............................................................................... 1

PowerPoint Presentation of the Quarterly Report ............................................. 2

Memorandum Concerning Billing and Collection ............................................... 3

Memorandum Concerning Recycling Facilities .................................................. 4

Memorandum Proposing the Banning of Yard Waste, Untreated Lumber, Inert
Material and Cardboard ....................................................................................... 5

Policy Banning Yard Waste, Untreated Lumber, Inert Material and Cardboard ...... 6

Flyer Distributed to Customers Concerning New Banning Policy .................... 7

Request for Expressions of Interest (RFEI) ........................................................ 8

# Quarterly Report of the Receiver

## Civil Case No. 02-00022
## United States of America v. Government of Guam
## Guam Solid Waste Management Division

Prepared for:



U.S. District Court of Guam

Submitted by:



Gershman, Brickner & Bratton, Inc.
8550 Arlington Blvd, Suite 203
Fairfax, Virginia 22031

July 10, 2008

Printed on recycled paper

Civil Case No. 02-00022
United States of America v Government of Guam

Solid Waste Management Division

Pursuant to the Court's Order, dated March 17, 2008, appointing Gershman, Brickner & Bratton, Inc. (GBB) as Receiver for the Solid Waste Management Division of the Department of Public Works of the Government of Guam, we are pleased to submit to the Court this Quarterly Report ("Report") . The purpose of this Report is to describe to the Court the progress made toward compliance with the Consent Decree since the Court's March 17th Order was issued. As an integral part of this Report, the Receiver is also submitting the attached presentation entitled "Quarterly Report for Receivership for the Government of Guam, Department of Public Works, Solid Waste Management Division" (see Tab 2).

**Background**

The Court and the parties to this matter are very familiar with the background and events that have led to the Court's decision to place the Solid Waste Management Division into federal receivership; therefore, this report will not focus on that background in any detail. However, in order to undertake the assignment for the Court, it was important that the Receivership Team thoroughly review the issues and the background involved in this matter. To accomplish this review, GBB initiated the following activities:

- Reviewed the Consent Decree and the documents previously filed with the Court in this matter (approximately 6,000 pages);
- Performed an initial review of the design and engineering work already completed by the design teams engaged by the Government of Guam;
- Communicated with officials of the Court, U.S. EPA, and the Government of Guam to gain a better understanding of their perspectives on the issues;
- Reviewed the Management Audit conducted for the Public Utilities Commission by the Georgetown Consulting Group;
- Reviewed the Public Auditor's Audit of the Solid Waste Management Division; and
- Began the process of reviewing the financial condition of the Solid Waste Management Division and the Government of Guam.

In addition, we were able to schedule an in-depth consultation with the Court prior to the beginning of a Judicial Conference the Judge attended in Washington, D.C. Our consultation with the Court was held on April 12-13, 2008, after which we were able to schedule a meeting with Congresswoman Madeleine Bordallo's key staff to explore potential federal financial assistance for achieving compliance with the Consent Decree. This meeting occurred on April 14, 2008. The opportunity to meet with the Court and the congressional staff was very important to assuring a positive beginning for the work needed to achieve compliance with the Consent Decree.

Prior to our arrival in Guam, we also developed a Website to better inform the public about the activities of the Receivership. The Website (www.guamsolidwastereceiver.org ) will also serve as a communication tool with the media and assist the receivership in communicating with the customers and potential contractors of the Solid Waste Management Division.

## First Visit to Guam

The Receivership Team arrived in Guam on April 24, 2008, to begin on-the-ground operations in Guam. Our on-the-ground operations will continue without interruption until full compliance with the Consent Decree is achieved.

We also conferred with the Court and Guam's governmental and community leaders including:

❖ Governor Felix P. Camacho
❖ Speaker Judith T. Won Pat, Ed.D
❖ Attorney General Alicia G. Limtiaco
❖ Members of the Guam Legislature
❖ Public Auditor Doris Flores Brooks, CPA
❖ Chief of Staff J. George Bamba
❖ Chairman Simon A. Sanchez II, Consolidated Commission on Utilities
❖ Director Lawrence P. Perez, Department of Public Works
❖ Director Bertha Duenas, Bureau of Budget & Management
❖ Director Lourdes M. Perez, Department of Administration
❖ Administrator Anthony Blaz, Guam Economic Development and Commerce Authority

Other meetings with staff of the officials listed above were also very informative and helpful.

Meetings were also held with the leadership of the military services based on Guam. These meetings included Rear Admiral W.D. French, United States Navy and Brigadier General Douglas H. Owens, United States Air Force and key members of their staffs. These meetings were followed by further discussions with Captain Paul T. Fuligni and key members of his staff. A result of these meetings has been a mutual effort with Captain Fuligni and the Receiver to develop a Memorandum of Understanding ("MOU") as a basis for the military's future use of the new landfill. Military use of the new landfill will avoid the need for the military to develop additional landfill capacity of its own on Guam and reduce the cost of the needed landfill capacity for both the citizens of Guam and the military.

Additionally, we have participated in meetings with representatives of the Joint Guam Program Office, Retired Major General David Bice and Mr. Joe Ludovici, to brief them on the activities of the Receiver and to understand potential funding opportunities for developing infrastructure that supports the forthcoming military buildup on Guam.

During our initial work on Guam, we also briefed the media and had the opportunity to meet with several businesses interested in working with the Receiver to develop the facilities and programs needed to achieve compliance with the Consent Decree. We also met with representatives of the US EPA, Guam EPA, and consultants to Guam Department of Public Works, Solid Waste Management Division working on Consent Decree Projects.

While all of the activities described above are essential to the successful completion of our responsibilities, an equally important aspect of our work has been an assessment and improvement of the operations of the Solid Waste Management Division and gaining an understanding of the financial condition of the Solid Waste Management Division.

## Operations of the Solid Waste Management Division

The operations of the Solid Waste Management Division were much worse than we had expected. While we found a dedicated staff of front line workers, these men and women are forced to work against tremendous obstacles to maintain basic trash collection and disposal services. Almost all of the Government-owned equipment was in a severe state of disrepair, with most of it inoperable due to a lack of parts and maintenance. This has resulted in excessive use of rental equipment at an extraordinarily high cost. In an effort to hold down such expenses, the trucks collecting trash are operated almost 24 hours a day, leaving no time for regular or preventive maintenance, thus perpetuating the cycle of high rental cost and poor service.

The cost of the rental of equipment varies from day to day, but seems to average about $11,000 per day. At this rate, the cost would exceed $4 million annually, a much greater sum than would be required to repair and replace the equipment owned by the Solid Waste Management Division. It should be noted that when rental equipment is used, operators for the equipment are also leased, leaving employees of the Solid Waste Management Division underutilized at a significant cost to the customers of the Solid Waste Management Division. The potential savings and improvements to service to be gained by better management in this area are substantial.

Working conditions for the front line workers are also much worse than we anticipated. In addition to the poor condition of the equipment, the shower and locker room facilities available to most workers are in extremely poor condition, safety hazards are extensive, and maintenance facilities damaged by storms occurring years earlier remain unrepaired.

Costly rental equipment has also been employed extensively, and often unproductively, in the work at Ordot Dump. The lack of a sprinkler service to control dust has been a major problem for the workers and citizens who live in the immediate vicinity of Ordot Dump. While a scale was finally put in place, the cost of the scale's delivery, installation and rental for only three months was approximately the cost of a new scale. The scale has been removed at the request of the Receiver.

It is apparent, however, that operations at Ordot Dump have been improved as a result of both the Receiver's management as well as the Court's continuous attention and regular visits. In addition, the following actions have been taken by the Receiver:

- The dumping area for residents has been relocated to an area near the scale house for safety and operational reasons;
- Regular sprinkler service has been reinstated to control dust;
- Proper daily cover procedures have been initiated;
- Additional staffing has been dedicated to the operations at Ordot Dump; and
- Increased management oversight of operations has begun.

Improved operations cannot, however, overcome the fact that Ordot Dump is in violation of the Clean Water Act and is rapidly running out of space for waste. To comply with the Consent Decree, it must be closed, and in order to provide time to construct the new landfill, the remaining space at Ordot Dump must be used effectively and prudently. This Report will return to this topic after discussing the financial condition of the Solid Waste Management Division.

After bringing the conditions described in this Report to the attention of the Court and the Governor, the Governor issued an Executive Order declaring an emergency that will allow the Receivership to proceed with an expedited procurement of both equipment repairs and selected equipment replacement. This should allow the performance of the Solid Waste Management Division to improve markedly while also saving a minimum of $500,000 in annual rental expense.

We have also initiated an organizational realignment in the Solid Waste Management Division that will provide the Receivership with the management capacity and communications needed for future success. The workers of the Solid Waste Management Division and others within the Government of Guam have been very supportive of our efforts in this area and have facilitated the actions necessary to make the needed organizational changes.

Early in our discussions with officials of the Government of Guam, the Director of Public Works extended to the Receiver the services of Ms. Cynthia Jackson to assist with our work on a full-time basis. Given Ms. Jackson's previous work on the Consent Decree projects and her extensive experience in the Government of Guam, we accepted Mr. Perez's offer. After discussions with the Department of Administration's Human Resources Division, it was recommended to the Receiver that the services of Ms. Jackson be provided to the Solid Waste Management Division under a Memorandum of Understanding (MOU) that would allow her to be reasonably compensated for the services she would provide. Without the MOU arrangement, Ms. Jackson would have to be paid significantly less than the employees she would supervise. This approach was discussed with the Office of the Governor and the Attorney General and approved by both.

Ms. Jackson will serve as the Chief Administrative Officer of the Solid Waste Management Division, responsible for human resources; contract management; customer service and billing and environmental education. The last element of her responsibilities, environmental education, will be especially important as we develop initiatives in the areas of recycling and household hazardous waste. The success of this vital part of implementing the Consent Decree is dependent upon effective education of the citizens and businesses of Guam to work successfully within a new system designed to maximize recycling and assure proper handling of household hazardous waste.

We have also secured the services of Mr. Jack Tucker to work with Mr. Anderson as the Receiver's Operations Manager in Guam and to assure the Receiver's continuous management presence in Guam when Mr. Anderson is unable to be present. Mr. Tucker is a knowledgeable and skilled solid waste professional with over 27 years of experience at all levels of environmental service operations, including: Director of Operations for Metro Public Works in Nashville, TN, Plant Manager of a permitted hazardous waste Transfer Storage and Disposal Facility (TSDF), and Solid Waste and Recycling Superintendent.

## Financial Condition of the Solid Waste Management Division

As background for this review, it is helpful to consider the results of the most recent six fiscal years. As can be seen from Table 1, the Solid Waste Management Division has experienced significant fluctuations

in expenditures and revenues. On the expenditure side, some of the fluctuations in spending may be explained by unsuccessful past efforts to address the deficiencies in the Solid Waste Management Division's programs that ultimately led to Receivership. On the revenue side, the fluctuations are less severe since FY 2005 and seem to have stabilized at around $6 million annually.

Table 1

Guam Solid Waste Management Division Operating Account

Financial Results FY 2002 to 2007

| Funding Categories | FY 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 | FY 2007 |
|---|---|---|---|---|---|---|
| Revenue | $ 4,490,811 | $ 6,426,359 | $ 3,503,800 | $ 6,004,317 | $ 5,684,009 | $ 6,186,854 |
| Expenditures | $ 6,660,443 | $ 8,417,758 | $ 4,078,508 | $ 5,161,338 | $ 4,690,495 | $ 5,600,860 |
| Excess/(Deficiency) | $ (2,169,632) | $ (1,991,399) | $ (574,708) | $ 842,979 | $ 993,514 | $ 585,994 |
| Beginning Fund Balance (Deficit) | $ 3,728,868 | $ 1,559,236 | $ (432,163) | $ (1,006,871) | $ (163,892) | $ 829,622 |
| Ending Fund Balance (Deficit) | $ 1,559,236 | $ (432,163) | $ (1,006,871) | $ (163,892) | $ 829,622 | $ 1,415,616 |

Note: FY 2005 and 2007 include transfers in of $100,000 in FY 2005 and other uses of funds of $6,823 in FY 2007. FY 2007 is unaudited.

The financial problems in these years took a relatively healthy fund balance of $3.7 million in FY 2002 to a deficit of $1.0 million in FY 2004. This significant dip in the financial health of the Solid Waste Management Division was driven by a spike in expenditures in FY 2002 and 2003 and a significant downturn of revenue in FY 2004. A return to what appears to be more normal patterns of revenue and expenditures has restored the fund balance to approximately $1.4 million at the conclusion of FY 2007, with a further improvement through March 31, 2008, to approximately $1.8 million.

As noted in recent audits and the Receiver's own analysis (see Tab 3), the Solid Waste Management Division also has a significant accounts receivable ("AR"), much of it dating back several years. While better management of the AR will undoubtedly improve the financial performance of the Division, it is unlikely that the current AR in excess of one year in age has significant real value. A collection contract or contracts will be put in place to collect what can be collected, but for the purposes of this analysis the AR's value will not be considered. Consistent performance in trash collection and improvements in billing and effective account collection remain the most important factors in the long-term financial performance of the Solid Waste Management Division and are crucial to its ability to finance the debt needed to address the requirements of the Consent Decree.

FY 2008 Expected Results

In the current fiscal year, there are six accounts that are available for paying certain expenses of the Solid Waste Management Division and the Consent Decree Projects. These accounts, the source of the funding, the total FY 2008 appropriations, the obligations to date and the unobligated balance available after the first six months of FY 2008 are displayed in Table 2:

Table 2

## Solid Waste Management Division Accounts

### Fiscal Year 2008 As of 3/31/08

| Account Name | Source of Funds | FY 2008 Appropriations | YTD Total Obligations | Balance Available |
|---|---|---|---|---|
| Solid Waste Management | Tipping Fees | $ 5,880,808.00 | $ 2,917,625.24 | $ 2,963,182.76 |
| Ordot Landfill Closure | Federal CIP Grant | $ 155,699.00 | $ 90,120.71 | $ 65,578.29 |
| Compact Ordot Dump Closure | Federal DOI Grant | $ 1,318,000.00 | $ 1,200,000.00 | $ 118,000.00 |
| Compac New Solid Waste Landfill | Federal DOI Grant | $ 983,052.00 | $ 983,052.00 | $ - |
| DOI CIP New MSWLF Supplement | Federal DOI Grant | $ 133,000.00 | $ - | $ 133,000.00 |
| Consent Decree - Ordot Dump | General Fund - Governor | $ 3,805,000.00 | $ 3,804,870.00 | $ 130.00 |
| **Total** | | **$ 12,275,559.00** | **$ 8,995,667.95** | **$ 3,279,891.05** |

The "Solid Waste Management" account is the main operating account of the Solid Waste Management Division. It is funded from the revenues generated by the Solid Waste Management Division's tipping fees. Total obligations through March 31, 2008 are about 49.6% of the budget. We will return to the expected results for this account when discussing the emergency spending needs of the Solid Waste Management Division in the next section of this Report.

The "Ordot Landfill Closure", "Compact Ordot Dump Closure", "Compact New Solid Waste Landfill" and the "DOI CIP Project New MSWLF" accounts are funded with federal funds from the Department of Interior. These accounts have been the primary source of funding for the land needed for the Layon Landfill project and have also funded staffing dedicated to the Consent Decree Projects. These funds paid for three FTEs in FY 2006 and 2007 and one FTE in FY 2008. This has also been the source of funding for much of the design work that has been undertaken for both the closure of Ordot Dump and the construction of the new landfill planned for Layon. Virtually all of the remaining funds available from these grants will be required for completing the land acquisition for Layon; therefore, no significant portion of these grants will be available for other purposes and all the funds should be fully obligated by the end of the current fiscal year.

No grant awards were made for solid waste related projects for FY 2009. The process for FY 2010 grant funding is currently getting underway. To the extent that additional grant funds can be obtained through this source of funding, it will reduce the amount of capital that must be raised, and increases in tipping fees will be mitigated accordingly. The decision-makers for this are the Governor and federal authorities.

### FY 2008 Emergency Spending

After the Receiver brought the condition of equipment and the work environment to the attention of the Court and the Governor, the Governor issued an Executive Order declaring an emergency that will allow the Receivership to proceed with an expedited procurement of both equipment repairs and selected equipment replacement.

The estimated costs of the emergency purchases needed immediately to allow the Solid Waste Management Division to continue basic operations are outlined in Table 3:

Table 3

| Solid Waste Management Division Emergency Procurement Estimated Cost June, 2008 | | | |
|---|---|---|---|
| **Items** | **Repairs** | **Purchase** | **Total:** |
| Refuse Collection Trucks | $65,000 | $750,000 | $815,000 |
| Roll Off Trucks | $75,000 | $200,000 | $275,000 |
| Roll Off Waste Containers | N/A | $180,000 | $180,000 |
| Heavy Equipment | $150,000 | N/A | $150,000 |
| Roll Off Recycling Containers | N/A | $100,000 | $100,000 |
| Skid Loader Grapple Hook | N/A | $45,000 | $45,000 |
| Survey Equipment | N/A | $2,500 | $2,500 |
| Shower | $1,000 | 0 | $1,000 |
| Mold Assessment / Resolution | TBD | 0 | TBD |
| Roof | TBD | 0 | TBD |
| Scales | N/A | $90,000 | $90,000 |
| Rolling Stock Maintenance | TBD | TBD | TBD |
| **Total:** | **$291,000** | **$1,367,500** | **$1,658,500** |

In order to cover the anticipated cost of these emergency purchases, an analysis of the operating budget of the Solid Waste Management Division is necessary to determine the extent to which these costs can be paid from the approved operating budget.

FY 2008 Operating Budget

A review of the results of the first half of FY 2008 show that the Solid Waste Management Division spent or obligated 49.6 percent of its approved budget during this six-month period. If this expenditure trend continued for the rest of FY 2008, total spending for the year would be approximately $5.83 million, about $47,000 under the authorized budget. Spending projections made by the Solid Waste Management Division as of March 31, 2008, projected that it would spend its entire budget. Since a spending level that is exactly that of the budget is unlikely, it seems reasonable to conclude that this estimate was one designed to "protect" the budget from transfers to other parts of the government by projecting that it would all be required.

A more rational approach to projecting spending is to examine the level of spending that occurred during the first six months of previous fiscal years (as a percentage of the full year's actual spending) and use these prior spending patterns as predictors of future spending. Unfortunately, as Table 1 demonstrates, expenditure patterns for the Solid Waste Management Division have been erratic in recent years. There does, however, seem to be a similar pattern between FY 2008 spending and

spending in the immediately preceding year. While one year is not a trend, if the pattern of spending in FY 2007 held for the second half of FY 2008, we could expect substantially higher savings, with total spending for the year coming in at about $5.3 million, more than $550,000 under the authorized budget. The following table illustrates the two projections of FY 2008 spending:

Table 4

## Projected FY 2008 Spending
### Solid Waste Management Division Operating Budget

| DESCRIPTION | Projected FY 08 SWD Staff | | Projected FY 08 Based on Prior Year | | Actual FY08 @ 3/31 | |
|---|---|---|---|---|---|---|
| | | | | | | |
| REGULAR SALARY | $ | 2,445,442 | | $2,260,464.95 | | $1,115,442.00 |
| OVERTIME SALARY | $ | 50,000 | $ | 44,643.56 | $ | 32,583.00 |
| FRINGE | $ | 691,896 | $ | 663,992.16 | $ | 313,896.00 |
| TRAVEL | $ | 20,499 | $ | - | | |
| CONTRACT | $ | 1,955,149 | | $1,741,575.58 | | $1,261,819.00 |
| SUPPLIES | $ | 628,888 | $ | 564,603.58 | $ | 167,542.00 |
| EQUIPMENT | $ | 10,000 | $ | 26,404.92 | $ | 4,810.00 |
| WORKERS COMP BENEFITS | $ | 5,000 | | | | |
| DRUG TESTING CHARGES | $ | 2,000 | | | $ | 378.00 |
| POWER UTILITY | $ | 43,300 | $ | 8,506.37 | $ | 10,824.00 |
| WATER UTILITY | $ | 9,000 | $ | 429.82 | $ | 2,250.00 |
| TELEPHONE | $ | 16,001 | $ | 12,069.12 | $ | 8,081.00 |
| CAPITAL | $ | 3,632 | $ | - | | |
| **Grand Total** | | **$5,880,807.00** | | **$5,322,690.06** | | **$2,917,625.00** |

Note: Authorized Budget for FY 2008 is $5,880,808.

It should be noted that the travel expenditures budgeted are for the employees of the Solid Waste Management Division. Even thought the projections show no expenditures and project none for the year, there will likely be some spending in this category to allow key employees to attend critical disaster training activities sponsored by the federal government.

Given the pressures on the budget from equipment rentals, repairs and increasing fuel costs, the higher projections of spending are certainly appropriate although the final numbers likely are somewhere between the two projections.

The other major factor in the Solid Waste Management Division's financial performance for FY 2008 is revenue. Revenue is affected by the increase in rates approved in late 2005 and changes in the

management of the billing process and accounts receivable function in response to very critical audits conducted by both the Georgetown Consulting Group and the Public Auditor. Table 5 reflects the approved rate increase:

Table 5

## Solid Waste Management Division

Rate Changes Approved November 2005

| Fees | Old Rate | | New Rate | | Rate Measure | % Change |
|------|----------|--|----------|--|--------------|----------|
| Residential | $ | 8.00 | $ | 10.00 | month | 25% |
| Tipping Fee (compacted) | $ | 16.00 | $ | 20.00 | cy | 25% |
| Tipping Fee (uncompacted) | $ | 4.00 | $ | 5.00 | cy | 25% |
| Self-Drop (under 3 cy) | $ | 2.00 | $ | 2.50 | pickup | 25% |
| Self-Drop (over 3 cy) | $ | 4.00 | $ | 5.00 | cy | 25% |

While the increase in rates should have had a significant effect on the final revenue numbers in FY 2006 (the change was effective from November 1, 2005), the FY 2006 audited financials reflect a decline in total revenue from FY 2005. The FY 2007 financials (unaudited as of the date of this Report) do reflect an increase of 4.8% in total revenue, but this does not come close to matching the rate increase granted over one year earlier.

Table 6

## Solid Waste Management Division

Selected Financial Statement Items FY2005 to FY2007

| Balance Sheet Items | FY 2005 | FY 2006 | % Change over FY05 | FY 2007 | % Change over FY05 |
|---------------------|---------|---------|--------------------|---------|--------------------|
| Total Revenue | $5,904,317 | $5,684,009 | -3.7% | $6,186,854 | 4.8% |
| Accounts Receivable (net) | $1,698,865 | $2,203,082 | 29.7% | $2,363,550 | 39.1% |
| Cash & equivalents | $514,611 | $840,560 | 63.3% | $1,347,833 | 161.9% |

It is unclear why this situation occurred. There was a significant increase in both the accounts receivable and cash. Both the Public Auditor and the Georgetown Consulting Group have clearly documented that management of the accounts receivable function for the Solid Waste Management Division was virtually non-existent during this period; therefore, the lack of any increase in revenue during this time may be indicative of transition problems in implementing the new rate structure and inaccurate measurement of revenue in previous periods.

As noted above, the financial statement does reflect a significant increase in cash for both FY 2006 and 2007. The FY 2006 change appears to be related more to a reduction in expenditures than increased revenue activity. In FY 2007 there was another significant increase in cash despite a significant increase

in spending, suggesting that the effect of the rate increase and more attention to the management of billing and receivables was at last having an effect.

Unfortunately, the trend does not seem to be continuing into FY 2008. The following table shows the amounts billed and the amount of cash collected in the first six months of FY 2008 compared to the same period in FY 2007:

Table 7

## Solid Management Waste Division
### Revenue Billed and Cash Collected
October to March FY 2007 and 2008

| FY | Month | Amount Billed | Cash Collected |
|---|---|---|---|
| 2007 | October | $ 565,256.0 | $ 459,152.0 |
| 2007 | November | $ 550,384.0 | $ 244,017.0 |
| 2007 | December | $ 571,529.0 | $ 390,253.0 |
| 2007 | January | $ 580,055.0 | $ 373,271.0 |
| 2007 | February | $ 596,425.0 | $ 905,649.0 |
| 2007 | March | $ 598,045.0 | $ 191,878.0 |
| | Total | $ 3,461,694.0 | $ 2,564,220.0 |
| 2008 | October | $ 547,267.0 | $ 388,572.1 |
| 2008 | November | $ 547,800.0 | $ 479,703.0 |
| 2008 | December | $ 571,811.0 | $ 651,249.0 |
| 2008 | January | $ 567,640.0 | $ 196,922.0 |
| 2008 | February | $ 548,390.0 | $ 423,977.0 |
| 2008 | March | $ 557,775.0 | $ 458,791.0 |
| | Total | $ 3,340,683.0 | $ 2,599,214.1 |

Neither the amounts billed nor the cash collected have changed significantly during the first six months of FY 2008 when compared to the same period in FY 2007. This suggests that we should not plan on a significant increase in revenue for FY 2008.

Projected FY2008 Year-end Results

Table 8 outlines a reasonable range of expected results for the Solid Waste Management Division in FY 2008:

Table 8

| Solid Waste Management Division Operating Account Projected Fund Balance FY 2008 | | | | |
|---|---|---|---|---|
| **Fund Balance** | **Low Estimate** | | **High Estimate** | |
| Fund Balance @ 9/30/07 | $ | 1,415,616 | $ | 1,415,616 |
| | | | | |
| Projected Revenue FY 2008* | $ | 6,300,000 | $ | 6,300,000 |
| Projected Expenses FY 2008** | $ | 5,880,800 | $ | 5,322,700 |
| Excess (Deficit) FY 2008 | $ | 419,200 | $ | 977,300 |
| | | | | |
| Funds Available | $ | 1,834,816 | $ | 2,392,916 |
| Emergency Purchases (high estimate +20%) | $ | 1,658,500 | $ | 1,990,200 |
| | | | | |
| Projected Fund Balance @ 9/30/08 | $ | 176,316 | $ | 402,716 |
| * Assumes at least $100,000 from the Recycling Fund **Excludes estimated cost of emergency purchases | | | | |

Projecting year-end results for any organization, no matter how good the data, is difficult. This is especially true when the organization is in the process of significant change and the data have a history of unreliability. Nevertheless, it is essential that management undertake such an exercise, especially when it confronts the necessity of making significant un-planned spending.

Based on the data available at this time, it appears reasonable to conclude that, in addition to current projections of normal operating expenses, there are funds available to pay for the essential emergency purchases and repairs outlined elsewhere in this Report. The small margin here and the quality of the data upon which the projections are made indicate a need for continuous monitoring and the need to eliminate any non-essential spending for the balance of the year. In addition, a proactive effort to improve the finances of the Solid Waste Management Division in FY 2009 and beyond is clearly required. Presently, the cost of the Receivership has not been paid from funds of the Solid Waste Management Division. It is being paid from the funds paid to the Court by the Government of Guam, which are from the General Fund of the government. Should this change at any time in the future, the cost of the Receivership itself would need to be added to any projections of cost made for future years.

## Recycling Revolving Fund

The Recycling Revolving Fund was created by the Guam Legislature in 2007. It was subsequently determined that rules had to be enacted and the implementation was delayed until the spring of 2008. The Bureau of Budget and Management has provided the following estimate (see Table 9) of the annual revenue that can be expected from the fee structure imposed to pay for recycling activities under this provision:

Table 9

## Estimated Recycling Revolving Fund

### Based on FY 2007 Vehicles

| Types of Vehicles | Number* | Fees** | | Total | |
|---|---|---|---|---|---|
| Cars, trucks, buses | 92,254 | $ 25.00 | $ | 2,306,350.00 | |
| Heavy Equipment | 221 | $ 30.00 | $ | 6,630.00 | |
| Motorcycles and Trailers | 4,105 | $ 3.00 | $ | 12,315.00 | |
| Total | 96,580 | | $ | 2,325,295 | |
| *Excludes Government and Military vehicles | | | | | |
| **Fees Pursuant to 10 GCA, CH 51 Article 5 §51506 | | | | | |

The extent to which these funds are actually collected in FY 2008 will further improve the Solid Waste Management Division's financial condition. They should also significantly enhance the future finances of the Solid Waste Management Division.

Finally, it should be noted that Guam law appears to authorize the fees to be increased by 25% every 24 months through rule. This should enable most or all of the recycling diversion cost of the Solid Waste Management Division to be covered by these fees. The law authorizing the fees does set some priorities for use of the funds as follows:

(a) First Priority - junk vehicles, tires, batteries, waste oil, white goods/appliances,
(b) Second Priority - paper, cardboard, plastic, and glass,
(c) Third Priority - other recyclable materials as determined by the Director.
(d) *Not more than* one (1) FTE employee at Guam Environmental Protection Agency to administer this Article.

The Director of Public Works, *no later than* ten (10) days after the end of each fiscal year, shall transfer from the Recycling Revolving Fund three percent (3%) of the total amount collected during that fiscal year to fund one (1) FTE employee at the Guam Environmental Protection Agency.

Based on the accounting reports for the period since the fees began to be collected for the Recycling Revolving Fund in March of this year, the Bureau of Budget and Management's estimate appears to be accurate. Since March, the Fund has collected over $600,000.

### Initial Plan of Action

Any plan to accomplish our goals must maintain a clear and unwavering focus on the Consent Decree as its guiding principle. Consequently, our plans revolve around the following:

- Close Ordot Dump as required by the Consent Decree;
- Construct and open a new landfill in Layon that meets all applicable laws and regulations;

- Minimize additional waste to Ordot Dump and properly size the new landfill with appropriate waste diversion goals and programs to achieve those goals; and

- Implement the Supplemental Environmental Project for a comprehensive waste diversion strategy for household hazardous waste.

With respect to Ordot Dump, our short term goals revolve around improving the management of the facility and minimizing the amount of new waste coming to Ordot. For the new landfill to be built at Layon, our initial goals are assuring complete control of the required land, resolution of remaining design issues with Guam EPA and U.S. EPA, and acquiring the appropriate permits and zoning approvals. The attached presentation (see Tab 2) details the steps we have taken and plan to take as we move forward.

### Conserving Space at Ordot

As discussed earlier in this Report, conserving space at Ordot Dump is among the most important tasks that must be accomplished in order to assure adequate capacity for disposal while the new landfill at Layon is completed. While the continuing improvements in management at Ordot Dump will help, the only way to assure that space at Ordot Dump is maximized is to reduce the amount of waste brought to Ordot for disposal.

Diverting waste from landfills through traditional recycling methods and better management of the waste stream is one of the most important aspects of a successful solid waste management program. In order to assess the current level of recycling activity on Guam, we conducted a series of site visits to the various organizations currently involved in recycling. Tab 4 provides the full report of our survey of the recycling facilities and programs visited. While the report demonstrates that there is recycling activity already on Guam, the infrastructure is not in place for recycling to effect an immediate and significant reduction in waste going to Ordot Dump. While putting that infrastructure in place is of vital importance, it will take some time to get into place and even more time to properly educate the customers of the Solid Waste Management Division in the effective use of the recycling infrastructure to begin diverting significant waste.

Fortunately, there is something that can be done quickly that will significantly reduce the amount of waste going to Ordot Dump. The last study of the make-up of Guam's waste stream, conducted in 1995, documented that 30-40 percent of the waste steam is composed of cardboard, yard waste, untreated lumber and other inert material. Tab 5 documents this more completely and demonstrates that there are several viable alternatives for disposal of such waste currently available on Guam.

Consequently, after consulting with the Attorney General's Office to ensure that we are within our authority as Receiver and for advice on the proper procedural approach, we have decided to stop accepting cardboard, yard waste, untreated lumber and other inert material at Ordot Dump effective July 17, 2008. This change will initially apply to all customers depositing waste at Ordot Dump and the three Solid Waste Management Division transfer facilities. This change also will be implemented at a future date for residential customers whose waste is collected by the Solid Waste Management Division.

The memorandum announcing the policy change is included in Tab 6, and the flyer we are distributing to explain the new policy is Tab 7.

## Ordot Dump Engineering Design and Related Work Status

Our efforts with respect to the Ordot Dump have been focused on proper oversight of the work already under contract with the consultant Duenas, Bordallo, Camacho & Associates (Consultant). Key among these is the Assessment Report, Value Engineering Feasibility and Cost/Benefit Analysis and the Quality Assurance Project Plan for the Remedial Investigation. Each of these deliverables is briefly summarized below along with their status.

### Assessment Report

The Assessment Report is to provide an evaluation of the scale data and other data on waste coming into Ordot Dump as well as cover used in the Dump operations. This information will then be applied to refine the estimated remaining capacity at Ordot Dump. These data were initially developed and generated in the Action Report and Closure Report prepared under the Court's direction prior to the appointment of a Receiver. A draft Report was submitted to the Receiver in May 2008and was critically reviewed by the Receiver Team. The Consultant was directed to perform a final topographic survey in order to present up-to-date estimates of the remaining space at Ordot.

Based on the available information to date, the incoming waste stream is approximately 274 tons per day. When the waste is placed, compacted and properly covered, the resulting average volume of airspace used per day is 641 cubic yards. This is an average and varies widely depending on the incoming waste tonnage and the compaction effort at the working face. These numbers will be updated as additional scale and survey data become available. However, if these numbers are used to estimate Ordot's remaining capacity, it indicates that maximum capacity will be reached in approximately 554 days or 18 months from April 1, 2008 (i.e. September 2009). This estimate does not, however, take into account several recent or planned initiatives that will maximize Ordot's capacity. These include: the waste ban policy, improved operations, waste placement in other portions of the site within the existing waste limits, and expanding the top deck. Based on these initiatives, it is reasonable to expect the life of the existing capacity to be extended an additional 12 months beyond September 2009 to September 2010.

### Value Engineering Feasibility and Cost/Benefit Analysis

In addition to the Assessment Report, the Consultants were directed to evaluate several value engineering design alternatives that have the potential to provide construction and operational/maintenance cost savings for the closure cap of Ordot Dump. The report is to evaluate whether it is technically feasible to implement the alternative and if so, what is the cost savings benefit associated with each. A draft Report was submitted to the Receiver in May 2008. This draft report was reviewed extensively by the Receiver Team resulting in significant revisions to the draft report. The

Consultant has now been directed to complete the report and make recommendations for incorporating it into the redesign work of the Ordot Dump closure cap design.

## Quality Assurance Project Plan

The Quality Assurance Project Plan (QAPP) is a plan to investigate the environmental impacts of Ordot Dump. The plan describes the investigative techniques and work plan for the evaluation of the soil and groundwater at the site. The results of this investigation will be used to develop a remedial action plan for any necessary site cleanup and long term environmental monitoring at the site during the closure and post closure periods at Ordot Dump.

A draft plan was submitted to the Receiver in May 2008 and the plan was extensively reviewed by the Receiver Team. As a result of the review, it was determined that the scope of work and budget provided to the Consultant by DPW did not adequately address the entire scope of the necessary work. Typically the work plan for an environmental investigation such as this is comprehensive in nature and characterizes the entire site. On the basis of these findings, the objectives and purpose of the draft QAPP were revised to reflect the more comprehensive work that is necessary. The Receiver Team is currently awaiting review of this document by GEPA and USEPA.

## Layon Landfill Engineering Design and Related Work Status

### Design

The design services being provided under contract by TG Engineers, LLC since the Receivership began include the completion of the draft Hydrogeological Report/Modeling, resolution of GEPA/EPA design issues and completing the Land Use Permit/Rezoning process. The Receiver Team has also requested for additional services, as amendments to the existing contract, for the preparation of Bid Documents for Mass Excavation and Access Roadway construction as well as design services for a leachate/sewer line.

### Draft Hydrogeological Report

The draft Hydrogeological Report was submitted to GEPA and EPA in late June 2008. The report represents a comprehensive assessment and modeling of the Layon site and supports the design, construction and operation of the landfill at the Layon site. We have summarized the findings here that are presented in the Executive Summary of the report.

The results show that groundwater generally flows downward away from the ground surface which is the anticipated condition encountered in this groundwater system. Therefore, this does not present a problem to the construction, operation and long term stability of the landfill. A hydraulic divide exists between the planned landfill footprint and the Ugum River. This means that when rainfall reaches the ground, and any groundwater within the planned footprint of the landfill, the rainfall will not flow to the Ugum River basin. The analysis indicates that the construction and operation of the landfill will not affect groundwater in the Ugum River basin.

The testing results indicate that the groundwater system in the area appears to be limited because the earth materials beneath many portions of the study area would not be expected to produce sufficient water to sustain substantial domestic, commercial or agricultural water supplies. In addition, groundwater samples from several monitoring wells contained background concentrations of iron and manganese, and to a lesser extent, arsenic, boron, barium, and nickel that are higher than the U.S. EPA and/or the World Health Organization limits for secondary drinking water criteria.

Some study results suggest that landfill construction could negatively impact some small wetlands near the landfill. Any negative impacts could largely be mitigated with proper stormwater management.

## GEPA/EPA Design Comments

The Receiver Team continues work with GEPA/EPA personnel to establish a collaborative and systematic process for addressing the issues raised by GEPA/EPA to the current design and the future modifications. Based on our initial discussions with GEPA/EPA in late April and early May, it was learned that Responses to Comments by the engineering team (TG Engineers/A-Mehr) had not reached the regulatory agencies and their staff at the time they were originally prepared in 2006. These Responses to Comments were forwarded to GEPA/EPA by the Receiver Team through TG Engineers on May 7, 2008. In the June 17, 2008 letter, EPA raised general concerns with the design. The Engineering Team promptly replied on June 25, 2008 with responses to these concerns which were forwarded to GEPA/EPA on June 30, 2008.

We are working toward a more collaborative process to efficiently address all design issues the regulatory agencies may have. The Receiver Team anticipates a full response from GEPA/EPA in the near future and we will move forward from there. We also expect comments on the Hydrogeological Report sometime in July or early August.

## Land Use Permit/Rezoning

Layon Landfill requires either a Land Use Permit to allow the operation of a landfill in an agricultural zone or a rezoning to industrial which allows the operation of a landfill. Several meetings were held between the Department of Land Management Director and Chief Planner, Attorney General's Office, Receiver, and Engineering Team to discuss the most appropriate approach to this process. Based on the recommendations of the Attorney General and the staff of the Department of Land Management, the best approach would be to apply for a Rezoning of the Landfill site following the standard Guam Land Use Commission (GLUC) process. By early July that process was underway. We anticipate expeditious consideration by the Commission.

## Bid Packaging for Construction

The Receiver Team has looked at several ways to expedite the execution of the construction effort for the Landfill site. Several bid packaging alternatives were considered, however, the best alternative to move construction of the Landfill forward, is to execute the mass excavation of Cells 1 and 2 as soon as possible followed a subsequent package for the liner construction and landfill facilities. During this time

the existing temporary road would be continued to be used until the new access road is constructed in a later phase.

## Related Bridge and Road Projects

In order to close Ordot Dump and open a new landfill at Layon, there are certain bridge and road improvements that are needed. These projects are not under the Receiver's control. The needed improvements include:

- Repair earthquake damage to correct slope failure on approach to the Asalonso Bridge.
- Replacement/upgrades to the following bridges:
    - Ylig Bridge; and
    - Talofofo Bridge
- Route 4 widening improvements needed for Haul Truck north of Ylig Bridge.
- Climbing/Slow Lane improvements needed:
    - North of Talofofo Bridge;
    - South of Talofofo Bridge;
    - North of Asalonso Bridge; and
    - South of Asalonso Bridge.

While we have been assured by the Director of the Department of Public Works that these improvements will be completed on a schedule that will not delay the Consent Decree Projects, we have received conflicting information suggesting uncertainty about the schedule. Clear and unequivocal commitments on these important improvements are needed. We hope the report from the Department of Public Works will provide the needed commitment.

## Capital Funding

In order to complete the projects necessary for compliance with the Consent Decree, capital funding is required. The areas requiring capital funding are:

- Acquisition of land for new landfill and access road;
- Bridge improvements on roads to Layon, if not already funded;
- Final designs and procurements for both the new landfill and Ordot Dump;
- Construction of the new landfill and new cells once in operation unless funds for new cells are accrued from tipping fees;
- Closure of cells and replacement of equipment at the new landfill during operation unless funds for those needs are accrued from tipping fees;
- Closing the Ordot Dump;
- Post-closure activities at Ordot Dump;
- Updating the equipment and establishing proper systems for the Solid Waste Management Division;
- Upgrade of convenience centers;
- Construction of transfer station(s);

- Construction of interim and permanent diversion/processing facilities; and
- Construction of a household hazardous waste facility.

While complete estimates are still being developed, preliminary estimates from the work performed for the Government of Guam prior to the Receivership indicate a need for capital funding in a range of $100 to $120 million.

Capital funding is most often provided through debt financing. By entering into debt financing, the costs of capital assets are spread over their useful life, allowing all of those who benefit from the assets to pay their fair share of the cost. Capital funding is sometimes provided by grants. In fact, some of the cost of the land needed for the new landfill and the design costs have already been paid by grants. Without debt or third-party grant financing, the cost of capital projects must be paid from current revenues of the government, which would normally create serious financial stress for the government, since tax rates and the rates of other government funding sources are not typically set to allow for such costs.

In the coming months, it will be necessary for a decision to be made about how capital funding is to be provided for these projects. The sources of capital for the Consent Decree Projects can reasonably be expected to come from one or more of the following methods:

1. General Obligation Bonds of the Government of Guam backed by general taxes;
2. Revenue Bonds secured by a stream of revenue from customers of the system;
3. Long-term private placement (negotiated long-term debt with a financial institution);
4. Build-finance-own/operate through a private company ;
5. Federal Grants;
6. Pay-As-You-Go cash funding by the Government of Guam; and/or
7. Short-term variable rate note secured by revenue under the Court's control.

We have engaged Public Financial Management, Inc., a leading independent advisor in debt financing for state and local governments throughout the United States, to assist us in developing a road map for a decision in this area. In addition, to better evaluate possible financing by a private company (method 4 above), we have issued a Request for Expressions of Interest (RFEI) to companies that have expressed some interest in the past and/or are believed to have interest. We have posted the RFEI to the Receiver's Website to allow any interested company to respond. The RFEI is not a formal procurement document and will not qualify or eliminate any company from any future procurement process for the Consent Decree Projects. Our goal with the RFEI is simply to gather information that will help in future decisions about this potential source of capital funding. The RFEI is provided in Tab 8.

**Legislation**

We have been asked to comment on certain legislation under consideration by the Guam Legislature. While we are appreciative of the desire to have our comments as such legislation is considered, we are also cognizant, as stated earlier in this Report, that we must maintain a clear and unwavering focus on the Consent Decree; therefore, we must conclude that anything that distracts from our focus on the Consent Decree must be avoided. We bring this to the Court's attention due to some recent comments in the media suggesting that we may be holding up consideration of the legislation by not providing our comments to the Legislature.

There are two pieces of proposed legislation upon which we have been asked to comment. One is legislation that is "An Act to repeal and reenact Sections 51101, 51102, 51103, 51104, 51110, 51111, 51118 and 51119 of Article 1, Chapter 51 of Division 2, Title 10 Guam Code Annotated Relative to Solid Waste Management. " While there may be numerous reasons for this legislation, its most obvious effect based on a cursory review is to repeal the current prohibition in Guam law on incineration. While this is certainly a legitimate subject for consideration by the Legislature, it is a controversial issue which appears to be beyond the scope of the Court's order under which we as a Receiver must operate.

The other proposed legislation upon which we have been asked to comment is a draft act to establish the Guam Recycling and Solid Waste Authority (RASA). This draft legislation states that it is a response to the recommendation made by the Magistrate Judge to the Court in this case that the Solid Waste Management Division be restructured as a public corporation. The legislation appears to grant broad powers to the RASA to administer a comprehensive solid waste program and to issue revenue bonds to finance the program. Again, this is certainly an appropriate issue for consideration by the Legislature, but from the perspective of the Receiver, it is pre-mature. There are many elements to the draft legislation, and its implementation will require much time and resources of the Division of Solid Waste Management and outside bond counsel. At this point in time, the resources of the Division of Solid Waste Management must stay focused on compliance with the Consent Decree.

There may come a point in the relatively near future when the Legislature may need to consider issuing bonds to cover the construction cost of the Consent Decree Projects. The current draft of the legislation seeks to address many issues such as bond covenants and other essential provisions of a successful bond issue that can only be addressed when we have completed more research and the requirements of the market for such bonds is better understood. To proceed with such legislation now, in the absence of this specific information, may lead to increased cost for the services of bond counsel and other financial professionals. When the time comes to consider this step to finance the Consent Decree Projects, we will be prepared to assist the Legislature and the Governor in any way the Court finds appropriate.

**Next Steps**

Over the course of the next quarter of our work, the Receivership Team will address the following areas and issues for the Solid Waste Management Division:

1. Maintain on-the-ground presence in Guam
2. Get SWMD vehicles repaired/replaced and improve services to residential customers
3. Continue to improve the new SWMD organization
4. Continue to advance the analysis for implementing the various needs outlined in the Initial Plan of Action
5. Consider timing of SWMD privatization of two-thirds of trash collection
6. Improve control and management of SWMD funds and receivables
7. Develop detailed plan for long-term financing
8. Complete the Plan of Action with detailed estimates of cost and schedules for construction and seek approval from the Court
9. Execute land use permit/rezoning process for Layon
10. Resolve/incorporate GEPA/U.S. EPA 9 design comments for Layon
11. Resolve GEPA issues with Ordot design
12. Establish estimated date for Ordot closure and develop redesign specifications
13. Identify changes needed in Guam law
14. Work with the PUC on future rate structures
15. Execute the approved Plan of Action
    1. Report to the Court on an ongoing basis
    2. Adjust the approved Plan of Action with the approval of the Court as circumstances require
16. Keep the Court, the Government of Guam, our customers, and other interested parties informed

Completing our research and making a recommendation to the Court on capital funding will be of critical importance to the next phase of our work. As noted above, a necessary component of this phase of the work will be development of a construction schedule that will also govern the need for both procurement activity and funding.

We have taken many important steps toward improving the operations of the Solid Waste Management Division. Many more improvements are required. The men and women of the Solid Waste Management Division have responded well to the challenge before them. We wish to thank them for their hard work, support and encouragement as we strive to provide them with the resources and leadership they need to succeed. We are confident that they will continue to rise to the challenge and provide Guam with a solid waste management system that will comply with the Consent Decree and meet the future needs of Guam.















































































Guam SOLID WASTE RECEIVER

# Quarterly Report
for
Receivership for the Government of Guam
Solid Waste Management Division

Pursuant to Order of the
United States District Court of Guam

Presented by
Gershman, Brickner & Bratton, Inc.

July 10, 2008

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.

Guam SOLID WASTE RECEIVER

## Table of Contents

1. Background Review
2. Status of Solid Waste Management on March 17, 2008
3. Initial Plan of Action
4. Challenges and Progress
5. Capital Funding
6. Next Steps

Appendix: The Receiver - Gershman, Brickner & Bratton, Inc.

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
2

Guam SOLID WASTE RECEIVER

# 1. BACKGROUND REVIEW

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

3

Guam SOLID WASTE RECEIVER

## On March 17, 2008, the Court Issued the Order of Receivership

GBB's initial steps included the following:

- Organize the project team to undertake the Receivership
- Review the Consent Decree and all documents previously filed with the Court (approximately 6,000 pages)
- Conduct initial review of the design and engineering work already completed
- Communicate with officials of the Court, U.S. EPA 9, and GovGuam
- Establish the Guam Solid Waste Receiver Website

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

4

**Guam** SOLID WASTE RECEIVER

## Website

www.GuamSolidWasteReceiver.org

- Guam Solid Waste Receivership Information Center
- Launched April 4, 2008
- Provides updates on progress to interested parties
- Platform for major announcements and procurement activity

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

5

**Guam** SOLID WASTE RECEIVER

GBB's initial steps (continued):

- Review the Management Audit conducted for the Public Utilities Commission by the Georgetown Consulting Group
- Review the Public Auditor's Audit of the Solid Waste Management Division
- Review the financial condition of GovGuam
- In-depth consultation with the Court prior to a conference Court attended on April 12-13, 2008 in Washington, D.C.
- Meeting on April 14, 2008, with Congresswoman Madeleine Bordallo's key staff on potential federal financial assistance for Guam Solid Waste

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

6

**Guam** SOLID WASTE RECEIVER

## Receiver's Activities during Initial Visit to Guam - April 24 into May 14, 2008

- Met with Court and Guam Government officials
- Began in-depth, on-the-ground review of the Solid Waste Management Division, Ordot Dump, and Layon new landfill site
- Visited Ordot Dump to identify immediate operations improvements
- Met with engineering teams to review designs and better understand the issues of each site

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc. 7

**Guam** SOLID WASTE RECEIVER

## Receiver's Activities during Initial Visit to Guam - April 24 into May 14, 2008

- Met with Military officials to understand their needs and begin exploration of partnership possibilities
- Met with various GovGuam officials regarding various administrative and procedural requirements
- Established Guam Solid Waste Receiver in charge of new Solid Waste Management Division and new organization for going forward

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc. 8

**Guam** SOLID WASTE RECEIVER

## GovGuam Solid Waste Management Division (SWMD) Overview

- 99 employees
- $ 5.6 million annual expenditures
- $ 6.2 million annual revenues
- Residential waste collected once per week by SWMD
- Other waste self-hauled or by private hauler
- 25% recycling law 2002
- 2% recycling achieved
- 4 transfer stations
- Ordot Dump
- New Landfill sited in Layon

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 11

**Guam** SOLID WASTE RECEIVER

## Steps Taken by Guam to Comply with the Consent Decree

- ✓ Rigorous site selection process completed
- ✓ Layon site selected and approved by Guam and U.S. EPA 9
- ✓ Initial design work of the new landfill completed
- ✓ Initial design work for the closure of Ordot completed
- ✓ Initiated condemnation of land needed for new landfill
- ✓ Funded initial estimated cost of the land needed for new landfill
- ✓ Conducted early studies in preparation for a revenue bond issue to finance Consent Decree Projects
- ✓ Established the Recycling Revolving Fund

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 12

Guam SOLID WASTE RECEIVER

## Overview SWMD Problems

- Ordot Dump out of regulatory compliance for 22 years
- Only 68% of billings for service collected
- Equipment old and in disrepair
- Cash handled at Transfer Stations and Ordot Dump
- Only 2% diversion as compared to 25% Guam law
- New landfill not built, not operating
- Ordot Dump not closed and pollution into nearby river and groundwater continues

GBB SOLID WASTE MANAGEMENT CONSULTANTS
*Gershman, Brickner & Bratton, Inc.* 13

Guam SOLID WASTE RECEIVER

## SWMD Packer Trucks - Old and Poorly Maintained

**2002 Sterling Packer**

**1992 Kenworth Packer**

GBB SOLID WASTE MANAGEMENT CONSULTANTS
*Gershman, Brickner & Bratton, Inc.* 14

**Guam** SOLID WASTE RECEIVER

## Military Solid Waste Management

- Navy and Air Force operate independently
- Private contractors provide collection and disposal services within military bases
- Continuing to improve their recycling initiative
- Now planning for future expansion with Marines relocation for 2014
- JGPO support for infrastructure improvements

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 31

**Guam** SOLID WASTE RECEIVER

## Other Issues Affecting the Future of Guam's Solid Waste System

- 2006 Guam Integrated Solid Waste Management
  - Sets out reasonable plans and objectives for Guam
  - Approved by the Guam Legislature
- 25% recycling requirement established by the Guam Legislature
- Guam Legislature has mandated privatization for two-thirds of SWMD residential collection

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 32

**Guam** SOLID WASTE RECEIVER

## Other Issues Affecting the Future of Guam's Solid Waste System

- Military build-up:
  - Marines being relocated from Okinawa – 25,545
  - Significant C&D materials between now and then
  - Projected Military population in 2014 – 40,635
  - Projected Military solid waste quantity in 2014 – 54,878 tons per year
  - Additional Military infrastructure needed for collection, diversion programs, and disposal
  - Opportunity to combine Military and GovGuam infrastructure needs

Source: NAVFAC; March 2008

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

33

**Guam** SOLID WASTE RECEIVER

## Pre-Receivership Estimates of Cost for Consent Decree Compliance

- 400 percent increases in SWMD Rates (PUC 2006 Audit)
- HDR's 2006 Study (performed for planned revenue bond issue)
  - Capital cost of $118 million
  - Residential collection fees of $22 per month
  - Tipping fees of $95 per ton
  - Annual operating cost of $8.8 million (FY 2010 projection)
  - Annual debt service expense $8.8 million (FY 2010 projection)

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

34

Guam SOLID WASTE RECEIVER

# 3. INITIAL PLAN OF ACTION

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc.

35

Guam SOLID WASTE RECEIVER

## Receivership Objectives

- Full compliance with the Consent Decree of February 11, 2004, as follows:
  - Close Ordot Dump as required by the Consent Decree
  - Construct and open a new landfill in Layon that meets all applicable laws and regulations
  - Minimize additional waste to Ordot and properly size new landfill with appropriate waste diversion goals and programs to achieve those goals
  - Implement the Supplemental Environmental Project for a comprehensive waste diversion strategy for household hazardous waste

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc.

36

**Guam** SOLID WASTE RECEIVER

## Receivership Objectives
(Continued)

- Build on the work that has already been done to the maximum extent feasible
- Work with and through the current staff of the Solid Waste Management Division to the maximum extent practical
- Develop a strategy for simultaneous planning and construction activity
- Develop diversion programs that will divert waste to the maximum extent practical

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc. 37

**Guam** SOLID WASTE RECEIVER

## Receivership Objectives
(Continued)

- Facilitate partnerships with the current and planned military organizations in Guam
- Develop a financing plan that provides adequate capital construction, debt service and operating funding for the projects
- Develop a financial management strategy that assures financial control, Court supervision, and timely payment to contractors and others critical to the completion of the Consent Decree projects

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc. 38

**Guam** SOLID WASTE RECEIVER

## Receivership Objectives
(Continued)

- Develop measurable standards for determining when the Receivership can end. Such standards should:
  - Require stable operations of the new landfill, the closure of Ordot and the day-to-day operations of the Solid Waste Management Division for a period of time satisfactory to the Court
  - Assure ongoing sustainable operations in compliance with all federal and Guam laws and regulation and in a professional environment free from political interference with the sound management practices required for this important function
  - Provide for periodic rate adjustments that will assure that debt service and operation and maintenance cost are adequately funded over the long term
  - Require that the GovGuam has deposited sufficient funds with a trustee, approved by the Court, to allow it to assume all debt incurred by the Receivership in completing the activities and projects required by the Consent Decree

GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*                                        39



**Guam** SOLID WASTE RECEIVER

**Priority Number 1.0**
## Build and Open New Landfill

- New landfill location at Layon
- Review work done by design team, TG Engineers
- Perform Gap Analysis of new landfill design
  - Overview performed by GBB with the assistance of Shaw
  - Formal response from GEPA and U.S. EPA 9 needed on responses to regulatory comments in order to move forward with finalizing design

GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*                                        40



Guam SOLID WASTE RECEIVER

**Priority Number 1.0**
# Build and Open New Landfill
**(Continued)**

- Complete land acquisition ASAP
  – Monitor litigation
  – Review updated appraisals for reasonableness
  – Coordinate with the U.S. District Court to ensure speedy resolution
  – Permit land use
- Resolve open design questions:
  – Mini cell first?
  – Construct in-gradient with ground water suppression or above gradient fill?
  – Other issues?
- Complete access roads to the extent required to allow construction
  – New road and utilities requirements
  – Evaluate need for new road vs. upgrade to existing construction road
  – Bid the work to begin ASAP

GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*                    41



Guam SOLID WASTE RECEIVER

**Priority Number 1.0**
# Build and Open New Landfill
**(Continued)**

- Bid and award construction of initial landfill capacity:
  – Develop options for opening and timeframe for those options
  – Option for additional initial capacity to serve Military's needs
  – Decide how construction/demolition waste to be handled going forward
- Review adequacy of bridges and roads to Layon with Guam's current consultant Parson's Brinckerhoff (PB):
  – Assess need for minimum bridge upgrades to assure access to the new landfill
  – Confirm schedule and funding availability
  – Bid the work to begin ASAP

GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*                    42











Guam SOLID WASTE RECEIVER

Priority Number 1.0

## Build and Open New Landfill

**(Continued)**

- Devise and implement operating plan for new landfill, as a part of a long-term integrated solid waste management plan, with the following options:
  - Intensive training of GovGuam personnel to manage and operate the new landfill
  - Consider long-term outsourcing to private entity (potential impact on cost of capital)

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 43

Guam SOLID WASTE RECEIVER

Priority Number 1.0

## Build and Open New Landfill

**(Continued)**

- Explore a joint venture with the military facilities in Guam:
  - Explore possibility of prepayment for services as an off-set to raising capital
  - Develop long-term operating strategy to assure Military that its investment will be protected
  - Consider joint strategies with the Military for HHW and diversion management

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 44

**Guam** SOLID WASTE RECEIVER

Priority Number 1.0

## Build and Open New Landfill

(Continued)

- Consider change in SWMD organizational alignment:
  - Evaluate compatibility with potential new public corporation for managing solid waste
  - Assign to one of Guam's other utilities or
  - Create as a new entity under the Consolidated Commission on Utilities

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 45

**Guam** SOLID WASTE RECEIVER

Priority Number 1.0

## Build and Open New Landfill

(Continued)

- Route 4 bridges and road improvements needed:
  - As part of the transportation route to the Layon Landfill, certain bridges require upgrades to Federal Highway minimum design load capacities of HS20 (36 Tons)

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 46

**Guam** SOLID WASTE RECEIVER

**Priority Number 1.1**
## Close Ordot Dump

- Conduct a Gap Analysis recommended by U.S. EPA 9 on the current closure plan developed for GovGuam by Dueñas, Bordallo, Camacho & Associates:
    - Gap Analysis conducted using the services of Shaw under an existing contract with the GovGuam (amendment to contract required)
    - Gap Analysis will consider all comments made by GEPA and U.S. EPA 9 on current closure design
- Devise a strategy that assures that waste (new and/or relocated materials) deposited at Ordot is handled in a way that facilitates the dump's final closure
- Develop a procurement strategy that assures that construction activity on the closure can begin at the earliest feasible date

GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS

Gershman, Brickner & Bratton, Inc.

47



**Guam** SOLID WASTE RECEIVER

**Priority Number 1.1**
## Close Ordot Dump
**(Continued)**

- Minimize additional waste to Ordot
    - Develop diversion strategies ASAP to minimize additional waste going to Ordot and future new landfill
        - Implement recycling diversion initiatives at convenience centers
        - Implement interim recyclables processing and market materials
        - Consider processing of recyclables in conjunction with Military or private sector
        - Explore feasibility of developing HHW program in conjunction with Military or private sector

GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS

Gershman, Brickner & Bratton, Inc.

48



Guam SOLID WASTE RECEIVER

Priority Number 1.2
**Achieve Reasonable Waste Diversion Goals and Implement Programs/Services**

Guam Law:
"The government of Guam must divert twenty-five percent (25%) of all solid waste by January 1, 2001, through source reduction, recycling and composting activities. Diverting twenty five percent (25%) of all solid waste requires the collective participation of the residential, commercial, industrial, and public sectors. The government shall continuously seek community participation and technology to further reduce solid waste."

GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS

Gershman, Brickner & Bratton, Inc.
49



Guam SOLID WASTE RECEIVER

Priority Number 1.2
**Achieve Reasonable Waste Diversion Goals and Implement Programs/Services**
(Continued)

Forecasted Impact of Increased Diversion

| Year | 2007* | 2010 | 2015 | 2020 |
|---|---|---|---|---|
| Annual Waste Generated in Tons* | 145,231* | 154,483* | 172,202* | 189,089* |
| Tons Diverted | 2,905* | 38,621 | 60,271 | 94,545 |
| Percent Diverted | 2%* | 25%** | 35%** | 50%** |
| Annual Tons to Landfill | 142,326* | 115,862 | 111,931 | 94,545 |

GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS

*Guam Integrated Solid Waste Management Plan, 2006; does not include Military
** Receiver assumption, March 2008

Gershman, Brickner & Bratton, Inc.
50



































































**Guam** SOLID WASTE RECEIVER

## FYI…Recycling Rates on Hawaiian Islands

| FY | 01 | 02 | 03 | 04 | 05 |
|---|---|---|---|---|---|
| Hawaii | 2.4% | 1.4% | 15.1% | 15.8% | 19.1% |
| Maui | 33.2% | 26.9% | 34.3% | 31.8% | 30.1% |
| Oahu | 31.3% | 31% | 31.7% | 31.0% | 35.0% |
| Kauai | 7.3% | 7.6% | 19.6% | 25.8% | 5.3% |
| State | 27.5% | 25.2% | 29.4% | 29.1% | 30.1% |

- State diversion goal is 50%
- HI 5 deposit system on beverage containers very effective

Note: County of Maui is a GBB client

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

51

**Guam** SOLID WASTE RECEIVER

**Priority Number 1.3**

## Supplemental Environmental Project

### Household Hazardous Waste (HHW)

- Complete review of previous design and selected site for new HHW facility
- Explore partnering with the Military to utilize their facilities and/or vendors in lieu of building new HHW facilities
- Develop education initiative for citizens and businesses to improve awareness of and compliance with HHW management

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

52

Guam SOLID WASTE RECEIVER
Priority Number 2.0
Improve Day-to-day Operations
Collection and Landfill
• Equipment Review
– Assure timely repair (outsource if necessary)
– Replace essential equipment that is not repairable
– Surplus excess or non-repairable equipment
– Develop long-term purchasing plan
• Full assessment of current operations at Ordot
– Assure ongoing scales data going forward
– Eliminate "free" dumping
– Other improvements as indicated
GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS
Gershman, Brickner & Bratton, Inc.
53

Guam SOLID WASTE RECEIVER
Priority Number 2.0
Improve Day-to-day Operations
Collection and Landfill
(Continued)
• Establish data collection protocol and ensure accurate data collection:
– Confirm tonnage and sources
– Evaluate current recycling volumes
• Review collection routes and schedules
– Improve efficiency of routing
– Explore privatizing as Public Law requires
– Consider contracting with other Guam utilities for customer service function
GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS
Gershman, Brickner & Bratton, Inc.
54

Guam SOLID WASTE RECEIVER
Priority Number 2.0
Improve Day-to-day Operations
Solid Waste Management Division
(Continued)
• Review training and safety program:
– Develop on-the-job training program for front-line workers
– Review record of work related injuries
– Develop initiative to address deficiencies
• Complete a job review for all positions in Solid Waste:
– Require transfers out of Solid Waste for any non-essential positions
– Review the status of LTA employees and evaluate the need for the positions going forward
– Review and address the training needs of supervisory staff
• Implement changes to stabilize and improve services
GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
55

Guam SOLID WASTE RECEIVER
Priority Number 2.1
Improve Finance and Administration
Solid Waste Management Division
• Address the issues identified in the recent management and performance audits
• Establish effective fee collection process for delinquent customer accounts
• Review and revise, as needed, internal control and accounting procedures
• Assure timely and secure payment of all solid waste vendors (for received and verified goods and services only)
• Establish a timely procurement process that follows Guam's laws and procedures
GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
56

Guam SOLID WASTE RECEIVER

**Priority Number 2.1**

## Improve Finance and Administration

### Solid Waste Management Division

**(Continued)**

- Establish full-cost accounting for all services
- Review and adjust rates for all services as needed to assure fairness and adequacy
- Provide financial and performance reporting to the Court, Government of Guam and the Public
- Work with the Court to facilitate independent and regular audits of the Receivership
- Develop effective web-based communication for the public and employees

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

57

Guam SOLID WASTE RECEIVER

**Priority Number 2.2**

## Request for Emergency Purchase to Address Urgent Needs

### Solid Waste Management Division

- Refuse collection trucks repair & replacement
- Roll-off trucks repair & replacement
- Roll-off waste containers
- Heavy equipment repair
- Roll-off recycling containers
- Skid loader grapple hook
- Survey equipment
- Shower repair
- Mold assessment / resolution
- Roof repair/replacement
- Scales for Ordot
- Rolling stock maintenance

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

58

Guam SOLID WASTE RECEIVER

# 4. Challenges and Progress

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

59

Guam SOLID WASTE RECEIVER

## Challenge: Improving the Management of Ordot

*Progress*

- ✓ The residential dump area replaced with a Convenience Box for safety and operational reasons
- ✓ Regular sprinkler service has been reinstated
- ✓ Proper daily cover procedures have been initiated
- ✓ Additional staffing has been dedicated to Ordot and
- ✓ Increased management oversight of operations

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

60

**Guam** SOLID WASTE RECEIVER

## Challenge: Preserving Space at Ordot

*Progress*

✓Consultation with mayors and affected businesses
✓Recycling locations identified and publicized
✓Cardboard, green and inert waste banned at Ordot effective July 17, 2008
❑Ban to be extended to residential collections at a later date

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.

61

**Guam** SOLID WASTE RECEIVER

## Materials Ban

***Time for a Change to Recycling***
***Key to Sustainable Waste Management for Guam***

- To be effective July 17, 2008 (Thursday)
- Decision made after extensive consultation with Guam's mayors and the businesses affected by the decision
- Ban on certain materials at the Ordot Dump and transfer stations
- Objectives:
  – Extend the capacity at the Ordot Dump
  – Increase recycling
  – Comply with GEPA Permit

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.

62

Guam SOLID WASTE RECEIVER
Banned Materials:
• Old corrugated cardboard containers (OCC)
• Yard and other vegetative waste
• Untreated wood
• Inert material
• Mixed loads
Ban Applies to:
• All commercial haulers
• All loads generated by the mayors' offices
• All loads generated by the Gov. of Guam's Departments
• All residential self haulers
GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
63

Guam SOLID WASTE RECEIVER
Ban Enforcement Policy
Visual inspection at gate
• If contains banned materials:
– Load refused and info provided
– Not an infraction
• If banned materials not detected but found at disposal point
– Customer takes back materials
– No money returned
– 1st and 2nd infractions = warning
– 3rd infraction = vehicle banned for 1 week
– Additional infractions = additional weeks added to ban
– After a month without infraction = customer in good standing
GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
64

**Guam** SOLID WASTE RECEIVER

## Facilities Accepting Banned Materials

- Northern Hardfill
  - Vegetative and green/ yard waste
  - Construction and demolition debris
- Guam Transport and Warehouse
  - Paper products
- Mr. Rubbishman
  - Corrugated cardboard

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.

65

**Guam** SOLID WASTE RECEIVER

## Reaction to the Ban Thus Far

- *Bob Perron, Mr. Rubbishman general manager, said he wholeheartedly supports the ban's intent. However, he said there are questions that remain unanswered."*
  Pacific Daily News, June 28, 2008
- *"This is something our government could have done a long time ago, but didn't have the will to," he [Recycling Association of Guam President Paul Tobiason] said.*
  Pacific Daily News, June 28, 2008
- *"… the new rules will finally force the island to coordinate and enforce recycling efforts." "Everyone must comply with these regulations, and GovGuam must make every effort to enforce them."*
  Pacific Daily News (Opinion Piece), June 30, 2008
- *"*

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.

66

Guam SOLID WASTE RECEIVER

## Challenge: Closing Ordot

*Progress*

✓Working with GEPA and U.S. EPA 9 to ensure sufficient capacity until new landfill opens
✓Ongoing studies and surveys:
- Value Engineering
- Remedial Investigation
- Operations Assessment
- Capacity Survey
- Weigh Data Collection/Evaluation

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
67

Guam SOLID WASTE RECEIVER

## Challenge: Building a New Landfill

*Progress*

✓Site selected
✓Receiver in possession of site
✓Funding in place to pay for land
✓Land use permit process underway
✓Design update underway
✓Construction schedule being developed

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
68

**Guam** SOLID WASTE RECEIVER

## Challenge: Building a New Landfill – Land Use Permit

*Progress*

- ✓Receiver following recommendations of:
  - ➢Land Management staff
  - ➢ Attorney General's Office
- ✓Normal Land Use Commission process to be followed
- ✓Expeditious process requested
- ✓Receiver will manage the process with the assistance of TG Engineers

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc.

69

**Guam** SOLID WASTE RECEIVER

## Challenge: Building a New Landfill - GEPA/U.S. EPA 9 Layon Design

*Progress*

- ✓U.S. EPA 9, GEPA and Receiver working to update work suspended in 2006
- ✓Mutual effort underway to establish a more collaborative process to:
  - ➢ Reduce redundancies and conflicts
  - ➢ Establish consensus between the Receiver and Regulators
  - ➢ Reduce the time required to complete the review process
- ✓EPA/GEPA currently reviewing Draft Hydrogeological Assessment Report

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc.

70

**Guam SOLID WASTE RECEIVER**

## Challenge: Building a New Landfill - Integrated Hydrogeologic Assessment Layon Landfill Site

*Progress*

✓Draft Assessment Report submitted to GEPA/U.S. EPA 9 for review and comment
- Confirms site as best location for new landfill
- Provides long-term conceptual modeling that can be used to monitor site as landfill is developed
- Provides guidance on conditions at the site that require special attention during and after construction

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc.

71

**Guam SOLID WASTE RECEIVER**

## Challenge: Bridge and Road Improvements

*Progress*

✓Identified bridges in need of repair, all critical to access new landfill
✓DPW and federal authorities made aware of the need
✓General assurances have been provided by DPW but no firm commitment
❑DPW to report to the Court in July 10, 2008 hearing

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc.

72

**Guam** SOLID WASTE RECEIVER

## Challenge: Recycling Tires and White Goods

*Progress*

✓Transfer Stations clean-up underway
✓DPW cooperating/assisting
✓White goods disassembled and recyclable materials sold
✓Tires are being recycled
✓Ongoing effort

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 75

**Guam** SOLID WASTE RECEIVER

## Challenge: Meeting the Military's Needs

*Progress*

✓Briefed Military leadership
✓Consulted with JGPO
✓Established good working relationships
✓Reached agreement to jointly develop a Memorandum of Understanding (MOU) to:
- Potentially save Military and Guam $$
- Enhance recycling
- Improve environment

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 76

**Guam** SOLID WASTE RECEIVER

Challenge: Poor Equipment and Working Conditions

*Progress*

- ✓Emergency purchase order issued by Governor
- ✓Funding for critical purchases identified
- ✓Credit holds released by important vendors
- ✓Purchasing underway
- ✓Progress on repairs
- ❑Complete emergency procurements

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
77

**Guam** SOLID WASTE RECEIVER

Challenge: Organization Not Structured to Support Workers or Customers

*Progress*

- ✓Established new organizational structure
- ✓Needed solid waste expertise now available
- ✓Engineering expertise now available
- ✓Experienced financial analysts on board
- ✓Cynthia Jackson assumes administrative management role

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
78

**Guam** SOLID WASTE RECEIVER

## Challenge: Improving Financial Management

*Progress*

- ✓Completed financial analysis of the current fiscal year
- ✓Reduced costly equipment rentals
- ✓Established Recycling Revolving Fund
- ✓Issued Request for Expressions of Interest (RFEI) to private companies interested in providing financing
- ✓Engaged Public Financial Management, Inc (PFM)

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc.

81

**Guam** SOLID WASTE RECEIVER

## Challenge: Improving Financial Management

**Solid Waste Management Division Accounts**
Fiscal Year 2008 As of 3/31/08

| Account Name | Source of Funds | FY 2008 Appropriations | YTD Total Obligations | Balance Available |
|---|---|---|---|---|
| Solid Waste Management | Tipping Fees | $ 5,880,808.00 | $ 2,917,625.24 | $ 2,963,182.76 |
| Ordot Landfill Closure | Federal CIP Grant | $ 155,699.00 | $ 90,120.71 | $ 65,578.29 |
| Compact Ordot Dump Closure | Federal DOI Grant | $ 1,318,000.00 | $ 1,200,000.00 | $ 118,000.00 |
| Compact New Solid Waste Landfill | Federal DOI Grant | $ 983,052.00 | $ 983,052.00 | $ - |
| DOI CIP New MSWLF Supplement | Federal DOI Grant | $ 133,000.00 | $ - | $ 133,000.00 |
| Consent Decree - Ordot Dump | General Fund - Governor | $ 3,805,000.00 | $ 3,804,870.00 | $ 130.00 |
| **Total** | | **$ 12,275,559.00** | **$ 8,995,667.95** | **$ 3,279,891.05** |

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc.

82

**Guam** SOLID WASTE RECEIVER

### Challenge: Improving Financial Management

Solid Waste Management Division Operating Account

Projected Fund Balance

FY 2008

| Fund Balance | Low Estimate | High Estimate |
|---|---|---|
| Fund Balance @ 9/30/07 | $ 1,415,616 | $ 1,415,616 |
| | | |
| Projected Revenue FY 2008* | $ 6,300,000 | $ 6,300,000 |
| Projected Expenses FY 2008** | $ 5,880,800 | $ 5,322,700 |
| Excess (Deficit) FY 2008 | $ 419,200 | $ 977,300 |
| | | |
| Funds Available | $ 1,834,816 | $ 2,392,916 |
| Emergency Purchases (high estimate +20%) | $ 1,658,500 | $ 1,990,200 |
| | | |
| Projected Fund Balance @ 9/30/08 | $ 176,316 | $ 402,716 |

* Assumes at least $100,000 from the Recycling Fund **Excludes estimated cost of emergency purchases

GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

83



**Guam** SOLID WASTE RECEIVER

### Challenge: Improving Financial Management

**Estimated Annual Recycling Revolving Fund**

Based on FY 2007 Vehicles

| Types of Vehicles | Number* | Fees** | Total |
|---|---|---|---|
| Cars, trucks, buses | 92,254 | $ 25.00 | $ 2,306,350.00 |
| Heavy Equipment | 221 | $ 30.00 | $ 6,630.00 |
| Motorcycles and Trailers | 4,105 | $ 3.00 | $ 12,315.00 |
| Total | 96,580 | | $ 2,325,295 |

*Excludes Government and Military vehicles

**Fees Pursuant to 10 GCA, CH 51 Article 5 §51506

Source: GovGuam Bureau of Budget and Management

GBB
SOLID WASTE
MANAGEMENT
CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

84













































**Guam** SOLID WASTE RECEIVER

## Challenge: Improving Residential Billing and Fee Collection

*Progress*

- ✓Cleaning up data base
- ✓Mapping customer locations
- ✓Requiring that all customers be properly registered for service
- ✓Sending notices to non-paying customers
- ✓Coordinating with Guam's Mayors
- ✓No pay – no trash pick-up
- ✓Obtaining the services of a bill collection agency

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

85

**Guam** SOLID WASTE RECEIVER

## Challenge: Improving Commercial/ Government Billing and Fee Collection

*Progress*

- ✓Banning delinquent customers from using facilities
- ✓AG pursuing legal action against worst delinquent customers
- ✓Improving reporting of non-paying commercial customers
- ✓Obtaining the services of a bill collection agency
- ✓Identifying changes needed to make commercial haulers directly responsible for tipping fees

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

86

Guam SOLID WASTE RECEIVER

# 5. Capital Funding

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc. 87

Guam SOLID WASTE RECEIVER

## Areas Requiring Capital Funding

- Acquisition of land for new landfill and access road
- Bridge improvements on roads to Layon, if not already funded
- Final designs for both new landfill and Ordot Dump
- Construction of the access roads and new landfill and new cells once in operation unless funds for new cells are accrued from tipping fees
- Closing the Ordot Dump
- Post-closure activities at Ordot
- Updating the equipment and establishing proper systems for the Solid Waste Management Division
- Upgrade of convenience centers
- Construction of transfer station(s)
- Construction of interim and permanent diversion/processing facilities
- Construction of household hazardous waste facility

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc. 88

Guam SOLID WASTE RECEIVER

## Capital Financing Alternatives

(More than one of these financing methods may be needed to address all Consent Decree Projects.)

A. General Obligation Bonds of the GovGuam backed by general taxes
B. Revenue Bonds secured by a stream of revenue from customers of the system
C. Long-term private placement (negotiated long-term debt with a financial institution)
D. Build-finance-own/operate through a private company
E. Federal Grants and pre-payment by the Military
F. Pay-Go cash funding by the GovGuam
G. Short-term variable rate note secured by revenue under the Court's control

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
89

Guam SOLID WASTE RECEIVER

## 6. Next Steps

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
90

Guam SOLID WASTE RECEIVER
Next Steps
1. Maintain on-the-ground presence in Guam
2. Get SWMD vehicles repaired/replaced and improve services to residential customers
3. Continue to improve the new SWMD organization
4. Continue to advance the analysis for implementing the various needs outlined in the Initial Plan of Action
5. Consider timing of SWMD privatization of two-thirds of trash collection
6. Improve control and management of SWMD funds and receivables
7. Develop detailed plan for long-term financing
8. Complete the Plan of Action with detailed estimates of cost and schedules for construction and seek approval from the Court
GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
91

Guam SOLID WASTE RECEIVER
Next Steps (Continued)
9. Execute land use permit/rezoning process for Layon
10. Resolve/incorporate GEPA/U.S. EPA 9 design comments for Layon
11. Resolve GEPA issues with Ordot design
12. Establish estimated date for Ordot closure and develop redesign specifications
13. Identify changes needed in Guam law
14. Work with the PUC on future rate structures
15. Execute the approved Plan of Action
1. Report to the Court on an ongoing basis
2. Adjust the approved Plan of Action with the approval of the Court as circumstances require
16. Keep the Court, the Government of Guam , our customers, and other interested parties informed
GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
92

Guam SOLID WASTE RECEIVER
GBB Corporate Overview
(Continued)
• By concentrating on solid waste, GBB's knowledge is more focused than in broad-based firms
• "Change Agents" to produce better services and facilities
• Headquartered in Fairfax, Virginia
• Principals and senior staff have over 150 years of combined experience
• Emphasis on technical feasibility, as well as the business, political, institutional, and public involvement aspects of successful implementation
• GBB is independent in: Approach... Design... Technology... Construction... Financing... Operations
GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
95

Guam SOLID WASTE RECEIVER
GBB
Working at the Leading Edge…
Understanding emerging developments and trends:
• Sustainable systems with reduced carbon footprint
• Automated collection and route optimization
• Landfill mining and reclamation
• Single-stream recyclables collection and processing
• C&D waste recycling and deconstruction
• Franchising
• Full-cost management and rate reform
• Privatization of systems and services
• Managed competition
• Pay-as-you-throw
• Special waste stream management
• Adding materials to existing recycling programs
• Advanced processing technologies
…GBB providing creative solutions
GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
96

# Guam SOLID WASTE RECEIVER

- Clients in 45 U.S. States
- Clients in Canada, Hong Kong, Australia and Chile
- In the U.S., clients range from some of the largest cities and counties to the most rural communities

**ALASKA**
Anchorage Law Firm
**ALABAMA**
Solid Waste Disposal Authority of Huntsville
**ARIZONA**
City of Tucson
**ARKANSAS**
City of Fort Smith
Tri-County Solid Waste District
**CALIFORNIA**
City of Oceanside
City of Avalon
San Gabriel Valley, San Marino
City of Beverly Hills
City of San Fernando
City of Torrance
San Bernardino County
City of Oxnard
City of Santa Clarita
Disney Imagineering
City of Ontario
City of Pasadena
**CONNECTICUT**
Town of Shelton
Town of Southbury
Town of Windsor
Connecticut Resources Recovery Authority
**DELAWARE**
Delaware Solid Waste Authority
**DISTRICT OF COLUMBIA**
U.S. Postal Service Headquarters
Aluminum Association
National Soft Drink Association
U.S. Conference of Mayors
St. Elizabeth's Hospital
Eagle Maintenance
District of Columbia Government
**FLORIDA**
Palm Beach County
Florida Department of Environmental Resources
Broward County
Lee County
Miami-Dade County
**GEORGIA**
Gwinnett County
Coastal Georgia Regional Development Center, Brunswick
College Park and East Point
Statesville
**HAWAII**
Maui County
Kauai County
**ILLINOIS**
Peoria County
CornerStone Material Recovery
Champaign and Urbana
U.S. Department of Energy
**INDIANA**
City of Valparaiso
City of Wabash
**IOWA**
Metro Waste Authority, Des Moines
Iowa Dept. of Natural Resources
East Central Intergovernmental Association
Hardin County
Scott Area Solid Waste Management Commission, Scott County
Carroll County
Audubon, Crawford, and Shelby Counties
Marshall County Landfill Commission
Marshall County
Ottumwa-Wapello Counties
Sioux City
Calhoun County
Upper Explorerland Region
Iowa Energy Policy Council
**KANSAS**
Kansas Department of Corrections
Harper County
**LOUISIANA**
Shreveport Chamber of Commerce
Jefferson Parish
City of New Orleans
City of Baton Rouge-Parish of East Baton Rouge
**MAINE**
Aroostook County
Waterville-Winslow
**MARYLAND**
City of Annapolis
City of Baltimore
Baltimore County
Washington County
Frederick County
Ocean City
City of Gaithersburg
Harford County
Maryland Office of Attorney General
Montgomery County
Northeast Maryland Waste Disposal Authority, Baltimore Anne Arundel County
Calvert County
Caroline County
Town of Easton
Charles County
Somerset County
Talbot and Queen Anne's Counties
Wicomico County
USPS – Baltimore Division
Maryland Recyclers Coalition
Maryland Dept. of the Environment
St. Mary's County
McCormick and Company
Prince George's County
Office Paper Systems, Inc.
Maryland Environmental Service
Maryland Reclamation
Legg Mason Wood Walker, Inc.
**MASSACHUSETTS**
City of Pittsfield
City of Springfield
City of Fitchburg
North Andover
Massachusetts Department of Environmental Management

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

97

# Guam SOLID WASTE RECEIVER

**MICHIGAN**
Michigan Dept. of Natural Resources
Lapeer County
Livingston County
City of Marquette
Muskegon County
City of Alpena
Southeastern Oakland County Resource Recovery Authority (SOCRRA)
City of Pontiac
Greater Detroit Resource Recovery Authority (GDRRA)
**MINNESOTA**
Metropolitan Council of the Twin Cities Area
St. Cloud Hospital, St. Cloud
Ramsey County
Lyon County
Blue Earth County
East Central Minnesota
Martin County
Minneapolis
**MISSISSIPPI**
City of Meridian
**MISSOURI**
Kansas City
City of Springfield
**MONTANA**
Yellowstone County (Billings)
**NEW HAMPSHIRE**
New Hampshire Office of State Planning
City of Portsmouth
City of Nashua
Plymouth – Franklin
ERRCO (Epping)
**NEW JERSEY**
Ocean County
Pollution Control Financing Authority of Warren County
Salem County
Essex County
Cape May Municipal Utilities Authority
New Jersey Department of Environmental Protection and Energy
Atlantic County
City of Sayreville
Pennsauken Solid Waste Management Authority
Financial Guaranty Insurance Co.
Wayne County
Lycoming County
Greene County
Bedford, Fulton, Huntingdon Counties SWA
**RHODE ISLAND**
Rhode Island Solid Waste Management Corp.
Town of South Kingstown
Town of Narragansett
**SOUTH CAROLINA**
City of North Myrtle Beach
Lexington County
South Carolina DHEC
**SOUTH DAKOTA**
State of South Dakota
**TENNESSEE**
City of Bartlett
City of Chattanooga
City of Collierville
City of Franklin
City of Memphis
Johnson City
Metropolitan Government of Nashville/Davidson County
Container Corp. of America
**TEXAS**
City of Arlington
City of Houston
City of Plano
City of Corpus Christi
City of Carrollton
City of Fort Worth
City of Lewisville
City of Frisco
**UTAH**
Salt Lake County
**VERMONT**
Northeastern Vermont Development Association
Northeast Kingdom
**VIRGINIA**
City of Chesapeake
City of Norfolk
City of Richmond
City of Alexandria
U.S. Army Engineer District, Fort Lee
Prince William County
Stafford County
Chesterfield County
Virginia Recycling Association
Central Virginia Waste Management Authority
Fairfax County
Appalachian Regional Recycling Consortium, Commonwealth of Virginia
Southeastern Public Service Authority of Virginia
City of Manassas
Arlington County
James City County
Culpeper County
Virginia Dept of Environmental Quality
Virginia Power
Rivanna Solid Waste Authority
City of Harrisonburg
Henrico County
**WASHINGTON**
King County
Clean Washington Center, Seattle
City of Seattle
City of Spokane
Snohomish County
Washington Department of Ecology
**WEST VIRGINIA**
City of St. Albans
South Charleston
West Virginia Solid Waste Management Board
Jefferson County
Kanawha County Solid Waste Authority, Charleston
Morgantown and Huntington
West Virginia Resource Recovery Solid Waste Disposal Authority
**WISCONSIN**
West Central Wisconsin Regional Planning Commission
Waukesha County
Richland Center
Dane County
Winnebago County
Outagamie County
Brown County
City of Janesville
Wisconsin Dept. of Natural Resources
Eau Claire County
La Crosse County
Manitowoc County
City of Milwaukee
Southeast Wisconsin
City of Prairie du Chien
**INTERNATIONAL**
Greater Toronto Area
Government of Hong Kong
U.S. Virgin Islands
Golder Associates – Australia
Santiago, Chile (C&D)
**OTHERS**
American Forest & Paper Association
American Paper Institute
Solid Waste Association of North America
U.S. Air Force
Council for Solid Waste Solutions
Johns Hopkins Health System
Marriott Corporation
Mobil Chemical Company
U.S. Conference of Mayors
U.S. Postal Service, Northeast Region
U.S. Environmental Protection Agency
U.S. Department of Energy
Office of Technology Assessment
U.S. Department of Housing and Urban Development
U.S. Department of Agriculture, Forest Service
Various Confidential Clients

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.*

98

**Guam** SOLID WASTE RECEIVER

## GBB's Relevant Island Experience

| | |
|---|---|
| • **Maui County, Hawaii** (Ongoing) | – Comprehensive Solid Waste System Analysis and Management Plan |
| • **Grand Cayman Island, BWI** (Ongoing) | – Landfill Mining Plan<br>– Waste-to-Energy Development Plan<br>– New System/Services Procurement |
| • **U.S. Virgin Islands** 1992-1996 (Work disrupted by two hurricanes) | – Waste Stream Characterization<br>– Recycling Markets Study<br>– Disposal Options Analysis<br>– System Cost Analysis |

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 99

**Guam** SOLID WASTE RECEIVER

## GBB Receiver Team

### Front Line

- **Harvey Gershman**, President and Receiver Officer-in-Charge
- **David Manning**, Special Principal Associate and Receiver Representative
- **Chace Anderson**, VP and Receiver Operations Manager
- **Jack Tucker,** Senior Project Manager and Receiver Operations Manager
- **Christopher Lund**, Senior Project Engineer, Landfill and Regulatory Analyst
- **Tim Bratton**, Senior VP and Landfill Analyst

### Support

- **Francois Coulombe**, Communications Manager
- **Mary-Jane Atwater**, Principal Associate and Public Information Analyst
- **David Seader**, Principal Associate, Financial and Procurement Analyst
- Others as needed

GBB SOLID WASTE MANAGEMENT CONSULTANTS

*Gershman, Brickner & Bratton, Inc.* 100

Guam SOLID WASTE RECEIVER

## Harvey Gershman

- 35+ years of experience in solid waste management
  - Product of Earth Day 1970
- Provides briefings to government management and elected officials and specializes in advising during the process for 'change'
- Instrumental in successful outcome of plans and implementation:
  - Baltimore, MD
  - Town of Babylon, NY
  - City of Plano, TX
  - City of Fort Worth, TX
  - City of Alexandria/Arlington County, VA
  - Office Paper Systems, Inc. – Gaithersburg, MD
  - City/Parish of Baton Rouge, LA
  - Metro Nashville and Davidson County, TN
- Project Administrator/Project Manager for public agencies
- SWANA Professional Achievement Award - 1993
- *MSW Management* Editorial Advisory Board
- National Recycling Coalition Policy committee for BOD, 2005-present

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc. 101

Guam SOLID WASTE RECEIVER

## David L. Manning

- Extensive experience in management of state and local governments:
  - Director of Finance for the Metropolitan Government of Nashville, Tennessee 1999-2007
  - Commissioner of Finance and Administration 1987-1995 during which time Tennessee was twice named the best managed state in the US
- Principal official responsible for planning, development and oversight of the Mayor's initiative to create a new "clean, green, and lean" solid waste plan for Nashville resulting in:
  - A plan that achieved compliance with all environmental and community objectives
  - Resulted in a significant improvement in the Community's recycling program;
  - Savings for the City's from the plan in excess of $200 million over the 20 year life of the capital investment and
  - Revitalized Nashville's district energy system from an unreliable and costly system to a modern, efficient and environmentally friendly system
- Appointed by the Tennessee Commissioner of Commerce and Insurance, as Special Deputy Receiver for a Tennessee HMO with approximately $250 million in revenue primarily serving Medicaid eligible Tennesseans

GBB SOLID WASTE MANAGEMENT CONSULTANTS

Gershman, Brickner & Bratton, Inc. 102

Guam SOLID WASTE RECEIVER
Chace Anderson
• Over 20 years of experience in the solid waste management field
• Owner of a small recycling collection business
• Recycling Coordinator for RSWA
• Solid Waste Administrator for RSWA
• Director of Division of Waste Management for Metro Nashville
• Director of Division of Heavy Equipment Fleet for Metro Nashville
• Project manager on California Waste Solution project to collect, process and market single stream recyclable materials for the City of San Jose, California
• Brings senior management experience from Nashville as well as a hands-on perspective developed as the Solid Waste Administer for the Rivanna Solid Waste Authority (Charlottesville, Virginia)
• Experience ranges from start-up implementation to budget development and management of $33 million per annum
• Developed and led public relations campaigns to, first, win political support for total solid waste system overhauls and, second, develop public acceptance and use of such new operations
GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
103

Guam SOLID WASTE RECEIVER
Jack L. Tucker
• 27 years of experience in various levels of management and administration
• Possesses the skill and knowledge in all levels of environmental service operations
• Prior positions include
– Director of Solid Waste Division Operations at the Department of Public Works of the Metropolitan Government of Nashville and Davidson County (Metro Nashville)
– Plant Manager of a permitted hazardous waste Transfer Storage and Disposal Facility (TSDF); National Manager of Field Operations; District Manager Field Operations; Project Manager/Estimator; Field Operations Supervisor; and Technical Sales Representative during his tenure at Environmental Systems Inc. (ENSCO):
GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.
104

**Guam** SOLID WASTE RECEIVER

## Christopher Lund, P.E.

- 15 years experience on Guam in Civil and Environmental Engineering
- Chief Engineer for GEPA, 2000 – 2006
- Has provided technical review and guidance to GEPA, DPW, Office of the Governor, US District Court, and the Guam Legislature during the Consent Decree process
- Member of the Guam Landfill Site Selection Committee and Municipal SWM Technical committee
- Has performed engineering design, construction quality assurance and management for several SWM projects in the CNMI, Guam, California, Nevada, Utah and Virginia

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.

105

**Guam** SOLID WASTE RECEIVER

## Tim Bratton

- Over 37 years' experience in project planning, procurement, economic analysis, and financing; assignments in 38 states
- Managed and directed full-cost accounting studies, privatization evaluations, and independent cost analyses; recycling, resource recovery, and landfill feasibility studies; comprehensive solid waste management plans, due diligence investigations and environmental site assessments for facility acquisition
- Background, education, and training is technical and financial
- Instrumental in successful outcome of plans and implementation:
  - Agawam, MA
  - Harford County, MD
  - Anne Arundel County, MD
  - Calvert County, MD

GBB SOLID WASTE MANAGEMENT CONSULTANTS
Gershman, Brickner & Bratton, Inc.

106

**Gershman, Brickner & Bratton, Inc.**
**8550 Arlington Boulevard, Suite 203**
**Fairfax, Virginia 22031-4620**
**(703) 573-5800 or 800-573-5801**
**Fax: (703) 698-1306**
**E-mail: gbb@gbbinc.com**
***www.gbbinc.com***
***http://www.guamsolidwastereceiver.org/***

# GUAM RECEIVER MEMORANDUM

| | |
|---|---|
| **TO:** | File |
| **FROM:** | David Seader |
| **DATE:** | May 14, 2008 |
| **RE:** | Observations, Recommendations and Comments on Billing and Collections |

The objectives of reviewing the billing and collection systems of the Guam Solid Waste Management Division (SWMD) are to find ways to improve the dependability of the revenue flow and to increase the collection rate, so that its operations can be assured of the cash flow it needs for its mission, and that the system will have a sufficient and secure revenue flow to support the needed financing(s) that we are anticipating. The review I made was not comprehensive and did not address overall best practices, but was more focused on things that could be done to improve the collection rate in the near term. The attachment hereto summarizes my review of the processes in place.

In the long term, it would be best to acquire a state-of-the-art customer Information system with full billing, collections, customer service and related functionality; most likely by joining the current effort of GWA and GPA to combine their customer information systems. Their goal is to have in place a newly acquired CIS for both utilities within 1-2 years, and it would be ideal if solid waste could be added to their proposed system. In addition to being a potentially effective solution per se, it would also help to establish the solid waste operation as an autonomous utility in the future, more similar to the CCUC-managed utilities than to a GovGuam line agency.

My overall observation is that the billing operation is adequate to the requirements of the system, and that the revenue problem is more a result of the structural limitations on the ability to collect billed amounts than on any billing problems. Much of the system is manual, especially the invoicing system for loads delivered at Ordot, and until that system can be automated and linked to the scale operation and customer information system (CIS), it would not improve matters that much to outsource the billing system. Of course, improvements can certainly be made in the existing CIS short of changing the system or privatizing it, but those should be of a lesser priority than focusing on improvement in the collection rate.

Overall, the billing picture for the first six months of FY2008 (October 2007 – March 2008) is as follows (details can be found in Appendix C):

| Customer Class | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Total | % |
|---|---|---|---|---|---|---|---|---|
| Major Commercial | $321,745 | $317,375 | $343,245 | $340,070 | $321,905 | $327,555 | $1,971,895 | 59% |
| Residential | $212,702 | $217,980 | $219,236 | $218,090 | $217,060 | $218,630 | $1,303,698 | 39% |
| Other Commercial | $6,275 | $6,065 | $3,905 | $4,675 | $4,740 | $4,065 | $29,725 | 1% |
| Government | $6,545 | $6,380 | $5,425 | $4,805 | $4,685 | $7,525 | $35,365 | 1% |
| Total | $547,267 | $547,800 | $571,811 | $567,640 | $548,390 | $557,775 | $3,340,683 | 100% |

Approximately 59% of the SWMD's revenues come from the 5 commercial haulers. This represents the most important revenue source for the Division. The Division's own residential customers account for about 39%. The Other Commercial and Government customers together account for less than 2% of revenues. As such, collections from those two classes of customers should be a low priority and, in fact, if they could be converted into customers of the commercial haulers, it would remove a burden from the SWMD. The following are my observations and initial activities with respect to the revenue streams from the various classes of customers.

## Major Commercial Hauler Revenues

The collection of tip fee revenues from the commercial haulers is complicated by the structure imposed by the laws of Guam. Essentially, the SWMD does not have the tools needed to track and follow up on any delinquencies of the commercial customers using the services of the 5 commercial haulers. Unless the current process is changed, it will be almost impossible to complete any financing supported by SWMD revenues. We have been looking at how to make improvements within the current framework, and have undertaken the following actions:

1. Letters will be sent to the haulers reminding them of the termination procedures in place for them to terminate any of their customers who are more than 60 days in arrears in their tip fee obligations, and requesting copies of the termination notices that they are required to give those customers. This may give SWMD some control over the collections from those customers, depending on the level of diligence and cooperation of the haulers. It may also open up a dialogue with the haulers on how to improve the system.
2. The AG's office has been asked to look into the current statutory structure for payments and collections to see how much latitude we have in getting more direct control over the process without requiring changes in law. Other lines of research requested of the AG include the following:
   a. The potential of making the tip fee a direct obligation of the commercial hauler through a service agreement arrangement.
   b. The potential for using the rule/regulation making ability of the Division to effect the direct obligation for commercial hauler tip fees.
   c. The extent of our audit ability with respect to the commercial haulers' customer records for the purpose of pursuing our collection rights.

Eventually, the tip fee payments from the weigh-ticket invoices must become the financial obligation of the hauler and SWMD should have no financial relationship with the individual commercial hauler customers. Only that change can establish the security of the revenue stream for any SWMD financing.

2

**Residential Customer Revenues**

The collection of residential revenues is hindered by the inability of SWMD to efficiently identify delinquent customers and terminate their service. Part of the problem is that the customer record in the billing system does not allow for the identification of the route that serves the customer (and the routes themselves are not uniquely coded with an ID numbering system). This makes it hard and clumsy to track payment history and relate it to a service termination process usable by Operations. There is a dormant geographic information system for SWMD that was initiated by Cynthia Jackson and completed last fall, but never used, that relates individual customers to routes in an electronic and hard-copy mapping system tied to the island's GIS. All registered residential customers have been identified on maps and are coded by route. As part of the mapping program, street addresses were updated and researched for accuracy. The data, however, have not been reconciled with the customer records in the CIS. This mapped data base can be a powerful tool in establishing the necessary links to manage residential customer collections, and we are taking steps to integrate it into our system.

Three steps are needed to establish control over the residential collection process:
1. Integration of the physical location data in the mapping system with the customer records in the CIS; and further cleaning and auditing of the street addresses, especially where customers live on unnamed streets or at unnumbered addresses.
2. Linking the payment history of every customer to its physical location and unique collection route.
3. Providing Operations with accurate real-time information on valid and terminated pick-up locations along every route.

We have initiated the process of completing the three steps. Meetings have been held with New Generation, which developed the mapping system for SWMD, and DMR, which manages the CIS for the Division. The following steps will be made:
1. DMR will get a copy of the customer address records from the mapping system and will reconcile the two systems with reports on non-conforming customers and incomplete data. SWMD can then follow up with GWA, the Mayors and other sources for completing the physical location data base.
2. The two databases will be linked by DMR and/or New Generation, so that the payment history and the customer pick-up location can be associated together. The combined system will be transparent to the user, so that it will appear as if there is only one customer data base. There is a server at SWMD that was obtained to run the GIS, and SWMD will investigate its use in the integrated system with the AS400 at DoA. The route information in the GIS can be used for organizing pick-up information for Operations.
3. Once these two steps are taken, Customer Service and Operations can design processes for effectuating terminations and reinstatements of service that drivers can easily use during collections. We would also look at some community information activities, mailings and public service announcements that alert customers to the new policies with regard to service maintenance, termination and reinstatement.
4. A copy of the GIS will be sent to Kevin Callen for his review and evaluation for its potential use in route optimization.

This discipline should improve residential collections at minimal cost to SWMD.

**Other Commercial Revenues**

The billing and collection activities for Other Commercial customers far outweigh their importance to the revenue stream. It would be quite advantageous to move all of those customers to the 5 commercial haulers, especially if we can effectuate the changes in the billing to those haulers as

3

stated above. Short of requiring the Other Commercial customers to use the haulers, we could establish a policy of a minimum load size, container size or other means of restricting use of Ordot to certain appropriate vehicles. Then the Other Commercial customers would have economic incentive to switch to commercial haulers, but still have the freedom to continue to use Ordot, but on SWMD terms.

Other Commercial customers that are in arrears sometimes get out from under their payment obligations by switching to commercial haulers and keeping their direct account inactive. We will be sending letters to the commercial haulers reminding them that they cannot haul solid waste from customers that were terminated until SWMD advises them that the delinquent customer has paid the amounts owed.

## Government Revenues

Like Other Commercial customers, government customers are more trouble than they are worth. The line agencies pay their invoice through journal entries controlled by a voucher system. The trouble is that the agency's budget may be debited for the payment, but the credit does not appear on the books of SWMD for some time later. This causes confusion and frustration of agencies that think they "paid" but are still banned by us because we haven't "received payment." SWMD must work with DoA/Accounts to improve the timeliness of the debiting and crediting of the respective accounts. It would be preferable to get the government agencies to sign up with the commercial haulers, with the proviso that we can get the changes we need as stated above.

## Self-Haul Revenues

Cash receipts from Ordot and the three transfer stations average about $23,000 per month, with about 60% of that amount generated at Ordot, and about a quarter of that amount from Dededo (see Appendix A). This is another category of revenues that is not cost-effective to manage. Perhaps SWMD could eliminate cash transactions at the disposal locations without eliminating the right to self-haul by establishing a sticker system for vehicles. Annually, residents could pay a fee for the right to use a non-commercial vehicle, identified by the sticker, to deposit waste at the disposal facilities. The use could be unlimited or limited to a certain number of visits by use of a punch card or coupon system. If the entire system were to be automated, the self-haulers could be required to use a credit or debit card to make payments at the disposal facilities instead of cash.

Because traffic at two of the transfer stations – Agat and Malojloj - is so limited, SWMD could consider restricting access to them to 2-3 days per week each and rotating the crew between the two locations, saving 3 FTEs.

## Collections of Past Due Accounts

A review of the aged A/R report for April 2008 revealed many problem areas for pursuing past due amounts. Appendix B summarizes the data for the four classes of accounts. Many accounts have receivable balances going back 5 or more years, but those may be inactive accounts, because the aging report has no activity invoiced or those accounts within the past 1-2 years. Many receivables will be challenged for lack of service, and there is scant data to confirm that service was delivered beyond the past 1-2 years. The major commercial accounts will complain that they are not liable for receivables beyond 60 days, and that they were never paid by their accounts.

4

Nonetheless, it may be useful to arrange for a collection agency to undertake the collection of the receivables, but only on a contingency basis. We are also looking into using the services of the CWA for revenue collection.

**<u>Residential Billing Cycle</u>**

Non-residential bills are sent out monthly, which is entirely appropriate. The residential bills are monthly as well, but are sent out quarterly, three at a time, with three due dates and three payments to be made. Each set of bills cost SWMD about $8,000 for printing and mailing, with an additional $8,000 for postage. We may want to consider semi-annual send out of monthly bills, which would save about $32,000 per year (but may increase customer service time sending out replacements for lost invoices), or even annual – a coupon system.

If it were possible, the residential billing should be switched to a quarterly billing. While the bills would go out four times per year, the payments would be larger and fewer ($30 v. $10), saving time and resources for SWMD and Accounts; semi-annual billing would save even more, though with anticipated increases in tip fees, a semi-annual payment might be hard for some customers to make.

**<u>Other Fees and Charges</u>**

Currently, SWMD imposes no late fees or interest on late payments. Such charges could increase the collection rate of residential customers, but would not have much impact beyond them. Also, no deposits are required of any customers with a checkered payment history. The practices of GWA, GTA and GPA should be consulted before looking to impose such charges.

Conversely, SWMD offers no discount for prepayment of the three (or more) monthly bills. A discount could increase cash flow, and could offset the imposition of any new charges.

5

# Review of
# Guam Division of Solid Waste Management
# Billing, Collections and Customer Service

## 1. Customer Information System

The SWMD customer information system resides in the GovGuam/DoA accounting system, Bacis, mounted on their AS400. In fact, the data base is mistakenly referred to as the AS400 system. The database software is written in RPG400 and is managed by an outside firm, DMR, which is responsible for any special requests or needs of SWMD. The information system seems to have the full range of functionality, including report generation and querying capability, though we haven't explored the extent of the system's capabilities or its limitations as yet.

The customer data base has four types of customer:
- Residential (R) – in 1-4 dwelling unit buildings
- Major Commercial (C)– commercial haulers
- Other Commercial(OC)
- Government (G)

There are approximately 21,000 active Residential accounts, 5 Major Commercial accounts, 114 Other Commercial accounts and 26 Government accounts. In addition, residents are allowed to self haul on a cash basis to Ordot or the 3 transfer stations. The data base also has about 11,600 inactive Residential accounts, and may have inactive Other Commercial accounts as well.

The original customer data base was provided by the GWA, and so the customer record has vestigial information from the water system. The customer record has the following information:
- Account #
- Customer name and phone #
- Customer ID – water meter (original) or social security # (new)
- Co-customer name and ID
- Employer (optional); work phone #, fax #, other phone #
- Mailing address
- Service location/street address/village/water meter route/book #
- Billing and payment history
- Notation of any billing disputes
- Other coding (inactive, updating record, etc.)

The record does not contain the solid waste collection route, but may have an appropriate field available for such information. Collection routes are not uniquely coded as of yet.

It is not clear if the data base is comprehensive or complete. Compared with the 21, 000 SWMD residential accounts, the GWA has 22,000 and the GPA has 39,000. Given the peculiarities among the utilities, meters v. physical units, and multi- v. single-family units, it would be difficult to reconcile the records in the SWMD data base. Still, a comparison with the current GWA system may be helpful in cleaning the SWMD data base. Though not a high priority, the data base should be cleaned, updated, purged of unnecessary records and searched for missing data. Missing residences may be self-haulers, commercial customers or simply not in the system, in which case SWMD is missing out on revenue.

Not every customer record has a street name and street number, making the coordination with physical collection more difficult. Some streets are unnamed and some residences have no assigned number. Village mayors may have more complete information on physical location of

6

customers, since all households must register with the villages. Other sources of information on physical locations include the planning agency and the one-stop center of DPW.

Access to the data base is by SWMD administration (Borja) and customer service (Benavente). New customers are added by means of a Registration Form, which is filled out by customers coming to the SWMD customer services office. To establish a new account, the customer must provide a photo ID, proof of ownership of the property (or copy of a lease agreement with authorization for service from the landlord) and a copy of a power/water bill (or work order for a new service). Customer terminations of service are handled the same way and require the customer to provide the same information. At termination, customers generally add the reason for the termination on the registration form, usually the reason is due to leaving the island, going to self-hauling or transferring service to a commercial hauler. To terminate service, the customer must first pay up all amounts due SWMD. By law, commercial haulers are not allowed to accept customers who are in arrears to SWMD. SWMD does not require terminated customers to provide proof of other service before allowing the termination.

To date in fiscal year 2008 there have been 534 new customers registered and 410 terminations.

## 2. Residential Billing

Residential customers are billed by SWMD three months at a time (not quarterly) in advance with a bill rendered for three one-month periods mailed out quarterly. The fee is $10.00 per month. Customers have 60 days from the date of the bill (which is the last day of the service month) to pay. The bills are prepared electronically and forwarded to the Graphic Center, a private vendor, for printing and mailing.

Customers may pay their bills by cash or check in the following ways:
- At a bank: Bank of Guam, Bank Pacific or Citizens Security Bank
- At a Treasury of Guam Cashier location: One-Stop Center or Treasurer's Office
- By mail
- Online (which also includes credit card payment capability)

Collection activity consists of sending out letters to delinquent accounts. Rarely, if ever, are residential customers terminated for non-payment.

A key requirement for increasing the residential collection rate for residential customers is to be able to link the payment history of a customer to its physical location, and then to alert the route driver to skip the stop of the delinquent account. SWMD cannot presently do that. Recently, SWMD contracted with New Generation to develop a geographic information system that in fact identified customers' locations and coded them by collection route. Collection routes are not yet coded consistently with the collection routes. That GIS is not currently on line and doesn't interact with the AS400 system with the account history. However, it does look to have potential to provide the necessary interactivity to provide the real-time information to drivers about current and delinquent accounts for collection.

## 3. Commercial Billing

The five commercial haulers are billed based on "weigh tickets" – called invoices – from their trucks dumping at Ordot. The invoice has the following information:
- The vehicle ID – plate #
- The hauler name
- The location of the waste picked up

7

- The size of the vehicle (charges are made to the hauler based on the volume of the vehicle, not the volume delivered or weight delivered)
- The total charge for the load (volume times unit price of that volume)

Four copies of the invoice are generated, one for SWMD, one for the driver, one for the customer file and one sent as back-up delivered with the monthly bill to the customer. The invoices are collected daily from Ordot and delivered to SWMD for processing. The invoices are consecutively numbered, and the gate agent must account for each one. At SWMD, the invoices are individually input into the AS400 system. Until the data entry of the invoices, the system is entirely manual. At the end of the month, the bill and the supporting invoices are hand delivered to the commercial hauler.

The hauler is supposed to back charge the tip fee to its individual accounts, although it is not clear if or how such an allocation takes place. The tip fee is due from the customer to the hauler, who is then required to transmit it to SWMD within 20 days from the billing date. The hauler is not required to pay SWMD for any tip fees due that were not paid by its customers. If the tip fee is not paid to the hauler within 60 days of the billing date, the hauler is supposed to send the customer a 30-day written notice of termination and, if the fee still has not been paid by the end of the 30 days, the hauler is to send SWMD a notice to that effect. Commercial haulers are not allowed to pick up trash from terminated customers. SWMD is supposed to notify the commercial hauler of the reinstatement of any commercial customer that has paid its outstanding invoices. The commercial hauler is not liable for any tip fees not paid to SWMD by its customers. SWMD is supposed to collect from the delinquent commercial customers.

This system is untenable for SWMD to maintain its revenue stream. There is probably no way to trace any non-payment of tip fees back to individual commercial customers, even if some control were established on the individual invoices (those invoices have a nominal location of the pick-up, but many are collected from routes with several customers, not one per invoice). It is also not clear how the haulers apply payments to SWMD tip fees v. hauler collection and other service fees, so that there may be an unresolvable dispute between the hauler and SWMD about the application of payments. Lastly, without complete access to the haulers' billing systems, which is unlikely to happen, SWMD (or even a collection agency) cannot effectively manage the fee collection system.

SWMD has been inconsistent in its pursuit of delinquent major commercial hauler accounts. Last February, the DPW Director sent the 5 haulers a request for their customer lists but no follow-up was made.

**4. Other Commercial Billing**

Bills for the Other Commercial accounts are prepared in the same manner as the Commercial accounts. Monthly bills are mailed directly to the commercial customer, who has 60 days to pay. The Other Commercial customers can be directly terminated by SWMD without the 30-day notice period required for Commercial customers. Other Commercial accounts that are in arrears greater than 60 days are banned from using Ordot until their accounts are made current.

New Other Commercial accounts pay by check at Ordot when they deliver their load, and are no longer billed monthly in arrears.

**5. Government Billing**

Bills for Government accounts are prepared in the same manner as the Commercial accounts. Monthly bills are hand delivered to the agencies through the central mail distribution system.

8

Payments are made by line agencies through a general voucher submitted to accounting; the autonomous agencies pay by check.

Collections are complicated by the voucher system, which is controlled by Accounts in the DoA. Accounts takes its own time to process the vouchers, delaying the payment to SWMD. Additionally, it is not clear that the payment is credited to SWMD at the same time as it is debited from the line agency, leading to confusion about whether the customer has actually paid or not, since SWMD sees only the credit when it hits the database, not the debit.

Agencies that are in arrears greater than 60 days are banned from using Ordot until their accounts are made current.

## 6. Self-Hauling Revenues

Residents are allowed to self-haul their trash to Ordot or one of the 3 transfer stations and pay at the gate, either $2.50 or $5.00 per load, depending on volume, which is determined by the gate agent. A log is kept of all vehicles depositing waste at each location, and a receipt is issued to the customer. The receipts are consecutively numbered and the gate agent must account for each one. At the end of the day, an SWMD employee collects the cash and receipts in a locked bag, confirms the amount deposited in the bag with the gate agent, and delivers the bag to the bank. The bank confirms the amount of cash with the SWMD delivery agent and deposits the cash in the solid waste division account. A set of the receipts is separately delivered to SWMD. If for some reason the cash cannot be collected by the SWMD agent, the gate agent would take the cash home overnight and wait until the end of the following day to complete the collection process.

While involving small amounts of money, the self-haul system is time consuming, not secure, and subject to abuse.

## 7. Customer Service (CS)

Customer Service is responsible for handling complaints, resolving billing disputes, registering new customers and customer terminations, and keying in invoice data into the billing system.

**Complaints.** To log complaints, CS uses a separate data base not integrated with the AS400 customer information system. Complaints are mostly about lack of service, but can include other matters, such as damaged containers or littering. For the first 4 months of 2008, there were a total of 1710 complaints, about 425 per month. Each complaint is recorded in the data base, coded and then given to Operations. Operations sends out a complaint crew to assess the reason for the complaint, usually a non-pick up, which may have been caused by a late put-out by the customer, non-compliance of the containers or overhanging trees preventing access by the truck. Operations is supposed to communicate back to CS the resolution of the complaint, but doesn't always do so. Also, drivers are supposed to record any non-pick ups, but do not generally do so.

**Billing Disputes and Credit Memos.** CS investigates billing disputes and prepares credit memos for adjustments, but is dependent on the DoA/Acounts for actual resolution. This can lead to unwarranted customer frustration with CS.

**Customer Registrations.** See above.

**Keying in Data.** Between customer calls, CS personnel key in the invoice data for the non-residential accounts from the Ordot disposal system.

9

## Appendix A
## Cash Collections at Ordot and Transfer Stations
## FY08 Year-to-Date

| Location | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | Total | % |
|----------|--------|--------|--------|--------|--------|--------|--------|-------|---|
| Ordot | $12,855 | $11,845 | $13,115 | $14,812 | $17,705 | $17,230 | $5,670 | $93,232 | 59% |
| Agat | $2,080 | $1,760 | $1,230 | $2,410 | $1,195 | $1,675 | $990 | $11,340 | 7% |
| Dededo | $6,425 | $6,395 | $6,375 | $8,155 | $6,045 | $6,295 | $3,285 | $42,975 | 27% |
| Malojloj | $1,942 | $1,885 | $2,180 | $1,755 | $1,560 | $1,630 | $850 | $11,802 | 7% |
| Total | $23,302 | $21,885 | $22,900 | $27,132 | $26,505 | $26,830 | $10,795 | $159,349 | 100% |

monthly average =    $22,764

## Appendix B
## Aged Accounts Receivable
## April 2008

| Customer Class | 61-90 Days | 91-120 Days | 121 days-1 Yr | 1 year + | 2 years + | 3 years + | 4 years + | 5 years + | 6 years + | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Residential** | $203,169 | $195,826 | $1,254,708 | $1,837,403 | $1,616,077 | $1,401,660 | $1,323,178 | $1,098,769 | $438,926 | $9,369,716 |
| **Major Commercial** | $309,520 | $282,391 | $577,181 | $80,706 | $0 | $0 | $53,588 | $935,932 | $297,212 | $2,536,529 |
| **Other Commercial** | $375 | $150 | $15,210 | $23,323 | $9,178 | $14,215 | $24,756 | $46,212 | $89,222 | $222,641 |
| **Government** | $4,265 | $4,675 | $43,990 | $9,565 | $0 | $0 | $0 | $0 | $0 | $62,495 |
| **Total** | $517,329 | $483,042 | $1,891,088 | $1,950,997 | $1,625,255 | $1,415,875 | $1,401,522 | $2,080,913 | $825,360 | $12,191,381 |

Case 1:02-cv-00022    Document 250-6    Filed 07/10/2008    Page 11 of 12

## Appendix C
## Billings and Collections
## FY08 – First 2 Quarters

| Class: | | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Total |
|---|---|---|---|---|---|---|---|---|
| **Major** | Billings | $322,105 | $317,925 | $343,245 | $339,620 | $322,385 | $328,255 | $1,973,535 |
| **Commercial** | Less: Credits | $610 | $600 | | | $480 | $800 | $2,490 |
| | Plus: Debits | $250 | $50 | | $450 | | $100 | $850 |
| | Net Billings | $321,745 | $317,375 | $343,245 | $340,070 | $321,905 | $327,555 | $1,971,895 |
| | Payments | $308,543 | $275,234 | $525,170 | $123,157 | $374,972 | $414,459 | $2,021,536 |
| | Collection Rate | 95.90% | 86.72% | 153.00% | 36.22% | 116.49% | 126.53% | 102.52% |
| **Residential** | Billings | $218,480 | $219,480 | $220,190 | $218,090 | $218,180 | $218,630 | $1,313,050 |
| | Less: Credits | $5,778 | $1,516 | $954 | | $1,120 | | $9,368 |
| | Plus: Debits | | $16 | | | | | $16 |
| | Net Billings | $212,702 | $217,980 | $219,236 | $218,090 | $217,060 | $218,630 | $1,303,698 |
| | Payments | 58,265.14 | 196,953.57 | 86,825.50 | 57,546.00 | 39,930.00 | 37,330.00 | $476,850 |
| | Collection Rate | 27.39% | 90.35% | 39.60% | 26.39% | 18.40% | 17.07% | 36.58% |
| **Government** | Billings | $6,545 | $6,385 | $5,390 | $4,790 | $4,685 | $7,525 | $35,320 |
| | Less: Credits | | $5 | | | | | $5 |
| | Plus: Debits | | | $35 | $15 | | | $50 |
| | Net Billings | $6,545 | $6,380 | $5,425 | $4,805 | $4,685 | $7,525 | $35,365 |
| | Payments | 0.00 | $100 | $0 | $2,785 | $3,740 | $327 | $6,952 |
| | Collection Rate | 0.00% | 1.57% | 0.00% | 57.96% | 79.83% | 4.35% | 19.66% |
| **Other** | Billings | $5,915 | $6,065 | $3,905 | $4,675 | $4,740 | $4,065 | $29,365 |
| **Commercial** | Less: Credits | | | | | | | |
| | Plus: Debits | $360 | | | | | | $360 |
| | Net Billings | $6,275 | $6,065 | $3,905 | $4,675 | $4,740 | $4,065 | $29,725 |
| | Payments | $21,764 | $7,415 | $39,253 | $13,434 | $5,335 | $6,675 | $93,876 |
| | Collection Rate | 346.84% | 122.26% | 1005.20% | 287.36% | 112.55% | 164.21% | 315.81% |
| **Total** | Billings | $553,045 | $549,855 | $572,730 | $567,175 | $549,990 | $558,475 | $3,351,270 |
| | Less: Credits | $6,388 | $2,121 | $954 | $0 | $1,600 | $800 | $11,863 |
| | Plus: Debits | $610 | $66 | $35 | $465 | $0 | $100 | $1,276 |
| | Net Billings | $547,267 | $547,800 | $571,811 | $567,640 | $548,390 | $557,775 | $3,340,683 |
| | Payments | $388,572 | $479,703 | $651,249 | $196,922 | $423,977 | $458,791 | $2,599,214 |
| | Collection Rate | 71.00% | 87.57% | 113.89% | 34.69% | 77.31% | 82.25% | 77.80% |

**Note:** Collection rate is on a cash basis

12

**TO:** Gershman, Bratton, Lund, Seader & Manning

**FROM:** Chace Anderson, Receiver Operations Manager

**DATE:** June 1, 2008

**RE:** **RECYCLING FACILITIES SITE VISITS**

### I. Summary

Gershman, Brickner & Bratton, Inc. (GBB) the court appointed receiver for the Solid Waste Management Division has requested to meet with Recycling Facility owners and private and public entities on Guam to get a better understanding of the recycling activities on island. Site visit appointments and short meetings were requested from recycling facilities listed on The Guam Environmental Protection Agency's Recycling Guide.

There are fifteen (15) recycling companies listed on the Guam Recycling Guide. We have visited (11) eleven recycling companies/facilities and conducted short meetings. Only (2) two companies were unavailable due to conflict schedules. These are the (South Pacific Environmental) SPE, which collects Hazardous Waste and Waste Management, which collects Medical Waste. There are also some recycling companies that are not included on GEPA's Recycling Guide however; they are in operation accepting recyclable waste such as metallic waste and green waste for composting. The Solid Waste Management Division (SWMD) will continue to coordinate with GEPA on updating the list of permitted recycling facilities.

Some issues presented were high shipping rates when the volume of shipment was below ten (10) overseas containers at a time to Asia or the US mainland. There are also issues in regards to limited storage capacity and limited volume of recyclable materials coming in from the community. Most recyclers will be willing to expand their operations should there be a substantial amount of recycling activities, which may increase the volume of recyclable materials on island.

### II. Recycling Facilities (GEPA List)

**Metals (Ferrous and Non-Ferrous)**
Balli Steel Guam, LLC
FSM Recycling
Island Scrap Yard (same owner as FSM)
Fermosa Recyling (Rising Year Int'l Guam Co.)

Triple Star Recycling
Xiong's Family, Inc.

**Tires**
Tomson, LLC

**Hazardous Waste**
Unitek Environmental

South Pacific Environmental

**Waste Oil**
GRESCO

**Cooking Oil and Grease**
Lucky One Pumping

**Corrugated Cardboard**
Mr. Rubbishman (Guahan Waste Recycling LLC)

**Paper, Cardboard (flat)**
Guam Transport and Warehouse

III.     **SITE VISIT REPORT**

**A. TOMSON, LLC - Tire Processing Facility**
Owner: Soo Ja Park
May 15, 2008
9:00 – 10:00 am

Tomson, LLC is the sole tire processing listed on the GEPA's recycling guide. Their facility is located at Route 15 back road to Andersen AFB, at the IBC Compound. Operational hours are from 8:00am to 5:00pm Monday – Friday.  This facility permitted can store up to 10,000 pieces of tires. TOMSON Customer base includes:

- Navy installation
- United Tire
- Lujan Tire
- EZ Tire

**Processing of Tires:**
1. TOMSON receives tires from customers for shredding/processing.
2. Out of the $3.00 disposal fee, $2.50 is paid out to TOMSON to process tires by other commercial tire companies, including the navy.
3. Steel belted tires are separated from non steel belted tires.
4. Machines rip steel belts out of the tires and company sells them to scrap metal.
5. Tires are processed /shredded. Shredded tires are approximately sold at $30.00/ton
6. Shredded tires are shipped off to Japan and Korea for recycling in a 40 ft. container.
7. TOMSON LLC can shred up to 1,400-1,500 tires a week.
8. 450 commercial tires = 1 ton

It was mentioned that they could accept the tires free from GovGuam if government would drop the tires off if room for storage is available. They are also willing to take in collected tires piled up at the transfer stations.

**Issues/Concern:**
1. Bigger space to accommodate tire storage and processing/operations.
2. Should there be a bigger space to relocate the operations, TOMSON, LLC may be willing to bring in larger machines and/or processing line.
3. No power/water in current facility.
4. A generator is currently powering operations.

**Future Expansion:**
TOMSON, LLC is also planning to collect and bale plastics for recycling. They brought in the machinery for the processing of plastics materials but have not used them.

 

**TIRE SHREDDER**

## B. GUAM TRANSPORT AND WAREHOUSE (GT&W)
Paper Collection
(includes other paper products, phonebooks and flat cardboard)
Owner: James Honda
May 15, 2007
10:00 – 11:00 am

GT&W is located at the Harmon Industrial Park and is open form 8:00am – 5:00pm Weekdays and 8:00am – 12:00pm Saturday. It is located near Mr. Rubbishman's OCC facility (not reviewed in this memo because it has already been discussed.) GTW accepts commonly used paper products free of charge. Paper products (fiber) are dropped off, shredded, baled, and shipped to Taiwan. They do not buy paper products from residents or private businesses. They accept all kinds of paper products including textbooks, phone books, and flat cardboards. GT&W also offers paper shredding services, trucking and warehousing. They are the only one on island who recycles non-OCC paper.

Equipment available: 1 baler and shredder; Currently company ships approximately 2 to 5 containers a month of paper to Taiwan. Usual daily operations for paper recycling is up to 1,500 lbs/day

**Future Expansion:**
GT&W may expand current recycling operations should there be considerable amount of paper to be recycled.

### C. UNITEK ENVIRONMENTAL
Hazardous Waste Collection and Disposal
Owner: Leroy Moore
May 15, 2007
1:00 -2:00pm

Unitek Environmental is an Environmental Service firm that basically deals with Hazardous Waste Disposal. They are located at Agat and operation hours are from 7am – 4pm Monday – Friday. Hazardous wastes collected are shipped back to the US mainland (Long Beach) for processing. The line they ship with is Matson. Used oil is delivered to the Cabras Power Plant. Their company also handles materials from the military installation here on island and was responsible for the clean up of PCB's in Coco's Island (located at the south end of Guam) worth $1 million dollars. Shipping costs for some Hazardous liquids/materials are approximately $12,000.00.

There was a Hazardous Waste Facility built for the commercial Port but is not currently permitted due to it sitting at a 100 ft flood plain. The Guam Port Authority needs to submit a maintenance and mitigation plan to the Guam EPA for them to issue a permit for the facility.

Unitek has been previously awarded the contract for the HASSO! Guam Collection event in 2005 worth $200,000 for the whole year for three(three) collection sites. Mr. Moore made mention that the last HASSO! Event they collected 4,000 NiCad batteries.

### D. GRESCO (Guam Refinery and Environmental Services Company)
Waste Oil
Vice President/General Manager: David Taitano
May 15, 2007
2:30- 3:30 pm

GRESCO facility is located in Agat and is open form 8:00 am -5:00pm weekdays. They collect, recycle and refine used oil. Their customer base includes auto shops, and other environmental companies. Residents are welcome to drop off their used/waste oil and are free of charge for the first five (5) gallons.

GRESCO is the only company on island listed on the Guam Recycling Guide that recycles used oil. Other companies that collect waste oil rely on GPA to take in the product. They usually pick up the used oil, clean it up and sell it to the power plant and they burn it as a fuel or we sell it to an asphalt plant or vessel or boiler.

The facility capacity is 250 thousand gallons of which 166 thousand is used for storage capacity. GRESCO also test what they collect to identify hazardous elements. On the last HASSO! Guam conducted by Guam EPA GRESCO collected 3,600 – 4,000 gallons of waste oil form residents who came to drop off their hazardous waste.

The process of recycling their waste oil is approximately 6 days. Water will evaporate from the oil and sediments settle at the bottom of their container on the

first three days. The next 2-3 days are dedicated to run what has recovered in their system.

**GRESCO REFINERY PLANT**

 

GRESCO refinery plant containers are numbered according to the processing method they use.

**E. Northern Hardfill (Operated by Primo's Heavy Equipment)**
Green Waste/Wood Waste and Construction Demolition Debris
Owner: Felix Quan
May 16, 2008
9:30 -10:30 am

The Northern Hardfill is privately owned and operated by Primo's Heavy Equipment. It is located at Yigo (Rt. 15 – Back road to AAFB) and Operates from 8:00am – 5:00pm Weekdays and Saturdays and closed from 12pm – 1pm (Weekdays and Saturdays) and Sundays. It receives green waste, construction, demolition debris from residents, private companies, military and other government projects. Current disposal fee for green waste is $4.00 per cubic yard.

The green waste and wood waste are grinded and turned into mulch. The mulch/ woodchips are given free to residents. Their equipment, a horizontal grinder, is regularly maintained. They do however, stop operations during heavy and continuous rain.

**Future Expansion:** It is expected that their operations will expand upon securing the lease of the lot next to the Dededo Transfer Station under the Chamorro Land Trust.

## Northern Hardfill

 

Green Waste Site

 



Horizontal Grinder used at the Northern hardfill to grind wood waste and turn it into mulch.

 

Horizontal grinder while in operations (tree trunk being fed to the machine for grinding)


Construction and Demolition Site (Northern Hardfill)

**F. PYRAMIND RECYCLING/FERMOSA RECYCLING**
**(Rising Year International Guam Co.)**
Non- Ferrous Metals, Aluminum, Steel Cans, Plastic Bottles,
Owner: Eric Hsueh
May 16, 2008
3:30 – 4:30pm

Pyramid Recycling is a 3rd generation family owned business. The owner Mr. Hsueh has two (2) scrap yards one located at the Harmon Industrial Park (Pyramid Recycling) which accepts plastic bottles, aluminum, copper, brass and computers. He stated that collection and recycling of plastic bottles is not feasible because there is no "bottle bill" program in place.
*(Note: Guam EPA states that their current permit to accept plastic is pending approval)*

Pyramid recycling approximately ships off 6 – 8 containers a month. As a family owned business, they have scrap yards in Taiwan and China. They were also contracted by the Anderson Airforce Base solid waste contractor to ship out collected aluminum and plastic. Their customer base ranges from private contractors and commercial haulers.

Mr. Hsueh states that is not feasible to put a metal shredder on island, since there is not enough volume of metal to shred, no incentive on island and shipping of the equipment may cost more. In Taiwan, there is three (3) shredders and only one in operation.

**FERMOSA** recycling also owned by Mr. Hsueh, is located in Harmon over a five (5) acre property. This facility accepts metallic waste. After metals are sorted and separated it is loaded in containers. Tires coming form the vehicles are given back to the contractor/client. Guam currently requires customs officers to be present during the loading of the materials (metallic waste) to check of stolen items such as (brass plates etc.).

Mr. Hsueh also mentioned that if white goods (refrigerator, washing machine etc) are taken apart prior to brining in their recycling facility, the scrap recovered then becomes a commodity rather that being it being junk.

**PYRAMID RECYCLING CENTER**



Scale at Pyramid Recycling



Balled wires ready for shipping



Baled plastic bottles from Anderson Air Force Base (AAFB) as per Mr. Eric  it took AAFB 2 years to collect so much plastic bottles at AAFB



Baled and Shrink wrapped aluminum cans ready for shipping.

# FERMOSA RECYCLING

 



Scrap Metal Inventory

 



Heavy Equipment sorting metals at Scrap yard

### H. XIONG'S FAMILY
Batteries, Metallic Waste, White Goods, Computers
Operations Manager: Jay – R
**May 21, 2008**
**2:00 pm**

Xiong's Family Recycling Center, is located in Harmon and has a seven (7) day operation and two (2) shift schedules. The first shift is from 8am -5pm, during the first shift, the facility receives from customers ferrous and non-ferrous materials. The second shift is from 9pm – 6pm and covers internal operations. They currently have a staff of 30 people.

Recent local public laws have prescribed scrap metal dealers not to buy any scrap metals after 5:00 pm. Xiong's recycling center does not have any metal shredder. They have stated that the only metal shredder they know is the one located next to the Dededo Transfer station and it is reported to be inoperable.

The facility sells their recyclable materials to the Asian region (Korea, India, Malaysia, Vietnam, Taiwan, and China). They have recently filled two (2) containers of scrap metal and are preparing the shipment to China. They currently deal with CTSI Logistics for their cargo transportation.

Residents pay a certain amount to dispose of their white goods. Prices usually range form $10 – $20 dollars per piece. Similar to Pyramid recycling, they would however buy form customers if white goods were dismantled.

FUTURE EXPANSION: They are trying to acquire a lease on the lot next to the transfer site to expand the facilities operations.

*(Note: Lot described is the same as described by Felix Quan, General Manager of Primo's)*


**Xiongs Scrap yard (back)**


**Weight scale at Xiong's Recycling Facility**


**Xiong's Scrap yard (inside)**

**I. FSM/ ISLA RECYCLING**
Metallic Waste, White Goods, Batteries, Aluminum, Copper, Brass
Owner: Jae Yoon Cha
Mr. John – translator and co –owner of Isla Recycling
**May 21, 2008**
**3:00 pm**

FSM Recycling is located at the Harmon Industrial Park and is a family owned business. They also own a scrap yard in Bello Road, Barrigada (ISLA Recycling) where they accept computers and white goods. They are currently shipping scrap metal to Korea where the prices of metals are high. Other markets for their materials include China and Taiwan.

Recently they have shipped off 3,480 tons of scrap metal to Korea. They have sold scrap metal to Balli steel due to the shortage of tons Balli Steel needs to have in order to ship by way of barge. They have stated that they can ship almost everything to Korea for recycling except for car scrap. They also stated that one of Guam's biggest problems is the storage for tires. Importers of shipments make deals with recyclers to lessen cost of shipment since most importers pay for the ship to come in and out even if the ship is empty.

FSM has recently bought equipments to support the collection and recycling of scrap metals, they have an equipment to cut and put scrap metal on a knuckle boon truck. They also have equipment that can pick up scrap metals on the spot. They have done area clean up for government project.

It was mentioned that qualifications for projects must include the proper equipment and regular maintenance of the machines.

**K. TRIPLE STAR RECYCLING**
Metallic Waste, White Goods
**May 22, 2008**
**10:00 am**

Triple Star Recycling is located in Harmon. They are open 7 days a week but only with one shift. Weekend usually cover internal operations. They accept scrap metal, aluminum, copper, brass from businesses and residents. It was mentioned that some of the tires they collected from junk vehicles were disposed at Ordot Dump.

Containers filled with scrap metals are usually shipped off two (2) to four (4) times a week.


**Triple Star Recycling Facility**

**J. BALLI STEEL**
Batteries, Metallic Waste, White Goods, Tires (500pcs. Storage capacity)
General Manager: Joe Sicad
May 22, 2008
2:00 – 4:30pm

Balli Steel corporate office is located at the Para Oceana Building in Harmon; their scrap yard is located at Polaris Point, in Piti. They are open from 8:00 am – 5:00pm weekdays.

Balli steel has been a contractor with the Airforce and Navy for clean up projects within their installations. They are currently working with the military contractor for metallic waste disposal. In 2005, Balli Steel was awarded the Abandoned Vehicle contract under DPW. As part of the beautification efforts for the island, the Abandoned Vehicle Program was set out to collect all abandoned vehicles, white goods, and tires. They have coordinated with the village Mayors to estimate the numbers of abandoned vehicles to be collected per village. The price of shipping out the scrap metal collected under this project is $30/ton. The project has been discontinued due to funding issues. Currently DPW still owes the company roughly $150,000. This project is currently on hold due to the government non-payment.

Balli Steel has provided the mayor will coupons (Balli Bucks) to give to their constituents. These coupons entitle village residents to dispose their white goods free at the company's scrap yard. Without the Balli Bucks, a resident can take in their white goods for $5.00 a piece. They have also mentioned that community partnership is essential to have the system continue.

FUTURE EXPANSION: They are planning to continue servicing the public with their programs such as the Balli Bucks with the Mayor's Council of Guam.





Balli Steel – Balli Bucks (as provided by the Hagatna Mayor's Office)


**K. LUCKY ONE PUMPING**
Waste Cooking Oil to Bio Diesel
General Manager: Richard Kempski
Senior Associate: Allen Turner
June 3, 2008
10:30 am

Lucky One Pumping, located in Anigua, has been converting used cooking oil to Bio – diesel or FAME (**F**atty **A**cid **M**ethyl **E**ster). They have been using biodiesel to operate and run their fleets. The current facility produces 12,000 gallons of biodiesel in a year. The process takes about 4 days to complete. Although the company deals with recycled used cooking oil, it uses the very expensive ingredient called Methanol, which currently cost $12/gallon.

Residents can bring in their waste cooking oil free (five gallons max). Companies are charged an amount to bring n their cooking oil and for Lucky One Pumping to collect. They also take in Navy's used cooking oil. The by-product for recycled cooking oil is soap.

FUTURE EXPANSION: They stated that even if there is a growing demand for bio-diesel there is not enough supply to meet the demand.



Used cooking oil is stored for sediments to settle.



Processing occurs in a 20 ft. container located at their office.



Processing of waste cooking oil to biodiesel.

**Gershman, Brickner & Bratton, Inc.**
**8550 Arlington Boulevard, Suite 203**
**Fairfax, Virginia 22031-4620**
_www.gbbinc.com_
_http://www.guamsolidwastereceiver.org/_

# GUAM RECEIVER MEMORANDUM

**TO:** H. Gershman, D. Manning, T. Bratton, C. Lund, and D. Seader

**FROM:** Chace Anderson (Receiver Operations Manager)

**DATE:** 5/25/08

**RE:** Receivership: Proposed Banning of yard waste, untreated lumber, inert material and OCC (Old Corrugated Containers) from the Ordot Dump and Transfer Stations

---

## Summary of Memorandum:

- Goal is to extend capacity at Ordot Dump until new landfill is open;
- EPA Guam had recommended that yard waste, untreated lumber, and inert material be banned from the dump;
- Banning this material will help increase compaction and extend life of the landfill;
- Private facilities for each of these items have been found on Guam;
- Recommendation:
  1. Develop and send letters to commercial haulers, customers on routes, and Mayors stating that these materials will be banned and when;
  2. Create and place sign at Dump's entrance notifying all customers of the ban and when it will take place;
  3. Create and deliver Public Service Announcements to all media outlets; and
  4. Notify Governor and other VIPs before ban is in effect.
  5. Banning Rules for Ordot Dump:
     o No yard/green waste
     o No inert material
     o No OCC
     o No untreated lumber
     o Mixed loads (loads consisting of above material) will be turned away

## Material:

The 1995 Waste Characterization study had found the following:

| Category of Material | Percent | |
| --- | --- | --- |
| OCC | (Wet Season) 18.65% | (Dry) 14.89% |
| Yard Waste | (Wet) 11.77% | (Dry) 24.0% |
| Untreated Lumber | (Wet) 1.40% | (Dry) 2.87% |
| Inert Material | (Wet) 0.00% | (Dry) 0.097% |

Current activity on the active face shows that roll off containers regularly come in with yard waste and untreated lumber as well as inert material. These materials come in both

segregated and mixed. OCC is seen coming out of front end loader collection vehicles as well as roll off containers. The Mayors regularly bring in truck and trailer loads of green waste. Front End loaders also bring in considerable amount of OCC into the Dump.

This material is hard to compact, some of it can be recycled, and all of it can go to other locations already existing in the private sector. The following pictures show material currently being dumped at the Ordot Dump.

TrashCo, a commercial hauler, brings in OCC and pallets:





Inert materials are coming in. Some we are diverting to use on roads; some have been going into the active face.



**Alternative Disposal Sites:**

**1. Northern Hardfill (Operated by Primo's Heavy Equipment)**
**Green Waste/Wood Waste and Construction Demolition Debris**
Location: Yigo (Rt. 15 – Backroad to AAFB)
Operational hours: 8:00am – 5:00pm Weekdays and Saturdays
Closed from 12pm – 1pm (Weekdays and Saturdays) and Sundays

The Northern Hardfill is privately owned and operated by Primo's Heavy Equipment. It receives green waste and construction and demolition debris from residents, private companies, military and other government projects. Current disposal fee for green waste is $4.00 per cubic yard.

The green waste and wood waste are grinded and turned into mulch. The mulch/ woodchips are given free to residents. Their equipment, a horizontal grinder, is regularly maintained.

Future Expansion: It is expected that their operations will expand upon securing the lease of the lot next to the Dededo Transfer Station under the Chamorro Land Trust.


Horizontal grinder of Primo's


Feeding tree trunk into the horizontal grinder


Green Waste/ Wood Waste Section


Hardfill (mortar, rubble, inert) Section

## 2. Guam Transport and Warehouse (GT&W)

**Paper Recycler - Office paper, Newspaper Magazines, Phone Books, Non- Corrugated cardboards, color paper, Envelopes, etc.**

Location: Harmon Industrial Park
Operational hours: 8:00am – 5:00pm Weekdays
8:00am – 12:00pm Saturday

GTW accepts commonly used paper products free of charge. Paper products (fiber) are dropped off, shredded, baled, and shipped to Taiwan. They do not buy paper products from residents or private businesses. They accept all kinds of paper products including textbooks, phone books, flat cardboards. GT&W also offers paper shredding services, trucking and warehousing.

Equipment available: 1 baler and shredder which can handle up to 4,000 lbs of paper. Currently they ship approximately 2-5 containers a month of paper to Taiwan. Usual daily operations for paper recycling is up to 1,500 lbs/day.

Future Expansion: GT&W may expand current recycling operations should there be a considerable amount of paper to be recycled.

## 3. Mr. Rubbishman (Guahan Waste Recycling)

**Corrugated Cardboard**

Location: Harmon Industrial Park
Operational hours: 8:00am – 5:00pm Weekdays

The facility owned and operated by Mr. Rubbishman currently receives and collects OCC which it then bales and ships to China. Customers can have dumpsters located at their facilities which Mr. Rubbbishman will collect.

## Education Activity Needed:

The following steps are recommended to be taken to provide adequate education of the ban before it goes into effect.

- Draft and send letters to commercial haulers and all Mayors (see attached draft);
- Residential customers on SWMD's trash collection routes will also be mailed notification that our collectors will not collect banned material (if we should decide to begin banning from non-commercial customers);
- Sign put up at all Transfer Stations and Ordot Dump;
- Public Service Announcement sent to all media outlets;
- Map of facilities that accept banned material and which are permitted;
- Active face operators and spotters must be fully briefed and encouraged to engage operators of vehicles to understand their waste composition and what will happen if they are found with banned material in their disposed load.

## Enforcement:

The following steps are recommended to be taken to provide adequate enforcement of the ban before it goes into effect.

- Active face operators and spotters must be fully briefed and encouraged to engage operators of vehicles to understand their waste composition and what will happen if they are found with banned material in their disposed load;
- Spotters and scale house technicians view material to be disposed and deny access if it includes banned material;
- If banned material is taken to the active face and dumped, the operator of the vehicle will be given a written Notice of Warning;
- EPA Guam will be asked to regularly watch the road to Ordot Dump during the first two weeks of the ban to cite illegal dumpers;
- SWMD should also be vigilant with watching for illegal dumpers on that road by having people;
- Once a second infraction is determined the entity will be excluded from using the Transfer Stations and Ordot Dump.  The following are two proposed outlines for possible actions against those who transgress the ban at both the Transfer Stations and Ordot Dump:

  Assumes we do not have to go to PUC:
  1st infraction =  5 times the normal tip fee paid
  2nd infraction = 10 times the normal tip fee paid
  3rd infraction =  2 week ban plus 10 times the tip fee paid on the offending load
  4th infraction =  4 week ban plus 10 times the tip fee paid on the offending load

  Assumes we would have to go to PUC for financial penalty:
  1st infraction = 1 warning
  2nd infraction = 1 week ban (whole company)
  3rd infraction =  2 week ban (whole company)

- If the entity making the infraction is a commercial, Gov Guam department, or a village public entity, then all will have their respective fleet excluded from Transfer Stations and Ordot Dump;
- If the entity making the infraction is a citizen, then that citizen will be banned from said facilities for same length of time as the other entities.

**Potential Customer Reactions to This Policy:**

Mayors: Each Mayor has a public works staff that keeps local parks and road ways clean of green waste.  Primo's is located in Yigo (up north) so those in the south will have to travel further.  Mayors have been generally supportive.

Commercial Customers:  An owner of a commercial hauling company was in the office and I asked him about the potential reaction to such a ban. His response was that it was a business opportunity for the haulers.  The ban will force his clients to separate, hence need more containers and hauls.  He also said that it is something that has been discussed for years so it would not be a surprise.

Citizens: Material coming from residences is small in weight.  Brush will most likely not be taken to grinding site; it may be kept in the yard or tossed among trees.  OCC may get taken to either recycling location or dropped in OCC recycling drop off.  Expect residential green waste to stay in the backyard or among trees; OCC recycling will increase.

Trash Collectors: OCC in the front end loaders will be a problem for the haulers because drivers are not able to see the material in the dumpster before it is dumped.  From viewing the active face, these trucks regularly dump significant amounts of OCC.  Expect companies

running front end loaders to ask for more time to educate customers. Rear loader trucks are capable of leaving behind the banned material.

Clients of Residential Collections: We could send each residential customer notification. Once collectors begin to leave behind OCC and other banned material, complaints will increase at our customer call center, calls to politicians will increase, calls of missed collections will increase causing our inspectors to spend more time checking and using more tags.

DRAFT LETTER

Dear Customer,

In an effort to increase recycling, extend capacity at the Ordot Dump, and comply with The Ordot Dump Waste Management Permit issued by the Guam EPA in 2005 (Permit No. 05-060LFL) request to ban specific materials from entering and being buried at the Ordot Dump, the following items will neither be accepted for disposal at the Ordot Dump nor accepted at any of the Solid Waste Management Division's Transfer Stations.  These items are the following:

- No Old Corrugated Containers (cardboard)
- No Yard / Green Waste (tree limbs and brush)
- No Untreated and unpainted Wood (wood free from preservative and paint)
- No Inert Material (hard fill made up of rock, pavement, and concrete)
- No Mixed Loads (loads that combine any one or more of the above banned material mixed with acceptable materials)

This ban will be implemented on Friday June ?, 2008.

Beginning on June 6, 2008, attendants will view all material coming into the Ordot Dump for the purpose of keeping banned materials out of the landfill.  If the customer is found to have dumped materials that include banned material a written Notice of Violation will be written and served to the operator.

Once a second infraction is determined the entity will be excluded from using any and all Transfer Stations and Ordot Dump.  The following shows the term of these bans:
- 1st infraction = written notice
- 2nd infraction = 1 week ban
- 3rd infraction =  2 week ban
- 4th infraction =  3 week ban

If the entity making the infraction includes, but not limited to, a commercial, Gov Guam department, or a village public entity, then all will have their respective fleet excluded from Transfer Stations and Ordot Dump during the term of these bans.

Please find attached a pamphlet showing the names and locations of known facilities that take some or all of these banned materials.

Thank you for your understanding and patience in this attempt to recycle materials and/or conserve and extend the capacity of the dump.

Sincerely,



# GUAM SOLID WASTE MANAGEMENT DIVISION
# RECEIVER POLICY MEMORANDUM

**DATE:**      June 27, 2008
**SUBJECT:**   Receivership:  Banning Policy at all Solid Waste Division Facilities

## The Policy

Effective July 17, 2008 the following materials will be added to the list of materials banned from disposal at the Ordot Dump and the three transfer facilities operated by the Solid Waste Management Division (SWMD) at Agat, Dededo and Malojloj:

1. **Old Corrugated Cardboard Containers (OCC):** corrugated cardboard boxes. These are widely recycled around the world.  Over 70 percent of the corrugated containers are recovered and recycled into new corrugated products.
2. **Yard and Other Vegetative Waste:**  a generic term used to define organic wastes from lawn, tree, horticultural and landscaping activities, including leaves, grass clippings, tree prunings, large cut waste timber and stumps, and other similar materials.  These items can be ground into mulch and/or composted to use in the garden.
3. **Untreated Wood:** wood, such as construction and demolition lumber or pallets, is considered untreated when neither paint/stain nor preservatives have been applied to it.  Untreated wood can be ground into mulch and composted or reused.
4. **Inert Material:** concrete, concrete blocks, bricks, rocks, and other bulky material.
5. **Mixed Loads:** loads containing one or more of the above material will be considered a mixed load as determined by SWMD personnel.

## Policy Goals

Banning yard and other vegetative waste, untreated wood, inert material, such as rocks and concrete, and corrugated cardboard from the SWMD's Transfer Facilities and Ordot Dump will do two things:

1. Encourage recycling by eliminating such items as cardboard and vegetative waste that can be recycled by private entities already operating on the Island of Guam; and
2. Increase capacity at the Ordot Dump while a new landfill is being designed and built.

Government of Guam
Department of Public Works, Solid Waste Division
542 North Marine Corps Drive, Tamuning, Guam  96913
Phone: (671) 646-3249, Ext. 201 or 212
www.GuamSolidWasteReceiver.org
www.gbbinc.com

Case 1:02-cv-00022     Document 250-9     Filed 07/10/2008     Page 1 of 2

**Customers to Whom the Ban Applies**

The ban applies to all customers who deliver waste to any of the SWMD's Transfer Facilities or Ordot Dump.  This includes:

- All commercial haulers
- All loads generated by the Mayors' Offices
- All loads generated by the Government of Guam's Departments
- All residential self haulers

While the ban will not immediately apply to residential customers collected by the Solid Waste Management Division, it is anticipated that the ban will be extended to them at a later date.

**Enforcement Rules**

The following rules will be used to enforce the ban of items from all customers using the SWMD's Transfer Facilities and Ordot Dump.

- All loads entering facilities are subject to visual inspection by SWMD employees at the gate.  If a load is found to contain banned material, the SWMD employee will inform the customer of the transport vehicle of the finding, advise the customer of the rules, inform the customer that the load cannot be dumped at the SWMD's facilities, and provide information as to what the customer can do with the load.  This is <u>not</u> considered an infraction of the  banning policy;

- If a load with banned material is not detected at the gate and a SWMD employee finds banned material at the disposal point, the employee will alert the customer who dumped the banned material of the issue.  The SWMD employee shall request that the customer get out of the vehicle, acknowledge the banned material, and answer questions regarding the identity of the customer.  The SWMD employee will obtain the customer's name and company (if applicable), the license plate number of the vehicle, and customer contact information.  The customer will be requested to take back the banned material as long as it is safe to do so.  No money will be returned to the customer for the material removed from the facility. This will be considered an infraction of the banning policy. The SWMD employee will then do the following:

  1. Upon a first and second time infraction, the customer committing the infraction will be warned and informed that upon a third infraction involving the same vehicle, that vehicle will be banned for a period of one (1) week from disposal at any and all of the SWMD facilities..

  2. Every additional infraction involving each specific vehicle will result in an additional week being added to that vehicle's exclusion from access to any and all SWMD facilities.

  3. After a one (1) month period during which a customer's vehicle, which had previously been cited as being used in the  delivery of banned material resulting in an infraction, has had no such infraction, the customer for that vehicle shall be considered in good standing with that vehicle and be provided the privilege of starting the process from the beginning for deliveries with that vehicle, with the next infraction, if any, involving that vehicle being considered as the first, resulting in only a warning.

# Time for a Change
## Recycling: Key to sustainable waste management for Guam



## New: Materials Ban at Guam Transfer Facilities and Ordot Dump

### Effective July 17, 2008

Beginning Thursday, July 17, 2008, the following materials will be added to the list of materials banned from disposal at the Ordot Dump and the three transfer facilities operated by the Solid Waste Management Division (SWMD) at Agat, Dededo and Malojloj:

- NO Corrugated cardboard boxes
- NO Vegetative, yard and organic wastes, such as leaves, grass clippings, tree prunings, large cut waste timber and stumps
- NO Untreated wood, including construction and demolition lumber or pallets
- NO Inert material, including concrete, concrete blocks, bricks, rocks and other bulky material
- NO Mixed loads containing one or more of the above material

### Why ban these materials?

- Cardboard, vegetative waste and untreated wood can be recycled
- Removing these materials will extend the life of the Ordot Dump while a new landfill is being built

### Customers to whom the ban applies

The ban applies to all customers who deliver waste to any of the SWMD's Transfer Facilities or Ordot Dump. This includes:

- All commercial haulers
- All loads generated by the Mayors' Offices
- All loads generated by the Government of Guam's Departments
- All residential self haulers

While the ban will not immediately apply to residential customers whose waste is collected by the Solid Waste Management Division, it is anticipated the ban will be extended to them at a later date.

### Penalties for infractions

The SWMD has established procedures for enforcing the policy and penalties for violating the ban. For information about the ban, including the enforcement policy and penalties for violating the ban, please visit **www.GuamSolidWasteReceiver.org.**



[More on the opposite side]

# What should be done with banned materials?

These materials should be recycled! The following businesses accept the materials subject to the ban:



## Corrugated Cardboard and Paper Products

**Guam Transport and Warehouse (GT&W)**
**Location:** Harmon Industrial Park
**Hours of Operation:** 8 a.m. – 5 p.m., Monday through Friday; 8 a.m. – noon Saturday
No fee. Also offers paper shredding, trucking and warehousing for fee.

## Corrugated Cardboard

**Mr. Rubbishman (Guahan Waste Recycling)**
**Location:** Harmon Industrial Park
**Hours of Operation:** 8 a.m. – 5 p.m., Weekdays




## Vegetative and Green/Yard Waste and Construction and Demolition Debris

**Northern Hardfill**
(Operated by Primo's Heavy Equipment)
**Location:** Yigo (Rt. 15 – Backroad to AAFB)
**Hours of Operation:** 8 a.m. – noon, 1 p.m. – 5 p.m., Weekdays and Saturday; closed Sunday
Charges disposal fee. Green waste and wood waste are ground into mulch and given free to residents.



**Government of Guam**
**Solid Waste Management Division**
542 North Marine Corps Drive
Tamuning, Guam 96913
Phone: 671-646-3249
www.GuamSolidWasteReceiver.org

**GBB**
SOLID WASTE
MANAGEMENT
CONSULTANTS
RECEIVER

 Printed on recycled paper.

Request for Expressions of Interest

for

Financing, Construction, and Operation

of the Layon Landfill

Inarajan, Guam

Due: July 15, 2008


Issued by

Gershman, Brickner & Bratton, Inc. (GBB)

as Receiver for the U.S. District Court of Guam


June 23, 2008

# Section 1 General Information about this Request for Expressions of Interest

## 1.1 Background and Purpose

The Island of Guam is a United States Territory with an area of 210 square miles in the Western Pacific Ocean. Guam has a population of approximately 170,000, and it is the largest and southern most of the Mariana Islands. The primary municipal solid waste disposal site in Guam is the Ordot Dump, which has existed since World War II and has been cited for violation of the Clean Water Act (33 U.S.C. §1251, et. seq.).

The Government of Guam entered into a Consent Decree with the United States Environmental Protection Agency ("U.S. EPA") on February 11, 2004, to close the Ordot Dump, cease all discharges into the Lonfit River, open a new municipal solid waste landfill, and develop and implement recycling and hazardous waste management strategies to reduce the volume of materials going into the landfill ("the Consent Decree Projects").

Following the Consent Decree, the Guam Government, through its Department of Public Works, Solid Waste Management Division, proceeded with certain studies, surveys, and engineering design toward the closure of the Ordot Dump and the siting and development of a new lined, leachate controlled municipal solid waste landfill. However, the schedule of compliance in the Consent Decree was not met and progress to achieve compliance has been deemed unsatisfactory by the U.S. EPA and the United States District Court of Guam and its consultants, which are monitoring the Government of Guam's activities toward compliance. Therefore, on March 17, 2008, the United States District Court of Guam issued a court order appointing Gershman, Brickner & Bratton, Inc. ("GBB"), a solid waste management consultant, as Receiver to achieve the Guam Government's compliance with the Clean Water Act as set forth in the Consent Decree and implementation of the Consent Decree Projects.

As Receiver, GBB has full power and authority to enforce the terms of the Consent Decree and assume all of the responsibilities, functions, duties, powers, and authority of the Guam Solid Waste Management Division of the Department of Public Works, and any and all departments or other divisions of the Department of Public Works insofar as they affect the Government of Guam's compliance with the Consent Decree. Working under the guidance of the Court and in consultation with the U.S. EPA, GBB has reviewed the work already performed by the Government of Guam and its consultants and building upon that work where possible, is in the process of developing and executing a plan that will provide both the financing and leadership necessary to successfully address these vital services for the people of Guam.

Since a new municipal solid waste landfill must be constructed and placed into operation before the Ordot Dump is closed, it is critical that this new landfill and certain access road improvements be financed and constructed as soon as possible. Through an extensive siting study and associated fieldwork, a final site for the new landfill has been selected at Layon in Inarajan (see Exhibit 1). This site is a 225-acre parcel with approximately 141 acres as the landfill footprint containing 14 million cubic yards of airspace. The initial solid waste intake projections are an estimated 450-500 tons per day or approximately 140,000 tons per year. Hydrogeologic work and engineering design of this landfill are substantially complete, and final design

and permitting for construction of this facility are anticipated within the next two to four months. Condemnation action to acquire the Property for the new landfill, its access road and slope easements through Eminent Domain on behalf of the Guam Department of Public Works has been filed with the court by the Guam Attorney General's office. This action is under appeal by certain property owners, a motion hearing has been held, and the Attorney General is awaiting the court's ruling.

**Exhibit 1**



It had been anticipated that financing of the construction of the new landfill and associated access road improvements would be through a revenue bond issue of the Guam Government, and GBB is evaluating the needs and conditions for such financing. However, GBB is aware that certain companies have inquired about the landfill construction and operation opportunity and have indicated an interest in also financing the construction and other capital needs of the facility under a "Build, Operate, Transfer" arrangement or other contractual structure creating a public-private partnership with the Government of Guam.

GBB believes that such private financing and partnership arrangement has merit and could possibly accelerate the implementation of the Layon Landfill and the Guam Government's compliance with the Consent Decree. Therefore, GBB desires to obtain a better understanding of the interests, needs, and relevant experience of

companies that could undertake such a partnering, and, in particular, the details of the potential financing structure and the needs and conditions of such private financing. Therefore, GBB, as Receiver, is issuing this Request for Expressions of Interest ("RFEI").

## 1.2 RFEI is Not a Solicitation for Which An Award Will be Made

This RFEI is not a formal procurement, solicitation, or request for proposals in any manner and no award will be made from this RFEI. GBB is simply requesting certain information in an organized format (set forth in Section 3 herein) from organizations that have interest in financing, constructing, and operating the Layon Landfill.

The information will assist GBB in understanding the organizations that have interest in the project and how they may be able to finance, construct, and operate the Layon Landfill in the mutual interests of the citizens of Guam and their organization. Submission of an Expression of Interest in response to this RFEI in no way commits any party to participation in the project, qualifies any party as an acceptable proposer to finance, construct and/or operate the Layon Landfill, or limits their ability to respond to any formal procurement by the Guam Government and/or the Receiver relative to the Layon Landfill or any Consent Decree Project that may be issued.

Likewise, failure to submit an Expression of Interest to this RFEI will not preclude or diminish in any way the ability of any qualified organization to be considered in formal procurement by the Guam Government and/or the Receiver relative to the Layon Landfill or any Consent Decree Project.

## 1.3 Receiver Contact Persons

Any communication regarding this RFEI should be made in writing via U.S. Mail and directed to Timothy Bratton, Senior Vice President, or Chris Lund, Senior Project Engineer, Gershman, Brickner & Bratton, Inc., 8550 Arlington Blvd., Suite 203, Fairfax, VA 22031, or e-mail tbratton@gbbinc.com or clund@gbbinc.com, respectively.

## 1.4 Written Questions

GBB will accept written questions by mail or e-mail, until five business days prior to the due date for Expressions of Interest. Any written questions received pertaining to this RFEI will be posted and answered on the Receiver's Website [www.guamsolidwastereceiver.org/receiver.html]. GBB will endeavor to respond to written questions within five business days of receipt. However, GBB makes no assurance that written responses will be tendered if, in the opinion of GBB, such information is evident in the RFEI, the question has already been answered or goes beyond the intended scope of the RFEI. Responses will not be attributed to the submitter.

## 1.5 Amendment or Cancellation of the RFEI

If this RFEI requires amendment, written notice of the amendment in the form of an Addendum will be posted on the Receiver's Website at www.guamsolidwastereceiver.org/receiver.html. GBB reserves the right to modify, amend or cancel this RFEI.

### 1.6 Incurred Expenses

GBB is not responsible nor does it accept any liability for any expenses that submitters may incur in preparing and submitting Expressions of Interest, including interviews or meetings, if any. Each party that submits an Expression of Interest does so at its own expense.

### 1.7 Confidentiality

Expressions of Interest submitted in response to this RFEI are subject to disclosure to the extent allowed by law. Submitters must mark any portions of their Expressions of Interest which 1) they deem confidential; and 2) would actually qualify as protected confidential material under Guam statutes in order for the material to be treated as confidential information. The marking of every page of the Expression of Interest as confidential does not meet this requirement.

### 1.8 Acceptance of Terms and Conditions

By submitting an Expression of Interest in response to this RFEI, submitter accepts all of the terms and conditions set forth in this RFEI.

## Section 2  Documents Available for Review

There are several documents regarding the proposed Layon Landfill available for review on the Guam Environmental Protection Agency ("Guam EPA") Website: www.guamepa.net. Among these are:

- Preliminary Landfill Site Suitability Report
- Landfill Site Evaluation Report
- Landfill Environmental Impact Statement Public Scoping Report

Also, additional information regarding the Landfill project can be found at www.guamlandfill.org and on the Receiver's Website at www.guamsolidwastereceiver.org/receiver.html.

## Section 3  Submission Requirements

### 3.1. General Requirements

Submission of an Expression of Interest shall constitute acknowledgement and acceptance of all the terms and conditions contained in this RFEI. Expressions of Interest may be modified or withdrawn by an appropriate document duly executed and delivered to the place where Expressions of Interest are to be submitted at any time prior to the due date for Expressions of Interest.

GBB reserves the right to waive irregularities in Expressions of Interest received in response to this RFEI, and any such waiver shall not modify any remaining requirements in the RFEI or excuse the submitter from compliance with the terms and conditions of the RFEI.
GBB shall accept all Expressions of Interest for review that are prepared and submitted in conformance with this RFEI, but reserves the right to accept or reject in whole or in part any or all Expressions of Interest submitted. Receipt of an

Expression of Interest by GBB or submission of an Expression of Interest to GBB confers no rights upon the submitter, nor does it obligate GBB in any manner.

## 3.2. Delivery and Acceptance of Expressions of Interest

Expressions of interest should be e-mailed on or before July 15, 2008, to tbratton@gbbinc.com.

All Expressions of Interest shall be clearly marked "Expressions of Interest for Layon Landfill Development Partnering."

## 3.3. Information Provided by Receiver

Information included in or provided with this RFEI or provided on Receiver's Website is provided solely for the convenience of parties submitting Expressions of Interest. NO REPRESENTATION OR WARRANTY OF ANY KIND IS MADE BY GBB AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION INCLUDED IN OR PROVIDED WITH THIS RFEI. Parties submitting Expressions of Interest are solely responsible for conducting such independent due diligence investigations as may be necessary for the submission of Expressions of Interest. GBB and its employees, consultants, agents and advisors are not responsible for the completeness or accuracy of any information distributed or made available, orally or in writing, with this RFEI.

## 3.4. Ownership and Disclosure

Expressions of Interest received in response to this RFEI will be maintained by GBB and are matters of public record and subject to public inspection except as set forth in Section 1.7 herein.

Neither GBB nor its staff, agents, employees, representatives, consultants and advisors shall be responsible or liable in any manner for any losses that a submitter may suffer from the disclosure of information or materials to third parties or any other claims or damages resulting from this RFEI process. All Expressions of Interest (other than portions thereof subject to patent or copyright protection, if any) will become the property of GBB upon submission.

## 3.5. Conducting Investigations/Requesting Supplementary Information

GBB reserves the right to conduct investigations with respect to the qualifications, experience and representations of the submitter and any team members. Each submitter and any team member, through its request for and receipt of this RFEI and submission of an Expression of Interest, consents to such investigations.

## 3.6. Submittal Format

Any party submitting an Expression of Interest shall utilize the format as set forth below. The items listed below, and the designated locations thereof, shall be included in the Expression of Interest and in the order shown. Each section shall be clearly labeled, with pages numbered and separated by tabs as follows:

**Tab 1 Cover Letter**

Tab 1 shall contain a cover letter describing the organization and expressing the interest of the organization in meeting the needs and interests of the Guam Government and the Receiver relative to the Layon Landfill financing, construction, and operation, as expressed in Section 1 of this Request.

**Tab 2 Contact Information Form and Organization Information Form**

The submitting organization shall include a completed Contact Information Form and an Organization Information Form in this Tab 2. The Forms to be used are provided in Appendix A and Appendix B, respectively, of this RFEI.

**Tab 3 Qualifications and Experience**

Tab 3 shall contain qualifications and experience that document the organization's ability, capacity, skills, resources, and financial strength to provide the outcomes desired by the Guam Government and the Receiver. As a minimum, the following information is requested:

- Organizational structure
- Résumés of key personnel who would be involved in the project/business relationship
- Description of overall experience of the organization, including projects involving financing by the organization, particularly landfill financing, permitting, ownership/operation, or other significant industrial development and environmental projects
- Description of other public-private partnerships of the organization and/or similar projects
- Description of experience, if any, with waste transport
- Description of organization's financial strength and creditworthiness (Include a copy of the financial statements for the last two fiscal years.)
- Description of any third party arrangements, agreements, relationships, and/or other business transactions that the organization would request, require, or suggest as necessary for the Layon Landfill financing/ownership partnership to be successfully structured and carried out with the Guam Government and/or the Receiver

**Tab 4 Description of Needs and Interests of the Organization**

In Tab 4, the submitting organization is requested to describe its business philosophy, key interests, needs, and conditions in partnering with the Guam Government and/or Receiver to meet the needs, interests, and goals as expressed in Section 1 of this Request. This description shall include financial and contractual needs; issues and constraints, if any, known or anticipated in a partnering/business arrangement with the Guam Government and/or Receiver; other parties who would be part of any business transaction and their expected needs and interests; and other relevant information, special features, and conditions that would be important for GBB to know and understand about the organization and the needs for a successful partnership and/or business arrangement for the financing, construction, and operation of the Layon Landfill.

Specifically outline any essential contract provisions or binding assurances that would be required and describe the financing method and provide a description of how the financing will affect the initial or future operation of the landfill. This should include but not be limited to how the anticipated financing would affect: initial and future tipping fees and other fees charged for the use of the landfill (we are not asking for specific fees but we are asking for a description of how the financing will affect the initial and future fees); any costs that are assumed to be passed through to the Government of Guam; any access to special financing arrangements made available through or facilitated by either the Government of Japan or the Government of the United States; and any other business terms that are essential to any proposal of your organization.

## Section 4  Review of Expressions of Interest

### 4.1  Review

Expressions of Interest received by GBB in response to this RFEI will be reviewed by GBB. It is anticipated that upon review of Expressions of Interest by GBB, certain questions and/or need for clarification of certain information or statements in such Expressions of Interest may be noted, in which case, GBB may issue letters to such submitters requesting additional information to answer questions and/or provide clarifications.

### 4.2  Interviews

GBB may elect to interview parties submitting Expressions of Interest in response to this RFEI. Interviews, if any, may be conducted face-to-face or they may be held via telephone conference call. However, GBB reserves, in its sole discretion, the right to interview only certain parties or to interview all parties submitting Expressions of Interest.

### Appendices

A.    Contact Information Form
B.    Organization Information Form

**APPENDIX A**
**REQUEST FOR EXPRESSIONS OF INTEREST**
**LAYON LANDFILL FINANCING, CONSTRUCTION, AND OPERATION**

### Contact Information Form

Name: _____

Title: _____

(2nd) Name: _____
$\qquad\qquad\qquad\qquad\qquad$ *(optional)*

Title: _____
$\qquad\qquad\qquad\qquad$ *(optional)*

Company: _____

Address: _____

_____

Telephone Number: _____

Fax Number: _____

E-mail (1st): _____

E-mail (2nd): _____

I/we prefer to be contacted by: *(circle one)* U.S. Mail, telephone, fax, e-mail.

I/we prefer correspondence to be sent by: *(circle one)* fax, e-mail.

**Please mail or e-mail completed form to:**

$\qquad$ Mr. Timothy Bratton
$\qquad$ Gershman, Brickner & Bratton, Inc.
$\qquad$ 8550 Arlington Boulevard
$\qquad$ Suite 203
$\qquad$ Fairfax, VA  22031-4620
$\qquad$ e-mail:  tbratton@gbbinc.com

**APPENDIX B**

**REQUEST FOR EXPRESSIONS OF INTEREST
LAYON LANDFILL FINANCING, CONSTRUCTION, AND OPERATION**

**ORGANIZATION INFORMATION FORM**

**A.    General Information**

Organization Name:

_____ _____

Address: _____

_____ _____

Telephone: _____    Fax: _____

E-Mail:

Contact: _____ _____

Type of organization (corporation, joint venture, partnership, individual):

_____ _____

If a corporation, list the names of all officers, directors, and shareholders possessing five percent or more of outstanding stock in the corporation.  If a partnership, list the names of all general and limited partners.  Attach additional sheets as necessary.

_____

_____

_____

_____

_____

_____

_____

_____

_____

**ORGANIZATION INFORMATION FORM**
**(Continued)**

**B.     Business Information**

1.  Describe the nature of your current business:

_____

_____

_____

2.  State the length of time you have been in that business under your present name:

_____

3.  With what other lines of business are you directly or indirectly affiliated?

_____

_____

_____

_____

4.  Have you ever failed to complete any contract awarded to you?

_____

If so, where and why?

_____

_____

_____

5.  Has any officer or partner of your organization ever been an officer or partner of some other organization that failed to complete a contract?

_____

If so, state name of individual, other organization, reason therefore, and bonding company:

_____

_____

**ORGANIZATION INFORMATION FORM**
**(Continued)**

6.  With what individuals or entities have you been associated as partner or otherwise during the past five years?  Attach additional sheets as necessary.

_____

_____

_____

_____

_____

_____

_____

7.  Have you, your partners, members, joint venturers, parent corporation, or subsidiaries been a party to any lawsuits, including any current investigations, indictments, or pending litigation, within the last five years?  If so, list these lawsuits. Attach additional sheets as necessary.

_____

_____

_____

_____

_____

_____

8.  Has any Facility that you operated been the subject of administrative or judicial action for alleged violation of environmental or public health laws or regulations?  If so, state the details and disposition.  Attach additional sheets as necessary.

_____

_____

_____

_____

_____

_____

## ORGANIZATION INFORMATION FORM
### (Continued)

9.  List any and all actions occurring within the last five (5) years which have resulted in revocation or suspension of any permit or authority to do business in any federal, state or local jurisdiction, recorded by Submitter, any officer or director thereof or any affiliate or related company.

_____

_____

_____

10.  List any and all actions occurring in the past five years that have resulted in the barring from public bidding recorded by Submitter, any officer or director thereof or any affiliate or related company.

_____

_____

11.  List any bankruptcy proceedings in the past five years recorded by Submitter, any affiliate or related company.

_____

_____

_____

_____

**ORGANIZATION INFORMATION FORM**
**(Continued)**

**C.      Main Office and Place of Performance**

Following is the name and location of (1) the main office and (2) place of business where the services will be performed.
Main Office:

_____

Name of Company

_____

Street Address

_____

City, State, and Zip Code

_____

_____

_____

Place of Business where services will be performed if different than Main Office:

_____

Street Address

_____

City, State, and Zip Code

The undersigned hereby declares that this Expression of Interest is made in good faith without fraud or collusion with any person or persons submitting an Expression of Interest on same RFEI and that the statements, representations, and information contained in this Expression of Interest, including this Organization Information Form, are accurate and truthful.
Signature of person duly authorized to sign Expression of Interest on behalf of the Submitter.

_____

Authorized Signature

_____

Title                                                  Date