IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CIVIL CASE NO. 02-00022 |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER RE: CONSENT DECREE** |
| ) | **TIMETABLE, FINANCING OPTIONS,** |
| GOVERNMENT OF GUAM, ) | **GUAM LAND USE COMMISSION** |
| Defendant. ) | |

On October 22, 2008, the parties came before the court for a status hearing. At that time the Receiver, Gershman, Brickner & Bratton, Inc. ("GBB"), presented its quarterly report in accordance with the court's appointment order. *See* Docket No. 239. The Receiver discussed the progress of the day to day operations of the Solid Waste Management Division since assuming responsibility over it on March 17, 2008. The Receiver also outlined a construction project timetable and discussed in detail the capital financing options to fund the various Consent Decree projects.

For the reasons stated below, the court issues this Order approving the proposed timetable, and ordering that within the time period designated herein, the elected leaders of the Government of Guam work cooperatively with GBB in the selection of a financing option, and the Guam Land Use Commission promptly make a determination on the pending zoning petition.

**I. HISTORICAL BACKGROUND**

The historical background of this case leading up to the entry of the Consent Decree on February 11, 2004, has been presented in several prior orders and need not be reiterated at length

///

///

here.[1] The court limits its discussion in this regard as it relates to the events leading up to the court's appointment of a federal receiver over the Solid Waste Management Division ("SWMD") of the Department of Public Works ("DPW").

In October 2007, this court began its oversight on this case. Monthly status hearings were held and site visits to the Ordot Dump were regularly conducted. It soon became clear that without immediate action it would be highly unlikely the Ordot Dump would be closed, and the Layon landfill constructed, in accordance with the timeline set forth by the parties.[2] The Government of Guam already missed many of the deadlines under the Consent Decree, most notably the October 2007 deadline for the closure of the Ordot Dump.

The inability of the Government of Guam to comply with the terms of the Consent Decree was not necessarily the result of a lack of effort on the part of the current Governor or even DPW. Rather, there was a lack of concerted attention given by those who could best address the magnitude of the problem for the past 22 years. As discussed more fully below, this court has repeatedly prodded the current Guam Legislature to actively participate in charting the course concerning the closure of the Ordot Dump and the opening of a new landfill. The Legislature has, at worst, impeded the Government of Guam's ability to comply with the Consent Decree, and at best, taken no action at all to meet the mandates of the Consent Decree. *See* footnote 3, *infra*.

The monthly status hearings and site visits continued, and although assurances were made to this court that DPW was working steadily on the closure of the Ordot dump, little in fact, was being done. The Legislature enacted legislation which prohibited the expenditures of funds for any landfill site that the Government of Guam did not own.[3] Ostensibly, the Government of Guam was

---

[1] The court hereby incorporates the factual recitations set forth in Docket Nos. 125 and 218.

[2] Again, the timelines set were ones agreed to by the parties in the Consent Decree.

[3] In September 2007 Public Law 29-19 was enacted, and Section 98 of that law provided:

**(b) Prohibition of Expending Public Funds.** All government of Guam agencies, departments, bureaus, boards, commissions, public corporations, autonomous and

2

prevented from proceeding with the design and construction of the Layon landfill. It was clear that this legislation "paralyzed the Government of Guam's ability to comply with the mandates of the Consent Decree." *See* Docket No. 218. As a result, the court invoked its authority under the Supremacy Clause to strike down the legislation. *Id.*

Notwithstanding the removal of the impeding legislation, progress was noticeably limited. It was clear that any work would be protracted and slow going at best. Time, however, was not on the Government of Guam's side, and each passing day with no progress put the public health and welfare at greater risk. Therefore, unconvinced that reasonable steps within the Government of Guam's power would be taken to ensure compliance with this court's orders in a timely manner, on March 17, 2008, the court appointed GBB[4] as the receiver to manage, supervise and oversee the SWMD of DPW. *See* Docket No. 239. This decision was made with due deliberation, and in recognition that the potential for real progress had been, and continued to be, thwarted by institutional and systemic impediments. Specifically, this court noted the lack of funding commitment for Consent Decree projects, the historical failure of the leadership of the Government of Guam to respond to the crisis, and the history of noncompliance with the mandates of the Clean Water Act and the Consent Decree. *See* Docket No. 239.

## II. IMPROVEMENTS SINCE APPOINTMENT OF FEDERAL RECEIVER

Since the appointment of GBB, the improvements in the operation of SWMD have been remarkable. The GBB team first arrived on Guam on April 24, 2008, and immediately began its

---

> semi-autonomous agencies, including . . ., and all other government instrumentalities, *shall* not expend funds on site-specific preparation, design work, mitigation, infrastructure upgrade *or* installation, *or* construction of a new landfill, *unless* the government of Guam has acquired and recorded fee simple ownership of the property in question.

In other words, this legislation prohibited expenditures toward the opening of Layon because the Government of Guam did not yet own the property.

[4] GBB is a professional consulting firm with extensive experience in solid waste management operations.

3

assessment of SWMD's operations. GBB found the working conditions deplorable.[5] At that time, there was only one government-owned garbage truck that was operable, which led to DPW renting additional trucks from private enterprises and implementing a three-shift schedule for residential refuse collection. Furthermore, all the heavy equipment used at the Ordot Dump was rented because the government-owned equipment was in a state of severe disrepair.[6] Rather than repair a government owned excavator, the Government of Guam instead opted to rent an excavator at a cost of approximately $260,000 a year.[7]

GBB, with the assistance of the Governor's declaration of emergency, has been able to make substantial progress in repairing government-owned equipment. Four garbage trucks are now operational, and three new trucks have been delivered. Shift work was reduced from three to two, and a normal working schedule of one shift has recently been restored. GBB now also has much of the equipment used at the Ordot Dump up and running. The excavator has been repaired and is now operational.

---

[5] Efforts to close the Ordot Dump undeniably require that the staff of SWMD be given the proper tools, resources and facilities, with which to accomplish SWMD's mission. This court conducted an unannounced site visit to SWMD facilities, and found the employees' shower room with no stalls and no shower heads. An employee who wished to shower did so by getting close to a moldy wall with water discharging from a hole on the wall. One garbage truck had an operator sitting on a kitchen chair in the cab of the truck because the original seat had been removed. The fleet maintenance shop had no roof to protect the staff who had to make repairs to the trucks. Additionally, DPW staff brought personal supplies to work in order to repair the government-owned trucks. The court has since revisited the facilities earlier this month and noticed substantial improvements in these areas.

[6] It was reported to this court that the costs of rented equipment ran as high as $11,000 a day. At this rate, the leased equipment exceeded a staggering amount of $4 million annually (almost two-thirds the annual budget of the Solid Waste Management Division). Since September 2008, the average rate for rental equipment has dropped significantly to $1400 per day.

[7] GBB reported that in the year 2000, the excavator broke down and needed a fan belt replaced at a cost of $118. Rather than replace the belt, an excavator was rented. The cost of renting the excavator for the year 2008 was alone almost $260,000. A new excavator could have been purchased for approximately $200,000. If an excavator was rented for the past eight years (at the stated annual rate herein), the Government of Guam spent over $2 million instead of replacing a $118 fan belt.

4

In order to extend the life of the Ordot Dump, in July 2008, GBB implemented a materials ban on green waste, construction waste and cardboard going into the Ordot Dump. The results of the ban have been significant, with a reduction of approximately 30% in the waste stream.[8]

In September 2008, GBB also launched a recycling initiative by strategically placing recycling drop-off containers in three different locations on island. It is anticipated that these efforts will further reduce the waste stream entering the Ordot Dump.

Moreover, GBB has continued its progress on finalizing the design of the new landfill, and the Layon zoning issues are expected to be resolved. In sum, the court finds the improvement in SMWD's operations in the last two quarters to be significant.

### III. RECEIVER'S PROPOSED TIMETABLE

GBB has now set a timetable for the Consent Decree projects. The most important project, and the one to be given highest priority, is the construction of the new landfill in Layon. Completion of this project is imperative, as Ordot Dump cannot be closed until the new landfill is opened. GBB has planned to allow for construction to proceed, while design, approval and procurement for other phases is ongoing. Toward this end, GBB has projected the start date of January 6, 2009, for the construction to begin on Cells 1 and 2 Earthwork, the Stormwater Management System, and the temporary road to Layon. *See* Docket No. 269. The court is cognizant that this projected start date is approximately three months away. GBB has also scheduled the start date of April 30, 2009, for the installation of the landfill liner systems for Cell 1 and entrance facilities, and for the construction of the access road to the new landfill. Again, this date is just months away. A major phase of construction at the new landfill is the Waste Water Treatment Plan Expansion and construction of a pre-treatment facility and sewer line, which would transport leachate from the new landfill to the Guam Waterworks Authority's treatment plant. GBB estimates that this six-week long project will begin on January 12, 2010. Adhering to these projected construction dates is imperative, especially

---

[8] Prior to the implementation of the ban the average daily volume of waste going into the Ordot Dump was 512 cubic yards. Since the ban went in effect, the average daily volume of waste going into the Ordot Dump has been reduced to 360 cubic yards. *See* Docket No. 269.

5

in regard to the construction of the landfill at Layon, as any delay in progress will concomitantly delay the closure of Ordot Dump.

In light of the 22 years of noncompliance and delays by the Government of Guam, the court finds that further delays are unacceptable and will not be tolerated. The court has reviewed the timetable and finds it reasonable and necessary. Accordingly, the court hereby adopts it in whole and hereby **ORDERS** all branches of the Government of Guam, to include but not limited to all Government of Guam agencies, departments and entities, to cooperate with, and assist GBB in meeting the deadlines as set forth in the timetable. *See* Docket No. 269, Tab 4; Docket No. 239.

## IV. FUNDING OPTIONS

As noted, it is critical that the schedule as outlined by the Receiver be followed and that funding be in place to pay for the projects as they proceed. It is clear that GBB has spent considerable time in analyzing the financial demands of funding for the various Consent Decree projects. GBB has estimated that the capital funding needed for the projects approximates $160 million. With the aid of financial experts, GBB identified various financing options that the Government of Guam must consider in order to fund the various Consent Decree projects. They are as follows:

### A. CAPITAL OPTIONS

#### 1. PRIVATE CAPITAL

Under a private capital model, all assets would be owned by a private entity that would recover its cost and profit through user charges. To explore this option, GBB issued a Request for Expressions of Interest (RFEI) that was sent to private companies that expressed an interest to GBB or that were suggested by others to GBB as interested and capable of financing and operating the landfill at Layon. In addition, the RFEI was placed on the Receiver's Website to provide further opportunity for other private entities to respond. GBB also sent the RFEI to the Joint Guam Program Office (JGPO) to share with Japanese authorities involved in the planned military build-up and any other group that JGPO believed should be included. The RFEI was an information gathering process designed to assist GBB in analyzing the potential to finance these projects with private capital.

Based on all information received, GBB recommended against this option. It found such a financing arrangement complex and would take an extended time to complete, possibly placing the schedule to open a new landfill and close the Ordot Dump in jeopardy. This option is also an incomplete solution because it would provide capital funding for only the new revenue producing facilities and would ignore the other capital needs of the SWMD, the most significant of which is the closing of Ordot Dump. Furthermore, private capital is a more costly approach than other options since the Government of Guam can borrow capital funds less expensively than a private sector company. While some form of tax-exempt financing for this approach may be possible, it is unlikely to be as inexpensive as direct government borrowing. Finally, the Government of Guam would have to cede broad authority to the private entity to assure that the private entity could recover its investment, which would likely require changes in Guam law that would be controversial and likely to cause much debate and unacceptable delay. For these reasons, GBB does not believe private capitalization is a viable option.

### 2. FEDERAL GRANTS

Another option the Government of Guam may rely upon is the use of federal grants. However, GBB has reported that it does not believe capital funding through federal grants can be realistically relied upon to fund the projects. While the cost of the land needed for the new landfill and the design costs have been paid for by federal grants, there is no guarantee that additional grant funds will be realized to pay for several outstanding Consent Decree projects. Similarly, GBB does not find that reliance on federal grants to be a realistic option.

### 3. "PAY AS YOU GO"

Under the "pay as you go" approach, funding would have to come directly from the Government of Guam's General Fund. GBB believes a "pay as you go" approach is unnecessarily disruptive to the other operations of the Government of Guam. This approach would require the Government of Guam to pay for the projects from the current revenues of the Government's General Fund. Given the limited financial resources and challenges facing Guam, such an approach could create serious financial stress upon an already taxed economy. Again, GBB does not recommend this option for the Government of Guam.

### 4. DEBT FINANCING OPTIONS

GBB believes that some sort of debt financing will have to be to be utilized. GBB recognizes that the Government already has a serious deficit and significant demands on its limited resources in many areas, including the impact of the impending build-up of military forces on Guam. Funding these Consent Decree projects without debt financing would appear to place an unacceptable and unnecessary, additional financial burden on the Government of Guam

Although debt financing is recommended, GBB recognizes that options for debt financing are limited due to Guam's poor credit history, its current financial condition, and its past poor performance in its solid waste program. GBB discussed the following debt financing options.

#### a. GENERAL OBLIGATION BONDS

One of the most common and effective means of providing capital funding is through the sale of general obligation bonds. These bonds are commonly understood and accepted in the capital markets and are backed by an unlimited tax pledge (i.e. the government promises to raise taxes to whatever extent required to repay the bond holders). This is called a pledge of the "full faith and credit" of the issuing government. The potential problems to this approach include Guam's poor credit ratings, which reflect the serious financial challenges it continues to confront in the management of its traditional governmental functions. Furthermore, there is a ceiling on general obligation bonds that has resulted in litigation all the way to the United States Supreme Court. Finally, there are also competing priorities for other infrastructure and public needs that will more than consume the available general obligation debt under the current debt ceiling. For these reasons, GBB does not believe this option is viable.

#### b. TRADITIONAL REVENUE BONDS

Revenue bonds are the most common method for financing the capital needs of a regulated utility such as the SWMD. Bonds are issued to finance the utility's infrastructure and other capital costs and are repaid from the rates charged customers. These rates are set to cover the cost of current operations, debt service on the bonds and provide a reasonable level of reserves to assure stability in operations and rates. Typically, revenue bonds are required to maintain a debt service reserve that is at least one year's debt service to avoid any disruption in the repayment schedule if the utility

8

encounters cash flow problems while in the process of adjusting its rates.

The financial markets judge the creditworthiness of the utility by its past track record and the environment in which it operates (political stability, business stability, economic viability and the degree to which the utility holds a monopoly on its market). Guam's SWMD requires much work and time before it is able to meet these expectations in a way that would persuade the markets that it is creditworthy for long-term bonds.

The fact that similarly situated utilities on Guam (the Guam Power Authority and the Guam Waterworks Authority) have been able to issue revenue bonds in recent years demonstrates the viability of this option as a funding mechanism. Unfortunately, these examples also demonstrate what is increasingly apparent – that the time required to achieve business stability, demonstrate the economic viability of the SWMD and to pass the laws or bond covenants that confer the monopoly status needed to assure the markets of repayment, is much too long for compliance with the Consent Decree to be achieved in a timely manner.

Even with these time constraints, GBB believes revenue bonds still appear to be the most appropriate method of financing for the Government of Guam. In order to issue these bonds in a reasonable timeframe, however, some form of additional security for the bondholders will be needed.

### c. Traditional Revenue Bonds with a Section 30 Financial Backstop

Additional security for revenue bonds is often provided by purchasing insurance or having the government pledge to back up the bonds with general tax revenue. Market conditions for bond insurance at this time are not favorable for utilities, even for utilities with strong performance records, so this is clearly not an option for Guam. Likewise, because of the serious financial conditions in which the Government of Guam currently operates, a general tax pledge is not likely to be effective.

In this situation, the term "backstop" is used to describe a financial guarantee that essentially becomes the market's credit insurance. Section 30 Funds are used as a guarantee because they come from the federal government and, with the proper pledge, can be diverted directly to bondholders if necessary. A financial backstop would work as follows: The borrower (in this case the Government of Guam) allows Section 30 funds to be placed in the hands of a trustee. The trustee is also the

trustee and custodian for the debt service to repay the bond holders (in some cases there may be two trustees who are contracted to work together).

Under this scenario, the trustee receives the debt service funding from tipping fees, pays the bondholders and releases the Section 30 funds to the Government of Guam. Should the trustee not receive all or some portion of the funds required to pay the bondholders, an amount equivalent to the shortfall is deducted from the Section 30 funds and the balance is released to the Government of Guam. In other words, the bondholder is held harmless and the government only loses if it fails to collect and/or transfer the tipping fee revenue needed to pay the bondholders. Since the funds to pay the debt service to the bondholders comes from fees charged to customers of the SWMD, the Government of Guam should never have a loss, unless it takes some action that disrupts the required flow of tipping fees to the trustee. After careful consideration, GBB has recommended that the Consent Decree projects be funded through a revenue bond issued and guaranteed by the Government of Guam's Section 30 funds.[9]

GBB has indicated its financing preference and the court concurs with its assessment. At this point, however, the decision regarding the funding option is one preferably best left in the hands of the executive and legislative bodies. Because time is of the essence and GBB's timetable will be adhered to, the decision must be made expeditiously. GBB reported that at the start of January 2009, there must be $20 million made available to GBB in order for work to begin. Accordingly, the Legislature and Governor are **ORDERED** to choose one of the financing options set forth by GBB or

///

///

---

[9] The Receiver has estimated the capital cost of the Consent Decree projects at approximately $160 million. $119.6 million of this capital is for the Layon Landfill and related facilities and operating equipment that will be a part of the new solid waste system as recommended by the Receiver. The Receiver intends to set tipping and trash collection fees at a level that will pay for the debt service on this capital. The Consent Decree project for the closure of the Ordot Dump is estimated to cost approximately $40.1 million. Since the Ordot Dump will no longer be a revenue producing facility, the Receiver has recommended that any debt service on the Consent Decree project to close the Ordot Dump be funded from general governmental revenue or federal capital grants.

10

adopt one of its own, and the counsel for Government of Guam shall file with the court a status report indicating the selected financing option by 12:00 noon, December 1, 2008. The Legislature and Governor shall work with GBB in making this decision.[10]

### V. GUAM LAND USE COMMISSION

Likewise, the court hereby reminds the Guam Land Use Commission ("GLUC") that, as an arm of the Government of Guam, it too is bound by the terms of the Consent Decree.[11] This court's order is very clear that the Government of Guam is "enjoined from interfering in any manner, or from failing to cooperate either directly or indirectly, with the Receiver in the performance of its functions and duties." *See* Docket No. 239, p. 19. This court has repeatedly stated that it respects the process in which Layon was selected as the new landfill site and will continue to enforce the Government of Guam's selection in this regard. The choice of Layon was a decision made by the Government of Guam with the concurrence of the United States Environmental Protection Agency ("USEPA") after several other sites were considered by professionals and dismissed as unsuitable. This site selection process concluded after extensive studies and research by USEPA and GEPA. There were more than 20 sites initially identified; a first level screening narrowed the number of potential sites to 12; further screening eliminated another six sites; and the remaining six were evaluated and scored, with Layon receiving highest scores. *See* Docket No. 229. The court cannot emphasize enough that the site selected was agreed upon by the parties, and formally approved by this court. No evidence exists of collusion that would call into question the validity of the selection.

---

[10] If the Governor and Legislature choose an option of its own, it must be deemed viable and approved by GBB. Notwithstanding this court's desire for cooperation in this regard, the Governor and Guam Legislature are reminded that this court endowed the Receiver with the authority to facilitate the "financing and/or borrowing of such funds necessary to carry out the duties relating to the Consent Decree . . . ." *See* Docket No. 239.

[11] The Consent Decree provided that the "Consent Decree shall apply and be binding upon the Government of Guam and its board, directors, agencies, authorities, departments (including and not limited to DPW and the Guam Environmental Protection Agency ("GEPA")), and their successors and assigns, and on the United States on behalf of U.S. EPA." *See* Docket No. 55, Consent Decree ¶ 2.

11

There has never been any allegation to suggest that the site selection process was somehow politically tainted or compromised. Moreover, GBB has agreed with the choice of Layon as a suitable site.

Therefore, to effectuate its orders and to safeguard the site selection process, the court hereby **ENJOINS** the GLUC from taking any contrary to the intent and purpose of the Consent Decree. If the GLUC denies the zone change as requested by the Receiver, its board members should be prepared to address this court as to specific reasons why they took such action. For example, the GLUC board members must be prepared to provide this court with sound environmental and scientific bases for their decision.

The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Supreme Court has interpreted the Act to "authorize a federal court 'to issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'" *Pennsylvania Bureau of Corrections v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985) (internal quotations omitted). Accordingly, the GLUC is **ORDERED** to promptly make a determination on the petition to rezone the Layon site suitable for construction of a landfill.[12]

### VI. ENFORCEMENT OF THE CONSENT DECREE

As noted above, the court has adopted the timelines as proposed by the Receiver, GBB. It is, therefore, **ORDERED** that they be followed and that the projects proceed without further delay. If the Government of Guam (which includes the Governor, Guam Legislature, the GLUC, and all government entities and instrumentalities) fails to follow the orders herein, the court shall construe such action, or inaction if that be the case, as a failure to cooperate with the Receiver, in violation

---

[12] GBB reported to the court that the GLUC meeting on the rezoning issue is scheduled for October 23, 2008. The court expects the GLUC to issue its decision timely and in accordance with this court's orders.

of this Order and Section III.D.2 of the court's order appointing the Receiver. *See* Docket No. 239.

The Government of Guam is reminded that a consent decree is a court order as it not only reflects "an agreement of the parties," but also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992). "[B]ecause a consent decree is a court-approved order, a district court has broad equitable discretion to enforce the obligations of the decree." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir.1995); *see also E.E.O.C. v. Local 580, Int'l Ass'n of Bridge, Structural and Ornamental Ironworkers*, 925 F.2d 588, 593 (2nd Cir. 1991) (stating that a court's "judicial discretion in flexing its supervisory and enforcement muscles is broad.").

One of the ways a court can enforce its orders is through the power of contempt. A district court has inherent power to enforce compliance with lawful orders through civil contempt. *Spallone v. United States*, 493 U.S. 265, 276 (1990); 18 U.S.C. § 401(3). "A district court has wide latitude in determining whether there has been a contemptuous defiance of a court order." *Hook v. Arizona*, 907 F. Supp. 1326, 1339 (D. Az. 1995). There is a wide range of civil contempt sanctions available to a court, such as "fine[s], imprisonment, receivership, and a broader category of creative, non-traditional sanctions." *United States v. States of Tenn.*, 925 F. Supp. 1292, 1303 (W.D. Tenn. 1995). For example, in *Delaware v. Valley Citizens' Council*, 678 F.2d 470 (3d Cir. 1982), the district court in Pennsylvania found the state in civil contempt for failing to comply with a consent decree judgment requiring the implementation of an inspection and maintenance program for auto emission systems. *Id.* at 474. The court ordered the U.S. Secretary of Transportation to refrain from awarding any federal highway funds to the state. *Id.*; *see e.g. F.T.C. v. Gill,* 183 F. Supp.2d 1171, 1186 (C.D. Cal. 2001) (in addition to coercive fines, court ordered rescission of all contracts and appointed a permanent receiver). The court will not hesitate in imposing the full range of equitable sanctions available to it, including the suspension of all federal funds, if the court finds a party in contempt.

Even non-parties may be held in contempt. *See, e.g.*, *Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1323 (9th Cir. 1998). "The Supreme Court has repeatedly emphasized the broad equitable powers of the federal courts to shape equitable remedies to the necessities of the particular

cases, especially where a federal agency seeks enforcement in the public interest." *S.E.C. v. Wencke*, 622 F.2d 1363, 1371 (9th Cir. 1980); *see also S.E.C. v. Hickey,* 322 F.3d 1123, 1131 (9th Cir. 2003) (authorizing asset freeze of third party to effectuate relief). In *Hickey*, the Ninth Circuit affirmed its earlier holding in *Wencke*, that "[t]he power of a district court to ... grant other forms of ancillary relief does not in the first instance depend on a statutory grant of power from the securities laws. Rather, the authority derives from the inherent power of a court of equity to fashion effective relief." *Hickey*, 322 F.3d at 1131 (quoting *Wencke*, 622 F.2d at 1371).

The Supreme Court has emphasized that all government officials, including legislators, are bound to comply with federal law and with the application of that law by federal courts. *Cooper v. Aaron*, 358 U.S. 1, 18 (1945). Our system of ordered liberty and rule of law depends upon the solemn obligation of all citizens, and especially public officials, to obey the law. A legislative body is not endowed with immunity such that it may deliberately disregard valid federal court orders.

As discussed herein, the court appointed GBB to oversee the closing of the Ordot Dump and the opening of the Layon landfill. To ensure that GBB can accomplish these tasks in an expeditious manner, there must be cooperation extended to GBB throughout all phases of these projects. Should GBB's efforts be met with resistance, GBB is entitled to institute civil contempt proceedings on its own. Precedent for such action is found in *Ex Parte Niklaus,* 13 N.W.2d 655 (Neb. 1944). In *Niklaus,* a receiver was appointed in an action wherein the defendants were directed to surrender possession of the real estate involved to the receiver. The court determined that the receiver was entitled to maintain civil contempt proceedings against a defendant who had violated the court order. *Id.* It was deemed immaterial that the receiver was not a party to the action, but was an officer of the court charged with the protection of the res of the litigation for the benefit of the parties. Moreover, the court, specifically stating that it dealt with "presentation of civil contempt," observed that "it is a matter of no importance who institutes such proceedings, since the alleged contemnor is not prejudiced in his defense by the particular mode in which the facts are brought to the attention of the court." *Id.* at 658, 659 (quoting 13 C.J. 60).

Similarly, in *Potter v. Emerson-Steuben Corp.*, 294 N.Y.S. 970 (N.Y. Sup. Ct. 1937), a permanent receiver of a corporation was held to be entitled to maintain a motion to adjudge the

defendants guilty of contempt of court (apparently civil contempt) for failure to comply with the provisions of a judgment directing them to pay over to the receiver specified amounts of money.

It is the court's hope that GBB will not have to initiate such proceedings. At the same time, the court has the duty to enforce its orders, and cannot in good conscience ignore the fact that for 22 years, the Government of Guam has failed to take any action to improve the environmental and health hazards that have plagued our island, our waters, and our people. Should GBB find it necessary to initiate contempt proceedings, the court will give immediate attention to the request. Lest there be any doubt, the court is committed to ensuring that the work already begun by GBB in its short tenure continues and that GBB receives the full support of the Government of Guam. The people of our island deserve no less from its elected leaders.

### VII. CONCLUSION

For the reasons stated above, the court **HEREBY ORDERS** compliance with the timetable as set forth in the October 22, 2008 Quarterly Report. Additionally, the court **HEREBY ORDERS**:

1. That the Guam Legislature and Governor work cooperatively with GBB in timely choosing a financing option for the Consent Decree projects, and shall file with the court a status report indicating the selected financing option by 12:00 noon, December 1, 2008;
2. That the Government of Guam deposit $20 million to a trustee to be subsequently designated by GBB and approved by the court by January 5, 2009;
3. That the GLUC promptly make a determination as to the re-zoning petition.

**SO ORDERED.**



/s/ Frances M. Tydingco-Gatewood
Chief Judge
Dated: Oct 22, 2008