# DISTRICT COURT OF GUAM
# TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL CASE NO. 02-00022 |
| Plaintiff, | |
| vs. | |
| GOVERNMENT OF GUAM, | **ORDER** |
| Defendant. | re Motion to Intervene |

This matter is before the court on a Motion to Intervene, filed on April 10, 2013, by certain former landowners[1] of the Dandan property which was selected as the site for the Layon Landfill. *See* ECF No. 1031. This motion was thereafter joined by other former landowners.[2] *See* ECF Nos. 1037 and 1041. These former landowners shall collectively be referred to as the "Former Landowners." In conjunction with its motion, the Former Landowners filed a Request for Judicial Notice. *See* ECF No. 1034. A second Request for Judicial Notice was filed on June 7, 2013, when the Former Landowners filed their Reply Brief . *See* ECF No. 1096.

---

[1] The Motion to Intervene was filed by former landowners Oxford Properties & Finance, Ltd., Joaquin C. Arriola, Douglas Cushnie, Calvo's Insurance Underwriters, Inc., Jones & Guerrero Company, Inc., Alfred C. and Diana Z. Ysrael, and Lee M. Holmes. *See* Mot. to Intervene, ECF No. 1031.

[2] Joinders to the Motion to Intervene were filed by Valencia Investments Corporation and Young Chull Kim. Aside from their joinders to the Motion to Intervene, these proposed interveners have not filed any other pleading.

The Motion to Intervene has been fully briefed by the parties.[3] Neither the Former Landowners nor any party requested the court to schedule the motion for hearing.[4] Having reviewed the submissions and relevant authorities, the court hereby issues the following Order granting in part the Requests for Judicial Notice but denying the Former Landowners' Motion to Intervene.

**BACKGROUND**

Although the court is intimately aware of the facts of this case, the court will summarize relevant facts for the benefit of those less familiar with this action and provide a background for the issues raised in the Motion to Intervene, specifically with regard to the Government of Guam's protracted efforts to obtain the financing needed for the Consent Decree projects.

A.    The Consent Decree and Selection of the Landfill Site

The Ordot Dump, owned and operated by the Government of Guam, had a long history of operational and environmental problems. Because it was unlined at its bottom and uncapped at its top, the Ordot Dump acted like a sponge, absorbing rain water and releasing it into Guam's rivers and streams after the rain water had percolated through the trash and picked up contaminants. The U.S. Environmental Protection Agency ("U.S. EPA") issued several administrative orders under the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, directing the Government of Guam to cease discharges of leachate from the Ordot Dump, and to design and construct a cover system to eliminate discharges of untreated leachate. After years of inaction and noncompliance with the U.S. EPA administrative orders, the United States initiated the present action on August 7, 2002.

---

[3] The parties have had sufficient opportunity to fully brief the matter, and the court has even permitted the filings to exceed the standard page limitations. *See* Order (June 6, 2013), ECF No. 1085 (granting Former Landowners' Motion for Leave to File Excess Pages).

[4] The court finds this motion suitable for decision without oral argument although the court prefers oral argument. *See* Rule LR 7.1(e) of the Local Rules of Practice for the District Court of Guam (reposing in court discretion to decide motions "on the basis of the written materials on file," even if parties have requested oral argument). Given the court's current trial schedule (it is presently presiding over a multi-defendant criminal trial that has spanned more than six weeks – including trial days on holidays and weekends – and is anticipated to last several more weeks), it would be difficult to schedule a hearing even if the parties requested one.

Shortly thereafter, the parties agreed to participate in settlement conferences facilitated by the former chief judge of this court. After approximately one year of extensive arm's length negotiations, the parties entered into a Consent Decree, which the court then approved on February 11, 2004. Consent Decree, ECF No. 55. Among other things, the Consent Decree established a schedule for the closure of the Ordot Dump and the construction and operation of a new, conforming municipal solid waste landfill. *Id.* at ¶¶8-9. Pursuant to the Consent Decree, the Department of Public Works ("DPW") was required to submit a list of three potential landfill sites to the U.S. EPA and Guam Environmental Protection Agency by March 2004. *Id.* at ¶9(a). The Consent Decree also required DPW to complete an environmental impact statement and thereafter advise the U.S. EPA of the preferred site for the new landfill. *Id.* at ¶9(b). Additionally, the Consent Decree mandated operations at the new landfill to begin by September 23, 2007, with operations at the Ordot Dump to cease by October 23, 2007. *Id.* at ¶¶8(i) and 9(i).

When the parties entered into the Consent Decree, they acknowledged that "the total amount of funding needed to complete the projects required under [the] Consent Decree is not currently available." *Id.* at ¶10(a). The Consent Decree thus required the Government of Guam, within 120 days after entry of the Consent Decree, to submit a financial plan which identifies "the funding source or sources and a schedule to secure funds for the capital and operating costs necessary" to pay for the various compliance measures required under the Consent Decree. *Id.* The Government of Guam agreed to "use its best efforts to obtain sufficient funding to fully implement the projects required by [the] Consent Decree." *Id.*

B.    Post-Consent Decree Activity and Appointment of a Receiver

Following the entry of the Consent Decree, the Government of Guam was able to complete some preliminary tasks but failed to meet more critical deadlines. For instance, after extensive scientific studies and research, the Government of Guam selected the Dandan site in 2005 as the best location for the new landfill. Additionally, the Government of Guam submitted its financial plan in June 2004 as required, and, after receiving the U.S. EPA's comments, revised its financial plan and resubmitted it in October 2004. *See* Machol Decl. at ¶3, ECF No. 74. The Government of

Guam's financial plan of 2004 indicated a preference for financing the initial sum of approximately $100 million through private activity bonds. *See* Government of Guam Financial Plan at Section 6, ECF No. 69-9 and 69-10.[5] These revenue bonds would then be re-paid through collection of tipping fees.

Concerned over the Government of Guam's lack of progress and failure to raise the financial resources necessary to complete the Consent Decree projects, on December 6, 2006 the United States petitioned the court to hold a status hearing and then later moved to enforce the Consent Decree. *See* ECF Nos. 56 and 68-69. Beginning in October 2007, the court conducted a series of monthly status hearings and site visits. Based on its failure to abide by the mandates of the Consent Decree, the court imposed stipulated penalties in the amount of $2.855 million against the Government of Guam. *See* Order (Dec. 14, 2007) at 2-3, ECF No. 177-1.

At a status conference held on November 20, 2007, the Government of Guam assured the court that it was prepared to move forward with the acquisition of the site for the new landfill and had even set money aside for its acquisition. *See* Tr. at 11-12, Nov. 20, 2007, ECF No. 170. Accordingly, the court ordered the Government of Guam to "negotiate the purchase of the Dandan site for the new landfill, or initiate eminent domain proceedings to acquire the site, on or before January 24, 2008." Order (Dec. 14, 2007) at 3, ECF No. 177-1. On January 24, 2008, the Government of Guam filed a Complaint to Acquire Property Through Eminent Domain in *Government of Guam v. 1,348,474 Square Meters, More or Less,* Superior Court of Guam Civil Case No. CV0084-08 (the "Layon Condemnation Case").[6] Additionally, based on appraisals of the property, the Government of Guam deposited $1.2 million and an additional $2.19 million[7] with the

---

[5] The Financial Plan is appended as Attachment 14 to the United States' Motion to Enforce Consent Decree, ECF No. 69.

[6] A copy of this complaint is attached as Exhibit 1 to the Former Landowners' Request for Judicial Notice, ECF No. 1034.

[7] The Government of Guam obtained these funds from federal grants through the Department of Interior. *See* Duenas Decl. and Duenas Second, ECF No. 276-4, appended as Attachs. 5-6 to

Superior Court of Guam as its estimate of just and full compensation for the fee simple interest in the property. *See* Mason Decl. at ¶¶5-6, ECF No. 276 and Attachs. 3-4 thereto, ECF No. 276-4.

Despite months of greater oversight and involvement, the court concluded that the "problem of a highly dysfunctional, largely mismanaged, overly bureaucratic, and politically charged solid waste system . . . is beyond correction by conventional methods." Order Re: Appointment of Receiver at 1, ECF No. 239. After much deliberation and upon consideration of the Government of Guam's lengthy history of violating the Clean Water Act and failure to comply with the Consent Decree, the court exercised its equitable powers and appointed Gershman, Brickner & Bratton, Inc. as the Receiver with "full power and authority to enforce the terms of the Consent Decree, and assume all of the responsibilities, functions, duties, powers and authority of the Solid Waste Management Division of the Department of Public Works." *Id.* at 15. The court, among other things, authorized the Receiver to "facilitat[e] the financing and/or borrowing of such funds necessary to carry out the duties relating to the Consent Decree as set forth in the Government of Guam's Revised Financial Plan." *Id.* at 16. The court further permitted that "[i]f, in the best judgment of the Receiver, the Revised Financial Plan fail[ed] to provide the means or methods of financing necessary or would unreasonably delay the progress in meeting the mandates of the Consent Decree, the Receiver [was] authorized to modify the Plan to provide for alternative means or methods of debt financing it deem[ed] appropriate." *Id.*

C. Financing of Consent Decree Projects under Receivership

In its October 22, 2008 Quarterly Report, the Receiver estimated the capital needed to achieve compliance with the Consent Decree was approximately $159.7 million, of which approximately $40 million would be required for the closure of the Ordot Dump. *See* ECF No. 269-1 at 13.[8] The Quarterly Report cautioned that these estimates were "subject to change as the

---

Mason Decl., ECF No. 276.

[8] The internal page numbers of the October 2008 Quarterly Report are different from the page numbers imprinted on the ECF footer. All citations to pleadings filed in this case and referred to in this Order are to the internal page number of the documents.

competitive bidding process provides the final measure of the cost for [the Consent Decree] projects." ECF No. 269-1 at 13. Furthermore, the "estimates related to the Ordot Dump's closure" would "require a full reexamination" as the time for the project to actually begin drew near because there was "a significant amount of remedial investigation that remain[ed] to be accomplished . . . to determine the extent of environmental damage that has occurred [at the Ordot Dump] and devise acceptable plans to mitigate the damage identified." *Id.* at 14. The Receiver's capital estimates did not include the cost for the acquisition of the land since the Government of Guam had already separately deposited "[f]unds to fully compensate the owners of the land . . . with the Superior Court of Guam." *Id.* at 27.

The Receiver's Quarterly Report stressed that the most complex and time-sensitive of the Consent Decree projects was the construction of the new Layon Landfill. Quarterly Report (Oct. 22, 2008) at 12, ECF No. 269-1. Completion of this project was imperative and had to be given the highest priority since the Ordot Dump could not be closed until the new landfill was opened. *Id.* The Receiver proposed a schedule to complete the various projects, *id.*, and stated that an initial sum of $20 million would be required to be deposited by the Government of Guam so that the construction projects could begin as scheduled and to "assure potential contractors . . . that they [would] be paid in a timely manner." *Id.* at 23. The Receiver also identified various financing options for the Government of Guam's consideration for funding the Consent Decree projects. *Id.* at 15-20. The Receiver ultimately recommended the Consent Decree projects be funded through a revenue bond issue guaranteed by Section 30 funds received by the Government of Guam.[9] *Id.* at 21.

Following the status hearing, the court approved the Receiver's proposed schedule. *See* Order (Oct. 22, 2008) at 6, ECF No. 272. The court also ordered the Government of Guam to deposit $20 million by January 5, 2009, to a trustee to be subsequently designated by the Receiver

---

[9] Section 30 funds are derived primarily from the federal income taxes collected by the federal government and paid by military personnel and other federal employees working in Guam.

and approved by the court.[10] *Id.* at 15. With respect to the mechanism for financing the Consent Decree projects, the court stated that "the decision regarding the funding option is one preferably best left in the hands of the executive and legislative bodies." Order (Oct. 22, 2008) at 10, ECF No. 272. Accordingly, the court ordered the Government of Guam to "choose one of the financing options set forth by the [Receiver] or adopt one of its own." *Id.* at 11. The Government of Guam was required to make its selection by December 1, 2008. *Id.*

On December 1, 2008, the Government of Guam filed its "Financing Plan," which set forth various legislation – both proposed and enacted – including proposed legislation that essentially adopted the Receiver's recommended financing option. *See* ECF No. 293. The court held hearings to discuss the Government's Financing Plan. The court ultimately found that the Government merely "propose[d] a 'plan to plan for financing' . . . [but did] not ensure that there [was] actual funding in place[.]" Order (Feb. 13, 2009) at 14, ECF No. 359. The court further stated that "if history [was] to be a predictor of future conduct, **the Government's plan is no plan at all**." *Id.* (emphasis in original). Thus, in order to achieve compliance with the Consent Decree, the court ordered the Government of Guam to make weekly cash deposits according to a court-adopted schedule, beginning with a $993,700.00 deposit on March 1, 2009. *Id.* at 18.

Instead of making the cash deposit, the Government of Guam filed a motion requesting the court reconsider its order to have it make weekly payments to finance the Consent Decree projects. *See* Mot. for Recons., ECF No. 369. The court issued an Order to Show Cause, *see* ECF No. 372, and eventually found the Government of Guam in civil contempt. *See* Order (Mar. 20, 2009) at 6, ECF No. 388. The court ordered the Government of Guam to immediately comply or face the immediate imposition of daily civil contempt sanctions. *Id.* at 14.

On April 3, 2009, the Government of Guam filed an application to suspend the required weekly cash payments. *See Ex Parte* Appl. for an Order to Suspend Weekly Payments, ECF

---

[10] The Government of Guam deposited this amount through a $20 million loan obtained through the Bank of Guam.

No. 400. Therein, the Government of Guam explained that recently enacted legislation (Public Law 30-7) would authorize the Governor, without the need for any further legislative authorization or action, to sell bonds not to exceed $202,425,000 for financing the Consent Decree Projects. *See* Government of Guam Mem. in Supp. at 7, ECF No. 401.[11] On April 14, 2009, the court suspended the Government of Guam's obligation to make weekly cash deposits. *See* Order (Apr. 14, 2009) at 1, ECF No. 423.

In its most recent Quarterly Report, the Receiver stated that "[b]ased on revised estimates, it is likely that there will not be enough money from the 2009 Section 30 Bonds to cover all of the [remaining] projects." Quarterly Report (May 21, 2013) at 33, ECF No. 1067-1. The Receiver maintained that "the closure of the Ordot Dump must be a priority," and thus contracting for the construction of these additional projects[12] would be deferred until the Receiver "successfully bid the final Dump closure project" and was confident that it had sufficient resources to complete the project as designed *Id.*

D.  The Layon Condemnation Case Judgment

On December 10, 2012, judgment in the approximate amount of $25 million was issued in the Layon Condemnation Case. *See* Former Landowners' Req. for Judicial Notice at 29, ECF No. 1034, Ex. 3 thereto. This judgment is accruing mandatory statutory interest at the rate of 6% per annum. *Id.*

On February 4, 2013, Lieutenant Governor Ray Tenorio wrote to Attorney General

---

[11] Eventually, the Government of Guam financed the Consent Decree projects through the sale of approximately $202.4 million in Limited Obligation (Section 30) Bonds, Series 2009A (the "Section 30 Bonds"). *See* Guam Economic Development Authority Bi-Weekly Progress Report (Jun. 23, 2009) at 3, ECF No. 455. Of this amount, approximately $139.7 million was allocated for deposit to the Project Construction Fund. *See* ECF No. 455-1 at 16. The Government of Guam also used approximately $20.8 million of the Section 30 Bonds to pay off the $20 million Bank of Guam loan. *Id.*

[12] Among others, these additional projects include upgrades to Dero Road, safety enhancements to Route 4 and reimbursement to the Government of Guam related to the USDA loan it sought.

1 Leonardo M. Rapadas requesting the Attorney General sign a Joint Requisition for the Receiver's
2 approval that would permit a portion of the Section 30 Bonds to be used to satisfy the $25 million
3 Layon Condemnation Case judgment. *See* Arriola Decl. at ¶4, ECF No. 1033, and Ex. 3 thereto,
4 ECF No. 1033-4. The Receiver was copied on this letter.

5     On February 7, 2013, the Receiver responded to Lt. Gov. Tenorio's letter, stating that "the
6 cost of closure [of the Ordot Dump] will be significantly higher than the preliminary 2008 estimate."
7 *See* Arriola Decl. at ¶7, ECF No. 1033, and Ex. 6 thereto at 4, ECF No. 1033-7. The Receiver
8 believed that "the remaining bond proceeds must be preserved for . . . the final closure of the Ordot
9 Dump" and therefore could not agree to the request that the remaining bond proceeds be used to
10 satisfy the $25 million judgment owed to the Former Landowners. *Id.* at 5.

11     On April 10, 2013, the Former Landowners filed the instant motion seeking to intervene in
12 this action so that they could petition the court to release the funds necessary to pay the Layon
13 Condemnation Case judgment. *See* ECF No. 1031.

14 <center>**DISCUSSION**</center>

15 **I.    Former Landowners' Requests for Judicial Notice**

16     The Former Landowners petition the court to take judicial notice of various documents in
17 support of their Motion to Intervene and their Reply Brief. *See* ECF Nos. 1034 and 1096. These
18 documents consist of certain pleadings filed in the Layon Condemnation Case, including the
19 complaint, appraisal reports, the Superior Court of Guam's Findings of Facts and Conclusions of
20 law, and the judgment in that action.

21     Federal Rule of Evidence 201 applies to judicial notice of adjudicative facts and states that
22 a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is
23 generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily
24 determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

25     Pursuant to this rule, a court may take judicial notice of matters of public record. *Lee v. City*
26 *of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). However, a court's power to take notice of public
27 records does not confer upon it the power to take judicial notice of disputed facts stated in public

records. *Id.* at 690. A court may take judicial notice of a public record which has a "direct relation to the matters at issue," but only of the existence of those matters (*i.e.*, the existence of a public document or of representations in the document); the court cannot take judicial notice of the veracity of arguments or disputed facts in the document. *George W. v. U.S. Dept. of Educ.*, 149 F. Supp. 2d 1195, 1199 (E.D. Cal. 2000). The existence and authenticity of a public record is judicially noticeable – such as the authenticity and existence of a particular order, pleading, public proceeding, or census report – but the veracity and validity of their contents, such as the underlying arguments made by the parties, disputed facts, and conclusions of fact, are not. *Cactus Corner, LLC v. U.S. Dept. of Agric.*, 346 F. Supp. 2d 1075, 1099 (E.D. Cal. 2004).

Accordingly, the court grants the Former Landowners' requests for judicial notice *only* as to the existence of the documents. The court denies the requests as to the veracity and validity of the contents of the documents.

**II.     Former Landowners' Motion to Intervene**

Rule 24 of the Federal Rules of Civil Procedure provides for two types of intervention – intervention of right and permissive intervention. Here, the Former Landowners only seek to intervene as of right pursuant to Rule 24(a). Rule 24(a) provides:

> Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a).

In this case, no statute of the United States confers an unconditional right to intervene. Instead, the Former Landowners seek intervention of right based on Rule 24(a)(2). The Ninth Circuit has adopted a four-prong test for such interventions. A party seeking to intervene as a matter of right must show: (1) the application is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest;

and (4) the existing parties may not adequately represent the applicant's interest. *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004) (quoting *United States v. City of Los Angeles*, 288 F.3d 391, 397 (9th Cir. 2002)). Failure to satisfy any one of these requirements is "fatal to the application." *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 950 (9th Cir. 2009).

The applicant for intervention bears the burden of proving that all four requirements for intervention have been met. *Alisal Water*, 370 F.3d at 919. "In determining whether intervention is appropriate, courts are guided primarily by practical and equitable considerations, and the requirements for intervention are broadly interpreted in favor of intervention." *Id.*

The court now examines each of the four requirements to determine whether the Former Landowners have met their burden.

**A.　Timeliness**

Rule 24(a)(2)'s first requirement is the timely filing of a motion to intervene. Courts consider three factors in determining whether a motion to intervene is timely: (1) the stage of the proceedings, (2) the prejudice to the parties, and (3) the reason for and length of the delay. *Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects, Inc.*, 309 F.3d 1113, 1119 (9th Cir. 2002).

　　　　1.　Stage of the Proceedings

This case was commenced more than 11 years ago. After participating for more than one year in a settlement conference with the former chief judge, the parties thereafter settled their dispute through a Consent Decree, which was entered by the court on February 24, 2004. *See* ECF No. 55. Based on the Government of Guam's lengthy history of violating the Clean Water Act and failing to comply with the Consent Decree, the court appointed a Receiver on March 17, 2008. *See* ECF No. 239. The Receiver successfully managed to cease operations at the Ordot Dump on August 31, 2011, and opened a conforming municipal solid waste landfill in Layon, which began accepting trash on September 1, 2011. The Former Landowners did not move to intervene until more than nine years after the parties had already settled and the Consent Decree – a final judgment – was entered. The court notes that "[i]ntervention after entry of a consent decree is reserved for exceptional cases."

*Alaniz v. Tillie Lewis Foods*, 572 F.2d 657, 658 (9th Cir. 1978) (citing *United States v. Blue Chip Stamp Co.*, 272 F. Supp. 432, 435-38 (C.D. Cal. 1967), *aff'd*, 389 U.S. 580 (1968)). The Former Landowners have not shown that this is one of those exceptional cases.

Since the Motion to Intervene was filed after the Consent Decree was approved, the first factor in the timeliness analysis weighs heavily against the Former Landowners. *See Alisal Water*, 370 F.3d at 922 (finding district court did not abuse its discretion in finding motion to intervene untimely as it was filed at an advanced stage in the litigation); *County of Orange v. Air California*, 799 F.2d 535, 538 (9th Cir. 1986) (court held that filing a motion to intervene filed after the parties had come to an agreement following five years of litigation weighed heavily against intervention, even though agreement had not yet been officially approved by the court).

### 2. Prejudice to the Parties

The Former Landowners assert that neither the United States nor the Government of Guam will be prejudiced by the intervention because they "are not seeking to upset or alter the Consent Decree, but rather to ensure that it is fully and lawfully enforced." Mem. P.&A. in Supp. of Mot. to Intervene at 10, ECF No. 1032. The United States contests the Former Landowners' assertion that the United States would not be prejudiced. The United States argues that intervention at this late stage of the proceedings would unnecessarily prolong the litigation and further delay the closure of the Ordot Dump. The court concurs.

Prejudice to the existing parties is one of the most important factors in determining timeliness. *United States v. Oregon*, 745 F.2d 550, 553 (9th Cir. 1984). In evaluating prejudice, courts consider whether "relief from long-standing inequities is delayed." *Alisal Water*, 370 F.3d at 922 (quoting *Alaniz*, 572 F.2d at 659). *See also Cal. Dep't of Toxic Substances Control*, 309 F.3d at 1119 (affirming denial of motion to intervene in long-litigated environmental action which would, *inter alia*, "unnecessarily prolong the litigation, threaten the parties' settlement, and further delay cleanup and development of the [Landfill]") (alteration in original).

In the present case, the court finds that intervention by the Former Landowners will result in delay and prejudice to the United States. The Consent Decree required the Ordot Dump to cease

all discharges of leachate by October 23, 2007. Consent Decree at ¶8(i), ECF No. 55. Because the Government of Guam did not adhere to the Consent Decree's schedule, the United States moved to enforce the Consent Decree, and this court thereafter appointed a Receiver on March 17, 2008. Due in part to the Government of Guam's failure to finance the Consent Decree projects, this closure deadline was further delayed. The Receiver now advises the court that the remaining balance of the Section 30 Bonds will not be sufficient to satisfy all projects required under the Consent Decree. *See* Quarterly Report (May 21, 2013) at 33, ECF No. 1067-1. Therefore, the Receiver recommends that closure of the Ordot Dump be prioritized. *Id.*

If permitted to intervene, the Former Landowners would seek a writ of mandate requiring the Receiver to pay the Layon Condemnation Case judgment from the Section 30 Bonds, but the Receiver believes that payment of said judgment would seriously impair its ability to complete the environmental closure of the Ordot Dump. *Id.* at 34-38. While the Former Landowners assert that they are not seeking to upset or alter the Consent Decree, intervention would compromise the long-litigated Consent Decree by further delaying the environmental closure of the Ordot Dump. The closure of the Ordot Dump has been delayed for almost six years, and the court affirms the Receiver's position that the closure be prioritized over all other projects. The remedial investigation work at the Ordot Dump has been completed. The Receiver has submitted its final closure plan and is ready to develop a bid procurement package for the Ordot Dump closure construction. The court will not tolerate any further delay to the closure of this environmental and health hazard.

### 3.  Reasons for and Length of Delay

Because the first two factors weigh against intervention, the Former Landowners must convincingly explain their delay in seeking intervention. "Although delay can strongly weigh against intervention, the mere lapse of time, without more, is not necessarily a bar to intervention." *Alisal Water*, 370 F.3d at 921. The Former Landowners contend there was no delay here since they filed their motion promptly, months after the Layon Condemnation Case judgment was issued and shortly after the Receiver stated that was not in a position to agree with the Government of Guam's request to use the remaining Section 30 Bonds to pay the judgment. *See* Mem. P.&A. in Supp. of Mot. to

1  Intervene at 10, ECF No. 1032.

2  "While the length of time that has passed since a suit was filed is not, in and of itself, determinative of timeliness, '[a] party seeking to intervene must act as soon as he knows or has reason to know that his interests might be adversely affected by the outcome of the litigation.'" *Cal. Dep't of Toxic Substances Control*, 309 F.3d at 1120 (quoting *United States v. Oregon*, 913 F.2d 576, 589 (9th Cir. 1990)).

7  This case has been long-litigated and has received much publicity. The court recalls that the appointment of a Receiver and the order directing the Government of Guam to make weekly cash deposits of $993,700[13] were the lead stories in the local print, radio and television media. As noted above, the Receiver's October 22, 2008 Quarterly Report estimated the capital needed to achieve compliance with the Consent Decree was approximately $159.7 million, of which approximately $78 million would be required for the construction cost at the Layon Landfill. *See* Quarterly Report (Oct. 22, 2008) at 13, ECF No. 269-1. The Receiver's capital estimates did not include the cost for the acquisition of the land since the Government of Guam had already separately deposited "[f]unds to fully compensate the owners of the land . . . with the Superior Court of Guam." *Id.* at 27. The Receiver's estimates were then used as the basis for the Government of Guam's sale of $202.4 million in bonds.

18  By October 2008, the Government of Guam had deposited about $3.4 million with the Superior Court of Guam as its estimate of just compensation for the fee simple interest in the property, but the landowners believed they were entitled to much more.[14] The Former Landowners

---

[13] Members of the media nicknamed these weekly cash payments "Million Dollar Mondays."

[14] According to the Superior Court of Guam's Findings of Fact and Conclusions of Law issued in the Layon Condemnation Case, the property owners estimated the value of the land at the date of taking (January 24, 2008) to be between $185 million and $300 million. *See* Former Landowners' Req. for Judicial Notice at 18, ECF No. 1034, Ex. 2 thereto at ¶25. According to the Expert Report of Randall Bell, MAI dated August 8, 2010, and submitted as Joint Trial Exhibit 51 in the Layon Condemnation Case, the just compensation on the date of taking was approximately $30.6 million. *See* Former Landowners' Req. for Judicial Notice at ¶2, ECF No. 1096, and Ex. 2 thereto, ECF No. 1096-43.

should have realized then that their interests may be adversely affected if the Government of Guam did not seek more financing to pay what the Former Landowners believed was just compensation. Despite the information provided in the Receiver's Quarterly Report[15] and the media coverage on the issue, the Former Landowners failed to move to intervene then.

Furthermore, the Receiver's Quarterly Report also indicated that there was some uncertainty about whether the Government of Guam had title to the Layon site.[16] *See* Quarterly Report (Oct. 22, 2008) at 27, ECF No. 269-1. The Receiver advised the court that the cloud over the title to the Layon site must be cleared immediately or financing will be almost impossible to obtain. *Id.* Thereafter, the court issued an order staying the Layon Condemnation Case pending this court's determination whether the Government of Guam had acquired legal title to the property. *See* Order Re: Briefing for Motion for Declaratory Judgment (Oct. 22, 2008) at 3, ECF No. 270. The court also directed that "[b]riefs concerning legal rights or interests pertaining to the Layon site . . . be filed by any other interested party or landowner[.]" *Id.* The Former Landowners thereafter filed motions requesting the court lift the stay in the Layon Condemnation Case.[17] *See* ECF Nos. 278-279. Based on their prior involvement in this case, the Former Landowners had constructive notice that their interests might be adversely affected by these proceedings.

The court finds that the Former Landowners could have intervened sooner to protect their interests. The Former Landowners should have known that the risks of waiting to intervene included possible denial of their motions to intervene as untimely, and they have offered no adequate

---

[15] Each of the Receiver's Quarterly Reports are publicly available on its website http://www.guamsolidwastereceiver.org/.

[16] On March 24, 2008, the Former Landowners moved to dismiss the eminent domain complaint on the ground that the Government of Guam had failed to meet all statutory requirements for the taking. *See* Mot. to Dismiss Eminent Domain Case and Motion to Lift Temporary Stay at 2, ECF No. 278. The Superior Court of Guam heard argument on the motion on May 2, 2008, and took the matter under advisement. *Id.* at 3.

[17] The court eventually lifted the stay it had imposed. *See* Order (Nov. 7, 2008), ECF No. 287.

explanation for their delay in seeking intervention. *See Oregon*, 913 F.2d at 589 (finding intervention untimely because applicants had notice of the proceeding and were aware that their interests would be discussed in settlement negotiations); *Cal. Dep't of Toxic Substances Control*, 309 F.3d at 1120 (finding intervention untimely because applicants had reason to know negotiations might produce settlement decree to their detriment yet they failed to intervene sooner); *Air California*, 799 F.2d at 538 (requiring applicant to intervene before settlement when applicant was aware that parties were attempting to reach a negotiated settlement and might look to applicant for help towards the settlement, even though applicant did not know terms of settlement); *Alaniz*, 572 F.2d at 659 (denying intervention 2.5 years after suit was filed and after entry of consent decree which was preceded by extensive, well-publicized industry-wide negotiations and the proposed intervenors either knew or should have known of these negotiations).

"Timeliness is 'the threshold requirement' for intervention as of right." *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997) (quoting *Oregon*, 913 F.2d at 588). Therefore, if the court finds the motion to intervene was untimely, it need not reach any of the remaining elements of Rule 24(a). *United States v. Washington*, 86 F.3d 1499, 1503 (9th Cir. 1996). Although the court finds the Former Landowners' Motion to Intervene was not timely, the court will nonetheless address the remaining requirements of Rule 24(a).

**B.** **Significant Protectable Interest Relating to the Litigation**

The next requirement for intervention as a matter of right is whether the Former Landowners have a significant protectable interest relating to the property or transaction that is the subject of the action. The Former Landowners claim they have a significant protectable interest in the proceeds of the 2009 Section 30 Bonds. Mem. P.&A. in Supp. of Mot. to Intervene at 11, ECF No. 1032. The Former Landowners note that pursuant to the direct orders of this court, the Government of Guam condemned the Layon property. The Former Landowners further contend that their "interest in the [Section 30] Bond proceeds also relate to this action because failure to use those proceeds to pay just compensation would jeopardize [the Government of Guam's] compliance with the Consent Decree." *Id.* at 12.

The Ninth Circuit has stated that "[a]n applicant for intervention has a significantly protectable interest if the interest is protected by law and there is a relationship between the legally protected interest and the plaintiff's claims." *Alisal Water,* 370 F.3d at 919.

The court notes that the United States initiated this suit against the Government of Guam for violating the Clean Water Act, and it sought injunctive relief and civil penalties. The Former Landowners are judgment creditors seeking merely to collect a debt owed by the Government of Guam. The court acknowledges that the Former Landowners have a legally protected interest, however, "[a]n economic stake in the outcome of the litigation, even if significant, is not enough." *Greene v. United States*, 996 F.2d 973, 976 (9th Cir. 1993). The Former Landowners' purely economic interest in the Section 30 Bonds "is several degrees removed from the overriding public health and environmental policies that are the backbone of this litigation." *Alisal Water*, 370 F.3d at 920 (holding that applicant was not entitled to intervene because its interest in the prospective collectability of debt was not sufficiently related to environmental enforcement action brought by United States). The Ninth Circuit has repeatedly held that purely economic claims of the type asserted by the Former Landowners do not create a protectable interest in litigation concerning environmental statutes. *See Montana v. U.S. EPA*, 137 F.3d 1135, 1142 (9th Cir. 1998);[18] *Portland Audobon Soc. v. Hodel*, 866 F.2d 302 (9th Cir. 1989), *cert. denied*, 492 U.S. 911.[19] Moreover, as

---

[18] In *Montana*, the state, county and municipalities which owned interests in land located within the boundaries of an Indian reservation challenged the EPA's grant of a permit which allowed the Indian tribe to establish water quality standards for the reservation. Irrigation districts and individual non-Indian irrigators owning land within the reservation sought to intervene. The court noted that none of the proposed intervenors held a permit that may potentially be modified by the tribe's change in water quality standards. The Ninth Circuit held that even if it assumed that EPA's approval of the tribal water quality standards program might affect the proposed intervenors' property values, "such a speculative and purely economic interest does not create a protectable interest in litigation concerning a statute that regulates environmental, not economic interests." *Id.* at 1142.

[19] In *Portland Audobon Society*, environmental advocacy groups sued the Interior Department to enjoin sales of old-growth timber, claiming that logging the old trees would threaten the habitat of the northern spotted owl. A logging advocacy group and some logging contractors were allowed to intervene on some of the claims but not the claim under the National Environmental

the court will discuss in the next section, the underlying litigation will not affect the Former Landowners' ability to collect on its judgment.

### C.    **Impairment of Protectable Interest**

The Former Landowners contend that their protectable interest will be impaired if it is not permitted to intervene in this case. The Former Landowners argue that absent an order from this court, the Receiver intends to use most, if not all, of the remaining proceeds from the Section 30 Bonds to pay for the closure of the Ordot Dump, thus leaving the Former Landowners with no other means to collect payment on the Layon Condemnation Case judgment.

The court finds the Former Landowners' argument unpersuasive. While the Receiver has recommended that the remaining proceeds from Section 30 Bonds be reserved for the closure of the Ordot Dump,[20] this fiscally prudent decision does not, as a practical matter, impair the Former Landowners' ability to seek redress in the Superior Court of Guam. The United States notes that on April 5, 2013, the Former Landowners filed a Motion for Writ of Mandate to Compel the Government of Guam to Pay Just Compensation. *See* United States' Opp'n at 11, ECF No. 1071 and Attachs. 1-3 thereto.[21] While the Superior Court of Guam may not be able to attach the funds

---

Policy Act ("NEPA"). The Ninth Circuit affirmed the denial of their motion to intervene in the NEPA claim on the ground that they lacked a protectable interest. Specifically, the Ninth Circuit held that the intervenors' claim, which centered around purely economic interests, had no relation to the interests intended to be protected by the statute at issue, NEPA. *Id.* at 309. Accordingly, the court concluded that they had no protectable interest justifying intervention as of right. *Id.*

[20] The Receiver's recommendation is consistent with the position announced by the court in prior Orders. *See* Order (Dec. 10, 2010) at 4, ECF No. 649 ("To ensure the necessary financing is in place, any capital savings shall be retained until the full cost of closure and post-closure care for the Ordot Dump is determined.") and Order (Nov. 3, 2011) at 2, ECF No. 836 (denying the Government of Guam's request to release proceeds from the Section 30 Bonds to reimburse itself for expenses it claimed were associated with Consent Decree projects, stating "[t]he costs of the final closure of the Ordot Dump are still uncertain; therefore, it is imperative that the bond proceeds remain available for the final closure.")

[21] On April 22, 2013, the Former Landowners and the Government filed a stipulation in the Superior Court of Guam agreeing to stay the motion for writ of mandate pending this court's resolution of the motion to intervene. *Id.* and Attach. 4 thereto.

remaining from the Section 30 Bonds, the Superior Court could order the Government of Guam to pay the judgment from other funds or even sell government property to satisfy the judgment. The remaining proceeds from the Section 30 Bonds are not the exclusive source of payment for the Layon Condemnation Case judgment.

In addition to the remedies available through the Superior Court of Guam, the Former Landowners have other options for collecting the monies owed to them. For instance, the Former Landowners may request the Government of Guam to raise its debt limit, and, if it chooses to do so, the Government of Guam may then borrow money to pay off the judgment. *See* Quarterly Report (May 21, 2013) at 36, ECF No. 1067-1. Because the Former Landowners have the ability to protect their interests through other means, the court concludes that they have not satisfied the third requirement under Rule 24(a). *See Alisal Water*, 370 F.3d at 921 (denying motion to intervene because district court had "set up a process for addressing claims that [was] adequate to protect [proposed intervenor's] interests."); *City of Los Angeles*, 288 F.3d at 402 (affirming denial of motion to intervene brought by community groups and individuals because they could bring separate suit against police officers and city for engaging in unconstitutional practices).

### D. **Adequacy of Representation**

Lastly, in order to intervene in this action, the Former Landowners need to show that the existing parties do not adequately represent their interests. The Ninth Circuit considers three factors in determining the adequacy of representation: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Araki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). "The most important factor in determining the adequacy of representation is how the interest compares with the interests of existing parties." *Id.* "Where parties share the same ultimate objective, differences in litigation strategy do not normally justify intervention." *Id.*

The Former Landowners assert that none of the existing parties can adequately represent their

interests, but this simply is not true. Here, the Government of Guam has and can adequately represent the interests of the Former Landowners. First, the court notes that the Lt. Governor petitioned the Receiver to approve payment of the Layon Condemnation Case judgment from the Section 30 Bonds. The court also recognizes that the Government of Guam (through the Cabot Mantanona law firm) fully supported the Former Landowners' Motion to Intervene. *See* ECF Nos. 1058-59. Finally, to the extent that the Office of the Attorney General may not have fully supported the Former Landowners' position with regard to intervention, the court has already approved a limited substitution of counsel which permits the Cabot Mantanona firm to represent the Government of Guam with regard to the issues raised in the Former Landowners' Motion to Intervene. The Government of Guam has demonstrated that it will undoubtedly make all of the Former Landowners' arguments, and is capable and willing to make such arguments. Under these circumstances, the Government of Guam – an existing party to this suit – shares the same ultimate objectives as the Former Landowners, *i.e.*, the release of Section 30 Bond proceeds to pay the Layon Condemnation Case judgment. Because the Former Landowners' interests are adequately represented by the Government of Guam, there is no need to require intervention at this time.

## CONCLUSION

For the foregoing reasons, the court (1) GRANTS in part the Requests for Judicial Notice and (2) DENIES the Motion to Intervene. The Former Landowners failed to meet their burden of establishing intervention as of right. The motion was not timely, the Former Landowners do not have a significant property interest related to this action, and even if they did, the Government of Guam is capable of representing the Former Landowners' interest in this action. Furthermore, disallowing intervention will not impede the Former Landowners' ability to protect their interest because they can still seek to enforce the judgment they received against the Government of Guam in the Superior Court of Guam.

IT IS SO ORDERED.



/s/ Frances M. Tydingco-Gatewood
Chief Judge
Dated: Aug 21, 2013