DISTRICT COURT OF GUAM

TERRITORY OF GUAM

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL CASE NO. 02-00022 |
| Plaintiff, | |
| vs. | |
| GOVERNMENT OF GUAM, | **ORDER** |
| | re Emergency Motion for Stay |
| Defendant. | Pending Appellate Review |

This matter is before the court on an Emergency Motion for a Stay Pending Appellate Review (the "Emergency Motion"), filed on September 26, 2013, by the Chief Legal Counsel for the Office of the Governor of Guam,[1] on behalf of the Government of Guam.[2] *See* ECF No. 1203. Therein, the Lieutenant Governor requests the court stay this action and direct the Receiver not to award or execute any new contracts on behalf of the Government of Guam pending review by the Ninth Circuit Court of Appeals of three matters currently on appeal.

---

[1] The Governor of Guam, the Hon. Eddie Baza Calvo, determined that he has a conflict which precludes his involvement in this action, and thus he assigned the executive power and the duty to act in this matter to the Lieutenant Governor of Guam. Decl. Raymond S. Tenorio (May 10, 2013) at ¶2, ECF No. 1053.

[2] In this action, the Government of Guam is represented by different sets of lawyers, as will be discussed *infra*. For ease of reference, the court will hereinafter refer to all filings and arguments made on behalf of the Government of Guam through the Governor's Chief Legal Counsel or through the Cabot Mantanona law firm as being made by the "Lieutenant Governor." Additionally, all filings and arguments raised on behalf of the Government of Guam through the Office of the Attorney General shall hereinafter be referred to as being made by the "Attorney General."

The court set the Emergency Motion for expedited briefing and heard argument from the parties on October 5, 2013.[3]  Having reviewed the submissions and relevant authority, the court hereby denies the Emergency Motion.

## BACKGROUND[4]

This case has been pending before the court for more than 11 years.  Because the parties are familiar with the facts and procedural history of this action, the court will not recite them here in great detail except as necessary to explain its decision.[5]

A.    The Consent Decree and Appointment of a Receiver

The United States initiated the present action on August 7, 2002, and sought injunctive relief and civil penalties against the Government of Guam for violations of the Clean Water Act,[6] 33 U.S.C. §§ 1251 *et seq.*  The parties thereafter entered into a Consent Decree, which became final when approved by the court on February 11, 2004.  *See* Consent Decree, ECF No. 55.  Among other things, the Consent Decree established a schedule for the Government of Guam to close the Ordot Dump and also construct and operate a new conforming municipal solid waste landfill.[7]  *Id.* at ¶¶8-9.

---

[3]  The hearing was held on a Saturday because it was the only time available for the court, given its very busy trial calendar.  The court is presently presiding over a complex, multi-defendant criminal trial which has spanned approximately 11 weeks (including trial days on federal holidays and weekends) and will hopefully conclude by the end of the month.

[4]  The Emergency Motion incorporated by reference the facts set forth the memorandum of points and authorities in support of the Lieutenant Governor's first motion to stay filed on September 13, 2013.  *See* Emergency Mot., at 3, ECF No. 1203.  Said memorandum claimed that the facts set forth therein "are, or should be, undisputed."  Mem. of P.&A. in Supp. Mot. to Stay at 2, ECF No. 1178.  Contrary to such representation, many of said "facts" are very much disputed by the United States.  *See* United States' Resp. to Emergency Mot. at 1-5, ECF No. 1215. The court, too, believes that the Lieutenant Governor's filings (the Emergency Motion, the reply brief to said motion, and the various motions to stay) contain numerous misrepresentations of the facts and record as will be discussed *infra.*

[5]  For a more thorough recitation of the background of this case, including the events that led to the appointment of a Receiver, the court incorporates by reference the following prior decisions: Order re Appointment of Receiver, ECF No. 239; Order re Motion for Reconsideration, ECF No. 1157; and Order re Motion to Intervene, ECF No. 1164.

[6]  The record reveals that the Government of Guam has been on notice of its violation of the Clean Water Act for decades.

[7]  After extensive scientific studies and research, the Government of Guam selected the Layon site in 2005 as the best location for the new landfill.

1    The Consent Decree required operations at the new sanitary landfill to begin by September 23, 2007,

2    with operations at the Ordot Dump to cease by October 23, 2007. *Id.* at ¶¶8(i) and 9(i).[8]

3          Following the entry of the Consent Decree, the Government of Guam failed to meet critical

4    deadlines.  Concerned about the Government of Guam's  lack of progress and failure to raise the

5    financial resources necessary to complete the Consent Decree projects, on December 6, 2006, the

6    United States petitioned the court to hold a status hearing and then later moved to enforce the

7    Consent Decree.  *See* ECF Nos. 56 and 68-69.  After conducting monthly status hearings and site

8    visits, the court concluded that the "problem of a highly dysfunctional, largely mismanaged, overly

9    bureaucratic, and politically charged solid waste system . . . is beyond correction by conventional

10   methods." Order re Appointment of Receiver at 1, ECF No. 239.  After much deliberation and upon

11   consideration of  the Government of Guam's lengthy history of violating the Clean Water Act and

12   failure to comply with the Consent Decree, the court appointed Gershman, Brickner & Bratton, Inc.

13   as the Receiver with "full power and authority to enforce the terms of the Consent Decree, and

14   assume all of the responsibilities, functions, duties, powers and authority of the Solid Waste

15   Management Division[9] of the Department of Public Works." *Id.* at 15.  To accomplish its mission,

16   the court, among other things, authorized the Receiver to "enter into future contracts deemed

17   necessary" and to "facilitat[e] the financing and/or borrowing of such funds  necessary to carry out

18

19          [8]  When the parties entered into the Consent Decree, they acknowledged that "the total
     amount of funding needed to complete the projects required under [the] Consent Decree [was] not
20   currently available." *Id.* at ¶10(a). The Consent Decree thus required the Government of Guam,
     within 120 days after its entry, to submit a financial plan which identified "the funding source or
21   sources and a schedule to secure funds for the capital and operating costs necessary" to pay for the
     various compliance measures required under the Consent Decree.  *Id.*  The Government of Guam
22   agreed to "use its best efforts to obtain sufficient funding to fully implement the projects required
     by [the] Consent Decree."  *Id.*

23
            [9]  The Solid Waste Management Division will hereinafter be referred to as "SWMD." Under
24   Guam law, the SWMD was "a sub-entity" of the Department of Public Works, a department "within
     the Executive Branch of the government of Guam." *See* 5  GUAM CODE ANN. § 3106 and 10 GUAM
25   CODE ANN. § 51A103.  Upon enactment of Guam Public Law 31-020, SWMD is now known as the
     Guam Solid Waste Authority ("GSWA"), an autonomous, public corporation of the Government of
26   Guam.  *See* 10 GUAM CODE ANN. § 51A103. Following said enactment, the court vested the
     Receiver with "full power and authority over GSWA, to the full extent of its previously granted
27   authority over SWMD." Order (Sept. 2, 2011) at 9, ECF No. 798.

1  the duties relating to the Consent Decree as set forth in the Government of Guam's Revised

2  Financial Plan." *Id.* at 16.

3          B.      Financing and the Consent Decree Projects

4          In its October 22, 2008 Quarterly Report, the Receiver estimated the capital needed to

5  achieve compliance with the Consent Decree was approximately $159.7 million, of which

6  approximately $40 million would be required for the closure of the Ordot Dump. *See* Quarterly

7  Report (Oct. 22, 2008) at 13,[10] ECF No. 269-1. The Quarterly Report cautioned that these estimates

8  were "subject to change as the competitive bidding process provides the final measure of the cost

9  for [the Consent Decree] projects." *Id.* Furthermore, the "estimates related to the Ordot Dump's

10 closure" would "require a full reexamination" as the time for the project to actually begin drew near

11 because   there was "a significant amount of remedial investigation that remain[ed] to be

12 accomplished . . . to determine the extent of environmental damage that has occurred [at the Ordot

13 Dump] and devise acceptable plans to mitigate the damage identified." *Id.* at 14. The Receiver's

14 capital estimates did not include the cost for the acquisition of the land needed for the new landfill

15 since the Government of Guam had already separately deposited "[f]unds to fully compensate the

16 owners of the land . . . with the Superior Court of Guam."[11] *Id.* at 27.

17         Following the October 2008 quarterly status hearing and at the request of the Receiver,[12] the

18 court ordered the Government of Guam to deposit $20 million by January 5, 2009, to a trustee to be

19

20 ────────────────

21     [10]  The internal page numbers of the October 2008 Quarterly Report are different from the
    page numbers imprinted on the ECF footer.  All citations to pleadings filed in this case and referred
22  to in this Order are to the internal page number of the documents.

23     [11]  On January 24, 2008, the Government of Guam filed a Complaint to Acquire Property
    Through Eminent Domain in  *Government of Guam v. 1,348,474 Square Meters, More or Less,*
24  Superior Court of Guam Civil Case No. CV0084-08.  Based on appraisals of the property available
    at the time, the Government of Guam deposited $1.2 million and an additional $2.19 million with
25  the Superior Court of Guam as its estimate of just and full compensation for the fee simple interest
    in the property.

26     [12]  The October 22, 2008 Quarterly Report stated that an initial sum of $20 million would be
    required to be deposited by the Government of Guam so that the construction projects could begin
27  as scheduled and to "assure potential contractors . . . that they [would] be paid in a timely manner."

1  subsequently designated by the Receiver and approved by the court.[13]  *See* Order (Oct. 22, 2008)

2  at 15, ECF No. 272.  Although the Receiver recommended the Consent Decree projects be funded

3  through a revenue bond issue guaranteed by Section 30 funds received by the Government of Guam,

4  *see* Quarterly Report (Oct. 22, 2008) at 21, ECF No. 269-1, the Government of Guam instead opted

5  to finance the balance of the Receiver's $159.7 million estimate of the Consent Decree projects

6  through the sale of approximately $202.4 million in Limited Obligation (Section 30) Bonds, Series

7  2009A (the "Limited Obligation Bonds").  *See* ECF No. 455 at 3.  Of this amount, approximately

8  $139.7 million was allocated for deposit to the  Project Construction Fund. *See* ECF No. 455-1 at 16.

9       The Receiver achieved a major milestone under the Consent Decree when the Layon Landfill

10  began operating as Guam's new conforming municipal solid waste landfill on September 1, 2011.

11  *See* Minutes (Aug. 31, 2011), ECF No. 796 and Order (Sept. 2, 2011), ECF 798.   Although the

12  Ordot Dump stopped receiving trash for disposal on August 31, 2011, the environmental closure of

13  the Ordot Dump was still not completed as required by the Consent Decree.

14       At the most recent quarterly status hearing held on May 21, 2013, the Receiver informed the

15  court that the remedial field investigation work at the Ordot Dump had been completed and the final

16  closure plan had been submitted.  *See* Quarterly Report (May 21, 2013)  at 3-6, ECF No. 1067-1.

17  Barring any unforeseen circumstances or a shortfall of funding, the Receiver anticipated the

18  environmental closure of the Ordot Dump to be completed by the end of 2015.  *Id.* at 43, Fig. 14

19  (Current Receiver Schedule for Closure of the Ordot Dump).[14]  The Receiver further stated that since

20  the original estimates were made in the October 2008 Quarterly Report, a number of items have been

21  added to the list of projects associated with the Consent Decree, specifically (1) upgrades to the

22  residential transfer stations, (2) Route 4 safety enhancements, (3) Dero Road upgrades and

23  (4) possible improvements to the Inarajan waste water treatment plant expansion and leachate pre-

24

25       [13]  The Government of Guam deposited this amount through a $20 million loan obtained
26  through the Bank of Guam.

27       [14]  The Receiver's schedule also anticipated that the bidding, award and contracting of the
Ordot Dump closure construction would occur between July 2013 and January 2014. *Id.*

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 6 of 26

1 treatment - Layon.[15] *Id.* at 33-34. Because the cost for the Ordot Dump closure itself increased from

2 the original 2008 estimates, the Receiver warned that "it is likely that there will not be enough

3 money from the [Limited Obligation] Bonds to cover *all* of the projects." *Id.* at 33 (emphasis added).

4 Thus, the Receiver intended to "complete the planning and design phases for *all* the projects, but

5 *defer contracting for any additional construction for those projects until [the Receiver] successfully*

6 *bid the final Dump closure project and [was] confident that [it had] sufficient resources to complete*

7 *the projects as designed.*" *Id.* (emphasis added). The Receiver would only complete the additional

8 projects "[t]o the extent that funds remain available, or the Government of Guam makes additional

9 funds available." *Id.* at 34. The Receiver stated it was ready to develop a bid procurement package

10 for the Ordot Dump closure construction.

11     The court later asked the Receiver to submit a special report addressing the approximate time

12 frame for the Receiver's procurement process for the closure of the Ordot Dump. *See* Order

13 (Jun. 24, 2013) at 2, ECF No. 1120. In a Special Report filed with the court on June 28, 2013, the

14 Receiver stated there were two procurements connected to the closure of the Ordot Dump that would

15 begin in July: one for the closure of the Ordot Dump itself, and the other for construction

16 management services in connection with the closure project. Special Report Advising Court of

17 Receiver's Procurement Schedule (Jun. 28, 2013) at 2, ECF No. 1128.

18     With regard to the closure of the Ordot Dump, the Receiver submitted the following

19 schedule:

20 ///

21 ///

22 ///

23 ///

24

25     [15] As the Receiver further clarified at the October 5th hearing, these projects, although

26 related to the original Consent Decree projects, are not necessarily required by the Consent Decree. The Receiver further stated that these projects were either required or requested by the Government

27 of Guam after the Limited Obligation Bonds had been obtained, and thus were never included in the Receiver's original estimates.

| July 1,2013 | Required newspaper advertising - bid documents available to interested firms |
| July 15, 2013 | Interested firms submit prequalification package for evaluation |
| July 22, 2013 | Notice to firms submitting prequalification package of firms determined to be qualified |
| July 30-31, 2013 | Pre-bid meeting and site visit for prequalified bidders |
| September 6, 2013 | Bids due |
| Late September | Evaluation of bids completed and determination made of the lowest, responsible, qualified bidder.  Notice of Award to follow |
| Early October | Issue Notice to Proceed with the work |

As to the time frame for procurement of construction management services, the Receiver's schedule was as follows:

| July 17,2013 | Request for Proposals (RFP) is released |
| August 1, 2013 | Pre-proposal conference / teleconference |
| August 8, 2013 | Deadline for questions and requests for clarification |
| August 20, 2013 | Replies to questions and requests for clarification due |
| September 20, 2013 | Submission of proposals |
| Early October | Interviews of proposers if required |
| Late October | Notice of intent to award a contract |

The Receiver noted that the earliest that a binding contract would occur under either of the above schedules was late September 2013. *Id.*

C.     The Superior Court of Guam Layon Condemnation Case Judgment and Attempts to Substitute Counsel

On January 24, 2008, in the Superior Court of Guam, the Government of Guam filed a Complaint to Acquire Property Through Eminent Domain in Government of Guam v. 1,348,474 Square Meters, More or Less, Superior Court of Guam Civil Case No. CV0084-08 (the "Layon Condemnation Case").   On December 10, 2012, the Superior Court of Guam issued a judgment in the Layon Condemnation Case in the approximate amount of $25 million. *See* Former Landowners' Req. for Judicial Notice at 29, ECF No. 1034, Ex. 3 thereto. This judgment was accruing mandatory

1    statutory interest at the rate of 6% per annum. *Id.*

2        In February 2013, the Lieutenant Governor sought assistance from the Attorney General to

3    obtain the Receiver's approval for release of a portion of the Limited Obligation Bonds to be used

4    to satisfy the $25 million Layon Condemnation Case judgment. *See* A. Arriola Decl, Ex. 3 thereto,

5    ECF No. 1033-4. Counsel for some of the former landowners of the Layon Landfill also made a

6    similar request of the Receiver. *Id.* at ¶6. The Receiver responded to the Lieutenant Governor,

7    stating that he could not agree to the request because "the remaining bond proceeds must be

8    preserved for . . . the final closure of the Ordot Dump." *Id.,*Ex. 6 thereto at 5, ECF No. 1033-7.

9        On April 10, 2013, the former landowners filed a motion seeking to intervene in this action

10   so that they could petition the court to release the funds necessary to pay the Layon Condemnation

11   Case judgment.[16] *See* ECF No. 1031.

12       On April 26, 2013, a Substitution of Counsel was filed by the Lieutenant Governor on behalf

13   of the Government of Guam, *see* ECF No. 1045, and thereafter disapproved by the court on May 3,

14   2013, because the Substitution of Counsel did not comply with the technical requirements of Local

15   Rule GR 19.1(b)(1). *See* ECF No. 1047. The court also directed the Government of Guam to justify

16   the need to substitute counsel at that stage of the proceeding, especially after more than nine years

17   of representation by the Attorney General. *Id.* at 2.

18       On May 9, 2013, attorney Sandra C. Miller – the Chief Legal Counsel for the Office of the

19   Governor of Guam – filed an Entry of Appearance as Co-Counsel. *See* ECF No. 1051. In this filing,

20   Attorney Miller stated that "her appearance as co-counsel in this matter on behalf of the Defendant

21   [Government of Guam]" was "made by and through the Office of the Governor of Guam as the

22   lawful representative of the Government of Guam." *Id.*

23       On May 10, 2013 , in response to the court's Order of May 3, 2013, the Lieutenant Governor

24   filed an Amended Substitution of Counsel (the "Amended Substitution"), seeking to substitute the

25   Cabot Mantanona law firm as counsel for the Government of Guam for and in place of the Attorney

26

27       [16] The court later denied the motion to intervene. *See* Order (Aug. 21, 2013), ECF No. 1164.

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 9 of 26

1  General. *See* ECF No. 1052. The Amended Substitution asserted that a change in counsel was

2  necessitated by the Attorney General's conflict of interest, specifically with regard to the dispute over

3  the mechanism for payment of the $25 million judgment in the Layon Condemnation Case.

4        On May 16, 2013, the court issued an Order on the Amended Substitution.[17] *See* ECF

5  No. 1064. The court refuted the Lieutenant Governor's assertions that the Receiver was the former

6  client of the Attorney General in the Layon Condemnation, however, based on what had been

7  presented, the court found there was "a limited dispute between the Attorney General and the Office

8  of the Governor" over the use of the bond proceeds to pay the $25 million judgment. *Id.* at 3.

9  Therefore, the court approved the Lieutenant Governor's Amended Substitution only for the limited

10  purpose of allowing the Cabot Mantanona firm to represent the Government of Guam with regard

11  to the issues raised in the former landowners' Motion to Intervene. *See* May 16th Order at 4, ECF

12  No. 1064. The court ordered that "for all other purposes, the Attorney General shall remain counsel

13  of record for the Government of Guam." *Id.*

14        On May 28, 2013, the Lieutenant Governor filed a Motion for Reconsideration of the

15  May 16th Order. *See* ECF No. 1075. The Lieutenant Governor never asked that said motion be set

16  for hearing.[18] Following full briefing, the court denied the Motion for Reconsideration, concluding

17  that the Lieutenant Governor failed to met his heavy burden of showing any grounds for

18  reconsideration. *See* Order re Mot. for Recons. (Aug. 13, 2013), ECF No. 1157.

19        On September 26, 2013, the Lieutenant Governor filed a Notice of Appeal[19] seeking review

20  of the court's May 16th Order and the Order denying his Motion for Reconsideration. *See* ECF

21  No. 1202.

22  ///

---

23

24     [17] This Order shall hereinafter be referred to as the "May 16th Order."

25     [18] The Lieutenant Governor notes that the court told the parties it would hold a hearing on the Motion for Reconsideration. *See* Mem. of P.&A. in Supp. Mot. to Stay at 6, ECF No. 1178. Although the court prefers motions be set for oral argument, the court's heavy criminal trial docket made it very difficult to schedule such a hearing even if it were requested.

26

27     [19] Said Notice of Appeal was the second appeal taken by the Lieutenant Governor.

1    D.    Disagreement over Sealing of Receiver's Updated Estimates

2    In addition to the divergence of opinion between the Receiver and the Lieutenant Governor

3 over the use of bond proceeds to pay the $25 million Layon Condemnation Case judgment, the

4 Lieutenant Governor also disagreed with the Receiver's request to seal the updated cost estimates

5 for the remaining Ordot Dump closure projects.

6    At the May 21, 2013 quarterly status hearing, the Receiver made an oral request to submit

7 the updated cost estimates to the court under seal.  The Government of Guam was represented by Mr.

8 Mantanona at the status hearing, and neither he nor any party objected to the Receiver's request.

9 Subsequently, on May 23, 2013, the Receiver wrote to the court and renewed its request made at the

10 status hearing to submit its most recent cost estimates for the closure of the Ordot Dump and the

11 other pending Consent Decree projects under seal.  *See* Order (May 23, 2013), Ex. A thereto, ECF

12 No. 1070-1.  The Receiver explained that public disclosure of said estimates prior to the actual

13 bidding and contracting of the projects would likely harm the competitive bid process.  *Id.*  The court

14 granted the request and stated that such sealing was "subject to unsealing at a later date."[20]  *Id.*

15    On June 6, 2013, the Lieutenant Governor filed a Motion to Unseal Exhibit B.  *See* ECF No.

16 1087.  In its motion, the Lieutenant Governor asserted that the "Receiver has not articulated any

17 justification for keeping the documents sealed from interested parties." *Id.* at 5.  The following day,

18 the court set a briefing schedule for the Motion to Unseal.[21]  *See* Order (Jun. 7, 2013), ECF No. 1088.

19

20    [20] The cost estimates were attached as sealed Exhibit B to the May 23, 2013 Order.  *See* ECF
No. 1070-2.

21

22    [21]  As part of the briefing schedule, the court ordered the Receiver to file a special report in
response to the Motion to Unseal.  On June 20, 2013, the Receiver filed a Special Report.  *See* ECF

23 No. 1110.  Among other things, the Receiver addressed the Lieutenant Governor's argument that the
court should, at a minimum, release the estimates to the parties.  The Receiver raised "serious
reservations" about such a release and stated the following in its Special Report:

24

25    [T]he website for Attorney Mantanona's firm indicates that it represents Hawaiian
Rock Products, Hanson Permanente Cement Guam/Hanson Micronesia Cement, Inc.
and dck Worldwide.  Both Hawaiian Rock Products and Hanson Permanente Cement

26 Guam/Hanson Micronesia Cement, Inc. are major construction materials suppliers
on Guam who have supplied large quantities of materials in connection with the

27    (continued...)

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 11 of 26

1    The former landowners joined in the Motion to Unseal.[22]  *See* ECF No. 1095.

2         On June 24, 2013, the Lieutenant Governor filed an *Ex Parte* Application for Order

3    Amending Briefing Schedule on Motion to Unseal, or in the Alternative, Instructing Receiver not

4    to Issue Requests for Proposals Until Later Date.  *See* ECF No. 1117.  In said application, the

5    Lieutenant Governor requested the court expedite the briefing schedule on the Motion to Unseal, but

7    [21](...continued)
8    Layon Landfill construction and are highly likely to do the same with current and
     future Consent Decree projects, including the closure of the Ordot Dump.  In
9    addition, dck Worldwide is a major contractor on Guam that has shown interest in
     past Consent Decree projects and could become a bidder on future Consent Decree
10   projects, including the closure of the Ordot Dump.  This situation presents conflicts
     that have the potential to cause serious harm to the bidding process.

11   Special Report (Jun. 20, 2013) at 4, ECF No. 1110.

12        At the October 5th hearing, Attorney Miller stated that the first time she was made aware of
13   this potential conflict of interest was on September 20, 2013, when the Receiver submitted another
     Special Report regarding the opening of the bids received for the environmental closure of the Ordot
14   Dump and therein stated

15        It should also be noted that one of the bidders was dck-Sukut, LLC.  The parent
          company of dck is dck Worldwide which, as we noted in our Special Report
16        submitted June 20, 2013, is apparently represented by Attorney Rawlen Mantanona,
          counsel to the Lt. Governor in this case.

17   *See* Special Report (Sept. 20, 2013) at 2-3, appended to Notice, ECF No. 1193.

18        Attorney Miller stated at the October 5th hearing that the Cabot Mantanona law firm does
19   not represent Hawaiian Rock Products, Hanson Permanente Cement Guam/Hanson Micronesia
     Cement, Inc. and dck Worldwide.  Rather, one of the other attorneys at the firm used to represent
20   said business entities while employed at another law firm.  The court is perplexed why this was never
     brought to the court's attention before the October 5th hearing, especially since Mr. Mantanona filed
21   a reply brief to the Motion to Unseal back on July 5, 2013, yet he never even addressed the
     Receiver's concerns about releasing the cost estimates to the Cabot Mantanona firm because of this
22   potential conflict of interest.  *See* Reply Brief, ECF No. 1139.

23        [22]  The Motion to Unseal has been fully briefed and is pending before the court.  On
24   September 20, 2013, the Receiver sent the court a Special Report Advising the Court of the Bids
     Received for the Environmental Closure of the Ordot Dump, a copy of which was attached to the
25   court's Notice.  *See* ECF No. 1193.  In this Special Report, the Receiver advised the court that the
     bids for the environmental closure of the Ordot Dump were opened, with Black Construction
26   Corporation being the apparent low bidder.  *Id.*  Additionally, the Receiver disclosed that the
     apparent low bid was below the Receiver's $57 million estimate for the project.  *Id.*  At the
27   October 5th hearing, the court advised the parties it would do its best to schedule a hearing on the
     Motion to Unseal as soon as the criminal trial it was presently involved in had concluded.

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 12 of 26

1  the court denied the request as untimely. *See* Order (Jun. 24, 2013) at 2, ECF No. 1120.

2  Alternatively, the Lieutenant Governor requested the court to direct the Receiver not to issue

3  the requests for proposals ("RFPs") for projects related to the Ordot Dump closure until after the

4  court had ruled on the Motion to Unseal. The court stated that before it would rule on the Lieutenant

5  Governor's alternative request, it wanted the Receiver to file a special report advising the court of

6  an approximate time frame when it anticipates these RFPs would be issued. The Receiver filed its

7  Special Report. *See* Special Report Advising Court of Receiver's Procurement Schedule (Jun. 28,

8  2013), ECF No. 1128.

9  On July 1, 2013, the court denied the Lieutenant Governor's alternative request to delay the

10  procurement process until the court had determined the Motion to Unseal. *See* Order (Jul. 1, 2013),

11  ECF No. 1133. The court found no valid reason to delay the release of these procurements,

12  especially because the Government of Guam had already delayed the environmental closure of the

13  Ordot Dump by more than five years. *Id.* at 2.

14  On August 30, 2013, the Lieutenant Governor filed a Notice of Appeal of the court's July 1,

15  2013 Order. *See* ECF No. 1170.

16  E.  The Motions to Stay and Other Subsequent Filings

17  On August 13, 2013, shortly before the court issued its Order re Motion for Reconsideration,

18  the Attorney General filed a Motion for Clarification.[23] *See* ECF No. 1155. Therein, the Attorney

19  General sought clarification of the court's Order re Transition From Court-Appointed Receiver to

20  the GSWA Board (July 1, 2013), ECF No. 1132.[24] This clarification was being sought because

21

22  [23] The Attorney General's Motion for Clarification was electronically filed at 4:48 p.m. The
court's Order re Motion for Reconsideration was docketed at 6:10 p.m.

23

24  [24] The court issued two Orders on July 1, 2013. *See* ECF Nos. 1132 and 1133. The first
Order stemmed from a hearing held on June 26, 2013, to address concerns raised by the GSWA
25  Board of Directors (the "Board"). Some Board members had expressed a desire to have control and
authority over GSWA transition from the Receiver to the Board much sooner than the Receiver had
26  projected in its May 21, 2013 Quarterly Report. *See* Quarterly Report (May 21, 2013) at 43, ECF
No. 1067-1. In its July 1st Order, the court stated:

27  (continued...)

1  Attorney Miller served a Sunshine Act Request for Information (the "Sunshine Act Request") on the

2  Attorney General on August 2, 2013, and sought the disclosure of any and all communications

3  between the Attorney General and the Receiver and the Attorney General and the United States

4  relating to this Consent Decree case, the Layon Condemnation Case, the closure of the Ordot Dump

5  and the payment of the judgment in the Layon Condemnation Case.  Mot. for Clarification at 1-2,

6  ECF No. 1155.  The Lieutenant Governor believed that it was entitled to said information because

7  the documents and emails "constitute client files of the Government of Guam and the Governor of

8  Guam."  *See* Kathy A. Fokas Decl. (Aug. 13, 2013), Ex. A thereto, ECF No. 1156.  The Attorney

9  General forwarded the Sunshine Act Request to the Receiver and requested instructions.   In

10  response, the Receiver wrote that "[it did] not wish to waive GSWA's attorney/client privilege."  *Id.*,

11  Ex. B thereto.  Thus, the Attorney General posed the question as to "[w]ho holds the attorney/client

12  privilege for purposes of determining whether the [Attorney General's] litigation files in this case

13  and the [Layon] Condemnation Case may be disclosed to the Governor's Office?"  Mot. for

14  Clarification at 5, ECF No. 1155.  The Attorney General's position was that the Lieutenant Governor

15  may obtain copies of the requested information through April 18, 2011 – the date on which GSWA

16  was created.  *Id.*  The Attorney General further opined that "any and all information thereafter

17  belonged to the GSWA."  *Id.*  The Attorney General asserted that

18      upon creation of the GSWA on April 11, 2011, the [Attorney General's] client
        became the GSWA of the Government of Guam[.]
19

20      [24](...continued)
21      While the court is encouraged that the Board wishes to be actively involved in
        discussions and decisions concerning Ordot Dump and the Layon Landfill, the fact
22      remains that matters concerning both the Dump and Landfill remain Consent Decree
        project matters, under the purview of the Receiver, by order this court. See ECF No.
23      239. With that said, the Receiver has, and will retain, the same authority and control
        over such areas until such time as the court orders otherwise. In other words,
24      complete turnover of control and authority of [GSWA], when the time is right, will
        occur at a date ordered by this court.
25      . . .
        [A]t this critical time, the court expects the Receiver to accomplish its mission of
26      ensuring complete compliance with the Consent Decree. The Receiver shall continue,
        status quo, in their day-to-day operations of GSWA and the Consent Decree projects.
27  Order (July 1, 2013) at 2 & 4, ECF No. 1132.

. . .
Any and all information thereafter belongs to the GSWA. Pursuant to this [c]ourt's July 1 Order vesting the Receiver with continued authority of the Board of the GSWA, the Receiver has advised the [Attorney General] that it will not waive its attorney client privilege and has instructed the [Attorney General] not to produce the requested information to the Governor's Office.

Mot. for Clarification at 10, ECF No. 1155.

On August 27, 2013, the Lieutenant Governor filed an Opposition to the Attorney General's Motion for Clarification. *See* ECF No. 1168. Therein, the Lieutenant Governor took issue with the Attorney General's position and stated that

[t]he Government of Guam, as directed by the Executive Branch, is the client.
. . .
[T]here can be no question that the Executive Branch has every right to demand copies of its client files from the [Attorney General] which is its attorney, and that the [Attorney General] is obligated to comply with this demand.
. . .
The [Attorney General] owes its duty of professional loyalty to the Government of Guam *as a whole* and not just to the Executive Branch agency known as the GSWA or to the Receiver who controls it.

Opp'n at 4-6, ECF No. 1168 (emphasis in original).

On September 18, 2013, the court issued an Order stating that the Motion for Clarification did not present the court with enough facts for the court to conclude that the attorney-client privilege is applicable to shield the disclosure of the information sought by the Governor's Office. *See* Order (Sept. 18, 2013) at 4, ECF No. 1189. Accordingly, the court asked for further briefing on the matter.[25] *Id.*

The Lieutenant Governor next filed a series of motions seeking to stay this action. On

---

[25] The court gave the Attorney General until September 27, 2013, to file a supplemental brief. Responses to the supplemental brief were ordered to be filed by October 11, 2013, with the Attorney General to file a reply brief no later than October 18, 2013. *Id.*
     On September 27, 2013, the Attorney General filed a "Supplemental Response," requesting a 30-day extension in order to allow it time necessary to complete the search for emails (over 6,000 pages of emails had been identified and printed) and reasonable time for the Receiver to review said documents. *See* ECF No. 1210. At the October 5th hearing, the court advised the parties that it would grant the request for a 30-day extension on the briefing. Therefore, the Motion for Clarification is still unresolved and remains pending before the court.

1   September 13, 2013, the Lieutenant Governor filed a Motion to Stay and for Further Relief,[26] along

2   with a memorandum in support and supporting declarations. *See* ECF Nos. 1177-1180. Therein,

3   the Lieutenant Governor asked the court to stay this case until (1) Government of Guam is allowed

4   to be represented by unconflicted counsel; (2) the court determines whether the Attorney General

5   should be disqualified from representing any participant in this action after the issue has been

6   separately briefed and a hearing has been held, and (3) the court sets a briefing and hearing to

7   conduct a full review of the tainted proceedings and determine when the Attorney General began

8   taking instructions from the Receiver and what impact the Attorney General's conflict has had on

9   these proceedings. *See* Mem. of P.&A. in Supp. Mot. to Stay at 17, ECF No. 1178. The Lieutenant

10  Governor stated that

11          [w]hether or not the court agrees with the [Attorney General's] decision to treat the
            Receiver as its client, the [Attorney General] has a conflict of interest because of its
12          own decision to treat the Receiver as its client, as evidenced by the [Attorney
            General's] own conduct in this litigation, including its [M]otion for [C]larification
13          filed on August 13, 2013."

14  *Id.* at 10, n.5.

15          On September 18, 2013, the Lieutenant Governor filed a motion seeking to shorten time on

16  the determination of Motion to Stay #1. *See* ECF No. 1184. Shortly thereafter,[27] the court issued

17  an Order setting a briefing schedule for Motion to Stay #1.[28] *See* ECF No. 1188.

18          On September 20, 2013, the Lieutenant Governor filed an Emergency Motion for an Order

19  Granting a Temporary Stay of Procurement While the Government's Motion to Stay and for Further

20  ///

21  ///

22

23          [26]  For ease of reference, the Motion to Stay and for Further Relief shall hereinafter be
24  referred to as "Motion to Stay #1."

25          [27]  The motion to shorten time was electronically filed at 2:46 p.m., and the court's Order was
    docketed at 2:55 p.m.

26          [28]  Pursuant to the court's schedule, the Attorney General was directed to file a response by
    September 27, 2013, the United States' response was due by October 4, 2013, and the Lieutenant
27  Governor was directed to file a reply brief by October 11, 2013.

1  Relief is Pending.[29]  *See* ECF No. 1191.  Therein, the Lieutenant Governor asked the court to direct

2  the Receiver not to award or execute any contract on behalf of or binding the Government of Guam

3  or any instrumentality thereof, including the GSWA, while the Lieutenant Governor's Motion to

4  Stay #1 was pending.  The Lieutenant Governor noted that the "Receiver still had not disclosed its

5  estimates of the costs of [the Ordot Dump closure] contracts to the Government."  Sandra C. Miller

6  Decl. (Sept. 20, 2013) at ¶4, ECF No. 1192.  The Lieutenant Governor urged that "[t]he Government,

7  on behalf of the people of Guam, needs to be heard in this proceeding regarding its concerns about

8  these contracts, the process leading to these contracts, and their funding before they are awarded."

9  *Id.*

10      On September 25, 2013, the Lieutenant Governor filed the instant motion before the court

11  – the Emergency Motion for a Stay Pending Appellate Review – which was its third request for a

12  stay of this action.  *See* ECF No. 1199.  The court ordered expedited briefing.  On October 2, 2013,

13  the United States and the Attorney General filed their responses to the Emergency Motion.  *See* ECF

14  Nos. 1215 & 1216.  On October 3, 2014, the Lieutenant Governor filed two separate briefs to reply

15  to each of the responses filed.  *See* ECF Nos. 1221 & 1222.[30]

16                                  **DISCUSSION**

17      In the span of two weeks,[31] the Lieutenant Governor has filed three separate motions to stay:

18  Motion to Stay #1, ECF No. 1177, Motion to Stay #2, ECF No. 1191, and Emergency Motion, ECF

19  No. 1203.  In each of these motions, the Lieutenant Governor continues to assert that the Attorney

20  General has a conflict of interest that necessitates the Attorney General's removal from continued

21  representation of the Government of Guam.  The Lieutenant Governor claims the Government of

22  Guam's interests (as said interests are defined by the Lieutenant Governor) are not being protected

23

24      [29]  This motion shall hereinafter be referred to as "Motion to Stay #2."

25      [30]  The court will refer to the "corrected" reply briefs since Attorney Miller claims that the
26  briefs filed earlier that day (ECF Nos. 1218 & 1219) had a "line spacing issue."

27      [31]  Motion to Stay #1 was filed on September 13, 2013, and the Emergency Motion was filed
   on September 26, 2013.

1  in this action because the Attorney General continues to take instruction from the Receiver and now

2  claims the Receiver is its client to the exclusion of the rest of the Government of Guam.

3  Furthermore, the Lieutenant Governor asserts that because this court has not permitted it to be

4  represented or heard by unconflicted counsel, the Government of Guam has been denied due process,

5  leaving it with no other recourse but to appeal the court's denial of its substitution of counsel. The

6  court will address these claims in the context of the appropriate legal standard.

7       A.    Legal Standard for Motion to Stay Pending Appeal

8       As the Supreme Court has stated:

9       A stay is an "intrusion into the ordinary processes of administration and judicial
        review," *Virginia Petroleum Jobbers Assn. v. Federal Power Comm'n*, 259 F.2d 921,
10      925 (C.A. D.C. 1958) ( *per curiam* ), and accordingly "is not a matter of right, even
        if irreparable injury might otherwise result to the appellant," *Virginian R. Co. v.
11      United States*, 272 U.S. 658, 672 (1926). The parties and the public, while entitled
        to both careful review and a meaningful decision, are also generally entitled to the
12      prompt execution of orders[.]

13  *Nken v. Holder*, 556 U.S. 418, 427 (2009).

14      Accordingly, the party requesting a stay bears the burden of showing that the circumstances

15  justify a stay. *Id.* at 433-34.

16      The Supreme Court has also stated that a stay is "'an exercise of judicial discretion,' and

17  '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'" *Id.* at 433

18  (quoting *Virginian R. Co.*, 272 U.S. at 672-73). "The fact that the issuance of a stay is left to the

19  court's discretion does not mean that no legal standard governs that discretion. A motion to a court's

20  discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by

21  sound legal principles." *Nken*, 556 U.S. at 434 (internal quotations and citations omitted).

22      In determining whether a stay should be issued, the district court should consider the

23  following factors:

24       (1) whether the stay applicant has made a strong showing that he is likely to succeed
         on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3)
25       whether issuance of the stay will substantially injure the other parties interested in the
         proceeding; and (4) where the public interest lies.
26

27  *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

1    "The first two factors of the traditional standard are the most critical." *Nken*, 556 U.S. at 434.

2    "Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the

3    harm to the opposing party and weighing the public interest.   These factors merge when the

4    Government is the opposing party." *Id.* at 435.

5        The parties do not dispute this legal standard.  Thus, the court will now evaluate the factors

6    set forth in the *Nken* decision.

7        1.    Whether the Lieutenant Governor has made a strong showing that he is likely to
             succeed on the merits
8

9        "Regarding the first factor, *Nken* held that it is not enough that the likelihood of success on

10   the merits is 'better than negligible' or that there is a 'mere possibility of relief.'"  *Lair v. Bullock*,

11   697 F.3d 1200, 1204 (9th Cir. 2012)(quoting *Nken*, 556 U.S. at 434).   The Ninth Circuit requires

12   that, in order to satisfy the first factor, "'at a minimum,' a petitioner must show that there is a

13   'substantial case for relief on the merits.'"  *Id.* (quoting *Leiva–Perez v. Holder*, 640 F.3d 962, 966

14   (9th Cir. 2011)(*per curiam*)).

15       The Lieutenant Governor states that he is likely to succeed on the merits with regard to its

16   appeal of the court's orders concerning its attempts to substitute counsel because there has been a

17   breakdown in the attorney-client relationship and an actual conflict of interest, yet the court has not

18   permitted the Lieutenant Governor to replace the AG with counsel of his choosing.  To support this

19   claim, the Lieutenant Governor recites numerous "facts," however many of these "facts" have either

20   been disputed and rejected by the court (such as the assertion that the Receiver was the Attorney

21   General's client in the Land Condemnation Case), or are new facts or issues that have never been

22   resolved by the court in any of its previous decisions.  For instance, the Lieutenant Governor asserts

23   that the Attorney General has not consulted with the Lieutenant Governor since May 16, 2013, when

24   the court denied the Amended Substitution.  *See*   Mem. of P.&A. in Supp. Mot. to Stay at 5, ECF

25   No. 1178.   This was first disclosed to the court on September 13, 2013, when the Lieutenant

26   Governor filed Motion to Stay #1.  Additionally, the Lieutenant Governor asserts that the Attorney

27   General's Motion for Clarification (filed August 13, 2013) "introduced new facts" revealing a

1   broader conflict of interest because the Attorney General stated it had not been representing the

2   Governor since April 18, 2011, when GSWA was created, and has since then been taking direction

3   from its "client" – the Receiver, who controls GSWA, an autonomous agency.  *Id.* at 7.  However,

4   as the court has stated above, the Attorney General's Motion for Clarification is still unresolved.

5   The Lieutenant Governor asserts numerous allegations to support its claim that the Attorney General

6   has a conflict of interest and that a breakdown in communication has occurred to warrant the

7   substitution of counsel, yet these allegations were never brought to the court's attention by way of

8   a second motion for reconsideration.[32]  Instead, the Lieutenant Governor opted to file a motion to

9   stay, and, as stated previously, Motion to Stay #1 remains pending because briefing has not been

10  completed yet.  Many of these new facts were being asserted for the first time in the Lieutenant

11  Governor's pleadings filed after the court had already issued its decisions with regard to the

12  Amended Substitution and the Motion for Reconsideration.  The court stands by its previous

13  decisions with regard to the facts and issues raised in the Amended Substitution and the Motion for

14  Reconsideration.  Nevertheless, the court is open to reconsidering its prior rulings if new facts are

15  brought to its attention.  The court has not had a fair opportunity to address the issue of whether the

16  Attorney General indeed has a conflict of interest or whether there in fact has been a breakdown in

17  the attorney-client relationship because these new facts were only brought to the court's attention

18  after it had already ruled on the Motion for Reconsideration.

19          Additionally, the court can not agree with the Lieutenant Governor's claim that it is likely

20  to succeed on the merits of the appeal because the court has denied him a voice in these proceedings

21  through unconflicted counsel.  The court notes that on May 9, 2013, Attorney Miller entered her

22  appearance as "co-counsel in this matter on behalf of the Defendant [Government of Guam] . . . by

23  and through the Office of the Governor of Guam as the lawful representative of the Government of

24  Guam."  Entry of Appearance as Co-Counsel, ECF No. 1051.  Attorney Miller has been representing

25  the Lieutenant Governor's interests over the past five months since she entered her appearance as

26

27      [32]  At the October 5th hearing, Attorney Miller stated that she had considered filing a second
    motion for reconsideration but did not do so.

1  co-counsel. Additionally, the court permitted Rawlen Mantanona to represent the Government of

2  Guam for the limited purpose of addressing issues raised in the former landowners' Motion to

3  Intervene. *See* May 16th Order at 4, ECF No. 1064. Thus, the Government of Guam's interests have

4  been represented by three separate entities: the Attorney General, the Governor's Chief Legal

5  Counsel (Attorney Miller), and the Cabot Mantanona law firm (through Rawlen Mantanona).

6  Furthermore, the court has reviewed the docket sheet in this case and notes that since

7  April 10, 2013 (the date the Motion to Intervene was filed), there have been 53 filings made by

8  Lieutenant Governor through Attorney Miller or Mr. Mantanona.[33] Of these 53 filings, 15 were filed

9  by Mr. Mantanona,[34] and the remaining 38 were filed by Attorney Miller. These filings comprise

10 approximately 27.5% of the docket entries filed in the last six months. Thus, it is disingenuous to

11 assert that the court has not given the Lieutenant Governor a voice in these proceedings because the

12 record clearly shows that the Lieutenant Governor has been filing a plethora of pleadings through

13 counsel of his choosing. Moreover, the Governor, Lieutenant Governor and/or his counsel have been

14 present at all hearings in this case, and the court has given them a meaningful opportunity to be

15 heard. Contrary to the Lieutenant Governor's assertions, the Government of Guam does have a voice

16 in this court; it is represented by three separate lawyers, including two of its own choosing.

17 Accordingly, the court finds that the Lieutenant Governor has not made a strong showing that he is

18 likely to succeed on the merits of his appeals.

19     2.   <u>Whether the Lieutenant Governor will be irreparably injured absent a stay</u>

20 The second factor for this court to consider is whether the Lieutenant Governor will be

21 irreparably harmed absent a stay pending appeal. The Lieutenant Governor argues the Government

22 of Guam will be irreparably harmed because the Receiver intends to enter into contracts which will

23 saddle the Government with tens of millions of dollars over and above the Receiver's previous

24 estimated cost for the project. *See* Emergency Motion at 7-8, ECF No. 1203. But the Lieutenant

25

26     [33] A copy of this abridged docket sheet is appended to this Order.

27     [34] Mr. Mantanona's filings consist of the following docket entries: ECF Nos. 1045, 1052, 1053, 1055, 1056, 1065, 1075, 1086, 1087, 1112, 1117, 1118, 1130, 1131, 1139.

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 21 of 26

1  Governor's assertions are simply speculative at this stage. As the Receiver stated in his last

2  Quarterly Report, the Receiver would "defer contracting for any additional construction for those

3  projects until we have successfully bid the final Dump closure project and are confident that we have

4  sufficient resources to complete the projects as designed." Quarterly Report (May 21, 2013) at 33,

5  ECF No. 1067-1. The Receiver confirmed this at the October 5th hearing when he said that the

6  Receiver would not enter into any contracts if it did not have current funds available under the

7  current bond issue to fund said contracts. In other words, the Receiver would prioritize the Ordot

8  Dump closure project and the construction management contract associated with that project since

9  the Receiver has sufficient funds remaining from the bond proceeds to finance said contracts. The

10  additional projects – the upgrades to the residential transfer stations, Route 4 safety enhancements,

11  Dero Road upgrades and possible improvements to the waste water treatment plant – will have to

12  be deferred until the Receiver has the funds to complete those projects.[35] Thus, based on the

13  Receiver's written and oral statements, the court finds that the Lieutenant Governor has failed to

14  demonstrate that irreparable harm is likely if a stay is not granted.

15        The Lieutenant Governor further argues that he will suffer irreparable injury because the

16  Government of Guam has not had a meaningful opportunity participate in the process leading up to

17  the Ordot Dump closure contracts, including the closure design plans, and has been prevented from

18  raising serious concerns it has with regard to the Receiver's management of the dwindling bond

19  proceeds. *See* Emergency Motion at 8-9, ECF No. 1203. The court disagrees with these claims.

20        Aside from the Lieutenant Governor's legal team, the Government of Guam's "voice" has

21  been represented through the other executive branch entities such as the Guam Environmental

22  Protection Agency ("GEPA") and the Department of Administration ("DOA"). According to the

23  Receiver, GEPA has been involved since day one. GEPA representatives have been meeting with

24  the Receiver and the U.S. Environmental Protection Agency ("EPA") for biweekly conferences over

25

26       [35] The Receiver stated that he would work closely with the Lieutenant Governor and other
policy makers to obtain any additional funds needed to complete these added projects if the
27  Government of Guam still deemed them to be necessary.

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 22 of 26

1 the last several years. As noted in the most recent Quarterly Report, the development of the Ordot

2 Dump closure plan "involved regular and close coordination with EPA and GEPA for the review of

3 submittals and evaluation of the designs that will provide a long-term, stable closure cover system.

4 Key components of the closure cover and ancillary systems were vetted with the agencies and input

5 incorporated where necessary." Quarterly Report (May 21, 2013) at 2, ECF No. 1067. Furthermore,

6 on "February 22, 2013, GEPA, in its capacity as the solid waste regulating authority on Guam, issued

7 its approval of the cover design and concurred with EPA." *Id.* at 4-5. GEPA has been privy to every

8 aspect of the Receiver's closure plan, and the Government of Guam has been represented by GEPA

9 on these issues.

10     Additionally, the Government of Guam can not be heard to complain about the Receiver's

11 management of the bond proceeds because various Government of Guam entities have the ability

12 to review and object to payments before the Receiver makes disbursements. Pursuant to the

13 Disbursement Procedures governing the monies held in trust[36] for the Government of Guam for use

14 by the Receiver for Consent Decree projects, once the Receiver approves an invoice for payment,

15 the Receiver is required to prepare a payment requisition and forward the approved invoice and

16 requisition to the Government of Guam[37] to review the documentation and file with the Receiver any

17

18     [36] These monies are being held in an account at Citibank, N.A. Guam.

19

20     [37] Pursuant to Section 3.3 of the Disbursement Procedures, electronic copies of the invoices and Draft Requisition are sent to the following Government of Guam entities for their review and comment:

21

22     •    the Director of the Department of Administration or the Director's designee;
    •    the Director of the Bureau of Budget and Management Research or the Director's designee;

23     •    the Director of the Department of Public Works or the Director's designee; and
    •    the Office of the Public Auditor.

24

25 The Government of Guam entities will coordinate their review and communicate any written objections to specific payments to the Receiver. The Director of the Department of Administration is the official responsible for communicating any written objections to the Receiver.

26

27 *See* Disbursement Procedures at 7-8, ECF No. 376-2.

1   written objection it may have to the payment. *See* Disbursement Procedures at 7-8, ECF No. 376-2.[38]

2   The Government of Guam has never communicated any objection to the Receiver under the process

3   set forth in the Disbursement Procedures.

4           The Government of Guam has had a full and fair opportunity to have any of its concerns

5   addressed – whether said concerns involve the closure design or financial management – through

6   various government entities (GEPA, DOA, the Bureau of Budget and Management Research and the

7   Department of Public Works), all of whom are part of the Executive Branch and are answerable to

8   the Governor's Office.[39]  So when the Lieutenant Governor complains that it has not been heard in

9   this process, it is simply incorrect.  The court finds that the Lieutenant Governor has failed to

10  demonstrate any irreparable harm will result absent a stay.

11  ///

12  ///

13  _____

14      [38]  The Disbursement Procedures provide the following with regard to the Government of
     Guam's review:

15          The Government of Guam entities shall have seven (7) calendar days to review the
            Draft Requisition and file with the Receiver . . . any written objections it has to
16          making the payment.  If the Receiver . . . has not received a written objection within
            seven (7) calendar days, the Receiver . . . will deem that there are no objections to
17          making the payment.  If any of these Government of Guam entities makes a written
            objection, the Receiver . . . will work expeditiously to resolve the issue to the entity's
18          satisfaction.  If the entity's written objection is not resolved within ten (10) calendar
            days after receipt, the Receiver . . . will:

19
            1.      Authorize [Citibank] to make the  full payment notwithstanding the
20                  Government's written objection, if the Receiver determines that making the
                    payment is essential to maintaining the construction schedule;
21          2.      Authorize [Citibank] to make a partial payment, withholding that portion of
                    the payment to which the Government objects and continuing its effort to
22                  resolve the written objection; or
            3.      Place the payment on indefinite hold pending resolution of the Government's
23                  written objection.

24          Should the Receiver . . . be unable to resolve the Government's written objection, the
            written objection will be submitted to the Court for resolution.
25
     *Id.* at 8.
26
        [39]  In fact, at the court's October 5th hearing of the instant motion, counsel for the Lieutenant
27   Governor appeared surprised to learn of the extensive government participation.

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 24 of 26

1        3.    Whether issuance of the stay will substantially injure the other parties interested in the proceeding and

2        4.    Whether a stay is in the public's interest

3    Finally, the court will address the last two factors together since *Nken* instructs that these

4    factors merge when the government is the opposing party. *Nken*, 556 U.S. at 435.

5    In this case, the Lieutenant Governor is not simply asking the court to stay the orders from

6    which it is seeking an appeal, namely the May 16th Order and the Order re Motion for

7    Reconsideration. Instead, the Lieutenant Governor is asking the court to stay the closure of the Ordot

8    Dump until completion of the appeals process.

9    The court wants to re-emphasize that because of the Government of Guam's inactions, the

10   closure of the Ordot Dump has been delayed by almost six years now, which is why the court had

11   to appoint a Receiver in 2008. The court deemed the Receiver's appointment "necessary to achieve

12   expeditious compliance with the Consent Decree." Order re Appointment of Receiver (Mar. 17,

13   2008) at 15, ECF No. 239. Yet, now that the Receiver has informed the court that it is days away

14   from issuing the award of contract to close the Ordot Dump, the Lieutenant Governor is asking the

15   court to delay the process even more. At the October 5th hearing, the Receiver stated that a stay of

16   even a few months could significantly delay the Ordot Dump closure by one year since the

17   construction project requires two dry seasons[40] to be completed. At this rate, the United States

18   certainly is not getting what it bargained for when it entered into the Consent Decree with the

19   Government of Guam.

20   A stay as requested would result in the continuing violation of federal law, *i.e.*, the Clean

21   Water Act, and would lead to further environmental damage. As noted in the Receiver's Quarterly

22   Report, "groundwater quality [around the Ordot Dump] has been impaired to some degree by the

23   Dump." Quarterly Report (May 21, 2013) at 3, ECF No. 1067-1. Additionally, "[s]urface water

24   sampling in the Lonfit River and the western channel showed that leachate . . . discharging into the

25   channel and subsequently into the Lonfit River have impaired the water of the Lonfit River in the

26

27       [40] Based on the court's experience, Guam has two "seasons:" wet and dry. The dry season usually begins in January and runs through June.

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 25 of 26

1 immediate vicinity of the Dump." *Id.* at 4. The Receiver's closure plan will include the installation

2 of a closure cap/cover and construction of "all ancillary systems to manage stormwater, leachate and

3 landfill gas, as well as monitor groundwater and gas migration." *Id.* These measures are important

4 not only to prevent the further discharge of leachate from the Ordot Dump to the Lonfit River, but

5 also to minimize the risk of fire at the Dump.[41] A stay would only cause further negative

6 consequences to Guam's environment.

7     Furthermore, a stay of this action would result in increased costs for the Government of

8 Guam, and Attorney Miller conceded as much at the October 5th hearing. The stay requested by the

9 Lieutenant Governor could conceivably last at least one year, if not more. Aside from the natural

10 tendency of prices increasing due to the passage of time and inflation, the delay would also lead to

11 increased costs and a new round of bidding for the closure project. After the bids for the

12 environmental closure of the Ordot Dump were received and made public, the Receiver also

13 disclosed its cost estimate for the project. *See* Special Report (Sept. 20, 2013) appended to Notice,

14 ECF No. 1193. Another round of bidding would likely result in the submission of higher bids for

15 the closure project since potential bidders will already know what the Receiver expected to pay for

16 the project. Thus, granting a stay of these proceedings would impact the Government of Guam

17 financially by increasing costs for the closure of the Ordot Dump.

18     Finally, a stay of this case would result in harm to the public. The Ordot Dump is a public

19 nuisance, especially to the people of the village of Ordot who have been exposed to this

20 environmental and public health hazard for years. The public interest tips strongly against the

21 issuance of a stay. The court can not in good conscience allow this public detriment to continue.

22 The Government of Guam failed to live up to the commitments it made back in 2004 when it signed

23 the Consent Decree, so the court had no choice but to appoint a Receiver to bring the Government

24 of Guam into compliance. As the court has stated previously, the closure of the Ordot Dump will

25 finally bring an end to an era of non-compliance. The court and the public will not tolerate any

26

27     [41] The Ordot Dump has a history of frequent fires. *Id.* at 3.

further delay to this process.   Accordingly, the court hereby denies the Lieutenant Governor's

Emergency Motion.

### CONCLUSION

In conclusion, the court finds that the Lieutenant Governor has failed to meet his burden of

showing that the circumstances here warrant the extraordinary remedy of a stay pending appeal.   The

Lieutenant Governor has not demonstrated a strong showing that he is likely to succeed on the merits

of his appeals, nor has he demonstrated that irreparable injury will result absent a stay.   Instead, a

stay of these proceedings pending review by the Ninth Circuit Court of Appeals will negatively affect

the United States' enforcement of the Clean Water Act.   The Ordot Dump will keep discharging

leachate into the Lonfit River and will continue to pose an environmental and public health hazard

unless and until it is properly closed.   Furthermore, a stay would lead to increased costs for the

Government of Guam.   After weighing the four factors as instructed by *Nken*, the court hereby denies

the Lieutenant Governor's  Emergency Motion for a Stay Pending Appellate Review.

The Lieutenant Governor has informed the court that if the stay he requested was denied, he

would immediately seek review by the Ninth Circuit and ask the appellate court to stay these

proceedings.   In order to allow for an orderly emergency motion practice before the Ninth Circuit,

the court directs the Receiver to delay the awarding of contracts for the Ordot Dump closure

construction project and for construction management services until October 31, 2013. If a stay of

these proceedings is not ordered by the Ninth Circuit Court of Appeals by said date, the Receiver is

directed to proceed with the procurement process and awarding of contracts so as not to further delay

the environmental closure of the Ordot Dump.

IT IS SO ORDERED.



**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Oct 11, 2013**