1
2
3
4
5
6                          DISTRICT COURT OF GUAM

7                             TERRITORY OF GUAM

8

9    UNITED STATES OF AMERICA,                    CIVIL CASE NO. 02-00022

10                  Plaintiff,

11        vs.

12   GOVERNMENT OF GUAM,                                  **ORDER**
                                                 re Motion to Stay and for Further Relief
13                  Defendant.

14

15        This matter is before the court on a Motion to Stay and for Further Relief (the "Motion to

16   Stay"), filed on September 13, 2013, by the Chief Legal Counsel for the Office of the Governor of

17   Guam,[1] on behalf of the Government of Guam.[2]  *See* ECF No. 1177.   Therein, the Lieutenant

18   Governor requested:

19   _____

20        [1]  The Governor of Guam, the Hon. Eddie Baza Calvo, determined that he has a conflict
     which precludes his involvement in this action, and thus he assigned the executive power and the
21   duty to act in this matter to the Lieutenant Governor of Guam.  Decl. Raymond S. Tenorio (Sept. 13,
     2013) at ¶2, ECF No. 1179.  The Governor's conflict of interest is based on his family's interest in
22   the approximate $25 million judgment issued by the Superior Court of Guam in what has been
     referred to throughout this proceeding as the Layon Condemnation Case, *Government of Guam v.*
23   *1,348,474 Square Meters, More or Less,* Superior Court of Guam Civil Case No. CV0084-08.  *See*
     Att'y Gen. Resp. to Mot. to Stay at 5, n.6, ECF No. 1209.

24

25        [2]  In this action, the Government of Guam is represented by different sets of lawyers, as will
     be discussed *infra*.  For ease of reference, the court will hereinafter refer to all filings and arguments
26   made on behalf of the Government of Guam through the Governor's Chief Legal Counsel or through
     the Cabot Mantanona law firm as being made by the "Lieutenant Governor."  Additionally, all filings
27   and arguments raised on behalf of the Government of Guam through the Office of the Attorney
     General shall hereinafter be referred to as being made by the "Attorney General."

that these proceedings be stayed, that the Receiver be ordered to maintain the status quo, and that no new action be taken by the [c]ourt or its Receiver to enforce the Consent Decree against the Government until the following relief is granted: (1) the Government is allowed to be represented by unconflicted counsel; (2) the court has determined whether the AGO should be disqualified from representing any participant in this action after the issue has been separately briefed and a hearing has been held; and (3) the court sets a briefing and hearing schedule to conduct a full review of the tainted proceedings and determine when the AGO began taking instructions from the Receiver and what impact the AGO's conflict had on these proceedings.

*Id.* and Lt. Gov. Mem. P.&A. in Supp. Mot. to Stay at 2, ECF No. 1178.

The motion was fully briefed, and the court heard argument from the parties on October 25, 2013. Having reviewed the submissions and relevant authority, the court hereby grants the request to fully substitute the Attorney General with the Cabot Mantanona law firm as counsel for the Government of Guam, but denies the Motion to Stay in all other respects.

## BACKGROUND

This case has been pending before the court for more than 11 years. Because the parties are familiar with the facts and procedural history of this action, the court will not recite them here in great detail except as necessary to explain its decision.[3]

**A.    The Consent Decree and Appointment of a Receiver**

The United States initiated the present action on August 7, 2002, and sought injunctive relief and civil penalties against the Government of Guam for violations of the Clean Water Act,[4] 33 U.S.C. §§ 1251 *et seq.* The parties thereafter entered into a Consent Decree, which became final when approved by the court on February 11, 2004. *See* Consent Decree, ECF No. 55. Among other

---

[3] For a more thorough recitation of the background of this case, including the events that led to the appointment of a Receiver, the court incorporates by reference the following prior decisions: Order re Appointment of Receiver, ECF No. 239; Order re Motion for Reconsideration, ECF No. 1157; Order re Motion to Intervene, ECF No. 1164; and Order re Emergency Motion for a Stay Pending Appellate Review, ECF No. 1230.

[4] The record reveals that the Government of Guam has been on notice of its violation of the Clean Water Act since as early as 1986. In 1986, the U.S. Environmental Protection Agency ("EPA") issued an administrative order under the Clean Water Act directing the Department of Public Works to cease discharges of leachate from the Ordot Dump into the Lonfit River by May 1, 1987, but DPW failed to comply with this order. *See* Michael J. Lee Decl. at ¶4, ECF No. 75.

things, the Consent Decree established a schedule for the Government of Guam to close the Ordot

Dump and also construct and operate a new municipal solid waste landfill.[5]  *Id.* at ¶¶8-9.  The

Consent Decree  required operations at the Ordot Dump to cease by October 23, 2007.  *Id.* at ¶8(i).

Following the entry of the Consent Decree, the Government of Guam failed to meet critical

deadlines.  Concerned about the Government of Guam's  lack of progress and failure to raise the

financial resources necessary to complete the Consent Decree projects, on December 6, 2006, the

United States petitioned the court to hold a status hearing and then later moved to enforce the

Consent Decree.  *See* ECF Nos. 56 and 68-69.  After conducting monthly status hearings and site

visits, the court concluded that the "problem of a highly dysfunctional, largely mismanaged, overly

bureaucratic, and politically charged solid waste system . . . is beyond correction by conventional

methods."  Order re Appointment of Receiver at 1, ECF No. 239.  After much deliberation and upon

consideration of  the Government of Guam's lengthy history of violating the Clean Water Act and

failure to comply with the Consent Decree, the court appointed Gershman, Brickner & Bratton, Inc.

as the Receiver with "full power and authority to enforce the terms of the Consent Decree, and

assume all of the responsibilities, functions, duties, powers and authority of the Solid Waste

Management Division[6] of the Department of Public Works."  *Id.* at 15.

**B.    The Receiver's Work to Close the Ordot Dump**

The Receiver achieved a major milestone under the Consent Decree when the Layon Landfill

began operating as Guam's new conforming municipal solid waste landfill on September 1, 2011.

*See* Minutes (Sept. 1, 2011), ECF No. 796 and Order (Sept. 2, 2011), ECF 798.  Although the Ordot

---

[5]  After extensive scientific studies and research, the Government of Guam selected the Layon site in 2005 as the best location for the new landfill.

[6]  The Solid Waste Management Division will hereinafter be referred to as "SWMD."  Under Guam law, the SWMD was "a sub-entity" of the Department of Public Works, a department "within the Executive Branch of the government of Guam."  *See* 5 GUAM CODE ANN. § 3106 and 10 GUAM CODE ANN. § 51A103.  Upon enactment of Guam Public Law 31-020, SWMD is now known as the Guam Solid Waste Authority ("GSWA"), an autonomous, public corporation of the Government of Guam.  *See* 10 GUAM CODE ANN. § 51A103. Following said enactment, the court vested the Receiver with "full power and authority over GSWA, to the full extent of its previously granted authority over SWMD."  Order (Sept. 2, 2011) at 9, ECF No. 798.

1    Dump stopped receiving trash for disposal on August 31, 2011, the environmental closure of the

2    Ordot Dump was still not completed as required by the Consent Decree.

3           At the most recent quarterly status hearing held on May 21, 2013, the Receiver informed the

4    court that the remedial field investigation work at the Ordot Dump had been completed and the final

5    closure plan had been submitted. *See* Quarterly Report (May 21, 2013) at 3-6, ECF No. 1067-1.

6    Barring any unforeseen circumstances or a shortfall of funding, the Receiver anticipated the

7    environmental closure of the Ordot Dump to be completed by the end of 2015. *Id.* at 43, Fig. 14

8    (Current Receiver Schedule for Closure of the Ordot Dump).[7] The Receiver further stated that since

9    the original estimates were made in the October 2008 Quarterly Report, a number of items had been

10   added to the list of projects associated with the Consent Decree, specifically (1) upgrades to the

11   residential transfer stations, (2) Route 4 safety enhancements, (3) Dero Road improvements and

12   (4) upgrades to the Inarajan waste water treatment plant expansion and leachate pre-treatment -

13   Layon.[8] *Id.* at 33-34. Because the cost for the Ordot Dump closure itself increased from the original

14   2008 estimates, the Receiver warned that "it is likely that there will not be enough money from the

15   [Limited Obligation] Bonds to cover *all* of the projects." *Id.* at 33 (emphasis added). Thus, the

16   Receiver intended to "complete the planning and design phases for *all* the projects, but *defer*

17   *contracting for any additional construction for those projects until [the Receiver] successfully bid*

18   *the final Dump closure project and [was] confident that [it had] sufficient resources to complete*

19   *the projects as designed.*" *Id.* (emphasis added). The Receiver would only complete the additional

20   projects "[t]o the extent that funds remain available, or the Government of Guam makes additional

21   funds available." *Id.* at 34. The Receiver stated it was ready to develop a bid procurement package

22   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

23          [7] The Receiver's schedule also anticipated that the bidding, award and contracting of the
     Ordot Dump closure construction would occur between July 2013 and January 2014. *Id.*

24          [8] As the Receiver further clarified at the hearings held on October 5 and 25, 2013, these
25   projects, although related to the original Consent Decree projects, are not necessarily required by the
     Consent Decree. Instead, the Receiver reported that these projects were either required or requested
26   by the Government of Guam after the Limited Obligation Bonds had been obtained, and thus were
     never included in the Receiver's original capital estimates as presented in its October 22, 2008
27   Quarterly Report (ECF No. 272) and used as the basis for obtaining financing through what has been
     referred to as the Section 30 Bonds.

1    for the Ordot Dump closure construction.

2           The court later asked the Receiver to submit a special report addressing the approximate time

3    frame for the Receiver's procurement process for the closure of the Ordot Dump.  *See* Order

4    (Jun. 24, 2013) at 2, ECF No. 1120.  In a Special Report filed with the court on June 28, 2013, the

5    Receiver stated there were two procurements connected to the closure of the Ordot Dump that would

6    begin in July: one for the closure of the Ordot Dump itself, and the other for construction

7    management services in connection with the closure project.  Special Report Advising Court of

8    Receiver's Procurement Schedule (Jun. 28, 2013) at 2, ECF No. 1128.

9           On September 20, 2013, the Receiver submitted a Special Report advising the court that the

10   bids for the environmental closure of the Ordot Dump were opened, with Black Construction

11   Corporation being the apparent low bidder.  *See* Notice, ECF No. 1193.  The Receiver also indicated

12   that it expected to issue a Notice of Award in late September or early October.  *Id.*   On

13   September 27, 2013, the Receiver filed another Special Report stating that "[b]ecause of the

14   complexity of the bid and the simultaneous evaluation of proposals received for Construction

15   Management Services together with the need to assure the process is conducted in an orderly

16   manner," the actual award for the environmental closure of the Ordot Dump would likely occur in

17   mid-October.  *See* Special Report at 2, ECF No. 1207.

18          On October 11, 2013, the court instructed the Receiver to delay the awarding of contracts for

19   the Ordot Dump closure project and for Construction Management Services until October 31, 2013.[9]

20   *See* Order re Emergency Motion for a Stay Pending Appellate Review at 26, ECF No. 1230.

_____

22          [9]  The Lieutenant Governor had filed two Notices of Appeal with regard to decisions rendered
     by this court.  *See* ECF Nos. 1170 and 1202.  On September 26, 2013, the Lieutenant Governor filed
23   an Emergency Motion for a Stay Pending Appellate Review (the "emergency Motion").  *See* ECF
     No. 1203.  The Lieutenant Governor requested the court stay this action and direct the Receiver not
24   to award or execute any new contracts on behalf of the Government of Guam pending review by the
     Court of Appeals for the  Ninth Circuit.  The Lieutenant Governor informed the court that if the stay
25   was denied, he would immediately seek review by the Ninth Circuit and ask the appellate court to
     stay these proceedings.  In order to allow for an orderly emergency motion practice before the Ninth
     Circuit, the court directed the Receiver to delay the awarding of contracts.
26          Since then, the Lieutenant Governor filed a third Notice of Appeal.  *See* ECF No. 1233.  This
     latest appeal is not related to the court's denial of the Emergency Motion.  Instead, the Lieutenant
27   Governor appealed the court's order denying in part the Attorney General's Motion for Clarification.
     *See* Order, ECF No. 1189.

1    **C.    The Layon Condemnation Case Judgment and Attempts to Substitute Counsel**

2            On December 10, 2012, the Superior Court of Guam issued a judgment in the Layon

3    Condemnation Case in the approximate amount of $25 million. *See* Former Landowners' Req. for

4    Judicial Notice at 29, ECF No. 1034, Ex. 3 thereto. This judgment was accruing mandatory statutory

5    interest at the rate of 6% per annum. *Id.*

6            On February 4, 2013, the Lieutenant Governor sought assistance from the Attorney General

7    to obtain the Receiver's approval for release of a portion of the Limited Obligation Bonds to be used

8    to satisfy the $25 million Layon Condemnation Case judgment. *See* Quarterly Report (May 21,

9    2013) at Tab 12(a), ECF No. 1067-18. Counsel for some of the former landowners of the Layon

10   Landfill also made a similar request of the Receiver.[10] *See* A. Arriola Decl. at ¶6, ECF No. 1033.

11   The Receiver responded to the Lieutenant Governor, stating that he could not agree to the request

12   because "the remaining bond proceeds must be preserved for . . . the final closure of the Ordot

13   Dump." *See* Quarterly Report (May 21, 2013) at Tab 12(b), ECF No. 1067-19.

14           On April 26, 2013, a Substitution of Counsel was filed by the Lieutenant Governor on behalf

15   of the Government of Guam, *see* ECF No. 1045, and thereafter disapproved by the court on May 3,

16   2013, because the Substitution of Counsel did not comply with the technical requirements of Local

17   Rule GR 19.1(b)(1). *See* ECF No. 1047.

18           On May 9, 2013, attorney Sandra C. Miller – the Chief Legal Counsel for the Office of the

19   Governor of Guam – filed an Entry of Appearance as Co-Counsel. *See* ECF No. 1051. In this filing,

20   Attorney Miller stated that "her appearance as co-counsel in this matter on behalf of the Defendant

21   [Government of Guam]" was "made by and through the Office of the Governor of Guam as the

22   lawful representative of the Government of Guam." *Id.*

23           On May 10, 2013, the Lieutenant Governor filed an Amended Substitution of Counsel (the

24   "Amended Substitution"), seeking to substitute the Cabot Mantanona law firm as counsel for the

25   _____

26           [10] On April 10, 2013, the former landowners filed a motion seeking to intervene in this action
     so that they could petition the court to release the funds necessary to pay the Layon Condemnation
     Case judgment. *See* Mot. to Intervene, ECF No. 1031. The court subsequently denied this request.
27   *See* Order (Aug. 21, 2013), ECF No. 1164.

1   Government of Guam for and in place of the Attorney General. *See* ECF No. 1052. The Amended

2   Substitution asserted that a change in counsel was necessitated by the Attorney General's conflict

3   of interest, specifically with regard to the dispute over the mechanism for payment of the $25 million

4   judgment in the Layon Condemnation Case.

5          On May 16, 2013, the court issued an Order on the Amended Substitution.[11]  *See* ECF

6   No. 1064. The court refuted the Lieutenant Governor's assertions that the Receiver was the former

7   client of the Attorney General in the Layon Condemnation. However, based on what had been

8   presented, the court found there was "a limited dispute between the Attorney General and the Office

9   of the Governor" over the use of the bond proceeds to pay the $25 million judgment. *Id.* at 3.

10  Therefore, the court approved the Lieutenant Governor's Amended Substitution only for the limited

11  purpose of allowing the Cabot Mantanona firm to represent the Government of Guam with regard

12  to the issues raised in the former landowners' Motion to Intervene. *See* May 16th Order at 4, ECF

13  No. 1064. The court ordered that "for all other purposes, the Attorney General shall remain counsel

14  of record for the Government of Guam." *Id.*

15         On May 28, 2013, the Lieutenant Governor filed a Motion for Reconsideration of the

16  May 16th Order. *See* ECF No. 1075. Following full briefing, the court denied the Motion for

17  Reconsideration, concluding that the Lieutenant Governor failed to met his heavy burden of showing

18  any grounds for reconsideration. *See* Order re Mot. for Recons. (Aug. 13, 2013), ECF No. 1157.

19  **D.     The Motions to Stay**

20         Despite the court's rulings on the Amended Substitution and the Motion for Reconsideration,

21  the Lieutenant Governor continued to ask the court to disqualify the Attorney General and to stop

22  the Receiver from awarding the contract to close the Ordot Dump. On September 13, 2013, the

23  Lieutenant Governor filed the instant Motion to Stay. *See* ECF No. 1177. On September 20, 2013,

24  the Lieutenant Governor filed an Emergency Motion for an Order Granting a Temporary Stay of

25

26

27         [11]  This Order shall hereinafter be referred to as the "May 16th Order."

1 Procurement While the Government's Motion to Stay and for Further Relief is Pending.[12]  *See* ECF

2 No. 1191.

3       On September 25, 2013, the Lieutenant Governor filed an Emergency Motion for a Stay

4 Pending Appellate Review (the "Emergency Motion").  *See* ECF No. 1203.  The court denied the

5 Emergency Motion on October 11, 2013, finding that the Lieutenant Governor failed to meet his

6 burden of showing that the circumstances warranted the extraordinary remedy of a stay pending

7 appeal. *See* ECF No. 1230.

8 **DISCUSSION**

9       The Lieutenant Governor asks that these proceedings be stayed and that the Receiver take

10 no further action to enforce the Consent Decree until certain other relief he requests is granted.  First

11 among such "other relief" the Lieutenant Governor seeks is to be represented by "unconflicted

12 counsel" based on a purported conflict of interest by the Attorney General and a breakdown in the

13 attorney-client relationship.

14 **A.    Whether Substitution of the Attorney General is Warranted**

15       "A trial judge is required to order a substitution of counsel if, after a hearing, it is

16 demonstrated that there is a breakdown in the attorney-client relationship or that 'an actual conflict

17 of interest existed.'" *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir. 1990) (quoting *Wood v. Georgia*,

18 450 U.S. 261, 273–74 (1981)).

19       According to the Lieutenant Governor's declaration, the Attorney General has not consulted

20 with the Lieutenant Governor about this case since May 16, 2013, when the court denied the

21 Amended Substitution. *See* Raymond S. Tenorio Decl. (Sept. 13, 2013) at ¶6, ECF No. 1179.  This

22 statement is confirmed by Sandra Miller who stated that she has "not been consulted by the

23 [Attorney General] regarding this case since the [c]ourt denied the Government's substitution of

24 counsel on May 16, 2013."  Miller Decl. at ¶3, ECF No. 1180.  Furthermore, in May 2013, the

25

26     [12]  Therein, the Lieutenant Governor asked the court to direct the Receiver not to award or
execute any contract on behalf of or binding the Government of Guam or any instrumentality thereof,
27 including the GSWA, while the Lieutenant Governor's first motion to stay was pending.

1   Attorney General refused to provide the Lieutenant Governor with the complete client file in this

2   case despite instructions to do so.  *See* Raymond S. Tenorio Decl. (Sept. 13, 2013) at ¶5 and Ex. 1

3   thereto, ECF No. 1179.

4          Because the files were not turned over, on August 2, 2013, the Governor's Chief Legal

5   Counsel sent a Sunshine Act Request to the Attorney General seeking all documents and records

6   "which constitute client files of the Governor of Guam" with regard to this case and the Layon

7   Condemnation Case in the Superior Court of Guam.  *See* Kathy A. Fokas Decl. at ¶3 and Ex. A

8   thereto, ECF No. 1156.  In turn, the Attorney General provided the Sunshine Act Request to the

9   Receiver and asked for instructions as to whether the GSWA would waive its attorney-client

10  privilege so as to permit the disclosures to the Lieutenant Governor.  *Id.* at ¶4, Ex. B thereto.  The

11  Attorney General sought instructions from the Receiver because it believed that upon creation of the

12  GSWA on April 11, 2011, the Attorney General's client became the GSWA.  *See* Motion for

13  Clarification at 10, ECF No. 1155.  In light of the Receiver's "instructions," the Attorney General's

14  position was that the Lieutenant Governor may only obtain copies of the requested information

15  through April 18, 2011; any and all information created thereafter would not be produced since said

16  information belonged to the GSWA.  *Id.*

17         In light of the Attorney General's recent revelation that it considered GSWA to be its client

18  and was taking instructions from the Receiver, the Lieutenant Governor then filed series of motions

19  to stay these proceedings and requested the court allow it to be represented by unconflicted counsel.

20         Because the Attorney General represents various agencies and instrumentalities of the

21  Government, it is not unusual for the Attorney General, through his various assistants, to represent

22  adverse agencies in intra-governmental disputes.  Before the Attorney General filed its Motion for

23  Clarification, the court was led to believe that whenever a dispute arose between the Governor's

24  Office and an agency represented by the Attorney General, the Attorney General would take

25

26

27

1  instructions from the Administration. *See* Sandra C. Miller Decl., Ex. A thereto, ECF No. 1075-1.[13]

2  Thus, it was a surprise when the Attorney General first revealed on August 13, 2013, that it was

3  taking "instructions" from GSWA instead of the Governor's Office and was thus refusing to turn

4  over to the Lieutenant Governor documents in its "client files" that were created after April 18, 2011.

5      Based on these new facts, the court finds that there has been a breakdown in the attorney-

6  client relationship. The breakdown may have started from what the Lieutenant Governor perceived

7  was reluctance on the part of the Attorney General to agree with the release of bond proceeds to pay

8  the $25 million judgment in the condemnation action,[14] but it has quickly escalated in the last few

9  months. The court finds that there is a lack of communication between the Attorney General and

10 the Lieutenant Governor dating back to May 16, 2013, and this lack of communication has led to a

11 relationship clouded by an atmosphere of non-cooperation. The Attorney General disregarded the

12 Lieutenant Governor's instructions to turn over its client files, and because of the lack of

13 communication between them, the Lieutenant Governor had to resort to sending a Sunshine Act

14 Request to obtain client files which should have been released to him when first requested. Based

15 on this demonstrated breakdown in the attorney-client relationship, the court hereby grants the

16 Lieutenant Governor's request to have the Attorney General fully substituted with the Cabot

17 Mantanona law firm.

18     Having granted the Lieutenant Governor's request for full substitution of counsel, the next

19 issue for the court to address is whether this action should be stayed.

20 **B.      Whether a Stay is Warranted**

21     In considering whether to grant a stay, the cases set forth the following standard:

22     A district court has inherent power to control the disposition of the causes on its

23 _____

24 [13] Exhibit A is a letter dated April 25, 2013, from Deputy Attorney General J. Patrick Mason to Anita Arriola (counsel for some former Layon landowners) in response to a Sunshine Act Request. Therein, Mr. Mason stated that "[w]hen a conflict of arises between an agency and the

25 Administration, we take client instructions from the Governor's Office."

26 [14] At the October 25th hearing, Mr. Mason also confirmed this when he stated that there had never been a problem with the Attorney General's representation until the filing of the motion to

27 intervene by the former landowners.

docket in a manner which will promote economy of time and effort for itself, for counsel, and for litigants. The exertion of this power calls for the exercise of a sound discretion. Where it is proposed that a pending proceeding be stayed, the competing interests which will be affected by the granting or refusal to grant a stay must be weighed. Among these competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.

*CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936)). The Lieutenant Governor, as the party requesting the stay, bears the burden of proving that a stay is warranted. *Clinton v. Jones*, 520 U.S. 681, 708 (1997) (citing *Landis*, 299 U.S. at 255).

    1.    <u>Whether Harm Would Result if Action is Stayed</u>

The first factor the court must weigh is the resulting harm if this action is stayed. The United States contends that a stay would result in serious harm because the proper environmental closure of the Ordot Dump would be delayed, resulting in the continued violation of the Clean Water Act. The United States notes that a stay would subject the people of Ordot with additional exposure to this ongoing public nuisance. Additionally, leachate will continue to discharge from the Dump into the Lonfit River. This continued violation of the Clean Water Act is what led to the filing of this suit in the first instance. Yet, 11 years later, the Ordot Dump continues to still discharge untreated leachate, and a stay of this action will only prolong this ongoing violation.

The Lieutenant Governor attempts to minimize the harm that would result if this matter is stayed. The Lieutenant Governor contends that the United States will only suffer a "slight delay" in the completion of the closure cover of the Ordot Dump and that this delay would not have "any significant environmental impact." *See* Lt. Gov. Mem. P.&A. in Supp. Mot. to Stay at 9, ECF No. 1178. This is simply a mischaracterization of the facts. Pursuant to the terms of the Consent Decree – an agreement the parties entered into in 2004 – the Ordot Dump was supposed to be closed six years ago, in October 2007. Because the Government of Guam failed to live up to its various obligations under the Consent Decree, the court had to appoint a Receiver to bring the Government

1   of Guam into compliance.  Thus, a stay would only prolong the more than six-year delay that has

2   already been experienced in this case.[15]  Furthermore, contrary to the Lieutenant Governor's

3   assertions, the Receiver's most recent Quarterly Report notes that "groundwater quality [around the

4   Ordot Dump] has been impaired to some degree by the Dump," and that "[s]urface water sampling

5   in the Lonfit River and the western channel showed that leachate . . . discharging into the channel

6   and subsequently into the Lonfit River have impaired the water of the Lonfit River in the immediate

7   vicinity of the Dump."   Quarterly Report (May 21, 2013) at 3 and 4, ECF No. 1067-1.  The

8   environmental impact of the Ordot Dump can not be ignored.  The Ordot Dump is a public nuisance,

9   especially to the people of the village of Ordot who have been exposed to this environmental and

10  public health hazard for years.  In addition to the leachate discharges into the Lonfit River, the Ordot

11  Dump also exposes the surrounding residents to the risk of fire from the uncollected landfill gas.

12  Before the Receiver's appointment, the Ordot Dump experienced frequent fires that required the

13  evacuation of residents living in the surrounding areas.  The environmental closure of the Ordot

14  Dump will include the construction of an ancillary system to manage the landfill gas.

15      A stay would also result in continued violation of federal law and negatively affect the United

16  States' enforcement of the Clean Water Act.  After years of inaction or noncompliance with its

17  administrative orders, the United States initiated this enforcement action and thereafter entered into

18  a Consent Decree with the Government of Guam.  The Consent Decree is not merely a contract

19  between the Government of Guam and the United States; it is a federal court order that is enforceable

20  by this court.  Yet, six years after the Government of Guam was required to close the Ordot Dump

21  – a deadline it agreed to – and on the threshold of the Receiver awarding the contract for the closure

22  of the Ordot Dump, the Lieutenant Governor comes before the court to request an "indefinite stay"

23  of this action.  At the October 25th hearing, the court inquired how long of a stay was the Lieutenant

24  Governor requesting, and Mr. Mantanona stated he could not ask for a specific amount of time but

25

26      [15]   If the court considers the time frame from 1986, when the EPA first issued an
    Administrative Order to have the leachate discharges cease by May 1987, a total of 26 years have
27  passed and the untreated leachate continues to discharge into the Lonfit River.

1   instead was asking that the stay be imposed "for as long as is necessary." The court notes that

2   indefinite stays are disfavored. *Yong v. INS*, 208 F.3d 1116, 1119 (9th Cir. 2000). At this rate, the

3   United States certainly is not getting what it bargained for when it entered into the Consent Decree

4   with the Government of Guam.

5       Finally, a stay would lead to increased costs for the Government of Guam and possibly a new

6   round of bidding for the closure project. The Receiver has stated that a stay of even a few months

7   could significantly delay the Ordot Dump closure by one year since the construction project requires

8   two dry seasons to be completed. A delay of this magnitude would require a rebidding of the project,

9   and another round of bidding would likely result in the submission of higher bids for the closure

10  project (perhaps by several million dollars) since potential bidders already know what the Receiver

11  expected to pay for the project.

12      Based on the above, the court finds that the harm to be sustained by the people of Guam and

13  the United States weighs against the granting of a stay.

14      2.      Whether There is Sufficient Hardship to Justify Staying this Proceeding

15      The *Landis* court cautions that "if there is even a fair possibility that the stay . . . will work

16  damage to some one else[,]" then the movant "must make out a clear case of hardship or inequity

17  in being required to go forward." *Landis*, 299 U.S. at 255. Here, there is more than a fair possibility

18  that the stay will work damage against the environment, the people of Guam and the United States

19  as discussed in the previous section. Thus, the Lieutenant Governor must clearly show that he will

20  suffer hardship or inequity if required to go forward.

21      The Lieutenant Governor asserts that the "minimal damage" resulting from a stay is far

22  outweighed by the violation of the Government of Guam's due process rights. But the court is still

23  unclear what due process rights have been violated. First, the Government claims that it has not been

24  permitted to be meaningfully represented in this action. But that is not true since Sandra Miller and

25  Rawlen Mantanona have been permitted to make numerous filings with this court. Additionally, the

26  Attorney General had been diligently working to represent the Government of Guam's interest since

27

1    the inception of the case.[16]  As pointed out by Mr. Mullaney and Mr. Mason at the October 25th

2    hearing, there had never been a concern or complaint raised by the prior administration or the current

3    administration about the Attorney General's representation until the former landowners filed a

4    motion to intervene in an attempt to seek the release of bond proceeds to pay the Layon

5    Condemnation Case judgment.  Despite the Lieutenant Governor's complaint that the Attorney

6    General has not been acting to protect the Government of Guam's interest but has instead been

7    working on the Receiver's behalf for the last two years, the record in this case shows otherwise.  For

8    example, on August 25, 2011, the Attorney General filed a motion requesting the court order the

9    Receiver to release bond funds to reimburse the Government of Guam for expenditures paid from

10   the General Fund between 2006 and 2010 for expenditures associated with engineering and

11   environmental engineering services for both the construction of the Layon Landfill and closure of

12   the Ordot Dump.[17]  *See* Att'y Gen. Mot. for Order Authorizing Receiver to Pay Capital cost

13   Expenses from Bond Proceeds, ECF No. 790.  The Attorney General took such action on behalf of

14   the Government of Guam because the Receiver declined to release the bond proceeds to pay for such

15   expenses.[18]  In addition to the Attorney General's legal representation, the court notes that either the

---

16

17          [16]  The court notes that the Attorney General has always acted professionally in representing
18   the Government of Guam's interests in this action.  The Attorney General worked closely with the
     Receiver and bond counsel to obtain bond financing and ensure that the bond proceeds were
19   appropriately used for their intended purposes.  The Attorney General assisted the Receiver with
     reviewing procurement contracts and other matters related to compliance with the Consent Decree.
20   Additionally, the Attorney General worked to clear up land ownership issues on lands required for
     the closure of the Ordot Dump.  Finally, the Attorney General worked with various government
21   agencies, including the Department of Public Works, to address safety concerns with the roads
     leading to the Layon Landfill.

22          [17]  The expenses for which the Government of Guam sought reimbursement largely occurred
23   prior to the Receivership.  *See* Special Report (Sept. 29, 2011) at 3.

24          [18]  The Receiver agreed that bond proceeds may be used to pay the requested costs.  *See*
     Special Report (Sept. 29, 2011) at 3.  Nevertheless, the United States and the Receiver asserted that
25   the remaining bond proceeds should be reserved for the costs associated with the final closure of the
     Ordot Dump.  The court denied the motion but stated that "[i]f the court is able to determine to its
26   satisfaction, based on final construction cost for the closure of the Ordot Dump and an approved
     post-closure plan, that funds are available to pay all of the costs for the proper closure of the Ordot
27   Dump and the post-closure maintenance of the Ordot Dump, the court would be willing to give
     further consideration to this matter."  Order (Nov. 3, 2011) at 2, ECF No. 836.

1   Governor, the Lieutenant Governor or a representative from the Governor's Office (often times the

2   Governor's legal counsel) was always present at each of the quarterly status hearings, and the court

3   has afforded them the opportunity to address the court and raise any concerns they may have.  The

4   Lieutenant Governor fails to provide any factual support for his contention that the Government of

5   Guam suffered any prejudice over the last two years by the Attorney General's representation, and

6   any claim of prejudice is certainly not true going forward since the court has permitted the Lieutenant

7   Governor to fully substitute the Attorney General with Mr. Mantanona.

8           The Lieutenant Governor further argues that the lack of meaningful representation prevents

9   him from participating in and protecting the Government of Guam's interests, specifically because

10  "the Receiver intends to saddle the Government with contracts that will ultimately cost the

11  Government of Guam tens of millions of dollars over and above the Receiver's previous estimated

12  cost for the project."  *See* Lt. Gov. Mem. P.&A. in Supp. Mot. to Stay at 14, ECF No. 1178.

13  Contrary to such assertions, the Receiver has not asked the court to require the Government of Guam

14  to provide any additional funds to complete the Consent Decree projects.  The Receiver has

15  repeatedly stated that it  has sufficient funds remaining from the bond proceeds to finance the

16  Consent Decree projects.  However, with regard to the additional projects[19] which the Government

17  of Guam has asked for but are not required under the Consent Decree, the Receiver stated that said

18  projects would be deferred until the Receiver has sufficient resources to complete those projects.

19  Thus, the Receiver has chosen to prioritize the Ordot Dump closure project and the construction

20  management contract since there is enough money from the bond proceeds to accomplish these

21  projects and the closure is required under the Consent Decree.  At the October 25th hearing, the

22  Receiver reiterated that he will not award any contract that was not funded by bond funds.  The

23  Lieutenant Governor's claims that the Receiver will saddle the Government with tens of millions of

24

25

26  _____

27       [19]  These projects include the upgrades to the residential transfer stations, Route 4 safety
     enhancements, Dero Road upgrades and possible improvements to the waste water treatment plant.

1  dollars in looming obligations[20] is purely conjecture at this stage and is contrary to facts presented

2  in the Receiver's Quarterly Report and at the hearings held on October 5 and 25, 2013.

3  The Lieutenant Governor also argues that because it was denied a meaningful opportunity

4  to be heard, it was unable to raise "serious concerns it ha[d] with the process leading to [the Ordot

5  Dump closure] contracts." *See* ECF No. 1178 at 15. The Lieutenant Governor simply makes this

6  assertion without providing any details about what these "serious concerns" might be. Certainly the

7  Government of Guam does not have complete control in this process because a Receiver was

8  appointed after the Government of Guam failed to comply with the Consent Decree. Nevertheless,

9  the Government of Guam has had a role in the Receiver's work to close the Ordot Dump. The court

10 notes that the Guam Environmental Protection Agency ("GEPA") has been working with the

11 Receiver for many years on the Ordot Dump closure project. As noted by the court in the Order

12 denying the Emergency Motion,

13    GEPA representatives have been meeting with the Receiver and the U.S.
       Environmental Protection Agency ("EPA") for biweekly conferences over the last
14     several years. As noted in the most recent Quarterly Report, the development of the
       Ordot Dump closure plan "involved regular and close coordination with EPA and
15     GEPA for the review of submittals and evaluation of the designs that will provide a
       long-term, stable closure cover system. Key components of the closure cover and
16     ancillary systems were vetted with the agencies and input incorporated where
       necessary." Quarterly Report (May 21, 2013) at 2, ECF No. 1067. Furthermore, on
17     "February 22, 2013, GEPA, in its capacity as the solid waste regulating authority on
       Guam, issued its approval of the cover design and concurred with EPA." *Id.* at 4-5.
18     GEPA has been privy to every aspect of the Receiver's closure plan, and the
       Government of Guam has been represented by GEPA on these issues.

19

20    [20] At the October 25th hearing, Mr. Mantanona argued that there are insufficient bond funds
       remaining to cover the cost of post-closure care of the Ordot Dump, which the Receiver's estimated
21     at $14 million. *See* Quarterly Report (May 21, 2013) at 39, ECF No. 1067-1. Post-closure care
       includes the maintenance and operation cost of all of the infrastructure (cover system, landfill gas
22     collection system, leachate collection system, etc.) over the post-closure life of the Ordot Dump, and
       is required by both federal and Guam law and regulation to be funded for 30 years after closure is
23     complete. Based on the Receiver's calculations, the cost for the entire 30-year period is estimated
       to be about $14 million on a net present value basis. However, the actual cost each year for the 30-
24     year period averages $476,405.66 per year. *Id.* at Tab 14, ECF No. 1067-27. Post-closure care
       expenses, by its very nature, are normally considered operating expenses instead of capital costs.
25     As the Receiver noted, "[t]ypically, funds are set aside throughout the life of a landfill to provide for
       post-closure care after the facility is closed." Quarterly Report (May 21, 2013) at 39, ECF No. 1067-
26     1. However, as with so many other things related to the Ordot Dump, the Government of Guam did
       not set aside funds for this cost during the period it operated the Ordot Dump, so it will have to pay
27     for the post-closure cost on an ongoing basis. *Id.* Thus, Mr. Mantanona's argument is without merit
       since the Section 30 Bonds only covered capital costs and not operating expenses.

1  Order re Emergency Motion for Stay Pending Appellate Review at 21-22, ECF No. 1230.

2  At the October 25th hearing, Mr. Mantanona stated that he spoke with GEPA personnel

3  recently and left with the "impression" that GEPA had no voice in the design process and was

4  basically told that GEPA had to simply comply or be held in contempt. These claims were refuted

5  by the United States and the Receiver. Mr. Mullaney stated that he was never made aware of any

6  concern that GEPA was not being heard. According to Laurie Williams,[21] who has attended the

7  technical meetings with GEPA in San Francisco, there has always been a full exchange of views at

8  these technical meetings and no one's view would be ignored. The Receiver also confirmed Mr.

9  Mullaney's statements about GEPA's participation. According to the Receiver, GEPA is an integral

10  and equal player in this regulatory process. GEPA has always been fully apprised of the Receiver's

11  closure plans. Mr. Mantanona also implied that the closure design plans contained extra "bells and

12  whistles" that were not otherwise necessary or required.[22] However, the Receiver stated that the

13  closure as it is contemplated by the Receiver and has been bid has nothing in it that is not otherwise

14  required by applicable law and regulations for the closure of a facility like the Ordot Dump. Thus,

15  Mr. Mantanona's claims are simply not supported by any evidence.

16  Finally, the Lieutenant Governor claims that it was "prevented from raising the serious

17  concerns it has with the Receiver's management of the existing money set aside by the Government,

18  which remains unaccounted for and appears to be rapidly dwindling." See ECF No. 1178 at 15. The

19  Lieutenant Governor is simply adopting the allegations raised by the former landowners, but this

20  repetition of an unsupported allegation does not make it a fact or any more persuasive. The

21  Lieutenant Governor has been able to investigate these allegations, and if he finds any evidence of

22  mismanagement of funds, the court invites him to bring it to the court's immediate attention through

23  a properly filed motion. If the allegations are substantiated, then the court will take appropriate

24  action. Thus, a stay of the proceedings is not necessary at this time since the Disbursement

25

26

27  [21] Ms. Williams is an attorney with EPA.

   [22] Mr. Mantanona asked, "Do we need to drive a Cadillac when a Chevy will do?"

Procedures[23] which have been in existence since 2009 are sufficient to guard against claims of mismanagement of funds. These procedures already permit various executive branch agencies (Department of Administration, Department of Public Works and the Bureau of Budget and Management Research) to review all disbursements the Receiver intends to make prior to their payment. These executive branch agencies have never raised any substantive objection since the Disbursement Procedures were implemented. Thus, the Lieutenant Governor has not met his burden of showing sufficient hardship will be suffered to justify staying this proceeding.

Although the Lieutenant Governor's motion raises the above concerns to justify his request for a stay, Mr. Mantanona revealed at the October 25th hearing that the real "hardship" the Lieutenant Governor is concerned about is the payment of the Layon Condemnation Case judgment to former landowners. Mr. Mantanona stated that said judgment continues to incur interest at the rate of $110,000 per month and thus payment of this judgment should be made a priority even above

---

[23] The Disbursement Procedures provide the following with regard to the Government of Guam's review:

> The Government of Guam entities shall have seven (7) calendar days to review the Draft Requisition and file with the Receiver . . . any written objections it has to making the payment. If the Receiver . . . has not received a written objection within seven (7) calendar days, the Receiver . . . will deem that there are no objections to making the payment. If any of these Government of Guam entities makes a written objection, the Receiver . . . will work expeditiously to resolve the issue to the entity's satisfaction. If the entity's written objection is not resolved within ten (10) calendar days after receipt, the Receiver . . . will:
>
> 1.  Authorize [Citibank] to make the full payment notwithstanding the Government's written objection, if the Receiver determines that making the payment is essential to maintaining the construction schedule;
> 2.  Authorize [Citibank] to make a partial payment, withholding that portion of the payment to which the Government objects and continuing its effort to resolve the written objection; or
> 3.  Place the payment on indefinite hold pending resolution of the Government's written objection.
>
> Should the Receiver . . . be unable to resolve the Government's written objection, the written objection will be submitted to the Court for resolution.

Disbursement Procedures at 8, ECF No. 376-2.

1  the need to close the Ordot Dump.[24]  The court disagrees.  As Mr. Mullaney noted at the October

2  25th hearing, the Consent Decree here is the equivalent of a federal court judgment.  It was entered

3  in 2004 – eight years before the Layon Condemnation Case judgment was issued.  Pursuant to the

4  terms of the Consent Decree, failure to close the Ordot Dump by the October 2007 deadline as

5  agreed subjects the Government of Guam to stipulated penalties of $5,000 per day.[25]  *See* Consent

6  Decree at ¶12(a)(iii), ECF No. 55.  Thus, a stay would likely result in the possibility of an even

7  greater financial hardship to the Government of Guam.

8         3.   <u>Whether a Stay Furthers the Orderly Course of Justice</u>

9        The final factor the court must weigh is whether a stay will further the orderly course of

10  justice.  It is ironic that the Lieutenant Governor contradicts himself by stating that "a stay will allow

11  the court and the parties to put the enforcement of the Consent Decree back on track" when what the

12  Lieutenant Governor's motion seeks is an order directing the Receiver to take no further action to

13  enforce the Consent Decree.  A stay of this action at this stage to permit the Lieutenant Governor to

14  investigate his claims of financial mismanagement by the Receiver will not simplify the issues but

15  will instead further complicate the issues[26] and extend the environmental damage that results from

16  the continued discharge of leachate into the Lonfit River.

---

[24]  The Lieutenant Governor's letter dated March 27, 2013, to the Receiver confirms the view that payment of the Layon Condemnation Case judgment is this administration's priority over the closure of the Ordot Dump.  In his letter, the Lieutenant Governor states

> Paying the judgment out of the Landfill Bonds now and then working together with the Government to ensure that there are sufficient funds to pay for closure of the Ordot Dump is a workable alternative[.] . . . [I]t would be unconscionable to expect the people of Guam to shoulder additional tax and debt burden when there is already $40 million from the Landfill Bond proceeds available to pay the just compensation judgment.  To the extent that the Landfill Bond proceeds are insufficient for that purpose, the Government welcomes the assistance of the Receiver to develop a plan for paying for Consent Decree projects[.]

*See* Quarterly Report (May 21, 2013) at Tab 12(f), ECF No. 1067-24.

[25]  This is the equivalent of $150,000 per month ($5,000 x 30).

[26]  The Lieutenant Governor has not justified why the government's investigation into the claimed mismanagement of funds can not occur while the Ordot Dump closure project moves forward.  Such actions can proceed on parallel tracks.

1    The Government of Guam has been non-compliant with the Clean Water Act for decades.

2  The "problem of a highly dysfunctional, largely mismanaged, overly bureaucratic, and politically

3  charged solid waste system" is what led the court to appoint a Receiver after the Government of

4  Guam failed to live by its obligations under the Consent Decree.  Order re Appointment of Receiver

5  at 1, ECF No. 239.  The court charged the Receiver with ensuring the Government of Guam's

6  expeditious compliance with the Consent Decree.  As the court has stated previously, the closure of

7  the Ordot Dump will finally bring an end to an era of non-compliance.  The court appointed the

8  Receiver to complete the task the Government of Guam failed to accomplish.  The Receiver has both

9  the authority and the funds needed to proceed with the closure of the Ordot Dump.  Thus, a stay

10  would not further the orderly course of justice but will instead delay something that should have

11  already happened six years ago pursuant to the federally enforceable Consent Decree.

12                                      **CONCLUSION**

13    The court grants the Lieutenant Governor's request to fully substitute the Attorney General

14  with the Cabot Mantanona law firm based on a breakdown in the attorney-client relationship.

15  However, after weighing the competing factors, the court finds that a stay of these proceedings is

16  unwarranted.[27]  A stay would result in further environmental harm and ongoing violation of the

17  Clean Water Act since the Ordot Dump will continue to discharge untreated leachate into the Lonfit

18  River.  A stay would also mean that the leachate discharges and uncontained landfill gas will remain

19  a public health hazard for the surrounding residents. Despite claims to the contrary, the Government

20  of Guam will not suffer any hardship or inequity if the procurements were allowed to proceed since

21  the Receiver has sufficient monies within the bond issue – within the original estimates that were

22  made – to complete the closure of the Ordot Dump.  Finally, a stay would not further the orderly

23  course of justice but would instead delay the Government of Guam's compliance with the Consent

24    _____

25    [27]  In light of the court's ruling today and its ruling denying the Emergency Motion, *see* Order, ECF No. 1230, the court finds the following motions to be moot: Motion to Shorten Time on Motion to Stay and for Further Relief (ECF No. 1184); Emergency Motion for an Order Granting

26  a Temporary Stay of Procurement While the Government's Motion to Stay and for Further Relief is Pending (ECF No. 1191); Motion for Clarification of Order Setting Expedited Briefing (ECF

27  No. 1199); and Request for an Order on Motion to Stay and for Further Relief (ECF No. 1234).

Decree.[28]    Accordingly, the Receiver is directed to proceed with the procurement process and awarding of contracts for the Ordot Dump closure construction project and for construction management services associated thereto.[29]

        IT IS SO ORDERED.



                                                /s/ Frances M. Tydingco-Gatewood
                                                    **Chief Judge**
                                                **Dated: Oct 29, 2013**

---

[28] The court emphasizes that the Receiver estimates it will take two dry seasons to complete the construction work to close the Ordot Dump.  But before the work can begin at the start of the next dry season (January 2014), contractors must factor in the time needed to order and ship materials to Guam, given its distance and weather.

[29] In its Order denying the Lieutenant Governor's Emergency Motion to Stay Pending Appellate Review, the court directed the Receiver not to award these contracts until October 31, 2013, because the Lieutenant Governor had indicated that he would appeal the denial of the stay, and the brief delay would allow for an orderly motion practice before the Court of Appeals for the Ninth Circuit.  *See* Order (Oct. 11, 2013) at 26, ECF 1230.  Consistent with said Order, unless a stay of these proceedings is ordered by the Ninth Circuit Court of Appeals by October 31, 2013, at 5:00 p.m. Chamorro Standard Time, the Receiver shall thereafter proceed with the awarding of said contracts so as not to further delay the environmental closure of the Ordot Dump.