DISTRICT COURT OF GUAM

TERRITORY OF GUAM

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

GOVERNMENT OF GUAM,

    Defendant.

CIVIL CASE NO. 02-00022

**ORDER**
re Financing Post-Closure Care
for the Ordot Dump

On September 30, 2014, the Government of Guam filed a Financing Plan and priority list (hereinafter, the "Financing Plan") to address the financing of various projects which were not covered by the money from the Limited Obligation (Section 30) Bonds, Series 2009A (the "Limited Obligation Bonds"). *See* ECF No. 1416. These projects included (1) upgrades to the residential transfer stations, (2) Route 4 safety enhancements, (3) upgrades to Dero Road and (4) post-closure care for the Ordot Dump. The court held several evidentiary hearings to discuss the various unfunded projects and the Government of Guam's Financing Plan.[1] Having read the parties' briefs and heard testimony and oral argument on the matter, the court now issues the following Order that specifically addresses the post-closure care for the Ordot Dump.[2]

---

[1] *See* Minutes (Jan. 21, 2015), ECF No. 1496; Amended Minutes (Jan. 22, 2015), ECF No. 1499; Minutes (Feb. 3, 2015), ECF No. 1512; Minutes (Feb. 4, 2015), ECF No. 1513; Minutes (Feb. 5, 2015), ECF No. 1515; and Minutes (Feb. 6, 2015), ECF No. 1518.

[2] The court decided it would address the financing for each project in separate orders. On April 20, 2015, the court issued the first of such orders, which dealt with the financing needed to upgrade and permit the transfer stations. *See* Order, ECF No. 1571. On May 1, 2015, the court

# BACKGROUND[3]

On December 3, 2003, the United States lodged with the court a proposed Consent Decree, which had been fully signed by the parties. *See* Notice of Lodging of Consent Decree, ECF No. 46. After the necessary publication and comment period had been satisfied, the court approved the Consent Decree on February 11, 2004. *See* Consent Decree, ECF No. 55. Among other things, the Consent Decree established a schedule for the closure of the Ordot Dump and the construction and operation of a new conforming municipal solid waste landfill. *Id.* at ¶¶8-9. The Consent Decree mandated operations at the new landfill to begin by September 23, 2007, with operations at the Ordot Dump to cease by October 23, 2007. *Id.* at ¶¶8(i) and 9(i).[4] Additionally, as part of the closure of the Ordot Dump, the Consent Decree required the Government of Guam to submit a post-closure care and monitoring plan. *Id.* at ¶8(b)(i).

When the parties entered into the Consent Decree, they acknowledged that "the total amount of funding needed to complete the projects required under [the] Consent Decree [was] not currently available." *Id.* at ¶10(a). The Consent Decree thus required the Government of Guam, within 120 days after its entry, to submit a financial plan which identified "the funding source or sources and a schedule to secure funds for the capital and operating costs necessary" to pay for the various compliance measures required under the Consent Decree.[5] *Id.* The Government of Guam agreed

---

issued the second order which addressed the financing of the Dero Road project. *See* Order, ECF No. 1574.

[3] Because the parties are familiar with the facts and procedural history of this action, the court will not recite them here in great detail except as necessary to explain its decision. For a more thorough recitation of the background of this case, including the events that led to the appointment of a Receiver, the court incorporates by reference the following prior decisions: Order re Appointment of Receiver, ECF No. 239; Order re Motion for Reconsideration, ECF No. 1157; Order re Motion to Intervene, ECF No. 1164; Order re Emergency Motion for a Stay Pending Appellate Review, ECF No. 1230; and Order re Motion to Stay and for Further Relief, ECF No. 1243.

[4] The Government of Guam did not meet these deadlines. Instead, under the Receivership, the Ordot Dump stopped receiving trash for disposal on August 31, 2011, and the new landfill in Layon was not opened until September 1, 2011. *See* Minutes (Sept. 1, 2011), ECF Nos. 795-96.

[5] The Government of Guam submitted its financial plan in June 2004 as required, and, after receiving the U.S. EPA's comments, revised its financial plan and resubmitted it in October 2004.

to "use its best efforts to obtain sufficient funding to fully implement the projects required by [the] Consent Decree." *Id.*

The Government of Guam failed to meet critical Consent Decree deadlines, and the United States ultimately moved to enforce the Consent Decree. *See* ECF Nos. 68-69. Based on its concern over the lack of progress by the Government of Guam and after conducting numerous monthly status hearings and site visits, the court appointed a Receiver with "full power and authority to enforce the terms of the Consent Decree, and assume all of the responsibilities, functions, duties, powers and authority of the Solid Waste Management Division of the Department of Public Works, and any and all departments, or other divisions of the Department of Public Works [("DPW")] insofar as they affect the Government of Guam's compliance with the Consent Decree."[6] Order Re: Appointment of Receiver (Mar. 17, 2008) at 15-16, ECF No. 239. Among other things, the court authorized the Receiver to "facilitat[e] the financing and/or borrowing of such funds necessary to carry out the duties relating to the Consent Decree as set forth in the Government of Guam's Revised Financial Plan." *Id.* at 16. The court further ordered that "[i]f, in the best judgment of the Receiver, the Revised Financial Plan fail[ed] to provide the means or methods of financing necessary or would unreasonably delay the progress in meeting the mandates of the Consent Decree, the Receiver [was] authorized to modify the Plan to provide for alternative means or methods of debt financing it

---

*See* Machol Decl. at ¶3, ECF No. 74.

[6] Upon enactment of Guam Public Law 31-020, the Solid Waste Management Division ("SWMD") became the Guam Solid Waste Authority ("GSWA"), an autonomous, public corporation of the Government of Guam. 10 GUAM CODE ANN. § 51A103. The court thereafter vested the Receiver with "full power and authority over GSWA, to the full extent of its previously granted authority over SWMD." Order (Sept. 2, 2011) at 9, ECF No. 798. Although the new law also created a Board of Directors for GSWA, the court has stressed that the Receiver will "retain full administrative and operational control over GSWA to assure that the resources needed to achieve full compliance with the Consent Decree are provided." Order (July 3, 2014) at 5, ECF No. 1378. *See also* Order (July 1, 2013) at 2, ECF No. 1132 ("While the court is encouraged that the Board wishes to be actively involved in discussions and decisions concerning Ordot Dump and the Layon Landfill, the fact remains that matters concerning both the Dump and Landfill remain Consent Decree project matters, under the purview of the Receiver, by order this court. . . . [T]he Receiver has, and will retain, the same authority and control over such areas until such time as the court orders otherwise. In other words, complete turnover of control and authority of SWMD, when the time is right, will occur at a date ordered by this court.")

deem[ed] appropriate." *Id.*

Initially, the Receiver estimated the capital needed to achieve compliance with the Consent Decree would be approximately $159.7 million, of which approximately $40 million would be required for the closure of the Ordot Dump. *See* Quarterly Report (Oct. 22, 2008) at 13, ECF No. 269-1. The Quarterly Report cautioned that the estimates were "subject to change as the competitive bidding process provide[d] the final measure of the cost for [the Consent Decree] projects." ECF No. 269-1 at 13. The Receiver further stated that the "estimates related to the Ordot Dump's closure" would "require a full reexamination" as the time for the project to actually begin drew near because there was "a significant amount of remedial investigation that remain[ed] to be accomplished . . . to determine the extent of environmental damage that ha[d] occurred [at the Ordot Dump] and devise acceptable plans to mitigate the damage identified." *Id.* at 14.

The Government of Guam eventually opted to finance the Consent Decree projects through the sale of approximately $202.4 million in Limited Obligation Bonds. *See* ECF No. 455 at 3. Of this amount, approximately $139.7 million[7] was allocated for deposit to the Project Construction Fund. *See* ECF No. 455-1 at 16.

The cost for the Ordot Dump closure increased from the Receiver's original 2008 estimates, and on May 21, 2013, the Receiver informed the court and the parties that "it is likely that there will not be enough money from the [Limited Obligation] Bonds to cover all of the projects" related to the Consent Decree. *See* Quarterly Report (May 21, 2013) at 33, ECF No. 1067-1. Among the unfunded projects was the post-closure care for the Ordot Dump as required under the Consent Decree and by both federal and Guam regulations. The Receiver then estimated the unadjusted cost for the entire 30-year post-closure care period to be $18,626, 404.[8] *Id.* at 40. The Receiver further

---

[7] The Government of Guam deposited an initial amount of $20 million – obtained through a loan with the Bank of Guam – with a trustee designated by the Receiver and approved by the court.

[8] On December 22, 2014, the Receiver informed the court that after participating in a technical conference with U.S. EPA and the Guam Environmental Protection Agency ("GEPA"), the Receiver believed its original estimate for the post-closure care would "significantly increase." *See* Special Report re Financing Plan at 4, ECF No. 1464. In its latest status report, the Receiver stated that it "continue[s] to work with U.S. EPA to refine the Post Closure Care Plan and reach

computed the required contribution to the reserve in 2016 to fund the post-closure care (*i.e.*, the net present value cost) was approximately $14,292,170. *Id.*

The court directed the Receiver and the Government of Guam to meet and discuss the development of a plan to pay for the unfunded projects. The Receiver and the Government of Guam did not reach an agreement with regard to the financing of these projects, and thus on September 30, 2014, the Government of Guam filed its Financing Plan. *See* ECF No. 1416.

**DISCUSSION**

As stated previously, the Consent Decree required the Government of Guam to submit a post-closure care and monitoring plan. *See* Consent Decree at ¶8(b)(i), ECF No. 55. Pursuant to U.S. EPA regulations, an owner or operator of a municipal solid waste landfill ("MSWLF") is required to continue monitoring and maintaining the landfill once it is closed to protect against the release of hazardous constituents to the environment. The federal closure and post-closure care regulations are set forth in Title 40, Code of Federal Regulations, Part 258, Subpart F - Closure and Post-Closure Care.[9]

---

agreement on its estimated cost." *See* Quarterly Report (Mar. 5, 2015) at 10, ECF No. 1531-1. The Receiver's new estimate is $20,367,699, with a net present value of $15,670, 894. *Id.* at 35 and Tab 12 thereto.

[9] Post-closure care activities consist of monitoring and maintaining the waste containment systems and monitoring groundwater to ensure that waste is not escaping and polluting the surrounding environment. The required post-closure care period is 30 years from site closure, but this can be shortened or extended by the director of an approved state program as necessary to ensure protection of human health and the environment. 40 C.F.R. § 258.61(b).

Pursuant to Section 258.61(a), specific post-closure care requirements consist of maintaining the integrity and effectiveness of the:
- Final cover system;
- Leachate collection system;
- Groundwater monitoring system; and
- Methane gas monitoring system.

The owner/operator of a closed MSWLF must prepare a written post-closure care plan that provides:
- A description of all required monitoring and maintenance activities, including the frequency with which each activity will be performed;
- The name, address, and telephone number of the person to contact during the post-closure care period; and
- A description of planned uses of the land during the post-closure care period.

Post-closure care expenses, by its very nature, are normally considered operating expenses instead of capital costs. As the Receiver noted, "[t]ypically, funds are set aside throughout the life of a landfill to provide for post-closure care after the facility is closed." *See* Quarterly Report (May 21, 2013) at 39, ECF No. 1067-1. However, as with many other things related to the Ordot Dump, the Government of Guam did not set aside funds for this expense during the period it operated the Ordot Dump.

The Government of Guam does not dispute that the costs of post-closure care are expenses directly required by the Consent Decree. Rather, the Government of Guam contests the method of funding this cost and the other unfunded projects. The Government of Guam proposes to establish a separate trust account to accumulate funds over the next 30 years and to deposit an initial $1 million in seed money into said account. *See* GovGuam Financing Plan at 9, ECF No. 1416. The Government of Guam states that the $1 million deposit should be taken from money GSWA owes the Government of Guam in reimbursement for Section 30 funds used to pay the debt service on the Limited Obligation Bonds. Furthermore, the Government of Guam proposes that about $49,000 be collected monthly from GSWA's operations and revenues and deposited into the post-closure care trust account. *Id.*

The United States strongly opposes the Government of Guam's proposal. Based on its track record, the United States argues that the court can not simply trust that this time the Government of Guam will set aside on an ongoing basis the funds needed for the post-closure care of Ordot, especially because it never set such funds aside in the decades it operated the Ordot Dump. The United States asks that the court adopt the Receiver's approach for funding this cost, which is essentially to use the funds previously reimbursed to the Government of Guam for debt service. *See* Quarterly Report (June 25, 2014) at 36-37, ECF No. 1369-1.

---

Any use of the land during this period must not disturb the integrity or operation of any of the waste containment systems or the monitoring systems. At the end of the post-closure care period, the owner/operator must certify that the post-closure care has been completed in accordance with the official post-closure care plan. 40 C.F.R. § 258.61(e). This certification must be signed by an independent, registered professional engineer or the state director. *Id.* Once signed, the certification is placed in the facility's operating record. *Id.*

The Government of Guam states it does not have the funds needed to pay for the post-closure care costs up front and instead suggests that this expense be paid for on an ongoing basis by requiring the Receiver to set aside money each month from GSWA's revenues and deposit said funds into a post-closure care trust account. The Government of Guam asserts that if GSWA's revenues are insufficient to pay for the monthly set aside for the post-closure care and other unfunded projects, then the Receiver should petition the Public Utilities Commission ("PUC") for a rate increase.

The court notes that when the Government of Guam obtained financing through the Limited Obligation Bonds, it anticipated that fees collected from solid waste customers would allow GSWA to reimburse the Government of Guam approximately 75% of the Section 30 money used to pay the debt service on said bonds. *See* Quarterly Report (Dec. 9, 2010) at Tab 6 (Aug. 16, 2010 letter from GEDA Administrator to Receiver), ECF No. 646-6 and Quarterly Report (July 18, 2012) at 40, ECF No. 972-1. No debt service was due in 2009, the year the funds were borrowed. In 2010, almost $8.2 million in debt service was paid from capitalized interest funds that were also borrowed, so Section 30 revenue was not needed to make the payment. In 2011, debt service of approximately $8.6 million was paid, with about $4.1 million coming from capitalized interest and the balance – approximately $4.5 million – came from Section 30 revenue. In 2012, the debt service amount was about the same. The Receiver used GSWA revenues to fully reimburse the Government of Guam the $4.5 million it spent in Section 30 funds to pay the debt service.

However, as noted in the Receiver's July 2012 Quarterly Report, beginning in 2013 and succeeding years, full debt service payments would begin since there was no more capitalized interest remaining. *Id.* The Government of Guam's annual debt service thus increased to about $12 million beginning in 2013. *Id.* The Receiver explained that a significant increase in tipping fees and residential trash collection fees would be required if the Government of Guam wished to be reimbursed for the full $12 million in Section 30 revenue that it would be required to pay each year for the debt service.

The Receiver further stressed that the rates it was then charging were adequate to provide for the operations and reserves of GSWA through 2015 and also to pay the $4.5 million annually toward the debt service on the Consent Decree Bonds. *Id.* If the Government of Guam wanted full

reimbursement, however, then the rates would have to increase. The Receiver believed that the decision about how to pay for the debt service was an internal Government of Guam decision, and accordingly, the Receiver took no position with regard to the rate options it presented to the PUC. *Id*. The Receiver stated it was prepared to implement whatever the Government of Guam decided, but to date, Guam's elected officials have not initiated a rate increase with the PUC.

The Government of Guam contends that the court gave the Receiver the sole authority to petition the PUC for rate increases. The Government of Guam notes that the Order appointing the Receiver charged the Receiver with authority to apply to the PUC "for rate increases for residential waste collection services and/or tipping fees on a temporary or permanent basis, as appropriate." Order re Appointment of Receiver at 16, ECF No. 239.

While the court authorized the Receiver to petition for rate increases, the court's Order did not reserve such authority for *only* the Receiver. The Receiver presented the PUC with various rate options, and the Government of Guam could have certainly intervened before the PUC to indicate which of the rate options it preferred. In a letter dated December 21, 2012, from PUC legal counsel Frederick Horecky to then Attorney General Leonardo Rapadas, Mr. Horecky asked "whether the Government of Guam wishe[d] to intervene in [the] rate proceedings and request an increase in commercial and residential Guam Solid Waste Authority Rates for 2013." *See* Letter attached as an exhibit to Special Report re Financing Plan, ECF No. 1464. Mr. Horecky further stated "[i]f the Government of Guam wishe[d] to intervene in the pending proceeding before the PUC, it may file a Petition for Intervention pursuant to Rule 8 of the PUC's Rules for Practice and Procedure." *Id*. The Government of Guam never took any action before the PUC, and any funding the Government of Guam has forfeited is a direct result of its own failure to act.

Furthermore, the Receiver notes the Government of Guam is more than capable of enacting a rate increase by legislation. For example, in July 2010, the Government of Guam enacted Public Law 30-165, which provided $150,000 annually to the villages of Inarajan and Ordot. 10 Guam Code Ann. § 511005. These funds were to come from the tipping fees generated from solid waste customers, and the PUC could adjust these amounts every five years for inflation. *Id*. The Receiver assisted the Government of Guam and PUC in implementing this matter, and it collected the rate and

remitted it to the respective villages. The Receiver states that the Government of Guam could use the same legislative approach it used in setting the Host Community Premium rates in order to ensure that the rates paid by solid waste customers is sufficient to fully reimburse the Government of Guam for the debt service paid.

Based on the above, the court finds that both the Receiver and the Government of Guam have the ability to petition the PUC for a rate increase if either believes it is necessary. The Receiver continues to maintain that the current rates are sufficient to allow it to fully implement the Consent Decree and fulfill its fiduciary duty. *Id.* at 9. While these rates were sufficient for a time to partially reimburse the Government of Guam for debt service it paid from its Section 30 revenue, the Government of Guam's failure to provide additional financing for the unfunded projects identified by the Receiver – projects which include GSWA's capital needs as well as the post-closure expense of the Ordot Dump – now make it necessary to apply all of GSWA's current revenue to these purposes. The court has already authorized the Receiver to "complete these projects using the funds it currently has at its disposal, which includes the $4.5 million it annually reimburses to the Government of Guam's General Fund." *See* Order (Mar. 17, 2014) at 21, ECF No. 1319. Nothing presented in the Government of Guam's Financing Plan or during the evidentiary hearings would cause the court to reach a different result.

As the United States noted, funding the post-closure care of the Ordot dump is one of the most critical issues before the court. Because of the Receiver's efforts, Guam is on the threshold of the proper environmental closure of the Ordot Dump. It is imperative that sufficient funds be set aside to monitor and maintain all of the infrastructure (*i.e.,* the cover system, the landfill gas collection system, the leachate collection system, etc.) over the 30-year post-closure period. Although the Receiver is not responsible for the Government of Guam's failure to set aside the funds for the post-closure care during the decades the Government of Guam operated the Ordot Dump, based on the authority bestowed upon it by the court, the Receiver is now responsible for implementing the Consent Decree and complying will all regulations for post-closure care of the Ordot Dump.

The court notes that the financing scheme previously proposed by the Receiver likely may

not be sufficient, especially since the Receiver's new estimates for the post-closure care costs have significantly increased. Additionally, the Receiver has been authorized to use the $4.5 million in annual debt reimbursement to the Government of Guam to fund the upgrades to the transfer stations and the Dero Road upgrades. *See* Order (Apr. 20, 2015), ECF No. 1571 and Order (May 1, 2015), ECF No. 1574. Thus, there may not be ample funds remaining to fully fund a trust account for the post-closure care costs before the Receivership ends. The court shares the United States' concern that without assured funding for the maintenance of the Ordot Dump post-closure, the environmental closure of the Ordot Dump is at risk. Accordingly, the court orders the Receiver to develop a plan to pay for the post-closure care expenses, and, if this cost is to be funded on an ongoing basis, then the Receiver's plan shall include a dedicated funding mechanism to secure funds necessary to fully implement all post-closure care and monitoring actions.

## CONCLUSION

There is no dispute between the parties and the Receiver that the Consent Decree required the Government of Guam to submit a post-closure care and monitoring plan. *See* Consent Decree at ¶8(b)(i), ECF No. 55. The parties differ on how to finance the costs of post-closure care expenses. The Government of Guam failed to set aside the funds for the post-closure care during the time it operated the Ordot Dump, and the Government of Guam states it does not now have the funds necessary to pay for said expense. The court has already approved the Receiver's proposal to fund the post-closure care costs on an ongoing basis from the debt service reimbursements accumulating in the special account. However, if these funds are insufficient to meet the post-closure care funding obligations before the end of the Receivership, then the Receiver shall develop a financing plan that includes a dedicated funding mechanism to secure monies necessary to fully implement all post-closure care and monitoring actions

IT IS SO ORDERED.



**/s/ Frances M. Tydingco-Gatewood**
     **Chief Judge**
**Dated: May 27, 2015**