1
2
3
4
5
6                    DISTRICT COURT OF GUAM

7                      TERRITORY OF GUAM

8
9   UNITED STATES OF AMERICA,              CIVIL CASE NO. 02-00022

10            Plaintiff,

11       vs.

12   GOVERNMENT OF GUAM,                              **ORDER**
                                          re Emergency Motion for Stay
13            Defendant.                      Pending Appellate Review

14

15       Pending before the court is an Emergency Motion for Stay Pending Appellate Review

16  ("Motion for Stay"), filed by  Morrico Equipment LLC ("Morrico").  *See* ECF No. 1716.  The

17  motion is precipitated by the court's January 27, 2017 Order directing the court-appointed Receiver

18  to proceed with a new invitation for bid for the procurement of cab forward[1] refuse trucks.  *See* ECF

19  No. 1712.  Morrico  appealed the court's decision to the U.S. Court of Appeals for the Ninth Circuit,

20  *see* Notice of Appeal, ECF No. 1714, and thereafter requested this court to stay its Order pending

21  resolution of its appeal.  Based on the relevant filings from Morrico,[2] the Receiver and the United

22

23       [1]  "Cab forward" trucks are also known as "flat nose" or "cab over" trucks. Decl. R. Chace
    Anderson at ¶7, ECF No. 1686.  As explained to the court at the hearing held on January 13, 2017,
24  the driver's compartment in a cab forward truck sits over the front axle and engine compartment,
    which places the driver closer to the front of the truck.  On the other hand, the driver compartment
25  on a conventional cab truck is located behind the engine compartment housed under the hood and
    sticks out at the front of the truck.
26
27       [2]  On March 22, 2017, Morrico filed a Declaration of Allan Morrison.  *See* ECF No. 1734.
    This declaration was filed after briefing on the Motion for Stay had been completed, and Morrico

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 2 of 21

States[3] and having heard argument on the matter, the court now issues the following Order.

## BACKGROUND

### A. The Consent Decree and Appointment of a Receiver

On August 7, 2002, the United States initiated the present action and sought injunctive relief and civil penalties against the Government of Guam for violations of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* The parties thereafter entered into a Consent Decree, which became final when approved by the court on February 11, 2004. *See* Consent Decree, ECF No. 55. Among other things, the Consent Decree established a schedule for the Government of Guam to close the Ordot Dump and also construct and operate a new municipal solid waste landfill.[4] *Id.* at ¶¶8-9. The Consent Decree required operations at the Ordot Dump to cease by October 23, 2007. *Id.* at ¶8(i). Additionally, as part of the closure of the Ordot Dump, the Consent Decree required the Government of Guam to submit a post-closure care and monitoring plan. *Id.* at ¶¶8(b), (c) and (h).

Following the entry of the Consent Decree, the Government of Guam failed to meet critical deadlines. Concerned about the Government of Guam's lack of progress and failure to raise the financial resources necessary to complete the Consent Decree projects, on December 6, 2006, the United States petitioned the court to hold a status hearing and then later moved to enforce the Consent Decree. *See* ECF Nos. 56 and 68-69. After conducting monthly status hearings and site visits, the court concluded that the "problem of a highly dysfunctional, largely mismanaged, overly bureaucratic, and politically charged solid waste system . . . is beyond correction by conventional

---

did not seek leave of court before it filed the declaration. *See* CVLR 7(h). Accordingly, the court declines to consider the contents of this declaration.

[3] The Government of Guam, the defendant in this action, was given an opportunity to respond to the Motion for Stay. *See* Order (Feb. 6, 2017), ECF No. 1722. The Government of Guam chose not to file a response. This is consistent with the Government of Guam's position on the Receiver's Motion for Clarification when the Government of Guam stated that the issue raised in said motion "involves an *operational* issue" and thus the "Government of Guam takes no position on said motion." GovGuam Resp. to Mot. for Clarification, ECF No. 1698 (emphasis added).

[4] After extensive scientific studies and research, the Government of Guam selected the Layon site in 2005 as the best location for the new landfill.

methods." Order Re: Appointment of Receiver (the "Appointment Order) at 1, ECF No. 239. After

much deliberation and upon consideration of the Government of Guam's lengthy history of violating

the Clean Water Act and failure to comply with the Consent Decree,[5] the court appointed Gershman,

Brickner & Bratton, Inc. as the Receiver with "full power and authority to enforce the terms of the

Consent Decree, and assume all of the responsibilities, functions, duties, powers and authority of the

Solid Waste Management Division[6] of the Department of Public Works." *Id.* at 15. In the

Appointment Order, the court authorized the Receiver "[t]o enter[] into future contracts deemed

necessary" and to "follow the procedures required in Guam's statutes and regulations, unless, in the

best judgment of the Receiver, such compliance would unreasonably delay the progress in meeting

the mandates of the Consent Decree[.]" *Id.* at 16.

      B.  Financing Consent Decree Projects and Post-Closure Care for the Ordot Dump

      The Receiver initially estimated the capital needed to achieve compliance with the Consent

Decree would be approximately $159.7 million, of which approximately $40 million would be

required for the closure of the Ordot Dump. See Quarterly Report (Oct. 22, 2008) at 13, ECF

No. 269-1. The Quarterly Report cautioned that the estimates were "subject to change as the

competitive bidding process provide[d] the final measure of the cost for [the Consent Decree]

projects." *Id.* at 13. The Receiver further stated that the "estimates related to the Ordot Dump's

closure" would "require a full reexamination" as the time for the project to actually begin drew near

because there was "a significant amount of remedial investigation that remain[ed] to be

---

    [5]  For a more thorough recitation of the background of this case, including the events that led to the appointment of a Receiver, the court incorporates by reference the Appointment Order, ECF No. 239

    [6]  Guam Public Law 31-020 converted the Solid Waste Management Division ("SWMD"), which was then a sub-entity of the Department of Public Works (a department within the Executive Branch of the government of Guam), to an autonomous, public corporation of the Government of Guam to be known as the Guam Solid Waste Authority ("GSWA"). 10 GUAM CODE ANN. § 51A103. The court thereafter vested the Receiver with "full power and authority over GSWA, to the full extent of its previously granted authority over SWMD." Order (Sept. 2, 2011) at 9, ECF No. 798.

1   accomplished . . . to determine the extent of environmental damage that ha[d] occurred [at the Ordot

2   Dump] and devise acceptable plans to mitigate the damage identified." *Id.* at 14.

3       The Receiver also identified various financing options for the Government of Guam's

4   consideration for funding the Consent Decree projects. *Id.* at 15-20.  The Receiver recommended

5   that the Consent Decree projects be funded through a revenue bond guaranteed by Section 30 funds

6   received by the Government of Guam.  *Id.* at 21.  The Government of Guam, however, opted to

7   finance the Consent Decree projects through the sale of approximately $202.4 million in Limited

8   Obligation Bonds, which pledged Section 30 funds as the source of repayment. *See* ECF No. 455

9   at 3.  Because the Government of Guam had deposited an initial amount of $20 million dollars for

10  the Consent Decree projects, approximately $139.7 million of the total fond funds was  deposited

11  into the  Project Construction Fund. *See* ECF No. 455-1 at 16.

12      The Receiver ceased operations at the Ordot Dump on September 1, 2011, and the new Layon

13  Landfill was opened the following day. *See* Minutes, ECF Nos. 795 and 796.  Although the Receiver

14  was able to open the new landfill under budget, financial concerns persisted.

15      The cost for the Ordot Dump closure increased from the Receiver's original 2008 estimates,

16  and on May 21, 2013, the Receiver informed the court and the parties that "it is likely that there will

17  not be enough money from the [Limited Obligation] Bonds to cover all of the projects" related to

18  the Consent Decree. *See* Quarterly Report (May 21, 2013) at 33, ECF No. 1067-1.  These unfunded

19  projects included: (1) upgrades to the residential transfer stations, (2) Route 4 safety enhancements,

20  (3) upgrades to Dero Road and (4) post-closure care for the Ordot Dump.  The court directed the

21  Receiver and the Government of Guam to meet and discuss the development of a plan for additional

22  financing or funding to pay for the unfunded projects.  The Receiver and the Government of Guam

23  could not agree on whether all the additional projects were required under the Consent Decree, and

24  if required, how to finance these projects.

25      Ultimately, after briefing and hearings, the court issued separate orders as to each of the

26

27

unfunded projects.[7] Pertinent to the instant matter is the Order concerning the funding for the post-closure care costs for the Ordot Dump. *See* Order (May 27, 2015), ECF No. 1582. Pursuant to U.S. EPA regulations, an owner or operator of a municipal solid waste landfill ("MSWLF") is required to continue monitoring and maintaining the landfill once it is closed to protect against the release of hazardous constituents to the environment. The federal closure and post-closure care regulations are set forth in Title 40, Code of Federal Regulations, Part 258, Subpart F - Closure and Post-Closure Care.[8]

Post-closure care expenses, by their very nature, are normally considered operating expenses instead of capital costs. As the Receiver noted, "[t]ypically, funds are set aside throughout the life of a landfill to provide for post-closure care after the facility is closed." *See* Quarterly Report (May 21, 2013) at 39, ECF No. 1067-1. However, as with many other things related to the Ordot Dump, the Government of Guam did not set aside funds for this expense during its operation. Thus, the court ordered the Receiver to fund these costs on an ongoing basis from the monies the Receiver had been setting aside in a special account.[9] Order (May 27, 2015) at 10, ECF No. 1582. If,

---

[7] *See* Order (Apr. 20, 2015) (upgrades to transfer stations), ECF No. 1571, Order (May 1, 2015) (Dero Road upgrades), ECF No. 1574, Order (May 27, 2015) (post-closure care for Ordot Dump), ECF No. 1582, and Order (June 29, 2015) (Route 4 safety enhancements), ECF No. 1592.

[8] Post-closure care activities consist of monitoring and maintaining the waste containment systems and monitoring groundwater to ensure that waste is not escaping and polluting the surrounding environment. The required post-closure care period is 30 years from site closure, but this can be shortened or extended by the director of an approved state program as necessary to ensure protection of human health and the environment. 40 C.F.R. § 258.61(b).

Pursuant to Section 258.61(a), specific post-closure care requirements consist of maintaining the integrity and effectiveness of the final cover system, leachate collection system, goundwater monitoring system and methane gas monitoring system. Any use of the land during this period must not disturb the integrity or operation of any of the waste containment systems or the monitoring systems.

[9] From 2011 to early 2014, the Receiver had been giving the Government of Guam GSWA revenues equivalent to the $4.5 million spent in Section 30 funds to pay the debt service on the limited obligation bonds. Beginning in May 2014, however, the Receiver began withholding these funds and accumulating them in a special account for purposes of paying for the remaining Consent Decree projects as well as the post-closure care of the Ordot Dump. *See* Order (Sept. 12, 2014), ECF No. 1405.

1  however, these funds were insufficient to meet the post-closure care funding obligations before the

2  end of the Receivership, then the court ordered the Receiver to develop a financing plan that

3  included a dedicated funding mechanism which secured the funds necessary to fully implement all

4  post-closure care and monitoring actions. *Id.*

5          The Receiver presented its plan for financing the post-closure care of the Ordot Dump in its

6  October 21, 2015 Status Report. *See* ECF No. 1634-1. After giving the Government of Guam an

7  opportunity to submit its own proposed alternative financial plan and allowing the parties to

8  comment on each proposal, the court ultimately adopted the Receiver's proposed financial plan. *See*

9  Order (May 2, 2016) at 15, ECF No. 1668.

10         Under said plan, beginning in fiscal year ("FY") 2016 through approximately FY2023,

11 approximately $2 million will be set aside annually and deposited into the Ordot Dump Post-Closure

12 Reserve. *Id.* at 10. These funds will come from the approximately $4.5 million in annual revenue

13 that was previously used to reimburse the Government of Guam for debt service. In FY2016 and

14 2017, the Receiver will be responsible for depositing said funds into the Ordot Dump Post-Closure

15 Reserve, for a total of $4 million during the remaining Receivership period. *Id.* To assure the

16 needed funds are set aside and remain available post-Receivership, the court will appoint a trustee

17 when the Receivership ends to manage the funds in the Ordot Dump Post-Closure Reserve. *Id.*

18 Additionally, all commercial refuse haulers on island will be ordered to make their payments through

19 the trustee, and, upon receipt of said funds, the trustee will deduct what is needed to fully fund the

20 Ordot Dump Post-Closure Reserve[10] and pass the balance through to GSWA for operations. The

21 trustee will continue these monthly set asides into the Ordot Dump Post-Closure Reserve until the

22 reserve is fully funded, which is anticipated to occur in FY2023. Quarterly Report (Oct. 21, 2015)

23 at 49-50 and Table 17, ECF No. 1634-1.

24         The Ordot Dump was environmentally closed on March 28, 2016. *See* Minutes, ECF

25 No. 1665.

26  _____

27         [10] The Receiver recommended that this amount not exceed $374,758.08 per month. *See*
   Quarterly Report (Oct. 21, 2015) at 51, Fig. 41, ECF No. 1634-1.

C. Procurement of Refuse Trucks and Related Proceedings

On September 18, 2014, GSWA issued an Invitation for Bid ("IFB") GSWA-001-15 ("IFB #1") to solicit bids for refuse collection trucks. IFB #1 specifically required that the cab and body should be "cab forward." *See* Decl. R. Chace Anderson at ¶6a,[11] ECF No. 1686.

On September 25, 2014, Morrico submitted a written pre-bid question to GSWA requesting that the bid specification allow for a conventional cab design. Office of the Public Auditor ("OPA") Decision (Feb. 20, 2015), Findings of Fact at ¶5.[12] On October 1, 2014, GSWA issued Addendum 1 to IFB #1, which amended certain specifications but did not amend the cab forward specification to permit a conventional cab design. *Id*. at ¶6.

On October 9, 2016, Morrico filed a protest of the cab forward specification, and GSWA denied the protest as untimely and advised Morrico that the cab forward specification was necessary to meet GSWA's needs. Decl. R. Chace Anderson at ¶6a, ECF No. 1686.

On November 6, 2014, Morrico appealed the matter to the OPA. OPA Decision (Feb. 20, 2015), Findings of Fact at ¶12, Ex. 1 to Decl. K. Fowler, ECF No. 1694. On February 20, 2015, the OPA determined that Morrico's protest was timely and that the cab forward specification unnecessarily restricted competition in violation of Guam law. *Id.*, Conclusion at ¶¶1-2. Accordingly, the OPA ordered GSWA to immediately amend the IFB to allow vendors to bid conventional cab models for the refuse collections trucks. *Id.* at ¶3.

On March 6, 2015, GSWA filed a Verified Complaint for Judicial Review in the Superior Court of Guam. *See* Findings of Fact and Conclusions of Law at ¶21, *GSWA v. Brooks*, Superior Court of Guam Civil Case No. CV0185-15, attached as Ex. B to Request for Judicial Notice, ECF No. 1706. A bench trial was held on August 2, 2016, and the Superior Court of Guam took the

---

[11] The Declaration of Mr. Anderson contains two paragraphs numbered 1. *See* ECF No. 1686 at 1 and 2. To avoid confusion, the second paragraph numbered "1" which follows paragraph "6" shall hereinafter be referred to as paragraph "6a."

[12] The OPA Decision is appended as Exhibit 1 to the Declaration of K. Fowler, ECF No. 1694.

1   matter under advisement following a status hearing held on September 12, 2016. *Id.* at ¶¶32 and 36.

2          On October 14, 2016, the Receiver issued IFB GSWA-002-017 ("IFB #2"), pursuant to the

3   authority granted to it by the court's Appointment Order. Decl. R. Chace Anderson at ¶16, ECF No.

4   1686. Similar to IFB #1, IFB #2 also sought to procure "cab over" trash trucks. *Id.* and Ex. F thereto.

5   Upon motion of Morrico, however, the Superior Court of Guam stayed IFB #2 and refrained GSWA

6   from purchasing any new trucks. *Id.* and Ex. G thereto.

7          On November 4, 2016, the Receiver filed an *Ex Parte* Motion for Clarification.  ECF

8   No. 1685.  Therein, the Receiver requested that the court clarify its Appointment Order, specifically

9   with regard to the Receiver's authority to depart from Guam law if, in the best judgment of the

10  Receiver, compliance with Guam law would unreasonably delay the progress in meeting the

11  mandates of the Consent Decree.[13]   The court permitted the parties and Morrico to respond to the

12  Receiver's motion.  *See* Order (Nov. 18, 2016), ECF No. 1691.

13         On December 16, 2016, the Superior Court of Guam issued its Findings of Fact and

14  Conclusions of Law with regard to the Receiver's Verified Complaint for Judicial Review and

15  affirmed the OPA's Decision.  *See* Ex. B to Request for Judicial Notice, ECF No. 1706.   The

16  Superior Court of Guam ordered GSWA to immediately amend IFB #1 to allow vendors to bid

17  conventional cab models for the refuse collection trucks.  *Id.* at 9.

18         On January 27, 2017, the court issued the Order re *Ex Parte* Motion for Clarification (the

19  "Clarification Order").  *See* ECF No. 1712.  Based on the evidence presented to the court, the court

20  found that the "cab forward specification is critical to the safety needs of GSWA and the public and

21  that GSWA can no longer wait to procure these trucks." *Id.* at 10.  Although the court  approved the

22  Receiver's exercise of authority in issuing IFB #2, based on concerns expressed by the OPA and

23  Superior Court of Guam decisions, the court ordered the Receiver to issue a new invitation for bid

24  for the cab forward refuse collection trucks and include in its procurement record all papers and

25  _____

26         [13]  The Appointment Order permitted "any party . . . to apply to this court at any time for
    further orders and directions as may be necessary or appropriate to carry out or construe [the
27  Appointment Order.]"  Appointment Order at 19, ECF No. 239.

1    materials used by GSWA to develop the cab forward specification, including a copy of the court's

2    order and the declaration of Thomas D. Parker.[14] *Id.* at 10-11.

3         On February 1, 2017, Morrico filed a Notice of Appeal of the court's Order re *Ex Parte*

4    Motion for Clarification. *See* ECF No. 1714.

5         On February 3, 2017, Morrico filed the Motion for Stay, along with its Memorandum in

6    Support. *See* ECF Nos. 1716-17. The Receiver filed is Opposition on February 17, 2017, *see* ECF

7    No. 1727, and on February 17, 2017, the United States filed its Response to the Motion for Stay.

8    *See* ECF No. 1729. On March 3, 2017, Morrico filed a Reply brief. *See* ECF No. 1730. On

9    March 21, 2017, the court heard argument on the matter, *see* Minutes, ECF No. 1735.

10                                      **DISCUSSION**

11        A. Legal Standard for Motion to Stay Pending Appeal

12        As the Supreme Court has stated:

13        A stay is an "intrusion into the ordinary processes of administration and judicial
          review," *Virginia Petroleum Jobbers Assn. v. Federal Power Comm'n*, 259 F.2d 921,
14        925 (C.A. D.C. 1958) ( *per curiam* ), and accordingly "is not a matter of right, even
          if irreparable injury might otherwise result to the appellant," *Virginian R. Co. v.
15        United States*, 272 U.S. 658, 672 (1926). The parties and the public, while entitled
          to both careful review and a meaningful decision, are also generally entitled to the
16        prompt execution of orders[.]

17   *Nken v. Holder*, 556 U.S. 418, 427 (2009).

18        Accordingly, the party requesting a stay  bears the burden of showing that circumstances

19   justify a stay. *Id.* at 433-34.

20        The Supreme Court has also stated that a stay is "'an exercise of judicial discretion,' and

21   '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'" *Id.* at 433

22   (quoting *Virginian R. Co.*, 272 U.S. at 672-73). "The fact that the issuance of a stay is left to the

23   court's discretion does not mean that no legal standard governs that discretion. A motion to a court's

24   discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by

25   sound legal principles." *Nken*, 556 U.S. at 434 (internal quotations and citations omitted).

26   _____

27        [14]  The United States filed the Declaration of Thomas D. Parker to support its Response to
     the *Ex Parte* Motion for Clarification. *See* ECF Nos. 1696-97.

In determining whether a stay should be issued, the district court should consider the following factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

"The first two factors of the traditional standard are the most critical." *Nken*, 556 U.S. at 434. "Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the [g]overnment is the opposing party." *Id.* at 435.

The parties do not dispute this legal standard. Thus, the court will now evaluate the factors set forth in the *Nken* decision.

  B. <u>Whether Morrico has made a strong showing that it is likely to succeed on the merits</u>

Morrico argues that it has a substantial case for relief on the merits because there are serious legal questions raised regarding the Clarification Order at issue here. First, Morrico contends that the court erred by granting to the Receiver in the Appointment Order the authority and discretion to deviate from compliance with Guam law. Morrico contends that this authority granted to the Receiver violates federal law that requires a "receiver . . . [to] manage . . . the property in his possession . . . according to the requirement of the valid laws of the state[.]" 28 U.S.C. § 959(b). The court finds that Morrico can not succeed on this argument because it is moot.

The Receiver followed the local laws when it issued IFB #1 to procure refuse collection trucks in September 2014. In August 2016, the Receiver advised the court that the series of protests by Morrico had delayed the acquisition of vehicles to GSWA's operations, and that such delay "puts at risk the quality of service to its customers, the revenue needed to operate GSWA, and the ability of GSWA to achieve compliance with the Consent Decree." Order (Aug. 12, 2016) at 7, ECF No. 1677. The court directed the Receiver to keep the court updated on the status of the procurement appeals since "[a]ny compromise to the service provided to residential customers will negatively

1  impact the revenue needed to operate GSWA and will in turn affect GSWA's ability to complete all

2  Consent Decree related projects." *Id.* at 8.  After the Superior Court of Guam stayed GSWA's

3  IFB #2, the Receiver immediately petitioned this court to clarify the authority granted to it and to

4  approve its exercise of authority in issuing IFB #2. *See* Motion for Clarification at 8, ECF No. 1685.

5  While the court agreed with the Receiver's exercise of authority in issuing IFB #2, the court ordered

6  the Receiver not to proceed with said IFB #2 but to issue a new invitation for bid.  Clarification

7  Order at 10-11, ECF No. 1712.

8       Thus, while Morrico now objects to the authority the court granted the Receiver in the

9  Appointment Order to deviate from compliance with Guam law, Morrico's objection is moot since

10  the court has not authorized the Receiver to proceed with IFB #2.

11       Morrico next asserts this court erred when it attempted to "retroactively resurrect the

12  Receiver's void act of issuing" IFB #2.  Motion for Stay at 6, ECF No. 1717.  This argument, too,

13  is irrelevant, because contrary to Morrico's assertions, the court did not "revive" IFB #2.  The court's

14  Clarification Order specifically instructed the Receiver to "issue a new invitation for bid and to

15  include in the procurement record all papers and materials used by GSWA to develop the cab

16  forward specification, including a copy of [the Clarification  Order] and [Thomas] Parker's

17  Declaration."  Clarification Order at 10-11, ECF No. 1712.  The court finds that Morrico can not

18  succeed on this issue since it, too, is moot since the Receiver was not authorized to proceed with the

19  procurement of refuse collection trucks under IFB #2 but was instead ordered to issue a new

20  invitation for bid.

21       Morrico also asserts that the court erred by engaging in appellate review over the

22  procurement appeals before the OPA and the Superior Court of Guam.  Morrico, again,

23  mischaracterizes the nature of the court's ruling.  As noted above, the Appointment Order permitted

24  any party to petition the court for further directions as may be necessary to carry out or construe its

25  provisions.  Appointment Order at 19, ECF No. 239.  This is exactly what the Receiver did when it

26

27

1  filed the Motion for Clarification. After giving the parties and Morrico[15] an opportunity to respond

2  to the motion and present argument, the court made certain findings of fact with regard to the cab

3  forward design and the impact further procurement delay would have on GSWA's operations and

4  ability to expeditiously comply with the Consent Decree.

5          The court acted well within its authority to make such findings. The Consent Decree is not

6  merely an agreement between the parties – the United States and the Government of Guam. Rather,

7  it is also a final judgment and order of this court, and the All Writs Act, 28 U.S.C. § 1651,

8  "empowers a district court to protect its judgment from a subsequent action that frustrates the

9  purpose of the settlement agreement and order." *Sandpiper Village Condo Ass'n v. Louisiana-*

10 *Pacific*, 428 F.3d 831, 841 (9th Cir. 2005). Based on this authority, the court issued its Appointment

11 Order and subsequently the Clarification Order, to help ensure that there would be no further delay

12 to procuring the refuse trucks since further delay risked the quality of service to GSWA customers,

13 the revenue needed to operate GSWA, and the ability of GSWA to achieve compliance with the

14 Consent Decree. While the court's findings and conclusions differ from those of the OPA and the

15 Superior Court of Guam, the court's actions can not be characterized as improper appellate review

16 of the Guam procurement proceedings. This court's independent findings and conclusions differ

17 because the court was presented with additional information by way of Thomas Parker's Declaration

18 that was not available to the OPA and the Superior Court of Guam. Morrico has not made a

19 substantial case for relief on this claimed error that the court improperly conducted appellate review.

20         Morrico further argues that the court's Clarification Order "ran afoul of the *Younger*[16]

21 abstention doctrine" because it had the effect of "enjoin[ing] the proceedings pending in Guam

22

23         [15] In its response, the United States argued that Morrico has no standing to appeal the court's
   Clarification Order because Morrico is not a party to this action nor did Morrico move to intervene

24 in this case. U.S. Resp. at 6-7, ECF No. 1729. The court agrees that there is a question as to whether
   Morrico has appellate standing absent intervention, but that inquiry is best left to the Ninth Circuit

25 Court of Appeals to resolve.

26         [16] *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* involved a facial First Amendment-based
   challenge to the California Criminal Syndicalism Act, and the Supreme Court held that absent

27 extraordinary circumstances federal courts should not enjoin pending state criminal prosecutions.

1    courts and render[ed] any ability to enforce the Superior court Judgment a nullity." Mem. P. & A.

2    Supp. Mot. for Stay at 10, ECF No. 1717.  The court disagrees with this contention and finds that

3    *Younger* abstention is not applicable to the facts before the court.

4            The Supreme Court has stated that "[f]ederal courts . . . have no more right to decline the

5    exercise of jurisdiction which is given, than to usurp that which is not given.  Jurisdiction existing,

6    . . . a federal court's obligation to hear and decide a case is virtually unflagging.  Parallel state-court

7    proceedings do not detract from that obligation." *Sprint Comms., Inc. v. Jacobs*, 134 S. Ct. 584, 593

8    (2013) (internal citations and quotations omitted). *Younger* recognized an exception to this general

9    rule.

10           The Supreme Court's concern for comity and federalism has led it to expand the protection

11   of *Younger* beyond state criminal prosecutions, but it has reaffirmed that "only exceptional

12   circumstances justify a federal court's refusal to decide a case in deference to the states. *New*

13   *Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989) ("*NOPSI*").

14   *NOPSI* identified three such "exceptional circumstances." First, *Younger* precludes federal intrusion

15   into ongoing state criminal prosecutions. *Id.*, 491 U.S. at 368.  Second, certain "civil enforcement

16   proceedings" warrant *Younger* abstention. *Id.*  Finally, federal courts should refrain from interfering

17   with pending "civil proceedings involving certain orders . . . uniquely in furtherance of the state

18   courts' ability to perform their judicial functions." *Id.*  The Supreme Court has affirmed that these

19   three "exceptional" categories define *Younger's* scope. *Sprint*, 134 S. Ct. at 591.

20           Based on these precedents, the Ninth Circuit has recognized that

21           [i]n civil cases, therefore, *Younger* abstention is appropriate only when the state
             proceedings:  (1) are ongoing, (2) are quasi-criminal enforcement actions or involve
22           a state's interest in enforcing the orders and judgments of its courts, (3) implicate an
             important state interest, and (4) allow litigants to raise federal challenges.  If these
23           "threshold elements" are met, we then consider whether the federal action would
             have the practical effect of enjoining the state proceedings and whether an exception
24           to *Younger* applies.

25   *ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014)

26   (citations omitted).

27           The Superior Court of Guam proceeding here did not fall within the three exceptional

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 14 of 21

1    categories of cases identified in *NOPSI*. The local proceeding was a procurement appeal between

2    a private litigant (Morrico) and the Receiver, acting on behalf of GSWA, an autonomous agency.

3    It was not a parallel state criminal proceeding, nor was a quasi-criminal enforcement action.

4    Additionally, the Superior Court of Guam's decision and judgment on the procurement appeal was

5    not a "core" order that implicated Guam's "interest in enforcing the orders and judgments of it

6    courts." *Sprint*, 134 S. Ct. 588. As noted by the Ninth Circuit,

7    "[c]ore" orders involve the administration of the state judicial process – for example,
     an appeal bond requirement, *Pennzoil Co. v. Texaco, Inc.,* 481 U.S. [1], 12-14, 107
8    S. Ct. 1519[, 1526-28], a civil contempt order, *Juidice [v. Vail]*, 430 U.S. [327,]
     335–36, 97 S. Ct. 1211[, 1217-48], or an appointment of a receiver, *Lebbos v. Judges
9    of the Superior Court*, 883 F.2d 810, 815 (9th Cir. 1989).

10   *ReadyLink Healthcare*, 754 F.3d at 759.

11   The Superior Court of Guam's Findings of Fact and Conclusions of law involves "a single

12   state court judgment" reviewing IFB #1 and Guam procurement law, not the process by which Guam

13   "compel[s] compliance with the judgments of its courts." *Potrero Hills*, *Potrero Hills Landfill, Inc.*

14   *v. City of Solano*, 657 F.3d 786, 886 (9th Cir. 2011). Although this court's findings differed from

15   the findings of the Superior Court of Guam, this is irrelevant. The Ninth Circuit has stated that "[i]f

16   the mere possibility of inconsistent federal and state court judgments justified *Younger* abstention,

17   *Younger* would swallow whole both *Colorado River* abstention and preclusion." *ReadyLink*

18   *Healthcare*, 754 F.3d at 760.

19   Assuming, however, that the Superior Court of Guam proceeding fell within one of the three

20   exceptional circumstances, the court still does not believe that the *Younger* abstention doctrine is

21   applicable. In this case, the proceedings were still ongoing in the Superior Court of Guam when the

22   Receiver filed the Motion for Clarification, however, the proceedings had concluded by the time the

23   court heard argument on the Motion for Clarification and issued its Clarification Order. Although

24   Morrico contends the Superior Court of Guam proceeding implicated an important interest,

25   specifically Guam's interests in ensuring the Receiver complied with Guam procurement law in

26   acquiring the refuse trucks, the court disagrees.

27   In *Potrero Hills*, the Ninth Circuit **discusses** the scope of what constitutes an important state

interest.  The court stated:

> The key to determining whether comity concerns are implicated in an ongoing state proceeding – and thus whether the second Younger requirement is met – is to ask whether federal court adjudication would interfere with the state's ability to carry out its basic executive, judicial, or legislative functions.  Unless interests "vital to the operation of state government" are at stake, federal district courts must fulfill their "unflagging obligation" to exercise the jurisdiction given them.

*Potrero Hills*, 657 F.3d at 883 (citation omitted).

Here, the procurement appeal before the Superior Court of Guam did not "implicate any important local interests vital to the operation of [the Government of Guam]."  *Id.*  It is important to point out that while the Government of Guam is a party to this proceeding, the Government of Guam chose not to take a position on the Motion for Clarification. *See* GovGuam Resp. to Mot. for Clarification, ECF No. 1698.  The Government of Guam stated that the issue before the court involved an "operational issue" not the enforcement of its procurement laws. *Id.*  Based on this position and the Government of Guam's failure to take a position on the Motion for Stay, it certainly does not appear that any action this court took on the Motion for Clarification "would interfere with [Guam's] ability to carry out its basic executive, judicial or legislative functions." *Potrero Hills*, 657 F.3d at 883 (9th Cir. 2011).  The essential functions of Guam's judiciary were not unduly hampered by the Receiver's Motion for Clarification or this court's Clarification Order.

Finally, the court finds the *Younger* abstention doctrine to be inapplicable because the Receiver and the United States would not have the ability to raise federal concerns in the Superior Court of Guam proceeding.  Again, the local proceeding involved a procurement appeal.  The United States was not a party to that action, and it would be highly unlikely that the Superior Court of Guam would have allowed the United States to intervene in that proceeding.  The Superior Court of Guam would have no authority to address the Receiver's concerns about the scope of authority this court had granted to it, nor would the Superior Court of Guam have been in a position to address the United States' concern that continued delay in the procurement process would jeopardize the funding scheme approved by the court to fund the post-closure care of the Ordot Dump.  Because the *Younger* "threshold elements" are not met, the court need not consider whether the federal action

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 16 of 21

would have the practical effect of enjoining the state proceedings and whether an exception to *Younger* applies.

Morrico's final argument is that this court erred when it found that cab forward trucks were safer than conventional trucks and would not unduly restrict competition. The court disagrees with Morrico's assertion and concludes that the evidence before the court supports such findings. Specifically, the Declaration of Thomas Parker[17] states

> The collection truck is a *critical safety* component in the solid waste industry. Collection trucks with a cab forward (also referred to as cab over) design, as required by the Receiver in its solicitation specification, is the industry standard in the United States for *safety* reasons. Cab forward trucks have significantly greater visibility for the driver, which is particularly important in areas that have potential poor sight distances, narrow roads, the possibility of people or animals entering the roadway suddenly, or where weather and vegetation can impact visibility. See the Anderson Declaration documenting that these potential safety hazards are common on Guam. ECF No. 1686 at 2.
>     Based on my experience, the majority of residential and commercial collection trucks manufactured today have the cab forward design because it represents the *industry standard for safety in solid waste management*. Consequently, there are many manufacturers of collection trucks with cab forward design. Elimination of the cab forward design requirement is inconsistent with the industry's standard for safety in solid waste management.

Decl. Thomas D. Parker at ¶¶6-7, ECF No. 1697 (emphasis added).

Additionally, the court's finding is supported by the Declaration of R. Chace Anderson, who has over 20 years o f experience in waste management. Decl. R. Chace Anderson at ¶2, ECF No. 1686. In Mr. Anderson's professional experience and opinion, cab forward trucks are "demonstrably safer refuse collection trucks for both the driver and the community than the conventional cab." *Id.* at ¶7. Thus, the court did not err in finding that collection trucks with a cab forward design was safer than conventional cabs, nor did it err when it found that a cab forward specification would not unduly restrict competition since "there are many manufacturers of collection trucks with cab forward design," Decl. Thomas D. Parker at ¶7, ECF No. 1697. *See also* Decl. R. Chace Anderson

---

[17] Mr. Parker is a Licensed Professional Engineer with "over 30 years of civil and environmental engineering experience specializing in solid waste management, with particular expertise in evaluating safety in the solid waste industry." Decl. Thomas D. Parker at ¶1, ECF No. 1697.

1  at ¶9, ECF No. 1686 ("the specification for a cab-forward design is not proprietary. Several

2  manufacturers produce this design so competition is not the issue.")

3          The court disagrees that Morrico has a substantial case for relief on the merits because there

4  are no serious legal questions regarding the Clarification Order as Morrico contends. Thus, as to the

5  first factor in the *Nken* decision, Morrico has not made a strong showing that it is likely to succeed

6  on the merits. Nevertheless, the court will go on to address the remaining *Nken* factors.

7          C.  Whether Morrico will be irreparably injured absent a stay

8          With regard to the second factor, Morrico, as the movant, bears the burden of demonstrating

9  that irreparable injury is *likely* – not just possible – in the absence of a stay. *Winter v. Nat. Res.*

10 *Defense Council, Inc.*, 555 U.S. 7, 375 (2008). Here, Morrico asserts the court's Order has caused

11 it to sustain irreparable injury because Morrico has been "stripped . . . of its right to participate in

12 a public procurement for refuse trucks . . . after Morrico already prevailed before the [OPA] . . . and

13 . . . the Superior Court [of Guam.]" Mem. P. & A. Supp. Mot. for Stay at 15, ECF No. 1717.

14 Morrico notes that Guam's procurement law limits the remedies of a winning protestor to bid

15 preparation costs. 5 Guam Code Ann. § 5425. Thus, without a stay, Morrico contends that it will

16 be irreparably damaged because it can only recover its bid preparation costs if it were to prevail and

17 not any loss of anticipated profits.

18          In support of its claim, Morrico cites to *Acrow Corp. of America v. United States* , 97 Fed.

19 Cl. 182 (2011), and *Essex Eclectro Eng'rs, Inc. v. United States*, 3 Cl. Ct. 277 (1983). These cases

20 found that a bid protestor is irreparably harmed when recovery is limited to bid preparation costs in

21 a suit for damages but not loss of anticipated profits. The court takes no issue with these decisions,

22 but finds they are not directly applicable here because the action before this court or the Ninth Circuit

23 Court of Appeals does not involve a bid protest. Additionally, the loss of anticipated profits is only

24 relevant if a bidder can establish it would prevail on the merits. Here, however, Morrico has failed

25 to demonstrate that it has a substantial case for relief on the merits.

26          Additionally, Morrico's claim that it would have suffered irreparable harm by not having an

27 opportunity to compete in the procurement is unfounded. There is nothing that precluded Morrico

1   from bidding on the new invitation for bid which this court ordered as long as its bid met the

2   specification of the procurement, including the cab forward design. As noted above, there are many

3   manufacturers of collection trucks with the cab forward design. Just because Morrico chose not to

4   submit a bid does not entitle it to a stay pending appeal.

5           D.  Whether a stay will substantially injure other parties and the public's interest

6           Morrico asserts that there will be no substantial injury to other parties to this proceeding if

7   a stay on the procurement of cab forward trucks is imposed, but the court disagrees.

8           For instance, Morrico contends that the United States' principal interest in these proceedings

9   is to enjoin further violation of the Clean Water Act, and this interest has been satisfied with the

10  closing of the Ordot Dump and the opening of the Layon Landfill. Mem. P.&A. Supp. Mot. for Stay

11  at 17, ECF No. 1717. The United States, on the other hand, asserts that it has a vital interest in

12  ensuring that the Receiver, on behalf of the Government of Guam, achieves expeditious compliance

13  with the Consent Decree. U.S. Resp. at 10, ECF No. 1729.

14          The Consent Decree required the Government of Guam to submit a post-closure care plan

15  and to implement it. Consent Decree at ¶¶8(b), (c) and (h), ECF No. 55. The court had previously

16  found that "funding the post-closure care of the Ordot dump is one of the most critical issues before

17  the court," and thus it was "imperative that sufficient funds be set aside to monitor and maintain all

18  of the infrastructure (*i.e.,* the cover system, the landfill gas collection system, the leachate collection

19  system, etc.) over the 30-year post-closure period." Order (May 27, 2015), at 9, ECF No. 1582.

20  "[W]ithout assured funding for the maintenance of the Ordot Dump post-closure, the environmental

21  closure of the Ordot Dump [was] at risk." *Id.* at 10. Eventually, the court approved the Receiver's

22  financing plan that included a dedicated funding mechanism and fully funded post-closure care costs

23  for the Ordot Dump within eight years. Order (May 2, 2016) at 13 and 15, ECF No. 1668.

24          The court found that a further delay in procurement of the refuse collection trucks will

25  seriously impact GSWA's ability to comply with the Consent Decree, specifically with regard to

26  financing and implementing the post-closure care plan. Clarification Order at 8-9, ECF No. 1712.

27  The procurement delay resulted in an urgent need for GSWA to replace its deteriorating fleet of

1   trucks. *See* Decl. R. Chace Anderson at ¶17, ECF No. 1686 ("We can no longer wait to procure

2   these trucks. . . . GSWA's current fleet is well past its useful life expectancy . . . [, and] repairs and

3   maintenance costs has almost doubled" from $405,480.50 in FY2014 to $738,766.34 in FY2016).

4   Delaying the purchase of new trucks would place the quality of service to its residential customers

5   at risk, which in turn would impact a third of GSWA's revenue since many residential customers

6   stop paying their bills when service is poor. Clarification Order at 9, ECF No. 1712. Additionally,

7   "old equipment in need of more and more maintenance work will destabilize all of GSWA's revenue

8   since GSWA would have to rapidly spend down its reserves creating an inability for GSWA to pay

9   all of its bills." *Id.* Thus, the United States is justified when it states that it has a vital interest at

10  stake here since a further stay of the procurement would negatively affect the Government of Guam's

11  expeditious compliance with the Consent Decree.

12          Morrico's assertion that "payment of all remaining Consent Decree projects has been secured

13  out of commercial tipping fees, " *see* Mem. P.&A. Supp. Mot. for Stay at 19, ECF No. 1717, is

14  disingenuous.    As the court previously stressed,   "[w]hile [the Receiver's] financial plan

15  encompasses the use of income generated from large commercial accounts only, the viability of such

16  a plan *presumes* that GSWA revenue from residential customers remains stable."

17          Additionally, Morrico claims that GSWA has accumulated over $24 million in its accounts

18  and that "[a]ll GSWA has to do is pay a portion of those [funds] into a reserve fund." *Id.* and

19  Erratum, ECF No. 1725. This is incorrect. As noted in the Receiver's most recent status report,

20  GSWA's cash position as of June 30, 2016, was $9.9 million. Status Report (Nov. 7, 2016) at 32,

21  ECF No. 1687-1. This represents a little more than six months of operating cash, which the court

22  agrees is reasonable and not excessive for GSWA.

23          Morrico argues that the public has a strong interest in insuring the integrity of Guam's

24  procurement process. Mem. P.&A. Supp. Mot. for Stay at 17, ECF No. 1717. The court agrees, and,

25  as noted, above, the procurement process can proceed because a cab forward design would not

26  unduly restrict competition since many manufacturers of refuse collection trucks have such a design.

27          In addition to the impact on financing the post-closure care costs, a stay on the procurement

United States of America v. Government of Guam, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 20 of 21

of cab forward trucks will negatively impact the safety of GSWA employees and the public that they serve. Certainly, Morrico would not deny that the public has an interest in ensuring a safe working environment for public employees. Based on the experience of the solid waste professionals – Mr. Parker and Mr. Anderson – cab forward collection trucks are the industry standard for safety reasons since they provide significantly greater visibility for the driver. "[C]ompetition to acquire the lowest cost safe vehicle is GSWA's goal and it should not be relegated to a less safe vehicle in order to achieve a savings at the expense of the safety of its crew and the public." Decl. R. Chace Anderson at ¶9, ECF No. 1686.

After reviewing the various interests at stake here, the court finds that a further stay of the procurement of cab forward refuse trucks would negatively impact the safety of GSWA employees and the public, the service provided to residential customers, the revenue needed to operate GSWA and in turn affect GSWA's ability to expeditiously comply with the Consent Decree. Accordingly, the court finds that the parties – both the United States and the Government of Guam – would be substantially injured if a stay were granted and the public interest tips sharply against a stay pending appeal.

## CONCLUSION

Based on the above analysis, the court hereby DENIES the Motion for Stay since Morrico has not met its burden of showing that circumstances justify a stay pending appeal. Because the court has not granted a stay, it will also DENY the Receiver's request that Morrico post a bond pending appeal.

Because Morrico has indicated it will seek a stay with the appellate court, in order to allow for an orderly emergency motion practice before the Ninth Circuit, the court directs the Receiver to delay the awarding of the new invitation for bid until April 28, 2017. If a stay is not ordered by the Ninth Circuit Court of Appeals by said date, the Receiver is directed to proceed with the procurement process and awarding of contract so as not to further delay obtaining the cab forward

///

///

<u>United States of America v. Government of Guam</u>, Civil Case No. 02-00022
Order re Emergency Motion for Stay Pending Appellate Review

page 21 of 21

1 refuse trucks that are critical to the safety needs of GSWA and the public, as well as the operations

2 of GSWA and its ability to expeditiously achieve compliance with the Consent Decree.

3       IT IS SO ORDERED.



**/s/ Frances M. Tydingco-Gatewood**
     **Chief Judge**
**Dated: Apr 07, 2017**