**THE DISTRICT COURT OF GUAM**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL CASE NO. 02-00022 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DECISION and ORDER** |
| vs. | ) | Granting Government of Guam's Motion for |
| | ) | Leave to Bring Claims Against Gershman, |
| GOVERNMENT OF GUAM, | ) | Brickner & Bratton in the Contractor Case |
| | ) | (ECF No. 2104) |
| Defendant. | ) | |
| | ) | |

Pending before the court is the Government of Guam's ("GovGuam's") motion seeking permission to sue the Receiver, Gershman, Brickner & Bratton ("GBB" or the "Receiver"), through the filing of an amended complaint in the case of *Government of Guam v. Black Construction Corp., et al.*, Civil Case No. 24-00011 (the "Contractor Case") that asserts various causes of action against GBB personally for alleged faulty closure design and construction. After reviewing the filings and having heard argument from the parties, the court now issues this Order granting GovGuam's Motion for Leave to Bring Claims Against GBB in the Contractor Case.

## I.     BACKGROUND

### A.     Appointment of Receiver

On December 3, 2003, the United States lodged with the court a proposed Consent Decree. *See* Notice of Lodging of Consent Decree, ECF No. 46.[1]  After the necessary publication and comment period had been satisfied, the court approved the Consent Decree on February 11, 2004.

---

[1]  Unless otherwise specified, all ECF citations in this Order are to the docket in the instant case, referred to as the "Consent Decree Case."

1    *See* Consent Decree, ECF No. 55.   Among other things, the Consent Decree established a schedule

2    for the closure of the Ordot Dump and the construction and operation of a new conforming

3    municipal solid waste landfill.  *Id.* at ¶¶ 8-9.  The Consent Decree mandated operations at the new

4    landfill to begin by September 23, 2007, with operations at the Ordot Dump to cease by October 23,

5    2007.  *Id.* at ¶¶ 8(i) and 9(i).

6            GovGuam did not meet these deadlines.  As a result, on March 17, 2008, the court exercised

7    its equitable powers and appointed GBB as the federal receiver with "full power and authority to

8    enforce the terms of the Consent Decree, and assume all of the responsibilities, functions, duties,

9    powers and authority of the Solid Waste Management Division of the Department of Public Works,[2]

10   and any and all departments, or other divisions of the Department of Public Works insofar as they

11   affect the Government of Guam's compliance with the Consent Decree."  Order re Appointment of

12   Receiver (the "Appointment Order") at 15-16, ECF No. 239.  Among the powers granted to the

13   Receiver, the court stated:

14           the Receiver shall have the authority required or necessary for the complete
             management and control of the Consent Decree projects, including but not limited

15           to:
                     (a) The supervision of all of Government of Guam's employees associated

16           with the Consent Decree projects;
                     (b) The performance of existing contracts;

17                   (c) The entering into future contracts deemed necessary.  In awarding any
             future contracts, the Receiver shall follow the procedures required in Guam's statutes

18           and regulations, unless, in the best judgment of the Receiver, such compliance would
             unreasonably delay the progress in meeting the mandates of the Consent Decree;

19                   (d) The hiring of all such consultants, professionals, contractors, engineering
             firms or counsel which the Receiver deems necessary for the performance of

20           administrative, financial advisory, legal, accounting, engineering, construction, and
             operations services[.]

21

22   *Id.* at 16.

23           In order to facilitate the Receiver's work and afford some measure of protection, the

24   Appointment Order provided: "The Receiver is responsible solely to this court.  The Receiver shall

25   not be personally liable for any act done in compliance with this Order.  No suit shall be filed against

26   _____

27   [2]  The duties of the Solid Waste Management Division were later transferred to the Guam Solid
     Waste Authority ("GSWA"), which was created in 2011 with the passage of Guam Pub. L. 31-20.

28   *See* 10 GUAM CODE ANN. § 51A103.

*United States of America v. Government of Guam*, Civil Case No. 02-00022
Order Granting Government of Guam's Motion for Leave to Bring Claims Against GBB

page 3 of 24

1    the Receiver without the consent of the court." *Id.* at 17-18.

2         On August 31, 2011, the Ordot Dump stopped receiving municipal solid waste for disposal,

3    and the new landfill in Layon was opened on September 1, 2011. *See* Mins. (Sept. 1, 2011), ECF

4    Nos. 795-96, and Order, ECF No. 798.

5         The Ordot Dump closure construction was substantially completed at the end of December

6    2015, with minor construction cleanup activities continuing through January 2016. Quarterly Report

7    of Receiver (Aug. 4, 2016) at 3, ECF No. 1675-1. The construction included the installation of an

8    engineered final cover system, a leachate collection and removal system, a stormwater management

9    system, and a landfill gas monitoring and collection and control systems. *Id.* at 3-10. On May 12,

10   2017, U.S. EPA "formally accepted the certification of the closure construction for the Ordot

11   Dump." Quarterly Report of Receiver (May 17, 2017) at 10, ECF No. 1739-3. On August 10, 2017,

12   the Guam EPA approved the certification for closure of the Ordot Dump. *See* Quarterly Report of

13   Receiver (Aug. 23, 2017) at 11, ECF No. 1749-3 and Tab 4 thereto, ECF No. 1749-6.

14        Unfortunately, the amount of leachate generated did not decline as expected for the Ordot

15   Dump.

16        Based on historical leachate data from the Receiver, the volume of leachate from the
         Ordot Dump has been steadily rising since 2015. In FY2017, the average monthly
17       flowrate reported over a 12-month period from November 2015 to October 2016 was
         approximately 615,000 gallons per month. By FY2022, the average monthly
18       flowrate reported over a 12-month period from May 2021 to April 2022 was
         2,656,000 gallons per month (more than quadrupled volume).
19

20   Third Joint Report at 3, ECF No. 1948.

21        By December 2022, the Receiver and regulatory agencies put together a plan of action to

22   investigate the source of and address the increasing leachate volume. Fourth Joint Report at 1, ECF

23   No. 1964.

24   **B.    The Contractor Case**

25        On May 6, 2024, GovGuam initiated a lawsuit against four contractors allegedly hired by the

26   Receiver to provide design and construction services related to the closure of the Ordot Dump. *See*

27   Compl., ECF No. 1., in Contractor Case. That complaint essentially alleged a "faulty closure design

28   and construction" which allows "surface water and groundwater from areas outside the dump . . . to

infiltrate through the ground, mingle with the waste and existing leachate, and contribute to the

leachate volume, significantly increasing disposal costs ultimately borne by the public." *Id.* at ¶ 2.

GovGuam's allegations were based on the Final Report Investigation of Leachate Flow

prepared by Geosyntec Consultants, Inc. (the "Geosyntec Report")[3] in May 2024. According to the

Geosyntec Report,

> the most likely source of elevated leachate flows at the Ordot Facility is groundwater inflow to the Western Leachate Interceptor Trench (WLIT), located along the western toe of the landfill. A review of the as-built design of the WLIT indicates that it is highly susceptible to groundwater and surface water inflow for the following reasons: (i) it was constructed in a historical surface water drainage channel; (ii) it was installed within highly permeable bedrock without installation of a liner system (the original design of the WLIT included a geomembrane liner, but this liner was removed through a design modification during construction with minimal documentation for why the design change was made); (iii) it was buried below as much as 20 ft of permeable fill material; and (iv) it was located at a lower elevation than the nearby relocated western surface drainage channel.

Geosyntec Report at 1, ECF No. 1-1 in 24-CV-00011.

The complaint in the Contractor Case asserted five causes of action against the various

contractors: (i) Breach of Contract, (ii) Breach of Warranty, (iii) Professional Negligence, (iv)

Recovery of Responses Costs Pursuant to Section 107(A) of CERLCA,[4] and (v) Declaratory

Judgment of Liability for Future Response Costs Pursuant to Section 113(g)(2) of CERLCA. *See*

Compl., ECF No. 1. in Contractor Case.

In addition to filing the Complaint against the four contractors, GovGuam filed a Motion for

---

[3] A copy of the Geosyntec Report is appended as Exhibit A to the Complaint in the Contractor Case. *See* ECF No. 1-1 in 24-CV-00011.

[4] CERCLA stands for the  Comprehensive Environmental Response, Compensation, and Liability Act.

> In 1980, Congress enacted [CERCLA], 94 Stat. 2767, as amended, 42 U.S.C. § 9601 *et seq.*, also known as the Superfund statute, to address "the serious environmental and health risks posed by industrial pollution," *Burlington N. & S. F. R. Co. v. United States*, 556 U.S. 599, 602 (2009). The Act seeks "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *CTS Corp. v. Waldburger*, 573 U.S. 1, 4 (2014) (internal quotation marks omitted).

*Atl. Richfield Co. v. Christian*, 590 U.S. 1, 6 (2020) (parallel citations omitted).

Leave to File Amended Complaint, seeking permission to assert the following additional causes of action against GBB personally: (vi) Recovery of Responses Costs Pursuant to Section 107(A) of CERLCA, (vii) Declaratory Judgment of Liability for Future Response Costs Pursuant to Section 113(g)(2) of CERLCA, (viii) Breach of Fiduciary Duty,[5] and (ix) Negligence.[6] Mot. Leave File Am. Compl., and Ex. A (Proposed First Amended Complaint ("FAC")), ECF No. 2 in the Contractor Case.

In lieu of opposing the Motion for Leave to File Amended Complaint in the Contractor Case, the Receiver filed in the Consent Decree Case a Motion for Order Enforcing Order Prohibiting GovGuam from Suing Receiver Without Permission of this Court. *See* ECF No. 2070. On September 17, 2024, the court granted the Receiver's motion and ordered GovGuam to seek permission to sue the Receiver in the Consent Decree Case. *See* Order, ECF No. 2095.

On September 27, 2024, GovGuam filed the instant motion and memorandum in support

---

[5] The Proposed FAC alleged GBB breached its fiduciary duty by (1) failing to properly close the Ordot Dump, pursue claims against the four contractors, (2) mismanaging the design and construction of the Ordot Dump closure and failing to take due care in managing the work of its contractors, and (3) omitting material facts and making misrepresentations to Guam and the court concerning the increased leachate volume, the exceedances of design capacity and the cessation of leachate discharge. Proposed FAC at ¶¶ 224-26, ECF No. 2-1 in the Contractor Case.

[6] GovGuam asserted that

> GBB designed, altered, constructed, and oversaw the closure of the Ordot Dump imprudently and without due diligence; authorized work and approved change orders submitted by its contractors without a reasonable inquiry into the circumstances and risks associated with the proposed changes; and neglected to exercise ordinary care in its management of the closure projects at Ordot.
>
> GBB failed to exercise ordinary care because a reasonably careful party that learned of the risks of the nature and kind alleged here would not design, construct, or oversee the construction of the closure at Ordot Dump in the manner that it did.
>
> Had GBB skillfully, prudently, and diligently designed, constructed, and oversaw all the components of the remedy, leachate volume would have decreased and the financial burden on Guam would have lessened. Instead, leachate volume has increased, as has the financial burden on Guam.

Proposed FAC at ¶¶ 231-233, ECF No. 2-1 in the Contractor Case.

1   seeking leave to bring claims against GBB in the Contractor Case. *See* ECF Nos. 2104-5. The

2   Receiver filed its Opposition on November 26, 2024, and GovGuam filed a Reply on December 10,

3   2024. *See* ECF Nos. 2132 and 2137. Additionally, on January 18, 2025, the court granted the

4   Receiver's Motion for Leave to File Declaration Christopher Lund, *see* ECF Nos. 2152-53, and

5   GovGuam filed a response thereto on February 11, 2025. *See* ECF No. 2157. The court heard

6   argument from the parties on February 21, 2025, and thereafter took the matter under advisement.

7   *See* Mins., ECF No. 2163.

8   **II.    ANALYSIS**

9           **A.    Whether the issue of the Receiver's immunity is relevant in determining**

10                  **whether GovGuam may sue the Receiver**

11          GovGuam first asserts that permission to sue GBB should be granted because its Proposed

12  FAC establishes a *prima facie* case against GBB for the causes of action asserted therein. GovGuam

13  relies on the case of *In re Kashani*, 190 B.R. 875 (B.A.P. 9th Cir. 1995).[7] There, the court affirmed

14  the bankruptcy judge's requirement that the debtors produce a proposed complaint before granting

15  leave to sue the trustee, stating "[b]efore such leave may be granted, the prospective plaintiffs must

16  set forth a prima facie case against the trustee." *Id.* at 885.

17          The Receiver disputes that the Proposed FAC alleges *prima facie* claims for relief. *See*

18  Opp'n at 21-25. The Receiver asserts that any decision to allow suit must involve a determination

19  of whether the Receiver is immune from such suit. *Id.* at 11. The Receiver notes that even in the

20

21  _____

22  [7] In *Kashani*, debtors filed a Chapter 11 bankruptcy petition, and a trustee was appointed to manage
    assets of debtors' bankruptcy estate. Debtors then moved for leave to sue the trustee "for breach of

23  fiduciary duty and negligence." *Id.* at 879. Debtors indicated that they intended to wait until the
    conclusion of bankruptcy proceedings before bringing suit in state court. Included in debtors'

24  motion were some "examples" of the trustee's actions in administering the estate assets that would
    form the basis of the suit. The bankruptcy court indicated that it was inclined to continue the hearing

25  on the debtors' motion to allow the debtors to file a proposed complaint. When the debtors stated
    that they were not required to file a proposed complaint nor would do they do, the court denied the

26  debtors' motion pending the submission by the debtors of a proposed complaint. The debtors
    appealed, arguing (1) the bankruptcy court should have granted leave to sue in federal court, if such

27  approval was necessary, (2) the bankruptcy court should have granted leave to sue in state court, (3)
    the additional requirement of providing a proposed complaint was an abuse of discretion.

28

*United States of America v. Government of Guam*, Civil Case No. 02-00022
Order Granting Government of Guam's Motion for Leave to Bring Claims Against GBB
page 7 of 24

*Kashani* case, the BAP instructed the bankruptcy court that part of its analysis should consider whether "the claims involve the individual acting within the scope of his or her authority under the statute or orders of the bankruptcy court, so that the trustee is entitled to quasi-judicial or derived judicial immunity."[8] *Kashani*, 190 B.R. at 886. The court further stated that the bankruptcy court did not abuse its discretion in requiring the submission of a proposed complaint because "some of [the debtors'] claims arose out of hearings or court orders where prior court approval was specifically

---

[8] The *Kashani* court's full instructions to the bankruptcy court was as follows:

> Upon receiving the information from the moving party or the proposed plaintiffs (in this case, the Debtors), the bankruptcy court should consider the following analysis:
> 1. Whether the acts or transactions relate to the carrying on of the business connected with the property of the bankruptcy estate. If the proceeding is under 28 U.S.C. § 959(a), then no court approval is necessary. However, the moving party may request this initial review by the bankruptcy court in the motion for leave to sue the trustee, or perhaps in the form of a complaint, seeking a declaratory judgment from the bankruptcy court.
> 2. If approval from the appointing court appears necessary, do the claims pertain to actions of the trustee while administering the estate? By asking this question, the court may determine whether the proceeding is a core proceeding or a proceeding which is related to a case or proceeding under Title 11, United States Code.
> 3. Do the claims involve the individual acting within the scope of his or her authority under the statute or orders of the bankruptcy court, so that the trustee is entitled to quasi-judicial or derived judicial immunity?
> 4. Are the movants or proposed plaintiffs seeking to surcharge the trustee; that is, seeking a judgment against the trustee personally?
> 5. Do the claims involve the trustee's breaching her fiduciary duty either through negligent or willful misconduct?
>
> By conducting such an analysis, the bankruptcy court will determine whether the issues affect solely the administration of the bankruptcy estate and should be heard by the bankruptcy court. The bankruptcy court will also be able to determine whether the claims have been previously decided on the merits and should not be pursued by the movants or proposed plaintiffs on the basis of res judicata or collateral estoppel. The bankruptcy court will also be in a position to determine whether the trustee is entitled to quasi-judicial or derived judicial immunity. Again, one or more of these factors may be a basis for the bankruptcy court to retain jurisdiction over the claims. Such an analysis will also assist the bankruptcy court in determining which claims should be tried in another forum.

*Id.* at 886-87.

1   granted to the [t]rustee.  Therefore, the [d]ebtors may have failed to set forth a prima facie case for

2   leave to sue the [t]rustee."  *Id.* at 885.

3           The instant case is similar to the facts in *Plata v. Schwarzenegger*, 2008 WL 2558000 (N.D.

4   Cal. June 24, 2008), where Medical Development International ("MDI") sought leave to sue the

5   Receiver appointed by the court to manage California's prison medical system in his official capacity

6   in state court.[9]  The district court stated that it "may  refuse MDI's request for leave to sue if MDI

7   fails to set forth a *prima facie* case against the Receiver or if MDI's claims are without foundation."

8   *Id.* at *2.  After reviewing MDI's proposed complaint, the court concluded that "MDI has failed to

9   set forth a prima facie case on which there is a reasonable probability of recovery because the

10  Receiver would be immune from MDI's suit."  *Id.* at *3.

11          Based on the *Kashani* and *Plata* cases, the court finds that it is appropriate to consider  the

12  issue of the Receiver's immunity at this stage of the pleadings in determining whether GovGuam has

13  set forth a *prima facie* case such that it should be granted leave to file the Proposed FAC against

14  GBB personally.  This is consistent with the Supreme Court's position that "like other forms of

15  official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of

16  damages."  *Mireles v. Waco*, 502 U.S. 9, 11 (1991).  If in fact the Receiver enjoys derivative or

17  quasi-judicial immunity, then the immunity issue should be addressed from the start to alleviate the

18  burdens of litigation attendant to lawsuits.

19          **B.      Whether the Receiver is immune from GovGuam's proposed claims**

20          The Receiver maintains it is immune from the proposed suit and claims which relate to the

21  design and construction of the Ordot Dump's closure.   As the proponent of the claim of immunity,

22  the Receiver bears the burden of establishing that such immunity is justified.  *In re Castillo*, 297 F.3d

23  940, 947 (9th Cir. 2002).  The Receiver asserts two grounds for such immunity.

24  ///

25

26  [9]  In *Plata*, the receiver expelled MDI personnel from two California state prison institutions based
    on concerns that MDI was unlawfully practicing medicine without a license.  *Id.* at *1.  In bringing
27  suit against the receiver, MDI did not "contest that the [r]eceiver is generally entitled to invoke
    quasi-judicial immunity to bar suits for damages.    Instead, MDI contend[ed] that the [r]eceiver is
28  not entitled to immunity . . . because the acts complained of are not judicial in nature."  *Id.* at *3.

1                                    **1.        Protection afforded by the Appointment Order**

2                   First, the Receiver asserts that it was acting in compliance with the court's Appointment

3       Order when it undertook the actions complained of by GovGuam.  The Receiver notes that the

4       Appointment Order specifically provides that "the Receiver shall not be personally liable for any act

5       done in compliance with this [Appointment] Order."  Appointment Order at 17, ECF No. 239. The

6       Receiver contends that there are no allegations in the Proposed FAC that the Receiver took actions

7       that were not done in compliance with the Appointment Order.  The Receiver maintains that all of

8       acts that form the basis for GovGuam's purported claims were done in compliance with the power

9       and authority granted to it under the Appointment Order.  GBB asserts that in its official capacity

10      as Receiver – and not personally – it "engaged designers, constructions consultants and contractors

11      to design and construct the Dump Closure Project[] as required under Paragraph 8 of the Consent

12      Decree" and that it "hired Brown & Caldwell to operate and maintain the Ordot Dump during the

13      post-closure period. . . which entail[ed] monitoring the leachate captured by the collection systems

14      constructed at the Ordot Dump and the treatment of the leachate[.]" Opp'n at 16, ECF No. 2132.

15      Although the Proposed FAC asserts that faulty design and construction led to increased volumes of

16      leachate being collected and treated at the Ordot Dump, the Receiver maintains that the design and

17      construction were specifically court-authorized acts for the Receiver to undertake in carrying out its

18      duties under the Appointment Order and thus it should not be personally liable in connection with

19      said actions.

20                  GovGuam refutes the Receiver's assertion that the Appointment Order's grant of immunity

21      is as broad as the Receiver claims, arguing that this court never approved or authorized GBB to act

22      negligently or without regard to its fiduciary duties.  *See* Reply at 2-3, ECF No. 2137.  GovGuam

23      notes that the Appointment Order contemplated that GBB *may* be sued with consent from the court.

24      *See* Appointment Order at 17-18, ECF No. 239 ("No suit shall be filed against the Receiver without

25      the consent of the court.").  GovGuam insists that this provision of the Appointment Order would

26      be rendered meaningless if any and all actions taken by GBB were immune from suit.  Additionally,

27      GovGuam asserts that the Appointment Order envisioned the Receiver consistently keeping the court

28      informed as to the compliance progress with the Consent Decree, but the Proposed FAC alleges that

1  GBB "failed to fulfill this most basic of responsibilities or keep the parties or court apprised of . . .

2  various critical design changes that it approved, such as eliminating the use of a liner and using

3  different fill material that ultimately led to the infiltration of surface and ground water, and caused

4  excessive leachate flows beyond the represented design capacity of the closure system."  Reply at

5  3-4, ECF No. 2137.  GovGuam thus argues that the Appointment Order cannot shield GBB for acts

6  it took without the knowledge of the court and Guam and without apprising either of the risks of the

7  design and construction changes it had approved.

8          The court agrees with GovGuam on this point.  While the Appointment Order stated that the

9  Receiver would not be personally liable for any acts done in compliance with the court's Order, the

10 court foresaw that a situation could arise that would warrant GBB be held liable, hence the inclusion

11 in the Appointment Order of the last sentence in paragraph III.B.4. that no suit may brought without

12 consent of the court.  Whether the Receiver's acts were "in compliance" with the Appointment Order

13 is the crux of GovGuam's proposed claims.  As authorized by the Appointment Order, the Receiver

14 hired the contractors and engineers to construct and design the Ordot Dump Closure Project as

15 required by the Consent Decree.  The Consent Decree, however, required that GovGuam design "the

16 dump cover system including methods and procedures to be used to install the cover system and

17 operational plans to implement measures to cease discharge of pollutants into water of the United

18 States[,]" and "[o]ther measures necessary to comply with Government of Guam regulations

19 regarding closure of municipal solid waste landfills."  Consent Decree at ¶ IV.8, ECF No. 55.  If the

20 allegations in the Proposed FAC are true, that GBB mismanaged the design and construction of the

21 Ordot Dump and that GBB failed keep the court and parties herein informed of the risks of the

22 alleged changes to the design and construction, it is unlikely that the court's Appointment Order

23 would have excused the alleged conduct with a grant of immunity.  Thus, the language of the

24 Appointment Order on its own cannot be interpreted as giving the Receiver the broad immunity it

25 asserts it was otherwise given.

26          **2.      Whether the Receiver enjoys immunity under established case law**

27          Next, the Receiver asserts it is entitled to immunity under well-established legal principles.

28 *See* Opp'n at 17-21, ECF No. 2132.  The Receiver's Opposition cites to a number of cases that

discuss the immunity enjoined by court appointed receivers or trustees. As noted therein, the Ninth

Circuit's "case law teaches that absolute judicial immunity generally immunizes persons . . . who,

pursuant to court appointment, administer the affairs of litigants. For instance, trustees appointed

in a bankruptcy proceeding are afforded absolute immunity." *New Alaska Dev. Corp. v. Guetschow*,

889 F.2d, 1298, 1302-03 (9th Cir. 1989). The Ninth Circuit recognized that absolute derivative

judicial immunity is also appropriate for receivers appointed by state courts to manage the business

assets of a marital estate during a dissolution proceeding. *Id.* at 1303. The Ninth Circuit stated that

"receivers are court officers who share the immunity awarded to judges." *Id.* (quoting *Kermit Const.*

*v. Banco Credito Y Ahorro Ponceno*, 547 F.2d 1, 2 (1st Cir.1976)). A "receiver functions as an arm

of the court by making decisions about the operation of a business that the judge otherwise would

have to make. A receiver operates a business only because the court has directed him to do so in

connection with a case pending before the court." *Id.* at n.6. "Absent broad immunity, receivers

would be a lightning rod for harassing litigation aimed at judicial orders." *New Alaska Dev.* at 1303

(internal quotation marks omitted).

   The Receiver maintains that "[o]nly *ultra vires* actions – actions that fall outside the scope

of their duties as [receivers] – are not entitled to immunity." Opp'n at 18, ECF No. 2132 (quoting

*Matter of Ondova Ltd. Co.*, 914 F.3d 990, 993 (5th Cir. 2019). The Receiver contends that it is

"shielded from liability" for its "lawful exercise[] of judgment and discretion even if, in hindsight,"

it was incorrect. *Id.* (quoting *n re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 282, 292 (Bankr.

S.D.N.Y. 2010). "If immunity applied only to decisions that turned out to be proper, there would

be no need for the doctrine of immunity." *Id.* The Receiver further asserts that holding receivers

liable for lawful exercises of judgment and discretion "would deter future [receivers] for fear they

could be held liable for every discretionary decision." *In re Bernard L. Madoff Inv. Sec. LLC*, 440

B.R. 282, 292 (Bankr. S.D.N.Y. 2010). In determining whether an act may form the basis for

immunity, the Receiver insists that "the relevant inquiry is the 'nature' and 'function' of the act, not

the 'act itself.'" *Mireles,* 502 U.S. at 13.[10]

The Receiver asserts that the Proposed FAC's allegations, at best, allege that the Receiver made errors with respect to managing the design and construction of the Ordot Dump Closure Project, over which it had broad authority under the Appointment Order. The Receiver maintains that even if in hindsight GBB's decisions were incorrect, GBB should still be shielded from suit because the allegations relate to GBB's appropriate exercise of judgment and discretion in completing the project. Opp'n at 19, ECF No. 2132. The Receiver goes on to cite a number of cases[11] to support its contention that it is immune for the actions it undertook in carrying out its

---

[10]   In *Mireles*, an attorney brought an action against a state court judge alleging that the judge authorized police officers to use excessive force to seize the attorney from another courtroom and bring him before the state court judge after the attorney failed to appear for a court hearing. *Id.* at 10. The district court granted the judge's motion to dismiss finding "complete judicial immunity," and the Ninth Circuit reversed because "the alleged actions were not taken in his judicial capacity" in authorizing the use of excess force. *Id.* at 11. The Supreme Court reversed, stating:

> a judge's direction to police officers to carry out a judicial order with excessive force is not a "function normally performed by a judge." But if only the particular act in question were to be scrutinized, then any mistake of a judge in excess of his authority would become a "nonjudicial" act, because an improper or erroneous act cannot be said to be normally performed by a judge. If judicial immunity means anything, it means that a judge "will not be deprived of immunity because the action he took was in error . . . or was in excess of his authority."

*Id.* at 12-13 (internal citation omitted).

[11]   These cases include:

* *In re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 282 (Bankr. S.D.N.Y. 2010) - The court appointed trustee for the substantively consolidated liquidation, under the Securities Investor Protection Act, of an investment company through which a Ponzi scheme was operated. *Id.* at 286. The trustee brought an adversary proceeding to avoid and recover alleged preferential and fraudulent transfers of over $1 billion, and the answering defendants asserted four counterclaims against the trustee based on a letter the trustee sent to Goldman Sachs. *Id.* at 287. The trustee moved to dismiss the counterclaims, and the court granted the motion, finding that the trustee has immunity from liability because the alleged act of sending the letter was performed in good faith and within the scope of his statutory and court-appointed duties. *Id.* at 289-90.

* *In re Castillo*, 297 F.3d 940 (9th Cir. 2002) - Due to clerical error, Chapter 13 bankruptcy trustee miscalendared plan confirmation hearing, and neither the debtor or her counsel appeared. *Id.* at 943. The trustee informed the court that a plan payment had not been made,

*United States of America v. Government of Guam*, Civil Case No. 02-00022
Order Granting Government of Guam's Motion for Leave to Bring Claims Against GBB

page 13 of 24

and the debtor's Chapter 13 case was dismissed. *Id.* The lender foreclosed on the debtor's residence, and it was sold to a third party. *Id.* at 944. The bankruptcy court refused to set aside the foreclosure sale, but granted leave to bring suit against the trustee and her staff attorney in state court. *Id.* When the bankruptcy court denied the trustee's motion to reconsider, the trustee appealed, and the BAP affirmed in part and reversed in part, extending quasi-judicial immunity for damages relating to the miscalendering of the hearing but not for damages resulting from the failure to give notice of the hearing. *Id.* The trustee then challenged the bankruptcy court's decision granting leave to sue the trustee in state court. *Id.* The Ninth Circuit "agree[d] with the BAP that the scheduling of hearings by the bankruptcy trustee is a discretionary function protected by absolute immunity." *Id.* at 951. However, the Ninth Circuit concluded that the "BAP went astray by segregating what is essentially one function – controlling the docket – into two discrete tasks. Both the scheduling and giving of notice of hearings are part of the judicial function of managing the bankruptcy court's docket in the resolution of disputes. This function is unquestionably discretionary in nature." *Id.*

• *Bennett v. Williams*, 892 F.2d 822 (9th Cir. 1989) - Debtor filed for voluntary bankruptcy, and the court appointed a trustee, who in turn hired a company to manage the debtor's numerous rental properties. The trustee obtained court approval to hire the management company, and the debtor was aware of said hiring but did not object to said hiring. After the bankruptcy case was dismissed, the debtor brought suit against the trustee and the management company alleging that the management company failed to collect rents and made defective repairs. The debtor alleged the trustee was negligent in hiring and supervising the management company. The district court found that the trustee was entitled to immunity and dismissed the suit, and the debtor appealed. On appeal, the Ninth Circuit held that the trustee, "acting within the scope of her authority, with the informed approval of the court and notice to the debtor, is entitled to derived quasi-judicial immunity for her discretionary acts of hiring and supervising" the property manager. *Id.* at 825. The court acknowledged that the debtor was "not remediless" because he "retain[ed] his action against [the management company] in state court."

• *Janvey v. Alguire*, 2015 WL 898757 (N.D. Tex. Mar. 2, 2015) - District court appointed a receiver for a multi-district litigation proceeding, and the receiver brought an action against former employees seeking disgorgement of proceeds the defendants received. *Id.* at *1. The defendants asserted various counterclaims against the receiver, and the receiver moved to strike and dismiss the counterclaims. In granting the receiver's motion to dismiss, the court stated:

> Generally, court appointed receivers act as arms of the court and are entitled to share the appointing judge's absolute immunity provided that the challenged actions are taken in good faith and are within the scope of the authority granted to the receiver. Where nothing in the complaint indicates that the receiver has acted outside the scope of authority granted to him by the court, the receiver is immune from liability and dismissal of the claims against the receiver is appropriate[.]

*Id.* at *2 (quotation marks and internal citations omitted).

Considering the language used in the orders appointing the receiver, the court

1  duties and which form the basis for claims in the Proposed FAC.

2        In response, GovGuam asserts that the Receiver has not met its burden of establishing that

3  it enjoys qualified immunity.  GovGuam cites to the *Bennett* case, where the Ninth Circuit explained

4  that "certain standards have evolved which a trustee must satisfy before immunity may attach.  The

5  trustee should obtain court approval and give notice to the debtor of a proposed action.  The trustee's

6  disclosure to the court must be candid.  The act must be within the trustee's official duties."  892

7  F.2d at 823 (internal citations omitted).  GovGuam refutes the Receiver's claims that it has kept the

8  court and the parties informed of its actions each step of the way.  While the Receiver points to all

9  the various meetings involving U.S. EPA and Guam EPA and the reports filed with the court, *see*

10  Opp'n at 4-9, GovGuam maintains that the Receiver "can point to nothing demonstrating that it

11  advised the parties or the [c]ourt of the design and construction decisions that Guam alleges were

12  negligent."  Reply at 6, ECF No. 2137.  GovGuam argues that GBB's submissions of design and

13  construction plans do not prove that it "analyzed the risks inherent in the various known options and

14  [brought] the risks to the attention of the court and the parties for their consideration in the decision-

15  making process." *Id.* (quoting *In re Sundance*,[12] 149 B.R. 641, 654-55 (Bankr. E.D. Wash. 1993))

16

17          found that the defendants had not alleged that the receiver committed an act of willful

18          malfeasance or gross negligence in their counterclaims for tortious interference with
        business relations, breach of fiduciary duty and breach of contract, and absent such

19          allegation, the receiver was entitled to immunity for carrying out the tasks assigned
        to him. *Id.* at *4.  With regard to the counterclaim for gross negligence, the court

20          found that the defendants did not seek prior approval from the court before filing said

21          counterclaim, as thus dismissed the counterclaim.

22  [12]  In the *Sundance* case, the Washington state court appointed Scott Property Management, Inc.

23  ("SPM") as the receiver of a fruit orchard after the mortgagee filed a complaint to foreclose the
mortgage.  The appointment order authorized SPM to take "the necessary action and expend the

24  necessary funds to prune and spread the [o]rchard." *Id.* at 646.  As part of its proposed budget to the
court, the receiver requested that the trees be staked to prevent wind damage.  Staking involved the

25  use of wooden stakes that were treated with a "Dip" to prevent deterioration.  *Id.* at 647.

26  Additionally, SPM used various pesticides at the orchard.  *Id.*  SPM later moved to amend the order
adopting the orchard budget and detailed the "expenditures necessary to maintain and preserve the

27  [o]rchard according to prevalent horticultural practices and standards" in the county.  *Id.*  at 646.
The court approved SPM's motion and also approved subsequent budget requests and reports on

28  operations.  *Id.* at 647.

(brackets omitted).

The court agrees with GovGuam that, at this time, the Receiver has not satisfied the Ninth Circuit's requirements before immunity may attach. It is disputed whether GBB has kept the court, GovGuam and the regulatory agencies fully informed of the issues or risks associated with the design and construction changes it allegedly approved or the scope and source(s) or the leachate generation at the Ordot Dump so as to avoid liability for the asserted claims. Additionally, as alleged by GovGuam, the Proposed FAC's claims of negligence, breach of fiduciary duty and CERCLA liability go well beyond the incorrect decisions based on "judgment and discretion" discussed in the Receiver's string of cases. The errors alleged against GBB are not simply clerical mistakes or a failure to collect rents and make repairs. Instead, the allegations, if true, are much more substantial and pose a potential risk of injury to the environment and human health.

GovGuam claims that GBB's substantive argument regarding its immunity defense are premature and improper at this stage of the proceedings because said issue "require[s] a developed evidentiary record on summary judgment, and 'triable issues of fact preclude resolution' of GBB's entitlement to immunity determination at this time." Reply at 7, ECF No. 2137.

The court has reviewed the cases cited by GovGuam in support of this proposition but does not find them directly applicable to the facts here. For instance, in *Gomez v. Toledo*, 446 U.S. 635 (1980), a police officer sued the Commonwealth of Puerto Rico's police superintendent, alleging that his suspension and discharge violated his civil rights. The district court dismissed the action,

---

A little over three years later, the debtor filed a Chapter 11 bankruptcy petition in Montana. Finding that SPM had ably performed its duties as receiver, the Montana bankruptcy court excused SPM from turning over the orchard and ultimately transferred the debtor's case to the Eastern District of Washington. *Id.*

After the debtor's plan was confirmed, the trustee moved for approval of an accounting, termination and discharge of its custodianship, and exoneration of the bond. *Id.* The mortgagee's successor in interest and the mortgagor's stockholders objected to the motion, asserting that SPM was liable for cleanup costs in connection with release of hazardous substances at the orchard. *Id.* at 648.

The parties filed cross motions for summary judgment, and the bankruptcy court held that SPM was not personally liable to the bankruptcy estate for simply engaging in abnormally dangerous activities within the scope of its authority and that SPM was entitled to derivative judicial immunity under CERCLA in both its roles as the state court receiver and the bankruptcy custodian.

1    and the First Circuit affirmed. The issue before the Supreme Court was "whether, in an action

2    brought under 42 U.S.C. § 1983 against a public official whose position might entitle him to

3    qualified immunity, a plaintiff must allege that the official acted in bad faith in order to state a claim

4    for relief or alternatively, whether the defendant must plead good faith as an affirmative defense."

5    *Id.* at 635-36. The Supreme Court ultimately held that a plaintiff is not required to allege that the

6    defendant acted in bad faith in order to state a § 1983 claim for relief, but the burden is on the

7    defendant to plead good faith as an affirmative defense. *Id.* at 640. GovGuam appears to cite to this

8    case for the proposition that arguments regarding the immunity defense are improper at this stage

9    of the proceeding, but that is not what the *Gomez* case holds. Instead, after discussing the allocation

10   of the burden of pleading, the Supreme Court stated that it "has never indicated that qualified

11   immunity is relevant to the existence of the plaintiff's cause of action; instead we have described it

12   as a defense available to the official in question." *Id.* Thus, *Gomez* does not necessarily support

13   GovGuam's contention that it would be improper to discuss immunity at this stage of the proceeding.

14          Additionally, in *Davis v. John*, 485 F. Supp.3d 1207 (C.D. Cal. 2020), a state prisoner

15   brought a § 1983 action against a prison chaplain in his individual and official capacities, alleging

16   violations of the First Amendment's Free Exercise Clause, the Fourteenth Amendment's Equal

17   Protection Clause and the Religious Land Use and Institutionalized Persons Act arising from the

18   chaplain allegedly prohibiting the prisoner from displaying a Nation of Islam flag in the multi-use

19   chapel. *Id.* at 1212-13. The chaplain filed a motion to dismiss on various issues, including that he

20   was entitled to qualified immunity. *Id.* at 1214. The district court reviewed the allegations in the

21   complaint, granted leave to amend most of the claims, and because it was allowing the prisoner to

22   file an amended complaint, the court "decline[d] to rule at [that] time on the issue of qualified

23   immunity, an issue often better resolved on summary judgment." *Id.* at 1224. Thus, the *Davis*

24   court's decision was partially motivated by the fact that it was allowing the plaintiff to file an

25   amended complaint. That is not the situation here.

26          The other case cited by GovGuam is *Lewis v. Liberty Mut. Ins. Co.*,. 953 F.3d 1160 (9th Cir.

27   2020). There, consumers brought a products liability lawsuit against the manufacturer of an outdoor

28   fire bowl, which exploded during refueling, and were awarded $45 million in damages. *Id.* at 1163.

1   When the manufacturer declared bankruptcy, the consumers brought a direct action against the

2   manufacturer's insurers for payment on the judgment. *Id.* at 1162. The district court granted the

3   insurers' motion to dismiss on the grounds of forum *non conveniens* since the insurance policy with

4   the manufacturer had a forum selection clause designating Australian courts as the exclusive forum.

5   *Id.* at 1163. The consumers appealed and argued, among other things, that the Australian court may

6   not accept to hear their case since, under the Australian rules of procedure, they must first request

7   leave of court to file an action to recover the judgment. *Id.* at 1169. The Ninth Circuit stated that

8   this requirement did not appear to impair the consumers' ability to air the merits of their claim since

9   this was just a "formality" and there was no serious risk that the Australian court would deny their

10  leave to file suit. *Id.* Thus, *Lewis* involved the application of Australian laws and rules, and has

11  nothing to do with immunity.[13]

12        GovGuam's Reply next cites to the case of *Easley v. City of Riverside*, 890 F.3d 851 (9th Cir

13  2018), on reh'g en banc, 765 F. App'x 282 (9th Cir. 2019)[14] quoting it for the position that "where

14  

15  [13]  The court finds the *Lewis* case to be inapplicable, but perhaps GovGuam relies on *Lewis* because
    GovGuam believes that requiring it to seek leave from this court to bring suit against GBB is just
16  a formality, and nothing would prevent the Receiver from raising the merits of its immunity defense
17  once the court permits the Proposed FAC to go forward.

18  [14]  In *Easley*, an arrestee brought a § 1983 claim in state court against the police officer and the city,
    alleging that the officer used excessive force when he shot the arrestee three times following a traffic
19  stop. The case was removed to federal court, and after the filing of an amended complaint, the
    officer answered asserting that he was entitled to qualified immunity from suit, liability and
20  damages. *Id.* at 854-55. The parties negotiated a partial dismissal of some of the claims, and the
    officer agreed not to seek summary judgment on the remaining claims. *Id.* at 855. When the parties
21  appeared for a pretrial conference, the court *sua sponte* raised the issue of the officer's entitlement
    to qualified immunity. *Id.* The district court ordered an evidentiary hearing, which took place over
22  two days, and thereafter issued an order determining that there was no genuine issue of material fact
    for determination by a jury and that the officer was entitled to qualified immunity and judgment as
23  a matter of law. *Id.* The arrestee appealed, challenging the district court's *sua sponte* grant of
    summary judgment as procedurally impermissible and argued that there were genuine issues of
24  material fact that remained as to the issue of the officer's entitlement to qualified immunity. *Id.* The
    Ninth Circuit panel affirmed the district court, but the dissent asserted that summary judgment was
25  improper and the matter should be remanded for resolution of the contested factual issues. *Id.* at
    867. The dissent reasoned
26  

27  

28        It is well established that the question of eligibility for qualified immunity should be

1   factual issues remain, 'the immunity question is transformed from a doctrine providing immunity

2   from suit to one providing a defense at trial.'" Reply at 7, ECF No. 2137 (quoting *Easley*, 890 F.3d

3   at 868).[15]

4          The court notes that neither of the parties cite to *Morley v Walker*, 175 F.3d 756 (9th Cir.

5   1999), where a pastor brought a § 1983 action against a deputy district attorney who allegedly

6   arrested the pastor without probable cause and acted improperly during ensuing proceedings. The

7   deputy district attorney moved to dismiss the complaint, arguing that the claims were barred by

8   absolute or qualified immunity. *Id.* at 759. The district court denied the motion, and the deputy

9   district attorney appealed. The Ninth Circuit stated that the court "was not equipped at this stage to

10  determine whether qualified immunity will ultimately protect [the officer]. Those issues must be

11  resolved at summary judgment or at trial." *Id.* at 761. The *Morley* case is analogous to the facts

12  here. GovGuam has asserted allegations in the Proposed FAC, and the Receiver argues that those

> resolved at the earliest stage possible in the proceedings because it is an immunity
> from suit and not merely a defense to liability. But in this case, the district court's
> two-day evidentiary hearing was a de facto bench trial, and [the officer] therefore has
> already suffered whatever abstract harm might result from an infraction upon his
> asserted immunity from suit, mooting consideration of that injury for our purposes
> on appeal.
>
> When, as here, triable issues of fact preclude resolution of an official's entitlement
> to qualified immunity, then the immunity question is "transformed from a doctrine
> providing immunity from suit to one providing a defense at trial." On remand,
> "special interrogatories to the jury can be used to establish disputed material facts,"
> which the district court can then rely upon to determine [the officer's] eligibility for
> qualified immunity as a matter of law.

*Id.* at 867-68 (Pratt, D.J. dissenting) (internal citations omitted).

       The *Easley* panel decision was reversed by an *en banc* panel in a Memorandum decision.
*See* 765 Fed. Appx. 282 (2019). The *en banc* panel found that the district court "resolved disputed
factual issues, some of which required the court to assess witnesses' credibility. Resolving disputed
issues of fact and making credibility determinations are not permitted at the summary judgment
stage." *Id.* at 284. The *en banc* panel stated that the officer may still assert their qualified immunity
by filing a motion under Fed. R. Civ. P. 50(a) before the case is submitted to the jury. *Id.*

---

[15] GovGuam fails to note in its citation that the quote is actually taken from the dissenting opinion
in *Easley*.

allegations should not go forward since it has immunity.  The facts have not been developed enough for the court to determine that the Receiver is immune from the claims that assert serious breaches of the Receiver's duties to this court and the people of Guam.  The language in the Appointment Order did not specify what sort of claims the court would allow to proceed against the Receiver.  The Proposed FAC asserts critical design and construction errors that have allegedly cost GovGuam millions of dollars.  At this early stage in the proceedings, it is premature for the court to find that the Receiver acted within the scope of its duties such that it would be immune from the asserted claims.  After the discovery process has concluded, the parties are free to again raise the immunity issue at the summary judgment stage with a more developed factual record.

### C.    Whether GovGuam has established a *prima facie* case

Because the court has determined that it is premature at this stage of the proceedings to find that the Receiver is immune from suit, the court must next examine whether GovGuam's Proposed FAC establishes a *prima facie* case against the Receiver.

### 1.    CERCLA claims

The Sixth and Seventh causes of action in the Proposed FAC seeks to hold the Receiver liable under CERCLA for environmental response costs it has incurred and will continue to incur in the future in connection with the Ordot Dump.  *See* Proposed FAC at ¶¶ 205-220, ECF No. 2-1 in the Contractor Case.  Under CERCLA, the "owner and operator"[16] of a "facility" is liable, jointly and severally, for response costs associated with the release or threatened release of hazardous substances at the facility.  42 U.S.C. § 9607(a)(1).  "To be an operator of a hazardous waste facility, a party . . . must play an active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management."  *Long Beach Unified Sch. Dist*., 32 F.3d at 1367.  The Proposed FAC asserts that the "Ordot Dump is a 'facility' as the term is used in section 107(a) of CERCLA, 42 U.S.C. § 9607(a)[.]"   Proposed FAC at ¶ 206, ECF No. 2-1 in the Contractor Case.

---

[16]   While the statute use the conjunction "and," the Ninth Circuit has "read these categories in the disjunctive" such that "a party may be liable either as an owner or as an operator (or both, of course)."  *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin California Living Tr.*, 32 F.3d 1364, 1367 (9th Cir. 1994).

1  Additionally, GovGuam contends that the Receiver is an "owner" and an "operator" of the Ordot

2  Dump in that it "plays an active role in managing the Ordot Dump and oversees the monitoring and

3  supervision of Brown & Caldwell's post-closure work at the Ordot Dump and the technical work

4  relating to the Ordot Dump Post-Closure Care Plan.  Further, GBB manages the funds in the Ordot

5  Dump Post-Closure Care Reserve Account." *Id.* at ¶¶ 208-211.

6          The Receiver asserts that it cannot be liable under CERCLA because it is not an operator or

7  owner of the facility.  GBB contends that an exception applies under 42 U.S.C. § 9601(20)(D)[17] in

8  that it acquired control over the Ordot Dump "'in connection with law enforce activity;' namely the

9  enforcement action by U.S. EPA" in the Consent Decree Case.  Opp'n at 22, ECF No. 2132.

10  GovGuam counters GBB did not become a "State or local government" simply because it was

11  appointed Receiver over a GovGuam agency.  Reply at 9, ECF No. 2137.  Additionally, GovGuam

12  argues that the second sentence of Section 9601(20)(D) would nonetheless exempt GBB from the

13  exception it "caused or contributed to the release or threatened release of a hazardous substance from

14  the facility." *Id.* (quoting 42 U.S.C. § 9601(20)(D)).

15          The Receiver, in turn, claims that the exception to the exception does not apply to it because

16  the Receiver did not cause any release of hazardous substances, but rather was appointed to stop the

17  release of leachate that was already occurring at the Ordot Dump.  *See* Opp'n at 22, n. 7, ECF

18  No. 2132.  Despite the Receiver's argument, the court tends to agree with GovGuam that the second

19

20  ----

[17]  This exception to liability for owners or operators provides in its entirety:

21

22          The term "owner or operator" does not include a unit of State or local government
        which acquired ownership or control through seizure or otherwise in connection with

23          law enforcement activity, or through bankruptcy, tax delinquency, abandonment, or
        other circumstances in which the government acquires title by virtue of its function

24          as sovereign. The exclusion provided under this paragraph shall not apply to any
        State or local government which has caused or contributed to the release or

25          threatened release of a hazardous substance from the facility, and such a State or
        local government shall be subject to the provisions of this chapter in the same manner

26          and to the same extent, both procedurally and substantively, as any nongovernmental
        entity, including liability under section 9607 of this title.

27

28  42 U.S.C. § 9601(20)(D).

sentence of Section 9601(20)(D) does not shield the Receiver from liability because, as alleged in the Proposed FAC, "[d]uring the time GBB operated and/or owned the Ordot Dump, 'releases' or threatened releases of 'hazardous substances' to the environment in the form of leachate seeps and overflows occurred at and onto the Ordot Dump and the Lonfit River." Proposed FAC at ¶ 212, ECF No. 2-1 in the Contractor Case. Thus, even if the Appointment Order made GBB a unit of a the local government, GBB still qualifies as an owner or operator because GovGuam has alleged that the Receiver "caused or contributed to the release or threatened release of a hazardous substance from the facility." 42 U.S.C. § 9601(20)(D).

The Receiver also argues that it is not liable under CERCLA because it was performing duties of the GSWA in its sovereign capacity and cites to the case of *Lincoln v. Republic Ecology Corp.,* 765 F. Supp. 633 (C. D. Cal. 1991) to support its assertion. *See* Opp'n at 22-23, ECF No. 2132. The court finds the *Lincoln* case to be inapplicable to the facts here. The issue before the court in *Lincoln* was whether the "third-party defendant City of Pasadena . . . [could] avoid liability as an 'arranger' of hazardous substances" pursuant to 42 U.S.C. § 9607(a)(3). *Lincoln*, 765 F. Supp. at 633. Here, the Proposed FAC does not seek CERCLA liability against GBB as an "arranger" of hazardous substances; rather, GovGuam seeks to impose liability based on the Receiver's role as an "operator" or "owner" of the Ordot Dump. As discussed above, CERCLA liability will attach to sovereign state and local government units that cause or contribute to the release or threatened release of a hazardous substance from covered facility.

Having reviewed the allegations in the Proposed FAC, the court finds that GovGuam has met its burden of establishing a *prima facie* case for CERCLA liability against the Receiver.

### 2.       Breach of Fiduciary Duty and Negligence claims

The Eighth and Ninth causes of action assert Breach of Fiduciary Duty and Negligence claims against the Receiver. *See* Proposed FAC at ¶¶ 221-234, ECF No. 2-1 in the Contractor Case. GovGuam asserts that it has alleged all the required elements against GBB. *See* Mem. Supp. GovGuam's Mot. for Leave to Bring Claims Against GBB at 6-8, ECF No. 2105. The Receiver argues that GovGuam has failed to state viable claims for breach of fiduciary duties or negligence.

First, the Receiver asserts that even if immunity did not apply, GovGuam's claims fail as a

1    matter of law since GBB did not owe any duty to Guam *per se* because the court's Appointment

2    Order stated that "[t]he Receiver is responsible solely to this court." Opp'n at 23, ECF No. 2132

3    (quoting Appointment Order at § III(B)(4), ECF No. 239). If the Receiver was only responsible to

4    this court, as GBB argues, then the Receiver owed no duty to Guam, which is a necessary element

5    to support the breach of fiduciary duty and negligence claims. The court declines to read its

6    Appointment Order so narrowly. As noted in GovGuam's Reply, past filings in this case have

7    acknowledged that the Receiver owes a fiduciary duty not only to this court but to the people of

8    Guam to properly manage the island's solid waste system. *See* Reply at 10-11, ECF No. 2137.

9    Additionally, case law supports the conclusion that receivers owe a fiduciary duty to the appointing

10   court and the estates over which they are appointed. *See Sundance*, 149 B.R. at 654 ("When a

11   receiver accepts appointment to its office, it undertakes duties to the court and to the estate."); *see*

12   *also S.E.C. v. Schooler*, No. 3:12-CV-2164-GPC-JMA, 2015 WL 1510949, at *3 (S.D. Cal. Mar. 4,

13   2015) ("receiver owes a 'fiduciary duty to the owners of the property under his care' and thus must

14   'protect and preserve' the receivership estate's assets 'for the benefit of the persons ultimately

15   entitled to it'") (quoting *Sovereign Bank v. Schwab*, 414 F.3d 450, 454 (3d Cir.2005)).

16           Second, the Receiver argues that district courts in the Ninth Circuit require a party who

17   asserts that a trustee or receiver has breached his duty to allege a grossly negligent or intentional

18   breach of a duty rather than a mere negligence breach. Opp'n at 23-24, ECF No. 2132. The court

19   has reviewed the cases[18] relied upon by the Receiver. Those cases discussed whether a trustee was

20   immune from liability for simple negligence or whether liability had to be premised on gross

21   negligence or on willful and deliberate acts. As discussed above, the factual record has not been

22   fully developed on the issue of immunity, so the court is not prepared at this time to rule that the

23   Receiver is immune from the proposed claims, regardless of whether said claims assert a simple

24   breach of duty or whether the breach rises to the level of gross negligence or an intentional breach.

25   It is sufficient that at this stage of the proceedings the Proposed FAC alleges the requisite elements

26

27   _____

     [18] These cases are *In re Cont'l Coin Corp*, 380 B.R. 1 (Bankr. C.D. Cal. 2007), aff'd sub nom. *In
     Re Cont'l Coin Corp.*, No. 1:00-BK-15821-GM, 2009 WL 2589635 (C.D. Cal. Aug. 21, 2009) and

28   *In re Cochise Coll. Park, Inc.*, 703 F.2d 1339 (9th Cir. 1983).

for the claims asserted as required under Guam law.

Finally, the Receiver argues that it was a leak in Guam Waterworks Authority's water pipe that caused the increase in leachate from the Ordot Dump, not a breach of the Receiver's duties. *See* Opp'n at 25, ECF No. 2132. Whether the Receiver is ultimately correct that this leak was the real and only cause of the increased leachate levels is an issue to be resolved at a later date and is not ripe for the court's determination at this time. The court must only determine at this stage whether the allegations in the Proposed FAC establish a *prima facie* case for breach of fiduciary duty and negligence, and, as noted above, the court finds that GovGuam has met its burden.

**D.      Whether claims against the Receiver should be brought in the Contractor Case**

The final issue before the court is whether GovGuam should be allowed to pursue its claims in the Contractor Case or the Consent Decree Case. While the proposed causes of action are directly related to the Receiver's work in closing the Ordot Dump, the court finds merit in GovGuam's argument that it would be more appropriate for the claims to proceed in the Contractor Case. The claims brought by the United States against GovGuam in the Consent Decree are different in nature than the allegations asserted by GovGuam in the Proposed FAC against the Receiver and the four contractors. Additionally, most of the terms of the Consent Decree have been satisfied, with essentially one requirement remaining before the Consent Decree Case can be closed. The Contractor Case is in its initial stages with discovery still ongoing. The court finds that it would conserve judicial resources if the claims proceeded in the Contractor Case and would not result in piecemeal litigation of the claims. Because the Contractor Case is proceeding before the below-signed judge, this should ameliorate the Receiver concerns about the suit proceeding in a different forum since this court is well aware of the history of this case.

III.      **CONCLUSION**

Based on the above analysis, because there is a dispute over the claims and the Receiver's actions, the court concludes that without further factual development through the discovery process, it is too early to determine whether the Receiver acted within the scope of its duties to permit it to be shielded from liability against the asserted claims. The court declines to make a ruling on the Receiver's claim of immunity at this time, but the parties are free to raise the issue at the summary

*United States of America v. Government of Guam*, Civil Case No. 02-00022
Order Granting Government of Guam's Motion for Leave to Bring Claims Against GBB

page 24 of 24

judgment stage with a more developed factual record.  The court finds that GovGuam has met its burden of establishing a *prima facie* case against the Receiver for the claims asserted in the Proposed FAC.  Accordingly, the court grants GovGuam's Motion for Leave to Bring Claims Against GBB in the Contractor Case.  GovGuam is ordered to file the FAC, as proposed, no later than seven days from the date of this Order.

IT IS SO ORDERED.



**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Jul 09, 2025**